**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| LULA WILLIAMS, GLORIA TURNAGE, GEORGE HENGLE, DOWIN COFFY, and FELIX GILLISON, JR., *on behalf of themselves and all individuals similarly situated*, | : : : : : |
| Plaintiffs, | : : |
| v. | : : |
| BIG PICTURE LOANS, LLC; MATT MARTORELLO; ASCENSION TECHNOLOGIES, INC.; DANIEL GRAVEL; JAMES WILLIAMS, JR.; GERTRUDE MCGESHICK; SUSAN MCGESHICK; and GIIWEGIIZHIGOOKWAY MARTIN, | : : : : : : |
| Defendants. | : : |

Civil Case No. ___3:17cv461___

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs, Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy and Felix Gillison, Jr. ("Plaintiffs"), *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Class Action Complaint against Defendants, they allege as follows:

### INTRODUCTION

1.      It is well established that Virginia's usury laws "are founded upon considerations of public policy." *Town of Danville v. Pace*, 66 Va. 1, 19 (1874). Even in an era where "state-by-state lobbying campaigns" have persuaded state legislators to reverse "nearly three hundred years" of prohibitions against "double- or even single-digit interest rate caps," Virginia has remained committed to its *longstanding* view that it is contrary to public policy to charge excessive interest rates to Virginians. Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 (2012) (providing historical context on usury laws). Virginia's strong public policy against excessive interest rates is

not only hammered home by its criminalization of such conduct, but its civil remedies are also severe for it has long been established that "[h]owever small amount of usurious interest contracted for, and however large amount of money loaned, *the contract is declared void, and the lender forfeits the whole amount of the debt and interest.*" *Brockenbrough's Ex'rs v. Spindle's Adm'rs*, 58 Va. 21, 32 (1866) (emphasis added).

2.      This case involves a criminal enterprise that was established with the intent of evading state usury laws. In an apparent attempt to insulate themselves from any legal liability, Defendants established what is commonly referred to as a "rent-a-tribe" business model, where a payday lending scheme associates with a Native American tribe in an attempt to cloak itself in the privileges and immunities enjoyed by the tribe—or to at least create the illusion that it enjoys tribal immunity.

3.      To facilitate blatant violations of state usury laws, Defendant Matt Martorello ("Martorello") approached the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe") for the purpose of establishing a rent-a-tribe scheme. Under the rent-a-tribe model, Defendants made high interest loans in the name of Big Picture Loans, LLC ("Big Picture Loans"), which claim to be owned and operated by the Tribe. In reality, Martorello's company, Bellicose Capital, LLC ("Bellicose Capital"), funded the loans, controlled the underwriting, and handled the day-to-day operations of the business. In return for the use of its name, the Tribe received 2% of the revenue,[1] but otherwise the Tribe had no control over the income or expenses of Big Picture Loans.

---

[1] Zeke Faux, *Payday Lenders are Changing the Game Ahead of a U.S. Crackdown,* Bloomberg (Feb. 4, 2016) ("Bellicose has collected tens of millions of dollars, with the tribe keeping about 2 percent of the revenue, according to documents provided by a person involved in the deal."), https://www.bloomberg.com/news/articles/2016-02-04/payday-lenders-are-changing-the-game-ahead-of-a-u-s-crackdown.

4.      This lawsuit challenges the legality of Defendants' loans and seeks to enforce Virginia's longstanding public policy against usurious loans. Plaintiffs seek a declaratory judgment that the loan agreements related to Defendants' rent-a-tribe scheme are void and unenforceable. Defendants' usurious loans were void *ab initio* pursuant to Va. Code. § 6.2-1541(A), which provides that any loan containing an interest rate above 12% "shall be void."[2] Further, Plaintiffs seek a judgment declaring that the loan agreement's choice-of-law and forum selection provisions are unenforceable as a matter of public policy and because the provisions attempt to deprive consumers of both a remedy and of a day in court.

5.      Plaintiffs also seek an injunction against all Defendants, prohibiting them from lending or collecting loans in Virginia[3] as well as actual damages and treble damages from Defendants Big Picture, Ascension Technologies, Martorello, and Daniel Gravel for their participation in the unlawful lending enterprise, which violated Virginia's usury laws, unjustly enriched the Defendants, and violated the Racketeer Influenced and Corrupt Organizations Act ("RICO").[4] As a result of their participation in the enterprise, Big Picture, Ascension Technologies,

---

[2] *Rahmani v. Resorts Intern. Hotel, Inc.*, 20 F. Supp. 2d 932, 935 (E.D. Va. 1998) (Ellis, J.) (explaining that a gambling contract "is void under Virginia law, it is a complete legal nullity, one that has no legal force or binding effect").

[3] Defendants James Williams, Jr., Giiwegiizhigookway Martin, Gertrude McGeshick, and Susan McGeshick are the chief executive officers of the Tribe. This lawsuit seeks to enjoin these tribal officials from ongoing violations of federal law, and, thus, the tribal officials are not protected by the Tribe's immunity. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978) ("As an officer of the Pueblo, petitioner Lucario Padilla is not protected by the tribe's immunity from suit."); *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2034 (2014) ("As this Court has stated before . . . tribal immunity does not bar such a suit for injunctive relief against *individuals,* including tribal officers, responsible for unlawful conduct." (citing *Santa Clara Pueblo*, 436 U.S. at 59). Plaintiffs do not seek any monetary damages from any of the tribal officials as a result of their participation in the rent-a-tribe scheme.

[4] Plaintiffs anticipate that Big Picture Loan's will claim to be "an arm of the tribe" and thus protected by tribal immunity. Although the doctrine of tribal sovereign immunity protects the Tribe itself, it does not automatically extend to economic subdivisions of a tribe, and the Court must determine whether these entities are "analogous to a governmental agency, which should benefit from sovereign immunity" or whether they are more like a "commercial business enterprise, instituted for the purpose of generating profits for [their] private owners." *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1184 (10th Cir. 2010) (citing *Gavle v. Little Six, Inc.*, 555 N.W.2d 284, 293 (Minn.1996)). In addition to the allegations alleged in this Complaint concerning the creation, purpose, and structure of Big Picture Loans, Big Picture is not entitled to sovereign immunity because 98% of the profits of the scheme went to non-tribal participants and the companies were established for the sole purpose of

Martorello, and Daniel Gravel violated Virginia's usury laws and RICO's prohibition against the "collection of unlawful debt," which RICO defines as a debt incurred in "the business of lending money" where "the usurious rate is at least twice the enforceable rate" under State of Federal law. 18 U.S.C. § 1961(6).

## JURISDICTION

6.     This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as a majority of Plaintiffs are residents of this District and Division and a substantial part of Plaintiffs' claims occurred in Virginia.

## PARTIES

8.     Plaintiff Lula Williams ("Williams") is a natural person and resident of this Division and District.

9.     Plaintiff Gloria Turnage ("Turnage") is a natural person and resident of this Division and District.

10.     Plaintiff George Hengle ("Hengle") is a natural person and resident of this Division and District.

11.     Plaintiff Felix Gillison, Jr. ("Gillison") is a natural person and resident of this Division and District.

---

evading state usury laws. Further, extending the protections of tribal immunity to the scheme alleged in this case would not serve the policies underlying tribal sovereign immunity.

12.     Plaintiff Dowin Coffy ("Coffy") is a natural person and resident of this Division and District.

13.     Defendant Big Picture Loans is a limited liability company doing business as an internet lending website under the domain name www.bigpictureloans.com. In return for a small fraction of the revenue, the Tribe allowed the lending scheme to use its name and falsely claim that it is operated by the Tribe. At all times relevant hereto, the Tribe did not participate in the day-to-day operations of Big Picture Loans and did not fund the loans or handle the servicing or collection of the loans. Big Picture Loans was formerly known as Red Rock Tribal Lending, LLC, who did business under the domain name www.castlepayday.com.[5] Big Picture Loans is the successor in interest of Red Rock.

14.     Defendant Martorello is a natural person and resident of Puerto Rico. Martorello was the founder and chief executive officer of Bellicose Capital, which Martorello created to make and collect the usurious loans described herein. As explained below, Martorello was the architect of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise.

15.     Defendant Ascension Technologies, LLC, f/k/a Bellicose Capital, LLC was a limited liability company previously organized under the laws of the U.S. Virgin Islands and then Puerto Rico. Bellicose Capital was formed by Martorello in 2011 to make the usurious loans to Virginia consumers. Although Defendants held it out as a "managing consulting company," Bellicose Capital was the actual entity that procured the investment capital, serviced the loans, and received the vast majority of the revenue from the loans, which was then funneled to Martorello. Due to various lawsuits against Martorello's competitors and anticipated regulation from the

---

[5] Castle Payday, *We Have Big News! Castle Payday is now Big Picture Loans*,
https://www.bigpictureloans.com/CastlePaydayRedirectLanding (last visited June 22, 2017).

Consumer Financial Protection Bureau ("CFPB"), Martorello transferred Bellicose to the Tribe in April 2016 in an attempt to shield Bellicose Capital's illegal business practices. The Tribe rebranded Bellicose as Ascension Technologies, which continues to operate with minimal tribal involvement or benefit to the Tribe.

16.     Defendant Daniel Gravel ("Gravel") was the general counsel for Bellicose Capital and was one of the masterminds of the rent-a-tribe lending scheme described herein. As early as August 2012, Gravel had direct personal involvement in the day-to-day operations of the illegal enterprise and participated in the management of the legal affairs of the company, including drafting and reviewing the software, financial, payment processing, and servicing contracts that enabled the enterprise to operate. Additionally, Gravel drafted and reviewed all advertising and marketing materials for the enterprise and made the decisions regarding the legal content in the websites and contracts.

17.     Defendant James Williams, Jr. ("Mr. Williams") is the tribal chairman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

18.     Defendant Giiwegiizhigookway Martin ("Ms. Martin") is the tribal chairwoman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

19.     Defendant Gertrude McGeshick is the secretary of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

20.     Defendant Susan McGeshick is the treasurer of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

## FACTUAL BACKGROUND

**A.     Virginia's Longstanding Public Policy Prohibiting Usurious Loans.**

21.     More than forty years before the signing of the Declaration of Independence, Virginia enacted its first usury law, which capped interest rates at 6 percent. John W. Edmonds, *Virginia Law of Interest and Usury*, 10 U. Rich. L.R. 77 (1975) (citing 4 Hennings Stat. 194).

22.     Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984).

23.     The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *Id.* (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972).

24.     In accordance with this longstanding public policy, a person may not charge an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A).

25.     The consumer finance licensing requirements are designed to protect Virginia consumers from predatory lenders like Defendants. Virginia's licensing requirements include physical presence in the commonwealth and a minimum amount of liquid assets. Va. Code § 6.2-1507(A)(2). Additionally, before granting a license, the Commission must make specific findings concerning the applicant lender such as the character and fitness of the applicant and the applicant's knowledge of applicable Virginia laws and regulations. Va. Code § 6.2-1507.

**B.      Defendants Established an Enterprise to Evade Virginia's Licensing Requirements and Usury Laws.**

26.      Over the last decade, businesses have sought to evade state lending laws like Virginia's by entering into ventures with Native American tribes "so they can use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012)).

27.      Defendant Matt Martorello recognized the exorbitant profits he could achieve by not complying with Virginia's usury laws and lending out high interest loans to some of Virginia's most vulnerable consumers.

28.      Recognizing this, Martorello established a rent-a-tribe business model for his company, Bellicose Capital, associating themselves with the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe"), a federally recognized tribe located in the Upper Peninsula of Michigan.

29.      With the assistance of Gravel, Martorello and Bellicose helped form Big Picture Loans and Red Rock—two companies formed as "business enterprises" of the Tribe, which claimed to be "wholly owned" and "operated as an instrumentality of the Tribe."[6]

30.      Although the Tribe holds itself out as the actual lender of the internet payday loans, the Tribe is merely a front, and Bellicose Capital provided the infrastructure to market, fund, underwrite, and collect the loans, including by providing the following services: lead generation, technology platforms, payment processing, and collection procedures.

---

[6] *See, e.g.*, Lac Vieux Desert Band of Lake Superior Chippewa Indians, Resolution # T2014-066, Approving the Creation of the Wholly Owned and Operated Lending Entity—Big Picture Loans, LLC (Aug. 26, 2014), http://www.lvdtribal.com/pdf/BPL%20Organizing%20Documents.pdf.

31.     Upon information and belief, the Tribe had no control over the income or expenses of either Red Rock or Big Picture Loans.

32.     Instead, the Tribe allowed Defendants to use their name as a front and, in return, received a nominal, 2% flat fee of the revenue. Delvin D. Hawley, *Payday Lenders on the Run*, Bloomberg Business Week (Feb. 8, 2016) ("Matt Martorello's company, Bellicose Capital, helps an American Indian tribe in Michigan run websites that offer small loans to the public at annualized interest rates as high as 780 percent. The tribe gets 2 percent of the revenue, while Martorello makes millions.").

33.     Upon information and belief, tribal members do not participate in the day-to-day operations of Red Rock or Big Picture Loans and nearly all the activities associated with these companies occurred off the Lac Vieux Reservation, such as the call centers, payment processing, and servicing of the loans.

34.     Despite representations in the loan agreements that Big Picture Loans and Red Rock were owned and operated by the Tribe, Bellicose Capital was the *de facto* owner and controlled the operations of the Big Picture Loans and Red Rock.

35.     Moreover, nearly all activities performed on behalf of Big Picture and Red Rock were performed by officers and employees of Bellicose who were not located on the Lac Vieux Reservation. Instead, they were Bellicose Capital employees located in the Virgin Islands, Puerto Rico, and the Philippines.

36.     Upon information and belief, the money loaned to Plaintiffs was transferred from a bank account owned and operated or controlled by Bellicose Capital and Martorello, and neither the Tribe nor its officials were allowed to access the accounts.

37.     Furthermore, neither Big Picture Loans nor Red Rock ever accepted consumer payments after the loan agreement was executed. Rather, all payments went to Bellicose Capital, who then kicked back, at most, the 2% flat fee to the Tribe.

38.     Additionally, Bellicose Capital also handled the lead generation used to identify and solicit potential consumers.[7]

39.     For example, Bellicose Capital procured consumer reports from Trans Union in an attempt to identify consumers who may be susceptible or in need of a loan.

40.     If a Virginia consumer's report showed that he or she may be susceptible to a high-interest loan, then Bellicose Capital sent correspondences to the home of the consumer in Virginia stating that he or she is "one of 1,442 people in Richmond" that are pre-approved, that the loan is "a smarter way to borrow," and that funds can be deposited "as early as tomorrow." (Feb. 27, 2017 Letter to Turnage).

41.     If a consumer called the number on the letter, he or she would reach a call center in the Philippines, who took direction and instructions from Bellicose Capital and not the Tribe.

42.     Upon information and belief, Bellicose Capital's lead generation procedures were developed by Martorello and Gravel.

43.     In the past few years, federal regulators have begun cracking down on rent-a-tribe arrangements.

---

[7] In order to find potential customers, internet lenders pay companies known as "lead generators," which are businesses that collect information on potential consumers to solicit for high-interest loans. Pew Charitable Trust, *Fraud and Abuse Online: Harmful Practices in Internet Payday Lending* (Oct. 2014), http://www.pewtrusts.org/~/media/assets/2014/10/payday-lending-report/fraud_and_abuse_online_harmful_prac-tices_in_internet_payday_lending.pdf. Lead generators pay high fees to several sources, such as consumer reporting agencies, to acquire borrower information to determine whether a consumer has ever applied or received an internet loan or whether a consumer may be in need or qualify for an additional loan. *Id.*

44.     For example, the United States Attorney for the Southern District of New York has indicted Scott Tucker and Timothy Muir, competitors of Defendants, for engaging in exactly the same unlawful-lending "rent a tribe" and collection practices alleged herein.

45.     The Tucker indictment, which sets out a strikingly similar set of facts, includes: (1) Mr. Tucker, through the use of shell companies, personally lent money to thousands of consumers through payday loans; (2) Tucker personally controlled virtually every aspect of the operations of these sham entities; (3) these sham entities shared employees, computer systems, and "other operating costs and infrastructure of a single lending business"; and (4) Mr. Muir acted as general counsel for one of the Tucker entities. *United States v. Tucker*, Case No. 16-crim-091 (S.D. N.Y. Feb. 9, 2016) (Dot. 1 at ¶¶ 1–3).

46.     For example, the indictment explains:

In truth and in fact, as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, while TUCKER and MUIR took steps to create the sham appearance of tribal ownership and control of the Tucker Payday Lenders, Tribes 1–3 played no substantive role in the ownership or operation of the Tucker Payday Lenders at any time. To create the sham appearance of ownership, TUCKER assigned nominal ownership of the Tucker Payday Lenders to Tribes 1-3 (that is, Ameriloan, United Cash Loans, US Fast Cash, Advantage Cash Services and Star Cash Processing were assigned to Tribe 1, One Click Cash was assigned to Tribe 2, and 500 Fast Cash was assigned to Tribe 3), and from time to time caused Tribes 1-3 to appear as the businesses' owners on certain corporate and financial documents. However, in truth and in fact, at all relevant times, and as TUCKER and MUIR well knew, Tribes 1-3 had no power to make any decisions on behalf of any of the Tucker Payday Lenders, no control over the income or expenses of any of the Tucker Payday Lenders, and no entitlement to the Tucker Payday Lenders' profits.

Similarly, to create the sham appearance that Tribes 1–3 not only owned, but operated, the Tucker Payday Lenders, SCOTT TUCKER, the defendant, caused members of two of the tribes (Tribe 1 and Tribe 2) to have a tribal member press a key on a computer on a daily basis on tribal lands to purportedly "approve" the extension of credit on hundreds or thousands of loans that the Tucker Payday Lenders, through their approximately 600 employees in Kansas, had in fact already approved and agreed to provide to customers. TUCKER did not require a third tribe that purportedly owned and operated one of the Tucker Payday Lenders (Tribe 3) to engage in this sham participation in the operations of his business at all.

*Id*. at ¶¶ 23-24.

47.     Just like the Tucker defendants, Defendants' business relationship with the Tribe was nothing more than an attempt to mislead consumers and regulators by an illusion that Defendants were protected by tribal immunity.

48.     After these rent-a-tribe schemes were uncovered through private lawsuits and governmental enforcement actions against Defendants' competitors, Martorello "sold" Bellicose Capital to the Tribe in an effort to further insulate the scheme from liability. Faux, *supra* note 1.

49.     As part of this arrangement, the Tribe paid Martorello $1.3 million dollars, plus he is entitled to receive as much as $300 million in future payments. Faux, *supra* note 1. In other words, the Tribe continues to accept a nominal fee in return for the use of its name.

50.     And while it is now organized under the laws of the Tribe, Ascension Technologies continues to be operated in the same manner and by the same individuals who ran Bellicose Capital—none of whom are affiliated with the Tribe.

51.     For example, approximately 20 individuals identify Ascension Technologies as their employers on LinkedIn. However, none of these people are located on the reservation.

52.     Instead, many of them list Atlanta, Mississippi, or Puerto Rico as the place where they are located.

53.     Upon information and belief, none of these people are members of the Tribe and nearly all of the activities of Ascension Technologies are performed by these non-tribal members who are not located on the reservation.

**C.      Defendants Made Loans to Virginia Consumers Charging Interest in Excess of 12% APR.**

54.      Defendants marketed, initiated, and collected usurious loans in Virginia. Martorello and Gravel chose Virginia as a place where loans and collection efforts would ensue, and they participated in and knew of the actions of Red Rock, Big Picture, and Bellicose in Virginia.

55.      Martorello and Gravel knew the subject loans were illegal under Virginia law, but they pursued the scheme anyway through Red Rock, Big Picture, and Bellicose in Virginia.

56.      In order to qualify for Defendants' loan product, consumers were required to electronically sign a form contract created by Defendants—not created by the Tribe.

57.      Under the terms of the standard Loan Agreements, the interest rates charged were significantly greater than 12% APR.

58.      For example, Defendants charged Williams with an APR of 649.8%—more than 50 times the 12% interest cap in Virginia for companies that are not licensed by the Commission. Va. Code § 6.2-303(A).

59.      Similarly, Defendants charged Turnage with an APR of 693.2%; Hengle with an APR of 607.5%; Coffy with an APR of 607.5%; and Gillison, Jr. with an APR of 627.2%.

60.      None of the Defendants had a consumer finance license permitting them to make loans charging interest in excess of 12% APR when they made the loans to Plaintiffs nor did they ever attempted to obtain such a license. *See* Va. Code § 6.2-1501. The Tribe also did not have a consumer finance license in Virginia.

61.      Accordingly, Defendants' loans are null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs. Va. Code § 6.2-1541(A).

62.    Defendants received at least $1,330 from Williams as a result of Defendants' illegal loan to her—most of which Defendants credited as payment for interest or other fees.

63.    Defendants received at least $319.80 from Turnage as a result of Defendants' illegal loans to her—most of which Defendants credited as payment for interest or other fees.

64.    Defendants received at least $2,500 from Hengle as a result of Defendants' illegal loans to him—most of which Defendants credited as payment for interest or other fees.

65.    Defendants received at least $1,150 from Coffy as a result of Defendants' illegal loans to him—most of which Defendants credited as payment for interest or other fees.

66.    Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c); *see also* 18 U.S.C. § 1961(6) (defining "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate").

67.    As a result of Defendants' conduct, including participation in the Enterprise, Defendants are liable to Plaintiffs and the class for twice the total amount of interest paid on the usurious loans pursuant to Va. Code § 6.2-305(A), and Defendants are also jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## D.    Defendants' Loan Agreements Are Void and Unenforceable Under Virginia Law.

68.    Because the loans were made without a consumer finance license and used an annual APR in excess of 12%, the agreements were void *ab initio* under Virginia law. Va. Code. § 6.2-1541(A) ("A loan contract shall be void if any act has been done in the making or collection thereof that violates § 6.2-1501.").

69.     Defendants' loan agreements not only violate Virginia's public policy against usurious loans as codified in Va. Code. § 6.2-1541(A), but they also contain unconscionable and unenforceable choice of law and forum selection provisions that seek to disclaim all laws and deprive consumers of their day in court.

70.     For example, Williams' Loan Agreement provides:

**GOVERNING LAW AND FORUM SELECTION**: This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal law"), including but not limited to the Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code and summarized below for your convenience.

. . .

**TRIBAL DISPUTE RESOLUTION PROCEDURE**: The Tribe has established a Tribal Dispute Resolution Procedure (the "Procedure") to review and consider any and all types of complaints made by you or on your behalf relating to or arising from this Agreement. . . . The Tribe and Enterprise intend and require, to the extent permitted by Tribal law, that any complaint lodged, filed, or otherwise submitted by you or on your behalf to follow the Procedure. Under the Procedure, a consumer who, in the course of his otherwise lawful and proper use of Enterprise's business believes himself to be harmed by some aspect of the operation of any part of Enterprise's business, ***shall direct his concerns or dispute to Enterprise in writing***. A person's complaint to the Enterprise shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, ***and does not create any binding procedural or substantive rights for a petitioner***. The Enterprise will investigate the complaint and respond as soon as reasonably practicable, but no later than thirty (30) days from the receipt of the complaint. In the event that the consumer is dissatisfied with Enterprise's determination, he may initiate Formal Dispute Resolution by requesting an administrative review of Enterprise's determination by submitting such request in writing to the Tribal Financial Services Regulatory Authority ("Authority"), P.O. Box 249, Watersmeet, MI 49969, no later than ninety (90) days after receiving Enterprise's determination.

(Feb. 15, 2016 Loan Agreement, attached as Ex. 1 at 5).

71.     Turnage, Hengle, Coffy, and Gillison, Jr.'s loan agreements contained virtually identical governing law and forum selection clauses.

72.     Upon information and belief, the governing law and forum selection clauses were template language included in all loan agreements involving Red Rock and Big Picture.

73.     Defendants' governing law clause is unenforceable because it violates public policy concerns in Virginia and was procured through fraud and misrepresentations, including that Red Rock and Big Picture Loans were "wholly owned" and "operated by" the Tribe.

74.     These statements were false, misleading, and designed to create the appearance that consumers were doing business with a neutral, government-like entity.

75.     In reality, the loans were owned and operated by Bellicose Capital, who funded the loans, controlled the underwriting, and handled the day-to-day operations of the businesses, including the interactions with consumers and collections.

76.     Likewise, the forum selection clause is also unenforceable because it seeks to deprive consumers of a remedy and their day in court. Rather than selecting an alternative dispute resolution procedure, Defendants use the forum selection clause as a means of depriving consumers of a remedy and a day in court.

77.     For example, the Tribal Dispute Resolution Procedure claims that consumers do not have "any binding procedural or substantive rights" against Big Picture.

78.     Additionally, the Tribal Dispute Resolution Procedure purportedly allows consumers to lodge a "Formal Dispute Resolution" with the "Tribal Financial Services Regulatory Authority."

79.     However, the Formal Dispute Resolution is a sham because the Tribal Financial Services Regulatory Authority does not have subject matter jurisdiction to consider: (1) any claims brought under state or federal law or (2) claims regarding the legality of the debt. Tribal Financial

Services Authority Comm. Regs., Reg. 1.1 § 4, *available at* http://www.lvdtribal.com/pdf/TFSRA-Regulations.pdf.

80.     In particular, the Regulations indicate that the Tribal Financial Services Regulatory Authority will not "grant the consumer an opportunity be heard" if the only allegation is that the loan "is illegal in a jurisdiction outside the jurisdiction of the Tribe." Tribal Financial Services Authority Comm. Regs., Reg. 1.1 § 4(b).

81.     Additionally, the Regulations provide that the Tribal Financial Services Regulatory Authority may "resolve the dispute in favor of the consumer upon a finding that the [tribal entity] *violated a law or regulation of the Tribe*." Tribal Financial Services Authority Comm. Regs., Reg. 1.1 § 4(c) (emphasis added).

82.     In essence, Defendants used the forum selection and choice of law clauses to convert it into "a choice of no law clause." *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016).

83.     Accordingly, Plaintiffs request the Court to enter a declaratory judgment that the governing law and forum selection provisions are unenforceable as to Virginia consumers.

## COUNT ONE:
## DECLARATORY JUDGMENT
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

84.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

85.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

> **Declaratory Judgment Class**: All persons who: (1) received a loan with either Red Rock or Big Picture Loans (2) when they resided or were located in Virginia and (3) where the loan contained an interest rate greater than 12%.

**Declaratory Judgment Sublass**: All persons who: (1) received a loan with either Red Rock or Big Picture Loans (2) when they resided or were located in Virginia (3) and the agreement concerning the loan included a choice-of- law or forum selection clause similar or identical to one in Paragraph 70.

Plaintiffs are members of the Declaratory Judgment Class and Subclass.

86.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

87.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loan agreements are void under Va. Code. § 6.2-1541(A); (2) whether the loan agreements are void as a matter of public policy; and (3) whether the choice-of-law and forum selection provisions are enforceable.

88.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

89.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class, because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of

the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them not to vigorously pursue this action.

90.  **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Litigating the validity and enforceability of each loan agreement would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

91.  As explained above, Defendants' loan agreements not only violate Virginia's usury statutes and public policy, but they also contain unconscionable choice of law and forum-selection provisions that are void and unenforceable for public policy concerns.

92.  The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the Loan Agreements as well as the validity, if any, of the choice of law and forum-selection provisions.

93.  Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

94.     Accordingly, Plaintiffs seek a declaratory judgment that the choice of law and forum-selection provisions are void and unenforceable under Va. Code. § 6.2-1541(A) and as a matter of Virginia's well-established public policy.

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

95.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.[8]

96.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Virginia RICO Class"—initially defined as:

> All Virginia residents who executed a loan with Red Rock or Big Picture where the loan was originated and/or any payment was made on or after June 22, 2013.

Plaintiffs are members of the Virginia RICO Class.

97.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by the profits generated by Defendants, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

98.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These common questions predominate over the questions affecting only individual class members. The common questions include: (1) whether the Enterprise constitutes an "enterprise" under RICO; (2) whether

---

[8] For Counts II and III, Plaintiffs do not seek any monetary relief from Defendants Williams, Jr., Martin, Gertrude McGeshick, and Susan McGeshick. Plaintiffs seek injunctive relief only as to Defendants Williams, Jr., Martin, Gertrude McGeshick, and Susan McGeshick.

Defendants participated in the Enterprise; (3) whether the loans violated Va. Code § 6.2-1501 because the interest rates were too high; and (4) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

99.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts and legal theories as each of the class members.

100.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class that they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

101.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised

by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

102.    **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiff and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the Enterprise, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in the Enterprise; and ordering the dissolution of any entity associated with the Enterprise.

103.    As alleged above, Defendants violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

104.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

105.    All of the loans made to Virginia residents and collected by Defendants included an interest rate far in excess of twice the enforceable rate in Virginia.

106.    Martorello and Gravel, during the pertinent times, were directly and materially involved in this intentional misconduct and knew the subject loans were illegal under Virginia law, but they pursued the scheme anyway through Bellicose Capital.

107.    This conduct began sometime as early as 2011, continues to date, and will be repeated again and again in the future to the detriment of Virginia consumers.

108.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c).

109.     Accordingly, Defendants Big Picture Loans, Matt Martorello, Ascension Technologies, and Daniel Gravel are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT THREE:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

110.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

111.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class, initially defined as:

> All Virginia residents who executed a loan with Red Rock or Big Picture where the loan was originated and/or any payment was made on or after June 22, 2013.

112.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

113.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

114.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

115.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

116.   **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate equitable injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of the Enterprise, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in the Enterprise; and ordering the dissolution of each entity that has engaged in the Enterprise.

117.   As alleged above, Defendants violated § 1962(d) of RICO by entering into a series of agreements to violate § 1962(c) and Virginia's usury laws, including the agreement between Defendants and Tribe that established the terms and operations of the rent-a-tribe business.

118.   Accordingly, Defendants Big Picture Loans, Matt Martorello, Ascension Technologies, and Daniel Gravel are jointly and severally liable to Plaintiffs and the putative class

members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C.

§ 1964(c).

**COUNT FOUR:**
**VIOLATIONS OF VIRGINIA USURY LAWS**
**(CLASS CLAIM AGAINST BIG PICTURE LOANS, MATT MARTORELLO,**
**ASCENSION TECHNOLOGIES, DANIEL GRAVEL)**

119.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth

at length herein.[9]

120.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this

action for themselves and on behalf of a class—the "Virginia Usury Class and Subclass"—initially

defined as follows:

> **Virginia Usury Class**: All Virginia residents who executed a loan with Red Rock
> or Big Picture where any amount of principal, interest, fees, or other charges were
> repaid.

> **Virginia Usury Subclass**: All Virginia residents who executed a loan with Red
> Rock or Big Picture where any interest was paid on or after June 23, 2015.

121.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs

allege that the class members are so numerous that joinder of all is impractical. The names and

addresses of the class members are identifiable through the internal business records maintained

by Defendants, and the class members may be notified of the pendency of this action by published

and/or mailed notice.

122.    Based on the estimated size of the class and the volume of loans offered by

Defendants, Plaintiffs believe that the amount in controversy easily exceeds $5 million when

considering the amounts repaid by Virginia borrowers, as well as the amount of outstanding debt

---

[9] For Counts IV and V, Plaintiffs do not seek any relief from Defendants Williams, Jr., Martin, Gertrude McGeshick, and Susan McGeshick. Plaintiffs use the term "Defendants" in Count IV and V only refers to the defendants identified under the headings, *i.e.*, Big Picture Loans, Matt Martorello, Ascension Technologies, and Daniel Gravel.

that will be cancelled as part of the relief sought in this lawsuit. Settlements involving similar tribal lending enterprises have far exceeded $5 million, including a settlement recently approved by this Court. *See, e.g., Hayes v. Delbert Servs. Corp.*, Preliminary Approval Order, 3:14-cv-00258-JAG, Doc 193 (Jan. 30, 2017) (granting preliminary approval of a class action settlement that included $9.43 million in compensation and forgiving $5.9 million in outstanding debt) https://secure.dahladmin.com/VACASH/content/docu-ments/PreliminaryApprovalOrder.pdf; Press Release, Office of Att'y Gen., Ga., Attorney General Chris Carr Announces $40 Million Plus Settlement with Online Payday Lender (Feb. 8, 2017), https://law.georgia.gov/press-releases/2017-02-08/attorney-general-chris-carr-announces-40million-plus-settlement-online ($23.5 million in compensation, $17 million in loan forgiveness, $1 million civil penalty, and $500,00 attorney's fees and costs).[10]

123. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made by Defendants of the Virginia Usury Class claims violated Virginia Code Section § 6.2-1501 because their interest levels were too high and (2) what is the proper recovery for Plaintiffs and the class members against each of the Defendants.

---

[10] *See also* News Release, Attorney Gen. Pam Bondi, Fl., Attorney General Bondi and OFR Reach Multimillion Dollar Settlements with Online Lender (Jan. 12, 2017), http://myfloridalegal.com/__8525622-20065EE67.nsf/0/2F836464563D0EB5852580A600709370?Open&Highlight=0,western,sky ($11 million in compensation, $15 million in loan forgiveness, $500,000 civil penalty, $500,000 administrative fine, and $250,000 for costs); *Internet Lender CashCall, Inc. Barred from Doing Business in Minnesota*, Minn. Att'y Gen. Lori Swanson, https://www.ag.state.mn.us/Office/PressRelease/20160819InternetLender.asp (last visited May 24, 2017) ($11.7 million in monetary relief including a $4.5 million restitution fund).

124. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

125. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

126. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

127.    All of the loans made by Defendants to Virginia consumers used an interest rate greater than 12% and none of the exceptions to Va. Code § 6.2-303 apply.

128.    Accordingly, Plaintiffs and the class Members are entitled to recover from Defendants an amount equal to the total amount of interest paid in excess of 12% plus twice the amount of such usurious interest that was paid in the two years preceding the filing of this action, attorney's fees, and costs. Va. Code § 6.2-305(A).

**COUNT FIVE:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM AGAINST BIG PICTURE LOANS, RED ROCK, MATT**
**MARTORELLO, ASCENSION TECHNOLOGIES, DANIEL GRAVEL)**

129.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

130.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Virginia Unjust Enrichment Class"—initially defined as follows:

> **Virginia Unjust Enrichment Class**: All Virginia residents who executed a loan with Red Rock or Big Picture where any amount of principal, interest, fees, or other charges were repaid.

131.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

132.    Based on the estimated size of the class and the volume of loans offered by Defendants, Plaintiffs believe that the amount in controversy easily exceeds $5 million when considering the amounts repaid by Virginia borrowers, as well as the amount of outstanding debt

that will be cancelled as part of the relief sought in this lawsuit. Settlements involving similar tribal lending enterprises have far exceeded $5 million, including a settlement recently approved by this Court. *See, e.g., Hayes v. Delbert Servs. Corp.*, Preliminary Approval Order, 3:14-cv-00258-JAG, Doc 193 (Jan. 30, 2017) (granting preliminary approval of a class action settlement that included $9.43 million in compensation and forgiving $5.9 million in outstanding debt) https://secure.dahladmin.com/VACASH/content/docu-ments/PreliminaryApprovalOrder.pdf; Press Release, Office of Att'y Gen., Ga., Attorney General Chris Carr Announces $40 Million Plus Settlement with Online Payday Lender (Feb. 8, 2017), https://law.georgia.gov/press-releases/2017-02-08/attorney-general-chris-carr-announces-40million-plus-settlement-online ($23.5 million in compensation, $17 million in loan forgiveness, $1 million civil penalty, and $500,00 attorney's fees and costs).

133. <u>**Predominance of Common Questions of Law and Fact**</u>**. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Plaintiffs and the class members conferred a benefit on Defendants of the Virginia Unjust Enrichment Class claims; (2) whether Defendant knew or should have known of the benefit; (3) whether Defendants retained an unjust benefit because the loan was void; and (4) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

134. <u>**Typicality**</u>**. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

135. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

136. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

137. All of the loans made by Defendants to Virginia consumers were void and unenforceable.

138.    Plaintiffs conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefit; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

139.    Accordingly, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Big Picture or Red Rock.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request the Court enter judgment for themselves and the class they seek to represent against Defendants, including for:

A.    Certification of this matter to proceed as a class action;

B.    Declaratory, injunctive, and compensatory relief as pled herein;

C.    Attorney's fees, litigation expenses, and costs of suit; and

D.    Any further relief the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**LULA WILLIAMS, GLORIA TURNAGE, GEORGE HENGLE, DOWIN COFFY, and FELIX GILLISON, JR.,** *on behalf of themselves and all individuals similarly situated,*

By:_____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com

James W. Speer, VSB#23046
VIRGINIA POVERTY LAW CENTER
919 E. Main Street, Suite 610
Richmond, VA 23219

(804) 782-9430
(804) 649-0974
Email: jay@vplc.org

*Counsel for Plaintiffs*