**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

LULA WILLIAMS, GLORIA TURNAGE,
GEORGE HENGLE, DOWIN COFFY, and           Civil Case No. 3:17-cv-00461-REP
FELIX GILLISON, JR., *on behalf of themselves
and all individuals similarly situated*,

                       Plaintiffs,

v.

BIG PICTURE LOANS, LLC; MATT MARTORELLO;
ASCENSION TECHNOLOGIES, INC.;
DANIEL GRAVEL; JAMES WILLIAMS, JR.;
GERTRUDE MCGESHICK; SUSAN MCGESHICK;
and GIIWEGIIZHIGOOKWAY MARTIN,

                       Defendants.

_____ /

**BIG PICTURE LOANS, LLC AND ASCENSION TECHNOLOGIES, INC.'S BRIEF IN
SUPPORT OF THEIR MOTION TO DISMISS FOR LACK OF SUBJECT MATTER
JURISDICTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

FACTS ...................................................................................................................................... 2

    The Lac Vieux Desert Band of Lake Superior Chippewa Indians................................. 2

    LVD's lending and consumer financial services operations...................................... 3

    LVD enacted law to regulate its lending.................................................................... 3

    LVD's Business Ordinance.......................................................................................... 5

    LVD began lending with Red Rock............................................................................. 5

    LVD expanded to its current online lending operation.............................................. 6

    Big Picture's lending process...................................................................................... 12

    Plaintiffs' Complaint makes sweeping and unsupported allegations. ....................... 14

ARGUMENT ........................................................................................................................ 15

I.    Because Big Picture and Ascension are arms of LVD, Plaintiffs' claims are barred by tribal sovereign immunity. ..................................................................................................... 16

    A.    Legal Standard under Fed. R. Civ. P. 12(b)(1). ............................................... 16

    B.    Big Picture and Ascension, as arms of LVD, are immune from suit. ............................ 16

        1.    *Breakthrough* Factor 1: Big Picture and Ascension were created by the Tribe pursuant to Tribal law. ....................................................................................... 18

        2.    *Breakthrough* Factor 2: Big Picture and Ascension's purposes are to operate LVD's tribal lending operation to further LVD's self-self-sufficiency and self-determination....... 19

        3.    *Breakthrough Factor 3:* Big Picture and Ascension are exclusively controlled by LVD……………………………………………………………………………………………...21

i

4.     *Breakthrough* Factor 4: The Tribe intended to vest Big Picture and Ascension with LVD's sovereign immunity. .............................................................................................. 22

5.     *Breakthrough* Factor 5: Big Picture and Ascension generate revenue exclusively for LVD. 23

6.     *Breakthrough* Factor 6: The purpose of sovereign immunity is furthered by extending LVD's sovereign immunity to Big Picture and Ascension................................................... 24

C.     As arms of LVD, Big Picture and Ascension are immune from Plaintiffs' RICO claims 25

D.     Big Picture and Ascension join and incorporate the LVD Officers' motion to dismiss. 26

CONCLUSION ....................................................................................................................... 27

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Allen v. Gold Country Casino*
464 F.3d 1044 (9th Cir. 2006) ........................................................................... 15, 16

*Berger v. Pierce*
933 F.2d 393 (6th Cir. 1991) ................................................................................... 25

*Blitz v. Napolitano*
700 F.3d 733 (4th Cir. 2012) ................................................................................... 16

*Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*
629 F.3d 1173 (10th Cir. 2010) ......................................................................... passim

*Buchanan v. Sokaogon Chippewa Tribe*
40 F. Supp. 2d 1043 (E.D. Wis. 1999).................................................................... 25

*ESAB Group, Inc. v. Centricut, Inc.*
126 F.3d 617 (4th Cir. 1997) ................................................................................... 26

*Everette v. Mitchem*
146 F.Supp.3d 720 (D. Md. 2015) ..................................................................... passim

*Feezor v. Babbitt*
522 U.S. 807 (1997)................................................................................................. 25

*Gavle v. Little Six, Inc.*
555 N.W.2d 284 (Minn.1996)................................................................................. 17

*Genty v. Resolution Trust Corp.*
937 F.2d 899 (3rd Cir.1991) ................................................................................... 25

*Howard v. Plain Green, LLC, et al*
E.D. Va. No. 2:17CV302, WL --- (E.D. Va. August 7, 2017)............................ passim

*In re Intramta Switched Access Charges Litig.*
158 F. Supp. 3d 571 (N.D. Tex. 2015) ................................................................... 24

*In the Matter of Sorhaindo v Ascension Technologies, LLC*
Case No WD-005-2016-STX (V.I. Dep't of Labor August 20, 2016) ...................... 20

*Int'l Shoe Co. v. State of Wash., Office of Unemp't Comp. and Placement*
326 U.S. 310 (1945)................................................................................................. 25

*McNeily v. United States*
6 F.3d 343 (5th Cir. 1993) ...................................................................................... 25

32898947v1

*Mich. v. Bay Mills Indian Cmty.*
572 U.S. __, 134 S. Ct. 2024 (2014) ...................................................................... 16

*Morgan Bldgs. & Spas*
No. CIV-09-730-M, 2011 WL 308889 .................................................................... 23

*Settlement Funding, LLC v. Von Neumann-Lillie*
274 Va. 76 (2007) .................................................................................................... 26

*Smith v. Babbitt*
875 F.Supp. 1353 (D. Minn.1995), *aff'd,* 100 F.3d 556 (8th Cir.1996), *cert. denied sub nom.* ... 25

*Snowbird Constr. Co. v. US*
666 F.Supp. 1437 (D.Idaho 1987) ......................................................................... 25

*SunTrust Bank v. Vill. at Fair Oaks Owner, LLC*
766 F.Supp.2d 686 (E.D. Va. 2011) ...................................................................... 16

*Team Sys. Int'l, LLC v. Haozous*
No. CIV-14-1018-D, 2015 WL 2131479 (W.D. Okla. May 7, 2015), aff'd, 656 Fed. Appx. 907
     (10th Cir. 2016) ................................................................................................ 19, 21

*U.S. ex rel. Morgan Bldgs. & Spas, Inc. v. Iowa Tribe of Oklahoma*
No. CIV-09-730-M, 2011 WL 308889 (W.D. Okla. Jan. 26, 2011) ........................... 18

*United States v. Bly*
510 F.3d 453 (4th Cir. 2007) ................................................................................. 16

*United States v. Bonanno Org. Crime Fam. of La Cosa Nostra*
879 F.2d 20 (2d Cir. 1989) ..................................................................................... 25

*United States v. Jones*
225 F.3d 468 (4th Cir. 2000) ................................................................................. 15

## Statutes

12 U.S.C. § 5481(27) ................................................................................................ 4
12 U.S.C. § 5495 ....................................................................................................... 4
12 U.S.C. § 5551 ....................................................................................................... 4
12 U.S.C. § 5552 ....................................................................................................... 4
18 U.S.C. § 1965 ......................................................................................... 14, 15, 25
25 U.S.C. § 1300h ..................................................................................................... 2
25 U.S.C. § 1300h-2(a) ............................................................................................. 2
25 U.S.C. § 461 ......................................................................................................... 2
28 U.S.C. § 1332(d)(2) ............................................................................................ 14

28 U.S.C. § 1367 ............................................................................................................... 14
28 U.S.C. § 1391(b) ........................................................................................................... 14

**Rules**

Fed. R. Civ. Pro. 12(b)(1) ........................................................................................ 2, 15, 26
Fed. R. Civ. Pro. 12(b)(2) ............................................................................................. 2, 25

**Regulations**

12 CFR 1040 ....................................................................................................................... 13
12 CFR 1040.3 (b)(2)(ii) .................................................................................................... 13
12 CFR 1040.4(a)(2)(vi) ..................................................................................................... 13
Tribal Consumer Financial Services Regulatory Code § 1.1(a) ................................................ 3
Tribal Consumer Financial Services Regulatory Code § 1.1(d) ................................................ 3
Tribal Consumer Financial Services Regulatory Code § 1.1(h) ................................................ 4
Tribal Consumer Financial Services Regulatory Code § 1.1(i) ................................................. 4
Tribal Consumer Financial Services Regulatory Code § 1.2(a) ................................................ 3
Tribal Consumer Financial Services Regulatory Code § 1.2(c) ................................................ 3
Tribal Consumer Financial Services Regulatory Code § 1.2(g) ................................................ 3
Tribal Consumer Financial Services Regulatory Code § 1.3 ................................................ 3, 4
Tribal Consumer Financial Services Regulatory Code § 1.3(d) ................................................ 4
Tribal Consumer Financial Services Regulatory Code § 10 ...................................................... 4
Tribal Consumer Financial Services Regulatory Code § 11 ...................................................... 4
Tribal Consumer Financial Services Regulatory Code § 11.3 ................................................... 4
Tribal Consumer Financial Services Regulatory Code § 12 ...................................................... 4
Tribal Consumer Financial Services Regulatory Code § 2.4 ..................................................... 4
Tribal Consumer Financial Services Regulatory Code § 4.13 ................................................... 4
Tribal Consumer Financial Services Regulatory Code § 4.14 ................................................... 4
Tribal Consumer Financial Services Regulatory Code § 4.15 ................................................... 4
Tribal Consumer Financial Services Regulatory Code § 4.16.2 ................................................ 4
Tribal Consumer Financial Services Regulatory Code § 4.18 ................................................... 4
Tribal Consumer Financial Services Regulatory Code § 5 ........................................................ 4
Tribal Consumer Financial Services Regulatory Code § 5.1 ..................................................... 4
Tribal Consumer Financial Services Regulatory Code § 5.2(b)(8) ............................................ 4
Tribal Consumer Financial Services Regulatory Code § 6 ........................................................ 4
Tribal Consumer Financial Services Regulatory Code § 6.4 ..................................................... 4
Tribal Consumer Financial Services Regulatory Code § 7 ........................................................ 4
Tribal Consumer Financial Services Regulatory Code § 9.3 ..................................................... 4
Tribal Consumer Financial Services Regulatory Code § 9.4(b) ................................................ 5
Tribal Consumer Financial Services Regulatory Code § 9.4(f) ................................................. 5
Tribal Consumer Financial Services Regulatory Code § 9.4(g) ................................................ 5

Defendants, Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, LLC ("Ascension"), by counsel, hereby move to dismiss the Complaint against them under Fed. R. Civ. P. 12(b)(1) and 12(b)(2).

## INTRODUCTION

The threshold issue in this lawsuit against Big Picture and Ascension is whether tribal sovereign immunity bars Plaintiffs' claims. All five causes of action hinge on whether Defendants Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, LLC ("Ascension") are economic arms and instrumentalities ("arms of the tribe") of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD"). Plaintiffs have built their entire case on the unfounded allegation that Big Picture and Ascension are not arms of the tribe:

> [T]he Court must determine whether these entities are 'analogous to a governmental agency, which should benefit from sovereign immunity' or whether they are more like a 'commercial business enterprise, instituted for the purpose of generating profits for [their] private owners.' [Compl. ¶ 5 n. 4.]

Under the fundamental principles of tribal sovereign immunity, Indian tribes, tribal officials, and arms of the tribe are immune from suit *unless* immunity is expressly and unequivocally abrogated by Congress or waived by the tribe, which indisputably has not occurred here. Tribal sovereign immunity also shields Indian tribes, tribal officials, and arms of the tribe from enforcement of state laws and regulations.

The facts in this case plainly establish that Big Picture and Ascension are arms of LVD and thus entitled to the protections of tribal sovereign immunity. Plaintiffs' unsupported claims to the contrary are simply not tenable in light of the evidence set forth below. And Plaintiffs' have not pled that sovereign immunity has been abrogated or waived.

With the Court's finding that Big Picture and Ascension are arms of the tribe and thus LVD's tribal sovereign immunity extends to all matters alleged, this lawsuit can be readily dismissed. Other defects in the Complaint also abound.

For the reasons explained below, Big Picture and Ascension respectfully request that this Court dismiss the Complaint against them under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2).

## FACTS

### The Lac Vieux Desert Band of Lake Superior Chippewa Indians.

LVD is a federally recognized Indian tribe whose members continue to reside close to their ancestral homeland near Watersmeet, Michigan (the "Reservation"). 25 U.S.C. § 1300h. LVD has always governed itself according to its own laws, regulations, and cultural norms. As a federally recognized Indian tribe, LVD inherently possesses all the attributes of sovereignty. In 1988, under the Indian Reorganization Act, 25 U.S.C. § 461 *et seq*., Congress recognized LVD "as an independent tribal entity." 25 U.S.C. § 1300h-2(a). On May 14, 1992, "to govern [] under [its] own laws and customs, to maintain and foster [its] tribal culture, to protect [its] homeland . . . and to ensure [its] rights guaranteed by treaty with the Federal Government," LVD adopted its current Constitution ("LVD Constitution") "for the government, protection and common welfare of [LVD]." (Attach. #1, LVD Const., Preamble).

The LVD Constitution establishes its tribal council ("LVD Council") as the governing body of LVD with enumerated authority, in part, to enact law and manage the economic affairs of LVD to "promote and protect the health, safety, education, and general welfare of the Band and its members." (Attach. #1, Art. IV, §§ 1(a), (b), (f), (j); 2).

**LVD's lending and consumer financial services operations.**

After being hit especially hard by the 2008 recession, LVD developed a comprehensive economic development strategy to build a more diversified economy.  (Attach. #2, Aff. Michelle Hazen, ¶4).  Part of that strategy included establishing an online lending operation.  In the short-term, LVD sought out private investment and experienced vendors willing to teach LVD how to operate a successful online consumer financial services business.  (Attach. #2, ¶ 10).  LVD's long-term strategy was to grow its lending operation by acquiring its service providers and organizing additional support entities, and ideally, for LVD itself to invest its earned revenue back into its businesses to maximize the benefits to LVD.  (Attach. #2, ¶ 13).

**LVD enacted law to regulate its lending.**

On July 8, 2011, LVD enacted the Tribal Consumer Financial Services Regulatory Code ("Regulatory Code"), which authorized wholly owned online consumer lending entities to operate from the Reservation exclusively to help "improve [LVD's] economic self-sufficiency, to enable [LVD] to better serve the social, economic, educational, and health and safety needs of its members and visitors, and to provide its members with opportunities to improve their own economic circumstances." (Attach. #3, Resolution #2011-053; Attach. #4, Regulatory Code, §§ 1.1(a), (d); 1.3).  The Regulatory Code confirms that LVD's intent in entering the on-line lending marketplace is, in part, to "[d]iversify and expedite the development of [its] economy," "[e]nsure that all consumer financial services profits are used for the benefit of [LVD] and [its] community," and to "[e]nsure that [LVD] provides a Tribal-based forum for the fair and orderly resolution of consumer financial services disputes consistent with [LVD's] preservation of sovereign immunity." (Attach. 4, § 1.2(a), (c), (g)).

The Regulatory Code requires all people and entities engaged in tribal consumer financial services to be licensed and to comply with the Regulatory Code and all applicable federal laws. (*Id.*, §§ 1.3(d), 5, 6, 7, 5.2(b)(8)). To ensure compliance with the law, the Regulatory Code requires licensees to maintain a compliance management system. The Regulatory Code also limits the types of services and products a licensee can offer and controls consumer agreements, *e.g.*, capping loan amounts at $5,000, limiting finance charges, limiting consumers to three loans at any time, and capping repayment terms at four years. (*Id.* §§ 6.4, 7, 10–12, 11.3). Finally, the Regulatory Code requires that all tribal lending occur on Indian lands. (*Id.* §§ 1.1(h), 1.3, 2.4, 5.1).

To regulate licensees and enforce the Regulatory Code, LVD created the Tribal Financial Services Regulatory Authority ("TFSRA"). (Attach. #5, Resolution #2011-030; Attach. 4 §§ 1.1(i), 4.16.2). Considered by the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5481 *et seq.* ("CFPA"), as a co-regulator alongside the Consumer Financial Protection Bureau ("CFPB") and state regulatory agencies,[1] the TFSRA is empowered by the Regulatory Code to focus on three key areas: (1) licensing and regulating entities engaged in tribal consumer financial services authorized by the Regulatory Code and applicable federal laws and regulations; (2) protecting consumers by receiving and investigating complaints; and (3) providing a quasi-judicial and judicial forum to hear and adjudicate licensee enforcement actions and consumer complaints. (Attach. 4 §§ 4.13, 4.14, 4.15, 4.18, 9.3).

To protect consumers, the Regulatory Code contains a comprehensive consumer dispute resolution process that mirrors federal and state administrative procedures by empowering the

---

[1] *See* 12 U.S.C. § 5481(27) (including federally recognized Indian tribes within the definition of "State."); 12 U.S.C. § 5495 (requiring the CFPB to coordinate with State regulators); 12 U.S.C. §§ 5551-52 (allowing a State attorney general or regulator to bring a civil action to enforce the CFPA in State court over State licensed entities).

TFSRA to serve in a quasi-judicial capacity and preside over consumer dispute hearings.  After an administrative hearing, an aggrieved consumer may appeal by filing a petition for review with the LVD Court, and the LVD Court may review the TFSRA's administrative record and decisions according to the codified standards.  (*Id*., § 9.4(b), (f)).  The LVD Court is required to issue an opinion and order as a final decision in the matter.  (*Id.*, § 9.4(g)).

### LVD's Business Ordinance

Empowered by the LVD Constitution, on August 26, 2014, the LVD Council modernized its business organization laws and enacted the LVD Business Entity Ordinance ("Business Ordinance") to encourage tribal commerce.  (Attach. #6, Resolution #T2014-068, Attach. 7 Business Ordinance, Ch. 1 § 1(A)-(F)).  The Business Ordinance establishes comprehensive procedures for the creation, operation, and dissolution of various types of business entities: corporations, non-profit corporations, and tribally owned and individually owned limited liability companies ("LLCs").  (*See generally* Attach. #7).

Significantly, the Business Ordinance states clearly that a tribally owned LLC "shall be considered a wholly owned and operated instrumentality of [LVD] and shall have all the privileges and immunities of [LVD], including but not limited to [LVD]'s sovereign immunity from suit, except as explicitly waived by the LVD Council" and clearly explains that the Business Ordinance does not waive LVD's sovereign immunity or the immunity extended to any tribally owned business. (Attach. #7, Ch. 1 § 3; Ch. 5 § 8(E); Attach. #6).  The Business Ordinance also disclaims consent to suit in any federal or state court. (*Id.*).

### LVD began lending with Red Rock

In September 2011, LVD organized non-party Red Rock Tribal Lending, LLC ("Red Rock") to begin operating in the online consumer lending space.  (Attach. #8, Resolution #2011-

041; Attach. #9, Red Rock Articles of Organization, as amended ("Red Rock Articles")).  Red

Rock was organized under tribal law, [2] was wholly owned and operated by LVD, and operated as

an arm of the tribe entitled to LVD's sovereign immunity and originated loans from LVD's

Reservation.  (Attach. #8; Attach. #9).  To learn the lending industry, Red Rock contracted with

Bellicose VI, LLC ("Bellicose") for vendor management services, compliance management

assistance, marketing material development, and the development of risk modeling and data

analytics.  (Attach. #2, ¶10).  Red Rock consulted with Bellicose about operations, but ultimately

all decisions were made by Red Rock's managers.  (Attach. #2, ¶11).

Over its first four years of operation, LVD learned about the sophisticated world of the

online lending industry.  (Attach. #2, ¶13).  With its newfound knowledge and a solid business

structure in place, to take the next step in its long-term economic development strategy, the LVD

Council looked to mature its operations by growing its portfolio, increasing distributions to LVD,

increasing on-reservation employment opportunities, and acquiring businesses to support its tribal

lending.  (Attach. #2, ¶13).

### LVD expanded to its current online lending operation.

In August 2014, to further its economic development efforts, LVD formed Big Picture as

a wholly owned arm of the tribe to become LVD's sole tribally owned lending business.  (Attach.

#10, Resolution #T2014-066; Attach #11, Resolution #T2015-09; Attach. #12, First Amended Big

Picture Articles of Organization ("Big Picture First Amended Articles")).  Later, in February 2015,

LVD created Tribal Economic Development Holdings, LLC ("TED") as a wholly owned arm of

the tribe organized to "promote the economic development of [LVD] through the development of

---

[2] Red Rock was organized under LVD's first business entity ordinance, however as Red Rock is
not named as a defendant in this lawsuit, Defendants will not belabor the issue.

business opportunities . . ." and to oversee all future tribal lending operations as a holding company.  (Attach. #13, Resolution #T2015-08; Attach. #14, TED First Amended Articles of Organization ("TED Amended Articles"); Attach. 15, Resolution #T2016-047).  And finally, in February 2015, LVD created Ascension as a wholly owned subsidiary of TED to "operat[e] one or more Tribal marketing, technology and vendor services businesses . . ." (Attach. #16, Resolution #T2015-10; Attach. #17, Ascension First Amended Articles of Organization ("Ascension First Amended Articles"); Attach. #18, Ascension First Amended Operating Agreement).

With its newly formed tribal businesses firmly established, LVD, through TED, bought Bellicose (through a seller-financed transaction) to acquire its intellectual property related to online lending, as well as its existing data, software, and corporate goodwill.  (Attach. #2, ¶22; Attach. #19, Resolution #T2015-059; Attach #20, Resolution #T2015-060).  TED's acquisition of Bellicose's assets were assigned down to Ascension and Bellicose's liabilities were assigned to Big Picture.  Big Picture then contracted with Ascension for marketing, technology, compliance, and vendor management services.  (Attach. #21, Big Picture License; Attach. #22, Big Picture-Ascension Services Agreement).  Bellicose has since ceased to exist.

Finally, on February 16, 2016, LVD authorized Red Rock to assign the vast majority of its consumer loans and obligations to Big Picture.  (Attach. #23, Resolution #T2016-018; Attach. #24, Assignment and Assumption Agreement Red Rock-Big Picture).  The remainder of Red Rock's consumer loans were written off as bad debt.  (Attach. #2, ¶23).  Big Picture notified all (former) Red Rock consumers about the assignment, as well as the fact that Big Picture would now service those loans.  (Attach. #25, Notice of Assignment to Consumers).

After ample time to resolve any disputes, Red Rock formally dissolved on February 17, 2016.  (*See* Attach. #7 §§ 22–23; Attach. #26, Resolution #T2016-021; Attach. #27, Red Rock

Articles of Dissolution; Attach. #28, Red Rock Notice of Dissolution to Unknown Claimants; Attach. #30, Letter to TFSRA).

Today, TED oversees Big Picture and Ascension.  Big Picture operates LVD's sophisticated online lending operation to generate revenue exclusively for LVD with the shared purpose of furthering LVD's self-determination and self-sufficiency by building LVD's economy. (Attach. #13; Attach. #11; Attach. #16).  Ascension supports Big Picture's lending at a below market rate but with top of the market services.  Now, lending, marketing, management, and underwriting are all performed by LVD's businesses.  All three entities are headquartered and operate on LVD's reservation.  (Attach. #14; Attach. #12; Attach. #17).  Currently, Big Picture employs fifteen employees and Ascension employs thirty-one employees.  (Attach. #2, ¶24, 25).

TED, Big Picture, and Ascension are all run by LVD Council-appointed managers who have been delegated authority by the LVD Council to oversee day-to-day[3] business operations. (Attach. #31, Big Picture First Amended Operating Agreement, § 5.1(a); Attach. #18, § 5.1(a). *E.g.*, Attach. #32, Big Picture Meeting Minutes (Nov. 30, 2015); Attach. #33, Ascension

---

[3] The term "day-to-day operations" includes, but is not limited to: the review and approval of: underwriting strategies and models; marketing strategies (like website updates, direct mail campaigns, designs, etc.); collections strategies and interaction with consumers' debt consolidators; complex payment arrangements with consumers; financing options for operational cash; call center scripts and operational strategies; and updates and edits thereto when necessary; ensuring proper corporate governance and compliance with Tribal laws; interacting with legal counsel on a variety of issues including determining legal strategy and replies to inquiries; and regularly reporting to and reviewing monthly reports and financial statements with the Tribal Council; interaction with the Tribe's Controller and auditors as needed; oversight of all processing of all applications and all loans; to approve a loan application and originate and fund the loan, or to deny a loan application and not originate or fund a loan; to manage relationships and contracts with consultants, credit bureaus, third-party utility service providers (like internet, power, and phones), and office materials suppliers; to monitor ACH uploads; to received, processed, uploaded, assessed, mail; to process and deposit of consumer payments; to process consumer complaints, state attorneys general correspondences, and the Better Business Bureau inquiries; to open and maintain bank accounts; to correspond with outside government offices; and to represent the business to outside groups and organizations.

Delegation of Authority Policy).  However, TED, Big Picture, and Ascension's managers are each expressly limited to the powers identified in their organizing and operating documents and any other express limitations—that is to say that no appointee can usurp the LVD Council's authority. (Attach. #34, TED First Amended Operating Agreement, § 5.2; Attach. #31, § 5.2; Attach. #18, §5.2).  To further ensure LVD Council's ongoing control, TED, Big Picture, and Ascension regularly report to the LVD Council regarding changes in operation, personnel, consumer complaints, litigation, revenues, distributions, etc.  (Attach. #34, § 4.7; Attach. #31, §5.8; Attach. #18, § 5.8).

Big Picture and Ascension have formed a joint Compliance Management Board to ensure strict compliance with all applicable law.  (Attach. 4, § 6.4; Attach. #35, Oversight and Compliance Management Board Policy).  Both ensure that sufficient resources are allocated to meet the companies' compliance needs and lawful obligations.  (Attach. #35).  Compliance Management Board approval is required for: (1) any new compliance policies or changes to current compliance policies; (2) reports from the Compliance Director; (3) audit findings; (4) due diligence summaries, contracts and related information for all vendors related to consumer financial services; (5) annual budgets; and (6) appointment of a Compliance Director and Backup Compliance Director. (Attach. #35).

Big Picture maintains its operating account with a regional state-chartered bank.  (Attach. #36, Resolution #T2014-096).  All consumer loans are funded through this operating account, all consumer payments go to this operating account, all payroll is paid through this operating account, all vendors are paid from this operating account, all investments are deposited here, and all distributions to LVD are made from this account.  (Attach. #2, ¶26).  The account maintains sufficient funds to support its operations.  (Attach. #2, ¶26).

Big Picture uses its income from its consumer loans to pay its expenses and then distributes profits to LVD—Big Picture does not make profit for itself.  (Attach. #31, § 6.2).  Big Picture also uses capital from private investors (e.g., hedge funds, individuals, trusts, and businesses) to fund and grow its business.  (Attach. #2, ¶27).  Investments are made through traditional loan and security agreements and a promissory note, and Big Picture bears the responsibility to its investors.  (Attach. #2, ¶27).  One of those investors is LVD, which has invested over $7 million in Big Picture.  (Attach. #37, Aff. Chairman Williams, ¶8).

Overall, Big Picture now provides more than 10% of LVD's general fund today and has the potential to fund more than 30% of LVD's government budget in the coming years.  (Attach. #37, ¶10).  If Big Picture fails as a business or defaults on its loan obligation, LVD will lose a significant portion of its government budget and millions of its own investment, which would have dire consequences for LVD's members.  (*See* Attach. #37, ¶8-10; Attach. #2 ¶31). Collectively, Big Picture and Ascension have been able to distribute profits to LVD to serve the social, economic, education, and health and safety needs of its members:

> This revenue supports essential governmental services that would otherwise be underfunded, including education, social services programs, health care, senior services, housing, and law enforcement.  Because [LVD] does not have available to it the same avenues of revenue generation that other governmental bodies have, such as imposing property, sales, or income tax on its members, and because it is not an accessible area for traditional brick-and-mortar economic development, this essential governmental revenue comes almost exclusively from Big Picture and its online lending operation.  [Attach. #37, ¶10; LVD Comment to CFPB Small Dollar Rule.]

Specifically, revenues have been used to:

- Fund, in whole or in part, more than twenty essential government services, including LVD's housing program, court, police department, health clinic and pharmacy, member enrollment services, family services, infrastructure, cultural and historical preservation, education, and basic government operations;

- Meet leverage requirements necessary to secure $14.1MM in financing for LVD's new health clinic and to refinance casino debt;

- Fund college scholarships and pay for educational costs for members such as student housing, books, school supplies and equipment;

- Create home ownership opportunities through tribally purchased homes as well as subsidize members' home purchases and rental programs;

- Provide a bridge loan to complete the new LVD health clinic that offers medical, dental, optical, chiropractic, pharmacy, and cultural healing services to the regional community;

- Fund new vehicles for the LVD Police Department;

- Fund an Ojibwe language program and other cultural programs;

- Fund social services programs such as foster care payments for eligible children, propane purchase assistance, assistance for family care outside of the community, as well as cover burial and other funeral expenses for members' families;

- Fund renovations and new office space for the Tribe's Social Services Department;

- Fund youth activities;

- Fund courtroom and office space renovations for the Tribal Court; and,

- Fund Tribal Elder nutrition programs and Tribal Elder home care and transport services. (Attach. #2, ¶31).

The LVD Council has directed every aspect of LVD's economic development, including its tribal lending, which is demonstrated by approximately 100 LVD Council resolutions spanning the last 7 years: creating consumer financial service companies; entering and terminating agreements with business partners and investors, consultants, attorneys, vendors, etc.; making decisions on the overall structure of the lending operation; evaluating risks and benefits of bringing vendor services in-house; seeking investors; controlling the acquisitions and mergers of several of the early participants in its lending operation; authorizing the execution of documents; approving

limited waivers of immunity; enacting and amending law; overseeing the TFSRA; participating in national lending trade groups and associations, and approving tribal and business budgets.  (Attach. #37, ¶7).

### Big Picture's lending process.

Big Picture operates as an online lending business from the Reservation.  (Attach #12)   Big Picture's offices and employees are located on the Reservation.  (Attach #2, ¶25).  Big Picture's websites are hosted on servers that are located on the Reservation.  (*Id.,* ¶30(a)).  All loans are originated on the Reservation after applications are approved by Big Picture employees.  (*Id.*, ¶29).

To take a loan from Big Picture, consumers must log onto Big Picture's website and complete an application, and review and agree to the Consent to Electronic Communications with Big Picture.  (*Id.*, ¶30(a)).  The completed loan application is reviewed by Big Picture using an extensive software-based process until Big Picture either accepts or declines the loan application.  (*Id.*, ¶30(b)).  The loan transaction, at this stage, is not yet approved.  (*Id.*, ¶30(c)).

If Big Picture accepts the loan application several additional steps take place for each and every loan transaction.  (*Id.*, ¶30(c)).  First, the applicant is prompted to select their desired loan amount of up to $5,000.00 and the term of the loan, and to review their estimated annual percentage rate, which is based on the underwriting determination of the consumer's ability and willingness to repay.  (*Id.*, ¶30(c)(1-2)).  Second, the applicant is required to review in its entirety the loan agreement containing the annual percentage rate of the loan, the payment schedule, and several other disclosures.  (*Id.*, ¶30(c)(3-5)).  Third, the applicant must acknowledge and agree to the loan agreement, including terms of the loan agreement, select their payment method, and electronically sign the application.

(*Id.*, ¶30(c)(6)).  Fourth, Big Picture's on-Reservation employees perform a final verification of the loan agreement and disbursement details as well as other personally identifying information. (*Id.*, ¶30(c)(7)).  Finally, Big Picture's on-Reservation employees approve the loan transaction by reviewing the loan agreement one last time and manually typing in the date to disburse the funds, thereby authorizing the electronic approval of the loan agreement.  This approval results in loan origination and causes the loan proceeds to be sent to the customer.  (*Id.*, ¶30(c)(8)).  If the loan application is denied, the consumer receives a notice of the denial.  (*Id.*, ¶30(d)).

Big Picture uses a standard loan agreement for all consumers that is typical within the consumer lending industry.  (Attach. #38, RA Form Approving SIL Consumer Loan Agreement (Jan. 19, 2017)).  The loan agreement clearly explains that the contract is formed with Big Picture, a Financial Services Licensee duly licensed by the TFSRA operating within the TFSRA's jurisdiction.  (Compl., Ex.1, pp. 1, 2).  The loan agreement explains that when the consumer electronically signs and consents to the terms, it is treated as if the consumer physically signs the loan agreement on LVD's Reservation.  (Compl., Ex. 1, pp. 2, 6).  Significantly, the loan agreement contains two pages explaining the applicable law and the consumer's right to redress of any disputes or complaints.  (See Compl., ¶ 70).  Immediately after the governing law section, there are two sections explaining that Big Picture is shielded from unconsented suit by tribal sovereign immunity.  (Compl., Ex. 1, pp. 4–5).  Finally, the loan agreement expressly limits the consumer's "right to file suit against [Big Picture] for any claim or dispute arising from or relating to th[e] Agreement" by precluding jury trials, arbitration,[4] and class action suits.  (Compl., Ex. 1, p. 5). Instead, the loan agreement contains a detailed dispute resolution process.  (*Id.*).

---

[4] On July 10, 2017, Part 12 CFR Part 1040 was added to Chapter X in Title 12 of the Code of Federal Regulations regulating Arbitration Agreements.  Significantly, Section 1040.3 (b)(2)(ii) exempts "[a]ny State, Tribe, or other person to the extent such person qualifies as an 'arm' of a

**Plaintiffs' Complaint makes sweeping and unsupported allegations.**

Plaintiffs' Complaint amounts to a lengthy attempted policy argument against predatory lending.  There are only a handful of actual allegations against Defendants, and those few allegations are overloaded with embellishment and largely stem from unsupported articles and unrelated (and ongoing) federal indictments of non-parties.  (*See, e.g.*, ¶¶  1; 3-4; 14; 16; 21-26; 32; 44-46; 48; 49).

The Complaint alleges jurisdiction arising under RICO, 18 U.S.C. § 1965, the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), and supplemental jurisdiction for Plaintiffs' state law claims under 28 U.S.C. § 1367.  The Complaint alleges venue is proper under 28 U.S.C. § 1391(b) as Plaintiffs reside within this federal district.  The Complaint does not allege a basis for personal jurisdiction over any Defendant.

It appears from the substantive allegations that Plaintiffs theorize that Martorello established a "rent-a-tribe business" model and convinced LVD to participate in a conspiracy to violate Virginia's usury laws by using Big Picture as a front while Martorello secretly controlled the lending scheme.[5]  (*See* ¶¶ 27–32, 33–42, 54–60).  By violating Virginia law, Plaintiffs allege that Defendants also violated RICO for collecting "unlawful" debts.  (*See, e.g.*, ¶ 66).  Plaintiffs further allege that the loan agreements contain "unconscionable and unenforceable choice of law

---

State or Tribe under Federal sovereign immunity law and the person's immunities have not been abrogated by Congress."  In addition to the 1040.3 (b)(2)(ii) exemption, the new regulation addresses concerns regarding unintended waivers by adding 1040.4(a)(2)(vi) related to required disclosure/notice provisions and provides language to alleviate any waiver of sovereign immunity questions.

[5] A "rent-a-tribe" scheme has come to describe an illicit business model involving non-tribal people and entities who intend to avoid state laws by loosely affiliating with an Indian tribe and paying a nominal fee to "rent" the Indian tribe's name and protection of tribal sovereign immunity, which purportedly is intended to disguise profiteering.

and forum selection provision that seek to disclaim all laws and deprive consumers of their day in court." (¶¶ 69–70).

The Complaint alleges five causes of action:

- Count 1 seeks to certify a class for a declaratory judgment that the choice of law and forum selection provisions of the Plaintiffs' loan agreements are void and unenforceable. (¶¶ 84-94).

- Counts 2 and 3 allege class RICO claim alleging that the tribal lending activity is actually a RICO enterprise formed to create and to collect unlawful debts. Plaintiffs seek an injunction ordering Defendants to divest any interest in the lending and dissolve the businesses, as well as actual damages, treble damages, costs, and attorney's fees pursuant from Big Picture, Martorello, Ascension, and Gravel. (¶¶ 95-109; 110-18).

- Counts 4 and 5 allege class usury and unjust enrichment claims in violation of Virginia law against Big Picture, Martorello, Ascension, and Gravel and seek damages in an amount equal to the total amount of interest paid in excess of 12% plus twice the amount of such usurious interest that was paid in the two years prior to filing of the complaint, recovery of all amounts repaid on all Big Picture and Red Rock Loans, plus attorney fees and costs. (¶¶ 119-28).

Finally, the Complaint alleges Plaintiffs are entitled to damages under RICO and under Virginia law as well as other equitable relief. (¶¶ 62–65, 67, 94, 102, 109, 116, 118, 128, 139).

## ARGUMENT

Plaintiffs agree that LVD is a sovereign Indian tribe and fully shielded from unconsented suit by its inherent sovereign immunity. (*See, e.g.*, Compl. ¶ 5 n. 3 ("[T]he doctrine of tribal sovereign immunity protects [LVD] itself. . .")). Moreover, all sovereigns are immune from RICO. Thus, the parties agree that *if* Big Picture and Ascension are arms of LVD, they are also shielded from unconsented suit by tribal sovereign immunity. (Compl. ¶ 5 n. 3).

The facts clearly establish that Big Picture and Ascension are arms of LVD. For that reason, the Court must dismiss this lawsuit.

15

I.      **Because Big Picture and Ascension are arms of LVD, Plaintiffs' claims are barred by tribal sovereign immunity.**

A.      **Legal Standard under Fed. R. Civ. P. 12(b)(1).**

Tribal sovereign immunity, like the immunity of state governments or the federal government, is considered an issue of subject matter jurisdiction that is properly resolved pursuant to a motion to dismiss under Fed. R. Civ. P. 12(b)(1). *See United States v. Jones*, 225 F.3d 468, 469 (4th Cir. 2000) ("Sovereign immunity deprives a court of jurisdiction."); *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006).

The plaintiff bears the burden of establishing subject matter jurisdiction, and when subject matter jurisdiction is challenged, "the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings." *Blitz v. Napolitano*, 700 F.3d 733, 736 n. 3 (4th Cir. 2012) (citation omitted). *See also SunTrust Bank v. Vill. at Fair Oaks Owner, LLC*, 766 F.Supp.2d 686, 688 (E.D. Va. 2011).

B.      **Big Picture and Ascension, as arms of LVD, are immune from suit.**

As sovereign governments, federally-recognized Indian tribes possess common law immunity from suit. *Mich. v. Bay Mills Indian Cmty.*, 572 U.S. __, 134 S. Ct. 2024, 2030 (2014). Tribal sovereign immunity has been recognized by the Supreme Court "for well over a century," as a "core attribute" of tribal sovereignty and remains fully intact unless expressly waived by the tribe or abrogated by Congress. *Id.* at 2030, 2037, 2040 ("[I]t is fundamentally Congress's job, not [the Courts], to determine whether or how to limit tribal immunity."). It is undisputed that as a federally recognized tribe, LVD is shielded from unconsented suit by tribal sovereign immunity.

Tribal sovereign immunity is broad in scope and applies in both federal and state court. It also applies to economic instrumentalities of the tribal government, deemed "arms of the tribe." *Allen*, 464 F.3d at 1046 (9th Cir. 2006).

The Fourth Circuit has acknowledged that arms of the tribe are entitled to sovereign immunity.  *See United States v. Bly*, 510 F.3d 453, 465 (4th Cir. 2007) (Motz J., concurring) (citation omitted).  However, the Fourth Circuit has not squarely addressed *how* to determine when an entity is an arm of the tribe.  In the absence of guidance from the Fourth Circuit, district courts within the Fourth Circuit have used the most widely accepted test, which comes from the Tenth Circuit's decision in *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173 (10th Cir. 2010).  *See, e.g.*, *Everette v. Mitchem*, 146 F.Supp.3d 720 (D. Md. 2015); *Howard v. Plain Green, LLC, et al*, E.D. Va. No. 2:17CV302, WL --- (E.D. Va. August 7, 2017).  Plaintiffs have also relied upon *Breakthrough* to frame their case by citing *Breakthrough,* 629 F.3d at 1184, which explains the issue presented here:

> 'Does the resulting entity have a distinct, nongovernmental character and therefore is not immune, or is it merely an administrative convenience, *i.e.,* a "subordinate [tribal] economic organization," and therefore immune?'  Put differently, we must determine whether the Authority and the Casino are 'the kind[s] of tribal entit[ies], analogous to a governmental agency, which should benefit from the defense of sovereign immunity, or whether [they] [are] more like ... commercial business enterprise[s], instituted solely for the purpose of generating profits for [their] private owners.'  [*Breakthrough*, 629 F.3d at 1184 (quoting *Gavle v. Little Six, Inc.,* 555 N.W.2d 284, 293 (Minn.1996)); *cf.* Compl. ¶ 5 n. 4.]

*Breakthrough* requires the court to look to six factors to determine whether an entity is an arm of a tribe: (1) the method of creation of the entity; (2) the purpose of the entity; (3) the entity's structure, ownership, and management, including the Tribe's control over the entity; (4) whether the Tribe intended for the entity to have sovereign immunity; (5) the financial relationship between the Tribe and the entity; and (6) whether the purposes of tribal sovereign immunity are served by granting sovereign immunity to the entity.  *Breakthrough*, 629 F.3d at 1187.  *Howard* and *Everette*, both cases within the Fourth Circuit, have relied on *Breakthrough* to dismiss cases against tribally-

owned lending entities, and as explained below, both *Howard* and *Everette* analyze factual circumstances directly applicable to Big Picture and Ascension.

In both *Howard* and *Everette*, the court applied the *Breakthrough* factors and found that: (1) the lending entities were created pursuant to tribal law; (2) they were created to encourage tribal economic development; (3) they were wholly owned and controlled by the tribes; (4) the tribes intended for the lending entities to have sovereign immunity; (5) the revenues earned by the lending entities inure to the benefit of the tribes and were used to fund important tribal programs; and (6) granting immunity to the tribal lending entities served to promote tribal self-determination and to protect the tribes' treasuries, thus serving the historic purposes of sovereign immunity.  *See Howard*, E.D. Va. No. 2:17CV302, WL --- , Dkt. #21, at *9–13; *Everette*, 146 F. Supp. 3d at 724–25.  Both courts found *all* of the *Breakthrough* factors weighed in favor of finding that the tribal lenders were arms and instrumentalities of the tribes and thus shielded by tribal sovereign immunity.

Just as in *Everette* and *Howard*, *all* of the *Breakthrough* factors readily support the finding that Big Picture and Ascension are arms and instrumentalities of LVD and are this immune from suit.

> **1.  *Breakthrough* Factor 1: Big Picture and Ascension were created by the Tribe pursuant to Tribal law.**

The first *Breakthrough* factor weighs in favor of Big Picture and Ascension, as it cannot be disputed that both were created by LVD under LVD law.

LVD relied solely upon its Business Ordinance to create Big Picture and Ascension as wholly owned tribal LLCs.  (Attach. #10; Attach. #11; Attach. #12; Attach. #31; Attach. #16; Attach. #39, Resolution #T2016-048; Attach. #17; Attach. #18); s*ee also, e.g.*, *U.S. ex rel. Morgan Bldgs. & Spas, Inc. v. Iowa Tribe of Oklahoma*, No. CIV-09-730-M, 2011 WL 308889, at *3 (W.D.

Okla. Jan. 26, 2011) (finding a tribal business formed by the tribal business committee under tribal law and the tribe's constitution weighed in favor of finding the tribal business was a subordinate economic entity entitled to sovereign immunity).

LVD's law requires – and all evidence shows – that LVD is the sole member of both Big Picture and Ascension by virtue of TED, LVD's holding company.  (Attach. #7, Ch. 5, §8(B); Attach. #10; Attach. #11; Attach. #12; Attach. #31; Attach. #16; Attach. #39; Attach. #17; Attach. #18).   Big Picture and Ascension were created to be "wholly owned and operated instrumentalit[ies] of [LVD]."  (Attach. 7, Ch. 5, § 8(E); Attach. #10; Attach. #11; Attach. #12; Attach. #31; Attach. #16; Attach. #39; Attach. #17; Attach. #18).   Thus, this factor is straightforwardly satisfied.

### 2. *Breakthrough* Factor 2: Big Picture and Ascension's purposes are to operate LVD's tribal lending operation to further LVD's self-self-sufficiency and self-determination.

The second factor is also undisputedly in favor of Big Picture and Ascension because LVD created both companies to develop its economy by generating revenue to fund essential governmental services and to employ members.  *See e.g.*, *Team Sys. Int'l, LLC v. Haozous*, No. CIV-14-1018-D, 2015 WL 2131479, at *3 (W.D. Okla. May 7, 2015), aff'd, 656 Fed. Appx. 907 (10th Cir. 2016) ("[The Tribal business] was created by the Tribe's governing body, its general council, as a wholly owned corporation of the Tribe to fulfill a "duty to provide for the health, safety, morals and welfare of all persons within the jurisdiction of the Tribe.").

While Big Picture and Ascension's stated purposes are specific to their enumerated business functions, as critical pieces of LVD's overall economic development strategy, their purposes must be considered as contributors to the ultimate goal of strengthening LVD's self-sufficiency and self-determination.  (Attach. #12, Art. 4; Attach. #17, Art. 5).

LVD chose to shepherd its economic development by creating TED as a holding company to "diversify the economy of the Tribe's Reservation in order to improve [LVD]'s economic self-sufficiency" and to "promote the economic development of [LVD] through the development of business opportunities" and to hold subsidiaries, *e.g.*, Big Picture and Ascension, "in furtherance of economic development." (Attach #13; Attach. #14, Art. 5).

TED guides Big Picture and Ascension to work in tandem. Collectively, these companies work to develop LVD's economy and to improve LVD's economic self-sufficiency by "[enabling] LVD to better serve the social, economic, education, and health and safety needs of its members and visitors, and to provide it members with opportunities to improve their own economic circumstances." (Attach. #4, § 1.1(a)). Thus, both Big Picture and Ascension were created as pieces of the greater strategy to help LVD meet its members' needs, as well as to help LVD "pursu[e] the Tribe's goal of self-sufficiency and self-determination" and to generate revenue for LVD, to create jobs for members, and to help build a stable economy on LVD's Reservation. (*See* Attach. #4 at § 1.1(b)).

As listed above, Big Picture and Ascension have generated significant revenue for LVD to support critical government programs and services such as law enforcement, home ownership programs, health care, education funding, and programs to maintain LVD's culture and history. Moreover, as an unquantifiable benefit comes the pride and dignity of the LVD people who are improving their lives and their communities through their hard work and perseverance.

In sum, it is clear that Big Picture and Ascension's collective purpose is to generate essential revenues to further LVD's self-self-sufficiency and self-determination.

### 3. *Breakthrough Factor 3: Big Picture and Ascension are exclusively controlled by LVD.*

LVD owns and exercises *exclusive* control and management over both Big Picture and Ascension, thereby satisfying the third *Breakthrough* factor.  The entirety of LVD's economic development strategy demonstrates that LVD has plenary and exclusive control over all businesses and business decisions through its multi-tiered business and management structure.  (Attach. #12, Arts. 8–9; Attach #17, Arts. 8–9; Attach. #14, Arts. 8–9).  *See, e.g., In the Matter of Sorhaindo v Ascension Technologies, LLC*, Case No WD-005-2016-STX (V.I. Dep't of Labor August 20, 2016)(Attach. #40)(finding that Ascension is a wholly owned and operated entity of LVD, and thus tribal sovereign immunity precluded the Virgin Islands Department of Labor from bring suit).

As TED's sole owner and member, the LVD Council appoints TED's managers and has delegated certain authority to those managers.  In turn, TED appoints and has delegated certain authority to Big Picture and Ascension's managers, which are tribal members (appointed by majority vote of the LVD Council while acting as the sole member of TED).  Similarly, any of these managers may be removed only "by majority vote of the LVD Council" (Attach. #31, §5.1(d); Attach. #18, §5.1(d)).  *See also, e.g., Team Sys. Int'l*, No. CIV-14-1018-D, 2015 WL 2131479, at *3 (where a tribe's "common management" of a tribal business by the tribe's business committee weighed in favor of the extension of tribal sovereign immunity to the arm of the tribe).

Within the delegated authority, these managers possess sufficient autonomy to conduct day-to-day business operations, while significant business decisions and operational changes are tracked with a comprehensive review and approval process to document changes to: compliance management systems, internal policies and procedures, vendor oversight, and collection and settlement guidelines; the loan agreement; underwriting criteria; webpage design; marketing; and changes to the loan products. (Attach. #38).

21

The LVD Council has retained exclusive control over certain critical activities. Despite delegating management of the day-to-day operations, managers may not: borrow, pledge, assign, convey, encumber, or otherwise restrict the assets; to sell or otherwise dispose of all or substantially all of the assets; or, waive sovereign immunity. (Attach. #31, Art. 5, §5.2; Attach. #18, Art. 5, §5.2). The LVD Council also maintains oversight of its appointed mangers requiring monthly meetings to receive reports regarding business operations, changes to staffing and vendor support, budgets and estimated distributions back to LVD, and to obtain any necessary approvals.

### 4. *Breakthrough* Factor 4: The Tribe intended to vest Big Picture and Ascension with LVD's sovereign immunity.

The fourth factor in the *Breakthrough* analysis considers whether LVD intended for the entity to have LVD's sovereign immunity. In this case, it is undeniable that LVD intended to confer its sovereign immunity to both Big Picture and Ascension.

First, the LVD Council resolutions approving the formation of Big Picture and Ascension express clearly that "as a wholly owned and operated instrumentally of the Tribe, shall be possessed of all the privileges of [LVD], including but not limited to the sovereign immunity of [LVD], which shall not be waived unless authorized by the [LVD] Council." (Attach. #10; Attach. #16; Attach. #13).

Second, both Big Picture and Ascension were organized under the Business Ordinance which mandates that LVD-owned LLCs shall possess "all the privileges and immunities" of [LVD] "including but not limited to [LVD]'s sovereign immunity from suit." (Attach. #7, Ch. 5, § 8(E)). Third, Big Picture and Ascension's Articles of Organization both contain the same provision conferring immunity: "The sovereign immunity of the Company shall remain intact unless waived by the Member pursuant to a duly authorized resolution of the [LVD] Council of the [LVD]." (Attach. #12, Art. 7; Attach. #17, Art. 7).

Finally, both Big Picture and Ascension's Operating Agreements prohibit the managers from authorizing waivers of tribal sovereign immunity for either company or for LVD. (Attach. #31, Art. 5 §5.2(c); Attach. #18, Art. 5 §5.2(c)). That power rests solely with the LVD Council. (Attach. #, Art. 5 §5.2(c); Attach. #17, Art. 5 §5.2(c)).

The fact that the LVD Council has at times enacted limited waivers of sovereign immunity irrefutably evidences LVD's intent to vest Big Picture and Ascension with its tribal sovereign immunity in the first place—as otherwise, no "waiver" would be necessary. *See e.g.*, *Morgan Bldgs. & Spas*, No. CIV-09-730-M, 2011 WL 308889, at *4 (finding that a tribe may waive immunity of an arm of the tribe and not simultaneously waive the tribe's immunity).

### 5. *Breakthrough* Factor 5: Big Picture and Ascension generate revenue exclusively for LVD.

Similar to the tribal lending businesses involved in *Howard* and *Everette*, under the fifth *Breakthrough* factor, profits received from Big Picture and Ascension are all remitted to LVD and used to fund governmental services for its members, as described above. Both Big Picture and Ascension's Operating Agreements require distributions back to its member, TED, whenever cash account balances exceed $500.00. (Attach. #31, Art. 6 §6.2; Attach. #18, Art. 6 §6.2). In turn, TED has an identical provision in its Operating Agreement requiring a distribution back to LVD when cash account balances are more than $500.00. (Attach. #18, Art. 6 §6.2). Big Picture's and Ascension's profits thereby inure exclusively to LVD.

Simply put, Big Picture, Ascension, and TED cannot distribute profits to anyone other than LVD, and there is no evidence to show that any of these entities have ever distributed profits to anyone other than LVD.

An additional aspect of *Breakthrough's* "financial relationship" factor that is not preset in *Howard* or *Everette* is LVD's investor relationship with Big Picture. (*See* Attach. #37, ¶9). As

one of Big Picture's investors, LVD not only earns profit as the sole equity owner, but also earns additional revenues through interest on its investment.  (*Id.*)  Thus, the case for sovereign immunity here is itself even strong than that which was present in *Howard* and *Everette.*

> 6.   ***Breakthrough*** **Factor 6: The purpose of sovereign immunity is furthered by extending LVD's sovereign immunity to Big Picture and Ascension.**

In *Howard*, this Court examined "the policies underlying tribal sovereign immunity and its connection to tribal economic development" to determine "whether those policies are served by granting immunity to the economic entity." *Howard,* E.D. Va. No. 2:17CV302, WL --- at *11–12 (internal citations omitted).  Such economic policies included the "protection of the tribe's monies, as well as preservation of tribal cultural autonomy, preservation of tribal self-determination, and promotion of commercial dealings between Indians and non-Indians." *Id.*  Similarly, in *Everette*, the court found that extending sovereign immunity to a tribe's lending businesses protects the tribe's treasury, which is "one of the historic purposes of sovereign immunity in general." *Everette*, 146 F. Supp. 3d at 725.  The same is true here.

As discussed above, LVD relies heavily on the revenues generated from Big Picture and Ascension to fund government services relied upon by its members.  More than 10% of LVD's current general fund budget is dependent upon revenue generated from Big Picture.  That translates to 180 on-Reservation jobs (with benefits) that are funded both directly and indirectly by Big Picture and Ascension revenues.  By 2020, it is expected that revenue from Big Picture will be LVD's primary source of income, exceeding all other revenue.

Indeed, extending sovereign immunity to Big Picture and Ascension, as LVD intended, protects a significant source of the Tribe's revenue, thereby serving "one of the historic purposes of sovereign immunity in general." *Everette*, 146 F.Supp.3d at 725.  The extension of sovereign

24

immunity also "plainly promote[s] and fund[s] the Tribe's self-determination through revenue generation and the funding of diversified economic development." *Breakthrough*, 629 F.3d at 119. *See also In re Intramta Switched Access Charges Litig.*, 158 F. Supp. 3d 571, 575 (N.D. Tex. 2015) (where the court found economic, social, and other benefits were provided to tribes by arms that "as tribally owned and controlled telecommunications companies, not only are they providing important benefits to their reservations and members, but the telecommunications and broadband services they provide their members—including access to health, education, and emergency services—are fully consistent with the federal government's longstanding policy of encouraging tribal self-sufficiency and economic development.").

As such, the sixth *Breakthrough* factor weighs heavily towards the extension of sovereign immunity to Big Picture and Ascension as these businesses promote economic development and LVD's self-sufficiency—central purposes underlying tribal immunity.

In sum, *all* of the *Breakthrough* factors support the extension of LVD's sovereign immunity to Big Picture and Ascension as arms of LVD.

## C.      As arms of LVD, Big Picture and Ascension are immune from Plaintiffs' RICO claims

For the reasons above, Big Picture and Ascension are arms of LVD.  Stated plainly, no court has found that RICO is applicable to any sovereign or otherwise abrogates sovereign immunity.  See *Smith v. Babbit,* 875 F.Supp. 1353, 1365 (D. Minn.1995), *aff'd,* 100 F.3d 556 (8th Cir.1996), *cert. denied sub nom. Feezor v. Babbitt,* 522 U.S. 807 (1997).[6]  As RICO contains no

---

[6] *See also United States v. Bonanno Org. Crime Fam. of La Cosa Nostra*, 879 F.2d 20, 23 (2d Cir. 1989) (concluding that Section 1964(c) does not evince an unequivocal expression of congressional intent to expose the U.S. government to RICO liability); *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 914 (3rd Cir.1991) (stating that a RICO civil action may not be maintained against a municipality because a municipality cannot be liable for the treble damages imposed in such an action.); *McNeily v. United States*, 6 F.3d 343, 350 (5th Cir. 1993) (rejecting plaintiff's

language which suggests Congress "unequivocally" waived Indian tribes' sovereign immunity, LVD and Big Picture and Ascension are immune from Plaintiffs' RICO claims.[7]

For these reasons, Big Picture and Ascension respectfully requests this Court grant dismissal under 12(b)(1) as they are arms of LVD and entitled to tribal sovereign immunity.

### D. Big Picture and Ascension join and incorporate the LVD Officers' motion to dismiss.

To avoid burdening the Court with duplicative briefing, Big Picture and Ascension join and incorporate by reference the authorities and legal arguments cited in the LVD Officers motion to dismiss and other substantive motions filed by the LVD Officers.

---

attempts to sue the FDIC under RICO); *Berger v. Pierce*, 933 F.2d 393, 397 (6th Cir. 1991) (stating that "it is clear that there can be no RICO claim against the federal government."); *Buchanan v. Sokaogon Chippewa Tribe*, 40 F. Supp. 2d 1043, 1047 (E.D. Wis. 1999) (holding that Congress has not authorized RICO claims against an Indian tribe, and the Indian tribe had not waived immunity for RICO claims, tribal sovereign immunity barred the claims.) *cf. Snowbird Constr. Co. v. US*, 666 F.Supp. 1437, 1440-41 (D.Idaho 1987) (court held that Indian tribe sovereign immunity did not bar RICO suit against a housing authority established by a tribal council only after concluding that "sue and be sued" language set forth in tribal ordinance "unequivocally expressed" waiver of housing authority's sovereign immunity thereby allowing adjudication of RICO suit).

[7]Under Rule 12(b)(2), Big Picture and Ascension protest personal jurisdiction in this district, as Plaintiffs have exploited RICO solely as a mechanism to forum shop which underlies the purposes of RICO and makes personal jurisdiction unreasonable. The exercise of personal jurisdiction will only be reasonable if it does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., Office of Unemp't Comp. and Placement*, 326 U.S. 310, 316 (1945). Moreover, to the extent that Virginia has honored loan agreements with interest rates that exceed Virginia law, RICO should be inapplicable as this matter is readily resolved by treating Big Picture as the Virginia Supreme Court has treated similarly situated lenders. *See, e.g.*, *Settlement Funding, LLC v. Von Neumann-Lillie*, 274 Va. 76, 81 (2007) (where the Virginia Supreme Court enforced a choice of law provision applying law without limits on loan interest rates). However, to the extent that the Fourth Circuit is in discord with the other circuits and has held that § 1965(d) authorizes nationwide service of process and venue without evidence of any minimum contacts within the district, Big Picture and Ascension will reserve its rights and not belabor the argument. *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997).

## CONCLUSION

For the reasons stated above, the Court should find that Big Picture and Ascension are arms of LVD and entitled to the extension of sovereign immunity, which precludes Plaintiffs' claims. As such, Big Picture and Ascension respectfully request that this Court grant their Motion to Dismiss and dismiss this matter with prejudice.

**BIG PICTURE LOANS, LLC, ASCENSION TECHNOLOGIES, INC.**

By:/s/David N. Anthony
David N. Anthony
Virginia State Bar No. 31696
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
Email: david.anthony@troutmansanders.com

Karrie Sue Wichtman (admitted *pro hac vice*)
Justin A. Gray (admitted *pro hac vice*)
ROSETTE, LLP
25344 Red Arrow Highway
Mattawan, MI 49071
Telephone: (269) 283-5005
Facsimile: (517) 913-6443
Email: kwichtman@rosettelaw.com
Email: jgray@rosettelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of September, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will then send a notification of such filing (NEF) to the following:

Kristi C. Kelly
Andrew J. Guzzo
Casey S. Nash
KELLY & CRANDALL PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA  22030
Telephone: 703-424-7570
Facsimile: 703-591-0167
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com
Email: casey@kellyandcrandall.com
*Counsel for Plaintiffs*

James W. Speer
VIRGINIA POVERTY LAW CENTER
919 E. Main Street, Suite 610
Richmond, VA  23219
Telephone: 804-782-9430
Facsimile: 804-649-0974
Email: jay@vplc.orga
*Counsel for Plaintiffs*

David F. Herman
Jonathan P. Boughrum
Richard L. Scheff
MONTGOMERY MCCRACKEN WALKER
& RHOADS LLP
123 S Broad Street
Philadelphia, PA 19109
Telephone: 215-772-1500
Facsimile: 215-772-7620
Email: dherman@mmwr.com
Email: jboughrum@mmwr.com
Email: rscheff@mmwr.com
*Counsel for Defendant Matt Martorello*

/s/ David N. Anthony
David N. Anthony
Virginia State Bar No. 31696
*Counsel for Defendants*
TROUTMAN SANDERS LLP
1001 Haxall Point
Richmond, Virginia 23219
Telephone: (804) 697-5410
Facsimile: (804) 698-5118
Email: david.anthony@troutmansanders.com

28