**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

|  |  |  |
|---|---|---|
| LULA WILLIAMS, GLORIA TURNAGE, GEORGE HENGLE, DOWIN COFFY, and FELIX GILLISON, JR., *on behalf of themselves and all individuals similarly situated,* | : : : | |
| Plaintiffs, | : | |
| v. | : | CIVIL ACTION NO. 3:17-cv-461 |
| | : | |
| BIG PICTURE LOANS, LLC, MATT MARTORELLO, ASCENSION TECHNOLOGIES, INC., DANIEL GRAVEL, JAMES WILLIAMS, JR., GERTRUDE MCGESHICK, SUSAN MCGESHICK, and GIIWEGIIZHIGOOKWAY MARTIN, | : : : : : | |
| Defendants. | : | |
| | : | |

**DECLARATION OF MATTHEW MARTORELLO IN SUPPORT OF**
**DEFENDANTS BIG PICTURE LOANS, LLC AND ASCENSION**
**TECHNOLOGIES, LLC'S REPLY IN SUPPORT OF THEIR**
**MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

I, Matthew Martorello, being of lawful age and competency and upon my oath, do declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. My name is Matthew Martorello. I am competent to testify regarding the matters set forth herein. I have personal knowledge of the facts stated in this declaration and know them to be true. I am a defendant in the above captioned lawsuit.

I.      **BACKGROUND**

2.   I am aware that in connection with the above captioned suit, Defendants Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, [LLC]'s ("Ascension's") filed a Motion to Dismiss for lack of Subject Matter Jurisdiction ("Motion").

3.   Plaintiffs had noticed my deposition for October 30, 2017.  Plaintiffs claimed that my deposition was necessary to support their jurisdictional arguments opposing, among other things, the Motion.

4.   Plaintiffs unilaterally cancelled my deposition and have not sought information from me relating to the issues raised in Big Picture and Ascension's Motion.

5.   I am also aware that on December 7, 2017, Plaintiffs filed their Opposition to Defendants Big Picture Loans, LLC and Ascension Technologies, LLC's Motion to Dismiss for lack of Subject Matter Jurisdiction ("Opposition").

6.   I have reviewed both Plaintiffs' Complaint and their Opposition and have found both to be filled with abundant misrepresentations, half-truths, and frequent false statements.

7.   For example, neither I nor any company I own or manage have entered into any loan contracts with consumers under the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD").

8.   Neither I nor any company I own or manage have entered into any contracts with consumers under LVD laws that contain a choice-of-law clause requiring the application of LVD laws.

9.   Neither I nor any company I own or manage have ever purchased any consumer loan originated by LVD or by any of LVD's wholly owned and operated companies.

10. Additionally, neither I nor any company I own or manage have ever collected or attempted to collect any consumer debts originated by LVD or any of its wholly owned and

operated companies including: Big Picture, Ascension, Red Rock Tribal Lending, LLC ("Red Rock"), and Duck Creek Tribal Financial, LLC ("Duck Creek").

11. As detailed below, I have found many additional misrepresentations and half-truths within Plaintiffs' Complaint and motion briefs filed in this matter.

12. Had Plaintiffs called me for testimony, I would have testified consistent with this affidavit and corrected many of Plaintiffs' misrepresentations and false statements.

## II.    HISTORICAL EVENTS

13. Plaintiffs' repeatedly label my relationship with LVD as a "rent-a-tribe" venture or enterprise.  This is false and conclusory label Plaintiffs have self-servingly applied to legitimate business transactions both to create a cause of action and now in an effort to avoid dismissal of this lawsuit.

### A.    LVD approached Martorello in 2011 to assist them create and grow online lending businesses.

14. In mid-2011, I learned that LVD had identified me as a potential consultant..

15. Before LVD approached me in 2011, I was not familiar with issues of Indian sovereignty.  As such, before agreeing to serve as a consultant to LVD, I personally engaged multiple attorneys who were experienced with Native American sovereignty and the legality of the sovereign lending businesses for advice and consultation.

### B.    Red Rock Tribal Lending

16. Related to LVD's desire to begin online consumer installment lending, I learned that on September 11, 2011 LVD formed Red Rock by Tribal Council Resolution 2011-041 and under LVD's Limited Liability Company ordinance.

17. I was not involved in the creation of Red Rock, but made aware Red Rock had been formed.

18. I have never been a member of Red Rock.  I have never had any ownership interest in Red Rock.  No company I own or manage has ever been a member or owner of Red Rock.

19. At one point, I personally reviewed Red Rock's Articles of Organization for Red Rock, and understood that LVD was the sole member of Red Rock.

20. I understood that Red Rock's governing documents provided that it would be managed by two co-managers.

21. I have never served as a co-manager of Red Rock.  No company I own or manage has ever served as a co-manager of Red Rock.

22. As a consultant to Red Rock, I made suggestions and offered advice to Red Rock's co-managers.  Red Rock's co-managers were ultimately responsible for all decisions regarding Red Rock's operation.  I have never made a decision on behalf of Red Rock.  No company I own or manage has ever made any decision on behalf of Red Rock.  Any action I took on behalf of Red Rock was either authorized by my contractual relationship or delegated to me by Red Rock.

23. I have never originated a consumer loan on behalf of Red Rock.  No company I own or manage ever originated a consumer loan on behalf of Red Rock.

24. At all times, Red Rock made the final decision to lend to a consumer. Additionally, only Red Rock's co-managers reviewed and approved all marketing materials and campaigns, including the prescreening of credit reports.

25. I have never purchased, in whole or in part, any consumer loan originated by Red Rock.  No company I own or manage has ever purchased, in whole or in part, any consumer loan originated by Red Rock.

26. I have never taken any action to collect, in whole or in part, any consumer loan originated by Red Rock.  No company I own or manage has ever taken any action to collect, in whole or in part, any consumer loan originated by Red Rock.

27. Red Rock provided companies Bellicose and SourcePoint certain limited access to bank accounts pursuant to a deposit access control agreement ("DACA").  All DACAs were approved by both the co-managers of Red Rock and LVD's Tribal Council.  The DACAs permitted companies I owned and managed to perform banking services for Red Rock.  All such services were performed pursuant to a servicing agreement with Red Rock.  At all times and at their sole discretion either Red Rock or LVD could have terminated the DACAs.

28. Plaintiffs have alleged that I had control over Red Rock's bank accounts.  I have been a signatory on certain accounts only in a capacity to facilitate accounts payable, and never without express contractual or delegated authority. I was never able to take action with any accounts unless authorized by contractual or delegated authority from Red Rock or LVD.

C.     **The Servicing Agreements between SourcePoint and Red Rock.**

29. Under an October 25, 2011 written servicing agreement ("Servicing Agreement"), a company I owned Bellicose VI, LLC ("Bellicose VI"), provided consulting services to Red Rock.

30. On April 15, 2012, Bellicose VI assigned the Servicing Agreement to SourcePoint VI, LLC ("SourcePoint").  SourcePoint was a wholly owned subsidiary of Bellicose Capital, LLC ("Bellicose").  I had an ownership interest in Bellicose.

31. SourcePoint hired Bellicose's employees to perform services to Red Rock under the Service Agreement.  For example, I was an employee of Bellicose and my consulting services to LVD were via this relationship.

-5-

32. To my knowledge, from the formation of Red Rock until mid-February 2016, Red Rock's customers made payments according to the terms of their loan agreements.

33. I am familiar with the Servicing Agreement between Red Rock and SourcePoint and have reviewed again very recently and in light of Plaintiffs' allegations.

34. Contrary to what Plaintiffs have represented to the Court, Red Rock did not receive two percent of the *net* revenues under the terms of the Servicing Agreements.  Instead, as the documents I have reviewed that were provided in discovery demonstrate LVD chose to structure their arrangement to stabilize their monthly income as a percentage of *gross* revenues, adjusted for bad debts.

35. In addition to the distributions, under the Servicing Agreement, LVD received and retained the significant additional economic value of ownership of all intellectual property developed under the agreement by SourcePoint.

36. LVD suggested this form of revenue split as it guaranteed LVD's lending entities would always generate income for LVD's general fund while simultaneously incentivizing SourcePoint to assist LVD in the growth and the maintenance of an efficient and successful business for the benefit of LVD.

37. Plaintiffs' arguments conflate "adjusted gross income," "net income," and "net profit," which are very different concepts, and Plaintiffs have repeatedly mischaracterized and interchanged these terms in a misleading fashion before this Court.

38. For example, Plaintiffs have represented to the Court that "the loans generated a net profit of $161.9 million" during the period from January 1, 2014 through August 31, 2015. (ECF No. 84 at 22.)  But my review of the materials shows that the figure of $161.9 million is ***not*** net profit—it is the adjusted ***gross*** revenue.  Indeed, from the $161.9 million, SourcePoint

and Red Rock were separately required to pay tens of millions of dollars to their vendors and creditors. Amounts paid to vendors and creditors are all common items which a business must deduct from gross income to determine its actual net profit.

39. Under the Servicing Agreement, neither I nor SourcePoint were permitted to bind or obligate Red Rock in any way inconsistent with the Servicing Agreement.

40. SourcePoint was contractually required to assist LVD in identifying and negotiating contracts with service providers and vendors. Under the Servicing Agreement, contracts proposing any waiver of Red Rock's sovereign immunity were required to be executed by Red Rock after consultation and approval by LVD's Tribal Council.

41. Under the Servicing Agreement, Red Rock made the final decision on whether to lend to specific customers. Neither I nor SourcePoint has ever made the decision to lend to a specific consumer on behalf of Red Rock. Instead, SourcePoint made underwriting recommendations to Red Rock's co-managers who reviewed and independently decided whether to implement.

42. Plaintiffs have also cynically elided portions of e-mails in an effort to present a skewed and false narrative to the Court. Specifically, Plaintiffs have repeatedly characterized an e-mail supporting the false notion that SourcePoint "identified potential borrowers" and marketed loans to those borrowers by directing mass mailings to the eligible consumers without any involvement from LVD or its co-managers. (ECF No. 84 at 5 n.6.) But when considering the full text of the e-mail without Plaintiffs' elisions, the context makes clear that the Red Rock's co-managers were required to approve the suggested action, and the employee is actually e-mailing the co-managers to "request a phone call with one or both of you this afternoon to review an extremely important recommendation for Red Rock," – specifically SourcePoint's

recommendation.  Such recommendations from SourcePoint and co-manager approvals were required under the plain language of the Servicing Agreement, and were the routine and regular business practice of SourcePoint and Red Rock.

43. Under the plain terms of the servicing agreement, SourcePoint was paid to "develop and recommend" procedures and policies for certain items for Red Rock, including, but not limited to: financial reporting, financing, compliance, marketing, human resources, managing third-party vendor relationships, collections, and risk assessment.  In this way SourcePoint was required to develop intellectual property for the benefit of LVD and which LVD owned.  Obtaining this intellectual property provided significant assets to LVD throughout their relationship with SourcePoint.

44. Under the Servicing Agreement, Red Rock paid SourcePoint to develop potential marketing campaigns for Red Rock.  SourcePoint did not simply implement these marketing campaigns on behalf of Red Rock, but instead presented the marketing strategies to Red Rock's co-managers for their evaluation and ultimate approval or rejection.

45. Under the Servicing Agreement, Red Rock paid SourcePoint to develop underwriting criteria to recommend for implementation by Red Rock.  SourcePoint did not simply implement these underwriting criteria on behalf of Red Rock, but instead presented the underwriting criteria to Red Rock's co-managers for their evaluation and ultimate approval or rejection.

46. Under the Servicing Agreement, Red Rock provided SourcePoint with the exclusive opportunity to act as a consultant to LVD's lending businesses.  This exclusivity provision provided significant benefits to both parties, and was only effective so long as

-8-

SourcePoint was assisting Red Rock to generate sufficient business and returns for LVD's benefit.

### III.     THE SALE OF BELLICOSE TO LVD

47. Since the beginning of my relationship with LVD, I understood that LVD had always intended to utilize my consulting services to assist them to build their valuable IP and to better understand how to run a successful online consumer lending business.

48. As LVD gained additional knowledge and sophistication, I understood that LVD had always intended to increase its ability to manage and run a successful lending business while decreasing outsourced consulting services.

49. To that end, since at least 2012, LVD and I have engaged in multiple conversations relating to the potential sale of my consulting businesses to LVD to accelerate LVD's ability to maintain a profitable online consumer lending business with no outsourced consulting services.

50. As a result of these discussions, I was aware that on or about February 2015, LVD transformed its tribal lending business infrastructure to prepare to purchase Bellicose and ensure protections for LVD, including liability limitations.  I learned that around this time LVD formed Tribal Acquisition Company, LLC ("TAC"), Tribal Economic Development Holding, LLC ("TED"), Big Picture, and Ascension Technologies.

51. Eventually we agreed to a seller-financed transaction with non-fixed payments over a fixed seven-year term (with full forgiveness of all remaining amounts at the end of the seven-year term).  LVD believed this structure enabled LVD to accomplish its goals of economic self-sufficiency while also providing the seller with the best chance of maximizing its return during the seven-year term of the Note.

52. After the basic structure of a deal was agreed to, I continued to negotiate with LVD for several more months over many provisions of the sale.

53. On January 26, 2016, TED bought Bellicose and Eventide became the seller-financier.  The transaction was memorialized by a promissory note ("Note") and other necessary documents.

54. The transaction obligated TED to pay up to $300,000,000.00 to Eventide over a seven-year term.  However, under the plain terms of the Note, TED will make variable payments of principal and interest to Eventide over the seven-year term of the Note.  After seven years, all principal and interest remaining unpaid is forgiven in full by Eventide.

55. LVD wanted the ability to make variable monthly payments as opposed to fixed monthly payments.  I understood that these variable payments were intended to ensure that LVD would consistently receive necessary funds to help support its citizens and government.  Because of the cyclical nature of online installment lending, LVD believed that fixed monthly payments of principal and interest might inadvertently and unintentionally force a default under loan agreements by and between Big Picture and its independent creditors thereby substantially impacting business operations during months where revenues were unable to support the fixed payment amounts.

56. In connection with the seven-year term of the Note, the variable payments provide the possibility for TED to pay substantially less than the full $300,000,000 without the risk of jeopardizing future revenue streams for LVD.  Additionally, in connection with the firm termination date for the Note, LVD is able to anticipate tens of millions of dollars in additional revenues beginning as soon as the Note is paid off in full or terminates after seven years with significant loan forgiveness.

-10-

57. Payments to Eventide under the Note are made as follows:  First, Big Picture makes a distribution to TED based on Big Picture's *gross* revenues.  Second, TED distributes a portion of that to LVD and has chosen to re-invest a portion of *gross* revenues back into Big Picture to be used to grow Big Picture's business.  (It should be noted that the percentages of gross revenues distributed increases over the course of the Note.  For example, effective January 1, 2017, the parties agreed to a 1% increase (from 2% to 3%) in the monthly distribution calculation and a 3% increase (a total of 6% of the gross revenue calculation).  Third,  Big Picture pays its creditors, vendors, and all other expenses of the business.

58. Only if there is money remaining after the payments described above and TED's reserve for the growth of the business are the remaining funds paid to Eventide.

59. Because payments to Eventide are made *after* payment of the expenses of the business, the Note requires TED to submit budgets and expenses Eventide, which allows Eventide an opportunity to ensure that Big Picture and Ascension paid market rates for ordinary and necessary business expenses, and did not inflate expenses to deprive Eventide of payments. The reports allow Eventide to protect its interests.

60. Under the Note, to protect its interests, Eventide may inquire or object to certain expenses.  Eventide has never unreasonably withheld its consent to expenses, nor has it objected to the reasonable expansion of the business – even when expansion created additional debt for Big Picture which meant smaller (or no) payments to Eventide.

61. Under the Note, regardless of whether Eventide receives its payments, however, LVD *__always__* receives income and principal reinvestments each month as a percentage of the businesses' gross revenue.

62. Under this waterfall payment methodology, there are often months in which Eventide receives no principal payment under the Note from TED because TED has no net income from which to make a payment to Eventide. Since the close of the transaction, Eventide has not received a payment on the Note on at least five occasions. TED, however, always receives 100% of the Net Income of Big Picture Loans, and is guaranteed its distribution and equity reinvestments each month.

63. With every Note Payment made, TED is paying down its principal and the Tribe is receiving equity consideration as consistently recorded on its audited financial statements. Since the close of the transaction, Eventide note payments have amounted to $21,375,922.10, while the Tribe's total economic consideration obtained under the Note totals $28,184,007.69. As such, the Tribe has received the majority of economic benefit since the close of the Transaction.

64. The Note carries a fixed interest rate of 1.8% per year.  In my experience this interest rate is significantly below the rate at which LVD could go into the marketplace and borrow funds.

65. After the sale was complete, neither I nor any company I own or manage had any involvement in the transfer of the assets sold to TAC.

66. Neither I nor any company I own or manage had any involvement in the decision to create TED.

67. Neither I nor any company I own or manage directed or controlled the creation of Big Picture.

68. Neither I nor any company I own or manage directed or controlled the creation of Ascension.

69. Contrary to the allegations of Plaintiffs, the decision to sell Bellicose to LVD was not motivated by impending threats of litigation or enforcement actions by government agencies. Indeed, much of the discussions as to the motivation behind the sale transaction described by Plaintiffs' Complaint are nonsensical and are temporally problematic.  Plaintiffs claim there were certain "motivating factors" for the sale which, in reality, occurred eighteen months to three years before the sale transaction closed.

## IV.  SINCE JANUARY 2016, MARTORELLO HAS ONLY BEEN A CREDITOR

70.  Since the close of the sale transaction in January 2016, I have had only had limited involvement with LVD and its businesses related to the Note and at times anecdotal ideas or recommendations related to the online lending industry as a whole.

71.  I have never accessed any of the software systems, databases, bank accounts or records of TED.

72.  I have never had any involvement in the operations of TED.

73.  I have never made any decisions on behalf of TED.

74.  I have never provided any consulting services to TED.

75.  I have never solicited investors on behalf of TED.

76.  I have never made any decisions on behalf of Big Picture.

77.  I have never provided any consulting services or advice to Big Picture, LLC as to how to operate their business.

78.  I have never hired or fired any employee of Big Picture.

79.  I have never made the decision whether or not to lend to any consumer on behalf of Big Picture.

80.  I have never suggested marketing strategies to Big Picture.

81.  I have never suggested underwriting criteria to Big Picture.

82.  I have never suggested policies and procedures to Big Picture.

83.  I have never accessed any of the software systems, databases, bank accounts or records of Big Picture.

84.  I have never provided services of any kind to Big Picture.

85.  Since January 2016, Big Picture's co-managers have come to me on occasion requesting permission from Eventide to undertake expenses for Big Picture which exceeded budgeted expenses.  I had no role in proposing or suggesting the undertaking of such expenses. I have never objected to the recommendations and requests from the co-managers of Big Picture.

86.  As far as I am aware, Big Picture's co-managers make all decisions on behalf of that company.

87.  I have never accessed any of the software systems, databases, bank accounts or records of Ascension.

88.  I have never made any decisions on behalf of Ascension,

89.  I have never provided any consulting services or advice to Ascension as to how to operate their business.

90.  I have never hired or fired any employee of Ascension.

91.  I have never suggested marketing strategies to Ascension.

92.  I have never suggested underwriting criteria to Ascension.

93.  I have never suggested policies and procedures to Ascension.

94.  I have never solicited investors on behalf of Ascension.

95.  I have never assisted Ascension to provide any services to Big Picture.

96.  I have never provided services of any kind to Ascension.

-14-

97.   As far as I am aware, Ascension's co-managers make all decisions on behalf of that company.

## V.       PLAINTIFFS' MISREPRESENTATIONS

98.   I have reviewed Plaintiffs' Complaint in this matter.

99.   Plaintiffs' Complaint is filled with numerous misleading statements, which I believe were crafted by Plaintiffs' attorneys, which do not reflect historical facts as they occurred and to me it seems clear that Plaintiffs never engaged in a sufficient investigation into the underlying facts.

100. For example, Plaintiffs allege that "Matt Martorello approached the Lac Vieux Desert Band of Lake Superior Chippewa Indians for the purpose of establishing a rent-a-tribe scheme." (Compl. ¶ 3.)  Similarly, the Complaint alleges that I was an "architect" of a rent-a-tribe scheme.  (Compl. ¶¶ 14, 28.)  Both statements are demonstrably and verifiably false.  LVD had already decided to engage in online lending and the structure in which they were going to do it before they approached me to provide consulting services.

101. Similarly, Plaintiffs allege that "Martorello's company, Bellicose, funded the loans, controlled the underwriting, and handled the day-to-day operations of the business." (Compl. ¶ 3.)  This statement is demonstrably false.  Neither I nor Bellicose have ever funded any loans made to consumers by any of LVD's lending businesses.  Neither I nor Bellicose have "controlled" any underwriting criteria used by and of LVD's lending businesses – at all times the LVD business retained full control over the underwriting criteria used to make loans to consumers.  Neither I nor Bellicose have controlled the day-to-day operations of Big Picture.

102. Plaintiffs allege that "Martorello and Bellicose helped form Big Picture and Red Rock…."  (Compl. ¶ 29.)  Neither I, nor Bellicose, helped form Big Picture or Red Rock.

103. Plaintiffs allege that "Bellicose was the *de facto* owner and controlled the operations of the [sic] Big Picture and Red Rock." (Compl. ¶ 31.) Bellicose did not own, *de facto* or otherwise, Big Picture or Red Rock. Bellicose did not have any ownership interest in Big Picture or Red Rock. Bellicose did not control the operations of Big Picture or Red Rock. Bellicose could not bind or otherwise make any decisions relating to the operation of Big Picture or Red Rock without the express approval of LVD or those entities' co-managers.

104. Plaintiffs allege that "upon information and belief, the money loaned to Plaintiffs was transferred from a bank account owned and operated or controlled by Bellicose and Martorello, and neither the Tribe nor its officials were allowed access [to] the accounts." (Compl. ¶ 36.) I did not fund any loans to Plaintiffs. Bellicose never funded any loans to Plaintiffs. Neither I nor Bellicose have ever owned any of Big Picture, or Red Rock's consumer accounts.

105. Plaintiffs allege that "neither Big Picture nor Red Rock ever accepted consumer payments after the loan agreement was executed. Rather, all payments went to Bellicose…" (Compl. ¶ 37.) Bellicose has never accepted or collected a consumer loan payment under any loan agreement originated by Big Picture or Red Rock.

106. Plaintiffs' allege that Bellicose procured consumer reports and sent correspondences to Virginia consumers in February of 2017. (Compl. ¶¶ 39-40.) At the time alleged, Bellicose had merged into TAC and no longer had any legal existence. As such, neither I nor Bellicose took the action alleged in ¶¶ 39 and 40 of the Complaint.

107. Throughout the Complaint, Plaintiffs allege that I collected debts from Virginia consumers and chose to make loans to Virginia consumers. As I understand LVD's lending, all loans are made from LVD's reservation to customers based on criteria other than the customers'

locations.  I have never collected any debts from any consumers in Virginia.  I have never had any control over Red Rock or Big Picture's lending decisions, including the decision to lend in any particular state.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: __12/21/17__          BY: _____

Matthew Martorello