

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LULA WILLIAMS, et al.,
on behalf of themselves and all
individuals similarly situated,

    Plaintiffs,

v.                     Civil Action No. 3:17-cv-461

BIG PICTURE LOANS, LLC, et al.,     **PUBLIC VERSION**[1]

    Defendants.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANTS BIG PICTURE LOANS AND ASCENSION TECHNOLOGIES' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION (ECF No. 22). Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, Inc. ("Ascension") argue that the Court lacks subject matter jurisdiction over all claims asserted against them because they qualify as arms of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("the

---

[1] This opinion was initially filed under seal on July 3, 2018. See Memorandum Op. (ECF No. 130). The Clerk provided copies of the sealed opinion to Plaintiffs, Big Picture, and Ascension, who were given fourteen days to request that certain information in the public version of the opinion remain sealed. See ECF No. 131 at 1-2. Following that order, Big Picture and Ascension indicated that the majority of the documents cited or discussed in the opinion could be unsealed, or could remain sealed with only limited redactions that would not affect the opinion. See Response to July 3 Order (ECF No. 133) at 4-9. The Court agreed with their proposed approach, and minor changes have been made to the opinion to account for the unsealing and re-filing of certain documents. See ECF No. 143.

Tribe") and are thereby entitled to tribal sovereign immunity. For the reasons set forth below, the motion was denied. See ECF No. 124.

**BACKGROUND**

A. **Factual Background**

1. **Tribal Regulatory Structure**

The Tribe is a federally recognized Indian tribe, and its members reside close to their ancestral homeland near Watersmeet, Michigan. 25 U.S.C. § 1300h(1)-(2). Its status as an "independent tribal entity" has consistently been reaffirmed. See id. § 1300h-2(a). As a result, the Tribe is a sovereign entity that can create its own laws and regulations.

To that end, the Tribe adopted its current constitution on May 14, 1992 ("the LVD Constitution") for the Tribe's "government, protection and common welfare." ECF No. 23-1 at 1, 19. Among other things, the LVD Constitution established the Tribe's council ("the LVD Council"), granting it the authority to, inter alia, enact law, including ordinances and regulations; manage the Tribe's economic affairs; and "promote and protect the health, safety, education, and general welfare of the [Tribe] and its members." Id. art. IV, § 1(a)-(b), (f). The Council could also charter organizations and delegate them with

the authority to manage the Tribe's economic affairs. Id. § 1(j).

The Tribe initially pursued economic self-sufficiency by opening a casino in the late 1990s. The casino provided significant revenue for the Tribe until 2008, when the recession severely limited the casino's revenue stream and forced the Tribe to explore other avenues to improve its finances. One of these steps was to start tribal businesses in certain areas, such as online lending, that would yield profits for the Tribe. Hazen Aff. (ECF No. 34-1) ¶¶ 2-5.

On July 8, 2011, the LVD Council enacted the Tribal Consumer Financial Services Regulatory Code ("the Code"), which legalized online lending by the Tribe. July 8, 2011 Resolution (ECF No. 23-5) at 1; Nov. 18, 2011 Resolution (ECF No. 23-3) at 1-2. The purpose of the Code was, inter alia: (1) to "[d]iversify and expedite the development of the [Tribe's] economy" in order to "improve the Tribe's economic self-sufficiency [and] to enable the Tribe to better serve the social, economic, educational, and health and safety needs of its members and visitors"; (2) to "[e]nsure that all consumer financial services profits are used for the benefit of the Tribe and [it]s community"; and (3) to "[e]nsure that the Tribe provides a Tribal-based forum for the fair and orderly

resolution of consumer financial services disputes consistent with the Tribe's preservation of sovereign immunity." Code (ECF No. 23-4) §§ 1.1(a), 1.2(a), (c), (g). The Code required that all entities offering tribal consumer financial services obtain licenses through a particular licensing process, as part of which licensees had to certify that they would "abide by all applicable Tribal and Federal laws, regulations and policies." Id. §§ 1.3(d), 5-7, 5.2(b)(8). It also established specific rules for certain financial services transactions, including small loans transactions. See id. § 11.

The Code also created the Tribal Financial Services Regulatory Authority ("the TFSRA") to enforce the Code and regulate licensees. Id. § 4.1. As a governmental subdivision of the Tribe, the TFSRA was "under the direction and control of the [LVD] Council." Id. § 4.4. However, the Code granted the TFSRA certain independent powers, including, as relevant here, the powers: (1) to "promulgate, adopt, and enforce regulations and rules furthering the purpose and provisions of the th[e] Code"; (2) to discipline licensees and other persons "by ordering immediate compliance, issuing fines and sanctions, and suspending or revoking any [l]icense pursuant to the hearings and due process required by Section 4.18 of th[e] Code"; and (3) to investigate any licensee or person engaging in consumer

financial services within the Tribe's jurisdiction. Id. § 4.13(a)-(d), (h)-(i); id. §§ 4.14, 4.16, 4.18.

In addition, the Code placed the TFSRA at the center of a three-tiered dispute resolution process for loan borrowers from tribal licensees. First, consumers that are "aggrieved" by a licensee's action must submit a written complaint to the licensee. The licensee must respond in writing within thirty days, and if it does not, it may be fined by the TFSRA in an amount equivalent to the greater of the outstanding principal loan amount or $1,500. Id. § 9.2(a)-(b). Second, consumers dissatisfied with a licensee's response (or who receive no response at all) may submit a written request for administrative review to the TFSRA within ninety days of the licensee's determination. The TFSRA may then "investigate the dispute in any manner it chooses," including by granting an administrative hearing. If such a hearing occurs, consumers can be represented by counsel at their own expense, and the TFSRA can conduct matters before and during the hearing in a quasi-judicial manner. After any hearing, the TFSRA must issue a written decision that contains its factual findings and conclusions of law, and "may grant or deny any relief as the [TFSRA] determines

appropriate."[2] Consumers can then request rehearing, which the TFSRA may grant or deny at its discretion. Id. § 9.3(a)-(g). Finally, consumers may appeal adverse TFSRA decisions by filing a written petition for review with the Tribal Court ("the LVD Court") within ninety days of the TFSRA's decision. The LVD Court's review is limited to the TFSRA's administrative record, and the Court must give deference to the TFSRA's interpretations and applications of the Code. It can only reverse a decision that is "arbitrary and capricious, or that . . . is not supported by the evidence," and must not reverse because of "[m]ere disagreement with the [TFSRA]'s factual findings." The LVD Court's subsequent opinion is final and cannot be appealed. Id. § 9.4.

---

[2] Plaintiffs allege that the TFSRA's powers with regard to a hearing are constrained by TFSRA Regulation 1.1. Compl. ¶¶ 79-81. That regulation states that the TFSRA "will adhere to the dispute resolution procedures set out under section 9.3 of the Code." However, the regulation also indicates that the TFSRA: (1) "[m]ay grant a fair opportunity to be heard about the dispute if . . . the [TFSRA] finds the existence of a material issue as to whether or not the alleged act or practice is unfair or deceptive, or in violation of existing tribal consumer finance laws or regulations"; (2) "[w]ill not grant the consumer an opportunity to be heard if the only allegation contained in [a] consumer complaint is an allegation that the consumer finance service provided is illegal in a jurisdiction outside the jurisdiction of the Tribe"; and (3) "[m]ay resolve the dispute in favor of the consumer upon a finding that the [l]icensee has violated a law or regulation of the Tribe."

The latest development in the Tribe's history of economic regulation occurred on August 26, 2014, when the LVD Council enacted the Business Entity Ordinance ("the Business Ordinance"). Aug. 28 Resolution (ECF No. 23-6) at 1-2. The Business Ordinance created comprehensive procedures for the creation, operation, and dissolution of various tribal entities, including limited liability companies ("LLCs"). See generally Business Ordinance (ECF No. 23-7). Relevant to this dispute, the Ordinance stated that a tribally-owned LLC with the Tribe as its sole member would "be considered a wholly owned and operated instrumentality of the Tribe and . . . have all the privileges and immunities of the Tribe, including but not limited to the Tribe's sovereign immunity from suit, except as explicitly waived by the [LVD] Council." Id. Ch. 5, § 8(E). The Ordinance further indicated that those LLCs would be subject to the LVD Court's jurisdiction, but that such provision would not waive any claim to sovereign immunity in state or federal court. Id. Ch. 1, § 3(A), (D).

### 2. Beginning of Tribal Lending Operations

Soon after the Code was enacted, the Tribe began operating in the online lending arena when the LVD Council organized Red Rock Tribal Lending, LLC ("Red Rock") as a tribally-owned LLC on September 14, 2011. See Sept. 14, 2011 Resolution (ECF No. 23-

7

8). The company was managed by two members of the Tribe, and the Tribe was Red Rock's sole member. Red Rock Arts. of Organization (ECF No. 23-9), Art. 7; Hazen Aff. ¶¶ 6-7. The Complaint alleges that Matt Martorello ("Martorello")—along with Bellicose Capital, LLC ("Bellicose")[3] and Bellicose's general counsel, Daniel Gravel ("Gravel")—associated with the Tribe to form Red Rock. Compl. (ECF No. 1) ¶¶ 13, 29. Martorello, however, states that he was never a manager or member of Red Rock, nor were any of the companies that he owned or managed. Martorello Decl. (ECF No. 106-1) ¶¶ 18-21. Red Rock provided loans to consumers from its offices on the Reservation, and its employees, computers, and records were all located there. Moreover, as a tribal business, Red Rock was regulated by the TFSRA. Hazen Aff. ¶¶ 8-9.

Red Rock subsequently decided to contract with an outside entity to better learn the lending industry. The Tribe had identified Martorello as a potential consultant in mid-2011, but he was not involved in the creation of Red Rock. Martorello Decl. ¶¶ 14, 17. Then, on October 25, 2011, Red Rock contracted with Bellicose VI, LLC ("Bellicose VI")—a subsidiary of Bellicose—for it to provide Red Rock with vendor management

---

[3] Martorello was the founder and chief executive officer of Bellicose. Compl. ¶ 14.

services, compliance management assistance, marketing material development, and risk modeling and data analytics development. Hazen Aff. ¶ 10; Servicing Agm't[4] (ECF No. 83-2) at 1. On April 15, 2012, Bellicose VI assigned its interest in the contract to SourcePoint VI, LLC ("SourcePoint"), another Bellicose subsidiary. Hazen Aff. ¶ 12; Servicing Agm't at 1.

The Servicing Agreement detailed the revenue distribution structure for Red Rock's lending business and each party's duties as to that business. Under the contract, revenues were distributed first to Red Rock, which received 2% of all gross revenues "plus bad debt recoveries minus the sum of charge backs and bad debt charge-offs." Servicing Agm't §§ 2.25, 6.4.1. The remainder was then distributed in the following order: (1) to SourcePoint, to reimburse it for advances made to Red Rock and for servicing expenses; (2) to any of Red Rock's creditors, to pay outstanding debt that was then due; and (3) to SourcePoint, to pay its monthly servicing fee. Id. § 6.4.2-.5. The servicing fee was a variable performance-based fee equivalent to whatever cash basis revenue remained after the distributions above, and was at a minimum $20,000. Id. § 3.5.1. Martorello claims that

---

[4] The parties have not provided the original servicing agreement between Red Rock and Bellicose VI, but there is no indication that its provisions were substantially different than those in the Servicing Agreement between Red Rock and SourcePoint.

the Tribe itself suggested this revenue split because it guaranteed monthly income for the Tribe's general fund while also incentivizing SourcePoint to help the Tribe grow its businesses. Martorello Decl. ¶ 36. In addition, aside from these distributions, Red Rock received and retained ownership of all intellectual property developed under the Servicing Agreement by SourcePoint. Id. ¶ 35.

The Agreement also assigned specific responsibilities to SourcePoint. For instance, after noting that SourcePoint was being engaged as Red Rock's "independent contractor" to perform the services noted, the Agreement granted to SourcePoint "the authority and responsibility over all communication and interaction whatsoever between [Red Rock] and each service provider, lender and other agents of [Red Rock]." Id. § 3.1. The contract also prevented Red Rock from operating its lending business anywhere without using SourcePoint to provide its management and consulting services for those operations. Id. § 3.3.1. In addition, the Servicing Agreement required SourcePoint to select a bank account to store all funds generated by Red Rock's lending, and gave SourcePoint—unless otherwise agreed between Red Rock and SourcePoint—the "sole signatory and transfer authority over such bank accounts," as well as "sole authority to sweep monies from such bank accounts"

to distribute revenues under the priority structure. Id. § 4.4. Finally, the Agreement gave SourcePoint numerous other duties concerning the day-to-day functioning of Red Rock's lending business, such as: (1) "[s]creening of and selecting service providers and lenders, and negotiating agreements with such service providers and lenders on behalf of [Red Rock]"; (2) "[d]evelopment and promotion of sound and positive business relationships on behalf of [Red Rock] with the designated service providers and lenders"; (3) preparation of regulatory, compliance, training, education, financial reporting and accounting, website content, and marketing standards; (4) "providing pre-qualified leads to [Red Rock] and providing the necessary credit-modeling data and risk assessment strategies" to Red Rock; and (5) "training and monitoring [Red Rock] employees . . . that operate [Red Rock]'s call center." Id. § 4.2.1.[5]

However, the Servicing Agreement also limited the ultimate authority of SourcePoint over Red Rock's management decisions.

---

[5] Based, presumably, on the Servicing Agreement, Plaintiffs allege that: Bellicose funded and underwrote Red Rock's loans; the money loaned was transferred from a bank account controlled by Bellicose and Martorello, which tribal officials could not access; Bellicose accepted consumer payments directly; and the only funds that Red Rock, Big Picture, or the Tribe ever received or handled was the specified revenue percentage under the Servicing Agreement. Compl. ¶¶ 30-32, 36-37.

For instance, the provision allowing SourcePoint to provide leads and credit-modeling data to Red Rock also said that "[t]he criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion of [Red Rock] and [Red Rock] shall execute all necessary loan documentation." Id. § 4.2.1(i). Similarly, SourcePoint "ha[d] no authority to engage in origination activities, execute loan documentation, or approve the issuance of loans to third parties. Final determination as to whether to lend to a consumer rest[ed] with [Red Rock]." Id. § 4.1.1. SourcePoint also needed the Tribe's written consent "to do any of the following: (1) to borrow, pledge, assign, convey, encumber, grant security interest in, guaranty, or otherwise restrict the assets of [Red Rock]; (2) to sell or otherwise dispose of all or substantially all of the assets of [Red Rock]; [or] (3) to waive the sovereign immunity of [Red Rock]." Id. § 4.1.2. In other words, SourcePoint's duties, although numerous, were to be limited to providing "reasonable measures for the orderly administration and management" of Red Rock. Id. § 4.2.1.

Some evidence also indicates that Red Rock's role under the Servicing Agreement was more substantial than Plaintiffs suggest. Red Rock's co-manager, Michelle Hazen ("Hazen"), says that, "[w]hile Red Rock received advice and consulted with

12

Bellicose about operations, all final decisions about operations were made by Red Rock's managers." Hazen Aff. ¶ 11; see also ECF No. 83-4 (e-mail from SourcePoint employee to tribal members recommending adoption of direct mail campaign prepared by SourcePoint). Similarly, Martorello indicates that, as a consultant,[6] he "made suggestions and offered advice to Red Rock's co-managers," but "Red Rock's co-managers were ultimately responsible for all decisions regarding Red Rock's operation." Furthermore, Martorello, Bellicose, and SourcePoint never, on Red Rock's behalf, made lending decisions; originated a consumer loan; purchased a loan originated by Red Rock; or took any action to collect a Red Rock loan. Instead, Red Rock always made the final decision to lend to a particular consumer, and Red Rock's co-managers, including Hazen, always reviewed and approved marketing materials, including the prescreening of credit reports.[7] Finally, Bellicose's and SourcePoint's access to

---

[6] As permitted by the Servicing Agreement, SourcePoint hired Bellicose employees, including Martorello, to perform certain services for Red Rock. Martorello Decl. ¶ 31.

[7] Plaintiffs cite Big Picture's interrogatory response to assert that Red Rock's role in the lending process was limited to "final verification of the applicant's information in the loan agreement," including "the applicant's e-signature, the due dates, the payment schedule, [and] the applicant's bank information." Big Picture Interrogatory Responses (ECF No. 91-4) ¶ 24. This statement is misleading. First, the response addressed Big Picture's loan evaluation procedure, and thus had

Red Rock's bank accounts was limited by deposit access control agreements provided by Red Rock, which Red Rock or the Tribe could terminate at any time. Furthermore, although Martorello was a signatory on certain Red Rock accounts, he claims that he was listed that way only "to facilitate accounts payable, and never without express contractual or delegated authority." Martorello Decl. ¶¶ 22-28.

Red Rock then began making loans to consumers, including some in New York. In February 2013, the New York Department of Financial Services ("the Department") sent cease-and-desist letters to a number of lending entities, including the Tribe, accusing them of "using the Internet to offer and originate illegal payday loans to New York consumers, in violation of New York's civil and criminal usury laws."[8] Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs., 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013) (internal quotations omitted). The Department also sent letters to third parties that credit and debit payday loan payments, advising them that the Department

nothing to do with Red Rock. Second, the response did not concern Big Picture's relationship with third parties, and even noted that "[n]o third party participates in Big Picture's [loan] evaluation." Id.

[8] New York prohibits annual interest above 16% on loans greater than $250,000, N.Y. Gen. Obligations Law § 5-501; N.Y. Banking Law § 14-a(1), and criminalizes annual interest above 25%, N.Y. Penal Law § 190.40.

14

would pursue enforcement actions against lenders that refused to cease and desist. Id. at 356-57. This threat of regulatory enforcement caused the lending entities' business partners to limit or end their relationship with the entities, which in turn led the entities to seek a preliminary injunction preventing the Department from enforcing New York's anti-usury statutes against them—in part because any regulation would infringe on the entities' tribal sovereignty. See id. at 357-58. However, the court denied the entities' request, finding that they had not shown a likelihood of success on the merits because their online lending to New York consumers constituted off-reservation activity, and could therefore be properly regulated under New York's non-discriminatory anti-usury laws. See id. at 360-61. The Second Circuit affirmed this decision in October 2014. See Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs., 769 F.3d 105 (2d Cir. 2014). The Tribe's response to these decisions is unknown.

### 3. Expansion of Tribal Lending Business

After 2011, through its operation of Red Rock and relationship with Bellicose and Martorello, the Tribe gained knowledge of the online lending industry. Hazen Aff. ¶ 13; Martorello Decl. ¶¶ 47-48. The Tribe wanted to apply that knowledge to expand its online lending platform and increase

15

profitability for the Tribe, employ more tribal members, and acquire its vendors' businesses so that the Tribe would earn more money. Hazen Aff. ¶ 13. As part of that strategy, the LVD Council organized Big Picture on August 26, 2014. Aug. 26, 2014 Resolution (ECF No. 23-10). Big Picture was formed "as a wholly owned and operated instrumentality of the Tribe," and was managed by two tribal members, Hazen and James Williams ("Williams"). Id. at 2-3. Big Picture was meant to serve as an independent tribal lending entity that would "ultimately consolidate the business" of the Tribe's other lending entities, Red Rock and Duck Creek Tribal Financial, LLC. Id. at 1.

On February 5, 2015, the LVD Council formed another entity, Tribal Economic Development Holdings, LLC ("TED"), to operate the Tribe's current and future lending companies. Feb. 5, 2015 TED Resolution (ECF No. 23-13). The Tribe was the sole member of TED, and Hazen and Williams were designated as its co-managers. Id. at 3; TED Arts. of Organization (ECF No. 23-14), Arts. 8-9. Big Picture's membership was also restructured so that TED became its sole member. Big Picture Arts. of Organization (ECF No. 23-13), Arts. 8-9. Then, also on February 5, the LVD Council formed Ascension as a subsidiary of TED "for the purpose of engaging in marketing, technological and vendor services" to support the Tribe's lending entities. Feb. 5, 2015 Ascension

Resolution (ECF No. 23-16) at 1. Ascension was created "as a wholly owned and operated instrumentality of the Tribe," with TED as its sole member, and was managed by Hazen and Williams. Id. at 2-3; Ascension Arts. of Organization (ECF No. 23-17), Arts. 8-9. Hazen and Williams named Brian McFadden ("McFadden") as Ascension's President. Feb. 5, 2015 Ascension Resolution at 3.

### 4. Tribe's Acquisition of Bellicose

Since 2012, Martorello and the Tribe had engaged in multiple conversations about the potential sale of Martorello's consulting companies to the Tribe, which would allow the Tribe to engage in online lending without relying on outside vendors for support services. The creation of TED and Ascension and reorganization of Big Picture in February 2015 were undertaken to enable the Tribe to more easily purchase Bellicose, in part because those steps added layers to protect the Tribe from liability. Martorello Decl. ¶¶ 49-50; Martorello Sept. 11, 2015 E-mail (ECF No. 83-8) at LVD-DEF00014697. In addition, around that time, the LVD Council formed Tribal Acquisition Company, LLC ("TAC"), with TED as its sole member and Hazen and Williams as co-managers, for the sole purpose of acquiring Bellicose without creating a nexus between TED and Delaware. Sept. 14,

17

2015 Merger Resolution (ECF No. 34-2) ("the Merger Resolution") at 2; Martorello Sept. 11, 2015 E-mail at LVD-DEF00014697.

In early 2015, the parties agreed on the basic framework of the merger: a seller-financed transaction with non-fixed payments over a seven-year term, with any outstanding amount due being forgiven at the end of that term. According to Martorello, the Tribe requested this structure because it would enable the Tribe to accomplish its goals of economic self-sufficiency more easily. Martorello Decl. ¶ 51. The seller-financier would be Eventide Credit Acquisitions, LLC ("Eventide"), a company managed and majority-owned by multiple entities of which Martorello was the president. Merger Resolution at 3; Eventide Operating Agm't, Sched. A (ECF No. 91-11). Eventide would provide a $300 million loan to TED, which TED would then use to purchase Bellicose. Merger Resolution at 3. After this structure was set, Martorello continued negotiating with the Tribe over the next several months. Martorello Decl. ¶ 52. The parties reached a final agreement on September 14, 2015, memorializing the terms of the deal in a loan agreement ("the Loan Agreement") and a promissory note ("the Note"). Merger Resolution at 7-9; see generally Loan Agreement (ECF No. 83-17); Note (ECF No. 83-11). As part of the transaction, the LVD Council approved a limited waiver of TED's and Big Picture's sovereign immunity in

connection with TED's repayment of the Eventide loan during its seven-year term. See Sept. 14, 2015 Immunity Waiver Resolution (ECF No. 34-3) at 2-8. On January 26, 2016, the Tribe finally completed its purchase of Bellicose, including subsidiaries like SourcePoint, and acquired all of Bellicose's data, software, and corporate goodwill. Martorello Decl. ¶ 53; Hazen Aff. ¶ 22.

Under the Note, revenues from Big Picture's lending business are distributed monthly in several steps. First, Big Picture makes a distribution to TED of Big Picture's gross revenues. Note § 1.2(a); Martorello Decl. ¶ 57. TED then distributes 2% of those gross revenues to the Tribe, until half of the total loan amount has been paid, at which time the distribution percentage increases from 2% to 4%. Note § 1.2(b)(1). The parties agreed to increase the monthly distribution from 2% to 3% in or around September 2016.[9] Note Addendum (ECF No. 91-18); Martorello Decl. ¶ 57. If TED defaults under the Loan Agreement, then the monthly distribution to the Tribe reduces to zero. Note § 1.2(b)(1); see also Loan Agreement § 6.1 (describing events triggering default). Second, TED pays an additional 2% of gross revenues to the Tribe to be

---

[9] That agreement also indicated that the percentage distribution would increase from 3% to 6% when half the loan had been repaid. Note Addendum; Martorello Decl. ¶ 57.

reinvested "in growing the loan portfolio."[10] Note § 1.2(b)(2). That reinvestment amount must "stay in equity within [TED] or [Big Picture] conducting lending" until the Note and Loan Agreement terminate. As with the first distribution, this payment reduces to zero if TED defaults. Note § 1.2(b)(2). Third, TED and Big Picture must pay any interest and principal due to other creditors. Id. § 1.2(b)(3).

Fourth, an amount is deducted to pay "[o]rdinary and necessary business expenses" incurred in connection with Big Picture's lending business, including payments to tribal and non-tribal vendors.[11] Id. § 1.2(b)(4); Martorello Decl. ¶ 57. Those expenses may not exceed reasonable rates for particular services, and TED and Big Picture have a fiduciary duty to Eventide to ensure that they do not "undermine the [p]arties' intent to maximize the cash flows directed to retire the Note as soon as possible." Note § 1.2(b)(4). Accordingly, TED must

---

[10] The initial reinvestment amount was $1.3 million, but the amount was reduced to 2% of gross revenues for each month thereafter. Note § 1.2(b)(2).

[11] The Note also identifies certain "[n]on-deductible expenses," which are taken instead from the Tribe's 2% monthly distribution or the 2% reinvestment amount at TED's choice. These include: (1) any tax, fine, or licensing fee charged by the Tribe, except for certain regulatory fees or fines charged by the TFSRA; (2) any attorneys' fees award from a suit related to the Bellicose merger documents; or (3) any ordinary and necessary expenses that Eventide does not agree to pay and that, in the aggregate, exceed $25,000 per year. Note § 1.2(b)(5).

submit a monthly budget and expense report to Eventide, which Eventide uses to ensure that the expenses are reasonable and not inflated to deprive Eventide of payments it will receive under the Note. Id. § 1.2(c); Martorello Decl. ¶ 59. The Note allows expenses based on a "reasonable expansion" of Big Picture's lending operations in light of "industry climate and norms." Note § 1.2(b)(4)(b). Nonetheless, Eventide must approve a budget for such expansion to ensure that TED's repayment of the loan is not affected. Id. Martorello claims that Eventide has "never unreasonably withheld its consent to expenses, nor has it objected to the reasonable expansion of the business—even when expansion created additional debt for Big Picture which meant smaller (or no) payments to Eventide." Martorello Decl. ¶ 60.

Finally, TED pays to Eventide the "Net Cash Available"—that is, Big Picture's gross revenues minus all the distributions and deductions above. That amount is applied first to any unpaid principal, and then to unpaid interest.[12] Note § 1.2. As Martorello explains, because Eventide receives payments last under the Note's distribution structure, it is possible that Eventide will not receive a principal payment in some months

---

[12] The Note carries a fixed interest rate of 1.8% per year, Note at 1, which Martorello claims is "significantly below the rate at which [the Tribe] could go into the marketplace and borrow funds," Martorello Decl. ¶ 64.

because TED has no net income from which to make a payment. This situation has occurred on at least five occasions. TED, on the other hand, has always received all of Big Picture's net income, and is guaranteed to receive its 3% distribution and reinvestment amount every month. Martorello Decl. ¶ 63.

Each payment to Eventide under the waterfall structure is accompanied by a payment schedule. Note § 1.2(c). Based on these schedules, and other financial statements, Martorello states that TED has consistently paid down its principal under the Note, such that the Tribe has been receiving an equity interest in the lending support services that it acquired through Bellicose. He notes that, since the close of the acquisition, Eventide's Note payments have amounted to $21,375,922.10, whereas the total economic consideration obtained by the Tribe under the Note has been $28,184,007.69. Martorello Decl. ¶ 63; McFadden Aff. (ECF No. 106-17) ¶ 17. However, the exact basis of those figures is unclear. In fact, Plaintiffs cite two documents with different numbers than those provided by Martorello. One indicates that, as of June 2017, the cumulative repayment to Eventide was $17,968,528.36, and the cumulative amount to TED was $4,924,930.94 ($1,963,708.81 in distributions, and $2,961,222.13 in reinvestments). Pls. Opp. (ECF No. 90) at 11, 21-22. The second shows slightly higher numbers than those

through December 2017. See id. Those figures are consistent with Big Picture's assertion that, by September 2017, TED had distributed approximately $20.5 million in loan payments to Eventide and nearly $5 million to the Tribe ($3,035,374.90 in distributions, and $1,948,999.53 in reinvestments). Big Picture Suppl. Interrogatory Responses (ECF No. 102-3) ¶ 1. Martorello's calculations might include amounts not accounted for in those spreadsheets, such as the economic value of Bellicose's data or corporate goodwill, but that is hard to discern. In any event, the Note is fixed to expire seven years after its execution date—thus, by September 14, 2022—at which time "the remaining balance is forgiven." Note § 1.3.

The Tribe finished restructuring its lending businesses soon after the Bellicose purchase. TAC dissolved in late January 2016 after control of Bellicose had been transferred to TED. Arts. of Dissolution (ECF No. 91-9). Around the same time, Bellicose's assets were assigned to Ascension and its liabilities were assigned to Big Picture, and Bellicose ceased to exist. Shortly thereafter, on February 16, 2016, Big Picture engaged Ascension as an independent contractor to provide Big Picture with the servicing support services that Ascension had carried over from Bellicose. Intratribal Servicing Agm't (ECF No. 91-17) § 3.1; see also McFadden Feb. 24, 2015 Letter (ECF

No. 91-30) (noting that all Bellicose VI positions and operations would be merged into Ascension).

The Intratribal Servicing Agreement is similar to the earlier Servicing Agreement between Red Rock and SourcePoint. In particular, the contract requires that Ascension "develop and recommend to [Big Picture] . . . reasonable measures for the orderly administration and management of [Big Picture] in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of vendor relationships, collections and risk assessment," and then describes most of the same day-to-day operational responsibilities that SourcePoint had. Intratribal Servicing Agm't § 4.2.1; see also Servicing Agm't § 4.2.1. Ascension also receives a monthly fee, which is the sum of the following: (1) "[m]anpower charges," which are Ascension's salary costs, payroll taxes, and other employment expenses; (2) internal expenses, which are capped by Ascension's servicing budget; (3) overhead expenses, in different amounts based on whether Big Picture is the beneficiary of such expenses; and (4) a bonus plan for Ascension's employees. Intratribal Servicing Agm't § 3.4.

Big Picture, however, retains the same managerial authority as Red Rock. To that end, the Intratribal Servicing Agreement specifically provides that "[t]he criteria used to extend funds

24

to individual borrowers will remain within the sole and absolute discretion of [Big Picture] . . . and [Big Picture] . . . shall execute all necessary loan documentations." Id. § 4.2.1(k). Likewise, Ascension "has no authority to engage in origination activities, execute loan documentation, or approve the issuance of loans to consumers. Final determination as to whether to lend to a consumer rests with [Big Picture] . . . ." Id. § 4.1. In addition, even though McFadden and Simon Liang ("Liang"), Ascension's controller, were added as authorized signers for Big Picture's bank accounts, ECF No. 83-23, their authority is bound by deposit account control and lockbox agreements, Intratribal Servicing Agm't §§ 4.4, 4.7. The only real limitation on Big Picture's authority is the Loan Agreement, which prevents TED or Big Picture from amending or terminating the Intratribal Servicing Agreement during the loan's seven-year term without Eventide's written consent. Loan Agm't § 5.12.

On the same day that Big Picture contracted with Ascension, the LVD Council also authorized Red Rock to assign the majority of its consumer loans and obligations to Big Picture. Hazen Aff. ¶ 23; Feb. 16, 2016 Assignment Resolution (ECF No. 23-23) at 2-3; see generally Assignment Agm't (ECF No. 23-24). All unassigned loans were written off as bad debt, and Red Rock subsequently dissolved. Hazen Aff. ¶ 23; Red Rock Arts. of

25

Dissolution (ECF No. 23-27); Feb. 16, 2016 Dissolution Resolution (ECF No. 23-26). Hazen, as co-manager of Red Rock, gave the appropriate notice of dissolution to the TFSRA and to any party that might have claims against Red Rock. See ECF Nos. 23-28, 23-29. Big Picture then sent a notice of assignment to all consumers whose loans it had received, instructing them that Big Picture would begin collecting their loan payments effective February 17, 2016. ECF No. 23-25.

### 5. Current Management of Big Picture and Ascension

TED now oversees both Big Picture and Ascension. All three entities have their headquarters on the Reservation. TED Operating Agm't (ECF No. 23-33) § 1.3; Big Picture Operating Agm't (ECF No. 23-30) § 1.3; Ascension Operating Agm't (ECF No. 23-18) § 1.3. Big Picture currently employs fifteen individuals on the Reservation. Ascension employs thirty-one individuals, most of whom work outside the Reservation at Ascension's satellite offices, Hazen Aff. ¶¶ 24-25, which appear to be in (at least) Atlanta, Mississippi, and Puerto Rico, Compl. ¶¶ 50-53. Hazen and Williams, both LVD Council members, co-manage all three companies. Hazen Aff. ¶¶ 2, 15, 18-20; Williams Aff. (ECF No. 23-36) ¶¶ 1, 11-13. That position grants them the broad authority to, in the case of Big Picture, "perform all actions as may be necessary or appropriate to carry out the business of

26

[Big Picture] including but not limited to the power to enter into contracts for services, to manage vendor relationships, to manage personnel issues and affairs of [Big Picture]." Big Picture Operating Agm't § 5.1(a).[13] Where the managers' power is limited by the operating agreements, the ultimate authority resides in the LVD Council. See id. § 5.2. Similarly, all three entities must submit quarterly reports to either the LVD Council (for TED) or TED (for Big Picture and Ascension). Id. § 5.8; TED Operating Agm't § 4.7; Ascension Operating Agm't § 5.8.

Hazen has been Big Picture's CEO since December 2015. Hazen Aff. ¶ 20. However, as for Ascension, Hazen and Williams have delegated to McFadden: (1) the "approval of Ascension strategic direction," which must be communicated at least quarterly to the co-managers; (2) "authority to execute documents on behalf of Ascension"; (3) "authority to open and maintain bank accounts"; (4) "authority to adopt, terminate, or change employee benefit plans or programs"; and (5) "authority regarding all matters necessary for . . . day to day management." Ascension Delegation of Authority Policy (ECF No. 91-13) § 1.4. McFadden must report regularly to Hazen and Williams about the authority exercised

---

[13] Hazen and Williams are granted similarly broad management authority under nearly identical provisions in TED's and Ascension's operating agreements. See TED Operating Agm't § 5.1(a); Ascension Operating Agm't § 5.1(a).

under those provisions and any matters that might fall under their purview. Id. § 1.5. McFadden also must obtain co-manager approval "for changes in operations, personnel, and distributions." McFadden Aff. ¶ 8.

Martorello asserts that he has had limited contact with the Tribe since it purchased Bellicose in January 2016. As he states, he has never been involved in TED's operations, made any decisions on its behalf, provided any consulting services to it, or solicited any investors on its behalf. Likewise, he has never provided any consulting services to Big Picture or Ascension; suggested marketing strategies, underwriting criteria, or other policies to them; accessed any of their software systems, databases, bank accounts, or records; or hired or fired their employees. Martorello has interacted with Hazen and Williams when they have requested Eventide's permission to undertake expenses for Big Picture that exceeded budgeted expenses under the Note, but Martorello never proposed that they incur those expenses, nor did he object to their requests. Martorello Decl. ¶¶ 70-97; see also McFadden Aff. ¶¶ 13-16. Furthermore, says McFadden, neither Eventide nor Martorello participates in Ascension's day-to-day operations, and Ascension does not seek Eventide's or Martorello's consent for those operations, except if Ascension needs to expand its budget. Even in that case,

explains McFadden, he would first obtain Hazen's or Williams' approval before contacting Eventide. McFadden Aff. ¶¶ 10-12.

Big Picture operates in some ways as an independent financial entity. It maintains its operating account with a regional bank, where it funds all its loans, receives all consumer payments, pays all payroll and vendors, deposits all its investments, and makes distributions to TED and the Tribe.[14] Big Picture relies on private investors to fund its lending operation, including the loans themselves. These investments are made through traditional loan agreements and promissory notes, under which Big Picture is responsible to each investor. Hazen Aff. ¶¶ 26-27. The Tribe itself has invested over $7 million. Williams Aff. ¶ 8.

Moreover, Big Picture's lending operation has yielded concrete financial benefits for the Tribe. Any profits that Big Picture earns are allocated to its sole member, TED, which in turn allocates those profits to the Tribe. Big Picture Operating Agm't § 6.1; TED Operation Agm't § 6.1.[15] If Big Picture's cash

---

[14] As with Red Rock, Plaintiffs allege that Big Picture does not ever handle the money loaned to or paid by consumers. See Compl. ¶¶ 30-32, 36-37.

[15] Ascension has an identical provision in its operating agreement, Ascension Operating Agm't § 6.1, but Ascension does not generate any profit that it could allocate.

29

account balance exceeds $500, it must declare an immediate distribution and transfer the excess to TED. Big Picture Operating Agm't § 6.2. It is unclear if this always occurs, as e-mails from Liang to Martorello about repayment of Eventide's loan contain language indicating that Big Picture's cash balance was greater than $500, but that Big Picture "would like to keep [the balance] for lead acquisition and loan origination in future months." See, e.g., ECF No. 83-24 at MARTORELLO_000218. In any event, beyond the profits obtained through the Note's revenue distributions, the Tribe also receives interest payments as a substantial investor in Big Picture. Proceeds from Big Picture's business now comprise more than 10% of the Tribe's general fund, and those profits could possibly fund more than 30% of the Tribe's budget over the next few years. Williams Aff. ¶¶ 9-10.

The Tribe relies on Big Picture's funds for governmental programs and services. Id. ¶ 10. Specifically, Big Picture's revenues have been used to, in whole or in part: meet requirements necessary to secure $14.1 million in financing for the Tribe's new health clinic; refinance casino debt; fund college scholarships and pay for educational costs for members such as student housing, books, school supplies and equipment; create home ownership opportunities for members through

tribally-purchased homes; subsidize tribal members' home purchases and rentals; provide a bridge loan to complete the new tribal health clinic that offers services to the regional community; fund new vehicles for the Tribe's Police Department; fund an Ojibwe language program and other cultural programs; provide foster care payments for eligible children, propane purchase assistance, and assistance for family care outside of the community; cover burial and other funeral expenses for members' families; fund renovations and new office space for the Tribe's Social Services Department; fund youth activities; renovate a new space for the LVD Court and bring in telecom services for remote court proceedings; and fund tribal elder nutrition programs and tribal elder home care and transport services. Hazen Aff. ¶ 31.

### 6. Big Picture's Lending Process

As noted, Big Picture has its principal place of business on the Reservation, and its employees are all located there. The servers for Big Picture's websites are also stored on the Reservation. And, because all loan applications are approved by Big Picture employees on the Reservation, all consumer loans are originated there. Id. ¶¶ 28, 30(a).

To obtain a loan from Big Picture, consumers must log onto the company's website and complete and submit an application.

31

Big Picture then conducts a review using a software-based underwriting process and either accepts or denies the application. Id. ¶ 30(a)-(b). That software consolidates consumer credit data from third-party service providers to verify applicants' information and determine creditworthiness. Big Picture Interrogatory Responses ¶ 24. An applicant receives a notice of denial if the application is denied. Hazen Aff. ¶ 30(d).

Even if an application is accepted, the consumer must complete several more steps before the loan is finalized. First, the website prompts applicants to select their desired loan amount, which may be as high as $5,000. Second, applicants must select the term of the loan, and Big Picture in turn provides an estimated annual percentage rate ("APR") based on the underwriting software's determination of an applicant's repayment ability. Third, applicants must review Big Picture's standard loan agreement, which includes the loan's APR and repayment schedule. Fourth, applicants must acknowledge their review of, and agree to, the loan agreement—including the choice-of-law, forum-selection, and jury trial waiver clauses—and Big Picture's privacy disclosures. Finally, applicants must select their payment method. Id. ¶ 30(c)(1)-(6).

Once a consumer signs the loan agreement, the contract goes to Big Picture for its employees' review. Employees on the Reservation perform a final verification of the applicant's information in the loan agreement and other details. If there are no issues, the reviewing employee manually enters the date of disbursal of funds, which authorizes electronic approval of the agreement. This action also causes the loan to be originated and triggers the transmission of instructions for the particular application to a third-party payment processor, which then disburses the funds to the consumer. Id. ¶ 30(c)(7)-(8).

### 7. Tribe's Lending Activities in Virginia

The parties have not provided evidence regarding Red Rock's or Big Picture's lending activities in Virginia specifically. However, the Complaint alleges that Martorello and Gravel intentionally chose Virginia as a place where Red Rock and Big Picture would offer loans and collect payments, and they proceeded with this plan notwithstanding their knowledge that the loans would be illegal under Virginia's usury laws. Certain defendants then began marketing, initiating, and collecting loans in Virginia. Consumers were required to electronically sign the form loan agreement described above. Under the terms of that contract, the loans were subject to an APR that was much higher than 12%. However, neither the Tribe nor any of the

defendants had a consumer finance license permitting them to charge interest at such a high rate, and they never attempted to obtain such a license. Compl. ¶¶ 54-57, 60.

Lula Williams, Gloria Turnage ("Turnage"), George Hengle ("Hengle"), Dowin Coffy ("Coffy"), and Felix Gillison, Jr. ("Gillison"; with Lula Williams, Turnage, Hengle, and Coffy, collectively, "Plaintiffs") all entered into loans with Big Picture, and their loan agreements with Big Picture specified that interest would be charged at greater than 12% APR. Lula Williams' loan was subject to an APR of 649.8%; Turnage's loan was subject to an APR of 693.2%; Hengle's and Coffy's loans were subject to an APR of 607.5%; and Gillison's loan was subject to an APR of 627.2%. Based on those rates, Plaintiffs paid various amounts to Big Picture, most of which were credited as payment for interest or other loan-related fees. Id. ¶¶ 58-59, 62-65.

The loan agreements also contained the following provisions:

> GOVERNING LAW AND FORUM SELECTION: This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal law"), including but not limited to the [Tribal Consumer Financial Services Regulatory] Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code

and summarized below for your convenience. . . .

TRIBAL DISPUTE RESOLUTION PROCEDURE: The Tribe has established a Tribal Dispute Resolution Procedure (the "Procedure") to review and consider any and all types of complaints made by You or on Your behalf relating to or arising from this Agreement. The Procedure is found at Section 9 of the Code. You can find the Code at [Big Picture's] website, . . . or You may request a physical copy by written request mailed . . . to the Tribal Financial Services Regulatory Authority, P.O. Box 249, Watersmeet, Michigan 49969. The Tribe and [Big Picture] intend and require, to the extent permitted by Tribal law, that any complaint lodged, filed, or otherwise submitted by you or on your behalf to follow the Procedure. Under the Procedure, a consumer who, in the course of his otherwise lawful and proper use of [Big Picture]'s business believes himself to be harmed by some aspect of the operation of any part of [Big Picture]'s business, shall direct his concerns or dispute to [Big Picture] in writing. A person's complaint to [Big Picture] shall be considered similar in nature to a petition for redress submitted to a sovereign government, without waiver of sovereign immunity and exclusive jurisdiction, and does not create any binding procedural or substantive rights for a petitioner. [Big Picture] will investigate the complaint and respond as soon as reasonably practicable, but no later than thirty (30) days from the receipt of the complaint. In the event that the consumer is dissatisfied with [Big Picture]'s determination, he may initiate Formal Dispute Resolution by requesting an administrative review of [Big Picture]'s determination by submitting such request in writing to the Tribal Financial Services

> Regulatory Authority ("Authority"), P.O. Box
> 249, Watersmeet, MI 49969, no later than
> ninety (90) days after receiving [Big
> Picture]'s determination.

ECF No. 1-1 at 4-5; <u>see also</u> Compl. ¶¶ 70-71. These are the choice-of-law and forum-selection provisions referenced above.

## B. Procedural Background

On June 22, 2017, Plaintiffs brought suit against Big Picture, Ascension, Martorello, Williams, Gertrude McGeshick, Susan McGeshick, Giiwegiizhigookway Martin,[16] and Gravel. They asserted five class claims:

(1) COUNT ONE, Declaratory Judgment, against all defendants, stating that the choice-of-law and forum-selection provisions in all loan agreements made by Big Picture or Red Rock to Virginia residents are void and unenforceable;

(2) COUNT TWO, Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), against all defendants;

---

[16] Williams, the McGeshicks, and Martin (collectively, "the LVD Officers") are all members of the LVD Council: Williams is the Chairman, Gertrude McGeshick is the Secretary, Susan McGeshick is the Treasurer, and Martin is the Vice-Chairwoman. Compl. ¶¶ 17-20.

(3) COUNT THREE, Violations of RICO, 18 U.S.C. § 1962(d), against all defendants;[17]

(4) COUNT FOUR, Violations of Virginia Usury Laws, against Big Picture, Martorello, Ascension, and Gravel; and

(5) COUNT FIVE, Unjust Enrichment, against Big Picture, Martorello, Ascension, and Gravel.

Compl. ¶¶ 84-139.

After some defendants indicated that they would seek dismissal of the Complaint on the basis of, among other grounds, lack of subject matter jurisdiction and personal jurisdiction, the Court ordered the parties to conduct jurisdictional discovery. ECF No. 17. Following discovery disputes, the Court ordered Defendants to produce some documents that it had previously withheld as privileged. ECF No. 49. That same day, the Court granted Plaintiffs' and Gravel's joint motion to dismiss Gravel from the action without prejudice. ECF Nos. 46, 50. The Court later granted the LVD Officers' motion to dismiss the claims against them on Rule 12(b)(6) grounds, and Plaintiffs chose not to file an Amended Complaint. ECF Nos. 117, 122.

---

[17] For Counts Two and Three, Plaintiffs seek injunctive relief only as to the LVD Officers, and both damages and injunctive relief as to Big Picture, Ascension, and Martorello. Compl. ¶ 95 n.8.

Accordingly, Big Picture and Ascension are the only remaining defendants besides Martorello.

**DISCUSSION**

## I. Legal Standard

Fed. R. Civ. P. 12(b)(1) tests whether the court has subject matter jurisdiction to resolve the claims before it.[18] Sovereign immunity issues are generally considered jurisdictional in nature and, as a result, are appropriately resolved in the context of a Rule 12(b)(1) motion. See United States v. Jones, 225 F.3d 468, 469 (4th Cir. 2000) ("Sovereign immunity deprives a court of jurisdiction."); Best Med. Belgium, Inc. v. Kingdom of Belgium, 913 F. Supp. 2d 230, 236 (E.D. Va. 2012) ("Subject matter jurisdiction encompasses the scope of sovereign immunity."). When a defendant seeks dismissal under Rule 12(b)(1), the plaintiff bears the burden of proving subject matter jurisdiction. Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991); see also Lucas v. Henrico Cty. School Bd., 822 F. Supp. 2d 589, 599 (E.D. Va. 2011). Nonetheless, as explained below, there is some

---

[18] Big Picture and Ascension also assert that the Court lacks personal jurisdiction over them, but they spend little time arguing this point given the Fourth Circuit's broad reading of RICO's nationwide service of process provision. See ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 627 (4th Cir. 1997). Thus, the Court will not address any personal jurisdiction issues in this opinion.

38

disagreement here about which party bears the burden with respect to tribal sovereign immunity.

Two types of Rule 12(b)(1) motions exist:

> First, a 12(b)(1) motion may attack the complaint on its face, asserting that the complaint fails to state a claim upon which subject matter jurisdiction can lie. In such a challenge, a court assumes the truth of the facts alleged by plaintiff, thereby functionally affording the plaintiff the same procedural protection he or she would receive under Rule 12(b)(6) consideration.
>
> However, a 12(b)(1) motion may also . . . challenge the existence of subject matter jurisdiction in fact, apart from the pleadings. In such a challenge, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.

Lucas, 822 F. Supp. 2d at 599 (internal citations omitted). Moreover, in the latter situation—including where, as here, a defendant asserts sovereign immunity—the court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." White Tail Park, Inc. v. Stroube, 413 F.3d 451, 459 (4th Cir. 2005) (internal quotations omitted); see also Blitz v. Napolitano, 700 F.3d 733, 736 n.3 (4th Cir. 2012) ("[On] a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings . . . ." (second

alteration in original) (internal quotations omitted)). The court then must "weigh[] the evidence to determine its jurisdiction." <u>Adams v. Bain</u>, 697 F.2d 1213, 1219 (4th Cir. 1982).

## II. Tribal Sovereign Immunity

### A. Legal Standard

#### 1. In General

Federally-recognized Indian tribes are "separate sovereigns pre-existing the Constitution" that, "unless and until Congress acts, . . . retain their historic sovereign authority." <u>Michigan v. Bay Mills Indian Cmty.</u>, 572 U.S. ___, 134 S. Ct. 2024, 2030 (2014) (internal quotations omitted). "Among the core aspects of sovereignty that tribes possess . . . is the common-law immunity from suit traditionally enjoyed by sovereign powers," which shields tribes from liability "absent congressional authorization (or a waiver)." <u>Id.</u> at 2030-31 (citing <u>Kiowa Tribe of Okla. v. Mfg. Techs., Inc.</u>, 523 U.S. 751, 756 (1998)). The Supreme Court has on multiple occasions refused to "confine [tribal] immunity . . . to transactions on reservations and to governmental activities." <u>Kiowa</u>, 523 U.S. at 754-55; <u>see also</u> <u>Bay Mills Indian Cmty.</u>, 134 S. Ct. at 2036 (declining to revisit <u>Kiowa</u> and recognize "any exceptions for commercial or off-reservation conduct"). Thus, even though this broad scope of

immunity may have "unfortunate consequences," it is "settled law." Everette v. Mitchem, 146 F. Supp. 3d 720, 723 (D. Md. 2015) (citing Bay Mills Indian Cmty., 134 S. Ct. at 2052 (Thomas, J., dissenting) ("In the wake of Kiowa, tribal immunity has also been exploited in new areas that are often heavily regulated by States. For instance, payday lenders . . . often arrange to share fees or profits with tribes so they can use tribal immunity as a shield for conduct of questionable legality.")); see also Kiowa, 523 U.S. at 756 (acknowledging that tribal immunity is "settled law," even if "[t]here are reasons to doubt the wisdom of perpetuating the doctrine").[19]

Consistent with the idea that "an arm or instrumentality of the State generally enjoys the same immunity as the sovereign itself," Lewis v. Clarke, 581 U.S. ___, 137 S. Ct. 1285, 1290 (2017), courts in other circuits have universally held that "an

---

[19] The Supreme Court has not addressed whether, under Kiowa, "immunity should apply in the ordinary way if a tort victim, or other plaintiff who has not chosen to deal with a tribe, has no alternative way to obtain relief for off-reservation commercial conduct." Bay Mills Indian Cmty., 134 S. Ct. at 2036 n.8; see also Kiowa, 523 U.S. at 758 ("[I]mmunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims."). However, Plaintiffs willingly chose to contract with Big Picture when obtaining their loans, and Big Picture's association with the Tribe (and possible protection by sovereign immunity) was obvious from the face of Big Picture's loan agreements, so none of those hypothetical situations present themselves here.

entity that functions as an arm of a tribe shares in the tribe's immunity," Alabama v. PCI Gaming Auth., 801 F.3d 1278, 1287-88 (11th Cir. 2015); see also White v. Univ. of Cal., 765 F.3d 1010, 1025 (9th Cir. 2014); Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort, 629 F.3d 1173, 1183 (10th Cir. 2010); Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth., 207 F.3d 21, 29 (1st Cir. 2000); Hagen v. Sisseton-Wahpeton Cmty. Coll., 205 F.3d 1040, 1043 (8th Cir. 2000); In re IntraMTA Switched Access Charges Litig., 158 F. Supp. 3d 571, 575 (N.D. Tex. 2015). Although the Fourth Circuit has implicitly approved of this conclusion, it has never affirmatively adopted it. See United States v. Bly, 510 F.3d 453, 465 (4th Cir. 2007) (Motz, J., concurring); Aleman v. Chugach Support Servs., Inc., 485 F.3d 206, 213 (4th Cir. 2007). Nonetheless, several courts in the Fourth Circuit have taken the consensus approach. See Howard v. Plain Green, LLC, No. 2:17CV302, 2017 WL 3669565, at *3 (E.D. Va. Aug. 7, 2017), report and recommendation adopted, 2017 WL 3669096 (E.D. Va. Aug. 24, 2017); Everette, 146 F. Supp. 3d at 723; Madewell v. Harrah's Cherokee Smokey Mountains Casino, No. 2:10CV8, 2010 WL 2574079, at *3 (W.D.N.C. May 3, 2010), report and recommendation adopted, 730 F. Supp. 2d 485 (W.D.N.C. 2010).

The parties do not dispute that Big Picture and Ascension would be immune from suit if they qualify as arms of the Tribe, so the sole question here is whether they do so. Federal and state courts have employed several tests to determine if an entity is an arm of a tribe, but the most common was laid out in Breakthrough. See 629 F.3d at 1187-88 & n.10; Howard, 2017 WL 3669565, at *3 ("Federal courts have not settled on a uniform test, but the Tenth Circuit's analysis is the most comprehensive . . . ."). Under that framework, courts consider six factors to decide if the relationship between tribes and entities is close enough to justify immunity: "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities."[20] Breakthrough

---

[20] The court did "not conclude[] that those factors constitute an exhaustive listing or that they will provide a sufficient foundation in every instance for addressing the tribal-immunity question." Breakthrough Mgmt., 629 F.3d at 1187 n.10 (emphasis in original). However, the parties do not suggest that the Court should rely on any factors other than those listed, so this limitation is not meaningful here.

Mgmt., 629 F.3d at 1183, 1187-88. Courts should apply these factors only to the entity claiming tribal immunity, but the entity's "prior operations under [different] names may shed light on the inquiry." People ex rel. Owen v. Miami Nation Enters., 386 P.3d 357, 376 (Cal. 2016).[21] The central question "'is not whether the activity may be characterized as a business, which is irrelevant under Kiowa, but whether the entity acts as an arm of the tribe so that its activities are properly deemed to be those of the tribe.'" In re IntraMTA, 158 F. Supp. 3d at 576 (quoting Allen v. Gold Country Casino, 464 F.3d 1044, 1046 (9th Cir. 2006)). In resolving that issue, courts should "take[] into account both formal and functional considerations—in other words, not only the legal or organizational relationship between the tribe and the entity,

---

[21] Big Picture and Ascension criticize Plaintiffs' frequent citations to Miami Nation on the basis that the case's discussion of tribal immunity tried to align Breakthrough with California law, not federal law. But tribal immunity is a common-law immunity that operates the same way in state and federal court, so the location of the underlying lawsuit in Miami Nation does not make that case any less helpful here. Indeed, Breakthrough itself relied heavily on cases from state courts, including California courts. See 629 F.3d at 1187-88. Moreover, the Tenth Circuit, which authored Breakthrough, has agreed with Miami Nation's more practical view of tribal immunity (albeit to require more jurisdictional discovery, and not to decide the ultimate immunity question). See Finn v. Great Plains Lending, LLC, 689 F. App'x 608, 611 (10th Cir. 2017). Thus, Miami Nation can help explain the Breakthrough factors even if the tests in those cases are different.

but also the practical operation of the entity in relation to the tribe." Miami Nation, 386 P.3d at 365. "These functional considerations illuminate the degree to which imposition of liability on the entity would practically impair tribal self-governance." Id. at 371.

### 2. Burden of Proof

Before turning to the merits of the jurisdictional dispute, the Court must first address which party bears the burden of proof as to a tribal arm's entitlement to sovereign immunity. Big Picture and Ascension contend that this question is easily answered because, in the Fourth Circuit, a plaintiff responding to a Rule 12(b)(1) motion must prove that subject matter jurisdiction exists. Richmond, Fredericksburg & Potomac R. Co., 945 F.2d at 768. However, this cursory assertion ignores the complexity of the jurisdictional issues raised by sovereign immunity. It is well-settled that the plaintiff bears the burden of showing subject matter jurisdiction, and that tribal immunity—like any sovereign immunity—"'deprives a court of jurisdiction'" over a defendant. Everette, 146 F. Supp. 3d at 723 (quoting Jones, 225 F.3d at 469). But those statements do not necessarily imply that tribal immunity is a matter of subject matter jurisdiction in the traditional sense—like, for instance, diversity of citizenship—or, instead, a factual issue

with jurisdictional implications. In fact, "the jurisdictional nature of tribal immunity has never been definitively settled," and has sometimes been discussed in terms of *personal* jurisdiction, at least in California courts. Miami Nation, 386 P.3d at 370. Federal courts have also reached differing conclusions on the point. Compare Miner Elec., Inc. v. Muscogee (Creek) Nation, 505 F.3d 1007, 1009 (10th Cir. 2007) ("Tribal sovereign immunity is a matter of subject matter jurisdiction . . . .") with In re Prairie Island Dakota Sioux, 21 F.3d 302, 305 (8th Cir. 1994) (tribal immunity "is a jurisdictional consideration separate from subject matter jurisdiction"). This categorization is important: pure subject matter jurisdictional issues, unlike tribal immunity, cannot be waived, and must be raised sua sponte by a court if it might lack the ability to hear a case. See Miami Nation, 386 P.3d at 370. Given these contrasts, it is possible that the burden for tribal immunity issues should be allocated differently than the burden for subject matter jurisdictional issues.

Moreover, even assuming that tribal immunity is a question of subject matter jurisdiction, that should not necessarily put the burden on Plaintiffs to prove that Big Picture and Ascension are not entitled to sovereign immunity. Such placement would effectively assume the truth of Big Picture's and Ascension's

46

assertion that they should be immune from suit in the same way as the Tribe itself. "Arm-of-the-tribe cases, however, require the court to decide an antecedent question: whether [the entities] can claim sovereign immunity in the first instance." Id. (alteration in original) (internal quotations omitted). Big Picture and Ascension may be right that Plaintiffs, having received extensive information from jurisdictional discovery, can prove that Big Picture and Ascension are not entitled to tribal immunity just as easily as those entities can prove that they are entitled to it. At the same time, even if the parties can access the same evidence, one side must present it in a way that convinces the Court to make a particular decision, and there is no reason that Big Picture and Ascension should be freed from having to do so before the Court finds that they are entitled to tribal immunity. Stated differently, it would be odd to treat Big Picture and Ascension as immune entities without making them show it first. See id. at 371 ("An entity that is formally distinct from the tribe will be immune from suit only insofar as it benefits from the tribe's own immunity. . . . But until the entity has proven it should be treated as an extension of the tribe, it is no more entitled to a presumption of immunity than any other party.").

With these considerations in mind, most courts have concluded that an entity seeking tribal immunity must show by a preponderance of the evidence that it is entitled to that immunity, either as an arm of the tribe or as the tribe itself. See Gristede's Foods, Inc. v. Unkechuage Nation, 660 F. Supp. 2d 442, 465 (E.D.N.Y. 2009); City of N.Y. v. Golden Feather Smoke Shop, Inc., No. 08-CV-3966, 2009 WL 705815, at *4 (E.D.N.Y. Mar. 16, 2009); Miami Nation, 386 P.3d at 371. But see Cash Advance & Preferred Cash Loans v. State, 242 P.3d 1099, 1113 (Colo. 2010) (requiring plaintiff to prove by a preponderance of the evidence that tribal entities are not entitled to immunity because tribal immunity "bears a substantial enough likeness to subject matter jurisdiction to be treated as such for procedural purposes"). Besides the practical aspects noted above, those courts found considerable support in cases involving arms of the state, in which courts have held that the governmental entity invoking the Eleventh Amendment must show that it qualifies as an arm of the state. See, e.g., Golden Feather, 2009 WL 705815, at *4; see also U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 147 (4th Cir. 2014) (Traxler, C.J., concurring in judgment in part and dissenting in part) ("[T]he circuits that have considered similar assertions of arm-of-state status have uniformly concluded that it is an affirmative defense to be

raised and established by the entity claiming to be an arm of the state."). Because the arm-of-the-tribe and the arm-of-the-state analyses are functionally identical in the sovereign immunity context, it is illogical to place the burden on different parties in each situation.

The problem here is that the Fourth Circuit has not addressed which party bears the burden on the arm-of-the-state question. Plaintiffs claim that the Fourth Circuit has held that "'arm-of-state status . . . must be treated as an affirmative defense.'" Pls. Opp. at 17 (quoting Oberg, 745 F.3d at 148 (Traxler, C.J., concurring in judgment in part and dissenting in part)). That contention is plainly wrong, as the language quoted is from Chief Judge Traxler's opinion concurring in the judgment and dissenting, which is not precedent. The majority in Oberg, however, did acknowledge that "arm-of-the-state status may well constitute an affirmative defense in the related Eleventh Amendment context." 745 F.3d at 136. Relying on that brief statement, another judge in the Court has concluded that the entity asserting sovereign immunity bears the burden of demonstrating that it is an arm of the state. Pele v. Pa. Higher Educ. Assistance Agency, 13 F. Supp. 3d 518, 522 (E.D. Va. 2014); see also Pope v. Barnwell Cty. Sch. Dist. No. 19, No. 1:16-CV-01627-JMC, 2017 WL 1148741, at *4 (D.S.C. Mar. 28,

2017). Accordingly, the arm-of-the-state framework is just as influential here in determining which side has the burden in the arm-of-the-tribe inquiry as it was in <u>Miami Nation</u> and <u>Golden Feather</u>. As a result, the Court will join those courts in concluding that the entities claiming tribal sovereign immunity—here, Big Picture and Ascension—bear the burden of establishing by a preponderance of the evidence that they are entitled to that immunity as arms of the tribe.

## B. Application of <u>Breakthrough</u> Factors

Reviewing the six <u>Breakthrough</u> factors in the context of the parties' jurisdictional discovery, the Court concludes that Big Picture and Ascension have not met their burden of proof and, therefore, are not entitled to sovereign immunity.

### 1. Method of Creation

The first factor "focuse[s] on the law under which the entity was formed. Formation under tribal law weighs in favor of immunity, whereas formation under state law has been held to weigh against immunity." <u>Miami Nation</u>, 386 P.3d at 372 (internal citations omitted). Consistent with that statement, courts have found that this factor supports sovereign immunity where entities' formation documents showed that they were organized under and operated pursuant to tribal law. <u>See</u> <u>White</u>, 765 F.3d at 1025; <u>Breakthrough Mgmt.</u>, 629 F.3d at 1191–92; <u>Allen</u>, 464

F.3d at 1046; Howard, 2017 WL 3669565, at *3; Everette, 146 F. Supp. 3d at 724; In re IntraMTA, 158 F. Supp. 3d at 576; Miami Nation, 386 P.3d at 376. In contrast, this factor has weighed against sovereign immunity where it was clear that the purported tribal entities were incorporated under state law. See Somerlott v. Cherokee Nation Distributors, Inc., 686 F.3d 1144, 1149 (10th Cir. 2012); J.L. Ward Assocs., Inc. v. Great Plains Tribal Chairmen's Health Bd., 842 F. Supp. 2d 1163, 1176 (D.S.D. 2012).

Applying that rationale here, this factor weighs in favor of immunity. Big Picture and Ascension were both organized through resolutions by the LVD Council, which was itself exercising the power given to it by the LVD Constitution, and the entities operated pursuant to the Tribe's Business Ordinance. See Aug. 26, 2014 Resolution at 1-2 (Big Picture); Big Picture Arts. of Organization at 1; Feb. 5, 2015 Ascension Resolution at 1-2; Ascension Arts. of Organization at 1. The same is true of Red Rock, the loans of which were assigned to Big Picture after TED acquired Bellicose. Sept. 14, 2011 Resolution at 1; Red Rock Arts. of Organization at 1. As in the cases noted above, these tribal formation documents justify Big Picture's and Ascension's claims to sovereign immunity.

Plaintiffs contend that looking only to the documents under which Big Picture and Ascension were organized fails to account

for other circumstances surrounding their formation—namely, the cease-and-desist letter issued to Red Rock by the New York Department of Financial Services, the "mounting pressure" against rent-a-tribe schemes, and Hazen's inability to explain who decided to create Big Picture. Pls. Opp. at 18. It is true that "[t]he circumstances under which the entity's formation occurred, including whether the tribe initiated or simply absorbed an operational commercial enterprise," may be relevant to this factor. Miami Nation, 386 P.3d at 372. Here, it is telling that Big Picture and Ascension were not formed until after the Tribe was denied an injunction against the New York cease-and-desist. See Otoe-Missouria, 974 F. Supp. 2d at 353. Plaintiffs have presented credible evidence that, following that decision, Martorello and the Tribe looked for ways to restructure Red Rock's lending operation in order to reduce exposure to liability. Indeed, several steps in February 2015— the formation of TED and Ascension, the reorganization of Big Picture with TED as its sole member, and the initiation of the Tribe's Bellicose purchase—were apparently taken with that very goal in mind. Moreover, although Red Rock was formed as a tribal entity, Bellicose and its subsidiaries, like SourcePoint, were a critical part of Red Rock's business. Thus, by creating Big Picture and Ascension, the Tribe was not starting an independent

lending operation but rather facilitating the absorption of Red Rock's fully-functioning lending enterprise—which had a decidedly non-tribal character, given Bellicose's involvement. Big Picture and Ascension may be right that Hazen's lack of knowledge about the decision to create Big Picture is not meaningful on its own. But, viewed in context, Hazen's unawareness teaches that the impetus behind the formation of Big Picture and Ascension was Martorello and Bellicose's desire to avoid liability, more so than the Tribe's interest in starting its own business. Consequently, these circumstances limit the extent to which this factor weighs in favor of sovereign immunity. Moreover, the real significance of this evidence is in the second Breakthrough factor: the purpose factor.

However, Plaintiffs' second assertion—that Ascension's registration as a foreign LLC in Puerto Rico also affects the formation factor—is much less persuasive. Somerlott held that the Breakthrough factors are "inapplicable to entities which are legally distinct from their members and which voluntarily subject themselves to the authority of another sovereign which allows them to be sued." Somerlott, 686 F.3d at 1149-50. Plaintiffs point out that, although Ascension may be organized under tribal law, it subjected itself to the laws and the possibility of being sued in Puerto Rico by registering as a

foreign LLC there. See P.R. Laws tit. 14, §§ 3522(a), 3806(b), 4021(a)(1). But Somerlott's holding was premised entirely on the entity's incorporation under state law, which distinguished the case from others in which entities claiming to be arms of a tribe were "organized, in some form or another, under tribal law." 686 F.3d at 1149; see also J.L. Ward, 842 F. Supp. 2d at 1176 (entity was "created by incorporation under South Dakota, rather than tribal, law" (emphasis added)). Plaintiffs' attempt to skirt this limitation is unsupported by Somerlott, which demonstrated its holding by explaining that a corporation owned by the United States but incorporated under New York law would not share the United States' sovereign immunity. 686 F.3d at 1150. Ascension's background is obviously different, as it is both owned by the Tribe and incorporated under its laws. See Rassi v. Fed. Program Integrators, LLC, 69 F. Supp. 3d 288, 291 (D. Me. 2014) (distinguishing Somerlott where tribe formed subordinate entity under similar circumstances). Thus, this argument misses the mark. As a result, the first Breakthrough factor supports a finding of sovereign immunity for both Big Picture and Ascension, albeit with the caveat noted above.

### 2. Purpose of Entities

The second factor "encompasses both the stated purpose for which the entity was created and the degree to which the entity

actually serves that purpose." Miami Nation, 386 P.3d at 372; see also Breakthrough Mgmt., 629 F.3d at 1192-93 (considering both elements). The initial question is whether the entity has a stated purpose that "relates to broader goals of tribal self-governance" separate from the entity's commercial activities, like developing the tribe's economy or funding governmental services, or whether "the entity was created solely for business purposes and without any declared objective of promoting the tribe's general tribal or economic development." Miami Nation, 386 P.3d at 372 (internal quotations omitted). If such a purpose exists, the inquiry then turns to the entity's "execution" of that purpose; the "fit . . . need not be exact, but the closer the fit," the more it supports tribal immunity. Id. For instance, evidence of "the number of jobs [the entity] creates for tribal members or the amount of revenue it generates for the tribe" suggests that it is an arm of the tribe, but "evidence that the entity engages in activities unrelated to its stated goals or that [it] actually operates to enrich primarily persons outside of the tribe or only a handful of tribal leaders" shows the opposite.[22] Id. at 373.

---

[22] Miami Nation cites no case law in support of this required "fit" between purpose and execution. See 386 P.3d at 372-73. Nonetheless, Miami Nation's conclusion makes sense logically, and Breakthrough supports the more exacting inquiry called for

The stated purposes of both Big Picture and Ascension relate to the Tribe's goal of economic self-sufficiency. Big Picture's stated purpose is "[t]o engage in the business of operating one or more Tribal lending business(es)," Big Picture Arts. of Organization, Art. 5, which it does as part of the LVD Council's "strategic economic development efforts" that are aimed at "diversify[ing] the economy of the Tribe's reservation in order to improve the Tribe's economic self-suffiency," Aug. 26, 2014 Resolution at 1. Similarly, Ascension's stated purpose is "[t]o engage in the business of operating one or more Tribal marketing, technology and vendor service business(es)," Ascension Arts. of Organization, Art. 5, which helps fulfill the same tribal economic development efforts, see Feb. 5, 2015 Ascension Resolution at 1. Those stated purposes must also be read in conjunction with that of TED, the sole member of both entities, which works "[t]o promote the economic development of the Tribe through the development of business opportunities." TED Arts. of Organization, Art. 5. Along the same lines, TED's management activities are intended "to further the economic development of the Tribe." Feb. 5, 2015 TED Resolution at 1. These goals—development and execution of an online lending

---

by Miami Nation. See Breakthrough Mgmt., 629 F.3d at 1192-93 (examining entity's revenue allocation in considering purpose).

business to gain revenue for the Tribe's economic benefit—are extremely similar to those that other courts have found relate to tribal self-governance. See Breakthrough Mgmt., 629 F.3d at 1192 (casino was created to "further[] the economic prosperity of the Tribe"); Howard, 2017 WL 3669565, at *3 (stated purposes included "increase[ing] [sic] Tribal revenues and enhance[ing] [sic] the Tribe's economic self-sufficiency and self-determination" (alterations in original)); Everette, 146 F. Supp. 3d at 724 (entity's purpose was "to engage in lending related activities that will generate additional revenues for the Tribe"); Gavle v. Little Six, Inc., 555 N.W.2d 284, 294 (Minn. 1996) (stated purpose was "improv[ing] the business, financial or general welfare" of the entity and tribe (alteration in original)).

On the surface, these stated purposes seem to favor Big Picture and Ascension. However, as set out in Section II.B.1 above, the record shows that the formation of Big Picture and Ascension, and indeed, much of the tribal restructuring, was for the real purpose of helping Martorello and Bellicose to avoid liability, rather than to help the Tribe start a business. And, that finding means that Big Picture and Ascension have not carried their burden on the purpose factor.

57

Plaintiffs also contend that Big Picture and Ascension do not fulfill their stated purposes in practice. First, they say, Big Picture and Ascension have not provided any information about the number of jobs created for the Tribe or the amount of revenue received by the Tribe from their business. Second, they note that Ascension does not employ any tribal members and generates no revenue for the Tribe. Third, they assert that Big Picture is structured such that the primary beneficiaries are Hazen (who is paid more than the other tribal employees of Big Picture) and Martorello (given that TED uses most of Big Picture's revenue to make loan payments to Eventide).[23]

All three arguments have merit. First, Plaintiffs are wrong to claim that Big Picture and Ascension have provided no information about the revenue generated for the Tribe; Williams has explained that money from Big Picture constitutes more than 10% of the Tribe's general fund, and may contribute more than 30% of the fund within the next few years. Williams Aff. ¶ 10.

---

[23] Plaintiffs also argue that Red Rock's distribution of limited revenue to the Tribe in 2014 and 2015 should influence the Court's decision. However, Red Rock is a defunct entity that made distributions pursuant to a servicing agreement with another entity, SourcePoint, that also no longer exists, and that agreement has no bearing on the parties asserting tribal immunity (the relationship of which is governed by an entirely different contract). Given those differences, Red Rock's situation does not "shed light on the [purpose] inquiry" and will not affect the Court's consideration of this factor. Miami Nation, 386 P.3d at 375.

The Tribe obtains these funds both through TED's monthly 3% distributions, and as interest on its substantial investment in Big Picture's enterprise. See id. ¶¶ 8-10. Nonetheless, courts assessing an entity's execution of purpose have examined how much revenue the tribe actually received from the entity. See Breakthrough, 629 F.3d at 1192-93 (concluding that entity's business "clearly benefit[ed] the Tribe" based on percentage allocation of revenue to certain tribal governmental functions); Everette, 146 F. Supp. 3d at 724 (noting that revenue was used "to fund various tribal governmental, educational, and social services" and to provide specified "essential services"). In that regard, Hazen's statement that those funds "support LVD governmental essential services and support the LVD community" in numerous ways, Hazen Aff. ¶ 31, is far too general, as it sheds no light on how much Big Picture's revenue helped fund those services. That money might, for instance, constitute only a small, insignificant part of the funding for the services that Hazen has identified. If that is true, then Big Picture would not be effectively serving the Tribe's economic development. The evidence provided by Big Picture and Ascension, which bear the burden of proof here, is too vague to eliminate that possibility.

59

Furthermore, even if Big Picture's revenue is a meaningful portion of the Tribe's general fund, the revenue received by the Tribe is a sliver of Big Picture's total earnings. The entity seeking immunity in Breakthrough provided 100% of its revenue to various tribal services. 629 F.3d at 1192-93. Here, in contrast, the Note expressly limits the funds available to the Tribe to 5% of Big Picture's monthly revenue—the 3% monthly distribution and the 2% reinvestment amount, if the latter is treated as a current benefit to the Tribe.[24] See Note § 1.2. Breakthrough did not specify any revenue allocation percentage that must be reached to reflect an adequate fit between purpose and execution, but Miami Nation noted that a similarly small revenue distribution—a monthly payment of either 1% of the entity's revenue or $25,000—would not economically benefit the tribe. See 386 P.3d at 377-78. The evidence here further indicates that Big Picture has, over time, given the Tribe a little less than $5 million, whereas TED has made loan repayments to Eventide of

---

[24] Plaintiffs assert that this amount is not a current benefit because TED will not receive any reinvestment amount if it defaults on the loan. No evidence shows that TED is likely to default in the near future, and the Big Picture balance sheets cited by Plaintiffs appear to treat that reinvestment amount as a current asset. Plaintiffs' assertion thus relies on the wholly speculative premise that TED will, at some future date, take some action that qualifies as an event of default. See Loan Agm't § 6.1. The Court will not base its conclusion about Big Picture's purpose on a guess about the future.

about $20 million.[25] Big Picture Suppl. Interrogatory Responses ¶ 1. In other words, even under this broader view—which accounts for the months in which Eventide has not received any distribution—the Tribe has only received about 20% of Big Picture's total revenue, still a relatively small percentage. That imbalance shows that Big Picture has not served its stated purpose very well. And, even if Big Picture will not owe Eventide anything after the Note terminates in several years, Note § 1.3, the revenue distribution disparity will almost certainly have increased in that period, assuming Big Picture's revenue stream remains similar to what it has been since the parties entered into the Note.

Ascension is in a very similar position. That company supports Big Picture's lending operations and generates no revenue itself, see Intratribal Servicing Agm't § 3.4, so the purpose analysis for Big Picture applies to Ascension in much the same way. Some evidence also demonstrates that Ascension

---

[25] As noted, Martorello claims that the Tribe has actually obtained more economic consideration than Eventide since the Bellicose purchase. Martorello Decl. ¶ 63. However, that assertion is based on his valuation of equity consideration from some unknown "audited financial statements." Id. Because Big Picture and Ascension have not provided those statements here, it is impossible to verify the accuracy of Martorello's statement in the face of conflicting evidence showing that the Tribe's actual economic benefit under the Note has been dwarfed by Eventide's.

fulfills its nominal purpose even less effectively than Big Picture. Whereas Big Picture's employees primarily belong to the Tribe and work on its reservation, Ascension does not employ any non-tribal members, instead relying mostly on employees that previously worked at Bellicose. That composition may have been justified when Ascension was formed in 2015 because the company needed individuals with certain technical knowledge for the required support services, and Bellicose's employees were the perfect candidates. But, in the several years since, Hazen's and Williams' testimony instructs that the Tribe has done little more than encourage tribal members to pursue educational opportunities that would allow them to work for Ascension and Big Picture in the future.[26] Thus, Ascension has failed to contribute much to the Tribe's self-governance, either directly (by supporting Big Picture's minimal revenue generation) or indirectly (by hiring tribal employees).

Finally, Big Picture's and Ascension's compensation structures underscore the companies' poor execution of their purposes. Despite what Plaintiffs claim, the evidence does not

---

[26] Plaintiffs' assertion that Ascension or the Tribe has not started any training programs for tribal members to work at the company assumes, without any apparent basis in the evidence, that the Tribe has both the capacity and the funds to do so. This failure to pursue some possibly unachievable hypothetical goal does not count against Ascension in the purpose analysis.

indicate that Martorello himself has received any substantial economic benefit from Big Picture, certainly not in the same sense as the non-tribal individuals in Miami Nation. See 386 P.3d at 363, 378 (noting that individuals used alleged tribal entities' checks to pay for their personal expenses). However, Plaintiffs' breakdown of the compensation of Hazen, other tribal employees of Big Picture, all employees of Ascension, and the total amount paid to Ascension by Big Picture clearly illustrates two things: (1) Hazen has profited from Big Picture's lending operation far more than any other tribal members, and (2) Ascension's employees are paid handsomely compared to Big Picture's employees. These compensation differences lead to the conclusion that Big Picture and Ascension primarily benefit individuals and entities outside the Tribe, or only one tribal leader, both of which are inconsistent with the goal of economic development. See id. at 373.

Given these circumstances—and even granting that the fit between purpose and execution need not be exact, id. at 372—Big Picture and Ascension have largely failed to fulfill their stated purposes. Accordingly, this factor weighs against sovereign immunity for both entities.

### 3. Structure, Ownership, and Management of Entities, Including Amount of Tribe's Control

This factor focuses primarily on the leadership of the entity claiming immunity. See Breakthrough Mgmt., 629 F.3d at 1193. "Relevant considerations include the entity's formal governance structure, the extent to which it is owned by the tribe, and the entity's day-to-day management." Miami Nation, 386 P.3d at 373. However, an entity's "outsourc[ing] management to a nontribal third party is not enough, standing alone, to tilt this factor against immunity." Id.; see also Gavle, 555 N.W.2d at 295 ("[C]ontrol of a corporation need not mean control of business minutiae; the tribe can be enmeshed in the direction and control of the business without being involved in the actual management."). In that case, the inquiry turns to the tribe's involvement despite the nontribal leadership. "Evidence that the tribe actively directs or oversees the operation of the entity weighs in favor of immunity; evidence that the tribe is a passive owner, neglects its governance roles, or otherwise exercises little or no control or oversight weighs against immunity." Miami Nation, 386 P.3d at 373.

Big Picture is an LLC that is 100% owned and operated by its sole member, TED, which in turn is 100% owned and operated by its sole member, the Tribe. Big Picture Arts. of

Organization, Arts. 8-9; TED Arts. of Organization, Arts. 8-9. Big Picture is also managed by two tribal members, Hazen and Williams, who were appointed by majority vote of the LVD Council and must be removed in the same way. Hazen Aff. ¶ 15; Williams Aff. ¶ 12; Big Picture Operating Agm't § 5.1(a), (d). As co-managers, Hazen and Williams are granted the broad authority to "bind [Big Picture] individually," and "to do and perform all actions as may be necessary or appropriate to carry out the business of [Big Picture] including but not limited to the power to enter into contracts for services, to manage vendor relationships, [and] to manage personnel issues and affairs of [Big Picture}." Big Picture Operating Agm't § 5.1(a). They are precluded only from restricting or selling Big Picture's assets or waiving its sovereign immunity, for which they must obtain TED's consent (by majority vote of the LVD Council). Id. § 5.2. Furthermore, to the extent that Hazen and Williams are not involved in the day-to-day operations of Big Picture, the Tribe has a substantial role in those operations, as the entity employs a number of tribal members and conducts all of its operations on the Reservation. Hazen Aff. ¶ 24. Finally, the executive leadership of Big Picture preserves the Tribe's influence, as Hazen is the company's CEO. Id. ¶ 20; see also Breakthrough, 629 F.3d at 1193 (factor weighed both for and

against immunity where directors of entity were all tribal members but some executive officers were non-tribal members). This general structure is to assure that Big Picture is answerable to the Tribe at every level, which supports immunity. See Howard, 2017 WL 3669565, at *4; Everette, 146 F. Supp. 3d at 724-25; In re IntraMTA, 158 F. Supp. 3d at 577; J.L. Ward, 842 F. Supp. 2d at 1176-77.

Plaintiffs claim, however, that Big Picture's formal structure is overcome in practice by Ascension's substantial role. In support of this assertion, Plaintiffs highlight the Intratribal Servicing Agreement,[27] which, they contend, confers significant day-to-day responsibilities on Ascension and permits little oversight by Big Picture. They acknowledge that the Agreement does not grant Ascension the authority to "engage in origination activities, execute loan documentation, or approve the issuance of loans to consumers." Intratribal Servicing Agm't § 4.1. However, they note, the Agreement assigns to Ascension the duties to give "pre-qualified leads" to Big Picture and to provide "the necessary credit-modeling data and

---

[27] Plaintiffs are correct that the Intratribal Servicing Agreement and the Servicing Agreement delegate nearly identical responsibilities to Ascension and SourcePoint, respectively. See Intratribal Servicing Agm't § 4.2.1; Servicing Agm't § 4.2.1. However, it is unclear how this similarity affects the control inquiry, as Plaintiffs do not explain how the Servicing Agreement limited the Tribe's control over Red Rock.

risk assessment strategies" used by Big Picture to decide whether to issue a loan. Id. § 4.2.1(k). Because Ascension generally identifies potential loan applicants by prescreening credit reports and then directs mass mailings to those consumers, Plaintiffs say, Big Picture's role is limited to verifying details at the loan approval stage. This minimal involvement is further shown by Williams' lack of knowledge about entities owned by Big Picture.

Plaintiffs' argument relies on two underlying contentions: (1) that the Tribe's formal oversight of Big Picture is meaningless given Ascension's dominant role in Big Picture's lending operations; and (2) that, assuming Ascension has such a role, that entity is not controlled by the Tribe. Both arguments are persuasive. As to the first assertion, it is true that the Intratribal Servicing Agreement also states that "[t]he criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion" of Big Picture, and that Big Picture "shall execute all necessary loan documentation." Id. Nonetheless, considering that Ascension's responsibilities allow it to identify borrowers based on Ascension's own credit-modeling system and then prepare mass mailings to those consumers, it does not appear that Big Picture has much discretion to exercise when it receives recommendations or

documents from Ascension. Indeed, Ascension's actions in effect reduce Hazen's and William's responsibilities in the loan process to pro forma review and approval of key business decisions. See ECF No. 91-3; see also Big Picture Interrogatory Responses ¶ 24. Viewed in conjunction with Ascension's numerous other responsibilities under Section 4.2.1, this control is too limited to support a finding of tribal immunity. See Miami Nation, 386 P.3d at 373.

Moreover, evidence that Williams is not familiar with three Big Picture subsidiaries shows that Hazen and Williams do little to oversee Big Picture's operations as co-managers. Big Picture and Ascension point to several documents that, they say, suggest just the opposite: that those individuals "actively direct[] or oversee[] the operation of [Big Picture]." Id. For instance, Hazen and Williams have discussed items like Big Picture's operating budget and employee handbook, ECF Nos. 102-15, 102-16; and approved forms sent by employees concerning, inter alia, company policies and procedures, compliance management, and personnel decisions, ECF No. 106-13. This evidence reflects that Hazen and Williams exercise some managerial oversight over Big Picture's operations. However, Williams' testimony about other issues, like his non-involvement in Big Picture's day-to-day and lack of knowledge about customer service representatives'

responsibilities operations, demonstrates that such oversight is narrow in both scope and depth. Consequently, Big Picture has not shown by a preponderance of the evidence that the Tribe, through Hazen and Williams, controls Big Picture, so this factor weighs against immunity for that entity.

The question of Ascension's tribal control is not as close. Just like Big Picture, Ascension is an LLC that is 100% owned and operated by its sole member, TED. Ascension Arts. of Organization, Arts. 8-9. Hazen and Williams also manage Ascension, and the operating agreement gives them the same broad powers as with Big Picture and requires an LVD Council vote for their appointment and removal. Hazen Aff. ¶ 19; Williams Aff. ¶ 13; Ascension Operating Agm't §§ 5.1-5.2. At the same time, as in Breakthrough, the Tribe's control is diminished by the appointment of a non-tribal member, McFadden, as Ascension's president. See 629 F.3d at 1193. Likewise, Ascension conducts most activities outside the Reservation and employs only non-tribal members. In light of this non-tribal management, the Court must consider whether the Tribe is an active or passive owner. See Miami Nation, 386 P.3d at 373. Here, that inquiry revolves around the extent of Hazen and Williams' oversight of Ascension and the influence of non-tribal actors on Ascension's decisions.

Ascension has presented evidence that McFadden must obtain Hazen's or Williams' approval for "changes in operations, personnel, or distributions," McFadden Aff. ¶ 8, and that Ascension employees have submitted request and approval forms to Hazen and Williams for certain business decisions, ECF No. 106-13. Ascension's operating agreement also reserves primary oversight of the company's actions for Hazen and Williams. See Ascension Operating Agm't § 5.1(a). Nonetheless, those assertions of oversight are undercut materially because Hazen and Williams have delegated to McFadden the authority to approve Ascension's "strategic direction, goals and targets"; execute documents on the company's behalf; open and maintain Ascension's bank accounts; adopt, terminate, or change employee benefit plans; and oversee "all matters necessary for the day to day management of Ascension." Ascension Delegation of Authority Policy § 1.4. These actions are all important managerial ones that can significantly affect an entity's directions and its decisions. And, the evidence tends to show that the real management function lies not with Hazen and Williams, but with McFadden. On balance, that evidence augurs against Ascension's immunity claim.

Plaintiffs make much of provisions in the Loan Agreement that prevent TED and Ascension from modifying the Intratribal

Servicing Agreement or terminating or replacing any managers or officers of Ascension, among other entities, without Eventide's consent. Loan Agreement §§ 5.12, 5.14. Although there is no evidence that these rights have been exercised, their mere presence is evidence that goes against a finding of immunity because they confer on Eventide, and hence Martorello, significant control mechanisms over significant aspects of Ascension's operations. On balance, the control factor slightly favors a finding against immunity. At best for Big Picture and Ascension, it is neutral, and thus does not aid them in meeting their burden of proof.

### 4. Tribe's Intent with Respect to Sharing of Sovereign Immunity

Big Picture's and Ascension's formation documents show that the Tribe intended for both entities to share its immunity. The resolutions organizing each company state:

> [T]he [LVD] Council believes it to be in the best interest of the Tribe to create such an entity which, as a wholly owned and operated instrumentality of the Tribe, shall be possessed of all the privileges of the Tribe, including but not limited to the sovereign immunity of the Tribe which shall not be waived unless authorized by the [LVD] Council . . . .

Aug. 26 2014 Resolution at 2; Feb. 5, 2015 Ascension Resolution at 2. Each entity's articles of organization reiterate that

"[t]he sovereign immunity of the [entity] shall remain intact unless waived by [TED] pursuant to a duly authorized resolution of the [LVD] Council." Big Picture Arts. of Organization, Art. 7; Ascension Arts. of Organization, Art. 7. Other courts have found similar language sufficient for this factor to support tribal immunity. See Breakthrough, 629 F.3d at 1193-94; Howard, 2017 WL 3669565, at *4; Everette, 146 F. Supp. 3d at 725.

Plaintiffs concede that this factor weighs in Big Picture's and Ascension's favor, but argue that the Court should accord it the least weight out of all the factors. Plaintiffs are right that the intent factor "reveals little about 'whether the entity acts as an arm of the tribe so that its activities are properly deemed to be those of the tribe,'" Miami Nation, 386 P.3d at 379 (emphasis in original) (quoting Allen, 464 F.3d at 1046), but they mistake the significance of that statement. Miami Nation simply held that tribal intent "cannot, without more, . . . tip the balance in favor of immunity" where that factor is the only one to point "unequivocally" in that direction. Id. (internal quotations omitted). Big Picture and Ascension do not ascribe to this factor such outsized importance in the immunity analysis; indeed, they discuss it the least of any Breakthrough factor. Moreover, neither Miami Nation nor any other case holds that the

72

intent factor should be given any less weight. Therefore, the Court will consider this factor as it would any other.

But here the intent factor must be assessed in perspective of the context in which Big Picture and Ascension were created. As explained above, the record shows that those entities were intended to be vehicles that would shield Martorello and Bellicose from liability. Then, on this record, the intent factor weighs against a finding of immunity because to do otherwise is to ignore the driving force for the Tribe's intent to share its immunity. Here, the Tribe's intent no doubt was, in part, to help the Tribe, but to do so by providing its immunity to shelter outsiders from the consequences of their otherwise illegal actions.

### 5. Financial Relationship Between Tribe and Entities

The "starting point" for this factor is "whether a judgment against the entity would reach the tribe's assets." Miami Nation, 386 P.3d at 373; see also J.L. Ward, 842 F. Supp. 2d at 1176 (factor weighed against immunity because "[a] suit against [the entity] would not appear to affect, at least not directly, any particular tribe's fiscal resources"). However, "direct tribal liability . . . is neither a threshold requirement for immunity nor a predominant factor in the overall analysis." Miami Nation, 386 P.3d at 373; see also Breakthrough Mgmt., 629

73

F.3d at 1187 ("Although . . . the financial relationship between a tribe and its economic entities is a relevant measure of the closeness of their relationship, . . . it is not a dispositive inquiry.").[28] After all, "[s]ome tribes rely on [an entity's] business revenues to an extent that a judgment against the entity could effectively strike a blow against the tribal treasury, regardless of whether the tribe is directly liable." Miami Nation, 386 P.3d at 373. Consequently, courts consider the extent of the tribe's dependence on the entity "'for revenue to fund its governmental functions, its support of tribal members, and its search for other economic development opportunities.'" Id. (quoting Breakthrough Mgmt., 629 F.3d at 1195). Accordingly, "[i]f a significant percentage of the entity's revenue flows to the tribe, or if a judgment against the entity would significantly affect the tribal treasury, this factor will weigh in favor of immunity even if the entity's liability is formally limited." Id.

---

[28] Miami Nation specifically rejected holdings by other state courts that the tribe's direct liability (or lack thereof) was dispositive of the financial relationship factor. See 386 P.3d at 373 (citing Sue/Perior Concrete & Paving, Inc. v. Lewiston Golf Course Corp., 25 N.E.3d 928, 935 (N.Y. 2014); Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents, 84 P.3d 437, 440-41 (Alaska 2004)). Given that Sue/Perior and Runyon represent the minority approach on this issue, the Court will not follow them here.

The Tribe would not be directly affected by any judgment against Big Picture or Ascension. Each entity's operating agreement contains a liability limitation provision that makes the entity's "debts, liabilities, and obligations" its own. Big Picture Operating Agm't § 4.3; Ascension Operating Agm't § 4.3. The entities' interrogatory responses confirm that the Tribe would not be liable for any judgment against the entities because they are LLCs. Big Picture Interrogatory Responses ¶ 23; Ascension Interrogatory Responses (ECF No. 83-13) ¶ 18. Accordingly, neither company can satisfy this aspect of the financial relationship factor.

Other evidence further establishes that Big Picture and Ascension lack a strong financial connection to the Tribe. The structure of the Note ensures that the Tribe's monthly gains will only consist of, at most, 5% of Big Picture's revenue. Thus, as described above, the Tribe has received a little less than 20% of the total revenue distributed under the Note. Because the Tribe receives a very small part of Big Picture's revenue, this factor does not cut the same way as in cases where "all of [the entity's] profits inure[d] to the benefit of the Tribe." Howard, 2017 WL 3669565, at *4; see also Breakthrough Mgmt., 629 F.3d at 1195 ("One hundred percent of the Casino's revenue goes to the Authority and then to the Tribe.").

Furthermore, the other evidence that Big Picture and Ascension claim weighs in favor of immunity is unconvincing. First, notwithstanding the interest payments that the Tribe receives as an investor in Big Picture, Williams Aff. ¶¶ 8-9, the total distributions to the Tribe under the Note are limited. Consequently, although it might be true in theory that "any reduction in [Big Picture]'s revenue that could result from an adverse judgment against it would therefore reduce the Tribe's income," Breakthrough Mgmt., 629 F.3d at 1195, the actual effect on the Tribe appears to be insubstantial. Second, Big Picture's revenue does not play as important a role in the Tribe's general fund as in other cases where this factor supported immunity. See Breakthrough Mgmt., 629 F.3d at 1195 (tribe "depend[ed] heavily on the [entity]" for funding); Everette, 146 F. Supp. 3d at 724. As noted, Big Picture has not provided an exact breakdown of revenue allocation to different tribal services, so it is impossible to discern how the Tribe would be affected, if at all, if a judgment harmed Big Picture's operations. Third, there is evidence that Big Picture does not comply with its operating agreement's mandatory cash distribution requirement when balances exceed $500. See, e.g., ECF No. 83-24 at MARTORELLO_000218; see also Big Picture Operating Agmt' § 6.2. If Big Picture does not transfer its funds to TED when it

should, then the Tribe likely does not need that money on a timely basis. Given these circumstances, this factor weighs against Big Picture.

Ascension's financial relationship with the Tribe is not very different. By its own admission, Ascension does not generate revenue for itself or for the Tribe, so a judgment against Ascension could not possibly affect the Tribe's revenue directly. However, given that Ascension performs critical services for Big Picture, any judgment that limited Ascension's operations or forced it to close would, by extension, drastically reduce Big Picture's revenue. This potential indirect effect on the Tribe's general fund is important in the financial relationship framework. See Breakthrough Mgmt., 629 F.3d at 1195; Miami Nation, 386 P.3d at 373. Yet, for the reasons detailed above, any reduction in Big Picture's revenue would not be felt strongly by the Tribe itself. Consequently, this factor also weighs against immunity for Ascension.

### 6. Fulfillment of Purposes Underlying Tribal Immunity

The final factor assesses "the policies underlying tribal sovereign immunity and its connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities." Breakthrough Mgmt., 629 F.3d at 1187. "Those policies include protection of the tribe's

monies, as well as preservation of tribal cultural autonomy, preservation of tribal self-determination, and promotion of commercial dealings between Indians and non-Indians." Id. at 1188 (internal citations and quotations omitted); cf. Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla., 498 U.S. 505, 510 (1991) (federal statutes affirming tribal immunity "reflect Congress' desire to promote the goal of Indian self-government, including its overriding goal of encouraging tribal self-sufficiency and economic development" (internal quotations omitted)).

At first glance, granting sovereign immunity to Big Picture and Ascension would appear to serve these purposes. As noted, more than 10% of the Tribe's general fund comes from Big Picture's revenue, and that percentage will increase to more than 30% in the next few years. In addition, Hazen has stated that those funds "are used to provide a variety of social services and other benefits for the Tribe." Howard, 2017 WL 3669565, at *4. Even though Ascension does not make any money itself, it necessarily contributes to Big Picture's revenues by providing crucial technical and marketing services. As a result, both entities seem to "promote and fund the Tribe's self-determination through revenue generation and the funding of

diversified economic development." Breakthrough Mgmt., 629 F.3d at 1195; see also Everette, 146 F. Supp. 3d at 725.

However, a closer look reveals that neither Big Picture nor Ascension fulfills those goals very well, if at all. The inadequacies of Hazen's general statements about the Tribe's use of Big Picture's revenues are detailed above. Because the extent to which the Tribe has actually used Big Picture's funds for the services noted by Hazen is unclear, the Court cannot tell whether granting immunity here "directly protects the . . . Tribe's treasury, which is one of the historic purposes of sovereign immunity in general." Allen, 464 F.3d at 1047. Moreover, even assuming that Big Picture's lending operation and Ascension's support have contributed to the Tribe's economic self-development to some extent, those entities' actions have primarily enriched non-tribal entities like Eventide and, possibly, individuals like Martorello. The Bellicose purchase, and the resulting Note and Loan Agreement, have undoubtedly yielded some benefits for the Tribe. Yet, by limiting the Tribe's monthly distribution to a very small percentage of Big Picture's revenue, the Note forces the Tribe to receive those benefits at substantial cost—a reality that is illustrated by the sharp disparity in distributions received by the Tribe and Eventide since TED began repaying the loan.

Consequently, as Plaintiffs note, granting immunity here might have the unintended consequence of preventing the Tribe from obtaining favorable terms in future business transactions, as non-tribal entities would not be inclined to offer repayment above a certain rate. Thus, even if the Tribe is not bound by the Note's distribution structure forever, the example will have been set. Therefore, although Big Picture and Ascension serve the core purposes of tribal immunity to some extent, these circumstances cause this factor to weigh against immunity for both entities.

### C. Weight of Factors

For the reasons discussed above, Big Picture and Ascension have the burden to prove arm-of-the-tribe immunity by a preponderance of the evidence. That means the weighing of factors must permit a finding of immunity. On this record, that balance actually falls the other way, and weighing everything on the balance, the Court finds that neither entity qualifies as an arm of the Tribe. Therefore, Big Picture and Ascension are not immune from suit here.

**CONCLUSION**

For the foregoing reasons, DEFENDANTS BIG PICTURE LOANS AND ASCENSION TECHNOLOGIES' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION (ECF No. 22) was denied.

It is so ORDERED.

_____ /s/ _____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  July 27, 2018