IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LULA WILLIAMS, et al.,

    Plaintiffs,

v.                      Civil Action No. 3:17-cv-461

BIG PICTURE LOANS, LLC,
et al.,

    Defendants.

## MEMORANDUM OPINION

The matter is before the Court on PLAINTIFFS' MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE (the "Motion") (ECF No. 340). Although the title of the Motion mentions only documents withheld on the basis of the attorney-client privilege, the text of the Motion seems to compel production of documents withheld on the basis of the work-product doctrine as well. For the following reasons, the Motion will be granted in part and denied in part.

## BACKGROUND

As explained in detail in the MEMORANDUM OPINION (ECF No. 146) entered on July 27, 2018 (the "Sovereign Immunity Opinion"), at the core of this case lie consumer loans bearing interest rates of more than 600% that are alleged to violate Virginia's usury laws and a lending scheme (implemented through a convoluted corporate maze) that is alleged to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The Sovereign Immunity

Opinion is incorporated by reference to help explication of the facts in this case as of the time the Sovereign Immunity Opinion was issued. Since then, additional factual information has been provided through discovery in the case against Defendant Matt Martorello.

## A. Additional Factual Background

### 1. The Lac Vieux Desert Band of Lake Superior Chippewa Indians Starts An Online Lending Business

In 2011, the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe") started to engage in online lending. On July 8, 2011, the Tribe's council (the "LVD Council") enacted the Tribal Consumer Financial Services Regulatory Code (the "Code"), which legalized online lending by the Tribe. July 8, 2011 Resolution (ECF No. 23-5) at 1; Nov. 18, 2011 Resolution (ECF No. 23-3) at 1-2.

Soon after the Code was enacted, the LVD Council organized Red Rock Tribal Lending, LLC ("Red Rock") as a tribally-owned LLC on September 14, 2011. See Sept. 14, 2011 Resolution (ECF No. 23-8). The company was managed by two members of the Tribe, and the Tribe was Red Rock's sole member. The purpose of Red Rock was to make loans to consumers from its offices on the Reservation, and its employees, computers, and records were all located there. Red Rock was regulated by a governmental subdivision of the Tribe called the Tribal Financial Services Regulatory Authority, which

was created to enforce the Code and regulate licensees. Hazen Aff. (ECF No. 34-1) ¶¶ 8-9; Code (ECF No. 23-4) § 4.1.

Red Rock decided to contract with an outside entity to better learn the lending industry and to obtain a source to fund its online lending. The Tribe had identified Martorello as a potential consultant in mid-2011. Martorello Decl. (ECF No. 366-10) ¶¶ 14, 17. Martorello owned Bellicose VI, LLC ("Bellicose VI") and SourcePoint VI, LLC ("SourcePoint").[1] On October 25, 2011, Red Rock contracted with Bellicose VI for it to provide Red Rock with vendor management services, compliance management assistance, marketing material development, and risk modeling and data analytics development. Hazen Aff. ¶ 10; Servicing Agm't (ECF No. 344-2) at 1 (the "Servicing Agreement"). On April 15, 2012, Bellicose VI assigned its interest in the Servicing Agreement to SourcePoint. Hazen Aff. ¶ 12; Servicing Agm't at 1.

Even though Red Rock was solely owned by the Tribe, Martorello—through his company, SourcePoint—handled most material aspects of the lending business and funded Red Rock's operations. See generally Servicing Agm't. Under the Servicing Agreement, revenues were distributed first to Red Rock, which received 2% of all gross revenues "plus bad debt recoveries minus the sum of

---

[1] Bellicose Capital, LLC ("Bellicose Capital") was then created on October 9, 2013 to further insulate Bellicose VI and SourcePoint from liability. See Bellicose Capital's Delaware Incorporation Statement (ECF No. 344-4).

charge backs and bad debt charge-offs." Servicing Agm't §§ 2.25, 6.4.1. The remainder was then distributed in the following order: (1) to SourcePoint, to reimburse it for funding advances made to Red Rock and for servicing expenses; (2) to any of Red Rock's creditors, to pay outstanding debt that was then due; and (3) to SourcePoint, to pay its monthly servicing fee. Id. § 6.4.2-6.4.5. The Servicing Agreement also assigned specific responsibilities to SourcePoint. For instance, after noting that SourcePoint was being engaged as Red Rock's "independent contractor" to perform the services noted, the Servicing Agreement granted to SourcePoint "the authority and responsibility over all communication and interaction whatsoever between [Red Rock] and each service provider, lender and other agents of [Red Rock]." Id. § 3.1 (emphasis added). The Servicing Agreement also prevented Red Rock from operating its lending business anywhere without using SourcePoint to provide its management and consulting services for those operations. Id. § 3.3.1. In addition, the Servicing Agreement required SourcePoint to select a bank account to store all funds generated by Red Rock's lending, and it gave SourcePoint—unless otherwise agreed between Red Rock and SourcePoint—the "sole signatory and transfer authority over such bank accounts," as well as "sole authority to sweep monies from such bank accounts" to distribute revenues under the priority structure. Id. § 4.4. The Servicing Agreement also placed in SourcePoint virtually all

significant duties concerning the day-to-day functioning of the lending business being conducted in Red Rock's name, including: (1) selecting and negotiating with service providers and lenders; (2) "[d]evelopment and promotion of sound and positive business relationships," including "the enforcement or termination of agreements with such service providers and lenders"; (3) preparation of regulatory, compliance, training, education, and accounting standards, as well as standards for "screening and review of" "website contents, marketing and consumer relations practices"; (4) providing "pre-qualified leads" and the "credit-modeling data and risk assessment strategies"; (5) oversight of Red Rock's call center in the Philippines; and (6) sales to third-party debt collectors. Id. § 4.2.1.[2]

As a result of this structure, Red Rock received merely $3.2 million in profits from January 1, 2014 through August 31, 2015, even though the loans generated a net profit of $161.9 million, with most of the profit going to Martorello. Red Rock Accounting Sheet (ECF No. 344-3) at 1-4. Martorello owned 85.1% of Bellicose

---

[2] Plaintiffs allege that: Bellicose funded and underwrote Red Rock's loans; the money loaned was transferred from a bank account controlled by Bellicose Capital and Martorello, which tribal officials could not access; Bellicose Capital accepted consumer payments directly; and the only funds that Red Rock, Big Picture, or the Tribe ever received or handled was the specified revenue percentage under the Servicing Agreement. Compl. (ECF No. 1) ¶¶ 30-32, 36-37; the Motion (ECF No. 340) at 4. Neither Martorello nor the Corporate Defendants have presented evidence that Bellicose Capital was not the funding source for the Red Rock loans.

Capital; and his brother, Justin Martorello, owned 9.9% of the shares.  Dec. 31, 2015 Statement for Bellicose Capital (ECF No. 193-3).  The remaining 5% was owned by Brian McFadden, Simon Liang, and James Dowd—Bellicose Capital's officers, who occupy their same roles with Ascension Technologies, Inc. ("Ascension").  Id.

### 2. The New York and CashCall Litigations And the Decision to Restructure

In 2013, New York regulators issued cease-and-desist letters to Red Rock, accusing it and other lending entities of "using the Internet to offer and originate illegal payday loans to New York consumers, in violation of New York's civil and criminal usury laws." Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs., 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).  Thereafter, the Tribe, along with the Otoe-Missouria Tribe of Indians, sued the New York State Department of Financial Services to prevent it from enforcing New York's usury laws and to allow the Tribe to sell New York residents short-term, high interest loans.  Id. at 355.

The United States District Court for the Southern District of New York held that Red Rock was "subject to the State's non-discriminatory anti-usury laws" because the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands." Id. at 361.  Ten days later, Martorello formed Bellicose Capital, in order to add a protective layer to insulate liability.  See Bellicose Capital's Delaware Incorporation Statement (ECF No. 344-4).

6

Additionally, a few months after the decision in <u>Otoe-Missouria Tribe</u> was issued, the Consumer Financial Protection Bureau (the "CFPB") brought a similar case against CashCall, Inc. ("CashCall"), a payday loan operation that used a "Tribal Lending Model." <u>See</u> <u>Consumer Fin. Prot. Bureau v. CashCall, Inc.</u>, No. CV 15-07522-JFW, 2018 WL 485963, at *1-*3 (C.D. Cal. Jan. 19, 2018), <u>appeal filed</u> (9th Cir. April 12, 2018).

Martorello paid attention to the CashCall case, and, on January 3, 2014, he wrote that he was concerned that the CFPB was attacking "legit tribal lending operations." Jan. 2014 Email Thread (ECF No. 341-4) at 3. He asked Rob Rosette of Rosette, LLP—which is counsel for Ascension and Big Picture Loans, LLC ("Big Picture") (collectively the "Corporate Defendants") in this case—about whether the CFPB thought differently about "true sovereign nation lending" compared to the "Tribal Lending Model" that involved Native American lenders assigning the loans to different non-tribal servicers. <u>Id.</u> In the same email chain—which included lawyers from Rosette, members of the Tribe, the Tribe's general counsel, and Martorello's brother—Martorello expressed that he was "glad" that a meeting between him and CFPB regulators had not occurred and that the regulator did not know that Martorello was going to meet with him. <u>Id.</u> And, Martorello acknowledged that, if the CFPB began to take action against Red Rock and similar

lenders, there would be "a long, expensive and difficult fight where the stakes are very literally everything." Id.

Originally, the Servicing Agreement between Red Rock and Martorello's companies—Bellicose VI and SourcePoint, which were subsidiaries of Bellicose Capital—was to last until December 31, 2018. Servicing Agm't § 3.2. However, Martorello changed his mind about how the lending business should operate and decided to make changes. To that end, on August 11, 2014, Martorello told Jim Williams, Jr., Chairman of the Tribe, that "we're working on something we should have in the next few days which will have some talking points to go over about the concept for a potential bigger deal for LVD learning the Servicing business. Maybe we should start from here with a phone call, and then if we're close you can come to Puerto Rico to finalize business terms?" Aug. 2014 Email Thread (ECF No. 344-6) at 1.

In the meantime, the LVD Council enacted the Business Entity Ordinance on August 26, 2014. First Aug. 26, 2014 Resolution (ECF No. 23-6) at 1-2. The Business Entity Ordinance created comprehensive procedures for the creation, operation, and dissolution of various tribal entities, including limited liability companies ("LLCs"). See generally Business Entity Ordinance (ECF No. 23-7). The Business Entity Ordinance further stated that a tribally owned LLC that had the Tribe as its sole member would "be considered a wholly owned and operated

8

instrumentality of the Tribe and . . . [would] have all the privileges and immunities of the Tribe, including but not limited to the Tribe's sovereign immunity from suit, except as explicitly waived by the [LVD] Council." Id. Ch. 5, § 8(E). That same day, the LVD Council organized Big Picture. Second Aug. 26, 2014 Resolution (ECF No. 23-10). Big Picture was formed "as a wholly owned and operated instrumentality of the Tribe," and was nominally managed by two tribal members, Michelle Hazen ("Hazen") and James Williams ("Williams"). Id. at 2-3. Big Picture was meant to "ultimately consolidate the business" of the Tribe's other lending entities, Red Rock and Duck Creek Tribal Financial, LLC. Id. at 1.

Soon after, on October 1, 2014, the United States Court of Appeals for the Second Circuit affirmed the decision of the Southern District of New York in Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services, 769 F.3d 105 (2d Cir. 2014), finding that the district court had "reasonably concluded" that Red Rock failed to establish that it was likely to succeed on its claim that New York could not stop it from issuing loans and that "a tribe has no legitimate interest in selling an opportunity to evade state law." Id. at 112-14. After that decision, on November 4, 2014, Karrie Wichtman, a lawyer who was with Rosette, LLP and who was counsel for Red Rock at the time, sent an email to Martorello, explaining that, although the Second

Circuit's decision was in some ways a victory for the Tribe, Martorello should take the option of "go[ing] quietly into the night and restructure based on what we know from the opinion in order to build an even stronger case for future litigation." Nov. 4 Email From Wichtman to Martorello (ECF No. 398-1) at 2.

In response to the decision of the Second Circuit, Martorello and the Tribe took steps to make Ascension (the new servicer of the loans) and Big Picture operational relatively quickly. Big Picture received an employer identification number ("EIN") from the Internal Revenue Service on December 1, 2014, which is shown in an email that Wichtman sent to Martorello and members of the Tribe among others. IRS Email Containing Big Picture's EIN (ECF No. 344-7) at 1-2. On February 5, 2015, the Tribe formed another entity, Tribal Economic Development Holdings, LLC ("TED"), the asserted purpose of which was to operate the Tribe's current and future lending companies. Fed. 5, 2015 TED Resolution (ECF No. 23-13). On the same day, the LVD Council created Ascension as a wholly owned and operated servicing entity and a subsidiary of TED, and it designated McFadden—the former president of Bellicose Capital and a part owner of Eventide Credit Acquisitions, LLC ("Eventide"), a company managed and majority-owned by multiple entities of which Martorello was the president—as the president of Ascension. Feb. 5, 2015 Ascension Resolution (ECF No. 344-8) at 1-2. Ascension was created "as a wholly owned and operated

instrumentality of the Tribe," with TED as its sole member, and was managed by Hazen and Williams. Id. at 2-3.

Around the same time, the LVD Council had formed Tribal Acquisition Company, LLC ("TAC")—which, like Ascension, had TED as its sole member and Hazen and Williams as co-managers—for the sole purpose of acquiring Bellicose Capital without creating a nexus between TED and Delaware. Sept. 14, 2015 Merger Resolution (ECF No. 34-2) (the "Merger Resolution") at 2.

### 3. The Merger and the Creation of the Corporate Defendants

In early 2015, the parties agreed on the basic framework of the merger: a seller-financed transaction with non-fixed payments over a seven-year term, with any outstanding amount due being forgiven at the end of that term. The seller-financier would be Eventide. Merger Resolution at 3; see generally Eventide Operating Agm't (ECF No. 344-12). Eventide was to provide a $300 million loan to TED, which TED would then use to purchase Bellicose Capital. Merger Resolution at 3. After this rather convoluted structure was set, Martorello continued negotiating with the Tribe over the next several months. Martorello Decl. ¶ 52. The parties reached a final agreement on September 14, 2015, memorializing the terms of the deal in a loan agreement (the "Loan Agreement") and a promissory note (the "Note"). Merger Resolution at 7-9; see generally Loan Agm't (ECF No. 83-17); Note (ECF No. 83-11). As part of the transaction, the LVD Council approved a limited waiver

11

of TED's and Big Picture's sovereign immunity in connection with TED's repayment of the Eventide loan during its seven-year term. See Sept. 14, 2015 Immunity Waiver Resolution (ECF No. 34-3) at 2-8. On September 14, 2015, the Tribe entered into the Merger Agreement and Plan of Merger to purchase Bellicose Capital from Eventide. Merger Agm't (ECF No. 344-1). In a most unusual provision, the Merger Agreement provides that all Bellicose Capital's "information now or that may be discovered on equipment of any kind or in any written materials <u>shall be immediately provided to [the Tribe's acquisition company] and deleted or destroyed by the holder so that holder retains no copies of [Bellicose Capital's] information</u>." Merger Agm't § 2.6(d) (emphasis added). Finally, on January 26, 2016, using the loan from Eventide, the Tribe completed its purchase of Bellicose Capital, including subsidiaries like SourcePoint and Bellicose VI, and it acquired all of Bellicose Capital's data, software, and corporate goodwill. Martorello Decl. ¶ 53; Hazen Aff. ¶ 22.

The Tribe finished restructuring its lending businesses soon after the Bellicose Capital purchase. TAC dissolved in late January 2016 after control of Bellicose Capital had been transferred to TED. Arts. of Dissolution (ECF No. 91-9). Around the same time, Bellicose Capital's assets were assigned to Ascension, and its liabilities were assigned to Big Picture. Afterward, Bellicose Capital ceased to exist. Shortly thereafter,

on February 16, 2016, Big Picture, which was to own the loans, engaged Ascension as an independent contractor to provide Big Picture with the servicing support services that Ascension had carried over from Bellicose Capital.  Intratribal Servicing Agm't (ECF No. 398-13) § 3.1.  Big Picture retained the same managerial authority as Red Rock.  Thus, "[t]he criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion of [Big Picture] . . . and [Big Picture] . . . shall execute all necessary loan documentations."  Id. § 4.2.1(k).  Likewise, Ascension "has no authority to engage in origination activities, execute loan documentation, or approve the issuance of loans to consumers.  Final determination as to whether to lend to a consumer rests with [Big Picture]."  Id. § 4.1.

After the sale, the ownership interest in Eventide was essentially the same as it had been under the Bellicose Capital arrangement: Martorello's companies owned an 85% interest in Eventide; his brother, Justin Martorello, owned a 10% interest; and McFadden, Dowd, and Liang owned a 5% interest collectively, even as they each served as officers for Ascension.  Member Listing of Eventide (ECF No. 193-8).

### 4.    The Corporate Defendants' Structure

On the same day that Big Picture contracted with Ascension, the LVD Council also authorized Red Rock to assign the majority of its consumer loans and obligations to Big Picture.  Hazen Aff.

13

¶ 23; Feb. 16, 2016 Assignment Resolution (ECF No. 23-23) at 2-3;
see generally Assignment Agm't (ECF No. 23-24).  Big Picture
currently employs fifteen individuals on the Reservation.  Hazen
Aff. ¶ 24.  Ascension employs at least forty individuals, who work
outside the Reservation at Ascension's satellite offices, which
appear to be in Atlanta, Puerto Rico, and the Virgin Islands.
Ascension's Second Am. Resp. to Interrog. at Attachment 2 (ECF No.
193-10) at 12.  The Tribe has no involvement with Ascension's day-
to-day operations.  Ascension's Second Am. Resp. to Interrog. At
6-8.

Hazen has been Big Picture's CEO since December 2015.  Hazen
Aff. ¶ 20.  However, as with Ascension, Hazen and Williams have
delegated to McFadden (the president of Ascension, who is not a
member of the Tribe and formerly was the president of Bellicose
Capital): (1) the "approval of Ascension strategic direction,"
which must be communicated at least quarterly to the co-managers;
(2) "authority to execute documents on behalf of Ascension";
(3) "authority to open and maintain bank accounts"; (4) "authority
to adopt, terminate, or change employee benefit plans or programs";
and (5) "authority regarding all matters necessary for the day to
day management of Ascension."  Ascension Delegation of Authority
Policy (ECF No. 91-13) § 1.4.

Further, from the evidence presented by the plaintiffs and as
previously discussed by the Court in the Sovereign Immunity

Opinion, Hazen and Williams do little to oversee the lending business as co-managers. Williams' testimony about his non-involvement in Big Picture's day-to-day operations and lack of knowledge about customer service representatives' responsibilities show that his oversight is narrow in scope and death. Sovereign Immunity Opinion at 68-69. Further, as previously discussed, Ascension conducts most (if not all) operations from outside of the Tribe's reservation and employs only non-tribal members. Id. at 69.

### 5. Martorello's Communications With Attorneys About the Sale

Throughout these events from the time of the Otoe-Missouria Tribe litigation up until the eventual sale of Bellicose Capital to the Tribe, Martorello discussed corporate restructuring, the Tribal lending model, and the Tribe's lending operations with several attorneys. From the privilege logs attached to the Motion, it appears that Martorello discussed those topics with, and received advice on them from, the following attorneys: (1) Jennifer Weddle of Greenberg Traurig, LLP and Mike McBride III of Crowe & Dunlevy about "filing with Commissioner of Financial Regulation" on January 23, 2015; (2) James Fitzsimmons of Budd Lerner about a broker agreement on June 9, 2015 and on June 24, 2015, and about the sale of Bellicose Capital on August 29, 2016, which included various agreements involved in the merger; (3) William Blum and Robert Ladislaw of Solomon Blum Heymann LLP about an "entity

15

structure" on June 17, 2015 and about various tax matters relating to the Bellicose Capital sale from May 11, 2016 through August 31, 2016; (4) Dianette M. Rivera Melendez, Juan Feliciano, and Edgar Rios Mendez of Pietrantoni Mendez & Alvarez LLC about "structure changes" and tax matters related to the sale from June 16, 2015 to August 31, 2016; (5) Jeanelle Alemar of JAE Legal Services LLC about "structure changes" and "corporate structure" on June 17, 2015 and June 23, 2015; (6) John L. Williams of Conner & Winters about the Bellicose Capital merger and "[n]on-surviving companies" from January 27, 2016 to August 30, 2016; (7) David Nissman of ILP+ McChain Miller Nissman LLC about a document called the "Zeke article" on February 8, 2016; (8) Joel Winston, Blake Sims, and Jean Noonan of Hudson Cook, LLP about regulatory advice and industry lawsuits from June 2, 2016 to June 29, 2016; and (9) Andrew Smith of Covington & Burling, LLP regarding a commercial dispute with the Tribe and other regulatory advice on June 29, 2016 and June 30, 2016. See generally Martorello's Privilege Logs (ECF Nos. 341-24 and 341-25).

## B. Procedural Background

In this case, Martorello is alleged to have arranged the corporate restructuring and the lending operation in a way to insulate himself and the Corporate Defendants from liability under state usury laws and federal credit-regulating laws by trying to put the Corporate Defendants within the sovereign immunity of the

Tribe. The plaintiffs allege that these actions were done so that Martorello, Big Picture, and Ascension could violate Virginia's usury laws and RICO with impunity by being clothed in the Tribe's sovereign immunity. Specifically, the Corporate Defendants are alleged to have made loans with an annual percentage rate ("APR") up to an amount of 693.2%, which exceeds the maximum amount of 12% allowed in Virginia unless the person first obtains a consumer finance license from the Commonwealth (which neither the Corporate Defendants nor Martorello have done). Compl. ¶¶ 54-67; Va. Code §§ 6.2-1501(A), 6.2-303(A). Further, the Corporate Defendants and Martorello are alleged to have violated RICO by "collecti[ng] unlawful debt," which is defined as "a debt . . . which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. §§ 1962(c), 1961(6).[3]

The plaintiffs allege, and have made a prima facie case to prove, that the sale of Bellicose Capital to the Tribe did not substantively change anything related to the lending business in which Martorello and the Tribe were engaged while operating that

---

[3] In full, section 1962(c) says,
(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

business through Red Rock (the lending operation found to be conducting illegal activity by the United States District Court for the Southern District of New York and the Second Circuit). Further, they allege, and have offered substantial proof to show, that the sale was essentially a sham transaction meant to clothe the Corporate Defendants in the Tribe's tribal sovereign immunity in a so-called a "rent-a-tribe" business model, in which a payday lending scheme associates with a Native American tribe to avoid state and federal law. Compl. ¶¶ 2-4. The plaintiffs allege, and have offered substantial evidence to prove, that the sale transaction was devised by Martorello to shield him and his closely-held corporations as well.

The plaintiffs have shown that the convoluted sale transaction and the attendant corporate restructuring (following adverse legal decisions) was designed by Martorello and his lawyers, with the involvement of the Tribe and its lawyers, to continue the lending operation that had been held to be illegal by federal courts. They point to Chairman Williams' statement in his deposition that McFadden's job was not different at Ascension than it was at Bellicose Capital except "[t]he difference is now he answers to the Tribe" and that "everything that was being done [at Bellicose Capital] was just transferred over to Ascensions [sic] to keep the flow going." Williams Deposition Excerpt (ECF No. 344-10) at 3-4. Another member of the Tribe, Secretary Susan

18

McGeshick, said that Bellicose Capital "did like the – the same thing as Ascension does today." McGeshick Deposition Excerpt (ECF No. 344-11) at 3. And, as the Court already has held, certain provisions of the Servicing Agreement "confer on Eventide, and hence Martorello, significant control mechanisms over significant aspects of Ascension's operations." Sovereign Immunity Opinion at 71. Indeed, Martorello can revoke the shares that McFadden, Liang, and Dowd—all officers of Ascension—have in Eventide. See Eventide Operating Agm't at 5 ("The Manager [Martorello], in his sole and absolute discretion, may require a Member to sell all or a portion of the Interest of such Member, on not less than fourteen (14) days' notice (a 'Mandatory Repurchase')"); id. at 19 (showing that McFadden, Liang, and Dowd were officers at Eventide).

In further pursuit of proof of these claims, the plaintiffs sought documents and interrogatory answers about the above-described merger and restructure and the lending operations in which the Corporate Defendants are engaged. Martorello objected, inter alia, on grounds that his asserted subjective good faith defense to the plaintiffs' claims "about the legality of the tribal business model and [the Tribe's] lending operations" relies only "on non-privileged information provided by attorneys." Martorello's Resp. to Interrog. (ECF No. 341-1) at 7-8. Essentially, he argues that he should not be held liable for the plaintiffs' claims because he had a good faith belief that his

19

conduct, the corporate restructuring that followed the decision declaring that Red Rock's lending was illegal, and the ensuing lending business were lawful.

As a result, the plaintiffs filed the Motion, asking the Court to:

> (1) compel[] the production of all documents withheld on Martorello's privilege logs (ECF Nos. 341-24 and 341-25);
>
> (2) requir[e] Martorello to disclose all the advice that he received regarding: (i) the legality of the tribal business model, (ii) the legality of LVD's lending operations, (iii) the restructure, and (iv) any litigation involving any similar business models, including but not limited to any litigation involving CashCall, John Reddam, Scott Tucker, Charles Hallinan, Think Finance, and Kenneth Rees; and
>
> (3) find[] a waiver of privilege and work product as to: (i) any documents destroyed as part of the sale of Bellicose Capital to the Tribe, including any documents retrieved by Martorello and the attorneys who represented the companies and (ii) any communications in regard to the documents' destruction.

See id.

## DISCUSSION

### I. THE ATTORNEY-CLIENT PRIVILEGE ISSUE

The attorney-client privilege "is the oldest of the privileges for confidential communications known to the common law." Upjohn v. United States, 449 U.S. 383, 389 (1981). The privilege is intended to "promote broader public interests in the observance of law and administration of justice," and it "recognizes that sound legal advice or advocacy serves public ends

and that such advice or advocacy depends upon the lawyer's being fully informed by the client." Id.

The Fourth Circuit uses what it calls the "classic test" for determining the existence of attorney-client privilege:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client

Hawkins v. Stables, 148 F.3d 379, 383 (4th Cir. 1998) (quoting United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982)). Here, the parties do not dispute that the sought information at issue is covered by the attorney-client privilege.

The plaintiffs argue that, for two reasons, Martorello must turn over his communications with his attorneys that relate to the above-described corporate restructuring, the Tribal lending model, and the formation and operation of the Tribe's lending business sales transactions, including all advice that Martorello received regarding: (i) the legality of the tribal business model, (ii) the legality of LVD's lending operations, (iii) the restructure, and (iv) any litigation involving any similar business models, including but not limited to any litigation involving CashCall,

John Reddam, Scott Tucker, Charles Hallinan, Think Finance, and Kenneth Rees. See The Motion (ECF No. 340). First, the plaintiffs argue that Martorello has waived the attorney-client privilege by asserting a good faith defense. Second, they argue that the so-called crime/fraud exception to the attorney-client privilege applies to require production of the sought after documents pertaining to the legality of the lending business model, the Tribe's operations, and the Corporate Defendants' structure and restructure following the decision in Otoe-Missouria Tribe. Each argument will be addressed in turn.

## A. Whether Martorello Has Waived the Attorney-Client Privilege

Martorello has waived the attorney-client privilege, say the plaintiffs, because he asserted, as a defense, his good faith belief that the Tribe's business model, the structure and restructure described from pages 2-16 above, and the Tribe's lending operations were legal.

Waiver of the attorney-client privilege can be either expressed or implied. Express waiver is not at issue here.

In the Fourth Circuit, "[i]mplied waiver occurs when a party claiming the privilege has *voluntarily* disclosed confidential information on a given subject matter to a party not covered by the privilege." Hanson v. U.S. Agency for Int'l Dev., 372 F.3d 286, 294 (4th Cir. 2004); see also Hawkins, 148 F.3d at 384 n.4 ("As a general rule, implied waiver occurs when the party claiming

22

the privilege has made any disclosure of a confidential communication to any individual who is not embraced by the privilege."); United States v. Juan, 48 F. Supp. 3d 853, 859 (E.D. Va. 2014) (stating that "other courts have more broadly described the trigger for a waiver as anything that might put the nature of the attorney's prior advice or the attorney-client relationship 'at issue'"). And, putting one's good-faith belief at issue can lead to such waiver. In In re Grand Jury Subpoena, 341 F.3d 331 (4th Cir. 2003), the Fourth Circuit held that there was an implied waiver when a defendant said "that he had acted in a particular way relying on the legal advice of an attorney." Id. at 337; see also United States v. Moazzeni, 906 F. Supp. 2d 505, 512 (E.D. Va. 2012) ("[Implied] waiver may occur if the client places the attorney-client relationship in issue, for example, by affirmatively invoking a defense of good faith reliance on advice of counsel."). The Second Circuit has put the matter somewhat differently, holding that implied waiver is present in three situations: (1) "when a client testifies concerning portions of the attorney-client communication," (2) "when a client places the attorney-client relationship directly at issue," and (3) "when a client asserts reliance on an attorney's advice as an element of a claim or defense." See In re County of Erie, 546 F.3d 222, 228 (2d Cir. 2008) (quoting Sedco Int'l S.A. v. Cory, 683 F.2d 1201, 1206 (8th Cir. 1982)). The test of the Fourth Circuit is somewhat

more broadly expressed than the one articulated by the Second Circuit. But, the two approaches are harmonious in that the waiver is found because of a defense that, in whole or in part, relies on the advice of counsel or testimony about portions of an attorney-client communication.

The assertion of an "advice of counsel" defense has been described as a "'quintessential example' of an implied waiver of the privilege." See id. But, it is clear that "a party must *rely* on privileged advice from his counsel to make his claim or defense" for a waiver to occur. Id. at 229; see also 1 McCormick On Evid. § 93 (7th ed.) ("It has accordingly become established that if a party interjects the 'advice of counsel' as an essential element of a claim or defense, then that party waives the privilege as to all advice received concerning the same subject matter.").

In his Answer to the Complaint, Martorello stated that "Defendant, Matt Martorello, at all times relevant acted in good faith and in a lawful manner towards consumers and in conformity with all applicable laws and regulations." Martorello's Answer (ECF No. 35) at 23. In his responses to the plaintiffs' interrogatories about his defense, Martorello elaborated that his defense was "based, in part, on non-privileged information provided by attorneys Jennifer Weddle, Karrie Wichtman, Blake Sims, John Williams, Jennifer Galloway, Dan Gravel, Saba Bazzazieh, and Robert Rossette, as well as others at their

24

respective law firms, as well as from additional non-attorney public sources, about the legality of the tribal business model and [the Tribe's] lending operations." Martorello's Resp. to Interrog. at 7-8. Martorello also answered that "Martorello and his attorneys performed significant due-diligence on the Tribe's contemplated transactions and business efforts, as the Tribe and its business advisors and attorneys did with Martorello." Id. at 9. Martorello's pleadings make clear that he intends to prove in his defense that he believed "in the lawfulness of the [Tribe's] lending business" because Rick Gerber, CEO of the financial institution used by the Tribe, "advised that the FDIC [] told him that tribal lending businesses were not illegal." Id. at 11. And, he intends to prove as well: (1) that the representations made by the Tribe's attorneys about the legality of the Tribe's business; and (2) that "consultation with counsel provided Martorello with the assurances that the servicing relationship whereby Bellicose or SourcePoint would assist the Tribe's lending businesses was lawful in all respects." Id. at 12 (emphasis added). Finally, Martorello adds that Bellicose Capital, at his direction, "spent nearly $1 million building compliance management system ('CMS'), and hired attorneys and experts to help manage and provide guidance regarding compliance." Id.

The plaintiffs argue that Martorello's good faith defense, as evidenced by his interrogatory responses and his briefs, means

that he cannot prevent disclosure of any advice related to that belief and that Martorello is trying to reveal beneficial communications while withholding other less helpful ones, which, of course, he cannot do. C.f. E.I. Dupont de Nemours & Co. v. Kolon Indus., Inc., 269 F.R.D. 600, 605 (E.D. Va. 2010). Further, they argue that there is waiver because Martorello affirmatively placed his subjective belief regarding the lawfulness of his conduct as an issue in this case. Martorello responds that the plaintiffs are conflating an advice of counsel defense—which would lead to waiver—with his asserted good faith defense based on non-privileged information—which, in his view, should not lead to waiver. Further, Martorello relies on In re Itron, Inc., 883 F.3d 553, 561 (5th Cir. 2018), to argue that requiring him to turn over privileged documents would essentially force him to lose his privilege merely because the documents are relevant to the lawsuit.

The record here shows that Martorello has waived the attorney-client privilege as to all communications with counsel regarding the restructure of the lending business; all communications regarding the legality of the Tribe's business model; all communications regarding the legality of the Tribe's lending operations; and all communications regarding litigation involving similar business models (including CashCall, John Reddam, Scott Tucker, Charles Hallinan, Think Finance, and Kenneth Rees).

The record shows that Martorello's good faith defense has placed his communications with attorneys at issue in this case, waiving the attorney-client privilege about the foregoing topics. As demonstrated by his interrogatory answers, the statements in his Answer to the Complaint and in his briefs, Martorello has asserted that he is going to rely on far more than public, non-privileged information. For example, Martorello has shown that his purported good faith beliefs were based, in part, on the facts that: (1) he and "his attorneys performed significant due-diligence on the Tribe's contemplated transactions and business efforts, as the Tribe and its business advisors and attorneys did with Martorello," Martorello's Resp. to Interrog. at 9; (2) "consultation with counsel provided Martorello with the assurances that the servicing relationship whereby Bellicose or SourcePoint would assist the Tribe's lending businesses was lawful in all respects," id. at 12 (emphasis added); and (3) Bellicose Capital, at Martorello's direction, "spent nearly $1 million building compliance management system ('CMS'), and hired attorneys and experts to help manage and provide guidance regarding compliance." Id. (emphasis added). Further, in DEFENDANT MATT MARTORELLO'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE (ECF No. 366), Martorello acknowledges that he and the Tribe "secured multiple formal and informal opinions from counsel

opining that the [the Tribe's] tribal lending model was viable and that Indian sovereign immunity would apply, precluding the application of state and federal laws." Id. at 16.

All these statements show that Martorello's asserted belief that the Tribe's lending business and the corporate restructuring at issue were legal was partially, if not almost entirely, based on his reliance on information communicated to him by attorneys. Thus, on this record, Martorello has affirmatively waived the attorney-client privilege by arguing that he had a good faith belief that he was following the law. See U.S. v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991) (holding that waiver occurred when a party testified that "he thought his actions were legal," which "put his knowledge of the law and the basis for his understanding of what the law required" at issue); Henry v. Quicken Loans, Inc., 263 F.R.D. 458, 469 (E.D. Mich. 2008) ("[W]hen a party asserts a defense of good faith or reasonableness, and affirmatively offers testimony that the party consulted with their attorney as factual support for the defense, and when counsel's advice in some way supports the defendant's good faith belief, the defendant has put his counsel's advice 'at issue' and thereby waives the attorney client privilege on the narrow subject matter of those communications.").

Martorello's heavy reliance on In re Itron is misplaced. In that case, the Fifth Circuit addressed whether a plaintiff waived

its attorney-client privilege merely by filing a lawsuit in which attorney-client communications were relevant. 883 F.3d at 556. The Fifth Circuit said that it could not hold that waiver occurred "whenever the client files a lawsuit to which privileged communications, if disclosed, might prove 'highly relevant'—even if the client never relies on or uses those communications to make her legal case." Id. at 560 (emphasis added). Nothing of the sort is present here. Martorello affirmatively responded that he was relying on the opinions of attorneys and communications with them as part of his defense. So, In re Itron provides no help for him.

This case is much more similar to Henry, in which a party "affirmatively asserted advice of counsel as a basis for its good faith" by stating that counsel "confirmed" the party's understanding and reinforced its good faith efforts to comply with the law. 263 F.R.D. at 470. The Court in Henry held:

> By including consultations with counsel as a basis for its good faith, [the party] has transformed the defense of good faith into a 'good faith reliance on counsel' defense. Once the defendant has relied (even in small part) on privileged communications to make its case, fairness requires that the privilege be put aside in order for the plaintiff to test the defendant's contentions.

Id. That is what Martorello has done here.

The burden is on Martorello to show that the attorney-client privilege applies to his case and "that the privilege was not waived." Jones, 696 F.2d at 1072. Martorello failed in that

29

burden because his "[s]elective disclosure for tactical purposes waive[d] the privilege." Id.

The scope of the waiver is defined in large measure by the nature of the asserted good faith defense. And, here, the assertion of good faith is quite broad. That is because Martorello's good faith defense is that he believed that the restructuring of the lending business after the decision in Otoe-Missouria Tribe, the Tribe's business model, and the Tribe's lending operations were lawful. The scope thusly defined is as to those topics. We also consider that Fed. R. Evid. 502(a) provides that:

> When the disclosure [of a communication or information covered by the attorney-client privilege] is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together.

Id. (emphasis added). The key determinations here are what communications are part of "the same subject matter" as the communications in Martorello's defense and what "ought in fairness" should be considered with those communications. Id.

The Fourth Circuit has said that subject matter waiver is limited to "other communications relating to the same subject matter." Jones, 696 F.2d at 1072 (emphasis added). "However, it is settled that, 'when a party reveals part of a privileged

30

communication to gain an advantage in litigation, the party <u>waives</u>
<u>the attorney-client privilege as to all other communications</u>
<u>relating to the same subject matter</u>. Selective disclosure for
tactical purposes waives the privilege.'" <u>Kolon Indus.</u>, 269 F.R.D.
at 605 (emphasis added) (quoting <u>Jones</u>, 696 F.2d at 1072).
"Selective disclosure occurs not only when a party reveals part of
one privileged communication, but also when a party reveals one
beneficial communication but fails to reveal another, less
helpful, communication on the same matter." <u>United States ex rel.</u>
<u>Mayman v. Martin Marietta Corp.</u>, 886 F. Supp. 1243, 1252 (D. Md.
1995). However, to fall under the scope of subject matter waiver,
the other documents must be "directly related" to the subject at
issue. <u>See</u> <u>United States v. (Under Seal)</u>, 748 F.2d 871, 875 n.7
(4th Cir. 1984).

Here, the Motion asks the Court to:

(1) compel the production of all documents withheld on
Martorello's Privilege Logs (ECF Nos. 341-24 and 341-
25); [and]

(2) require Martorello to disclose all the advice that
he received regarding (i) the legality of the tribal
business model, (ii) the legality of LVD's lending
operations, (iii) the restructure, and (iv) any
litigation involving any similar business models,
including but not limited to any litigation involving
CashCall, John Reddam, Scott Tucker, Charles Hallinan,
Think Finance, and Kenneth Rees.

The Motion (ECF No. 340). The Motion also asks the Court to "find
a waiver of privilege and work product as to (i) any documents
destroyed as part of the sale of Bellicose Capital to the Tribe,

31

including any documents retrieved by Martorello and the attorneys who represented the companies and (ii) any communications in regard to the documents' destruction." Id.

The record shows that Martorello's good faith defense encapsulates all documents and communications in his Privilege Logs (ECF Nos. 341-24 and 341-25) that are asserted as protected by the attorney-client privilege (all of which are directly related to the lending business's restructure, the Tribe's business models, or the Tribe's lending business either before or after the restructure). In other words, Martorello must turn over all documents in part (1) of the Motion's request as to which there is a claim of attorney-client privilege as well as all advice called for in part (2) of the Motion. As to part (3) of the Motion, Martorello must turn over any communications with attorneys that discuss or relate to the destruction of his emails as those emails relate to the sale of Bellicose Capital to the Corporate Defendants, to the destruction of the records of Bellicose Capital as provided in the Merger Agreement, and to the raison d'etre for the destruction provision.

Other courts have held that waivers of this scope are necessary to prevent selective disclosure. See Scott v. Chipotle Mexican Grill, Inc., 67 F. Supp. 3d 607, 617 (S.D.N.Y. 2014) (finding that the defendant had to produce "all responsive documents previously withheld on privilege grounds" when it had

asserted a good faith defense); <u>United States v. Exxon Corp.</u>, 94 F.R.D. 246, 249 (D.D.C. 1981) ("[B]ecause the waiver is generated by the injection of an entire [good faith] defense, the magnitude of the waiver must be proportionally larger. . . . [T]he waiver must pertain to all documents bearing upon the subject matter of the defense. Otherwise, the party interposing the defense is free to divulge only those documents that are most favorable to his defense; this is precisely the inequitable result that the waiver doctrine seeks to avoid."); <u>see also</u> <u>Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.</u>, 237 F.R.D. 618, 626 (N.D. Cal. 2006) (holding that where "the disclosures were made deliberately in order to secure a legal advantage," the scope of the waiver is broad). Considering the breadth and reach of Martorello's good faith defense and the principles announced in <u>Scott</u>, <u>Exxon</u>, and <u>Roche</u>, the scope of the waiver is necessarily broad to avoid the effect of selective disclosure.

**B. Whether Martorello's Communications With Counsel Fall Within The Crime/Fraud Exception To The Attorney-Client Privilege**

The plaintiffs also assert that Martorello's communications in part (2) of the Motion are subject to the so-called "crime/fraud" exception to the attorney-client privilege. Although labeled as an "exception" to the privilege, the crime/fraud jurisprudence is better considered as "an exclusion of certain activity from the reach of the [attorney-client] privilege[]." <u>Rambus, Inc. v. Infineon Technologies AG</u>, 220 F.R.D.

264, 281 (E.D. Va. 2004) (citing In re Grand Jury Subpoena, 731 F.2d 1032, 1038 (2d Cir. 1984)). "[M]any courts have applied the exception to situations falling well outside of the definitions of crime or fraud." Id. Whatever it may be called (and here it will be called the exception because that is how most cases refer to it), the exception provides that the attorney-client privilege may be lost "when a client gives information to an attorney for the purpose of committing or furthering a crime or fraud." See In re Grand Jury Proceedings #5 Empaneled January 28, 2004, 401 F.3d 247, 251 (4th Cir. 2005).

The party asserting the crime/fraud exception must make a prima facie showing that the privileged communications fall within its reach. In re Grand Jury Proceedings #5, 401 F.3d at 251. The prima facie showing requires evidence that: "(1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme and (2) the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud." Id.

The first facet of the test is satisfied by a "showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." Id. at 254-55. The second facet is satisfied if the "privileged communications . . . bear a close relationship to [the

34

party's] existing or future scheme to commit a crime or fraud,"
which is demonstrated by "evidence of the contents of the[]
documents." See id. at 255. This evidence can include "detailed
summaries of the allegedly privileged documents," an "*in camera*
hearing involv[ing] an examination of the actual documents for
which privilege is claims," or evidence "by other means that
allegedly privileged documents are connected to a crime or fraud
such as through testimony or a reliable government proffer." See
id. at 253-55. The focus is on the client's knowledge, and "it is
enough that the communication furthered, or was intended by the
client to further, that illegality." Id. at 251 (quoting In re
Grand Jury Proceedings (U.S. v. Under Seal), 102 F.3d 748, 751
(4th Cir. 1996)).

    The plaintiffs argue that the crime/fraud exception applies
here because all legal advice in part (2) of the Motion was made
to further the alleged fraud of organizing the Corporate Defendants
and structuring and operating the lending business on which
Martorello and the Tribe were engaged so as to permit the making
and collection of loans that are unlawful under state and federal
laws, i.e., in furtherance of crimes. Specifically, they argue
that the advice was sought to violate Virginia Code § 6.2-1540,
which makes it a class 2 misdemeanor to participate in a violation
of Virginia's usury statute, Virginia Code § 6.2-1501. Section

6.2-1501(a) limits a business to contracting for a loan interest rate of greater than 12%. See id.; Va. Code § 6.2-303(A).

The plaintiffs also allege that the advice in section (2) of the Motion was sought to devise a scheme to allow the "collection of [an] unlawful debt," which is defined as "a debt . . . which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate," in violation of RICO. 18 U.S.C. §§ 1962(c), 1961(6).

Martorello responds that the plaintiffs' crime/fraud theory is erroneous because they mischaracterize the arrangements at issue as a sham transaction when the Tribe always planned to acquire Bellicose Capital, and because they assume that Martorello was given similar advice as the attorney gave in CashCall. Further, relying on In re Napster Inc. Copyright Litigation, 479 F.3d 1078, 1097-98 (9th Cir. 2007), Martorello argues that, standing alone, restructuring an enterprise to limit liability is insufficient to animate the crime/fraud principle. Martorello argues that the exception does not apply because the lending business restructure was not for a "knowingly unlawful end"; instead, Native American tribes have a right to choose tribal law in contractual relations, so there was nothing done that was unlawful. Next, Martorello argues that there is no evidence that the privileged documents have a "close relationship" to an existing

36

or future scheme and that the plaintiffs cannot rely on broad, unsupported statements to meet this facet.

In reply, the plaintiffs argue that the emails between Martorello and others connected to the Tribe show that (1) Martorello and the Tribe restructured for criminal purposes (namely, violating Virginia and other states' usury laws and for collection of unlawful debts in violation of RICO); and (2) Martorello's conduct went beyond restructuring to limit liability.

The plaintiffs have made a prima facie case that: (1) Martorello and the Corporate Defendants intended to lend at usurious rates of interest in violation of Virginia and other states' laws and that they intended to engage in conduct (collecting unlawful debt) in violation of RICO; and (2) Martorello and the Corporate Defendants engaged the lawyers to help in achieving their objectives. Virginia Code § 6.2-1540 makes clear that it is a crime to participate in the violation of Virginia's usury statute, which limits a business to contracting for a loan interest rate of greater than 12%. See Va. Code § 6.2-1501. The plaintiffs have made a compelling case that Martorello participated in such an endeavor on his own and with the Corporate Defendants.

And, the plaintiffs have made a prima facie case that Martorello violated RICO. As stated earlier, a section 1962(c)

violation requires: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity" or, alternatively, "collection of unlawful debt." See 18 U.S.C. § 1962(c); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985) (footnote omitted); see also Gibbs v. Haynes Investments, LLC, No. 3:18CV48, 2019 WL 1314921, at *23 (E.D. Va. Mar. 22, 2019) ("To establish a violation of § 1962(c), Plaintiffs must allege that the [] Defendants (1) conducted the affairs of an enterprise (2) through the collection of unlawful debt (3) while employed by or associated with (4) the 'enterprise engaged in, or the activities of which affect, interstate or foreign commerce'" (footnotes omitted) (quoting 18 U.S.C. § 1962(c)); Small Bus. Admin. v. Echevarria, 864 F. Supp. 1254, 1266 (S.D. Fla. 1994) (stating that to prove a RICO violation, a plaintiff "must establish the following four elements: (1) income derived from a 'pattern' of racketeering or the collection of an unlawful debt, (2) the use or investment of the income in the acquisition, establishment, or operation by a defendant (3) of an 'enterprise' (4) engaged or affecting interstate commerce" (quoting Pelletier v. Zweifel, 921 F.2d 1465, 1489-90, 1518-19 (11th Cir. 1991)); Leonard B. Sand, et al., Modern Federal Jury Instructions, Instruction 52-19 (stating that to show a violation of section 1962(c), the evidence must permit a finding that: (1) "an enterprise existed as alleged in the indictment"; (2) "the enterprise affected interstate or

38

foreign commerce"; (3) "the defendant was associated with or employed by the enterprise"; (4) "the defendant engaged in a pattern of racketeering activity (*or* the collection of unlawful debt)"; and (5) "the defendant conducted or participated in the conduct of the enterprise through that pattern of racketeering activity (*or* the collection of unlawful debt)"). And, Martorello and the Corporate Defendants are alleged to have violated RICO's conspiracy provision by conspiring to do such activity that violates section 1962(c). <u>See</u> 18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.").

Here, the plaintiffs have made such a prima facie case as to these elements because (1) Martorello and the Corporate Defendants worked together to restructure the Corporate Defendants and to set up the tribal business model and the lending operations in which they were jointly engaged so that usurious loans could be made and collected; (2) he participated in an "enterprise"[4] by working with the Corporate Defendants and others to restructure the Corporate Defendants and the lending business to make those illegal loans, and he had "<u>some</u> part in directing the enterprise's affairs," <u>Reves v. Ernst & Young</u>, 507 U.S. 170, 179 (1993) (indeed, Martorello's

---

[4] RICO says an "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961.

was a critical role); (3) there was a pattern of making usurious loans and collecting unlawful debt because Martorello and the Corporate Defendants enforced the loan agreements against the plaintiffs and others who received loans from the Corporate Defendants that violated states' usury laws; and (4) Martorello and the Corporate Defendants collected "unlawful debt" by receiving payments from the plaintiffs and others "where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

Further, the plaintiffs have satisfied the second facet of their prima facie case by showing that Martorello and the Corporate Defendants engaged the advice of lawyers to achieve their criminal ends. The plaintiffs have offered Martorello's Privilege Logs, and the description of the documents in the "privilege comments" sections of the Privilege Logs (ECF Nos. 341-24 and 341-25) show that the "privileged communications . . . bear a close relationship to [the party's] existing or future scheme to commit a crime or fraud." In re Grand Jury Proceedings #5, 401 F.3d at 255. As discussed above, the Privilege Logs show that Martorello's communications with various attorneys—Jennifer Weddle, Mike McBride III, James Fitzsimmons, William Blum, Robert Ladislaw, Dianette M. Rivera Melendez, Juan Feliciano, Edgar Rios Mendez, Jeanelle Alemar, John L. Williams, David Nissman, Joel Winston, Blake Sims, Jean Noonan, and Andrew Smith—categorically all

related to his efforts to evade state usury laws and to engage in conduct that violated RICO (collecting unlawful debts). Those comments reveal that Martorello's communications with counsel involved subjects including: (1) filings with the New York Commissioner of Financial Regulation; (2) discussions involving the various agreements at issue in this case and the "deal structure"; (3) discussions regarding the tribal lending business's "entity structure" and "tax structure"; (4) requests for legal advice related to press releases about the lending business; (5) various discussions about taxing Eventide and the other entities; (6) discussions about "regulatory advice"; (7) the Merger Agreement and the "sale transaction"; and (8) debt financing for Big Picture. See generally ECF Nos. 341-24 and 341-25. These descriptions show that all the advice sought by the plaintiffs relates to Martorello's scheme to make and collect usurious loans, in violation of Virginia law and RICO. See 18 U.S.C. §§ 1962(c)-(d), 1961(6); Va. Code §§ 6.2-1501(A), 6.2-303(A). In addition, the documents setting out Martorello's good faith defense show that involvement of counsel in achievement of the criminal conduct as to which the plaintiffs had made a prima facie case.

Moreover, the documents about the corporate restructure and the Tribe's lending operations sought in part (2) of the Motion lie at the core of the alleged crimes and fraud by outlining how the restructuring and the lending operation are to be accomplished,

and those documents are inherently closely related to the alleged crime and fraud, which is an additional reason that the second facet of the crime/fraud test are made out.[5]

Finally, since the Motion was originally filed, in accordance with the ORDER dated March 28, 2019 (ECF No. 441), Martorello has produced 601 documents for *in camera* review that he claims are covered by the attorney-client privilege and the work-product doctrine. After reviewing the privilege logs attached to those documents, it is clear that the documents all relate to the structuring and operating the lending business, and the Tribal lending model, thereby further supporting the conclusion that the second facet of the crime/fraud exception is made out.

## C. The Alleged Spoliation of Evidence

Relying on Rambus, the plaintiffs argue, in a summary fashion, that the crime/fraud exception applies to all documents and records destroyed as part of the sale of Bellicose Capital as well as any communications planning, or in furtherance of, the destruction of those documents and records, because Martorello and the Tribe purposefully spoliated the evidence. The plaintiffs point to the Merger Agreement, which provides that "[a]ll [Bellicose Capital's]

---

[5] In the first privilege log (ECF No. 341-24), one communication with David Nissman of ILP+ McChain Miller Nissman LLC dated February 8, 2016 is called the "Zeke article." Because the Court has no context or explanation as to what this document is or how it relates to Martorello's various actions, at this time, Martorello does not have to turn over the communication unless it pertains to the lending business or the corporate restructure.

information now or that may be discovered on equipment of any kind or in any written materials shall be immediately provided to [TAC] and deleted or destroyed by the holder so that holder retains no copies of Company information," Merger Agm't at § 2.6(d), and to an email from the Corporate Defendants' counsel that said that all of Martorello's emails, save a few "pre-2014 travel confirmation emails," "were deleted shortly after the time of the [sale of Bellicose Capital to the Tribe] according to the requirements in the [Merger Agreement]." Jan. Email from Justin Gray (ECF No. 341-19) at 1. But, there is no other information in the record showing why the Merger Agreement included this provision or who was involved in the destruction of the documents, records, and emails.

Martorello responds to the plaintiffs' spoliation argument by: (1) saying that finding spoliation at this point is premature because, by ORDER dated January 23, 2019 (ECF No. 326), that topic is made subject to discovery and because the Tribe, not Martorello, deleted the emails; and (2) pointing to Jennifer Weddle's declaration that the Tribe, not Martorello, directed her firm to delete its client files. See Weddle Decl. (ECF No. 341-3) at 2. Thus, in his view, the Tribe's conduct cannot be imputed on him.

Spoliation is "the willful destruction of evidence or the failure to preserve potential evidence for another's use in pending or future litigation." Rambus, 220 F.R.D. at 281 (quoting Trigon

Ins. Co. v. United States, 204 F.R.D. 277, 284 (E.D. Va. 2001)).
To establish spoliation, the movant must show (1) that the adverse
party had a duty to preserve evidence and (2) that it nevertheless
intentionally destroyed the evidence. Id. "The duty to preserve
material evidence arises not only during litigation but also
extends to that period before the litigation when a party
reasonably should know that the evidence may be relevant to
anticipated litigation." Silvestri v. Gen. Motors Corp., 271 F.3d
583, 591 (4th Cir. 2001). And, "[i]f a party cannot fulfill this
duty to preserve because he does not own or control the evidence,
he still has an obligation to give the opposing party notice of
access to the evidence or of the possible destruction of the
evidence if the party anticipates litigation involving that
evidence." Id.

As explained in Rambus, the crime/fraud exception applies to
materials or communications to plan or further the spoliation of
evidence because "spoliation is fundamentally inconsistent with
the asserted principles behind the recognition of the attorney-
client privilege, namely, 'observance of law' or the
'administration of justice,'" and because "spoliation directly
undermines the administration of justice." 220 F.R.D. at 283
(quoting Commodity Futures Trading Comm'n v. Weintraub, 471 U.S.
343, 348 (1985)). But, as in Rambus, that conclusion alone does
not resolve whether the crime/fraud exception applies to all the

"documents destroyed as part of the sale of Bellicose Capital to the [Tribe], including any documents retrieved by Martorello and any attorneys who represented his company." The Motion (ECF No. 340). The plaintiffs must show that: (1) Martorello was engaged in or planning a scheme of spoliation when he sought the advice of counsel or the input of the lawyers to further the scheme; and (2) the documents containing the communications or work product bear a close relationship to Martorello's scheme to engage in spoliation. Rambus, 220 F.R.D. at 283. At this stage, the plaintiffs have failed to fulfill their burden because their briefing merely summarily argues that (except for the destruction of Martorello's emails) spoliation occurred. And, because discovery on the spoliation issue is still not complete, it is best not to decide whether Martorello spoliated any evidence at this stage. Once discovery on the spoliation issue is completed, the plaintiffs may file a motion addressing the alleged spoliation of evidence and the consequences thereof on the attorney-client privilege and the attorney-work-product protection.

However, the provision of the Merger Agreement calling for the destruction of all of Bellicose Capital's records is very unusual. And, given that the operations of Bellicose that were in effect when the Red Rock lending program was the subject of the Otoe-Missouria Tribe litigation were found to be unlawful, it is permissible to conclude that the destruction of Bellicose

45

Capital's records has all the hallmarks of evidence spoliation on issues in this case. And, it is beyond dispute that lawyers, Martorello, and the Corporate Defendants were involved in the negotiations of the Merger Agreement. Also, the waiver of privilege found in Part I.A above operated to waive the attorney-client privilege respecting the reasons for including (and the negotiations surrounding) the contractual provision that requires the destruction of Bellicose Capital's documents and records, as well as Martorello's emails. Therefore, the discovery addressing the spoliation of evidence may include depositions of Martorello and all lawyers involved in the formulation, drafting, and implementation of the provision and the reasons for it. They may be deposed as well about the destruction of Martorello's emails. Briefing may be augmented to include the results of such depositions. Counsel shall confer and propose a schedule and, by May 20, 2019, shall submit a proposed order scheduling depositions and a new briefing schedule with all discovery and briefing on the spoliation to be completed by August 30, 2019.

## II. THE WORK-PRODUCT DOCTRINE

In the Motion, the plaintiffs ask the Court to "compel[] the production of all documents withheld on Martorello's privilege logs," including those that are covered by the work-product doctrine, and to "find[] a waiver of . . . work product as to: (i) any evidence destroyed as part of the sale of Bellicose Capital to

the LVD, including any documents retrieved by Martorello and any attorneys who represented his companies; and (ii) any communications or information created in the planning of or in furtherance of the spoliation." But, the PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO COMPEL INFORMATION WITHHELD ON THE BASIS OF ATTORNEY-CLIENT PRIVILEGE (ECF No. 341) provides only a cursory discussion of the attorney work-product doctrine. Indeed, the plaintiffs do not even differentiate between whether the sought information is opinion or non-opinion (fact) work product, the discovery of which involve different standards respecting disclosure. See In re Martin Marietta Corp., 856 F.2d 619, 625-26 (4th Cir. 1988) (stating that subject matter waiver applies to non-opinion work product but not opinion work product). And, the plaintiffs do not even mention the work-product doctrine in their reply.

Thus, if the plaintiffs want to obtain the attorney work-product, they must refile their motion to compel explaining how there has been a waiver of the work-product protection and/or how that protection has been forfeited by the crime-fraud exception.

Any submission on that topic shall be filed by June 14, 2019. The response must be filed by June 28, 2019, and the reply must be filed by July 12, 2019.

## CONCLUSION

For the reasons, and to the extent, stated above, the Motion will be granted in part and denied in part.

/s/ REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May 3, 2019