# EXHIBIT 31

In the Matter Of:

*LULA WILLIAMS, et al.*

*vs*

*BIG PICTURE LOANS, LLC, et al.*

---

*CRAIG MANSFIELD*

*January 18, 2019*

---



CRAIG MANSFIELD - 01/18/2019

```
 1              UNITED STATES DISTRICT CIRCUIT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     Richmond Division

 3   -------------------------------------------------------
     LULA WILLIAMS, et al.,
 4
                Plaintiffs,
 5
     v.                                  Case No. 3:17-cv-00461
 6
     BIG PICTURE LOANS, LLC, et al.,
 7
                Defendants.
 8   -------------------------------------------------------

 9

10

11

12

13

14

15   -------------------------------------------------------

16               VIDEO-RECORDED DEPOSITION

17                          OF

18                  CRAIG R. MANSFIELD

19   -------------------------------------------------------

20

21

22

23

24

25   Taken January 18, 2019      By Christine M. Clark, RPR
```

Epiq Court Reporting Solutions - Minneapolis
1-877-489-0367                          www.deposition.com

```
 1  Q. Which lawyer is that?
 2  A. With Karrie.
 3  Q. When you say Karrie, you mean Karrie Wichtman?
 4  A. Karrie Wichtman.
 5  Q. You'd agree that those are your initials on the
 6     Certificate of Compliance that's attached to this
 7     letter?
 8  A. Yes.
 9  Q. And then your signature at the end?
10  A. Yes.
11  Q. Was this certificate something that was requested by
12     LST?
13  A. I don't recall.
14  Q. But in it you're certifying compliance to certain
15     regulations and laws; is that right?
16           MR. DUROCHER:  Object to the form.
17  A. That is correct.
18  Q. And so the reason why you would feel comfortable
19     certifying compliance is because you believe that the
20     things that Red Rock was doing were legal?
21  A. Yes.
22  Q. Mr. Mansfield, I want to just turn back to Number 17
23     really quickly.  I just want to make sure I've got the
24     timing right for your exit from the business.  So,
25     again, it appears that you offered your two week notice
```

1    on January 16th; is that right?

2  A. Yes.

3  Q. Why did you submit your resignation to Karrie Wichtman?

4  A. She has direct contact with the tribal council, and I
5     also cc'd the -- my co-manager.  Perhaps, I should have
6     probably done it the other way around by looking at it,
7     but I just shot it out and said this was what I was
8     doing.

9  Q. So just to be clear, the person who is carbon copied
10    here is Michelle Hazen, and that's your co-manager?

11 A. Yes.

12 Q. Do you know who replaced you as co-manager?

13 A. I believe it's Jim Williams.  I don't know for a fact,
14    but I believe it is.

15 Q. Do you know whether that happened two weeks after this
16    email or not?

17 A. I don't know when it took place.

18 Q. Earlier you testified that it was at tribal council's
19    direction who would be the co-manager of the tribal
20    lending entities, right?

21 A. The tribal council appoints.

22 Q. And so the tribal council was required to change the
23    co-managers, right?

24 A. I would assume so, yes.

25 Q. So, in other words, Jim Williams would have to have been

```
 1     correct?
 2  A. Yes.
 3  Q. Okay.  And Red Rock and Duck Creek both make unsecured
 4     loans; is that correct?
 5              MR. DUROCHER:  Or made.
 6              MR. ALBANESE:  Made.
 7              MR. DUROCHER:  Thank you.
 8              MR. ALBANESE:  Yes.  Yes.  They don't exist
 9     anymore.
10  Q. MR. ALBANESE:  Made unsecured loans; is that correct?
11  A. Yes.
12  Q. Why do you need two different entities to make unsecured
13     loans?
14  A. I don't know the answer to that.
15  Q. But you were on the council when Duck Creek was created,
16     right?
17  A. Yes.
18  Q. And you were on the council when Red Rock was created,
19     right?
20  A. Yes.
21  Q. But your testimony today is you don't know why you
22     needed both to be created?
23  A. Again, it was seven years ago.  I don't remember
24     everything verbatim what happened.  It's. . .
25  Q. Okay.
```

```
 1  A. I've heard it.
 2  Q. Do you know if it was associated with Duck Creek?
 3  A. I don't recall how that all -- how one became the next
 4     or how it all worked together.
 5  Q. Did Red Rock make loans under a particular name?
 6              MR. WITSCH:  Objection to the form, leading.
 7  A. I don't know the answer to that.
 8  Q. MR. ALBANESE:  Okay.  So all right.  Let me back up.
 9     Does the name Castle Payday mean anything to you?
10  A. Yes.
11  Q. Okay.  What's Castle Payday?
12  A. It's -- it's kind of like what Pepper Cash is, and I'm
13     not -- I don't remember everything, how it worked.
14  Q. Okay.  I'm not going to ask you to do this because I
15     can't make you.  But if you were to -- if I were to --
16     if you wanted to find out how everything worked, who
17     would be the first person you called?
18              MR. WITSCH:  Objection to the form.
19              MR. DUROCHER:  Yeah.  Maybe I'd just ask for
20     clarification there.  How everything worked with
21     respect to?
22  Q. MR. ALBANESE:  Okay.  So, Mr. Mansfield, you don't
23     recall the specifics of how Duck Creek, Pepper Cash, Red
24     Rock, and Castle Payday were all related; is that
25     correct?  Is that your testimony?
```

1   A. That's correct.
2   Q. Okay.  Were there certain underwriting criteria in terms
3      of whether Red Rock or Duck Creek would approve a loan?
4   A. There were things discussed about that.  Do I remember
5      exactly what they are?  No, I do not.
6   Q. But were there underwriting criteria, do you remember,
7      just in general?
8   A. Well, there was, I believe so, yes.
9   Q. Okay.  Do you know who would have developed that
10     underwriting criteria?
11  A. That information would have been provided by our service
12     provider, our paid service provider.
13  Q. Okay.  And your paid service provider was Bellicose?
14  A. Yes.
15  Q. Were there -- do you know if there were any
16     verifications done to ensure that the information that
17     that the borrower was providing was correct?
18  A. No, I do not.
19  Q. Okay.  You said earlier that I think that the -- the
20     tribe ultimately had the authority about whether to fund
21     the loan or not; is that correct?
22  A. Yes.
23  Q. How would they indicate to fund the loan?
24  A. I -- we had the account the money went through that we
25     were the ones that would actually put the money in and

```
 1  Q. Okay.  Was Jason your -- you said he was assistant
 2     manager?
 3  A. Yeah.  He was the assistant for a while.
 4  Q. Okay.  After you hired Jason, did you have any other
 5     assistant managers while you were co-manager?
 6  A. No.  I -- he became the manager after me.
 7  Q. Okay.  So and you -- you said the loan authorization
 8     took place on reservation grounds ultimately, right?
 9     Like the ultimate decision whether to fund the loan,
10     that occurred on tribal grounds?
11  A. What we did was like I would push -- you know, we would
12     run through the process, and at the end of the day we
13     would run the money in and out of the accounts.  That's
14     what we did on the tribal grounds at the very beginning.
15     As far as the information about that, that wasn't my
16     area of expertise, and I'm not 100 percent sure on that.
17  Q. Okay.  But you don't know the precise process about how
18     the --
19  A. No, I don't.
20             MR. ALBANESE:  Okay.
21             MR. DUROCHER:  He didn't --
22             THE WITNESS:  I'm sorry.
23             MR. DUROCHER:  He said no, I don't before he
24     asked his question.
25  Q. MR. ALBANESE:  Yeah.  Sorry.  So you don't know the
```

```
 1    precise process on how the decision of whether to fund
 2    the loan occurred?
 3 A. No, I don't.
 4 Q. So can you say for certain here today that it occurred
 5    on tribal grounds?
 6              MR. DUROCHER:  That what occurred on tribal
 7    grounds?
 8              MR. ALBANESE:  The ultimate decision to fund
 9    the loan.
10              MR. WITSCH:  Objection to the form.
11 A. When I was -- at the time that I was involved in it, I
12    don't have the recollection of how that -- how that part
13    worked.
14 Q. Okay.
15 A. I don't know how it is now.  I just don't recall at the
16    very time when we did all of that, the origination.
17 Q. Okay.  So, sitting here today, you don't recall at the
18    time you were co-manager whether the ultimate
19    determination to fund the loan was made on tribal
20    grounds?
21 A. I don't have the recollection, and I don't know the
22    answer to it.
23 Q. Okay.  You said earlier that there would be -- well,
24    let's talk about how the -- you said the money would go
25    in and out of the tribe's bank account; is that correct?
```

```
 1    was used --
 2              MR. WITSCH:  Objection to the form.
 3  Q. MR. ALBANESE:  -- in relation to Red Rock loans.
 4              MR. WITSCH:  Objection to the form.
 5  Q. MR. ALBANESE:  Are you aware of any call center in the
 6    Philippines being used at Red Rock?
 7              MR. WITSCH:  Objection to the form.
 8  A. I'm aware there were call centers in the Philippines.
 9    Yes.
10  Q. MR. ALBANESE:  Okay.  And call centers in the
11    Philippines were used at the time you were co-manager of
12    Red Rock?
13              MR. WITSCH:  Objection to the form.
14  A. Yes.
15  Q. MR. ALBANESE:  And what did those call centers do?
16  A. I -- I don't know exactly what they did, but we would
17    support them and answer questions for them.
18  Q. Okay.
19  A. About loans that people had.
20  Q. Okay.  So were they -- were they performing a similar --
21    were the people working at the call center in the
22    Philippines performing a similar function to the people
23    working on tribal grounds, the call center
24    representatives?
25              MR. DUROCHER:  Object to the form.
```

1  A. I don't know the answer to that question.

2  Q. MR. ALBANESE:  Do you know how many people were working
3     at the call center in the Philippines?

4  A. No, I do not.

5  Q. Did you ever talk to -- you directly, did you ever talk
6     to anybody working at the call center in the
7     Philippines?

8  A. I never talked to anybody directly.

9  Q. Okay.  And you don't -- do you know -- well, never mind.
10    Scratch that.  Let's talk about -- oh, so you can pull
11    out Exhibit 17 again.

12           MR. DUROCHER:  It's in this stack right
13    here.  I can find it for you.

14           MR. WITSCH:  I'm sorry.  John, you said 17?

15           MR. ALBANESE:  Yeah.  It's the email.  It's
16    the resignation email.

17           MR. WITSCH:  Thank you.

18 Q. MR. ALBANESE:  So you resigned on January 16th, 2014; is
19    that correct?

20 A. That's correct.

21 Q. Why did you resign?

22 A. Well, at the very beginning I was interested in
23    business.  I thought I could do a lot more to help out
24    than I actually found out what I could do.  As far as
25    what I believe that the company needed at the time was

```
 1     somebody that would be more dedicated to being a
 2     co-manager, where I was in charge of at times different
 3     entities, and I had a full-time position running the
 4     hotel.
 5  Q. So is it fair to say you were stretched pretty thin?
 6  A. I was stretched.
 7  Q. Okay.  So, in other words, you just feel you couldn't
 8     commit enough of yourself to the tribal lending
 9     entities?
10  A. That's correct.
11  Q. Okay.  Let's look at Exhibit 9, which is the servicing
12     agreement between Red Rock and SourcePoint.  How much
13     were you paid, or were you paid to be the co-manager at
14     Duck Creek and Red Rock?
15  A. No, I wasn't.
16  Q. So you didn't receive any --
17  A. I received as much money as every tribal member received
18     from it.
19  Q. Okay.  But you didn't take a separate salary for being
20     the co-manager at Duck Creek and Red Rock?
21  A. Not as a co-manager, no.
22            MR. DUROCHER:  Sort of like a federal
23     employee these days, right?
24            MR. ALBANESE:  Yeah.  Right.  Nobody's
25     getting paid.
```

1  Q. MR. ALBANESE: Did you get a salary at Sovereign Lending
2     Solutions as a co-manager?
3  A. No, I didn't.
4  Q. Okay. Were you -- was your only salary through your
5     work at the casino or hotel?
6  A. Yes. The only other time I received payment was when I
7     was the operations manager for the three to month
8     period.
9  Q. Oh, who was the operations manager after you?
10 A. It would have been my assistant.
11 Q. Okay. How much -- do you recall how much you were
12    getting paid as the operations manager?
13 A. Somewhere around $23 an hour.
14 Q. And you said earlier you were working -- when you were
15    operations manager, you were working 40 hours a week at
16    the --
17 A. I was still working my full-time position at the other
18    place.
19 Q. Okay. Do you know if your co-manager, Michelle Allen,
20    was paid at the time for being a co-manager?
21 A. I don't have any knowledge of that.
22 Q. Can you look at -- it's page 11 of the document. And
23    then if you go to at the top, there's the little k.
24 A. Mm-hmm.
25 Q. Subsection (k), I'm just going to read the second

```
 1  Q. MR. ALBANESE:  Can we look at page 9 here?  I'm going to
 2     just kind of go through these duties here at the bottom
 3     of 4.2.  So 4.2.1, it says, Consistent with the
 4     Servicing Budget, the Servicer shall develop and
 5     recommend to the Enterprise and to the Operations
 6     Manager and Tribal Representatives, reasonable measures
 7     for orderly administration and management of the
 8     Enterprise in the areas of financial reporting,
 9     financing, regulatory compliance, marketing, human
10     resources, development of third-party servicer
11     relationships, collections and risk assessment,
12     including:  (a) Screening and selecting service
13     providers and lenders, and negotiating agreements with
14     such service providers and lenders on behalf of the
15     Enterprise on such terms and conditions as Servicer may
16     reasonably determine to be appropriate, including but
17     not limited to potentially securing a funding agreement
18     between Alpha Credit Resources and the Enterprise,
19     whereby Alpha Credit Resources, LLC may serve as a --
20     may serve as Commercial Finance Provider for the
21     Unsecured Lending Business.
22         Did I read that correctly?
23  A. Yes.
24  Q. Did you have any -- did you, as co-manager, did you have
25     any role in the screening of and selecting service
```

```
 1     providers and lenders?
 2  A. I do not recall that, no.
 3  Q. Okay.  Do you know if Michelle Allen had any role in
 4     screening of and selecting service providers and
 5     lenders?
 6  A. I don't have any, no.
 7  Q. Did you have any role in negotiating agreements with
 8     such service providers and lenders?
 9  A. No.
10  Q. Okay.  Do you know if Michelle Allen had any role in
11     that?
12  A. I am not sure.  No.  I don't know if she did or not.
13  Q. Is it fair to say that your servicer performed those
14     tasks, to your knowledge?
15            MR. WITSCH:  Objection to the form, calls
16     for speculation.
17  A. It would be fair to say that he would make suggestions
18     to us as to which direction we should go, and, if there
19     was, then we would follow it, or, if we discussed it and
20     thought that it was something we should do, then we
21     could go that route.
22  Q. So, when you say he, you mean Matt Martorello?
23  A. Bellicose.  Yes.  Matt Martorello.
24  Q. Okay.  Did you have interactions with anyone else at
25     Bellicose other than Matt Martorello?  And I think
```