IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| JOETTE PETE, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:19-mc-26 (REP) |
| | ) | |
| BIG PICTURE LOANS, et al., | ) | |
| | ) | |
| Respondents. | ) | |
| LULA WILLIAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:17-cv-461 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| RENEE GALLOWAY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:18-cv-406 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MATT MARTORELLO'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
MOTION UNDER RULE 30(D) FOR FURTHER DEPOSITION BASED ON CONDUCT
THAT IMPEDED QUESTIONING AND FOR EXPEDITED RULING
(ECF 23 & 24, 747 & 748, 391 & 392, respectively)**

In response to the Court's direction during the June 5, 2020 telephone conference, Matt Martorello respectfully submits this Supplemental Memorandum In Support Of Motion Under Rule 30(d) For Further Deposition Based On Conduct That Impeded Questioning And For

Expedited Ruling (the "Rule 30(d) Motion"). As the Court requested, Martorello sets forth below the questions his counsel would have posed to Ms. Pete during her deposition had Plaintiffs' counsel not impeded the deposition by asserting an inapplicable "informer's" privilege.[1]

## I. PROPOSED QUESTIONS

Martorello sets forth below the proposed questions his counsel would have posed to Ms. Pete during her deposition had Plaintiffs' counsel not impeded the deposition by asserting an inapplicable "informer's" privilege. Martorello reserves the right to ask additional follow-up questions depending on Ms. Pete's responses. Martorello has organized his proposed questions by relevant individual, as follows:

**A. Matt Martorello**

1. Did any of the other crimes that you say occurred on the reservation that you spoke to the FBI about have anything to do with Matt Martorello?

2. What did you tell the FBI about the crimes allegedly involving Matt Martorello?

3. What did the FBI tell you about the crimes allegedly involving Matt Martorello?

4. Did you reach out to the FBI about the crimes allegedly involving Matt Martorello?

5. Did the FBI reach out to you about the crimes allegedly involving Matt Martorello?

6. What FBI office did you speak with about the crimes allegedly involving Matt Martorello?

7. When did you speak to the FBI about the crimes allegedly involving Matt Martorello?

---

[1] Martorello's Rule 30(d) Motion is ECF 23 & 24, 747 & 748, and 391 & 392, respectively, in the above-captioned matters.

8. Who at the FBI did you speak with about the crimes allegedly involving Matt Martorello?

9. Did you meet with the FBI about the crimes allegedly involving Matt Martorello?

10. When approximately did you meet with the FBI about the crimes allegedly involving Matt Martorello?

11. How many times did you meet with the FBI about the crimes allegedly involving Matt Martorello?

12. What FBI field office did you meet with about the crimes allegedly involving Matt Martorello

13. Were all of your meetings with the FBI about the crimes allegedly involving Matt Martorello at the same field office?

14. Did you take notes of your meetings with the FBI about the crimes allegedly involving Matt Martorello?

15. Do you still have your notes about the crimes allegedly involving Matt Martorello?

16. Did you provide the FBI with any documents about the crimes allegedly involving Matt Martorello?

17. Do you still have copies of any documents you provided to the FBI about the crimes allegedly involving Matt Martorello?

18. Do you know if the FBI conducted an investigation of the crimes allegedly involving Matt Martorello?

19. Do you know if the FBI is currently conducting an investigation of the crimes allegedly involving Matt Martorello?

20. What did the FBI communicate to you about the investigation of the crimes allegedly involving Matt Martorello?

21. Did the FBI pursue or file charges against Matt Martorello for the alleged crimes?

22. Did any other governmental entity pursue or file charges against Matt Martorello for the alleged crimes?

23. If so, what charges were brought in relation to the crimes allegedly involving Matt Martorello?

24. Where were the charges related to the crimes allegedly involving Matt Martorello brought?

25. Did the FBI provide you with any documents or communications regarding the investigation of the crimes allegedly involving Matt Martorello?

26. Do you still have the documents provided to you by the FBI about the crimes allegedly involving Matt Martorello?

27. Do you know if the FBI spoke to anyone else about the crimes allegedly involving Matt Martorello?

28. When was the last time you spoke to the FBI about the crimes allegedly involving Matt Martorello?

**B. Chairman Williams**

1. Did any of the other crimes that you say occurred on the reservation that you spoke to the FBI about have anything to do with Chairman Williams?

2. What did you tell the FBI about the crimes allegedly involving Chairman Williams?

3. What did the FBI tell you about the crimes allegedly involving Chairman Williams?

4. Did you reach out to the FBI about the crimes allegedly involving Chairman Williams?

5. Did the FBI reach out to you about the crimes allegedly involving Chairman Williams?

6. What FBI office did you speak with about the crimes allegedly involving Chairman Williams?

7. When did you speak to the FBI about the crimes allegedly involving Chairman Williams?

8. Who at the FBI did you speak with about the crimes allegedly involving Chairman Williams?

9. Did you meet with the FBI about the crimes allegedly involving Chairman Williams?

10. When approximately did you meet with the FBI about the crimes allegedly involving Chairman Williams?

11. How many times did you meet with the FBI about the crimes allegedly involving Chairman Williams?

12. What FBI field office did you meet with about the crimes allegedly involving Chairman Williams

13. Were all of your meetings with the FBI about the crimes allegedly involving Chairman Williams at the same field office?

14. Did you take notes of your meetings with the FBI about the crimes allegedly involving Chairman Williams?

15. Do you still have your notes about the crimes allegedly involving Chairman Williams?

16. Did you provide the FBI with any documents about the crimes allegedly involving Chairman Williams?

17. Do you still have copies of any documents you provided to the FBI about the crimes allegedly involving Chairman Williams?

18. Do you know if the FBI conducted an investigation of the crimes allegedly involving Chairman Williams?

19. Do you know if the FBI is currently conducting an investigation of the crimes allegedly involving Chairman Williams?

20. What did the FBI communicate to you about the investigation of the crimes allegedly involving Chairman Williams?

21. Did the FBI pursue or file charges against Chairman Williams for the alleged crimes?

22. Did any other governmental entity pursue or file charges against Chairman Williams for the alleged crimes?

23. If so, what charges were brought in relation to the crimes allegedly involving Chairman Williams?

24. Where were the charges related to the crimes allegedly involving Chairman Williams brought?

25. Did the FBI provide you with any documents or communications regarding the investigation of the crimes allegedly involving Chairman Williams?

26. Do you still have the documents provided to you by the FBI about the crimes allegedly involving Chairman Williams?

27. Do you know if the FBI spoke to anyone else about the crimes allegedly involving Chairman Williams?

28. When was the last time you spoke to the FBI about the crimes allegedly involving Chairman Williams?

**C. Michelle Hazen**

1. Did any of the other crimes that you say occurred on the reservation that you spoke to the FBI about have anything to do with Michelle Hazen?

2. What did you tell the FBI about the crimes allegedly involving Michelle Hazen?

3. What did the FBI tell you about the crimes allegedly involving Michelle Hazen?

4. Did you reach out to the FBI about the crimes allegedly involving Michelle Hazen?

5. Did the FBI reach out to you about the crimes allegedly involving Michelle Hazen?

6. What FBI office did you speak with about the crimes allegedly involving Michelle Hazen?

7. When did you speak to the FBI about the crimes allegedly involving Michelle Hazen?

8. Who at the FBI did you speak with about the crimes allegedly involving Michelle Hazen?

9. Did you meet with the FBI about the crimes allegedly involving Michelle Hazen?

10. When approximately did you meet with the FBI about the crimes allegedly involving Michelle Hazen?

11. How many times did you meet with the FBI about the crimes allegedly involving Michelle Hazen?

12. What FBI field office did you meet with about the crimes allegedly involving Michelle Hazen

13. Were all of your meetings with the FBI about the crimes allegedly involving Michelle Hazen at the same field office?

14. Did you take notes of your meetings with the FBI about the crimes allegedly involving Michelle Hazen?

15. Do you still have your notes about the crimes allegedly involving Michelle Hazen?

16. Did you provide the FBI with any documents about the crimes allegedly involving Michelle Hazen?

17. Do you still have copies of any documents you provided to the FBI about the crimes allegedly involving Michelle Hazen?

18. Do you know if the FBI conducted an investigation of the crimes allegedly involving Michelle Hazen?

19. Do you know if the FBI is currently conducting an investigation of the crimes allegedly involving Michelle Hazen?

20. What did the FBI communicate to you about the investigation of the crimes allegedly involving Michelle Hazen?

21. Did the FBI pursue or file charges against Michelle Hazen for the alleged crimes?

22. Did any other governmental entity pursue or file charges against Michelle Hazen for the alleged crimes?

23. If so, what charges were brought in relation to the crimes allegedly involving Michelle Hazen?

24. Where were the charges related to the crimes allegedly involving Michelle Hazen brought?

25. Did the FBI provide you with any documents or communications regarding the investigation of the crimes allegedly involving Michelle Hazen?

26. Do you still have the documents provided to you by the FBI about the crimes allegedly involving Michelle Hazen?

27. Do you know if the FBI spoke to anyone else about the crimes allegedly involving Michelle Hazen?

28. When was the last time you spoke to the FBI about the crimes allegedly involving Michelle Hazen?

## II. RELEVANCE OF PROPOSED QUESTIONS

Contrary to Plaintiffs' counsel's objections during the deposition, Martorello's questions are directly relevant to this case. As explained in the Rule 30(d) Motion, the proposed questions seek information relevant to exploring Ms. Pete's potential bias and prejudice against Martorello, as well as other Tribal council members that Ms. Pete has accused of making misrepresentations to the Court in their sworn testimony and other improper conduct in relation to the Tribal lending businesses forming the subject matter of this litigation.[2] *See, e.g., Williams* ECF 756-16 (accusing Michelle Hazen of submitting an "inaccurate" declaration). Such inquiries are directly within the scope of discovery. *See Behler v. Hanlon*, 199 F.R.D. 553, 561 (D. Md. 2001) ("[E]xamples of bias/prejudice … [are] squarely within the scope of discovery authorized by Rule 26(b)(1), in either its present, or immediately preceding version."). The proposed line of questioning is also relevant to Ms. Pete's credibility. The relevance of the proposed questioning is borne out by Plaintiffs' repeated reliance on Ms. Pete's declaration and deposition testimony in their recent Statement of Position Regarding Material Misrepresentations And Omissions Made to the Court, *Williams*, ECF 755 at 10-11, 20 n.12, 28, ECF 756-16; *Galloway*, ECF 399.

For example, Plaintiffs cite Ms. Pete's declaration in support of their contention that Martorello and Tribal witnesses advanced "the false narrative and misrepresentations that LVD created Red Rock to learn the industry, it controlled the lending operation, and developed the business acumen to form Big Picture Loans." *Williams,* ECF 755 at 10. According to Plaintiffs:

---

[2] Martorello has tailored his proposed questions to Ms. Pete to individuals and entities directly relevant here, including, but not limited to, the upcoming evidentiary hearing. Ms. Pete, however, was not deposed exclusively with respect to the evidentiary hearing. Accordingly, the proper scope of her deposition must be viewed with respect to the case as a whole, and ultimately, possible presentation of her testimony to a jury (if and when a trial is set in these matters), as Ms. Pete is not subject to the subpoena power of the Court.

8

> The former Vice Chairwoman explained: "When Tribal Council initially agreed to the deal with Martorello," they "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything[.]" *Id*. at ¶¶ 2-3. Pete, the second highest ranking Tribal Council member during the relevant time, further confirmed that it is inaccurate that Red Rock "contracted with Bellicose VI 'to learn the lending industry'" as posited by the Tribal Defendants. *Id*. at ¶ 6. According to Pete, learning the industry was "never the goal when LVD formed Red Rock," and Martorello did not "attempt to teach [them] anything about the business." *Id*.

*Id.* at 10-11.  Plaintiffs also cite Ms. Pete's declaration in support of their contention that "the co-managers were volunteers, who were involved for 'optics' and to provide pro forma approval of recommendations provided by Bellicose."  *Id.* at 20, n.12.

During her deposition, however, despite the averments in her declaration, ECF 756-16, Ms. Pete admitted that:

- She did not personally perform any services for Duck Creek Financial, Ex. 1 at 20;

- she was never an employee of Duck Creek Financial, *id.*;

- she was never in the offices of Duck Creek Financial, *id.*;

- she was never involved in the day-to-day operations of Duck Creek Financial, *id.*;

- she knows nothing about what records were maintained by Duck Creek Financial, *id.*;

- she does not have any personal knowledge about how Duck Creek stored its data, *id.* at 64;

- she was never an employee of Red Rock, *id.* at 22;

- she was never in the offices of Red Rock, *id.*;

9

- she could not identify when Red Rock moved into the casino on the Reservation or into the old tribal center on the Reservation,[3] *id.* at 22-23;

- she knew none of the employees of Red Rock while they were in the casino other than its co-managers Michelle Hazen and Craig Mansfield, and then Chairman Williams, *id.* at 23-24;

- she knew none of the employees of Red Rock after it moved to the old tribal offices except Michelle Hazen and "the regulators," *id.* at 24;

- she did not perform any services for Red Rock at any time, *id.* at 25;

- she did not play any role in the day-to-day operations of Red Rock, *id.*;

- she knows nothing about what records Red Rock maintained as part of its business, *id.*;

- she does not have any personal knowledge about how Red Rock stored its data, *id.* at 63;

- she does not know if Red Rock's computers were located on the reservation, *id.* at 163;

- she does not know if Red Rock's records were on the reservation, *id.* at 163-64;

- she [erroneously] believes Ascension Technologies is "one of the entities affiliated with Red Rock," *id.* at 25;

- she does not know when the inception of Red Rock was, *id.* at 165;

- she does not know when employees, computers, and records of Red Rock were allegedly located off the reservation, *id.*;

- she does not remember how Ascension Technologies was affiliated with Red Rock or what Ascension Technologies does, *id.* at 26;

- she has never performed any services for Ascension Technologies, *id.*;

- she has never played any role in the day-to-day operations of Ascension Technologies, *id.*;

- she has never been to the offices of Ascension Technologies, *id.* at 28;

---

[3] Ms. Pete did, however, admit that Red Rock's offices were initially at the casino on the Reservation and then the old tribal center on the Reservation. *Id.* at 22-23.

10

- she has no personal knowledge of how Ascension stores its data, *id.* at 66;

- she has never performed any services for Big Picture Loans, *id.* at 28-29;

- she has no personal knowledge of how Big Picture Loans stores its data, *id.* at 66;

- she could not remember what SourcePoint did, *id.* at 64,

- she never performed services for SourcePoint, *id.*;

- she was never involved in the day-to-day operation of SourcePoint, *id.;*

- she has no personal knowledge about how SourcePoint stored its data, *id.*,

- she has no personal knowledge about how Bellicose stored its data, *id.* at 65;

- she is not familiar with the term "backing up data" and does not know how Red Rock, Duck Creek, SourcePoint, Bellicose, Big Picture Loans, or Ascension saved or backed up their data, *id.* 66-69;

- she has no personal knowledge about whether LVD, Red Rock, Big Picture Loans, Ascension, Bellicose, or Matt Martorello destroyed any evidence relating to this lawsuit, *id.* at 70-71;[4]

---

[4]  Plaintiffs, apparently now realizing after Ms. Pete's deposition that their ghost-written declaration, in which 'Ms. Pete' alleges that "a shredding company was also hired to destroy paper records related to the business" and that "[t]his had never been done in the past *and was performed specifically to conceal the truth about the business*" itself contains inaccurate misrepresentations, now appear to have abandoned their reliance on Ms. Pete's declaration in support of their bogus spoliation argument.  *See* ECF 756-16, ¶ 11 (emphasis added); *compare Galloway,* ECF 286 at 4-5 (relying on paragraph 11 of Pete Declaration) *with Williams,* ECF 755 at 48-49 (omitting any reference to paragraph 11 of Pete Declaration).  As Ms. Pete clarified at her deposition, her only knowledge of documents being shredded was when the Tribe's legal counsel, Ms. Wichtman, "would come to the council to present structural changes or resolutions or formations of business entities [and] would immediately be collected after the meeting and immediately shredded."  Ex. 1 at 74-75.  Ms. Pete admitted that any other information about anyone destroying documents relating to the subject matter of this litigation is "*just hearsay from tribal membership and workers at the tribal center in which I was not privy to because I did not work there any longer.*"  *Id.* at 75-76 (emphasis added).  And specifically with respect to the shredding truck discussed in her declaration, Ms. Pete admitted that her averments in her declaration *were based on pure hearsay*:

- she has no personal knowledge about what data exists today that was maintained by Red Rock, Duck Creek, SourcePoint, Bellicose, Big Picture Loans, or Ascension; *id.* at 69-70;

- although it was her belief "from documents she read" that Bellicose "originated the loans," *id.* at 65, she does not have any personal knowledge of *how* Bellicose allegedly originated the loans; *id.* at 66;

- she does not know if Martorello originally contacted LVD or if LVD originally contacted Martorello, *id.* at 88-89;

- she admitted that Rob Rosette first discussed the initiative and then Matt Martorello appeared, *id.* at 88-89, and that she "[does] not know how he [Martorello] was retained or invited.  All I know is he was just there one day," *id.* at 130.

- the entire basis for the statement in her declaration that LVD would receive 2 percent of the gross revenue[5] from the loans was "was the fact that 2 percent is not a hundred percent wholly owned by the tribe," *id.* at 137-38;

- it is her belief that for a business to be wholly owned by the Tribe it has to receive 100% of the revenue and profit of the business, *id.* at 138-39;

- her statement that the Tribe understood it would "have no risk" was based merely on her understanding that "it was a lucrative business" and therefore, there'd be no risk to the tribe, *id.* at 140;

---

> *I did not see* it like I seen what we just discussed about documents being destroyed, *so they just told me that there was a shredding truck, they were shredding everything.* It's never happened before. *That was just hearsay*, but it was information that I stated as far as what I know about documents being shredded, my personal knowledge *and hearsay*.

*Id.* at 76 (emphasis added).  When asked who had told her about the shredding, Ms. Pete indicated that there were numerous people who did so, but she could only specifically recall the janitor telling her about it.  *Id.* at 77-78.  These individuals did not tell her what specific documents were being shredded and ironically given her declaration, Ms. Pete indicated that she "just didn't pay attention 'cause I'm like I don't speak on what I didn't see or know of personally." *Id.* at 78-79 (emphasis added).

[5]  According to Ms. Pete, gross revenue is "the revenue that you generate minus the cost of operating the business, *id.* at 135-36.

12

- she does not know if training of how to underwrite and market and service and fund and collect loans was shared with others outside of Tribal council, *id.* at 146;

- she does not know if Martorello or others at Red Rock tried to train the people who worked for Red Rock or Duck Creek and cannot say one way or another whether training ever occurred, all she knows is what she was allegedly told by the Tribe's counsel, Karrie Wichtman and Ken Akini, *id.* at 147, 149;

- she never personally spoke with any employees of Red Rock or Duck Creek to determine whether they thought they were being trained in the operation of business, *id.* at 149;

- she has no personal knowledge or basis to other than alleged statement made by Karrie Wichtman to say that Red Rock loans were not originated by Red Rock, *id.* at 150-51; and

- she has no personal knowledge to support her statement that "Red Rock would have no reason to reject a loan that satisfied Martorello's lending criteria because Martorello ran the business and bore all the risks," *id.* at 151.

Ironically, Ms. Pete stated during her deposition: *"I don't speak on what I didn't see or know of personally." Id.* at 79. Yet, as evidenced by the above, Ms. Pete lacks personal knowledge with respect to almost all of her ghost-written declaration.[6] From other deposition questioning it is clear that Ms. Pete's willingness to sign the inaccurate declaration was sparked by her personal grudge and vendetta against various Tribal council members, including Michelle Hazen and Chairman Williams.

The animosity that Ms. Pete harbors toward two of the Tribal entities' primary witnesses in support of sovereign immunity, Michelle Hazen and Chairman Williams, as well as other Tribal council members is obvious from deposition testimony. Ms. Pete admitted that she ran against Chairman Williams in 2010 and lost by thirteen votes. *Id.* at 12, 13-14, 16. Ms. Pete also admitted that she was *involuntarily* removed from Tribal council in 2016 per a judicial

---

[6] Ms. Pete admitted during her deposition that Plaintiffs' counsel wrote her declaration. *Id.* at 81.

13

proceeding instituted under the Tribe's Constitution. *Id.* at 15. Before her involuntary removal from Tribal council, Ms. Pete made $120,000 a year as Vice Chairwoman. *Id.* at 19. And Ms. Pete states several times during her deposition that although "they're all my cousins, the entire council, but I haven't talked to them," since she was involuntarily removed from Tribal council. *Id.* at 29-30. When asked if she considered her cousin Michelle Hazen her friend, Ms. Pete responded that friends are "non-existent" because "[n]obody is honest. Nobody is loyal." *Id.* at 31. When asked if Chairman Williams was her friend, she responded "[h]e's my cousin, not my friend." *Id.* at 32. And when asked if other members of Tribal council were her friends, she similarly responded "[t]hey're my cousins, not my friends." *Id.* Ms. Pete also testified that Michelle Hazen would allegedly mock her following tribal council votes. *Id.* at 91-92.

Ms. Pete's potential bias and prejudice against Martorello, Chairman Williams, and Michelle Hazen, who Plaintiffs and Ms. Pete have accused of making misrepresentations to the Court in their sworn testimony and other improper conduct in relation to the Tribal lending businesses forming the subject matter of this litigation is both relevant and discoverable.

### III. CONCLUSION

For the reasons stated above, and in Martorello's Rule 30(d) motion, the Court should order Ms. Pete to submit to further deposition of two additional hours, be ordered to answer the above questions and any appropriate follow-up questions and Plaintiffs' counsel should be ordered to pay the reasonable attorneys' fees and costs incurred in pursuit of this Motion and the further deposition of Ms. Pete.

Respectfully submitted,

MATT MARTORELLO

By:/s/ *John M. Erbach*
M. F. Connell Mullins, Jr. (VSB No. 47213)
Email: cmullins@spottsfain.com

14

<div style="margin-left: 40%;">

Hugh McCoy Fain, III (VSB No. 26494)
Email: hfain@spottsfain.com
John Michael Erbach (VSB No. 76695)
Email: jerbach@spottsfain.com
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Telephone: (804) 697-2000
Facsimile: (804) 697-2100

Richard L. Scheff (admitted *pro hac vice*)
ARMSTRONG TEASDALE, LLP
2005 Market Street
29th Floor, One Commerce Square
Philadelphia, PA 19103
Telephone: 267.780.2000
Facsimile: 215.405.9070
Email: rlscheff@ armstrongteasdale.com

Michelle Lynne Alamo (admitted *pro hac vice*)
ARMSTRONG TEASDALE, LLP
4643 S. Ulster Street, Suite 800
Denver, CO 80237
Telephone: 720.722.7189
Facsimile: 720.200.0679
Email: malamo@armstrongteasdale.com

*Counsel for Defendant Matt Martorello*

</div>

## **CERTIFICATE OF SERVICE**

The undersigned counsel certifies that on this 8th day of June, 2020, the foregoing was filed using the Court's CM/ECF system, thereby serving a copy on all counsel of record electronically.

By:/s/  *John M. Erbach*
John M. Erbach (VSB No. 76695)
jerbach@spottsfain.com
SPOTTS FAIN PC
411 East Franklin Street, Suite 600
Richmond, Virginia 23219
Telephone: (804) 697-2000
Facsimile:  (804) 697-2100