# EXHIBIT 1

```
                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE EASTERN DISTRICT OF VIRGINIA
                             Richmond Division
                                 - - -


     LULA WILLIAMS, et al.,    : NO.: 3:17-cv-00461
              Plaintiffs        :
        vs.                     :
     BIG PICTURE LOANS,         :
     LLC, et al.,               :
              Defendants        :
     ----------------------     : ---------------------
     RENEE GALLOWAY, et         : NO.: 3:18-cv-406-REP
     al.,                       :
              Plaintiffs        :
        Vs.                     :
     BIG PICTURE LOANS,         :
     LLC, et al.,               :
              Defendants        :


                                 - - -
                        Tuesday, May 26, 2020
                                 - - -

               REMOTE VIDEOTAPED DEPOSITION of JOETTE
     PETE, taken pursuant to notice, commencing at
     approximately 10:10 a.m., before Lynn Parlapiano,
     Professional Court Reporter and Notary Public in
     and for the Commonwealth of Pennsylvania.
                                 - - -


                      MAGNA LEGAL SERVICES
                        (866) 624-6221
                        www.MagnaLS.com
```



Page 12

```
 1     Q.      And for how long did you work there?
 2     A.      It was temporary, seasonal for the
 3  winter months.
 4     Q.      In what winter?
 5     A.      Not this past winter, the winter
 6  before.
 7     Q.      Okay.  So the winter of 2018 to 2019?
 8     A.      Yeah.
 9     Q.      All right.  Now, while you were -- when
10  you were first elected to Tribal Council?
11     A.      I don't remember.  I know there was --
12  I think it was in 2001 maybe.  I don't remember.
13  I don't have my résumé in front of me.
14     Q.      Okay.  When did you become the vice
15  chair of the council?
16     A.      In 2008 through 2010.  And then I had
17  ran against Jimmer Williams and I lost by 13
18  votes and so then the following year, I had ran
19  for vice again I believe.
20     Q.      So let me see if I understand this.
21  You were elected to the Tribal Council you
22  believe in 2001.  For how long did you serve on
23  Tribal Council as a member?
24     A.      I don't remember.  I don't know the
```



Page 13

1   exact dates.

2       Q.      You don't remember the exact -- was it

3   more than one term?

4       A.      Yes.

5       Q.      Do you know how many terms it was?

6       A.      I don't remember.

7       Q.      All right.  And for how long is each

8   term?

9       A.      Two years.

10      Q.      So you served continuously as a member

11  of the Tribal Council beginning in 2001 for at

12  least two terms; is that an accurate statement?

13      A.      I'm sorry.  You're breaking up.

14      Q.      So beginning in or about 2001, you

15  served as a member of the Tribal Council for at

16  least two consecutive terms; is that correct?

17      A.      I don't remember the dates.

18      Q.      Okay.  And you became vice chair in

19  2008, correct?

20      A.      Yes.

21      Q.      And that was also a two-year term?

22      A.      Yes.

23      Q.      And then did you -- you ran again in

24  2010 and you lost that election; is that what



1   you're saying?

2      A.      Yes.  I don't remember the dates.

3      Q.      You don't remember the dates?

4      A.      I wish I would have known to bring my

5   résumé.

6      Q.      Okay.  So but let me just understand

7   this and tell me whether my understanding is

8   correct or incorrect.

9              You were elected as vice chairman or

10  chairperson of the Tribal Council, you served a

11  single term and then you lost an election; is

12  that correct?

13     A.      Yes.

14     Q.      And then at some point, you were

15  re-elected?

16     A.      Yes.

17     Q.      And do you know when you were

18  re-elected?

19     A.      I don't.

20     Q.      Okay.  And when did you stop being on

21  Tribal Council?

22     A.      When did what?

23     Q.      When did you stop being on Tribal

24  Council?



Page 15

```
 1     A.        When I was removed in 2016.

 2     Q.        And when in 2016 were you removed?

 3     A.        August 12, 2016.

 4     Q.        And I assume that was not voluntary;

 5  you didn't agree to that?

 6     A.        Correct.

 7     Q.        And so you were voted off the council?

 8     A.        No.

 9     Q.        You were not.  How did it come about

10  that you were removed from the council?

11     A.        (Inaudible.)

12     Q.        Sorry?

13     A.        Per the removal proceedings according

14  to the constitution, it was via judicial

15  proceedings.

16     Q.        Okay.  Okay.  Now, I think you said

17  when you lost the election for vice chair, you

18  lost that to James Williams?

19     A.        Yes.

20     Q.        And is that the person who currently

21  serves --

22               (The court reporter asked for

23  clarification.)

24  BY MR. SCHEFF:
```



Page 16

```
 1     Q.      Ms. Pete?

 2     A.      Yes.

 3     Q.      I think you said that when you lost the

 4  election for vice chair, you lost it to James

 5  Williams; is that correct?

 6     A.      No.  It was for chairman.

 7     Q.      You ran for chairman?

 8     A.      Yes.

 9     Q.      Okay.  And you lost that to James

10  Williams?

11     A.      Yes.

12     Q.      Is he the current chairman of the tribe

13  as far as you know?

14     A.      Yes.

15     Q.      So when you lost the election for

16  chairman, did you remain as vice chairman?

17     A.      No, 'cause you can't run for dual

18  positions.

19     Q.      So for a period -- I'm sorry.  I didn't

20  mean to interrupt you.  You can --

21     A.      You can only accept one position.  You

22  can't run for chairman, secretary, treasurer or

23  council.  You have to choose one position.

24     Q.      Okay.  So there was a period of
```



Page 19

```
 1     A.        I don't think so.

 2     Q.        You don't think so?

 3     A.        I don't remember.

 4     Q.        Was being the vice chair of the Tribal

 5     Council a full-time job?

 6     A.        Yes.

 7     Q.        Okay.  So is it your testimony that you

 8     really couldn't perform any other tasks while you

 9     were vice chairman of the Tribal Council?

10     A.        Yeah, when you're raised here, but when

11     you're Tribal Council, that was not a full-time

12     position until 2012 I believe.  When the tribe

13     had moved to the Watersmeet Township offices,

14     then the council members became full-time

15     employees.

16     Q.        Okay.  And what was the salary that you

17     earned as vice chairman of the Tribal Council?

18     A.        I think it was 120,000.

19     Q.        Okay.  And what was your salary when

20     you were on the Tribal Council?

21     A.        Maybe 80,000.  I don't remember.

22     Q.        Have you ever heard of a company called

23     North Country Financial?

24     A.        I can't recall.
```



Page 20

1     Q.      You can't recall whether you have.

2   Okay.

3             Have you ever heard of a company called

4   Duck Creek Financial?

5     A.      Yes.

6     Q.      Okay.  Did you ever work for Duck Creek

7   Financial?

8     A.      It was part of the tribe's organization

9   or entity, but I would never received any payment

10   from Duck Creek.

11    Q.      And you never performed any services

12   for Duck Creek; is that correct?

13    A.      Just as a Tribal Council.

14    Q.      Were you ever hired as an employee of

15   Duck Creek Financial?

16    A.      No.

17    Q.      Okay.  Did you ever receive any

18   compensation from Duck Creek Financial?

19    A.      No, not that I recall.

20    Q.      Were you ever in the offices of Duck

21   Creek Financial?

22    A.      No.

23    Q.      Do you know where the offices of Duck

24   Creek Financial were?



Page 22

```
 1      Q.      And did you ever work for Red Rock
 2   Lending?
 3      A.      No, just as in my council capacity.
 4      Q.      Were you ever in the offices of Red
 5   Rock?
 6      A.      No.
 7      Q.      Do you know where the offices of Red
 8   Rock were?
 9      A.      Yes.
10      Q.      Where were they?
11      A.      Initially they were at the -- online
12   and then at the casino and then at the tribal --
13   old tribal offices.
14      Q.      I'm sorry.  You said -- the first
15   office you identified was online?
16      A.      Yeah.  There was no office space.
17      Q.      During what period of time was that?
18      A.      I don't recall the exact dates.
19      Q.      And when was Red Rock's offices -- when
20   were they in the casino?
21      A.      Before they moved to the old tribal
22   center.
23      Q.      What dates?
24      A.      I do not know.
```



Page 23

```
 1     Q.      What year?

 2     A.      2015 maybe, '14, '15.

 3     Q.      That's when they were in the casino?

 4     A.      No.  That's when they had moved to the

 5   old tribal center.

 6     Q.      When in 2014 did they move?

 7     A.      I don't know the exact date.

 8     Q.      And when did they move into the casino?

 9     A.      I don't know the exact date.

10     Q.      What year?

11     A.      I don't know the exact date.

12     Q.      So you can't identify a year that they

13   moved into the casino?

14     A.      What?

15     Q.      You can't identify a year that Red Rock

16   moved into the casino?

17     A.      No.

18     Q.      All right.  Where in the casino were

19   they?

20     A.      In room 400.

21     Q.      Okay.  And who were the employees of

22   Red Rock while they were in the casino?

23     A.      I do not know.

24     Q.      You don't know?
```



Page 24

```
 1    A.      No.
 2    Q.      And who were --
 3    A.      I know Michelle Hazen.
 4    Q.      I'm sorry?
 5    A.      Michelle Hazen.
 6    Q.      Okay.  Anyone else?
 7    A.      Craig Mansfield.
 8    Q.      Anyone else?
 9    A.      It depends on what date you're --
10  initially that's how it was and then the
11  co-managers, then Craig had asked not to be part
12  of it, and then Jimmer became a co-manager with
13  Shelly.
14    Q.      Okay.  Any other employees of Red Rock
15  that you can identify while Red Rock was located
16  in the casino in room 400?
17    A.      No.
18    Q.      Now, when they moved to the old tribal
19  offices, can you name any of the employees of Red
20  Rock?
21    A.      Michelle Allen, the regulators, which
22  also worked at the casino, Mesabi McGeshick,
23  Lilly Anne Williams and Jordan McGeshick.
24    Q.      And when you refer to the regulators,
```



1   do you mean regulators from the tribe, tribal

2   regulators?

3       A.       Yeah.

4       Q.       What was the name of the tribal

5   regulatory agency?

6       A.       I don't remember.

7       Q.       Okay.  Did you ever perform any

8   services for Red Rock at any time?

9       A.       In what?

10      Q.       Did you ever play -- did you perform

11  any services for Red Rock at any time?

12      A.       No.

13      Q.       Did you play any role in the day-to-day

14  operations of Red Rock?

15      A.       No.

16      Q.       Do you know anything about what records

17  Red Rock maintained as part of its business?

18      A.       No.

19      Q.       Are you familiar with a company called

20  Ascension Technologies?

21      A.       Yes.

22      Q.       And what is Ascension Technologies?

23      A.       They are one of the entities affiliated

24  with Red Rock.



```
 1     Q.      Have you finished your answer?

 2     A.      Yes.

 3     Q.      Okay.  How was Ascension Technologies

 4  affiliated with Red Rock?

 5     A.      I don't remember.

 6     Q.      What does Ascension Technologies do?

 7     A.      I don't remember.

 8     Q.      Have you ever performed any services

 9  for Ascension Technologies?

10     A.      No.

11     Q.      Have you ever played any role in the

12  day-to-day operations of Ascension Technologies?

13     A.      No.  Any role I played was only in my

14  capacity what was shared with Tribal Council in

15  which I was opposed to.

16     Q.      Okay.  And had you ever heard of a

17  company called Big Picture Loans?

18     A.      Yes.

19     Q.      And what is Big Picture Loans?

20     A.      It's the overarching entity of all the

21  entities within the lending industry not wholly

22  owned by the tribe.

23     Q.      Big Picture Loans is not wholly owned

24  by the tribe?
```



1      A.      I don't know.

2      Q.      Have you ever performed any services

3  for Big Picture Loans?

4      A.      No.

5      Q.      Have you ever played any role in the

6  day-to-day operations of Big Picture Loans?

7      A.      No.

8      Q.      Do you know anything about the records

9  that Big Picture Loans maintains?

10     A.      No.

11     Q.      Have you ever been to the offices of

12  Ascension Technologies?

13     A.      No.

14     Q.      Do you know where the offices are?

15     A.      No.

16     Q.      Have you ever been to the offices of

17  Big Picture Loans?

18     A.      No.

19     Q.      Do you know where the offices are?

20     A.      Well, there's a sign on the

21  reservation.

22     Q.      Explain that, please.

23     A.      There's a sign that says Big Picture

24  Loans and an arrow to the reservation, but I've



Page 29

1    never been in there.

2        Q.       And where on the reservation is that

3    sign?

4        A.       Right next to the police station.

5        Q.       Okay.  And does the arrow point to the

6    police station or towards the police station?

7        A.       Yes.

8        Q.       Okay.  But you've never gone in that

9    direction to the offices of Big Picture Loans?

10       A.       I've never been in those offices, no,

11   when it was acquired or had their offices in

12   there.

13       Q.       Okay.  When is the last time you ever

14   had any communication with Michelle Hazen?

15       A.       With who?

16       Q.       Michelle Hazen.

17       A.       What type of communication because she

18   did live across the street from me?

19       Q.       Any communication.

20       A.       Maybe 2015 maybe, '16.  I don't know.

21       Q.       Okay.  And just to be clear, when I say

22   any communication, I mean speaking to her in

23   person or on the telephone, writing a letter to

24   her, sending a text message to her, sending an



Page 30

1   e-mail to her, any form of communication.

2        A.        I don't remember.

3        Q.        You don't remember, but it was either

4    2015 or '16?

5        A.        It's been years.  I don't know.

6    They're all my cousins.

7        Q.        I'm sorry.  Could you repeat your

8    answer?  I didn't hear you.

9        A.        She's my cousin, but don't -- they're

10   all my cousins, the entire council, but I haven't

11   talked to them.

12       Q.        Okay.  And what about with Chairman

13   Williams, when's the last time you had any

14   communication with Chairman Williams?

15       A.        August 12, 2016.

16       Q.        So the day that you were removed as

17   vice chairman of the tribe?

18       A.        Yes.

19       Q.        The last time you communicated with

20   Chairman Williams?

21       A.        Uh-huh.

22       Q.        Uh-huh meaning yes?

23       A.        Yes.

24       Q.        Okay.  Thank you.



1           Would you describe Michelle Hazen as a

2    friend of yours?

3      A.      She's my cousin.

4      Q.      Okay.  My question was, would you

5    describe her as a friend of yours?

6      A.      Facebook friend, friend?  I don't know

7    what you mean.

8      Q.      Well, what's your understanding of the

9    term friend?

10     A.      That it's non-existent.

11     Q.      I'm sorry?

12     A.      It's non-existent.

13     Q.      What's non-existent?

14     A.      Friends.

15     Q.      Friends are non-existent?

16     A.      Correct.

17     Q.      What do you mean by that?

18     A.      Nobody is honest.  Nobody is loyal.

19    Those are my definitions of a friend.

20     Q.      So someone who's loyal and honest?

21     A.      Yes.

22     Q.      So are you saying that -- and I'm sorry

23    if I misunderstood the answer to your question.

24           I asked whether Michelle Hazen was a



Page 32

```
 1   friend and so is that a yes or a no?
 2        A.        She's not loyal and she's not honest,
 3   so no.
 4        Q.        Okay.  What about Chairman Williams?
 5        A.        He's my cousin, not my friend.
 6        Q.        Okay.  What about other members of the
 7   Tribal Council with whom you served, friends?
 8        A.        They're my cousins, not my friends.
 9        Q.        Okay.  And is anyone who is a tribal
10   member of LVD your friend?
11        A.        No.
12        Q.        Okay.  Ms. Pete, you currently live in
13   Northern Minnesota; is that correct?
14        A.        Yes.
15        Q.        For approximately how long have you
16   lived in Northern Minnesota?
17        A.        A year.
18        Q.        So you moved to Northern Minnesota
19   sometime in 2019?
20        A.        I don't know.  I kept my residency in
21   Michigan.  I don't know the exact dates.
22        Q.        Okay.  Prior to your relocating to
23   Northern Minnesota, where did you live?
24        A.        In Watersmeet, Michigan.
```



1     Q.       Do you know who he works for?

2     A.       No.

3     Q.       Do you know anyone by the name of Brian

4  McFadden?

5     A.       Yes.

6     Q.       Who's Brian McFadden?

7     A.       I think he worked for Rosette.  I'm not

8  sure.

9     Q.       Okay.  So you interacted with him in

10 his capacity as someone who worked for Rosette?

11    A.       No.

12    Q.       Did you not interact with him at all?

13    A.       I just know the name.

14    Q.       Just know the name.  Okay.

15    A.       I can't remember.

16    Q.       Okay.  Now, do you know what the word

17 spoliation means?

18    A.       Exfoliation?

19    Q.       Not exfoliation.  Spoliation,

20 s-p-o-l-i-a-t-i-o-n?

21    A.       No.  What does it mean?

22    Q.       Do you have any personal knowledge

23 about how Red Rock stored its data?

24    A.       No.



Page 64

1     Q.      Do you have any personal knowledge

2   about how Duck Creek stored its data?

3     A.      No.

4     Q.      Do you have any personal knowledge --

5   strike that.

6             Have you ever heard of a company called

7   SourcePoint?

8     A.      Yes.

9     Q.      And what's SourcePoint?

10    A.      SPVI.

11    Q.      And what did it do?

12    A.      I don't remember.

13    Q.      Do you -- did you ever perform any

14  services for SourcePoint?

15    A.      No.

16    Q.      Did you ever -- were you ever involved

17  in the day-to-day operations of SourcePoint?

18    A.      Nope.

19    Q.      Do you know -- do you have any personal

20  knowledge about how SourcePoint stores its data?

21    A.      No.

22    Q.      Have you ever heard of a company called

23  Bellicose?

24    A.      Yes.



1    Q.      What's Bellicose?

2    A.      Matt Martorello's company.

3    Q.      And what did it do?  What did it do?

4    A.      They originated the loans.

5    Q.      How do you know that?

6    A.      Because that's how it was set up.

7    Q.      How do you know that Bellicose

8   originated the loans?

9    A.      From the documents that I read.

10   Q.      What documents did you read that said

11  that?

12   A.      Documents that I provided to the FBI

13  and to you.

14   Q.      Okay.  And so whatever documents that

15  say that Bellicose originated the loans you gave

16  to the FBI and to Mr. Cooperstein?

17   A.      Yes.  I gave everything.

18   Q.      Are there any other documents that you

19  have which you contend show that Bellicose

20  originated the loans?

21   A.      No.

22   Q.      Okay.  Do you have any personal

23  knowledge about how Bellicose stored its data?

24   A.      No.



Page 66

1      Q.      Do you have any personal knowledge of
2    how Bellicose originated the loans?
3      A.      No.
4      Q.      Do you have any personal knowledge of
5    how Big Picture Loans stores its data?
6      A.      No.
7      Q.      Do you have any personal knowledge of
8    how Ascension Technologies stores its data?
9      A.      No.
10     Q.      What's the -- strike that.
11             Are you familiar with the term backing
12   up data?
13     A.      No.
14     Q.      So would it be accurate to say that you
15   don't know how Red Rock backed up its data?
16     A.      No.
17     Q.      It wouldn't be accurate or you don't
18   know how Red Rock backed up its data, correct?
19             MS. DRAKE:  Objection.
20             You can answer.
21   BY MR. SCHEFF:
22     Q.      You can answer, Ms. Pete.
23     A.      Can you repeat it, please?
24     Q.      You don't have any personal knowledge



1    about how Red Rock backed up its data, correct?

2       A.      No.

3       Q.      And you don't have any personal

4    knowledge about how Duck Creek backed up its

5    data, correct?

6              MS. DRAKE:  I object to this entire

7    line.  She already said she doesn't know what the

8    phrase backed up data means, so --

9    BY MR. SCHEFF:

10      Q.      Okay.  You can answer the question, Ms.

11   Pete.

12      A.      No.

13      Q.      And you don't have any personal

14   knowledge about how SourcePoint backed up its

15   data, correct?

16      A.      That's correct.

17      Q.      And you don't have any personal

18   knowledge about how Bellicose backed up its data,

19   correct?

20      A.      Maybe you can stop saying correct

21   because you're -- just ask the question.  Can you

22   repeat it again?

23      Q.      Yes.

24              You don't have any personal knowledge



Page 68

1  about how Bellicose backed up its data; is that

2  correct?

3      A.      No, I don't.  No.

4      Q.      And you don't have any personal

5  knowledge about how Big Picture Loans backed up

6  its data?

7      A.      No.

8      Q.      And you don't have any personal

9  knowledge about how Ascension Technologies backed

10 up its data, correct?

11     A.      No, I do not.

12     Q.      What about do you have any personal

13 knowledge about how Red Rock saved its data?

14     A.      No.

15     Q.      How about Duck Creek, personal

16 knowledge about how Duck Creek saved its data?

17     A.      No.

18     Q.      Personal knowledge about how

19 SourcePoint saved its data?

20     A.      No.

21     Q.      Personal knowledge about how Bellicose

22 saved its data?

23     A.      No.

24     Q.      Personal knowledge about how Big



Page 69

1    Picture Loans saved its data?

2        A.      No.

3        Q.      No personal knowledge about how

4    Ascension Technologies saved its data, correct?

5        A.      No.

6        Q.      Is that right?  Ms. Pete?

7        A.      Yes.

8        Q.      You don't have any personal knowledge

9    about how Ascension Technologies saved its data;

10   is that correct?

11       A.      No, I do not.

12       Q.      All right.  Do you know what data --

13   strike that.

14               Do you have any personal knowledge

15   about what data exists today that was maintained

16   by Red Rock?

17       A.      No.

18       Q.      Do you have any personal knowledge

19   about what data exists today that was maintained

20   by Duck Creek?

21       A.      No.

22       Q.      Do you have any personal knowledge

23   about what data exists today by SourcePoint?

24       A.      No.



Page 70

1     Q.       How about Bellicose?

2     A.       No.

3     Q.       How about Big Picture Loans?

4     A.       No.

5     Q.       How about Ascension Technologies?

6     A.       No.

7     Q.       Do you have any personal knowledge

8  about whether LVD destroyed any evidence relating

9  to this lawsuit?

10    A.       No.

11    Q.       Do you have any evidence -- strike

12  that.

13             Do you have any personal knowledge

14  about whether Red Rock destroyed any evidence

15  relating to this lawsuit?

16    A.       No.

17    Q.       Do you have any personal knowledge of

18  whether Big Picture Loans destroyed any evidence

19  relating to this lawsuit?

20    A.       No.

21    Q.       Do you have any evidence, any personal

22  knowledge as to whether or not Ascension

23  Technologies destroyed any evidence relating to

24  this lawsuit?



Page 71

1      A.      No.

2      Q.      Do you have any personal knowledge as

3  to whether Bellicose destroyed any evidence

4  relating to this lawsuit?

5      A.      No.

6      Q.      Do you have any personal knowledge as

7  to whether Matt Martorello destroyed any evidence

8  relating to this lawsuit?

9      A.      No.

10     Q.      Are you aware of any efforts taken by

11  anyone to destroy evidence relating to this

12  lawsuit?

13     A.      So --

14     Q.      Did you hear the question, Ms. Pete?

15     A.      Yes.

16             MR. PATTNI:  She's asking for --

17             MR. SCHEFF:  Sure.  Okay.  That's

18  fine.

19             MR. PATTNI:  -- me a question.  So

20  can we take a quick 30 second break?

21             MR. SCHEFF:  We can take as much

22  time as you want.

23             THE VIDEOGRAPHER:  The time is

24  11:28 a.m.  We're off the record.



Page 74

1    want to know what you believe was destroyed, when

2    it was destroyed and the basis for your

3    knowledge.

4        A.      Okay.  Any and all documents when

5    Karrie Wichtman would come to the council to

6    present structural changes or resolutions or

7    formations of business entities would immediately

8    be collected after the meeting and immediately

9    shredded except I would not give my packet

10    because to me that was the records of the tribe

11    for the next administration to follow and

12    understand the business.

13        Q.      Okay.

14        A.      So I have problems with, you know, your

15    asking the question in that format.

16        Q.      That's fine.  Thank you for clarifying.

17               And how many times did Karrie Wichtman

18    collect documents after a Tribal Council meeting

19    and shred them?

20        A.      I don't know.  As far as I know, every

21    single time.

22        Q.      And what other information do you have

23    -- strike that.

24               I just want to clarify your testimony.



Page 75

```
 1    The documents that Ms. Wichtman collected from
 2    others and shredded, she did not collect from
 3    you, correct?
 4        A.      Correct.
 5        Q.      And you kept those documents?
 6        A.      Yes.
 7        Q.      And are those among the documents that
 8    you gave to Mr. Cooperstein?
 9        A.      Yes.
10        Q.      All right.  And so we have all those
11    documents now, correct?
12        A.      Yes.
13        Q.      All right.  Good.
14                Other information that you have about
15    anyone destroying documents or data relating to
16    this matter at any time, anyone?
17        A.      What's the question?
18        Q.      Other than what you've just disclosed
19    about Ms. Wichtman collecting documents and
20    shredding them after Tribal Council meetings, do
21    you have any other information about anyone
22    destroying documents relating to the subject
23    matter of this litigation at any time?
24        A.      Yeah, just hearsay from tribal
```



1   membership and workers at the tribal center in

2   which I was not privy to because I did not work

3   there any longer.  I did not see it like I seen

4   what we just discussed about documents being

5   destroyed, so they just told me that there was a

6   shredding truck, they were shredding everything.

7   It's never happened before.  That was just

8   hearsay, but it was information that I stated as

9   far as what I know about documents being

10   shredded, my personal knowledge and hearsay.

11      Q.      So the personal knowledge that you have

12   is what you described that Ms. Wichtman did,

13   correct?

14      A.      Yes.

15      Q.      And the hearsay knowledge that you have

16   is what you've just described was told to you; is

17   that right?

18      A.      Yes.

19      Q.      Okay.  And I just want to confine the

20   time periods, if I can.

21              So your knowledge about Ms. Wichtman

22   collecting documents at the end of a Tribal

23   Council meeting and shredding them, that's during

24   the time period that you were on the Tribal



Page 77

 1    Council either as a Tribal Council member or a

 2    vice chair; is that correct?

 3        A.      Yes.

 4        Q.      Okay.  And the hearsay information that

 5    you have that workers related to you, that was

 6    after you left Tribal Council; is that right?

 7        A.      Yes.

 8        Q.      And before you moved up to Minnesota?

 9        A.      Yes.  I stayed in for like a year,

10    two years.  I don't know.

11        Q.      Okay.  But it was after you left the

12    Tribal Council and before you came up to

13    Minnesota; is that right?

14        A.      Yeah.  Yes.

15        Q.      Which workers told you that documents

16    were being shredded?

17        A.      Janitors, tribal members.

18        Q.      Can you give me their names, please?

19        A.      I believe Corrine McGeshick was one.

20    She was a janitor.  Numerous phone calls.  I

21    don't remember 'cause I was just like I don't

22    care.  I'm done with it.

23        Q.      So other than -- is it Corrine

24    McGeshick?



1      A.      Yes.

2      Q.      Other than Corrine McGeshick, today you

3  can't identify any other people that told you

4  that documents were shredded?

5      A.      No.  There's numerous people.  I don't

6  -- I didn't pay attention.

7      Q.      Can you tell me any of their names

8  other than Corrine McGeshick?

9      A.      No.

10     Q.      And what documents did Corrine

11  McGeshick and others tell you were shredded?

12     A.      They just said they're shredding

13  everything.  There's never been a shredding

14  truck, so it was just their thoughts.

15     Q.      You didn't witness any of the

16  shredding; is that correct?

17     A.      Not what they were suggesting, just

18  what I seen.

19     Q.      And what you saw was with Karrie

20  Wichtman as you've described a couple minutes

21  ago, correct?

22     A.      And Tribal Council members, yes.

23     Q.      Okay.  Excuse me.

24             Now, so Corrine McGeshick didn't tell



Page 79

1    you what specific documents were being shredded,

2    correct?

3        A.        No.

4        Q.        And these other people whose names you

5    can't remember today, they didn't tell you what

6    specific documents were being shredded either; is

7    that correct?

8        A.        No.

9        Q.        Did they say what the documents even

10   related to?

11       A.        No.  I just didn't pay attention 'cause

12   I'm like I don't speak on what I didn't see or

13   know of personally.

14       Q.        Okay.  Excuse me.

15                 Ms. Pete, you electronically signed a

16   declaration in this case.  Do you remember that?

17       A.        Yes.

18       Q.        And what was the reason why you signed

19   a declaration?

20       A.        I don't have -- I don't think I had a

21   car, computer.  I don't -- and it is 2020.

22       Q.        I'm sorry.  I'm asking why -- how did

23   it come about that you signed a declaration in

24   this case?



1    her name.

2              MR. PATTNI:  You had answered it.

3    If you don't remember, you can just say you don't

4    remember.

5              THE WITNESS:  I don't know.

6    BY MR. SCHEFF:

7    Q.       And this was last August 2019; is that

8    right?

9    A.       Yes.

10   Q.       And the people who prepared it were

11   lawyers for the plaintiffs; is that right?

12   A.       Yes.

13   Q.       So you told your story to lawyers for

14   the plaintiffs and they wrote your declaration?

15   A.       Yes, and upon my approval with an

16   amendment to it, I had signed it.

17   Q.       So you revised it a couple of times and

18   then when you were satisfied with it, you signed

19   it; is that right?

20   A.       I believe there was one revision.

21   Q.       Okay.  And do you remember what was

22   revised?

23   A.       I think one was where they had said

24   something about the -- it was misunderstanding



1    I'm going to read that into the record.

2              "In 2011, Tribal Council was approached

3    by Matt Martorello with an opportunity to

4    participate in a lending business.  In the fall

5    of 2011, Martorello visited our reservation to

6    meet with Tribal Council to present the deal.

7    During this presentation, Martorello explained

8    that his company would run the business if LVD

9    allowed him to claim that LVD law applied to the

10   loans.  Under the deal, LVD would receive

11   2 percent of the gross revenue of the loans."

12             Have I read that correctly?

13      A.     Yes.

14      Q.     Okay.  How do you know that

15   Mr. Martorello was the one who approached LVD

16   with an opportunity to participate in the lending

17   business?

18      A.     'Cause he was standing right in front

19   of me during the presentation.

20      Q.     How do you know that he's the one that

21   contacted LVD as opposed to LVD contacting him?

22      A.     I don't know that.

23      Q.     You don't know one way or the other?

24      A.     I know that Rob Rosette had initially



1   said that -- discussed this initiative and then

2   Matt Martorello appeared.

3       Q.      Okay.  And again -- and I just want to

4   clarify something because I want to make sure

5   we're careful.

6               Ms. Pete, when Mr. Rosette said what

7   you've just testified to, was he acting in his

8   capacity, as far as you know, as a lawyer for

9   LVD?

10      A.      Yes.

11      Q.      All right.  I want to know what he said

12  as a lawyer for LVD, okay?

13      A.      Yes.

14      Q.      All right.  Now, when did

15  Mr. Martorello come to Tribal Council, if you

16  know?

17      A.      Like July or August of --

18      Q.      Of what year?

19      A.      2011.

20      Q.      And you were the vice chair of the

21  Tribal Council at the time?

22      A.      I believe so.  I'm -- I don't know.  I

23  believe so.

24      Q.      Okay.  But you remember being in a



Page 91

1    other?

2        A.      No.

3        Q.      At the meeting with Mr. Martorello at

4    Tribal Council, did you voice an objection to the

5    tribe moving forward with a lending operation?

6        A.      Yes.

7        Q.      And who did you voice that to?

8        A.      Whenever they voted, I did.

9        Q.      I'm sorry?

10       A.      Whenever they voted, I did.

11       Q.      You voted against it?

12       A.      Correct.

13       Q.      All right.  And do you have a record of

14   you voting against it; did you keep those

15   resolutions where its recorded that you voted

16   against it?

17       A.      No.  We would not get -- we would not

18   receive anything after the chairman signed it.

19   It would just be meeting minutes that would be

20   posted that indicated what was passed or what

21   wasn't passed and it wouldn't say who was for or

22   against.

23               I specifically remember that because

24   when I was opposed to it, Michelle Hazen was the


MAGNA
LEGAL SERVICES

Page 92

1    secretary and she said too bad that it doesn't

2    state who was opposed to it, ha, ha, ha.

3        Q.      And when was that; when was that

4    conversation that you're relating from Ms. Hazen?

5        A.      She would say that all the time.

6        Q.      So are you saying that every time you

7    voted against a resolution, that's what Ms. Hazen

8    would say to you?

9        A.      Yes.

10       Q.      And who else was present when she would

11   do that?

12       A.      I didn't pay attention, but I'm sure

13   its on record, audio.

14       Q.      Were Tribal Council meetings tape

15   recorded?

16       A.      Yes.

17       Q.      How do you know that?

18       A.      Because I was on the Tribal Council.

19       Q.      Did you ever listen to the recordings?

20       A.      No.  Only when I had requested specific

21   meeting minutes and at the time, Vera Klingman

22   was the secretary and she gave me the wrong

23   recordings.  When I listened to it, it was the

24   recordings of me questioning the council about



Page 130

1    Tribal Loan Management and Tribal Lending

2    Solutions are going to enter into a contract with

3    the tribe and they were going to help the tribe

4    set up an online lending operation to consumers;

5    isn't that right?

6        A.      Yes.

7        Q.      All right.  And as part of that effort,

8    Tribal Loan Management and Tribal Lending

9    Solutions identified Mr. Martorello as a person

10   who could assist the tribe in doing that; isn't

11   that right?

12       A.      I don't know if that's correct.  All I

13   know -- I don't know how he was retained or

14   invited.  All I know is he was just there

15   one day.

16       Q.      So you don't know how he came to be

17   there one day?

18       A.      No, I don't.

19       Q.      Is that correct?

20       A.      The only link that I knew of was from

21   Rob Rosette.

22       Q.      And Rob Rosette is part of Exhibit 3;

23   he's part of Tribal Loan Management, correct?

24                   MS. DRAKE:  Object as to form,



Page 135

1    Q.      Why not?

2    A.      Because none of that, any documents

3  state that our sovereignty will be shared.

4    Q.      That's why you didn't think of

5  Exhibit 3, that contract, when you signed the

6  declaration?

7    A.      No.

8    Q.      Okay.  That's fine.

9            Let's go to the last sentence of

10  paragraph two.  So I'm going to need the first

11  page and then the second page.

12            "During this presentation, Martorello

13  explained that his company would run the business

14  if LVD allowed him to claim that LVD law applied

15  to the loans.  Under the deal, LVD would receive

16  2 percent of the gross revenues from the loans."

17            Have I read that correctly?

18    A.      Yes.

19    Q.      Do you know what gross revenue is?

20    A.      Yes.

21    Q.      What is it?

22    A.      It's the income that you generate from

23  whatever business you're running.

24    Q.      Sorry?



Page 136

1    A.       It's the gross revenue -- the revenue

2    that you generate minus the cost of operating the

3    business.

4    Q.       That's the gross revenue?

5    A.       Yes.

6    Q.       You're sure that's not the net revenue?

7    A.       Yes.

8    Q.       Okay.  So as far as you understood, the

9    deal that Mr. Martorello presented would have LVD

10   taking 2 percent of gross revenue, which you

11   understand to be total amount of revenue of the

12   business minus all the costs?

13   A.       Can you put page two up without the

14   faces on it?  Okay.

15   Q.       How's that?

16   A.       Better.

17   Q.       Okay.  So you understood that the deal

18   that Mr. Martorello presented to the tribe was

19   that they would receive 2 percent of the revenue

20   minus the costs?

21              MS. DRAKE:  Object as to form.

22              MR. PATTNI:  Have him repeat his

23   question.

24              THE WITNESS:  Yeah.  I'm getting



Page 137

1    lost here.  Can you repeat the question?

2    BY MR. SCHEFF:

3        Q.      Yeah.

4                You -- well, let's go back to your

5    definition of gross revenue.

6                Did I understand you correctly when you

7    said that gross revenue means the total amount of

8    money taken in by the business less all of the

9    business's costs; is that right?

10       A.      Yes.

11       Q.      All right.  So is that what

12   Mr. Martorello explained to the tribe, that they

13   would receive 2 percent of the revenue generated

14   by the business after all the costs had been

15   paid?

16       A.      No.

17       Q.      What did he say?

18       A.      I don't -- I'd have to look at my

19   documents because there's taxation issues and

20   questions also.

21       Q.      Well, you signed this declaration which

22   says under the deal, LVD would receive 2 percent

23   of the gross revenues from the loans.  What was

24   the basis for you saying that?



Page 138

1      A.       What was the basis of what?

2      Q.       What was the basis of you saying that?

3      A.       The whole basis of every single

4   statement and sentence I wrote was the fact that

5   2 percent is not a hundred percent wholly owned

6   by the tribe.

7      Q.       What's not wholly owned by the tribe?

8      A.       Our net, that is not wholly owned by

9   the tribe.

10     Q.       So is it your belief that -- is it your

11  position that a business wholly owned by the

12  tribe has to receive one-hundred percent of the

13  revenue and profit of that business?

14     A.       When it is said that it's wholly owned

15  by the tribe, yes.

16     Q.       So unless a business receives a hundred

17  percent of the revenue and profit, it can't be

18  wholly owned by the tribe?

19     A.       Unless it receives -- can you repeat --

20     Q.       So unless the tribal business receives

21  one-hundred percent of the revenue and the

22  profit, it can't be tribally owned -- it can't be

23  wholly tribally owned; is that your testimony?

24     A.       I guess it would depend upon if it was



Page 139

```
 1    incorporated or corporated or formed under tribal

 2    law.

 3         Q.        Okay.

 4         A.        That's a whole different story.

 5         Q.        So if it was formed under tribal law,

 6    the business was formed under tribal law, in

 7    order for that business to be wholly owned by the

 8    tribe, is it your testimony that that business

 9    has to receive all the revenue and all the profit

10    that it generates?

11                   MS. DRAKE:  Object as to form.

12                   THE WITNESS:  Yes.

13    BY MR. SCHEFF:

14         Q.        Yes?

15         A.        Yes.

16         Q.        Okay.  Let's go on to paragraph three.

17                   "When Tribal Council initially agreed

18    to the deal with Martorello, we understood that

19    all aspects of the lending business would be

20    handled by Martorello and that the tribe would

21    have no risk."

22                   Have I read that correctly?

23         A.        Yes.

24         Q.        What did you mean when you said the
```



Page 140

1    tribe would have no risk?

2        A.      That he would teach us how to run the

3    business.

4        Q.      And why does that mean the tribe would

5    have no risk?  I don't understand that.  Can you

6    explain that?

7        A.      Pretty much like it was a lucrative

8    business.

9        Q.      It was what?

10       A.      A lucrative business.

11       Q.      And so therefore, there'd be no risk to

12   the tribe?

13       A.      Yes.

14       Q.      Isn't it the case that there'd be no

15   risk to the tribe because the tribe would be

16   receiving 2 percent of the gross revenue from the

17   loans, not 2 percent of the net revenue from the

18   loans?

19               MS. DRAKE:  Object as to form.

20               THE WITNESS:  Isn't it?  What do

21   you mean?

22   BY MR. SCHEFF:

23       Q.      Isn't it the case that the tribe was

24   receiving 2 percent of the revenues of the



Page 146

1    A.       It depends on what aspect is -- passing

2    out flyers on a car.  There's talking to someone,

3    communication, internet, leads.  So yes, I

4    understand what marketing is.

5    Q.       Okay.  And what do you understand the

6    term servicing to mean in line four, paragraph

7    three?

8    A.       That they would be servicing, teaching

9    us how to service any applications and any

10   consumers and then funding and then teaching

11   about the collection of the loans and then it

12   would be passed to the tribe, but none of that

13   was ever shared with the council.

14   Q.       Do you know whether it was shared, that

15   is the training of how to underwrite and market

16   and service and fund and collect, with other

17   people who were outside the council, but members

18   of the tribe?

19           MS. DRAKE:  Object as to form,

20   compound, foundation.

21           THE WITNESS:  No.

22   BY MR. SCHEFF:

23   Q.       Do you know whether Mr. Martorello and

24   the people that worked for him tried to train the



Page 147

1    people who worked for Red Rock?

2        A.        No.

3                MS. DRAKE:   Object as to --

4    BY MR. SCHEFF:

5        Q.        Do you know whether Mr. Martorello and

6    the people who worked for him tried to train the

7    people who worked for Duck Creek?

8        A.        No.

9        Q.        You just don't know whether it happened

10   or didn't happen; you just know that it wasn't

11   shared with the Tribal Council?

12       A.        Yes.

13       Q.        Okay.  Let's go to paragraph four.  Do

14   you see in the second --

15       A.        I want to back up to that last question

16   you had and telling me what I knew and didn't

17   know, but -- can the court reporter say the last

18   few sentences?

19                (The requested portion of the

20   record was read back by the court reporter.)

21                THE WITNESS:  Yeah, because the

22   attorneys, Karrie Wichtman and Ken Akini, stated

23   that Susie McGeshick was not doing what she was

24   supposed to do.  Nothing was getting done.  The



Page 149

```
 1    A.       My answer was no, they were not.
 2   That's my personal knowledge based on the
 3   information that was provided to me by the
 4   attorneys, Karrie Wichtman and Ken Akini.
 5    Q.       Did you ever speak with any of the
 6   employees of Red Rock or Duck Creek to determine
 7   whether they thought they were being trained in
 8   the operation of the business?
 9    A.       No.
10    Q.       Let's go to paragraph four, second
11   line.  Do you see the word originate?
12    A.       Yes.
13    Q.       What does that mean?
14    A.       The application process.
15    Q.       The application process.  Okay.  Why is
16   it in quotes?
17    A.       'Cause it didn't originate there.
18    Q.       I'm sorry.  What didn't originate
19   there?
20    A.       It didn't originate -- any applications
21   originate there.  There's no way to tell which
22   ones did and which ones didn't because Bellicose
23   was located in Puerto Rico.
24    Q.       I thought that you said that you were
```



Page 150

1    not involved -- that you testified you were not

2    involved in the day-to-day operations of Red

3    Rock; is that correct?

4         A.    Yes.

5                    MS. DRAKE:  Objection,

6    mischaracterizes her testimony.

7    BY MR. SCHEFF:

8         Q.    Is that a yes, Ms. Pete?

9         A.    Yes.

10        Q.    And you weren't involved in the

11   day-to-day operations of Duck Creek; isn't that

12   right?

13        A.    Right.

14        Q.    Okay.  So Ms. Pete, how do you know

15   then that Duck Creek or Red Rock did not

16   originate the loans that it made; how do you know

17   that?

18        A.    Because what Karrie said, it wasn't

19   being done by Susie McGeshick.  That's one

20   instance.

21        Q.    Other than information that you

22   received from a third party, Ms. Wichtman, do you

23   have any other basis to say that Red Rock loans

24   were not originated by Red Rock?



Page 151

 1    A.      No.

 2    Q.      Ms. Pete --

 3    A.      Yes.

 4    Q.      -- let's go through paragraph four.

 5            You said:  "But this responsibility was

 6   immaterial because Red Rock would have no reason

 7   to reject a loan that satisfied Martorello's

 8   lending criteria because Martorello ran the

 9   business and bore all the risks."

10            What's the basis for you saying that?

11              MS. DRAKE:  Object as to form.

12              THE WITNESS:  That he -- basically

13   because it wasn't being done by the tribe and

14   then it would -- they would ship them to him or

15   whatever Karrie did because Susie wasn't doing

16   it, they wouldn't have to be rejected because his

17   criteria was what she said.  I don't know.  I

18   didn't see any of those applications.  I just

19   heard of what was being done.

20   BY MR. SCHEFF:

21    Q.      And you heard about that on one

22   occasion?

23    A.      No, numerous.

24    Q.      Numerous occasions.  But you never



Page 163

1    I'm asking about the time period November 2011 to

2    February of 2016, did Red Rock have employees in

3    Puerto Rico and Atlanta during that time period?

4        A.     I don't know.  I'd have to look at the

5    documents.

6        Q.     Okay.  During the period November of

7    2011 to February of 2016, what is the basis for

8    you saying that Red Rock's computers -- strike

9    that.

10             During the time period November of 2011

11   to February of 2016, were Red Rock's computers

12   located on the reservation?

13                 MS. DRAKE:  Object as to the form.

14                 THE WITNESS:  Where were they, is

15   that what you said?

16   BY MR. SCHEFF:

17       Q.     I asked whether they were on the

18   reservation.

19       A.     I don't know.

20       Q.     Okay.  During the period November of

21   2011 to February of 2016, were the records of Red

22   Rock -- strike that.

23             Were the records of Red Rock on the

24   reservation?



Page 164

1     A.      I don't know.

2     Q.      Okay.  So the next sentence of

3  paragraph five then says:  "I understand" --

4     A.      Can you put it up?  Yeah.

5     Q.      Yeah.  Sorry.

6             I'm starting at the very last word on

7  page two where it says:  "I" -- if you can go to

8  page three, please -- "understand that

9  Martorello" --

10             MS. DRAKE:  The exhibit is covered

11  up by the photos on the screen, so maybe we can

12  just display page three if that's what you're

13  talking about.

14             MR. SCHEFF:  That's fine.

15  BY MR. SCHEFF:

16     Q.      "I understand that Martorello operated

17  Red Rock exclusively for a significant amount of

18  time after its inception."

19             Have I read that correctly?

20     A.      Yes, you have.

21     Q.      For how long a period of time did

22  Martorello operate Red Rock exclusively after its

23  inception?

24     A.      I don't know.



Page 165

1    Q.      Can you estimate?

2    A.      No.

3    Q.      Do you know when the inception of Red

4    Rock was?

5    A.      No.

6    Q.      The last sentence of paragraph five

7    says:  "I understand that some employees,

8    computers and records were located off the

9    reservation."

10          During what time period are you

11   referring to in your declaration when you wrote

12   that sentence?

13   A.      I don't know.  I just know that there

14   are some employees, computers and records that

15   were off the reservation.

16   Q.      Are you unable to say during what time

17   period that occurred?

18   A.      Yes.

19   Q.      All right.  I think we've already

20   talked about paragraph six.  Let's go to

21   paragraph seven, please.

22          First sentence:  "Additionally,

23   although business information was kept secret

24   from Tribal Council, it was my understanding that

