# Exhibit 39

| | |
|---|---|
| **From:** | mattm@bellicosevi.com |
| **To:** | Karrie Wichtman |
| **Subject:** | RE: CFPB and Tribes |
| **Date:** | Tuesday, June 19, 2012 9:11:50 AM |
| **Attachments:** | image001.jpg |
| | image002.png |

That's really great news.  I'd love to switch the portfolios over to self-financed entities when they are ready!  Right around the end of the Alpha line of credit in 36 months should be perfect timing.

I wish I could come up with an answer quickly on the NAFCC/NALA stuff, but I have to think about it.  I'm not that familiar with it and its goals vs. OLA or the costs.  I think the costs were extremely high vs. OLA for NALA.  I have to review their website at some point here and see what they are about.

The one thing I don't want is the TLM relationship to be a sour point for the Tribe's attitude about the SPVI relationship ("if it were a different Servicer, we wouldn't have to pay TLM any more").  Just let me know how I can help!


**Regards,**

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com



\*\*This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.\*\*

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Monday, June 18, 2012 2:14 PM
**To:** mattm@bellicosevi.com
**Subject:** RE: CFPB and Tribes

Matt,

No apologies necessary.  I appreciate your comprehensive responses and the fact that you took the time to do so.  I will discuss your concerns re: anonymity and the NAFCC/NALA involvement with Shelly and Craig.  We do plan to attend the Denver event of the two organizations this week, however, rest assured that proprietary information will not be shared regarding the LVD tribal entities or SPVI.  I also cannot see any competitor weakening the SPVI and LVD relationship, they are quite happy with the services provided by SPVI and are looking forward to a long business relationship.  I am not sure that the Tribe, itself, has the means to support the involvement with NAFCC/NALA, thus the request to access lobby/litigation reserve funds to allow for their continued involvement.  Given, SPVI's stance on participation, is this even an option?

CONFIDENTIAL                                                                                                                                                          ROSETTE_REVISED 044598

Overall, sounds like our weaknesses are covered or at least being addressed. I did not mean to convey that the Tribe was not happy with the current percentage received and I am glad that the current pay structure has been found legally sound, at least in one circuit. I hope you did not take it that way – it was just an area, if I were a regulator, I would attack. Your explanation regarding the risk associated with your investment paints a clearer picture as to the defensibility of the model. That is what I was hoping for. With regard to LVD receiving more profits, I believe that they will be in a position to make such an investment, if they so desire in the near future (18-24 months), given the return on investments that have closed this year and the capital gains that they will likely see from those as well as the re-investment in their own facility which will change almost the entire face of the gaming floor this summer. It would be great to see them graduate to the lender level. As far as TLM, the agreements had no termination date and ceased only when the relationship ceased between the vendors, investors and the Tribe. Furthermore, the "consulting fee" was to be received for any investment, indirect or indirect, of "Bona Fide Investors" to the Tribe's Lending business for which TLM made some sort of introduction between the vendor/investor and the Tribe. This includes "any and all assignees, associates, affiliates, partners, agents, employees or any other entity or person that benefits through its contact or communication." I am a little unclear about how far this reaches – I know the intent is as far as any investor making any investment in the Tribe's lending businesses, however, in the case where we find ourselves with RRTL and Alpha, TLM has had no involvement with the due diligence or anything else associated with this potential additional funding source – but because of the SPVI introduction and the potential argument that Alpha has an "associate" relationship with SPVI – the consulting fee will be expected by TLM when that funding falls into place. I also think the agreement was to include any servicer regardless of introduction through its non-circumvent clause. And no, the consulting agreement does not have a cap regarding the amount of Tribal Net Profits it may receive. I fear that even in the scenario of opening a new portfolio, because of the TLM introduction of SPVI to the Tribe, they would argue that they get the fee from that too. I, however, believe that the Tribe making its own investment is entirely different, regardless of the use of the same Servicer, and will be arguing that TLM is entitled to no such fee if that were to come to fruition. I am aware that TLM has approached some of its clients with a buy-out opportunity, I am certain it will be offered to LVD as well, I just hope that it is a fair proposal, that the Tribe sees the advantages of doing such, and that they have the means to make it happen.

Thank you for the opportunity to speak candidly and for the honesty in your responses. Personally, I think it is your willingness to have discussions like these that set you apart from other Servicers and greatly contributes to your success!

Sincerely,

**Karrie S. Wichtman, Attorney**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office

480.242.6959 - Cell

517.913.6443 – Fax

kwichtman@rosettelaw.com

www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Monday, June 18, 2012 10:53 AM
**To:** Karrie Wichtman
**Subject:** RE: CFPB and Tribes

Thanks Karrie, sorry for the delay… my thoughts are below (sorry so lengthy)

**Regards,**

**Matt Martorello**

Mobile: 773-209-7720

Email: MattM@BellicoseVI.com



**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

---

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Friday, June 15, 2012 5:54 PM
**To:** mattm@bellicosevi.com
**Subject:** RE: CFPB and Tribes

Matt,

As far as I know we have not received anything.  I will inquire with the Chairman, his Executive Secretary, Shelly and Craig to see if something was received.  Jennifer gave me the heads up about these letters about a month ago and I did inform the Tribe that we might be getting one.  As far as the NAFCC/NALA, I understand your concern about calling unnecessary attention to ourselves, however, the advocacy work that is being done by the NAFCC and being in the know through our participation gives us an advantage of not being surprised when issues arise such as the recent legislation proposed by Senator Merkley.  Are you saying that you would rather Shelly and I not go out to Denver next week to attend the merger meeting scheduled between the NAFCC/NALA?  I guess I am more afraid about not being involved and allowing someone else to dictate to us what

best practices are or will be, as well as ensure that the folks making the decisions are the Tribal entities and not someone else.**[Matt Martorello]**  This sounds like a deeper more fundamental interest for tribes to ensure the right groundwork is being laid for a budding new industry.  We at SPVI seem to favor letting the other players bear the brunt and defend aggressively (which thankfully guys like Tucker have done a great job at standing strong) giving us the free look at how to avoid expensive legal trouble.  We have the same perspective for our offshore lenders and even our state licensed lender.  In fact, at OLA we very rarely go and have found reporters crashing events there to try to get intel.  We much prefer to operate through trusted 3rd parties for these events and stay off the radar.  We are also concerned that the Tribe will be working closely with other large competing Servicer's to SPVI now, which could lead to a competitive disadvantage for SPVI if the Tribe decides that it does not want the exclusive anymore, or if a competitor to SPVI weakens the enthusiasm of LVD having the relationship with SPVI as it is.  So as we finance the build of a stronger tribal lending business and we are betting on the long-term year 3 profitability, we don't want to lose out on the returns associated with such intellectual and financial investment.

As far as the ability of the CFPB being able to investigate Tribes, it is my understanding that the CFPB's authority is regulatory in nature and derived from the Dodd-Frank bill in which Tribes are treated as States over which the CFPB has no regulatory control.  I am not certain, however, about the FTC's reach.  **[Matt Martorello]**  This is wonderful, sounds like the FTC is the only potential issue here.  I know Tucker is challenging the authority of the FTC right now for the first time ever by a Tribe.  So we'll learn soon on how that pans out.  SPVI is working on a new loan product/consumer loan agreement and working with the software system to make it work.  This will address each concern the FTC had with Tucker so that they can never have such concerns with SPVI clients.  We are planning to have that wrapped up in the next 3 or 4 weeks.

We have a fight coming and I understand you wanting to lay low, but we can't escape it forever.  I am not saying I want to waive a banner and say "look at us" but our model is one of the best there is, we have made every effort to ensure tribal control, and are tweaking things almost constantly, it seems, to allow for more tribal control.  While some may attack the role of the Servicer, your role is integral to our success – you have the know-how and the funding sources to ensure that the business is fruitful for the Tribe.  You asked me a little while ago, if there is anything that I would change about our current model or if I were a regulator how I would attack it.  Personally, I see  only a few issues – on the regulatory side, the Tribal Regulatory Authority that is, it needs to have a designated employee, even if only part time, to ensure that licensing is done correctly and tracked and that audits of lending practices are performed.  We are certainly in compliance with the law at present, but internally the Tribe's need to embrace this as a new position intended to strengthen the model and protect the Tribe and consumers.**[Matt Martorello]**  I don't foresee any more licenses being required in the near term.  I guess it depends on what the TRA decides it wants to do on this compliance stuff.  Annual review?  If so, I'd imagine just requiring somebody's attention for 2 - 3 weeks a year to get through that process.   The second piece is the profit to the Servicer, we have to be prepared to show that the percentage of net profit that the Servicer is receiving is defensible compared to what the Tribe is receiving.  In the casino management context there is a certain percentage cap per regulations at 30%, or maybe 40% I believe, that a manager is legally allowed to receive in order to ensure that the benefit of the business is to the Tribe and not the Manager.  That being said, the fact that in our current arrangement the Servicer pays all operating expenses and

then throwing in the Lobby/Litigation account and potential expenses there, and the minimum guaranteed payment to the Tribe, certainly takes a bite out of any net profit realized by the Servicer, but what does that calculation truly look like in our situation?  I think that is where we will  be attacked and it is the weakest link in the model.  **[Matt Martorello]**  This was tested in Colorado with Tucker at 1% and the Supreme Court of Colorado upheld it with flying colors, and no justification was even necessary for them to do so.  There was a specific comment you see in the decision about it that was very supportive.  I'd imagine that casino fee discussion might come up in a lot of circles over the next year or so.  The thing is, this industry is nothing like the casino industry.  The casino industry has a calculated definable "edge" in which you make money and it's a cash business vs. having everything out on the street in loans that you may never get back (operational risk of massive losses which is common, ACH/Bank risk of closure, regulator risk of lawsuit and ending industry before you reach your period of profitability, etc.).  In payday lending, more lenders fail and LOSE their entire investment than there are lenders that succeed.  Even despite the bank/ach/regulatory risk! Folks jump into this business thinking the profits are so large, but they don't know what they are doing.  It is so very sensitive to underwriting and marketing and operations, that one little tweak the wrong way and you are losing massive dollars before you even know you have a problem on your hands (this is because you lend money today, and you don't know how it did for another month or two… meanwhile, you've been putting out all of your funds under a model before you've realized the model is flawed and losing 50% of cash put in each month).  Majority of lenders fail.  Those that don't fail are facing diminishing profits, increased competition, restrictions in marketing efforts from Google, and now the legal bills are several times as costly as they used to be thanks to increased regulation.  All the while, the "end" is always around each corner with the FTC and CFPB and the banks/ACH providers getting heavily influenced to stop serving lenders.  In fact, if we don't have a Wells Fargo replacement done, Iron Fence would likely lose $4,000,000 come July 1.  If we lost our ACH provider and had no replacement, Iron Fence would lose even more than that.  The risk in this industry is massive and takes many forms.  In a casino in know I'm only giving back 97% of every dollar played in Blackjack and I know I can't have all of my money frozen (like losing my bank/ACH), I can't have the FTC come in and file suit for likely more assets than I have, etc. etc.  Also, I don't have options in the casino model where in Lending I can operate via offshore, state COL, state-by-state, etc.

RRTL for example has paid TNP of about $80k I think, maybe $100k… Iron Fence has loaned RRTL over $5,000,000 and SPVI has lost over $2,000,000 to date on servicing RRTL by eating the expenses with no revenue.  If the FTC shut RRTL down today, we would be in trouble.  This will continue this way for about 18 months where RRTL will have SPVI on the losing end and TNP will have been over $400k.  This is why SPVI gets compensated on the back-end (which unlike the casino business there may never be a back end) in years 3 and 4 when it will break-even.  SPVI is guaranteeing TNP in an industry where majority of entrants fail and hoping to get to profitability in year 4.

Another consideration is that unlike the Casino model, there are alternatives.  Offshore lending means no FTC involvement and legal costs associated with that fight, no CFPB issues, and no recurring legal expenses with dealing with BBB inquiries and AG letters (today is arguably the best model to raise capital for).  Choice of law state licensed lending is also still a viable alternative, as is state-by-state licensed lenders like the $1bn company cashnetusa.com does very well, and is a public company.  But so long as these other options are out there the Servicing Fees will won't ever reach

anything close to the casino model.

The biggest proponent I know of, but is a very private study, was done by a Servicer that I am close friends with.  Their entity had Ernst & Young come in and do an economic study on what the right fee relative to industry risk was, and this was done 3 years ago.  Today the cost of leads have increased about 70%, and the regulatory/legal risk has reached all new levels.  E&Y came out deciding that the lender was entitled to a bond yield of equivalent risk, and the result was converted into a low single digits % of revenue.  So this is how the Servicer built their contract and bills the Lending entity, and this study is required to provide to the IRS (the most diligent of all in terms of fair pricing) with confidence that the model in which the Servicer charges the lender is fair.

Now all of that said, I get the feeling the Tribes may want more money.  They may feel it's not that hard, that they could do it on their own, etc.  That they are getting more involved now with CFPB/FTC attacks.  However, the level of sophistication behind the scenes built into the IP that SPVI uses, which makes SPVI clients succeed while majority of lenders fail, is massive.  Going at it alone is an exercise in how much money do you want to lose before you make it up the learning curve high enough to know how to do it right.  That takes a lot of analytics to get there and the faster the better.

Today, I am VERY interested in going to Tribes that can self-finance, and I would offer something equating to about 25% of the Net Profit in such a deal.  I would do this with every Tribe I could get.  The reason that number is not 51% is because I'm better off operating with other models/lenders, or lending myself as a choice of law or state licensed lender even if it is the Tribe's money, the time and effort it takes to manage portfolios is a limited skill set.  I would say the minimum investment would be $3,000,000.  I would love to do something like this with LVD on a 3rd portfolio that is capitalized by the Tribe itself.  Obviously with RRTL/DCTF the risk is all Iron Fence, but this model allows the Tribe to fund it, the Tribe to take the financial risk, and the Tribe to enjoy higher benefits.  They would earn more than any tribe out there, but they would be responsible for to fund their own venture.  Maybe we should do a 3rd portfolio in something similar to this model if LVD has the funds.

One comment pertaining to the interest of assessing market value… Servicers are not all apples to apples.  You might think one Servicer's model is cheaper than another, but their practices will yield 1/2 the revenue as ours, per dollar invested (Think Finance for example).  Or they charge a flat $100 fee per originated loan and they mark up their leads by 50% to minimize the profitability of the lender BEFORE they do a split that looks larger on the surface (also like Think Finance).

Lastly, the TLM piece is problematic for a whole host of reasons, and while I do not have any doubt that for bringing the regulatory structure and the Servicers to the table there should be a  fee paid to TLM and notwithstanding their recent timely and effective resolution to the Wells Fargo issue and leading us to USB, 50% of the Tribe's profits has always been a bit excessive in my opinion.   However, that is the agreement entered into by the Tribe, and incorporated into our agreement, and ultimately the Tribe has benefitted greatly from the introduction and the entry into the on-line lending industry.  However, if there was a way to pay for the value received by TLM as a result of the introduction and structural documents provided and part amicably with TLM, I would hope that the Tribe would pursue it.***[Matt Martorello]***  I understand this completely.  Is there a duration to the

TLM relationship?  Or is there a cap on the maximum amount they get from TNP?  Most importantly, does LVD have to pay them on EVERY relationship they get into, even if TLM doesn't make the intro to the Servicer?

Those are my thoughts...☺

Sincerely,

**Karrie S. Wichtman, Attorney**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.242.6959 - Cell
517.913.6443 – Fax
kwichtman@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT.  ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION.  IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE.  THANK YOU FOR YOUR COOPERATION.

---

**From:** mattm@bellicosevi.com [mailto:mattm@bellicosevi.com]
**Sent:** Friday, June 15, 2012 3:48 PM
**To:** Karrie Wichtman
**Subject:** CFPB and Tribes

I heard many tribes received investigation letters from the CFPB on Wednesday, did you hear anything about this?  I'm kind of an advocate right now for LVD to be laying low and under the radar while we let everyone else sort things out over the very rocky next 6 months.  I think the NALA/NAFCC stuff has a great purpose for a voice, but I think it's best done at an anonymous level via 3rd parties like yourself who have client-attorney privilege.  Being super active, I think makes it easier to put up a target for FTC/CFPB to figure out who to send investigations to.  Just wondering what your thoughts are on this, because admittedly I know little to nothing about the organizations or the ability for the CFPB to investigate at all (or the FTC for that matter).

Regards,

**Matt Martorello**
Mobile: 773-209-7720
Email: MattM@BellicoseVI.com



**This email and any files transmitted with it are confidential and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

CONFIDENTIAL                                                                                                                                                        ROSETTE_REVISED 044605