# Exhibit 90

**To:** manish.goyal@aranca.com[manish.goyal@aranca.com]
**From:** Matt Martorello
**Sent:** Wed 12/7/2016 2:22:14 PM
**Subject:** RE: PR Hybrid

I'd like to supplement this to keep you up to speed... Do you have any experts on staff in this area who could be helpful to figuring out tax treatment on all of this in addition to the asset by asset valuations? Thinking about 2012, 3 ways this 7.7mm liquidation value could go.
1) Customer Contracts, if in reviewing the agreement I take the position that they owned all IP, not me.  I've waffled on this one thinking back further...  Tax treatment = Potentially Section 936 Operating Intangible, may or may not be subject to ATB election (all very material, could be 100% US sourced Ordinary Income instead of bifurcated to PR day count at 0%, and capital gains for US day count)

2) A series of IP, and to a lesser extent maybe the customer contract.  if I owned the IP... Tax Treatment = asset by asset where maybe some is Operating Intangible again.

3) Goodwill, which sounds a lot like customer contract in this instance, but perhaps it is something more.  Perhaps it is "potential" of the business... Tax treatment = based on where it's created, definition of created is still unclear

Based on what we know, we now have to decide which of the 3 were prevalent here, and that seems much more of an art form than a science.

Like to nail down the tax treatment of each while we continue reviewing classifications closely.


-------- Original message --------
From: Matt Martorello <matt@liontllc.com>
Date: 12/6/16 5:07 PM (GMT-04:00)
To: manish.goyal@aranca.com
Subject: FW: PR Hybrid

Hi Manish, I recently did a deep dive to see what potential IP existed as part of the $7.7mm miscellaneous "liquidation value" and came up with a lot of clarity I think.  Let me know your opinion on IP ownership, GW, and $7.7mm being 100% customer contracts:

## 2012 Potential for Intangible Assets:

**About IP**: The client/Tribe often argued with me that they view all of the IP and data as their property.  They strongly believed that SPVI was paid to create the IP for them, and to facilitate them in using it.  Early on, I agreed with their position, but in 2014 I argued opposite to that (as I wanted to sell the business, it felt pretty pertinent).  Now, reading the contracts, nothing is stated about IP, but it is very clear in Section 4.2 that SPVI is hired for the service of creating all of these business methods for the Tribe.  It appears pretty clear that the Tribe was correct, in that the IP created to service their business, was always their property.

As such, I am of the opinion that the only IP of any relevance was the contracts with the clients.  With that, I'm not sure there could have been any GW, since this was 1 contract/client business (1 tribe with 2 portfolios) and there was no public face at all to the business (i.e. no reputation value).  The value of the repeat customers/reputation, is really identified directly as these 2 servicing contracts.  Such that, putting the value on these servicing contracts and having GW, would sound redundant.  I think this is supported by the

DT for some reason avoiding calling $7.7mm Goodwill.  My inclination is that this all supports $7.7mm being classified entirely as "customer contracts".

**Summary of the Businesses:**

1) Bellicose

    a. (holding company) earns no income,

    b. Employer for 100% of the employees.  Heavy majority of which worked solely on the SPVI contracts

2) SPVI (sub)

    a. Contracted with 3 clients to provide services to build/operate their businesses (2 of the same Native American Tribe).

    b. Provided managerial, technical and financial expertise for development of the clients' unsecured lending businesses.

    c. By separate contract, call center outsourcing services, project management and consulting services by marking up a contract SPVI had with LCI (call center in Philippines).  LCI would charge about $5.60 an hour and we would bill clients at US rates of about $14.50 an hour (average was probably $120k every 2 weeks in billing of SPVI clients)

    d. It was estimated that the industry would be wiped out in Feb 2014 by the new CFPB, and/or operation chokepoint tactics.

       i. Accurately enough, the clients lost the ability to debit borrower bank accounts in January 2014 when their ACH provider was shut down with no warning as a direct result of Operation Choke Point.  The clients were in default with their hedge fund, and very narrowly escaped massive disaster.  One week later, the Tribes were able to get a new ACH provider.  The clients made no loans for many months after out of fear banking would be fully cut off for good.

3) Iron Fence

    a. Lending entity, it borrows money from 3rd parties (and some from Bellicose too) and lends to the clients earning a 1% APR spread on the money if managed efficiently, which it often was not timed right to earn the spread.

    b. Maturity dates were 12/31/2018

4) ICA

    a. Provides consulting related to 2 deals, to affiliates:

CONFIDENTIAL
MARTORELLO_011446

    i. One is to SourcePoint LLC (not to be confused with SPVI) for managing (consulting services) it's deal with a tribal casino in Oklahoma (Grand Lake Casino) where SP leased 230 slot machines to the tribe

    ii. Other is to SP LLC for setting up an investment related to a casino boat venture

**To be considered as potential IP - by entity:**

A) SourcePoint VI, LLC:

    a. Customer Contracts:

        i. RRTL (LVD Tribe) and DCTF (LVD Tribe) were identical:

            1. Termination Date – 12/31/18 (auto 2 year renewal, unless notified)

            2. Assignable with consent of the Tribe

            3. Payment to SPVI is performance based:

                a. Tribe takes a distribution calculated as Sum of Gross Revenues plus Bad Debt Recovery, minus the sum of Charge Backs and Bad Debt Charge Off, and multiplying all of the foregoing by 2%. Remainder (if any) is SPVI's Servicing Fee.

                b. SPVI promised a $20k/month minimum to the Tribe, several months SPVI earned nothing for revenues

            4. RRTL cannot compete (given nature of the performance based servicing fee to SPVI)

        ii. WMS – This business was being terminated immediately (Q1 2013), no valuation work was done by DT on this immaterial business relationship with SPVI

    b. Hot Assets

        i. Subject to careful review of Section 4.2 (unclear yet)

    c. Company Books/Records?

    d. Goodwill (Given the above… i.e. all of the value is the 2 customer contracts with just 1 party, I'm not sure this is possible to exist. There was no "reputation" value.)

B) Bellicose IP:

    a. ALL employees were Bellicose employees (however, DT did NAV for BVI and therefore I'm not sure a valuation of the Management team is relevant)

        i. Agreement existed b/w Bellicose and SPVI dated 1/1/13, but it was ignored (was supposed to be $80k/month).

  ii. 2014 we did $40k monthly fee and paid it from Jan 2014 and after

 b. QA center over the outsourced call centers, located in St Croix (6 employees monitoring the outsourced call centers and training them better)

C) Iron Fence Investments:

 a. Relationship with OAF, LLC -  who provided debt to IFI, and in turn went to clients

 b. Company Books/Records

D) Tribe (listing this in case different interpretation is made for ownership of IP, based on read of the Servicing Agreement.  If there is, I can elaborate on below later):

 a. U/W Methods – New Customers

 b. U/W Methods – Returning Customers

 c. Marketing Methods – New Customers

 d. Marketing Methods – Returning Customers

 e. Domain(s)?

 f. Financial Forecasting, Budgets, Working Capital Management for Loan deployment of customers

 g. SOPs to handle live customer leads and open loan accounts, at the call center level

 h. Training Manuals for new employees

 i. Collections Strategy for Bad Debt – Nothing unique, just a schedule of when to call folks post default and rules for how to address bad debt accounts and what is allowed for CSRs or Managers to settle with the customers

 j. Vendor Relationships – All of these relationships can be obtained by just going to trade shows and visiting their booths, I don't believe there is anything material.  **All of these contracts at this time were between the 3rd party and SPVI, in order to protect SPVI, though reading the contract now I think I was supposed to ask their approval to have done that (i.e. subcontract for my services required their consent)**:

  i. Lead Providers

  ii. Debt Buyers

  iii. Underwriting data providers

  iv. Outside call centers

      v. Loan Management Software

   b. Compliance Management Manuals – Did not exist in 2012

---

**From:** Matt Martorello
**Sent:** Tuesday, December 6, 2016 2:03 PM
**To:** 'jbradley@buddlarner.com' <jbradley@buddlarner.com>
**Cc:** Zayra Emanuelli <zayra@liontllc.com>
**Subject:** PR Hybrid
**Importance:** High

Hi John,

I fear sending you the confusing opinion letter puts us several steps back to getting to some pressing issues. Here are the 2 most pressing issues, which I view as independent of the opinion letter:

This is about Goodwill created (or not created) in 2012, when I liquidated a C-Corp that I was sole shareholder of, and continued the basis (with adjusted basis) personally, through the disregarded entity Bellicose Capital, LLC (the entity later assigned into the Hybrid in 2015). Only the 2012 liquidation of C-corp is relevant for these questions:

1) #1 priority to figure out:
    a. Could GW have existed from a liquidation of a business to myself in 2012?
        i. Is that even possible for me to pay for "reputation of the business" when all I am doing is taking out all of the assets?
        ii. PMA lawyer said on the last call, he doesn't think we could have GW in 2012 but he had to research it.
        iii. BDO said today they don't think I'd have GW from the 2012 transaction. BDO also seemed to think to the extent GW represents repetition of customers, that it'd be captured for me in the value of my 2 servicing contracts (I only have 2 long-term clients)
    b. The valuation team is beginning their asset-by-asset valuation today for 2012. Do we tell them that the sum of IP valuations they are doing must total $7.7mm (with or w/o GW, per outcome above)?:
        i. $7.7mm is the "liquidation value" per Deloitte 2012 FMV study (attached), not sure why they did not call it GW. The accounting firm, in 2013 and 2014 called it GW for amortization purposes but they say it doesn't matter. It was never impairment tested.
        ii. BDO's valuation people said today, under any circumstance, NAV including intangibles and GW MUST total the 7.7mm liquidation value so the values equate exactly to the DCF values that Deloitte performed.

So the fundamental question is, did any of that $7.7mm "liquidation value" equate to GW in 2012?

I'm attaching the 2012 return and 2012 DT valuation.


Best,

CONFIDENTIAL        MARTORELLO_011449



**Matt Martorello** / President
773-209-7720 / Matt@LiontLLC.com

**Liont, LLC**
875 Carretera 693, Suite 202, Dorado, PR 00646
http://www.LiontLLC.com

This electronic mail, including any attachments, is confidential and intended solely for the use of the individual to whom it is addressed.  Use or distribution by any unintended recipient is prohibited. Please notify the sender immediately if you have received this email by error and delete this email and all attachments from your system.

CONFIDENTIAL                                                                                                                            MARTORELLO_011450