# Exhibit 93

**To:** Ashish Rane[ashish.rane@aranca.com]
**Cc:** Zayra Emanuelli[zayra@liontllc.com]
**From:** Matt Martorello
**Sent:** Fri 3/10/2017 4:33:58 PM
**Subject:** RE: DRAFT memorandum regarding timing of evolution of CFPB rule
Memo regarding Small Dollar Rule history; Final 03-10-2017.docx

That was fast, final version attached for your records and incorporation to study/content

---

**From:** Matt Martorello
**Sent:** Friday, March 10, 2017 12:13 PM
**To:** 'Ashish Rane' <ashish.rane@aranca.com>
**Cc:** Zayra Emanuelli <zayra@liontllc.com>
**Subject:** FW: DRAFT memorandum regarding timing of evolution of CFPB rule

Wanted to get you the draft, some very minor edits may be coming later today or next week, but I think you'll find this very convincing as to why we thought (and data supported) "end of days in 2015" followed by 2016 suspecting we were in fact a "going concern" and **even at a competitive advantage** come Q2 2016!

You'll notice that the rule went from shutting everyone down, to shutting down the storefront payday product (meaning that entire demand and market opens up to online install, as a massive competitive advantage!)

As for Chokepoint, you'll see the data showing the choking off of transactional volume (a lot of fear prevalent in the markets). Followed by a very strong recovery in 2nd Half of 2015 and on into 2016. You could imagine, this isn't only about the lenders and their volume, but a debt provider whose borrower puts out 100% of the borrowed funds and then suddenly cannot access banking to get that money back, would certainly be jumping on the sidelines in 2014/2015.

---

**From:** Hackett, Rick [mailto:rhackett@hudco.com]
**Sent:** Friday, March 10, 2017 11:25 AM
**To:** Matt Martorello <matt@liontllc.com>
**Cc:** Tim Ranney (tranney@clarityservices.com) <tranney@clarityservices.com>; Hackett, Rick <rhackett@hudco.com>
**Subject:** DRAFT memorandum regarding timing of evolution of CFPB rule

Dear Matt

I attach a DRAFT of the memo you requested.
Please let me know if it is acceptable and I will issue it in final.
Thanks
Rick

Richard P. Hackett
Partner, Admitted in Maine
Hudson Cook, LLP
Direct: (207) 541-9556 | Cell: (207) 210-3409
22 Free Street | Suite 205 | Portland, ME 04101

HUDSON
COOK

The information contained in this transmission may be privileged and may constitute attorney work product. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact Richard Hackett at rhackett@hudco.com or (207) 541-9556 and destroy all copies of the original message and any attachments.



Hudson Cook, LLP • Attorneys at Law • www.hudco.com

22 Free Street | Suite 205 | Portland, ME 04101
Direct: 207-541-9556 • Cell: 207-210-3409

rhackett@hudco.com

**PRIVILEGED AND CONFIDENTIAL MEMORANDUM**

**To:** Matt Martorello

**From:** Rick Hackett

**Date:** March 9, 2017

**Subject:** History of Federal Regulatory Intervention in Small Dollar Lending

Matt,

*Context*

You have asked us to reconstruct the history of developments in federal regulatory intervention in the small dollar lending market during the period 2015-2016. We have particularly focused in this memo on the public pronouncements and the known stakeholder interactions of the CFPB, which has now proposed a rule that will significantly impact small dollar installment lenders like your business, as well as other markets such as storefront payday lending and auto title lending. We also review briefly the information we have regarding the impact of Operation Chokepoint, an effort of the Department of Justice (DOJ) and the federal prudential banking regulators. As you requested, our primary focus is the change in outlook for your online installment lending servicing business between the end of Q2 2015 and the end of January 2016.

Although your companies are clients of Hudson Cook LLP, this memorandum is not intended to provide any legal advice or opinion. This work has been prepared in our capacity as business consultants to Clarity Services, and is intended to provide an accurate record of activities in which we participated in that capacity. In addition, given the sensitive nature of the work of the Small Dollar Round Table (described below), you have agreed to limit distribution of this memorandum to company officials, consultants, attorneys and advisors who have a need to access this information in support of the company's dealings with relevant government authorities, as well as to those authorities themselves.

*Summary Conclusions*

Beginning in the late fall of 2013, Operation Chokepoint severely threatened online lenders, who were faced with the loss of critical access to the payments system. This resulted both from "back channel" pressure on depository institutions by bank examiners who "blacklisted" high rate lenders and from pubic attacks by DOJ in the *Four Oaks* case. We can observe the resulting negative effects in transaction flow of lender business that we have studied in our work with Clarity Services. However, by late 2015 that transaction flow appears to have recovered substantially, suggesting that the pressure on lender access to banking services had diminished by the end of 2015.

Of greater significance, the CFPB's publication of its Outline of Proposals for Payday, Auto Title and Similar Loans ( "SBREFA Outline") on March 26, 2015 sent shock waves through the affected industries. By mid-2015 available information about CFPB intentions suggested that single payment (payday) lenders would be put out of business completely and online lenders of all types would face insurmountable regulatory requirements to document

consumer ability to repay (ATR). However, subsequent to the SBREFA hearing in April 2015, the CFPB engaged extensively with industry to obtain practical input into the process of refining its SBREFA Outline into a detailed rule. That input ultimately resulted, in June 2016, in a set of proposals that clearly favored online installment lenders who had the ability and history of using automated data inputs to underwrite loans, and clearly disfavored storefront single payment lenders, who utilize little or no underwriting. This memo reviews the history of public, but not published, interactions with the Bureau that led to a more optimistic view of online installment lender prospects by early 2016. We understand that you were privy to these developments indirectly, as a customer of Clarity Services. Clarity was an active and continuing participant in the regulatory interactions described below.

*Operation Chokepoint*

We have published detailed information about the effects of Operation Chokepoint on the online lending market, in our capacity as consultants to Clarity Services. In that capacity, we have access to de-identified versions of the Clarity production database. That database contains the history of hundreds of millions of loan applications and tens of millions of loan transactions of hundreds of small dollar lenders, mostly online. Our work is published at www.nonprime101.com.

Our first review of the results of Operation Chokepoint was published in February, 2015. See the link below.[1] Our data in 2015 showed a significant loss of business by online lenders correlating with the first reports of Operation Chokepoint activities. That loss affected online installment lenders most severely, because those lenders must rely on ACH access to consumer accounts to receive payments over an extended period of time. The mere threat of a future interruption of ACH access by the ODFI (the bank of account for the lender) would force curtailment of new loans. Since Chokepoint was completely opaque, taking the form of secret pressure by bank examiners on depositories, that was unpredictable as to timing, the threat to a longer term lender was impossible to quantify, but severe. This opacity and uncertainty necessarily affected the ability of lenders to obtain funding for ongoing operations from capital sources.

Our 2015 data showed the results on the market in Figure 1:

**FIGURE 1: COUNT OF LOANS BY TYPE BY QUARTER**

[1] **https://www.nonprime101.com/wp-content/uploads/2016/07/Regulatory-Intervention-Report-4-v2-3415.pdf**

**TRIBAL LENDERS**

As you can see from Figure 1, Operation Chokepoint began in the fall of 2013 and severely impacted all tribal originated online loans, with the greatest impact on installment loans. At the time of our study in early 2015, there was no indication of recovery of online installment business.

We recently had occasion to conduct a new study of online lending volumes, this time tracking trends for a group of lenders who have been customers of Clarity for at least 3 years. Unlike the data shown above, this study includes both tribal lenders and state licensed online lenders. As shown in Figure 2, online lending has recovered significantly from the effects of Chokepoint, even though some lenders continue to report difficulties maintaining multiple banking relationships.

**Figure 2: Growth of Count of Online Loans Quarterly 2013-2016; Q1 2013 = 100**



As seen in Figure 2, our mix of tribal and state-licensed online installment lenders showed the severe business dip seen on our study of tribal lenders in 2013-2014. By Q2 2015, however, that retrenchment ended and began a sustained recovery, although it was not clear the recovery was continuous until the end of 2015. Our data also shows a reduction in online installment volume in 2016. Even in 2016, however, the market retained volume that is 400% of the levels of Q1 2014, the worst point in Choke Point. Our data suggests that reductions in 2016 volumes reflect tighter credit criteria and not reduced demand. We will publish a paper on this issue in April 2017.

The market data above reflects the state of public information about Operation Chokepoint by early 2016. DOJ did not file additional cases after *Four Oaks.* In additional, Congressional pressure was placed on DOJ and the prudential banking regulators by legislators who strongly opposed non-transparent attempts to harm lawful businesses through the secret supervisory process.

Thus, by January 2016, it was reasonable to conclude, and the market had concluded, that the threat presented by Operation Chokepoint had run its course – or was at least manageable.

***CFPB Rulemaking***

From the publication of its first data study on storefront payday lending in April 2013, the CFPB had telegraphed that it was severely troubled by consumer use patterns in single-payment or payday loans. The publication of the SBREFA Outline in March 2015, however, was the first formal indication that the Bureau planned to regulate other liquidity products such as installment loans and title loans.

The approach of the SBREFA Outline was necessarily broad brush and non-specific. The SBREFA process requires providing just enough information to put small businesses on notice of the potential scope of a future rulemaking, in order to allow them to participate in a public hearing through "Small Entity Representatives" chosen by the CFPB.



The SBREFA outline was fairly specific, however, in its description of proposed underwriting requirements. It suggested that lenders would be required to compute consumer cash flows in order to demonstrate ATR for a loan. The lender would need to show computations demonstrating that the consumer's income was sufficient to pay existing legal obligations, costs of living, and the new loan payment, without being cash-flow negative in any pay period over the term of the loan. More significant for online lenders, the SBREFA Outline suggested that lenders would need to manually review proof of income, and proof of obligations such as residential leases and child support orders. Given the small dollar amounts involved, the outlined requirements involved costs that would outweigh the revenues from the loans involved.

Such was the state of play in June 2015.

As we now know, the CFPB significantly moderated the ATR approach in its actual proposed rule in June 2016. It authorized use of images of income documents and even use of databases built off of such images to verify income. It also authorized "screen scraping" of bank account information showing income. More important for the online installment industry, it clarified that proof of a consumer's existing obligations need only involve consumer-stated information (which can be collected easily in an online application) and verification of that information through automated data feeds, namely a major bureau credit report and a specialty credit report (the latter covering small dollar lending). Finally, information regarding a consumer's living expenses could be proxied by using publicly available datasets, such as those published by the Bureau of labor Statistics (BLS).

The ramifications for online installment lenders of the June 2016 evolution of CPFB thinking were strongly positive. Online installment lenders are already adept at utilizing automated data feeds for underwriting. In addition, commercially available products to combine those feeds with BLS proxies to produce a "regulatory ATR" analysis were announced shortly after the June rule proposal.[2] While it was likely that some current customers of online installment lenders could not pass a regulatory ATR test, it was also likely that most of the storefront payday customers would be denied that product as a result of the rule.[3] Those customers who were pushed out of the storefront payday market, however, would very likely qualify for the smaller payments of an installment loan.[4]

In short, the Bureau's ultimate proposal was workable for online installment lenders, in a way that the SBREFA Outline was not, and the rule proposal also promised to displace a large number of storefront payday customers into the online installment market.

We understand your ultimate question to be: was it reasonable to predict this outcome in January 2016? We believe a knowledgeable observer of the regulatory interaction at that time would say "yes."

*What Industry Insiders Knew Before June 2016*

Beginning as far back as 2011, when I served as Assistant Director of the CFPB responsible for the small dollar market, CFPB sought regular interaction with small dollar lender trade associations and major market participants. CFPB also regularly interacted with consumer advocate groups about small dollar lending, including Pew Research,

[2] See, for example, Clarity Services ClearAbility product.

[3] The storefront payday industry would almost certainly contract by over 80% under the rule, and perhaps disappear entirely except in large cities, given the significant overhead costs of the bricks and mortar channel. See **https://www.nonprime101.com/wp-content/uploads/2017/02/report-9-updated.pdf**

[4] **See https://www.nonprime101.com/wp-content/uploads/2017/01/Report-8-Can-Storefront-Payday-Borrowers-Become-Installment-Loan-Borrowers-Web-1.23.pdf**

***Confidential & Privileged***

CONFIDENTIAL MARTORELLO_011677



National Consumer Law Center, The Center for Responsible Lending, The National Council of La Raza and others. CFPB's purpose included informing the stakeholders of the results of ongoing research, receiving input on related research and policy arguments, and understanding business realities in the affected markets. CFPB's overarching purpose was to continue the availability of small dollar credit, but in a much safer and sustainable form than the market currently provided. CFPB also sought to promote dialogue between stakeholders, believing its job would be made easier and less controversial, to the extent that principles and approaches could be hammered out that were acceptable to both industry and consumer advocates.

In view of CFPB's approach, a group of online installment lenders as well as selected vendors to the industry (including Clarity Services), reached out to the consumer advocate groups identified above and invited them to participate in a series of round tables to discuss the impending rule. Encouraged by a non-partisan moderator hired to lead the group, many of the consumer advocates joined that effort.

The "Small Dollar Roundtable (SDR)," as it came to be known, began meeting in December 2014. By February 2015, it scheduled its first joint meeting with Bureau officials and rule writers. Some of the early concepts from that time period showed up in the SBREFA outline.

Soon after the April, 2015, SBREFA hearing, the CFPB reached out to the SDR for another meeting. Among other things, the Bureau sought industry ideas on how their ATR approach could be made workable in the real world of automated underwriting. By the fall of 2015, the SDR had met a half dozen times and had agreed on underwriting principles. Those presented to the CPFB in **October 2015**, included the following:

"The Small Dollar Roundtable supports the use of third party verification of income and expenses:

- The CFPB regulation should allow lenders to use non-paper based electronic information feeds to make underwriting decisions, to the extent that such information is from third party transaction or other business records, and not solely from self-certified consumer information.
- Permissible electronic sources should include commercial or governmental records maintained in the ordinary course, provided the lender reasonably believes they are reliable.
- Third party transaction information is permitted as long as it is generated from customer transactions.

The Small Dollar Roundtable supports the use of third party statistical proxies for calculating expenses, where no electronic feed of customer-specific information is available. As an example, BLS or census data for housing expense would be reasonable proxy where no mortgage exists, provided that the proxy is made specific to the consumer's residential location (e.g., census tract or Zip+4). Proxies may not be used for income verification."

The foregoing approaches all made their way into the June 2016 rule proposal.

While the CFPB provided no formal assurance that it would follow these suggestions in 2015, this writer felt it was likely that CFPB would be heavily influenced by the SDR's recommendation. The SDR's input

provided both (a) a workable way to achieve CFPB goals of low-cost in-depth underwriting (at high speeds), and (b) a solution that many consumer advocates thought was sufficient in reducing risks to consumers. Based on this logic, in 2015 Clarity Services accelerated its plans to build an automated ATR system based on the foregoing principles and shared those plans with its customers – as well as its optimism that the system approach would fit the rule proposal.

We understand that your company was one of the Clarity customers who was brought into the loop on these developments in late 2015.[5] If that is the case, then you had a reasonable basis in early 2016 to conclude that there was a good opportunity for business continuation under the impending CPFB rule proposal – indeed the rule might increase your business due to its unfavorable treatment of storefront payday lending.

---

[5] The SDR activities were necessarily confidential amongst the participants in 2015, although they were revealed in general terms in the CFPB's rule proposal. The details set forth herein are confidential, and you are not authorized to share them except as provided in the second paragraph of this memorandum.