**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **LULA WILLIAMS, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil Action No. 3:17-cv-461 (REP)** |
| | ) | |
| **BIG PICTURE LOANS, LLC, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

| | | |
|---|---|---|
| **RENEE GALLOWAY, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil Action No. 3:18-cv-406 (REP)** |
| | ) | |
| **BIG PICTURE LOANS, LLC, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL**
**MISREPRESENTATIONS AND OMISSIONS MADE TO THE COURT**

Plaintiffs, by counsel, submit this Statement detailing the material misrepresentations and omissions made during the sovereign immunity phase of the litigation.

## INTRODUCTION

Even in the calm and deliberate tone expected in federal litigation, there is no other way to say this than: Defendants' earlier filings were designed to deliberately and materially mislead the Court. Attempting to capitalize on their destruction of documents, Defendants offered a fictious storyline designed to convince the Court that: (1) the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD") created Red Rock to "learn the lending industry"; (2) Red Rock was "managed by appointed LVD members and under the control of the LVD Council"; (3) LVD "had acquired years of knowledge and business acumen related to the online lending industry," thereby prompting it to purchase Bellicose "to begin in-housing services"; and ultimately, "[t]hrough Ascension, LVD would be able to 'in-house' many of the activities previously performed by its third-party vendors, including Bellicose, resulting in significant cost savings and efficiencies." *Galloway v. Big Picture Loans, LLC*, Case No. 3:18-cv-406, ECF 40 at 5-7. Martorello was the architect and substantial part of this effort.  His efforts to mislead the Court were in bad faith, vexatious, calculated, and in violation of his duty of candor to the Court.

Before addressing the misrepresentations, it is important to begin by noting that the Fourth Circuit's opinion does not help Martorello regardless of any misrepresentations. The court was grappling with whether Big Picture and Ascension benefited from tribal sovereign immunity, nothing else. As the Fourth Circuit made clear: "<u>the potential merit</u> of the borrowers' claims against Big Picture and Ascension—and the lack of a remedy for those alleged wrongs—<u>does not sway the tribal immunity analysis</u>." *Williams v. Big Picture Loans, LLC*, No. 18-1827 (4th Cir. 2019), ECF 127 at 28 (emphasis added). In other words, tribal immunity "limits how states can enforce

1

their laws against tribes or arms of the tribes, but… it does not transfigure debts that are otherwise unlawful under RICO into lawful ones." *United States v. Neff*, 787 F. App'x 81, 92 (3d Cir. 2019).

Indeed, although tribal sovereign immunity broadly protects the coffers of a tribe, the Supreme Court has expressly acknowledged that there are a "panoply of tools" available to "shutter, quickly and permanently" unlawful conduct involving tribes. *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014). Most notably, "tribal immunity does not bar [] a suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct." *Id*. (citations omitted). Tribal sovereign immunity is also "simply not in play" when a person seeks recovery from a tribal employee in his or her individual capacity—even when the wrongful conduct was within the scope of tribal employment. *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017).

From these principles, it naturally flows that sovereign immunity neither protects nor legalizes the conduct of Martorello, a non-tribal individual. The ongoing case against Martorello— the architect and primary beneficiary of the scheme—is one of the "panoply of tools" available to shutter the unlawful conduct and obtain recourse for those who have repaid these illegal loans. The Fourth Circuit's opinion did nothing to absolve him; and, again, it expressly stated that the "potential merit of the borrowers' claims… does not sway the tribal immunity analysis." *Williams*, 929 F.3d at 185. Put differently, the Fourth Circuit's decision provided Big Picture and Ascension with "a shield, [] not a sword," and it remains that the tribe and its "officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law." *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 128 (2d Cir. 2019).

And to the extent the Court determines that the Fourth Circuit's decision has any effect as to the claims against Martorello, it should not consider the Fourth Circuit's decision as binding in

light of the of new evidence before the Court, which was intentionally destroyed to avoid the true nature of the method of creation, purpose, intent, and structure of Big Picture and Ascension.

## MISREPRESENTATIONS

### I.   Defendants made misrepresentations designed to create a storyline that LVD created Red Rock to learn the lending industry and controlled the business.

The Tribal Defendants and Martorello put together a false narrative to fabricate supposed context for the creation, purpose, and structure of Big Picture Loans and Ascension Technologies. The first part of this narrative was that the LVD created Red Rock to "learn the lending industry." The declarations submitted by its co-managers follow this same story. Ex. 1, Decl. of Michelle Hazen at ¶ 10("To learn the lending industry, Red Rock contracted with Bellicose … for vendor management services, compliance management assistance, marketing material development…Red Rock consulted with Bellicose about operations, but ultimately all decisions were made by Red Rock's managers.") (emphasis added); *id*. at ¶ 11 ("While Red Rock received advice and consulted with Bellicose about operations, all final decisions about operations were made by Red Rock's managers.").  To facilitate this story, the Martorello made a materially false declaration containing a significant number of misrepresentations designed to develop the false narrative that LVD created Red Rock to learn the lending industry.

As is now known from internal correspondence Defendants had attempted to destroy before discovery, Red Rock was meant to be just a front. Martorello's companies handled <u>all</u> of the material aspects of the lending business without any meaningful involvement of the LVD, Tribal Council or the co-managers. After regulators caught onto the scheme, Martorello and Red Rock attempted to enhance what Martorello actually called the "optics" of the co-managers' involvement, while continuing to allow him operational control.

### A.  Background on the creation of the tribal lending business model.

To understand what happened in this case, it is helpful to have some background and context regarding the tribal lending industry in general, as well as Robert Rosette's prominent involvement within the industry. Most states have usury laws that limit the amount of interest that a lender can charge on a loan. To evade these laws, payday lenders originated their loan products in the name of national banks, who were exempt from state interest-rate caps under the National Bank Act. *See* 12 U.S.C. § 85. Under these arrangements, the bank served as a conduit for the loans in exchange for a fee, but the payday lender funded, serviced, and collected the loans—a tactic known as "rent-a-bank."

When federal regulators began cracking down on these rent-a-bank arrangements, the payday lenders developed a solution—they adapted the structure to use Native American tribal entities as the conduit to ostensibly cloak the loans in tribal sovereign immunity. *See, e.g.*, Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012) (providing background on payday loans and describing the rent-a-tribe model as "the most recent incarnation of payday lending companies regulation-avoidance").

When the crackdown began, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, No. CV157522JFWRAOX, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016). Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id*. Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and

would not have to comply with licensing and usury laws in states where borrowers resided." *Id*.

On the other side of the table was the law firm, Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments and tribal entities." Rosette, *Our Firm*, available at: https://www.rosettelaw.com/our-firm/ (last visited on April 4, 2019). According to a lawsuit filed against him, "Rosette has set up more than thirty payday loan enterprises at more than a dozen tribes." *Williams & Cochrane, LLP v. Quechan Tribe of Fort Yuma Indian Reservation*, 2018 WL 2734946, at *5 (S.D. Cal. June 7, 2018) (citing Am. Compl. at ¶ 222). As reflected in this case, "a significant portion of the revenue from these enterprises goes to Rosette," *id*., albeit through a management company known as Tribal Loan Management, LLC.

In the "world of tribal online lending," Rosette is "what's called a 'matchmaker,'" *i.e.*, a "middleman who brings together two worlds that would otherwise not meet: Native American tribes and payday lending enterprises." Joanna Zuckerman Bernstein & Julia Harte, *The Sovereign Matchmaker*, Al Jazeera America (June 19, 2014), available at: http://projects.aljazeera.com/2014/payday-nation/matchmaker-payday.html. Under the conventional wisdom at the time, matchmakers would solicit tribes to engage in these ventures, offering the incentive of revenue without the tribes doing any of the work, "as lenders typically manage business operations themselves." *Id*.

Rosette played the role of matchmaker between Martorello and LVD. On July 8, 2011, Rosette's company, Tribal Loan Management, LLC, ("TLM") entered into an Exclusivity Agreement and Letter of Intent "to develop and operate a lending operation providing small loans to consumer over the internet[.]" Ex. 2 at JPB00382. As part of this, TLM agreed "to provide an entire turn-key lending operation to provide consumers with small loans," and "a business structure

and <u>pro-forma models</u>" to "achieve maximum profitability to the Tribe in its first month of operation." *Id*. at JPB00383 (emphasis added). The agreement further acknowledged that TLM would be "required to spend significant resources both in up-front cash, and to exploit relationships" to "provide a <u>turn-key lending operation</u>." *Id*. (emphasis added). To that end, TLM was "to negotiate and enter into Transaction Documents with any and all parties… <u>to develop and manage all aspects</u> of the Project." *Id*. at JPB00383 (emphasis added).

The Exclusivity Agreement is important because it establishes that LVD did not create Red Rock to "learn the lending business" as repeatedly asserted. Instead, TLM was used—consistent with the conventional wisdom at the time—to provide a "turn-key operation," "pro-forma models," and "to develop and manage all aspects" of the business. *Id*.

### B. Martorello's post-declaration testimony and discovered communications surrounding the formation of the venture further demonstrate that Red Rock did not contract with Bellicose "to learn the industry."

After working several years at KPMG, Martorello "started online lending" in 2008. Ex. 3, Martorello Dep. 26:9-14. Before entering into tribal lending, Martorello had an ownership interest in an online lending company called "MMP Finance," which made "online payday loans." *Id.* at 33:18-35:20. Utilizing the domain name "www.peppercash.com," Martorello made usurious loans that claimed to be "governed by the laws of Costa Rica." Ex. 4 at ROS002-0000691. In the spring of 2011, Martorello attended an online lending conference with "breakout sessions" related to tribal lending. Ex. 5, Martorello Dep. II,. 21:10-21. According to Martorello, there "was a lot of favorable on-point case law that was coming out in 2010" regarding tribal lending, prompting large hedge funds like "TCV and Sequoia" to provide capital to these ventures. *Id*. at 21:12-16.[1]

---

[1]  Technology Crossover Ventures and Sequoia Capital are venture capital firms https://www.sequoiacap.com/companies/. Both TCV and Sequoia were early investors in Think Finance, profiting significantly from its illegal business and are now subject to lawsuits for their

At the conference, a "mutual colleague" introduced Martorello to Scott Merritt, who was interested in selling software to Martorello for his online lending business. Ex. 6, Merritt Dep. at 28:16-21. During this conversation, Martorello "indicated that he had an interest in working with Native American tribes." *Id.* at 31:3-4; *see also id*. at 93:16-20 (testifying that Martorello expressed his desire to find a tribal partner during this initial meeting). Merritt introduced Martorello to Rosette, who was "a very well-known attorney in that space." *Id.* at 32:7-11. Thus, shortly after the execution of the Exclusivity Agreement between LVD and TLM, it appears that a non-disclosure agreement was executed between Martorello and Rosette. *See* Ex. 7 at ROS002-000149 (identifying the document as "Subject to Mutual Non-Disclosure Agreement Dated July 11, 2011).

Rosette and Martorello's communications over the next several months demonstrate that Red Rock was not created "to learn the industry," and it was intended to be a turnkey operation that allowed non-tribal members "to develop and manage all aspects" of the business. *Compare* Ex. 2 at JPB00383; *with* Ex. 1, Hazen Decl. at ¶ 10 ("In order to learn the lending industry, Red Rock contracted with Bellicose VI…); *id*. at ¶ 11 ("While Red Rock received advice and consulted with Bellicose about operations, all final decisions about operations were made by Red Rock's managers."). Martorello's declaration attempted to facilitate this false narrative, brazenly asserting that he <u>was not involved in the creation of Red Rock</u>, but made aware Red Rock had been formed." Ex. 8, Martorello Decl. at ¶ 17 (emphasis added). The Tribal Defendants used this same narrative before the Fourth Circuit. Ex. 9, Reply Brief at 10, n. 7 ("The Tribe approached Martorello in 2011 after independently deciding to explore tribal lending, *not* the other way around.").

This story about the creation of Red Rock was a lie. Martorello not only selected the name,

---

involvement. *See, e.g., Gibbs v. Stinson*, No. 3:18CV676, 2019 WL 4752792, at *2 (E.D. Va. Sept. 30, 2019) (denying Sequoia's motion to dismiss the complaint).

but he was provided with Red Rock's organization documents and operating agreement for review prior to having it approved by the Tribe. For example, a contemporaneous email regarding the process confirmed, "Matt has indicated that the intended Tribal LLC should be established as 'Red Rock Lending, LLC' a Tribal Entity." Ex. 10 at ROS002-001889; *see also* Ex. 11 at ROS002-000695, Aug. 23, 2011 email from Flint Richardson[2] (telling Martorello "[y]ou can name [the tribal entity]!!"); Ex. 12 at ROS002-000681, Aug. 23, 2011 email from Martorello ("I like the name **Red Rock Tribal Cash, LLC**.") (emphasis in original).[3] Despite all of this, Martorello signed a declaration falsely claiming he "was not involved in the creation of Red Rock, but made aware Red Rock had been formed." Ex. 8, Martorello Decl. at ¶ 17 (emphasis added); *see also id*. at ¶ 102 ("Neither I, nor Bellicose, helped form Big Picture or Red Rock.")

Further evidence of the Defendants' efforts to mislead this Court and the Fourth Circuit comes from an email chain from August 2011 discussing the basic structure of the business model. The email chain started with an email from Martorello to Rosette and Richardson about the structure of the venture. Ex. 13 at ROSETTE_REVISED_052501.[4] Martorello asked if the "tribal lending entity had a tribal management company, which was going to be the Bellicose customer[?]" *Id*. Richardson responded "no," and clarified that Martorello's "ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION. THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE <u>BUT ARENT INVOLVED IN THE BUSINESS</u>." *Id*. at ROS001 _052500 (caps in original; underline added for emphasis).

---

[2] Richardson was Rosette's business partner at TLM.

[3] *See also* Ex. 10 at ROS002-001889 ("PROVIDE A DRAFT OF THE RED ROCK TRIBAL LENDING, LLC ORGANIZATION DOCUMENT AND OPERATING AGREEMENT FOR [MARTORELLO'S ATTORNEY] TO REVIEW PRIOR TO HAVING IT APPROVED BY LVD AT THE NEXT SCHEDULED COUNCIL MEETING.") (caps in original).

[4] Hereafter, Plaintiff's uses ROS001 to refer to documents produced in Rosette's first production.

And when asked by Martorello to further elaborate on this point, Flint Richardson explained that "REPRESENTATIVES FROM THE TRIBE ARE THE LLC's "MANAGERS". THE SERVICER, <u>BELLICOSE OPERATES THE BUSINESS COMPLETELY</u>." *Id*. at ROS001 _052498 (caps in original; underline added for emphasis).

Richardson's email further explained the catch, *i.e.*, how this seemingly deceptive model was legal. According to Richardson, the "cornerstone of the sovereign model," was the delegation of "Loan Originations" to the tribal lending entity. *Id*. at ROS001 _052497. So long as the loans were originated by a server on tribal land, they were purportedly exempt from state laws. Richardson further recommended Martorello to "engage Claudia Callaway in order to assist" him "with the agreements." *Id*. Like Rosette and Richardson, Callaway too believed that origination of the loans by tribal entities—even with the servicer operating every other aspect of the business— would exempt the loans from compliance with state usury laws.[5]

Richardson's email explaining the business model is consistent with the Exclusivity Agreement. In unequivocal terms, Richardson explains that the "managers" are not "involved in the business," *i.e.*, a far different reality than the statements presented to this Court. And tellingly, Richardson then used a scare quote around the word "managers," signaling that the word was not being used in its traditional sense. Consistent with this, four years into the venture, Martorello sent an email explaining that "**<u>[a]s far as I know, the Manager's don't really do anything</u>**." Ex. 14 at ROS001_043978 (emphasis added).

---

[5] *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2018 WL 485963, at *3 (C.D. Cal. Jan. 19, 2018) (detailing advice provided by Callaway to CashCall, including she "advised that because the loans made pursuant to the Tribal Lending Model were originated by a tribe or tribal member, the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided.").

The initial draft of the servicing agreement mirrored the concept described in Richardson's email. Among other things, this proposed agreement made clear that Red Rock, "through a contractual relationship, desire[d] to retain and engage [Bellicose] as its independent contractor to develop, <u>manage</u>, <u>operate</u>, and <u>maintain</u> the Unsecured Lending Business[.]" Ex. 15 at ROS002-000527 (emphasis added); *id*. at Rosette002-000533 ("It is the Parties' intentions that all business and affairs in connection with the day-to-day operation, management, and maintenance of [Red Rock], including the establishment of operating days and hours, shall be the responsibility of the Servicer."). Martorello—not LVD, Red Rock, Tribal Council, or TLM—took issue with overtly representing his control in the contractual language, objecting to the use of the word "'management' all over it," which he characterized as "not good." Ex. 16 at ROS002-00493.

When considered together and alone, the Exclusivity Agreement, Richardson's email, and the initial draft of the proposed servicing agreement are significant because they directly contradict the false narrative and misrepresentations that LVD created Red Rock to learn the industry, it controlled the lending operation, and developed the business acumen to form Big Picture Loans. *See, e.g*., Ex. 8, Martorello Decl. at ¶ 48. This false narrative became necessary after government enforcement actions and private litigation uncovered the illegality of the tribal lending model.

The false narrative is also contrary to the testimony of Joette Pete, who served as the Vice Chairwoman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians from 2010 until 2016, *i.e.*, from the inception of Red Rock through the restructure of Big Picture. Ex. 17, Pete Decl. at ¶ 1. The former Vice Chairwoman explained: "When Tribal Council initially agreed to the deal with Martorello," they "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything[.]" *Id*. at ¶¶ 2-3. Pete, the second highest ranking Tribal Council

member during the relevant time, further confirmed that it is inaccurate that Red Rock "contracted with Bellicose VI 'to learn the lending industry'" as posited by the Tribal Defendants. *Id*. at ¶ 6. According to Pete, learning the industry was "never the goal when LVD formed Red Rock," and Martorello did not "attempt to teach [them] anything about the business." *Id*.[6]

### C. Martorello's payment of broker fees for the introduction, as well as his attempt to find another tribe, further shows that his declaration is false.

Martorello e-mail discovered after his false declaration was filed unequivocally establishes that he misrepresented the genesis of the relationship. For example, in email dated January 11, 2017, Martorello himself revealed what actually happened: "If I wanted to get a new contract," *i.e.*, servicing agreement, "I'd probably <u>call a broker who would introduce me to tribes and charge me a few hundred K</u> (<u>we sent how much we paid for the initial intro</u> in a prior email)." Ex. 19 at Martorello_008958 (emphasis added). At best for Martorello, this email proves his declaration is misleading. Ex. 8, Martorello Decl. at II(A) ("LVD approached Martorello in 2011 to assist them [*sic*] create and grow online lending business."). No one at LVD approached Martorello as posited; he <u>paid</u> hundreds of thousands of dollars for the introduction.

Martorello not only paid a broker for the introduction, but he also paid LVD an incentive payment of $10,000.00 for entering into the servicing agreements. Ex. 20 at ROS002-0000073-74, email from Martorello's attorney ("we're looking for two servicing agreements, one for the new business 'Red Rock' and one for the old business, Castle. We're thinking there should appropriately be two separate incentive payments to the tribe of $5,000 for each business. Are

---

[6] Although she was never disclosed or identified by the Defendants, Plaintiffs learned post-declaration of Pete's potential knowledge after Justin Martorello produced text messages from February 2016, indicating that "Joette has rallied support that it is 'rent a tribe' in the community." Ex. 18 at Justin_Martorello_00844.

there wire instructions so Matt could arrange for the money to be wired to the tribe at closing?"). If the LVD approached him, why would Martorello pay it a kickback? The kickback is further evidence that LVD did not approach Martorello to learn the industry, but rather an incentive payment from Martorello was made to entice it to enter this illegal business.

What's more, as early as June 2012, Martorello was looking for another tribal relationship in case LVD tried to renegotiate or terminated its relationship with him. Ex. 21 at FR0000068. At this time, Martorello wrote an e-mail to Merritt and Richardson, stating:

> I think I'd like to find a second tribal client. While I like the exclusivity and very much like the relationship with LVD, I am concerned about the long term as I think they likely have motives not aligned with an exclusive servicing arrangement, and I think they are starting to feel underpaid as the heat comes on at the federal level.
>
> To have second tribal client, even if just a small portfolio, provides so much needed comfort. …
>
> I'd like to do the exact same deal with a back up tribe. I know you guys got it taken care of, let me know what are options.

*Id*. Thus, the suggestion that LVD approached Martorello, who was disinterested in tribal lending, is false. In reality, Martorello paid for the introduction to attempt to exploit sovereign immunity and tribal law. And as soon as he felt like LVD was "starting to feel underpaid," he attempted to find "a second tribal client" for "much needed comfort." *Id*.

### D. Rosette and Richardson agree not to introduce any other payday lenders to LVD as part of the transaction.

Although characterized as a "servicing" agreement, internal documents show that Rosette, Richardson, and Karrie Wichtman (general counsel to the LVD) understood that Martorello's company was the lender. In particular, following a call with Martorello, Richardson wrote that they would agree "NOT to introduce <u>any new PDL's </u>to LVD as long as Bellicose ha[d] a relationship with LVD." Ex. 22at ROS002-0001218 (underline added). Stated differently, this was

an acknowledgement that Martorello was a "PDL," *i.e.*, a payday lender (not merely a loan servicer), and his company should have the exclusive right to lend through the LVD. This email—which copied Rosette and Wichtman—shows the intention behind the lending arrangement, which was completely contrary to that represented to this Court.

### E. New evidence shows that Red Rock did not have any employees and operations were conducted, at least initially, in Chicago.

To further support their false narrative, Hazen's declaration asserts that Red Rock provided its online loans "from its offices on LVD's reservation lands" and "[a]ll of Red Rock's employees, computers, and records were on LVD's reservation lands at all times." Ex. 1, Hazen Decl. at ¶ 8. This is objectively false. In a March 2012 e-mail chain (discovered after the original declaration and sovereign immunity motion), Martorello asks Craig Mansfield, tribal co-manager of Red Rock, to come to Chicago "where the duties that will be happening at LVD are occurring today (email, strategy, ACH)" so he could "see it live in action and sit with the crew, etc." Ex. 23 at CM0000869. Martorello's email—inviting Mansfield to come to Chicago to observe "the duties" that "will be happening at LVD"—directly contradicts Hazen's declaration that Red Rock's employees, computers, and records were on reservation lands "at all times." *Id*.

Worse yet, Hazen's declaration hid or misled as to the fact that Red Rock did not have a single employee. This was uncovered during the deposition of Justin Martorello, i.e., Defendant s brother and the Vice President of Bellicose who was "responsible for the oversight of the Tribal Lending Entities overall operations including: risk, analytics, compliance, marketing, P&L, operations, and technology." Ex. 24 at Martorello_005441. In his deposition, Justin Martorello testified "I don't believe that Red Rock had employees." Ex. 25 at 49:4-5; *compare with* Ex. 8, Martorello Decl. at ¶ 103 ("Bellicose did not control the operations of Big Picture or Red Rock."). Hazen's declaration, thus, either: (1) materially misrepresented the existence of Red Rock's

employees; or (2) shows that she had such little knowledge about operations that she could truthfully make those statements.

Martorello's declaration also misrepresents that he has "never taken any action to collect, in whole or in part, any consumer loan originated by Red Rock." Ex. 8, Martorello Decl. at ¶ 26; *see also id*. at ¶ 105 ("Bellicose has never accepted or collected a consumer loan payment under any loan agreement originated by Big Picture or Red Rock."). This is completely false—the Servicing Agreement expressly provides that Bellicose "shall collect all gross revenues and other proceeds connected with or arising from the operation of [Red Rock]… and deposit proceeds daily into a bank account…" Ex. 26 at § 4.9, Martorello_026273. Further, Martorello's email to Hazen and Wichtman revealed that Red Rock did not handle collections as they did not occur on the reservation. Ex. 27 at ROS001_043487 ("Collections probably will begin in 2015 in Watersmeet[.]"). And in reality, "collections" were accomplished via an ACH transfer, which was overseen by Bellicose. Ex. 2 at Martorello_005441 (describing McFadden's responsibilities as the manager of "payment processing for Tribal client portfolios including: ACH, RCC, Debit/Credit Card."); *id*. at Martorello_005446 (describing Bellicose's payment processing responsibilities, including acquiring and maintaining processing relationships; maintaining procedures for daily processing; managing ACH upload process; controlling the state distribution to different payment processors).

**F.  New evidence shows that the Defendants attempted to enhance the "optics" but not the substantive involvement of the co-managers, who were specifically prohibited from learning key information about the business.**

Bellicose not only "completely operated the business," but it intentionally kept Red Rock's co-managers in the dark about basic details of the business, such as vendor contracts and underwriting formulas. This is evident from an email from August 2014—almost three years into

the business—where Bellicose sent a request for approval. *See generally* Ex. 28. When Wichtman

forwarded the request to Hazen, she wrote "due to the desire to learn and the pending restructure,"

she recommended that Hazen "set up a conference call with SPVI so she could learn the specifics

regarding the direct mail launch." *Id*. at ROS001_45269. In response, Martorello wrote:

> Remember when we started, that all of these vendors and systems Jennifer is white
> boarding out were tied internally within SPVI systems behind the scenes, just like
> services do in the banking and credit card space. The vendor contracts and formulas
> used were are very closely guarded internal IP and entirely unattainable by the
> clients. Running clients through it all is what we built and do. The only reason we
> moved elements to be direct with client was because the risk of working with tribal
> clients was more and more dangerous and optics became very important. So the
> trust element came into play as a necessity and exposure of IP may have been the
> result.
>
> If there is a fundamental disagreement on IP ownership though, I'd Imagine the
> elements I mentioned required in a deal are far from obtainable. In fact, I think if
> that were the case, LVD would essentially make the claim that they already own us
> today.

*Id*. at ROS001_045267 (emphasis added).[7] Such "internal eyes only" correspondence directly

contradicts Martorello's Declaration, as does Wichtman's response, which stated that she "wasn't

recommending that SPVI disclose its secret sauce but only that SPVI be willing to explain to the

Co-Managers what exactly they are approving." *Id*. at ROSETTE045267. She added "do

[Chairman Williams] and [Hazen] even know what 'DM'[direct mail] means because I don't." *Id*.

Martorello's response establishes that the genesis of the tribal lending arrangement was a

front. In no uncertain terms, Martorello explained that "when we started, that all of these vendors

and systems" were "tied internally within SPVI systems behind the scenes[.]" Ex. 28 at

---

[7] Ex. 8 at ¶ 35 ("LVD received and retained the significant additional economic value of ownership
of all intellectual property developed under the agreement by SourcePoint."); *id*. at ¶; *see also* Ex.
29 (showing Martorello was "paranoid" about transferring SPVI's intellectual property prior to
repayment of the note).

ROS001_045267 (emphasis added). He further added that "[t]he vendor contracts and formulas used were [our] very closely guarded internal IP and entirely unattainable" by Red Rock. *Id.* (emphasis added).[8] The only reason this changed—requiring "elements to be direct" with Red Rock—was "because the risk of working with tribal clients was more and more dangerous and optics became very important." *Id.* (emphasis added). The importance of this email cannot be understated: it is direct evidence that: (1) all the vendors, systems, and formulas to run the business were internally tied to Martorello, (2) they were initially "entirely unattainable," and (3) they changed because "optics became very important." Stated differently, Red Rock was not created to allow LVD "to learn the industry." And even though the "optics became very important," the August 2014 reality was that Martorello continued to withhold all material operations information from Red Rock, even while trying to cosmetically enhance the appearance of co-manager involvement by creating a check-the-box review of the tasks. *Id.*

Another email from February 2015 demonstrates that LVD/Red Rock had not "acquired years of knowledge and business acumen related to the online lending industry," thereby prompting it to purchase Bellicose "to begin in-housing services." *Galloway v. Big Picture Loans, LLC*, Case No. 3:18-cv-406, ECF 40 at 5-6. In this email chain, Wichtman wrote to Martorello:

---

[8] Even though Martorello "guarded the formulas used," his Declaration nonetheless asserted that "SourcePoint made underwriting recommendations to Red Rock's co-managers who reviewed and independently decided whether to implement." Ex. 8 at ¶ 41. But without access to the formulas used, any approvals must have been pro-forma as there would be no way for the co-managers to meaningfully participate without the "formulas used," which were Martorello's "very closely guarded internal IP." Ex. 27 at ROSETTE045267. Martorello told a completely different story in his declaration. Ex. 8 at ¶ 41; *id.* at ¶ 45 ("Under the Servicing Agreement, Red Rock paid SourcePoint to develop underwriting criteria to recommend for implementation by Red Rock. SourcePoint did not simply implement these underwriting criteria on behalf of Red Rock, but instead presented the underwriting criteria to Red Rock's co-managers for their evaluation and ultimate approval or rejection."); *id.* at ¶ 101 ("Neither I nor Bellicose have 'controlled' any underwriting criteria used by and of LVD's lending businesses – at all times the LVD business retained full control over the underwriting criteria used to make loans to consumers.").

> If the [Tribal Servicing Entity] is going to survive after the sale sunsets or is complete – <u>it cannot operate in a vacuum</u> – it's a tribal business and the Tribe needs to know what is happening and be learning about the operation of the TSE through building relationships with TSE employees. Upper level management and tribal leadership <u>should become aware of all aspects of operation</u> of the [Tribal Servicing Entity].

Ex. 30 at ROS001 _050595 (emphasis added). Broken down, this email shows: (1) Wichtman's belief that the current business was being operated in a vacuum; (2) the Tribe did not know what was happening; and (3) the Tribe was not learning about the operation of the servicing entity or building relationships with its employees. In response, Martorello stated "I believe the TSE execs will be able to communicate things to the Co-Managers in layman's terms so they can understand how things work and can handle the communications to Tribal council." *Id*. But if the co-managers made "all decisions regarding the business"—as repeatedly asserted in Martorello and Hazen's declarations—this should never have been part of the conversation in February 2015.

Three weeks later, Martorello and Wichtman had a similar exchange. Wichtman raised concerns about the Tribe's ability to run the business with Bellicose's executives. Ex. 31 at ROS001_053119 ("I am not certain how this will work or how the Tribe won't need anyone when there is so much to do and learn."). Martorello replied: "I guess one question I have is <u>who are you expecting to learn it</u>? <u>There isn't much to 'do</u>' for the Buyer <u>since it's built</u> and designed to be sold to be self-sustaining <u>as a passive investment opportunity</u>." *Id*. at Rosette_53118. Martorello further added: "I think I need clarity on exactly who you are expecting to learn and what is you want them to learn. I can't learn science because the words frustrate me too much. Just the same, if you're hoping to jam a square peg through a round hole, something will get broke." *Id*. at ROS001 _053119. After Wichtman provided additional thoughts, Martorello even more candidly explained:

> I wouldn't buy Pfizer and then ask to be CEO, or everyone will be out of a job at Pfizer in 12 months when I destroy it. <u>The optics are important due to the bastards</u>

<u>out there against us, but the practicality and sustainability of the business is the
basic necessary foundation over optics.</u>

*Id*. at 053118 (emphasis added). Contrary to Martorello's declaration, the initial business model and subsequent restructure was all about "optics," not the LVD's desire to learn the industry or acumen gained through Red Rock.

### G. The Deposition Testimony of Red Rock's co-manager, Craig Mansfield, demonstrates the lack of involvement of the co-managers.

The Tribal Defendants, as well as Martorello, falsely asserted that "Red Rock consulted with Bellicose about day-to-day operations, but all decisions were either made by Red Rock's managers or expressly delegated and overseen by Red Rock's managers." ECF 40 at 5; Ex. 1, Hazen Decl. at ¶¶ 11. This directly contradicts the initial design crafted by Martorello and Rosette, as well as the evidence cited above. Additionally, the depositions of Red Rock's co-managers, Craig Mansfield and Hazen, demonstrate the nominal involvement of Red Rock's co-managers.

Mansfield, along with Hazen, was one of the designated co-managers of Red Rock until he resigned in January 2014. Ex. 32, Mansfield Depo. at 82:22-83:2. Despite supposedly working hand-in-hand for more than two years, Hazen could not recall whether Mansfield was even a Red Rock co-manager.[9] Despite not being able to recall *who* the other manager was, Hazen nonetheless signed a declaration somehow claiming that "all final decisions about operations were made by Red Rock's managers." Ex. 1 at ¶ 11. If Hazen could not recall regarding the identity of the other co-managers, she cannot credibly testify as to the decisions they purportedly made.

Mansfield's testimony also demonstrates that the Defendants misrepresented Red Rock's involvement and control over operations. For example, when asked if Red Rock made loans under

---

[9] In particular, Hazen was expressly asked "[d]o you know if Mr. Williams or Craig Mansfield were a co-manager of Red Rock Tribal Lending with you?" Ex. 33, Hazen Dep. at 26:4-7. In response to this question, she testified "I don't recall." *Id*.

a particular name, Mansfield testified "I don't know the answer to that," and he could not explain its association with Castle Payday. Ex. 32, Mansfield Dep. at 104:5-13. In other words, Mansfield could not identify or explain the most basic piece of information about Red Rock, *i.e.*, the name it did business as and used when interacting with consumers.[10] He also could not explain why the enterprise created two separate entities, Red Rock and Duck Creek, as opposed to operating a single entity—a seemingly important detail for a manager of a business.[11]

Mansfield further demonstrated a lack of knowledge for each of the material aspects of the lending business—even for the limited tasks ostensibly designated to Red Rock under the Servicing Agreement. For example, Mansfield did not know the process of "how the decision of whether to fund the loan occurred." Mansfield Dep. at 114:25-115:3. Or whether that process occurred on the reservation. *Id*. at 115:4-14. He did not know how loans were originated, including "whether the ultimate determination to fund the loan was made on tribal grounds." *Id*. at 115:15-22. He further testified that he did not know what verifications were completed to ensure that borrowers provided the correct information, *id*. at 112:15-18, how Red Rock obtained the money it needed to fund the loans, *id*. at 128:24-129:12, or any details about the call center in the Philippines or what it did on behalf of Red Rock. *Id*. at 119:20-120:1.

### H. Other evidence establishes that the co-Manager position was merely titular and such appointees had no meaningful involvement.

The co-manager's lack of involvement at Red Rock is also evident from several other pieces of evidence, including the material omission that Red Rock's co-managers were unpaid

---

[10] *See* Ex. 34 (loan agreement: (1) identifying the lender as "Red Rock Tribal Lending, LLC d/b/a CastlePayday.com," and (2) instructing consumers to email"support@castlepayday.com.").

[11] Ex. 32, Mansfield Dep. at 91:12-14 ("Q. Why do you need two different entities to make unsecured loans? A. I don't know the answer to that.").

volunteers. For example, when asked during his deposition if he was "paid to be the co-manager," Mansfield testified "No, I wasn't." *Id*. at 121:11-15. He simply "received as much money as every tribal member received from it." *Id*. at 121:17-18. During this time, Mansfield was "still working [his] full-time position" at the casino. *Id*. at 122:6-13.[12] This is significant because someone cannot learn a complicated lending business—being operated thousands of miles away from their residence—when they are a full-time employee working for another company. Put differently, if the Tribe was genuinely committed to learning the business, it would have employed someone full-time so they could actually learn the business. The Tribe did not do this, however, because it was intentionally designed so that "BELLICOSE OPERATE[D] THE BUSINESS COMPLETELY," Ex. 13 at ROS001 _052498.

Other email, such as that from September 2013, *i.e.*, almost two years into the lending business, conclusively evidences that lack of any material involvement. During that time, Red Rock's attorneys were seeking information from Martorello to provide in Chairman Williams's declaration to be filed in *Otoe-Missouria* litigation. Ex. 35 at ROS001_46388. Rather than obtaining this basic information from Chairman Williams, Red Rock's lawyers asked Justin Martorello to provide operational information so that they could "supplement Chairman Williams' declaration with regard to the specific operational impacts that RRTL has faced post-DFS action." *Id*. That the Martorellos—not Chairman Williams, Hazen, or Mansfield—were the source of this information shows that the Tribal Defendants misrepresented the involvement of its co-managers.

---

[12] Similarly, it appears Hazen was a volunteer manager as well (unless she was receiving payments unbeknownst to the Tribal Council). Ex. 27 at ROSETTE_REVISED_043485, Dec. 2, 2014 email from Hazen ("I guess I have to ask you to take into consideration the fact that I have <u>volunteered</u> from the get go to do whatever it took to move this business forward…") (emphasis added); *see also* Ex. 17, Pete Decl. at ¶ 7 ("the co-managers were volunteers, who were involved for 'optics' and to provide pro forma approval of recommendations provided by Bellicose.").

Moreover, it is telling that LVD/Red Rock's general counsel did not even know the operational structure of the lending enterprise, asking the Martorello's to review the "attached operational diagram" and let them know if it was "consistent with Red Rock's structure?" *Id*.

In another email dated September 28, 2013, Wichtman expressed her concern to Martorello that she had been unable to answer basic questions about the business when asked by a bank, and thus she needed enough information "in order to be comfortable handling these questions." Ex. 36 at ROS001 _047091. In particular, Wichtman wrote:

> While I am fairly familiar with the fact that both [Red Rock] and [Duck Creek] offer installment loan products… there was a question raised from [the bank's] compliance department that the product offered is just a 'dressed up' payday loan product—that requires me and the Co-managers to gain a better understanding of our short term finance products in order to be comfortable handling these questions. While I assured [the bank] that our product is not a pay day product and does not require ACH… that was about all I could say. Is there more that we can offer regarding the product that would be useful for the Co-managers and I to become familiar with to better answer these questions?"

*Id*. Wichtman and the co-managers lacked even the most basic understanding of the loan product offered by Red Rock other than that it was "not a payday product and does not require ACH." *Id*.

In addition, new evidence shows that Wichtman was authorized to use the co-managers' signatures on documents. Ex. 37 at ROS001 _058681 ("We have [Chairman Williams] and Shelly's signature on file for  use when they are not available to sign."). Wichtman not only had the "signature on file," but she was signing "on a regular basis for quite some time[.]" *Id*.

## I. The Tribal Defendants and Martorello misrepresented LVD's revenue share and involvement in negotiating the waterfall.

Another material misrepresentation and omission presented throughout this case has been that "LVD developed a comprehensive economic development strategy to build a more diversified economy." ECF 40 at 3. In reality, the LVD did not develop anything—this is one of several partnerships designed by Robert Rosette and his firm, who facilitated the transaction for their own

personal benefit; and not just in the form of legal fees. Rather, Rosette's company, Tribal Loan Management, received a "brokerage fee" of 50% of Red Rock's revenue share. Ex. 26 at § 7.15. Hazen lied about Red Rock's revenue share under oath.[13] The same is true for Martorello's declaration. Ex. 8 at ¶ 34 (claiming that Red Rock received 2% of gross revenue).

Rosette's profit sharing—in an amount equivalent to LVD—is problematic for a business claiming to be "wholly owned and operated by LVD." ECF 40 at 5. Indeed, Martorello raised concerns with Rosette's 50% cut in July 2012, complaining that "TLM shouldn't be profit sharing like an owner." Ex. 38 at ROS001 _046397. This component "really [was] an issue to" Martorello, who believed TLM's revenue share put his "capital lent at risk." *Id*. He thought it was "very important we remove TLM as a 'profit sharing 50% of retained earnings broker' because it sounds like '50% owner,'" which "negates the entire tribal owned component that makes [him] as financer/servicer feel like [he was] safe." *Id*. Wichtman, Rosette's law partner, expressed similar concerns. She believed that "the TLM piece is problematic for a whole host of reasons," and while she did not "have any doubt that for bringing the regulatory structure and the Servicers to the table there should be a fee paid to TLM," that "50% of the Tribe's profits ha[d] always been a bit excessive" in her opinion. Ex. 39 at ROS001 _044603.

So what did they do? Within a month of Martorello's objection, Rosette and LVD agreed to recharacterize the broker's fee pursuant to a "Side-Letter Agreement" dated August 1, 2012. Ex. 40 at ROS002-0001919. Rather than paying the "broker's fee," LVD paid a flat-fee of $960,000.00 to TLM for "professional services from June 2011 through July 2012," including "the

---

[13] When asked "[w]hat percentage contribution would [the government] receive on a monthly basis from Red Rock Tribal Lending out of the revenue?" Ex. 33, Hazen Dep. at 35:18-36:1. Hazen testified "2 percent of the gross." *Id*. at 36:2.

development of all Tribal Consumer financial services laws and associated regulatory framework for review and consideration by Tribal client." Ex. 41 at ROS002-0001918. This amount was paid in $40,000.00 installments from September 2012 through August 2014. *Id*. Consistent with this, Red Rock entered into an Amended and Restated Servicing Agreement dated July 31, 2012, which removed the broker's fee provision. Ex. 42 at Martorello_003474.

The broker's fee is important because it shows the dominant role of Rosette in creating the lending venture, the lack of intended financial benefit to LVD and, thus, the LVD's lack of incentive to be actively involved in the business. What's more, Martorello misrepresented the origin of the revenue split, falsely claiming that "LVD suggested this form of revenue split as it guaranteed LVD's lending entities would always generate income for LVD's general fund while simultaneously incentivizing SourcePoint to assist LVD in the growth and the maintenance of an efficient and successful business for the benefit of LVD." Ex. 8, Martorello Decl. at ¶ 36. To the contrary, it was Martorello who proposed the 2% as it was the industry standard at this time. *See, e.g.*, Ex. 6, Merritt Depo. 48:2-5 ("the two percent was Matt's proposed revenue retention for LVD. So I took that ask to Rosette to see if it would fly, and that was what I remember happening."). Further, there is no evidence that "LVD" proposed anything to Martorello.

## II.    Defendants Misrepresented Big Picture Loan's method of creation and purpose.

The Tribal Defendants and Martorello lied about the reasons for creating Big Picture Loans. In particular, Martorello's declaration stated "the decision to sell Bellicose to LVD was not motived by impending threats of litigation or enforcement actions by government agencies." Ex. 8, Martorello Decl. at ¶ 69; *see also* Martorello Decl. at ¶ 49. Martorello further described this theory as "nonsensical and temporally problematic." *Id*. And before the Fourth Circuit, the Tribal

Defendants argued that "there was no evidence" that the restructure was intended to provide Martorello/his companies with immunity.[14]

The new evidence obtained shows the falsity of these misrepresentations. This evidence shows that: (1) Big Picture Loans was created for another tribe, but halted due to the district court's decision in *Otoe-Missouria*; (2) anticipating an unfavorable decision in *Otoe-Missouria*, Martorello urged the LVD to use Martorello's "Big Picture Loans" in order to "rebrand" Red Rock; (3) Martorello was desperate to sell the business because of fear of prosecution/investigation; and (4) LVD was not initially interested in the sale.

### A. New evidence unequivocally establishes that Martorello's declaration falsely proclaims that "the decision to sell Bellicose to LVD was not motived by impending threats of litigation or enforcement actions by government agencies."

As early as **November 2012**—a little over a year into the business—Martorello had concerns about the viability of the tribal lending model. Ex. 43. In this email, Martorello wrote that he had "some urgent questions" for them "on valuation." *Id*. at MARTORELLO_038990. Among other things, he asked how they would value several illegal businesses, such as online poker sites, medical marijuana stores, and drug cartels. *Id*. He further added that "[t]his industry is going to be living in the grey area of its legality for another year or two," and that they had already "received dozens of letters from State AGs saying we need to be licensed and sending Cease and Desist orders." *Id*. In his view, there was "no business with such risk to it" as the tribal lending

---

[14] Fourth Circuit Court of Appeals, Oral Argument/Listen to Oral Arguments, Opening Argument of William Hurd, Audio File at 13:53-14:30, http://www.ca4.uscourts.gov/OAarchive/mp3/18-1827-20190507.mp3 (Hurd: "Essentially, the idea below seems to be that by doing business with Martorello" and "acquiring SourcePoint, that we are protecting him from something or other or we are cloaking him with sovereign immunity, how can that be?" The Court: "Well, what is the evidence of that in any event?" Hurd: "There is no evidence. In fact, the evidence is quite to the contrary. . . . He has no sovereign immunity. And the idea that somehow that that is the purpose" that this was some "extravagant of altruism to protect this non-tribal guy, it just makes no sense.").

model, and the "bottom line" was that "this business will simply not exist in 2 to 3 years," at least how it did then. *Id*. at MARTORELLO_038990-1. In addition to monetary risks, Martorello explained that Greenberg Traurig provided him with a 20-page legal opinion, concluding that he could be liable "for aiding and abetting felony crime[s]" in states like Georgia. *Id*.

The arrangement was supposed to last until December 31, 2018, per the Servicing Agreement. Ex. 42 at § 3.2. But less than two years in, state and federal regulators caught on to Red Rock's illegal lending practices and threatened to take action. *See, e.g.,* Ex. 44 at ROS001_040489, Sept. 2012 Ltr. from Atty. Gen. for Ark.; , ROS001_040859, July 2013 Ltr. from Atty. Gen. from Conn.; ROS001_041125, Aug. 2012 Ltr. from Atty. Gen. for N.C.; EROS001_043269, July 2012 Cease & Desist from Atty. Gen. for KY.

The biggest threat came on August 6, 2013, when the New York Department of Financial Services ("NY DFS") issued a cease and desist to 35 online lending companies, including Red Rock.[15] The NY DFS not only issued a cease and desist sent to the "lenders," but the bigger threat posed was the letters it sent to 117 banks and the National Automated Clearinghouse Association, requesting that "they work with DFS to cut off access to New York customer accounts for illegal payday lenders." *Id*. In his public comments on the letters, the Superintendent of Financial Services warned: "Companies that abuse New York consumers should know that they can't simply hide from the law in cyberspace. We [a]re going to use every tool in our tool-belt to eradicate these illegal payday loans that trap families in destructive cycles of debt." *Id*.

Six days after the issuance of the cease and desist, Rosette—who represented multiple other

---

[15] *See, e.g.*, The Official Website of New York State, *Press Room*, *Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans That Harm New York Consumers* (Aug. 6, 2013), *available at* https://www.governor.ny.gov/news/cuomo-administration-demands-35-companies-cease-and-desist-offering-illegal-online-payday-loans.

tribal lenders—had already drafted a complaint against the NY DFS "for LVD's consideration." Ex. 45 at ROSETTE_REVISED_041064. In an email to Martorello, Rosette wrote that he "believed strongly if we do nothing we may forever lose the tribal online lending opportunity." *Id*. Rosette further added that it would be "impossible to unwind or undo what the State of New York (in collaboration with federal agencies) have started without a legitimate piece of litigation being filed." *Id*. In a separate email to Martorello, Wichtman echoed these concerns, writing "[w]hat do we achieve by laying low waiting for the next bomb to drop—hoping that it doesn't blow us up?" Ex. 46 at ROSETTE_REVISED_049126. She further added that "[n]othing will be filed unless and until fully vetted with the Tribe and you." *Id*.

On multiple occasions, Martorello expressed concern with joining the litigation as he believed the litigation would be all regulators needed "to do to shut down the business at LVD b/c we simply would not be able to afford to stay in business anymore." *Id*. at ROS001_049125 Additionally, he added that the "LVD's house" was not "completely in order yet." *Id.* Because of Martorello's dominance over operations, he cautioned that "LVD" did not "represent the best facts" at the moment because they were not originating the loans on the LVD's reservation. Ex. 47 at ROS001_046605. Although the Tribal Defendants have represented that "the contracts for all loans … are formed on the reservation,"[16] the loan contracts actually originated through an "automated process" that did not require handling by BPL employees. Ex. 33, Hazen Dep. at 191:5-21, 192:1-7. And although Defendants assert that a final verification of loan agreements was performed on the reservation, Hazen testified that employees located in a call center in the Philippines also would perform that task. *Id.* at 193:4-22. Ms. Hazen did not know what percentage

---

[16] *See, e.g.*, Ex. 48, Hazen Decl. at ¶ 30 ("All loans are originated on the Reservation after applications are approved by Big Picture employees located on the Reservation."); Ex. 8, Martorello Decl. at ¶ 107 (falsely claiming "all loans are made from LVD's reservation.").

of the approximately 10,000 loans originated each month were verified by employees located on tribal lands. *Id.* at 194:1-18. Given the enterprise contracted with 200 customer service representatives in the Philippines, Ex. 33 at 161:2-15, the vast majority of the final verifications inevitably had to occur off the reservation.

Martorello became comfortable enough with a lawsuit and it was filed in August 21, 2013. That lawsuit backfired—the district court not only denied Red Rock's motion for an injunction, its findings jeopardized the entire business model. Most notably, in an opinion issued on September 30, 2013, the court found that Red Rock was "subject to the State's non-discriminatory anti-usury laws" because the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands." *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 361 (S.D.N.Y. 2013). The court further noted that Red Rock "built a wobbly foundation for their contention" that the activity was occurring on "on the Tribes' lands," and contrary to their argument, consumers did not "in any legally meaningful sense, travel[] to Tribal land." *Id.* at 360. Thus, there was "simply no basis" to conclude that the Tribes were "treated differently from any other individuals or entities" that "lend to New York residents." *Id.* at 361.

        i.        **Fearing prosecution and liability, Martorello immediately contacts Rosette regarding a restructuring "sale" to provide his companies with sovereign immunity.**

*Otoe-Missouria* created a significant liability for Martorello and Bellicose, who did not have a colorable claim of sovereign immunity. In an email sent two days after the district court's decision, Martorello wrote that the decision "presents a significant liability for [Bellicose] and we do not believe that we should service any new New York loans." Ex. 49 at ROS001_006304-5. He further indicated that they were willing to see existing loans through completion, "but [they] simply cannot flaunt the clear ruling from Judge Sullivan's order, however legally incorrect it

might be." *Id*. at 6305 (emphasis added). Martorello further stated a concern that the "finding that tribal enterprises are subject to New York's anti-usury laws will be regarded as sufficiently final… such that it will precipitate their potential investigation and potential prosecution of us personally and our companies if we continue" to conduct business in New York. *Id*. at 6304.

Two weeks after the district court's decision, Martorello sent an email to Rosette regarding a restructure to protect Martorello/Bellicose. In this email, which had a subject line entitled "LVD to take ownership of Bellicose VI," Martorello presented some options for a restructure so that Bellicose could attempt to share in LVD's immunity.[17] One of those options was for Bellicose to "[a]ssign today LVD 51% of Bellicose via Equity only membership interest tied to the SPVI subsidiary only." Ex. 50. Additionally, he proposed assigning 51% of the interests in his other businesses involved in the scheme. *Id*. Each of these transactions, per Martorello, would be "structured to provide all entities sovereign immunity." *Id*. (emphasis added). And trying to maximize his profits before the business was shut down, Martorello further proposed that BlueTech, his trust, would "own 49% equity, but 100% profits interests until month 49," *i.e.*, ensuring Martorello would retain the profits until the business was gone. *Id*.[18]  The importance of this email cannot be overstated:  Martorello sought to nominally transfer ownership of in a deal "structured to provide all entities sovereign immunity" while retaining 100% profits.

---

[17] Before the Fourth Circuit, the Tribal Defendants argued that "there was no evidence" that the restructure was intended to provide Martorello/his companies with immunity. Fourth Circuit Court of Appeals, Oral Argument/Listen to Oral Arguments, Opening Argument of William Hurd, Audio File at 13:53-14:30, http://www.ca4.uscourts.gov/OAarchive/mp3/18-1827-20190507.mp3.

[18] On a different occasion, Martorello urged Wichtman to consider a previous idea of the LVD adopting him, writing "something that really struck me [in *Otoe-Missouria*] was they mentioned the citizenship of the participants a lot. At council we talked about adoption. It seems like an excellent next step, not to mention an honor to me personally as well." Ex. 51 at ROS001_053384.

Less than six hours after his initial e-mail to Rosette, Martorello sent a similar, but <u>less candid</u> e-mail to the members of LVD's Tribal Council, which was never produced by Big Picture, Ascension, Rosette, or the Tribe. *See* Ex. 17 at pg. 6 (Exhibit 1 to Pete Decl.). In this e-mail, entitled "SPVI Equity Transfer to LVD," Martorello wrote: "Below is the <u>beginning of a concept</u> I have to facilitate a transition to LVD of MY businesses." *Id*. (emphasis added). The email provides the exact time and date for "the beginning of" the "concept" of the restructure. *Id*. In other words, the LVD's acumen was not the impetus behind the sale.

Martorello's email also provided the basic framework for the restructure. He would "[a]ssign today to LVD – 51% of Bellicose VI, LLC," but "0% profits interest" until four years after the restructure. *Id*. Martorello added: the "<u>Current Manager (myself) will be locked in as the decision maker for 48 months</u>, at which point they will hire a new Manager to replace me." *Id* (emphasis added). Martorello further expressed his belief that "the items below should be able to get us to a <u>term sheet with the goal of FINAL documents delivered on 10/30/13</u>." *Id*. (caps in original, underline added). Yet, despite Defendants' repeated contention the Tribe was "always" interested in buying the business, no member of the Tribal Council responded to this email or jumped at the opportunity to execute the term sheet by October 2013.

A few weeks later, Martorello reiterated his concerns to Wichtman. In an email dated October 29, 2013, he informed Wichtman that vendors and debt providers of Red Rock were "asking what would happen to everything if the ruling in NY were upheld[?]" Ex. 52. The repercussions, according to Martorello, would be "<u>certain death</u>" and "all vendors including [SourcePoint], banks, ACH processors, bureaus etc would all obviously shut down if it were considered off reservation activity[.]" *Id*. (emphasis added). He further added that "class actions" and "personal threats of enforcement actions against individuals by regulators has everyone

spooked," causing "several of the biggest servicers" to "shut down." *Id*. In closing, Martorello proclaimed "[d]esperately hoping that Rule 19 works and a favorable outcome on the appeal!" *Id*.

On November 8, 2013, Martorello sent another email to Wichtman, explaining that Red Rock was "down now about 55% from where it was in July" and that SourcePoint was "about to be discovered and will need extreme resources to defend itself against all kinds of aiding and abetting and 'true lender' claims" coming in the first quarter of 2014. Ex. 53 at ROS001_052787. He further noted that there was a "very significant possibility that should we even survive long enough to get there," he would need "to defend [him]self even personally (in more than civil matters), with no ongoing business or revenue at all should the decision be made in the appeal that the activity is in fact OFF reservation (a certain end to the industry)." *Id*.

On December 30, 2013, Rosette circulated a legal memorandum regarding Martorello's proposed nominal transfer of ownership and retention of all profits, which analyzed whether "whether formation of a new entity that is co-owned by the Tribe and Source Point and subject to the proposed profit, management and voting controls" suggested by Martorello would be "sufficient to pass muster with the 'arm of the tribe' test to extend the Tribe's sovereign immunity from suit to the new LLC." Ex. 54 at ROS001 _052248.

In response, Martorello indicated that one of the proposed features—a 10% revenue allocation to the tribal entity—was not "going to work from a business standpoint" and he "might as well be a state licensed lender[.]" *Id*. at ROS001_052247. If litigation occurred, he further added "[w]hat I think you'd tell a court" is "that if the deal were not done," then the Tribe would not know if SPVI: (1) "would be around in 10 days given the industry," (2) execute "its termination provision in accordance with the" servicing agreement, or (3) "hike rates as risk has gone through the roof with detractors now seeking out SPVI's of the world for major attacks." *Id*. Martorello

also stressed the urgency of the deal, writing:

> **Clock is ticking before I end up in a Cash Call type attack though, at which point, I think the deal is about dead.**

*Id*. at 052248 (emphasis added).[19]

In early January, things continued to get worse for the industry, as well as for Martorello's enterprise specifically. On January 8, 2014, the Department of Justice announced a consent decree with a major ACH provider, which Robert Rosette described as "the most disastrous result we have seen yet," and he predicted that he "would not be a surprise if we lost the last remaining banks and ach processors servicing tribal accounts after reading the consent decree." Ex. 56 at ROS001_052155. Sure enough, the enterprise lost its only ACH processer the following day, which "obviously ha[d] major implications for [M]att since he ha[d] no other processors." Ex. 57. And when the enterprise attempted to obtain a different processor, one bank explained that they were told "if the bank so much as processes a single transaction [t]he DOJ will be relentless in shutting them down under the full weight of the US government." Ex. 58 at ROS001_036580.

Despite all of this evidence, Martorello still argues that "Plaintiffs' narrative on this point is a simple, but ultimately incorrect, theme—that Martorello recognized the potential regulatory risk, and sold Bellicose to the Tribe because of that risk and in an effort to limit his potential liability." ECF 277 at 26-27. But unquestionably these emails conclusively establish that Martorello: (1) created the concept for the restructure; (2) in an attempt to exploit the doctrine of sovereign immunity; (3) due to concerns that his company would be held liable for its violations of the law; and (4) accordingly, sought to transfer nominal ownership of the company yet retain

---

[19] *See also* Ex. 55 at LVD-00018128 (characterizing the CFPB's position as "without question a major attack on legit tribal lending operations"); *id*. (stating that if a similar "attack" on the Red Rock operation happened, he warned, "the stakes are very literally everything").

all of the net profits generated by the lending business. And they conclusively establish that the Defendants misrepresented the reasons for the restructure, including their false narrative that LVD "had acquired years of knowledge and business acumen related to the online lending industry," thereby prompting it to purchase Bellicose "to begin in-housing services." ECF 40 at 5-9.

### ii. New evidence shows that Martorello created Big Picture for another tribe, but halted the venture after the *Otoe-Missouria* decision.

To facilitate their story, Defendants further misrepresented the circumstances surrounding the formation of Big Picture, which they contended "was created to be an online lending business in order to bring revenue to LVD[.]" ECF 40-3, Ex. 48, Hazen Decl. at ¶ 16; *see also* ECF 38 at 5 ("LVD began by creating Big Picture in August 2014."). This part of the story is designed to create the appearance that the LVD was the driving force behind, and came up with, the idea for the creation of Big Picture Loans. And when asked "whose idea" was it "to create Big Picture Loans," Hazen lied under oath that it was the "tribe's." Ex. 33 at Hazen Depo. 34:4-8. And when asked "who picked the name," she testified "[i]t was kind of a group discussion." *Id*. at 38:7-9.

In reality, documents produced from a third-party marketing firm show that Martorello created Big Picture Loans at least a year before LVD supposedly created/formed Big Picture. The domain name was registered on September 18, 2013. Ex. 59. Martorello's marketing company provided a "Communications Plan," for Bellicose Capital dated September 30, 2013, *i.e.*, the same day the district court issued its opinion in *Otoe-Missouria*. Ex. 60 at PHEN0002899. This document shows that Bellicose had anticipated launching Big Picture with another tribe located at the Fort Belknap Indian Reservation, *Id*. at PHEN0002904, but the launch of the lending enterprise was on hold pending ACH configuration. *Id*. at PHEN0002908. And shortly after the district court's decision in *Otoe-Missouria*, Justin Martorello e-mailed the marketing company, instructing

that tasks associated with "Big Picture" should be a "FULL STOP," and "given the massive attacks on the industry we do not plan [to] use these sites." Ex. 61 at PHEN0003894.

### iii.   Anticipating an affirmance by the Second Circuit, Martorello urges Wichtman and Hazen to "rebrand" Red Rock to Big Picture.

New evidence further shows that the Tribal Defendants and Martorello lied about the reason for creating Big Picture, which was formed <u>before</u> Martorello approached Chairman Williams about the potential restructure. Most notably, Hazen's declaration falsely claimed that "[a]fter four years of operating Red Rock, LVD had gained considerable experience and knowledge of the online lending industry," and, thus, "LVD looked to expand its online lending business to earn more money for LVD," and "to acquire our vendors' businesses so the lending would be more profitable." Ex. 1, Hazen Decl. at ¶ 13. Against this false backdrop, Hazen's declaration claimed that "LVD created Big Picture Loans" in August 2014. We now know conclusively that this is not what happened.

What actually happened was that Martorello urged Wichtman, Hazen, and Chairman Williams to "rebrand" Red Rock in July 2014. Ex. 62 at ROS001-058409. In this email, Martorello explained that that "RRTL ha[d] been blacklisted and rolled through the mud in the press" following the *Otoe-Missouria* decision. *Id*. He further added that "it's time to get away from the word 'payday' and the black mark of RRTL before rules come out and things get hotter." *Id*. Thus, Martorello suggested "form[ing] ASAP a new LLC with a new domain/brand, for purposes of transferring all contracts, assets, bank accounts, liabilities etc. over to the new entities when ready." *Id*. Bellicose would "gladly facilitate the work," but it needed "the entity formed and approv[ed] to begin doing so as to step 1." *Id*. In conclusion, Martorello stated "the sooner we can get moving away from 'Payday' and the poor image of RRTL the better." *Id*. Despite this, Martorello's declaration misleadingly claims that "Neither I nor any company I own or manage <u>directed</u> or

33

controlled the creation of Big Picture." Ex. 8, Martorello Decl. at ¶ 67 (emphasis added); *see also id*. at ¶ 102 ("Neither I, nor Bellicose, helped form Big Picture[.]")

The evidence further shows that Red Rock was supposed to be rebranded into another concept developed by Martorello, known as Chorus Loans. On August 25, 2014, Martorello e-mailed Wichtman that "Chorus has been sold." Ex. 63 at ROS001-043437. But Martorello had "another really great brand" known as Big Picture Loans. *Id*. In this e-mail, Martorello attached a document entitled "Big Picture Site Design" showing a fully developed website, logo and brand for Big Picture. *Id*. at ROS001-043437-57. Wichtman, who was drafting the resolution for approval by tribal council, responded "[w]hich one do you want me to use?" Ex. 64 at ROS001-043435. It was left up to Martorello to decide on "BigPictureLoans.com," a domain name that he already owned. The following day, Wichtman presented a resolution for the creation of Big Picture, as well as approving its Articles of Organization and Operating Agreement. Ex. 65, Resolution # T2014-066.

The creation of Big Picture—before Martorello even communicated with Chairman Williams about the restructure—is significant to the *Breakthrough* factors addressing method of creation and purpose. Contrary to the story told to this Court and the Fourth Circuit, Big Picture was created as a "rebrand" after Red Rock "ha[d] been blacklisted and rolled through the mud in the press" following the *Otoe-Missouria* decision. Ex. 62 at ROS001-058409. And it was created at the insistence of Martorello, who urged the "forming ASAP a new LLC with a new domain/brand, for purposes of transferring all contracts, assets, bank accounts, liabilities etc. over to the new entities when ready." *Id*. Put differently, the creation and its surrounding purpose was not the result of "years of knowledge and business acumen related to online lending," but rather an effort to rebrand the current product at the urging of Martorello.

34

iv.   **In August 2014, Martorello makes first overture and conveys urgency to Chairman Williams, but LVD does not seem interested in the restructure.**

Martorello was also paying close attention to the litigation involving others industry, including cases filed against CashCall, Scott Tucker, and others.[20] Although the term of the Servicing Agreement was effective until December 31, 2018, Martorello knew the business model was at risk and the consequences would be severe. Ex. 55 at LVD-DEF00018129 (explaining the CFPB would go after "all revenue ever collected from consumers" and that "number" was "unobtainable by every investor combined."). On August 11, 2014, Martorello sent an email to Chairman Williams—not vice versa—"we're working on something" that "will have some talking points to go over about the concept for a potential bigger deal for LVD learning the Servicing business." Ex. 68 at LVD-DEF00020786 (emphasis added). Martorello suggested to start "with a phone call, and then if we're close you can come to Puerto Rico to finalize" the terms. *Id.*

On August 26, 2014, Martorello sent another email to Chairman Williams providing more details and stressing the urgency of the restructure. Ex. 69. He wrote that Bellicose wanted to "move quickly to transition the business into very capable hands." *Id.* at ROS001-048541. Martorello further explained that he had "to stress the urgency on [his] end" and "SPVI/BVI are looking to move very quickly on such an exit." *Id.* at ROS001-048541-2. Far from being the LVD's idea to restructure, he further noted that "rather than putting the business on the 'auction block' to the highest bidder," they were coming "exclusively to LVD," but it was "important that LVD knows that time is of the essence for SPVI/BVI in getting a sale done." *Id.* Martorello indicated

---

[20] Ex. 66 at Rosette_048497 (email from Martorello to Rosette in response to *CashCall* opinion, asserting "Let's zero in asap on minimizing my risk for being individually liable like CO just successfully did to Butch [W]ebb. . . . I don't want my company on anything that goes to the CFPB."); Ex. 67 (email to Wichtman about Tucker/AMG Services settlement with the Federal Trade Commission).

that he wanted to know "if LVD is interested or not interested," so they could "move as quickly as SPVI/BVI needs to so that we're not inadvertently disadvantaged." *Id*. At this same time, Martorello told Rosette: "If we can't reach terms with LVD to buy SPVI, then SPVI will be sold to another Tribe (likely Middletown).". Ex. 70.

Williams did not respond to Martorello's email that day, prompting Martorello to email Wichtman later that evening. He had not heard "anything back from the Chairman," nor did he get "any sense of excitement from anyone[.]" Ex. 29 at ROS001-045272. Instead, as far as Martorello knew, Tribal Council "only approved evolving the term sheet into something that would be reviewed later to ask questions about, and if approved, then it'd be binding." *Id*. He further stressed that there would be "a lot of legal details to go through" on the deal and "the seller will have to keep a final say so in business decisions to protect the business from being destroyed by the new owner before paid." *Id*. (emphasis added). Martorello made clear he did not want anything beyond cosmetic changes, explaining there was "[n]o need to reinvent the wheel or shake things up, just need to keep it alive and then use the earnings from it to take risks with and do other things." *Id*.

> ### v.   Following the Second Circuit decision, the parties decide "to go quietly into the night and restructure."

On October 1, 2014, the need for cosmetic changes became urgent when the Second Circuit affirmed the district court's decision in *Otoe-Missouria*. The Second Circuit made several damaging findings, including that "New York's usury laws apply to all lenders, not just tribal lenders[.]" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 117 (2d Cir. 2014). The court also observed that "Native Americans 'going beyond the reservation boundaries' must comply with state laws as long as those laws are 'non-discriminatory [and] … otherwise applicable to all citizens of that [State].'" *Id.* at 113 (quotations omitted).

After the Second Circuit issued its decision, Martorello wrote to Wichtman on October 10,

2014, urging her (as general counsel for LVD and Red Rock) to drop the case. Ex. 71 at ROS001-043659 ("I can't urge any stronger that LVD not proceed"). He indicated that "SPVI won't be willing to testify, or do anything as the result of another filing will certainly end in a slew of attacks on me, SPVI and my team." *Id*. Ultimately, Wichtman agreed and, as she explained in a subsequent email, their best option was to:

> **go quietly into the night and restructure** based on what we know from the opinion in order to build an even stronger case for future litigation.

Ex. 72 at ROS001_001130 (emphasis added); *see also* Ex. 73 at ROS001-044075 (Martorello proclaiming that he wanted "BPL to be born from the learnings of all 2nd circuit commentary[.]").

The parties started moving quickly to restructure the business—even though they had not reached an agreement in principle to the major terms, including the price to be paid. Among other things, Wichtman obtained a tax EIN for BPL on December 1, 2014. Ex. 74. On February 5, 2015, the Tribal Council adopted a resolution creating Ascension and designating Brian McFadden as its president. Ex. 75. Immediately following Ascension's creation, SourcePoint began assigning its contracts to Ascension—another sign that the restructure was not an arm's length transaction, but a façade designed to protect Martorello and his team. *See, e.g.*, Ex. 76. Similarly, Ascension designated McFadden and Simon Liang as the signatories on its bank account on February 19, 2015. Ex. 77. All of these steps—creation of Ascension, designation of McFadden as its president, assignment of contracts, adding signatories to bank accounts—were taken months before the parties entered into the Agreement and Plan of Merger dated September 14, 2015. Ex. 78.

Because Defendants' execution of the internal plan to destroy this evidence, it was not discovered until after the Defendants' motion had been decided and appealed. When examining the purpose factor, the Fourth Circuit then found that "the evidence does not support the district court's conclusion that the creation of the Entities was only or primarily intended to benefit

Martorello or that the creation of Big Picture and Ascension <u>was solely the product</u> of Martorello's design and urging." *Williams*, 929 F.3d at 178 (emphasis added). Due to the destruction of documents and discovery misconduct, the previous evidence available was confined to two emails: (1) the January 2014 e-mail from Martorello regarding his concern about the CFPB and New York enforcement actions; and (2) the August 2014 e-mail sent by Martorello asking Chairman Williams for a time to discuss "a potential bigger deal for [the Tribe] learning the Servicing business." *Id*. In other words, neither this Court nor the Fourth Circuit had the benefit of the extensive and direct evidence above showing: (1) the creation of Big Picture was a rebranding at the urgence of Martorello; and (2) the restructure was the product of Martorello's design and urging. When considered alone and together, this new evidence (as opposed to the two e-mails in the record in *Williams*), conclusively establishes that the restructure was "only or primarily intended to benefit Martorello," and that it was a product "of his design and urging." *Williams*, 929 F.3d at 178.

### B. New evidence shows that the restructure was designed to maintain non-tribal control over operations while, at the same time, insulate Martorello's childhood friend and business partner.

Contrary to Defendants' theme that the restructure would enhance LVD's ability to learn the business, discovered evidence shows that it was designed to ensure—and required—the Martorello team's continued control of operations. As Martorello explained to Wichtman, "<u>the seller will have to keep a final say so in business decisions</u> to protect the business from being destroyed by the new owner before paid." Ex. 29 at ROS001-045272. Martorello made clear he did not want anything beyond cosmetic changes, explaining there was "[n]o need to reinvent the wheel or shake things up, just need to keep it alive and then use the earnings from it to take risks with and do other things." *Id*. And while Hazen appears to have been originally uncomfortable with the idea, Wichtman convinced her "to leave the org chart unchanged" and understood the

"importance of keeping status quo to ensure success!" Ex. 79 at 00135. And all of this came at the orders of Martorello, who insisted that "the Bellicose Companies will be sold only 'as is', with existing Management in place and the company remaining substantially the same." Ex. 80 at ROS001-040179; *id*. (explaining the business "needs to be run in the same format it is today.").

They maintained the status quo even though one of Rosette's lawyer identified the structure opened them up to rent-a-tribe arguments similar to "the current class action litigation pending in Vermont," *Gingras v. Rosette*. Ex. 81 at ROS001-043997. To avoid this, she wondered whether they needed "to put these things in writing." *Id*. Martorello insisted the term be in writing, saying it was "take it or leave it[.]" *Id.* at ROS001-043996. He further added that "Servicer comfort" was the "only way" that an important investor would "be involved." *Id*. From "their perspective," if LVD "was to cut SPVI out of the picture, then [it] simply cannot perform as a business." *Id*.

Consistent with this, Martorello explained in a different email before closing, BPL's "[l]enders care about the person who runs the business at AT." Ex. 14 at ROS001-043978. So long as the restructure documents were "clear that the position in question and under scrutiny to the lenders is President and CEO (Brian)," then it was ok. *Id*. And this is exactly what they did—BPL contractually relinquished the right to control operations to its "servicer," Ascension, who contractually relinquished the right to control its operations to McFadden. *See* Exs. 82 & 83. It all remained exactly the same except for one change: it was now ostensibly "structured to provide all entities sovereign immunity" per Martorello's desire. Ex. 50.

The structure was also designed to "insulate" McFadden. Ex. 30. As Wichtman explained, she and Matt "contemplated" in 2015 that "the co-managers would be named as Shelly and the Chairman in order to further insulate Brian as a tribal employee." *Id*. at ROS001-050593. This "co-manager insulate model," as labeled by Wichtman, would provide an extra layer of protection

39

for McFadden "as President." *Id.* at ROS001-050595. McFadden "would then have his duties defined by his position description, his contract and certain delegations of authority by the Co-Managers" to ensure control over the operations as needed by Martorello. *Id.* at ROS001-050593.

An email chain prior to closing further demonstrates that the restructure was a sham. This e-mail chain starts with an e-mail from John Williams, Bellicose's attorney, noting that Ascension's "Operating Agreement puts all the power in the hands of the Manager." Ex. 14 at ROS001-043978. John Williams added that the "office of President is not mentioned" and asked Wichtman "[s]houldn't Brian, as President, be the Manager of that sub?" *Id.* In response, Wichtman stated that she had not "looked at the AT docs in a while," but seemed "to remember Brian was appointed at Matt's direction as President but the Co Mrg[s] were still Shelly and the Chairman." *Id.* Wichtman further added "[c]ollateral is protected under the agreements not positions or people. What has changed?" *Id.*

In response to Wichtman's e-mail, Martorello explained that the enterprise's lenders "care about the person who runs the business at AT." *Id.* So long as the restructure documents were "clear that the position in question and under scrutiny to the lenders is President and CEO (Brian)," then it was ok. Martorello further wrote "**[a]s far as I know, the Manager's don't really do anything**." *Id* (emphasis added). In closing, Martorello explained that he would leave it up to John Williams on what the transaction documents "say if that jives, and what the authority is of BMF vs the Managers, **but if Managers are really only involved per the [operating agreement] to get feedback from the CEO/President**" then that seemed "OK." *Id.* (emphasis added). If the managers did "more than that" or the transaction documents "say the position of concern are the managers," then there was "some cleaning up to do" according to Martorello. *Id.* Two days after this exchange, John Williams e-mailed Wichtman a draft of the Delegation of Authority Policy to

ensure it was clear who had operational control. Ex. 84 at CW0001, Jan. 16, 2016 e-mail from John Williams. After a few minor edits, it was signed by Hazen and Williams on January 22, 2016. *Id*. at CW00009.

### C. Martorello retained control over McFadden through Eventide.

BPL claims that "[a]fter the acquisition was complete, Martorello's relationship" changed from "a consultant employed by Bellicose" to "a creditor as owner of Eventide." ECF 40 at 8; ECF 40-3 ¶ 22; ECF 38-5 ¶ 22. To that end, BPL asserts that Martorello "has no authority over Big Picture" and that he "had no involvement in any aspect of Big Picture's operations" since the acquisition. *Id*.; *see also* ECF 87 at 3; ECF 88 at 3. This is false and misleading. Understanding Martorello's continued authority over the business requires an understanding of the various, inter-related agreements crafted as part of the restructure. First, through the Intratribal Servicing Agreement, BPL relinquished to Ascension the right to control the vast majority of the responsibilities for its operations. Ex. 83. Ascension then contractually relinquished the right to control its operations to McFadden, Martorello's childhood friend and business partner.[21] Under the Delegation of Authority Policy, Ascension delegated to McFadden the authority to handle Ascension's "strategic direction, goals and targets," and over "all matters necessary for the day to day management of Ascension." Ex. 82 at § 1.4(a)-(e)). And while Hazen and Williams' authority to appoint the president seems to provide some control, the Loan Agreement neutralizes this power because it requires Hazen and Williams to obtain approval from Martorello (albeit via Eventide) to replace McFadden. Ex. 86.

Martorello created a check on McFadden's power through Eventide's operating agreement,

---

[21] Ex. 5, Martorello Dep. at 94:20-22 ("A. I've known Brian McFadden from riding bikes in the fourth grade."); Ex. 85 (showing McFadden owned shares in Bellicose).

which allows him to revoke McFadden's shares with 14-days' notice. Ex. 87 at § II(I). Martorello considered wielding this power in August 2016 as evidenced by a text message exchange with his brother, another former officer of Bellicose and now owner of Eventide. Ex. 79 In this text exchange, Martorello expressed concern that "Brian [McFadden] and James [Dowd] are getting too big for their britches." *Id.* at 00157. He further explained that "they see monthly wires and are starting to think they deserve a lot more of it now than the $1mm a year Brian makes for being a hired CEO." *Id.* Martorello wrote that McFadden "may have to be disappointed somewhere down the near term road," as "he's not the founder and $1mm a year buys a lot of very capable replacements." *Id*. Put differently, even after the sale, Martorello remained in control through this ability to remove McFadden, albeit by revoking his shares and equity in Eventide.

### III.  To bolster the appearance of a legitimate transaction, Defendants materially misrepresented the value of Bellicose and the acquired assets.

*Value of Bellicose*. The Defendants have made material misrepresentations about the value of Bellicose, such as that it "was valued at just over $100 million" at the time of the sale. *See Galloway I*, ECF 40 at 7. Unsurprisingly, they did not cite any evidence to support this assertion, which is directly contradicted by a significant number of documents showing that Bellicose had little, *if any*, value at the time of the merger and closing. And at the oral argument before the Fourth Circuit in *Williams*, the Tribal Defendants asserted "there has been no suggestion and certainly no evidence and no finding that the Tribe somehow paid too much for" Bellicose.[22] They made a similar representation in their Fourth Circuit reply brief. *See* Ex. 9 at 12 ("There is no evidence the purchase price exceeded the value of the assets acquired."). While unavailable in *Williams*, there

---

[22] Fourth Circuit Court of Appeals, Oral Argument/Listen to Oral Arguments, Opening Argument of William Hurd, Audio File at 4:47-4:55, http://www.ca4.uscourts.gov/OAarchive/mp3/18-1827-20190507.mp3.

is now an abundance of evidence showing that the Tribal Defendants misrepresented the value of the business, which was worthless as it was about to be shutdown.

For example, in an email dated **October 2**, **2015**,[23] Martorello provides his thoughts on "FMV vs. FV" of Bellicose, i.e., its fair market value v. future value. Ex. 88. Explaining his certainty in the business' low fair market value, Martorello provided 11 points, including "1) the Tribe is buying it b/c our contract gets terminated and they want this to continue[,] 2) Operation Chokepoint is a risk for SPVI owners but not for the Tribe[,] 3) All lawsuits against Servicers is removed from the equation for the Tribe to lose us… 7) They risk that they lose their debt investors if we go away, this deal keeps debts investors comfortable to remain, whereas they'd leave if a new vendor replaced us… 10) IN THE UNLIKELY EVENT that the CFPB rule doesn't take them down, then they pay as they go via a Seller financed deal rather than taking risk. . . ." *Id*. at LIONT_09845-6 (emphasis in original). Martorello further added "there is the risk that we get shut off from banking immediately (or the Tribe does) and we suffer catastrophic damages even worse than CFPB rule." *Id*. at LIONT_09846.

Similar e-mails reinforce the same core point. For instance, Martorello sent a similar e-mail to a business valuation firm on December 5, 2015, *i.e.*, about six weeks before the closing. Martorello's email explained that "efforts would be attempted by [s]tate governments to shut down tribal lenders (and are being attempted in fact)." Ex. 89 at Martorello_009775. One of those was an action filed by the Pennsylvania AG, which Martorello characterized as "the most significant issue/risk to SPVI" as "PA could bring the same claims against SPVI for sure." *Id*. He further added that Red Rock had already "received threats from several state AGs demanding they stop lending or they will come after them." *Id*. In addition to attorney general threats, the NYDFS has

---

[23] The Agreement and Plan of Merger was signed on September 14, 2015. *See* Ex. 79.

"issues too" with tribal lending "and they could go after SPVI as well." *Id*. In conclusion, Martorello encouraged the firm to include all "of the support you can that says CFPB rule <u>will shut this business down</u>, and how operation choke point is hurting everyone." *Id*. (emphasis added).

In another e-mail, Martorello wrote once again that "[i]t was estimated that the industry would be wiped out in Feb 2014 by the new CFPB, and/operation chokepoint tactics." Ex. 90 at Martorello_011446. Martorello further explained that "[a]ccurately enough, the clients lost the ability to debit borrower bank accounts in January 2014" and they "made no loans for many months after out of fear banking would be fully cut off for good." *Id*. Consistent with this, Martorello sent a similar e-mail to the President of the Online Lender's Association ("OLA"), asking for a simple report "that justifies a position I have taken on the industry in a valuation study." Ex. 91 at OLA_0000020. That position, as Martorello explained, was that "Servicing of Tribal Lending will be shut down from new loan originations and forced into orderly liquidation mode (at best)… as a result of two factors: 1) CFPB (new rule or otherwise)" and "(2) Operation choke point (in this case that terms includes AG lawsuits like VT/PA v. Think [Finance].")." There are multiple other emails reiterating this position that the tribal lending would be shut down.[24] All of this evidence blatantly contradicts the Defendants' claim that "Bellicose was valued at just over $100 million" at the time of the sale, as well as similar representations to the Fourth Circuit. *See* Ex. 9 at 12.

*Value of Assets*. The material misrepresentations are further apparent if one considers the specific "assets" involved in the transfer according to the Defendants, who have identified four assets acquired by the sale: (1) intellectual property, (2) goodwill, (3) existing data, and (4)

---

[24] *See also* Ex. 92 at LIONT_05387 ("Lawsuits by AGs and regulators against SPVI, myself, or the client (as the reports and cases filed to date against competitors supports) may end the business or seriously shrink the business"); Ex. 93 at MARTORELLO_011671 ("we thought (and data supported) 'end of days in 2015'" because of Operation Chokepoint).

software. Ex. 48, Hazen Declaration at ¶ 20.[25] Defendants never attempt to place a value on any of these "assets," and for good reason. These assets were (1) something the Tribe already owned (the intellect property), (2) something that had no value (the good will), (3) something licensed from a third party (the software), and (4) something the Tribe should have had access to (the data).

The first asset "intellectual property" was already owned by the Tribe. As Martorello detailed in an email to a tax professional: "**About IP**: The client/Tribe often argued with me that they view all of the IP and data as their property. They strongly believed that SPVI was paid to create the IP for them, and to facilitate them using it. Early on, I agreed with their position, but in 2014 I argued the opposite to that (as I wanted to sell the business, it felt pretty pertinent)." Ex. 90 MARTORELLO_011445 (bold in original; underline added). Martorello further noted, "[n]ow, reading the contracts" it is "very clear" that "SPVI [was] hired for the service of creating all of the business methods for the Tribe" and it is "pretty clear that the Tribe was correct" and the "IP created to service their business, was always their property." *Id*. (emphasis added); *id*. ("I am of the opinion that the only IP of any relevance was the [servicing] contracts with the [tribal] clients.").[26] Because the intellectual property was "always" the Tribe's property, it is materially misleading to suggest it purchased it as part of the sale.

Martorello's email further shows that the second asset, the goodwill, did not exist. As Martorello explained: "I'm not sure there could have been any GW [i.e., good will], since this was

---

[25] Exhibit 1 is Hazen's declaration from *Williams*; Exhibit 48 is her declaration from *Galloway*. Notably, Hazen's declaration from Williams never identified intellectual property as one of the items acquired by the merger. Ex. 48 at ¶ 20.

[26] Among the many others, this email shows that Martorello is willing to change his position on a whim, including on significant matters. This practice has continued before this Court, including in his declaration which falsely claims "Since the beginning of my relationship with LVD, I understood that LVD had always intended to utilize my consulting services to assist them to build their valuable IP. . . ." Ex 8 at ¶ 47.

1 contract/client business (1 tribe with 2 portfolios) and <u>there was no public face at all to the</u> <u>business (i.e. no reputation value)</u>." *Id*. (emphasis added). This was part of the design—no one was supposed to know about Martorello's involvement in operations. Ex. 53 at ROS001-052787 (email from Martorello complaining that he was "about to be discovered and will need extreme resources to defend itself against all kinds of aiding and abetting and 'true lender' claims.").

So that leaves the "existing data" and "software." Ex. 48, Hazen Declaration at ¶ 20; *see also* Ex. 1 at ¶ 6. But since Bellicose was a "1 contract/client business," any existing data should have been the Tribe's in the first place. In other words, if Red Rock was the lender and made all final decisions as posited, it would have no reason to acquire the servicer's existing data; it's the lender's data which is used by the servicer. That just leaves software, but there is no evidence that Bellicose developed or owned any software to transfer to the Tribal Defendants. Rather, like any other servicer, SourcePoint used loan management software; it did not own it.[27] Thus, even ignoring the direct evidence regarding Martorello's business being on the brink of shutdown, the math does not even come close to adding up to $100 million.

## IV.    The Tribal Defendants and Martorello misrepresented that "cost savings" was the impetus behind the merger.

The Tribal Defendants claim that they "acquired years of knowledge and business acumen related to online lending," and "had the expertise to begin in-housing services that were previously provided by outside vendors" like Bellicose. ECF 40 at 6; ECF 38 at 5; *see also* Ex. 1 ¶ 13 ("LVD looked to expand its online lending business to earn more money for LVD[.]"). To that end, the Corporate Defendants claim that the acquisition of Bellicose enabled them to bring "'in-house'

---

[27] *See Williams v. Big Picture Loans, LLC*, Case No. 3:17-cv-461 (E.D. Va.), ECF 480-1 (certification from Big Picture's third-party loan software management company regarding its preservation of the loan data).

many of the activities… resulting in significant cost savings and efficiencies." ECF 40 at 7; *see also* ECF 38 at 15 (arguing that Ascension enhances self-sufficiency because it is "a below-cost service provider," which "in turn generates more profit for LVD."); Ex. 33, Hazen Dep. at 63:3-6.

That cost savings, according to Defendants, resulted in a decrease of "approximately $1.4 million per month on outsourced services," to spending "on average "$224,262.71 per month through its relationship with Ascension." *See Galloway I*, ECF 38 at 22. In other words, the Defendants claim that "$1.2 million saved per month is more profit to LVD." *Id.* That is simply untrue. Rather than paying for "outsourced services," BPL is paying the same amount to Eventide as a creditor. And it still receives a percentage of the gross revenue. Because the LVD's income is based on gross revenue, it did not matter whether Ascension generated a savings to Big Picture Loans. Eventide and, thus, Martorello are receiving 100% of the "savings."

Even putting these misleading statements aside, it is false to assert that Ascension is "a below-cost service provider." ECF 38 at 15. In reality, the new contract requires BPL to pay "110% of the hourly salary costs" for Ascension's employees. Ex. 83 at § 3.4. Additionally, the restructure contemplated "a bonus plan" of "no more than 150% of employee wages[.]" *Id.* Consistent with this, McFadden went from making $171,285.00 at Bellicose to $265,000.00 at Ascension. *Compare* Ex. 85, *with* Ex. 94. Similarly, James Dowd and Simon Liang's salaries increased by $60,000.00. *Compare* Ex. 85, *with* Ex. 94. Far from "saving" by bringing these services "in-house," the lending business is now paying *more* for the *same* services provided by Bellicose.

And there is a reason why they did this. As Martorello explained: Bellicose's employees were "frightened about the deal already" and "keeping these employees" was "vital to not have a mutiny on [their] hands." Ex. 95 at ROS001-040216. In a similar email, Martorello explained that there needed to be continued separation because "the PR effect of hiring on (existing or new) very

talented/vested career professionals who will understand they risk being labeled by peers as working for some 'illegal' lender is a major handicap on the organization, as opposed to working for a cutting edge tech/analytics shop that is more protected from the biased media." Ex. 80 at Rosette040179.[28] Thus, to ensure that they could incentivize employees to continue to work for the illegal lending enterprise, the transaction required Big Picture to pay an increased cost.

## V.    An adverse inference should be drawn against Martorello, who destroyed relevant evidence such as his emails.

"Under the spoliation of evidence rule, an adverse inference may be drawn against a party who destroys relevant evidence." *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995). "As a general proposition," a district court has "broad discretion" to impose "adverse inferences from a party's failure to present evidence, loss of evidence, or the destruction of evidence." *Id*. at 156. Although it exists here, a finding of bad faith "is not always necessary." Id. (citing *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.1993)). "To draw an adverse inference from the absence, loss or destruction of evidence, it would have to appear that the evidence would have been relevant to an issue" or "would naturally have been introduced as evidence." *Id*. at 156.

An adverse inference should be drawn against Martorello at this posture because after the acquisition, Martorello's emails were intentionally destroyed when he knew or should have known of litigation. *Williams v. Big Picture Loans, LLC*, No. 3:17-CV-461, 2019 WL 1983048, at *15 (E.D. Va. May 3, 2019) (discussing the destruction of Martorello's emails). As reflected by the documents recently obtained from third parties, Martorello's old emails are highly relevant to many issues in this case and would have been used as evidence. And one important category has

---

[28] Even though it was his concept to keep the "lender" and "servicer" separate, Martorello's declaration falsely claims that "[n]either I nor any company I own or manage directed or controlled the creation of Ascension." Ex. 8, Martorello Decl. at ¶ 68.

been completely lost: Martorello's emails with the other officers and directors of Bellicose/SourcePoint. When considering the statements made to outsiders of his companies, it naturally follows that Martorello was speaking more candidly with insiders, such his brother.

## VI.  Martorello's conduct since the settlement with the Defendants unmasks the truth.

Martorello's sham claim that Eventide is a "mere creditor" for the Tribal Defendants was entirely dropped when the Tribal Defendants settled. Upon that settlement, Martorello moved to assert the actual control he intended and had to that point covertly exercised. The Tribal Defendants could not dare settle without his permission. By letter dated December 12, 2019, Eventide's counsel asserted that the Tribe or its affiliated entities are in material breach of their obligations to Eventide. Ex. 96. Specifically, Eventide claims that it has numerous controls and related rights to oversee the business operations based on the terms of the subject Secured Promissory Note, the Loan and Security Agreement, and the Parental Guarantee. *Id*. at 3–12.

On December 16, 2019, Eventide demanded arbitration, claiming that the tribe-affiliated companies are in default of the loan agreement.  Ex. 97. In the demand for arbitration, Eventide asserts its right of control over the Tribal Defendants' "business model" and "[lending] product and business polic[ies]." *Id*. at 12, 18, 22, 25-26. Due to the Tribal Defendants' failure to operate in its best interest and subject to agreed controls, Eventide claims that the Tribal Defendants are in breach of their fiduciary duties. *Id*. at 17, 21-22.

The next day, in another attempt to exert his control, Martorello through Eventide sued the Tribal Defendants in the Western District of Michigan seeking a temporary restraining order to stay the settlement in this Court.  *Eventide Credit Acquisitions, LLC v. Big Picture Loans, LLC*, No. 2:19-cv-00256-JTN-MV, Dkts. 1, 5 (W.D. Mich. Dec. 17, 2019). Two days later, on December 19, the Michigan court denied Eventide's motion for temporary injunctive relief.  *Id*., Dkt. 14

(W.D. Mich. Dec. 19, 2019).  In its ruling, the court acknowledged that the loan agreement "attempts to place strict requirements on [Tribal] Defendants' conduct of their business," but Eventide failed to prove any of the requisite elements in support of the TRO.  *Id.*, Dkt. 14 at 3.

On December 18, 2019, Eventide moved to intervene and to object to the terms of the settlement, claiming the settlement would breach the Tribal Defendants' "fiduciary obligations" to maximize the recovery to Eventide and "would result in an improper subordination of Eventide's superior rights and interest." *Galloway v. Williams*, No. 3:19-cv-470, Dkt. 43-1 (E.D. Va. 2019). And seeking to revisit their rights and control over the lending operation, Martorello even had his company Eventide file a Chapter 11 bankruptcy and related adversary proceeding, seeking to stay the settlement pending in this Court as well as extend the stay of all litigation against Martorello and his affiliates.  *Eventide Credit Acquisitions, LLC v. Big Picture Loans, LLC*, No. 20-04008-elm (N.D. Tex. Bankr. Jan. 29, 2020).

Each of these positions directly contradicts the position Martorello has taken up to this point in this litigation, *i.e.*, claimed passivity as a creditor to, and LVD's supposed full control of, the lending scheme. As Rosette pointed out in his letter to Eventide's counsel on December 13, Eventide's efforts to "unduly exert control of Big Picture" demonstrate that it is "seeking to act as the *de facto* lender." Ex. 98 at 1. With Martorello "representing himself as an [Eventide] decisionmaker," their attempts to undermine the settlement demonstrate "Mr. Martorello's efforts to control Big Picture's business, which will certainly prove detrimental to his existing legal challenges." *Id.* at 2. Rosette also forecasted that the "exercise of the remedies Mr. Martorello seeks will . . . expose your client to a civil RICO claim." (*Id.* at 1.)

Respectfully submitted,

Date: June 17, 2020                    _____
                                                       /s/
                                        Kristi C. Kelly, Esq., VSB #72791

Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com

Leonard A. Bennett, VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com

E. Michelle Drake
John G. Albanese
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 594-5999
Facsimile: (612) 584-4470
Email: emdrake@bm.net
Email: jalbanese@bm.net

Beth E. Terrell
Jennifer Rust Murray
Elizabeth A. Adams
TERRELL MARSHALL LAW GROUP PLLC
Email: bterrell@terrellmarshall.com
Email: jmurray@terrellmarshall.com
Email: eadams@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, WA 98103
Telephone: (206) 816-6603
Facsimile: (206) 319-5450

*Attorneys for Plaintiffs and Proposed Classes*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of June 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system which will send a notification of such filing (NEF) to all counsel of record.

_____/s/_____
Kristi Cahoon Kelly (VSB# 72791)
KELLY  GUZZO, PLC
3925 Chain Bridge Rd, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
*Counsel for Plaintiff*
