# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| LULA WILLIAMS, GLORIA TURNAGE, | : |
| GEORGE HENGLE, DOWIN COFFY, and | : Civil Case No. 3:17-cv-461 |
| FELIX GILLISON, JR., *on behalf of themselves* | : |
| *and all individuals similarly situated,* | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| | : |
| BIG PICTURE LOANS, LLC; | : |
| MATT MARTORELLO; | : |
| ASCENSION TECHNOLOGIES, INC.; | : |
| DANIEL GRAVEL; JAMES WILLIAMS, JR.; | : |
| GERTRUDE MCGESHICK; SUSAN MCGESHICK; | : |
| and GIIWEGIIZHIGOOKWAY MARTIN, | : |
| | : |
| Defendants. | : |
| | : |

**Expert Report of**
**ERIC C. HENSON**

**January 11, 2019**

# TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY OF CONCLUSIONS ............................. 1
    A.   WITNESS BACKGROUND AND PURPOSE OF ANALYSIS ................................... 1
    B.   ASSIGNMENT AND MATERIALS CONSIDERED .............................................................. 1
    C.   SUMMARY OF CONCLUSIONS ................................................................................... 3

II.     APPROACHES TO TRIBAL ECONOMIC DEVELOPMENT ........................ 4
    A.   THE PLANNER'S APPROACH ................................................................................... 4
    B.   CHANGING FEDERAL POLICY ................................................................................. 5
    C.   THE NATION BUILDING APPROACH ......................................................................... 7

III.    TRIBAL GAMING AND ONLINE LENDING ............................................. 10
    A.   THE INDIAN GAMING REGULATORY ACT ................................................................ 10
    B.   THE CONSUMER FINANCIAL PROTECTION ACT CONTEMPLATES TRIBAL INVOLVEMENT IN
         CONSUMER FINANCIAL PRODUCTS AND SERVICES .................................................... 15
    C.   THE NATIVE AMERICAN FINANCIAL SERVICES ASSOCIATION ...................................... 17

IV.     INCENTIVES FOR TRIBES TO GENERATE REVENUE ............................ 19
    A.   TRIBAL CIRCUMSTANCES LEND THEMSELVES TO ONLINE BUSINESSES ...................... 19
    B.   ECONOMIC INCENTIVES FOR TRIBES TO ENGAGE IN BUSINESS VENTURES ................. 30

## I.  INTRODUCTION AND SUMMARY OF CONCLUSIONS

### A.  Witness Background and Purpose of Analysis

1. I am an Executive Vice President at Compass Lexecon and I serve as a research fellow/affiliate at The Harvard Project on American Indian Economic Development ("Harvard Project").  During the course of my career I have developed expertise in economic development and tribal affairs, and I work in these areas in my consulting and academic endeavors.  In addition, I am a citizen of the Chickasaw Nation.

2. I have a Master's degree in Public Policy from the Kennedy School of Government at Harvard University, an MA in Economics from Southern Methodist University and a BBA in business economics from the University of Texas at San Antonio.  While I was a graduate student at Harvard, I focused on the intersection of tribal governments and business activities on tribal lands (my thesis project examined the importance of uniform commercial code development and implementation for economic development on a reservation in Montana).  I attended the Kennedy School as the Christian Johnson Native American Fellow from 1996 to 1998.

3. Since completing my graduate studies at the Kennedy School, I have consulted, testified, published, and taught on issues relating to tribal affairs.  Research my colleagues and I undertook resulted in publication of *The State of the Native Nations: Conditions Under US Policies of Self-Determination*, which was published in 1998 by Oxford University Press.  I recently co-taught a course on Native American economic development at Harvard, and I plan to do so again starting in late January.  The course is titled *Native Americans in the Twenty-First Century* and is cross-listed at both the Kennedy School of Government and the Graduate School of Education (in this role I have an appointment as a Visiting Senior Scholar at the Harvard University Native American Program).  Over the past 20 years I have been involved in a number of consulting engagements that relate to tribal affairs and American Indian economic development.  On five occasions I have provided testimony before the US Congress on Indian affairs (twice in the Senate and three times in the House of Representatives).

4. My CV is attached hereto as Appendix A and illustrates my prior consulting work, publications, and other professional activities.  I have been supported in my work on this matter by staff at Compass Lexecon.  My time is being billed by Compass Lexecon at a rate of $765 per hour on this engagement; my compensation in no way depends on the opinions presented herein or the outcome of this dispute.

### B.  Assignment and Materials Considered

5. I have been asked by counsel for Matt Martorello to provide expert opinions relating to how tribal economies are developed under current federal policies that call for tribal self-governance.  I have also been asked to consider how the development of tribal gaming enterprises has exhibited certain similarities to the

more recent development of tribal lending ventures.  Finally, I have been asked to provide insight into how the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD") would have economic incentives to develop a number of commercial enterprises in order to fund tribal governmental activities.  In the course of my work, I have reviewed allegations put forth in two separate cases filed by Plaintiffs.[1]

6.  In addition to the two complaints filed by Plaintiffs, I have reviewed other documents including a Memorandum Opinion,[2] responses to interrogatories,[3] and depositions and associated exhibits.[4]  I have also considered various materials gathered by both myself and staff working under my direction (a number of which are available publicly).  A list of these materials is included here as Appendix B.

7.  In this report, I discuss how the business activities at issue impact the economic health of the Tribe and enhance LVD's ability to exercise its sovereignty under a federal mandate for greater self-governance.  I also consider the Tribe's regulatory and operational involvement in developing its online lending enterprises,[5] as part of LVD's ongoing efforts to foster economic development and generate tribal revenue.  I understand that discovery is ongoing and that the Tribe has not been participating in this litigation.  If asked to do so, or if LVD does take part in the lawsuit, I expect I would supplement this report, as appropriate.

---

[1]  Lula Williams, et al., v. Big Picture Loans, LLC, et al., *Class Action Complaint*,  United States District Court for the Eastern District of Virginia (Richmond Division), filed June 22, 2017 (hereinafter "Williams Complaint"); and Renee Galloway, et al., v. Big Picture Loans, LLC, et al., *Class Action Complaint*, United States District Court for the Eastern District of Virginia (Richmond Division), filed June 11, 2018 (hereinafter "Galloway Complaint").

[2]  Lula Williams, et al., v. Big Picture Loans, LLC, et al., *Memorandum Opinion*, United States District Court for the Eastern District of Virginia, (Richmond Division), filed July 27, 2018 (hereinafter "Memorandum Opinion").

[3]  For example, Lula Williams, et al., v. Big Picture Loans, LLC, et al., *Defendant Big Picture Loans, LLC's Second Amended and Supplemented Response to Plaintiff Lula Williams's First Set of Interrogatories*, United States District Court for the Eastern District of Virginia (Richmond Division), November 3, 2017 (hereinafter "Big Picture Loan's Second Amended Response to Williams Interrogatories").

[4]  These include:  Deposition of Michelle Hazen, October 16, 2017 ("Hazen Deposition"); Videotaped Deposition of Gertrude McGeshick, November 13, 2017 ("McGeshick Deposition"); Videotaped Deposition of James Williams, Jr., November 13, 2017 ("James Williams Deposition"); Videotaped Deposition of James V. Dowd, November 13, 2018 ("Dowd Deposition"); Oral and Videotaped Deposition of Matthew Martorello, August 30, 2018 ("Martorello Deposition").

[5]  These enterprises include Big Picture Loans, LLC (hereinafter "Big Picture") and Ascension Technologies (hereinafter "Ascension").  According to formation documents, Big Picture was created to serve as a tribal lending entity, and Ascension was created to provide marketing, technological, and vendor services to LVD's lending enterprises (Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution #T2014-066*, August 26, 2014 and Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution #T2015-10*, February 5, 2015).

### C.  Summary of Conclusions

8.  Federal policy today encourages American Indian economic development, self-governance, and self-determination so that tribes may improve their economic, social, and cultural positions, as well as the lives of their tribal citizens.  Preserving the tribes' control of governmental, socioeconomic, and business development on their lands – including with respect to the types of business enterprises that the tribes can enter into – aligns with and advances these federal policies.

9.  LVD entered into a set of business arrangements with outside parties that facilitated tribal efforts to engage in online lending.  LVD established a regulatory regime to oversee online lending, and LVD is engaged in a seven-year process that will allow the Tribe to meet the terms of its September 14, 2015 purchase of Bellicose Capital LLC by way of payouts pursuant to an initial loan from Eventide Credit Acquisition LLC on or about January 25, 2023.[6]

10.  The revenues secured by LVD from online lending have been used to provide or enhance a range of governmental services, including elder services, subsidized housing, cultural programs, youth activities, a bridge loan for a new health clinic, and other social services.  The lending enterprises that the Tribe has been part of has helped address pressing economic development needs faced by the LVD community and the tribal government.  These enterprises are akin to other business ventures that tribes throughout Indian Country have entered into, and appear to have been established in a manner consistent with the mechanisms the Tribes would have utilized in other ventures, be they online lending, gaming, tourism/entertainment, or the like.

11.  Tribes in general face a variety of barriers that undermine their ability to conduct business on tribal lands or otherwise generate revenues locally.  Some of the difficulties in using tribal lands for location-based enterprises reflect the physical characteristics found throughout much of Indian Country (e.g., lack of modern infrastructure, small landholdings (which prevent the development of industries needing large infrastructure), and geographically isolated locations).  Other challenges inhibiting tribal economic development stem from legal and regulatory restrictions arising from some Indian lands being held in trust by the federal government for the benefit of the tribes.  This prevents tribes from using many of their landholdings as collateral in securing loans, while at the same time undercuts the ability of tribes to build a tax base or establish tribal taxing authority.  Coupled with historically decreasing levels of federal funding, these economic realities force Indian tribes to consider a range of businesses, including those that can be

---

[6]  The purchase date can be seen at Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution No. T2015-059*, September 14, 2015.  The 2023 date is found at Lula Williams, et al. v. Big Picture Loans, et al., *Declaration of Matthew Martorello in Support of Defendants Big Picture Loans, LLC and Ascension Technologies, LLC's Reply in Support of Their Motion to Dismiss for Lack of Subject Matter Jurisdiction*, United States District Court for the Eastern District of Virginia (Richmond Division) at ¶¶ 53-54.

conducted via ecommerce. This includes online lending, which is particularly appealing to some tribes given its location-independence.

12. Noteworthy parallels exist between the development of tribal gaming enterprises and online lending. When tribes initially entered the highly-regulated gaming industry, they did not have the capital, managerial talent, or technical skills to start and operate successful casino businesses. As a result, tribal governments sought outside expertise to help them manage their gaming enterprises, as well as to provide technological solutions associated with many popular gaming products (such as electronic bingo and slot machines). In addition to facilitating tribal gaming operations, outside experts also trained tribal employees, so that tribes were better positioned to manage their enterprises themselves. These circumstances are mirrored in the similarly highly-regulated online lending industry, as tribes formalized contractual relationships with outside experts to facilitate their entry into a new industry.

13. I understand that Judge Payne issued a Memorandum Opinion on July 27, 2018 that found neither of the entities currently associated with the Tribe's online lending, Big Picture Loans LLC ("Big Picture") or Ascension Technologies ("Ascension"), "qualif[y] as an arm of the Tribe"[7] and has found it questionable whether it well supports the goals of encouraging tribal-self-sufficiency and economic development.[8] I do not intend to provide legal opinion and have been asked to heed this ruling from the Court. At the same time, I have been asked to opine on the economic incentives faced by the LVD government and provide insight into why the Tribe made rational decisions to enter into the commercial relationships that have facilitated online lending on the Lac Vieux Desert reservation.

14. The analyses presented below, coupled with personal observations from my recent visit to the LVD Reservation, indicate that socioeconomic outcomes for the citizens of LVD lag behind those of the country as a whole. High rates of poverty and unemployment are not easily overcome in a geographic area as remote as the LVD Reservation, and it is clear that economic development efforts continue to be needed in the region.

## II. APPROACHES TO TRIBAL ECONOMIC DEVELOPMENT

### A. The Planner's Approach

15. Prior to the 1960s, federal policies and programs that did exist within Indian Country constituted what we refer to as a "Planner's Approach" to economic and community development. The Planner's Approach treated economic development as a fundamental question of resources and expertise, as opposed to one of

---

7 Memorandum Opinion at page 78.

8 Memorandum Opinion at page 79.

incentives and institutions.  The Planner's Approach typically provided grants and loans in a well-intended effort to stimulate economic development.  However, this heavy-handed approach was driven by federal budget allocations and has had a strong adverse impact on many native communities, as tribal politics revolved around which elected officials could most effectively capture (or perhaps extract), funds from the federal government.  Under the Planner's Approach, what was originally intended to be a solution to underdevelopment instead seems to have perpetuated it, degrading the core tenets of economic development into a series of rent-seeking behaviors.

16. Another fundamental flaw of the Planner's Approach was the erroneous assumption that a nation's economic development is mechanically achieved by following a predetermined blueprint.  While it is often advisable and advantageous to plan ahead, it is nearly impossible to "plan" an economy to ensure sustainable economic development.  Tribal councils, national legislatures, or federal planners can hardly be expected to correctly select a portfolio of businesses, projects, and activities that will not only survive, but also meet the varied and changing needs of tribal citizens over time.[9]

## B.  Changing Federal Policy

17. Recognizing the need for change and movement away from the Planner's Approach, a series of federal policies in the 1960s began to radically alter the US government's approach to supporting American Indian tribes.  An early marker of this change in federal policy is the *1964 Economic Opportunity Act*, legislation which empowered tribal governments by sending funds directly to tribal coffers, instead of routing them through a federal bureaucracy to determine their intended use.  In the late 1960s, President Johnson underscored his intent to increase tribal self-determination in a special message to the US Congress proposing that the path forward would be one of "a [federal] policy of maximum choice for the American Indian:  a policy expressed in programs of self-help, self-development, and self-determination."[10]

18. The US government has affirmed and furthered the goal of tribal self-determination with a series of laws and proclamations over the following decades.  Examples

---

[9]   For a discussion in the context of Indian Country, see, the Statement of Joseph P. Kalt, Before the United States Senate Committee on Indian Affairs, *Establishing a Tribal Development Corporation,* September 20, 2004, noting that "Economic development is an organic process.  In an environment in which opportunities are subject to the vicissitudes of competition and continually changing marketplace conditions, economic development occurs as the sum of small, adaptive decisions of myriad individuals who by luck or preparation are in the right place at the right time to take advantage of unplanned prospects.  Economic development is much more analogous to tenacious plants looking for places to pop up and take root, than to an engineered system."

[10]   Lyndon B. Johnson, "Special Message to the Congress on the Problems of the American Indian: 'The Forgotten American',"  United States Congress, Washington DC, March 6, 1968 at https://files.eric.ed.gov/fulltext/ED125789.pdf, accessed on December 27, 2018.

include:  President Nixon's 1970 special message to the US Congress expressing the federal interest in tribal self-governance; the *1975 Indian Self-Determination and Education Assistance Act*, which put tribal governments in greater control of federal funds used to provide tribal citizens and their families with basic governmental services; the *1983 Indian Tribal Governmental Tax Status Act,* enacted under President Reagan to grant tribal governments the same status as state governments regarding federal taxation in many circumstances; the *1988 Indian Gaming Regulatory Act* ("IGRA"), allowing tribes to establish gaming enterprises (often pursuant to compacts with state governments); and the *1991 Tribal Self-Governance Demonstration Project Act,* which expanded the control that tribes are able to exercise over federal funds in the provision of a range of tribal governmental services.  Another more recent example can be seen in the *2010 Indian Health Care Improvement Act*, which made permanent previous healthcare-related legislation that had been in place in one form or another since 1976, in an effort to address the "gaping health care disparities" still faced by American Indians and Alaska Natives, when compared to non-tribal populations.[11]  Recent and pending legislation in a number of sectors would continue to extend this federal commitment to greater tribal self-determination and self-government.[12]

19. These actions, and others like them, shifted the US government's approach to the trust obligation from one of federal direction to tribes into one of federal support for tribal governments and tribal initiatives.  With this new approach, tribal economies improved from consistently underperforming in their regions to (in many instances) outperforming neighboring communities.  Beginning with the 1990 Census, tribal economic growth has improved rapidly, and continues to improve across the United States.[13]  Using the additional latitude afforded to them by the US government, tribes are adopting general tenets of effective, long-term

---

[11]   Indian Health Service, "Indian Health Care Improvement Act Made Permanent," March 27, 2010, at https://www.ihs.gov/newsroom/pressreleases/2010pressreleases/indianhealthcareimprovementactmadeper manent/, accessed December 27, 2018.

[12]   For example, the *Indian Trust Asset Reform Act* of 2016 (Public Law 114-178, June 22, 2016, which can also be found at 25 USC §§ 5601-02) reaffirms the "unique Federal responsibility to Indians," and the "duty to promote tribal self-determination regarding governmental authority and economic development."  One of the most recent examples can be found in passage of what is known as the *2018 Farm Bill*, or the *Agriculture Improvement Act of 2018* (the *2018 Farm Bill* is included in *Public Law 115-334*, passed on December 20, 2018 (hereinafter "*2018 Farm Bill*")).  The *2018 Farm Bill* included several provisions for enhanced tribal agricultural and economic development, including at § 10113 the right of tribes to become the "primary regulatory authority over the production of hemp in a State or a territory" and at § 6204 provisions to enhance tribal access to broadband programs, which is important infrastructure for economic development on reservations.

[13]   Jonathan Taylor and Joseph Kalt, *American Indians on Reservations:  A Databook of Socioeconomic Change between the 1990 and 2000 Censuses*, The Harvard Project on American Indian Economic Development, January 2005; Randall Akee and Jonathan Taylor, *Social and Economic Change on American Indian Reservations:  A Databook of the US Censuses and the American Community Survey, 1990-2010*, May 15, 2014, at taylorpolicy.com/us-databook, accessed on December 27, 2018.

economic development and fostering an environment in which both tribal revenue-generating enterprises and individual tribal citizens can prosper.

## C. The Nation Building Approach

20. Tribal governments that are building their communities and growing their economies by taking control of their own decision making are using a "Nation Building" approach. The best examples of the Nation Building approach to tribal governance are all characterized by four key components. These are: capable governing institutions, a cultural match in the form of government in place, a consistent exercise of tribal sovereignty, and strategic leadership.

21. **Capable governing institutions:** The nature of a society's institutions, whether social, cultural, and/or governmental, determines the incentives around productive or unproductive activity. Research by the Harvard Project and the Native Nations Institute at the University of Arizona has consistently found several characteristics that lead to greater tribal economic development. These key attributes are: (i) a rule of law, implying respect for tribal law, as well as legitimate and established channels for dispute resolution; (ii) the separation of politics from day-to-day administration and business affairs, so that enterprises and economic transactions are free from societal politics and power struggles; and (iii) an efficient bureaucracy with clear procedures, good record-keeping, effective administrative processes, reliable computer networks, and so on.[14]

22. **A cultural match:** The social norms and worldview of citizens that interact with a society's institutions are of great significance to tribal economic development.[15] While the importance of local conditions and political willpower in building and promoting effective institutions as part of economic development cannot be ignored, there must first be a cultural match in order to sustain economic development. In this context, a cultural match is the consonance between the structure of a society's formal institutions of governance (and its economic development initiatives) and its underlying norms of political power and authority (i.e., culture). In order to function effectively, a society's institutions and corresponding economic development must be consistent with underlying cultural, political, and organizational norms. Simply put, they must be seen as legitimate in the eyes of the society's citizenry.[16]

---

[14] For further discussion of tribal institutions and administration, see Stephen Cornell and Miriam Jorgensen, "Getting Things Done for the Nation: The Challenge of Tribal Administration," *Rebuilding Native Nations*, Tucson: The University of Arizona Press, 2007 (hereinafter "Getting Things Done").

[15] Miriam Jorgensen, *Bringing the Background Forward: Evidence from Indian Country on the Social and Cultural Determinants of Economic Development*, Doctoral Dissertation, May 2000, at page 129.

[16] For further discussion of the importance of a cultural match to tribal institutions, see Manley Begay, Stephen Cornell, Miriam Jorgensen, and Joseph Kalt, "Development, Governance, Culture: What Are They and

23. **The exercise of sovereignty:**   Self-determination is a key issue within Indian Country and is vital to sustainable economic development.   There are four issues connecting sovereignty and self-determination to economic and community development within Indian Country.   They are:  (i) existing institutions designed without a close match to the unique economic needs of native nations are impractical (and perhaps impossible) to change without self-determination and an exercise of sovereignty; (ii) it is unquestionably difficult to get a local community involved and interested in the payoff from tribal economic investments absent a strong sense of ownership; (iii)  accountability, which is linked closely to the concept of ownership, is critical, as those making the investments and program decisions need to be held accountable for how all federal (and tribal) resources are used; and (iv) leadership matters in all political settings, including tribal.[17]

24. **Strategic leadership:**   There are an increasing number of astute, capable, and highly experienced leaders emerging within Indian Country.   This is demonstrated by tribes (and tribal leadership) taking charge of issues irrespective of federal support.   A key quality of the most effective tribal leadership is the ability to strategically look to the long-term.   Leaders help their native nations the most when they "move away from a firefighting, band-aids, and factional conflict approach to governance, focusing their energies less on crisis management and more on developing sustainable solutions to problems."[18]   Elected leadership that is able to do this directs a tribe toward the kind of society that should be built in the community, and is able to make the decisions necessary to reach that objective, even if such decisions do not serve any given politician in the short term.[19]

---

What Do They Have to Do with Rebuilding Native Nations," *Rebuilding Native Nations*, Tucson: The University of Arizona Press, 2007.

[17]   For further discussion of the Nation Building approach and tribal sovereignty, see Stephen Cornell and Joseph Kalt, "Two approaches to the Development of Native Nations:  One Works, the Other Doesn't," *Rebuilding Native Nations*, Tucson: The University of Arizona Press, 2007.

[18]   Stephen Cornell, Miriam Jorgensen, Joseph Kalt, and Katherine Spilde, "Seizing the Future:  Why Some Native Nations Do and Others Don't," *Joint Occasional Papers on Native Affairs*, Harvard Project on American Economic Development, October 2003, at page 4.

[19]   In a Senate hearing in 2006, Dr. Miriam Jorgensen spoke of at least three related outcomes derived from tribal control of economic development efforts (see the record of the oral hearing at https://www.gpo.gov/fdsys/pkg/CHRG-109shrg27563/html/CHRG-109shrg27563.htm, accessed on December 27, 2018).  These outcomes are ownership, accountability, and leadership development.  An increased sense of ownership in this context leads to accountability, which is critical because in a model where the federal government makes decisions for tribes, "program managers are accountable to Washington and not to tribal citizens ... but under ... manifestations of self-determination and sovereignty, tribal government program managers become accountable to tribal citizens for how resources [including] a tribal government's own resources, are used."  It should not be surprising that tribal accountability for programs administered by tribes themselves leads to improved program outcomes in sectors ranging from forestry management to health care.  Dr. Jorgensen went on to describe what she termed the "largely unsung payoff to self-determination," which is the development of better tribal leadership.  Better tribal leadership can only be achieved when tribal leaders are empowered to practice the act of governance, and better "leadership

25. After years of research, it has become clear that tribes must have autonomy in order to foster institutions that are a cultural match for their societies. Successful tribal governments are characterized by effective institutions paired with a cultural match. This is why a Nation Building approach, acting upon policies of sovereignty and self-determination,[20] has been the only strategy that has shown any prospect of breaking the patterns of poverty and dependence that became so familiar on reservations from the late 1800s until at least the 1990s.[21] It is only logical that self-rule is required for a culture to put in place institutions that are a cultural match. Aggressive assertions of sovereignty resulting in culturally synchronous self-governed institutions are the uniform qualities marking successful economic development in Indian Country. It has repeatedly been shown that when a tribe takes control of its institutions and runs them in congruence with its own cultural norms, the result is a set of economic, social, and political systems that work for its citizens.[22] Continued dependence on the federal government for grants and guidance removes accountability for tribal leadership and undermines the processes necessary for stable and lasting economic development.[23] The negative results of such dependence should not be surprising.

---

skills result in more effective bureaucracy, creative programming, new economic opportunities, and even the expanded use of self-governance, so you get a virtuous cycle of economic growth and community change going in these communities." For additional discussion of the role of tribal leaders, see Manley Begay, Stephen Cornell, Miriam Jorgensen, and Nathan Pryor, "Rebuilding Native Nations: What Do Leaders Do?," *Rebuilding Native Nations*, Tucson: The University of Arizona Press, 2007.

[20] Tribal sovereignty is key: "Even so, for modern Indian nations engaged in the process of nation building, tribal sovereignty is the most critical legal instrument required to achieve self-determination. Tribal sovereignty allows Indian nations to make their own decisions, free from the interference of federal, state, and local government entities. Absent tribal sovereignty, there would be no Indian nationhood, no ability of Indians to create and maintain their own governance structures, economies, and local laws." (Matthew Fletcher, *Federal Indian Law,* West Academic Publishing, 2016 at pages 237-238.) The United Nations Declaration on the Rights of Indigenous Peoples, signed in 2010 by President Barack Obama, also acknowledged that "strengthening the political, cultural, and economic independence of native communities is beneficial both for these communities and for the nation states in which they live." (Stephen L. Pevar, *The Rights of Indians and Tribes*, Oxford University Press, 2012 at page 82.)

[21] For more information on the Nation Building approach, see: The Harvard Project on American Indian Economic Development, *The State of the Native Nations: Conditions Under US Policies of Self-Determination*, New York: Oxford University Press, 2008 (hereinafter "The State of the Native Nations"), starting at page 26.

[22] Stephen Cornell and Joseph P. Kalt, "Reloading the Dice: Improving the Chances for Economic Development on American Indian Reservations," *Joint Occasional Papers on Native Affairs*, No. 2003-02, 2003.

[23] While dependence on the federal government has been proven to be counterproductive to lasting tribal economic development, properly placed investment in tribes by the federal government, in line with the Nation Building approach, can have beneficial effects for tribes. However, a recent report by the US Commission on Civil rights found that this kind of productive investment is severely lacking in Indian Country and falls short of the trust responsibility owed by the US government to tribes (US Commission on

26. Despite a movement toward policies of self-determination and tribal sovereignty (i.e., Nation Building), dire socioeconomic conditions still pervade Indian Country. Half of tribal citizens living on or near reservations were unemployed as of 2013,[24] which was nearly seven-fold the national unemployment rate at the time, and is more than ten-fold the current national unemployment rate of 3.9%.[25] Poverty rates have also been persistently and disproportionately high for Native Americans, frequently calculated at more than double the rate for non-tribal citizens. Between 2006 and 2010, the poverty rate for Native Americans was 32%, compared to 14% for non-natives.[26] Along similar lines, American Indians also suffer from a lack of basic infrastructure and substandard housing. As reported by the US Department of Treasury in 2001, nearly one third of Native Americans had to travel over 30 miles to find an ATM or bank, and more than two-thirds of reservation roads were in need of improvement.[27] Additionally, over one-third of Indian homes lacked adequate water as of 2008.[28] Facing such persistent negative conditions, it is not surprising that tribes would consider enterprise development as a means to address their socioeconomic challenges.

## III. TRIBAL GAMING AND ONLINE LENDING

### A.  The Indian Gaming Regulatory Act

27. The current dispute is but one example in a long line of proceedings pitting tribal business interests against non-tribal jurisdictions. Many of the most well-known of these cases have to do with Indian commerce in tobacco sales. A common theme across these disputes is that non-tribal authorities' actions attempt to undercut the tribes' efforts to operate the business enterprise(s) in question or to benefit from inherent advantages (such as the ability to tax or not tax tribal commerce) that

---

Civil Rights, *Broken Promises:  Continuing Federal Funding Shortfall for Native Americans*, December 2018 (hereinafter "*Broken Promises 2018*")).

[24]  Robert Miller, "Sovereign Resilience:  Reviving Private Sector Economic Institutions in Indian Country," *BYU Law Review 2018*, Issue 6, August 2018 (hereinafter "Miller 2018") at page 4.  Miller also notes that other studies and tribes have reported unemployment rates as high as 90% on some reservations.

[25]  Bureau of Labor Statistics, Labor Force Statistics from the Current Population Survey, Unemployment Rates, 2008-2018, at https://data.bls.gov/timeseries/LNS14000000, accessed on December 27, 2018.

[26]  Miriam Jorgensen, *Access to Capital and Credit in Native Communities*, Native Nations Institute, 2016 at page 4.

[27]  Miller 2018 at page 6.  In addition to having to travel long distances to reach a bank, Native Americans are also frequently foreclosed from many of the services banks provide, such as obtaining loans or borrowing against home equity, due to factors such as the "near absence of mortgage home ownership in Indian Country."  (Robert Miller, "Creating Economic Development on Indian Reservations", PERC, Volume 30, No. 2, Fall 2012, at https://www.perc.org/2012/09/14/creating-economic-development-on-indian-reservations/, accessed on December 27, 2018.)

[28]  Miller 2018 at page 6.

should be enjoyed by the tribes.  Examples include *Moe v. Confederated Salish and Kootenai Tribes of the Flathead Reservation* (taxation questions where a tribal citizen was selling tobacco products without a Montana license), *Washington v. Confederated Tribes of the Colville Reservation* (taxation questions where tribes were selling tobacco products), *Department of Taxation and Finance of New York v. Milhelm Attea & Bros., Inc.* (questions of state authority over cigarettes, taxation, and retail sales), and *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma* (taxation questions regarding retail cigarette sales at a tribal convenience store).[29]

28. A prominent case dealing with tribal gaming is known as *California v. Cabazon Band of Indians* and was decided in 1987.[30]  The dispute had to do with tribal bingo parlors and card clubs in California, which were open to the public and frequented by non-Indians.  The state sought to apply its regulations governing the operation of bingo games and the county sought to apply its local ordinance regulating bingo, as well its ordinance effectively prohibiting the card games that were being conducted by the Band.  The Court found it important that tribes were creating new services and opportunities tied to gaming enterprises, stating that the tribes were "generating value on the reservations through activities in which they have a substantial interest."[31]  The decision was in-line with extant federal and tribal interests in tribal self-sufficiency being bolstered by gaming.[32]  The US government further strengthened its interest in tribal gaming as a means of supporting tribal self-

---

[29]    I offer no legal opinion here or elsewhere in this report.  I provide these examples as context for the discussion that follows.  For a brief synopsis of these cases, see David Getches, Charles Wilkinson, Robert Williams, Matthew Fletcher, and Kirsten Carpenter, *Cases and Materials on Federal Indian Law 7th Edition*, West Academic Publishing, Minnesota, 2017 at pages 666-672.

[30]    *California v. Cabazon Band of Indians*, 480 US 202 (1987), referred to hereinafter as "Cabazon."

[31]    See e.g., Cabazon at page 220.  See also, Eric Henson and Luxman Nathan, "The Political Economy of Indian Gaming: The New England Experience," *Federal Reserve Bank of Boston*, Winter 2000 and Steven Light, "The Cabazon Decision: Opening the Door to Indian Gaming – 20 Years Later," *Indian Gaming*, April 2007.

[32]    Cabazon recognized the importance of gaming to both tribal and federal interests.  The Court held that "State jurisdiction is pre-empted if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority.  The federal interests in Indian self-government, including the goal of encouraging tribal self-sufficiency and economic development, are important, and federal agencies, acting under federal laws, have sought to implement them by promoting and overseeing tribal bingo and gambling enterprises.  Such policies and actions are of particular relevance in this case, since the tribal games provide the sole source of revenues for the operation of the tribal governments, and are the major sources of employment for tribal members.  To the extent that the State seeks to prevent all bingo games on tribal lands while permitting regulated off-reservation games, the asserted state interest in preventing the infiltration of the tribal games by organized crime is irrelevant, and the state and county laws are preempted.  Even to the extent that the State and county seek to regulate short of prohibition, the laws are preempted, since the asserted state interest is not sufficient to escape the preemptive force of the federal and tribal interests apparent in this case."  (Cabazon at page 203.)

governance the year following *Cabazon* with passage of the *Indian Gaming Regulatory Act* ("IGRA").[33]

29. In the aftermath of *Cabazon* and the passage of IGRA, the US Senate recognized that tribal gaming revenues would be akin to those derived by states and their gaming activities (such as lotteries).[34]  The US government further recognized that tribal gaming revenues would be critical for the provision of fundamental governmental services such as health care and youth services.[35]  IGRA specifically provided oversight mechanisms such as the creation of the National Indian Gaming Commission ("NIGC") and required that tribes use their gaming profits for governmental purposes.  This is a critical distinction between commercial gaming operations (which can disburse any profits to owners/shareholders) and tribal gaming operations (which are earmarked for the public good).  From the outset, Indian gaming was established to address longstanding socioeconomic shortfalls by allowing tribal governments to potentially develop profitable enterprises, while simultaneously requiring that any profits thus derived be used for the good of tribal communities.[36]

30. As is well known, what had previously been a relatively minor sector in tribal economies was now primed to grow, and for a limited number of tribes, to grow substantially.  However, gaming was not the first or only industry in which tribes participated, and governmental involvement in business ventures is not unique to Indian nations.  State governments, local governments, and the federal government all operate revenue-generating enterprises.  The federal government operates the US Postal Service and gift shops in national parks.  Many states participate in lotteries and/or sell alcoholic beverages, and others are home to state-owned corporations.[37]  These enterprises serve the governed and the revenues they derive

---

[33]   IGRA (*Indian Gaming Regulatory Act*, Public Law 100-497, October 17, 1988) specifically declares its purpose to be "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."

[34]   Senate Report No. 100-446 on the Indian Gaming Regulatory Act, to accompany S. 555, August 3, 1988 (hereinafter "Senate Report 100-446), at pages 3072 and 3105.

[35]   Senate Report 100-446 at page 3072.

[36]   House of Representatives Debate on S. 555, September 26, 1988 at page 25379; Katherine Spilde and Jonathan Taylor, "Economic Evidence on the Effects of the Indian Gaming Regulatory Act on Indians and Non-Indians," *UNLV Gaming Research & Review Journal*, 2013, Volume 17, Issue 1 (hereinafter "Spilde and Taylor 2013").

[37]   More than 40 states operate lotteries (National Conference of State Legislatures, "Keeping State Lottery Revenue Alive," at http://www.ncsl.org/research/fiscal-policy/keeping-state-lottery-revenue-alive.aspx, accessed on December 27, 2018).  Nearly 20 states sell alcoholic beverages (Alcohol and Tobacco Tax and Trade Bureau, "Alcohol Beverage Authorities in United States, Canada, and Puerto Rico," at https://www.ttb.gov/wine/state-ABC.shtml#US, accessed on December 27, 2018).  In fiscal year 2017, Virginia reported over $900 million in gross sales from its state-operated Alcoholic Beverage Control stores (Virginia Department of Alcoholic Beverage Control, *Annual Report 2017*, at page 2) and nearly $2 billion in sales from its lottery, with the over $550 million in net proceeds allocated toward supporting local public

typically cover some or all of the costs of the services in question.  In the case of governmental enterprises such as lotteries, these state-administered business ventures typically cover the costs of the games plus a range of other governmental programs as well.  For example, Virginia's lottery notes that "since 1999, 100% of the Lottery's profits support Virginia public education, K-12."[38]  The Virginia lottery is required to transfer all of its net income to the Commonwealth of Virginia, where the net proceeds enter the Lottery Proceeds Fund and are "constitutionally mandated to support local public education."[39]  Tribes operate their enterprises with similar ends in mind.

31. Tribal gaming has played a particularly important role in funding the activities and services that allow a number of Indian tribes to self-govern.  The NIGC reported gross gaming revenues of $32.4 billion from tribal enterprises in 2017, which have been growing at an average of about 3% each year since 2010.[40]  The total Indian gaming revenues reported in 2017 consist of revenues from 492 gaming establishments operated by 246 gaming tribes in 29 different states.[41]  In 2016, tribal gaming represented over 44% of the commercial gaming revenues in the United

---

education (*2017 Virginia Lottery Annual Financial Report* at page 3 (hereinafter "*2017 VA Lottery Report*")).  Other examples range from alcohol sales in New Hampshire, to farming operations in North Dakota, to multi-state electrification services.  In fiscal year 2017, the State of New Hampshire generated $136 million in net revenue from sales of liquor and wine at State operated liquor stores (Charles Arlinghaus, et al., *State of New Hampshire Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 2017*, June 30, 2017 at page 43).  The North Dakota Mill and Elevator Association is a state-owned corporation that provides over half of its profits to the North Dakota State General Fund (North Dakota Mill, "About Us," at https://www.ndmill.com/index.cfm/about/about-us/, accessed on December 27, 2018), and the Tennessee Valley Authority is a governmental/corporate agency that provides electricity to seven states and reinvests its revenues in operations and local economic development (Tennessee Valley Authority, "About TVA," at https://www.tva.com/About-TVA, accessed on December 27, 2018).

[38]  The Official Site of The Commonwealth of Virginia, "Virginia Lottery," at https://www.virginia.gov/agencies/virginia-lottery/, accessed on December 26, 2018.

[39]  *2017 VA Lottery Report* at page 3.

[40]  National Indian Gaming Commission, Growth in Indian Gaming, "Growth in Indian Gaming Graph 2008-2017," at https://www.nigc.gov/images/uploads/reports/Graph2017GrossGamingRevenueTrends.pdf, accessed on December 27, 2018.  This has been a significant slowdown from the average annual growth rate of over 9% from 2000 to 2010 (see National Indian Gaming Commission, Growth in Indian Gaming, "Growth in Indian Gaming Graph 1999-2009," at https://www.nigc.gov/images/uploads/reports/2009%20Growth%20in%20Indian%20Gaming.pdf, accessed on December 27, 2018 and National Indian Gaming Commission, Growth in Indian Gaming, "Growth in Indian Gaming Graph 2001-2010," at https://www.nigc.gov/images/uploads/reports/2010GamingRevenuesChartswebversion3 charts2%201.pdf, accessed on December 27, 2018).

[41]  National Indian Gaming Commission, "Media Advisory:  Press Conference:  Chairman Chaudhuri and Commission to Announce Indian Gaming's 2017 Gross Gaming Revenues," June 5, 2018, at https://www.nigc.gov/images/uploads/2018-06-04_Media%20Advisory-2017GGRpressconferenceFINAL .pdf, accessed on December 27, 2018.

States.[42]  As required by IGRA, Indian gaming profits have to be invested in tribal governmental operations, funding items such as social services, healthcare, cultural initiatives, and environmental programs.[43]

32. As discussed above, federal actions and legislation such as IGRA and the *1975 Indian Self-Determination and Education Assistance Act* shifted the United States' approach to the trust obligation from one where the federal government treated Indians as passive wards into one where the US supports tribal governments and tribal initiatives.  This approach has brought marked improvement in many tribal economies.  Since the 1990 Census, tribal economic growth has improved rapidly, and continues to improve across the United States.[44]  As tribal economies continue to develop, the US government has continued to encourage tribal governments to expand their roles in providing for their citizens/members.

33. Neighboring jurisdictions benefit from tribal enterprises and tribal investments in infrastructure and services upon which tribal enterprises are built.  Tribal business ventures typically source supplies (e.g., these range from electric power to vehicles) from outside tribal lands.  In doing so, tribal purchases create employment, reduce the use of public assistance required for the poor and unemployed, and generate income and taxes for nearby state and local governments.  In addition, the employees of tribal enterprises, many of whom are not tribal citizens, spend the bulk of their incomes in non-tribal communities where their transactions are taxed by non-tribal taxing authorities.

34. This holds true for tribal gaming.  In fact, peer-reviewed research on the spillover effects of Indian gaming repeatedly finds that:  "In addition to direct fund transfers [under IGRA compact payments in lieu of taxes], nearby off-reservation communities also benefit from Indian gaming's economic spillovers."[45]  These benefits arise because, among other factors:  (i) "Indian gaming attracts customers from further away than more competitively distributed amenities, making Indian gaming facilities net contributors to the local or regional economies";[46] (ii) Indian gaming by its very nature occurs in tribal areas where unemployment and the use

[42]  American Gaming Association, "State of the States:  The AGA Survey of the Casino Industry," 2017, at page 6.

[43]  Spilde and Taylor 2013 at page 15.

[44]  Jonathan Taylor and Joseph Kalt, *American Indians on Reservations:  A Databook of Socioeconomic Change between the 1990 and 2000 Censuses*, The Harvard Project on American Indian Economic Development, January 2005; Randall Akee and Jonathan Taylor, *Social and Economic Change on American Indian Reservations:  A Databook of the US Censuses and the American Community Survey, 1990-2010*, May 15, 2014, at taylorpolicy.com/us-databook, accessed on December 27, 2018.

[45]  Randall Akee, Katherine Spilde, and Jonathan Taylor, "The Indian Gaming Regulatory Act and its Effects on American Indian Economic Development," *Journal of Economic Perspectives*, Summer 2015 (hereinafter "Akee, Spilde, and Taylor") at page 201.

[46]  Akee, Spilde, and Taylor at page 201.

of social services (including state-provided social services) otherwise tend to be higher than average and incomes tend to be lower than average; (iii) the economic growth represented by Indian gaming is seen in statistics reflecting declining poverty[47] which tends to reduce citizen's reliance on social services;[48] and (iv) as tribal enterprise workers earn and spend their incomes throughout the region and as tribal enterprises source services and supplies from the regional economy, so-called multiplier effects create further employment and income, and income and sales taxes are collected by non-tribal governments.[49]

## B. The Consumer Financial Protection Act Contemplates Tribal Involvement in Consumer Financial Products and Services

35. Indian gaming and tribal online lending are two business activities that hold certain parallels, the most obvious of which is the heavily regulated nature of both industries. In addition to being cast in the role of enterprise operator, tribes that engage in gaming or online lending find themselves in the additional position of serving as regulator/co-regulator of the industry.[50] Over the past decade, as federal regulation of personal consumer finance ramped up, tribes engaged in gaming were often well positioned to enter the emerging niche of online lending.[51]

---

[47]   Akee, Spilde, and Taylor at Table 1 and page 198.

[48]   Matthew Fletcher, "In Pursuit of Tribal Economic Development as a Substitute for Reservation Tax Revenue," *North Dakota Law Review*, 2004 (hereinafter "Fletcher 2004") at page 781.

[49]   Tadayuki Hara, *Quantitative Tourism Industry Analysis*, Elsevier Inc., Oxford, 2008, at sections 3.5.1.3-3.5.1.4 and 6.1.2.

[50]   Tribes in these business sectors play a regulatory/co-regulatory role. That is, in the gaming industry, tribes work with the federal government and the National Indian Gaming Commission. In the online lending industry, tribes are in a position to work with the federal government alongside the Consumer Financial Protection Bureau.

[51]   Lack of prior managerial expertise, operational know-how, and technical capabilities on the part of tribes initially characterized the early Indian gaming experience, much as they came to characterize initial efforts of tribes entering the online lending business. Capital constraints presented another hurdle to tribes embarking on large-scale gaming endeavors, and such constraints remain for poor tribes that were/are in the early stages of online personal consumer finance (see e.g., Gavin Clarkson, Katherine Spilde, and Carma Claw, "Online Sovereignty: The Law and Economics of Tribal Electronic Commerce," *Vanderbilt Journal of Entertainment & Technology Law*, Fall 2016, Volume 19, Number 1 (hereinafter "Clarkson, Spilde, and Claw 2016) at pages 17-18; Katherine Spilde, "E-Commerce Opportunities for Tribal Governments," *Indian Gaming*, October 2012 at page 53; and Fletcher 2004 at page 793). In order to overcome these barriers, tribes have "had to look outside the tribe for management or technical expertise. Such partnering is common for tribal entities entering a new industry and it has succeeded in the past…" (Clarkson, Spilde, and Claw 2016 at page 18). In the case at hand, the Tribe gained exposure to a loan management software program (see Dowd Deposition at pages 61-65), credit modeling data and risk assessment strategies (see Martorello Deposition at pages 141-142; Hazen Deposition at page 65), data analytics, and marketing strategies (see Hazen Deposition at pages 63-67) through their relationships with outside service providers that were at one time associated with Mr. Martorello (Affidavit of Michelle Hazen, September 28, 2017 ("Hazen Affidavit") at ¶¶ 10-13). A Harvard study finds that "policy toward Indian enterprises ought to mimic venture capital models in at least one way – the combination of financial investment with knowledge transfer. Nonetheless,

36. Following the financial collapse of 2008 and 2009, the US Congress moved swiftly to enact provisions that were intended to protect consumers from a range of potential financial pitfalls.   Part of this body of legislation is known as the *Consumer Financial Protection Act* ("CFPA") of 2010.   The primary purpose of the CFPA was to establish the Consumer Financial Protection Bureau ("CFPB"). Of relevance to this dispute, the language of the CFPA treats tribes as states:  "The term 'State' means any State, territory, or possession of the United States … or any federally recognized Indian tribe, as defined by the Secretary of the Interior under section 479a-1(a) of title 25."[52]   It is clear that tribes were cast in the position of those who regulate the types of financial activities of interest in this dispute.   The language of the legislation does not appear to put states in the position of regulating tribal financial institutions, as tribes are considered to be the equivalent of the states themselves in the plain language of the legislation.[53]

37. The mandate for CFPB is to "regulate[] the offering and provision of consumer financial products or services under the federal consumer financial laws and [to] empower[] consumers to make better informed financial decisions."[54]   The CFPB further purports to recognize that protecting consumers nationwide includes "paying particular attention to the needs and concerns of Indian Country."[55]  To this end, the CFPB ostensibly recognizes that it must respect the unique relationship between the federal government and tribes.   The CFPB website provides links to an Exam Manual and Supervisory Highlights as "resources which Tribal Regulatory Authorities should find useful as they supervise companies that provide consumer financial products or services."[56]   While the CFPB acknowledges the importance of recognizing the needs and concerns of Indian Country, some of its early actions (i.e., from near the time of its inception) have been counter to this stated interest in deference to federal policies of tribal sovereignty and self-determination.

---

if we take federal 'aid capital' as given, the survey data indicate that, to ensure a good return on investment, tribal enterprises also must have adequate access to technical and managerial skill development resources." (See Miriam Jorgensen and Jonathan Taylor, "What Determines Indian Economic Success?  Evidence from Tribal and Individual Indian Enterprises," Joint Occasional Papers on Native Affairs, Harvard Project on American Economic Development, June 2000 at pages 11-12.)

[52]   12 USC § 5481(27).

[53]   I do not intend to offer legal opinion here, or at any point in my work on this matter.

[54]   Consumer Financial Protection Bureau, "About us," at https://www.consumerfinance.gov/about-us/, accessed on December 28, 2018.

[55]   Consumer Financial Protection Bureau, "Working with tribal governments," at https://www.consumerfinance.gov/tribal/, accessed on December 28, 2018.

[56]   Consumer Financial Protection Bureau, "Working with tribal governments," at https://www.consumerfinance.gov/tribal/, accessed on December 28, 2018; Consumer Financial Protection Bureau, "Consumer Financial Bureau Policy for Consultation with Tribal Governments," April 2013, at https://files.consumerfinance.gov/f/201304_cfpb_consultations.pdf, accessed on December 28, 2018.

## C.  The Native American Financial Services Association

38. Formed in 2012, the Native American Financial Services Association ("NAFSA") is a trade association "that advocates for tribal sovereignty, promotes responsible financial services, and provides better economic opportunity in Indian Country for the benefit of tribal communities."[57]  NAFSA engages in a number of activities that are similar to many trade groups, such as sharing resources, creating best practices and by-laws, and educating Indian Country about available growth opportunities in the financial services industry.[58]  The organization maintains comprehensive best practices that its member tribes must adhere to, and strict criteria for membership. Membership is limited to those who commit themselves to compliance with NAFSA's mission, vision, and best practices, such as the offering of financial products authorized under tribal law and compliant with federal consumer protection laws,[59] and the Board of Directors is drawn entirely from the ranks of NAFSA's tribal members.[60]

39. A key issue facing tribes around the time of the founding of NAFSA was a series of early regulatory actions by the CFPB against tribal entities engaged in online lending.  The CFPB brought several tribes and their service providers under Civil Investigatory Demands without consulting the tribes, effectively abandoning the co-regulatory structure set out in the CFPA and disregarding tribal sovereignty and a federal mandate requiring government-to-government consultation between federal authorities and tribes.[61]  NAFSA has opposed CFPB regulatory actions

---

[57]   Native American Financial Services Association, "NAFSA Mission and Vision," at https://nativefinance.org/our-mission-and-vision/, accessed on December 28, 2018.

[58]   Native American Financial Services Association, "NAFSA Fact Sheet," at https://nativefinance.org/nafsa-fact-sheet/, accessed on December 28, 2018.

[59]   Native American Financial Services Association, "Become a Member of NAFSA," at https://nativefinance.org/join-nafsa/, accessed on December 28, 2018; Native American Financial Services, "Best Practices," at https://nativefinance.org/best-practices/, accessed on December 28, 2018.  Several years ago, the National Congress of American Indians ("NCAI") passed a resolution supporting "member tribes offering online short term consumer financial products and services, which are authorized under tribal law, consistent with federal consumer protection laws as well as relevant Congressional directives."  (National Congress of American Indians, Resolution #TUL-13-056, 2013.)

[60]   Native American Financial Services Association, "NAFSA Board of Directors," at https://nativefinance.org/nafsa-board-of-directors/, accessed on December 28, 2018.

[61]   Native News Online, "NAFSA to Congress: CFPB Targets and Actively Dismisses Tribal Sovereignty," October 4, 2017, at https://nativenewsonline.net/currents/nafsa-congress-cfpb-targets-actively-dismisses-tribal-sovereignty/, accessed on December 28, 2018.

against tribal lending entities and efforts to treat tribes as commercial enterprises rather than sovereign entities themselves.[62]

40. There are a number of tribes that have been active in the online lending industry in the last several years.  These tribes often exhibit some of the marketplace characteristics faced by LVD.  For example, the Lac Courte Oreilles Band of Lake Superior Chippewa Tribe is located 150 miles from Minneapolis and approximately 330 miles from Milwaukee.  The Tribe operates an online lending business called Blue Trust Loans.[63]  The Rosebud Sioux Tribe, located over 220 miles from Sioux Falls in South Dakota, operates online lending businesses known as Zoca Loans and Q Credit.[64]

41. In the case of the Habematolel Pomo,[65] ecommerce in personal consumer finance was attractive not only because of the small and rural location of its land base (approximately 120-140 miles away from Sacramento and San Francisco on a small parcel of land of only 119 acres),[66] but also because of the relatively quick revenue generation associated with online lending.[67]  The Tribe opened a casino in 2012

---

[62]  Native News Online, "NAFSA Submits Amicus Brief in Key Tribal Lending Case in Federal Court," November 8, 2017, at https://nativenewsonline.net/currents/nafsa-submits-amicus-brief-key-tribal-lending-case-federal-court/, accessed on December 28, 2018.

[63]  Blue Trust Loans website, at https://www.bluetrustloans.com/index.aspx, accessed on December 27, 2018. In 2017, per-capita income on the Lac Court Oreilles Reservation and Off-Reservation trust land was approximately half of the national average at $16,888.  The Tribe also experienced relatively high rates of unemployment (18.4% compared to the 6.6% national average) and family poverty (30.1% compared to the 10.5% national average) over the same time period (US Census Bureau, 2013-2017 American Community Survey 5-Year Estimates, "Selected Economic Characteristics" (hereinafter "ACS Estimates 2013-2017")).

[64]  Zoca Loans website, at https://www.zocaloans.com/en/, accessed on December 27, 2018, and Q Credit website, at http://www.qcredit.com/, accessed on December 27, 2018.  Per-capita income on the Rosebud Indian Reservation and Off-reservation trust land in 2017 was $11,124, only 36% of the national average. Additionally, over half of all people on the Reservation were living below the poverty line in 2017 (ACS Estimates 2013-2017).

[65]  The Tribe runs online lending operations known as Silver Cloud Financial, Golden Valley Lending, Majestic Lake Financial, and Mountain Summit Financial (Silver Cloud Financial website, at https://www.silvercloudfinancial.com/, accessed on December 27, 2018; Golden Valley Lending website, at https://www.goldenvalleylending.com/, accessed on December 27, 2018; Majestic Lake Financial website, at https://www.majesticlakefinancial.com/, accessed on December 27, 2018; and Mountain Summit Financial website, at https://www.mountainsummitfinancial.com/, accessed on December 27, 2018).

[66]  San Diego State University, "California Indians and Their Reservations: An Online Dictionary," at http://libguides.sdsu.edu/c.php?g=494769&p=3390037, accessed on December 27, 2018.  According to the Habematolel Pomo, the Tribe currently holds "just over 11 acres of trust lands in a remote part of California," (see Consumer Financial Protection Bureau v. Golden Valley Lending, Inc., Silver Cloud Financial, Inc., Mountain Summit Financial, Inc., and Majestic Lake Financial, Inc., *Amended Memorandum in Support of Defendants' Motion to Dismiss,* United States District Court for the District of Kansas, filed October 10, 2017 at page 6).

[67]  Per-capita income of $18,293 on the Tribe's Upper Lake Rancheria lagged behind the United States in 2017, at approximately 59% of the national average, and the unemployment rate was 10.7% for the same time period (ACS Estimates 2013-2017).  Note that due to small sample sizes, demographic measures on some

after a long bureaucratic process, and the facility was not yet profitable by 2014.[68] In contrast, the Tribe's online lending businesses started operating at approximately the same time, and were funding 100% of the (non-federal) tribal governmental budget by 2015.[69]

## IV. INCENTIVES FOR TRIBES TO GENERATE REVENUE

### A.  Tribal Circumstances Lend Themselves to Online Businesses

42. LVD is located far from urban centers, with its headquarters in Watersmeet, Michigan.  Watersmeet is approximately 280 miles from both Minneapolis and Milwaukee (Figure 1 shows a map of the area surrounding LVD's Reservation). The nearest employment opportunities outside of tribal enterprises are often found thirty to fifty miles away.[70]  Many remote locations such as LVD's tribal headquarters have infrastructure shortfalls that are known to undermine a wide range of economic development efforts.  For example, NCAI reported in 2017 that 14.2% of tribal households did not have access to basic electricity services, and 41% of tribal lands do not have access to broadband internet.[71]  As a result, businesses frequently choose not to establish operations on Indian reservations due to the lack of infrastructure, and tribal governments are then unable to improve the infrastructure available due to a lack of on-reservation business and investment.[72] Remote locations, coupled with a lack of the kinds of infrastructure that many modern businesses would take for granted, lend themselves to tribes having a great interest in considering a range of online businesses.[73]

---

tribal lands, in particular Alaskan villages and California Rancherias, are not reported.  For example, family poverty is listed as zero for the Upper Lake Rancheria as of 2017.

[68]   Clarkson, Spilde, and Claw 2016 at page 22.

[69]   Clarkson, Spilde, and Claw 2016 at page 23.

[70]   Clarkson, Spilde, and Claw 2016 at page 19.  Prior to construction of the Tribe's new health clinic, tribal members had to travel 75 to 100 miles to receive health services (James Williams Deposition at page 201). In addition to being remote, the Tribe faces dire socioeconomic conditions.  Per-capita income on the LVD Reservation was a mere $8,673 in 2017, only 28% of the national average.  Additionally, 40% of all families and nearly half of all people on the Reservation were living below the poverty line in 2017.  These outcomes are exacerbated by the fact that only 14.1% of the population 25 years and older have Bachelor's degrees or higher (ACS Estimates 2013-2017; US Census Bureau, American Community Survey 5-Year Estimates 2013-2017, "Educational Attainment").

[71]   National Congress of American Indians, *Tribal Infrastructure: Investing in Indian Country for a Stronger America*, 2017 at pages 10 and 22.  Note that these statistics are not drawn solely from tribal lands located far from urban centers.

[72]   Clarkson, Spilde, and Claw 2016 at page 5.

[73]   Katherine Spilde, "E-Commerce Opportunities for Tribal Governments," *Indian Gaming*, October 2012 at page 52.  As this and other litigation has illustrated, significant portions of some tribal budgets have been derived from online lending over the past several years.  Clarkson, Spilde, and Claw 2016 (at page 20) report

43. In addition, a number of tribes have very small land bases, limiting the potential for economic development in a range of industries requiring large footprints and associated physical infrastructure. For example, several Rancherias in California (such as Barry Creek and Big Valley) contain far less than a single square mile of landholding. Likewise, some non-California reservations are also surprisingly small (the Flandreau Reservation in South Dakota is less than four square miles and the Grand Traverse Reservation in Michigan is less than two square miles).[74]

44. Regardless of the surface land available, many economic development initiatives on tribal lands are stymied by the fact that the land is often held in trust by the federal government for the benefit of the tribes. I have testified on this in the US Congress, and a number of researchers point to a range of ways in which land status undercuts tribal economic development. Examples include hurdles Indians face when trying to secure loans,[75] multiple overlapping authorizations being needed for certain developments, arbitrary limits to the time frames over which leases can run,[76] and the trust status of tribal lands, which renders many tribal landholdings unavailable for taxation.[77]

45. Even for tribes that choose to enter the gaming industry, there is no guarantee of profits. Tribes that do succeed at gaming must first have sufficient land upon which to build facilities, and critically, need to be located near urban centers from which to draw substantial numbers of customers. In addition, there are increasing numbers of non-tribal gaming facilities entering the marketplace. According to the NIGC, in recent years approximately 40% of Indian gaming establishments reported annual gross revenues of $10 million or less, and about 21% of Indian

---

that the Otoe-Missouria tribe in Oklahoma funded 40% of its tribal budget through tribal lending entities in 2015.

[74] US Census Bureau, 2010 Census American Indian and Alaska Native Summary File, "Geographic Identifiers."

[75] The trust status of many tribal land parcels renders the acreage ineligible for use as collateral, foreclosing tribes from leveraging one of their most valuable resources to access global capital markets. For further discussion, see Robert Miller, *Reservation "Capitalism": Economic Development in Indian Country*, University of Nebraska Press, Lincoln, Nebraska, 2012 at page 94, and The State of the Native Nations at pages 101-102. Alternating land parcels, with one section held in trust and one section held in fee, also inhibits the ability to benefit from economies of scale in some industries, such as farming, and complements difficulties that arise in raising capital (see Naomi Schaefer Riley, "One Way to Help Native Americans: Property Rights," *The Atlantic*, July 30, 2016, at https://www.theatlantic. com/politics/ archive/2016/07/native-americans-property-rights/492941/, accessed on December 27, 2018, and Ronald Trosper, "American Indian Relative Ranching Efficiency," *American Economic Review*, 1978, Vol 68(4) at pages 503-516).

[76] Dustin Frye, *Leasing, Law, and Land Tenure: Measuring the Impact of the Long-Term Leasing Act of 1955 on Indian Land Holdings*, December 11, 2012.

[77] Statement of Lance Morgan, US Senate, Senate Committee on Indian Affairs, *Oversight Hearing on Indian Economic Development,* May 10, 2006, 109th Congress, Washington: GPO, 2006.

gaming establishments reported annual gross revenues under $3 million.[78]  While the total number of Indian gaming establishments has been increasing year-on-year, the count of Indian gaming establishments within certain areas has fluctuated, indicating that not all gaming operations are assured success and some occasionally cease operations.[79]  Being located far from urban centers makes casino gaming a much less viable option for tribes, and thus increases the appeal of a range of online or call-center type of businesses.[80]

46.  Further compounding the frequently dire economic status of tribes is the limited federal funding available to support tribal needs.[81]  When adjusted for inflation, funding for the Bureau of Indian Affairs ("BIA") and the Office of the Special

---

[78]  National Indian Gaming Commission, Gross Gaming Revenue Reports, "Gross Gaming Revenues 2013-2017," at https://www.nigc.gov/images/uploads/reports/Chart2017GamingRevenuesbyRange.pdf, accessed on December 27, 2018.

[79]  National Indian Gaming Commission, Gaming Revenue Reports by Region, at https://www.nigc.gov/commission/gaming-revenue-reports, accessed on December 27, 2018.  For example, the NIGC reports one less tribal gaming establishment in the "Portland" region (consisting of Alaska, Idaho, Oregon, and Washington) and one less tribal gaming establishment in the "St. Paul" region (consisting of Indiana, Iowa, Michigan, Minnesota, Nebraska, and Wisconsin) from fiscal year 2016 to fiscal year 2017 (see National Indian Gaming Commission, "FY16-FY17 Gaming Revenues by Region," at https://www.nigc.gov/images/uploads/reports/Chart2017GamingRevenueDistributedbyRegion.pdf, accessed on December 27, 2018).

[80]  This has been the case at LVD as well.  The Tribe operated a casino beginning in the late 1990s but saw its revenue stream significantly limited by the impact of the recession in 2008 (The Otoe-Missouria Tribe of Indians, et al. v. New York State Department of Financial Services; Benjamin M. Lawsky, *Declaration of James Williams, Jr. in Support of Motion for a Preliminary Injunction*, United States District Court for the Southern District of New York, filed August 29, 2013 at ¶¶ 9-10 and 25 (hereinafter "James Williams Declaration")).  In order to find an alternative source of revenue to replace the lost gaming revenue, the Tribe had to consider other enterprises such as online lending (see Memorandum Opinion at page 3; Hazen Affidavit at ¶¶ 3-5).

[81]  Funding shortfalls that negatively impact Indian Country are not confined to the BIA.  The US Commission on Civil Rights undertook a major study of this in the early 2000s and found that the Indian Health Service, native law enforcement, Indian programs at the Department of Housing and Urban Development, the Indian Education Program at the Department of Education, and the Food Distribution Program for Indian reservations at the Department of Agriculture were all inadequate.  Budgets were (i) smaller in proportion than five years prior; (ii) "when deflated, amounted to a loss of spending power"; (iii) "decreased as a proportion of the department's total discretionary budget for the last two years"; (iv) declined "when accounting for inflation"; and the like (US Commission on Civil Rights, *A Quiet Crisis: Federal Funding and Unmet Needs in Indian Country*, July 2003 (hereinafter "*A Quiet Crisis 2003*" at pages 114-115).  These funding shortfalls persist to this day, as a more recent report by the US Commission on Civil Rights found that despite some progress, the findings of the 2003 report continue to ring true (*Broken Promises 2018*).  For instance, the more recent report found that the Indian Health Service budget meets "just over half the health care needs of Native Americans who suffer striking health deficiencies and disparities" (*Broken Promises 2018* at page 4), the BIA only met 21% of the funding needs for native law enforcement in 2017 (*Broken Promises 2018* at page 207), housing conditions have significantly deteriorated since the 2003 report (*Broken Promises 2018* at page 137), the Education Program continues to be underfunded (*Broken Promises 2018* at page 205), and budget cuts to *Farm Bill* investments continue to threaten Native American food access, despite increased funding in some areas (*Broken Promises 2018* at page 191).

Trustee declined by $6 million yearly over the 1975-2000 time period.[82]   The average annual growth of the BIA's total enacted budget adjusted for inflation over the years from 2006 to 2017 has been approximately 0.5%.[83]   Furthermore, the budget for human services (such as social services, welfare assistance, and housing improvement) has declined by an average of 1% annually over the same time period.[84]   Meanwhile, from 1975 to 2017, the size of the economy of the United States more than tripled,[85] and the annual federal budget increased from $1.2 trillion (in 2017 dollars) to approximately $4 trillion.[86]

47.   As noted in 2003 by the US Commission on Civil Rights, "The federal government, through laws, treaties, and policies established over hundreds of years, is obligated to ensure that funding is adequate to meet [tribal] needs."[87]   Despite this series of obligations, the Commission went on to find "that funding for services critical to Native Americans – including health care, law enforcement, and education – is disproportionately lower than funding for services to other populations."   At the time of the Commission's report, it was evident that the US "government's withdrawal from its previous commitments" left American Indians with "fewer services and less funding than other populations."[88]

48.   This pullback by the US government can only increase what is sometimes called the "institutional gap" that has formed at the intersection of poorly-defined tribal property rights, an inability to collateralize loans, a dearth of profitable investment opportunities, and an underdevelopment of tribal skills and expertise.[89]   The federal government's lack of commitment to addressing Native American socioeconomic distress is counter to its own stated understanding of what will be required to

---

[82]   *A Quiet Crisis 2003* at page 33.  A similar pattern of decreased federal funding available to serve tribal needs can be observed in the present day.  In FY 2019, the total amount of federal funding requested for programs serving tribes and Native American communities was about $20 billion, approximately $2 billion less than the FY 2018 enacted federal funding level (*Broken Promises 2018* at pages 27-28).

[83]   US Department of the Interior, Budget Justifications and Performance Information, 2006-2019.

[84]   US Department of the Interior, Budget Justifications and Performance Information, 2006-2019.

[85]   Bureau of Economic Analysis, Table 1.1.6 Real Gross Domestic Product, Chained Dollars.

[86]   Congressional Budget Office, Budget and Economic Data, "Historical Budget Data," April 2018, at https://www.cbo.gov/about/products/budget-economic-data#3, accessed on December 27, 2018. Furthermore, "per capita federal spending for Native Americans is now a little more than half that of other Americans" (Jeff Keohane, "The Rise of Tribal Self-Determination and Economic Development," *American Bar Association Human Rights Magazine,* Spring 2006, Vol. 33, No. 2).

[87]   *A Quiet Crisis 2003* at page iii.  See also, *Broken Promises 2018* at page 1.

[88]   *A Quiet Crisis 2003*, generally, and especially at pages iii, 5, and 115.  These insufficient funding amounts for American Indians remain relatively stagnant, as the *Broken Promises 2018* report notes that "Since 2003, funding for Native American programs has mostly remained flat, and in the few cases where there have been increases, they have barely kept up with inflation or have actually resulted in decreased spending power" (*Broken Promises 2018* at page 4).

[89]   See, e.g., Terry Anderson, Testimony to the US Commission on Civil Rights, "Quiet Crisis: Federal Funding and Unmet Needs in Indian Country, 2016 Update," February 19, 2016.

overcome Indian poverty.   For example, the *Native American Business Development, Trade Promotion, and Tourism Act* of 2000 describes conditions faced by tribes and what will be required to address tribal needs:

> (7) the capacity of Indian tribes to build strong tribal governments and vigorous economies is hindered by the inability of Indian tribes to engage communities that surround Indian lands and outside investors in economic activities on Indian lands;

> (8) despite the availability of abundant natural resources on Indian lands and a rich cultural legacy that accords great value to self-determination, self-reliance, and independence, Native Americans suffer higher rates of unemployment, poverty, poor health, substandard housing, and associated social ills than those of any other group in the United States;

> (9) the United States has an obligation to assist Indian tribes with the creation of appropriate economic and political conditions with respect to Indian lands to—

>> (A) encourage investment from outside sources that do not originate with the tribes; and

>> (B) facilitate economic ventures with outside entities that are not tribal entities;

> (10) the economic success and material well-being of Native American communities depends on the combined efforts of the Federal Government, tribal governments, the private sector, and individuals;

> (11) the lack of employment and entrepreneurial opportunities in the communities referred to in paragraph (7) has resulted in a multigenerational dependence on Federal assistance that is—

>> (A) insufficient to address the magnitude of needs; and

>> (B) unreliable in availability; and

> (12) the twin goals of economic self-sufficiency and political self-determination for Native Americans can best be served by making available to address the challenges faced by those groups—

>> (A) the resources of the private market;

>> (B) adequate capital; and

>> (C) technical expertise.[90]

---

[90]   *Native American Business Development, Trade Promotion, and Tourism Act* of 2000, Public Law 106-464, November 7, 2000, which can also be seen at 25 USC §4301.

49. In the words of the US Commission on Civil Rights, "[T]he federal government continues to fail to support adequately the social and economic wellbeing of Native Americans.  Due at least in part to the failure of the federal government to adequately address the wellbeing of Native Americans over the last two centuries, Native Americans continue to rank near the bottom of all Americans in health education, and employment outcomes."[91]  Research by the US Commission on Civil Rights finds that federal funding for Native American programs, which is part of the US government's trust responsibility to tribes "remains grossly inadequate,"[92] and has resulted in major disparities as described in paragraphs 50 to 56 below.

50. **Criminal Justice and Public Safety:**  The report finds that underfunding of tribal law enforcement, structural barriers to tribal criminal justice systems, and the fact that Native Americans have the highest rates of crime victimization in the country all work against the ability of tribes to provide adequate criminal justice for their citizens.  Despite legislation such as the *Tribal Law and Order Act* of 2010, which encouraged coordination among tribal, state, and federal law enforcement, tribes remain unable to provide basic attributes essential to a criminal justice system.  For instance, law enforcement officers with no legal training doubled as prosecutors at three New Mexico pueblos, and a detention facility in South Dakota put six inmates in a cell for one person due to overcrowding.[93]  Although recent federal funding from the Department of Justice and the BIA has increased, funding still falls far short of tribal law enforcement needs, and a BIA analysis found that $337 million in additional funding was needed to bring staffing in Indian Country up to national levels.[94]

51. **Health Care:**  The US Commission on Civil Rights notes that Native Americans experience a shorter life expectancy and disproportionately high rates of maternal and infant mortality, as well as elevated levels of psychological and behavioral health problems, relative to the rest of the nation.  Despite these needs, the funding allocated to the Indian Health Service ("IHS") to provide health care to Native Americans lags behind national spending.  For instance, in 2017, IHS health care expenditures per person were $3,332, while federal health care spending nationwide was $9,207 per person.[95]  Furthermore, the IHS budget has remained static for decades, when adjusted for inflation, despite efforts such as the *Affordable Care Act* and the *Indian Health Care Improvement Act* to address these disparities.

52. **Education:**  The Commission demonstrates that in real terms, funding for tribal schools through the Bureau of Indian Education ("BIE") has also remained

---

[91]   *Broken Promises 2018* at Letter of Transmittal.

[92]   *Broken Promises 2018* at page 4.

[93]   *Broken Promises 2018* at pages 52-53.

[94]   *Broken Promises 2018* at page 48.

[95]   *Broken Promises 2018* at pages 66-67.

relatively static over the past decade.  This works in opposition to improving the performance gaps between Native American students and their peers, as Native American students have the lowest educational attainment and highest dropout rates of any racial or ethnic group in the US.[96]  About 93% of Native American students attend public schools with 7% attending BIE schools, but each presents its own challenges for Indian students.[97]  Public schools have been found to present inaccurate information about Native Americans which can be harmful to students.[98]  On the other hand, many tribal schools suffer from operational inefficiencies, financial mismanagement, a low level of internet connectivity, and inferior teacher quality, all of which contribute to measurable and undesirable academic outcomes for Native students.[99]

53. **Housing:**   The report also finds that Indian Country suffers from substandard housing conditions and an inferior and insufficient affordable housing supply.  Efforts to address dire housing shortages continue to be underfunded by the federal government.  The US Department of Housing and Urban Development ("HUD") determined in 2017 that the funding currently provided is far below what is needed to address inadequate housing in Indian Country.[100]  The number of Native American households with incomplete plumbing facilities is ten times the national average, and the percentage of Native households that are considered overcrowded is nearly three times the national average.[101]  These conditions are worsening over time, as HUD found that between 2003 and 2015, for tribal people, "the number of overcrowded households, or households without adequate kitchens or plumbing, grew by 21 percent."[102]  The *Native American Housing Assistance and Self Determination Act* of 1996 replaced separate housing assistance programs with what is known as the Indian Housing Block Grant to attempt to improve the adverse housing situation in Indian Country, but funding for the program has declined over time, when adjusted for inflation.[103]

54. **Economic Development:**   Economic development challenges in Indian Country have left some reservations with average unemployment rates at 80% or higher, and over 25% of Native Americans live in poverty.[104]  Poor socioeconomic conditions,

---

[96]   *Broken Promises 2018* at page 114.

[97]   *Broken Promises 2018* at page 98.

[98]   *Broken Promises 2018* at page 121.

[99]   *Broken Promises 2018* at pages 102, 112, 126, and 128.

[100]  *Broken Promises 2018* at page 136.

[101]  *Broken Promises 2018* at page 136.

[102]  *Broken Promises 2018* at page 137.

[103]  *Broken Promises 2018* at pages 142 and 211.

[104]  *Broken Promises 2018* at pages 156-157.  The poverty rates pointed to by the US Commission on Civil Rights are "higher than the poverty rate of any other racial group in the US" and Indian unemployment rates

including substandard housing, low educational attainment, poor health outcomes, and lack of employment opportunities are all "connected, and an assessment of equity and opportunity should intentionally focus on this connectedness" and "perpetual underfunding at the federal level presents significant barriers for economic development and for Native American self-determination."[105]

- **Economic Development (Infrastructure):**  Economic development in Indian Country is hindered by the underfunding of tribal infrastructure.  The unique trust status of Indian lands complicates investment in infrastructure, and a restructuring of the Land Buy Back Program (which allocates federal funds to purchase trust land back), which included a decrease of requested funds for real estate trust services in FY2018 and FY2019, reduced the opportunity for tribal nations to use their land to further their economic development goals.[106]  Furthermore, physical infrastructure projects in Indian Country have been underfunded for decades, which "hampers the ability of Tribal Nations to fully leverage their economic potential."[107]  The lack of transportation infrastructure and public transportation in Indian Country poses yet another barrier to sustainable economic development.[108]  Finally, utility needs including water, sanitation, and electricity are often unmet in Indian Country, in large part due to insufficient funding at the federal level.[109]

- **Economic Development (Natural Resources):**  Natural resource development on reservations is also crucial for advancing tribal economic development in some situations.  Despite the fact that energy resources in Indian Country were valued at around $1.5 trillion in 2014, many of these resources remain untapped, and funding for programs aiming to assist in energy resource development on tribal lands continues to decrease.[110]  A lack of access to clean water also plagues Indian Country, and many Indian water rights settlements remain unapproved by Congress, leaving tribes without the necessary funds to secure access to clean, drinkable water.[111]  Furthermore, agriculture, forestry, and fishing are all critical components of a number of tribal economies, but funding for BIA forestry, fish, wildlife, and parks has decreased from FY2017 to

---

are "more than double the national average" with on-reservation unemployment rates soaring far above those levels.  In addition, commuting distances to work can be massive, while pay rates are "one-third less than that of white Americans."

[105]   *Broken Promises 2018* at page 159.

[106]   *Broken Promises 2018* at pages 163-164.

[107]   *Broken Promises 2018* at page 165.

[108]   *Broken Promises 2018* at page 168.

[109]   *Broken Promises 2018* at pages 171-172.

[110]   *Broken Promises 2018* at pages 177-179.

[111]   *Broken Promises 2018* at pages 180-181.

FY2019.[112]  Many tribes are also highly vulnerable to climate change due to their physical location and dependence on natural resources, but the BIA Tribal Resilience Program, aimed at increasing the ability of tribes to bounce back from issues caused by climate change, has experienced decreasing funding since 2015, with no proposed funds available for FY2019.[113]

- ▪ **Economic Development (Federal Role in Tribal Enterprises):**  Tribes must have access to capital to operate successful tribal enterprises, which in turn increase sovereignty and bolster tribal economies.  The Indian Loan Guaranty, Insurance, and Interest Subsidy Program (which is managed by the BIA Division of Capital) works to offer loans to tribal enterprises that would otherwise be unable to receive them.  However, despite the $1 billion provided in loan guarantees and insurance, only $8 million for lending and $80 million in lending authority had been allocated as of 2015, and the President's FY2019 budget only requested $6.7 million in funding to guarantee or insure $108.6 million in loans.  Another federal program geared towards increasing access to capital for tribes is the Native American Community Development Financial Institutions ("CDFIs") Assistance Program, which is run by the US Department of the Treasury.  This program allocates financial awards to native CDFIs for providing access to credit, capital, and financial services.  However, almost half of the native CDFIs reported in a 2016 survey that they were unable to fully fund loans approved by lending committees, with financial resources falling short by at least 10% of the approved loan amount.[114]

55. Throughout this most recent report from the US Commission on Civil Rights, there are many points made about how a rural setting in much of Indian Country impacts tribal economic development.  In the health care category, federal initiatives such as the Tele-Behavioral Health Center of Excellence use tele-video services to attempt to resolve the difficulties faced by health care providers in remote areas.  These difficulties include meeting continuing education requirements for licensure receiving the most recent clinical guidelines.[115]  In terms of education, the report describes how BIE schools are often remote and their locations make it difficult to recruit teachers, while also increasing dependency on high-speed internet to allow native students and teachers to access educational resources that are not present in their communities.  However, many BIE schools continue to have only a low level of internet connectivity.[116]  Internet access is also a pillar of economic development, yet extending broadband access in remote tribal areas is typically more expensive

---

[112]   *Broken Promises 2018* at page 192.

[113]   *Broken Promises 2018* at pages 193-195.

[114]   *Broken Promises 2018* at pages 200-201.

[115]   *Broken Promises 2018* at page 83.

[116]   *Broken Promises 2018* at pages 126-128.

than in urban centers.[117]  Rural location also poses a barrier to addressing the physical infrastructure problems found in Indian Country, leading to deficiencies in water and sanitation, utilities, telecommunications, and transportation systems, which then leads to reduced financing and development opportunities.[118]  In many instances where increases in funding are observed, federal spending still falls short of the needs facing rural communities.  For example, despite an overall nominal increase in the IHS budget between FY2015 and FY2019, IHS noted that it still faced significant challenges in rural communities, including difficulties of "recruiting and retaining qualified healthcare staff, providing competitive salaries, and the availability of suitable housing, schools, and community resources for staff."[119]

56.  These needs induce tribes to engage in business activities in efforts to overcome the institutional gap noted above.  The US Commission on Civil Rights advises that "Congress should honor the federal government's trust obligations and pass a spending package to fully address unmet needs, targeting the most critical needs for immediate investment.  This spending package should also address the funding necessary for the buildout of unmet essential utilities and core infrastructure needs in Indian Country such as electricity, water, telecommunications, and roads."[120]  In the meantime, tribes use what assets and resources they have to generate revenues to address the host of socioeconomic needs facing their communities.

57.  All of the factors noted here lend themselves to a number of tribes finding ecommerce and online businesses particularly attractive, and online lending is an option that, for some tribes, appears to be viable.[121]  NCAI has issued a resolution

---

[117]  *Broken Promises 2018* at page 175.

[118]  *Broken Promises 2018* at page 165.

[119]  *Broken Promises 2018* at page 69.

[120]  *Broken Promises 2018* at Letter of Transmittal.  LVD suffers from many of the difficulties discussed in the most recent report from the US Commission on Civil Rights (see, e.g., James Williams Declaration at ¶ 8).

[121]  Even in instances where tribes have profitable casinos, they are always on the lookout to expand service offerings and expand their clientele, including services that can be provided online.  Recent news indicates that sports betting is a growing niche of the gaming market and is of great interest to tribes already generating profits in their casinos.  The current regulatory environment appears to constrain mobile sports betting to on-property activity, but tribes and non-tribal service providers are indicating great interest in entering this segment of the marketplace (see, e.g., Kevin Draper, Tim Arango, and Alan Blinder, "Indian Tribes Dig In to Gain Their Share of Sports Betting," May 21, 2018 at https://www.nytimes.com /2018/05/21/sports/sports-betting-indian-casinos.html, accessed on January 2, 2019).  One such example is MGM Resorts International's joint venture with GVC Holdings, a large sports betting and gaming group.  The MGM-GVC venture has expressed significant interest in partnering with tribes to develop sports betting products and services on tribal lands (MGM Resorts International, "MGM Resorts International Retains TFA Capital Partners as Strategic Advisor for Development of Key Tribal Sports Betting Partnerships," December 4, 2018, at https://s22.q4cdn.com/513010314/files/doc_news/MGM-Resorts-International-Retains-TFA-Capital-Partners-As-Strategic-Advisor-For-Development-Of-Key-Tribal-Sports-Betting-Partnerships.pdf, accessed on January 3, 2019).  The Oneida Indian Nation has also announced a partnership

reinforcing the rights of tribes to engage in online lending, specifically supporting "member tribes offering online short term consumer financial products and services, which are authorized under tribal law, consistent with federal consumer protection laws as well as relevant Congressional directives."[122]  The Great Plains Tribal Chairman's Association, made up of 16 tribal leaders in North Dakota, South Dakota, and Nebraska, has also issued a similar resolution supporting the sovereign rights of its member tribes to "develop their economies including entering the short term loan industry."[123]

58. Furthermore, lending businesses such as that run by LVD can be an important offset to the general inability tribes have when it comes to tax collection.  For many governments around the world, taxing authority is foundational to the act of governance.  Taxation authority both allows a government to raise revenue and to influence social and public policy.  And, of course, tribal taxing authority would allow for advancement of the federal and tribal interests in tribal sovereignty and self-governance.[124]  However, most tribal governments are limited in their ability to generate significant tax revenue, and so turn to enterprise development instead.

59. On the issue of tribes turning to businesses as an alternative to governmental funding by way of taxation, NCAI states:

> [T]ribes must surmount many developmental challenges – including physical remoteness, lack of any property or income tax base, capital access barriers, and the paternalistic attitudes of policymakers – to assert their rights to self-determination.  Many tribes exist in territorial isolation, far from centers of traditional commerce and capital.  Lacking a tax base and the means to develop and invest in their tribal lands, these Indian communities

---

with Caesars Entertainment to launch sports betting in 2019 at its Turning Stone Resort and Casino in New York State (Glenn Coin, "Caesars, Turning Stone to offer sports betting in New York," January 2, 2019, at https://www.syracuse.com/news/2019/01/caesars-turning-stone-to-offer-sports-betting-in-new-york.html, accessed on January 4, 2019).

[122] National Congress of American Indians, Resolution #TUL-13-056, 2013.  Furthermore, in support of the Habematolel Pomo of Upper Lake Tribe's online lending activities, the NCAI asserts that "the degree to which Defendants utilize vendors or employ non-Indians or their degree of commercial success bear in no way on the sovereign nature of their activities, nor the reality that the Tribe has made the sovereign determination to engage in lending activity and regulate that activity under Tribal law." (See Consumer Financial Protection Bureau vs. Golden Valley Lending Inc., et al., *Brief of the National Congress of American Indians as Amicus Curiae in Support of Defendants' Motion to Dismiss*, United States District Court (District of Kansas), No. 2:17-cv-02521-JAR-JPO, filed November 27, 2017 (hereinafter "NCAI Amicus Brief") at page 7).

[123] Great Plains Tribal Chairman's Association, Resolution No. 21-9-6-13, September 6, 2013.

[124] See, e.g., The State of the Native Nations at page 43; Getting Things Done at pages 146-147; and Sarah Hicks, "Intergovernmental Relationships:  Expressions of Tribal Sovereignty," *Rebuilding Native Nations*, Tucson:  The University of Arizona Press, 2007, at pages 248-249.

have not been able to obtain a sustainable capital base from which to provide basic governmental services for their citizens. Resultantly, many tribes have struggled for decades to fulfill their duty to develop businesses and infrastructure, healthcare, and other vital services for their members.  Because of these barriers, tribal governments increasingly and necessarily rely on tribally-owned and controlled businesses, engaging in commercial activities, to generate revenue to support tribal government and services to tribal members, crucial to breaking the cycle of poverty created by decades of failed federal policy has created for Native Americans.[125]

## B.   Economic Incentives for Tribes to Engage in Business Ventures

60. When studies such as those by the US Commission on Civil Rights, as well as the stark socioeconomic indicators reported by the US Census, are viewed alongside the well-documented needs faced by those living on tribal lands, it is no wonder that tribal leadership in many instances embraced (and continues to embrace) a wide range of potential revenue-generating opportunities, including online lending.

61. Tribes such as LVD are prime examples of those having economic incentives to engage in business ventures that do not rely on proximity to major urban centers. LVD was previously part of the Keweenaw Bay Indian Community; however, in the 1960s the Tribe set out to secure recognition as a distinct tribal nation.  In 1988, President Reagan signed the *Lac Vieux Desert Band of Lake Superior Chippewa Indians Act*, which recognized LVD as separate from the Keweenaw Bay Band. Throughout the 1990s, LVD operated a series of enterprises, including a motel, golf course, gaming facility, and restaurant.[126]   The Tribe also operates a construction business, provides day care services, and runs a fish hatchery.[127] LVD's gaming facility provided "significant revenue for the Tribe until 2008, when the recession severely limited the casino's revenue stream and forced the Tribe to explore other avenues to improve its finances."[128]

62. Prior to its involvement with companies associated with Mr. Martorello, LVD was engaged in consumer lending; over time the Tribe established Red Rock Tribal Lending ("Red Rock").[129]   Red Rock and Big Picture were established as tribal

---

[125]   NCAI Amicus Brief at pages 7-8 (footnote omitted).

[126]   Lac Vieux Desert Band of Lake Superior Chippewa Indians, "A Brief History of the Lac Vieux Desert Tribe," at http://www.lvdtribal.com/history.html, accessed on December 26, 2018.

[127]   Clarkson, Spilde, and Claw 2016 at page 19.

[128]   Memorandum Opinion at page 3.

[129]   Hazen Deposition at page 25; Dowd Deposition at pages 24-28.

enterprises that fall under the LVD Tribal Council.[130]  Management at both Red Rock and Big Picture was structured to provide for two tribal citizens to serve as co-managers.[131]  The businesses have always had a physical presence on the LVD Reservation, with a call center housing customer service representatives located in Watersmeet (Big Picture employs about a dozen or more people locally[132]).

63.  While the Constitution of LVD enumerates the power of the Tribal Council "to levy and collect taxes or assessments against members, non-members, and businesses,"[133] the Tribe appears to have little ability to fund itself with a robust taxing regime.  This hampers its ability to raise revenue, undercuts the viability of tribal services, and subverts the Tribe's efforts to engage in sustainable economic development.  Like many other tribes, LVD has had to turn to an array of business ventures to shore up tribal coffers,[134] and tribal business ventures are a primary source of revenue.[135]  LVD touts substantial revenues from online lending, with evidence indicating that up to 46% of the governmental budget has come from these businesses.[136]  Funds of this sort are particularly useful for tribal purposes, as lending revenues do not carry the same disbursement and investment restrictions as federal funds (which tend to be earmarked for particular types of spending).  The ability to allocate funds freely is, by its very nature, important for tribal self-determination and the practice of self-rule.[137]  The Tribe has recently expressed

---

[130]   Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution #2011-041*, September 14, 2011; Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, Resolution *#T2014-066*, August 26, 2014.

[131]   Hazen Affidavit at ¶¶ 7 and 15; Affidavit of James Williams, Jr., September 28, 2017 ("James Williams Affidavit") at ¶ 12; Hazen Deposition at page 25.

[132]   Hazen Deposition at Exhibit 14; Hazen Deposition at page 163.  In addition to oversight of the on-reservation components of the business, these co-managers interfaced with outside service provider staff located far afield, and now work with Ascension personnel located in Atlanta.

[133]   *Constitution of the Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan,* May 14, 1992, at Article IV(g).

[134]   Further complicating revenue generation is the fact that the number of gaming facilities has increased dramatically over the past several years, leading to increased competition and declining revenues for a number of tribes (this is the case for LVD (see, e.g., James Williams Deposition at page 201)).

[135]   See, e.g., James Williams Deposition at page 201.

[136]   James Williams Declaration at ¶ 22.

[137]   Revenues from tribal enterprises are often placed into a general fund, and at that point, because dollars are fungible, are not easily traced from any particular source or to any specific use.  Allocations from a tribe's general fund are made per the priorities and budgeting processes of the tribe in question, typically according to what is deemed most important for socioeconomic needs, economic development projects, and the like. The practice of tribes "calling their own shots" is at the heart of what Harvard Project research finds most important for tribal self-sufficiency.  In addition, tribal involvement with non-tribal industry participants is consistent with tribal sovereignty and self-determination.  LVD's actions to establish and own lending businesses align with federal interests in tribal governments developing a wide array of revenue-generating enterprises, and profits from these enterprises have been directed to addressing pressing social needs.  In

expectations that more than 30% of the tribal budget will come from Big Picture revenues over the next few years, which further underscores the importance of tribal business ventures and implies that tax collection has been insignificant and far insufficient for funding LVD's government.[138]

64.  Tribes have entered business ventures in a wide range of industries, and they have done so by way of an array of mechanisms in which they partner with, employ, or purchase access to outside expertise, managerial talent, industry knowledge, or financial capital.  I have encountered tribes engaging in businesses in this fashion in industries ranging from tourism, to federal contracting, to health care, to energy development, and of course, to gaming.  Gaming provides probably the richest set of examples of partnerships by which tribes engage with outside expertise, managerial talent, and industry knowledge.  They also frequently gain access to the capital markets by way of partnerships with others.

  ▪  **LVD as an outside investor in the gaming sector:**  Public records indicate that LVD invested in a Louisiana-based casino management company called Machal LLC in 2007, which helped the Jena Band of Choctaw Indians open the Choctaw Pines Casino in Alexandria, Louisiana in February 2013.[139]  LVD links to employment opportunities at the Choctaw Pines Casino on its own employment website.[140]  The NIGC shows a contract on January 26, 2012 between the Jena Band of Choctaw Indians and Machal[141] which approved a loan to enable the creation of a 46,000 square foot facility with 700 Class II slot

---

addition, the businesses have provided employment opportunities and established a foundation for building operational and managerial skills among tribal citizens.

[138]  James Williams Affidavit at ¶ 10.

[139]  Adrienne Roberts, "Lake Superior Chippewa Indians in Michigan's UP Acquires Lending Company," DBusiness, January 28, 2016 at http://www.dbusiness.com/daily-news/Annual-2016/Lake-Superior-Chippewa-Indians-in-Michigans-UP-Acquires-Lending-Company/, accessed on December 28, 2018; McGeshick Deposition at pages 59-61; "Lac Vieux Desert Band of Lake Superior Chippewa Indians Bolsters Tribal Economic Development Portfolio with Purchase of Bellicose Capital, LLC," January 27, 2016 at https://www.prnewswire.com/news-releases/lac-vieux-desert-band-of-lake-superior-chippewa-indians-bolsters-tribal-economic-development-portfolio-with-purchase-of-bellicose-capital-llc-300210679.html, accessed on January 7, 2019.

[140]  Lac Vieux Desert Band of Lake Superior Chippewa Indians, "Employment Opportunities," at http://www.lvdtribal.com/employment.html, accessed on December 28, 2018.

[141]  National Indian Gaming Commission, "Approved Management Contracts," at https://www.nigc.gov/finance/approved-management-contracts, accessed on January 7, 2019 (hereinafter "NIGC Approved Management Contracts").

machines and a buffet style restaurant.[142]   As of early 2018, the Tribe had plans to open an 80-room hotel at the casino.[143]

- **Other examples from tribal gaming:**   There are many other examples akin to this from tribal gaming.[144]   For instance, the Prairie Band Potawatomi Nation contracted with Harrah's Entertainment for the management of its casino, the Prairie Band Casino & Resort in Kansas.   Harrah's managed the property from 1998 until July 1, 2007, at which time management operations were transferred to the Tribe.[145]   Several other tribes have partnered with Harrah's Entertainment for their gaming enterprises.   For example, HCAL LLC, a subsidiary of Harrah's, has managed the Rincon Band of Luiseño Indians' Harrah's Resort Southern California since 2001/2002,[146] the Ak-Chin's Harrah's Ak-Chin Casino since its opening in 1994,[147] and the Eastern Band of Cherokee Indians' Harrah's Cherokee Casino Resort since 1996/1997.[148]   The NIGC also shows contracts for tribal casino operations between the Eastern Band of Cherokee Indians of North Carolina and Harrah's NC Casino Company, and the Upper Skagit Indian Tribe of Washington and Harrah's Washington Corporation.[149]

- The story of the Mashpee Wampanoag Tribe of Massachusetts provides a current example of a tribe working with outside developers, and also highlights the type of risks outsiders take on when working in Indian Country.[150]   Genting

---

[142]   Casino Careers, "Machal, LLC," at https://www.casinocareers.com/clientsb.php?OurClients_ID=977, accessed on January 7, 2019.

[143]   Indianz.com, "Jena Band of Choctaw Indians celebrates fifth birthday of casino," February 12, 2018 at https://www.indianz.com/IndianGaming/2018/02/12/jena-band-of-choctaw-indians-celebrates.asp, accessed on January 7, 2019.

[144]   NIGC Approved Management Contracts.

[145]   Business Wire, "Prairie Band Potawatomi Nation to Assume Management of Harrah's Prairie Band Casino in 2008," at https://www.businesswire.com/news/home/20050510005875/en/Prairie-Band-Potawatomi-Nation-Assume-Management-Harrahs, accessed on December 28, 2018 and Harrah's Entertainment, Inc., "Disclosures Regarding Harrah's Entertainment, Inc., Exhibit 99.1," 2007 at page 59 (found at https://www.sec.gov/Archives/edgar/data/858339/000119312508005698/dex991.htm, accessed on December 28, 2018).

[146]   Rincon Band of Luiseño Indians, "Tribal Government," at http://www.rincontribe.org/tribal-council, accessed on December 28, 2018; NIGC Approved Management Contracts.

[147]   Bethany Blundell, "Harrah's, Ak-Chin renew casino management agreement," Maricopa Monitor, at https://www.pinalcentral.com/maricopa_monitor/news/harrah-s-ak-chin-renew-casino-management-agreement/article_5393bd36-2fc0-5a67-8333-f69c24434574.html, accessed on December 28, 2018; NIGC Approved Management Contracts.

[148]   Scott McKie, "Council tables amended gaming management agreement," Cherokee One Feather, April 4, 2017, at https://theonefeather.com/2017/04/council-tables-amended-gaming-management-agreement/, accessed on December 28, 2018; NIGC Approved Management Contracts.

[149]   NIGC Approved Management Contracts.

[150]   Of course, outside financing, expertise, and management skills can also come from other tribes and tribally-owned enterprises.   For instance, the Enterprise Rancheria of Maidu Indians has contracted with a subsidiary

Malaysia heavily invested in the Tribe's planned casino, with those investments currently being at risk due to regulatory issues surrounding the status of the Mashpee Wampanoag.[151]  This regulatory uncertainty only arose in 2018, but the origins of the controversy go back to technicalities of the Mashpee Wampanoag's status in the 1930s.[152]  Genting Malaysia has recently announced a $440 million "impairment loss" due to stalled casino operations arising from the litigation surrounding the status of the Tribe's land base.[153]

65. My own tribe, the Chickasaw Nation, works with a number of outside business partners.  These range from casino-related developments (at the WinStar World Casino and Resort in Thackerville, Oklahoma, the Nation contracts with the Hnedak Bobo Group for architecture and design,[154] and maintains business relationships with Everi Holdings Inc. for mobile payment services,[155] compLexity Gaming for electronic sports,[156] and GAN for web and mobile gaming options[157]).  Chickasaw has utilized outside developers for hotel accommodations at the facility, and provides gaming services to other tribes (e.g., the Wampanoag Tribe of Gay Head (Aquinnah) uses the services of the Chickasaw's Global Gaming Solutions

---

of Seminole Hard Rock Entertainment, which is owned by the Seminole Tribe of Florida, to develop and manage its Hard Rock Hotel & Casino Sacramento at Fire Mountain in California (Indianz.com, "Enterprise Rancheria sees progress on 'Hard Rock' development," November 29, 2018 at https://www.indianz.com/IndianGaming/2018/11/29/enterprise-rancheria-sees-progress-on-ha.asp, accessed on January 7, 2019).

[151]  Indianz.com, "Mashpee Wampanoag Tribe still working with backer of derailed casino," December 4, 2018 at https://www.indianz.com/IndianGaming/2018/12/04/mashpee-wampanoag-tribe-still-working-wi.asp, accessed on January 9, 2019.

[152]  Indianz.com, "NCAI: Mashpee Wampanoag Tribe 'stripped' of its sovereignty," September 11, 2018 at https://www.indianz.com/News/2018/09/11/ncai-mashpee-wampanoag-tribe-stripped-of.asp, accessed on January 9, 2019.

[153]  Indianz.com, "Mashpee Wampanoag Tribe warns of losses due to stalled casino," December 10, 2018 at https://www.indianz.com/IndianGaming/2018/12/10/mashpee-wampanoag-tribe-warns-of-losses.asp, accessed on January 7, 2019.

[154]  Indian Gaming Magazine, "WinStar World Casino and Hotel and Hnedak Bobo Group Continue Expansion Evolution," March 2014, at http://www.indiangaming.com/istore/Mar14_WinStar.pdf, accessed on December 28, 2018.

[155]  Everi, "Everi to Provide Expanded Payments Solutions to WinStar World Casino and Resort Through CashClub Wallet Mobile Application," September 27, 2017, at http://ir.everi.com/investor-relations/investor-news/news-details/2017/Everi-to-Provide-Expanded-Payments-Solutions-to-WinStar-World-Casino-and-Resort-Through-CashClub-Wallet-Mobile-Application/default.aspx, accessed on December 28, 2018.

[156]  ESports Insider, "compLexity announces partnership with WinStar World Casino," November 13, 2018 at https://esportsinsider.com/2018/11/complexity-announces-partnership-with-winstar-world-casino/, accessed on December 28, 2018.

[157]  Business Wire, "GAN Launches Simulated Gaming for WinStar World Casino and Resort," May 12, 2017, at https://www.businesswire.com/news/home/20170511006425/en/GAN-Launches-Simulated-Gaming-WinStar-World-Casino, accessed on December 28, 2018.

company).[158]   A non-gaming example of the Chickasaw Nation partnering with outsiders to leverage a service providers expertise can be seen in the Nation's work with Rosetta Stone to advance and enhance the ability of tribal citizens to learn the Chickasaw language.[159]

66.  LVD entered into a number of business arrangements with outside parties to engage in the online lending industry.[160]  On September 14, 2015, the Tribe's holding company, Tribal Economic Development Holdings ("TED"), received a loan from Eventide Credit Acquisition LLC to purchase Bellicose Capital LLC, whose function had been to provide services to Big Picture's loan portfolios.[161]  The purchase took the form of a merger between LVD's Tribal Acquisition Company and Bellicose.[162]  LVD created TED to facilitate its lending activities and to serve as an "independent tribally owned entity, to create and operate one or more Tribal lending and ancillary businesses" that would "further the economic development of the Tribe."[163]   LVD is currently engaged in a seven-year process to pay out the initial loan from Eventide for its September 14, 2015 purchase of Bellicose.[164]

67.  Figures 2-3 summarize some of the agreements between LVD lending entities and service providers.  Figure 2 shows some of the duties outlined in the servicing agreement between the previous Red Rock lending entity and the outside service provider SourcePoint VI LLC.[165]  The agreement, with a retroactive effective date of October 25, 2011, describes the terms of the services that SourcePoint was to provide to Red Rock.  As outlined in the agreement and shown in the figure, the role of SourcePoint was largely to "develop and recommend to the Enterprise and

---

[158]   Global Gaming Solutions website, at http://www.globalgamingsol.com/, accessed on January 9, 2019; George Brennan, MV Times, "Tribe announces gambling partner," August 22, 2018 at https://www.mvtimes.com/2018/08/22/tribe-announces-gambling-partner/, accessed on January 9, 2019.

[159]   Chickasaw Nation, "Chickasaw Language Revitalization Program," at https://www.chickasaw.net/Services/Chickasaw-Language-Revitalization-Program.aspx, accessed on January 9, 2019.

[160]   Economic reasoning indicates that if successful, this litigation is likely to substantially hamper LVD's online lending by deterring outside service providers and business partners from doing business with the Tribe.

[161]   Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution No. T2015-060*, September 14, 2015.

[162]   Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution No. T2015-059*, September 14, 2015.

[163]   Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution No. T2015-08*, February 5, 2015.

[164]   Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution No. T2015-059*, September 14, 2015; *Secured Promissory Note* at page 4 (MARTORELLO_000131).

[165]   *Amended & Restated Servicing Agreement Between Red Rock Tribal Lending, LLC and SourcePoint VI, LLC,* July 31, 2012, with retroactive effect to October 25, 2011 (hereinafter "Red Rock Servicing Agreement").

to the Operations Manager and Tribal Representatives, reasonable measures for the orderly administration and management of Enterprise."[166]   Red Rock then was responsible for deciding whether to implement the recommendations, as it had the sole authority to enter into contracts.[167]   Figure 3 shows the servicing agreement between Big Picture Loans LLC and Ascension Technologies LLC.  This servicing agreement is dated February 16, 2016, and the terms of the agreement detail similar roles between Big Picture and Ascension as had been in place between Red Rock and SourcePoint.[168]

68. I recently visited the LVD Reservation, and it is clear that economic development efforts continue to be needed in the region.  Evidence indicates that the revenues secured by LVD from online lending are important to the Tribe, and have been used to provide or enhance a range of jobs and governmental services, including elder services, subsidized housing, cultural programs, youth activities, a bridge loan for a new health clinic, and other social services.[169]

69. However, the Reservation continues to face economic and geographical challenges. The LVD Reservation is in a remote location, with the regional airport being located in Marquette, approximately 120 miles away.  The closest towns I observed are Bruce Crossing, MI (which is an unincorporated town[170]), located 19 miles away, and Land O'Lakes, WI, a small town across the state line about 9 miles away. On a drive through Watersmeet, one observes the Northern Waters casino, the new health clinic, the LVD governmental offices, a gas station/convenience store, and a café.  There is also a prominent non-tribal snowmobile dealership.  As far as can be observed, activity in the town, and commercial activity on a snowy day in January, was rather limited.  I spent approximately an hour in the casino and saw about half a dozen customers.  Automobile traffic through town in the middle of a weekday

---

[166]   Red Rock Servicing Agreement at page 9.

[167]   Red Rock Servicing Agreement at page 11.  Some testimony for how these roles were acted upon can be seen in depositions.  See, e.g., Martorello Deposition at pages 31-43 and 136-144.  For instance, in its development of regulatory and compliance standards, Red Rock declined a SourcePoint compliance management system because it was already independently building its own (Martorello Deposition at page 138).  Similarly, Red Rock's duties grew over time, as in 2013, Red Rock was getting leads on its own, rather than having pre-qualified leads provided by SourcePoint as outlined in the servicing agreement (Martorello Deposition at page 141).

[168]   *Intratribal Servicing Agreement Between Big Picture Loans, LLC and Ascension Technologies, LLC,* February 16, 2016.  Similar to the note above, testimony for how these roles were acted upon can be seen in depositions.  For example, Big Picture CEO Michelle Hazen noted in her deposition that she worked together with Ascension employees to take on the duties of risk modeling and data analytics (Hazen Deposition at pages 65-67).

[169]   Big Picture Loan's Second Amended Response to Williams Interrogatories at Response to ¶ 1; Hazen Affidavit at ¶ 31; James Williams Deposition at pages 200-202; James Williams Declaration at ¶¶ 21 and 23-25.

[170]   Michigan Department of Technology, Management and Budget, "Ontonagon County," May 8, 2010 at https://www.michigan.gov/documents/CGI_COUNTY-v4_ONTONAGON_COUNTY_125295_7.pdf, accessed on January 9, 2019.

was minimal, further lending weight to the fact that LVD has economic incentives to continue engaging in online businesses and other commerce that can access customers located away from the Reservation, or in urban markets with more population and activity.


_Eric Henson_
Eric C. Henson
January 11, 2019

Figure 1
# LAC VIEUX DESERT INDIAN RESERVATION



**Source:** ArcGIS Online; National Atlas of the United States.

Figure 2
# RED ROCK TRIBAL LENDING AGREEMENT WITH SOURCEPOINT VI

| **Servicing Fee Minimum** | $20,000/month |
|---|---|
| **Examples of Services** | a) Select service providers and lenders<br>b) Develop business relationships<br>c) Recommend suggested practices<br>d) Recommend regulatory and compliance standards<br>e) Recommend training and education standards<br>f) Recommend standards for financial reporting<br>g) Recommend website contents, marketing and consumer relations<br>h) Monitor designated service providers and lenders<br>i) Provide credit-modeling data and risk assessment strategies<br>j) Train call center employees<br>k) Sell loan transactions in default |

**Source:** *Amended & Restated Servicing Agreement Between Red Rock Tribal Lending, LLC and SourcePoint VI, LLC*, July 31, 2012, with retroactive effect to October 25, 2011.

Figure 3
# BIG PICTURE LOANS AGREEMENT WITH ASCENSION TECHNOLOGIES

| | |
|---|---|
| **Servicing Fee** | Sum of manpower charges, internal expenses, non-affiliated overhead expenses, and Enterprise/Servicer Retention Incentive Plan |
| **Examples of Services** | a) Select vendors and Commercial Finance Providers<br>b) Develop business relationships<br>c) Identify vendors<br>d) Recommend suggested practices<br>e) Recommend regulatory and compliance standards<br>f) Recommend training and education standards<br>g) Assist CEO with hiring and discharge of employees<br>h) Recommend standards for financial reporting<br>i) Recommend website contents, marketing and consumer relations<br>j) Monitor designated vendors<br>k) Provide credit-modeling data and risk assessment strategies<br>l) Train call center employees<br>m) Sell Consumer Loan Transactions in default |

**Source:** *Intratribal Servicing Agreement Between Big Picture Loans, LLC and Ascension Technologies, LLC,* February 16, 2016.
**Note:** The monthly distribution to the Tribe changed from 2% of the gross revenue to 3% in September of 2016 (*Secured Promissory Note, 2016* at MARTORELLO_000128; *Addendum to Secured Promissory Note,* September 2016 at LVD-DEF00006281).



APPENDIX A
CURRICULUM VITAE

# Eric Conrad Henson

Compass Lexecon
200 State Street, 9th Floor
Boston, MA 02109
617-520-0200 main
617-520-0224 direct
ehenson@compasslexecon.com

**PROFESSIONAL EXPERIENCE**

Compass Lexecon, Boston, MA and Tucson, AZ
*Executive Vice President*, 2017-present;
*Senior Vice President*, 2013-2017; *Vice President,* 2009-2013; *Managing Director,* 2006-2008; *Director,* 2005; *Managing Consultant,* 2004; *Senior Consultant,* 2001-2004; *Consultant,* 1998-2001

> Provides economic analysis and expert testimony in the areas of valuation, antitrust claims, data analysis, competition, and market structures. Conducts research on Native American economic development and governance.

Harvard Project on American Indian Economic Development, John F. Kennedy School of Government, Harvard University, Cambridge, MA
*Research Fellow/Research Affiliate*, 1998-present

> Research and teaching relating to governments, public policy, and economic development in Indian Country at the John F. Kennedy School of Government at Harvard University (and its affiliate the Udall Center for Public Policy at the University of Arizona). Applicant evaluator for the Honoring Nations program. Serving as a *Senior Policy Scholar* for the Harvard University Native American Program for 2018-2019 (co-teaching *Native Americans in the Twenty-First Century* (KSG-PED-502 and GSE-A102)).

Fidelity Investments, Boston, MA
*Industry Analyst*, 1997-1998

> Assisted in the development of quantitative models to forecast outperformance of S&P 500 industry groups. Programmed econometric software and built macros in MS Access to process performance reports.

Haver Analytics, New York, NY
*Manager, United States Economics Database,* 1995-1996
> Interacted as a consultant with leading economists, governmental department heads, and private industry clients. Found solutions for technological problems associated with the electronic transfer of data and data anomalies.

Clean Environments, San Antonio, TX
*CAD Operator*, 1993
> Created site maps for environmental consultants and prepared materials for client presentations.

**EDUCATION**

John F. Kennedy School of Government, Harvard University, Cambridge, MA
> MPP, 1998
> Thesis: *The Importance of a Uniform Commercial Code for Economic Development on Native American Reservations*

Southern Methodist University, Dallas, TX
> MA, Economics, 1995

University of Texas at San Antonio, San Antonio, TX
> BBA, Business Economics, 1992

**EXPERT TESTIMONY**

The Hopi Tribe
> In the Apache County Superior Court of the State of Arizona, *In re The General Adjudication of All Rights to Use Water in the Little Colorado River System and Source,* Expert Report, November 9, 2018. Analysis of tribal economic development efforts and the need for water supplies.

Think Finance, LLC
> In the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, *In re Think Finance LLC, et al., Debtors,* Expert Report, August 13, 2018; Deposition, September 11, 2018. Analysis of tribal participation in the online lending industry.

Think Finance, LLC
> In the United States District Court for the Eastern District of Pennsylvania, *Commonwealth of Pennsylvania v. Think Finance, LLC, et al.,* Expert Report, August 13, 2018. Analysis of tribal participation in the online lending industry.

2

Congressional Testimony

> Statement to US House of Representatives, Committee on Oversight and Government Reform, Subcommittee on the Interior, Energy, and Environment, *Hearing on Tribal Energy Resources: Reducing Barriers to Opportunity*, July 17, 2018 (written and oral testimony).

Keweenaw Bay Indian Community

> In the US District Court, Western District of Michigan, *Keweenaw Bay Indian Community v. Nick A. Khouri,* Expert Report, May 25, 2018 (highly confidential); Rebuttal Report, July 20, 2018 (confidential); Deposition, September 7, 2018 (confidential). Analysis of sales and tobacco taxes on tribal lands in Michigan.

Albrecht et al. and Abbey et al.

> In the Superior Court of the State of California, County of Riverside, *Leonard Albrecht et al. v. Riverside County* and *Patricia L. Abbey et al. v. Riverside County,* Expert Report, February 20, 2018; Deposition, March 9, 2018; Trial Testimony, October 1, 2018. Consolidated class action case involving analysis of taxation on tribal lands in California.

Young, et al.

> In the US District Court, Southern District of West Virginia, Beckley Division, *Eric Young, et al. v. Act Fast Delivery of West Virginia, Inc.*, Affidavit, November 2, 2017 (confidential); Affidavit, November 15, 2017 (confidential); Affidavit, January 10, 2018 (confidential); Affidavit, January 26, 2018 (confidential); Deposition, February 8, 2018 (confidential); Trial Testimony, February 27, 2018. Data analysis pertaining to mileage, travel times, and earnings for pharmaceutical couriers in a collective action lawsuit; provided calculation of damages.

Congressional Testimony

> Statement to US House of Representatives, Committee on Natural Resources, *Hearing on HR 215, American Indian Empowerment Act*, October 25, 2017 (written and oral testimony).

Lao Holdings NV and Sanum Investments Limited

> In arbitration under the rules of the International Centre for Settlement of Investment Disputes, *Lao Holdings NV v. Lao People's Democratic Republic (ICSID Case No. ARB(AF)/16/2); Sanum Investments Limited, v. Lao People's Democratic Republic (ICSID Case No. ADHOC/17/1)*, Witness Statement (with Joseph P. Kalt), September 1, 2017 (confidential). Evaluation of damages relating to gaming properties in Laos. Analysis addressing proper discount rates and determination of a quantum of harm for expropriated assets.

Eric Johnson

> In the Court of Chancery in the State of Delaware, *In re Oxbow Carbon LLC Unitholder Litigation*, Expert Report, June 5, 2017 (confidential).  Evaluation of a methodology for valuing units/shares in a privately held company in the energy industry.

Spring Creek Coal LLC

> ONRR Case No. 12.00736.001, *Value of Spring Creek Coal for Payment of Federal Royalty January 1, 2008 to December 31, 2011*, Expert Report (with Joseph P. Kalt), April 7, 2017 (confidential).  Evaluation of alleged underpayments of coal royalties arising from production in Montana.  Analysis relating to the proper economic framework for valuation along the chain of commerce from production to end use, the value of intermediate services, and sound techniques for utilization of price benchmarks.

Sanum Investments Limited

> In an arbitration under the rules of the Singapore Arbitration Center, *Sanum Investments Limited, Claimant, v. ST Group Co., Ltd., Sithat Xaysoulivong, S.T. Vegas Co., Ltd., S.T. Vegas Enterprise Ltd, Xaya Construction Co., Ltd. and Xaysana Xaysoulivong, Respondents*, Witness Statement (with Joseph P. Kalt and Steven R. Peterson), April 20, 2016 (confidential).  Evaluation of damages relating to gaming properties in Laos.  Project addressed proper discount rates and determination of a quantum of harm for expropriated assets.

Congressional Testimony

> Statement to US House of Representatives, Committee on Natural Resources, *Hearing on HR 538, Tribal Prosperity and Self-Determination through Energy Development*, October 4, 2016 (written and oral testimony).

Congressional Testimony

> Statement to US Senate Committee on Indian Affairs, *Hearing on Empowering Indian Country:  Coal, Jobs, and Self-Determination*, April 8, 2015 (written and oral testimony).

Navajo Agricultural Products Industry (Navajo Nation)

> Sworn testimony before the Navajo Resources and Development Committee regarding evaluation of damages arising from the failure of the federal government to complete a major farming/irrigation project in the southwestern United States, June 25, 2014.  Analysis addressed lost rents, forgone use of water rights, unfunded project completion costs, discount rates, and ongoing operations and maintenance expenditures.

Casa Trading LLC

> In an arbitration under the rules of the London Court of International Arbitration and the Judicial Authority of the Dubai International Financial Centre, *DME Mergeco Limited and Dubai Mercantile Exchange Limited v.*

4

*Casa Trading Limited*, and *Dubai Mercantile Exchange Limited v. Casa Trading Limited, Claim Number 002/2010*, Damages/Settlement Opinion, September 20, 2010 (confidential).  Analysis of damages allegedly arising from actions undertaken by a mercantile exchange in the Middle East, which resulted in the economic loss of a trading firm's equity position in the exchange, and loss of access to trading activities on the exchange.  Project addressed potential evolution of trading in the Middle East, a range of valuation methodologies, and determination of an appropriate discount rate.

Congressional Testimony

Statement to US Senate Committee on Indian Affairs, *Hearing on S.519, The Native American Capital Formation and Economic Development Act of 2003*, April 30, 2003 (written and oral testimony).

## OTHER EXPERT/CONSULTING RETENTIONS

Citizen Potawatomi Nation

Evaluation of potential infrastructure refurbishment.   Project addressed expected demand for restored rail service, cost-benefit analysis, and the impact more efficient rail service would imply for surrounding areas.  (2017)

United States Soccer Federation (USSF)

In the US District Court, Eastern District of New York, *North American Soccer League, LLC v. United States Soccer Federation, Inc.*   Analysis of the marketplace for professional soccer in the United States, league designations under USSF's standards, and evaluation of oversight of the sport by USSF.  (2017)

Glass and Stoltenberg

In the Court of Chancery of the State of Delaware, *Jon L. Glass and Wayne B. Stoltenberg, Petitioners, v. Riley Exploration Group, Inc. (f/k/a Cinco Resources, Inc.), Respondent*.   Valuation of a small oil and gas company; project addressed proper discount rates and forward-looking oil and gas prices.  The dispute settled prior to finalization of testimony.  (2017)

Tuba City Unified School District

Analysis of cash flows for a school district located on Navajo tribal lands.  Project centered on evaluation of the feasibility of issuing construction bonds to replace aging school buildings, financial analyses, and discounted cash flow calculations.  (2015)

Seneca Nation of Indians

Evaluation of damages stemming from construction of a major highway built over Indian land, allegedly without proper compensation.  (2010-2011)

5

Pokagon Band of Potawatomi Indians

    Strategy consulting relating to economic development initiatives geared toward enterprise diversification.  Project addressed financial analysis, the roles played by Board members and economic development staff, cost-benefit analysis, and prioritization of investment decisions.  (2010)

Greenberg Traurig LLP

    Privileged consulting relating to the existing framework governing rights-of-way on tribal lands, access to infrastructure for the purpose of energy development, value of rights-of-way, and potential federal legislation altering the administration of rights-of-way going forward.  (2006)

Cook Inlet Region, Inc. (a Native Corporation)

    Valuation of oil and gas properties relating to a tax dispute.  Analysis addressed comparable properties, valuation techniques, and calculation of appropriate discount rates; project included in-person negotiation with the IRS.  (2005-2006)

Hualapai Tribe

    Evaluation of economic development opportunities arising from a revision to the National Park Service's management plan for the Colorado River.  Analysis addressed assumptions underlying projections of use, appropriate discount rates, and likely damages arising under various management scenarios. (2005)

Shivwits Band of Paiute Indians

    Lease negotiations between the tribe and a multinational corporation with cobalt and tungsten processing operations on tribal land.  Prepared financial analysis regarding value of lease extension, participated in multi-party negotiations, and advised the tribe and legal counsel on economics of facility viability.  (2001-2002)

**ADDITIONAL SUPPORT/CONSULTING EXPERIENCE**

Ysleta del Sur Pueblo

    Review of an assessment of reginal impact from a tribal gaming operation. (2018-2019)

City of McKinney TX

    Analysis of a wholesale water agreement.  Project included analysis of rate design and conservation incentives, wholesale versus retail supply and demand factors, and changing water consumption patterns for a number of cities in the DFW metropolitan area.  (2018)

Hualapai Tribe
> Analysis of a water rights settlement for Indian community and enterprises. Project included analysis of regional impacts arising from construction of a water pipeline and expanded opportunities for growth initiatives.  (2017-2018)

Union Pacific Railroad Company
> Analysis of class certification issues and damages claims in two disputes having to do with the right-of-way along a rail/pipeline corridor.  (2016-2018)

United States Soccer Federation (USSF)
> Provided written work product.  Evaluated alleged wrongful behavior in designation of soccer leagues as Division I or Division II.  Project addressed the USSF's role in administration of the sport in a way that seeks to grow the game in the United States.  (2016)

SolarCity Corporation
> Evaluated residential utility rates and public policy for integration of distributed generation into an Arizona utility's service territory.  Project addressed the marketplace for electricity and allegations of anti-competitive conduct.  (2015-2017)

Citizen Potawatomi Nation
> Analysis of the applicability of state sales taxes to tribal enterprises.  Case addressed contributions made by various governments to the business and regulatory environment in which tribal enterprises operate.  (2015-2016)

Navajo Health Foundation/Sage Memorial Hospital
> Evaluated harms arising from denial of funds required to provide healthcare to community members.  Case addressed damages stemming from direct harm due to lack of health care, harms arising from lack of provision of contract support costs, and indirect harms arising from the lack of healthcare funding, all of which undermined the ability of the Navajo Nation to provide a range of other governmental services.  (2015-2016)

Venoco, Inc. and its Board of Directors
> Examination of allegations of underpayment in a take-private transaction for a previously publicly traded oil and gas company.  Case addressed valuation of producing and prospective properties in several locations throughout the United States.  (2014-2016)

SandRidge Energy
> Examination of the marketplace for oil and gas leases in Oklahoma.  Case addresses measurement of bonus and royalty rates paid for "investigated" transactions and comparable "non-investigated" transactions.  (2014-2016)

Ramah Navajo Chapter and a Class of Indian Tribes and Tribal Enterprises
> Analysis of harms arising from the US government's failure to provide for contract support costs when contracting or compacting with tribes for the provision of governmental services by the tribes.  (2014)

LM Ericsson, Inc., Qualcomm, Inc., Alcatel-Lucent USA, Inc., and the Third Generation Partnership Project
> Analysis of how specifications and standards are set in the telecommunications industry.  Case addressed allegations that marketplace participants could unfairly influence the decision-making process.  (2013-2014)

Crow Nation
> Evaluation of a coal production tax credit on Indian lands.  Analysis of tax incentives for continuing/expanding production and measurement of regional impacts from economic activity associated with mining operations.  (2013-2014)

Enbridge (US), Inc.
> Evaluation of alleged damages stemming from the purchase and reversal of a crude-oil transporting pipeline in Oklahoma and Texas.  Case addressed crude oil price differentials between major trading hubs, the value of crude oil transportation services, and sound techniques for damages estimates.  (2013-2014)

Yakama Nation
> Provided written work product.  Evaluation of inputs for use in the calculation of a gasoline tax rebate for a tribe in the Pacific Northwest.  Analysis addressed determination of annual fuel usage and an assessment of the number of tribal individuals eligible for the rebate.  (2013)

Venoco, Inc.
> Evaluation of alleged underpayments of oil royalties arising from production off the coast of California.  Case addressed the proper economic framework for valuation along the chain of commerce from production to refinery usage, the value of crude oil transportation services, and sound techniques for utilization of price benchmarks.  (2013)

SandRidge Energy
> Examination of the marketplace for natural gas and carbon dioxide in Texas.  Case addressed marketplace infrastructure, netback pricing, prudence of development of processing assets, and the marketability of natural gas and carbon dioxide at the point of production.  (2012-2013)

8

Ramah Navajo School Board, Inc.
>    Evaluation of harms arising from denial of funds required to provide healthcare to community members.  Case addressed damages stemming from direct harm due to lack of health care, multiplier effects in the community, and indirect harms arising from the lack of healthcare funding undermining the ability to provide a range of other governmental services.  (2012)

The Hershey Company
>    Analysis of claims of an antitrust conspiracy in pricing of chocolate products. Case addressed the structure of the marketplace, the economics of strategic competition, and an analysis of unilateral versus cooperative conduct by manufacturers.  (2011-2013)

Kaiser-Francis Oil Company
>    Examination of the marketplace for natural gas in Oklahoma.  Case addressed marketplace infrastructure, netback pricing, and the marketability of natural gas at the point of production.  (2011-2012)

United States Soccer Federation (USSF) and Major League Soccer (MLS)
>    Evaluation of alleged antitrust/anticompetitive behavior leading to the bankruptcy of a promoter of international exhibition matches.   Project addressed a non-profit's role in administration of a sport that provides public goods, a professional league's role in the development of the sport, allegations of discriminatory behavior, and proper definition of a relevant market.  (2010-2012)

Citizen Potawatomi Nation
>    Evaluation of ability to access federal stimulus funds for infrastructure refurbishment.  Project addressed the requirements for funding application, expected demand for restored rail service, cost-benefit analysis, and the impact more efficient rail service would imply for surrounding areas.  (2009)

North West Shelf Gas Party Limited
>    Examination of the marketplace for natural gas in an Australian state.  Case addressed the natural gas supply chain, the history of the marketplace, long-term contracting, marketplace infrastructure, the economic principles of fair market value, LNG exports, and the relevant marketplace for determining fair market value.  (2008-2009)

Shell Oil Company, Shell Oil Products Company, Shell Trading (US) Company, Equilon Enterprises LLC, Motiva Enterprises LLC, and TRM Company
>    Examination of various marketplaces for gasoline in the northeastern United States and Puerto Rico.  Cases addressed marketplace infrastructure, gasoline manufacturing, transportation assets, storage and terminal accessibility, imports from abroad, and supply shares brought to the marketplace by various producers and manufacturers.  (2007-2014)

9

Halliburton
> Analysis of antitrust claims stemming from provision of fluids used in deepwater drilling environments. Examination of the marketplace participants that provide such fluids, and their substitutes, as well as the history of development of the fluids in dispute. (2007-2008)

Cabot Corporation
> Examination of the marketplace for industrial metals used in high-tech applications. Case included analysis of the marketplace for these products and the commercial interactions of the major players on the buyers' side and the sellers' side of long-term contracts. (2007-2009)

New Times Media LLC, SF Weekly LP, and East Bay Express Publishing LP
> Examination of the marketplace for advertising space in the San Francisco Bay area. Analysis of changing marketplace conditions, substitutes for print advertising space, and the economics of pricing to cover marginal costs. (2007-2008)

Plains Pipeline LP, Plains Marketing LP, Apache Corporation, Energy Development Corporation (HIPS), Inc., GOM Shelf LLC, National Offshore LP, Newfield Exploration Company, NW Pipeline, Inc., Offshore Shelf LLC, Offshore Energy I LLC, and W&T Offshore, Inc.
> Damages assessment following harm to a major offshore pipeline caused by a ship dropping anchor onto the pipeline. Analysis addressed valuation techniques, calculation of appropriate discount rates, and utilization of expectations of future oil and gas prices. (2007-2008)

Western Refining, Inc.
> Examination of the competitive implications of the proposed merger of two refining companies. The analysis focused on assertions that the merger would adversely affect competition in the gasoline marketplace in the southwestern United States. (2007)

Tulalip Tribes of Washington
> Analysis of tax burdens and public policy relating to sound taxation policies. (2006-2007)

BP America Production Company, ExxonMobil, Anadarko Petroleum Corporation, Chevron USA, Inc., Burlington Resources, Inc., ConocoPhillips, Shell Oil Company, Total Exploration Production USA, Inc., Marathon Oil Company, Dominion Resources, Devon Energy Corporation, and Oxy USA, Inc.
> Royalty valuation analysis focused on lease-level transactions. Principal areas of research included market structure analysis of domestic natural gas industry, effects of transaction costs on the determination of value, the economic functions of different contract structures found within the natural

10

gas industry, and the economic role of and the determination of value provided by various market participants operating between the lease and the downstream markets.  (2006-2010)

Columbia Gas Transmission Corporation, Columbia Gulf Transmission Company, Dominion Cove Point LNG LP, Dominion Cove Point LNG Company LLC, Base Petroleum, Inc., Howard Energy Company, Inc., Columbia Energy Services Corporation, Dynegy, Inc., SEMCO Energy Services, SEMCO Pipeline Company, Virginia Electric and Power Company, The Wholesale Power Group, Southern Company Energy Marketing GP LLC, and El Paso Merchant Energy, LP

> Analysis of class certification issues surrounding a proposed class of natural gas marketers.  Case addressed transportation and storage options available during times of pipeline congestion, allegations of preferential treatment for a subset of Defendant shippers, and appropriateness of certification of the class action. (2006-2009)

Qualcomm, Inc., Nokia, Inc., Motorola, Inc., T-Mobile USA, Inc., Ericsson, Inc., and Lucent Technologies, Inc.

> Analysis of mechanisms by which specifications and standards are set in the industry.  Case addressed allegations that marketplace participants could unfairly influence the decision-making process.  (2006-2007)

T-Mobile International AG

> Class action that required analysis of terms of service agreements for mobile phone customers, evaluation of contracting, and assessment of the structure of the marketplace for mobile phone services.  (2005-2008)

Duke Energy LNG Sales, Inc.

> International arbitration regarding a breach of contract in the marketplace for LNG.  Case addressed size of LNG marketplace in the US, LNG tanker availability, natural gas prices, evaluation of damage estimates submitted by adverse party, and calculation of an appropriate discount rate.  (2005-2006)

Chevron USA, Inc.

> Evaluation of market value for natural gas produced from offshore State lands. Case addressed marketplace infrastructure, netback pricing, appropriate discount rates, and similar production for neighboring onshore fields.  (2004)

Shell Oil Company, Shell Western E&P, Inc., Shell Cortez Pipeline Company, Kinder Morgan $CO_2$ Company LP, Mobil Oil Corporation, Mobil Producing Texas and New Mexico, Inc., and Cortez Pipeline Company

> Determination of market value for inputs into the oil exploration and production process.  Case addressed market structure analysis, input valuation, and allegations of breach of prior settlement terms.  (2003-2004)

11

Shell Western E&P, Inc., Shell Gas Trading Company, and Shell Oil Company
>Royalty valuation analysis focused on lease-level cash transactions and implementation of an enhanced oil recovery (EOR) operation.  Principal areas of research included market structure analysis of domestic oil industry, effects of transaction costs on the determination of value, the economic role and determination of value provided by various market participants operating between the lease and the downstream markets, and the prudence of the timing of the initiation of EOR floods in Texas.  (2002-2003)

Samish Indian Nation
>Damages analysis of tribal non-recognition by the federal government. Assessed tribal rights and modeled tribal finances in the absence of federal recognition.  (2002-2003)

Northwest Indian Fisheries Commission
>Examined the economics of natural resources applicable to fishing rights and protection policies for internal use by the consortium.  Conducted economic literature review and prepared frameworks for continuing consortium analysis. (2002-2003)

SDDS, Inc.
>Calculation of appropriate discount rate and determination of damages from a temporary taking that led to the bankruptcy of the company and the cancellation of construction of a solid waste disposal facility.  Principal areas of research included application of valuation techniques to a project that had gone through multiple rounds of litigation prior to our retention, determination of similarly situated companies, and industry practices regarding financial and cash flow analysis.  (2002-2003)

Conoco, Inc., Amoco Production Company, and Amoco Energy Trading Corporation
>Evaluation of the upstream market for natural gas in one of the prominent US producing regions.  Principal areas of research included structure of the regional marketplace, analysis of the factors influencing the value of natural gas, and the economic role and the determination of value-added by various market participants operating between the wellhead and points downstream. (2001-2003)

Chevron USA, Conoco, Inc., and Murphy Exploration & Production Company
>Calculation of appropriate discount rates and gas price forecasts in light of a breach of contract/taking claim.  (2001-2002)

Tosco Corporation
>Evaluation of the downstream (refinery to pump) market for petroleum products in Hawaii.  Investigation of alleged collusion between downstream products companies and harm to consumers from asserted artificially high products prices.  (1999-2002)

12

Bass Enterprises Production Company and Enron Oil and Gas Company
> Assessed fair market rental value of oil-bearing property temporarily taken by the federal government.  (1999-2001)

Shell Oil Company, Shell Western E&P, Inc., Shell Cortez Pipeline Company, Kinder Morgan $CO_2$ Company LP, Mobil Oil Corporation, Mobil Producing Texas and New Mexico, Inc., and Cortez Pipeline Company
> Determined market value for inputs into the oil exploration and production process.  Case addressed pipeline tariff rates, market structure analysis, and input valuation.  (1998-2001)

BP Amoco, PLC and Atlantic Richfield Company
> In a case before the Federal Trade Commission, examined the competitive implications of the proposed merger of two major oil companies.  Focused on assertions that the merger would adversely affect competition in the bidding for rights to explore on the Alaska North Slope and that the combined company would have increased control over the supply of light sweet crude oil deliverable under futures contracts and thus would have increased ability to manipulate NYMEX trading.  (2000)

Yellowstone Pipeline Company
> Market power analysis in support of an application for rerouting an oil products pipeline.  (1999)

Exxon Corporation, Shell Oil Company, and Union Oil Company of California
> Royalty valuation analysis focused on lease-level cash transactions.  Principal areas of research included market structure analysis of the domestic oil industry, effects of transaction costs on the determination of value, the economic functions of different contract structures found within the oil industry, and the economic role and the determination of value provided by various market participants operating between the lease and the downstream markets.  (1998-2000)

**SELECT REPORTS, PUBLICATIONS, AND LEGISLATIVE TESTIMONY**
Statement to US House of Representatives, Committee on Oversight and Government Reform, Subcommittee on the Interior, Energy, and Environment, *Hearing on Tribal Energy Resources:  Reducing Barriers to Opportunity*, July 17, 2018.

"Discounted Cash Flow Valuation for Oil and Gas Pipelines," Pipeline and Gas Journal, December 20, 2017.

Statement to US House of Representatives, Committee on Natural Resources, *Hearing on HR 215, American Indian Empowerment Act*, October 25, 2017.

13

*Economic Impact of the Hualapai Water Rights Settlement and Proposed Diamond Creek Pipeline,* Research support for the Hualapai Tribe and Professor Joseph P. Kalt, The Harvard Project on American Indian Economic Development, July 16, 2017.

Statement to US House of Representatives, Committee on Natural Resources, *Hearing on HR 538, Tribal Prosperity and Self-Determination through Energy Development*, October 4, 2016.

Statement to US Senate Committee on Indian Affairs, *Hearing on Empowering Indian Country:  Coal, Jobs, and Self-Determination*, April 8, 2015.

*The Mining of Crow Nation Coal:  Economic Impact on the Crow Reservation, Big Horn County, and Montana,* Research support for the Crow Nation and Professor Joseph P. Kalt, The Harvard Project on American Indian Economic Development, February 4, 2014.

*Native Lands and Natural Resource Development*, served on the Advisory Board for Revenue Watch International, October 2010 to June 2011.

*The State of the Native Nations* (The Harvard Project on American Indian Economic Development, with JB Taylor, CEA Curtis, S Cornell, KW Grant, MR Jorgensen, JP Kalt, and AJ Lee), *Oxford University Press*, June 2008.

"Remember Our Indian Heritage" (with Kevin Red Star), opinion piece in *The Oklahoman*, August 2007.

"Wealth Building in Rural America: Potential in Human Diversity" (with coauthors), Washington University, Center for Social Development, 2006.

"Rural Wealth Building" (with Luxman Nathan and Anna Lee), Washington University, Center for Social Development, March 2005.

Comments on "Myths and Realities of Tribal Sovereignty:  The Law and Economics of Indian Self-Rule," by Professors Kalt (KSG) and Singer (HLS), written and oral comments presented at the Native Issues Research Symposium, Harvard Business School, December 5, 2003.

"Toward a Complete Picture," Let's Go:  Southwest USA Adventure Guide, St. Martin's Press, December 2003.

Statement to US Senate Committee on Indian Affairs, *Hearing on S.519, The Native American Capital Formation and Economic Development Act of 2003*, April 30, 2003.

"Native America at the New Millennium" (with JB Taylor, S Beane, K Bishop, SS Black, KW Grant, MR Jorgensen, J King, AJ Lee, H Nelson, and Y Roubideaux), in

14

*American Indian Research & Grants Assessment Project,* The Harvard Project on American Indian Economic Development, April 2002.

"The Political Economy of Indian Gaming:  The New England Experience" (with Luxman Nathan), *Communities and Banking*, No. 28 (publication of the Federal Reserve Bank of Boston), Winter 2000.

"Reserve-Based Economic Development:  Impacts and Consequences for Caldwell Land Claims" (with Kenneth W. Grant, Joseph P. Kalt, and Manley A. Begay, Jr.), August 10, 1999.

"Adopting Commercial Codes:  Overcoming Lending Barriers on Reservations" (with Luxman Nathan), *Communities and Banking*, No. 24 (publication of the Federal Reserve Bank of Boston), Winter 1999.

"Tool of Sovereignty:  The Crow Commercial Code" (with Luxman Nathan), Harvard Project Report Series 98-4, April 1998.


**SELECT PRESENTATIONS AND SPEAKING ENGAGEMENTS**

September 2018
Economic Impact of the Hualapai Water Rights Settlement and Proposed Diamond Creek Pipeline – Grand Canyon West, AZ (Tribal Council and Department of Interior Officials)

July 2018
*Hearing on Tribal Energy Resources:  Reducing Barriers to Opportunity* – Washington, DC (US House of Representatives, Committee on Oversight and Government Reform, Subcommittee on the Interior, Energy, and Environment)

February 2018
The First Year of President Trump – Native America Calling

October 2017
*HR 215, American Indian Empowerment Act* – Washington, DC (US House of Representatives, Committee on Natural Resources)

September 2017
Business Development on Indian Lands – Ignacio, CO (Rocky Mountain Indian Chamber of Commerce and the Southern Ute Tribe)

March 2017
Nation Building:  Research in Indian Country – Cambridge, MA (Harvard University)

15

October 2016
*HR 538, Tribal Prosperity and Self-Determination through Energy Development* – Santa Fe, NM (US House of Representatives, Committee on Natural Resources)

April 2016
The Facts About Taxes – Native America Calling

October 2015
*Homelessness in Indian Country* – Advisory Roundtable – San Diego, CA (National Congress of American Indians)

September 2015
*Research in Indian Country* – Advisory Roundtable – Boston, MA (Native American Finance Officers Association/Federal Reserve Bank of Minneapolis)

June 2015
The Future of Coal – Native America Calling

April 2015
*Empowering Indian Country:  Coal, Jobs, and Self-Determination* – Crow Agency, MT (Senate Committee on Indian Affairs)

February 2015
Economic Modeling and Scenario Analysis – Litchfield Park, AZ (Tuba City Unified School District)

January/February (annually) 2015-2016
Nation Building:  Research in Indian Country – Flagstaff, AZ (Northern Arizona University)

April 2014
Economic Development Isn't Only About Economics – Rock Hill, SC (American Indian Chamber of Commerce of South Carolina)

January/February (annually) 2011-2014
Nation Building:  Research in Indian Country – Tucson, AZ (University of Arizona)

January (annually) 2009-2018
Perspectives on the Challenges Facing Native America – Cambridge, MA (Harvard University)

March 2013
Nation Building Through Economic Development – New Town, ND (Three Affiliated Tribes of the Fort Berthold Reservation)

16

July 2012
Energy Resources and Sustainable Economic Development – New Town, ND (Three Affiliated Tribes of the Fort Berthold Reservation)

August 2010
Strategic Planning for Sustainable Economic Development – Watervliet, MI (Pokagon Band of Potawatomi Indians)

July 2010
Governance Analysis for Native Nations – St. Michael, ND (Spirit Lake Sioux Tribe)

April 2010
Long-Term Planning and Strategic Orientation – East Lansing, MI (Michigan Economic Development Corporation)

June 2007
The State of the Native Nations – New York, NY

December 2006
United We Thrive – Oklahoma City, OK

April 2005
To the Point – National Public Radio

March 2005
The State of American Indian Economic Development – Palm Springs, CA (Western Knight Center, Annenberg School for Communication, University of Southern California)

December 2004 to October 2005
Rosebud Economic Development Corporation – Advisory Project – Mission, SD (REDCO Board of Directors)

January 2004
Best Practices in Aboriginal Business and Economic Development – Banff, Alberta – Aboriginal Leadership and Management Program (The Banff Center)

December 2003
Native Issues Research Symposium – Cambridge, MA – The Law and Economics of Tribal Self-Government (HUNAP)

October and November 2003
Advisory Council Member, Tribal Asset Building Project – Mystic Lake, MN – (Kathryn M. Buder Center for American Indian Studies and the Center for Social Development, Washington University)

17

July 2003
Economic Development in Indian Country – Angoon, AK – Tongass Leadership
Team Meeting (USDA Forest Service)

June 2003
Economic Security and Good Governance – Phoenix, AZ (National Congress of
American Indians Mid-Year Session)

April 2003
*S.519 The Native American Capital Formation and Economic Development Act of
2003* – Washington, DC (Senate Committee on Indian Affairs)

August 2002
Sovereignty Matters – Cross Lake, Manitoba (Pimicikamak Cree Nation)

January/February/March 2002
NativeEdge Training Project – Phoenix, Portland, Oklahoma City (Department of
Housing and Urban Development)

July 2001
Models for Economic Development – Washington, DC (Tribal Diplomats' Circle)


**BOARD SERVICE**
Oregon's Kitchen Table Democracy – Portland, OR
Service on the Board of Directors for a nonprofit at Portland State University that
focuses on collaborative governance and a range of efforts to connect city, state, and
federal governments with the communities and citizens they represent (2015-present).

Revenue Watch International – New York, NY
Served on the Advisory Board for "Native Lands and Natural Resource
Development," published June 2011 (2010-2011).

Debt Education and Certification Foundation – Benbrook, TX
Served on the Board of Directors, as Treasurer of the Board, and as Chair of the
Finance Committee for a TX nonprofit corporation (2005-2010).

18

**HONORS AND AWARDS**
Who's Who Legal Arbitration 2019:  Expert Witness Analysis, *Global Arbitration Review*; 2018 Consulting Experts Guide, *Who's Who Legal*, Financial Advisory and Valuation – Quantum of Damages; 2018 Who's Who Legal:  Arbitration, *Global Arbitration Review*; 2017 Consulting Experts Guide, *Who's Who Legal*; 2017 Arbitration:  Expert Witness Analysis, *Who's Who Legal*; 2016 Consulting Experts Guide, *Who's Who Legal*; 2016 International Who's Who of Commercial Arbitration, *Global Arbitration Review*

Christian Johnson Native American Fellow, *John F. Kennedy School of Government, Harvard University*; American Express Philanthropic Scholar, *University of Texas at San Antonio*; Chaparral Presidential Scholar, *University of Texas at San Antonio*; Golden Key National Honor Society, *University of Texas at San Antonio*

**OTHER PROFESSIONAL ACTIVITIES**
Member of the National Rural Economic Developers Association; Past Member/Owner of Cardovie Capital Development LLC (MA); Member/Owner of CCHI LLC (TX)

19

# Appendix B

## Materials Considered

1. Lula Williams, et al., v. Big Picture Loans, LLC, et al.*, Class Action Complaint*, United States District Court for the Eastern District of Virginia (Richmond Division), filed June 22, 2017;

2. Renee Galloway, et al., v. Big Picture Loans, LLC, et al., *Class Action Complaint*, United States District Court for the Eastern District of Virginia (Richmond Division), filed June 11, 2018;

3. Lula Williams, et al., v. Big Picture Loans, LLC, et al., *Memorandum Opinion*, United States District Court for the Eastern District of Virginia, (Richmond Division), filed July 27, 2018;

4. Lula Williams, et al., v. Big Picture Loans, LLC, et al.*, Defendant Big Picture Loans, LLC's Second Amended and Supplemented Response to Plaintiff Lula Williams's First Set of Interrogatories*, United States District Court for the Eastern District of Virginia (Richmond Division), November 3, 2017;

5. Consumer Financial Protection Bureau v. Golden Valley Lending, Inc., Silver Cloud Financial, Inc., Mountain Summit Financial, Inc., and Majestic Lake Financial, Inc., *Amended Memorandum in Support of Defendants' Motion to Dismiss*, United States District Court for the District of Kansas, filed October 10, 2017;

6. Consumer Financial Protection Bureau vs. Golden Valley Lending Inc., et al., *Brief of the National Congress of American Indians as Amicus Curiae in Support of Defendants' Motion to Dismiss*, United States District Court (District of Kansas), No. 2:17-cv-02521-JAR-JPO, filed November 27, 2017;

7. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Lula Williams's First Set of Interrogatories to Defendant Daniel Gravel*, United States District Court, Eastern District of Virginia, Richmond Division, filed July 27, 2018;

8. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff's First Set of Requests to Defendant Daniel Gravel,* United States District Court, Eastern District of Virginia, Richmond Division, filed July 27, 2018;

9. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Lula Williams's First Set of Interrogatories to Defendant Ascension Technologies, Inc.,* United States District Court, Eastern District of Virginia, Richmond Division;

10. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff's First Set of Requests for Production of Documents to Defendant Ascension Technologies, Inc.,* United States District Court, Eastern District of Virginia, Richmond Division;

11. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Ascension Technologies, Inc.'s Objections to Plaintiff Lula Williams's First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

12. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Ascension Technologies, Inc.'s Objections to Plaintiff Lula Williams's First Set of Requests for Production*, United States District Court, Eastern District of Virginia, Richmond Division;

13. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Ascension Technologies, Inc.'s Response to Plaintiff Lula Williams's First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

14. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Ascension Technologies, Inc.'s Response & Objections to Plaintiff Lula Williams's First Set of Requests for Production*, United States District Court, Eastern District of Virginia, Richmond Division;

15. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Ascension Technologies, LLC's First Amended and Supplemented Response to Plaintiff Lula Williams's First Set of Interrogatories*, Eastern District of Virginia, Richmond Division;

16. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Brian McFadden Verification Statement*;

17. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Ascension Technologies, LLC's Second Amended and Supplemented Response to Plaintiff Lula Williams's First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

18. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff George Hengle's First Set of Interrogatories to Defendant Ascension Technologies, Inc.*, United States District Court, Eastern District of Virginia, Richmond Division;

19. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff's Requests for Admissions to Defendant Ascension Technologies, Inc.*, United States District Court, Eastern District of Virginia, Richmond Division;

20. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff's Second Set of Requests for Production of Documents to Defendant Ascension Technologies, Inc.*, United States District Court, Eastern District of Virginia, Richmond Division;

21. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Lula Williams's First Set of Interrogatories to Defendant Big Picture Loans, LLC*, United States District Court, Eastern District of Virginia, Richmond Division;

22. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiffs' First Set of Requests for Production of Documents to Defendant Big Picture Loans, LLC*, United States District Court, Eastern District of Virginia, Richmond Division;

23. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Big Picture, LLC's Objections to Plaintiff Lula Williams's First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

24. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Big Picture Loans, LLC's Response to Plaintiff Lula Williams's First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

25. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Big Picture Loans, LLC's Objections & Response to Plaintiff Lula Williams's First Set of Requests for Production,* United States District Court, Eastern District of Virginia, Richmond Division;

26. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Big Picture Loans, LLC's First Amended and Supplemented Response to Plaintiff Lula Williams's First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

27. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Michelle Hazen Verification*, United States District Court, Eastern District of Virginia,    Richmond Division;

28. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Big Picture Loans, LLC's Second Amended and Supplemented Response to Plaintiff Lula Williams's First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

29. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff George Hengle's First Set of Interrogatories to Defendant Big Picture Loans*, United States District Court, Eastern District of Virginia, Richmond Division;

30. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff's Requests for Admissions to Defendant Big Picture Loans, LLC*, United States District Court, Eastern District of Virginia, Richmond Division;

31. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff's Second Set of Requests for Production of Documents to Defendant Big Picture Loans, LLC*, United States District Court,  Eastern District of Virginia, Richmond Division;

32. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s Objections to Plaintiff Lula Williams's First Set of Requests for Production*, United States District Court, Eastern District of Virginia, Richmond Division;

33. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Lula Williams's First Set of Interrogatories to Defendant James Williams, Jr.,* United States District Court, Eastern District of Virginia, Richmond Division;

34. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff's First Set of Requests for Production of Documents to Defendant James Williams, Jr.*, United States District Court, Eastern District of Virginia, Richmond Division;

35. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s Objections to Plaintiffs' First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

36. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s Objections to Plaintiff Lula Williams's First Set of Requests for Production*, United States District Court, Eastern District of Virginia, Richmond Division;

37. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s Objections and Response to Plaintiffs' First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

38. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s Objections to Plaintiff Lula Williams's First Set of Requests for Production*, United States District Court, Eastern District of Virginia, Richmond Division;

39. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s First Amended and Supplemented Responses to Plaintiffs' First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

40. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *James Williams, Jr.'s Verification*, United States District Court, Eastern District of Virginia, Richmond Division;

41. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s Second Amended and Supplemented Responses to Plaintiff's First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

42. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s First Set of Interrogatories to Plaintiff Felix Gillison, Jr.*, United States District Court, Eastern District of Virginia, Richmond Division;

43. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s First Set of Requests for Production of Documents to Plaintiff Felix Gillison, Jr.*, United States District Court, Eastern District of Virginia, Richmond Division;

44. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Interrogatories to Plaintiff Felix Gillison, Jr. Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

45. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Requests for Admission to Plaintiff Felix Gillison, Jr. Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

46. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Requests for Production of Documents to Plaintiff Felix Gillison, Jr. Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

47. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Felix Gillison, Jr.'s Objections to Matt Martorello's First Set of Interrogatories Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

48. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Felix Gillison, Jr.'s Objections to Matt Martorello's First Set of Requests for Admission Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

49. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Felix Gillison, Jr.'s Objections to Matt Martorello's First Set of Requests for Production of Documents Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

50. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's Second Set of Requests for Production of Documents to Plaintiff Felix Gillison, Jr.*, United States District Court, Eastern District of Virginia, Richmond Division;

51. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Lula Williams's First Set of Interrogatories to Defendant Giiwegiizhigookway Martin*, United States District Court, Eastern District of Virginia, Richmond Division;

52. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiffs' First Set of Requests for Production of Documents to Defendant Giiwegiizhigookway Martin*, United States District Court, Eastern District of Virginia, Richmond Division;

53. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Giiwegiizhigookway Martin's Objections to Plaintiff's First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

54. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Giiwegiizhigookway Martin's Objections to Plaintiff Lula Williams' First Set of Requests for Production,* United States District Court, Eastern District of Virginia, Richmond Division;

55. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Giiwegiizhigookway Martin's Objections & Responses to Plaintiffs' First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

56. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Giiwegiizhigookway Martin's Objections & Responses to Plaintiffs' First Set of Requests for Production*, United States District Court, Eastern District of Virginia, Richmond Division;

57. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Giiwegiizhigookway Martin's First Amended and Supplemented Responses to Plaintiff's First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

58. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Giiwegiizhigookway Martin's Second Amended and Supplemented Responses to Plaintiff's First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

59. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Lula Williams's First Set of Interrogatories to Defendant Matt Martorello*, United States District Court, Eastern District of Virginia, Richmond Division;

60. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiffs' First Set of Requests for Production of Documents to Defendant Matt Martorello*, United States District Court, Eastern District of Virginia, Richmond Division;

61. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Matt Martorello's Objections to Plaintiff Lula Williams' First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

62. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Matt Martorello's Objections to Plaintiffs' First Set of Requests for Production of Documents*, United States District Court, Eastern District of Virginia, Richmond Division;

63. Williams v. Big Picture Loans, LLC, et al., *Defendant Matt Martorello Privilege Log – Vol. 1*, October 2, 2017;

64. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Matt Martorello's Responses to Plaintiffs' First Set of Requests for Production of Documents*, United States District Court, Eastern District of Virginia, Richmond Division;

65. Lula Williams, et al. v. Big Picture Loans, LLC, et al., Defendant Matt Martorello's Revised Objections to Plaintiff Lula Williams' First Set of Interrogatories, United States District Court, Eastern District of Virginia, Richmond Division;

66. *Martorello / Williams Documents Responsive to RFP Directed to Martorello*, November 3, 2017;

67. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff George Hengle's First Set of Interrogatories to Defendant Matt Martorello*, United States District Court, Eastern District of Virginia, Richmond Division;

68. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiffs' Requests for Admissions to Defendant Matt Martorello*, United States District Court, Eastern District of Virginia, Richmond Division;

69. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiffs' Second Set of Requests for Production of Documents to Defendant Matt Martorello*, United States District Court, Eastern District of Virginia, Richmond Division;

70. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Objections of Defendant Matt Martorello to Plaintiff George Hengle's First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

71. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Objections of Defendant Matt Martorello to Plaintiffs' Requests for Admissions*, United States District Court, Eastern District of Virginia, Richmond Division;

72. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Objections of Defendant Matt Martorello to Plaintiffs' Second Set of Requests for Production of Documents*, United States District Court, Eastern District of Virginia, Richmond Division;

73. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Responses and Revised Objections of Defendant Matt Martorello to Plaintiff George Hengle's First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

74. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Responses and Revised Objections of Defendant Matt Martorello to Plaintiffs' Request for Admissions*, United States District Court, Eastern District of Virginia, Richmond Division;

75. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Responses and Revised Objections of Defendant Matt Martorello to Plaintiffs' Second Set of Requests for Production of Documents*, United States District Court, Eastern District of Virginia, Richmond Division;

76. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Revised Responses and Revised Objections of Defendant Matt Martorello to Plaintiff George Hengle's First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

77. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Matt Martorello's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)*, United States District Court, Eastern District of Virginia, Richmond Division;

78. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Matt Martorello's Objections to Plaintiffs' First Set of Requests for Production of Documents*, United States District Court, Eastern District of Virginia, Richmond Division;

79. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Matt Martorello's Objections to Plaintiff Lula Williams' First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

80. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Interrogatories to Plaintiff Dowin Coffy Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

81. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Interrogatories to Plaintiff Felix Gillison, Jr. Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

82. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Interrogatories to Plaintiff George Hengle Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

83. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Interrogatories to Plaintiff Gloria Turnage Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

84. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Interrogatories to Plaintiff Lula Williams Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

85. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Requests for Admission to Plaintiff Dowin Coffy Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

86. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Requests for Admission to Plaintiff Felix Gillison, Jr. Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

87. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Requests for Admission to Plaintiff George Hengle Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

88. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Requests for Admission to Plaintiff Gloria Turnage Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

89. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Requests for Admission to Plaintiff Lula Williams Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

90. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Requests for Production of Documents to Plaintiff Dowin Coffy Relating to Class Certification,* United States District Court, Eastern District of Virginia, Richmond Division;

91. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Requests for Production of Documents to Plaintiff Felix Gillison, Jr. Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

92. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Requests for Production of Documents to Plaintiff George Hengle Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

93. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Requests for Production of Documents to Plaintiff Gloria Turnage Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

94. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Requests for Production of Documents to Plaintiff Lula Williams Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

95. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Lula Williams's First Set of Interrogatories to Defendant Gertrude McGeshick*, United States District Court, Eastern District of Virginia, Richmond Division;

96. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiffs' First Set of Requests for Production of Documents to Defendant Gertrude McGeshick*, United States District Court, Eastern District of Virginia, Richmond Division;

97. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Gertrude McGeshick's Objections to Plaintiffs' First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

98. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Gertrude McGeshick's Objections to Plaintiff Lula Williams' First Set of Requests for Production*, United States District Court, Eastern District of Virginia, Richmond Division;

99. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Gertrude McGeshick's Objections & Responses to Plaintiffs' First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

100. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Gertrude McGeshick's Objections & Responses to Plaintiff Lula Williams' First Set of Requests for Production*, United States District Court, Eastern District of Virginia, Richmond Division;

101. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Gertrude McGeshick's First Amended and Supplemented Reponses to Plaintiffs' First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

102. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Gertrude McGeshick Verification*, United States District Court, Eastern District of Virginia, Richmond Division;

103. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Gertrude McGeshick's Second Amended and Supplemented Responses to Plaintiffs' First Set of Interrogatories*, United States District Court, Eastern District of Virginia, Richmond Division;

104. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Lula Williams's First Set of Interrogatories to Defendant Susan McGeshick*, United States District Court, Eastern District of Virginia, Richmond Division;

105. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiffs' First Set of Requests for Production of Documents to Defendant Susan McGeshick*, United States District Court, Eastern District of Virginia, Richmond Division;

106. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Susan McGeshick's Objections to Plaintiff Lula Williams' First Set of Requests for Production*, United States District Court, Eastern District of Virginia, Richmond Division;

107. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Susan McGeshick's Objections & Responses to Plaintiff Lula Williams' First Set of Requests for Production,* United States District Court, Eastern District of Virginia, Richmond Division;

108. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s First Set of Interrogatories to Plaintiff Dowin Coffy*, United States District Court, Eastern District of Virginia, Richmond Division;

109. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s First Set of Requests for Production of Documents s to Plaintiff Dowin Coffy*, United States District Court, Eastern District of Virginia, Richmond Division;

110. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Interrogatories to Plaintiff Dowin Coffy Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

111. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Requests to Plaintiff Dowin Coffy Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

112. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Requests for Production of Documents to Plaintiff Dowin Coffy Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

113. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Dowin Coffy's Objections to Matt Martorello's First Set of Interrogatories Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

114. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Dowin Coffy's Objections to Defendant Matt Martorello's First Set of Requests for Admission Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

115. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Dowin Coffy's Objections to Defendant Matt Martorello's First Set of Requests for Production of Documents Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

116. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Dowin Coffy's Responses to Matt Martorello's First Set of Interrogatories Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

117. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Dowin Coffy's Responses to Defendant Matt Martorello's First Set of Requests for Admission Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

118. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Dowin Coffy's Responses to Defendant Matt Martorello's First Set of Requests for Production of Documents Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

119. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's Second Set of Requests for Production of Documents to Plaintiff Dowin Coffy*, United States District Court, Eastern District of Virginia, Richmond Division;

120. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s First Set of Interrogatories to Plaintiff George Hengle*, United States District Court, Eastern District of Virginia, Richmond Division;

121. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s First Set of Requests for Production of Documents to Plaintiff George Hengle*, United States District Court, Eastern District of Virginia, Richmond Division;

122. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set of Requests for Production to Plaintiff George Hengle Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

123. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff George Hengle's Objections to Matt Martorello's First Set of Interrogatories Relating to Class Certification,* United States District Court, Eastern District of Virginia, Richmond Division;

124. Lula Williams, et al. v. Big Picture Loans, LLC, et al*., Plaintiff George Hengle's Objections to Defendant Matt Martorello's First Set of Requests for Admission Relating to Class Certification,* United States District Court, Eastern District of Virginia, Richmond Division;

125. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff George Hengle's Objections to Matt Martorello's First Set of Requests for Production of Documents Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

126. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff George Hengle's Responses to Matt Martorello's First Set of Interrogatories Relating to Class Certification,* United States District Court, Eastern District of Virginia, Richmond Division;

127. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff George Hengle's Responses to Defendant Matt Martorello's First Set of Requests for Admission Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

128. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff George Hengle's Responses to Defendant Matt Martorello's First Set of Requests for Production of Documents Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

129. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's Second Set of Requests for Production of Documents to Plaintiff George Hengle*, United States District Court, Eastern District of Virginia, Richmond Division;

130. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s First Set of Interrogatories to Plaintiff Gloria Turnage*, United States District Court, Eastern District of Virginia, Richmond Division;

131. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s First Set of Requests for Production of Documents to Plaintiff Gloria Turnage,* United States District Court, Eastern District of Virginia, Richmond Division;

11

132. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Gloria Turnage's Objections to Defendant Matt Martorello's First Set of Requests for Admission Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

133. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Gloria Turnage's Objections to Matt Martorello's First Set of Requests for Production of Documents Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

134. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Gloria Turnage's Objections to Matt Martorello's First Set of Interrogatories Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

135. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Gloria Turnage's Responses to Matt Martorello's First Set of Interrogatories Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

136. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Gloria Turnage's Responses to Defendant Matt Martorello's First Set of Requests for Admission Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

137. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Gloria Turnage's Responses to Defendant Matt Martorello's First Set of Requests for Production of Documents Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

138. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's Second Set of Requests for Production of Documents to Plaintiff Gloria Turnage*, United States District Court, Eastern District of Virginia, Richmond Division;

139. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s First Set of Interrogatories to Plaintiff Lula Williams*, United States District Court, Eastern District of Virginia, Richmond Division;

140. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s First Set of Requests for Production of Documents to Plaintiff Lula Williams*, United States District Court, Eastern District of Virginia, Richmond Division;

141. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant James Williams, Jr.'s First Set of Interrogatories to Plaintiff Lula Williams Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

142. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set Requests for Admission to Plaintiff Lula Williams Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

143. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's First Set Requests for Production of Documents to Plaintiff Lula Williams Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

144. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Lula Williams' Objections to Matt Martorello's First Set of Interrogatories Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

145. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Lula Williams' Objections to Defendant Matt Martorello's First Set of Requests for Admission Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

146. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Lula Williams' Objections to Defendant Matt Martorello's First Set of Requests for Production of Documents Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

147. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Lula Williams' Responses to Matt Martorello's First Set of Interrogatories Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

148. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Lula Williams' Responses to Defendant Matt Martorello's First Set of Requests for Admission Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

149. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff Lula Williams' Responses to Defendant Matt Martorello's First Set of Requests for Production of Documents Relating to Class Certification*, United States District Court, Eastern District of Virginia, Richmond Division;

150. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Matt Martorello's Second Set of Requests for Production of Documents to Plaintiff Lula Williams*, United States District Court, Eastern District of Virginia, Richmond Division;

151. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Matt Martorello's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)*, United States District Court, Eastern District of Virginia, Richmond Division;

152. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Memorandum of Law in Support of Defendant Matt Martorello's Motion to Dismiss the Complaint*

*Pursuant to Fed. R. Civ. P. 12,* United States District Court, Eastern District of Virginia, Richmond Division;

153. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Memorandum of Law in Support of Defendant Matt Martorello's Motion to Stay*, United States District Court, Eastern District of Virginia, Richmond Division;

154. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Motion of Defendant Matt Martorello to Dismiss the Complain Pursuant to Fed. R. Civ. P. 12*, United States District Court, Eastern District of Virginia, Richmond Division;

155. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Defendant Matt Martorello's Motion to Stay*, United States District Court, Eastern District of Virginia, Richmond Division;

156. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff's Fed. R. Civ. P. 26(a)(1) Initial Disclosures*, United States District Court, Eastern District of Virginia, Richmond Division;

157. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Plaintiff's Motion for Class Certification of Claims Against Defendant Matt Martorello*, United States District Court, Eastern District of Virginia, Richmond Division;

158. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Scheduling Order*, United States District Court, Eastern District of Virginia, Richmond Division;

159. Lula Williams, et al. v. Big Picture Loans, LLC, et al., *Opposition to Plaintiff's Motion for Class Certification of Claims Against Defendant Matt Martorello*, United States District Court, Eastern District of Virginia, Richmond Division;

160. Statement of Joseph P. Kalt, Before the United States Senate Committee on Indian Affairs, *Establishing a Tribal Development Corporation,* September 20, 2004;

161. Lyndon B. Johnson, "Special Message to the Congress on the Problems of the American Indian: 'The Forgotten American'," United States Congress, Washington DC, March 6, 1968;

162. United States Senate, Committee on Indian Affairs, *Oversight Hearing on Economic Development in Indian Country*, May 10, 2006;

163. Senate Report No. 100-446 on the Indian Gaming Regulatory Act, to accompany S. 555, August 3, 1988;

164. House of Representatives Debate on S. 555, September 26, 1988;

165. Statement of Lance Morgan, US Senate, Senate Committee on Indian Affairs, *Oversight Hearing on Indian Economic Development,* May 10, 2006, 109th Congress, Washington:  GPO, 2006;

166. Terry Anderson, Testimony to the US Commission on Civil Rights, "Quiet Crisis: Federal Funding and Unmet Needs in Indian Country, 2016 Update," February 19, 2016;

167. Deposition and Exhibits of Michelle Hazen, October 16, 2017;

168. Videotaped Deposition and Exhibits of Gertrude McGeshick, November 13, 2017;

169. Videotaped Deposition and Exhibits of James Williams, Jr., November 13, 2017;

170. Videotaped Deposition and Exhibits of James V. Dowd, November 13, 2018;

171. Oral and Videotaped Deposition and Exhibits of Matthew Martorello, August 30, 2018;

172. Videotaped Deposition and Exhibits of Lula Williams, October 4, 2018;

173. Videotaped Deposition and Exhibits of Marcella Singh, October 4, 2018;

174. Videotaped Deposition and Exhibits of Gloria Turnage, October 4, 2018;

175. Videotaped Deposition and Exhibits of Dowin Coffy, October 5, 2018;

176. Videotaped Deposition and Exhibits of George Hengle, October 5, 2018;

177. Videotaped Deposition of Rick H. Gerber, December 17, 2018;

178. LVD-DEF00017103 – LVD-DEF00017105;

179. LVD-DEF00017106 – LVD-DEF00017107;

180. LVD-DEF00017108 – LVD-DEF00017109;

181. LVD-DEF00017110;

182. LVD-DEF00017111 – LVD-DEF00017113;

183. LVD-DEF00007031;

184. LVD-DEF00000563 – LVD-DEF00000570;

185. LVD-DEF00013614 – LVD-DEF00013623;

186. LVD-DEF00017101– LVD-DEF00017102;

187. LVD-DEF00014694 – LVD-DEF00014706;

188. MARTORELLO_000067 – MARTORELLO_000095;

189. LVD-DEF00000424;

190. LVD-DEF00003085 – LVD-DEF00003088;

191. LVD-DEF00010139;

192. LVD-DEF00000310;

193. MARTORELLO_000203 – MARTORELLO_000248;

194. *California v. Cabazon Band of Indians*, 480 US 202 (1987);

195. Lula Williams, et al. v. Big Picture Loans, et al., *Declaration of Matthew Martorello in Support of Defendants Big Picture Loans, LLC and Ascension Technologies, LLC's Reply in Support of Their Motion to Dismiss for Lack of Subject Matter Jurisdiction*, United States District Court for the Eastern District of Virginia (Richmond Division);

196. Affidavit of Michelle Hazen, September 28, 2017;

15

197. The Otoe-Missouria Tribe of Indians, et al. v. New York State Department of Financial Services; Benjamin M. Lawsky, *Declaration of James Williams, Jr. in Support of Motion for a Preliminary Injunction*, United States District Court for the Southern District of New York, filed August 29, 2013;

198. Affidavit of James Williams, Jr., September 28, 2017;

199. Affidavit of Brian McFadden, December 21, 2017;

200. Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution #T2014-066*, August 26, 2014;

201. Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution #T2015-10*, February 5, 2015;

202. *Constitution of the Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan,* May 14, 1992;

203. Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution No. 2011-30*, July 8, 2011;

204. Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution # 2011-041*, September 14, 2011;

205. Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution No. 2011-053*, November 18, 2011;

206. Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution No. T2014-068*, August 26, 2014;

207. Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution # T2015-08*, February 3, 2015;

208. Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution No. T2015-059*, September 14, 2015;

209. Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution No. T2015-060*, September 14, 2015;

210. Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution # T2016-018*, February 16, 2016;

211. Lac Vieux Desert Band of Lake Superior Chippewa Tribal Government, *Resolution #T2016-021*, February 16, 2016;

212. *First Amended and Restated Articles of Organization of Ascension Technologies, LLC*, July 7, 2016;

213. *Articles of Organization of the Red Rock Tribal Lending, LLC*, September 14, 2011;

214. *First Amended and Restated Articles of Organization of Tribal Economic Development Holdings, LLC*, July 7, 2016;

215. Lac Vieux Desert Band of Lake Superior Chippewa Indians, Red Rock Tribal Lending, LLC, *Articles of Dissolution – Limited Liability Companies*, effective February 17, 2016;

16

216. Ascension Technologies, LLC, *Delegation of Authority Policy*, effective January 22, 2016;

217. Big Picture Loans, LLC, *2017 Business Plan*;

218. Big Picture Loans, *Meeting Minutes*, December 1, 2015;

219. Lac Vieux Desert Band of Lake Superior Chippewa Indians, *Business Entity Ordinance*;

220. The Lac Vieux Desert Band of Lake Superior Chippewa Indians, *Tribal Consumer Financial Services Regulatory Code*;

221. Red Rock Tribal Lending, LLC d/b/a Castle Payday, *Notice of Dissolution*, February 17, 2016;

222. Lac Vieux Desert Band of Lake Superior Chippewa Indians, *Wiindamaagewin "News,"* July 21, 2017;

223. Lac Vieux Desert Band of Lake Superior Chippewa Indians, *Wiindamaagewin "News,"* October 23, 2017;

224. Lac Vieux Desert Band of Lake Superior Chippewa Indians, *Wiindamaagewin "News,"* September 15, 2017;

225. *First Amended and Restated Operating Agreement of Ascension Technologies, LLC*, July 7, 2016;

226. *First Amended Operating Agreement of Big Picture Loans, LLC*, February 2015;

227. *Schedule A of the Operating Agreement of Eventide Credit Acquisitions, LLC*, January 27, 2016;

228. *First Amended and Restated Operating Agreement of Tribal Economic Development Holdings, LLC*, July 7, 2016;

229. *Secured Promissory Note*, 2016;

230. *Addendum to Secured Promissory Note*, September 2016;

231. *Amended & Restated Servicing Agreement Between Red Rock Tribal Lending, LLC and SourcePoint VI, LLC*, July 31, 2012, with retroactive effect to October 25, 2011;

232. *Intratribal Servicing Agreement Between Big Picture Loans, LLC and Ascension Technologies, LLC*, February 16, 2016;

233. *Indian Trust Asset Reform Act* of 2016 (Public Law 114-178, June 22, 2016, which can also be found at 25 USC §§ 5601-02);

234. *Agriculture Improvement Act of 2018* (included in *Public Law 115-334*, passed on December 20, 2018);

235. *Indian Gaming Regulatory Act*, Public Law 100-497, October 17, 1988;

236. 12 USC § 5481(27);

237. *Native American Business Development, Trade Promotion, and Tourism Act* of 2000, Public Law 106-464, November 7, 2000, which can also be seen at 25 USC §4301;

238. Miriam Jorgensen, *Bringing the Background Forward:  Evidence from Indian Country on the Social and Cultural Determinants of Economic Development*, Doctoral Dissertation, May 2000;

239. Stephen Cornell, Miriam Jorgensen, Joseph Kalt, and Katherine Spilde, "Seizing the Future:  Why Some Native Nations Do and Others Don't," *Joint Occasional Papers on Native Affairs*, Harvard Project on American Economic Development, October 2003;

240. Stephen Cornell and Joseph P. Kalt, "Reloading the Dice:  Improving the Chances for Economic Development on American Indian Reservations," *Joint Occasional Papers on Native Affairs*, No. 2003-02, 2003;

241. Robert Miller, "Sovereign Resilience:  Reviving Private Sector Economic Institutions in Indian Country," *BYU Law Review 2018*, Issue 6, August 2018;

242. Miriam Jorgensen, *Access to Capital and Credit in Native Communities*, Native Nations Institute, 2016;

243. Robert Miller, "Creating Economic Development on Indian Reservations", PERC, Volume 30, No. 2, Fall 2012;

244. Eric Henson and Luxman Nathan, "The Political Economy of Indian Gaming: The New England Experience," *Federal Reserve Bank of Boston*, Winter 2000 and Steven Light, "The Cabazon Decision: Opening the Door to Indian Gaming – 20 Years Later," *Indian Gaming*, April 2007;

245. Katherine Spilde and Jonathan Taylor, "Economic Evidence on the Effects of the Indian Gaming Regulatory Act on Indians and Non-Indians," *UNLV Gaming Research & Review Journal*, 2013, Volume 17, Issue 1;

246. Randall Akee, Katherine Spilde, and Jonathan Taylor, "The Indian Gaming Regulatory Act and its Effects on American Indian Economic Development," *Journal of Economic Perspectives*, Summer 2015;

247. Matthew Fletcher, "In Pursuit of Tribal Economic Development as a Substitute for Reservation Tax Revenue," *North Dakota Law Review*, 2004;

248. Gavin Clarkson, Katherine Spilde, and Carma Claw, "Online Sovereignty:  The Law and Economics of Tribal Electronic Commerce," *Vanderbilt Journal of Entertainment & Technology Law*, Fall 2016, Volume 19, Number 1;

249. Katherine Spilde, "E-Commerce Opportunities for Tribal Governments," *Indian Gaming*, October 2012;

250. Miriam Jorgensen and Jonathan Taylor, "What Determines Indian Economic Success?  Evidence from Tribal and Individual Indian Enterprises," Joint Occasional Papers on Native Affairs, Harvard Project on American Economic Development, June 2000;

251. Katherine Spilde, "E-Commerce Opportunities for Tribal Governments," *Indian Gaming*, October 2012;

252. Naomi Schaefer Riley, "One Way to Help Native Americans: Property Rights," *The Atlantic*, July 30, 2016;

253. Ronald Trosper, "American Indian Relative Ranching Efficiency," *American Economic Review*, 1978, Vol 68(4);

254. Dustin Frye*, Leasing, Law, and Land Tenure:  Measuring the Impact of the Long-Term Leasing Act of 1955 on Indian Land Holdings*, December 11, 2012;

255. Jeff Keohane, "The Rise of Tribal Self-Determination and Economic Development," *American Bar Association Human Rights Magazine,* Spring 2006, Vol. 33, No. 2;

256. Miriam Jorgensen, ed., *Rebuilding Native Nations*, Tucson: The University of Arizona Press, 2007;

257. Matthew Fletcher, *Federal Indian Law,* West Academic Publishing, 2016;

258. Stephen L. Pevar, *The Rights of Indians and Tribes*, Oxford University Press, 2012;

259. The Harvard Project on American Indian Economic Development, *The State of the Native Nations:  Conditions Under US Policies of Self-Determination*, New York: Oxford University Press, 2008;

260. David Getches, Charles Wilkinson, Robert Williams, Matthew Fletcher, and Kirsten Carpenter, *Cases and Materials on Federal Indian Law 7th Edition*, West Academic Publishing, Minnesota, 2017;

261. Tadayuki Hara, *Quantitative Tourism Industry Analysis*, Elsevier Inc., Oxford, 2008;

262. Robert Miller, *Reservation "Capitalism":  Economic Development in Indian Country*, University of Nebraska Press, Lincoln, Nebraska, 2012;

263. Jonathan Taylor and Joseph Kalt, *American Indians on Reservations: A Databook of Socioeconomic Change between the 1990 and 2000 Censuses*, The Harvard Project on American Indian Economic Development, January 2005;

264. Randall Akee and Jonathan Taylor, *Social and Economic Change on American Indian Reservations: A Databook of the US Censuses and the American Community Survey, 1990-2010*, May 15, 2014;

265. Indian Health Service, "Indian Health Care Improvement Act Made Permanent," March 27, 2010;

266. National Indian Gaming Commission, "Media Advisory:  Press Conference: Chairman Chaudhuri and Commission to Announce Indian Gaming's 2017 Gross Gaming Revenues," June 5, 2018;

267. American Gaming Association, "State of the States:  The AGA Survey of the Casino Industry," 2017;

268. Native News Online, "NAFSA to Congress: CFPB Targets and Actively Dismisses Tribal Sovereignty," October 4, 2017;

269. Kevin Draper, Tim Arango, and Alan Blinder, "Indian Tribes Dig In to Gain Their

Share of Sports Betting," May 21, 2018;

270. MGM Resorts International, "MGM Resorts International Retains TFA Capital Partners as Strategic Advisor for Development of Key Tribal Sports Betting Partnerships," December 4, 2018;

271. Glenn Coin, "Caesars, Turning Stone to offer sports betting in New York," January 2, 2019;

272. Adrienne Roberts, "Lake Superior Chippewa Indians in Michigan's UP Acquires Lending Company," DBusiness, January 28, 2016;

273. Business Wire, "Prairie Band Potawatomi Nation to Assume Management of Harrah's Prairie Band Casino in 2008";

274. Disclosures Regarding Harrah's Entertainment, Inc., Exhibit 99.1," 2007;

275. Bethany Blundell, "Harrah's, Ak-Chin renew casino management agreement," Maricopa Monitor;

276. Scott McKie, "Council tables amended gaming management agreement," Cherokee One Feather, April 4, 2017;

277. Indian Gaming Magazine, "WinStar World Casino and Hotel and Hnedak Bobo Group Continue Expansion Evolution," March 2014;

278. Everi, "Everi to Provide Expanded Payments Solutions to WinStar World Casino and Resort Through CashClub Wallet Mobile Application," September 27, 2017;

279. ESports Insider, "compLexity announces partnership with WinStar World Casino," November 13, 2018;

280. Business Wire, "GAN Launches Simulated Gaming for WinStar World Casino and Resort," May 12, 2017;

281. "Lac Vieux Desert Band of Lake Superior Chippewa Indians Bolsters Tribal Economic Development Portfolio with Purchase of Bellicose Capital, LLC," January 27, 2016;

282. Indianz.com, "Jena Band of Choctaw Indians celebrates fifth birthday of casino," February 12, 2018;

283. Indianz.com, "Mashpee Wampanoag Tribe warns of losses due to stalled casino," December 10, 2018;

284. Indianz.com, "Enterprise Rancheria sees progress on 'Hard Rock' development," November 29, 2018;

285. Murray Evans, Washington Post, "Tribe plows millions into Remington Park," March 3, 2011;

286. NBC 5 Dallas-Fort Worth, "Lone Star Park Sold to Subsidiary of Chickasaw Nation," May 16, 2011;

287. Randy Ellis, NewsOK, "Chickasaw subsidiary buys part of Lone Star Park racetrack," May 15, 2011;

288. USA Today, "Investor in Grand Canyon Skywalk dies at 51," June 14, 2013;

289. Native American Financial Services Association, "Best Practices";

290. Advancia, "Tribal 8(a) Advantage;"

291. Indianz.com, "Mashpee Wampanoag Tribe still working with backer of derailed casino," December 4, 2018;

292. Indianz.com, "NCAI: Mashpee Wampanoag Tribe 'stripped' of its sovereignty," September 11, 2018;

293. George Brennan, MV Times, "Tribe announces gambling partner," August 22, 2018;

294. National Conference of State Legislatures (www.ncsl.org);

295. Alcohol and Tobacco Tax and Trade Bureau (hwww.ttb.gov);

296. North Dakota Mill and Elevator Association (www.ndmill.com);

297. Tennessee Valley Authority (www.tva.com);

298. The Commonwealth of Virginia (www.virginia.gov);

299. National Indian Gaming Commission (www.nigc.gov);

300. Consumer Financial Protection Bureau (www.consumerfinance.gov);

301. Native American Financial Services Association (nativefinance.org);

302. Native News Online (nativenewsonline.net);

303. Blue Trust Loans (www.bluetrustloans.com);

304. Zoca Loans (www.zocaloans.com);

305. Q Credit (www.qcredit.com);

306. Silver Cloud Financial (www.silvercloudfinancial.com);

307. Golden Valley Lending (www.goldenvalleylending.com);

308. Majestic Lake Financial (www.majesticlakefinancial.com);

309. Mountain Summit Financial (www.mountainsummitfinancial.com);

310. San Diego State University (libguides.sdsu.edu);

311. Congressional Budget Office (www.cbo.gov);

312. The New York Times (www.nytimes.com);

313. Lac Vieux Desert Band of Lake Superior Chippewa Indians (www.lvdtribal.com);

314. Rincon Band of Luiseño Indians (www.rincontribe.org);

315. Casino Careers (www.casinocareers.com);

316. Indianz.com (www.indianz.com);

317. Global Gaming Solutions (www.globalgamingsol.com);

318. Chickasaw Nation (www.chickasaw.net);

319. Michigan Department of Technology (www.michigan.gov);

320. US Commission on Civil Rights, *Broken Promises: Continuing Federal Funding Shortfall for Native Americans*, December 2018;

321. Bureau of Labor Statistics, Labor Force Statistics from the Current Population Survey, Unemployment Rates, 2008-2018;

322. US Census Bureau, 2013-2017 American Community Survey 5-Year Estimates, "Selected Economic Characteristics";

323. US Census Bureau, American Community Survey 5-Year Estimates 2013-2017, "Educational Attainment";

324. US Census Bureau, 2010 Census American Indian and Alaska Native Summary File, "Geographic Identifiers";

325. US Commission on Civil Rights, *A Quiet Crisis: Federal Funding and Unmet Needs in Indian Country*, July 2003;

326. US Department of the Interior, Budget Justifications and Performance Information, 2006-2019;

327. Bureau of Economic Analysis, Table 1.1.6 Real Gross Domestic Product, Chained Dollars;

328. Congressional Budget Office, Budget and Economic Data, "Historical Budget Data," April 2018;

329. Virginia Department of Alcoholic Beverage Control, *Annual Report 2017;*

330. *2017 Virginia Lottery Annual Financial Report;*

331. Charles Arlinghaus, et al., *State of New Hampshire Comprehensive Annual Financial Report for the Fiscal Year Ended June 30, 2017;*

332. National Congress of American Indians, Resolution #TUL-13-056, 2013;

333. National Congress of American Indians, *Tribal Infrastructure: Investing in Indian Country for a Stronger America*, 2017;

334. Great Plains Tribal Chairman's Association, Resolution No. 21-9-6-13, September 6, 2013;

335. Big Picture Loans, *Customer Agreement*;

336. *Tribal Distribution and Eventide Repayment;*

337. Letter of Michelle Hazen to Tribal Financial Services Regulatory Authority, *Re: Dissolution of Red Rock Tribal Lending, LLC; Assignment of Active Loans*, August 3, 2016;

338. *Lula Williams Loan Agreement;*

339. National Atlas of the United States;

340. ArcGIS Online;


And all other materials cited in my report and figures.