**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

---

**LULA WILLIAMS, GLORIA TURNAGE, GEORGE HENGLE, DOWIN COFFY, and FELIX GILLISON, JR.,** *on behalf of themselves and all individuals similarly situated,*

**Plaintiff,**

**V.**

**BIG PICTURE LOANS, LLC; MATT MARTORELLO; ASCENSION TECHNOLOGIES, INC.; JAMES WILIAMS, JR.; GERTRUDE MCGESHICK; SUSAN MCGESHICK; and GIIWEGIIZHIGOOKWAY MARTIN,**

**Defendants,**

**3:17cv461**

---

**EXPERT REPORT OF JOHN M. NORMAN**

**JANUARY 11, 2019**

_____
John M. Norman, CPA
Partner
GreerWalker LLP

# TABLE OF CONTENTS

I.    QUALIFICATIONS ................................................................................. 1

II.   INTRODUCTION AND SCOPE OF ENGAGEMENT ............................... 1

III.  SUMMARY OF OPINIONS .................................................................... 2
      A.   Seller-financing is widely and commonly used in private business transactions. ........ 2
      B.   The terms of the Bellicose Transaction are consistent with a seller-financed sale
           arrangement known as an installment sale that is contemplated by the Internal
           Revenue Service ("IRS") and commonly used to defer taxable gains on the sale of
           a business ................................................................................................................ 2
      C.   The timing of the Bellicose Transaction provided additional tax benefits to Mr.
           Martorello ................................................................................................................ 2
      D.   The terms and covenants of the Bellicose Transaction are common in seller
           financed transactions and generally align the interests of the buyer and seller .......... 2

IV.   BACKGROUND .................................................................................... 2
      A.   Pleadings and Allegations ........................................................................................ 2
      B.   Terms of the Bellicose Transaction ........................................................................... 4
           1.   Acquisition Price and Financing ......................................................................... 4
           2.   Interest and Payment Terms .............................................................................. 4
           3.   Note Term and Acquisition Amount .................................................................... 5
           4.   Continuing Interest and Control .......................................................................... 5
           5.   Assumption of Liabilities .................................................................................... 6

V.    BASIS FOR OPINIONS ........................................................................ 7
      A.   Seller-financing is widely and commonly used in private business transactions. ........ 7
      B.   The terms of the Bellicose Transaction are consistent with a seller-financed sale
           arrangement known as an installment sale that is contemplated by the Internal
           Revenue Service ("IRS") and commonly used to defer taxable gains on the sale of
           a business ................................................................................................................ 8
           1.   Contingent Payment Installment Sale Treatment History .................................... 9
           2.   Installment Sale Regulations .............................................................................. 9
           3.   Installment Sale IRS Letter Rulings ................................................................. 11
      C.   The timing of the Bellicose Transaction provided additional tax benefits to Mr.
           Martorello .............................................................................................................. 13
      D.   The terms and covenants of the Bellicose Transaction are common in seller
           financed transactions and generally align the interests of the buyer and seller ......... 14
           1.   Seller's Ongoing Involvement in Business Operations ...................................... 14
           2.   Loan Covenants .............................................................................................. 15
           3.   Payment Terms ............................................................................................... 16

VI.   COMPENSATION ............................................................................... 19

VII.  INFORMATION RELIED UPON ........................................................... 19

*Expert Report of John M. Norman*
**GreerWalker LLP**

## I.     Qualifications

I am a Senior Partner with GreerWalker LLP ("GreerWalker") and Managing Director of GreerWalker LLP's exit planning and investment banking affiliate, GreerWalker Corporate Finance LLC.  GreerWalker is a North and South Carolina based public accounting and business advisory firm.  I have over 25 years of experience in tax and business advisory services including exit planning and corporate transactions.  Additionally, I have a strong focus on corporate domestic as well as international tax issues.  I am a Certified Public Accountant ("CPA") and hold a Bachelor of Science in Business Administration and Masters of Taxation from University of South Carolina.  My curriculum vitae is included with this report as **Appendix A**.  It includes selected professional experience and publications authored in the last ten years. I have not testified in the last four years.

## II.  Introduction and Scope of Engagement

GreerWalker LLP was retained by Armstrong Teasdale, LLP ("Armstrong Teasdale"), counsel for Matt Martorello in the above-captioned matter to develop expert opinions related to the sale of Bellicose Capital, LLC ("Bellicose Capital") from seller Eventide Credit Acquisitions, LLC ("Eventide") to acquiror LVD Tribal Acquisition Company, LLC ("LVD") a wholly owned subsidiary of the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe").[1]  This sale is referred to herein as the "Bellicose Transaction."  I reviewed the Agreement and Plan of Merger dated October 7, 2015 ("Merger Agreement") and related transactional documents (collectively the "Transaction Documents") to opine on the terms and nature of the Bellicose Transaction and related tax implications.

If necessary and requested, I will respond to the opinions and conclusions of Plaintiffs' expert witness or witnesses.  Such responses may not be limited to the topics included in this report.  If requested by Armstrong Teasdale, I will testify at deposition and trial.  I have personally supervised and reviewed the work performed by staff working with me on this matter. When used in this report, "I" refers to me and my staff working under my direct supervision and control.

---

[1] Agreement and Plan of Merger, first paragraph.

*Expert Report of John M. Norman*
*GreerWalker LLP*

## III.   Summary of Opinions

**A.   Seller-financing is widely and commonly used in private business transactions.**

**B.   The terms of the Bellicose Transaction are consistent with a seller-financed sale arrangement known as an installment sale that is contemplated by the Internal Revenue Service ("IRS") and commonly used to defer taxable gains on the sale of a business.**

**C.   The timing of the Bellicose Transaction provided additional tax benefits to Mr. Martorello.**

**D.   The terms and covenants of the Bellicose Transaction are common in seller financed transactions and generally align the interests of the buyer and seller.**

## IV.   Background

**A.   Pleadings and Allegations**

Plaintiffs, Lula Williams, Gloria Turnage, George Hengle, Dowin Coffy and Felix Gillison, Jr. (collectively, "Individual Plaintiffs") filed a Class Action Complaint on behalf of themselves and others on June 22, 2017 (the "Complaint").[2]  As this matter is a class action litigation, the plaintiff class is referred to collectively as "Plaintiffs."  In the Complaint, Plaintiffs allege the following:

- Defendant Matt Martorello approached the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe") for the purposes of establishing a "rent-a-tribe" scheme.[3]  Plaintiffs describe a "rent-a-tribe" scheme as "a payday lending scheme" whereby an individual or entity "associates with a Native American tribe in an attempt to cloak itself in the privilege and immunities enjoyed by the tribe."[4]

---

[2] Class Action Complaint, p. 1.
[3] Class Action Complaint, paragraph 3.
[4] Class Action Complaint, paragraph 2.

- Mr. Martorello made usurious consumer payday loans.[5]  He made them in the name of Big Picture Loans, LLC (formerly known as Red Rock Tribal Lending, LLC and referred to herein as "Big Picture Loans") which claimed to be owned and operated by the Tribe to claim tribal immunity from usury laws.[6]

- Despite representations in the consumer loan agreements that Big Picture Loans and Red Rock Tribal Lending, LLC ("Red Rock") were owned and operated by the Tribe, Bellicose Capital was the *de facto* owner and controlled the operations of Big Picture Loans.[7]

- Bellicose Capital handled the lead generation used to identify and solicit potential consumer borrowers and was the actual entity that procured the investment capital, serviced the loans, and received the vast majority of the revenue from the loans.[8]

- Mr. Martorello's company, Bellicose Capital, LLC ("Bellicose Capital"), funded the loans, controlled the underwriting, and handled the day-today operations of Big Picture Loans.[9]

- The Tribe had no control over the income or expenses of Big Picture Loans and allowed Defendants to use their name as a front in return for a nominal 2% flat fee of the revenue.[10]

- The Tribe paid Martorello $1.3 million plus he is entitled to receive as much as $300 million in future payments.  In other words, the Tribe continues to accept a nominal fee in return for the use of its name.[11]

The claims asserted by Plaintiffs include: (1) Declaratory Judgment as a class claim against all Defendants, (2) Violations of RICO, 18 U.S.C. Section 1962(c) as a class claim against all Defendants, (3) Violations of RICO, 18 U.S.C. Section 1962(d) as a class claim against all Defendants, (4) Violations of Virginia Usury Laws as a class claim against Big Picture Loans, Matt Martorello, and Ascension Technologies, and (5) Unjust Enrichment as a class claim against Big Picture Loans, Red Rock, Matt Martorello, Ascension Technologies, and Daniel

---

[5] Class Action Complaint, paragraph 14.
[6] Class Action Complaint, paragraphs 3, 4, and 13.
[7] Class Action Complaint, paragraph 34.
[8] Class Action Complaint, paragraphs 15 and 38-40.
[9] Class Action Complaint, paragraph 3.
[10] Class Action Complaint, paragraph 3 and 32.
[11] Class Action Complaint, paragraph 49.

*Expert Report of John M. Norman*
**GreerWalker LLP**

Gravel.[12]

Mr. Martorello denies facilitating illegal lending.[13]  He alleges that Bellicose Capital engaged in lawful business activities with tribal lending entities which were wholly owned and operated by the Tribe.[14]  Specifically, Mr. Martorello alleges that an entity in which he has an interest sold Bellicose Capital, along with its subsidiaries, to the Tribe on or about January 26, 2016 in a seller-financed transaction.[15]  In other words, while Plaintiffs allege that "Bellicose Capital was the *de facto* owner and controlled the operations of Big Picture Loans" at the time when the alleged usurious consumer loans were made and solicited to consumer borrowers, Mr. Martorello contends that Bellicose Capital itself was wholly owned by the Tribe as of January 26, 2016 and thereafter.

### B.  Terms of the Bellicose Transaction

Per the Transaction Documents, LVD, a wholly owned subsidiary of the Tribe, acquired Bellicose Capital from Eventide.[16]  Certain terms associated with that transaction (i.e., the Bellicose Transaction) are discussed below.

### 1.  Acquisition Price and Financing

Per the Transaction Documents, the amount of consideration to be paid is up to $300,000,000 ("Acquisition Amount" or "Note Amount").[17]  Payment of the Acquisition Amount was arranged by LVD's parent organization through a Secured Promissory Note and associated Loan and Security Agreement with Eventide as the lender.[18]  In other words, the Bellicose Transaction was seller-financed.

### 2.  Interest and Payment Terms

Tribal Economic Development, LLC ("TED"), a wholly-owned subsidiary of the Tribe, agreed to pay the principal sum of the Secured Promissory Note (i.e., the Acquisition Amount) with interest at a rate of 1.8% per annum.[19]  Principal and interest on the Secured Promissory Note are to be paid monthly using Net Cash Available.[20]  Payments are to be applied to any costs

---

[12] Class Action Complaint, pp. 17, 20, 23, 25, and 28.
[13] Martorello Answer and Affirmative Defenses, paragraph 3.
[14] Martorello Answer and Affirmative Defenses, paragraph 3.
[15] Martorello Answer and Affirmative Defenses, paragraphs 40 and 48.
[16] Agreement and Plan of Merger, first paragraph.
[17] Agreement and Plan of Merger, article 2.7.
[18] Agreement and Plan of Merger, article 2.7.  Secured Promissory Note, first paragraph.  Loan and Security Agreement, first paragraph.
[19] Secured Promissory Note, first and second paragraph.
[20] Secured Promissory Note, article 1.2.

associated with an Event of Default, then to a reduction of the principal balance, and then to unpaid interest.[21] Net Cash Available is defined in the Secured Promissory Note as Gross Revenues deposited into TED and its subsidiaries' accounts, minus the following:

- A Monthly Distribution to the Tribe equal to 2% of the Gross Revenues until (50%) of the Note Amount has been repaid at which time the percentage increases from 2% to 4%.[22] Effective January 1, 2017, the Monthly Distribution increased from "[3%] of the Gross Revenues until such time as … [$150,000,000.00] inclusive of principal and interest has been paid toward the Acquisition Amount at which time the percentage shall increase from [3% to 6%.]"[23]

- A one-time reinvestment of $1.3 million and a monthly reinvestment of 2% of Gross Revenues paid to the Tribe and reinvested by the Tribe in growing the loan portfolio.[24]

- All interest accrued and scheduled principal payments on any Senior Debt.[25]

- Ordinary and necessary business expenses.[26]

The Secured Promissory Note further states, "Each payment shall be accompanied by a schedule showing how such payment was calculated," and gives Eventide "the right to inspect … books and records to … verify the payments[.]"[27]

### 3. Note Term and Acquisition Amount

The Term of the Secured Promissory Note is seven years.[28] At expiration, all outstanding principal is forgiven.[29] As such, the $300 million Acquisition Amount is effectively a maximum selling price.

### 4. Continuing Interest and Control

The Merger Agreement calls for the cancellation and conversion of all equity interests in Bellicose Capital.[30] In other words, any equity interests existing before the effective date "cease

---

[21] Secured Promissory Note, article 1.2.
[22] Secured Promissory Note, article 1.2, 1.2(a), and 1.2(b)1.
[23] Addendum to Secured Promissory Note, effective as of January 1, 2017.
[24] Secured Promissory Note, article 1.2(b)2.
[25] Secured Promissory Note, article 1.2(b)3.
[26] Secured Promissory Note, article 1.2(b)4.
[27] Secured Promissory Note, article 1.2(c).
[28] Secured Promissory Note, article 1.3.
[29] Secured Promissory Note, article 1.3.
[30] Agreement and Plan of Merger, article 2.6.

to have any rights … except the right to receive the Merger Consideration."[31]   The Merger Consideration appears to be limited to cash, i.e., the $300 million Acquisition Amount or principal payments on the related seller financing.   Furthermore, the Loan and Security Agreement states:

> None of the covenants or other provisions … shall be deemed to … give [Eventide] the right or power to exercise control over the day to day affairs or management of [TED] or any Subsidiary …

> Nothing contained in this Agreement or the other Transaction Documents shall be deemed to create an equity investment in [TED] or any Subsidiary on the part of [Eventide] or a partnership between [Eventide] and [TED] or any Subsidiary … The relationship between [Eventide] and [TED] and any Subsidiary … is solely that of creditor and debtor.  [Eventide] shall not have … any fiduciary relationship or duty to … [TED] or any Subsidiary … there is no agency or joint venture relationship between [Eventide] and [TED and any] Subsidiary … by virtue of, the Transaction Documents[.][32]

### 5.  Assumption of Liabilities

The Merger Agreement calls for the assumption of all Bellicose Capital liabilities by LVD.[33]

---

[31] Agreement and Plan of Merger, article 2.6.
[32] Loan and Security Agreement, articles 7.14 and 7.15.
[33] Agreement and Plan of Merger, article 2.3.

## V.   Basis for Opinions

### A.   Seller-financing is widely and commonly used in private business transactions.

The Bellicose Transaction is an example of a seller-financed transaction.  In my professional experience, seller-financing is widely and commonly used to finance the purchase of private businesses.  As additional support for that opinion, I cite two common resources used in practice.

First, GF Data provides data on middle-market private equity-sponsored transactions.  GF Data provides a quarterly publication called Key Deal Terms.[34]   In its latest publication of Key Deal Terms (Fall 2018), GF Data reported that seller-financing or earnouts were used in 34.8% of all deals in 2017.[35]  That percentage rose to 38.2% in the first half of 2018.[36]

Second, Wiley Finance publishes a text titled Middle Market M&A, Handbook for Investment Banking and Business Consulting ("Middle Market M&A").  That text states:

> There are various forms of acquisition consideration in a deal, such as cash, deferred purchase price (seller financing and earnouts), and equity.  The type of consideration to be used in an acquisition depends on the resources of the buyer, the business objective, the necessities of the parties, and the tax consequences applicable to the different forms of consideration …
>
> A buyer may finance an acquisition through a deferred purchase price mechanism, such as a promissory note or an earnout … An earnout is a payment to be made after the closing of the transaction based on the performance of the acquired business following the closing.[37]

The Bellicose Transaction involves a deferred purchase price as described by Middle Market M&A.  As the text states, there are several reasons why buyers and sellers choose among the different forms of acquisition consideration.  One is tax consequences.  In addition, buyers and sellers choose a deferred purchase price for other reasons.  Middle Market M&A discusses some of those reasons, stating:

> In the middle market, seller financing is typically used to … [b]ridge the gap between what institutional lenders and investors will finance and the amount for

---

[34] GF Data, Key Deal Terms, Fall 2018.
[35] GF Data, Key Deal Terms, Fall 2018.
[36] GF Data, Key Deal Terms, Fall 2018.
[37] Middle Market M&A, pp. 160-161.

which the sellers are willing to trade the business [and to] preserve the senior credit capacity of the business for working capital.[38]

Based on my review of the Transaction Documents and related post-closing documents, any of these reasons may have been applicable in the decision to seller-finance the Bellicose Transaction.  Specifically, the tax consequences are discussed in more detail below.

As discussed in more detail below, in my professional experience, seller-financed transactions typically include control measures similar to those stated in the Transaction Documents and utilize calculations to determine the payments of the promissory note.  As an example, I was involved in a seller-financed transaction that utilized a calculation for determining the cash flow used for promissory note payments and the cash flow reinvested in the business.  Any excess cash, as determined by the calculation, was used for a promissory note payment.  Additionally, the loan agreement contained covenants that required the seller to consent to certain actions by the buyer that may affect the promissory note payments.

**B.   The terms of the Bellicose Transaction are consistent with a seller-financed sale arrangement known as an installment sale that is contemplated by the Internal Revenue Service ("IRS") and commonly used to defer taxable gains on the sale of a business.**

The IRS defines an installment sale as a transaction involving the disposition of property where at least one payment is to be received after the close of the taxable year in which the disposition occurs.[39]  For income tax purposes, all transactions qualifying as installment sales must be accounted for using the installment method.[40]  The installment method allows taxpayers to defer taxable gains on installment sales until the deferred payments are actually received.[41]  Otherwise, taxpayers would be taxed in the year of the sale, even if the payments are received after the close of the taxable year.

Generally, installment sale treatment provides a tax benefit because the taxable gains, and related tax payments, are deferred.  As discussed in the sub-sections below, seller-financed transactions, such as the Bellicose Transaction, are contemplated by the IRS and treated as installment sales.  As such, tax planning and minimization would have been a valid reason behind the seller-financed structure and terms of the Bellicose Transaction as is commonly the case for similar transactions.

---

[38] Middle Market M&A, p. 249.
[39] Code Section 453(b)(1).
[40] Internal Revenue Code, Section 453(a).
[41] BNA Portfolio 565-3rd: Installment Sales, Section I.B.: Historical Background.

*Expert Report of John M. Norman*
*GreerWalker LLP*

### 1.   Contingent Payment Installment Sale Treatment History

The Revenue Act of 1926 provided for the installment method in reporting gain on sales of property with deferred payments.[42]  The Internal Revenue Code of 1954 codified the installment method in Section 453.[43]  The installment method provisions of the Internal Revenue Code and corresponding Income Tax Regulations have been updated and amended over the years, including with the passage of Public Law 96-471, i.e., the Installment Sales Revision Act of 1980 ("The Act") which significantly revised Section 453.[44]

One revision introduced in The Act was the extension of installment method treatment and reporting to contingent payment obligations.  The Act also prompted the Treasury Department to implement Temporary Regulations 15A-453-1 which provided additional and specific guidance for such transactions.[45]  According to these temporary regulations, a sale or disposition in which the aggregate sales price cannot be determined by the close of the taxable year in which the transaction took place is known as a contingent payment sale.[46]  Section 453 remains in the current Internal Revenue Code and was applicable in 2016, i.e., the year of the Bellicose Transaction.[47]

### 2.   Installment Sale Regulations

The following subsections discuss certain regulations related to installment sale treatment.  I am unaware of any regulations that would disqualify the Bellicose Transaction for this treatment.  Rather, the IRS regulations, and examples provided therein, illustrate how the IRS contemplates installment sales like the Bellicose Transaction.

#### i.   Retained Interest Disqualification

A transaction is ineligible for contingent payment installment sale treatment if the seller retains an interest in the property.  More generally, Temporary Regulation 15A.453-1 states:

> The term "contingent payment sale" does not include transactions with respect to which the installment obligation represents … a retained interest in the property which is the subject of the transaction, an interest in a joint venture or a partnership, an equity interest in a corporation or similar transactions[.][48]

As discussed above, the Bellicose Transaction did not provide for any continuing interest in

---

[42] BNA Portfolio 565-3rd: Installment Sales, Section I.B.: Historical Background.
[43] Internal Revenue Code of 1954, Section 453.
[44] Treasury Decision (T.D.) 7768, Section 453. – Installment Method.
[45] Treasury Decision (T.D.) 7768, Section 453. – Installment Method.
[46] Temporary Regulation 15A.453-1(c)(1).
[47] Internal Revenue Code, Section 453.
[48] Temporary Regulation 15A.453-1(c)(1).

Bellicose Capital or any other entity.  All consideration, whether current or deferred, appears to be cash.  Therefore, the Bellicose Transaction appears to qualify as a contingent payment sale per the regulation.  Furthermore, there would have been a tax disincentive for Mr. Martorello to retain an interest in Bellicose Capital through Eventide since it would disqualify the transaction for installment sale treatment.

### ii.  Fixed Payment Term and Maximum Selling Price

The regulations specifically address three types of contingent payment installment sales, i.e., sales agreements with (1) a stated maximum selling price, (2) a fixed period, or (3) neither a stated maximum selling price nor fixed period.[49]  Furthermore, the same retained interest exclusion cited above specifically states that the regulation is applicable "regardless of the existence of stated maximum selling price or a fixed payment term."[50]  Still, terms such as a maximum selling price and fixed period, which are terms included in the Bellicose Transaction, are anticipated by the IRS as terms that may be included in contingent payment installment sales.

### iii.  Contingencies

Treasury Regulation 15A.453-1 states:

> … contingent payment sales are to be reported on the installment method.  As used in this section, the term "contingent payment sale" means a sale or other disposition of property in which the aggregate selling price cannot be determined by the close of the taxable year in which such sale or other disposition occurs.[51]

As such, the Net Cash Available payment defined in the Transaction Documents and discussed above, appears to be a contingent payment, i.e., a term that is contemplated by the IRS.

### iv.  Examples Provided by the IRS

Temporary Regulation 15A.453-1 includes the following two examples to illustrate a contingent payment installment sale:

> Example (1). A sells all of the stock of X corporation to B for $100,000 payable at closing plus an amount equal to 5% of the net profits of X for each of the next nine years, the contingent payments to be made annually together with adequate stated interest. The agreement provides that the maximum amount A may receive, inclusive of the $100,000 down payment but exclusive of interest, shall be $2,000,000.  A's basis in the stock of X inclusive of selling expenses, is

---

[49] Temporary Regulation 15A.453-1(c)(1).
[50] Temporary Regulation 15A.453-1(c)(1).
[51] Temporary Regulation 15A.453-1(c)(1).

*Expert Report of John M. Norman*
*GreerWalker LLP*

$200,000.  Selling price and contract price are considered to be $2,000,000. Gross profit is $1,800,000, and the gross profit ratio is 9/10 ($1,800,000/$2,000,000).  Accordingly, of the $100,000 received by A in the year of sale, $90,000 is reportable as gain attributable to the sale and $10,000 is recovery of basis.

Example (2). C owns Blackacre which is encumbered by a long-standing mortgage of $100,000. On January 15, 1981, C sells Blackacre to D under the following payment arrangement: $100,000 in cash on closing; nine equal annual installment payments of $100,000 commencing January 15, 1982; and nine annual payments (the first to be made on March 30, 1982) equal to 5% of the gross annual rental receipts from Blackacre generated during the preceding calendar year.  The agreement provides that each deferred payment shall be accompanied by a payment of interest calculated at the rate of 12% per annum and that the maximum amount payable to C under the agreement (exclusive of interest) shall be $2,100,000.  The agreement also specifies that D will assume the long-standing mortgage.  C's basis (inclusive of selling expenses) in Blackacre is $300,000.  Accordingly, selling price is $2,100,000 and contract price is $2,000,000 (selling price of $2,100,000 less the $100,000 mortgage). The gross profit ratio is 9/10 (gross profit of $1,800,000 divided by $2,000,000 contract price). Of the $100,000 cash payment received by C in 1981, $90,000 is gain attributable to the sale of Blackacre and $10,000 is recovery of basis.[52]

These examples provided by the IRS describe sales with terms similar to the Bellicose Transaction including a fixed payment term, maximum selling price, and contingent payments. As such, it appears that the IRS contemplates transactions similar to the Bellicose Transaction and considers them a sale.

### 3.  Installment Sale IRS Letter Rulings

In addition to tax regulations like those discussed above, taxpayers seek additional, case-specific guidance by requesting Private Letter Rulings from the IRS.  A Private Letter Ruling (PLR) is a written statement issued to a taxpayer that interprets and applies tax laws to the taxpayer's represented set of facts.[53]  PLRs are published on the IRS's website and online tax research services such as Bloomberg BNA ("BNA") contain PLRs in their search libraries.[54]

PLRs are tagged using a Uniform Information Listing number (UIL) or Index Number to indicate the specific subject(s) in question.  For example, requests for guidance on installment sales use a UIL or Index Number of 453 or 0453.[55]  This installment sale topic is further broken down into subtopics that are identified by extensions to the UIL or Index Number (for example,

---

[52] Temporary Regulation 15A.453-1(c)(2)(i)(B).
[53] https://www.irs.gov/tax-exempt-bonds/teb-private-letter-ruling-some-basic-concepts.
[54] https://apps.irs.gov/app/picklist/list/writtenDeterminations.html
[55] Based on searches on the IRS site and BNA for installment sale topics it appears that 0453 is the UIL associated with that topic which is also the relevant IRC Section number.

453.09 or 0453.09 represents contingent payment sales).[56]

The IRS database maintains PLRs published from January 1999 and later.[57]  BNA's PLR database is larger, containing PLRs dating back to 1976.[58]  For that reason, I used BNA's PLR database to identify PLRs applicable to contingent payment installment sales.

As of January 11, 2019, a search on BNA's income tax library for UIL 0453 yielded 654 PLRs.  Of those results, 36 appear to be related to contingent payment installment sales.  The table below represents the various search terms used and the resulting number of PLRs returned.

**Table 1**
**BNA Private Letter Ruling Search Results as of January 11, 2019 by Search Term**

| Search Term | Results |
| --- | --- |
| UIL Number(s) 0453. | 130 |
| UIL Number(s) 0453.09 | 10 |
| UIL Number(s) 453. | 19 |
| UIL Number(s) 453.09 | 0 |
| Index Number: 0453. | 3 |
| Index Number: 0453.09 | 0 |
| Index Number: 453. | 75 |
| Index Number: 453.09 | 22 |
| Index Nos.: 0453. | 427 |
| Index Nos.: 0453.09 | 4 |
| Index Nos.: 453. | 0 |
| Index Nos.: 453.09 | 0 |
| **Total Results - 453. / 0453.** | **654** |
| **Total Results - 453.09 / 0453.09** | **36** |

As shown in Table 1 above, PLRs related to installment sales, and more specifically contingent payment installments sales, are not uncommon.  Furthermore, I reviewed each of the 36 PLRs covering contingent payment installment sales, and none questioned whether the contingent payment installment terms invalidated the sale.  Rather, all 36 presumed a valid transaction.  Additionally, many of the 36 contingent payment installment sale PLRs stated facts

---

[56] Based on searches on the IRS site and BNA for installment sale topics it appears that 09 is the subtopic code associated with contingent payment installment sales.
[57] https://apps.irs.gov/app/picklist/list/writtenDeterminations.html.  When sorted by release date, the earliest record in the IRS database is January 8, 1999.
[58] https://www.bloomberglaw.com/product/tax/search.  The BNA search has a "year" criteria.  The earliest available year upon which a user can search is 1976.

and transaction terms similar to those in the Bellicose Transaction.  As one example, PLR 9638018 is summarized as follows:

- Corp X's assets were sold to Corp Y
- Corp Y assumed the liabilities of Corp X as part of the transaction
- Additional consideration for the sale included a payment of $c at closing
- The sales agreement included a provision for contingent payments over the next five years based on net operating profits for each year after the sale
- The sales agreement included a stated maximum amount of $f to be received
- Taxpayer represents that $f is of no economic significance and merely a requirement of a foreign stock exchange[59]

The Taxpayer requested the PLR to determine whether an alternative basis recovery method may be allowed under Treasury Regulation 15A.453-1(c)(7)(ii).  The IRS agreed with the Taxpayer and concluded that the contingent payment installment sale with a maximum stated selling price was eligible for alternative basis recovery relief.  In other words, the fact of a valid sale was not being questioned, it was presumed.

### C.  The timing of the Bellicose Transaction provided additional tax benefits to Mr. Martorello.

I understand that, as of the date of the Merger Agreement, Mr. Martorello was a resident of Puerto Rico but contemplating a move to the continental United States for personal reasons.  In January 2012, Puerto Rico approved Act No. 22-2012 ("Act 22").[60]  The stated purpose of Act 22 is to "encourage individuals who have not been residents of Puerto Rico during the fifteen-year period preceding the approval of this Act and who maintain investments within or without the United States to establish residency in Puerto Rico."[61]  Act 22 further states:

> … this Act provides these individuals with a full Puerto Rico tax exemption on the passive income earned from their investments. In the case of long-term capital gains, individuals covered under this legislation shall be exempt from Puerto Rico income taxes on recognized gains after becoming residents of Puerto Rico and during the exemption period provided herein.[62]

I understand that Mr. Martorello was eligible for this exemption as a resident of Puerto Rico. As such, by selling Bellicose Capital prior to his contemplated move from Puerto Rico, the gains

---

[59] IRS Private Letter Ruling PLR 9638018 (06/19/1996).
[60] Certified English Translation of Act No. 22-2012 (H.B. 3657) of the 6th Regular Session of the 16th Legislative Assembly of Puerto Rico.
[61] Certified English Translation of Act No. 22-2012 (H.B. 3657) of the 6th Regular Session of the 16th Legislative Assembly of Puerto Rico.
[62] Certified English Translation of Act No. 22-2012 (H.B. 3657) of the 6th Regular Session of the 16th Legislative Assembly of Puerto Rico.

on the sale of Bellicose Capital were tax exempt.  On the other hand, if the sale took place after Mr. Martorello's contemplated move, the sale would have been subject to United States federal capital gains taxes, likely at a rate of 20%.[63]  Additionally, had Mr. Martorello retained his interest in Bellicose Capital his income from that investment would have been subject to U.S. income taxes at ordinary individual income tax rates.  As such, it appears that Mr. Martorello had a tax incentive to sell Bellicose Capital (i.e., what I understand was an appreciated asset) prior to that contemplated move.

Additionally, the payment terms of the promissory note were beneficial to both Eventide and the Tribe.  As discussed above, principal and interest on the Secured Promissory Note are to be paid monthly using Net Cash Available.[64]  According to the Secured Promissory Note, interest on the promissory note is paid "at an interest rate of 1.8% per annum or such other minimum interest rate required under United States tax regulations."[65]  By utilizing a low interest rate, the Secured Promissory Note amount is amortized more quickly due to a larger principal payment. As such, the debt amount decreases on the Tribe's balance sheet and the value of Bellicose Capital to the Tribe increases.  Furthermore, Eventide received beneficial tax treatment as interest income is taxed at a different rate than principal payments received by the seller.

### D.  The terms and covenants of the Bellicose Transaction are common in seller financed transactions and generally align the interests of the buyer and seller.

In my professional experience as a consultant and tax advisor in business transactions, I have been involved in many seller-financed business transactions.  Many of those transactions contained terms similar to those in the Bellicose Transaction.  Generally, the overall structure and terms of such a sale are viewed as mutually beneficial to the buyer and seller.  The terms of the Bellicose Transaction related to the seller's ongoing involvement in the business operations, payments to the parties, and loan covenants are common for that reason.

### 1.  Seller's Ongoing Involvement in Business Operations

In the Complaint, Plaintiffs state, "At all times relevant hereto, the Tribe did not participate in the day-to-day operations of Big Picture Loans … nearly all the activities associated with these companies occurred off the [Tribe's] reservation, such as the call centers, payment processing,

---

[63] CCH Tax Research Consultant, SALES: 15,200, Taxation of Capital Gains and Losses.
[64] Secured Promissory Note, article 1.2.
[65] Secured Promissory Note, first paragraph.

*Expert Report of John M. Norman*
*GreerWalker LLP*

and servicing of the loans."[66]  However, following a business transaction, particularly a seller-financed transaction, it is common for the seller to maintain a level of involvement in the business, and for operations to continue as they were before including that the workforce and key employees remain in place.  Middle Market M&A further states that "employment agreements are often part of M&A transactions and represent the method by which key employees… remain in the employ of, or otherwise provide services to, the buyer following the closing of the transaction."[67]

Furthermore, contingent payment seller-financed transactions are often viewed as a way to provide the buyer with the benefit of the seller's industry and company-specific expertise.  To that point, Middle Market M&A states:

> … an earnout can act as an incentive for the seller and key employees to remain in place and commit to the business after the acquisition.  This allows more seamless transition of the business from the seller to the buyer.[68]

Additionally, in a contingent payment seller-financed transaction, the seller is motivated to increase the company's profitability.  Per the Wiley Finance text Middle Market M&A, in a deferred purchase price mechanism such as an earnout "the buyer agrees to pay a higher purchase price based on future performance.  However, the seller is paid the additional payments only if the future performance meets the agreed-on targets."[69]  At the same time, increased profitability is beneficial to the buyer because it means the purchased company is more valuable.

While the Loan and Security Agreement did not give Mr. Martorello or Eventide the "right or power to exercise control over the day to day affairs or management of [TED] or any Subsidiary," it is common and mutually-beneficial for sellers to remain active in the operations of a business for these reasons.[70]

## 2.  Loan Covenants

The Loan and Security Agreement contains certain covenants that require Eventide, as the lender, to consent to certain actions by Big Picture Loans that may affect the payment of the promissory note.  Examples of this include:

---

[66] Class Action Complaint, paragraphs 13 and 33.
[67] Middle Market M&A, p, 161.
[68] Middle Market M&A, p, 165.
[69] Middle Market M&A, p, 161.
[70] Loan and Security Agreement, article 7.15(a).

- Approval of additional indebtedness of TED or any of its subsidiaries.[71]

- Approval of the operating budget and expenses of the TED subsidiaries.[72]

- Approval of manager, director, or officer changes by TED or any of its subsidiaries. The Loan and Security Agreement further states "consent of the Lender, [may] not be unreasonably withheld, conditioned, or delayed."[73]

Communications between Eventide and the Tribe indicate that those parties adhered to these covenants.  For example, the Tribe requested and Eventide approved additional indebtedness by four lenders on November 3, 2016.[74] Additionally, on November 17, 2016, Eventide approved the 2017 operating budget, Big Picture Loans' relocation to a new facility, and staff hires related to an Atlanta office expansion.[75]  In my professional experience, covenants such as these are typical in seller-financing and loan agreements.  To that point, The Handbook of Financing Growth, a text published by Wiley Finance states:

> [A] borrower may be prohibited from (1) making capital expenditures in excess of an agreed-upon amount, (2) making dividends or distributions in excess of certain levels, (3) making investments, loans, or advances in excess of specified amounts, (4) incurring additional indebtedness in excess of agreed-upon levels, (5) creating additional liens, (6) selling assets, (7) canceling loans owed to the borrower, and (8) entering into leases for terms longer than a specified maximum term and in excess of specified maximum lease payment amounts.[76] (emphasis added)

Furthermore, it is generally in the interest of a lender to have input on items critical to the operation or cash flows of a debtor such as operating budgets and key personnel changes.

### 3.  Payment Terms

Plaintiffs allege that the "Tribe allowed Defendants to use their name as a front and, in return, received a nominal, 2% flat fee of the revenue."[77]  As discussed above, the Transaction Documents originally specified a Monthly Distribution to the Tribe equal to 2% of Gross Revenue increasing to 4% of Gross Revenue after 50% of the note is repaid.[78]  This appears to be the "nominal, 2% flat fee of the revenue" to which Plaintiffs are referring.  In my opinion, the

---

[71] Loan and Security Agreement, article 5.1.
[72] Secured Promissory Note, article 1.2(b)4.
[73] Loan and Security Agreement, article 5.14.
[74] Martorello_000019-000023.
[75] Martorello_010242-01245.
[76] The Handbook of Financing Growth, p, 183.
[77] Class Action Complaint, paragraph 32.
[78] Secured Promissory Note, article 1.2(b)1.

Bellicose Transaction provided the Tribe with more than a nominal benefit for several reasons.

First, the 2% "flat fee" or Monthly Distribution percentage was eligible to increase to 4% after 50% repayment (i.e., $150 million) on the note.  Furthermore, the Secured Promissory Note was amended to increase those payment percentages to 3% and 6%, respectively.[79]  Documents produced in this matter detail the monthly payments calculated and payable to each party (i.e., TED and Eventide) through November 2018.[80]  According to those documents, the Tribe began receiving Monthly Distributions based on 2% of Gross Revenue in February 2016, i.e., the first month after the Bellicose Transaction closed.[81]  Furthermore, the Monthly Distribution percentage increased to 3% of Gross Revenue in January 2017, at which time the Tribe began receiving payments based on the increased percentage.[82]  As of April 2018, the Tribe began temporarily receiving payments based on 6% of Gross Revenue through November 2018.[83]  Based on the documents produced in this matter, the Monthly Distributions received by the Tribe from February 2016 through November 2018 (i.e., 34 months) total ▮▮▮▮▮▮[84]  On an annual basis, that is approximately ▮▮▮▮▮▮[85]

Second, the Transaction Documents require a monthly reinvestment of 2% of Gross Revenues to be paid to the Tribe and reinvested by the Tribe in growing the loan portfolio.[86]  This monthly reinvestment is in addition to the unrestricted Monthly Distributions received by the Tribe, as discussed above.  This provision serves to increase the business value to the Tribe, in addition to monthly cash distributions received by the Tribe.  Based on the documents produced in this matter, the monthly reinvestment received and reinvested by the Tribe from February 2016 through November 2018 (i.e., 34 months) totals ▮▮▮▮▮▮[87]  On an annual basis, that is approximately ▮▮▮▮▮▮[88]  Collectively, the Tribe received approximately ▮▮▮▮▮▮ in Monthly Distributions and reinvestment through November 2018, despite mitigating certain risks as discussed below.



[79] Addendum to Secured Promissory Note, effective as of January 1, 2017.
[80] ▮▮▮▮▮▮
[81] ▮▮▮▮▮▮
[82] ▮▮▮▮▮▮
[83] Second Addendum to the Secured Promissory Note effective May 11, 2018, Third Addendum to the Secured Promissory Note effective August 13, 2018, and Martorello_012687, "Dist and Rep Schedule" tab.
[84] ▮▮▮▮▮▮
[85] ▮▮▮▮▮▮
[86] Secured Promissory Note, article 1.2(b)2.
[87] ▮▮▮▮▮▮
[88] ▮▮▮▮▮▮

Third, a flat fee on revenue carries less risk than net income or net cash flow because it is not subject to operating leverage.  In other words, payments that are net of expenses, such as those received by Eventide in the Bellicose Transaction, are more variable and thus carry more risk by comparison to the Tribe's Monthly Distribution and reinvestment.

Fourth, the contingent payment structure of the Bellicose Transaction further transfers risk from the Tribe to Eventide.  Specifically, it transfers valuation risk (i.e., the risk that the company was improperly valued for purposes of the transaction).  To that point, Middle Market M&A states:

> Earnouts tend to bridge the gap in differences of value between sellers and buyers … Earnouts provide an efficient means of transferring some risk from a buyer to a seller.  A seller with high performance goals and expectations accepts a contingent payment while the buyer, likely less informed about the seller's future projections, is able to shift the valuation risk to the seller.[89]

Fifth, at the end of the seven-year note term, any remaining principal debt is forgiven, and the Tribe will own Bellicose Capital unencumbered by the seller note.

The payment terms of the Bellicose Transaction and the calculation of Net Cash Available are consistent with seller-financed transactions.  Utilization of calculations for determining the payments of promissory notes and the cash flow reinvested in the business is common in seller-financed transactions.  As discussed above, I was involved in a seller-financed transaction that utilized a calculation for determining the cash flow used for promissory note payments and the cash flow reinvested in the business.  Any excess cash, as determined by the calculation, was used for a promissory note payment.  Additionally, the loan agreement contained covenants that required the seller to consent to certain actions by the buyer that may affect the promissory note payments.

---

[89] Middle Market M&A, p, 165.

*Expert Report of John M. Norman*
**GreerWalker LLP**

## VI.   Compensation

GreerWalker is being compensated for my work on this matter at a rate of $470 per hour. Rates for personnel that may assist me vary from $100 to $470 per hour.  Since this engagement is not yet complete, it is not now possible to determine the total compensation that will be paid to GreerWalker for this engagement.  My compensation is not contingent on the outcome of this case.

## VII.   Information Relied Upon

In addition to my years of experience as a Certified Public Accountant ("CPA") and tax professional, the expert opinions contained in this report are based on the facts and circumstances of this matter and the documents that I received and relied upon during the course of my retention on this matter.  The documents upon which I relied in forming the opinions contained in this report are listed in **Appendix B** and in the footnotes to this report. The opinions contained in this report are based on currently available information.  Should new or additional information that is relevant to the opinions in this report become available, I will supplement or amend my opinions as necessary.  Finally, the information contained in this report may be used to develop illustrative exhibits for use at trial.

Appendix A



# John M. Norman, CPA
Curriculum Vitae

_____

**Position**
Partner, GreerWalker LLP, CPA's & Business Advisors
Managing Director, GreerWalker Corporate Finance, LLC
227 West Trade Street, Suite 1100
Charlotte, NC  28202
Phone: (704) 377-0239
E-mail: john.norman@greerwalker.com

**Professional History**
GreerWalker, LLP, Charlotte, NC – Partner
GreerWalker Corporate Finance, LLC – Managing Director
PricewaterhouseCoopers, International Tax and Financial Services Industries Practice – Tax Consultant

**Education**
Bachelor of Science in Business Administration, University of South Carolina
Master of Taxation, University of South Carolina

**Professional Certifications**
Certified Public Accountant, North Carolina, Certificate #23551

**Summary of Experience**
John Norman is a senior partner at GreerWalker LLP and the Managing Director of GreerWalker Corporate Finance LLC. As a tax partner, he has the overall responsibility for the firm's global services and manufacturing and distribution practice. He has more than 25 years of experience in tax and business advisory services with a strong focus on corporate domestic and global tax issues. He provides tax planning, compliance and consulting services to a wide range of clients, including businesses in the financial services industry. John has significant expertise in entity selection, entity structure, ownership changes, mergers and acquisitions, and transfer pricing.

As the Managing Director of GreerWalker LLP's exit planning and investment bank affiliate, GreerWalker Corporate Finance LLC, John has also the overall responsibility for the firm's services including third party sales, family ownership transitions, management buyouts, recapitalizations, and buyer representation.

**Professional Affiliations**
Member, American Institute of Certified Public Accountants (AICPA)
Member, North Carolina Association of Certified Public Accountants (NCACPA)
Member, Carolina World Trade Association
Member, German American Chamber of Commerce
Member, Charlotte World Affairs Council
Member of Allinial Global Membership Committee

John M. Norman
Page 2 of 2

**<u>Community Service</u>**
Board of Professional Advisors – Foundation for the Carolinas
Past President and Treasurer – Smart Start of Mecklenburg County
Past President and Treasurer – Mental Health Association of Central Carolinas
Board of Directors, Past President – Lowe's YMCA
Past Treasurer – Alexander Youth Network

**<u>Publications</u>**
Norman, John M. and Claudia L. Kelley. "Repayment of Business Debt After Business Ceases". *The Tax Advisor.* September 2004:566-570
Norman, John "World of Consequences in Tax Rule Changes". *Charlotte Business Journal.* September 18, 2009

**Lula Williams, et Al.  v. Big Picture Loans, LLC, et Al.**
**Documents Considered**

Appendix B

| Count | Description |
|-------|-------------|
| 1 | Answer-Big Picture, et al..pdf |
| 2 | Answer-Martorello.pdf |
| 3 | Consent Motion for Ext of Time.pdf |
| 4 | Docket.pdf |
| 5 | Scheduling Order.pdf |
| 6 | Williams.complaint.pdf |
| 7 | Liont_00031.pdf |
| 8 | 2015-10-07 - Eventide Loan and Security Agreement.pdf |
| 9 | 2015-10-07 - Parental Guarantee and Sovereign Immunity Waiver.pdf |
| 10 | 2015-10-07 - Plan of Merger; effective 2016-01-26.pdf |
| 11 | 2016-01-26 - Certificate of Merger.pdf |
| 12 | 2016-01-26 - Eventide Secured Promissory Note - dated 10-7-15; effective date 2016 01 26.pdf |
| 13 | 2016-01-26 - Letter Agreement [Fully Executed].pdf |
| 14 | 2016-02-14 - Letter Agreement re Merger Close Time Extensions [Fully Executed].pdf |
| 15 | 2016-02-xx - ECA Agency Agreement [Fully Executed].pdf |
| 16 | 2015 Aranca Report.pdf |
| 17 | MARTORELLO_002910_image.pdf |
| 18 | LVD-DEF00008257.pdf |
| 19 | LVD-DEF00008604.pdf |
| 20 | LVD-DEF00008606.pdf |
| 21 | LVD-DEF00008608.pdf |
| 22 | LVD-DEF00019384.pdf |
| 23 | LVD-DEF00019385.pdf |
| 24 | LVD-DEF00019397.pdf |
| 25 | LVD-DEF00019398.pdf |
| 26 | LVD-DEF00019412.pdf |
| 27 | LVD-DEF00019413.pdf |
| 28 | LVD-DEF00019929.pdf |
| 29 | LVD-DEF00020224.pdf |
| 30 | LVD-DEF00020253.pdf |
| 31 | LVD-DEF00020482.pdf |
| 32 | MARTORELLO_000019.pdf |
| 33 | MARTORELLO_000020.pdf |
| 34 | MARTORELLO_000021.pdf |
| 35 | MARTORELLO_000022.pdf |
| 36 | MARTORELLO_000023.pdf |
| 37 | MARTORELLO_000192.pdf |
| 38 | MARTORELLO_000194.pdf |
| 39 | MARTORELLO_000194.xlsx |
| 40 | MARTORELLO_000195.pdf |
| 41 | MARTORELLO_000195.xlsx |
| 42 | MARTORELLO_000196.pdf |
| 43 | MARTORELLO_000196.xlsx |
| 44 | MARTORELLO_000197.pdf |
| 45 | MARTORELLO_000197.xlsx |
| 46 | MARTORELLO_000198.pdf |
| 47 | MARTORELLO_000200.pdf |
| 48 | MARTORELLO_000200.xlsx |
| 49 | MARTORELLO_000201.pdf |
| 50 | MARTORELLO_000201.xlsx |
| 51 | MARTORELLO_000202.pdf |
| 52 | MARTORELLO_000202.xlsx |

**Lula Williams, et Al.  v. Big Picture Loans, LLC, et Al.**
**Documents Considered**

Appendix B

| Count | Description |
|-------|-------------|
| 53 | MARTORELLO_000203.pdf |
| 54 | MARTORELLO_000205.pdf |
| 55 | MARTORELLO_000205.xlsx |
| 56 | MARTORELLO_000206.pdf |
| 57 | MARTORELLO_000206.xlsx |
| 58 | MARTORELLO_000207.pdf |
| 59 | MARTORELLO_000207.xlsx |
| 60 | MARTORELLO_000216.pdf |
| 61 | MARTORELLO_000218.pdf |
| 62 | MARTORELLO_000220.pdf |
| 63 | MARTORELLO_000220.xlsx |
| 64 | MARTORELLO_000221.pdf |
| 65 | MARTORELLO_000221.xlsx |
| 66 | MARTORELLO_000222.pdf |
| 67 | MARTORELLO_000222.xlsx |
| 68 | MARTORELLO_000223.pdf |
| 69 | MARTORELLO_000230.pdf |
| 70 | MARTORELLO_000232.pdf |
| 71 | MARTORELLO_000232.xlsx |
| 72 | MARTORELLO_000233.pdf |
| 73 | MARTORELLO_000233.xlsx |
| 74 | MARTORELLO_000234.pdf |
| 75 | MARTORELLO_000234.xlsx |
| 76 | MARTORELLO_000245.pdf |
| 77 | MARTORELLO_000247.pdf |
| 78 | MARTORELLO_000249.pdf |
| 79 | MARTORELLO_000255.pdf |
| 80 | MARTORELLO_001286.pdf |
| 81 | MARTORELLO_001287.pdf |
| 82 | MARTORELLO_001287.xlsx |
| 83 | MARTORELLO_001288.pdf |
| 84 | MARTORELLO_001288.xlsx |
| 85 | MARTORELLO_001289.pdf |
| 86 | MARTORELLO_001289.xlsx |
| 87 | MARTORELLO_001313.pdf |
| 88 | MARTORELLO_001314.pdf |
| 89 | MARTORELLO_001318.pdf |
| 90 | MARTORELLO_001319.pdf |
| 91 | MARTORELLO_001321.pdf |
| 92 | MARTORELLO_001418.pdf |
| 93 | MARTORELLO_001419.pdf |
| 94 | MARTORELLO_001503.pdf |
| 95 | MARTORELLO_001505.pdf |
| 96 | MARTORELLO_001506.pdf |
| 97 | MARTORELLO_001506.xlsx |
| 98 | MARTORELLO_001507.pdf |
| 99 | MARTORELLO_001507.xlsx |
| 100 | MARTORELLO_001508.pdf |
| 101 | MARTORELLO_001508.xlsx |
| 102 | MARTORELLO_001509.pdf |
| 103 | MARTORELLO_001511.pdf |
| 104 | MARTORELLO_001543.pdf |

**Lula Williams, et Al.  v. Big Picture Loans, LLC, et Al.** Appendix B
**Documents Considered**

| Count | Description |
|---|---|
| 105 | MARTORELLO_001544.pdf |
| 106 | MARTORELLO_001545.pdf |
| 107 | MARTORELLO_001546.pdf |
| 108 | MARTORELLO_001547.pdf |
| 109 | MARTORELLO_001548.pdf |
| 110 | MARTORELLO_001549.pdf |
| 111 | MARTORELLO_001550.pdf |
| 112 | MARTORELLO_001551.pdf |
| 113 | MARTORELLO_001552.pdf |
| 114 | MARTORELLO_001554.pdf |
| 115 | MARTORELLO_001565.pdf |
| 116 | MARTORELLO_001567.pdf |
| 117 | MARTORELLO_001570.pdf |
| 118 | MARTORELLO_001571.pdf |
| 119 | MARTORELLO_001573.pdf |
| 120 | MARTORELLO_001574.pdf |
| 121 | MARTORELLO_001576.pdf |
| 122 | MARTORELLO_003206.pdf |
| 123 | MARTORELLO_003211.pdf |
| 124 | MARTORELLO_003213.pdf |
| 125 | MARTORELLO_003753.pdf |
| 126 | MARTORELLO_003755.pdf |
| 127 | MARTORELLO_003810.pdf |
| 128 | MARTORELLO_003922.pdf |
| 129 | MARTORELLO_003923.pdf |
| 130 | MARTORELLO_003923.xlsx |
| 131 | MARTORELLO_003924.pdf |
| 132 | MARTORELLO_003924.xlsx |
| 133 | MARTORELLO_003925.pdf |
| 134 | MARTORELLO_003925.xlsx |
| 135 | MARTORELLO_003940.pdf |
| 136 | MARTORELLO_003941.pdf |
| 137 | MARTORELLO_003941.xlsx |
| 138 | MARTORELLO_003942.pdf |
| 139 | MARTORELLO_003942.xlsx |
| 140 | MARTORELLO_003994.pdf |
| 141 | MARTORELLO_003995.pdf |
| 142 | MARTORELLO_004158.pdf |
| 143 | MARTORELLO_004194.pdf |
| 144 | MARTORELLO_004195.pdf |
| 145 | MARTORELLO_004781.pdf |
| 146 | MARTORELLO_004788.pdf |
| 147 | MARTORELLO_004789.pdf |
| 148 | MARTORELLO_004790.pdf |
| 149 | MARTORELLO_004792.pdf |
| 150 | MARTORELLO_004824.pdf |
| 151 | MARTORELLO_004825.pdf |
| 152 | MARTORELLO_004827.pdf |
| 153 | MARTORELLO_004850.pdf |
| 154 | MARTORELLO_007904.pdf |
| 155 | MARTORELLO_007905.pdf |
| 156 | MARTORELLO_007907.pdf |

**Lula Williams, et Al.  v. Big Picture Loans, LLC, et Al.**
**Documents Considered**

Appendix B

| Count | Description |
|-------|-------------|
| 157 | MARTORELLO_007949.pdf |
| 158 | MARTORELLO_007951.pdf |
| 159 | MARTORELLO_007952.pdf |
| 160 | MARTORELLO_007954.pdf |
| 161 | MARTORELLO_007955.pdf |
| 162 | MARTORELLO_007968.pdf |
| 163 | MARTORELLO_007990.pdf |
| 164 | MARTORELLO_007996.pdf |
| 165 | MARTORELLO_008004.pdf |
| 166 | MARTORELLO_008162.pdf |
| 167 | MARTORELLO_008163.pdf |
| 168 | MARTORELLO_008200.pdf |
| 169 | MARTORELLO_008201.pdf |
| 170 | MARTORELLO_008209.pdf |
| 171 | MARTORELLO_008210.pdf |
| 172 | MARTORELLO_008272.pdf |
| 173 | MARTORELLO_008273.pdf |
| 174 | MARTORELLO_008279.pdf |
| 175 | MARTORELLO_008280.pdf |
| 176 | MARTORELLO_008303.pdf |
| 177 | MARTORELLO_008305.pdf |
| 178 | MARTORELLO_008305.xlsx |
| 179 | MARTORELLO_008306.pdf |
| 180 | MARTORELLO_008307.pdf |
| 181 | MARTORELLO_008308.pdf |
| 182 | MARTORELLO_008309.pdf |
| 183 | MARTORELLO_008310.pdf |
| 184 | MARTORELLO_008311.pdf |
| 185 | MARTORELLO_008312.pdf |
| 186 | MARTORELLO_008316.pdf |
| 187 | MARTORELLO_008319.pdf |
| 188 | MARTORELLO_008326.pdf |
| 189 | MARTORELLO_008328.pdf |
| 190 | MARTORELLO_008333.pdf |
| 191 | MARTORELLO_008338.pdf |
| 192 | MARTORELLO_008343.pdf |
| 193 | MARTORELLO_008348.pdf |
| 194 | MARTORELLO_008353.pdf |
| 195 | MARTORELLO_008358.pdf |
| 196 | MARTORELLO_008361.pdf |
| 197 | MARTORELLO_008364.pdf |
| 198 | MARTORELLO_008365.pdf |
| 199 | MARTORELLO_008379.pdf |
| 200 | MARTORELLO_008380.pdf |
| 201 | MARTORELLO_008381.pdf |
| 202 | MARTORELLO_008384.pdf |
| 203 | MARTORELLO_008385.pdf |
| 204 | MARTORELLO_008386.pdf |
| 205 | MARTORELLO_008387.pdf |
| 206 | MARTORELLO_008388.pdf |
| 207 | MARTORELLO_008389.pdf |
| 208 | MARTORELLO_008390.pdf |

**Lula Williams, et Al.  v. Big Picture Loans, LLC, et Al.**
**Documents Considered**

Appendix B

| Count | Description |
|-------|-------------|
| 209 | MARTORELLO_008391.pdf |
| 210 | MARTORELLO_008395.pdf |
| 211 | MARTORELLO_008399.pdf |
| 212 | MARTORELLO_008402.pdf |
| 213 | MARTORELLO_008419.pdf |
| 214 | MARTORELLO_008434.pdf |
| 215 | MARTORELLO_008438.pdf |
| 216 | MARTORELLO_008450.pdf |
| 217 | MARTORELLO_008453.pdf |
| 218 | MARTORELLO_008454.pdf |
| 219 | MARTORELLO_008455.pdf |
| 220 | MARTORELLO_008467.pdf |
| 221 | MARTORELLO_008471.pdf |
| 222 | MARTORELLO_008472.pdf |
| 223 | MARTORELLO_008475.pdf |
| 224 | MARTORELLO_008729.pdf |
| 225 | MARTORELLO_008731.pdf |
| 226 | MARTORELLO_008731.xlsx |
| 227 | MARTORELLO_008819.pdf |
| 228 | MARTORELLO_008824.pdf |
| 229 | MARTORELLO_008828.pdf |
| 230 | MARTORELLO_008836.pdf |
| 231 | MARTORELLO_008838.pdf |
| 232 | MARTORELLO_009219.pdf |
| 233 | MARTORELLO_009227.pdf |
| 234 | MARTORELLO_009230.pdf |
| 235 | MARTORELLO_009232.pdf |
| 236 | MARTORELLO_009235.pdf |
| 237 | MARTORELLO_009236.pdf |
| 238 | MARTORELLO_009241.pdf |
| 239 | MARTORELLO_009246.pdf |
| 240 | MARTORELLO_009335.pdf |
| 241 | MARTORELLO_009339.pdf |
| 242 | MARTORELLO_009340.pdf |
| 243 | MARTORELLO_009341.pdf |
| 244 | MARTORELLO_009342.pdf |
| 245 | MARTORELLO_009343.pdf |
| 246 | MARTORELLO_009344.pdf |
| 247 | MARTORELLO_009345.pdf |
| 248 | MARTORELLO_009346.pdf |
| 249 | MARTORELLO_009347.pdf |
| 250 | MARTORELLO_009349.pdf |
| 251 | MARTORELLO_009351.pdf |
| 252 | MARTORELLO_009352.pdf |
| 253 | MARTORELLO_009353.pdf |
| 254 | MARTORELLO_009354.pdf |
| 255 | MARTORELLO_009363.pdf |
| 256 | MARTORELLO_009365.pdf |
| 257 | MARTORELLO_009371.pdf |
| 258 | MARTORELLO_009399.pdf |
| 259 | MARTORELLO_009437.pdf |
| 260 | MARTORELLO_009442.pdf |

**Lula Williams, et Al.  v. Big Picture Loans, LLC, et Al.**
**Documents Considered**

Appendix B

| Count | Description |
|-------|-------------|
| 261 | MARTORELLO_009462.pdf |
| 262 | MARTORELLO_009486.pdf |
| 263 | MARTORELLO_009496.pdf |
| 264 | MARTORELLO_009508.pdf |
| 265 | MARTORELLO_009534.pdf |
| 266 | MARTORELLO_009538.pdf |
| 267 | MARTORELLO_009547.pdf |
| 268 | MARTORELLO_009548.pdf |
| 269 | MARTORELLO_009549.pdf |
| 270 | MARTORELLO_009556.pdf |
| 271 | MARTORELLO_009572.pdf |
| 272 | MARTORELLO_009579.pdf |
| 273 | MARTORELLO_009587.pdf |
| 274 | MARTORELLO_009705.pdf |
| 275 | MARTORELLO_009716.pdf |
| 276 | MARTORELLO_009717.pdf |
| 277 | MARTORELLO_009762.pdf |
| 278 | MARTORELLO_009783.pdf |
| 279 | MARTORELLO_009784.pdf |
| 280 | MARTORELLO_009784.xlsx |
| 281 | MARTORELLO_009785.pdf |
| 282 | MARTORELLO_009786.pdf |
| 283 | MARTORELLO_009794.pdf |
| 284 | MARTORELLO_009796.pdf |
| 285 | MARTORELLO_009816.pdf |
| 286 | MARTORELLO_009817.pdf |
| 287 | MARTORELLO_009820.pdf |
| 288 | MARTORELLO_009847.pdf |
| 289 | MARTORELLO_009849.pdf |
| 290 | MARTORELLO_009850.pdf |
| 291 | MARTORELLO_009857.pdf |
| 292 | MARTORELLO_009859.pdf |
| 293 | MARTORELLO_009880.pdf |
| 294 | MARTORELLO_009886.pdf |
| 295 | MARTORELLO_009889.pdf |
| 296 | MARTORELLO_009909.pdf |
| 297 | MARTORELLO_009939.pdf |
| 298 | MARTORELLO_009940.pdf |
| 299 | MARTORELLO_009960.pdf |
| 300 | MARTORELLO_009961.pdf |
| 301 | MARTORELLO_009962.pdf |
| 302 | MARTORELLO_009969.pdf |
| 303 | MARTORELLO_009972.pdf |
| 304 | MARTORELLO_009973.pdf |
| 305 | MARTORELLO_009974.pdf |
| 306 | MARTORELLO_009976.pdf |
| 307 | MARTORELLO_009978.pdf |
| 308 | MARTORELLO_009978.xlsx |
| 309 | MARTORELLO_009982.pdf |
| 310 | MARTORELLO_009984.pdf |
| 311 | MARTORELLO_009984.xlsx |
| 312 | MARTORELLO_010010.pdf |

**Lula Williams, et Al.  v. Big Picture Loans, LLC, et Al.**
**Documents Considered**

Appendix B

| Count | Description |
|-------|-------------|
| 313 | MARTORELLO_010013.pdf |
| 314 | MARTORELLO_010013.xlsx |
| 315 | MARTORELLO_010116.pdf |
| 316 | MARTORELLO_010118.pdf |
| 317 | MARTORELLO_010134.pdf |
| 318 | MARTORELLO_010149.pdf |
| 319 | MARTORELLO_010150.pdf |
| 320 | MARTORELLO_010151.pdf |
| 321 | MARTORELLO_010165.pdf |
| 322 | MARTORELLO_010180.pdf |
| 323 | MARTORELLO_010220.pdf |
| 324 | MARTORELLO_010222.pdf |
| 325 | MARTORELLO_010223.pdf |
| 326 | MARTORELLO_010223.xlsx |
| 327 | MARTORELLO_010224.pdf |
| 328 | MARTORELLO_010224.xlsx |
| 329 | MARTORELLO_010225.pdf |
| 330 | MARTORELLO_010225.xlsx |
| 331 | MARTORELLO_010226.pdf |
| 332 | MARTORELLO_010226.xlsx |
| 333 | MARTORELLO_010227.pdf |
| 334 | MARTORELLO_010238.pdf |
| 335 | MARTORELLO_010239.pdf |
| 336 | MARTORELLO_010239.xlsx |
| 337 | MARTORELLO_010240.pdf |
| 338 | MARTORELLO_010240.xlsx |
| 339 | MARTORELLO_010241.pdf |
| 340 | MARTORELLO_010241.xlsx |
| 341 | MARTORELLO_010242.pdf |
| 342 | MARTORELLO_010243.pdf |
| 343 | MARTORELLO_010254.pdf |
| 344 | MARTORELLO_010255.pdf |
| 345 | MARTORELLO_010272.pdf |
| 346 | MARTORELLO_010273.pdf |
| 347 | MARTORELLO_010274.pdf |
| 348 | MARTORELLO_010275.pdf |
| 349 | MARTORELLO_010280.pdf |
| 350 | MARTORELLO_010308.pdf |
| 351 | MARTORELLO_010309.pdf |
| 352 | MARTORELLO_010331.pdf |
| 353 | MARTORELLO_010337.pdf |
| 354 | MARTORELLO_010366.pdf |
| 355 | MARTORELLO_010368.pdf |
| 356 | MARTORELLO_010368.xlsx |
| 357 | MARTORELLO_010373.pdf |
| 358 | MARTORELLO_010374.pdf |
| 359 | MARTORELLO_010374.xlsx |
| 360 | MARTORELLO_010375.pdf |
| 361 | MARTORELLO_010378.pdf |
| 362 | MARTORELLO_010378.xlsx |
| 363 | MARTORELLO_010379.pdf |
| 364 | MARTORELLO_010381.pdf |

**Lula Williams, et Al.  v. Big Picture Loans, LLC, et Al.**
**Documents Considered**

Appendix B

| Count | Description |
|-------|-------------|
| 365 | MARTORELLO_010381.xlsx |
| 366 | MARTORELLO_010382.pdf |
| 367 | MARTORELLO_010382.xlsx |
| 368 | MARTORELLO_010383.pdf |
| 369 | MARTORELLO_010383.xlsx |
| 370 | MARTORELLO_010384.pdf |
| 371 | MARTORELLO_010391.pdf |
| 372 | MARTORELLO_010408.pdf |
| 373 | MARTORELLO_010409.pdf |
| 374 | MARTORELLO_010411.pdf |
| 375 | MARTORELLO_010412.pdf |
| 376 | MARTORELLO_010443.pdf |
| 377 | MARTORELLO_010444.pdf |
| 378 | MARTORELLO_010567.pdf |
| 379 | MARTORELLO_010574.pdf |
| 380 | MARTORELLO_010602.pdf |
| 381 | MARTORELLO_010607.pdf |
| 382 | MARTORELLO_010627.pdf |
| 383 | MARTORELLO_010632.pdf |
| 384 | MARTORELLO_010633.pdf |
| 385 | MARTORELLO_010634.pdf |
| 386 | MARTORELLO_010654.pdf |
| 387 | MARTORELLO_010802.pdf |
| 388 | MARTORELLO_010810.pdf |
| 389 | MARTORELLO_010812.pdf |
| 390 | MARTORELLO_010813.pdf |
| 391 | MARTORELLO_010815.pdf |
| 392 | MARTORELLO_010817.pdf |
| 393 | MARTORELLO_010818.pdf |
| 394 | MARTORELLO_011041.pdf |
| 395 | MARTORELLO_011042.pdf |
| 396 | MARTORELLO_011043.pdf |
| 397 | MARTORELLO_011044.pdf |
| 398 | MARTORELLO_011045.pdf |
| 399 | MARTORELLO_011046.pdf |
| 400 | MARTORELLO_011047.pdf |
| 401 | MARTORELLO_011048.pdf |
| 402 | MARTORELLO_011049.pdf |
| 403 | MARTORELLO_011050.pdf |
| 404 | MARTORELLO_011051.pdf |
| 405 | MARTORELLO_011052.pdf |
| 406 | MARTORELLO_011053.pdf |
| 407 | MARTORELLO_011054.pdf |
| 408 | MARTORELLO_011088.pdf |
| 409 | MARTORELLO_011090.pdf |
| 410 | MARTORELLO_011092.pdf |
| 411 | MARTORELLO_011789.pdf |
| 412 | MARTORELLO_011790.xlsx |
| 413 | MARTORELLO_011791.xlsx |
| 414 | MARTORELLO_011792.xlsx |
| 415 | MARTORELLO_011793.xlsx |
| 416 | MARTORELLO_011794.pdf |

**Lula Williams, et Al.  v. Big Picture Loans, LLC, et Al.**
**Documents Considered**

Appendix B

| Count | Description |
|---|---|
| 417 | MARTORELLO_011795.xlsx |
| 418 | MARTORELLO_011796.xlsx |
| 419 | MARTORELLO_011797.xlsx |
| 420 | MARTORELLO_011798.xlsx |
| 421 | MARTORELLO_011830.pdf |
| 422 | MARTORELLO_011831.xlsx |
| 423 | MARTORELLO_011832.xlsx |
| 424 | MARTORELLO_011833.xlsx |
| 425 | MARTORELLO_011834.xlsx |
| 426 | MARTORELLO_011920.pdf |
| 427 | MARTORELLO_011921.xlsx |
| 428 | MARTORELLO_011922.xlsx |
| 429 | MARTORELLO_011923.xlsx |
| 430 | MARTORELLO_011924.xlsx |
| 431 | MARTORELLO_011925.pdf |
| 432 | MARTORELLO_011926.xlsx |
| 433 | MARTORELLO_011927.xlsx |
| 434 | MARTORELLO_011928.xlsx |
| 435 | MARTORELLO_011929.xlsx |
| 436 | MARTORELLO_011930.pdf |
| 437 | MARTORELLO_011931.xlsx |
| 438 | MARTORELLO_011932.xlsx |
| 439 | MARTORELLO_011933.xlsx |
| 440 | MARTORELLO_011934.xlsx |
| 441 | MARTORELLO_011935.pdf |
| 442 | MARTORELLO_011936.xlsx |
| 443 | MARTORELLO_011937.xlsx |
| 444 | MARTORELLO_011938.xlsx |
| 445 | MARTORELLO_011939.xlsx |
| 446 | MARTORELLO_011940.pdf |
| 447 | MARTORELLO_011941.xlsx |
| 448 | MARTORELLO_011942.xlsx |
| 449 | MARTORELLO_011943.xlsx |
| 450 | MARTORELLO_011944.xlsx |
| 451 | MARTORELLO_011945.pdf |
| 452 | MARTORELLO_011946.xlsx |
| 453 | MARTORELLO_011947.xlsx |
| 454 | MARTORELLO_011948.xlsx |
| 455 | MARTORELLO_011949.xlsx |
| 456 | MARTORELLO_011950.pdf |
| 457 | MARTORELLO_011951.xlsx |
| 458 | MARTORELLO_011952.xlsx |
| 459 | MARTORELLO_011953.xlsx |
| 460 | MARTORELLO_011954.xlsx |
| 461 | MARTORELLO_011955.pdf |
| 462 | MARTORELLO_011956.xlsx |
| 463 | MARTORELLO_011957.xlsx |
| 464 | MARTORELLO_011958.xlsx |
| 465 | MARTORELLO_011959.xlsx |
| 466 | MARTORELLO_011960.pdf |
| 467 | MARTORELLO_011961.xlsx |
| 468 | MARTORELLO_011962.xlsx |

**Lula Williams, et Al.  v. Big Picture Loans, LLC, et Al.**
**Documents Considered**

Appendix B

| Count | Description |
|-------|-------------|
| 469 | MARTORELLO_011963.xlsx |
| 470 | MARTORELLO_011964.xlsx |
| 471 | MARTORELLO_011965.xlsx |
| 472 | MARTORELLO_011983.pdf |
| 473 | MARTORELLO_012013.pdf |
| 474 | MARTORELLO_012015.pdf |
| 475 | MARTORELLO_012019.pdf |
| 476 | MARTORELLO_012055.pdf |
| 477 | MARTORELLO_012056.xlsx |
| 478 | MARTORELLO_012057.xlsx |
| 479 | MARTORELLO_012058.xlsx |
| 480 | MARTORELLO_012059.xlsx |
| 481 | MARTORELLO_012060.pdf |
| 482 | MARTORELLO_012061.xlsx |
| 483 | MARTORELLO_012062.xlsx |
| 484 | MARTORELLO_012063.xlsx |
| 485 | MARTORELLO_012064.xlsx |
| 486 | MARTORELLO_012065.pdf |
| 487 | MARTORELLO_012066.xlsx |
| 488 | MARTORELLO_012067.xlsx |
| 489 | MARTORELLO_012068.xlsx |
| 490 | MARTORELLO_012069.xlsx |
| 491 | MARTORELLO_012678_image.pdf |
| 492 | MARTORELLO_012679.xlsx |
| 493 | MARTORELLO_012680.xlsx |
| 494 | MARTORELLO_012681.xlsx |
| 495 | MARTORELLO_012682.xlsx |
| 496 | MARTORELLO_012683_image.pdf |
| 497 | MARTORELLO_012684.xlsx |
| 498 | MARTORELLO_012685.xlsx |
| 499 | MARTORELLO_012686.xlsx |
| 500 | MARTORELLO_012687.xlsx |
| 501 | 20190104_133056.jpg |
| 502 | Martorello, Matt PR extension.pdf |
| 503 | Martorello, Matthew.pdf |
| 504 | MartorelloM  PR EXTENSION-EFILE CONFIRM.PDF |
| 505 | MM RM 2014 PR 482.pdf |
| 506 | 0331_Addendum to Secured Promissory Note Eventide.pdf |
| 507 | 2018 08 10 Proposed Addendum_ECA Note_final.pdf |
| 508 | Second Addendum to Promissory Note-MH Signed.pdf |
| 509 | GF Data's Fall 2018 Key Deal Terms Report.pdf |
| 510 | Middle Market M&A, Handbook for Investment Banking and Business Consulting published by Wiley Finance |
| 511 | The Handbook of Financing Growth published by Wiley Finance |
| 512 | BNA Portfolio 565-3rd: Installment Sales |
| 513 | Treasury Decision (T.D.) 7768, Section 453. – Installment Method |
| 514 | Internal Revenue Code 1986, Section 453 |
| 515 | Temporary Regulations 15A.453-1 |
| 516 | Internal Revenue Code of 1954, Section 453 |
| 517 | https://apps.irs.gov/app/picklist/list/writtenDeterminations.html |
| 518 | https://www.irs.gov/tax-exempt-bonds/teb-private-letter-ruling-some-basic-concepts |
| 519 | https://www.bloomberglaw.com/product/tax/search |

**Lula Williams, et Al.  v. Big Picture Loans, LLC, et Al.**
**Documents Considered**                              Appendix B

| Count | Description |
|---|---|
| 520 | Public Law 96-471 |
| 521 | IRS Private Letter Ruling PLR 8221115 (2/26/1982) |
| 522 | IRS Private Letter Ruling PLR 8251061 (9/20/1982) |
| 523 | IRS Private Letter Ruling PLR 8432040 (5/4/1984) |
| 524 | IRS Private Letter Ruling PLR 8508028 (11/21/1984) |
| 525 | IRS Private Letter Ruling PLR 8707025 (11/14/1986) |
| 526 | IRS Private Letter Ruling PLR 8812064 (12/28/1987) |
| 527 | IRS Private Letter Ruling PLR 8949018 (9/8/1989) |
| 528 | IRS Private Letter Ruling PLR 9013014 (12/21/1989) |
| 529 | IRS Private Letter Ruling PLR 9247010 (8/21/1992) |
| 530 | IRS Private Letter Ruling PLR 9309016 (12/2/1992) |
| 531 | IRS Private Letter Ruling PLR 9544020 (8/3/1995) |
| 532 | IRS Private Letter Ruling PLR 9638018 (6/19/1996) |
| 533 | IRS Private Letter Ruling PLR 9647035 (8/28/1996) |
| 534 | IRS Private Letter Ruling PLR 9811039 (12/11/1997) |
| 535 | IRS Private Letter Ruling PLR 200036014 (9/8/2000) |
| 536 | IRS Private Letter Ruling PLR 200403007 (1/16/2004) |
| 537 | IRS Private Letter Ruling PLR 200403008 (1/16/2004) |
| 538 | IRS Private Letter Ruling PLR 200403009 (1/16/2004) |
| 539 | IRS Private Letter Ruling PLR 200403010 (1/16/2004) |
| 540 | IRS Private Letter Ruling PLR 200403011 (1/16/2004) |
| 541 | IRS Private Letter Ruling PLR 200403012 (1/16/2004) |
| 542 | IRS Private Letter Ruling PLR 200403013 (1/16/2004) |
| 543 | IRS Private Letter Ruling PLR 200403014 (1/16/2004) |
| 544 | IRS Private Letter Ruling PLR 200403015 (1/16/2004) |
| 545 | IRS Private Letter Ruling PLR 200403016 (1/16/2004) |
| 546 | IRS Private Letter Ruling PLR 200546017 (11/18/2005) |
| 547 | IRS Private Letter Ruling PLR 200547003 (11/25/2005) |
| 548 | IRS Private Letter Ruling PLR 200603017 (1/20/2006) |
| 549 | IRS Private Letter Ruling PLR 200728039 (7/13/2007) |
| 550 | IRS Private Letter Ruling PLR 201111002 (3/18/2011) |
| 551 | IRS Private Letter Ruling PLR 201241001 (10/12/2012) |
| 552 | IRS Private Letter Ruling PLR 201417006 (4/25/2014) |
| 553 | IRS Private Letter Ruling PLR 201626009 (6/24/2016) |
| 554 | IRS Private Letter Ruling PLR 201626010 (6/24/2016) |
| 555 | IRS Private Letter Ruling PLR 201626011 (6/24/2016) |
| 556 | IRS Private Letter Ruling PLR 201626012 (6/24/2016) |
| 557 | Certified English Translation of Act No. 22-2012 (H.B. 3657) of the 6th Regular Session of the 16th Legislative Assembly of Puerto Rico |
| 558 | CCH Tax Research Consultant, SALES: 15,200, Taxation of Capital Gains and Losses |