This is the Initial Expert Report prepared by Richard E. Ross in accordance with Rule 26(a)(2)(C) of the Federal Rules of Civil Procedure. Discovery is ongoing and this report may be subsequently supplemented.

## INTRODUCTION

1.      I have been retained through Thomson Reuters Expert Witness Services by Armstrong Teasdale LLP, attorneys for Defendant Matthew Martorello regarding the customs, practices and standards in the finance and banking industry as it relates to small dollar installment loan consumer financing including but not limited to the various structures utilized by FinTech companies partnering with federally recognized Indian tribes. I was also asked to review the subject Tribe lenders/FinTech and servicing relationships for compliance with various banking and finance laws, rules, regulations and guidelines. In addition I was also asked to review and evaluate the subject Tribe/FinTech configurations with regard to the Rent-A-Tribe theories raised in the Complaint. Although Thomson Reuters Expert Witness Services bills my services at higher rates, the billing rateI receive is $300.00 per hour for review, analysis and consultation and $425.00 per hour for depositions, trial testimony and court appearances.  My fees are not contingent on the outcome of this litigation.

2.      I have over 40 years of experience in the banking industry and am a former member of the Board of Directors of two national banks.  I have held the position of Executive Vice President at each of these banks, where I was responsible for all assets of the bank, including loans and investments.  In this capacity, I was also the Senior Loan Officer and Chief Credit Officer responsible for all lending activities including credit approval, credit administration, credit analysis, loan documentation,

servicing, participation loans, and collections for Real Estate Lending, Commercial Lending, and Term and Installment Loans. As part of my responsibilities, I also wrote the policies and procedures for each of these lending areas and administered compliance with these policies. At two of the banks, I established residential mortgage and construction lending departments. I drafted and implemented policies and procedures regarding Consumer Protection compliance including but not limited to Regulation B (Equal Credit Opportunity Act), Regulation Z (TILA - Truth in Lending Act), Regulation E (Electronic Funds Transfer Act), Regulation X (RESPA - Real Estate Settlement Procedures Act), Fair Debt Collection Practices Act (FDCPA) and Fair Credit Reporting Act (FCRA). In addition, I was the Consumer Compliance Officer and Vice Chairman of the Operation Committee. My responsibilities included representing the banks with the federal regulators regarding Safety and Soundness bank Examinations, Consumer Compliance Examinations, and other matters.

3.     For the past 30 years, I have consulted with banks in Southern California such as Bank of America, Wells Fargo, Security Pacific, City National Bank, Coast Federal Savings, and Home Savings on matters of checking, consumer and commercial loans, servicing, and compliance regulations. I have also consulted with Federal Regulators (FDIC, RTC, OCC), the United States Attorney's Office - Southern District of California, and attorneys representing both banks and bank customers.

4.     In addition, for the past 17 years, I have also served as the Chief Credit Officer and a member of the Board of Directors for a bank trade group and approximately fifteen affiliated special purpose bank subsidiaries. My duties include organizational structuring for the transactions, negotiating, analyzing financial statements and credit worthiness, closing loans, and administering the loans including monitoring covenant compliance and regulatory compliance. As part of this association, I was also Chief Credit Officer for this bank trade group's loan participation clearinghouse. A copy of my current resume is attached hereto.

5.     I am also a member of the Governing Board for The City of Indianapolis, Indiana Redevelopment Community Development Entity (CDE), and am also a member of the Governing Board for the Town of French Lick, Indiana Redevelopment Community Development Entity (CDE).

Each of these CDE's extends loans and investments to create and preserve jobs and improve their communities.

6.      I am a member of Risk Management Association (RMA) National and San Diego Chapter and until recently a member of the American Bankers Association for the past 30 years.

7.      I have authored no articles in the past ten years.

8.      I have testified as an expert witness at least 30 times at trial and have given more than 45 depositions over the past 35 years.  While I do not maintain records of the case names and captions, Exhibit A attached hereto contains a list of cases in which I have testified during the past four years. I have testified in the California Superior Courts in San Diego, Orange, Imperial, Los Angeles, Riverside and San Bernardino Counties; in the Federal District Court – California Southern District and Central District; and in Federal Bankruptcy Court, California Central and Southern Districts and Texas Northwest District. My testimony has covered areas including but not limited to: Regulation Z, California Automobile Sales Finance Act (Civil Code §2981, et seq.), consumer protections laws and regulations, commercial and consumer loans including small dollar loans, borrower financial analysis, fraudulent financial statements, credit administration, interpretation of loan agreements, loan servicing, bank lending standards, banking customs and practices, participation loans, interpretation of promissory notes, interest calculations, and negotiable instruments.

9.      As part of this engagement I have reviewed the following: Complaint, Complaint and exhibits thereto, Court July 27, 2018 Memorandum of Opinion , the deposition testimony of James Dowd, Michelle Hazen, and Matthew Martorello along with the exhibits attached to each; as well as affidavits and/or declarations of Hazen, Martorello, McFadden, and Tribal Chairman Williams, Jr. I have also reviewed the various servicing agreements, promissory notes and loan agreements and other transaction, organization, and operational documents related to the relationship between Bellicose Capital, SourcePoint VI and Red Rock Tribal Lending and Big Pictures Loans. I have also reviewed a compilation of Recommendation to Take Action And Request For Approval. The quarterly FDIC Call Reports and Summary Financial Information for Chippewa Valley Bank were

also reviewed by me. In addition I reviewed the Consumer Loan Agreements which are the subject of this litigation. I have also reviewed various banking laws, regulations, rules, guidelines, bulletins, and financial institution letters as they existed during the relevant time period a number of which are identified in my comments below. In addition I reviewed financial statements, business plans, and confidential placement memorandums.   This is not intend to be exhaustive of the documents reviewed, rather a general summary of the types of items analyzed. A list of documents reviewed is attached hereto.

## SUMMARY OF FACTS

10.     A summary of the facts are set forth here and discussed in the remainder of the report.

### History, Operation and Structure Red Rock Tribal Lending, LLC (Red Rock)

11.     The LAC VIEUX DESERT BAND OF LAKE SUPERIOR CHIPPEWA INDIANS (Tribe or LVD) is a federally recognized Indian Tribe and according to the Office of Comptroller of the Currency (OCC), federal prudential regulator of national banks, the Tribe's status is that of a "domestic dependent nation" that exercises governmental authority over their members and their territory. Under the presidential executive order on Consultation and Coordination with Indian Tribal Governments dated November 6, 2000, the OCC recognizes tribal sovereignty and works with every federally recognized Indian tribe on a government to government basis. The Consumer Financial Protection Act (CFPA) (12 USC 5481(27) provides a definition of "State" which includes any federally recognized Indian Tribe, as defined by the Secretary of the Interior under section 5131(a) of title 25. The Tribe is a federally recognized Indian tribe. Therefore for consumer lending purposes the Tribe is the functional equivalent of a State. In order to promote Tribal economic development and economic welfare, the Tribe engaged in consumer lending beginning in the early 2000's. Desiring to expand their consumer lending operations for the benefit of the Tribe, representatives of the Tribe approached Matthew Martorello, who operated a servicing organization serving loans for other companies. This contact ultimately resulted in a Servicing Agreement dated October 25, 2011 (Servicing Agreement) between the Tribe's lending arm Red Rock Tribal Lending, LLC (Red Rock)

and Bellicose VI, Inc.'s wholly-owned subsidiary SourcePoint VI. LLC (Servicer).

12.    Red Rock and the Tribe's purpose in entering into the Servicing Agreement was to obtain managerial, technical and financial expertise and expertise for the development and operation of a "new Unsecured Lending Business", Internet-based online lending of short-term (2 months- 2 years) unsecured consumer small dollar installment loans ($200-$2,500) here in after "small dollar loan business." Under the terms of the Servicing Agreement, SourcePoint VI was also to provide investment and capital management services, management, operations and marketing consulting. In short the Red Rock was contracting for all the expertise necessary to develop an entirely "new" line of business. These services were to be provided to Red Rock and Duck Creek Tribal Financial, LLC formerly known as North Country Financial, LLC, all lenders are instrumentalities and commercial subdivisions of the Tribe.

13.    Red Rock was not a payday lender. Red Rock did not contract for any services related to payday lending. Under the 2011 Red Rock – SourcePoint VI Servicing Agreement, SourcePoint VI did contract to provide and did not provide any services related payday lending to Red Rock.

14.    Red Rock also did not contract with the Servicer for "Origination" services. The Servicing Agreement noted that the Servicer had no authority to engage in "Origination" activities, execute loan documents or approve the issuance of loans; and all Servicer and Tribal Representative deposition testimony confirmed this practice. Final determination as to whether to loan to a consumer rested solely with Red Rock. Likewise Red Rock remained in sole and absolute control and oversight of day-to-day operations.

15.    While the Servicing Agreement delegated wide latitude regarding the fintech (financial technology services), management, consulting, and professional services necessary to provide the expertise, experience and knowledge in order to accomplish the Red Rock's goals, Red Rock retained control of the operations by among other things requiring that activities, servicing budgets and business plans be approved by Red Rock.

16.    Since the new Unsecured Lending Business was a startup business, it was high risk for both Red Rock and the Servicer. In order to assuage concerns of the Servicer, Red Rock agreed to a exclusive non-compete relationship in which they would contract with no other Servicer and would organize no other Lenders who do not utilize the services of the Servicer. ██████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████

17.    Because the new Unsecured Lending Business was a startup, success was uncertain and there was no barometer to determine a reasonable servicing fee to be paid to the Servicer while at the same time promoting the Tribe's goal of building a profitable lending organization that could provide the income stream to support Tribal government programs. Since success of the new Unsecured Lending Business would be in large part the result of the Servicer's performance, the parties agreed to a performance-based servicing fee to incentivize the Servicer and assure Red Rock would gain the requisite skill, knowledge, and experience to grow the small dollar lending business. The formula for the service fee was Red Rock net profit after all expenses of the business were paid and after deducting 2% of the net cash gross revenues to be retained by Red Rock. This was a reasonable arrangement because if the Servicer failed to meet Red Rock's expectation of building a successful lending operation and meet or exceed performance targets, the Servicer received nothing, no service fee. Furthermore the Tribe had little to lose since Red Rock started at ground zero, with no capital, no organization, no commercial credit providers, and no lines of credit. The Servicing Agreement also set a floor below which Red Rock would retain a minimum of $20,000 of the lending operation's profits.  It should also be noted that the 2% net cash revenues to be retained by Red Rock is misleading as Red Rock's total percentage of net cash gross revenue exceeded 69%. It must also be understood that Net Tribal Profit is not an accounting term for profits of the business; rather it is a label for a profit sharing formula in the Servicing Agreement. For example as discussed below 2% of the net cash gross revenues represents 6.13% of Red Rock Net Income (Profit) in 2012.

18.    Two of the critical services to be provided under the Red Rock – SourcePoint VI Servicing

Agreement were access to working capital to support business operations and access to Commercial Finance Providers, credit providers loaning the money to fund the short term small dollar unsecured consumer installment loans. The ▮▮▮▮▮ Revolving Line of Credit to provide working capital for Red Rock operations is one example and Commercial Finance Provider Alpha Credit Resources LLC is another example. Interest paid by Red Rock on these loans was a significant use of net cash gross revenues. In addition principal repayments required under these loans were also a significant use of net cash gross revenues not reflected in Red Rock's Income Statement.

19.    Financial statement information for Red Rock operations have not been produced, and references to financial information in documents produced are mere snippets of information which defy analysis. However, while there is no financial information for Red Rock's start up year 2011, Dowd Exhibit 30 provided an Income Statement for 2012, the first full year of Red Rock's new Unsecured Lending Business (attached hereto as Ex R-1).  The 2012 Income Statement provides no information as to Servicing Fees or Tribal Net Profits paid, but the amounts earned can be calculated using the formulas provided in the Servicing Agreement, as well as a view of revenues generated, expenses incurred and net income (profit) produced. Ex R-2, attached hereto, is an analysis of Red Rock's 2012 Income Statement.   This analysis reveals Red Rock incurred a ▮▮▮▮▮ cost for consumer loan charge offs (▮▮▮ of Gross Revenue).  Red Rock incurred ▮▮▮▮▮ in costs to operate its business (▮▮▮ of Net Cash Revenue) and ▮▮▮▮▮ (▮▮▮ of Net Cash Revenue) in interest expense for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ All together Red Rock received ▮▮▮▮ of Gross Revenues generated and incurred a Servicing Fee expense of ▮▮▮▮▮, a reasonable fee for developing a nascent burgeoning new Unsecured Lending Business with tremendous upside potential.

20.    Both the Red Rock – SourcePoint VI Servicing Agreement and the ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (▮▮▮▮▮▮▮▮ required a Deposit Account Control Agreement (DACA). DACA are customary and commonly used agreement used by lenders and third parties frequently in combination with other agreements such as cash management services

and lenders. DACA does not alter or change the ownership of the account or the account owners right to the funds in the account. In the Red Rock DACA the agreement allowed the servicer to carry out its responsibilities set out the Servicing Agreement such as paying creditors, vendors, and other financial obligations of Red Rock. The DACA was also used to perfect Red Rock lenders' security interest in the deposit accounts. The DACA grants no more rights in the deposit accounts than are specified in the underlying agreement giving rise to the DACA. Likewise individuals or companies operating through a DACA have a good faith requirement to only conduct transactions in accordance with the underlying agreements.   The DACA is a tri-party agreement among a deposit account owner, lender and depository bank whereby the parties agree to the handling of the deposit account(s) and which parties may provide the bank instruction. Here DACAs were used in combination with cash management services provided by Servicer and to ███████████████

████████████████████████████████████████████████████; as well as addressing collateral sharing and priorities among other Red Rock lenders such as the Commercial Finance Providers.  Normally the only instruction given by the Lender is in the event of default. Here the DACA also permitted the Servicer to sweep the account and make disbursements to pay principal and interest on Authorized Debt, disburse Tribal Net Profits, and pay Servicing Fees and payments to vendors; all financial management services prescribed in the Servicing Agreement. ████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████

  21.     In summary, the Servicing Agreement was not a serving agreement as commonly understood, but it was in fact a third party agreement for the outsourcing of a myriad of business, management and professional services requiring technical knowledge and expertise not possessed by Red Rock and provided Red Rock the opportunity achieve its goal of establishing a new Unsecured Lending Business. All short-term small dollar consumer installment loans were underwritten, approved and originated on tribal lands. At no point did any party other than the Tribe own an interest or share in Red Rock. In 2016 Red Rock Tribal Lending, LLC was merged into or its assets assigned to Big Picture Loans, LLC. And Red Rock was dissolved.

History, Operation, and Structure of Tribal Economic Development Holdings, LLC and subsidiaries and affiliates Big Picture Loans, LLC and Ascension Technologies, LLC.

22.    Having operated Red Rock Tribal Lending, LLC for approximately 3 ½ years gaining experience, expertise and knowledge of the short term small dollar unsecured consumer installment business, the Tribe prepared to take the next step in its lending evolution by expanding its business and improving profitability for the benefit of the Tribe. The Tribe determined the most efficient way to accomplish this goal was to acquire its Servicer, SourcePoint VI thereby bringing a significant portion of their outsourced services in-house. The Tribe approached SourcePoint VI who was amenable to a sale and thereafter began negotiating the purchase/sale. February 5, 2015, the Tribe formed Tribal Economic Development Holdings, LLC (TED) and the owners of SourcePoint VI's parent corporation Bellicose Capital, LLC formed Eventide Credit Acquisitions, LLC (Eventide Credit) on February 9, 2015.

23.    Tribal Economic Development Holdings, LLC (TED) was 100% owned by and the sole member is the Tribe. TED is an instrumentality of the Tribe. A holding company normally does not produce goods and services itself, but owns shares or membership interests of other companies. In this regard the Tribe caused TED to organize three additional subsidiaries, LVD Tribal Acquisition Company, LLC, Big Picture Loans, LLC and Ascension Technologies, LLC. Under the plan of Merger Bellicose Capital, LLC would initially be merged into LVD Tribal Acquisition Company, LLC and subsequently would transfer some SourcePoint VI assets including Intellectual Property and other assets more particularly described in Exhibit B to the Agreement and Plan of Merger to Ascension Technologies, LLC. Big Picture Loans, LLC would obtain Red Rock Tribal Lending, LLC assets, Red Rock would then be dissolved and Big Picture Loans, LLC would continue as the Lender. Thus after closure of the acquisition Big Picture, LLC (Big Picture) would be the lender, and Ascension Technologies, LLC (Ascension) would assume responsibilities for services previously provided by SourcePoint VI. TED would incur the debt for the acquisition of Bellicose Capital. As under the prior configuration with Red Rock, the Tribal Council for the Tribe would act as the Board of Directors providing oversight for TED, Big Picture, and Ascension.

24.     The agreement for the purchase of Bellicose Capital as set forth in the Agreement and Plan of Merger dated October 7, 2015 was a leveraged buyout by TED. That is the Tribe arranged a $300 million loan from Eventide Credit Acquisitions, LLC (Eventide Credit) which was secured by the assets being acquired and repaid for from the cash flow generated by the Red Rock's lending business in concert with the acquired business. The Tribe, TED or its subsidiaries paid no earnest money or made any down payment on the purchase. While the consideration for the purchase is set at $300 million, the consideration is in reality the lesser of $300 million or the actual principal amount (calculated according to a formula set forth in the Secured Promissory Note) repaid during the seven year term with any unpaid principal outstanding under the note at the end of seven years forgiven. This was a remarkably advantageous and valuable loan provision negotiated by the Tribe. The value and importance of this loan provision is that it assured the Tribe would own a free and clear lending business at the end of seven years, even if the TED never repaid $1 of the Eventide Credit loan.

25.     In addition to the consideration for the purchase of Bellicose Capital, LVD Tribal Acquisition Company, LLC assumed liability for approximately ▮▮▮▮▮▮ of debt owed by Bellicose Capital as described in Exhibit A to Merger Agreement.  While the assets of Red Rock were assigned to Big Picture, Red Rock liabilities to Commercial Finance Provider Alpha Credit Resources, LLC were assumed by TED and the ▮▮▮▮▮▮ Revolving Line of Credit initially payable to Iron Fence and subsequently assigned to SourcePoint VI was transferred to Big Picture.

26.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ As discussed above, in order for the lender, Eventide Credit, to perfect its security interest in the deposit accounts, a DACA was utilized. The DACA was an agreement among the secured lender Eventide Credit, Big Picture, and Chippewa Valley Bank contains standard language and provisions including that the bank may take direction from the deposit account owner, Big Picture, until such time as the lender directs the bank to cease following instructions from the deposit account owner, usually in the event of default. Therefore on a day-to-day basis TED and subsidiaries Big Picture and Ascension exercise full control over the deposit accounts.

27.     Since the subject transaction is a leveraged buyout, the Loan and Security Agreement contains a number of restrictive clauses such as requiring Eventide Credit approval of annual operating budgets, material deviations from the annual budget, hiring and firing key personnel, and materially modifying the business model. In leveraged buyouts such as here, these are standard lender restrictive covenants and clauses. These Loan Agreement covenants are not indicia of ownership or control, rather the covenants are negotiated by the lender and included in the Loan Agreement in order to preserve collateral and the organizational and operating parameters the lender has determined are necessary to assure the borrower will continue to perform in the manner that has generated the profits and cash flow required to repay the loan. The covenants are the result of arm's length negotiation. The covenants do not allow the lender, Eventide Credit, to take over and make corporate decisions directly and Eventide Credit has not done so.

28.     The acquisition of Bellicose Capital was a fair deal for the Tribe and TED. Under the terms of the Merger Agreement the Tribe acquired an organization with specialized knowledge, skill and experience, as well as a proven track record along with the Intellectual Property (more particularly described in Merger Agreement Exhibit B) required to expand the business. Under the Secured Promissory Note and Loan and Security Agreement, TED was provided a flexible loan payment plan that addressed the needs of the business first, allowed increased distributions to the Tribe to support its government programs, a higher retention of profit in the business while setting repayment requirements for the Eventide Credit Secured Promissory Note based on profits.

29.     As discussed above regarding Red Rock, all short-term small dollar consumer installment loans were underwritten, approved and originated by Big Picture on Tribal lands. The Court July 27, 2018 Memorandum of Opinion reached the same conclusion. The IntraTribal Servicing Agreement is effectively a moot agreement as it is an intra-company management agreement and it is the prerogative of the de facto Board of Directors, LVD Tribal Council, and TED management to determine fair compensation among the affiliated entities. The letters, emails, reports, affidavit, declarations, deposition testimony and Recommendation To Take Action And Request For Approval depict active involvement of Red Rock Tribal co-manager and Tribal member employees in

conducting and managing daily operations and the day to day affairs of Red Rock. The Red Rock Tribal managers and co-managers conducted its business as a typical American company with the specialist recommending and the managers approving, modifying or rejecting the recommendations; as well as reacting to problems and identifying deficiencies and delegating and assigning tasks. Oversight by the Board of Directors, Tribal Council, was provided. The Tribal Council, TED and Big Picture managers and co-managers held monthly meetings, receiving and reviewing reports and financial information and discussing the state of the business. The documents also disclose policies and procedures in place and followed in order to obtain concurrence and approval of Big Picture managers for actions taken or to be taken. Tribal Council members and Tribal representatives were active and participated in industry trade associations such as Online Lends Alliance and Native American Financial Services Association.

30.     Based on the documents and testimony, at no point did any party other than that Tribe own an interest or share in Red Rock or TED and its subsidiaries Big Picture and Ascension.

31.     All lenders are financial intermediaries which rely on raising funds and capital from investors and other people in order to fund their lending operations. The manner in which lenders raise capital dictates the lender's organizational structure and processes. In addition the higher the risk profile of the lender, the higher the restrictions and covenants placed on the lender by the investors.

32.     Banks are financial intermediaries that take funds from depositors, pool that money and lend it to those seeking funds. They make money, by paying depositors less interest than they charge borrowers, and using the difference to pay expenses and pocketing amounts remaining after interest and expenses (profit). Banks offer checking and savings accounts, and certificates of deposit, as the vehicles to obtain depositor funds. One of the primary advantages of a bank is that deposited funds are insured by the Federal Deposit Insurance Corporation allowing a bank to pay lower interest rates because customer deposits are protected up to $250,000 in case of bank failure and are therefore less risky than non-bank lenders.

33.     Non-bank financial intermediaries take funds from investors, pool the money and lend it to

those seeking funds. Non-bank financial intermediaries make money by paying investors less interest than they charge borrowers, and using the difference to pay expenses and pocketing amounts remaining after interest and expenses (profit).   Non-bank financial intermediary lenders pledge collateral such as their outstanding loans as a method to reduce risk thereby lowering the interest costs because the collateral provide some protection in the case of a failure.

34.     Based upon my review of the documents and agreements, Big Picture Loans (Big Picture) is a financial intermediary lender structured as a traditional finance company portfolio lender. A traditional finance company lender arranges short-term Lines of Credit (LOC) and longer-term Term Loans. In the case of Red Rock Tribal Lending (Red Rock), Red Rock obtained a $30 million working capital line of credit from Iron Fence Investments, Inc. which appears to have been assigned to SourcePoint VI on or before December 11, 2015. Under the terms of the Merger Agreement, this line of credit appears to have been assigned to a successor in interest and assumed by Big Picture. In addition Big Picture appears to have debt from at least one other source, Alpha Credit Resources, LLC. Red Rock and Big Picture were obligated for all debt incurred to operate its lending business. Red Rock and Big Picture did not sell loans or participations in loans they generated. These are <u>not</u> characteristics of a Rent A Tribe model.

Tribal interest rate laws apply to loans which are subject of this action.

35.     The applicability of Tribe interest rates versus consumer state interest rates.

36.     The Consumer Financial Protection Act (CFPA) (12 USC 5481(27) provides a definition of "State" which includes any federally recognized Indian Tribe, as defined by the Secretary of the Interior under section 5131(a) of title 25. The Tribe is a federally recognized Indian tribe. Therefore for consumer lending purposes the Tribe is the functional equivalent of a State.

37.     It is clear that Tribe formed Red Rock and Big Picture with the intent to engage in interstate commerce and establish a national footprint for its lending operations. In so doing the Tribe could avoid the costs and training to comply with a myriad of state laws by using uniform documents and

interest rates nationally. Therefore the Tribe established Red Rock and Big Picture on Tribal lands. The Loan Agreements for the consumer loans which are the subject of this litigation each contain a choice of law provision providing for Tribal Law.

38.    Since passage of the Riegle-Neal Interstate Banking and Branching Efficiency Act of 1994 (Riegle Neal) which permitted interstate branching, the choice of law provisions and the application of state interest rate regulations are well settled. Prior to 1994 banks were located in one state minimizing the issue, but with the passage of Riegle Neal, banks and their branches operate in a number of states across the country requiring the determination of which state laws and concomitant interest rates would be applied. Under the terms of Riegle Neal the state where the main office of the bank is located is the Home State and a branch located in a state other than the Home State is located in a Host State. Riegle Neal also contains a usury savings clause which essentially provides that a bank providing credit across state lines may impose its Home State " law loan charges even though there is a branch of the same bank in the state of its customer". To make this determination of Home State versus Host State, Riegle Neal divides the loan process into two categories "ministerial" functions and "non-ministerial" functions. Where ministerial functions occur basically has no bearing on the determination of Home State verses Host States law.

39.    There are three "non-ministerial" functions evaluated to determine to where a loan (extension of credit) is made by an interstate bank and thus whether Home State or Host State interest rate laws apply. The three "non-ministerial" functions are 1) where the loan was approved (approval), 2) where the loan was dispersed (dispersal of funds), and 3) communication of the final approval by the bank to the borrower, the site from which the first communication of final approval comes. Riegle Neal has made clear that the closing of the loan as long as it does not indicate approval or dispersal is considered a ministerial function and has no effect on which state law applies.

**40.    Approval**

41.    In a subjective underwriting and approval process in which a person exercises credit judgment based on training, experience, policies and procedures, it is the physical location where a person with

the authority to make the final judgment, approval or denial, is located.  In a loan evaluated subject to nondiscretionary criteria that will be mechanically applied, automated underwriting, the loan approval occurs where the decision to implement the criteria is made.

42.    Based on the deposition testimony, affidavit, declarations, and documents produced, all loan approvals occurred on Tribal lands. The Court July 27, 2018 Memorandum of Opinion reached the same determination. Under some circumstances approvers had the authority to override the automated underwriting and policy approval procedures. All personnel with this authority were located on Tribal lands. In addition the servers and computers which implemented the automated underwriting programs were located on Tribal lands. All final decisions as to which criteria and credit scoring factors would be included in the algorithms and programs were approved by Red Rock or Big Picture managers, Tribal representatives, or the Tribal Council, all operating on Tribal lands.

43.    **Dispersal of Funds**

44.    In evaluating the dispersal of funds a distinction is made between the "actual dispersal of loan proceeds" and "delivering previously disbursed loan funds" to the customer. Actual dispersal is non-ministerial while delivering previously disbursed loan funds is ministerial. Obviously if the bank hands the borrower a check that is actual dispersal. On the other hand if loan proceeds are dispersed to the title company, escrow agent or other third-party that is "delivering previously disbursed loan funds".

45.    ███████████████████████████████████████████████████████████

███████████████████████ In an EFT transaction Red Rock or Big Picture instructs the bank to debit its account and forward the funds through the ACH network processors or Red Rock or Big Picture instructs an ACH network processor to debit its bank account and forward the funds to the account of the borrower. The actual dispersal occurred when the bank or ACH processor debited Red Rock or Big Picture's account. The instruction to debit Red Rock or Big Picture bank account was delivered from Tribal Lands. The non-ministerial disbursal of the loan proceeds occurred on Tribal. The delivery of the loan proceeds by the ACH network processor to the borrower is a minor

ministerial function. The Court July 27, 2018 Memorandum of Opinion also determined that dispersal occurred on Tribal lands.

46.   **Communication of Final Approval**

47.   Communication of the final approval is the linchpin in the loan process, for without it the borrower is unaware of the approval which then becomes moot and the loan proceeds are never disbursed. In effect communication of the final approval is the last step in the approval process. The communication of the final approval constitutes the final element in determining where a loan is made. The location from which the first communication of final approval is delivered is the relevant site. In the Tribal loan origination process, communication of the final approval is accomplished electronically. Tribal representatives on Tribal lands push the button which delivers the final approval notification.

48.   The Tribe meets all three tests used to determine which state interest rate laws apply and therefore Tribal interest rate laws apply to the consumer transactions in this matter.

49.   It should also be noted under the Riegle Neal, if the three-prong analysis cannot be determined, where the loan is made defaults to Home State interest rate laws (Tribal interest rate laws).

50.   SUMMARY OF OPINIONS

   a.   Red Rock and Big Picture Loans are not payday lenders. Red Rock and Big Picture Loans are small dollar consumer installment lenders.

   b.   Small dollar consumer installment loans serve legitimate needs of a large percentage of the American population. Approximately 40% of Americans cannot deal with a $400 financial emergency. Small dollar consumer installment loan lenders serve these needs.

c. The unsecured small dollar consumer installment loans extended by Red Rock and Big Picture Loans were valid when made.

d. The unsecured small dollar installment loans extended by Red Rock and Big Picture Loans were originated, approved, dispersed, and committed on Tribal Lands. The Tribal laws and interest rates are applicable to the transactions.

e. Both Red Rock and Big Picture Loans were organized and operated as a traditional finance company contracting for loans in its own name to provide working capital in order to conduct business operations. Neither company sold loans or participations from its portfolio.

f. The Unsecured Lending Business operated by the Tribe was/is not a Rent A Tribe business model.

g. The Tribe, Tribal representatives and co-managers, and Tribal members were actively involved in the day-to-day operations of the Tribe's Unsecured Lending Business and the Tribal Council acting as the Board of Directors provided oversight of the operations.

h. Red Rock or Big Picture Loans were the lenders to whom the small dollar consumer installment loans were first payable and therefore the lender, the only lender and the True Lender.

i. The 2011 Servicing Agreement between Red Rock Tribal Lending and SourcePoint VI was a third party service provider contract.

j. The 2011 Servicing Agreement provided customary and reasonable compensation for services rendered by the Servicer, SourcePoint VI.

k. Post January 26, 2016 leveraged buyout of Bellicose Capital, no servicing fees were paid

to Matthew Martorello or his affiliated entities. Post January 26, 2016 leveraged buyout all profits from operation of the Big Picture Loans Unsecured Lending Business were retained by Tribal entities or distributed to the Tribe for the benefit of its members.

l.  A Deposit Account Control Agreement (DACA) is not indicia of third-party control over lending operations. A DACA is a security agreement used by lenders to attached and perfect a security interest in deposit accounts held at a bank.

m.  Operation Choke Point was an illegal Department of Justice (DOJ) initiative conducted in concert with a few high-ranking members of the FDIC aimed at eradicating certain legal disfavored industries such as payday lenders which spilled over into other legal disfavored industries. Operation Choke Point impacted the Tribe and interfered with its ability to maintain a full legal banking relationship with Chippewa Valley Bank.

n.  The Tribe accomplished its long term goals of starting a new Unsecured Lending Business, gaining knowledge, experience, and expertise; and expanding its business to provide significant economic benefits for the welfare of the Tribe and its members.

o.  If the Tribe were a banking organization structured in the manner described and conducting its lending operations as here, whether as Red Rock or TED and subsidiary Big Picture; the conduct would be unquestioned. Every day banking organizations conduct their lending operations similar to the Tribe and export Home State interest rates. Furthermore as of July 31, 2018 the OCC began accepting National Bank Charter Applications from financial technology companies (fintech) engaged in the business of banking. The business of banking includes lending and online lenders such as the Red Rock and Big Picture are fintech companies. These National Bank Fintech Charters are special-purpose charters and the fintech companies are not required to accept deposits. In announcing the special-purpose charter the Comptroller of the Currency stated that "… companies that provide banking services in innovative ways deserve the opportunity to pursue that business on a national scale". The Comptroller of the

Currency also stated "The federal banking system must continue to evolve and embrace innovation to meet the changing customer needs…" (NR 2018 – 74).

51. <u>Payday Lending versus Small Dollar Loans</u> - Throughout the Complaint Plaintiffs describes the Defendants as PayDay Lenders involved in Payday Lending and extending Payday Loans. This characterization is incorrect. The defendants are not engaged in Payday Lending. The actual type Lending conducted by the defendants in this matter is Short Term, Small Dollar, Unsecured Installment Loans (Small Dollar Loans). The only common characteristics between Payday Lending and the defendants Small Dollar Loans are that the periodic required payments are usually scheduled to coincide with the borrower's paycheck schedule and the borrower normally remits payments by authorizing an EFT transfer (Electronic Funds Transfer), usually in the form of an ACH debit (Automated Clearing House).

52. Payday Lending sometimes known as deferred deposit advances, are small dollar very short term unsecured loans that borrowers promise to repay from their next paycheck or other regular income source. Payday Loans are very short-term in nature usually around 45 days or less. Typically under the Payday Loan arrangement the borrower provides a post dated check that will be held until loan maturity when it is then deposited as repayment for the loan or the borrower provides a debit authorization allowing the lender to debit the borrower's bank account. The Payday Loans are frequently single payment obligations with the only payment being made at maturity to pay off the loan. Another common Payday Loan plan provides for minimal periodic payments usually tied to the borrowers pay check schedule and one final balloon payment (more than three times the regular periodic payment). As noted above Payday loans are typically short term 45 day loans paid off over 3-4 weekly pay check period which is inadequate time to recover from what ever crisis prompted the need to borrow. The result is about 70% of borrower have to take out another loan at maturity or refinance the existing loan. About 25% of payday borrowers end up taking out at least 10 more loans incurring more fees with each new loan or renewal.  Balloon payment payday loans are large payments which absorbs the majority of a paycheck when the balloon payment comes due, again creating the need to refinance and incur more fees. Many payday lenders also charge a fee in addition

to interest leading to additional costs.

53.     The Defendants are engaged in Small Dollar Installment Loan lending. These Small Dollar Loans were extended under one of two loan Closed End plans: 1) STL plan which provides for level monthly principal payments plus interest with the monthly principal and interest payments declining over the term of the loan or 2) SIL (Simple Interest Loan) plan which provides for level monthly payments of principal and interest over the term of the loan which results in declining monthly interest. The Closed End Small Dollar Loans have a maturity from two months (60 days) to two years (24 months) and are fully amortizing (no balloon payment) installment loans. Characteristically, under both plans, the periodic payments occur weekly, bi-weekly, bi-monthly or monthly coinciding with borrower's pay check schedule. Under either Closed End Small Dollar Loan plan, the borrower chooses to either mail payments to the Lender or authorizes an EFT transfer usually in the form of an ACH debit. Red Rock and Big Picture small dollar installment loans have no fees and the loan term is structured with smaller payments made over a longer term. All three of the Plaintiffs' Loan Agreements were the STL plan. Coffy's agreement was with Red Rock while Williams and Hengle's agreements are with Big Picture.

54.     In early 2018 the Office of the Comptroller of the Currency (OCC), the prudential federal regulator for national banks encouraged banks to offer short term small dollar installments, typically 2 months to 12 months to help meet the credit needs of customers.

55.     Small dollar consumer installment loans serve legitimate needs of a large percentage of the American population. Approximately 40% of Americans cannot deal with a $400 financial emergency. Small dollar consumer installment loan lenders serve these needs.

56.     Yet a few high level bureaucrats at FDIC (see discussion of Operation Choke Point below), some State Regulators and Class Action attorneys have regularly targeted small dollar installment loan lenders (typically $200 -$2,500 loans) because they consider these loan as offering questionable financial value in spite of the fact that millions of Americans across all economic and educational strata regularly borrow small dollar installment loans. The OCC reported in 2017, that US consumers

borrow nearly $90 billion every year in short term, small dollar loans ranging from $300 to $5,000. Borrowers use small dollar loans because a vast segment of the population lives paycheck to paycheck. Living in this manner raises many emergencies such as medical bills, car repairs, car payments, home repairs, house payments or rent that cause the borrower to need money before the next paycheck arrives. If they do not pay their car loan, the car is repossessed. If they do not have a car, they might lose their job and if they lose their job they have no money. If they have no money they can not get their car back. If they do not pay rent or house payments, they are evicted then they are homeless. If they do not pay medical bills, they can not receive medical care, which if left untreated could lead to more medical costs. Therefore to pay the expenses for these emergencies, borrowers rely on short term small dollar installment loans. The short term small dollar installment loans obtained by Coffey, Williams, and Hengle are typical of such loans costing from $30 - $32 per hundred which is a high cost. However $30 per hundred is a small price to pay for the borrower to save the cost of larger problems. Big Picture Loan small dollar installment loans are fully disclosed with no hidden costs and thousands of their customers evaluate the loan costs and determine it is a small cost to meet the emergency and save them really big financial problems.

57.     Rent A Tribe

58.     The Unsecured Lending Business operated by Red Rock and Big Picture was/is not a Rent A Tribe business model or scheme.

59.     Plaintiffs describe Red Rock and Big Picture lending operations as a Rent A Tribe business model where a "payday lending scheme associates with a Native American tribe in an attempt to cloak itself and the privileges and immunities enjoyed by the tribe". In reality the Rent A Tribe label is a code word for de facto owner, also known as True Lender, and Predominant Economic Interest (discussed below). Rent A Tribe is a derivative of Rent A Bank which in all likelihood derives from bank credit card lending known as Rent A BIN (discussed below).  Under Rent A Bank and Rent A Tribe theories a bank or tribe is not required to be licensed to extend loans in the various states such as Virginia and can export their home state interest rates. For allowing the use of their name a small

fee is paid to the bank or tribe. Profits flow to the entity or entities which rent the name, and which exercises control over the lending organization and conducts lending operations.  The plaintiffs also allege that Bellicose Capital is the de facto owner and True lender.

60.   It should be noted that "de facto owner"/Lender, also known as True Lender, and Predominant Economic Interest are never applied to "favored" finance industry segments similarly structured and operated. These theories are only applied to "disfavored" payday lending and small dollar installment loans.

61.   Neither Red Rock nor Big Picture are payday lenders; however, it is informative to understand the FDIC guidance on payday loans and so-called Rent A Bank models on which Rent A Tribe theories are predicated. While some state regulators and many plaintiffs' attorneys have argued that the Rent A Bank model is illegal, FDIC's guidance regarding payday lending issued in 2005 clearly invalidates this argument.   FDIC's Financial Institution Letter (FIL) FIL 14-2005 specifically recognizes the right of banks to enter into third-party lending programs and states: "Insured depository institutions may have payday lending programs that they administer directly, using their own employees, or they may enter into arrangements with third parties. In the latter arrangements, the institution typically enters into an agreement in which the institution funds payday loans originated through a third-party. These arrangements also may involve the sale to the third-party of loans or servicing rights to the loans. Institutions also may rely on third parties to provide additional services that the bank would normally provide, including collections, advertising and soliciting applications." This language clearly recognizes Rent A Bank as a legal structure to conduct payday loan activities and is patterned after other permissible banking structures such as Rent A BIN employed in other consumer loan segments such as the credit card industry, residential mortgage lending, and automobile lending (discussed below). While the Tribe's Unsecured Lending Business is not organized as a Rent A Tribe and is not a Rent A Tribe business model, assuming arguendo it was; the structure would be legal and the Tribe's interest-rate laws would apply. Not withstanding this the Tribe did not establish Red Rock to evade state usury laws. The Tribe established Red Rock to build a lending business was to provide an income stream for the welfare of the Tribe.

62.     In 2011, the Tribe recognized it held a competitive economic advantage over non-tribe competitors due to the impact that conflicting state and local laws have on the efficiency and cost-effectiveness of their operations. However the Tribe did not possess the requisite experience, skill or expertise to exploit this opportunity. Therefore to develop this opportunity, the Tribe sought out third-party professionals who could provide the requisite skills and experience necessary to build a lending organization operating with a national footprint without interference from inconsistent state laws.  In this regard the Tribe contracted with Bellicose Capital and SourcePoint VI to provide the requisite services. The OCC as the prudential federal regulator of national banks operates on the same premise and works to preserve the national character of the national banking system by eliminating interference from inconsistent state laws.

63.     Banks and lenders are authorized to conduct lending activities through agents (third parties) and compensate the agents for their services. Likewise it is well established that the banks and non bank lenders and Tribal lenders may take such actions as are incidental to the business of lending, which includes hiring third parties to originate and service loans, to provide management, financial and professional services and to provide third parties compensation for these services.

64.     <u>Lending activities performed by third party vendors and lending activities performed in-house are functionally equivalent</u>. Third party contracts for lending activities such as advertising and soliciting applications, building and applying automated underwriting systems and credit scoring systems, negotiating for credit, or any other function necessary to support lending operations are the functional equivalent of these activities being performed in-house.  Performing all of the lending functions in-house and the outsourcing of certain lending functions to third party Defendants differed only in corporate form and the third party SourcePoint VI relationship was the functional equivalent of an internal Tribe division.  The existence of a third-party servicer or economic relationship does not affect the role the Red Rock or Big Picture as the actual lender of Small Dollar Installment Loans it makes. The small dollar installment loans were payable to Red Rock or Big Picture and Red Rock or Big Picture are the lenders.

65.     The Plaintiffs describe the common banking and lending practice of third party outsourcing as a scheme disguised as service contracts to extract revenues in the form of service fees so that the majority of the revenues were diverted to Matthew Martorello affiliated entities. According to the Plaintiffs, Defendants identified the Tribe as an entity willing to play the nominal lender function for a small fee with Matthew Martorello affiliates earning most of the revenues generated by the lending activity, denominated as fees or charges for services provided to the Red Rock and BPL lenders. The financial information presented in the documents dictate otherwise, in 2012 Red Rock was expending more than ███████ to operate the lending business.

66.     Implicit in the Plaintiffs' view is that services provided by entities affiliated with Mathew Martorello were not actually required by Red Rock, the entities affiliated with Matthew Martorello did not perform material services and should not be compensated for these services. Also implicit in the Plaintiffs' view is that Red Rock and BPL are not actively engaged in the process, merely renting their name and stepping aside. The customs and practices, various agreements, and the course of dealing between the parties dictate otherwise. The Tribal lending entities at times borrowed more than ███████████ and were at risk of loss of this amount in the event of default, hardly a nominal amount. And post buyout in 2017 the Tribe projected profits from the BPL lending business to exceed ███████ again hardly a nominal fee. ████████████████████ ████████████████████████████████████████ ████████████████

67.     It is an established practice for Banks and Lenders to enter into third-party relationships by outsourcing certain loan operational functions and seeking assistance in capital formation in order to assist them in attaining their strategic goals and as a vehicle for management to access greater expertise or efficiency for a particular lending activity. Outsourcing any third-party lending operation arrangement will result in a reduction in the Lenders direct control over the activity. However the Banks and Lenders are still responsible for the outsourced Lending activities as though the lending activity were handled within the organization and directly performed by the organization and thus outsourcing lending activities is the functional equivalent of being performed in-house. The primary

difference in managing the risk of in-house lending activities and outsourced lending activities is the manner in which risk is managed in a safe and sound manner. Outsourced Lending activities require adequate oversight to manage this risk. Adequate oversight includes periodic review of subjects such as the contractual relationships, assessing whether the objectives are being realized, monitoring compliance with applicable laws, rules, and regulations and testing loan programs operated on behalf of the Lenders. Failure to provide adequate safe and sound oversight does not imply that the outsourced required lending activities were not performed competently or did not achieve the strategic objective results. As previously discussed, Tribal representatives and Tribal member employees were actively involved in the day-to-day operations and the management and oversight of the lending activities and the Tribal Council acting as a Board of Directors met monthly to discuss lending operations and receive and review monthly financial data.

68.   <u>Banking and Finance Use and Management of Third-Party Relationships (Vendors)</u>

69.   The use of third party relationships is so pervasive in the banking and finance industry that on June 6, 2008, FDIC issued safety and soundness guidance (FDIC Financial Institution Letter herein after FIL - FIL 44-2008) addressing third party relationships and the obligation to manage the risks associated with the third party relationship. "For purposes of this guidance, the term "third party" is broadly defined to include all entities that have entered into a business relationship with the financial institution, whether the third party is a bank or a nonbank, affiliated or not affiliated, regulated or nonregulated, or domestic or foreign." (FIL 44-2008)

70.   According to FDIC FIL 44-2008, "… institutions generally enter into third-party relationships by outsourcing certain operational functions to a third party or by using a third party to make products and services available that the institution does not originate. Also, financial institutions may enter into arrangements with third parties in which the institution funds certain products originated by a third party. As the financial services industry continues to evolve, some financial institutions are also using third parties for functions that are either new or have traditionally been performed in-house." The third parties applying modern technology and the internet to the finance industry both

partner and compete with banks and are called FinTech entities.

71.    "The FDIC recognizes that the use of third parties can assist management in attaining strategic objectives by increasing revenues or reducing costs. The use of a third party also commonly serves as a vehicle for management to access greater expertise or efficiency for a particular activity."(FDIC FIL 44-2008)

72.    Through its safety and soundness June 6, 2008 Third Party Relationship Guidance, the FDIC clearly approves acknowledges, confirms, and recognizes the appropriateness of the use of third parties to "outsource certain operational functions to a third party or by using a third party to make products and services available that the institution does not originate", "fund certain products originated by a third party", "access greater expertise or efficiency for a particular activity", contract with a third party to "access, transmit, or perform transactions on sensitive customer information"; allow the "third party to market bank products or services";  and contract with a "third party to provide a product or perform a service involving <u>subprime lending or card payment transactions".</u> All of these activities are everyday permissible banking and finance functions incidental to the business of banking and lending which are contracted and performed by third party service providers and vendors throughout the banking and financing industry. Red Rock or Big Picture Small Dollar Installment Loans business outsourced these usual and customary functions and activities to SourcePoint VI; as well as entities not affiliated with Matthew Martorello. There was nothing unusual or special in outsourcing these functions and activities, it merely provided the Tribe vehicles to access greater expertise and efficiency, to generate greater volume, provide liquidity, and diversify risk.

73.    True Lender Also Known As De Facto Lender and Predominant Economic Interest

74.    "True Lender" concept is also variously known as "De Facto Lender" and "Predominate Economic Interest". The elements and standards of the True Lender theory are opaque with no clear factual constellation. True Lender, De Facto Lender or Predominate Economic Interest determination are evaluations of the transaction used to resolve which party or entity holds, acquires or maintains

the Predominant Economic Interest in the revenues generated by the loans. However True Lender theory is not a test, nor does it comport with any principles of lending, accounting or industry finance standards. It is a theory applied by some to disfavored industries such as payday lending and Small Dollar Lending, but not applied to other lending segments such as residential real estate mortgages or credit cards. It is a theory based on "you will know it when you see it" in which the outcome is always a certainty as the facts are in gathered in hindsight and applied to fit the current target. Thus by design True Lender results in allowing Plaintiffs and some officials to circumvent federal preemption laws and regulations authorizing the exportation of home state interest rates and sovereign immunity which effectively result in the export of interest rates. It is a truism that in absolute dollars terms, any entity or group of entities holding more than 51% of the transaction or lending entity will <u>always</u> have the Predominant Economic Interest thereby classifying it as the "True Lender" or "De Facto Lender". In this matter the Tribe was the sole member and 100% owner of Red Rock and was the sole member and 100% owner of TED which was the sole member and 100% owner of BPL. Therefore the Tribe as sole owner of Red Rock, and TED and its subsidiary BPL held the Predominate Economic Interests in the lending transactions.

75.    It is also true that none of three parties each owning a 33 1/3% undivided interest in a loan would hold a Predominant Economic Interest. For example residential real estate mortgages, is a consumer lending industry segment which also relies on federal preemption and is structured similar to the to so-called Rent A Bank/Tribe business model, and in which it is the lender's intent to immediately sell all or a majority of the mortgage loan upon closing into the secondary mortgage market. Under the Predominant Economic Interest theory, Fannie Mae or Freddie Mac owning 100% of the mortgage loans or investors in the subprime mortgages holding 93% - 97% interest in the mortgage loans the would be the True Lenders. Similarly in a Rent-A-BIN credit card arrangement, where the nominal bank lender immediately sold all or a majority of the credit card receivables (loans) to the non-bank third party which had originated, underwritten and approved the credit cards, the non-bank third party would be the True Lender. However Predominate Economic Interest, True Lender, De Facto Lender theory is never applied to these "favored" finance and lending industry segments.

76.    While there are no clear standards or elements set forth as part of the True Lender theory, proponents invariably start with three issues: 1) which parties perform the credit underwriting and approved the loans, 2) which party held the largest portion of the loans, and 3) whether the Lender immediately sold the loans to support the theory.

77.    Credit Underwriting and Loan Approval

78.    In this matter it is contended that it was the Matthew Martorello affiliated group which underwrote and approved the loans and not the Lender (Red Rock and/or Big Picture). This is incorrect. The documents, deposition testimony, declarations and affidavits, letters and emails confirm that the small dollar consumer installment loans were originated, approved, and closed on Tribal lands and all loans were approved by Tribal member employees who had been delegated lending authority. In addition it is contended that since Matthew Martorello affiliates assisted in developing the credit scoring models, that they were the de facto approvers of the loans. Banking regulators have clearly established that in the absence of a subjective credit approval system, where non-discretionary criteria are mechanically or electronically applied it is the approver of the criteria that will be applied is the approver. The CEO and Tribal member managers and co-managers approved the criteria and are therefore the credit approvers.

79.    Which Party Held The Largest Portion Of The Loans

80.    Many lending and finance industry segments are designed to sell off a majority (51%) or all (100%) of a particular loan transactions. Credit card loans and residential real estate mortgage segments along with automobile loans are examples. Therefore, it is common practice that a party other than the originating Lender will ultimately acquire the largest portion of the loans generated. Yet in these "favored" finance industry segments Predominate Economic Interest theory is not applied. To do so would invalidate federal preemption and valid when made principles which underlay the banking system and undermine free flow of capital in our national economy. In this matter Red Rock and BPL owned 100% of the loans, and extended all the loans using Red Rock and BPL funds. No other party including Matthew Martorello affiliated entities ever owned any of the

loans except perhaps a few loans which were sold after being charged-off.

81.   Who Bore Economic Monetary Risk and Who Controlled The Loan

82.   Red Rock or Big Picture continuously bore the economic risk from the time loan approval was communicated to the borrower until the small dollar installment loan was repaid. That Red Rock bore the economic risk is evident in the fact that in 2012 Red Rock lost ███████ from defaulted and charged-off small dollar installment loans. That BPL bore the economic risk is evident during the first six months of 2017 when BPL lost █████ from defaulted and charged-off small dollar installment loans.

83.   In summary all small dollar installment loans were funded with Red Rock or Big Picture funds. Only Red Rock or Big Picture working capital funds were used to conduct the lending operations. Red Rock or Big Picture bore the economic risks and transaction which risk is evidenced by the fact that these two lenders were incurring eight figure defaulted loan losses and these losses were funded with Red Rock or Big Picture funds. Red Rock or Big Picture originated, underwrote, and approved all small dollar installment loans. The appointed Tribal representatives and the Tribal member CEO, Tribal member co-managers of Red Rock and Big Picture controlled and operated the lending operations. The Tribe controlled Red Rock and Big Picture through ownership and its parent TED.

84.   The discussion of the finance industry segments discussed below, are provided as background for an understanding and context regarding comments and discussions expressed in this report.

85.   Rent-A-BIN, Rent-A-ICA - Marquette National Bank of Minneapolis v First of Omaha was a credit card case unanimously decided by the US Supreme Court in 1978 holding that national banks could export interest rates permissible in their home state to borrowers residing in other states thereby preempting individual state usury laws. As a result of this ruling the banks formed the VISA and MasterCard Associations with the goal of permitting bank credit cards programs to be deployed uniformly throughout the U.S.

86.     Today the principal credit card systems in the United States are the Visa Credit Card Association and the MasterCard Association (Association). Each of these Associations allows only financial institutions with deposits insured by the FDIC (FDIC insured banks) to members and to participate in their programs and issue credit cards under their brands. Thus non-bank entities can not be Association members, participate in merchant programs, and can not issue Visa or MasterCard credit cards.

87.     Each Association assigns one or more Bank Identification Numbers (BIN) (Visa) or Interbank Card Association Numbers (ICA) which is reflected in the first several digits of the cardholder account number to identify the issuing bank.

88.     FDIC insured bank Association members with licensed BINs or ICAs are authorized to permit other non-bank entities to conduct various credit card related activities including originating and issuing credit cards on behalf of the bank using the bank Association members' BIN or ICA. These arrangements are typically referred to as Rent-a-BIN or Rent-a-ICA (hereinafter Rent-A-BIN).

89.     In a credit card issuing Rent-A-BIN arrangement, the FDIC insured bank "rents" its right to originated and issue credit cards under the applicable Association's logo to a third-party in return for a rental fee (FDIC Credit Card Activities Manual chapter III and XIV). <u>The arrangement essentially entails the bank lending its ""name and "regulated-entity-status"(preemption) to a credit card program operated by a non-bank third party for a rental fee</u>. The non-bank third party generally solicits and approves credit card applications and issues the credit cards. The FDIC insured bank is identified as the issuer and the non-bank renter is generally not known to the cardholder.

90.     Typically in these Rent-A-BIN arrangements the FDIC insured bank immediately sells all (100%) or a majority (51%) of the credit card receivables generated by the credit card holders; retaining little or no interest in the transaction. Under an Issuing Rent-A-BIN arrangement, the FDIC insured bank simultaneously or subsequently transfers all or a majority of the credit card receivables off its books to its third party Rent-A-BIN renter or other non-bank third party.

91.    The FDIC insured banks use Rent-A-BIN renters and/or third parties for virtually all administrative and servicing functions including marketing and solicitation, underwriting and collections.

92.    Credit Card loans generated through these Rent-A-BIN arrangements may be prime credit, regular credit or subprime credit.

93.    Rent-A-BIN arrangements are recognized banking tools to mitigate risk and diversify risks associated with credit card lending. Rent-A-BIN arrangements, however, are not without risk, therefore the federal regulators provide safety and soundness guidance as to the bank risk in these arrangements primarily in the form of managing third party risk.

94.    The federal banking regulators, FDIC and OCC, give explicit approval to these Rent-A-BIN arrangements. Thus The FDIC and OCC indorses the renting of the banks "name" inorder to gain "regulated-entity-status" and the federal preemption and ability to export interest rates that accompanies it.

95.    Rent-A-BIN credit card programs are arrangements endorsed by the FDIC and are the exact models and structure used in Rent A Bank models and by association Rent A Tribe. (See Comparison of Rent-A-BIN and Rent-A-Bank model below.)

96.    The non-bank originator of this credit card debt would not have a Predominant Economic Interest in the credit card loans generated.

97.    The Lines of Credit borrower (Lender) is at risk for the borrowed funds until the Line of Credit is paid off.

98.    <u>Mortgage Banking Structure</u>

99.    Mortgage bankers are mortgage Lenders that originate and sell loans in pools on the

secondary market or to investors such as Freddie Mac and Fannie Mae (Government Sponsored Entity (GSE)) and other private investors. If they are non-depository institutions typically they finance loans with Warehouse Lines of Credit, but quickly selloff these loans in the secondary market so they can originate new loans.

100.   Portfolio mortgage Lenders originate and find their own loans, and may service them or sell the servicing rights to a third-party. Normally portfolio mortgage lenders are banks that hold customer deposit accounts which are used to fund the loans.

101.   Correspondent mortgage lenders originate and fund loans in their own name, then sell the loans off to larger mortgage lenders who in turn service them or sell them off in the secondary market. The correspondent mortgage lenders underwrite loans to credit criteria, terms and conditions of the larger mortgage lender or sponsor.

102.   A direct mortgage lender is a lender with a retail operation that works directly with the homeowner /borrower and has no need for a middleman or broker. The direct mortgage lender may be a portfolio mortgage lender or correspondent mortgage lender, in which case the loans will be accumulated and sold either to a correspondent mortgage banker or the secondary market. These loans will be underwritten to the credit criteria required by either the correspondent mortgage banker or the secondary market. While Freddie Mac and Fannie Mae are not lenders, rather mortgage purchasers and aggregators of loans to be sold in the secondary market, the vast majority of all residential are underwritten to Freddie Mac and Fannie Mae underwriting standards to assure the mortgages can be sold. In this regard Freddie Mac and Fannie Mae Automated Underwriting Systems (Desk Underwriter (DU) and Loan Prospector (LP)) are used to underwrite most residential mortgages whether or not the mortgages are targeted for sale to one of the GSEs.

103.   A wholesale mortgage lender operates through a network of independent mortgage brokers to originate loans. Once the independent broker has negotiated a transaction with the borrower, the transaction details are forwarded to the wholesale mortgage lender for underwriting and processing. The wholesale mortgage lender funds the loans and ultimately sells the loan in the secondary market

or to GSEs.

104.   The loans generated through these various mortgage banking arrangements may be prime credit, regular credit or subprime credit.

105.   The system to which mortgage loans are originated through non-bank lenders is known as the shadow banking system. The key characteristic in the shadow banking system is that the mortgage loan originator intends to immediately or subsequently sell its interest in the loan to a third-party which could be the secondary market or a bank. In this system which is the vast majority of mortgages originated in the United States, the originator would not have a predominant economic interest in the mortgage loans.

106.   <u>Fannie Mae/Freddie Mac (Government Sponsored Entity (GSE)) and its structure.</u>

107.   Freddie Mac and Fannie Mae are formally government-sponsored entities which became government owned subsequent to the financial crisis of 2008, which buy mortgage loans and package them into secondary market loan products.

108.   These entities historically set underwriting and approval guidelines for loans which they will purchase. In order to assure compliance with the underwriting criteria and the pricing, and terms and conditions under which they would acquire mortgages; the GSE's developed automated electronic underwriting programs to be used for loans being sold to them. Mortgage loan originators desiring to sell to Freddie Mac and Fannie Mae are required to use these automated electronic underwriting systems. Mortgage loan originators input credit information into the automated systems which then provide an unconditioned approval, contingent approval subject to, or a decline.

109.   Freddie Mac/Fannie Mae dictates the underwriting and credit criteria for which it will purchase mortgage loans. This is a cardinal rule in banking and finance, the entity purchasing a loan or participation dictates credit criteria terms and conditions.

110.   Automated Underwriting Systems

111.   Automated underwriting is a technology driven underwriting process that provides a computer-generated loan decision. The most widely known and used automated underwriting systems were developed by Freddie Mac and Fannie Mae for the mortgage industry. Fannie Mae's product is known as Desk Underwriter (DU) while the Freddie Mac system is known as Loan Prospector (LP).

112.   With the advent of online lending, FinTech companies are partnering with lenders to revolutionize automated underwriting and lending services. Using automated underwriting system allows lenders to take applications that are structured to take basic application information including addresses, Social Security numbers, and income data, then use basic loan application information to electronically retrieve relevant data such as borrower's credit history and processing the borrower's information through a programmed underwriting process that instantly arrives at a loan decision.

113. 

114.   Historically loan approval decisions have been based on subjective discretionary underwriting criteria applied by lender personnel with the training, experience, and skill to exercise judgment regarding approval or rejection of a loan application.  Under this subjective method of approving credit, it is the skill of the credit approver which determines the quality of loans made. Given the sheer quantity and volume of loan applications necessary to be approved in a small dollar installment lending program, the subjective method of approving credit in all likelihood cannot be staffed to process the volumes necessary for the successful operation of the loan program. Years ago the credit

card industry recognized that could not process credit card applications on a timely basis and moved to electronic Automated Underwriting Systems. As discussed above Freddie Mac and Fannie Mae also moved to automated underwriting systems years ago.

115.    Under automated underwriting and loan processing systems non-discretionary underwriting standards are imbedded in a credit-scoring model employing various algorithms that generate a credit decision. It is application of specific non-discretionary facts to the predetermined automatic underwriting criteria that produces the credit decision. Therefore it is the approver of the predetermined non-discretionary underwriting criteria that actually makes the credit decision. In this matter it is the lender co-managers, and Tribal Representative, and or the Tribal Council acting as the Board of Directors who makes these decisions in concert with recommendations from specialist possessing skills in the appropriate fields. In this regard the Red Rock and BPL operate as typical companies with the specialist recommending and management approving.

116.    Operation Choke Point

117.    Operation Choke Point (Choke Point) was an effort by the Department of Justice (DOJ), the FDIC and other federal regulators to freeze or choke out <u>legal politically disfavored businesses</u> including specifically payday lenders from the financial system. That Bank Examiners should avoid any perception that its processes are being influenced by political consideration is so well-founded that the FDIC Bank Examination Manual states: "Examinations must be kept free from political considerations, or the appearance of being influenced by political considerations in order to maintain the integrity and effectiveness of the examination process."

118.    Choke Point consisted of a number of high-ranking bureaucrats in the FDIC and other federal agencies taking it on themselves to shut down legal businesses such as payday lenders.

119.    Initially, the FDIC and OCC publicly identified safety and soundness concerns and began issuing guidance regarding the high-risk nature of payday lending. Generally speaking approximately 50% of all payday loans are charged-off.

120.   By 2011 the FDIC began to covertly discourage payday lending by expanding the risk management context of reputational risk to include negative publicity related to the bank's customers. Banks are extremely sensitive to its federal regulators and are fully aware that additional pressure can be brought on them increasing costs for audits and other oversight activities.

121.   As Choke Point covertly evolved, the FDIC began to bring pressure on banks to terminate relationships with payment processors (ACH network processors) that process electronic payments for payday lenders.

122.   Beginning in approximately in the latter part of 2013 or early 2014 some banks and their payment processors began to question the FDIC's actions. A number of these banks provided FDIC with the banks risk assessments showing that these legal businesses, including payday lenders pose no significant risk to the financial institution including financial, legal or reputational risk. At that time lawsuits were beginning to be brought challenging this regulatory environment and the FDIC began to back down.

123.   Choke Point impacted the Tribe and its relationship with its bank Chippewa Valley Bank. Because of choke point related concerns Chippewa Valley Bank at various points required several months in order to decide whether to engage in providing certain services to the Tribe lenders (Red Rock and Big Picture). Mr. Gerber, Chairman of Chippewa Valley Bank in his deposition describes why he felt compelled to go to Washington DC accompanied by the Chairman of the Tribe and meet with the Chairman of the FDIC. After waiting for new FDIC guidance Chippewa Valley Bank engaged in some services for LVD but never payment processing services.

124.   The actions of the FDIC throughout this period of time as it relates to legal businesses such as payday lenders was so egregious that in 2017 the Financial Institution Customer Protection Act of 2017 passed the House of Representatives with only two no votes.

125.   The Financial Institution Customer Protection Act of 2017 provides that (Sec. 2) this bill specifies that a federal banking agency may not request or order a depository institution to terminate

a customer account unless: (1) the agency has a valid reason for doing so, and (2) that reason is not based solely on reputation risk. Valid reasons for terminating an account include threats to national security and involvement in terrorist financing, including state sponsorship of terrorism. A federal banking agency requesting a termination must provide the depository institution with notification and justification.

Respectfully Submitted

Richard E. Ross

# Resume of Richard E. Ross

# Richard E. Ross Consultants, Inc.

Bank Services - Risk Management
Compliance, Loans, Checks
Litigation Support

32146 Caminito Osuna
Temecula, CA 92592
American Bankers Association Service Member

(858) 481-2510
Fax (858) 792-6044
richard@rrossinc.com

Richard E. Ross: My experience is summarized as follows:

1.   I have over 40 years experience in the banking industry and am a former member of the Board of Directors of two national banks.  I have held the position of Executive Vice President at two separate banks where I was responsible for all assets of the bank including loans and investments.  In this capacity, I was also the Senior Loan Officer and Chief Credit Officer responsible for all lending activities including credit approval, credit administration, credit analysis, loan documentation, servicing, and collections for Real Estate Lending, Commercial Lending (including working capital and accounts receivable lines of credit), Term and Installment Loans and Consumer Loans. Collection activities included (real estate, commercial and consumer) oversight of past due loans, ORE, and repossessions.  These responsibilities included negotiating and renegotiating construction, mortgage, commercial and consumer troubled loans and the elimination and disposition of non-performing loans.  In supervising and reconstructing problem and workout loans, I was involved with all aspects of insolvency and bankruptcy from creditor in possession, avoiding preference, fighting and lifting automatic stays to voiding discharges and abandoning claims.  As part of my responsibilities, I also wrote the policies and procedures for each of these lending areas, and administered compliance with these policies.  At two of the banks, I established residential mortgage and construction lending departments which did not exist at the time of my arrival, hiring and training all employees; as well as, drafting and implementing policies and procedures including consumer compliance such as Regulations B (Equal Credit Opportunity Act), Z (Truth in Lending) and X (RESPA - Real Estate Settlement Procedures Act).  In addition, I was the Consumer Compliance Officer.

I was also Vice-Chairman of the Operations Committee charged with responsibility for checking activity which included: branch personnel training, policies and procedures regarding opening, administering and closing checking accounts, approving checks for deposit, issuing cashier checks, returning checks, and problem resolution regarding checking accounts including issues related to deposit accounts, checking and funds transfer, forgeries and unauthorized use.

My responsibilities further included representing the banks with the federal regulators regarding both consumer compliance and safety and soundness issues.  For the past thirty (30) years, I have consulted with banks in Southern California such as Bank America, Wells Fargo, Citibank and CitiMortgage, Security Pacific, City National Bank, Coast Federal Saving, and Home Saving and Downey Savings on matters of checking, loans, servicing, and compliance regulations; as well as, consulting with Federal Regulators (FDIC, RTC, OCC), US Attorney Office Southern District and attorneys representing both banks and bank customers.  I am a member of the American Bankers Association, and Risk Management Association (RMA).

2.   I have testified as an expert witness at least thirty (30) times at trial and have given more than fifty (50) depositions over the past thirty (30) years.  While I do not maintain records of the case names and captions, I have testified in California Superior Courts in San Diego, San Francisco, Marin, Orange and Los Angeles Counties; in Federal District Court Southern District, Central District and Federal Bankruptcy Court Central and Southern Districts. My testimony has covered the areas of business and consumer credit evaluation, risk evaluation, credit administration, loan servicing, bank lending standards and custom and practices, custom and practices and standards for originating, evaluating, underwriting, administering, collection and servicing of loans and problem assets, loan participations, loan syndications, foreclosures, Regulation Z, Regulation B, Regulation X, Regulation CC, Regulation J, Bank Secrecy Act - money laundering, negotiable instruments, Fair Debt Collection, Fair Credit Reporting, automobile financing, CA Automobile Sale Finance Act, residential mortgage lending, impact of credit reporting on credit, letters of credit, forged instruments including checks, unauthorized account checking and accounts activity including transfers, custom practice and industry standards in opening, processing and administering checking accounts, check stop payments, wire transfers, safety deposit

boxes, bank policy and procedures (checking, loans, compliance, and Bank Secrecy Act), fraudulent financial statements, REO, interest calculations, interpretation of promissory notes, and bank/broker lending practices.

**Company Profile**

Since inception in late 1986, Richard E. Ross Consultants, Inc. has provided services and consulting in the areas of risk management, asset management, compliance audits and credit department outsourcing primarily to federally insured financial institutions, financial service companies, and title and insurance companies; as well as, attorneys practicing in the financial services area.

Richard E. Ross Consultants, Inc. is a financial services group which provides banking and financial services in four primary areas: 1) Asset Management & Loan Administration, 2) Regulatory Compliance, 3) Small Business Loan Rating & Correspondent Lending Coordination; and 4) Financial Industry Attorney Advisory Support Services.

Asset Management & Loan Administration negotiates structures, raises capital, closes and administers complex commercial loan transactions including New Market Tax Credit Loans for financial institutions, banks and financial institution syndicates. Services include loan underwriting and risk evaluation and ongoing compliance with loan agreements, and banking laws rules and regulations.

Regulatory Compliance provides audits and reviews for compliance with the Bank Secrecy Act; as well as, compliance areas covering consumer and banking regulations such as Regulation E – Funds Transfer, Regulation B – Equal Credit Opportunity, Regulation Z - Truth in Lending, Regulation CC – Expedited Funds Availability and the myriad of banking regulations covering all aspects of bank operations from capital, to investments to loans to non performing assets and assets for debts previously contracted (ORE and Repossessions) and New Markets Tax Credits.  After the work is completed, a detailed written report describing a program's status is provided along with written recommendations on how to develop and improve policies and procedures.

Small Business Loan Rating & Correspondent Lending Coordination operates a loan syndication & participation clearinghouse for a banking trade association of approximately 120 banks, providing an independent credit analysis and loan risk rating for business and consumer loans and bulk loan packages passing through a clearinghouse.  As part of this service, the company acts as an adjunct to the various bank credit departments by performing traditional credit department functions such as performing loan follow-up for receipt and review of loan documentation, and financial data; as well as continuing credit analysis of financial data and monitoring loan terms, conditions and covenants to support these loans.  This support includes review of loans for compliance with approvals, various banking laws and regulations, and timely receipt of required financial reporting and reporting to the various participants. Included in this service is review for compliance with various banking regulations including Regulation Z and Fair Lending laws.

Financial Industry Attorney Advisory Support Services are centered in banking and finance entities' compliance with laws and regulations, industry standards related to compliance; and issues related to loans and checking accounts for both consumer and commercial transactions.  In addition the company acts as a resource to identify banking issues and educating attorneys in banking structure, organization, and transactions. This service also includes forensic analysis and litigation support.

**Company President**

Richard E. Ross, the company founder and president, has over 40 years experience in the banking industry and is a former member of the Board of Directors of two national banks. He has held the position of Executive Vice President at two separate banks and was responsible for all assets of the bank including loans and investments. In this capacity, he served as the Chief Credit Officer and Risk Management officer responsible for all credit activities; as well as, Vice Chairman of the Operations Committee charged with oversight of deposit activities. In his role as Executive Vice President, he also served as Compliance Officer responsible for assuring compliance with banking laws and regulations including the various consumer regulations and the Bank Secrecy Act. In this capacity Mr. Ross was also liaison with State and Federal Regulators for both compliance and safety and soundness issues.

Mr. Ross until recently served on the Board of Directors of all the for-profit lending subsidiaries belonging to a non-profit bank trade association, Indiana Bankers Association, and fulfills the role of Chief Credit Officer and Compliance Officer. In addition until 2018, he also serve as the Chief Credit Officer for 16 banking subsidiaries and related entities.

Mr. Ross is also a member of the Governing Board for The City of Indianapolis, Indiana Redevelopment CDE.

Mr. Ross is also a member of the Governing Board for the Town of French Lick, Indiana Redevelopment CDE.

Mr. Ross is a service member of the American Bankers Association (ABA), and Risk Management Association formerly Robert Morris Association (RMA), and RMA San Diego Chapter.

## BANKING EXPERIENCE – Richard E. Ross

      Ten years as a member of the Board of Directors and Executive Vice President in charge of all assets of the bank. Positions held in banking included Asset/Liability Officer, Senior Credit Officer, Loan Review Officer, Commercial, Mortgage and Consumer Loan Officer and head of each department, Collection Officer, Problem Loan Work Out Officer, Chairman of the Investment Committee, Chairman of the Loan Committee, Vice Chairman Operations Committee, Chairman Operations Committee, Vice Chairman of the Executive Committee.

      Responsibilities included preparation, monitoring and reporting of the annual budgets, five year plans, Capital Budget plans for the regulators, preparation of all pre examination materials and Liaison with Examiners on all regulator examinations, evaluation of Allowance for Loan Loss, identification of problem and watch, Substandard, Doubtful, and Loss credits and assets; as well as, preparation and accuracy of Call reports. In addition, over saw and monitored all collection activities

including monthly past due for Mortgage, Commercial and Installment departments, non accrual loans, ORE, and repossessions. My duties also included negotiating and renegotiating Construction, Mortgage, Commercial and Consumer troubled loans and the elimination and disposition of non-performing assets.

As an executive officer of a multi-bank holding company my assignments were to existing banks or banks acquired from the FDIC which were unable to meet acceptable asset growth and earnings due to poor asset quality, and/or inexperienced or poorly trained loan officers. Reorganization and management of these institutions required immediate and continual asset quality evaluations, formulation, writing, implementation and monitoring of written loan policies and procedures for the Construction, Mortgage, Commercial, Consumer, Credit Card, Letter of Credit (site and stand-by), Loan Participation, Non-Accrual and ORE/repossession areas of the banks. In several instances this furthermore entailed the creation of Construction, Mortgage and Commercial lending departments. The assignments also included conducting classes and training in Letters of Credit, financial statement analysis, loan pricing, loan documentation, loan structuring and debt service analysis. After taking over these troubled banks with CAMEL ratings at unacceptable levels, I am not aware after reorganization and training that any bank under my care ever received lower than a 2 CAMEL rating.

In supervising and restructuring problem and workout loans, I was involved with all aspects of insolvency and bankruptcy from operating as a creditor-in-possession, avoiding preference, fighting and lifting automatic stays, and funding Chapter 11 plans to voiding discharges and abandoning claims.

As a lender and bank officer, I acquired intimate and first hand knowledge of the various forms of individual, and corporate forms, and their liability repercussions, banking laws, rules and regulations, offering circulars, prospectus, and SEC laws, rules and regulations, GAAP and financial reporting.

On special assignment to the holding company, assisted in developing, testing and implementing loan review procedures and systems.

My duties also included conducting due diligence investigations and analysis into asset quality, risk, and rate for purposes of bidding and purchasing assets from the FDIC in its Corporate and Receiver capacities; as well as, bulk portfolio purchases from other financial institutions. As Chief Loan Officer and Investment Committee Chairman, evaluated and approved credit worthiness, loan requests, and extensions of credit to correspondents, and credit unions, foreign and domestic banks, industrial banks and thrifts, finance companies, credit unions, investment and mortgage bankers, and other financial institutions; as well as type I, II, and III securities.

As a bank officer my responsibilities have encompassed negotiation and monitoring of transactions and loans to affiliates (banking and non-banking), inter bank charges, holding company charges and assessments, dividends, and service contracts.

## LEASING EXPERIENCING

Three years experience as a packager, negotiator and generator of middle market and leverage leases.  Duties also encompassed accountability for all bank participation loans, financing of leasing companies and entering into direct leases.  As part of a three man team to organize and operate a bank leasing company, operated as Director of Marketing, Lease Documentation Specialist, Leasing Officer and Credit Analyst.

**Operations    - Richard E. Ross, Vice-Chairman**

Duties and responsibilities included gathering customer information, and providing details of wire transfer requirements; as well as, initiating and receiving outgoing and incoming domestic and international wire transfers.

In addition, as Vice-Chairman of the Branch Operations Committee, over saw wire transfer reconciliation and wire transfer problem resolution, wire transfer compliance with safe sound banking practices and procedures.

These duties included assuring proper and accurate movement of funds from the wire transfer area through the banking system and included account posting and customer notification.

My duties also involved all aspects of bank and customer checking and deposit account activity, from approving and accepting deposits, check cashing, account fraud and problem resolution, determining costs and service charges, reconciling and preparing customer checking statements, to mailing checking statements.

**1986 TO PRESENT**

Providing consulting services to banks, litigation support to attorneys including banking Expert Witness testimony, financial institutions examinations and asset management services.  Litigation engagements have included banking expert testimony in Criminal and Civil banking cases in Federal District Court, Federal Bankruptcy Court, and State Superior Courts.  Testimony has included areas such as identifying Unsafe and Unsound Banking Practices, Director and Officer negligence, fraud, dishonesty, Course of Dealing between borrower and lender, Industry Customs and Standards, Checks, Checking, Construction Loan Policy and Procedures, Loan Participation.  Services to banks include asset management and loan administration, loan review, assets quality evaluations, regulatory compliance, loan loss projections, evaluation of adequacy of loan policies and procedures, Director Duties and Responsibilities and asset management including raising capital, negotiating, structuring, closing and administering loans.

# List of Documents Considered by Richard E. Ross

Document Reviewed by Expert Richard E. Ross

1. Amended & Restated Servicing Agreement October 25, 2011 effective July 31, 2012
2. Loan Agreement January 3, 2012 Iron Fence Investments, Inc. lender
3. Source Point VI letter December 11, 2015 (Iron Fence promissory note assigned)
4. Interim Servicing Agreement October 2015
5. Agreement and Plan of Merger October 7, 2015
6. Loan and Security Agreement October 7, 2015 Rental Guarantee and Sovereign Community waiver October 7, 2015
7. Secured Promissory Note January 26, 2016
8. Deposit Account Control Agreement January 2016
9. Chippewa Valley Bank (FDIC certificate number 12322 call reports and summary information
10. Intratribal Servicing Agreement February 16, 2016
11. Agency Agreement February 2016
12. Consumer Installment Long Agreements – Coffy, Williams, Hengle
13. FDIC Credit Card Activities Manual chapter III and XIV
14. July 27, 2018 Memorandum Opinion
15. Exhibit P compilation of Recommendation To Take Action and Request For Approval
16. Deposition transcript of Michelle Hazen and October 16, 2017 and exhibits thereto
17. Deposition transcript of James Dowd November 13, 2018 and exhibits thereto
18. Deposition transcript of Matthew Martorello August 30, 2018 and exhibits thereto
19. Big Picture website bigpictureloans.com
20. Declaration Matthew Martorello December 21, 2017
21. Affidavit Brian McFadden December 21, 2017
22. Affidavit of Michelle Hazen
23. Declaration of James Williams Jr Southern District of New York August 22, 2013 and exhibits thereto
24. Federal Reserve "Report on the Economic Well-Being of U.S. Households in 2016" dated May 2017
25. US Court of appeals, Second Circuit - Madden versus  Midland Funding
26. Michigan versus Bay Mills Indian Community  - US Supreme Court May 27, 2014
27. FDIC RMS Manual of Examination Policies 1.1
28. OCC Bulletin 2018-14, Installment Lending May 23, 2018
29. OCC NR 2018 – 74 --fintech charters, and OCC Licensing Manual Supplement Re: fintech companies
30. OCC "A Guide to Tribal Ownership of a National Bank" September 2002
31. Complaint Williams versus Big Picture et al.
32. Financial Statement  information Martorello_12678- 12679
33. CFPB proposed rule and final rule payday lending
34. Office of Inspector General-"FDIC's Role in Operation Choke Point…" Report AUD -15-008
35. OCC August 21, 2017 letter to the Chairman of Committee on Financial Services regarding OCC and Choke Point
36. FDIC FIL- 14- 2005 reissued in 2015 as FIL-52-2015 Guidelines for Payday Lending
37. OCC advisory letter AL 2000-10 regarding payday lending

38. FDIC Press Release PR-70-2003 FDIC Examination Guidance For Payday Lending
39. FDIC FIL-44-2008 Guidance For Managing Third-Party Risk
40. Bellicose Capital Amended and Restated Operating Agreement
41. Eventide Credit Acquisition Operating Agreement
42. Tribal Economic Development Holdings LLC Articles and Operating Agreement.


Note: all of the regulatory manuals, guidance and reports can be found on their websites.

# Exhibit 'A'
# Trial and Deposition Testimony for Richard E. Ross

Exhibit A
Initial Expert Report Submitted by Richard E. Ross
January 11, 2019
Williams v Big Picture Loans, LLC et. al

Below is a list of cases along with the case number (if known) in which bank expert
Richard E. Ross has provided deposition or trial testimony in the past four years.

1. Salute v Siminski, 9/24/18
   Superior Court of California - County of Los Angeles, Northwest District, Van Nuys LC105088
   Trial Testimony

2. Think Finance, ET AL,  9/13/18
   US Bankruptcy Court for Northern District of Texas 17-33964 (HDH)
   Deposition Testimony

3. Laurie B LLC v Wells Fargo 7/14/17
   US District Court Central District of California District CV14-3942 DMG-SSx
   Deposition Testimony

4. Steiner v Bayview Mortgage 11/18/16
   California Superior Court San Francisco CGC 13-52794
   Deposition Testimony

5. Arroyo v Imperial Bank / City National Bank 7/13/16
   US District Court of California Central District, Western Division
   Deposition Testimony

6. Ramirez v Balboa Thrift & Loan 4/20/16
   California Superior Court San Diego County Central District
   Deposition Testimony

7. Mt Olympus Mortgage v Anderson 3/10/16
   Superior Court California – Orange County
   Trial Testimony

8. Wells Fargo v MSK et al 2/23/16
   Superior Court California – San Diego North County 37-2011-00056812
   Trial Testimony

9. Wells Fargo v MSK et al 12/17/15
    Superior Court California – San Diego North County 37-2011-00056812
   Deposition Testimony

10. Mt Olympus Mortgage v Anderson 10/8/15
    Superior Court California – Orange County
    Deposition Testimony

11. Sutton v Citibank 10/14/14
    Superior Court California – Los Angeles BC523868
    Trial Testimony

12. Rindfleisch v California Coast Credit Union 10/2/14
    United States District Court – Southern District 13-CV-1882-DMS-NLS
    Deposition Testimony

13. Sutton v Citibank 8/19/14
    Superior Court California – Los Angeles BC523868
    Deposition Testimony

14. Badame v JP Morgan Chase 1/28/14
    Superior Court California – Los Angeles
    Deposition Testimony

Exhibit 'R-1'

2012 Income Statement Red Rock -Ross Exhibit

**Red Rock 2012 Income Statement**
(As Presented in Dowd Ex 30)



Exhibit 'R-2'

2012 Income Statement Red Rock - Ross Exhibit

Ross Analysis of Red Rock 2012 Income Statement
Extracted from Dowd Ex 30
(The presentation of some line items have been changed.)



2012 Income Statement Red Rock / Ross Exhibit

Ross Analysis of Red Rock 2012 Income Statement
Extracted from Dowd Ex 30
(The presentation of some line items have been changed.)

