Preliminary Expert Report[1]

Of

Lawrence S. Roberts

Lawrence S. Roberts

January 11, 2019
Date

---

[1] This preliminary report may be supplemented based on additional information or requests to examine additional issues related to federal policy and regulation of Indian tribes.

## I.   PROFESSIONAL QUALIFICATIONS

A.  I am Counsel at Kilpatrick Townsend and Stockton (Kilpatrick) in Washington, D.C.  I
    joined the firm on April 24, 2017.

B.  Prior to joining Kilpatrick, I served in multiple leadership positions at the Department of
    the Interior, Office of the Assistant Secretary – Indian Affairs, including: Acting
    Assistant Secretary, Principal Deputy Assistant Secretary, and Deputy Assistant
    Secretary for Policy and Economic Development.  I served in the Office of Assistant
    Secretary from September 6, 2012 through January 20, 2017.  During my tenure, I was
    responsible for managing all facets of Indian Affairs, including the Bureau of Indian
    Affairs, the Office of Indian Gaming, the Office of Indian Energy and Economic
    Development, the Office of Self Governance, and the Bureau of Indian Education (BIE).
    I advised Department of the Interior Secretary Ken Salazar and Department of the
    Interior Secretary Sally Jewell on Indian affairs matters.

C.  Prior to joining the Office of the Assistant Secretary – Indian Affairs, I served as General
    Counsel of the National Indian Gaming Commission (NIGC) from July 2010 until
    September 6, 2012.  During my service as General Counsel, I was the chief legal adviser
    to the Federal Commission that regulates Indian gaming.  I provided legal advice on all
    matters before the Chairperson and Commissioners, including: litigation, enforcement
    actions for violations of the Indian Gaming Regulatory Act (IGRA), Commission
    decisions, and the adoption of Commission rules and policies.  Specifically, I advised on
    matters involving IGRA, federal Indian law, and compliance with federal laws and
    regulations applicable to Indian gaming and the Commission.  This work included advice
    on the review and approval of tribal gaming ordinances, the review and approval of tribal

management contracts, minimum internal control standards, gaming licenses, and enforcement matters such as management of a gaming operation without a management contract approved by the NIGC.  During my term as General Counsel, the NIGC worked to revise and update many of its regulations applicable to Indian gaming.

D.  During my federal service at NIGC and Interior, I testified before Congress on multiple occasions on matters including: tribal self-governance and self-determination, economic development in Indian country, and gaming.

E.  Prior to serving as General Counsel at the National Indian Gaming Commission, I worked in private practice from 2002 to 2010 representing clients on a variety of federal Indian law and environmental law matters.

F.  Prior to private practice, I worked as an attorney at the United States Environmental Protection Agency, Office of General Counsel from 2001 to 2002.  I advised the Agency on matters relating to the implementation and enforcement of environmental laws within Indian country, including: tribal authority to establish federal water quality standards on Indian reservations; tribal applications to implement the Clean Air Act; and evaluating competing claims of State authority within Indian country.

G.  I began my legal career as a trial attorney through the United States Department of Justice Attorney General's Honors Program.  My work in the Indian Resources Section of the Environment and Natural Resources Division included litigation concerning tribal reserved treaty rights, reservation boundaries, tribal water quality standards, fee-to-trust acquisitions, tribal land claims, and other federal Indian law matters implicating tribal rights.  During my career at the Department of Justice from 1995 to 2001, I was awarded

two Special Commendations for Outstanding Service and the Assistant Attorney

General's Award for Alternative Dispute Resolution.

H.  I graduated from the University of Wisconsin – Madison in 1992 with a B.A. in Political

Science and Sociology.  I graduated from the University of Wisconsin Law School in

1995.  I am a citizen of the Oneida Nation.

I.  I currently serve on the Board of Trustees for the Institute of American Indian Arts.  I

also serve as a justice on the Miami Tribe of Oklahoma's Court of Appeals.

J.  I have never testified as an expert witness at trial or by deposition.

K.  My compensation to prepare this report and to testify in this case is my standard hourly

rate of $500 per hour.  To date, my total compensation is $37,500.

L.  A list of all publications authored in the previous 10 years is provided at the end of this

report.

II.  **OPINIONS**

**Executive Summary**

Based on over a decade of experience in federal government positions, my legal

education, and review of materials in this matter, I have reached a number of opinions regarding

tribal reserved rights, federal policies and roles in promoting and protecting tribal rights, federal

policies in promoting tribal economic development, and federal law as it relates to tribes.  As

discussed in more detail below, I express the following opinions:

- Unless a Federal treaty, statute, or regulation restricts a tribe or a tribal business, the
  prevailing federal law and policy is to promote tribal self-governance, tribal self-
  determination, and tribal economic development;

- The federal policy of tribal self-governance and tribal self-determination includes a
  tribe's sovereign right to contract with or license non-Indian businesses to promote
  economic development notwithstanding that the business may benefit the non-Indian
  partner.  Federal policy is to promote tribal self-governance by moving away from
  federal approvals of tribal actions, including contracting with third parties;

4

- It is common for tribes to seek to partner with non-Indians to develop and manage businesses with goal of ultimately managing the economic enterprise for themselves. Federal policy promotes such economic development;

- The Federal regulatory role is limited to authority provided by Congress through statute. When implementing that statute, the Agency should defer to tribal standards when possible. If a federal agency does not have an express regulatory role or responsibility regarding tribal activities, it should respect tribal standards; and

- A Tribe's freedom to contract with third parties so that a Tribe may provide e-commerce services has not been specifically limited by Congress.

As detailed below, these opinions are formed on direct experience in implementing federal policies and statutes for agencies that work directly with tribes, including the Department of the Interior, the National Indian Gaming Commission, and the Department of Justice.

A. **BASED ON MY LEGAL EDUCATION AND MY EXPERIENCE IN GOVERNMENT, IT IS MY OPINION THAT UNLESS A FEDERAL TREATY, STATUTE, OR REGULATION RESTRICTS A TRIBE OR A TRIBAL ECONOMIC ENTERPRISE, THE PREVAILING FEDERAL LAW AND POLICY IS TO PROMOTE TRIBAL SELF-GOVERNANCE, SELF-DETERMINATION, AND TRIBAL ECONOMIC DEVELOPMENT.**

Since the earliest days of the United States, the federal government has exercised plenary authority, to the exclusion of states, with regard to tribes. While the United States' policy has drastically vacillated between promoting tribal self-governance to advocating termination of tribes, the longstanding and current policy is to promote tribal self-governance and self-determination. The Court has long recognized that "unless and 'until Congress acts, the tribes retain' their historic sovereign authority." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (2014) (*quoting United States* v. *Wheeler*, 435 U. S. 313, 323 (1978)). The source of federal authority over Indian affairs is found in the Constitution itself, primarily in the Indian Commerce Clause, the Treaty Clause, and the Apportionment Clause.[2] The Supreme Court has repeatedly described the scope of Federal authority over Indian affairs as plenary and exclusive. *Lara*, 541

---

[2] *See Cohen's Handbook on Federal Indian Law (2005 ed)* § 5.01; *United States v. Lara*, 541 U.S. 193 (2004).

U.S. at 200.  As explained in the leading treatise on federal Indian Law, clear federal authority

over Indian affairs was important to James Madison in the drafting of the Constitution:

> [James Madison] noted that "[b]y the Federal Articles, transactions with the
> Indians appertain to Congress, yet in several instances the States have entered into
> treaties and wars with them."  Madison subsequently submitted a proposal that
> would grant the federal government authority to "regulate affairs with the Indians
> as well within as without the United States." The proposal was ultimately
> incorporated into article 1, section 8 of the Constitution, which reserved to
> Congress the power to "regulate commerce with foreign nations, among the
> several states, and with the Indian tribes."  The contrast with the Articles of
> Confederation, Madison's intent to end state encroachments on federal authority,
> and contemporary state interference with federal Indian policy, all contribute to
> the understanding of the Indian commerce clause as a broad grant of power to the
> federal government and a limit on state power to interfere with federal Indian
> policy.

*Cohen's Handbook on Federal Indian Law* (2005 ed) § 1.02[3] at 25.

An early exercise of the federal government's plenary authority regarding Indian affairs

was the enactment of the Indian Trade and Intercourse Act of 1790.  As one of the first laws

passed by Congress, the Act highlights the central importance the federal government placed on

the regulation of commerce with tribes.  The Act asserts federal control by instituting a licensing

structure for anyone seeking to trade with Indian tribes, restricting the sale of Indian lands to the

United States, and providing for exclusive federal authority to prosecute trespasses and crimes on

Indian lands.  Act of July 22, 1790, 1 Stat. 137.  The Indian Trade and Intercourse Act, enacted

first through a series of temporary measures that ultimately became permanent, reflects aspects

of early federal policy that remain central to current federal Indian policy.[3]  Namely, the federal

responsibility for Indian affairs and the protection of tribes against infringement of tribal rights.

In 1834, Congress enacted legislation formally providing for Indian Affairs in the War

Department.  This legislation formalized Indian affairs administratively, with the responsibility

---

[3] The Act was made permanent in 1802 and amended in 1834.

for implementing most of Title 25 of the United States Code ultimately being transferred to the Department of the Interior.

### i.   **Treaties**

In addition to early federal legislation, the United States and Tribes affirmed tribal self-governance and the Nation-to-Nation relationship through treaties ratified by the Senate. Treaties are not a grant of rights to tribes, but a grant of rights from tribes – tribes reserve all rights not explicitly granted to the United States. *United States v. Winans*, 198 U.S. 371 (1905). Prior to the end of treaty-making in 1871, treaties with Indian tribes were a primary mechanism for the federal government to recognize the inherent sovereign authority of tribes, to regulate commerce with tribes, and to reaffirm that state law did not apply to tribes.   While each of these principles is embodied in federal common law and statutes, the following treaties are examples of this well-established principle:

- **Treaty with the Creeks, 1790 (7 Stat. 35)** – "Article II.  The undersigned Kings, Chiefs and Warriors, for themselves and all parts of the Creek Nation within the limits of the United States, do acknowledge themselves . . . to be under the protection of the United States of America, and of no other sovereign whosoever; and they also stipulate that the said Creek Nation will not hold any treaty with an individual State, or with individuals of any State."

- **Treaty with the Cherokees, 1791 (7 Stat. 39)** – "Article VI. It is agreed on the part of the Cherokees, that the United States shall have the sole and exclusive right of regulating their trade."

- **Treaty with the Six Nations, 1794 (7 Stat. 44)** – "Article II. The United States acknowledge the lands reserved to the Oneida, Onondaga and Cayuga Nations . . . to be their property; and the United States will never claim the same, nor disturb them or either of the Six Nations, nor their Indian friends residing thereon and united with them, in the free use and enjoyment thereof . . .."

- **Treaty with the Choctaw, 1830 (7 Stat. 333)** – "Article IV. The Government and people of the United States are hereby obliged to secure to the said Choctaw Nation . . . the jurisdiction and government of all the persons and property that may be within their limits west, so that no Territory or State shall ever have a right to pass laws for the government of the Choctaw Nation . . . and their

descendants; and that no part of the land granted them shall ever be embraced in any Territory or State;".

- **Treaty with the Shawnee, 1831 (7 Stat. 355)** – "Article X. . . . And the United States guarantee that said [tribal] lands shall never be within the bounds of any State or territory, nor subject to the laws thereof;"[4]

- **Treaty with the Creeks, 1832 (7 Stat. 366)** – "Article XIV. The Creek country west of the Mississippi shall be solemnly guarantied to the Creek Indians, nor shall any State or Territory ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves, so far as may be compatible with the general jurisdiction which Congress may think proper to exercise over them."

- **Treaty with the Creeks, Etc., 1856 (11 Stats. 699)** – "Article IV. The United States do hereby solemnly agree and bind themselves, that no state or Territory shall ever pass laws for the government of the Creek or Seminole tribes of Indians . . . . Article XV. So far as may be compatible with the constitution of the United States, and the laws made in pursuance thereof, regulating trade and intercourse with the Indian tribes, the Creeks and Seminoles shall be secured in the unrestricted right of self-government . . . ."

Each of these treaty provisions are representative of the broader principle of tribal self-governance and that federal law will not infringe on tribal authority unless provided for through treaty or federal legislation. Further, such provisions addressed the substantial tribal concern of State attempts to exert authority over tribes and the United States' pledge to protect tribes against such attempts. In the 19th Century, the Supreme Court affirmed these doctrines in a series of cases known as the Marshall Trilogy.

### ii. Marshall Trilogy

In the early days of the Nation-to-Nation relationship between tribes and the Federal government, Chief Justice Marshall and the Supreme Court fortified the foundation of federal Indian law and policy in a series of cases issued between 1823 and 1832.[5] These cases continue

---

[4] Similar guarantees against the applicability of state law are found in Treaty with the Seneca, Etc., 1831(7 Stat. 351).

[5] *Johnson v. M'Intosh*, 21 U.S. 543 (1823); *Cherokee Nation v. Georgia*, 30 U.S. 1 (1831); *Worcester v. Georgia*, 31 U.S. 515 (1832).

to guide current policies, statutes, and court decisions regarding federal authority over Indian affairs and tribal self-governance.

In *Johnson*, the Court considered competing claims to title. Johnson's chain of title derived from direct purchases between individuals and a tribe whereas M'Intosh's title was obtained through a patent from the United States which had acquired title through treaty. The Court ruled that the tribe held aboriginal title that could only be extinguished by the sovereign and as such M'Intosh held valid title. This ruling reaffirmed the federal supremacy the United States exercised vis-à-vis third parties in dealing with Indian tribes by confirming that only the United States could extinguish tribal title and convey title to others. This principle of federal authority vis-à-vis states was reaffirmed by the Court in *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226 (1985), holding that state acquisitions of tribal land were unlawful under federal law.

In *Cherokee Nation v. Georgia*, the Tribe invoked the Court's original jurisdiction to enjoin Georgia laws within the Cherokee Nation. The Court concluded that it lacked jurisdiction over the suit because the Tribe was not a foreign state under the Constitution but rather a domestic dependent nation. Importantly, the Court recognized the distinct guardian to ward political relationship between the United States and tribes established in the Constitution. The Court explained:

> They may, more correctly, perhaps, be denominated domestic dependent nations. They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession when their right of possession ceases. Meanwhile they are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian.

30 U.S. at 13. The following year, the Court would elaborate on this guardian-ward relationship as it relates to tribal sovereignty in *Worcester v. Georgia*.

In *Worcester*, the Court considered whether Georgia's laws applied to non-Indians within the Cherokee Nation. The Court explained that the laws of Georgia had no effect within the Cherokee Nation given the United States' Nation-to-Nation relationship with tribes. The Court ruled:

> The Cherokee nation, then, is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of congress. The whole intercourse between the United States and this nation, is by our constitution and laws, vested in the government of the United States.
>
> The act of the state of Georgia, under which the plaintiff in error was prosecuted, is consequently void, and the judgment a nullity.
>
> The acts of the legislature of Georgia interfere forcibly with the relations established between the United States and the Cherokee nation, the regulation of which, according to the settled principles of our constitution, is committed exclusively to the government of the union.
>
> They are in direct hostility with treaties, repeated in in a succession of years, which mark out the boundary that separates the Cherokee country from Georgia; guaranty to them all the land within their boundary; solemnly pledge the faith of the United States to restrain their citizens from trespassing on it; *and recognise the preexisting power of the nation to govern itself*.
>
> They are in equal hostility with the acts of congress for regulating their intercourse and giving effect to the treaties.

31 U.S. at 520. (emphasis added). Accordingly, the Court ruled that State law was of no force or effect within the Cherokee Nation. While federal law has evolved since *Worcester*, the Court has repeatedly affirmed its foundational premise that unless Congress expressly provides otherwise, federal law and policy fosters and protects tribal self-governance.

### iii. Shifts in Congressional Policy and Subsequent Repudiation of Policies Other Than Tribal Self-Determination and Self-Governance.

In the decades following treaty making, Federal policy shifted dramatically toward a policy of allotting tribal lands and assimilation of tribes. The policy of allotment and

10

assimilation resulted in the severe loss of tribal land and put tremendous strain on tribal

governments.  One treatise describes the land loss as follows:

> Of the approximately 156 million acres of Indian land in 1881, less than 105
> million remained by 1890, and less than 78 million by 1900.  While Indian land
> holdings were reduced from 138 million in 1887 to 48 million in 1934, an
> additional 60 million acres that were either ceded outright or sold to non-Indian
> homesteaders and corporations as "surplus" lands are not included in the 90
> million acre loss.

Cohen's at § 1.04 at 78-79.  While Congress reversed and repudiated the policy of allotment and

assimilation in the 1930s, like a vase that has been dropped, the Federal government and tribes

continue today to address its devastating consequences with nearly every modern day aspect of

Indian affairs aimed at restoring the whole of tribal communities, piece by piece.

The federal government's shift in policy from allotment and assimilation to promoting

tribal self-determination is marked largely by the enactment of the Indian Reorganization Act

(IRA) in 1934.  Just prior to the enactment of the IRA, the Commissioner of Indian Affairs

described the policy of allotment and assimilation as follows:

> The Indian problem as it exists today, including the heaviest and most
> unproductive administration costs of public service, has largely grown out of the
> allotment system which has destroyed the economic integrity of the Indian estate
> and deprived the Indians of normal economic and human activity.

Prucha, Documents of United States Indian Policy (3rd Ed.) at 226.

The IRA focused on land restoration, economic development and promoting strong tribal

governments.  As described by the Department of the Interior in 1934, the IRA's aim was two-

fold:

> The repair work authorized by Congress under the terms of the act aims at both
> the economic and the spiritual rehabilitation of the Indian race.  Congress and the
> President recognized that the cumulative loss of land brought about by the
> allotment system . . . had robbed the Indians in large part of the necessary basis
> for self-support.  They clearly saw that this loss and the companion effort to break
> up all Indian tribal relations had condemned large numbers of Indians to become

> chronic recipients of charity; . . . that a major proportion of the red race was,
> therefore, ruined economically and pauperized spiritually.

*Id.* at 226.

The IRA implemented this change in policy through a number of mechanisms.  First, it stopped the alienation of existing tribal lands and put in place a framework to restore lands in trust for tribes and individuals.  Congress viewed a secure tribal land base as critical to promoting tribal economic development.  Second, the IRA established mechanisms for tribes to reorganize their tribal governments and to form tribal corporations to promote economic development.  At the time of the Act's passage, Interior described these provisions as "the first step" in a "difficult and laborious" rebuilding of tribal authority to manage their own affairs.  *Id.* at 228.  Commissioner Collier, an architect of the IRA, concluded that these federal efforts would ultimately result in greater tribal self-governance and self-determination:

> But the result should be the development of Indian leadership capable of making
> the Indian tribal organizations and corporations function effectively with a
> minimum of governmental interference.

*Id.* at 228.  In the ten years immediately following enactment of the IRA, 195 tribes voted to be included under its provisions.  Many of those same tribes adopted tribal corporate charters as provided for in section 17 of the Act.  Theodore Haas, Ten Years of Tribal Government Under I.R.A. at 4.  Section 17 charters typically provide broad authority for tribal corporations to contract for business purposes while preserving and protecting tribal assets.

In the 1950s Congress again dramatically shifted federal policy, this time pursuing a policy of terminating tribes by severing the Nation-to-Nation relationship and seeking to authorize the application of state law to tribes.  Like the policy of allotment and assimilation, the termination policy had severe negative impacts on tribal communities.  For many tribes that were

terminated, they suffered additional loss of tribal lands and were no longer able to access federal services and programs.

During the termination era, Congressional legislation sought to extend limited state jurisdiction over tribes. The most notable legislation during this period was Public Law 280 (P.L. 280). Enacted in 1953, P.L. 280 granted federal jurisdiction to six states[6] to extend state criminal jurisdiction over Indian country. Ten additional states agreed to accept jurisdiction in some respect. P.L. 280 is one of the few federal laws ever enacted by Congress expressly providing for limited state jurisdiction within Indian country and is a remnant of the termination era.[7]

As the detrimental impacts of the termination policy became more concrete, the federal government shifted its Indian policy back to supporting tribal self-determination and tribal self-governance. In 1968, President Johnson sent a special message to Congress calling for an end to termination and a shift to "a policy of maximum choice for the American Indian: a policy expressed in programs of self-help, self-development, self-determination." President Johnson, Special Message to the Congress on the Problems of the American Indian: The Forgotten American. Prucha at 249. Two years later, President Nixon carried forward a policy of tribal

---

[6] The five original states are California, Minnesota (except the Red Lake Reservation), Nebraska, Oregon (except the Warm Springs Reservation), and Wisconsin (except the Menominee Reservation). Alaska was later added.

[7] Congress subsequently amended P.L. 280 in 1968 to require tribal consent to a state that sought to exercise federal jurisdiction under P.L. 280 as well as to provide for retrocession of State jurisdiction to the federal government. States have retroceded federal jurisdiction over particular reservations in whole or in part. In 2010, Congress took further steps to ameliorate P.L. 280's delegation of federal jurisdiction by providing for federal concurrent jurisdiction to prosecute crimes on reservations in P.L. 280 states if a tribe requests such concurrent jurisdiction. 2010 Tribal Law and Order Act.

self-determination and self-governance in a special message to Congress.  President Nixon,

Special Message to the Congress on Indian Affairs, July 8, 1970.

President Nixon set forth a clear vision of federal policy to support tribal self-

determination and self-governance.  Explaining that federal Indian policy had "oscillated

between two equally harsh and unacceptable extremes" of paternalism and termination, the

President charted a policy wherein tribes "can become independent of Federal control without

being cut off from Federal concern and Federal support."  Prucha at 257-58.  A central

component of his vision was for tribal governments to deliver federal services that were being

provided by the federal government.  President Nixon made clear that in doing so tribes could

decide how to best provide those services:  "To run the activities for which they have assumed

control, the Indian groups could employ local people or outside experts."  *Public Papers of the

Presidents of the United States: Richard Nixon, 1970* at 568.  President Nixon also advocated for

programs that would provide financial incentives to encourage private lenders to loan funds for

tribal economic projects.  *Id.* at 571.  Further, he advocated for tribal long-term leasing authority

so that tribes could lease their lands entice outside commercial and industrial developers.  *Id.*

The President's leadership in this respect is often credited with Congress's enactment of

the Indian Financing Act of 1974 and the Indian Self-Determination and Education Assistance

Act of 1975 (ISDEAA).  Cohen's, § 22.02 at 1347.  In enacting ISDEAA, Congress reaffirmed

many of the policies it established in the IRA – principally its commitment "to supporting and

assisting Indian tribes in the development of strong and stable tribal governments, capable of

administering quality programs and developing the economies of their respective communities."

25 U.S.C. § 450a(b).  ISDEAA set in place a mechanism by which tribes could further develop

managerial expertise and experience through the delivery of federal programs.

The federal government has long supported tribal efforts to run federal programs.  For example, Interior provides grants to Tribes to support tribal control of BIE schools.  Today, tribes often decide to contract or compact federal functions so that those programs and services are delivered by the tribe itself.  Once contracted or compacted, tribes build management capacity, in part by deciding which employees to retain and utilize their existing expertise or hire to meet their self-governance goals.

In enacting the Indian Financing Act, Congress recognized the need to provide mechanisms to draw non-Indian businesses and expertise to tribes.  For example, in a colloquy with the Department Senator Fannin asked whether the policy was to encourage tribes to go into economic enterprises themselves rather than contract with non-Indian entities.  The Senator noted that "I would like to see some non-Indian groups that will try to work out some arrangements with them that will try to take away some of their managerial obligations.  In many instances, we feel, companies are moving on to a reservation, have the management to make success of the operation and help the Indian people and I am not trying to preclude that kind of operation." *Financing the Economic Development of Indians and Indian Organizations: Hearing on S. 1341 and Related Bills Before the Subcomm. on Indian Affairs of the Senate Comm. On Interior and Insular Affairs*, 93rd Cong. (May 31, 1973) at 65.  The Department noted the tribal need for management capability. *Id.*

In discussing a provision that would provide a revolving loan fund that tribes could access, Senator Abourezk questioned whether such a fund would actually provide more benefits to non-Indians.  The Department explained that such a fund would ultimately benefit tribes, explaining:

> There are instances, Mr. Chairman, where the private businessman will make a deal to sell portions of a company to the tribe so it becomes managed more and

> more by the tribe.  And they get a larger and larger percentage.  At first it would
> be a non-Indian corporation, but at the end it would be Indian owned.

*Id.* at 66.  Thus, in 1973 the federal government recognized and promoted the practice of tribes

partnering with non-Indian entities to develop expertise and then eventually acquire the business.

Congress ultimately placed some limitations with regard to eligibility of non-Indian

businesses for programs under the Act.  For example, Congress limited programs for "economic

enterprises" to those in which Indian ownership comprised "not less than 51 per centum of the

enterprise."  25 U.S.C. § 1452(e).[8]  Further, with regard to BIA revolving loans that tribes could

use to invest in non-Indian organizations, tribes were limited to using not more than "50 per

centum of a loan" made to the tribe for the purpose of making an investment in a non-Indian

organization.  25 U.S.C. § 1462.[9]  In other words, Congress recognized that non-Indian

businesses can perform a vital role in ultimately developing tribally owned and run businesses.

In the decades following ISDEAA, the federal government continues to repeatedly

embrace the policy of tribal self-determination and self-government through legislation and

policy.  President Ronald Reagan emphasized the importance of private investment and

development to assist tribal economies, stating:

> Tribes have had limited opportunities to invest in their own economies because
> often there has been no established resource base for community investment and
> development. . . . Development on the reservation offers potential for tribes and
> individual entrepreneurs in manufacturing, agribusiness and modern technology,
> as well as fishing, livestock, arts and crafts and other traditional livelihoods.
>
> It is the policy of this Administration to encourage private involvement, both
> Indian and non-Indian, in tribal economic development.  In some cases, tribes and

---

[8] The House Report explained that for certain programs, "[t]he Committee intends that such
Indian ownership be substantial and active in the management of the enterprise and not a
'strawman' ownership with active control of the enterprise in the minority, non-Indian
ownership."  Such programs included the loan guarantee program under § 204 and Indian
Business Grants under § 401.

[9] By the mid-1990s, Congress stopped appropriating funds for the revolving loan fund.

the private sector have already taken innovative approaches which have overcome the legislative and regulatory impediments to economic progress.

Statement of President Ronald W. Reagan on American Indian Policy, Jan. 24, 1983.

President Reagan's policy statement coincided with the growth of tribal gaming activities. As noted by the Supreme Court and the Ninth Circuit, in March of 1983 the Department of the Interior voiced its strong opposition to federal legislation that would subject tribes to state laws with regard to licensing, regulation, or prohibition of tribal gaming noting the inconsistency with the President's Policy Statement. The federal government noted, "[g]iven the often limited resources which tribes have for revenue-producing activities, it is believed that this kind of revenue-producing possibility should be protected and enhanced." *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 218 n.21 (1987). Likewise, the Department filed an affidavit supporting tribal gaming enterprises as a means of furthering tribal "economic self-sufficiency, the economic development of reservations and tribal self-determination." *Id.*

In the years leading up to and following the Supreme Court's *Cabazon* decision, Congress held multiple hearings on Indian gaming. Ultimately, in 1988 Congress enacted the Indian Gaming Regulatory Act, which provided federal standards for the regulation of tribal gaming. Critical provisions of IGRA provide for the continued tribal regulation of Indian gaming and the establishment of a federal commission to regulate certain aspects of Indian gaming. Congress was keenly aware that federal standards would infringe on tribal sovereignty and emphasized that IGRA was not intended to impose state regulation, stating:

> It is a long- and well-established principle of Federal-Indian law as expressed in the United States Constitution, reflected in Federal statutes, and articulated in decisions of the Supreme Court, that unless authorized by an act of Congress, the jurisdiction of State governments and the application of state laws do not extend to Indian lands. In modern times, even when Congress has enacted laws to allow a limited application of State law on Indian lands, the Congress has required the consent of tribal governments before State jurisdiction can be extended to tribal lands.

In determining what patterns of jurisdiction and regulation should govern the conduct of gaming activities on Indian lands, the Committee has sought to preserve the principles which have guided the evolution of Federal-Indian law for over 150 years.  In so doing, the Committee has attempted to balance the need for sound enforcement of gaming laws and regulations, with the strong Federal interest in preserving the sovereign rights of tribal governments to regulate activities and enforce laws on Indian land.  The Committee recognizes and affirms the principle that by virtue of their original tribal sovereignty, tribes reserved certain rights when entering into treaties with the United States, and that today, tribal governments retain all rights that were not expressly relinquished.

Consistent with these principles, the Committee has developed a framework for the regulation of gaming activities on Indian lands which provides that in the exercise of its sovereign rights, unless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands, the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities.

S. Rep. 100-466 at 5-6.

In recognition of the fact that many tribal gaming operations were or could be managed by non-Indians, the Commission was charged with the review and approval of future and existing management contracts.  25 U.S.C. §§ 2711, 2712.[10]  As discussed in further detail below, Congress's imposition of federal standards regarding management contracts placed federal limitations on a tribe's ability to contract.

While IGRA reflects a Congressional limitation on tribal self-government and self-determination, Congress has also enacted legislation removing federal restrictions to promote tribal self-governance, self-determination and economic development.  For example, in 2012 Congress enacted the Helping Expedite and Advance Responsible Tribal Home Ownership Act (HEARTH Act).  In the House Report of the bill, the Committee explained that federal review and approvals stifled tribal economic development:

When traveling in the Western United States, where most Indian lands are located, it is not difficult to identify the boundaries of an Indian reservation:

---

[10] IGRA also provides for Interior's review and approval of tribal-state gaming compacts regarding the regulation of class III gaming.

vacant space on one side, and development on the other. Private investment within Indian reservations--except in the anomalous case of Indian gaming (an issue not related to H.R. 205)--is about as scarce as it is in any nation where ownership of property is highly restricted by national governments. Investors cannot afford to wait the months or years it may take for BIA approval of a simple lease executed with a tribe. Investors simply put their money on the non-Indian side of the reservation.

H. Rep. No. 112-427, at 4 (2012). The Committee concluded that the HEARTH Act would foster tribal economic development by providing tribes with the flexibility to act quickly on surface leases of tribal lands without federal approval. Likewise, Congress continues to promote tribal self-determination. For example, in 2016 it enacted the Indian Trust Asset Reform Act which expressly reaffirmed "that the responsibility of the United States to Indian tribes includes a duty to promote tribal self-determination regarding governmental authority and economic development."[11]

---

[11] Likewise, in 2000 Congress enacted the Native American Business Development, Trade Promotion, and Tourism Act. P.L. 106-464. In that legislation, Congress expressly found that:

(6) the United States has an obligation to guard and preserve the sovereignty of Indian tribes in order to foster strong tribal governments, Indian self-determination, and economic self-sufficiency among Indian tribes;

(7) the capacity of Indian tribes to build strong tribal governments and vigorous economies is hindered by the inability of Indian tribes to engage communities that surround Indian lands and outside investors in economic activities on Indian lands;

\* \* \*

(9) the United States has an obligation to assist Indian tribes with the creation of appropriate economic and political conditions with respect to Indian lands to—
(A) encourage investment from outside sources that do not originate with the tribes; and
(B) facilitate economic ventures with outside entities that are not tribal entities;

(10) the economic success and material well-being of Native American communities depends on the combined efforts of the Federal Government, tribal governments, the private sector, and individuals;

25 U.S.C. § 4301.

Similarly, the Executive Branch continues to promote tribal economic development and self-determination by removing federal restrictions and deferring more to the decisions of tribal governments.  President Obama's commitment to tribal self-governance and the Nation-to-Nation relationship is detailed in annual White House Tribal Nations Conference Progress Reports during his Administration.[12]  For example, in 2012 and 2015 the Department updated its leasing regulations and right-of-way regulations to defer more to tribal landowners in the approval processes and in enforcement actions.  Residential, Business, and Wind and Solar Resource Leases on Indian Land, 77 Fed. Reg. 72440 (Dec. 5, 2012) (to be codified at 25 C.F.R. pt. 162); Rights-of-Way on Indian Land, 80 Fed. Reg. 72492 (Nov. 19, 2015) (to be codified at 25 C.F.R. pt. 169).  In the leasing context, the Department explained that "Tribal sovereignty and self-government are substantially promoted by leasing under these regulations, which require significant deference, to the maximum extent possible, to tribal determinations that a lease provision or requirement is in its best interest."  77 Fed. Reg. at 72447.  The policy of tribal self-determination and self-governance continues to the present.  *Indian Trust Asset Reform Act*, Pub. L. No. 114-178, § 102, 130 Stat. 432, 433 (2016).

Accordingly, it is my opinion that unless a federal treaty, statute or regulation imposes a restriction on a tribe or tribal enterprise, the longstanding federal law and policy is to promote tribal self-governance, self-determination, and economic development.

---

[12] *See A Renewed Era of Federal Tribal Relations: 2016 White House Tribal Nations Conference Progress Report*, Executive Office of the President (Jan. 2017).

**B. BASED ON MY EDUCATION AND MY EXPERIENCE IN GOVERNMENT, IT IS MY OPINION THAT THE FEDERAL POLICY OF TRIBAL SELF-GOVERNANCE AND TRIBAL SELF-DETERMINATION INCLUDES A TRIBE'S RESERVED SOVEREIGN RIGHT TO CONTRACT WITH OR LICENSE NON-INDIAN BUSINESSES TO PROMOTE ECONOMIC DEVELOPMENT NOTWITHSTANDING THAT THE BUSINESS MAY BENEFIT THE NON-INDIAN PARTNER. FEDERAL POLICY IS TO PROMOTE TRIBAL SELF-GOVERNANCE BY MOVING AWAY FROM FEDERAL APPROVALS OF TRIBAL ACTIONS, INCLUDING CONTRACTING WITH THIRD PARTIES.**

As discussed above, the federal government has a long history of vacillating its policy regarding the regulation of tribes and their contracts with third parties. Some of the earliest laws restricted who could purchase or lease Indian land,[13] regulated contracts with tribes,[14] and regulated trade with tribes.[15] For example, in the 1950s, Congress enacted legislation providing for the lease of Indian lands for business purposes.[16] As discussed above, in modern times federal policy has shifted away from paternalistic regulation of tribal contracts with third parties through legislation such as the HEARTH Act and instead has deferred to tribal decision-making consistent with the federal policies of tribal self-determination and tribal self-governance.

Prior to enactment of the HEARTH Act, the law required BIA approval of leases of tribal land. That approval process often resulted in significant delays of months or years, even for a simple lease. Through the HEARTH Act, Congress recognized that tribes which contracted such BIA functions successfully managed their own lands and put a statutory framework in place that essentially repealed the paternalistic policy for those tribes that wanted to exercise greater self-determination and self-governance. Under the Act, tribes may enter into leases without Interior approval if Interior has approved the tribe's leasing regulations. To date, over 25 tribes have had their leasing regulations approved. Many of the approvals concern leasing for business purposes.

---

[13] 25 U.S.C. § 177.
[14] 25 U.S.C. § 81.
[15] 25 U.S.C. §§ 261, 262.
[16] 25 U.S.C. § 415.

Indian gaming provides a useful context to further examine these federal policies as they relate to contracting with non-Indians or licensing non-Indian businesses to promote tribal economic development.  In 1979, the Seminole Tribe of Florida opened a gaming facility on tribal lands to generate economic development for the Tribe.  The Tribe "contracted with a private limited partnership that agreed to build and operate a bingo hall on the Indian reservation in exchange for a percentage of the profits as management fees." *Seminole Tribe of Fla. v. Butterworth*, 658 F.2d 310 (5th Cir. 1981), *cert. denied*, 455 U.S. 1020 (1982).  In 1981, the Fifth Circuit affirmed the Tribe's sovereign authority to engage in this gaming partnership free of state regulation or control.  For nearly a decade, Congress did not limit or restrict this form of tribal economic development or a tribe's sovereign authority to contract with non-Indians regarding gaming ventures.[17]

As Congress examined potential legislation to regulate Indian gaming, it looked particularly closely at the need to enact federal legislation specifically regulating management contracts with non-Indians.  In 1984, Congressman Vento from Minnesota expressed concern with non-Indians benefiting from tribal gaming operations, stating in a series of questions:

> But the problem I have is in the scope of taking in a management company or giving someone actual interest in the entity-and you said, to your knowledge, none of them have controlling interest-it seems to me that all of a sudden you're extending the immunity from the State and civil law regulatory function, you're extending that and actually encompassing a group of individuals that would not necessarily otherwise be exempt or immune from the State regulatory function. . . . I think we are talking about extending special privileges to basically non-Indians, people who are not part of the tribe, a part of the basis, I guess, for the difference in law.  So I have some problems and I think there is a contradiction inherent in that.  What would be the practical effect if that does not occur?

---

[17] Prior to the enactment of IGRA, there was little federal approval of tribal contracts with non-Indian entities that were managing or operating Indian casinos.  Most of these approvals were issued pursuant to 25 U.S.C. § 81.

The witness explained that if Congress prohibited non-Indians from contracting with tribes that many of the gaming operations would not exist, stating:

> The practical effect would be that a large amount of tribes wouldn't be able to get into the business right now if *they weren't allowed the freedom to contract in the manner that they wished to contract*. Sometimes that involves the use of funds, and it is speculative funds that these people are putting up. It's a gamble on their part and it's a risk. So they are asking for some amount of involvement or some amount of return. I think there are several tribes out there that could not afford to- I know they couldn't afford to-there are some tribes sitting here that wouldn't be getting anything if it wasn't for the fact that they didn't have some folks that were willing—

Hearing on H.R. 4566, Indian Gambling Control Act, at 44-45, 98th Congress (June 19, 1984) (emphasis added).[18]  Another tribal witness reiterated this point, explaining that the non-Indian management permitted the tribe to be successful because when they first started out the tribal investment was $50.  "Without the management, we never could have done anything."  *Id.* at 54.

This same hearing further highlighted that like states that needed to bring in expertise to run state lotteries, some tribes contracted with management or consulting groups to provide expertise to run casinos with a long term view that tribes would ultimately buy out the consulting interests so that they would become "100 percent tribal".  Hearing on H.R. 4566, Indian Gambling Control Act, at 41-42, 98th Congress (June 19, 1984).

In 1985, Congress again considered legislation to regulate Indian gaming.  Tribes expressed concern with limitations on management contracts that would discourage non-Indian investment in the gaming operations.  For example, the Gila River Indian Community in Arizona

---

[18] At this same hearing, then Congressman McCain suggested that gaming could result in "nontribal members making more money than the tribe."  The witness for the National Congress of American Indians noted that such a situation was not uncommon with tribes.  "The Indian Affairs field subsidizes a good many non-Indians in all areas. In construction, for example, the Bureau of Indian Affairs hires non-Indians. The education field has many non-Indians.  I don't think the Indian field, whether at the tribal or Federal level, has ever been exclusively Indian, nor does it purport to be."  *Id.* at 48.

expressed concern limiting management contracts to 40% of net revenues.  The Tribe explained,

"[t]his could pose a problem for Gila River and it should be kept in mind that Gila River, like

other Tribes, often do not have the necessary capital to start up extensive gaming operations.  To

unduly shackle a Tribe by discouraging off-Reservation investors does not make economic

sense."  Indian Gambling Control Act, Hearings on H.R. 1920 and H.R. 2404 at 66 (Hearings

held June 25, 1985 and September 13, 1985).  In this same Hearing Report, a witness testified

about general problems he had observed in tribal contracts with non-Indians, including excessive

profits to non-Indians, padding of expenses, the length of contracts and lack of employment

opportunities.  *Id.* at 185-188.  Congress, however, did not enact legislation in 1985 to limit tribal

authority to contract with non-Indians for gaming purposes.

The following year, Congress again held hearings on legislation to regulate Indian

gaming.  In considering provisions to limit management contract terms, one non-Indian

management contractor explained their reasonable contracts spanned anywhere from five to

twelve years in length with splits between the contractor and the Tribe varying from 55-45 to 60-

40. S. Hrg 100-341 at 159.  He further explained that none of the general managers were tribal

members but they were working with the tribes to train tribal members to be successors.  *Id.* at

161.  Other management contractors testified of the need for flexibility in management contracts,

expressing the concern that:

> too restrictive rules regarding contract length percentages and payback to the
> corporate investors coming onto the reservations so that those tribes that are in
> marginal areas, that don't have all the demographics of a lot of people, that may
> not get someone to come on unless they can do it for 10 or 15 years and get 45
> percent, they won't attract the seasoned and quality management companies, I
> think this is a serious concern.[19]

---

[19] The witness further testified that BIA guidelines at the time provided for management
contracts to "allow for up to three 5-year periods, and you can negotiate the second and third 5-
year periods up front as long as the percentage drops. It's like you go 5 years for 45 percent and

In 1987, perhaps as it became more apparent that Congress would act to limit the terms of management contracts, Congressman Richardson of New Mexico testified about the importance not interfering with existing contracts and reaffirming the tribal sovereign authority to contract to promote economic development. He explained:

> Many of the tribes which have bingo games have turned to private companies to manage the games on behalf of the tribes. Several tribes entered into contracts with these management companies, which were approved by the Secretary of the Interior pursuant to 25 U.S.C. section 81. These contracts were the result of extensive negotiations between the tribes and the companies, and have worked for the benefit of both parties. Congress must give serious consideration to protecting the sanctity of these contracts in any legislation on Indian gaming. Reconfirming the validity of these previously approved contracts in any new legislation will send a strong signal to private companies willing to invest in tribal enterprises. Such private investment is a crucial ingredient in the large task of economic development on Indian reservations.

IGRA Hearing 100-70 Part 1 at 126. See also Statement by Manuel Lujan, Jr. at 174.

The Department of the Interior also continued the federal government's support of tribal self-governance and in particular Indian gaming, whether the facility was operated by a tribe or non-Indians, stating:

> Mr. MARLENEE. Whether that bingo is run by Indians or non-Indians. Are you saying you support it, whether that is run by Indians or contracted out to non-Indians? You support it either way; is that correct?
> Mr. SWIMMER. We would support it on the reservation--
> Mr. MARLENEE. However they want to run it?
> Mr. SWIMMER. That is right, however they want to run it, under the jurisdiction of the tribe, however they want to run it.

IGRA Hearing 100-70 Part 2 at 216. In other words, the federal government supported tribal self-determination and self-governance in how tribes chose to regulate gaming within their jurisdiction.

---

the next 5 years for 40 percent, and the third for 35 percent et cetera-whatever can be fairly negotiated with paying the money back amortized over 3 or 4 or 5 years or up front if the tribe should so choose, with Secretarial approval at the area level." *Id* at 163.

Based on years of Congressional hearings, in 1988 Congress enacted IGRA finding that "numerous Indian tribes have become engaged in or have licensed gaming activities on Indian lands." 25 U.S.C. § 2701.  One purpose of IGRA is to provide a statutory basis for the regulation of Indian gaming.  25 U.S.C. § 2702.  Among other things, IGRA recognizes that non-Indian owned casinos may be licensed by tribes and establishes standards for management contracts of tribal casinos managed by third parties.  These provisions are discussed in more detail below.

Recognizing that pre-IGRA some gaming was conducted by non-Indians pursuant to tribal licenses, Congress expressly provided for non-Indian class II and class III facilities under IGRA.  Section 2710(b)(4) provides for the licensure of class II gaming facilities "owned by any person or entity other than the Indian tribe" and section 2710(d)(1)(A)(ii) extends these provisions to class III gaming facilities.  Non-tribally owned facilities are required to provide 60% of the net revenues to the tribe. § 2710(b)(4)(B)(III).  *See also* March 14, 2005 Memorandum from Cindy Shaw to NIGC Acting General Counsel (IGRA confirms tribes exclusive authority to regulate non-Indian gaming on non-Indian lands within reservation).

IGRA also sets minimum standards for class II and class III management contracts.  §§ 2711, 2712.  Among other things, IGRA limits the term to not more than seven years and the fee to not more than 40 percent of net revenues.  § 2711.  For those contracts that were approved by Interior prior to the enactment of IGRA, Congress provided the parties 180 days after notification of necessary modifications to come into compliance with the Act. § 2712.

In the years following the enactment of IGRA, Congress continues to hold oversight hearings on Indian gaming.  For example, in 1993 the House held a hearing on the implementation of IGRA.  Implementation of Indian Gaming Regulatory Act, Oversight Hearing, Subcommittee on Native American Affairs, Committee on Natural Resources, June 25,

1993.  The hearing record includes an Office of Inspector General Survey Report on implementation of the Act, including the number of gaming facilities and management contracts. The report concluded that there were approximately 257 gaming operations.  Of the 173 class II facilities, 113 were operated by tribes and 60 were operated pursuant to management contracts. Of the 84 class III operations, 57 facilities were operated by tribes and 27 were being operated under management contracts.  Since 1993, the National Indian Gaming Commission has approved 70 management contracts.  As discussed in Part III of this report, the number of management contracts has decreased as tribes decide to manage their own facilities.

Notwithstanding the limitations Congress set forth in IGRA, in other respects Congress has enacted or amended laws that expressly removes federal approval of contracts with tribes. For example, in 2000 Congress enacted the "Indian Tribal Economic Development and Contract Encouragement Act of 2000." P.L. 106-179.  Congress noted that many parts of section 81 providing for federal approval of contracts with tribes "have come to be antiquated and unnecessary."  H. Rep. 106-501 at 2.  The Senate Committee explained that section 81 was enacted during an era when Congress believed that tribes were not competent to contract with outside entities, but that "[t]here is no justification for such an assumption to provide the basis for federal policy in this era of tribal self-determination."  S. Rep. 106-150 at 8.  Among other things, the Indian Tribal Economic Development and Contract Encouragement Act limited section 81 to only those contracts that encumber Indian lands for a period of 7 or more years.

Similarly, as discussed above, Congress enacted the HEARTH Act to remove BIA approval of surface leases for those tribes that wanted to exercise greater self-governance and self-determination in this area.  In speaking on the bill, Congressman Cole explained that

restoring tribal authority to lease (contract) without federal approval was consistent with the federal policy of tribal self-determination and tribal sovereignty:

> This bill has strong bipartisan support, is a priority for Indian Country, and is strongly supported by the administration. It empowers tribes, encourages tribal self-government, decreases the dependency of tribes on the Federal Government, and speeds up economic development in Indian Country.

158 Cong. Rec. H2684 (daily ed. May 15, 2012) (statement of Rep. Cole).

Finally, most recently Congress enacted legislation providing for states and tribes to exercise primary regulatory authority over the production of hemp for purposes of federal law. Agricultural Improvement Act of 2018, Pub. L. No. 115-334, §297B (2018). If a tribe or state chooses not to take on this regulatory authority or the state or tribal plan is not approved by the Department of Agriculture, then the federal government performs this regulatory role. This framework reflects the federal policy of tribal self-determination and tribal self-governance and is similar in approach to legislation providing for tribes to set air and water quality standards as a matter of federal law on their reservations.

Accordingly, based on the foregoing, it is my opinion that the federal policy of tribal self-governance and tribal self-determination includes a tribe's reserved sovereign right to contract with or license non-Indian businesses to promote economic development notwithstanding that the business may benefit the non-Indian partner. Tribal sovereignty includes the right to contract as well as the right to license non-Indian owned businesses. Federal policy is to promote tribal self-governance by moving away from federal approvals of tribal actions.

**C. BASED ON MY EDUCATION AND MY EXPERIENCE IN GOVERNMENT, IT IS MY OPINION THAT TRIBES SEEK TO PARTNER WITH NON-INDIANS TO DEVELOP AND MANAGE BUSINESSES WITH GOAL OF ULTIMATELY MANAGING THE ECONOMIC ENTERPRISE FOR THEMSELVES. FEDERAL POLICY PROMOTES SUCH ECONOMIC DEVELOPMENT.**

Based on generations of experience, tribes have learned that partnerships with outside professionals serve to build tribal capacity and that in many circumstances tribal economies

28

benefit from tribes themselves owning the underlying business. As discussed above, the ISDEAA set a path for tribes to develop and build capacity to administer and run federal programs serving their communities and tribes have used that model in some respects to build and acquire tribal businesses. As further discussed above, Congress and the Executive Branch have repeatedly promoted the use of outside investment and expertise to develop tribal businesses and economies. In hearings leading to the enactment of the Indian Financing Act and the Indian Gaming Regulatory Act, Congress repeatedly heard testimony from the Administration and tribes of the need for capacity development through contracts with non-Indian entities to set a path for tribes ultimately owning and running the entity.

Whether it is the development of oil and gas resources, hydropower, timber resources, gaming, or other businesses, both tribes and the federal government have encouraged tribes to partner with non-Indian entities to build capacity so that tribes can operate those businesses. Congress has recognized this need and authorized tribal grants specifically to "develop[] or obtain[] the managerial and technical capacity needed to develop energy resources on Indian land[.]" 25 U.S.C. § 3502. Congress has likewise enacted legislation to guarantee loans to tribal entities that are at least 51% owned by tribes or tribal members. Tribes have utilized these federal programs and their own resources to ultimately acquire businesses that they manage for themselves.

Take for example energy development. For generations, tribes have leased their lands and received revenues on oil and gas production or hydropower. For some tribes, they have made the sovereign choice that the leasing model is their economic development plan. Other tribes, however, have partnered with or hired outside experts to help them develop tribal

businesses so that they are receiving more than just lease payments and royalties on oil and gas or electricity produced.

The Southern Ute Indian Tribe is an example of a tribe that has partnered with outside entities to develop expertise relating to oil and gas development to eventually transition to ownership of the underlying production and transmission companies.  The Tribe began like many tribes by leasing its lands for oil and gas development beginning in the late 1940s.  *Examining Federal Programs that Serve Tribes and Their Members*: Hearing Before the Subcomm. on the Interior, Energy and Environment of the House Comm. on Oversight and Government Reform, 115th Cong. (Feb 15, 2017) at 32.  By the mid-1970s the Tribe grew concerned that the mineral resources were not being properly managed and imposed a moratorium on future leasing.  *Id.* at 33.  They hired several non-Indian consultants to help evaluate their resources and build technical expertise.  Enhancing America's Energy Security: Oversight Hearing Before the House Comm. on Resources, 108th Cong. (Mar. 19, 2003) at 152.  After years of developing expertise, the tribe in 1992 created an oil and gas company to acquire leasehold interests on the reservation.  *Id.* at 153.  In 1994, the tribe entered into a partnership with a non-Indian entity to purchase a pipeline-gathering system operating on the reservation.  *Id.* at 153.  Today the tribe's business is the majority owner of the gathering company.  *Examining Federal Programs that Serve Tribes and Their Members*: Hearing Before the Subcomm. on the Interior, Energy and Environment of the House Comm. on Oversight and Government Reform, 115th Cong. (Feb. 15, 2017) at 33.

Similarly, the Salish and Kootenai Tribes of the Flathead Indian Reservation (Tribes) engaged in a decades long endeavor to ultimately acquire Kerr Dam, a nearly 200 mw hydroelectric facility.  S. 2132, Indian Tribal Energy Development and Self-Determination Act Amendments of 2014: Hearing Before the Senate Committee on Indian Affairs, 113th Congress,

S. Hrg. 113-338 (Apr. 30, 2014) at 26.  In the 1930s, the federal government issued the first

license for the Kerr Dam for a 50 year term.  In the 1970s, as relicensing was occurring, the

Tribes sought the license and ultimately reached a settlement under which a license was issued

jointly to the Tribes and the non-Indian power company under which the Tribes would have the

right to acquire the project for the last 20 years of the project and the non-Indian power company

would train, over a five year period, employees of the Tribes to assume operation and

maintenance of the project.  *Id.* at 28; https://www.energy.gov/indianenergy/salish-and-kootenai-

tribes-confederated-tribes-flathead-reservation-2011-project-0.  As the Tribes moved closer to

acquiring the Dam, it formed a tribal corporation and worked with consultants to build the

necessary capacity.  Through federal grants, the Tribes retained a power marketing coordinator

and a Plant operations and maintenance engineer to fulfill key functions. U.S. Department of

Energy, Tribal Energy Program, Award # DE-EE0005040 Final Report (Dec. 2014).  These

individuals brought decades of experience to managing, marketing and maintaining the

hydroelectric facility.  *Id.* at 6-7.  In 2014, the Vice Chairwoman described the multiple levels of

importance to the Tribes of their acquisition of the hydroelectric facility:

> By acquiring the Kerr Project, CSKT will be restoring ownership and control over
> lands of the Flathead Indian Reservation, its treaty-reserved homeland.  By
> assuming control over Kerr Dam, CSKT will be asserting management and
> control over Flathead Lake and the Flathead River, two critically important water
> resources of the Flathead Indian Reservation.  And by selling the electricity
> generated at the Kerr Project, CSKT will receive more income than it gets from
> rental of the Project land, which will allow the tribe to better meet the needs of
> our people.
>
> CSKT will have opportunities to develop businesses with the skill and ability to
> operate and maintain large energy generation facilities.  The Tribes will have
> opportunities to develop businesses to sell electricity for a profit.  We will create
> good-paying jobs in the local economy.  CSKT will be developing a collection of
> financial and professional resources that should encourage development of other
> projects that might benefit CSKT in the future.

Operating Kerr Dam will thus not only give CSKT control once again over the natural resources that the dam utilizes and affects, but it will also provide the tribe with much needed revenue to pay for and improve our tribal programs. We are already one of the largest employers in western Montana and are very proud of the role we play in creating jobs and helping the state's economy. Taking ownership of Kerr Dam will assure we can continue helping our people, our region and our state's economy.

*S. 2132, Indian Tribal Energy Development and Self-Determination Act Amendments of 2014*, S. Hrg. 113-338 at 27-28.

Finally, perhaps the most obvious area in which tribes have transitioned from partnering with non-Indian companies to managing the operations themselves is gaming. As discussed above, at the time of IGRA's enactment approximately 87 facilities were managed pursuant to management contracts. Over the decades since, tribes have developed capacity and expertise to manage their own gaming operations. This is reflected in the number of management contracts in effect. As of November 2014, there were 11 approved management contracts in effect. U.S. Gov't Accountability Office, GAO-15-355, Indian Gaming: Regulation and Oversight by the Federal Government, States, and Tribes 38 n.67 (2015). As in other areas of economic development, many tribes work with management contractors for a period of time and then ultimately decide to buyout the contractor and manage the gaming facility themselves. Indeed, management contracts sometimes expressly provide for a buyout option. *See* Third Amended and Restated Management Agreement Between the Pokagon Band of Potawatomi Indians and Great Lakes Gaming of Michigan, LLC. Tribes, such as the Pokagon Band of Potawatomi Indians, highlight the help non-Indian contractors provide and the self-governance aspects of taking on those management functions:

The early buy-out of our management agreement with Lakes Entertainment is a direct result of the tremendous success we have achieved with Four Winds Casino Resort. Lakes Entertainment has been a valuable and trusted partner for many years and we greatly appreciate everything they have done to help us achieve our independence. On behalf of all Pokagon Citizens and employees of Four Winds

32

Casino Resort, I'd personally like to thank Lyle Berman, Tim Cope and the rest of the Lakes Entertainment management team.

Pokagon Band of Potawatomi Indians Press Release (July 1, 2011).

That tribes seek to acquire and run the business themselves after gaining the necessary expertise is not surprising for a number of reasons.  First, for many tribes their own economic development is critical to providing governmental services to their communities.  Federal appropriations to provide essential governmental programs pursuant to trust and treaty obligations fall far short of the need.  For example, in FY 2016 Congress appropriated $347,976,000 for BIA law enforcement even though the need is estimated at $1 billion.  This shortfall in federal funding is common across the governmental programs with tribes needing to generate their own governmental revenues or go without being able to fully provide essential services.  In fact, federal appropriations for Indian Affairs at the Department of the Interior for 2017 are less than 10% of what tribes generate though Indian gaming.  Thus, in many respects tribal economic development though gaming has done more to foster self-governance and self-determination than appropriations.  This reality underscores the need of tribes to engage in economic development to provide governmental services given the significant shortfall of federal appropriations.

Further, federal grant or loan programs designed to foster tribal economic development often do not provide the stability, certainty, expertise, or scope needed to fully support tribal economic development.  By partnering with non-Indian entities, tribes are able to leverage outside investment and expertise while limiting their risk during the initial phase of the business.  Such partnerships are often multi-year commitments whereas grants are of limited duration and, like appropriations, subject to annual fluctuations.  Grants can also be resource intensive in terms

of application and reporting requirements and may also be limited in terms of how funds may be used.

Finally, Tribal economic development though outside partnerships and investment is often critical because tribes do not enjoy the same tax base and other streams of revenue enjoyed by states and local governments to provide essential governmental services. Indeed, even with the ability to generate significant, consistent revenues through sales or property taxes, 24 states look to commercial casino gaming as a means to fund governmental services. On Indian reservations, property taxes are often not viable because the tribe is in effect either taxing itself as a landowner or taxing its members which often may not have the resources to sustain a property tax. This, without outside investment and expertise, tribes often do not have the means to grow their tribal economies to provide essential governmental services.

D.  **BASED ON MY EDUCATION AND MY EXPERIENCE IN GOVERNMENT, IT IS MY OPINION THAT THE FEDERAL REGULATORY ROLE IS LIMITED TO AUTHORITY PROVIDED BY CONGRESS THROUGH STATUTE. WHEN IMPLEMENTING THAT STATUTE, THE AGENCY SHOULD DEFER TO TRIBAL STANDARDS WHEN POSSIBLE. IF A FEDERAL AGENCY DOES NOT HAVE AN EXPRESS REGULATORY ROLE OR RESPONSIBILITY REGARDING TRIBAL ACTIVITIES, IT SHOULD RESPECT TRIBAL STANDARDS.**

The federal policies of promoting and fostering tribal self-determination and tribal self-governance also serve to limit federal authority from infringing on tribal sovereignty. President Clinton recognized this fundamental principal when he issued Executive Order 13175: Consultation and Coordination with Tribal Governments (Nov. 6, 2000). In issuing the Executive Order, President Clinton emphasized the directive that federal agencies not infringe on tribal self-governance, stating:

> Today, there is nothing more important in Federal-tribal relations than fostering true government-to-government relations to empower American Indians and Alaska Natives to improve their own lives, the lives of their children, and the generations to come. We must continue to engage in a partnership, so that the first Americans can reach their full potential. So, in our Nation's relations with Indian tribes, our first principle must be to respect the right of American Indians and Alaska

> Natives to self-determination.  We must respect Native Americans' rights to
> choose for themselves their own way of life on their own lands according to their
> time honored cultures and traditions.

*Id.*  President Clinton's Order directed that when agencies were formulating or undertaking

policies "that have tribal implications" that those agencies "defer to Indian tribes to establish

standards" and to limit the scope of any federal standards to "preserve the prerogatives and

authority of Indian tribes." *Id.*  Every subsequent Administration has either embraced or

continued to implement Executive Order 13175.

An example of federal agencies deferring to tribal standards and tribal decisions to

implement a federal statute is found in BIA's regulations governing surface leases of tribal lands.

77 Fed. Reg. 72440 (Dec. 5, 2012).  In that rulemaking, BIA highlighted the direct connection

between tribal self-governance and economic development, stating:

> The leasing of trust or restricted lands facilitates the implementation of the policy
> objectives of tribal governments through vital residential, economic, and
> governmental services.  Tribal sovereignty and self-government are substantially
> promoted by leasing under these regulations, which require significant deference,
> to the maximum extent possible, to tribal determinations that a lease provision or
> requirement is in its best interest.

BIA explained that it had "reviewed the regulation to ensure that the final rule requires BIA to

defer to tribes in all possible cases, consistent with our trust responsibility." *Id.* at 72442.

Consistent with utilizing tribal standards, BIA adopted section 162.016 which expressly provides

that BIA "will comply with tribal laws in making decisions regarding leases, including tribal

laws regulating activities on leased land under tribal jurisdiction, including, but not limited to,

tribal laws relating to land use, environmental protection, and historic or cultural preservation."

In addition, the preamble to the final rule explained that a number of provisions were modified to

make clear that BIA was deferring to tribal standards and decisions in implementing the federal

law, including deference to:

- A tribe's negotiated value for a lease of tribal land and BIA will not require valuations of tribal land;

- tribal determinations that allow non-monetary forms of rental compensation for tribal is in the tribe's best interest;

- tribal determination that rental reviews and adjustments are not necessary;

- a tribe's determination that the lease term, including any renewal, is reasonable and is in its best interest.

The rulemaking record makes clear that a primary objective of BIA in revamping its leasing regulations to defer to tribal standards and decision-making was to promote economic development through agreements to lease tribal lands.

Another example of federal agencies deferring to tribal standards is found in BLM's 2015 final rule governing fracking on federal and Indian lands.[20] 80 Fed. Reg. 16128 (Mar. 26, 2015). During the course of that rulemaking, BLM consulted with tribes about federal standards for fracking on Indian lands. Among other comments, tribes advocated that BLM should allow tribes to opt-out of the federal rule or apply tribal standards to fracking activities on Indian lands. While BLM noted that it lacked statutory authority to implement an opt-out provision, BLM developed a process in section 3162.3-3(k) by which tribal standards could govern fracking activities on Indian lands. *Id.* at 16132. A little more than a year after the final rule was issued, BLM and the Southern Ute Indian Tribe agreed that tribal standards would govern fracking on Southern Ute lands. *See* November 4, 2016, BLM and Southern Ute Indian Tribe Press Release.

Finally, this deference to tribal standards is found also in the gaming context. For example, the National Indian Gaming Commission's regulation setting minimum internal control standards for class II gaming defers to tribal standards. In the preamble to the final rule, the

---

[20] In 2017, the Department of the Interior rescinded the fracking rule for reasons unrelated to the provisions regarding the potential applicability of tribal standards.

36

Commission explained that many tribes questioned the Commission's authority to regulate promotions and asserted that "the Commission should defer to [tribes] to establish standards[.] . . . The Commission agrees that [tribes] should establish standards, which is precisely the reason the standards do not detail requirements, and instead provide a general outline of areas that must be addressed and displayed to patrons." 77 Fed. Reg. 58710 (Sept. 21, 2012).  The Commission's approach was to regulate only to the extent necessary and to defer to tribes in setting the relevant standards.

Further, the Courts recognize the importance of tribal law and standards as they relate to tribal economic development through gaming.  An example is found in the National Indian Gaming Commission's attempted overreach of regulating Indian casino gaming.  After the enactment of IGRA, the Nation Indian Gaming Commission promulgated regulations instituting minimum internal control standards for class III gaming.  Tribes challenged this assertion of federal authority arguing that Congress did not expressly provide the Commission with jurisdiction to take such action.  The D.C. Circuit agreed, holding that the regulation was unlawful because Congress did not explicitly or implicitly provide such regulatory authority to the Commission.  *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134 (D.C. Cir. 2006).

Thus, for the reasons described above, it is my opinion that the Federal regulatory role is limited to the authority provided by Congress through statute.  When implementing a statute, the Agency should defer to tribal standards when possible.  If a federal agency does not have an express regulatory role or responsibility regarding tribal activities, it should respect tribal standards.

37

E. **BASED ON MY EXPERIENCE IN FEDERAL GOVERNMENT, A TRIBE'S FREEDOM TO CONTRACT WITH THIRD PARTIES SO THAT A TRIBE MAY PROVIDE E-COMMERCE SERVICES HAS NOT BEEN SPECIFICALLY LIMITED BY CONGRESS. UNLESS DIRECTED BY STATUTE, FEDERAL OFFICIALS SHOULD NOT SECOND GUESS TRIBAL BUSINESS DECISIONS.**

In my opinion, it is not uncommon for tribes to either directly hire non-Indians or contract with non-Indian entities to provide support services to tribal entities to achieve tribal goals. Other than 25 U.S.C. § 81, I am not aware of any general federal legislation that regulates or restricts a tribe's freedom to contract with third parties to provide necessary expertise or support to a tribally owned business.[21]

Section 81 provides for Interior review and approval of contracts or agreements that encumber Indian lands for a period of seven or more years. 25 U.S.C. § 81. As discussed above, in amending section 81 in 2000, Congress sought to promote tribal self-governance and self-determination by limiting the paternalistic policy of Interior review to only those contracts that encumber Indian lands for seven or more years. Based on the contracts that I have reviewed, none of them appear to encumber Indian lands for a period of seven or more years and thus they are not subject to section 81 approval.

Further, I am not aware of any specific federal legislation similar to IGRA that limits a tribe's ability to contract with third parties to engage in e-commerce. Again, IGRA is informative in that it reflects the federal policy of promoting tribal self-determination and tribal self-governance and limits NIGC review and approval to only management contracts. 25 U.S.C. § 2711. Other contracts such as consulting agreements, development agreements, and loan

---

[21] Of course, other statutes may place limits on contracts with tribes for specific purposes, such as leases of Indian lands, management contracts for gaming, terms of mineral development, grazing permits, etc. My opinion does not exclude the applicability of such laws. Rather, my point is that the right to contract is limited generally only when Congress legislates in that specific area.

agreements do not require NIGC approval if they do not provide for management of the gaming.
NIGC Bulletin No. 1994-5, Approved Management Contracts v. Consulting Agreements
(Unapproved Management Contracts are Void) (Oct. 14, 1994).  During my service at the
National Indian Gaming Commission, the Office of General Counsel routinely issued letters
informing tribes and third parties as to whether a particular agreement constituted a management
contract requiring NIGC approval pursuant to IGRA.  Thus, even in the highly regulated field of
Indian gaming, Congress has limited a tribe's freedom to contract only to management contracts.
In the field of e-commerce and tribal lending, I am not aware of any federal limitations on a
tribe's freedom to contract with third parties to provide consulting, management, or other
services other than potentially 25 U.S.C. § 81.

Based on my review of affidavits, declarations, and depositions,[22] my understanding is
that the Lac Vieux Desert Band of Lake Superior Chippewa Indians created tribal business
entities that contracted with non-Indian owned business entities to support those tribal business
entities' lending to third parties.  Over time, the relationship between the Lac Vieux Desert Band
of Lake Superior Chippewa Indians' business entities and non-Indian business entities has
evolved from one in which the tribal businesses contracted for various services and functions to
one in which the Tribe acquired non-Indian entities through a seller-financed transaction.
Declaration of Matthew Martorello in Support of Defendants Big Picture Loans, LLC and
Ascension Technologies, LLC's Reply in Support of their Motion to Dismiss for Lack of Subject
Matter Jurisdiction at ¶¶ 48-69.  This general course of tribal economic development, wherein a
tribe contracts with third parties to support a tribal business and later seeks to acquire those
support businesses or directly hire non-Indians with expertise is similar to tribal economic

---

[22] A list of all materials reviewed are included at the end of this report.

development in other industries as discussed above, including energy development and gaming.

I am not aware of any federal law, other than potentially 25 U.S.C. § 81, that limits a tribe's

ability to contract in this manner.

In depositions and affidavits, Chairman Williams, Councilwoman Hazen and others

describe the Tribe's initial contracting for services as a means to generate revenue, support their

business, and develop tribal capacity in the area of ecommerce.  They describe the ultimate goal

of acquiring  Bellicose Capital and SourcePoint as a strategy to reach the Tribe's long-term

economic goals.  September 28, 2017 Hazen Affidavit; October 16, 2017, Hazen Deposition, 34-

35; November 13, 2017, Williams Deposition, 122, 200-202; November 13, 2018 Dowd

Deposition, 102, 202-205.  Councilwoman Hazen explained that tribal council engaged in

several discussions regarding development of a long-term economic development plan that

would diversify the Tribe's sources of governmental revenue.  Hazen Deposition, 34-35.   Both

tribal leaders as well as others discuss how the Tribe's governmental gaming revenues had

decreased and that investment in Big Picture provides funding for essential governmental

programs and services. September 28, 2017 Williams Affidavit; September 28, 2017 Hazen

Affidavit; Williams Deposition, 201; November 13, 2018 Dowd Deposition, 199.

It is my opinion that tribal leaders are entrusted by their citizens to make decisions in the

best interest of the tribe.  It is reasonable for tribes to contract with outside entities to diversify

their streams of governmental revenue.  Further, it is reasonable for tribes to contract with

outside entities to develop tribal capacity and ultimately acquire those outside entities that have

served a tribal business. It is further my opinion that unless federal law provides otherwise, that

federal officials should not second guess tribal business decisions.  Tribes, as sovereigns, have

the ability to determine for themselves whether a contract with third parties, or a business

acquisition, is reasonable.

Publications and Presentations within the past 10 Years

1. Lawrence Roberts, "Warning Lights are Flashing on Trump's Tribal Agenda," Law360.com (Sept. 11, 2018), (*available at*: https://www.law360.com/articles/1081612/warning-lights-are-flashing-on-trump-s-tribal-agenda).

2. Larry Roberts, "DOI Actions Underscore Need for Tribal Consultation," Law360.com (July 25, 2017), (*available at*: https://www.law360.com/articles/947619/doi-actions-underscore-need-for-tribal-consultation).

3. Lawrence Roberts & Keith Harper, "US Supreme Court Opens Door to Sports Betting," JDSupra.com (May 16, 2018), (available at: https://www.jdsupra.com/legalnews/us-supreme-court-opens-door-to-sports-89991/).

4. Larry Roberts, "Organizing Indian Affairs for the Next 100 Years," Law360.com (Feb. 5, 2018), (*available at*: https://www.law360.com/articles/1009156/organizing-indian-affairs-for-the-next-100-years).

5. Larry Roberts & Charlie Galbraith, "Indian Country After 1st Year of the Trump Administration," Law360.com (Jan. 18, 2018), (*available at*: https://www.law360.com/articles/1003095/indian-country-after-1st-year-of-the-trump-administration).

6. Lawrence S. Roberts & Venice McGhee Prince, "The Department of the Interior Proposes Additional Regulatory Hurdles to Restoring Tribal Homelands," Lexology.com (Oct. 6, 2017), (available at:  https://www.lexology.com/library/detail.aspx?g=ee732819-ddfe-4940-bfac-de40304d5fe8).

7. Larry Roberts, "Trump Budget Proposal Leaves Tribes on Their Own," Law360.com (June 16, 2017), (*available at*: https://www.law360.com/articles/935671/trump-budget-proposal-leaves-tribes-on-their-own).


A. Questions and Answers with the NIGC Chairwoman and General Counsel, 8th Annual Northwest Gaming Law Summit (Dec. 2010).

B. Indian Gaming Finance Update, 8th Annual Northwest Gaming Law Summit (Dec. 2010).

C. The National Indian Gaming Commission: An Update from the General Counsel, 2011 Indian Law Conference Sponsored by the Minnesota American Indian Bar Association and Minnesota CLE (March 2011).

D. Keynote Address: 25 years of Federal Indian law, 25th Annual Coming Together of the Peoples Conference, Indigenous Law Students Association, University of Wisconsin Law School (March 2011).

E. Tribal Energy Development, Federal Bar Association DC Indian Law Conference (Nov. 2014).

F.    13th Annual Northwest Gaming Law Summit (Dec. 2015).

G.    Department of the Interior – Assistant Secretary Update, National Congress of American Indians 2016 Tribal Nations Legislative Summit (Feb. 2016).

H.    Federal Agencies' Efforts to Strengthen the Well-Being of Native Children and Families, National Indian Child Welfare Association's 34th Annual Conference (April 2016).

I.    Department of the Interior – Assistant Secretary Update, National Congress of American Indians 2016 Mid-Year Conference (June 2016).

J.    Advancing Trust Reform in Indian Country Beyond the 2016 Election, National Congress of American Indians 2016 Mid-Year Conference (June 2016).

K.    Message from the Department of the Interior, National Congress of American Indians 2016 Annual Convention (Oct. 2016).

L.    Reflections on Progress over the Past Eight Years and Pathways Forward to Strengthening the Nation-to-Nation Relationship, Sovereignty and E-Commerce: Innovating and Reshaping the Borders of Indian Country CLE Conference, Arizona State University College of Law (Feb. 2017).

M.    Progress in Indian Affairs and Pathways Forward to Strengthen the Nation-to-Nation Relationship, To Bridge a Gap Conference (Feb. 2017).

N.    The Impact of the Trump Administration on Indian Policy, 2017 Indian Law Conference Sponsored by Minnesota American Indian Bar Association and Minnesota CLE (May 2017).

O.    Tribal Homelands Restoration, Midwest Alliance of Sovereign Tribes (July 2017).

P.    Federal and Tribal Relations Update, United Tribes Tribal Leaders Summit, United Tribes Technical College (Sept. 2017).

Q.    National Indian Gaming Association Mid-Year Conference (Sept. 2017).

R.    View from Washington: What does the New Administration mean for Indian Country, Wisconsin State Bar (Sept. 2017).

S.    Energy, Infrastructure & Culture: Federal Consultation and Collaboration as Bridge Building, 37th Biennial Public Land Law Conference, University of Montana Law School (Oct. 2017).

T.    Tribal Proposals to Improve Federal Permitting Consultation, NCAI Annual Convention (Oct. 2017).

U.  Progress in Indian Affairs and Pathways Forward to Strengthen the Nation-to-Nation Relationship, Fall 2017 EPA New England Tribal Leaders Summit & Environmental Conference (Nov. 2017).

V.  Progress in Indian Affairs and Pathways Forward to Strengthen the Nation-to-Nation Relationship, Association on American Indian Affairs (Nov. 2017).

W.  Tribal Lending Litigation Update, Tribal Financial Regulators Conference (Nov. 2017).

X.  Comment from Former Assistant Secretaries of Indian Affairs, Wiring the Rez: Innovative Strategies for Business Development Via E-Commerce Conference (Feb. 2018).

Y.  Keynote Panel – State and Federal Views of the Regulatory Environment, Conference of Tribal Lending Commissioners (March 2018).

Z.  30 Years Later: IGRA and Economic Development, Federal Bar Association, Indian Law Conference (April 2018).

AA.  The Indian Gaming Regulatory Act at 30, National Indian Gaming Association (April 2018).

BB.  Interior Reorganization and Land Into Trust, National Congress of American Indians Mid-Year 2018.

CC.  Interior's Proposed Changes on Land Into Trust, Midwest Alliance of Sovereign Tribes 2018 Summer meeting.

DD.  Fee-to-Trust Panel, National Indian Gaming Association Legislative Summit (July 2018).

EE.  Public and Tribal Lands in the Trump Era, Tribal Land Planning Conference (Aug. 2018).

FF.  Land into Trust, National Congress of American Indians Annual Meeting (Oct. 2018).

**Materials Relied Upon in Preparing this Report**

<u>CASES</u>

*California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987)

*Cherokee Nation v. Georgia*, 30 U.S. 1 (1831)

*Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134 (D.C. Cir. 2006)

*County of Oneida v. Oneida Indian Nation*, 470 U.S. 226 (1985)

*Johnson v. M'Intosh*, 21 U.S. 543 (1823)

*Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (2014)

*Oneida Indian Nation v. County of Oneida*, 414 U.S. 661 (1974)

*Seminole Tribe of Fla. v. Butterworth*, 658 F.2d 310 (5th Cir. 1981), *cert. denied*, 455 U.S. 1020 (1982)

*United States v. Lara*, 541 U.S. 193 (2004)

*United States v. Winans*, 198 U.S. 371 (1905)

*Worcester v. Georgia*, 31 U.S. 515 (1832)

<u>STATUTES</u>

25 U.S.C. § 81

25 U.S.C. § 177

25 U.S.C. §§ 261, 262

25 U.S.C. § 415

25 U.S.C. § 450

25 U.S.C. § 1452(e)

25 U.S.C. § 1462

25 U.S.C. § 2701

25 U.S.C. § 2702

25 U.S.C. § 2710

25 U.S.C. § 2711

25 U.S.C. § 2712

25 U.S.C. § 3502

25 U.S.C. § 4301

Act of July 22, 1790, 1 Stat. 137

Agricultural Improvement Act of 2018, Pub. L. No. 115-334, §297B (2018)

Indian Financing Act of 1974

Indian Self-Determination and Education Assistance Act of 1975 (ISDEAA)

Indian Tribal Economic Development and Contract Encouragement Act of 2000." P.L. 106-179

*Indian Trust Asset Reform Act*, Pub. L. No. 114-178, § 102, 130 Stat. 432, 433 (2016)

Native American Business Development, Trade Promotion, and Tourism Act.  P.L. 106-464

Public Law 280 (Pub. L. 83-280)

TREATIES

Treaty with the Creeks, 1790 (7 Stat. 35)

Treaty with the Cherokees, 1791 (7 Stat. 39)

Treaty with the Six Nations, 1794 (7 Stat. 44)

Treaty with the Choctaw, 1830 (7 Stat. 333)

Treaty with the Shawnee, 1831 (7 Stat. 355)

Treaty with the Creeks, 1832 (7 Stat. 366)

Treaty with the Creeks, Etc., 1856 (11 Stats. 699)

Treaty with the Seneca, Etc., 1831(7 Stat. 351)

FEDERAL REGISTER

77 Fed. Reg. 58710 (Sept. 21, 2012)

77 Fed. Reg. 72440 (Dec. 5, 2012) (to be codified at 25 C.F.R. pt. 162)

80 Fed. Reg. 16128 (Mar. 26, 2015)

Rights-of-Way on Indian Land, 80 Fed. Reg. 72492 (Nov. 19, 2015) (to be codified at 25 C.F.R. pt. 169)

EXECUTIVE ORDERS

Executive Order 13175: Consultation and Coordination with Tribal Governments (Nov. 6, 2000)

LEGISLATIVE MATERIALS

158 Cong. Rec. H2684 (daily ed. May 15, 2012) (statement of Rep. Cole)

Enhancing America's Energy Security: Oversight Hearing Before the House Comm. on Resources, 108th Cong. (Mar. 19, 2003)

Financing the Economic Development of Indians and Indian Organizations: Hearing on S. 1341 and Related Bills Before the Subcomm. on Indian Affairs of the Senate Comm. On Interior and Insular Affairs, 93rd Cong. (May 31, 1973)

*Examining Federal Programs that Serve Tribes and Their Members*: Hearing Before the Subcomm. on the Interior, Energy and Environment of the House Comm. on Oversight and Government Reform, 115th Cong. (Feb 15, 2017)

H. Rep. 106-501

H. Rep. No. 112-427

Hearing on H.R. 4566, Indian Gambling Control Act, at 44-45, 98th Congress (June 19, 1984)

IGRA Hearing 100-70 Part 1.  See also Statement by Manuel Lujan, Jr.

Indian Gambling Control Act, Hearings on H.R. 1920 and H.R. 2404 (Hearings held June 25, 1985, Sept. 13, 1985, Nov. 14, 1985)

S. 2132, Indian Tribal Energy Development and Self-Determination Act Amendments of 2014: Hearing Before the Senate Committee on Indian Affairs, 113th Congress, S. Hrg. 113-338 (Apr. 30, 2014)

S. Hrg 99-207

S. Hrg 99-887

S. Hrg 100-70

S. Hrg 100-341

S. Rep. 100-466

S. Rep. 106-150

OTHER AUTHORITIES

*A Renewed Era of Federal Tribal Relations: 2016 White House Tribal Nations Conference Progress Report*, Executive Office of the President (Jan. 2017)

BLM and Southern Ute Indian Tribe Press Release (Nov. 4, 2016)

Butler, Kristin. How Colorado's Southern Utes Took Control of Their Economic Destiny. Indian Country Today (Feb. 16, 2017), https://newsmaven.io/indiancountrytoday/archive/how-colorado-s-southern-utes-took-control-of-their-economic-destiny-x8nBArGEWUO1xe2Kbnx6OA/

Cohen, Felix S., 1807-1953.  Cohen's Handbook of Federal Indian Law (1942 and 2005)

Haas, Theodore. Ten Years of Tribal Government Under I.R.A. (1947)

Memorandum from Cindy Shaw to NIGC Acting General Counsel (Mar. 14, 2005)

Moran, Susan. Indian Tribe Becomes Force in West's Energy Boom. The New York Times (July 27, 2007), https://www.nytimes.com/2007/07/24/business/24tribe.html

NIGC Bulletin No. 1994-5, Approved Management Contracts v. Consulting Agreements (Unapproved Management Contracts are Void) (Oct. 14, 1994)

Pokagon Band of Potawatomi Indians Press Release (July 1, 2011)

President Richard Nixon, Special Message to the Congress on Indian Affairs (July 8, 1970)

President Ronald W. Reagan on American Indian Policy (Jan. 24, 1983)

Prucha, Francis Paul.  Documents of United States Indian Policy, 3rd ed.

*Public Papers of the Presidents of the United States: Richard Nixon, 1970*

Salish and Kootenai Tribes, Confederated Tribes of the Flathead Reservation – 2011 Hydropower Project, https://www.energy.gov/indianenergy/salish-and-kootenai-tribes-confederated-tribes-flathead-reservation-2011-project-0

U.S. Department of Energy, Tribal Energy Program, Award # DE-EE0005040 Final Report (Dec. 2014)

U.S. Gov't Accountability Office, GAO-15-355, Indian Gaming: Regulation and Oversight by the Federal Government, States, and Tribes 38 n.67 (2015)

COURT/CASE DOCUMENTS

August 29, 2013 Declaration of James Williams, Jr. in Support of Motion for Preliminary Injunction

June 22, 2017 Class Action Complaint

September 28, 2017 Affidavit of Michelle Hazen

October 16, 2017 Deposition of Michelle Hazen

November 13, 2017 Deposition of Gertrude McGeshick

November 13, 2017 Deposition of James Williams, Jr.

December 21, 2017 Declaration of Matthew Martorello in Support of Defendants Big Picture Loans, LLC and Ascension Technologies, LLC's Reply in Support of their Motion to Dismiss for Lack of Subject Matter Jurisdiction

December 21, 2017 Affidavit of Brian McFadden

July 27, 2018 Memorandum Opinion

August 30, 2018 Deposition of Matthew Martorello

November 13, 2018 Deposition of James Dowd

December 17, 2018 Deposition of Rick Gerber

Declaration of Matthew Martorello in Support of Defendants Big Picture Loans, LLC

Ascension Technologies, LLC's Reply in Support of their Motion to Dismiss for Lack of Subject Matter Jurisdiction

CORPORATE DOCUMENTS & AGREEMENTS

Agency Agreement (Feb. 2016)

Agreement and Plan of Merger among LVD Tribal Acquisition Company, LLC and Bellicose Capital, LLC and Eventide Credit Acquisitions, LLC

Amended & Restate Servicing Agreement between Red Rock Tribal Lending, LLC and SourcePoint VI, LLC – July 31, 2012, with retroactive effect to October 25, 2011

Basic Structure Charts (LVD-DEF00006283, LVD-DEF00006549, and LVD-DEF00014701)

Corporate Structure – Historical – as of 2017-6-30

Interim Servicing Agreement between Big Picture Loans, LLC and Sourcepoint VI, LLC

Intratribal Servicing Agreement between Big Picture Loans, LLC and Ascension Technologies, LLC (January 2016)

Loan and Security Agreement (Oct. 7, 2015)

Parental Guarantee and Sovereign Immunity Waiver (Oct. 7, 2015)

Secured Promissory Note (Jan. 26, 2016)