**Expert Report of Lance G. Morgan**

Court:  United States District Court – Eastern District of Virginia
Case Number: 3:17 cv 461
Case Name: Lula Williams et al., Plaintiffs, vs Big Picture Loans, et al., Defendants
Date: January 10, 2019

I.    INTRODUCTION

A.  Qualifications

1.  My name is Lance Gregory Morgan, I am the owner of Lance Morgan Consulting, a tribal legal and business consulting firm with offices in Winnebago, NE.

2.  I am also the CEO and founder of Ho-Chunk, Inc., a tribal economic development corporation owned by the Winnebago Tribe of Nebraska, and an owner and the managing partner of Fredericks, Peebles, & Morgan, a national tribal law firm, and an adjunct professor of tribal economic law at Arizona State Law School.

3.  The statements herein are my own and do not reflect the positions of the institutions with which I am affiliated.

4.  I hold a Bachelor of Science Degree in Economics from the University of Nebraska, Lincoln, and a Juris Doctorate from Harvard Law School.  I specialize in economic and legal development of tribal government and tribal corporations, with an emphasis on tribal corporate structures, economic development strategy, and tribal socio-economic development strategy.

5.  In the course of my professional experience, I have examined, consulted and provided legal advice in areas relating to tribal corporate development, tribal corporate structures, tribal corporate legal matters and tribal socio-economic development projects and strategies.

6.  In the course of my professional experience I have given dozens of speeches at local, regional and national events relating to tribal law and tribal corporate development. I have delivered in person testimony to the U.S Senate Committee on Indian Affairs on three occasions relating to tribal economics, tribal government contracting and tribal internet issues and opportunities. I have also provided policy guidance to the White House Domestic Policy Council under President Barack Obama on government contracting, tax laws and regulatory impediments, and economic development opportunities for tribal governments.

7.  I also served on the Consumer Advisory Council to the Federal Reserve Board where I advised the Federal Reserve Board on several financial issues related to Indian Country and tribal consumers.

8. I am an enrolled member of the Winnebago Tribe of Nebraska.

9. My qualifications are attached hereto as Appendix C.

B. Purpose of Analysis

1. How do the Service Agreements[1] and Sales Agreement[2] compare to other tribal corporate structures, strategies, and operational and financial partnering relationships?

2. How does the breakdown of responsibilities between the tribal lending entities and their business partners involved in this case compare to the breakdown of responsibilities between tribal businesses and their business partners in other emerging tribal industries?

3. Was it rational for the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Lac Vieux Desert Band" or "Band" or "Tribe") to enter into the Service Agreements?

4. Was it rational for the Lac Vieux Desert Band to enter into the Sales Agreement?

C. Methodology and Basis for Opinion

1. In this report, I have reviewed filings, depositions, affidavits and various transactional documents related to this case. I have also referenced various federal statutes, regulations, court judgments, books, internet research, law review articles and U.S. Senate testimony regarding the subject. I am also relying on 25 years of professional experience as a tribal lawyer, tribal business executive and a tribal law professor. Documents relied upon are cited herein and/or in the list attached hereto as Appendix A and Appendix B.

II.   Summary of Expert Opinion

1. Based on my professional experience and the reasons set forth in this opinion, the Servicing Agreements and the Sales Agreement are similar to other tribal corporate structures, strategies, and operational and financial partnering relationships.

---

[1] See Appendix A; Amended and Restated Servicing Agreement between Red Rock Tribal Lending, LLC and Sourcepoint VI, LLC; the Servicing Agreement between Big Picture Loans, LLC VI, LLC; and the Intratribal Servicing Agreement Between Big Picture Loans, LLC and Ascension Technologies, LLC. (collectively the "Service Agreements").

[2] See Appendix A; Agreement and Plan of Merger between LVD Tribal Acquisition Company, LLC and Bellicose Capital, LLC and Eventide Credit Acquisitions dated October 7, 2015, ("Sales Agreement").

2. Based on my professional experience and the reasons set forth in this opinion, the breakdown of responsibilities between the tribal lending entities and their business partners involved in this case share many similarities to the breakdown of responsibilities between tribal businesses and their business partners in other emerging tribal industries.

3. Based on my professional experience and the reasons set forth in this opinion, the Service Agreements represent a rational approach from the Lac Vieux Desert Band's perspective to business development.

4. Based on my professional experience and the reasons set forth in this opinion the Sales Agreements represent a rational approach from the Lac Vieux Desert Band's perspective to business development and long-term growth.

III.   Background and Support for Opinion

A. The United States adopted destructive policies aimed at forced assimilation of Native Americans and dispossessing them of their homelands. As a result of these misguided policies, tribes had sunk deep into a cycle of poverty. Because of generational poverty and the remote areas in which they are located, tribes lacked a variety of general business and industry specific skills sets to implement many tribal economic development initiatives.  To address these skills gaps, the federal government adopted and implemented several statutory, regulatory and policy initiatives that authorized tribal involvement with non-tribal industry specific expertise and capital.  These federal policies and programs anticipated that tribes would eventually evolve and progress beyond the need for outside expertise and capital, and the various programs and policies were structured and incentivized accordingly.

B. General Economic Conditions

1. Tribal poverty has its roots in federal policy, federal Indian law and in the federal trust land system.  In combination, these issues have ensured that most tribes would struggle with poverty and all of the social problems associated with poverty. Tribes function in a highly restrictive environment where federal approvals are required to conduct the simplest business transactions on tribal land and the inability to collateralize or tax tribal trust land compounds the obstacles tribes face when working to achieve economic growth.  Tribes continue to seek legal methods to avoid or work with these restrictions to attain economic success.[3]

2. In my professional experience, these restrictions often combine to make it very difficult to attract investment capital on rural economically depressed reservations

---

[3] *Oversight Hearing on Economic Development in Indian Country: Hearing Before the Senate Indian Affairs Comm.* 109th Cong. 2nd Sess.  115-116 (2006) (statement of Lance Morgan, CEO, Ho-Chunk Incorporated).

and will often require the tribe to make considerable concessions in order to stimulate their local economies.

C.  Self Determination Era

1.  After alternating between federal policies related to tribes that ranged from termination of tribal status to promoting tribal self-governance, federal policy shifted in the late 1960s and early 1970s to policies that support tribal self-determination. This period is generally referred to as the Self-Determination Era.[4] The Self-Determination Era includes policies that:

a)  Recognize the distinct status of tribal governments;

b)  Support tribal self-determination;

c)  Support tribal self-government;

d)  Support tribal economic development; and

e)  Support tribal self-sufficiency.

D.  Tribes are Encouraged to Enter into Business by the Federal Government

1.  The tribal self-determination era began a process of fighting tribal poverty with tribally led economic development.  As a result, tribes were encouraged by the federal government to create their own jobs and income by creating tribal businesses in order to create more flexible discretionary income:

a.  A large portion of a tribal government's budget often consists of federal or state funding which are typically restricted to very specific uses.  This is especially true with tribes who have few financial resources.

b.  A tribe can use funds generated by its business activities in a completely discretionary manner.  Tribes generally create economic entities in order to generate discretionary income.  These discretionary funds are important to a tribe because they enable the tribe to impact their community in any manner they deem appropriate.

---

[4] American Indian Lawyer Training Program, **Indian Tribes as Sovereign Governments: A Sourcebook on Federal-Tribal History, Law, and Policy**. (2nd ed. 1991); Stephen Cornell, **The Return of the Native: American Indian Political Resurgence**. (1988); David E. Wilkins, **American Indian Politics and the American Political System**. (3rd ed. 2002).

2. Generational poverty and a lack of a consistent tribal tax base left the tribes with little investment capital and limited business experience. These factors created a pattern of failure for the initial wave of tribal business development.[5]

3. The legal, regulatory, and jurisdictional problems related to tribal economic development combined to make attracting investment capital very difficult. Investment capital simply bypassed most reservations that lacked natural resources or prime locations for gaming or real estate development.

4. Tribes adapted their approach to business development by creating more sophisticated corporate entities, innovative regulatory structures and using federal programs to partner with non-tribal entities to gain access to capital and industry specific knowledge.

5. The tribal strategy of partnering with non-tribal entities has become the norm in a wide range of business and development initiatives. These partnerships often result in some restrictions on tribal activity or significant portions of the management of the operations being outsourced to the partner.

6. As tribes develop their level of knowledge and capital, they often eliminate the need for partnering with non-tribal entities so that they can maximize income to fund the tribe's overall social development goals. This pattern has been repeated in gaming, government contracting and federal tax credit programs. Tribal lending is following the exact same path and tribes are in the midst of evolving into the stage where the need for non-tribal partners is being limited or eliminated.

E. IGRA, Indian Gaming Management Contracts, and The Evolution of the Tribal Gaming Industry

1. Congress passed the Indian Gaming Regulatory Act of 1988 ("IGRA")[6] to promote tribal economic development but anticipated that tribes would lack initial management expertise and in some cases access to capital to establish gaming operations. IGRA established a set of rules authorizing tribes to enter into gaming management contracts with non-tribal entities. IGRA anticipated that all management and accounting functions would be performed by the management company, established procedures for minimum guaranteed payments to the tribe, and established terms of 5 to 7 years for the initial management contracts. IGRA also anticipated that large portions of the net revenues of the gaming operation could be allocated to the management company as a fee for their management and compensation for providing the initial capital and financing.

2. Congress explicitly intended to advance several goals with IGRA, *inter alia*:

---

[5] See *Oversight Hearing on Economic Development in Indian Country: Hearing Before the Senate Indian Affairs Comm.* 109th Cong. 115-116 (2006) (statement of Lance Morgan, CEO Ho-Chunk, Inc.
[6] Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et. seq.* (1988).

    a)  "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency and strong tribal governments"; and

    b)  "to protect such gaming as a means of generating tribal revenue."[7]

3.  Federally Approved Indian Gaming Management Contracts;

    a)  "The Chairman (of the National Indian Gaming Commission) may approve any management contract entered into pursuant to this section only if he determines that it provides at least: [8]

        1.  for adequate accounting procedures that are maintained, and verifiable financial reports that are prepared, by or for the tribal governing body on a monthly basis;[9]

        2.  for access to the daily operations of the gaming to appropriate tribal officials who shall have a right to verify the daily gross revenues and income made from any such tribal gaming activity;[10]

        3.  for a minimum guaranteed payment to the Indian tribe that has a preference over the retirement of development and construction costs;[11]

        4.  for a contract term not to exceed five years, except that upon the request of an Indian tribe, the Chairman may authorize a contract term that exceeds five years but does not exceed seven years if the Chairman is satisfied that the capital investment required, and the income projections for the particular gaming activity require the additional time."[12]

    b)  IGRA expressly authorizes tribes to enter into agreements where large portions of the net revenues of the gaming operation are shared with the management company:

        1.  The Chairman may approve a management contract providing for a fee based upon a percentage of net revenues of a tribal gaming activity if the Chairman determines that such percentage fee is reasonable in light of surrounding circumstances.  Except as

---

[7] 25 U.S.C. § 2702 (1988).
[8] 25 U.S.C. § 2711(b) (1988).
[9] 25 U.S.C. § 2711(b)(1) (1988).
[10] 25 U.S.C. § 2711(b)(2) (1988).
[11] 25 U.S.C. § 2711(b)(3) (1988).
[12] 25 U.S.C. § 2711(b)(5) (1988).

otherwise provided in this subsection such fee shall not exceed 30 percent of the net revenues.[13]

2. Upon the request of an Indian Tribe, the Chairman may approve a management contract providing for a fee based upon a percentage of the net revenues of a tribal gaming activity that exceeds 30 percent but not 40 percent of the net revenues if the Chairman is satisfied that the investment required and income projections, for such tribal gaming activity require the additional fee requested by the Indian Tribe."[14]

c) Tribal governments rapidly developed their gaming knowledge base and after the initial management contracts expired most tribes did not renew the management agreements and took over direct control of managing their gaming operations, which increased the tribe's income.[15]

1. Example: As a tribal lawyer and business professional I was involved in the start-up of several tribal gaming operations. A typical tribe might have little to no gaming experience, and therefore, would enter into a federally approved gaming management contract with a non-tribal management company for 5 to 7 years. During the management contract period, the management company would receive the rights to a significant portion of the net profits of the tribal casino. The management company would generally plan, build, and arrange financing for the casino. The tribe's role would include regulating the casino and approval responsibilities over certain operational aspects of the gaming facility. Subject to the tribe's regulatory oversight and approval authority, the management company was responsible for almost all aspects of the management of the casino including: hiring, marketing, accounting, and arranging any additional financing needed to operate the facility or purchase equipment.

2. During that management contract period, the typical tribe learned as much as it could about gaming in general, developed its own operational knowledge, accumulated capital, and created its own business relationships in the gaming industry. This tribal learning curve was steep, but most tribes learned enough that they did not renew the management contract with the non-tribal entity beyond the initial period.[16]

---

[13] 25 U.S.C. § 2711(c)(1) (1988).
[14] 25 U.S.C. § 2711(c)(2) (1988).
[15] See *Approved Management Contracts*, nigc.gov, http://www.nigc.gov/finance/approved-management-contracts (last visited January 6, 2019).
[16] *Id.*

3. The tribes made a conscious and rational choice to hire a management company and pay the fees associated with it because they did not have the required knowledge and capital to enter the gaming business. The tribes were heavily incentivized to learn how to manage their own casinos because tribal gaming profits were increased substantially by not renewing the management company contract. These increased profits allowed the tribe to have an even larger positive social impact in their communities.

4. Once a tribe had gained enough gaming knowledge, they were able to function without the non-tribal company and operate, control, and regulate every aspect of their own casinos. This evolutionary pattern of rapidly building a tribal gaming knowledge base while working with a non-tribal company and then eventually taking complete control of their own tribal gaming operations was done repeatedly in Indian Country.

5. Rick Gerber, the CEO of Chippewa Valley Bank and a tribal member of the Lac Courte Oreilles Tribe, offers his perspective as a banker with substantial experience working with tribes. In his deposition he was asked about tribes using third party servicers in other industries and his understanding related to why they would utilize third party servicers. He responded: ". . . I am not aware that any presently do. I know when they – the majority of them first started their casinos, they used third—third party—third parties to help them get their casinos established. I think all of them at that point in time did, yes. . . Well originally, they did not have the expertise, so they would—they would engage—sign contracts, whether it would be three, five, ten years for that management . . . those management services, yes."[17]

6. Rick Gerber was asked in his deposition whether any of the tribal lending entities he was familiar with had entered into similar relationships and why would they have third party management firms he responded: "I think all of the Tribal lending entities that—that we have, have third-party management firms, yes. . . I would be guessing a little bit because I have never drilled down to it like I did at the casinos, but I know that initially, in discussions with tribes, they did not have the expertise . . ."[18]

F. Government Contracting Structures and the Evolution of the Tribal Government Contracting Industry

---

[17] Oral and Videotaped Deposition of Rick Gerber. **Lula Williams, et al. v. Big Picture Loans, et al.** Civil Case No. 3:17cv461; p. 20-21, United States District Court for the Eastern District of Virginia. Richmond Division. December 17, 2018.

[18] *Id* at p.21.

1. Federal contracting opportunities for tribal entities have had major positive impacts on tribal communities by stimulating the economies of some of the poorest communities in the country.  The federal contracting programs enable tribes to create jobs and corporate income, which are used to address the array of socio-economic issues of tribal communities.[19]

2. In the1980's, the U.S. Congress amended the Small Business Act of 1958[20] authorizing the Small Business Administration (SBA) to certify certain tribal corporations as SBA 8a businesses ("Tribal 8a"). The Tribal 8a business development program authorizes several contracting preferences with the federal government and its agencies for certified Tribal 8a entities.[21]

3. When the federal government authorized tribally owned corporations to enter into the government contracting business it also anticipated that the tribes would need a variety of expertise to succeed and authorized tribal corporations to participate in a variety of contracting programs designed to give the tribal entities extraordinary help in fulfilling the contracts.  However, most of the federal programs had limited time frames with the goal of allowing tribes to gain expertise and progress down the path of eventually not needing the specialized SBA partnering programs.

4. Limited Time Frame of the Tribal 8a Program

   a. Once a tribal company achieves Tribal 8a status, it can remain in the program for up to 9 years and then it will graduate and be expected to compete in a more competitive market.[22]

   b. Tribes are unique in the SBA 8a program.  They are the only entities authorized to form more than one SBA 8a corporation.  The SBA 8a program was designed to help individuals in a disadvantaged group.  However, tribes generally represent such large numbers of disadvantaged individuals that it was rational to change federal policy allowing tribes to create multiple Tribal 8a entities, each with a 9-year term.[23]

5. SBA Mentor/Protégé Program

   a. The SBA Mentor/Protégé Program is a business development program that allows a certified Tribal 8a small business (Protégé) with limited knowledge

---

[19] Johnathon Taylor, *A Report on the Economic, Cultural and Social Impacts of the Native 8(a) Program*, Native American Contractors Association Report (2012).

[20] Small Business Act 15 U.S.C. 637(a).

[21] *Promised Fulfilled: The Role of the SBA 8(a) Program in Enhancing Economic Development in Indian Country*. 112th Cong. 1st Sess. p. 19 Attachment A (2011) (Statement of Lance Morgan, Chairman of the Native American Contractors Association).

[22] See 13 C.F.R. 124.109(e)(3)(iii).

[23] 13 C.F.R. 124.109 (e)(3)(iii).

and capacity to work with a larger business (Mentor) with more capacity and knowledge to help the small business with the following[24]:

    A.  Guidance on internal business management systems, accounting, marketing, manufacturing, and strategic planning;

    B.  Financial assistance in the form of equity investments, loans and bonding;

    C.  Assistance navigating federal contract bidding, acquisition, and performance process;

    D.  Education about international trade, strategic planning and finding markets;

    E.  Business development, including strategy and identifying contracting and partnership opportunities; and

    F.  General and administrative assistance, like human resource sharing and security clearance support.

    b.  The first term of the mentor-protégé agreement may last up to three years and may be extended for another three years for a total term of 6 years.[25]

6.  SBA Joint Venture Agreements

    a.  The SBA allows a certified Tribal 8a business that has an approved mentor-protégé agreement to form joint ventures with other small business concerns for the specific purpose of performing one or more specific SBA 8a contracts[26]

    b.  A joint venture agreement is permissible only when the Tribal 8(a) concern lacks the necessary capacity to perform the contract on its own, and the agreement is fair and equitable and will be of substantial benefit to the Tribal 8a concern.[27]

7.  SBA Teaming Agreements

---

[24] 13 C.F.R 124.520.
[25] 13 C.F.R. 125.520 (e)(5).
[26] 13 C.F.R 124.520 (d).
[27] 13 C.F.R. 125.513.

    a. Allow Tribal 8a corporate entities to affiliate with other small businesses or even large corporations for the purpose of jointly pursuing a particular federal contract.[28]

8. SBA Policy Change Acknowledging Limited Tribal Capacity

    a. Prior to a regulatory change in 2004, tribes were essentially blocked from forming holding companies focused on government contracting because the SBA included all of the revenue from the other tribal subsidiaries of the tribal holding company when determining whether or not the company applying for the SBA 8a status was considered small. [29]

    b. A criticism of the existing policy was advanced in an administrative hearing explaining the tribes had limited existing knowledge, capital and business experience and that tribal holding companies were key to advancing the federal government's goal to help tribes emerge from poverty because it allowed tribes to pool their limited pools of capital and knowledge.[30]

    c. The ruling limiting tribal holding companies was specifically overturned to allow the revenue of other tribal subsidiaries to be excluded from the size eligibility determination for a tribal entity applying for 8a status.[31]

    d. The policy change has resulted in a new business model for tribes. It allowed tribal holding companies to continually form new entities in the government contracting industry that use the partnership options of SBA 8a programs. This change has enabled tribes to continue the cycle of using the relationships developed from the various SBA partnering programs to gain knowledge, bonding, capital and income to positively impact their socio-economic status.[32]

9. Example: A Typical Evolutionary Approach to Tribal Partnering in Government Contracting

    a. As the CEO of a tribal company engaged in government contracting and as the former Chairman of the Native American Contractors Association, I have significant experience in how tribes approach government contracting.

    b. Partnering is one of the primary keys to the initial success for tribal companies involved in government contracting. Tribal companies will often lack the necessary past performance to be awarded a particular contract. Therefore, the tribe must utilize the government's Mentor/Protégé Program, Joint

---

[28] 13 C.F.R 125.2.
[29] See 13 C.F.R. 109 (c)(2)(iii).
[30] Size Appeal of HCI Construction, Inc. SBA No. Siz-4460 (2001).
[31] 13 C.F.R 124.109 (c)(2)(iii).
[32] See 13 C.F.R. 124.109(e)(3)(iii).

Venture Agreements, or Teaming Agreements (collectively "Partnering Programs") to complete for certain contracts.[33]

c. The Partnering Programs give a benefit to each party. The tribe gains the past performance of the non-tribal partner and the non-tribal partner can take on the mantel of tribal status for purposes of a particular contract.

d. During the contract period, the non-tribal partner will often have direct operational responsibilities over several aspects of the contracts.

e. The Partnering Programs allow the non-tribal partner to provide assistance with general management decisions, accounting, human resources, business development, and strategic planning.

f. The Partnering Programs allow for the non-tribal entities to provide equity investments, bonding assistance, and loans to the tribal company.

g. These Partnering Programs are all limited in terms of time or revenue because the goal is to have the tribal entity gain enough experience to not need the Partnering Programs to be successful in the future.

h. The tribes also have strong financial incentives to not utilize the Partnering Programs once they have gained expertise. The Partnering Programs require that they share the profits with the non-tribal entity. Utilizing one of the Partnering Programs is a rational choice for a tribal company entering into a new business because it often lacks the necessary experience and past performance to be awarded the contract. However, after completion of the contract or the Partnering Program, the tribal entity will officially have the necessary past performance to pursue contracts without their current partner. Any new contracts will likely be more profitable to the tribal entity because they will not have to share the profits with any partners. This process can take 1 to 9 years, depending on the length of the contract, Partnering Program, or the SBA 8a certification period.

i. Tribal companies involved in government contracting have repeatedly used the Partnering Programs to gain the necessary past performance to pursue contracts without any partners in the future.

j. The profits from government contracting and the increased profits from no longer needing to partner with non-tribal entities allows the tribal company to help positively impact the tribe's socio-economic goals for its membership.

---

[33] See Ahne Minge & Andrew Twite, *The Impact of Surety Bonding on American Indian and Tribally Owned Contractors*, p. 5-6, Federal Reserve Bank of Minneapolis Community Development Report no 2014-1 (2014).

G.  Similarity to Tribal Gaming, Tribal Government Contracting and Tribal Lending

1.  The Sales and Service Agreements together position the Band to utilize a common business development technique in other tribal industries.   As illustrated by the earlier examples in tribal gaming and tribal government contracting, the tribes used their partnership relationships to gain experience, knowledge and capital.  After gaining the necessary knowledge, the tribes no longer needed a partner and were able to increase their profitability by eliminating the need for a partner.  The increased profits are key to fulfilling the Band's socio-economic goals for its membership.

2.  This pattern of tribal development has proven to be very successful with various tribes and the Band's lending development efforts seem to be following the same pattern used by other tribes in other industries to create, partner, learn and then totally control the business.  The following depositions and affidavits express the tribe's intent:

   a.  In an Affidavit by long term tribal council member and tribal lending company manager, Michelle Hazen, she stated that "In order to learn the lending industry, Red Rock contracted with Bellicose VI, LLC for vendor management services, compliance, management assistance, marketing material development, and development of risk modeling and data analytics."[34]

   b.  Michelle Hazen further explained in her affidavit why the tribe wanted to acquire its non-tribal partner: "After four years of operating Red Rock, LVD [the Band] had gained considerable experience and knowledge of the online lending industry.  LVD looked to expand its online lending business to earn more money for LVD, to employ more members and area residents, and to acquire our vendors' business so the lending would be more profitable."[35]

   c.  James Dowd, an employee and part owner of Bellicose Capital, responded in his deposition to the question of why the Band's company would open an office in Atlanta: "The Tribe had expressed a priority that they wanted to reduce their reliance on third-party vendors . . . to try and build a more holistic . . . business for themselves so that they could execute on some of the goals that they have for the business. . ."[36]

---

[34] Affidavit of Michelle Hazen. Lula Williams, et al. v. Big Picture Loans, et al. Civil Case No. 3:17cv461; no. 10, United States District Court for the Eastern District of Virginia. Richmond Division. September 28th, 2017.

[35] *Id.* at no. 13.

[36] Oral and Videotaped Deposition of James Dowd. Lula Williams, et al. v. Big Picture Loans, et al. Civil Case No. 3:17cv461; p. 102-3, United States District Court for the Eastern District of Virginia. Richmond Division.  November 13, 2018.

    d.   James Williams, Jr., the Band's elected tribal chairman, when asked in a deposition how the Band's purchase of the SourcePoint and Belllicose fit into the Tribe's long-term goal for economic development responded, ". . . it's a depressed area and really looking at what this business is capable of doing for the Tribe, for our future generations to come and looking at, you know, pro formas and how well our business is doing, . . . it's the focus of our future. . . It's everything that we have been looking for to take care of our Tribe for years to come and it's something that's very successful. . . those are the things that we want to provide for our community and our business, the way its structured and the way it is looking now is going to do that for us."[37]

3.   In my professional opinion, the Band's lending business was following the same evolutionary path as most tribal gaming and tribal government contracting businesses. The Sales Agreement represents the Band's effort to manage all aspects of its business operations without the need for a partner. This lawsuit was filed approximately 1.5 years after the Band entered into the 7-year Sales Agreement. The lawsuit attempts to create a static snapshot in time of the business and was filed while Band was in midst of evolving into an entity that managed all aspects of its business operations.

    a.   The Service Agreements and Sales Agreement need to be read in conjunction with each other with an understanding that they represent an obvious business evolutionary strategy to eventually maximize the Band's economic and social self-interest.

## H. Tax Credit Structures

1.   Tribes have substantial experience structuring companies and development projects using tax credit projects. Tribes are not able to capitalize on most tax credits directly because they are exempt from federal income tax.[38] Therefore, the non-tribal investor must retain a primary ownership interest in the development entity to incentivize capital investment in Indian Country. The number of years the non-tribal investor and/or developer must retain the primary ownership interest depends on the type of tax credit, however, in most instances the tribe or tribally affiliated entity will eventually gain full ownership and control of the project or development entity.[39]

2.   Renewable Energy Tax Credits and Accelerated Depreciation

---

[37] Oral and Videotaped Deposition of James Williams, Jr., **Lula Williams, et al. v. Big Picture Loans, et al.** Civil Case No. 3:17cv461; p. 200-201, United States District Court for the Eastern District of Virginia. Richmond Division.  November 13, 2017.

[38] 26 U.S.C. 7871.

[39] See Douglas McCourt, *Renewable Energy Development in Indian Country: A Handbook for Tribes*, Project for the National Renewable Energy Laboratory, pp. 27-28, 33, 73, 75-81 (June 2010 ed.)

a. Tribes often partner with a non-tribal renewable energy developer who can use the federal tax credits and when available can also use the accelerated depreciation directly or in partnership with its investors. The non-tribal developer also brings expertise and capital to the project.[40]

b. When developing renewable energy projects, the tribe can negotiate upfront ownership rights, or may choose to delay eventual ownership rights until after the tax credits and accelerated depreciation are fully utilized in order to maximize their financial impact for the project investors.[41]

c. Some renewable energy federal tax credits are for 10 years and this structure requires that the tribal project be owned by the non-tribal entity during the active period of the tax credits.[42]

d. During the period when the tax credits are active, a large percentage of the economic value of the projects inures to the non-tribal developer and/or its tax credit investor.[43] Often the primary way a tribe will receive income is from a fixed land lease payment where the renewable project is located.[44]

3. Low Income Housing Tax Credit Deal Structures

a. The federal government issues low income housing tax credits ("LIHTC"). Tribes can compete for the LIHTC tax credit allocations at the state level. However, because tribes are federally tax-exempt entities only outside investors are incentivized to buy these tax credits. The investors may own up to 99 percent of a tribal project for the 10-year period of the tax credits. After the 10-year period, the investors typically transfer their equity interest back to the tribal entity.[45]

4. New Market Tax Credit Deal Structures

a. New market tax credits ("NMTC") help attract investment in economically distressed areas. Tribal reservations automatically qualify as distressed areas. In order to maximize the financial impact, the NMTC investors will typically own up to 99 percent of the tribal project for the first 7 years. After the 7-year compliance period, the tribe will typically take over ownership of the entire project.[46]

---

[40] *Id.*
[41] *Id.* at 32-42, 80-82.
[42] *Id.* at 75-81.
[43] *Id.* at 80-82.
[44] *Id.* at 26-27, 58-60.
[45] *Low Income Housing Tax Credits 101,* Travois, Inc. (2013). Retrieved October 28, 2018 http://www.travois.com/wp-content/uploads/2013/09/LIHTC101.pdf.
[46] See 26 U.S.C. 45d.

I.  Internet Changes the Economic and Legal Environment

1.  Tribes and states are competing sovereigns with overlapping jurisdictions and as a result have a long history of conflict relating to criminal and civil regulatory authority, jurisdiction, and taxation matters.[47]

2.  The emergence of the Internet has allowed tribes to avoid efforts by state governments to assert indirect control over tribal economies.[48]

3.  States do not generally have the legal authority to directly regulate tribal governments or tribal corporations operating within a tribe's jurisdiction.  States have instead developed a system of asserting indirect control over business transactions on tribal land by focusing their statutes, regulations, enforcement efforts, and tax collection on entities who enter business partnerships with tribes.  States often use strong-arm tactics and threaten these entities who are mostly non-Indians with various enforcement actions.  These tactics can legally and economically isolate tribes from the normal stream of commerce and has the effect of indirectly allowing the states to impose their will on tribes.[49]

4.  Tribes can and do form their own Internet companies and regulatory systems under tribal law.  Since both the tribes and the tribally owned companies also have the protection of sovereign immunity and cannot be sued directly by the states or others, E-commerce has afforded tribes the opportunity to be aggressive and expand the scope of their economic development efforts.[50]  This is not an attempt to use tribal sovereign immunity to violate state law.  On the contrary, when used in this context, tribal sovereign immunity is used to protect and empower tribal economic and regulatory expansion.

5.  The evolution of the Internet has also largely upset the states' ability to assert indirect control over tribes because it allows the tribes to avoid the regulatory and taxation hurdles the states have erected to limit the tribes access to partners, capital and the general stream of commerce.[51]

---

[47] Kelly Croman & Johnathon Taylor, *Why Beggar Thy Indian Neighbor? The Case for Primacy in Taxation in Indian Country.* Joint Occasional Papers on Native Affairs, 2016-1, p. 3-4. (2016).

[48] Lance Morgan, *The Rise of Tribes and the Fall of Federal Indian Law,* 49 Ariz. St. L.J. 115, 132-135, (2017); *Internet Infrastructure in Native Communities: Equal Access to E-Commerce, Jobs and the Global Marketplace: Hearing before the S. Indian Affairs Comm.* 112th Cong. p. 37-39 p. 40-41 (2011) (Statement of Lance Morgan).

[49] Lance Morgan, *The Rise of Tribes and the Fall of Federal Indian Law,* 49 Ariz. St. L.J. 115, 120-123, (2017).

[50] *Id.* at 37, 41.

[51] *Internet Infrastructure in Native Communities: Equal Access to E-Commerce, Jobs and the Global Marketplace: Hearing before the S. Indian Affairs Comm.* 112th Cong. 37-39 p. 40-41 (2011) (Statement of Lance Morgan, CEO Ho-Chunk, Inc.).

6. Tribes have always had business partners when they participate in the normal stream of commerce. While states can exercise authority over the tribe's business partners when they operate on non-tribal land and within a state's jurisdiction, tribal internet partners are not generally located within the local state's jurisdiction. Therefore, the states and other parties involved have developed other approaches to disrupt business partnerships in Indian Country, which includes delegitimizing these partnerships, which help explain the origin of the term: "Rent a Tribe."[52]

7. The states and some courts have further reacted to the tribal E-commerce efforts by pursuing enforcement actions against tribal internet business partners. These enforcement actions seem calculated to reestablish the system of indirect control of the tribes and their internet business activities on tribal lands.[53]

8. In my professional opinion, the tribes are not "renting" out their status or regulatory jurisdiction. The tribes themselves are doing the "renting." The tribes, just like states routinely do, exercise their inherent sovereign powers to create a favorable regulatory environment to attract business and create a favorable environment for their own tribal corporations. However, these tribal entities need to develop their expertise and capital, and therefore, it is figuratively more accurate to state that the tribes are, "Renting Non-Tribal Expertise and Capital," instead of renting out themselves under a "Renting a Tribe model." Tribes typically continue to utilize partnerships until they reach a point where they can maximize their own profitability by limiting or completely eliminating the need for a business partner.

J. States Use Civil Regulatory Authority and Sovereign Immunity to Create Economic Incentives and Protect their Economic Interests.

1. Tribes have civil regulatory authority over their own territory and sovereign immunity and like state governments utilize these powers creatively. Since the tribal self-determination era, the use of these two governmental powers in conjunction with each other has become an expansive area of tribal law and increasingly has been used to create and protect economic opportunities for tribes in areas related to gaming, taxation, insurance, lending and creating friendly regulatory environments to attract jobs and capital.[54]

2. States, often in direct competition with each other, commonly use their civil regulatory authority to incentivize investment in areas related to gaming, corporate formation, taxation, insurance, and lending. The following are a few examples:

---

[52] See Class Action Complaint: *Lula Williams, et al. v. Big Picture Loans, et al.* Civil Case No. 3:17cv461; United States District Court for the Eastern District of Virginia. Richmond Division. July 22, 2017.
[53] See *Id.* At 37-38, 41.
[54] Lance Morgan, *The Rise of Tribes and the Fall of Federal Indian Law*, 49 Ariz. St. L.J. 115, 120-121, (2017).

a. Usury Laws:  In Marquette National Bank of Minneapolis v. First of Omaha Service Corp., 439 U.S. 299 (1978), the U.S. Supreme Court ruled that state anti-usury laws regulating interest rates cannot be enforced against nationally chartered banks based in other states.  This ruling allowed credit card companies to essentially "export" the rates allowed in their home states to customers in other states.

    A. In response to the ruling in the *Marquette* case, the State of South Dakota abolished its usury law to attract national banks with credit card operations to the state.[55]

    B. In 1981, in response to South Dakota's actions, Citibank moved its credit card operations to South Dakota and now has approximately 2,900 employees in the state and the financial services industry is one of the largest employers in the state.

    C. According to the U.S Census Bureau, South Dakota had a per capita income of $27,516 in 2016.  However, according to the Federal Deposit Insurance Corporation, South Dakota holds over $2.5 trillion in bank assets, the most of any state in the country and approximately $3 million per resident of South Dakota,[56] which is illustrative how successful the state's efforts have been at attracting the credit card industry and its financial assets.

    D. In 2010, First Premier, a national bank in South Dakota, legally issued a credit card for high risk borrowers with an annual percentage rate of 79.9 percent.[57]

b. Property Tax:  States commonly offer property tax incentives in the form waivers, discounts or tax increment financing.[58]

    A. Tribal trust land is generally not subject to property tax, and therefore, tribes will often market their lack of property tax as an economic development incentive, which is similar to state efforts to offer property tax incentives.[59]

---

[55] Amy Sullivan, *How Citibank Made South Dakota the Top State in the U.S. for Business*, The Atlantic, July 10, 2013.  https://www.theatlantic.com/business/archive/2013/07/how-citibank-made-south-dakota-the-top-state-in-the-us-for-business/425661.

[56] *Id.* (est. population of 833,000 in 2013; $2,500,000,000,000/833,000 = $3,001,200.00).

[57] Connie Prater, *Issuer of 79.9 % Interest Rate Credit Card Defends its Product*, CreditCard.com, February 12, 2010.  https://www.creditcards.com/credit-card-news/first-premier-79-rate-credit-card-1265.php#.

[58] *Rethinking Property Tax Incentives for Business*, Policy Focus Report/Lincoln Institute of Land Policy, (2012).

[59] *Oversight Hearing on Economic Development in Indian Country: Hearing Before the Senate Indian Affairs Comm.* 109th Cong. 115-116 (2006) (statement of Lance Morgan, CEO Ho-Chunk, Inc).

c. Corporate formation: The state of Delaware is a haven for corporate formation because of ease of formation and a well-defined legal structure and accommodating tax rules. This creative use of state civil regulatory authority and jurisdiction is widely accepted and provides an economic boost for the State of Delaware, which has more corporate entities than people. In 2011, Delaware collected more than $860 million in taxes and fees from its absentee corporate residents, or approximately 25 percent of the annual state budget.[60]

    A. Tribes, just like states, have increasingly chosen to create their own corporate codes, regulatory systems and courts to create a corporate regulatory system that takes full advantage of their unique tribal status.

d. Gaming: Nevada long ago exercised its civil regulatory authority as a sovereign entity to authorize casino gaming as an economic development tool and the majority of states have similarly authorized casinos while states like Utah and Hawaii have exercised their governmental authority and chose not to authorize casino gaming. It is simply the choice of the local government to participate in gaming or not.

3. Sovereign Immunity: States routinely protect their economic, legal and taxation interests by claiming Sovereign Immunity, including against tribal interests.

a. Gaming: In 1988, Congress pass the Indian Gaming Regulatory Act, which required that states negotiate in good faith with tribes to enter into gaming compacts.[61] It also authorized tribes to sue the states if they did not negotiate the compacts in good faith.[62] In 1996, the U.S. Supreme Court ruled that Congress could not abrogate the 11th amendment sovereign immunity of states to compel a state to negotiate a tribal gaming compact, which left the tribe without the ability to open a gaming operation.[63] In 1993, the State of Nebraska changed its constitution to allow a state gambling lottery and has received approximately $704 million in state lottery proceeds since its implementation.[64] Tribal gaming represents a competitive threat to the Nebraska State Lottery. In 1997, Nebraska successfully invoked its sovereign immunity when the Santee Sioux Tribe of Nebraska tried to sue the State of Nebraska to compel it to negotiate a gaming compact.[65] Nebraska can now directly protect its lottery revenues by invoking its sovereign immunity to prevent tribes from competing with its state lottery, and thereby, protecting

---

[60] Leslie Wayne, *How Delaware Thrives as a Corporate Tax Haven*, N.Y. Times, June 30, 2012 at BU1
[61] Indian Gaming Regulatory Act, 25 USC 2701 et. seq. (1988).
[62] *Id.* at 25, USC 2710 (1988).
[63] Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996).
[64] Nebraska Lottery. https://nelottery.com/homeapp/static/shared/halfbillion/index.html. (Last Visited). December 11, 2018.
[65] Santee Sioux Tribe of Nebraska vs State of Nebraska, 121 F.3d 427 (8th Cir. 1997).

the state's financial interests.  The State of Nebraska has never entered into a gaming compact with a tribe under the Indian Gaming Regulatory Act and because of it invoking sovereign immunity, the tribe cannot compel it negotiate a compact.

b. Tobacco: In 1998, 46 states, including Nebraska, settled a lawsuit with major tobacco companies by entering into what is called the Master Settlement Agreement ("MSA").[66]  The major tobacco companies agreed to pay the states approximately $200 billion over a 25-year period of time.  It required that non-participating tobacco manufacturers had to pay into an escrow fund.  The basic purpose of the escrow fund was to create price parity for participating and non-participating manufacturers under the MSA.  The states and major tobacco companies included tribes in the MSA without the tribe's acknowledgement or permission.  When states passed a series of laws attempting to impose the MSA escrow fees on tribal sales, the tribes objected on the grounds that the state could not impose its civil regulatory authority on tribal lands.  Tribal tobacco has become a large business for some tribes because if they do not apply the MSA escrow payments they can sell tribal products at a competitive discount.  The MSA allows the participating tobacco companies to reduce their payments to the state based on market share.  If the tobacco companies lose one (1) percent in market share, they can reduce their payments to the states by 3 percent.  The States now have a direct financial incentive to protect the market share of the major tobacco companies. Recently, a tribal corporation sued the State of Nebraska to declare that the state cannot impose its civil regulatory authority on the tribe to protect its financial interest in the MSA.[67]  The State of Nebraska filed a motion to dismiss the lawsuit partially based on the argument that Nebraska has not waived its sovereign immunity.[68]  Nebraska is attempting to use its sovereign immunity to prevent the tribe from challenging the state's imposition of the MSA and its related regulatory scheme on the tribe.  If Nebraska is successful, they will have used their sovereign immunity to protect their regulatory scheme and their financial interests from the payments under the MSA, which are approximately $37 million per year.

   A. In my professional opinion, this effort by Nebraska to utilize its sovereign immunity to protect both its regulatory and financial interests are not substantively different than what tribes are being accused of doing with tribal lending.

---

[66] Master Settlement Agreement, National Association of Attorneys General. www.naag.org/assets/redesign/files/msa-tobacco/MSA.pdf. (Last Visited Dec. 11, 2018)
[67] Complaint, at 9-12, HCI Distribution, Inc., et.al., v. Peterson, et.al., No. 18-cv-173 (D.Neb. April 20, 2018), ECF No. 1.
[68] *Def.* Br.Supp.Mot.Dismiss, at 11-12, HCI Distribution, Inc., et.al., v. Peterson, et.al., No. 18-cv-173 (D.Neb. Aug. 15, 2018), ECF No. 28.

K. Sovereign Immunity is partially an Economic Development and Regulatory Expansion Tool for Tribes and Not a Method to Violate State Law.

1. Tribal sovereign immunity is a common law doctrine providing that tribes and some tribal entities are immune from lawsuits and quasi-judicial proceedings without their consent or congressional waiver.[69]

2. Tribal sovereign immunity plays a role in the economic expansion of tribal law and tribal economies because the state cannot directly sue a tribe to stop a tribe from using its own sovereign authority to expand its inherent right to regulate its own economy.[70]

   a. Tribe's typically function in a state law-controlled paradigm and often are just exempt from some aspects of state law or regulations. However, tribes are increasingly passing their own laws and regulations. These tribal laws and regulations are intended to bypass the state-controlled system of tribal exemptions and replace it with a tribal regulatory system that completely preempts state law with tribal law.[71]

   b. The tribe's sovereign immunity is often critical to protecting the expansion of tribal law and regulatory authority from state encroachment. In these situations, tribal sovereign immunity is a critical tool of tribal economic expansion and regulatory empowerment and not a method for violating state law.[72]

3. States have asserted their own sovereign immunity as a defense to stop tribes from suing them, most notably when some states have claimed sovereign immunity in response to lawsuits filed by tribes for the states failure to negotiate gaming compacts in good faith.[73]

L. Revenue Sharing in Tribal/State Agreements and Compacts.

1. When tribes engage in commerce it must be remembered that they are often both a governmental entity and a corporate entity. Being a governmental entity impacts a tribe's approach regarding revenue sharing when partnering with non-tribal entities. Like most governments, tribes prefer an easy to calculate and verifiable revenue model. It is far easier to take a percentage of gross or adjusted revenue than it is to share a percentage of net income that can be manipulated in multiple ways. This is especially true with tribal governments who have a long history

---

[69] Michigan vs Bay Mills Indian Community, 134 S. Ct. 2024 (2014).
[70] Lance Morgan, *The Rise of Tribes and the Fall of Federal Indian Law*, 49 Ariz. St. L.J. 115, 122, (2017).
[71] See *Id.* at 121-122.
[72] *Id.* at 124, 126, 128.
[73] Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996).

being taken of advantage of financially[74] and still have an emerging sophistication in most business fields. In my experience, tribes often care more about getting an appropriate share of the financial profits without necessarily having to trust that their business partners will not manipulate the net income of the entity.

2. Tribal/State Gaming Revenue Sharing Structures.

   a. Tribal/State gaming compacts and other gaming agreements with states sharing tribal revenue are typically based on an easy to calculate top line metric and are rarely based on the net income of the gaming operator.[75]

      A. The State of Michigan requires the Lac Vieux Desert Band to remit 2 percent of its "net win" to local governments. "Net Win" is not based on net income and is instead defined as the total amount wagered on each electronic game of chance minus the total amount paid to players for winning wagers.[76] The Lac Vieux Desert Band has paid $8.3 million to the State of Michigan under this 2 percent provision.[77]

      B. The State of Michigan required Lac Vieux Desert Band to remit 8 percent of its "Net Win" to the Michigan Strategic Fund until the state violated an exclusivity provision in 1996. "Net Win" is defined as the total amount wagered on each electronic game of chance minus the total amount paid to players for winning wagers.[78] The Lac Vieux Desert Band paid $4.3 million to the Michigan Strategic Fund under this 8 percent provision.[79]

3. Tribal/State Energy Taxes are Generally Based on Value at the Time of Production

   a. Tribes and States have dual taxation authority over non-tribal energy and mineral extraction companies on tribal lands.[80]

---

[74] See Cobell vs. Salazar Settlement; Claims Resolution Act of 2010, Pub. L. No. 111-291, H.R. 4783 (2010).
[75] See Bureau of Indian Affairs, Office of Indian Gaming: Indian Gaming Compact Listing. https://www.indianaffairs.gov/as-ia/oig/gaming-compacts (last visited January 6, 2019).
[76] Stipulation for Entry of Consent Judgement; Consent Judgement. Sault Ste. Marie Tribe of Chippewa, et. al, v. John M. Engler, Governor of Michigan. Civ. No. 1:90 CV 611. P. 5-6, United States District Court Western District of Michigan. (August 1993).
[77] Michigan Gaming Control Board. Tribal 2% Payments to Local Units of State Government Chart, https://www.michigan.gov/documents/2_percent_Payments_76617_7.pdf. (2018).Last Visited January 6, 2018).
[78] Stipulation for Entry of Consent Judgement; Consent Judgement. Sault Ste. Marie Tribe of Chippewa, et. al, v. John M. Engler, Governor of Michigan. Civ. No. 1:90 CV 611. P. 4-5, United States District Court Western District of Michigan. (August 1993).
[79] Michigan Gaming Control Board. Tribal Payments to Michigan Strategic Fund. (March 29, 2018). www.michigan.gov/documents/mgcb/MEDC-MSF_Payment_Worksheet_2017-07-24_609815_7.pdf. (2018). Last visited January 6, 2018.
[80] See Cotton Petroleum Corp. v New Mexico 490 U.S. 163 (1989).

      b.  Both Tribes and States generally tax the actual value of the product at the time of production.  There is no consideration given to the profitability of the underlying energy company when assessing the various severance taxes.[81]

      c.  Tribes also enter in tax agreements with states to share the applicable energy severance taxes.  These taxes are generally based on the value at the time of production.  There is no consideration given to the underlying profitability of the energy company when assessing the taxes.[82]

  4.  Natural Resource Royalty Payments to Tribes are Based on the Value of the Resource at the Time of Production

      a.  The federal government collected and distributed approximately $639 million in royalty payments to tribes and tribal members in 2017.  These payments were based a percentage of the value of the resource at the time of production and the underlying profitability of the natural resource company was not a consideration.[83]

M.  Revenue Sharing in the Service Agreements

  1.  When tribes evaluate a new business or partnership there are multiple factors to consider, such as:

      a.  What is the long-term plan for the company and the tribe?

      b.  Does the tribe have the necessary expertise to develop and manage the company?

      c.  Can the tribe develop the necessary expertise?

      d.  What are the both short and long-term prospects for creating employment opportunities for tribal members?

      e.  Does the tribe have the necessary capital to start and grow the company?

      f.  How will the tribe structure its corporate entity and any partnerships?

      g.  What level of financial risk is the tribe willing to take?

---

[81] See N.M. Stat. Ann. §7-29-4.1(1978).
[82] Oil and Gas Tax Agreement Between The Three Affiliated Tribes and State of North Dakota. https://www.nd.gov/tax/data/upfiles/media/oilgastaxagreement.pdf?20181028220016. (2013)
[83] U.S. Department of Interior.  Natural Resources Revenue Data: Revenue from Natural Resources on Indian Land.  https://revenuedata.doi.gov/how-it-works/tribal-revenue/.

    h.   What value-added legal, economic or regulatory activity can the tribe or the unique tribal status bring to the business?

    i.   Will the business activity provide income to fund the tribe's social development goals for its membership?

2.  In one of the service agreements[84], the tribe received the "Tribal Net Profits" which is "calculated by adding the sum of Gross Revenues plus bad debt recoveries minus the sum of charge backs and bad debt charge-offs and then multiplying the sum of this amount by two (2) percent calculated on a monthly basis."[85]

3.  The question a tribe would likely ask itself when deciding to enter into such a service agreement would be:

    a.   If the tribal company and the servicing company were merged into one entity, what percent of the merged profits would the Tribal Net Profits calculation approximate and does that percentage represent a fair portion of the merged profits given the relative risks and value-added activities of each party?

    b.   Is it better to take an easy to calculate defined number than to be dependent upon a net income calculation that could be manipulated?

    c.   How does the 2 percent figure compare to other types of agreements the tribe has undertaken?

    d.   Does the return to the tribe compensate it for the amount of legal, regulatory and economic value-added activities the tribe is dedicating to the business?

    e.   Will this model allow the tribe to develop expertise and necessary capital to eventually no longer need an operational or financial partner?

    f.   Does this agreement help the tribe create both short and long-term employment opportunities for its membership?

    g.   Will the expected profits positively impact the tribe's discretionary budget?[86]

    h.   How will the expected profits generated help the tribe fulfill its socio-economic development goals?

---

[84] Amended and Restated Servicing Agreement Between Red Rock Lending, LLC and Sourcepoint VI, LLC, July 31, with retroactive effect to October 25, 2011.

[85] *Id.* at 2.25.

[86] A large portion of a tribal government's budget often consists of federal funding which are often restricted to very specific uses. A tribe can use funds generated by its business activities in a completely discretionary manner to impact its tribal membership in a variety of methods.

4. In my professional opinion and for reasons further detailed in the conclusion of this report, it would be reasonable for a tribe to consider the revenue sharing arrangements in the Service Agreements rational and a mutually beneficial business arrangement, especially if the profitability of the business represented a significant percentage of a tribe's discretionary budget.

N. Revenue Sharing in the Sales Agreement

1. The Tribe agreed to essentially buy out the non-tribal service company by entering into the Sales Agreement.[87] The tribe structured the buy-out so that they would continue to receive the 2 percent of gross revenues and eventually rising to 4 percent until the Secured Promissory Note ("Note") associated with the buy-out was paid off or the 7-year term of the Note expired. The Note also created a mechanism where the tribe would gradually capitalize the entity over the term of the Note. [88]

2. The Sales Agreement also would have resulted in the tribe maintaining a positive cash flow stream while also reinvesting substantial amounts of tribal capital back into the company.[89] The expiration of the tribe's debt obligation at the end of the 7-year period would have resulted in the tribal company managing all aspects of the company and greatly increasing the tribal company's profitability. The increased profitability would have allowed the tribe to positively impact its overall socio-economic development goals.

3. In my professional opinion and for reasons further detailed in the conclusion of this report, it would be reasonable for a tribe to consider the revenue sharing and the recapitalization provisions of the Sales Agreement and the term of the Note, a rational and mutually beneficial business arrangement.

O. Tribes Consider Tribal Business as Both a Social and Economic Development Tool

1. Most governments in the United States do not directly develop, own and operate the majority of large businesses in their jurisdictions. Tribal governments are compelled to develop most of the large businesses in their jurisdiction because they are often the only entity with the resources to develop a business in the highly restrictive tribal environment.[90] The profits generated from the tribe's businesses are important to the tribe because they create discretionary income which are not as restrictive as federal and state funding sources.

---

[87] Agreement and Plan of Merger among LVD Tribal Acquisition Company, LLC and Bellicose Capital, LLC and Eventide Credit Acquisitions, LLC. October 7, 2015.

[88] Secured Promissory Note between Tribal Economic Development Holdings, LLC and Eventide Credit Acquisitions, LLC., Sec. 1.2 and 1.3, January 26, 2016.

[89] See Id.

[90] See, Oversight Hearing on Economic Development in Indian Country: Hearing Before the Senate Indian Affairs Comm. 109th Cong. 115-116 (2006) (statement of Lance Morgan, CEO Ho-Chunk, Inc.).

2. In my professional experience, tribes are not motivated purely by profit considerations. The ability of the tribal company to impact and fund the tribe's socio-economic goals for its memberships are primary factors in whether to invest in or develop a tribal company.

3. The affidavits and depositions provided for my review give several examples of the Band's goal of using the tribal lending company's profits to help fulfill their socio-economic goals, including the following:

    a. Michelle Hazen, an elected tribal leader and lending company manager explained in an affidavit why the Band wanted to acquire its non-tribal partner: "After four years of operating Red Rock, LVD [the Band] had gained considerable experience and knowledge of the online lending industry. LVD looked to expand its online lending business to earn more money for LVD, to employ more members and area residents, and to acquire our vendors' business so the lending would be more profitable."[91]

    b. Michelle Hazen further explained in her affidavit how the profits from the tribal lending company helped provide funding for a wide array of local tribal government services including, ". . . housing program, the tribal court, the tribal police department, LVD's new health clinic and pharmacy, member enrollment services, family services, infrastructure, cultural and historical preservation, education, and basic government services. . . college scholarships . . . new vehicles for the LVD police department . . . Ojibwe language program and other cultural programs . . . youth activities . . . and tribal elder nutrition programs and tribal elder home care . . ."[92]

    c. James Williams, Jr., the Band's elected chairman, stated in his deposition that the Band used the profits from their lending entities to provide services to its membership including, ". . . a new clinic which is—allows for our tribal members to not have to go 75 to 100 miles to get services, health services. It –social service programs, general welfare programs, we provide services for our elders. . . we pay our elders monthly supplements to help them with their bills. We provide free education for our—our students that graduate from high school to go onto college. . ."[93]

P.  Tribes are Both Business and Government Entities Which Impacts Their Approach to Economic Development.

---

[91] Affidavit of Michelle Hazen. Lula Williams, et al. v. Big Picture Loans, et al. Civil Case No. 3:17cv461; no. 13, United States District Court for the Eastern District of Virginia. Richmond Division. September 28th, 2017.

[92] Id. at no. 31.

[93] Oral and Videotaped Deposition of James Williams, Jr., Lula Williams, et al. v. Big Picture Loans, et al. Civil Case No. 3:17cv461; p. 201, United States District Court for the Eastern District of Virginia. Richmond Division. November 13, 2017.

1. Tribes are following a natural progression from impoverished and unsophisticated governments at the beginning of the Self-determination era to tribes that are thriving and forming their own corporate entities. Tribes are doing what state governments have been doing for decades, which is utilizing their civil regulatory authority, sovereign immunity authority, and various federal incentive programs in ways to create economic and legal opportunities for themselves and their business partners.

2. While there are similarities to the state-corporate development paradigm, tribal governments are unique in that there are hundreds of federal laws, regulations, court decisions and treaties that apply to them almost exclusively. This fundamental difference often creates confusion when being reviewed by non-tribal courts systems and non-tribal governmental entities.[94]

   a. "Outdated and inaccurate perceptions of American Indian tribes continue to prevail in non-Indian communities and state officials may not understand that tribes are functioning governments."[95]

3. Tribes are increasingly using their inherent sovereign rights to act in their best economic and legal interests:[96]

   a. It is logical for a tribe to create a corporate regulatory structure to create tribal corporations that take full advantage of being a tribe.

   b. It is logical and legal for a tribe to create tribal corporate entities that enjoy sovereign immunity as a defense because both actual and threatened litigation can have major negative and costly impacts on tribes. Sovereign immunity is not used to violate state laws. On the contrary, sovereign immunity is used in conjunction with tribal law development to help protect and empower tribal legal and regulatory expansion.

   c. It is logical for a tribe to create innovative regulatory structures that incentivize investments on the reservation.

   d. It is logical for a tribe to use the Internet to expand their economy without fear of local state enforcement efforts meant to limit and isolate tribal economic growth in the E-commerce arena.

---

[94] See Kelly Croman & Johnathon Taylor, <u>Why Beggar Thy Indian Neighbor? The Case for Primacy in Taxation in Indian Country</u>. Joint Occasional Papers on Native Affairs, 2016-1, p. 3-4. (2016).
[95] Susan Johnson, et al., Government to Government: Models of Cooperation Between States and Tribes. p.1 (2009). Retrieved October 27, 2018, from http://www.nijc.org/pdfs/TTAP/NCSLGovttoGovt.pdf.
[96] Lance Morgan, *The Rise of Tribes and the Fall of Federal Indian Law*, 49 Ariz. St. L.J. 115, 115, 120-122, (2017).

    e.  It is logical to aggressively pursue economic development initiatives because it directly creates jobs and much needed income to fund the tribal governmental social, educational, and development programs for its membership.

4.  In my professional opinion, as tribal governments and tribal corporations develop expertise and acquire capital, they are able to strategize and develop comprehensive corporate and regulatory structures. This system allows for tribal economic partnerships to be created that are designed to attract the necessary capital and expertise to fulfill the overall socio-economic development goals of the tribes. The evolving tribal system is a unique marriage between corporate and government planning because the tribe controls both ends of the system. However, this evolution is the predictable result and logical progression of almost 50 years of the federal government pushing tribes towards self-governance, self-determination, and creating incentives for tribes to create corporate entities. The complexity of the tribal utilization of this emerging government/corporate development system is a sign of growing sophistication.

Q.  The Breakdown of Responsibilities in the Service Agreements and Sales Agreement are Typical for Tribes that Have an Evolving Knowledge Base in a New Industry.

1.  As stated previously, tribes follow an evolutionary cycle when entering into a new industry. They create the entity, often partner with another company to help learn the business and then generally are incentivized to completely take over a business without any partners or with partners in limited roles.

2.  The Band is portrayed in the lawsuit as a type of victim and was subjected to a "rent a tribe" model. However, the Band had already created a lending business prior to entering into the original Service Agreements.[97] The Band actively sought out expertise to help it grow its business and develop its sophistication and was not specifically targeted to be a "rent a tribe." [98] Bellicose and SourcePoint, the service companies, understood it was a developmental business opportunity and offered their expertise for a fee, which the Band agreed to presumptively to help develop its knowledge and capital base.[99]

3.  The Band regulated the tribal lending industry in its jurisdiction. The Service Agreements acknowledged the Band's regulation of the lending business and required the Band's approval of various recommendations from Bellicose VI, its

---

[97] Affidavit of Michelle Hazen. Lula Williams, et al. v. Big Picture Loans, et al. Civil Case No. 3:17cv461; no. 5-8, United States District Court for the Eastern District of Virginia. Richmond Division. September 28th, 2017.

[98] Id. at no 10; Oral and Videotaped Deposition of James Dowd. Lula Williams, et al. v. Big Picture Loans, et al. Civil Case No. 3:17cv461; p. 102-3, United States District Court for the Eastern District of Virginia. Richmond Division. November 13, 2018.

[99] See Servicing Agreements; See also, Secured Promissory Note between Tribal Economic Development Holdings, LLC and Eventide Credit Acquisitions, LLC., January 26, 2016.

servicing company. The affidavits of Michelle Hazen and Brian McFadden and depositions of James Dowd and Matthew Martorello make numerous and consistent references to the recommendation and approval process built into the Service Agreements and Sales Agreement.

4. It is my professional opinion it makes perfect sense for the Tribe to seek recommendations from its expert, but also incorporate a tribal approval process to both safeguard against any poor decisions and to develop the Tribal company's knowledge base. In fact, using and learning from their expert partners is referenced by tribal officials as one of the primary reasons the Tribe entered into the Service Agreements in the first place.[100] It would be illogical not to utilize their knowledge and recommendations.

R. The Limitations on Tribal Actions in the Sales Agreement and the Secured Promissory Note are Similar to Restrictions in other Tribal Partnering, Lending and Bonding Agreements.

1. The Secured Promissory Note[101] ("Note") related to the Sales Agreement requires various expenses come from non-affiliated entities and at reasonable market rates.[102] The Note also requires approval from the lender for budget expenses that are unusual or beyond the built-in five (5) percent annual escalator provision in the Note.[103]

2. Tribes exist in a highly restrictive capital environment.[104] Tribes often lack collateral. Tribes have sovereign immunity which makes lenders nervous. Tribes often lack business experience. Tribes also control the regulatory system and can pass restrictive or anti-business laws. Tribes appoint the judges in their own tribal court. Tribes can be motivated by social or political considerations, instead of business motivations only.[105] In my professional experience, these complications combine to make any business partner and/or lender extremely reluctant to work with tribes. This reluctance is why most lenders and business entities avoid tribal

---

[100] See Affidavit of Michelle Hazen. **Lula Williams, et al. v. Big Picture Loans, et al.** Civil Case No. 3:17cv461; no. 10, United States District Court for the Eastern District of Virginia. Richmond Division. September 28th, 2017; Oral and Videotaped Deposition of James Williams, Jr., **Lula Williams, et al. v. Big Picture Loans, et al.** Civil Case No. 3:17cv461; p. 13-15, United States District Court for the Eastern District of Virginia. Richmond Division. November 13, 2017.

[101] See Servicing Agreements; See also, Secured Promissory Note between Tribal Economic Development Holdings, LLC and Eventide Credit Acquisitions, LLC., January 26, 2016.

[102] Id, Art. 1.2(4)(a).

[103] Id, Art. 1.2(4)(b).

[104] See Oversight Hearing on Economic Development in Indian Country: Hearing Before the Senate Indian Affairs Comm. 109th Cong. 2nd Sess. 115-116 (May 10, 2006) (statement of Lance Morgan).

[105] See Ahne Minge and Andrew Twite, **The Impact of Surety Bonding on American Indian and Tribally Owned Contractors**, p. 5-10, Federal Reserve Bank of Minneapolis Community Development Report no 2014-1.

development opportunities and is one of the primary reasons' tribes are historically so impoverished.

3. If a lender, partner or bonding company decides to move forward with a tribe, it will often result in some limitations on capital expenditures, limitations on expenses, limitation on vendor agreements, cross collateralization agreements, dividend limitations, limitations on tribal regulatory fees and limitations on tribal taxation. These types of restrictions are common in tribal lending documents and in any agreements with a bonding company. These lenders or bonding companies fear that the tribe will change the rules, dividend all the money to themselves, claim sovereign immunity, or that they will not get a fair hearing in the tribal court system.

4. In my opinion, the Band would be more likely agree to the specific restrictions in the Sales Agreements and its related Secured Promissory Note because it has substantial experience with the business and the lender, and therefore, has a higher confidence level the company will be successful. The Sales Agreement and Note also creates a definitive timeline of 7 years on the business relationship, which likely makes the restrictions more palatable because they will end at a certain point.

5. In my professional experience, tribes do not necessarily like to operate with these lending or bonding restrictions. However, tribes are often presented with a simple choice of agreeing to the restrictions and hoping things develop for their economy or refusing and continue to have their economy and membership languish in poverty. Tribes will often agree to a variety of restrictions because they want and need to attract investment capital in order to stimulate much needed economic growth.

S. It is Unreasonable to Create a Racial and Jurisdiction Hiring Standard for Tribal Companies.

1. The Band is attempting to grow its business and still provide job opportunities in its jurisdiction for its membership.[106] As the Tribal lending business grew, it expanded its on-reservation employment base and expressed its desire to create more on-reservation job opportunities.[107] However, the population and skill sets are limited which required that the Band have employees in various locations.[108]

---

[106] Oral and Videotaped Deposition of James Williams, Jr., **Lula Williams, et al. v. Big Picture Loans, et al.** Civil Case No. 3:17cv461; p. 13-15, United States District Court for the Eastern District of Virginia. Richmond Division. November 13, 2017.

[107] Affidavit of Michelle Hazen. Lula Williams, et al. Big Picture Loans, et al. Civil Case No. 3:17cv461; no. 13, United States District Court for the Eastern District of Virginia. Richmond Division. September 28th, 2017.

[108] *Id.* at 15 -17, Oral and Videotaped Deposition of James Dowd. **Lula Williams, et al. v. Big Picture Loans, et al.** Civil Case No. 3:17cv461; p. 102-3, United States District Court for the Eastern District of Virginia. Richmond Division. November 13, 2018.

a. In my experience, not having a large skilled workforce in a rural area is not unusual and is especially problematic on tribal reservations. As CEO of the tribal company, Ho-Chunk, Inc., I have strong social, economic and political incentives to create job opportunities on the reservation. However, it is difficult to staff a fast-growing company with only on-reservation employment. Ho-Chunk, Inc., only has 140 of its approximately 1036 employees on or near the tribe's reservation.[109] In addition, only 157 or 15 percent of the 1036 employees are Native Americans.[110]

b. Ho-Chunk, Inc. cannot find enough skilled workers on its local rural reservation to fulfill its growth goals. However, the profits made from the off-reservation business activities help fuel ancillary development and job creation on the reservation. These on-reservation jobs are subsidized with off-reservation profits and often do not require such specific skill sets, which make them easier to staff with on-reservation employees. Therefore, strong off-reservation development and employment is often part of an overall tribal development strategy.

c. In addition, there are no legal requirements that a tribal company must only hire tribal members on its reservation and the suggestion of such a requirement would most likely be offensive to tribal governments and tribal entities. Non-tribal companies hire any person of any race they want in any location or jurisdiction they deem appropriate. Non-tribal companies routinely locate or relocate in areas with the best employees or the best economic or legal incentives.[111] Subjecting the Band's lending company to a standard that non-Indian companies would never be subjected to is categorically unfair and is an almost impossible standard to achieve given the negative social effect of the historical poverty of tribes on the skill set of the tribal labor force. In addition, if a non-tribal company even attempted to only hire members of only one race in one specific jurisdiction it would be illegal on multiple grounds.

IV.   CONCLUSION

1. Based on my professional experience and the reasons set forth in this opinion, the Servicing Agreements and the Sales Agreement (collectively the "Agreements") are similar to other tribal corporate structures, strategies, and operational and financial partnering relationships because of the following:

---

[109] Memorandum Letter from Jill Meadows-Jones, Human Resources Director of Ho-Chunk, Inc., dated Dec. 21, 20188.
[110] *Id.*
[111] See *Rethinking Property Tax Incentives for Business*, Policy Focus Report/Lincoln Institute of Land Policy. (2012).

a. The Agreements allow the Band access to industry specific expertise and are similar to operational structures authorized by the federal government for tribes in gaming management contracts and government contracting partnerships;

b. The Agreements allow the Band to access to development and on-going capital and are similar to financial structures authorized by the federal government in gaming management contracts, government contracting partnerships and various tax credit development projects;

c. The revenue sharing provisions of the Agreements are based upon a relatively easy to calculate gross revenue formula, which tribes use in a variety of contexts, including tribal/state gaming compacts, tribal/state tax compacts, natural resource development royalties and natural resource taxes;

d. The Agreements are structured to allow the Band to maximize the use of its inherent civil regulatory authority to create a favorable corporate and regulatory environment for business development and is similar to strategies used by states to encourage investment and development;

e. The Agreements anticipate that the Band would use its inherent rights, including sovereign immunity, to protect its economic and governmental interests which is similar to what tribes and states do in similar contexts;

f. The term of the Sales Agreement is similar in length and financial structure to gaming management contracts, government contracting partnerships, and tribal tax credit funded development projects;

g. The Agreements' partnering, regulatory, and corporate structures represent a sophisticated tribal government and business development strategy and are the logical culmination of the policies, statutes and regulations encouraged and adopted by the federal government since the beginning of the Tribal Self Determination Era.

h. The Agreements allow the Band to utilize a common business development technique in other tribal industries, including tribal gaming and tribal government contracting, and need to be read in conjunction with each other with an understanding that they represent an obvious business evolutionary strategy to eventually maximize the Band's long-term economic and social self-interest.

2. Based on my professional experience and the reasons set forth in this opinion, the breakdown of responsibilities between the tribal lending entities and their business partners involved in this case share many similarities to the breakdown of

responsibilities between tribal businesses and their business partners in other emerging tribal industries:

a.   When tribes first entered into gaming, they often entered into gaming management agreements with non-tribal companies.  The tribes entered into these management agreements because they lacked the necessary capital and experience to develop their own gaming operations.  The tribes delegated almost all aspects of the management of their gaming operations to the management company.  The tribes regulated the casino and maintained management oversight by approving of all major decisions and expenditures.  This system allowed tribes to evolve their knowledge and capital base to the point where they rarely renewed their management agreements and took complete control of their gaming operations.

b.   When a tribal company enters into the government contracting industry, it often lacks the past performance and financial capability to perform large contracts.  The tribal company will take advantage of one of the federal government's Partnering Programs, which often give large amounts of operation control to the non-tribal partner.  Once the tribe completes the contract under the Partnering Program, it no longer requires a non-tribal partner and will often perform the next contract on its own.

c.   Due to the unique fact that tribes control the company, the government and the court system, they are often subjected to highly restrictive agreements from partners, lenders and bonding companies.  These restrictive provisions protect those willing to invest capital in Indian Country and allow the tribes some chance of developing their economies.

d.   The Band's regulatory and approval process detailed in the Agreements maintains ultimate tribal control and allows the Band to evolve its knowledge base.  The Band's usage of experts for recommendations and Band approval is reasonable and is common in the development stages of both tribal gaming and tribal government contracting.  The Band hired the service company explicitly to bring their expertise to the Band to make those very recommendations and it would be illogical not to utilize their expertise.

e.   The Tribal lending industry is largely following the same evolutionary path as the tribal gaming and tribal government contracting industry and evolving down the path from partnering to complete control over its business operations.  Further, the Band's efforts to create an economy should not be subjected to selective and targeted attempts to delegitimize its approach to developing its business by turning the Band's social and economic weaknesses against it to further a self-serving legal interest:

   A.   The implication that a tribal company is not a legitimate company unless it primarily hires Native Americans on its reservation is legally

completely unsupported and likely offensive to tribes. The implication seems calculated to delegitimize the tribal company. Further, it ignores the real issues that historical poverty and rural economically depressed tribal areas must confront when trying to develop a modern workforce to fill certain jobs.

3. In my professional opinion, the Service Agreements represent a rational approach from the Lac Vieux Desert Band's perspective to business development because of the following:

   a. The Agreements allow the Band to utilize a common business development technique in other tribal industries. In tribal gaming and tribal government contracting, the tribes used their partnership relationships to gain experience and knowledge;

   b. The Service Agreements provided the Band with initial and ongoing development capital;

   c. The Service Agreements utilize partnering strategies that are consistent with similar strategies authorized by federal law and regulation and administered by the federal government;

   d. The Service Agreements were executed pursuant to the Band's inherent governmental authority to develop and utilize its own tribal corporate structure and civil regulatory system, as well as to enter into partnerships, and benefit from sovereign immunity as a legal defense to protect the tribal corporate entity;

   e. The recommendation and approval process incorporated into the Service Agreements is consistent with the Band's goal of gaining knowledge by utilizing the expertise of its servicing company.

   f. The Service Agreements' gross revenue sharing provisions are comparable to other methods of payments and profit-sharing structures that tribes utilize in other business and governmental contexts, including the Lac Vieux Desert Band's on-going payment to the State of Michigan of 2 percent of Net Win of their gaming operation.

   g. The Band can utilize the increased economic activity created by entering in the Service Agreements to directly create job opportunities for its membership. The Band can also use the profits generated from the expanded lending business to create discretionary income for the tribe which can be used to fund social programs and create additional ancillary local job opportunities for its membership.

4. In my professional opinion, the Sales Agreement represents a rational approach from the Lac Vieux Desert Band's perspective to business development because of the following:

   a. The Sales Agreement enables the Band to continue to develop its internal expertise over a 7-year term;

   b. The Note associated with the Sales Agreement and its forgivable loan provision after the 7-year term is similar to arrangements in other tribal development projects;

   c. The Sales Agreement's reinvestment provisions enable the Band to expand the internal capital base of the company;

   d. The Sales Agreement enables the Band to utilize its inherent advantages related to tribal corporate structure, tribal civil regulatory system, and sovereign immunity for economic gain;

   e. The Sales Agreement's gross revenue sharing provisions are similar to other methods of payments and profit-sharing structures that tribes are familiar with in other business and governmental contexts, including the Lac Vieux Desert Band's on-going payment to the State of Michigan of 2 percent of Net Win of their gaming operation.

   f. The recommendation and approval process incorporated into the Sales Agreement and the Note are consistent with the Band's goal of gaining knowledge by utilizing the expertise of its servicing company.

   g. The operational restrictions incorporated into the Sales Agreement and Note are consistent with restrictions tribes often agree to in other partnering, lending and bonding agreements.

   h. The Sales Agreement allowed the Band to utilize a common business development technique in other tribal industries.   In tribal gaming and tribal government contracting, the tribes used their partnership relationships to gain experience, knowledge and capital.  After gaining the necessary knowledge, the tribes no longer needed a partner and were able to increase their profitability by taking increased control overall all aspects of their business. After the 7-year term of the Sales Agreement and the Note, the profitability of the business would be increased.

      A. The Sales Agreement represents the Band's effort to manage all aspects of its business operations without the need for a partner.  This lawsuit was filed approximately 1.5 years after the Band entered into the 7-year Sales Agreement.  The lawsuit attempts to create a static snapshot in time of the business and was filed while Band was in

midst of evolving into an entity that managed all aspects of its business operations.

B. The Agreements should be read in conjunction with each other with an understanding that they represent an obvious business evolutionary strategy to eventually maximize the Band's economic and social self-interest.

  i. The increased profitability at the end of the term of the Sales Agreement and Note, would allow the Band to greatly increase public governmental services and local job opportunities for its membership by increasing the Band's overall discretionary income.

V.   Other Expert Testimony

A. I have not testified as an expert at a trial or deposition in the past.

VI.   Disclosure of Compensation

A. $1,000 per hour.

SUBMITTED on January 10, 2019

_Lance G. Morgan_
Lance G. Morgan

# APPENDIX A

## REFERENCE DOCUMENTS PROVIDED BY LEGAL COUNSEL

Affidavit of Brian McFadden. *Lula Williams, et al. v. Big Picture Loans, et al*. Civil Case No. 3:17cv461; United States District Court for the Eastern District of Virginia. Richmond Division. September 28th, 2017.

Affidavit of Michelle Hazen. *Lula Williams, et al. v. Big Picture Loans, et al*. Civil Case No. 3:17cv461; United States District Court for the Eastern District of Virginia. Richmond Division. September 28th, 2017.

Agency Agreement between Eventide Credit Acquisitions, LLC and various lenders. February 2016.

Agreement and Plan of Merger among LVD Tribal Acquisition Company, LLC and Bellicose Capital, LLC and Eventide Credit Acquisitions, LLC. October 7, 2015.

Amended and Restated Servicing Agreement between Red Rock Tribal Lending, LLC and Sourcepoint VI, LLC. July 31, 2012.

Ascension Technologies, LLC, Delegation of Authority Policy. January 22, 2016.

Class Action Complaint: *Lula Williams, et al. v. Big Picture Loans, et al*. Civil Case No. 3:17cv461; United States District Court for the Eastern District of Virginia. Richmond Division. July 22, 2017.

Intertribal Servicing Agreement Between Big Picture Loans, LLC and Ascension Technologies, LLC. January 2016.

Interim Servicing Agreement Between Big Picture Loans, LLC and Sourcepoint VI, LLC. October 2015.

Loan and Security Agreement between Tribal Economic Development Holdings, LLC and Eventide Credit Acquisitions, LLC. October 7, 2015.

Memorandum of Law in Support of Defendant Matt Martorello's Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12. *Lula Williams, et al. v. Big Picture Loans, et al*. Civil Case No. 3:17cv461; United States District Court for the Eastern District of Virginia. Richmond Division. September 29, 2017.

Memorandum Opinion. *Lula Williams, et al. v. Big Picture Loans, et al*. Civil Case No. 3:17cv461; United States District Court for the Eastern District of Virginia. Richmond Division July 27, 2018.

Oral and Videotaped Deposition of Matthew Martorello. Lula Williams, et al. v. Big Picture Loans, et al. Civil Case No. 3:17cv461; United States District Court for the Eastern District of Virginia. Richmond Division. August 30, 2018.

Oral and Videotaped Deposition of James Dowd. *Lula Williams, et al. v. Big Picture Loans, et al*. Civil Case No. 3:17cv461; United States District Court for the Eastern District of Virginia. Richmond Division. November 13, 2018.

Oral and Videotaped Deposition of Rick Gerber. *Lula Williams, et al. v. Big Picture Loans, et al.* Civil Case No. 3:17cv461; United States District Court for the Eastern District of Virginia. Richmond Division. December 17, 2018.

Oral Deposition of Michelle Hazen. *Lula Williams, et al. v. Big Picture Loans, et al.* Civil Case No. 3:17cv461; United States District Court for the Eastern District of Virginia. Richmond Division. October 16, 2017.

Oral and Videotaped Deposition of James Williams, Jr., *Lula Williams, et al. v. Big Picture Loans, et al.* Civil Case No. 3:17cv461; United States District Court for the Eastern District of Virginia. Richmond Division. November 13, 2017.

Parental Guarantee and Sovereign Immunity Waiver between Eventide Credit Acquisitions, LLC and the Tribe, TED and all Subsidiaries. October 7, 2015.

Secured Promissory Note between Tribal Economic Development Holdings, LLC and Eventide Credit Acquisitions, LLC. January 26, 2016

APPENDIX B

LIST OF DOCUMENTS AND PUBLICATIONS CITED IN ORDER OF APPEARANCE

This appendix includes all publications authored by me in the last 10 years.

*Oversight Hearing on Economic Development in Indian Country: Hearing Before the Senate Indian Affairs Comm.* 109th Cong. 2nd Sess. 115-116 (2006) (statement of Lance Morgan, Ho-Chunk Inc).

American Indian Lawyer Training Program. *Indian Tribes as Sovereign Governments: A Sourcebook on Federal-Tribal History, Law, and Policy.* American Indian Resources Institute Press. (1991).

Stephen Cornell. *The Return of the Native: American Indian Political Resurgence.* Oxford University Press. (1988).

David E. Wilkins, *American Indian Politics and the American Political System.* Rowman & Littlefield Publishers, Inc. (2002).

Indian Gaming Regulatory Act, 25 USC 2701 *et. seq.* (2018)

See Approved Management Contracts listing. National Indian Gaming Commission http://www.nigc.gov/finance/approved-management-contracts.

Johnathon Taylor, *A Report on the Economic, Cultural and Social Impacts of the Native 8(a) Program.* Native American Contractors Association Report. (May 2012).

Small Business Act 15 U.S.C. 637 (a).

*Promised Fulfilled: The Role of the SBA 8(a) Program in Enhancing Economic Development in Indian Country.* April 7, 2011. 112th Cong. 1st Sess. p. 19 Attachment A (2011) (Statement of Lance Morgan, Chairman of the Native American Contractors Association).

Size Appeal of HCI Construction, Inc. SBA No. Siz-4460(2001);

Ahne Minge & Andrew Twite, *The Impact of Surety Bonding on American Indian and Tribally Owned Contractors*, Federal Reserve Bank of Minneapolis Community Development Report no 2014-1,

Douglas McCourt, *Renewable Energy Development in Indian Country: A Handbook for Tribes,* Project for the National Renewable Energy Laboratory, NREL, (June 2010 ed.)

*Low Income Housing Tax Credits 101*, Travois, Inc. (2013). Retrieved October 28, 2018 http://www.travois.com/wp-content/uploads/2013/09/LIHTC101.pdf.

Lance Morgan, *The Rise of Tribes and the Fall of Federal Indian Law*, 49 Ariz. St. L.J. 115, (2017).

*Internet Infrastructure in Native Communities: Equal Access to E-Commerce, Jobs and the Global Marketplace: Hearing before the Senate Indian Affairs Comm.* 112th Cong. 2nd Sess. (2011) (Statement of Lance Morgan, CEO Ho-Chunk, Inc.).

Kelly Croman & Johnathon Taylor, *Why Beggar Thy Indian Neighbor? The Case for Primacy in Taxation in Indian Country.* Joint Occasional Papers on Native Affairs, JOPNA 2016-1, May 4, 2016.

Amy Sullivan, *How Citibank Made South Dakota the Top State in the U.S. for Business*, The Atlantic, July 10, 2013. https://www.theatlantic.com/business/archive/2013/07/how-citibank-made-south-dakota-the-top-state-in-the-us-for-business/425661.

Connie Prater, *Issuer of 79.9 % Interest Rate Credit Card Defends its Product*, CreditCard.com, February 12, 2010. https://www.creditcards.com/credit-card-news/first-premier-79-rate-credit-card-1265.php#.

*Rethinking Property Tax Incentives for Business,* Policy Focus Report/Lincoln Institute of Land Policy (2012).

Leslie Wayne, *How Delaware Thrives as a Corporate Tax Haven,* N.Y. Times June 30, 2012.

Nebraska Lottery. https://nelottery.com/homeapp/static/shared/halfbillion/index.html. Retrieved December 11, 2018.

Santee Sioux Tribe of Nebraska vs State of Nebraska, 121 F.3d 427 (8th Cir. 1997).

Master Settlement Agreement, retrieved December 13, 2018. www.naag.org/assets/redesign/files/msa-tobacco/MSA.pdf

Complaint, at 9-12, *HCI Distribution, Inc., et.al., v. Peterson, et.al.*, No. 18-cv-173 (D.Neb. April 20 2018), ECF No. 1.

Def.Br.Supp.Mot.Dismiss, at 11-12, *HCI Distribution, Inc., et.al., v. Peterson, et.al.,* No. 18-cv-173 (D.Neb. Aug. 15, 2018), ECF No. 28.

Michigan vs Bay Mills Indian Community, 134 S. Ct. 2024 (2014).

Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996).

Cobell vs. Salazar Settlement; Claims Resolution Act of 2010, Pub. L. No. 111-291, H.R. 4783 (2010).

Bureau of Indian Affairs, Office of Indian Gaming: Indian Gaming Compact Listing.
https://www.indianaffairs.gov/as-ia/oig/gaming-compacts.

Stipulation for Entry of Consent Judgement; Consent Judgement. Sault Ste. Marie Tribe of
Chippewa, et. al, v. John M. Engler, Governor of Michigan. Civ. No. 1:90 CV 611. P. 5-6,
United States District Court Western District of Michigan. (August 1993).

Michigan Gaming Control Board. Tribal 2% Payments to Local Units of State Government
Chart. (March 5, 2018),
https://www.michigan.gov/documents/2_percent_Payments_76617_7.pdf.

Michigan Gaming Control Board. Tribal Payments to Michigan Strategic Fund. (March 29,
2018). https://www.michigan.gov/documents/mgcb/MEDC-MSF_Payment_Worksheet_2017-07-
24_609815_7.pdf.

Cotton Petroleum Corp. v New Mexico, 490 U.S. 163 (1989).

Oil and Gas Tax Agreement Between The Three Affiliated Tribes and State of North Dakota.
(June 6, 2013).
https://www.nd.gov/tax/data/upfiles/media/oilgastaxagreement.pdf?20181028220016.

U.S. Department of Interior.  Natural Resources Revenue Data: Revenue from Natural Resources
on Indian Land.  https://www.revenuedata.doi.gov/how-it-works/tribal-revenue/.

Susan Johnson, et al. Government to Government: Models of cooperation between states and
tribes, p.1. (2009). Retrieved October 27, 2018, from
http://www.nijc.org/pdfs/TTAP/NCSLGovttoGovt.pdf.

APPENDIX C

QUALIFICATIONS OF LANCE MORGAN

---

## PROFESSIONAL EXPERIENCE

**Ho-Chunk, Inc.** – Winnebago, NE                                     *1995-Present*
Chief Executive Officer and President- An international tribal conglomerate involved in developing non-gaming aspects of the Winnebago tribal economy. One of the fastest growing companies in the Sioux City metro area, with over 1,000 employees and 2017 revenues of $230 million in a variety of industries including retail, hotels, construction, technology, government contracting, and distribution.

**Fredericks, Peebles & Morgan -** Omaha, NE                          *2004 –Present*
Managing Partner – Equity Partner in the largest Indian Law Firm in the country and advised multiple tribes on a wide variety of corporate, tribal development and taxation issues.  Helped multiple tribes establish tribal corporations and advise tribal corporations on a wide variety of corporate, tribal law and strategic issues.   Offices in California, Colorado, Nebraska, South Dakota, North Dakota, Michigan and Washington, D.C.

**Arizona State Law School** – Tempe, AZ                              *2005 – Present*
Adjunct Professor- Classes taught include Federal Indian Law and Contemporary Tribal Economic Development.   Published: "The Rise of Tribes and the Fall of Federal Indian Law." Arizona State Law Journal, 2017

**Department of the Interior** – Washington, D.C.                     *2004 – 2005*
Economic Policy Consultant- Responsible for developing an economic implementation plan for the Department of Economic Policy for the Bureau of Indian Affairs.

**Dorsey & Whitney** – Minneapolis, MN                               *1993-1994*
Associate Attorney - Worked in the Indian Law division of a national law firm. Practice areas included gaming on Indian lands and corporate law matters.

---

## EDUCATION

**Harvard Law School**
Cambridge, MA
Juris Doctor, 1993

**University of Nebraska**
Bachelor of Science in Economics & Business Administration, 1990
Lincoln, NE

## AWARDS & COMMENDATIONS

- Chief Standing Bear Humanitarian Award, Nebraska Commission of Indian Affairs, 2011
- Distinguished Alumni Speaker, Harvard Law School, 2003
- Board Member, Consumer Advisory Board for the U.S. Federal Reserve Bank, 2006 to 2009
- Nebraska Builder Award, University of Nebraska's highest possible award, 2013
- Advocate of the Year Award, Minority Enterprise Development, 2014
- Newsmaker of the Year, Sioux City Journal, 2015
- University of Nebraska, Lincoln, Commencement Speaker, 2013
- Regional Small Business Person of the Year, SBA, 2010
- Innovations in Government Award, Harvard University and the Ford Foundation, 2001
- Harvard Honoring Nations Award, Ho-Chunk, Inc., 2000
- Harvard Honoring Nations Award, Winnebago Community Development Fund, 2006
- Harvard Honoring Nations Award, Ho-Chunk Village, 2015
- White House Champion of Change Award, 2012
- Inc. Magazine, named one of "25 Top Entrepreneurs, We Love." 2004
- People Magazine, named one of "Most Fascinating People," 2002
- Featured in the Wall Street Journal, People Magazine, the Economist, and Fortune Magazine
- Named one of the 50 Faces of Indian Country, 2016
- Travois, Economic Development Professional of the Year, 2017

## SELECT SPEAKING ENGAGEMENTS

- Speaker, Arizona State Law School CLE, *Wiring the Rez: Innovative Strategies for Business Development Via E-*Commerce.  Session: *The Evolutionary Pattern of Tribal Internet Business Partnerships.* Jan. 2019.
- Speaker, Arizona State Law School CLE, *Inaugural Tribal Government E-Commerce: Innovating a New Geography of Indian Country.*  Session:  *Old and New Strategies of Innovation in Tribal Economic Development.* 2015
- Speaker, United States Senate Committee on Indian Affairs. *Internet Infrastructure in Native Communities: Equal Access to E-Commerce, Jobs and the Global Marketplace.* 2011
- Keynote Speaker, Northern Minnesota Tribal Economic Summit, *Building Business Through Partnerships,* 2011.
- Traphagen Distinguish Alumni Speaker, Harvard Law School, Tribal Development, 2003
- Canby Lecture, Arizona State Law School, *The Rise of Tribes and the Fall of Federal Indian Law.* 2016
- Hubbard Lecture, University of Nebraska and the Great Plains Art Museum, *Tribal Economics: A Dark Past and a Promising Future.* 2017

- Speaker, Harvard Project on American Indian Development, John F. Kennedy School of Government, *The Next Horizon: What Are the Looming Challenges in Building and Exercising Self Governance?* 2017
- Guest Speaker, Harvard Business School, *Building Sustainable Tribal Communities*. 2017
- Guest Speaker, University of Nebraska and the Great Plains Symposium, *Celebrating the Ho-Chunk Story.* 2015
- Keynote Speaker, Nebraska Investment Finance Authority, *Living Our Mission Every Day.* 2018
- Keynote Speaker, Great Plains Tribal Leaders' Economic Development Summit, *The Ho-Chunk Economic Development Model.* 2017
- Keynote Speaker, Navajo Nation Economic Summit, *Building Tribal Economies*, 2016
- Speaker, Arizona State Law School CLE, *Sustaining the Reservation: Creating Tribal Economies. Reservation Economic Diversification.* 2014
- Speaker, United States Senate Committee on Indian Affairs. *Promised Fulfilled: The Role of the SBA 8(a) Program in Enhancing Economic Development in Indian Country.* 2011
- Speaker, United States Senate Committee on Indian Affairs. *Oversight Hearing on Economic Development in Indian Country.* 2006
- Speaker, University of Arizona Law School, *All Roads lead to Chaco Canyon, Revitalizing Trade between Tribal Nations.* 2018
- Speaker, Federal Indian Bar Association, *Responding to the Trump Agenda: Preserving and Protecting our Rights in an Uncertain Time.* 2018
- Video Interview, Native Nations Institute, University of Arizona, *Building and Sustaining Tribal Enterprises.* 2006
- Keynote Speaker, Native American Summit, State of Utah, 2010
- Speaker, U.S. Department of Energy, Access to Opportunities, *Federal Contracting Role with Tribal Economic Development.* 2017
- Speaker, National Indian Gaming Tradeshow and Convention. *Pursuing Commercial Gaming Licenses: Caveat Emptor.* 2016
- Keynote Speakers, Creighton University, Mountain Plains Minority Supplier Development Council, *Opening Doors to New Horizons.* 2016

## PUBLICATIONS

- Lance Morgan, *The Rise of Tribes and the Fall of Federal Indian Law*, 49 Ariz. St. L.J. 115, (2017).

## SELECT TRIBAL CORPORATE ACTIVITIES

- Tigua, Inc., developed legal structure and initial strategy for the economic development corporation of the Ysleta Del Sur Pueblo Tribe.
- Prairie Band, L.L.C., developed legal structure and initial strategy for the economic development corporation for the Prairie Band Potawatomi Nation.

- Potawatomi Business Development Corporation, served as one the original board members for the economic development corporation for the Forest County Potawatomi Band.
- Osage, LLC, developed the legal structure and initial strategy for the economic development corporation of the Osage Nation.
- Dakota Futures, Inc., served on the initial board of directors and advised on several economic development strategies, for the economic development corporation of the Lower Sioux Indian Community.
- Chukchansi, Inc., served on their initial board and developed the initial strategy of the economic development corporation of the Picayune Rancheria of Chukchansi Indians
- Meskwaki, Inc., advised the tribe on legal structure of the development corporation of Meskwaki Nation.
- Kituwah Economic Development, L.L.C., board member for Eastern Band of Cherokee's economic development corporation.
- Hosted and informally advised many other tribes who visited Ho-Chunk, Inc. to learn more about tribal corporate structure, tribal strategy, tribal community development and tribal taxation related issues.

## BOARD MEMBERSHIPS

- Member, Board of Directors, Casey Family Programs, 2018
- Chairman, Native American Contractors Association, 2009 – 2012
- Member, Executive Committee of Board of Trustees, Smithsonian's National Museum of the American Indian, 2013 to 2018
- Chairman, Siouxland Chamber of Commerce, 2016
- Member, Board of Directors, Kituwah, Economic Development, L.LC, 2018
- Member, Board of Directors, Native American Bank, 2015 to present
- Member, Board of Directors, Liberty National Bank, 2002 - present
- Member, Board of Directors, Prairie Band, LLC, 2010 - 2015
- Member, Board of Directors, Dynamic Homes., a formerly public company, 1999 - 2001
- Member, Board of Directors, Potawatomi Business Development Company, 2005 -2009
- Member, Board of Directors, Lower Sioux Economic Development Corp. 2009 -2011
- Member, Board of Directors, Chukchansi, Inc., 2004 - 2008
- Member, Nebraska Rural Development Commission 2006 – 2007
- Member, Board of Directors, Little Priest Tribal College, 1997-2001

## BAR ADMISSIONS

State of Minnesota, 1993 - present
Winnebago Tribe of Nebraska, 1994 - present

## TRIBAL AFFLIATION

Enrolled Member of the Winnebago Tribe of Nebraska