# EXHIBIT OOOOOO

**Rick Gerber**

---

**From:** Matt Martorello <mattm@bellicosevi.com>
**Sent:** Thursday, May 29, 2014 2:16 PM
**To:** Rick Gerber
**Subject:** FW: House Oversight Committee Report on Operation Choke Point
**Attachments:** Staff-Report-Operation-Choke-Point1.pdf

In case you didn't see the results of the report.

Operation Choke Point has forced banks to terminate relationships with a wide variety of entirely lawful and legitimate merchants. The initiative is predicated on the claim that providing normal banking services to certain merchants creates a "reputational risk" sufficient to trigger a federal investigation. Acting in coordination with Operation Choke Point, bank regulators labeled a wide range of lawful merchants as "high-risk" – including coin dealers, firearms and ammunition sales, and short-term lending. Operation Choke Point effectively transformed this guidance into an implicit threat of a federal investigation.

**From:** Sarah Hoeller [mailto:shoeller@axiomstrategies.com]
**Sent:** Thursday, May 29, 2014 3:10 PM
**To:** Sarah Hoeller
**Subject:** House Oversight Committee Report on Operation Choke Point



*Committee On*
# Oversight & Government Reform

### Report: DOJ's Operation Choke Point Secretly Pressured Banks to Cut Ties with Legal Business
May 29, 2014

WASHINGTON – House Oversight and Government Reform Committee Chairman Darrell Issa (R-Calif.) today released a staff report, *The Department of Justice's "Operation Choke Point": Illegally Choking Off Legitimate Businesses?*, on the DOJ's wide-ranging investigation of banks and payment processors. The ostensible goal of the investigation is to combat mass-market consumer fraud by foreclosing fraudsters' access to payment systems. However, today's report finds the true goal of Operation Choke Point is to target industries deemed objectionable by the Administration.

"Operation Choke Point is the Justice Department's newest abuse of power," Issa said. "If the administration believes some businesses should be out of business, they should prosecute them before a judge and jury. By forcibly conscripting banks to do their bidding, the Justice Department has avoided any review and any check on their power."

1

On January 8, 2014, Chairman Issa and Subcommittee Chairman Jordan requested documents and communications related to Operation Choke Point.

The report is available here.

First appendix of documents here.

Second appendix of documents here.

**Key Findings**

- Operation Choke Point was created by the Justice Department to "choke out" companies the Administration considers a "high risk" or otherwise objectionable, despite the fact that they are legal businesses. The goal of the initiative is to deny these merchants access to the banking and payments networks that every business needs to survive.

- Operation Choke Point has forced banks to terminate relationships with a wide variety of entirely lawful and legitimate merchants. The initiative is predicated on the claim that providing normal banking services to certain merchants creates a "reputational risk" sufficient to trigger a federal investigation. Acting in coordination with Operation Choke Point, bank regulators labeled a wide range of lawful merchants as "high-risk" – including coin dealers, firearms and ammunition sales, and short-term lending. Operation Choke Point effectively transformed this guidance into an implicit threat of a federal investigation.

- The Department is aware of these impacts, and has dismissed them. Internal memoranda on Operation Choke Point acknowledge the program's impact on legitimate merchants. Senior officials informed Attorney General Eric Holder that as a consequence of Operation Choke Point, banks are exiting entire lines of business deemed "high risk" by the government.

- The Department lacks adequate legal authority for the initiative. Operation Choke Point is being executed through subpoenas issued under Section 951 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989. The intent of Section 951 was to give the Department the tools to pursue civil penalties against entities that commit fraud *against* banks, not private companies doing legal business. Documents produced to the Committee demonstrate the Department has radically and unjustifiably expanded its Section 951 authority.

- Contrary to the Department's public statements, Operation Choke Point was primarily focused on the payday lending industry. Internal memoranda and communications demonstrate that Operation Choke Point was focused on short-term lending, and online lending in particular. Senior officials expressed their belief that its elimination would be a "significant accomplishment" for consumers.

**NATIVE AMERICAN FINANCIAL SERVICES ASSOCIATION**

**WWW.MYNAFSA.ORG**

**This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.**

U.S. House of Representatives

# Committee on Oversight and Government Reform

Darrell Issa (CA-49), Chairman



### The Department of Justice's "Operation Choke Point": Illegally Choking Off Legitimate Businesses?

Staff Report
113th Congress

May 29, 2014

## Key Findings

- <u>Operation Choke Point was created by the Justice Department to "choke out" companies the Administration considers a "high risk" or otherwise objectionable, despite the fact that they are legal businesses.</u> The goal of the initiative is to deny these merchants access to the banking and payments networks that every business needs to survive.

- <u>Operation Choke Point has forced banks to terminate relationships with a wide variety of entirely lawful and legitimate merchants.</u> The initiative is predicated on the claim that providing normal banking services to certain merchants creates a "reputational risk" sufficient to trigger a federal investigation. Acting in coordination with Operation Choke Point, bank regulators labeled a wide range of lawful merchants as "high-risk" – including coin dealers, firearms and ammunition sales, and short-term lending. Operation Choke Point effectively transformed this guidance into an implicit threat of a federal investigation.

- <u>The Department is aware of these impacts, and has dismissed them.</u> Internal memoranda on Operation Choke Point acknowledge the program's impact on legitimate merchants. Senior officials informed Attorney General Eric Holder that as a consequence of Operation Choke Point, banks are exiting entire lines of business deemed "high risk" by the government.

- <u>The Department lacks adequate legal authority for the initiative.</u> Operation Choke Point is being executed through subpoenas issued under Section 951 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989. The intent of Section 951 was to give the Department the tools to pursue civil penalties against entities that commit fraud *against* banks, not private companies doing legal business. Documents produced to the Committee demonstrate the Department has radically and unjustifiably expanded its Section 951 authority.

- <u>Contrary to the Department's public statements, Operation Choke Point was primarily focused on the payday lending industry.</u> Internal memoranda and communications demonstrate that Operation Choke Point was focused on short-term lending, and online lending in particular. Senior officials expressed their belief that its elimination would be a "significant accomplishment" for consumers.

1

I. **Background**

Over the past year, the Department of Justice has initiated a wide-ranging investigation of banks and payment processors, known informally as "Operation Choke Point."[1] As of December 2013, the Department had issued over fifty subpoenas to banks and payment processors.[2] The ostensible goal of the investigation is to combat mass-market consumer fraud by foreclosing fraudsters' access to payment systems.[3] However, there is evidence that the true goal of Operation Choke Point is to target industries deemed "high-risk" or otherwise objectionable by the Administration.[4]

Following the launch of Operation Choke Point in spring 2013, a wide variety of fully lawful and legitimate businesses received notices that their bank accounts were being abruptly terminated. The terminations were often attributed to "regulatory trends" or "heightened scrutiny," and expressly disclaimed any negative assessment of the accountholder's financial risk.[5] The sheer breadth of industries affected – including firearms and ammunition sales,[6] adult entertainment,[7] check cashing,[8] and payday lending[9] – has generated significant concern with the objectives and scope of Operation Choke Point. William Isaac, a former Chairman of the Federal Deposit Insurance Corporation, has characterized the initiative an "attack on market economy," while *Techdirt* has warned of the propriety of forcing private banks into "dancing to a federal piper."[10]

Writing in *USA Today*, Glenn Reynolds expressed concern with the unforeseen consequences of allowing the Department of Justice to pressure banks to shut down the accounts of legal industries: "while abortion clinics and environmental groups are probably safe under the Obama Administration, if this sort of thing stands, they will be vulnerable to the same tactics if a different administration adopts this same thuggish approach toward the businesses that it dislikes."[11] Such a possibility is far from outlandish: at the same time the Administration is

---

[1] Presentation by a Trial Attorney in the Consumer Protection Branch, U.S. Dep't of Justice, to the Federal Financial Institutions Examination Council, Sept. 17, 2013 (slides on file with Committee staff).

[2] HOGR-3PPP000497.

[3] *See* Letter from Peter J. Kadzik, Principal Deputy Assistant Attorney General, Office of Legis. Affairs, U.S. Dep't of Justice, to Rep. Blaine Luetkemeyer (Sept. 12, 2013) (stating "[t]he Department seeks to combat fraud and other unlawful practices in the payment system, and our efforts are focused on all those engaged in illegal activity."); Congressional staff briefing with the Deputy Assistant Attorney General for Consumer Protection, Civil Div., U.S. Dep't of Justice, on Sept. 20, 2013.

[4] HOGR-3PPP000458.

[5] *See, e.g., infra* text accompanying note 30.

[6] Kelly Riddell, *'High risk' label from feds puts gun sellers in banks' crosshairs, hurts business*, WASH.TIMES, May 18, 2014.

[7] Glenn Harlan Reynolds, *Justice Department shuts down porn money: Column*, USA TODAY, May 26, 2014.

[8] William Isaac, *'Operation Choke Point: Way Out of Control*, AMERICAN BANKER, Apr. 27, 2014.

[9] Jessica Silver-Greenberg, *Justice Department Inquiry Takes Aim at Banks' Business With Payday Lenders*, N.Y. TIMES, Jan. 26, 2014.

[10] William Isaac, *'Operation Choke Point: Way Out of Control*, AMERICAN BANKER, Mar. 21, 2014; Timothy Geigner, *DOJ Morality Police May Be Behind Chase Closing Bank Account of Adult Film Actors*, TECHDIRT, May 1, 2014.

[11] Glenn Harlan Reynolds, *Justice Department shuts down porn money: Column*, USA TODAY, May 26, 2014.

2

pressuring banks to terminate relationships with legal industries, it is providing formal guidance to banks on how to provide financial services to the marijuana industry.[12]

Concerned that both the goal and mechanisms of Operation Choke Point constitute a serious abuse of the Department's civil investigative authority, on January 8, 2014, Chairman Issa and Subcommittee Chairman Jordan requested documents and communications related to Operation Choke Point. In response, the Department of Justice provided 853 pages of internal memoranda, email communications, and presentations. These internal documents confirm that the Operation Choke Point is an inappropriate exercise of the Department's legal authorities, and is being executed in a manner that unfairly harms legitimate merchants and individuals.

## II. <u>The Department Lacks Adequate Legal Justification for Operation Choke Point</u>

The Department is implementing Operation Choke Point through subpoenas issued under Section 951 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA).[13] Section 951 authorizes the Attorney General to seek civil money penalties against entities that commit mail or wire fraud "affecting a federally insured financial institution."[14] The Attorney General is further authorized, in contemplation of such a proceeding, to issue administrative subpoenas for the production of documents and the deposition of witnesses. Such subpoenas are not subject to judicial authorization, and apply to all records and witnesses the Attorney General "deems relevant or material to the inquiry."[15] Congress enacted FIRREA – and its extraordinary grant of civil investigative authority – in response to the savings and loan crisis of the late 1980s. The intent of Section 951 was to give the Department the tools to pursue civil penalties against individuals and entities that commit fraud *against* depository institutions.[16]

Documents produced to the Committee indicate that, in furtherance of Operation Choke Point, the Department has radically and inappropriately expanded its own authority under FIRREA. In a memorandum on Operation Choke Point prepared for Stuart F. Delery, the Assistant Attorney General for the Civil Division, senior officials candidly discuss the legal authority for the program. The discussion begins by flatly conceding that "[Section 951] was not designed principally to address consumer fraud . . . FIRREA penalties are paid to the Treasury, and the statute does not include a provision for restitution to victims of fraud."[17] The memorandum further acknowledges that Section 951 requires that the alleged fraud "[affect] a federally insured financial institution." In an end-run around this requirement, the memorandum posits that providing normal banking services to an allegedly fraudulent merchant creates a variety of "risks," and that these risks may "affect" the institution. The memorandum even concedes that these risks are strictly hypothetical, candidly admitting that "[t]he financial

---

[12] *See* Financial Crimes Enforcement Network, U.S. Dep't of the Treasury, Guidance: BSA Expectations Regarding Marijuana-Related Businesses, Feb. 14, 2014; *see also* Memorandum from James M. Cole, Deputy Attorney General, U.S. Dep't of Justice, to All United States Attorneys: Guidance Regarding Marijuana Enforcement (Aug. 29, 2013).
[13] 12 U.S.C. § 1833a.
[14] *Id.* at § 1833a(c)(2).
[15] *Id.* at § 1833a(f)(1)(C).
[16] Allyson B. Baker and Andrew Olmem, Venable LLP, *FIRREA: The DOJ's Expansive (and Expensive) Tool of Choice*, 29 WESTLAW J. OF CORP. OFFICERS AND DIRECTORS LIABILITY 3 (2013).
[17] HOGR-3PPP000336.

3

institutions we are investigating have not suffered any actual losses."[18] While the memorandum does cite a single recent court case, the Department's analysis clearly reflects the inherent legal error of using an anti-*bank fraud* statute to combat *merchant fraud*.

Frank Keating, president and CEO of the American Bankers Association and a former U.S. Attorney and Associate Attorney General, has called the Department's strategy "legally dubious."[19] In a recent op-ed in *The Wall Street Journal*, Mr. Keating explained:

> [The Department] is pressuring banks to shut down accounts without pressing charges against a merchant or even establishing that the merchant broke the law. It's clear enough that there's fraud to shut down the account, Justice asserts, but apparently not enough for the highest law-enforcement agency in the land to prosecute.
>
> . . .
>
> [The Department] is now blurring these boundaries and punishing the banks that help them fight crime. If a bank doesn't shut down a questionable account when directed to do so, Justice slaps the institution with a penalty for wrongdoing that may or may not have happened. The government is compelling banks to deny service to unpopular but perfectly legal industries by threatening penalties.[20]

Ultimately, the Department's tortured legal analysis has turned FIRREA on its head: Section 951 was intended to help the Department *defend* banks from fraud; instead, the Department is using it to *forcibly conscript* banks to serve as the "policemen and judges" of the commercial world.[21]

### III. **Impacts on Financial Services, Businesses, and Consumers**

#### a. Documents Show the Department is Targeting Legal Financial Services

The Department has consistently stated that the goal of Operation Choke Point is to combat mass-market consumer fraud. In a letter to the American Bankers Association and the Electronic Transaction Association on January 22, 2014, Assistant Attorney General Delery was unequivocal: "The Department wishes to make clear that the aim of these efforts is to combat fraud. The Department has no interest in pursuing or discouraging lawful conduct."[22] The Department reaffirmed this position in a letter to Chairman Issa and Subcommittee Chairman Jordan on January 24, 2014.[23] Documents produced to the Committee call into question the

---

[18] *Id.*
[19] Frank Keating, Op-Ed., *Justice Puts Banks in a Choke Hold*, WALL ST. J., Apr 24, 2014.
[20] *Id.*
[21] *Id.*
[22] Letter from Stuart F. Delery, Assistant Attorney General, Civil Div., Dep't of Justice, to Jeff L. Plagge, Chairman, American Bankers Ass'n, and Jason Oxman, Chief Executive Officer, Elec. Transaction Ass'n (Jan. 22, 2014).
[23] Letter from Peter J. Kadzik, Principal Deputy Assistant Attorney General, Office of Legislative Affairs, Dep't of Justice, to Darrell Issa, Chairman, H. Comm. on Oversight and Gov't Reform, and Jim Jordan, Chairman,

4

accuracy of these statements. Specifically, internal memoranda on Operation Choke Point clearly demonstrate that the Department's primary target is the short-term lending industry – an indisputably lawful financial service.

The idea for the initiative originated in the Consumer Protection Working Group of the Financial Fraud Enforcement Task Force. The working group's mission statement included a list of priorities:

> [T]his new Working Group will examine a wide variety of areas where consumers may be vulnerable to fraud. Those may include: identity theft, third-party payment processors and other payment fraud, student-consumer fraud, cramming, business opportunity schemes, data privacy, payday lending, counterfeiting, and schemes targeting servicemembers and their families.[24]

There is no explanation for why payday lending and payment processing – two legal financial practices – are included in a list of explicitly fraudulent activities.

After Operation Choke Point was underway, regular status reports reflect the initiative's intense focus on short-term lending. The *Eight-Week Status Report* on Operation Choke Point, prepared for Assistant Attorney General Delery on April 17, 2013, framed payday lending as the primary target of the initiative. In fact, it is the sole type of financial service mentioned in the memorandum.[25] The *Four-Month Status Report* on Operation Choke Point, prepared for Assistant Attorney General Delery on July 8, 2013, expressly identifies Internet payday lending as a fraudulent "scam" being targeted by the initiative.[26]

The strongest evidence that the Department is targeting certain lawful financial practices can be found in internal discussions of settlement negotiations. In an email dated October 1, 2013, the Director of the Consumer Protection Branch and the Deputy Assistant Attorney General for Consumer Protection discussed ongoing negotiations with subpoenaed banks.[27] The email notes that the Department's settlement proposals have included "specific bans [on] doing business" with whole categories of lawful financial services.[28] The email describes "specific language" on payday lending, debt relief companies, foreclosure rescue companies, and credit repair companies:

---

Subcomm. on Economic Growth, Job Creation, and Regulatory Affairs, H. Comm. on Oversight and Gov't Reform (Jan. 24, 2014).
[24] HOGR-3PPP000001.
[25] HOGR-3PPP000048-52 (The conclusion of the memorandum, entitled "Related Areas of Inquiry," does include a brief discussion of other financial services and products: "In addition to evaluating the payday lending industry, we are attempting to develop a better understanding of consumer fraud risk posed by emerging payment systems.").
[26] HOGR-3PPP000166.
[27] HOGR-3PPP000401.
[28] *Id.*

5

---

**From:** Blume, Michael S.
**Sent:** Tuesday, October 01, 2013 10:55 AM
**To:** Frimpong, Maame Ewusi-Mensah (CIV)
**Subject:** TPPP

Maame

FYI -- Rich, Joel, and I had a conversation about following up on Stuart's suggestions from last night. I'm happy to discuss in more detail, but the short of it is that they are already where Stuart wants them to be (i.e., pushing for the alternative, non-specific language rather than the specific language on payday lending). There are some nuances that we need to think through, which we are doing. For example, some proposals to banks have included specific bans doing business with debt relief companies, foreclosure rescue companies, and credit repair companies, and finding alternative, non-specific language presents unique challenges.

Mike

---

Such blanket prohibitions on entire industries are wholly inconsistent with the Department's repeated assertion it is merely pursuing fraudsters, and has "no interest" in discouraging lawful conduct.[29]

Operation Choke Point is having its desired effect –legitimate merchants in legal industries are being choked-off from the financial system. In a statement to the House Committee on Financial Services, a trade group of licensed money service businesses and lenders submitted recent account termination letters in which the bank explicitly attributed the termination to Operation Choke Point.[30] A sample of these letters includes:

- **Bank of America**: "[W]e reviewed the nature of your business in light of current regulatory trends affecting your industry. After careful consideration we've decided to close your existing Small Business checking account . . . ." (January 14, 2014)

- **Bank of Hawaii**: "Bank of Hawaii has made a business decision to close your above-referenced business deposit accounts. The primary reason for this account closure is the Bank's increasing business expenses involved with servicing this type of account for a customer that operates as a money service business and/or payday lender." (December 6, 2013).

- **Hancock Bank | Whitney Bank**: "We are unable to effectively manage your Account(s) on a level consistent with the heightened scrutiny required by our regulators for money service businesses due to the transactional characteristics of your business." (February 26, 2014)

- **Fifth Third Bank**: "During recent reviews of the payday lending industry, we have determined that the services provided by clients in this industry are outside of our risk

---

[29] *See supra* note 22.
[30] Statement of the Financial Service Centers of America to the U.S. House of Representatives Committee on Financial Services, Regarding the Impact of Recent Regulatory Supervisory and Enforcement Actions on Consumer Financial Services, Exhibit "A" (April 8, 2014).

6

> tolerance. As such, we will no longer be able to provide financial services to businesses that operate in that industry." (March 18, 2014)

Documents produced to the Committee demonstrate that this reaction is the precise goal of Operation Choke Point. The *Six-Month Status Report* on Operation Choke Point, prepared for Assistant Attorney General Delery on September 9, 2013, notes:

> Many of the banks that have received our FIRREA subpoenas have reported extensive relationships with Internet payday lenders, via payment processors. Several banks have informed us that, as a result of our subpoenas, they have taken a deeper look at these Internet payday lenders and their business practices. Finding substantial questions concerning the legality of the Internet payday lending business models and the loans underlying debits to consumers' bank accounts, **many banks have decided to stop processing transactions in support of Internet payday lenders. We consider this to be a significant accomplishment and positive change for consumers . . . .**[31] [emphasis added]

> . . .

> **Although we recognize the possibility that banks may have therefore decided to stop doing business with legitimate lenders, we do not believe that such decisions should alter our investigative plans.** Solving that problem – if it exists – should be left to legitimate lenders themselves who can, through their own dealings with banks, present sufficient information to the banks to convince them that their business model and lending operations are wholly legitimate.[32] [emphasis added]

Such an expectation – "if they are legitimate, they can prove it" – is patently absurd, and reminiscent of the formulation that "if one is *not* a witch, then they will sink rather than float." Furthermore, given that the Department has ordered banks to cease doing business with all short-term lenders in its settlement negotiations, no amount of evidence of legitimacy will be "sufficient" to secure a banking relationship.[33]

### b. Banks are Terminating Relationships with Legal Industries, Often Leaving Businesses with No Recourse

Operation Choke Point threatens countless legal businesses well outside of consumer finance. The Department's radical reinterpretation of its authority under FIRREA, in conjunction with recent policy announcements by bank examiners, is compelling banks to terminate longstanding lending and depository relationships with a wide array of lawful businesses and individuals. In 2012, the Federal Deposit Insurance Corporation issued revised guidance for FDIC-supervised institutions concerning their relationships with payment processors.[34] The guidance identified a variety of businesses who pose "elevated . . . legal,

---

[31] HOGR-3PPP000333.
[32] HOGR-3PPP000335.
[33] *Id.*
[34] Federal Deposit Insurance Corporation, Financial Institution Letter, FIL-3-2012, Jan. 31, 2012.

reputational, and compliance risks" to depository institutions.[35] According to the FDIC, these businesses include:

> ... credit repair companies, debt consolidation and forgiveness programs, online-gambling related operations, government grant or will-writing kits, payday or subprime loans, pornography, online tobacco or firearms sales, pharmaceutical sales, sweepstakes, and magazine subscriptions.[36]

An earlier announcement posted to the FDIC website provided an even more expansive list of "high-risk activity."[37]

Some merchant categories that have been associated with high-risk activity include, but are not limited to:

- Ammunition Sales
- Cable Box De-scramblers
- Coin Dealers
- Credit Card Schemes
- Credit Repair Services
- Dating Services
- Debt Consolidation Scams
- Drug Paraphernalia
- Escort Services
- Firearms Sales
- Fireworks Sales
- Get Rich Products
- Government Grants
- Home-Based Charities
- Life-Time Guarantees
- Life-Time Memberships
- Lottery Sales
- Mailing Lists/Personal Info
- Money Transfer Networks
- On-line Gambling
- PayDay Loans
- Pharmaceutical Sales
- Ponzi Schemes
- Pornography
- Pyramid-Type Sales
- Racist Materials
- Surveillance Equipment
- Telemarketing
- Tobacco Sales
- Travel Clubs

As with the formal guidance, FDIC provided no explanation or warrant for the designation of particular merchants as "high-risk." Furthermore, there is no explanation for the implicit equation of legitimate activities such as *coin dealers* and *firearm sales* with such patently illegal or offensive activities as Ponzi schemes, racist materials, and drug paraphernalia.

Operation Choke Point rendered the FDIC's policy announcements extremely significant. The initiative is predicated on a radical reinterpretation of FIRREA – that merely providing normal banking services to certain merchants creates a "reputational risk" that is an actionable violation under Section 951.[38] As a consequence of this reformulation, Operation Choke Point effectively transformed the FDIC guidance into an implicit threat of a federal investigation. Suddenly, doing business with a "high-risk" merchant is sufficient to trigger a subpoena by the

---

[35] *Id.* at 1.
[36] *Id.*
[37] Federal Deposit Insurance Corporation, Supervisory Insights, *Managing Risk in Third-Party Payment Processor Relationships* (Summer 2011).
[38] *See supra* text accompanying note 17.

Department of Justice. Banks are put in an unenviable position: discontinue longstanding, profitable relationships with fully licensed and legal businesses, or face a potentially ruinous lawsuit by the Department of Justice.

Documents produced to the Committee demonstrate that the Department was counting on this reaction. The initial internal proposal for Operation Choke Point argued that banks would be "sensitive" to the risk of a federal investigation, and could be expected to "scrutinize immediately" their relationships.[39] Recent news reports have detailed the consequences of this scrutiny. A May 18, 2014 article in *The Washington Times* describes how a number of firearms merchants – a category identified as "high risk" by the government – abruptly had their bank accounts frozen or terminated.[40] One such example is particularly telling:

> T.R. Liberti, owner and operator of Top Gun Firearms Training and Supply in Miami, has felt the sting firsthand. Last month, his local bank, BankUnited N.A., dumped his online business from its service.
>
> An explanatory email from the bank said: "This letter in no way reflects any derogatory reasons for such action on your behalf. But rather one of industry. Unfortunately your company's line of business is not commensurate with the industries we work with."[41]

The FDIC's policy statements on firearm and ammunition sales carry additional weight in light of FDIC's active involvement in Operation Choke Point. Documents produced to the Committee indicate that in April 2013, the head of the Compliance and Enforcement Group of FDIC's Division of Depositor and Consumer Protection reached out to the Department to discuss "potential investigative approaches" with respect to banks and payment processing.[42] Later, the FDIC volunteered two attorneys to assist in the Department's investigations.[43] The FDIC's close coordination with the Department was well-reported, and likely contributed to the banks' understanding that the FDIC policy statements carried with them the threat of a federal investigation.[44]

On May 7, 2014, the Department of Justice offered the following statement on Operation Choke Point: "Of course, we recognize that most of the businesses that use the banking system are not fraudsters. We're committed to ensuring that our efforts to combat fraud do not discourage or inhibit the lawful conduct of these honest merchants."[45] The experience of firearms and ammunition merchants – an industry far

---

[39] HOGR-3PPP000018.
[40] Kelly Riddell, *'High risk' label from feds puts gun sellers in banks' crosshairs, hurts business*, WASH.TIMES, May 18, 2014.
[41] *Id.*
[42] HOGR-3PPP000051.
[43] HOGR-3PPP000168.
[44] Alan Zibel and Brent Kendall, Probe *Turns Up Heat on Banks: Prosecutors Target Firms That Process Payments for Online Payday Lenders, Others*, WALL ST. J., Aug. 7, 2013.
[45] Posting of the Civil Division's Consumer Protection Branch to The Justice Blog, http://blogs.justice.gov/main/archives/3651 (May 7, 2014).

removed from consumer finance fraud – calls into question the sincerity of the Department's statements.

## IV. **Frustration of Congressional Oversight**

The immediate and serious impact of Operation Choke Point prompted intense Congressional scrutiny. On August 22, 2013, Representative Blaine Luetkemeyer and thirty Members of Congress wrote a letter to Attorney General Holder and FDIC Chairman Gruenberg. Citing a recent article in the *Wall Street Journal*, the Members expressed concern that the Department's actions amounted to an effort to "choke off short-term lenders."[46] In its response of September 12, 2013, the Department expressly challenged the fundamental premise of Representative Luetkemeyer's letter – that Operation Choke Point was focused on online lending: "[t]he Department's efforts in this regard are not targeted at any one of these scams; rather, we are targeting fraud and unlawful practices in all of them."[47] Expressing a desire to "clarify an apparent misunderstanding," the Department accused the authors of misinterpreting the contents of the *Wall Street Journal* article.

Documents produced to the Committee demonstrate the accuracy of the Representative Luetkemeyer's interpretation, and call into question the sincerity of the Department's response. As an initial matter, the internal memoranda and status reports described above show that payday lenders, and online lenders in particular, were a primary target of Operation Choke Point. More damning, however, is that senior Department officials had <u>precisely the same</u> understanding of the *Wall Street Journal* article as did Representative Luetkemeyer. In a series of emails from August 6, 2013, senior officials in the Civil Division discussed the Department's cooperation with the *Wall Street Journal* reporter. The Director of the Consumer Protection Branch summarized the initial inquiry as follows:

> This is connected to our third party payment processing initiative, in which we have been starting to pay closer attention to banks and processors who deal with payday lenders. **My view is that getting the message out that DOJ is interested in on-line payday lenders and the potential abuses is important.**[48] [emphasis added]

The Deputy Assistant Attorney General for Consumer Protection further described the Department's cooperation with the *Wall Street Journal* inquiry:

> We want to give you a heads up that [the Director of the Consumer Protection Branch] is doing a background interview this afternoon at 4pm **on online pay day lending. As we described for you at last week's meeting, we are engaged in a third-party payment processor initiative in which we are looking into banks that deal with processors who work for payday lenders of all types.**[49]

---

[46] Letter from Rep. Blaine Luetkemeyer, et al., to Attorney General Eric H. Holder, Jr. (August 22, 2013).
[47] Letter from Peter J. Kadzik, Principal Deputy Assistant Attorney General, Office of Legislative Affairs, Dep't of Justice, to Rep. Blaine Luetkemeyer (Sept. 12, 2014).
[48] HOGR-3PPP000307.
[49] HOGR-3PPP000308.

10

It is entirely unacceptable for the Department to formally accuse Members of Congress of "misunderstanding" the focus of a major Department initiative, when senior officials in charge of that initiative shared precisely the same understanding.

Nonetheless, such obfuscation was repeated at a Congressional staff briefing on September 20, 2013. In response to questions concerning the targets of Operation Choke Point, the Deputy Assistant Attorney General for Consumer Protection repeatedly stated that the target of Operation Choke Point was mass-market consumer fraud and that the Department was not singling out any particular industry.[50] Furthermore, the Deputy Assistant Attorney General refused to provide basic information unrelated to specific investigations, such as the level of return rate sufficient to trigger an investigation, or the identity of the individual to whom the Attorney General had delegated his Section 951 subpoena authority.

Documents produced to the Committee provide context for the nature of the Department's response to Congressional oversight. In a November 21, 2013 memorandum on Operation Choke Point addressed to the Office of the Attorney General, the Office of the Deputy Attorney General, and the Office of the Associate Attorney General, senior officials in the Civil Division indicated their belief that Congressional oversight of this matter was being "directed and funded primarily by the owner of a particular payment processor presently under investigation."[51] Such an accusation is both offensive and irresponsible, and reflects negatively on the Department's response to Congressional oversight of a major Department initiative.

## V. Conclusion

Forceful prosecution of those who defraud American consumers is both responsible and admirable. However, Department of Justice initiatives to combat mass-market consumer fraud must be legitimate exercises of the Department's legal authorities, and must be executed in a manner that does not unfairly harm legitimate merchants and individuals.

Operation Choke Point fails both these requirements. The Department's radical reinterpretation of what constitutes an actionable violation under § 951 of FIRREA fundamentally distorts Congress' intent in enacting the law, and inappropriately demands that *bankers* act as the moral arbiters and policemen of the commercial world. In light of the Department's obligation to act within the bounds of the law, and its avowed commitment not to "discourage or inhibit" the lawful conduct of honest merchants, it is necessary to disavow and dismantle Operation Choke Point.

---

[50] Congressional Staff Briefing with the Deputy Assistant Attorney General for Consumer Protection, Civil Div., U.S. Dep't of Justice, on Sept. 20, 2013.
[51] HOGR-3PPP000501.

11