Exhibit 33

# AGREEMENT AND PLAN OF MERGER

among

## LVD TRIBAL ACQUISITION COMPANY, LLC

and

## BELLICOSE CAPITAL, LLC

and

## EVENTIDE CREDIT ACQUISITIONS, LLC

CONFIDENTIAL                                                                              MARTORELLO_000096

## AGREEMENT AND PLAN OF MERGER

This Agreement and Plan of Merger (this "Agreement"), executed on September 14, 2015 but effective as of date of Close (the "Effective Date") is entered into among, LVD TRIBAL ACQUISITION COMPANY, LLC ("Acquiror") an entity wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians, a federally recognized Indian tribe (the "Tribe"), Bellicose Capital, LLC, a Delaware limited liability company ("Company"), and Eventide Credit Acquisitions, LLC, in its capacity as seller and member of the Company ("Seller").

## ARTICLE I
## RECITALS

1.1   The United States Congress has recognized and enacted legislation such as the Native American Business Development, Trade Promotion and Tourism Act (25 U.S.C. §§ 4301 et seq.) and other legislation which recognizes the federal policy and Congressional intent "to promote economic self-sufficiency and political self-determination for Indian tribes and members of Indian tribes" through offering services from Indian Country.

1.2   The Tribe is interested in expanding its e-commerce business interests in order to serve the much needed economic interests of the Tribe.

1.3   Historically, the Tribe has suffered from a lack of significant economic activity, however, with the advent of e-commerce activities occurring within the Tribe's jurisdiction and pursuant to Tribal law, including but not limited to the Tribal Consumer Financial Services Regulatory Code, the Tribe, through its wholly-owned corporate entities, has been able to engage in e-commerce in a meaningful way that enables Acquiror, or another successor Tribal entity, to achieve profits distributable to the Tribe that will be utilized for the benefit of the Tribe. Acquiror believes that the purchase of Company will help advance these efforts further.

1.4   Company has been engaged in servicing the loan portfolios of Red Rock Tribal Lending, LLC and Duck Creek Tribal Financial, LLC and intends to service the loan portfolio of Big Picture Loans, LLC, all wholly owned and operated arms and instrumentalities of the Tribe, and the valuation of such services has been used among other components such as goodwill to base the sales price, and the Tribe wishes to acquire Company.

CONFIDENTIAL

MARTORELLO_000097

1.5   On the Effective Date, the parties intend that Company be merged with and into Acquiror, with Acquiror surviving that merger on the terms and subject to the conditions set forth herein (the "Merger").

1.6   At Close, the Company shall provide Acquiror, in accordance with Delaware corporate and limited liability company law ("DCL"), a written consent of its member approving this Agreement, the Merger and the transactions contemplated hereby in accordance with the DCL;

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, and agreements set forth herein, and subject to the terms and conditions set forth herein, Seller, Company, and Acquiror agree as follows:

## ARTICLE II
## MERGER

2.1   The Merger. On the terms and subject to the conditions set forth in this Agreement, and in accordance with the DCL, at the time established in Section 2.2 on the Effective Date  provided that each of the conditions precedent have been satisfied, (a) the Company will merge with and into Acquiror, and (b) the separate corporate existence of Company will cease and Acquiror will continue its corporate existence under Tribal law as the surviving company (the "Surviving Company") in the Merger (collectively "Close").

2.2   Effective Time. Subject to the provisions of this Agreement, prior to Close, the Company and Acquiror shall cause a certificate of merger (the "Certificate of Merger") to be executed and filed with the Secretary of State of the State of Delaware in accordance with the relevant provisions of the DCL, to be filed at least seven (7) business days before closing, with the effective date of the Merger to be the Effective Time on the Effective Date, and shall make all other filings or recordings required under the DCL. The Merger shall become effective at such time as the Certificate of Merger has been duly filed with the Secretary of State of the State of Delaware or at such later date or time as may be agreed by Company and Acquiror in writing and specified in the Certificate of Merger in accordance with the DCL (the effective time of the Merger being hereinafter referred to as the "Effective Time") or as required by DCL.

2.3   Effects of the Merger. The Merger shall have the effects set forth herein and in the applicable provisions of the DCL. Without limiting the generality of the foregoing, and subject thereto, from and after the Effective Time, all property, rights, privileges, immunities, powers, franchises, licenses and authority of Company and Acquiror shall vest in the

CONFIDENTIAL

MARTORELLO_000098

Surviving Company with the exception that any tax credits or refunds from operations prior to January 1, 2016 shall remain the property and under the control of Seller, and all debts, liabilities, obligations, restrictions and duties of each of Company and Acquiror shall become the debts, liabilities, obligations, restrictions and duties of the Surviving Company. Acquiror or a successor entity of Acquiror specifically agrees to honor and assume the obligations evidenced by those certain promissory notes owed by Bellicose listed on Exhibit A (an updated Exhibit A shall be provided immediately before Close). This Agreement does not modify or terminate any of those notes.

2.4   Certificate of Existence; Operating Agreement. At the Effective Time, (a) the certificate of incorporation of Acquiror as in effect immediately prior to the Effective Time shall be the certificate of organization of the Surviving Company until thereafter amended in accordance with the terms thereof or as provided by applicable law, and (b) the operating agreement of Acquiror as in effect immediately prior to the Effective Time shall be the operating agreement of the Surviving Company until thereafter amended in accordance with the terms thereof, the certificate of existence of the Surviving Company or as provided by applicable Tribal law.

2.5   Directors and Officers. The directors and officers of Acquiror, in each case, immediately prior to the Effective Time shall, from and after the Effective Time, be the directors and officers, respectively, of the Surviving Company until their successors have been duly elected or appointed and qualified or until their earlier death, resignation or removal in accordance with the certificate of existence and operating agreement of the Surviving Company.

2.6   Effect of Merger. Provided the Merger has occurred, at the Effective Time, as a result of the Merger and without any action on the part of Acquiror, Company or any equity owner:

(a)   Cancellation of Company Equity. Units, interests and/or equity of the Company (collectively, "Equity") that are owned by Acquiror or Company shall automatically be cancelled and retired and shall cease to exist, and, except for the consideration set forth below, no further consideration shall be delivered in exchange therefor.

(b)   Conversion of Equity. All Equity of Company not cancelled pursuant to Section 2.6(a) that is issued and outstanding immediately prior to the Effective Time shall be cancelled and will cease to exist, and each holder of Equity of Company will cease to have any rights with respect thereto, except the right to receive the Merger Consideration (as hereinafter defined) in accordance with Section 2.7 hereof.

CONFIDENTIAL                                                         MARTORELLO_000099

(c)   Continuation of Acquiror.  All issued and outstanding equity of Acquiror at the Effective Time shall remain unchanged and Acquiror shall be the Surviving Company.

(d)   Clarification on Company Assets.  To verify those certain intellectual property and general intangible assets of Company (collectively, "IP") acquired by Acquiror through the Merger, the list of IP owned by Company is attached as Exhibit B.  All Company information now or that may be discovered on equipment of any kind or in any written materials shall be immediately provided to Acquiror and deleted or destroyed by the holder so that holder retains no copies of Company information. Seller shall make a good faith effort to identify, transfer and/or destroy all Company information that may inadvertently be in its possession after the closing within two (2) month of the closing.  Acquiror shall make a good faith effort to identify, transfer and/or destroy all non-Company information that may inadvertently be in its possession after the closing within two (2) months of the closing, and Acquiror agrees to allow Seller limited access to remove any non-Company information for two (2) months from the Effective Date.  During those two (2) months Seller shall take all commercially reasonable steps to remove any non-Company information from Acquiror servers and locations, and after two (2) months, Acquiror may destroy any remaining information found.  All parties agree to hold such information strictly confidential.  Seller may retain such information as required to prepare required tax returns and any retention requirement of applicable taxing jurisdiction.

2.7   Consideration. The amount of merger consideration to be paid to the Seller shall be an amount equal to three hundred million dollars $300,000,000 (the "Acquisition Amount").   Such consideration has been arranged by Acquiror's parent organization through a Secured Promissory Note and associated Loan and Security Agreement (collectively, the "Merger Consideration").

2.8  No Bad Acts. As of the execution date of this Agreement, each party agrees that it shall not take any actions that are materially adverse to the rights of any other party, including, without limitation, any change in the organizational structure, ownership or assets, business, management, contracts or otherwise, except that the conditions precedent to Close set forth in Section 3.2 are specifically excluded and shall not be considered a "bad act." Specifically, Acquiror agrees that the provisions of the Parental Guarantee and Sovereign Immunity Waiver are hereby incorporated into this Agreement as of the execution date.

## ARTICLE III
## CLOSING, DELIVERIES & ADJUSTMENTS

CONFIDENTIAL                                                                                            MARTORELLO_000100

3.1    The closing will take place on upon satisfaction of each of the conditions precedent set forth in Section 3.2, but in any event not earlier than January 6, 2016, but not later than February 15, 2016 (unless otherwise agreed to in writing by all parties), but effective on the Effective Date.

3.2    Conditions Precedent to closing. All of the following conditions precedent shall be met or waived in writing by each party prior to Close:

(a)    Company has provided Acquiror with the Certificate of Formation of the Company, certified as of a recent date and current under Delaware law by the Secretary of State of Delaware;

(b)    Company has provided Acquiror with certificates of the Secretary of State of Delaware as to the good standing of the Company as of a recent date under Delaware law of the Company;

(c) The execution of all Transaction Documents and any associated agreements by all parties thereto;

(d) The provision by Acquiror to Seller of a legal opinion satisfactory to Seller in similar substance as that provided to Senior Lenders regarding the legality of the Business and the enforceability of the Transaction Documents;

(e) Acquiror has provided Seller evidence of the termination of operations and the dissolution of Duck Creek Tribal Financial, LLC in accordance with Tribal law and on terms satisfactory to and acceptable to Seller;

(f) Acquiror has provided Seller with evidence of the merger of Red Rock Tribal Lending, LLC into Big Picture Loans, LLC or the assignment of all assets of Red Rock Tribal Lending, LLC to Big Picture, LLC and the dissolution of Red Rock Tribal Lending, LLC in accordance with Tribal law and on terms satisfactory to and  acceptable to Seller;

(g)    Any required approvals of any Senior Lenders;

(h)    Mutual approval of an operating budget for 2016;

(i) Lockbox and deposit account control agreements as described in Section 4.16 of the Loan and Security Agreement;

Agreement and Plan of Merger
6

(j)   An executed Servicing Agreement between Ascension Technologies, LLC and Subsidiaries making consumer loans satisfactory to and on terms acceptable to Seller;

(k)   The Tribe shall provide a legal opinion that the Tribal Financial Services Regulatory Code ("Code") (1) allows for protections of the Collateral and perfection of the security interest under the Loan Agreement and other Transaction Documents acceptable to the Lender; and (2) clarifies that Lender shall not be a regulated entity under the Code

(l)   Undated assignments in blank or other appropriate transfer documents, each in form and substance satisfactory to Lender, to be held in escrow by Lender, for (1) domain names and (2) vendor agreements agreed to by the Parties shall be placed in escrow for the benefit and security of the Lender; and

(m)   Undated merger agreement, in form and substance satisfactory to Lender, to be held in escrow by Lender, in which Ascension Technologies, LLC would be merged into an entity of Lender's choice upon an event of default.

(n)   Company has provided to Acquiror Exhibits A and B, as defined herein, and information reasonably related thereto.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF COMPANY

4.1   Company represents and warrants as of immediately before the Effective Time to Acquiror as follows:

(a)   Organization and Good Standing. Company is an entity duly formed with limited liability under the applicable laws of Delaware, validly existing and in good standing under the applicable laws of Delaware and has full power, authority and the legal right to own its properties and conduct its business, and to execute, deliver and perform its obligations under this Agreement.

(b)   Organizational Documents. Company is in compliance with its organizational documents.

(c)   Due Authorization; Enforceability. Company has the full power and authority to execute and deliver this Agreement and to perform all obligations hereunder. The execution, delivery and performance of this Agreement by Company has been duly authorized by all necessary corporate actions on its part and does not and will not contravene any provision of its organizational documents. This Agreement has

CONFIDENTIAL

MARTORELLO_000102

been duly executed and delivered by Company and constitutes the legal, valid and binding obligation of Company, enforceable against Company in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and/or other similar laws and general equitable principles.

(d) No Conflict. The execution, delivery and performance by Company of this Agreement and the transactions contemplated hereby does not violate, conflict with or result in a breach or default under the organizational documents of Company or any subsidiary or any other regulation applicable to Company or any subsidiary or any agreement or other document to which Company or any subsidiaryis a party or by which it or any of its property is bound.

(e) No Proceeding. To the knowledge of Seller, there is no litigation, administrative proceeding, enforcement action, or investigation before any court, tribunal or governmental body presently pending or threatened against Seller that has not been disclosed to Acquiror.

(f) No Outstanding Liabilities. There are no outstanding liabilities of the Company, including tax liability that exist other than those disclosed in Exhibit A.

(g) No Outstanding Guarantees. All guarantees related to the Company, or its members, have been released.

4.2 Capitalization. There are no: (a) outstanding securities convertible or exchangeable into equity of Company; (b) options, warrants, calls, subscriptions or other rights, agreements or commitments obligating Company to issue, transfer or sell any equity; or (c) voting trusts or other agreements, or understandings to which Company is a party or by which Company is bound with respect to the voting, transfer or other disposition of units, other than the Company's Operating Agreement.

4.3 No Conflict; Required Filings and Consents. Neither the execution and delivery of this Agreement by Seller or Company, nor the consummation by Seller or Company of the transactions contemplated hereby, nor compliance by Seller or Company with any of the provisions hereof, will (a) conflict with or result in a breach of any provisions of the certificate of formation of Company or Company's Operating Agreement, (b) constitute or result in the breach of any term, condition or provision of, or constitute a default under, or give rise to any right of termination, cancellation or acceleration with respect to, or result in the creation or imposition of any lien upon any property or assets of Company pursuant to any note, bond,

CONFIDENTIAL

MARTORELLO_000103

mortgage, indenture, license, agreement, lease or other instrument or obligation to which Company is a party or by which Company or any of Company's properties or assets may be subject, and that would, in any such event, have a material adverse effect on Company; or (c) violate any order or law applicable to the Company or its properties or assets.

## ARTICLE V
## REPRESENTATIONS, WARRANTIES A N D   C O V E N A N T S  OF THE SELLER

Seller represents and warrants as of immediately before the Effective Time to Acquiror as follows:

5.1   Authority, Validity and Effect. Seller is a business entity duly formed, validly existing, and in good standing under the applicable laws of its respective jurisdiction. Seller has all requisite power and authority to execute and deliver this Agreement and all agreements and documents contemplated hereby to be executed and delivered by it, and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and such other agreements and documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate, limited liability company or other action on the part of Seller as the only member of Company and no other action is needed. This Agreement has been duly and validly executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as limited by the general enforceability exceptions in Section 4.1 above.

5.2   Capitalization. There are no: (a) outstanding securities convertible or exchangeable into units of the Company; (b) options, warrants, calls, subscriptions, or other rights, agreements, or commitments obligating Company to issue, transfer, or sell any units; or (c) voting trusts or other agreements, or understandings to which the Company is a party or by which Company is bound with respect to the voting, transfer, or other disposition of units, other than Company's Operating Agreement.

5.3   Promissory Notes Assumed.   The promissory notes owed by Company described in Exhibit A are true and correct descriptions thereof as of the date of the execution of this Agreement.

5.4   No Conflict; Required Filings and Consents. Neither the execution and delivery of this Agreement by Seller or Company, nor the consummation by Seller or Company of the transactions contemplated hereby, nor compliance by Seller or Company with any of the provisions hereof, will (a) conflict with or result in a breach of any provisions of the certificate

CONFIDENTIAL

MARTORELLO_000104

of formation of Seller or the Seller's Operating Agreement, (b) constitute or result in the breach of any term, condition or provision of, or constitute a default under, or give rise to any right of termination, cancellation or acceleration with respect to, or result in the creation or imposition of any lien upon any property or assets of Seller pursuant to any note, bond, mortgage, indenture, license, agreement, lease or other instrument or obligation to which Seller is a party or by which Seller or any of Seller's properties or assets may be subject, and that would, in any such event, have a material adverse effect on Seller; or (c) violate any order or law applicable to the Seller or its properties or assets.

5.5    Title. Seller (a) is the only record and beneficial owner of the equity being sold; (b) has full power, right, and authority, and any approval required by law to make and enter into this Agreement and to sell, assign, transfer, and deliver the units to Acquiror; and (c) has good and valid title to the units free and clear of all liens, other than liens arising under Company's Operating Agreement. Upon the consummation of the transactions contemplated by this Agreement in accordance with the terms hereof, at the closing, Acquiror will acquire valid title to the units of Seller free and clear of all liens, other than liens created by Acquiror and pursuant to Company's Operating Agreement.

5.6 No Lawsuits.  Seller is unaware of any litigation or other governmental action of any type of pending against Seller, the Company, or any beneficial owner of the Company that has not been disclosed.

5.7. Access to IP.  At the closing, Seller will provide Acquiror with immediate secured access to all electronic data and IP of Company, and Aquiror will have the sole and exclusive right to access the IP of Company.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF ACQUIROR

Acquiror represents and warrants to  the  Seller on the date of execution of this Agreement and on the Effective Date as follows:

6.1    Organization and Standing. Acquiror is a limited liability company, duly organized, validly existing, and in good standing under Tribal law.

6.2    Authority, Validity and Effect. Acquiror has the requisite power and authority to execute and deliver this Agreement and the Transaction Documents to be executed and delivered by it, and to consummate the transactions contemplated hereby and thereby without obtaining any additional approvals (whether internal or third-party). The execution and

CONFIDENTIAL

delivery of this Agreement and such other Transaction Documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of Acquiror. This Agreement has been duly and validly executed and delivered by Acquiror and constitutes the legal, valid, and binding obligation of Acquiror, enforceable against Acquiror in accordance with its terms, except as limited by Article VIII herein. This Agreement, the Secured Promissory Note, the Loan and Security Agreement, the Parental Guarantee and Sovereign Immunity Waiver Agreement and any and all other documents, amendments or renewals executed and delivered in connection with any of the foregoing, are collectively hereinafter referred to as the "Transaction Documents."

6.3   No Conflict; Required Consents. Neither the execution and delivery of this Agreement by Acquiror, nor the consummation by Acquiror of the transactions contemplated hereby, nor compliance by Acquiror with any of the provisions hereof, will (a) conflict with or result in a breach of any provisions of the articles or certificate of existence or operating agreement or equivalent organizational documents of Acquiror; (b) constitute or result in the breach of any term, condition or provision of, or constitute a default under, or give rise to any right of termination, cancellation, or acceleration with respect to, or result in the creation or imposition of any lien upon any property or assets of Acquiror pursuant to any note, bond, mortgage, indenture, license, agreement, lease, or other instrument or obligation to which Acquiror is a party or by which Acquiror or any of Acquiror's properties or assets may be subject, and that would, in any such event, have a material adverse effect on Acquiror; or (c) violate any order or law applicable to Acquiror or any of its properties or assets.

6.4   Independent Due Diligence. In connection with its investment decision, Acquiror and/or its representatives have inspected and conducted such reasonable independent review, investigation, and analysis of the Company.

## ARTICLE VII
## MISCELLANEOUS AND GENERAL

7.1   Successors and Assigns. This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and permitted assigns consisting of TED and its Subsidiaries, but is not assignable by any party without the prior written consent of the other parties hereto.

7.2   Third Party Beneficiaries. Each party hereto intends that this Agreement does not benefit or create any right or cause of action in or on behalf of any person other than the parties hereto.

CONFIDENTIAL                                                    MARTORELLO_000106

7.3   Further Assurances. The parties shall execute such further instruments and take such further actions as may reasonably be necessary to carry out the intent of this Agreement. Each party hereto shall cooperate affirmatively with the other parties, to the extent reasonably requested by such other parties, to enforce rights and obligations herein provided.

7.4   Notices. Any notice or other communication provided for herein or given hereunder to a party hereto must be in writing, and (a) sent by facsimile transmission; (b) electronic mail, (c) delivered in person, (d) mailed by first-class registered or certified mail, postage prepaid, or (e) sent by Federal Express or other overnight courier of national reputation. Each such notice or communication will be effective (i) if given by facsimile, when the successful sending of such facsimile is electronically confirmed, (ii) if given by electronic mail, when electronic evidence of receipt is received, or (iii) if given by any other means specified in the first sentence of this Section 7.4, upon delivery or refusal of delivery.

> To Seller at:
> 875 Carretera 693
> Suite 202
> Dorado, PR 00646
>
> To Acquiror at:
> P.O. Box 704
> Watersmeet, MI 49969
>
> With copy to counsel:
>
> Rosette, LLP
> 25344 Red Arrow Highway, Suite B
> Mattawan, MI 49071.

7.5   Complete Agreement. This Agreement and exhibits hereto and thereto and the other documents delivered by the parties in connection herewith contain the complete agreement between the parties hereto with respect to the transactions contemplated hereby and thereby and supersede all prior agreements and understandings between the parties hereto with respect thereto.

7.6   Captions. The captions contained in this Agreement are for convenience of reference only and do not form a part of this Agreement.

7.7   Amendment. This Agreement may be amended or modified only by an instrument in writing duly executed by the parties.

CONFIDENTIAL                                                                     MARTORELLO_000107

7.8   Severability. Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction, subject to the limitations in Article VIII.

7.9   Survival. The releases, representations, warranties, covenants, and agreements of the Seller, the Company, and Acquiror contained in this Agreement (including the exhibits attached hereto) will survive the closing.

7.10   Release. The parties permanently release each other and each of their trustees, officers, directors, shareholders and members from, and irrevocably covenant to not commence any proceeding of any kind against any other party for, any and all claims, known and unknown, associated with past agreements entered into by the parties between the parties that occurred before closing except any claim associated with the provisions of the Transaction Documents.

7.11   Execution.  Document may be executed in multiple counterparts, all of which taken together shall constitute one and the same instrument. Delivery by any party of an executed counterpart of a signature page to this Agreement by telecopier, facsimile or portable document format (pdf) shall be effective as delivery of a manually executed counterpart hereof.

7.12   Definitions.  All capitalized terms used but not defined herein will have the respective meanings set forth in the Loan and Security Agreement, or if not defined therein, in the applicable other Transaction Document.

CONFIDENTIAL                                                                      MARTORELLO_000108

# ARTICLE VIII
# TRIBAL WAIVERS OF SOVEREIGN IMMUNITY, DISPUTES AND REMEDIES

8.1   Limited Waiver Of Sovereign Immunity.

(a)   Retention of Sovereign Immunity.  By executing this Agreement, Acquiror does not waive, limit or modify its sovereign immunity, except as expressly provided in this Article VIII.

(b)   Scope of Waiver.  Subject to the provisions of this Article VIII, Acquiror hereby expressly and irrevocably grants to Seller, a limited waiver of its sovereign immunity from suit and consents to process and suit in accordance with this Section.  These waivers apply to actions in which Seller alleges a default or breach by Acquiror of one or more of the specific obligations or duties expressly assumed by Acquiror under the terms of this Agreement and the Transaction Documents.  These waivers expressly include Seller's or an affiliate's ability to pursue in litigation:

(i)   specific performance or other specific action, or discontinuance of some action, by Acquiror to bring Acquiror into full compliance with its duties and obligations hereunder; or

(ii)   money damages for noncompliance with the terms and provisions of this Agreement; or

(iii)   Acquiror does not consent to a waiver of its sovereign immunity from suit except for the limited purposes as set forth in this Article VIII and as follows: (A) the dispute shall be brought by and limited to Seller and no other party or entity; (B) the dispute shall be limited to causes of action arising under this Agreement and the Transaction Documents pursuant to Section 8.5 and (C) to enforce any Arbitration Decision (as defined herein) or court order compelling arbitration pursuant to Section 8.5; and (D) any such award or damages resulting from the dispute shall be limited to the assets and revenues of Acquiror and no other assets of the Tribe.

(c)   Express Waiver.  Acquiror hereby expressly and irrevocably waives:

(i)   its rights to have any dispute, controversy, suit, action or proceeding arising under this Agreement heard in any forum other than the ones set forth in Section 8.2 whether or not such forum now exists or is hereafter created including, without limitation, any Tribal court or other tribunal, forum, council or adjudicative body of the Tribe (each a "Tribal Forum");

(ii)   any claim or right which it may possess to the exercise of jurisdiction by, any Tribal Forum, including, without limitation, any determination that any Tribal Forum has jurisdiction over any such dispute, controversy, suit, action or

CONFIDENTIAL

MARTORELLO_000109

proceeding or jurisdiction to determine the scope of such Tribal Forum's jurisdiction, and Seller does not consent to the jurisdiction of any Tribal Forum;

(iii)     any requirement which may exist for exhaustion of any remedies available in any Tribal Forum prior to the commencement of any dispute, controversy, suit, action or proceeding in any state or federal court even if any such Tribal Forum would have concurrent jurisdiction over any such dispute, controversy, suit, action or proceeding but for such waiver;

(iv)     its sovereign immunity as to an action by Seller in the United States District Court for the Western District of Michigan or any State of Michigan Circuit Court, and in the federal or state courts having appellate jurisdiction thereover, seeking injunctive and/or declaratory relief and/or money damages against Acquiror based solely upon an attempt by Acquiror to revoke its waiver of its sovereign immunity or other waivers granted under this Article VIII and solely to compel participation in arbitration proceedings pursuant to Section 8.5 and enforce an arbitration decision;

(v)     its sovereign immunity from a judgment or order (including any appellate judgment or order) and post judgment proceedings supplemental thereto consistent with the terms and provisions of this Article VIII, which is final because either the time for appeal thereof has expired or the judgment or the order is issued by a court having final appellate jurisdiction over the matter; and

(vi)     its sovereign immunity from the assertion or enforcement of any claim in any Tribal Forum (it being understood that this provision does not detract from or diminish any other waiver of the  Acquiror in this Article VIII).

8.2   Consent to Jurisdiction.  Acquiror consents to the jurisdiction of and to accept and be bound by any order or judgment of the United States District Court for the Western District of Michigan or any State of Michigan Circuit Court, and any federal or state court having appellate jurisdiction thereover for enforcement of an Arbitration Decision (as defined herein) consistent with the terms and provisions of this Article VIII.  It is the express intent of the parties that their first recourse for dispute resolution shall be to attempt to amicably resolve any issue, and second to the federal and state courts specified herein.

8.3   Enforcement Authorization of Governmental Authorities.  Without in any way limiting the generality of the foregoing, Acquiror expressly authorizes any governmental authorities who have the right and duty under applicable law to take any action authorized or ordered by any court, including, without limitation, to take such action as entering Acquiror's property, to give effect to any judgment or order entered, subject to this Article VIII.

8.4   Governing Law.  This Agreement, and any disputes or controversies arising hereunder, shall be governed by and construed according to the laws of the State of Delaware.

8.5   Dispute Resolution.  In the event that either Party to this Agreement believes that

CONFIDENTIAL

MARTORELLO_000110

the other Party has failed to comply with any requirement of this Agreement or a Transaction Document, or in the event of any dispute hereunder, including, but not limited to, a dispute over the proper interpretation of the terms and conditions of this Agreement, the following procedures shall be invoked:

(a) <u>Discussions between the Parties</u>. The goal of the Parties shall be to first resolve all disputes amicably and voluntarily whenever possible. A Party asserting noncompliance or seeking an interpretation of this Agreement first shall serve written notice on the other Party. The notice shall identify the specific Agreement provisions alleged to have been violated or that is in dispute and shall specify in detail the asserting Party's contention and any factual basis for the claim. Senior representatives of both Parties shall meet in person or by phone or other electronic medium within two (2) days of receipt of notice in an effort to resolve the dispute. A failure to meet shall be considered a failure to resolve the dispute and shall invoke Section (b) below.

(b) <u>Binding Arbitration</u>. After failure to resolve such disputes within two (2) days of notice, either Party may refer a dispute arising under this Agreement to arbitration with the American Arbitration Association (the "<u>AAA</u>"). If the dispute centers around an action of a Party, such action shall be postponed or discontinued during the pendency of the arbitration, provided that the lack of action shall not have a negative impact to the economic value of a Party. The Parties shall endeavor to mutually select one arbitrator from a list of qualified arbitrators, one of whom must have a minimum of five (5) years federal Indian law experience, one of whom must have a minimum of five (5) years of experience in financial or banking law, and one to be chosen by the other two and to be provided by the AAA. If the Parties cannot agree on arbitrators within three (3) Business Days, then the arbitrator shall be named by the AAA provided that they have the requisite experience. All hearings and other proceedings for such arbitration shall be held in Marquette, Michigan unless otherwise agreed to by the Parties in writing. The expenses of arbitration charged by the AAA shall be borne equally by the Parties, and each side shall bear its own other costs except that the winning Party may petition the arbitrators to award all or a portion of its expenses incurred in the dispute based on the facts of the dispute. The arbitrator shall determine whether the dispute is arbitrable and shall apply the substantive laws of the State of Delaware as well as the Commercial Arbitration Rules. The arbitrator shall issue a final and binding decision (the "<u>Arbitration Decision</u>") in which the remedies available through arbitration are limited to enforcement of the provisions of this Agreement and any associated equitable or monetary relief. The Arbitration Decision may be enforced as set forth in Section 8.5 (d) below.

(c) <u>Good Faith</u>. The Party asserting breach or seeking an interpretation of this Agreement under this Section 8.5 shall be deemed to have certified that to the best of such Party's knowledge, information and belief formed after reasonable inquiry, the claim of noncompliance or the request for interpretation of this Agreement is warranted and made in good faith and not for any improper purpose, such as to harass or to cause unnecessary delay or the needless incurring of the cost of resolving the dispute. If the dispute is found to have been initiated in violation of this Section 8.5, then the arbitrator, upon request or upon his or her own initiative, may impose upon the violating Party an appropriate sanction, which may include an award to

CONFIDENTIAL

MARTORELLO_000111

the other Party of its reasonable expenses incurred in having to participate in the arbitration.(d) Enforcement of Arbitration Decision. Notwithstanding any provision of law, either Party to the Agreement may bring an action against the other pursuant to the provisions of this Article VIII solely for the enforcement of the Arbitration Decision. The Parties agree that the Arbitration Decision shall be final, conclusive and binding on the Parties with respect to the matters decided, and shall be complied with by the Parties.  In such judicial proceedings, neither Party, without the prior written consent of the other Party, shall be entitled to contend that such arbitration award should be vacated, modified or corrected, and the Parties hereby expressly waive all other rights and remedies that might otherwise be available in such judicial proceeding.

(e) Fast-track Injunctive Relief. Either Party may bring an original action in a court of competent jurisdiction pursuant to this Article VIII to prevent actions by the other Party which could have a Material Adverse Effect if taken.  Such injunctive relief may only be taken to maintain the status quo during the Dispute Resolution process set forth in this Section 8.5.

8.6  Attorneys Fees.  Except as ordered by an Arbitration Decision or a court of competent jurisdiction for enforcement proceedings, all Parties shall bear their own costs, except that the prevailing party shall be reimbursed all reasonable attorneys' fees, in connection with any dispute resolution or enforcement proceedings authorized under this Agreement.  Anything in this Agreement to the contrary notwithstanding, the parties expressly agree that this provision shall survive the termination, for any reason, or expiration of this Agreement and any additional agreement contemplated herein.

8.7  Service of Process.  Acquiror and Seller hereby consent to any and all process which may be served in any such suit, action or proceeding, (a) by mailing a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to the party's address shown in this Agreement or as notified to Seller and (b) by serving the same upon Acquiror in any other manner otherwise permitted by law, and agrees that such service shall in every respect be deemed effective service upon Acquiror.

8.8  **JURY WAIVER.   ACQUIROR AND SELLER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, AND AFTER AN OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL, (A) TO THE FULLEST EXTENT ALLOWED BY THE STATE OF DELAWARE, WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE OBLIGATIONS, ALL MATTERS CONTEMPLATED HEREBY AND DOCUMENTS EXECUTED IN CONNECTION HEREWITH AND (B) AGREE NOT TO SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE, OR HAS NOT BEEN, WAIVED. ACQUIROR CERTIFIES THAT NEITHER SELLER NOR ANY OF ITS REPRESENTATIVES, AGENTS OR COUNSEL HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SELLER WOULD NOT IN THE EVENT OF ANY SUCH PROCEEDING SEEK TO ENFORCE THIS WAIVER OF RIGHT TO TRIAL BY JURY.**

8.9  Irrevocable Waiver.  Acquiror covenants and agrees it possess the requisite

CONFIDENTIAL

MARTORELLO_000112

authority from the governing body of the Tribe to give this limited waiver of sovereign immunity and other waivers contained in this Article VIII and that it is irrevocable for one (1) year after termination of all Transaction Documents, or in the Event of Default, for a period not to exceed twelve (12) months after transfer of the Collateral, or for any non-compete period as defined in the Transaction Documents, or for any period required to enforce any rights under this Agreement when such enforcement action is initiated within one year of the termination of all the Transaction Documents, whichever is longer.  Acquiror agrees not to revoke or limit, in whole or in part, the limited waivers of sovereign immunity or other waivers contained in this Article VIII.  Acquiror hereby consents to the entry of appropriate injunctive relief, consistent with the terms and conditions of this Agreement.

## ARTICLE IX
## INDEMNIFICATION

9.1   Each party shall indemnify and hold harmless (the "Indemnifying Party") the other party, and its respective affiliates, members, managers, officers, directors, trustees, agents and employees (collectively "Indemnified Parties") from and against any claim, loss, cost, liability, damage or expense (including, without limitation, reasonable attorneys' fees and costs of suits) that arise out of or relate to any breach by the Indemnifying Party of its express representations, warranties, covenants or other responsibilities set forth in this Agreement, provided however, the Indemnifying Party shall not be liable to any Indemnified Party for the foregoing to the extent any claims, loss, cost, liability, damage or expense (including, without limitation, reasonable attorneys' fees and costs) arise from any the Indemnified Party's gross negligence or willful misconduct, as determined pursuant to the dispute resolution procedures set forth in the Transaction Documents.

[signature pages to follow]

CONFIDENTIAL

MARTORELLO_000113

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the Effective Date.

**ACQUIROR:**

**LVD TRIBAL ACQUISITION COMPANY, LLC**

By: _Michelle Hazen_
Name: Michelle Hazen
Title: Co-Manager

**COMPANY:**

**BELLICOSE CAPITAL, LLC**

By: _Brian McFadden_
Name: Brian McFadden
Title: President

**SELLER:**

**EVENTIDE CREDIT ACQUISITIONS, LLC**

By: _____
Name: Matt Martorello
Title:  President, Liont, LLC, Manager

Agreement and Plan of Merger
19

# EXHIBIT A

## Notes Assumed

| Note Holder | Amount | Execution Date |
|---|---|---|
| Columbia Pipe & Supply Co. | 2,000,000.00 | 12/10/2012 |
| Timothy P. Arenberg | 700,000.00 | 12/10/2012 |
| Terrance J. Arenberg | 900,000.00 | 12/10/2012 |
| DTA Trinity Wealth Transfer Trust | 300,000.00 | 9/25/2013 |
| Columbia Pipe & Supply Co. | 4,000,000.00 | 11/21/2013 |
| Timothy P. Arenberg | 700,000.00 | 11/21/2013 |
| Terrance J. Arenberg | 750,000.00 | 11/21/2013 |
| DTA | 150,000.00 | 11/21/2013 |
| DMA | 150,000.00 | 11/21/2013 |
| Columbia Pipe & Supply Co. | 2,000,000.00 | 8/16/2014 |
| Timothy P. Arenberg | 400,000.00 | 12/10/2014 |
| Terrance J. Arenberg | 400,000.00 | 12/10/2014 |
| Jeremy Davis | 2,500,000.00 | 12/16/2014 |

CONFIDENTIAL

MARTORELLO_000115

## EXHIBIT B

Intellectual Property
Assets of Company

Seller hereby transfers to Buyer the following Intellectual Property Assets of the Company at Close:

    (1)      All Company records in either paper or electronic format;

    (2)      All data contained on Company's servers or individual computer except as set forth in Section 2.6(d);

    (3)      All templates, training manuals, and other information created for the benefit of Company;

    (4)      All copyrighted or patented materials or processes created by Company or Company's employees;

    (5)      Any Company computer codes and computer models developed by or on behalf of Company or by Company employees;

    (6)      All rights to licenses or other use rights owned or controlled by Company with third-party vendors; and

    (7)      All trade secrets developed by or on behalf of Company or by Company employees.

CONFIDENTIAL

MARTORELLO_000116