```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                     RICHMOND DIVISION

 4

 5      ---------------------------------------
                                         :
 6      LULA WILLIAMS, et al., on behalf  :
        of themselves and all individuals :   Civil Action No.
 7      similarly situated                :   3:17CV461
        vs.                               :
 8      BIG PICTURE LOANS, LLC, et al.    :
                                          :   July 15, 2020
 9      and                               :
                                          :
10      RENEE GALLOWAY, et al., as        :   Civil Action No.
        individuals and as representatives :   3:18CV406
11      of the classes                    :
                                          :
12      ---------------------------------------

13

14

15          COMPLETE TRANSCRIPT OF THE CONFERENCE CALL

16          BEFORE THE HONORABLE ROBERT E. PAYNE

17               UNITED STATES DISTRICT JUDGE

18

19      APPEARANCES:

20      Leonard A. Bennett, Esquire
        Consumer Litigation Associates, PC
21      763 J Clyde Morris Boulevard
        Suite 1A
22      Newport News, Virginia  23601

23

24                  Peppy Peterson, RPR
                    Official Court Reporter
25                 United States District Court
```

```
 1    APPEARANCES:   (cont'g)

 2    Kristi C. Kelly, Esquire
      Kelly Guzzo, PLC
 3    3925 Chain Bridge Road
      Suite 202
 4    Fairfax, Virginia  22030
      Counsel for the plaintiffs
 5

 6

 7

 8    Douglas Marsh, Esquire
      Armstrong Teasdale, LLP
 9    4643 S. Ulster Street
      Suite 800
10    Denver, Colorado  80327

11    John M. Erbach, Esquire
      Spotts Fain, PC
12    411 East Franklin Street
      Suite 600
13    Richmond, Virginia  23219
      Counsel for Matt Martorello
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S

2

3          THE COURT:  Hello.  This is Williams against Big

4   Picture, 3:17CV461, and Galloway against Big Picture,

5   3:18CV406, also known as Galloway 1.  Who is here for whom

6   starting with counsel for the plaintiff?

7          MR. BENNETT:  Your Honor, this is Leonard Bennett, as

8   well as Kristi Kelly is on the line for the plaintiff.

9          MR. ERBACH:  Your Honor, this is John Erbach on

10  behalf of Matt Martorello, and I believe I also have on the

11  line Doug Marsh who is an attorney with Armstrong Teasdale.

12         MR. MARSH:  Yes, Your Honor.  Doug Marsh from

13  Armstrong Teasdale for Matt Martorello.  Good morning and thank

14  you.  Afternoon.  Excuse me.

15         THE COURT:  All right, I have gotten now the second

16  amended witness list of the plaintiffs, and there are eight

17  depositions listed, one of which hasn't even been taken, and

18  two live witnesses, Matt Martorello and Justin Martorello.

19         The footnote to the plaintiff's second amended

20  witness list, ECF 95, footnote number two, says, "Plaintiffs

21  have served a subpoena on each of these adverse witnesses,"

22  meaning Matt Martorello and Justin Martorello, "for attendance

23  but are unsure whether they intend to appear in person.  If

24  these witnesses do not travel to the misrepresentation hearing,

25  plaintiffs will call them by videoconference."  Where do these
```

1    people live, Mr. Bennett?

2              MR. BENNETT:  They live in Texas, Your Honor.

3              THE COURT:  Where were they served?

4              MR. BENNETT:  In Texas.  I believe they were

5    served -- I believe defense counsel accepted service.

6              THE COURT:  Is there any reason to believe they're

7    not going to be here, Mr. Bennett?

8              MR. BENNETT:  Yes.  Judge, for Matt Martorello, the

9    defendant's own witness list identifies Mr. Matt Martorello as

10   intending to be here live and stated that his brother, Justin

11   Martorello, that the defendant was unsure whether Justin

12   Martorello would appear live or by videoconference.

13             THE COURT:  Mr. Marsh, what's the answer to that?

14             MR. MARSH:  Thank you, Your Honor.  Doug Marsh for

15   Matt Martorello.  I'll say --

16             THE COURT:  Mr. Marsh, I don't know what it is that's

17   going on, but we really cannot understand what you are saying.

18             MR. MARSH:  I'll call on a different line.  I

19   apologize.  One moment, please.

20             (Pause in proceedings.)

21             MR. MARSH:  This is Doug Marsh rejoining.  Is that

22   better, Your Honor?

23             THE COURT:  That's a whole lot better.  Thank you.

24             MR. MARSH:  I apologize.  I don't know why that's

25   happening.  I'll spare you the sob story.  It's not that

1    interesting.

2            We were talking about that this morning, trying to

3    find out what are -- what the Martorellos' plans are and

4    ability to travel.  As everyone knows, it's a hard time to be

5    traveling.  There are health implications, and not to go into

6    too many details about family situations, but there are

7    concerns about exposure to COVID that are especially pressing

8    for some of them.

9            As of right now, my understanding is that they both

10   intend to be there in person.  We're trying to lock that down

11   and know for certain that that is the case or whether there

12   needs to be any changes that need to be made to accommodate

13   those concerned, and we will lock that down and get back to

14   everyone if that changes as soon as possible.  But as of right

15   now, our understanding is they will be there.

16           THE COURT:  All right.  Now, I have -- I'm not sure

17   what the deal is here.  I have plaintiffs' second amended list,

18   and it's ECF number 495, and it's headed Galloway v. Big

19   Picture and Lula Williams v. Big Picture.  Then I have the same

20   thing, and it's ECF number 834.  One was filed on July 13th,

21   and the other one was filed on July 12th.  Excuse me, sorry.

22   It's number 835, and it was filed on July 13th.

23           So I've got one filed -- and they look to be the same

24   document, but they're different docket numbers.  Is it correct

25   that you are filing the documents in both cases, but the

1    documents are the same?  Is that correct, Mr. Bennett?

2            MR. BENNETT:  It is, Your Honor.

3            THE COURT:  All right.  I just wanted to make sure.

4    Now, I also have the defendants' witness list, but I can't find

5    it.  Hold on a minute.  I mislaid it.  Oh, here it is right

6    here.  No, that's not it.

7            All right, Martorello's amended witness list filed

8    July 12th, and it says you are putting on -- you know you're

9    going to put on 12 witnesses, and then you have this may call,

10   and it's 16 people, but one, two, three, four, five have been

11   withdrawn.

12           I would think you know by now what you're going to

13   do.  I'm trying to figure out the dimensions of this hearing,

14   Mr. Marsh, so I need to know with a little bit more precision

15   what you've got in mind here than just all these may call

16   witnesses that you've got listed in that document number 833,

17   and I guess -- I think that's in Galloway.

18           That's one thing.  And then the other thing is that

19   if I look at -- I've called for the depositions to be put

20   together in a way that I can assess what the information that I

21   have to deal with is, and I haven't seen them yet.  Apparently

22   they were just delivered to the courthouse, but when they came

23   over here, they were all piecemeal.  I couldn't figure out what

24   went with what.  So I sent them back to the plaintiffs and

25   said, put them together right with separate notebooks for each

1    one.

2            But what appeared to me was, and it seems confirmed

3    by looking at the comparative, that the following documents --

4    one is the plaintiffs' initial deposition designations filed

5    September 13th, ECF number 500, and then the plaintiffs'

6    objections to Matt Martorello's original deposition

7    designations, ECF number 501.  And I guess that's in the

8    Williams case; is that right?  No, the 800 is the Williams

9    case, and the 500 is in the Galloway case; is that right, Mr.

10   Bennett?

11           MR. BENNETT:  Yes, Your Honor.

12           THE COURT:  Okay.  Mr. Marsh, there are some 68 pages

13   of objections which bespeaks there's an awful lot of testimony.

14   Why -- I'm curious why there's so much testimony here that's

15   been designated by deposition.

16           MR. MARSH:  Thank you, Your Honor.  Your Honor, the

17   answer to that question is there is a lot to respond to.

18   There's a 50-page brief that plaintiff submitted to the Court

19   that outlines various statements that are alleged to have been

20   made that were incorrect, and this is evidence that we think is

21   responsive to that and shows that that is not, in fact,

22   correct, that the statements that Matt Martorello made are, in

23   fact, completely true.

24           THE COURT:  Well, I've been reading some of the

25   things that have been filed, and I've read all the expert

1   reports, and not one of those things, expert reports seems to

2   have anything to do with whether or not a statement is true or

3   not.  I'm sure I'll be able to hear from you when you tender

4   the witness whether that's the case, but you seem to have a

5   view that it's necessary for you to try the whole case over

6   again, or again -- excuse me, not again but try the whole case

7   on its merits as to whether or not these are good things, these

8   kind of loans are good things for society and what people say

9   about them in the abstract.

10          That isn't what's being tried here.  What I'm trying

11  to determine is whether or not certain statements are or are

12  not -- that were made to the Court and the Fourth Circuit are

13  or are not true.  And I think you've gone somewhat astray in

14  how you interpret what that charter is.

15          How many pages of these objections, Mr. Bennett, have

16  to do with the experts?

17          MR. BENNETT:  Judge, I'd say maybe, roughly a quarter

18  of them.

19          THE COURT:  I'll tell you how I feel.  Looking at Mr.

20  Martorello, Mr. Marsh, you say you're not even sure you're

21  going to call these people at all.  What's going to trigger

22  your decision to call them?

23          MR. MARSH:  Thank you, Your Honor.  Doug Marsh for

24  Martorello.  The question is going to be what it is that

25  plaintiffs focus on when they put their case in chief on.

1    Excuse me, when they put on whatever evidence they choose to
2    put on in this hearing.  There are a range of issues that
3    they've raised and range of different statements that they
4    claim to have been false.  They span the operations, where they
5    took place, what kinds of -- where the loans originated, where
6    the loans were collected, Matt Martorello's intention when he
7    began to facilitate this acquisition of Bellicose and
8    Sourcepoint.

9         So there's a wide range of different conduct that
10   plaintiffs could put at issue, and whatever we need to respond
11   to is going to be the basis of what we need to put up.

12        THE COURT:  Well, Mr. Marsh, a lawyer from
13   Philadelphia once told me, I fell off the turnip truck, back of
14   the turnip truck, but it wasn't yesterday.  What he was saying
15   was, I'm a little better able to grasp what's going on than you
16   think I am, perhaps.  And after reading the plaintiff's brief,
17   I would think you would know exactly what you need to respond
18   to and whether or not you're going -- an expert, for example,
19   has any business testifying about anything that's involved
20   here, and, if so, precisely what part of the testimony would be
21   necessary.  And yet you tell me that we're one week from the
22   hearing and you still don't know, and you're not even going to
23   know until after they put on their evidence.  That kind of
24   doesn't fly with me.  I don't understand that.

25        MR. MARSH:  Your Honor, thank you.  Doug Marsh for

1    Martorello again.  I don't think that's exactly what I said,

2    Your Honor.  What I said was we know what we need to do

3    depending on what it is that plaintiffs try to put forward.

4    There are two days for this hearing.  There are two days for

5    all of us to do what we want to do, whatever that is.  And I'm

6    sure that there will be time constraints on plaintiffs, too, as

7    far as what evidence they're able to put on.

8            So to the extent that they're able to adapt certain

9    arguments or forego certain arguments, we might be able to as

10   well.  But as of now, I see what plaintiffs have argued, and we

11   have marshalled what evidence we need to provide in counter to

12   those arguments.  We may not need to --

13           THE COURT:  But if am I to measure the validity of

14   your statement by the substance of the expert reports, you're

15   just absolutely wrong.  You're not doing any such thing.  You

16   are larding up the record with a whole bunch of things about

17   how wonderful these financial arrangements are and how they

18   work, and, you know, that isn't the issue here.  The issue is

19   whether somebody said something that wasn't true.  That's

20   what's the issue, whether misrepresentations were made, and if

21   you think -- you're going to have a certain amount of time, and

22   you're going to be allowed that time, and when that time is

23   over, you're through.

24           When we set this hearing it was for one day, two days

25   if necessary.  Now, have you all talked about how much time it

1  will take, Mr. Bennett, for you to put on your case?

2         MR. BENNETT:  We have not talked about that question.

3  We have talked about how to deal with the depositions.  Our

4  case -- if all of our depositions, in fact, went in, it

5  represents a total of 1,700 lines compared to 22,000 lines that

6  have been designated by the defendant.  And we certainly -- so

7  even if some of our designations were cut, I think that we get

8  our case in in half a day.

9         Most of our case is presented in the written filing

10  with some additional documents, and the examination of Mr.

11  Martorello is our primary in-court evidence, additional

12  evidence.

13         THE COURT:  So your estimate of the time you require

14  to present your case depends upon how the depositions are

15  admitted; is that what you are saying?

16         MR. BENNETT:  Yes, sir.

17         THE COURT:  And how do you propose to present the

18  deposition testimony?  Is it in videotape, for example, and

19  needs to be edited or what?  How is it I am going to get that

20  testimony?

21         MR. BENNETT:  Yes, sir.  So we have -- I mean our

22  preference in a world without all the -- originally our plan

23  had been to present it by videotape.  We still can't edit

24  between now and Tuesday until we know where we are with respect

25  to the objections.  But we would present ours by videotape.

```
 1              However, what we had proposed to defense counsel is
 2    that the parties would do two things; first, the degree that
 3    the depositions would be submitted within the record.  That
 4    doesn't solve the Court's tremendous burden necessarily, but it
 5    does mean that we don't have to read them into the court record
 6    themselves.  And the second --
 7              THE COURT:  Hold on a minute, will you please.
 8              (Discussion off the record).
 9              THE COURT:  Mr. Bennett, recite the Gettysburg
10    Address for a minute, will you?
11              MR. BENNETT:  I'm sorry, Judge?
12              THE COURT:  Recite the Gettysburg Address for a
13    minute.
14              MR. MARSH:  Four score and seven years ago, our
15    fathers brought forth --
16              THE COURT:  I'm trying to get the volume up and
17    figure out if we can get it -- if we're picking up or if
18    there's somebody who had a great distance from the microphone
19    or what.  All right, we've got our volume --
20              MR. BENNETT:  Is this better, Judge?
21              THE COURT:  Yes.
22              MR. BENNETT:  Okay.
23              THE COURT:  How many objections -- I don't have that
24    in front of me.  How many objections did Martorello make to
25    your deposition designations?
```

1              MR. BENNETT:  I think made far fewer.  I haven't

2     quantified it yet.  My head is still spinning dealing with all

3     the paper on these, but we didn't designate as much.  So I

4     can't give you a total number of lines of objection.  If the

5     Court would permit me a couple overviews.

6              Some of the issues that we've objected to would be

7     objections that we would like present with respect to the

8     transcripts but which we don't need to protect Your Honor from

9     making mistake.  For example, if there was an objection to the

10    transcript because it was leading, the Court -- there's no jury

11    here, and the Court could look at the evidence in a way --

12    accordingly.

13             Other types of objections we have are big picture, no

14    pun intended, but they're macrolevel objections that, for

15    example, the issue that Your Honor pointed out with respect to

16    the experts is present with a lot of the other testimony.  I

17    think the most pervasive objection from our perspective is the

18    scope objection, that the testimony that has been designated is

19    irrelevant because it doesn't pertain to the issues for the

20    misrepresentation hearing, for example.

21             And so the plan that I had suggested to counsel was

22    that we would present several discrete categories of

23    objections, and then it would be back on the parties -- it

24    would be our responsibility, based on the Court's ruling, to

25    then cull or cut out -- you know, essentially notate our own

1    objections as having been disposed of one way or the other.

2            So to the extent, for example, that there's pages and

3    pages of discussion about how the tribe made two percent of

4    this, and then you have seven witnesses say that, if the Court

5    finds that's irrelevant, then we would go through and cut those

6    out of whatever presentation we have, but given that we've

7    got -- I don't know what the total time is, but if there's

8    22,000 lines for the defendant and 1,700 for the plaintiffs,

9    rounded up to 24,000 lines of deposition testimony, that's a

10   week's worth of witness testimony.

11           And so I think it's important that the Court be able

12   to assess credibility but not by seeing these people in video

13   but maybe not as important as not spending a week and a half on

14   this.  I think even to decide the objections on a line-by-line

15   basis would be, would take a Herculean effort for Your Honor

16   and Your Honor's staff.

17           THE COURT:  Well, without getting into what's been

18   designated and reading it, there's not any way to know, but I

19   don't understand how one side has such a small amount of

20   designations and the other side has such a large amount.  I

21   don't quite understand how that works.

22           And the other thing is that I have the distinct

23   impression that there's some gamesmanship involved here in

24   tendering 22,000 lines of deposition testimony to be read,

25   dealt with.

1          So I think the thing to do is to give each of you an

2    amount of time, an equal amount of time, and you treat it

3    however you want to treat it and you put in whatever you think

4    is appropriate, and that's it.  I've read the submission of the

5    plaintiffs and looked at some of the background exhibits, and

6    I've read the submission of the defendant, and the things that

7    look like -- the things that appear to go whether something was

8    or wasn't true when said are not voluminous, but the effort to

9    demonstrate what a wonderful thing this particular form of

10   financing is carries a huge amount of paper and emphasis, it's

11   beginning to look like.

12          So how much -- I had planned on a day with part of a

13   day to go over the next day.  So I'm inclined to give the

14   plaintiff X amount of time and the defendant X amount of time,

15   and you spend it whatever way you want to spend it.  And I

16   would like to know your view on how much time you need.  You

17   all have now studied all of this, you've been through all of

18   the depositions.  So tell me how much time you think you need

19   to prove that they told -- what they said in the topics you've

20   identified in your paper were misrepresentations.  How much do

21   you need?

22          MR. BENNETT:  Your Honor, the plaintiff would like a

23   total of four hours.

24          THE COURT:  And you can have four hours, too, then,

25   Mr. Marsh.  And you can put in what you want to put in.  That

1   way we'll get it done -- we'll have to carry over a little bit

2   but won't have to carry over too much.

3            MR. MARSH:  Understood, Your Honor.  Clarifying

4   question.  Plaintiffs have suggested submitting depositions to

5   be read in chambers or viewed in chambers.  Is it Your Honor's

6   preference that we play the depositions in video or provide you

7   with transcripts to be read in chambers or videos viewed in

8   chambers?  How would Your Honor prefer we handle those?

9            THE COURT:  I will hear in court what you both have

10  to say.  I would prefer to see the videos, the witnesses

11  testify by video.  I'm not going to take all this deposition

12  testimony that you've designated in chambers and just read it.

13  You're going to have to show that it's relevant and that it's

14  admissible, both sides.  And if you don't, you don't.  So you

15  better pick your best shots and go from that.  Does that change

16  your approach to things, Mr. Bennett or Mr. Marsh?

17           MR. BENNETT:  Your Honor, this is Len Bennett.  Given

18  the -- so, of course, we're trying to balance the workload all

19  around, the workload on ourselves, the workload on the Court,

20  and workload on the defendant.  I don't know if the Court would

21  be open to this, but if we were to cut our time somewhat and

22  following the hearing -- we could actually do it in a day and

23  then following -- everybody, complete it in a day, and

24  following that hearing allow the parties to supplement within a

25  week with whatever deposition testimony by video the -- subject

1   to some additional time limit, for example, that the parties

2   want to supplement the record with.  And if the Court -- we can

3   actually submit that with video to the Court without open

4   hearing as part of the record, but that would enable the two

5   sides to clean up the video testimony to eliminate superfluous

6   issues about the objections and scope questions and be

7   efficient for all involved, for the Court, for the parties.

8            THE COURT:  No.  That just opens the door to add more

9   stuff.  Opening the door to you all is a dangerous proposition.

10  Fool me once, shame on you.  Fool me twice, shame on me.  So I

11  don't think that's going to work.  I think you need to get --

12  put your case together and put in the things that are

13  admissible and use your screening, your knowledge of the law

14  and the Rules of Evidence and edit, get it fixed up, present it

15  like you want it.  You put it on.  If there's an objection,

16  I'll rule on the objection to it at the time.

17           MR. BENNETT:  Yes, sir.

18           THE COURT:  And that seems to me to be the right way

19  to do it.  I'm not going to sit down and go through

20  22,000 pages of deposition.  I don't know any judge in the

21  country who would do that.  That's especially so when I know

22  that a good bit of it is useless.  That's the expert things,

23  things that I have read, reports.  I assume they're going to

24  try to put those in.  Were the experts deposed?

25           MR. BENNETT:  Yes, sir.

1              THE COURT:  What?

2              MR. MARSH:  Your Honor, this is Doug Marsh.  Most of

3    the experts were deposed.  There were two experts that were not

4    deposed, Mr. Norman and Mr. Roberts.  It had been our intention

5    to bring them live given that we don't have that deposition

6    testimony.

7              THE COURT:  Okay.

8              MR. MARSH:  If possible.  They were on our may call

9    list.

10             THE COURT:  I'm going to leave you all to your own

11   devices.  I'm going to convene the hearing in the morning --

12   I'm going to start the hearing at 10 o'clock on the morning of

13   the 21st, and each of you have a certain amount of hearing

14   time, and you've all agreed to four hours each.  You can use it

15   any way you want to.  And I'll take a 20-minute recess in the

16   morning, 20 in the afternoon.

17             But you're going to have present what you want me to

18   consider in court, not handed to me and say, please read it.

19   I'll let you take, formulate that plan in perspective of your

20   knowledge of the Rules of Evidence and the Rules of Procedure.

21   So that seems to me to say that we will -- I don't know that

22   we'll have eight hours on the 21st because we'll take an hour

23   for lunch, 20 minutes in the morning and 20 minutes in the

24   afternoon which seems to me to be the plaintiff will finish

25   four hours in the early afternoon.  You'll get started, Mr.

1    Marsh, and then we'll continue after we adjourn.  We'll

2    continue the next morning up to your duration.

3         Now, does that plan seem like you all can accomplish

4    that now that you know what each other are offering, you know

5    what the parameters are, and the essence of good lawyering is

6    knowing what to put on, what to prove, or, as Kenny Rogers

7    said, knowing when to walk away, knowing when to fold them and

8    knowing when to hold them.  So I'll let you all proceed in that

9    fashion.  Anybody disagree with that approach?  Nobody.

10        MR. BENNETT:  Your Honor, this is Len Bennett.  We

11   don't disagree with the approach.  I would, on our side, I

12   expect we would not use four hours in our opening argument so

13   that we could reserve some of that time for rebuttal.

14        THE COURT:  This isn't argument, Mr. Bennett.  This

15   is evidentiary.  If you want to confine -- if you want to take

16   your time and take part of it for rebuttal, save part of it for

17   rebuttal, that's okay with me, too.  Any objection to that, Mr.

18   Marsh?

19        MR. MARSH:  No objection, Your Honor, and I

20   understand your instructions.

21        THE COURT:  All right.  Well, we'll proceed that way,

22   and then we'll have a record, and I've got the briefs, and

23   we'll go from there.  That being the case, I see no need for

24   you all to be here tomorrow devoting your time to individual

25   rulings on deposition designations.  You'll weed the wheat from

1    the chaff in the process of readying yourself for a hearing, so

2    we won't have that tomorrow.

3              And, Mr. Bennett, I think it's obligatory on you to

4    let Mr. Marsh know at the beginning -- I mean while he's

5    getting ready to structure his case approximately how much time

6    are you going to put on your case in the opening, the case in

7    chief, and how much you're going to save for rebuttal out of

8    your allocated period.

9              MR. BENNETT:  Yes, sir.  I would expect we would do

10   three hours and one hour reserve.

11             THE COURT:  And you're going to have to each appoint

12   a timekeeper, and rulings on objections, at least at this

13   point, will not be counted, or hearing objections to evidence

14   will not be counted against your time limit unless I see that

15   it is -- your privilege of doing that is being abused, and then

16   it will count for both sides.  Same rules apply for everybody.

17   All right, anything else?

18             MR. BENNETT:  Yes, sir.  This is Len Bennett.  Just

19   to raise one issue that's always true on time-limited trials as

20   well.  It may be that we do not call Mr. Martorello in our case

21   in chief or do not call him extensively in our case in chief

22   because we anticipate that we may cross-examine Mr. Martorello,

23   and to the extent that we take a long time on

24   cross-examination, it wouldn't be fair that that time come out

25   of the defendant.  So I don't know how --

1              THE COURT:  What difference does it make whether you

2    cross-examine Mr. Martorello or not?  You're going to

3    cross-examine him anyway because he's a hostile witness.

4              MR. BENNETT:  Yes, sir.  It's just that we may not

5    need Mr. Martorello in our case.  For example, if we have his

6    letters and correspondence where he says A, B, C, and D, I

7    wouldn't need to call him and say, so when you claimed

8    otherwise in your declaration that was false; correct.

9              THE COURT:  Well, as a general proposition, in a

10   timed trial, cross-examination is charged against the

11   cross-examining party's time.

12             MR. BENNETT:  Yes, sir.

13             THE COURT:  Do you understand that to be the case,

14   Mr. Marsh?  I didn't mention that, but that's usually the way

15   it goes.

16             MR. MARSH:  Thank you, Your Honor.  I was actually

17   about to ask that question, and that's been my experience in

18   timed trials, whoever is on their feet asking questions, the

19   clock is ticking for them.  If plaintiffs call the witness,

20   then their clock is ticking.  When they sit down and defendants

21   ask their questions, now it's the defendant's clock that's

22   ticking.  It will pause only for reasonable objections that

23   Your Honor has noted.

24             That's been my experience doing this, and if -- I

25   think makes more sense than calling, for example, Matt

1   Martorello to answer whatever limited questions plaintiffs

2   have, we cross-examine on those questions, and then we change

3   turns and put Martorello for direct and cross again.  I think

4   it makes more sense to have him up once in which case just

5   having to cross-examination based on who is asking the

6   questions would facilitate that.

7           THE COURT:  Do you agree with that, Mr. Bennett?

8           MR. BENNETT:  I do, Your Honor.

9           THE COURT:  All right.  All right.  Now, the only

10  other -- I want to make sure that we're all on board and

11  everybody is satisfied with the way we're approaching this

12  given the way things have shaped up in the pretrial process.

13  Anybody have any objections to the procedure we're adopting?  I

14  take it we've all agreed to it, and I want to make sure that

15  that's correct with you all.

16          MR. BENNETT:  Plaintiff agrees or does not object.

17          MR. MARSH:  Martorello does not object, Your Honor.

18          THE COURT:  All right.  Make sure you have, each have

19  a timekeeper, and the way I've done it in the past is to have

20  people keep the opposing party's time or have each party keep

21  time, and if there's a dispute, then I resolve it.  Do you have

22  a preference?  The other way, of course, is for the party's

23  assistant to keep the party who is talking's time.  Do you have

24  a preference, gentlemen?

25          MR. BENNETT:  Your Honor, this Len Bennett.  Your

1   Honor, I believe that we would keep our own time, but we would

2   reconcile it with defense counsel, make sure that we're both

3   agreed, and if we have a conflict, then we would raise it with

4   the Court.

5           But I'm hopeful -- in just the short time I've been

6   working with Doug, now defense counsel, he's been fair-minded,

7   and we've been able to resolve some issues.

8           THE COURT:  Does that approach suit you, Mr. Marsh?

9           MR. MARSH:  It does, Your Honor, and it works just

10  fine.  I'm sure it will this time, too.

11          THE COURT:  All right, that sounds fine to me.  Thank

12  you all very much.

13          MR. MARSH:  Thank you, Your Honor.

14          MR. BENNETT:  Thank you, Judge.

15

16

17                  (End of proceedings.)

18

19

20          I certify that the foregoing is a correct transcript

21  from the record of proceedings in the above-entitled matter.

22

23

24  _____/s/_____          _____
    P. E. Peterson, RPR                    Date

25