```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF VIRGINIA

 3                       RICHMOND DIVISION

 4

 5    -------------------------------------
                                         :
 6    LULA WILLIAMS, et al., on behalf    :
      of themselves and all individuals   :   Civil Action No.
 7    similarly situated                  :   3:17CV461
      vs.                                 :
 8    BIG PICTURE LOANS, LLC, et al.      :
                                         :
 9    and                                 :   July 21, 2020
                                         :
10    RENEE GALLOWAY, et al., as          :
      individuals and as representatives  :
11    of the classes                      :   Civil Action No.
      vs.                                 :   3:18CV406
12    BIG PICTURE LOANS, LLC, et al.      :
                                         :
13    -------------------------------------

14
            COMPLETE TRANSCRIPT OF THE EVIDENTIARY HEARING
15
               BEFORE THE HONORABLE ROBERT E. PAYNE
16
                   UNITED STATES DISTRICT JUDGE
17

18    APPEARANCES:

19    Leonard A. Bennett, Esquire
      Kevin Dillon, Esquire
20    Consumer Litigation Associates, PC        VOLUME 1 OF 2
      763 J Clyde Morris Boulevard
21    Suite 1A
      Newport News, Virginia  23601
22

23

24                    Peppy Peterson, RPR
                     Official Court Reporter
25                 United States District Court
```

```
 1    APPEARANCES:   (cont'g)

 2    Amy L. Austin, Esquire
      Consumer Litigation Associates, PC
 3    626 East Broad Street
      Suite 300
 4    Richmond, Virginia   23219

 5    Kristi C. Kelly, Esquire
      Kelly Guzzo, PLC
 6    3925 Chain Bridge Road
      Suite 202
 7    Fairfax, Virginia   22030
      Counsel for the plaintiffs
 8

 9

10

11    Richard L. Scheff, Esquire
      Michael C. Witsch, Esquire
12    Armstrong Teasdale, LLP
      2005 Market Street
13    29th Floor
      One Commerce Square
14    Philadelphia, Pennsylvania   19103

15    Douglas Marsh, Esquire
      Armstrong Teasdale, LLP
16    4643 S. Ulster Street
      Suite 800
17    Denver, Colorado   80327

18    John M. Erbach, Esquire
      Spotts Fain, PC
19    411 East Franklin Street
      Suite 600
20    Richmond, Virginia   23219
      Counsel for Matt Martorello
21

22

23

24

25
```

```
1                        P R O C E E D I N G S

2

3              THE CLERK:  Case number 3:17CV461, Lula Williams, et

4    al., v. Big Picture Loans, LLC, et al., and case number

5    3:18CV406, Renee Galloway, et al., v. Big Picture Loans, LLC,

6    et al.  The plaintiffs are represented by Leonard Bennett,

7    Kristi Kelly, Amy Austin, and Kevin Dillon.  The defendant Matt

8    Martorello is represented by Richard Scheff, John Erbach,

9    Michael Witsch, and Doug Marsh.  Are counsel ready to proceed?

10             MR. BENNETT:  Plaintiffs are, Your Honor.

11             MR. SCHEFF:  Yes, Your Honor.

12             THE COURT:  All right.  This hearing is being also

13   conducted by Zoom, by way of Zoom; is that right?  Who is

14   present on Zoom, either audio or video?  Jon Hollis, who are

15   you with, Mr. Hollis?

16             MR. HOLLIS:  Good morning, Your Honor.  This is Jon

17   Hollis.  I'm with the law firm Woods Rogers, PLC.  I represent

18   the Bluetech Irrevocable Trust in the action Galloway 2.

19             THE COURT:  Karen Brewer, member of the public.  Ms.

20   Brewer, do you have any plan to try to make a statement or to

21   tell us anything?

22             MS. BREWER:  No, Your Honor.

23             THE COURT:  Are you a member of the class that is

24   proposed in either one of these cases?

25             MS. BREWER:  No, Your Honor.
```

```
1                    THE COURT:  All right.  Casey Nash, that's your

2       partner, or your lawyer who is associated with the plaintiffs.

3       John Scofield, attorney --

4                    MR. SCOFIELD:  Yes, Your Honor.

5                    THE COURT:  Who are you a lawyer for, Mr. Scofield?

6                    MR. SCOFIELD:  I'm not appearing today as counsel of

7       record for any parties.  I'm attending as a member of the

8       interested public.  I'm a co-counsel in the Oregon and

9       Massachusetts litigation on behalf of the plaintiffs.

10                   THE COURT:  On behalf of the plaintiffs in the cases

11      in Oregon and Massachusetts?

12                   MR. SCOFIELD:  Yes, Your Honor.

13                   MR. BENNETT:  Your Honor, Mr. Scofield is also --

14      he's with the firm of Caddell & Chapman.  You met Mr. Caddell.

15      They are now joining up with us in this litigation.  Mr.

16      Scofield has been a lawyer that I've known for quite sometime

17      and worked with my partner, Craig Marchiando.

18                   THE COURT:  Mr. Scofield, you're not planning to make

19      any statements or testify or anything, are you?

20                   MR. SCOFIELD:  No, Your Honor.

21                   THE COURT:  Mr. Marchiando is counsel of record in

22      these cases.  And there's no one else?  Are there any witnesses

23      who are not parties who we need to sequester?  No?  All right.

24      Thank you.

25                       Sometime ago in one of the pleadings filed in one of
```

1    these cases or both of these cases, it was asserted that Matt

2    Martorello and others had made misrepresentations of material

3    fact in previous proceedings in the Williams case.  Those

4    misrepresentations were alleged to have been made to this Court

5    and to the United States Court of Appeals for the Fourth

6    Circuit.

7            Thereafter, Mr. Martorello filed papers -- Mr.

8    Martorello is in Galloway -- is in Williams and Galloway 1?

9            MR. SCHEFF:  Yes, Your Honor, that's correct.

10           THE COURT:  And I think he filed them in both cases,

11   saying that the Williams decision in the Fourth Circuit was an

12   important part of pending motions in this case, motions to

13   dismiss, motions for jurisdiction, other motions, and denied

14   that there were any misrepresentations that were made by him or

15   by anybody else.

16           Accordingly, the Court concluded that it was

17   necessary to understand, A, what the misrepresentations were,

18   and, B, what the proof was that they were, in fact,

19   misrepresentations, and, subsequently, it will be necessary to

20   determine the extent to which they were material or relied

21   upon, but, at this stage, the issue of materiality is not

22   really at issue, and the -- except as pertains to whether or

23   not evidence proffered is relevant.

24           I asked the parties to submit written -- make written

25   submissions, and they did, and there were revised written

1    submissions, as I recall, and the parties asked that there be

2    an evidentiary hearing, and I agreed that we could have an

3    evidentiary hearing.  I'm not quite sure one was necessary, but

4    I take the view that if parties believe they can demonstrate

5    matters better in person, then I'm perfectly happy to have

6    that.

7         Given that there were some credibility questions

8    raised in the papers, I concluded that the evidentiary hearing

9    was an appropriate way to understand better how to resolve the

10   matter.  It had been my intent to proceed in a way that I have

11   proceeded in other matters, and that is to allow the parties to

12   submit depositions and deal with the designations and any

13   objections to them and then to consider just the parts -- have

14   the parties edit the tapes just to the parts that I had not

15   sustained any objections to or to which there was no objection

16   made and was told last week that there's some -- in preparation

17   for that, that there's some 22,000 lines of deposition

18   testimony at issue, and that is an utterly ridiculous way to

19   try to deal with any evidentiary issue, for the judge to do it

20   on his own or argue line by line for thousands of lines.

21        Therefore, what I did was tell each side that you

22   have four hours to present whatever you're going to present at

23   this hearing, and I will consider it, and you are on your own

24   as to what you want to present.  If there's a video, you're

25   supposed to present the videotape and present it to me in that

1     fashion, or if you have somebody read from the stand in that

2     fashion, present it in that fashion, that's how you use your

3     time.  It's your business.

4                I'll consider in making the decisions those things

5     that have been appended to the written filings, because I have

6     begun the process -- I've read the papers, and I've seen a good

7     many of the supporting documents, but I don't know that I can

8     say I've seen them all.

9                So when we start, each person will have four hours.

10    Each side is supposed to have somebody keeping time.  When you

11    are talking, your time is running.  When I'm talking, your time

12    is -- no time is running.  So when I'm ruling on an objection,

13    for example, no time is running.

14               I expect during each recess each side to coordinate

15    and talk with the other side about the time and make sure that

16    we're roughly the same.  We're not going to quibble over

17    seconds.  I'm going to resolve -- if there's a discrepancy of

18    less than a couple of minutes, I'm going to resolve in favor of

19    giving the party with the lowest time the -- that will be the

20    time we will use, and then they'll have that rather than the

21    highest time.

22               That is the -- if the two representatives of the

23    parties quarrel over what the time is, then the lowest time

24    will be the time selected if it's less than two minutes.  If

25    it's more than that, I'm going to have to deal with it.  And I

1    may end up expanding that as we go along.  I'm hopeful we can

2    get it straight.  So I'm expecting to hear from you what you

3    have to say.

4              Did anyone one want to make an opening statement,

5    because I will not count that as part of the four hours, but I

6    will not allow it to go forever.  Do you wish to make an

7    opening statement?

8              MR. BENNETT:  Very brief.

9              THE COURT:  Do you wish to make an opening statement?

10             MR. SCHEFF:  Yes, Your Honor, very briefly.

11             THE COURT:  The time does not apply to the opening

12   statement.

13             THE CLERK:  Judge, if I can interrupt --

14             THE COURT:  Hold on a minute, please, Mr. Bennett.

15             THE CLERK:  I just submitted a phone number, 610704,

16   into the meeting.

17             THE COURT:  And who is that?

18             MR. GUZZO:  Thank you, Nikki.  This is Andrew Guzzo,

19   Your Honor.  Sorry, I was having difficulty dialing in.

20             THE COURT:  Andrew Guzzo is a member of Ms. Kelly's

21   law firm -- right? -- and counsel of record on the case.

22             MR. GUZZO:  Yes, Your Honor.

23             THE COURT:  Did you have something you need to take

24   up?

25             MR. BENNETT:  No, sir.

```
 1            THE COURT:  All right.  Remember that when you are
 2   speaking, you need to be at the lectern with your mask off so
 3   that the court reporter can hear you, and my mask is off so she
 4   can hear me.  If there's going to be a witness, the witness
 5   will have the mask off, and after the testimony, the witness
 6   will be handed a wipe and will wipe down the microphone and the
 7   area around.  How many live witnesses are you planning to call,
 8   Mr. Bennett?
 9            MR. BENNETT:  Your Honor, we only plan on calling Mr.
10   Martorello.
11            THE COURT:  All right, Mr. Martorello.  And how many
12   live witnesses are you planning to call?
13            MR. SCHEFF:  Your Honor, we'll just be calling Mr.
14   Martorello as well.
15            THE COURT:  So the record is clear, you mean Matt
16   Martorello?
17            MR. SCHEFF:  That's correct, Your Honor.
18            THE COURT:  There was some -- Mr. Justin Martorello
19   was listed as someone who might attend by telephone, but that's
20   not happening; is that correct?
21            MR. SCHEFF:  Well, it will depend on the plaintiffs'
22   presentation, but presently we do not intend to call him, and
23   it would be remotely if we did call him.
24            THE COURT:  All right.  Thank you.  Mr. Bennett.
25            MR. BENNETT:  Thank you, Judge.
```

1    THE COURT:  So it is your intention to see if you

2    can -- you're going to hand some papers.  I couldn't figure out

3    why you were masking up.

4    MR. BENNETT:  Your Honor, this is just for the Court,

5    the court reporter, and Your Honor's law clerk's benefit a copy

6    of the declaration of Mr. Martorello that we'll be using as our

7    roadmap in our presentation.  That's also an exhibit that's

8    been designated, but we just provided a paper copy.

9    THE COURT:  That's document number 106-1 according to

10   the top.

11   MR. BENNETT:  Yes, sir.  Out of the Williams matter.

12   THE COURT:  Now, Mr. Scheff, I take it, has a copy.

13   MR. BENNETT:  I gave him a copy just now.

14   MR. SCHEFF:  I do, Your Honor.

15   MR. BENNETT:  The other thing, Judge, logistically,

16   the only other -- presently the only video deposition that we

17   intend to play is that of a gentleman -- I think both sides are

18   playing part of him -- Mr. Scott Merritt.  Part of the

19   deposition has some objections that the defendant has made.  I

20   would -- none of them are privilege or something I think that

21   would contaminate a record, and I've alerted Mr. Scheff to this

22   issue.

23   I would ask for the courtesy of allowing to play the

24   video, and if there are parts of that at the end of that --

25   it's an 18-minute clip -- that the defense counsel wishes to

1    address the Court on in terms of objection, that that be

2    permitted and that be permitted not part of the defendant's

3    time.

4              So, for example, rather than have to start and stop

5    the video dep logistically.

6              MR. SCHEFF:  Your Honor, this is -- as we see this,

7    this is a hearing where the Court is trying to determine

8    whether or not material misrepresentations have been made.  You

9    ought to hear the evidence.  You ought to hear all the

10   evidence.  To the extent that you choose to credit something,

11   you will.  To the extent you choose to give it less weight, you

12   will.  Unless there's something egregious in what they have

13   clipped from Mr. Merritt, I doubt we're going to have an

14   objection.

15             THE COURT:  All right.  If you proceed in that

16   fashion, you'll have to identify what part of it that you are

17   objecting to so they can go back and play the question and

18   answer so I can understand it.

19             MR. SCHEFF:  Yes, Your Honor.

20             MR. BENNETT:  May I have control over this briefly?

21   Just briefly in opening, Judge, and I don't, like in trial

22   maybe, intend to go through in full detail of what the

23   documents will show, but I do want to at least provide context,

24   at least from the plaintiffs' perspective, as to what we're

25   doing, what we think we're doing here today.

1          The Court knows, of course, everyone knows that the

2     plaintiffs allege in Williams and Galloway and each of the

3     other cases that the defendant, that Matthew Martorello led the

4     creation of a business, of a business model that we have

5     characterized as rent-a-tribe, that is a business that paid a

6     small amount to a tribe, an Indian tribe, in order to provide

7     what Mr. Martorello has characterized as optics.  That is to

8     provide that technical contracts between the lender and the

9     consumer would originate, with quotes around it, from the

10    tribal defendants rather than from Mr. Martorello.

11         You will have an opportunity today to hear from Mr.

12    Martorello.  You will also have an opportunity to hear him

13    explain the paper trail that was left since 2011 in which Mr.

14    Martorello acted in a way that is very different than what his

15    declaration suggests.

16         That declaration -- the question the Court noted of

17    materiality would come later, but I think that the Court needs

18    to understand how material it was.  The tribe, before this

19    Court, challenged the defendant -- jurisdiction over the tribal

20    defendants based on sovereign immunity, and the argument there

21    was that the tribe defendants were protected using the

22    *Breakthrough* factors from suit in this and other federal

23    courts.

24         And the basis there, the argument there, was that the

25    tribe really genuinely was trying to make money for its

1    citizenry, was attempting to engage in what it believed to be a

2    legitimate business for the benefit of the tribe and that

3    questions even of control, which the Fourth Circuit said maybe

4    didn't go as well for the tribal defendants as the other

5    *Breakthrough* factors, that the tribal defendants, on paper, had

6    control.

7            You will have an opportunity to see the

8    behind-the-scenes paper trail and, in fact, the benefit of

9    seeing it through today, given the positions that Mr.

10   Martorello and his corporate empire have taken about the

11   litigation and the rights of the tribe to settle and to set its

12   own interest rates, you'll have all that now.

13           But the Court needs to understand why we're here

14   today, why all this effort, why all this work has gone into

15   determining whether Mr. Martorello told the truth in his

16   declaration.

17           One of our esteemed colleagues --

18           THE COURT:  Excuse me one minute.

19           MR. BENNETT:  Yes, sir.

20           THE COURT:  Your paper asserts that

21   misrepresentations were made by other people.

22           MR. BENNETT:  Yes, sir.

23           THE COURT:  Are you going to address that, too?

24           MR. BENNETT:  Well --

25           THE COURT:  You say, I think, Hazen made

1    misrepresentations, and you say that the -- the statements in

2    oral argument to the Fourth Circuit and in briefs to the Fourth

3    Circuit were misrepresentations as well.  Are you saying that

4    all of the Fourth Circuit misrepresentations you are talking

5    about in your papers you're going to talk about here and that

6    they're tied to Mr. Martorello's misrepresentations, alleged

7    misrepresentations, or are they tied to the other people's

8    misrepresentations as well?

9              MR. BENNETT:  Right.  Your Honor, to the extent that

10   Mr. -- for example, the extent that Michelle Hazen said the

11   tribe did this, entered into this so that we could learn about

12   the business model, learn how it's done, learn about

13   underwriting, you're going to hear direct evidence today where

14   Mr. Martorello says, why would I possibly give you that

15   information so you can learn about this, you're not capable of

16   learning, and if you learned what would I have, what value

17   would I have.

18             You're going to hear that evidence, and it directly

19   confronts Michelle Hazen's declaration, but, at this stage, the

20   tribal defendants are not here.  I think based on what has

21   happened after the settlement --

22             THE COURT:  They know about the hearing.

23             MR. BENNETT:  They do.

24             THE COURT:  They chose not to be here.  That's their

25   choices.

```
 1              MR. BENNETT:  Understood, Judge, but we're attempting
 2   to streamline to the core part of what the dispute was -- or
 3   what the misrepresentations were, Mr. Hurd, I think, suggested
 4   appropriately in his argument before the Fourth Circuit.
 5              (Audio played.)
 6              THE COURT:  Wait just a minute.  Excuse me.  Is this
 7   video?
 8              MR. BENNETT:  It's just audio.  But I don't have
 9   control over the sound.
10              THE COURT:  What's wrong with the sound?
11              MR. BENNETT:  I think that it's the system
12   controlling --
13              THE COURT:  You mean it's not coming or too loud?
14              MR. BENNETT:  Too loud, I think.
15              THE COURT:  Do you have it in writing somewhere?
16              MR. BENNETT:  Yes, we will provide it in writing.
17              THE COURT:  So at this point, the record will say
18   argument of Mr. Hurd at the Fourth Circuit what, pages what to
19   what?
20              MR. BENNETT:  We will provide that for the record at
21   a break.
22              THE COURT:  All right.  So now you want to start
23   again?
24              MR. BENNETT:  Yes, sir.
25              (Audio played.)
```

 1          MR. BENNETT:  You will hear as I go through Mr.
 2   Martorello's declaration the evidence, you will see the
 3   documentary evidence -- it's in the plaintiffs' exhibits -- and
 4   understand that that core declaration, what Mr. Hurd
 5   successfully used at the appellate level, Mr. Martorello's
 6   declaration contains material falsities.
 7          And the Court has to, of course, accept my view of
 8   what a material falsity is for that to matter.  The oath that
 9   someone traditionally gives is to tell the truth, the whole
10   truth, and nothing but the truth, and I think that there are
11   different approaches to how some witnesses, maybe some lawyers,
12   approach the truth.
13          A material misrepresentation on the plaintiffs' side
14   means a statement that is made that is incomplete such --
15   includes statements that are made that are incomplete such that
16   they would mislead the reader or the listener.
17          And so to the extent, for example, if Mr. Martorello
18   testifies in his declaration that he and the companies that he
19   was involved in never collected any money from consumers and
20   the basis for that statement is because technically, on paper,
21   he was acting as a delegee of a tribal defendant, the tribal
22   defendant, on paper, was collecting even though all the
23   actions, the processes, the people were working for Mr.
24   Martorello's company.
25          You're going to hear as we go through the declaration

1    the history of this.  The Court is probably maybe too familiar

2    at this point, and it really began -- if we take us to July of

3    2011, and this is where one of the core disputes that the Court

4    is going to hear begins.

5           Mr. Martorello, prior to July 2011, had worked for an

6    accounting firm -- he has an accounting degree -- KPMG, and he

7    learned about a company called ThinkCash, which then became

8    Think Finance, one of the leading tribal lenders, and Mr.

9    Martorello decided to get into the predatory lending business

10   himself.

11          His first really big company he operated as a

12   supposed Costa Rican entity.  That is, Costa Rica was the

13   originator of his loans, and that was posing problems, and he

14   testified --

15          THE COURT:  The country of Costa Rica was originating

16   the loans?

17          MR. BENNETT:  Yes.  So the consumers in America were

18   -- in the United States were borrowing from Costa Rica and,

19   thus, were not to be bound by Virginia law, for example.  And

20   that wasn't working as well.  I don't know why, travel,

21   logistics, language, but Mr. Martorello testified, contrary to

22   what you'll see in his declaration, that he had heard some good

23   things coming up with the law, his testimony was 2010 some good

24   tribal lending law, and that some big lenders such as Sequoia

25   and TCV -- and this is in our misrepresentation brief, his

1    actual deposition testimony -- that some big lenders were

2    getting involved in that.  These were hedge fund lenders.

3           And so he then wanted to get involved.  And this is

4    where the first dispute you'll see in his declaration will be,

5    and you will hear -- our first witness will be Mr. Merritt, and

6    we will put Mr. Merritt on for roughly 18 minutes.

7           Mr. Merritt is somebody who was deeply engaged in the

8    mechanical operation of a tribal lending business model.  He

9    did not know LVD, he didn't know this tribe, and he hadn't been

10   contacted by anybody related to it.  His testimony will be he

11   approached Mr. Martorello --

12          THE COURT:  LVD is the Indian tribe of which the

13   tribal defendants in the case are -- to which they're related;

14   is that right?

15          MR. BENNETT:  That's correct.  And so Mr. Merritt

16   will testify that he went to this Online Lenders Alliance,

17   which was primarily a tribal lending organization, conference

18   in July of 2011 and sought out Mr. Martorello and met him so

19   that Mr. Merritt could try to interest him in some software, a

20   software deal unrelated to tribal lending but with respect to

21   these online loans.

22          Mr. Merritt's testimony, you'll see, is that Mr.

23   Martorello asked him to put Mr. Martorello in touch with some

24   tribes so he, Mr. Martorello, could enter into that field.

25          I think that, Judge, we'll leave opening and continue

1    with Mr. Martorello's testimony at the full history of this,

2    but that will be the first witness, and that will be the first

3    untruth that you hear that we focus on in Mr. Martorello's

4    declaration.

5         Mr. Martorello claims in his declaration, and you

6    will not see any evidentiary support for this other than the

7    declaration itself -- there's no documents that support this,

8    there's no witnesses that support it -- that somehow the tribe

9    came to the Online Lenders Alliance, sought out Mr. Martorello,

10   asked Mr. Martorello if it would be the tribe's vendor for a

11   new lending operation that LVD was attempting to set up, and

12   there is no evidence of that, and you will hear Mr. Merritt

13   give you an honest explanation.

14        You will also hear Mr. Merritt explain that

15   ultimately Mr. Merritt was involved, his own intermediary

16   company, advocating for Mr. Martorello in the creation of what

17   became the Red Rock lending businesses and, in fact, the

18   explanation for how it is that the tribal defendants were to

19   receive essentially a net of two percent -- that was after

20   write-offs and charge-offs and uncollectibles, etcetera -- and

21   how half of that money, half of the two percent of Mr.

22   Martorello's gross less these other net expenses, how half of

23   that money got paid to the middleman to set the deal up.  So

24   the tribe received less than one percent of that.

25        You'll hear his short explanation on that, and then

```
 1    we'll get right into Mr. Martorello and go through the
 2    difference between the history of the Red Rock and Big Picture
 3    lending models, the difference between the actual history and
 4    the history that was presented to this Court and the Fourth
 5    Circuit by Mr. Martorello in his declaration.
 6              THE COURT:  You're going to play depositions and have
 7    Mr. Martorello testify.
 8              MR. BENNETT:  We're going to have Mr. Martorello
 9    testify, but before we do that, we're going to play Mr.
10    Merritt, and I would cede the podium.
11              THE COURT:  Mr. Scheff, you have an opening
12    statement?
13              MR. SCHEFF:  Thank you, Your Honor.  Your Honor, I'm
14    going to be extremely brief.  Mr. Martorello's declaration,
15    according to the plaintiffs' brief, are materially -- has
16    material misrepresentations with respect to paragraph ten,
17    paragraph 17, paragraph 26, paragraph 36, paragraph -- excuse
18    me one second, Your Honor.  Paragraph 43, paragraph 47,
19    paragraph 69, paragraph 100, paragraph 102, paragraph 105,
20    paragraph 107.  There are other alleged misrepresentations in
21    the Hazen declaration and the Chairman Williams declaration.
22              As the Court noted, the tribal defendants are not
23    here today to defend their own statements.  Your Honor, the
24    declaration that was provided by Mr. Martorello was not
25    intended to detail every piece of evidence in the case or every
```

1    minutia in the case.  It was an overview of the way the parties

2    came together, the way the businesses were operated, who did

3    what, and what the present state of affairs were.

4         Like every case, Your Honor, this case is certainly

5    no different.  There are factual disputes in what happened.

6    People remember things differently.  Sometimes people remember

7    things the same way.  And the fact that there are factual

8    disputes does not mean that there have been material

9    misrepresentations.  And like every other case, there are

10   factual disputes in this case.  And some of those are important

11   factual disputes, and some of them are unimportant factual

12   disputes.

13        With respect to the one item that Mr. Bennett

14   highlighted for the Court with respect to sort of who came to

15   who and how the sort of calculation, if you will, of the

16   tribes's share of the business would be provided, you're going

17   to hear Mr. Martorello's story about how that came together,

18   you're going to hear Mr. Merritt's.  There are differences,

19   slight differences in what they say, but it doesn't mean that

20   anyone is providing material misrepresentations.  It means that

21   people may remember things differently.

22        I would refer the Court, again, not to that this is

23   the be-all and end-all, but just as an example, Defense

24   Exhibit 16, an email not from Mr. Martorello but an email to

25   him in the early stages of 2011 talking about how the

1  calculation was to come together.  It doesn't come from Mr.

2  Martorello, it comes from somebody else, a gentleman by the

3  name of Flint Richardson.

4          There are other documents which have been provided by

5  both sides which demonstrate indisputably that the tribe was

6  looking to get into online lending long before Mr. Martorello

7  ever came on the scene, as early as 2009, and, in fact, had

8  started another lending business before they even met Mr.

9  Martorello.

10         That's undisputed.  The documents are undisputed on

11  that, and the witnesses are undisputed on that.

12         THE COURT:  The documents you are talking about,

13  they're exhibits you have already filed?

14         MR. SCHEFF:  Yes, Your Honor, that's correct.

15         THE COURT:  And are the ones referred to on that

16  point referred to in your brief?

17         MR. SCHEFF:  Yes, Your Honor, they are.  Your Honor,

18  we have attached to our brief what we call a matrix.  I think

19  it's Exhibit A.  What it has is all the so-called alleged

20  misrepresentations, and it has all the exhibits adjacent to it

21  by number which we say support our view of what the evidence is

22  and the truth and accuracy of Mr. Martorello's deposition --

23  his declaration, excuse me.

24         So you'll hear Mr. Martorello live.  He'll answer

25  whatever question anyone asks him.  He'll be truthful, he'll be

1    credible, he'll talk about the story himself, all the different

2    issues.

3           We're going to play a number of different deposition

4    designations by video.  We'll play Karrie Wichtman who was

5    counsel to the tribe and counsel to the lending businesses.

6    She knows what happened.  She lived it every day.  We'll play

7    some of Ms. Hazen, we'll play of some of Rob Rosette who was

8    involved from the inception.  We'll play some of Mr. Merritt as

9    well.  There will be a number of different deposition witnesses

10   we play.

11          The number we play will depend on our time.  We may

12   run short, and we may have to, obviously, cut back on what we

13   intend to play, but we'll play whatever we can as time permits.

14          THE COURT:  Have you all worked out the objections so

15   there isn't any objections to what you are playing, do you

16   know, or where do we stand on that?

17          MR. SCHEFF:  We have not.

18          THE COURT:  We'll deal with that later.

19          MR. SCHEFF:  It would seem to me, Your Honor, that,

20   again, the search here is for the truth, and Your Honor ought

21   to hear all the evidence.  We're going to try to limit the

22   number of objections we make, period, whether anyone's

23   testimony, because we think the Court ought to hear it, the

24   Court ought to assess it in terms of making whatever

25   determination the Court is going to make.

1          THE COURT:  All right.

2          MR. SCHEFF:  Again, there will be factual disputes.

3    There's no question there's factual disputes.  That's a far cry

4    from material misrepresentations, and, ultimately, a jury will

5    have to decide what the truth is.  The jury will decide what

6    the merits are, the jury will listen to the witnesses, whether

7    it be live or in deposition, and they'll decide what happened.

8    But resolving factual disputes is different than material

9    misrepresentations.  Thank you, Your Honor.

10          THE COURT:  Thank you.  Now, at this point in time,

11   do you know if there are objections to your proposed

12   depositions that you're going to play, or have they been

13   resolved?

14          MR. SCHEFF:  I don't, Your Honor, but if you'll give

15   me one moment, I will confer with somebody at defense counsel

16   table to see what they can tell me about that.  Thank you.

17          Your Honor, the objections have not been resolved.

18          THE COURT:  When the deposition is being played,

19   you're going to stand up and make an objection to it at that

20   time; is that what you're going to do?

21          MR. BENNETT:  Given the way the timing of the day may

22   go, there probably will be a break, and maybe it will help to

23   know which of the 22,000 lines the defendant wishes to bring

24   up.  At this point, we don't have any idea.  We've not --

25          THE COURT:  I told you on the phone you all play what

1    you're going to play, and I'm going to rule on the basis of

2    objections unless you all -- on the basis of objections made

3    unless you all resolve things ahead of time, and I mean made at

4    the hearing so I can have the context.

5            MR. BENNETT:  Yes, sir.

6            THE COURT:  So I'll let you all talk during the

7    break.  If you have some way of solving them, okay.  I'm

8    surprised there wasn't an exchange of information ahead of time

9    after we had our conversation on the phone, but we didn't, so

10   I'll see what I can do.

11           Would you call GSA and ask them to find a way to cool

12   the room down a little bit.  Tell them that it was 100-plus

13   degrees yesterday, it's going to be 100 today, and I need them

14   to get on it right away if you would, please, ma'am.  Are you

15   ready with your first witness?

16           MR. BENNETT:  We are, Your Honor.  We would call

17   Matthew Martorello.

18           THE COURT:  All right, Mr. Martorello.

19

20                    **MATTHEW MARTORELLO,**

21   a defendant, called at the instance of the plaintiffs,

22   having been first duly sworn, testified as follows:

23

24           MR. BENNETT:  And actually, Judge, this is my

25   mistake.  I would not call --

```
 1                THE COURT:  Wait a minute, Mr. Martorello.

 2                MR. BENNETT:  I first intend to call Mr. Merritt by

 3     video, just play his video dep.

 4                THE COURT:  Mr. Martorello, you can just sit there if

 5     you want to.  If you want to go back and be with your counsel,

 6     you are free to, but you can just sit there.

 7                THE WITNESS:  Thank you.

 8                THE COURT:  This is the Merritt deposition.

 9                MR. BENNETT:  Yes, sir.

10                THE COURT:  As soon as you start playing, the time

11     will begin.

12                (Discussion off the record.)

13                THE COURT:  Who is this?

14                MR. BENNETT:  This is Scott Merritt, Your Honor.

15                THE COURT:  Are we ready, or what?

16                MR. DILLON:  Your Honor, I think the issue just

17     resolved itself.

18                THE COURT:  Thank you.

19                (Video deposition of Warren Scott Merritt played.)

20                MR. BENNETT:  Thank you.  Your Honor, for the record,

21     that deposition was of Warren Scott Merritt taken March 21st,

22     2019.  We'll certainly provide a copy, paper copy for the

23     record.

24                THE COURT:  Copy of what you played?

25                MR. BENNETT:  Yes, sir.
```

1           THE COURT:  And the copy will be what?

2           MR. BENNETT:  The transcript.

3           THE COURT:  What exhibit?

4           MR. BENNETT:  It will be -- Judge, I would offer that

5    as Exhibit 1.  I know we haven't -- 139.

6           THE COURT:  Plaintiff's Exhibit 139.

7           MR. BENNETT:  This was in the Williams case.  The

8    first voice examining the witness was Michelle Alamo

9    representing Mr. Martorello, and the second voice was Andrew

10   Guzzo representing the plaintiffs.  The third voice that was --

11   there was an objection.  I don't know the name of the

12   gentleman, but it was somebody representing the witness.  With

13   that, Judge, we could call Mr. Martorello.

14          THE COURT:  All right.  Mr. Martorello, the record

15   will reflect, has been sworn and, while that deposition was

16   playing, was sitting in the witness box.

17          MR. BENNETT:  Your Honor and Mr. Martorello, you have

18   the plaintiff's exhibits there, but to make it easy for you, I

19   also have a copy of Exhibit 106 which is your declaration.

20   It's in the books, but this one you can do anything you'd like

21   with.

22          THE WITNESS:  Thank you.

23          MR. BENNETT:  Ms. Brown, may I have control over the

24   system, please.  I'm sorry, I believe the witness was sworn --

25          THE COURT:  Yes.

1                         DIRECT EXAMINATION

2    BY MR. BENNETT:

3    Q    Mr. Martorello, we've spoken by phone before and other

4    depositions, discovery depositions, for example.  It's good to

5    see you again.

6    A    You as well, sir.

7    Q    You currently reside in Texas?

8    A    Yes, Dallas, Texas.

9    Q    And you have a college degree from what university?

10   A    University of Illinois.

11   Q    And when did you earn that degree and in what major or

12   what was your degree?

13   A    It was 2002, and it was a major, double major in

14   accounting and finance.

15   Q    And, at some point, you worked for different businesses,

16   but then you began to work for the accounting firm KPMG?

17   A    That's correct.

18   Q    What did you do for that accounting firm?

19   A    I was in the transaction services group, so that involved

20   asset-based lending work.

21              THE COURT:  Pull that microphone a little closer to

22   you.

23              THE WITNESS:  I'm sorry, okay.

24   Q    One of the clients that you were exposed to of KPMG was a

25   company called ThinkCash; is that correct?

Matthew Martorello - Direct

```
1    A    At the time, I think it was -- was it ThinkCash or Think

2    Finance?  Maybe it was -- we were hired by Silver Point

3    Capital, and we were sent to figure out maybe some potential

4    breaches of contract or something that was going on with a

5    facility to Think Finance.

6    Q    Yes, sir.  And I appreciate that it's not your fault that

7    I volunteered to just do four hours, but my question to you was

8    that your client was ThinkCash, and you said you're not sure

9    whether it was ThinkCash or Think Finance; right?

10   A    Yes, but it's ThinkCash.  At the time, I think it was

11   ThinkCash.

12   Q    And ThinkCash was a lending model that consumers, maybe

13   pejoratively, refer to as rent-a-bank.  Have you heard that

14   expression, rent-a-bank?

15   A    I've heard the expression.

16   Q    But then Think Finance became a tribal lending business

17   model, an evolution of the ThinkCash entities.

18   A    At some point years later, I believe that's -- well, I

19   mean, they service tribes through whatever platform they had.

20   I'm not aware of those details.

21   Q    Now, you had -- prior to 2011, you had been engaged in

22   some internet lending operations of your own; correct?

23   A    That's correct.

24   Q    And what was the name of the entity that you associated

25   with Costa Rica?
```

Matthew Martorello - Direct

1    A    I don't know that I associate it with Costa Rica, but

2    there was a client of ours that was called Cape Side, LLC,

3    which was a Delaware LLC that was a lender under the d/b/a

4    peppercash.com, and it did business in Costa Rica and in

5    accordance with U.S. federal law but choice of law Costa Rica

6    for the loans.

7    Q    And you were -- on paper, you were the servicer for this

8    other Delaware entity; right?

9    A    In actuality, we were the servicer for the entity.

10   Q    I understand.  And, again, that was PepperCash?

11   A    peppercash.com.  I believe that was early 2010.

12   Q    And, in 2010, you recall you previously testified that

13   there was -- quote, was a lot of favorable on point case law

14   that was coming out in 2010, close quote, regarding tribal

15   lending and that several large hedge funds like, quote, TCV,

16   all caps, and Sequoia, close quote, were providing capital for

17   those ventures.  Do you recall?

18         THE COURT:  The only question is do you recall

19   testifying that way.

20   A    I did testify similar to that, I think.

21   Q    And so in 2010 at least, you certainly were aware of the

22   issues of sovereign immunity in a tribal lending context?

23   A    No, that's not correct.

24   Q    You were aware of tribal lending business models

25   developing because of this, quote, a lot of favorable on point

Matthew Martorello - Direct

1  case law?

2  A    That's not correct.

3  Q    You were not so aware?

4  A    No.  I became aware of the case law after, and I learned

5  of tribal lending at the OLA conference when I met Scott

6  Merritt.

7            THE COURT:  At what lending --

8            THE WITNESS:  At the Online Lending conference when I

9  met Scott Merritt.

10  Q    And so when you testified in August 30th, 2018, that you

11  know -- quote, you know there was a lot of favorable on point

12  case law that was coming out in 2010, close quote, you were

13  testifying about what you learned about the online case law

14  coming out in 2010, or on point case law, you were testifying

15  what happened in 2011?

16  A    I was putting in context the conference and the

17  conversations that, you know, Think Finance had just -- excuse

18  me, ThinkCash had just partnered with these institutional funds

19  and that there had been a bunch of case law that had come out.

20  I didn't know that at the time.  I was putting that into

21  context of what was a big issue or talked about a lot at that

22  conference.

23  Q    So prior to attending the Online Lenders --

24            THE COURT:  So I understand, when you say it was

25  talked about a lot at that conference, are you talking about

1    lending through tribes, or are you talking about sovereign

2    immunity, or both?

3            THE WITNESS:  I'm talking specifically about tribal

4    lenders getting into business, and there was some case law, and

5    Think Finance started working with tribes --

6            THE COURT:  Does that include sovereign immunity for

7    the tribes as well in your conversations?

8            THE WITNESS:  No.  I don't think I was savvy enough

9    to know even the distinction or what that was.  It was really

10   just kind of like talked about generally as the next tribal

11   gaming, and that was all kind of understood.

12           THE COURT:  Do you remember what this favorable case

13   law was all about?

14           THE WITNESS:  That spurred those discussions at the

15   conference, I couldn't recall off the top of my head.

16           THE COURT:  Okay.

17   Q   So you were not savvy enough to understand the legal

18   concepts or questions involved with tribal lending sovereignty?

19   A   I disagree.  I think what I meant was I wasn't aware of

20   tribal sovereignty at all, any more than any other layperson,

21   at the time that I was in the conference and met Scott Merritt.

22           THE COURT:  You weren't aware of tribal immunity

23   other than as a layperson?

24           THE WITNESS:  Correct.

25           THE COURT:  Tell me what you know about -- what you

Matthew Martorello - Direct

1  knew about tribal immunity at that time, then, of this

2  conference, Online Lenders conference with Mr. Merritt.

3          THE WITNESS:  Well, I didn't have any experience with

4  tribes in any capacity.  You know, the only thing I knew,

5  really, would be that tribes have casinos, just as any

6  layperson would, but I didn't have any knowledge or experience

7  or understanding about tribal sovereignty at all.

8          THE COURT:  All right.

9  Q    So you've heard Mr. Merritt.  You've heard his testimony;

10  correct?

11  A    I did.

12  Q    How much money did Mr. Merritt make before that

13  deposition, roughly?  How much did his company make by putting

14  you together with LVD?

15  A    So because he was Tribal Lending Solutions, he partnered

16  with Tribal Lending Management, and that was the firm

17  associated with Rosette Associates.  They got paid in

18  aggregate, from what I knew until very recently, $960,000.  His

19  portion of that, I don't know what that was, but that was an

20  arrangement they had together that I didn't even really have

21  any privy to.

22          THE COURT:  You are using indefinite pronouns, and

23  you used "in the aggregate," and I don't know who "they" is or

24  what you mean by "in the aggregate."  Who was it that got

25  $960,000?

Matthew Martorello - Direct

```
 1              THE WITNESS:  I believe it went to -- I believe it

 2    went to TLM, Tribal Loan Management, and then what I wasn't

 3    privy to was that there was a partnership to share that with

 4    Scott's firm, TLS.  When I said "they," I was referring to TLS

 5    and TLM as a partner, as partners.

 6              THE COURT:  You don't know what Merritt personally

 7    got from TLS.

 8              THE WITNESS:  I don't know what his participation

 9    agreements were, no, I do not.

10    Q    You know Mr. Merritt made money by putting you together

11    with the LVD; right?  That's a fair assumption?

12    A    Yeah, the tribe paid him.

13    Q    And Mr. Merritt was heavily involved trying to create and

14    help create tribal lending models with his company; correct?

15    He's not a consumer advocate in terms of critical of tribal

16    lending; right?

17    A    I'm sorry, can you repeat the question?

18    Q    Sure.  Mr. Merritt was a supporter of tribal lending and

19    the tribal lending business model; correct?

20    A    Yes, I believe he said his company does pair together --

21    they are matchmakers, as he said.

22    Q    You're unaware of any axe to grind; Mr. Merritt and you

23    were not involved in litigation or any conflict?

24    A    No, not at all.

25              THE COURT:  What do we need?  I am connected.
```

Matthew Martorello - Direct

1             (Discussion off the record.)

2             THE COURT:  We're not keeping time on these --

3             MR. BENNETT:  We're good now.  I'm sorry, Judge.

4             THE COURT:  I don't care if the people who are not

5    here don't see anything on the Zoom.  Take it off the Zoom so

6    we can see what's going on in the courtroom.  That's the key

7    thing.  So forget the Zoom.  The people in Zoom can stay on,

8    but we are not going to run the evidence through the Zoom.  I

9    can't have that.  We'll be here forever doing that.

10            MR. BENNETT:  Right now I'm at Exhibit 1.  It should

11   be on your screen also.

12            THE COURT:  It's on the screen now.

13            MR. BENNETT:  Yes, sir.

14            THE COURT:  Is that this two-volume thing up here?

15            MR. BENNETT:  It is.  That's Exhibit 1, and I'm going

16   to go in order, generally in order.

17            THE COURT:  Go ahead and ask your question.  Can you

18   see it, Mr. Martorello?

19            THE WITNESS:  Yes, I can, Your Honor.

20            THE COURT:  And a hard copy is in that thing labeled

21   Volume 1 if you'd rather look at that.  It's up to you.

22   Q    Mr. Martorello, this is a letter of intent and exclusivity

23   agreement between Mr. Merritt's company and Mr. Rosette's

24   company.  Have you seen this document before today?

25   A    I've seen it through the discovery process.

1   Q    But you're aware that such an agreement -- you were aware

2   before the lawsuit that such an agreement existed?

3   A    I knew there was -- I didn't -- actually I didn't know

4   that TLS and TLM had partnered.  My assumption was that he was

5   part of TLM.

6   Q    In your declaration, which is document, Exhibit 106, if

7   you could turn to paragraph 14, please.  You have a paper copy

8   as well?

9   A    I do.

10          THE COURT:  Paragraph 14?

11          MR. BENNETT:  Paragraph 14.

12  Q    Now, Mr. Martorello, you said that you learned that LVD

13  had identified you as a potential consultant.  That was your

14  under-oath testimony; correct?

15  A    Correct.

16  Q    Let's get the background on this declaration.  What type

17  of input did you have in the drafting of this declaration, you

18  personally?

19  A    I had significant input.

20  Q    What does that mean?

21  A    I don't remember exactly three years ago, but I know that

22  I read it and probably wrote many of the --

23          THE COURT:  Let's go back to square one.  Did you

24  start off by writing the text of it on a piece of paper or

25  dictating it into a machine or typing it on a computer?  At the

1   very first shot at it, is it yours or somebody else's?

2            THE WITNESS:  I believe the first thing that I did is

3   I wrote the declaration in a computer.

4   Q    Let's -- we can go up to the very first paragraph

5   actually, and the heading, the declaration says that this is

6   true and correct to the best of your knowledge, information,

7   and belief.  And you understand that this declaration, and you

8   understood when you were drafting it and then signing it, that

9   you were to provide the truth, the whole truth, nothing but the

10  truth; correct?

11  A    That's correct.

12  Q    And turning to paragraph 14 again, under the heading LVD

13  approached Martorello in 2011, paragraph 14, you say, "In mid

14  2011, I learned that LVD had identified me as a potential

15  consultant."  Do you recall that?

16  A    I do.

17  Q    But at that point, your claim would have been that was Mr.

18  Merritt?

19  A    Mr. Merritt I viewed as LVD, as an agent of LVD who had

20  been seeking someone to help LVD for some time.

21  Q    And, of course, you are aware a lot of paper has been

22  produced in this case; right?

23  A    Of course.

24  Q    But you have not -- you're not aware of any documentary

25  evidence that shows that LVD was trying to reach out to you as

Matthew Martorello - Direct

1    a potential consultant.

2    A    I wouldn't use the word me specifically, but they were

3    seeking lending operations to start and help with it since

4    2009, 2010 with Scott Merritt.

5    Q    This says me.  14 says, "I learned that LVD had identified

6    me."  So you say I wouldn't say me specifically.  Does that

7    mean that you were incorrect in drafting paragraph 14?

8    A    No.  I think we just have a difference of interpretation.

9    LVD identified me as, you know -- Scott was working for LVD as

10   an agent, and he was seeking someone to provide services to

11   LVD, and when I met his partner, his partner had introduced me

12   to the concept of Think Finance, working with tribes, and I

13   said that was interesting.  He asked me if I would like to

14   learn about it, and I said, okay.  And he went and got Scott,

15   and Scott came over, and I don't recall him trying to sell me

16   software because he doesn't have online software.

17   Q    Well, again, my question to you is, you said under oath

18   under penalty of perjury -- did you write the under penalty of

19   perjury at the top of this declaration?

20   A    I don't think so.

21   Q    But you know that you were accountable under penalty of

22   perjury if you made an untruthful statement here; correct?

23   A    Correct.

24   Q    You said in your declaration that you learned that LVD had

25   identified me, meaning Matt Martorello, as a potential

Matthew Martorello - Direct

1    consultant, and now what you are saying is that what you recall

2    is that you spoke to somebody that said if you're interested in

3    tribal lending, why don't you talk to my partner Scott.

4    A    I guess I don't associate those as being the same thing.

5    I'm saying that LVD had, at some point, identified me as a

6    suitable consultant for their business.

7    Q    You're not testifying that that occurred, that they had

8    identified -- LVD had identified you at the point of your

9    attendance of this Online Lending Alliance conference?

10   A    I think that's accurate if I heard you correctly.  Can you

11   please repeat that?

12   Q    Sure.  How about this:  When did you learn -- I'm sorry.

13   What is your testimony about the time, the month of 2011 that

14   LVD supposedly identified you specifically as a potential

15   consultant?

16   A    Well, because I know Scott to have been an agent of LVD.

17   That's why I associate it with that moment.

18              THE COURT:  So it's at the conference then.

19              THE WITNESS:  Yes.

20   Q    And, at that point, your testimony is that you understood

21   at that point that Scott was an agent, supposedly an agent of

22   LVD?

23   A    Like I said, I didn't understand that at that time, but I

24   learned that later on.

25   Q    Okay.  And contrary to his testimony that you've just

Matthew Martorello - Direct

 1   watched.

 2   A    I think his testimony was very specific to TLS.

 3           THE COURT:  Excuse me a minute.  Don't ask the

 4   witness to comment on another witness's testimony.

 5           MR. BENNETT:  I'll withdraw the question, Judge.

 6           THE COURT:  And I don't want to hear what he has to

 7   say about the other witness's testimony either.  It's up to me,

 8   as the finder of the fact, to judge the credibility without the

 9   assistance of the lawyers or the witness.  The lawyers may

10   argue the case.

11           MR. BENNETT:  Yes, sir.

12   Q    I want to -- I'll come back to a couple other paragraphs,

13   but if you could take a look at paragraph 17 of 106, paragraph

14   17 of your declaration.

15   A    Okay.

16   Q    Now, you said you were not involved in the creation of Red

17   Rock but made aware that Red Rock had been formed.  Did you

18   type that in your draft?

19   A    I don't know that I used those exact words, but it may

20   have evolved from what I wrote originally.

21   Q    But you read this?

22   A    Yeah.  I'm sorry.  You asked if I typed it.

23   Q    I understand.

24   A    If it was edited or if I originally typed it.

25   Q    Separate question.  You read and understood that you were

1   swearing under penalty of perjury that you were not involved in

2   the creation of Red Rock but made aware Red Rock had been

3   formed.

4   A     Correct.

5   Q     Now, where did the name Red Rock Lending -- Red Rock come

6   from?

7   A     I asked the tribe what name -- what would the name of the

8   entity be, and they said, what would you like, what do you

9   like, and I said, I like Red Rock, and then they went with that

10   name.

11   Q     Okay.  Well, why don't we fill in that blank.  On your

12   screen, and if you want to look at this otherwise is Exhibit 3.

13   Exhibit 3 is an email chain that was produced in discovery in

14   this case, Bates number ROS002 through --

15             THE COURT:  You don't need to read all that.

16   Exhibit 3.

17             MR. BENNETT:  Yes, sir, Exhibit 3.

18   Q     And this starts, the email chain starts, the very last

19   page, August 9, 2011; is that right?

20   A     Yes, that's accurate.

21   Q     And at this point, you were heavily engaged with Scott

22   Merritt and Flint Richardson.  Flint Richardson was his partner

23   in his company; correct?

24   A     I don't know that we have been heavily engaged.  I don't

25   remember when the first emails began.

Matthew Martorello - Direct

1  Q    Well, take a look at that last page.  You have August 9th.

2  A    So that may have been the beginning.  I don't remember the

3  exact date, but that may have been the first sort of email.

4  I'm not sure.

5  Q    You're not sure, but it was at least by August 9th.

6  A    Yes, yeah.

7  Q    And then over the course of this chain, working from the

8  back forward, the next page up says -- and this is sent Friday,

9  August 19th, from you to Flint Richardson, Scott Merritt, and

10  Rob Rosette, and this is your email asking is the tribe ready

11  to go live, and you wanted to talk about the detail of

12  origination occurring at the tribe, you wanted to discuss

13  operating bank account activity.  This was your email that you

14  sent to Mr. Merritt, Mr. Richardson, and Mr. Rosette; correct?

15  A    Yes.  I wanted to go visit their operation and understand

16  what they were doing.

17  Q    Okay.  I want to go ahead and skip to the third page up or

18  from the beginning which would be at the bottom 695, and I can

19  call it out here for you.

20        At this point, this is your -- right in the middle of

21  the page, your email, August 23rd, 2011, "Is there an entity

22  name for the tribal LLC?  Obviously an LLC that will only be

23  tied solely to us, with a unique name that doesn't expose our

24  relations if another lender tribe entity had problems."  You

25  wrote that email; correct?

Matthew Martorello - Direct

1   A    Correct.

2   Q    And then Mr. Richardson responded right above, "You can

3   name it"; correct?

4   A    That's correct.

5   Q    And then right above that, Mr. Merritt said, "I was about

6   to say the same thing"; correct?

7   A    Yes, that's correct.

8   Q    And then turning to, while we're on this -- well, let's

9   turn to Exhibit 2 real quick just so we complete that circle.

10  The first page of Exhibit 2, this is an email from you to

11  Mr. Rosette, Mr. Richardson, and Mr. Merritt again dated

12  August 23, 2011, and it says, "For the tribal entity, is it an

13  LLC or corp?  I like the name Red Rock Tribal Cash, LLC, or

14  corp."  Do you see that?

15  A    I do see that.

16  Q    And that, of course, that's how Red Rock came about.  It

17  was your brainchild; right?

18  A    No.  They just asked me the name or what name I liked.  I

19  actually asked them what name it was first, and I understood

20  they already had operations, but it couldn't be formed until

21  the tribe actually created the entity.

22  Q    Okay.  Well, you also have, and I'm showing you in that

23  same -- on your screen, the next paragraph says you plan to

24  have draft documents done by the end of the week.  Who was Ryan

25  Bloom?

Matthew Martorello - Direct

1    A    I think he was a tribal attorney in Michigan.

2    Q    And so you were going to have draft documents done and

3    then sent to Ryan Bloom for finalization; correct?

4    A    That's correct.

5    Q    So if you were going to send them to the attorney by the

6    end of the week, who was drafting the documents?

7    A    I don't recall.

8    Q    Look, we've got a lot -- we have whole binders here and

9    we'll go through all these, but it's fair to say that you were

10   very active, you were not passive in reviewing the documents

11   that were created in these various exchanges with Mr. Rosette

12   and LVD.

13   A    So the draft documents here, I believe, are like a term

14   sheet or inducement agreement or a relationship document, not

15   to be confused with corporate formation or anything like that.

16   Q    Okay.  Let me take a look at Exhibit 5 for you.

17              THE COURT:  Wait a minute.

18              MR. BENNETT:  Yes, sir.

19              THE COURT:  You weren't writing the draft documents

20   you are referring to there, were you?

21              THE WITNESS:  No, no.

22              THE COURT:  So were they legal documents?

23              THE WITNESS:  I believe it was -- I'd like to --

24              THE COURT:  You said it's a term sheet.  What do you

25   mean by term sheet?

Matthew Martorello - Direct

1                    THE WITNESS:  Well, I remember --

2                    THE COURT:  What do you mean by term sheet?

3                    THE WITNESS:  I think it was called an inducement

4     agreement and like a term sheet of what the business

5     relationship would be between my company and the tribe.

6                    THE COURT:  But clearly is contemplated that they be

7     executed.  That means signed to you?

8                    THE WITNESS:  The term sheet, hopefully both parties

9     would sign the term sheet.

10                   THE COURT:  So it was to be executed?

11                   THE WITNESS:  If we could reach terms yes.

12                   THE COURT:  Was a lawyer drafting the documents for

13    you?

14                   THE WITNESS:  You know, I wouldn't have been drafting

15    them myself.  I do know that.

16                   THE COURT:  What lawyer were you using at the time to

17    draft your documents?

18                   THE WITNESS:  In terms of the term sheet

19    specifically?

20                   THE COURT:  In terms of what you're talking about in

21    this paragraph.  Who was it that drafted the document?  It

22    wasn't you, it was a lawyer working for you.  Who was the

23    lawyer?

24                   THE WITNESS:  Well, I'm actually saying -- I

25    apologize.  This is a long time ago, but it says that I plan to

Matthew Martorello - Direct

1   have the draft documents done by the end of the week.  I don't

2   think that means I was actually drafting the documents.  So I

3   wouldn't have done that.

4          THE COURT:  You said that.  I plan to have them done.

5   You were going to have them done by somebody.  You said it was

6   a lawyer.  Who was the lawyer who was drafting the documents

7   for you?  Who was that?

8          THE WITNESS:  I mean, I guess my point is I'm not

9   sure what I meant by "I plan to have the draft documents done."

10  I don't think I was saying that somebody had -- that I had

11  drafted documents or someone else had.  I think what I was

12  saying was there were draft documents that had to be done.  I

13  haven't read all this right now, but I don't know what those

14  draft documents were for sure, but I've testified, obviously,

15  that they provided me their servicing agreement, and I just

16  presumed that, you know, those were the draft documents that I

17  was maybe looking at and going to send to Ryan Bloom.  That's

18  the best I can offer.

19         THE COURT:  All right.  If that's what you are

20  saying, that's what I'll interpret it to mean.  I will tell

21  you, to me, when you say I plan to have the draft documents

22  done by the end of the week, you are taking responsibility for

23  them, or the other meaning is I hope that they are done.

24  Either way, somebody is drafting them because you said you

25  weren't.  I want to know who it was that was drafting them

Matthew Martorello - Direct

1  according to what you know, or do you not know?

2       THE WITNESS:  Obviously, I'm sorry, I can't recall

3  exactly --

4       THE COURT:  You can't remember the lawyer who was

5  representing you at this time?

6       THE WITNESS:  That was Ryan Bloom.  I do know that.

7       THE COURT:  All right.  So you, then, were drafting

8  the documents and going to send them to Bloom, your lawyer?

9       THE WITNESS:  No.

10      THE COURT:  You were going to get them from somebody

11  and send them to Bloom?

12      THE WITNESS:  Yes.  I either had them from somebody

13  or I was going to get them from somebody and send them to the

14  lawyer.

15      THE COURT:  Okay.

16  Q   Mr. Martorello, could you take a look at Exhibit 5 which I

17  also, I believe, have on your screen.  Now, this is an email

18  from Flint Richardson to Karrie Wichtman who was a lawyer with

19  the Rosette law firm at this time; correct?

20  A    That's correct.

21  Q   And she and Rob Rosette were representing the tribe;

22  correct?

23  A    Yes, that's correct.

24  Q   And this also was sent to Ryan Bloom and you; correct?

25  A    Correct.

Matthew Martorello - Direct

1          THE COURT:  Who is Flint Richardson?

2          THE WITNESS:  He is one of the partners in TLM.

3   Flint, Rob Rosette, and Scott Merritt were partners as the

4   agents of LVD that we looked at that contract a little while

5   ago for.

6          THE COURT:  TLM is Rosette's partnership?

7          THE WITNESS:  That's correct.

8          THE COURT:  And Wichtman was a lawyer for the tribe,

9   and she was in Rosette; is that right?

10          THE WITNESS:  That's correct.

11  Q    Now, you have -- this is an email that is a to-do list

12  with respect to the documents that were still being exchanged

13  to create Red Rock; is that correct?

14  A    So Flint -- this is from Flint to Karrie.  It seems like

15  there was an email that they had provided that Ryan had sent,

16  and then he lists what they were providing, the tribe's

17  constitution, its lending code, its ordinances, its bank stuff,

18  EIN.

19  Q    So at the top, this was sent to your lawyer, Ryan, and the

20  tribe's lawyer, Karrie; correct?

21  A    Yeah, that's correct.

22  Q    And it says, "Matt has indicated that the intended tribal

23  LLC should be established as Red Rock Lending, LLC, a tribal

24  entity"; correct?

25  A    Yes.

Matthew Martorello - Direct

```
1    Q    And then your lawyer and Karrie had to provide certain
2    documents including the tribe's constitution, ordinances, and
3    any resolution as well as a draft of the Red Rock Lending
4    organization documents and operating agreement for Ryan to
5    review prior to having it approved by LVD; correct?
6    A    Yes.  I believe Ryan requested these items.
7    Q    Your lawyer requested to review the Red Rock -- the
8    documents that were going to create the Red Rock Lending
9    entity?
10   A    Right, among the other things, yes.
11   Q    So when you, in paragraph 17 of your declaration -- and we
12   can go on.  We've got stacks of these.  I'm burning through my
13   time --
14          THE COURT:  Why don't you do this:  Why don't you
15   just ask the question, not going on.  If he continues to
16   ramble, I'm going to extend the time.
17          MR. BENNETT:  Yes, sir.
18          THE COURT:  Either he answers directly and I won't
19   have to extend the time, but if he continues to ramble and
20   reframe questions, I'm going to extend the time.  I want to get
21   to the bottom of things here.
22          MR. BENNETT:  Yes, sir.
23          THE COURT:  It doesn't help get to the bottom of
24   things if you are telling him how much evidence you've got.  He
25   doesn't need to know that.  All right, let's go.  Start your
```

Matthew Martorello - Direct

1    question.

2    Q    Mr. Martorello, in paragraph 17 of your declaration when

3    you swore under penalty of perjury that you were not involved

4    in the creation of Red Rock but made aware Red Rock had been

5    formed, now, today, you know that to be an untruthful

6    statement.

7    A    No.  I think I just disagree with you what the creation of

8    Red Rock is.

9    Q    Okay.

10   A    For example, the way I've thought of it is, you know, I

11   can provide a name for my son's child, but I don't create the

12   child.  The only one who can create the entity and the business

13   is the tribe.  So whatever advice they asked me for, if I give

14   them a name or we look at due diligence documents to consider

15   partnership, it's -- that doesn't do creation.  That isn't the

16   formation, and this was all in the context of the *Breakthrough*

17   factors which was what was the --

18            MR. BENNETT:  Objection; not responsive to my

19   question, Judge.

20            THE COURT:  He's also not asking you about creation.

21   He's asking you about another word in the sentence, a verb.

22   He's asking you about the verb, involved in the creation.

23            THE WITNESS:  Okay, my mistake.

24            THE COURT:  What he wants to know is, were you

25   involved in the creation of it no matter how you were involved.

1   He can get into the next question, he'll ask you how if the

2   answer is yes.  If the answer is no, then the answer is no.  Do

3   you understand?

4              THE WITNESS:  I believe so.

5              THE COURT:  Were you involved in the creation of Red

6   Rock?

7              THE WITNESS:  No.

8              THE COURT:  All right, that's the answer.

9   Q    Did your lawyer -- was your lawyer's review of the

10  documents creating Red Rock -- the organizational documents

11  prior to their being submitted to LVD's counsel for approval,

12  was your lawyer authorized by you to be involved in that

13  process?

14  A    I'm sorry again.  What process?

15             THE COURT:  The creation of Red Rock.

16             THE WITNESS:  No.  We didn't participate in the

17  creation of Red Rock.

18  Q    Paragraph 19, you swore under penalty of perjury that you

19  personally reviewed Red Rock's articles of organization for Red

20  Rock, and that's something that was true; right?  You did

21  personally review Red Rock's articles of organization; correct?

22  A    That's correct.

23  Q    But, in fact, you reviewed Red Rock's -- you and/or your

24  lawyer reviewed Red Rock's articles of organization before

25  those articles were submitted to LVD for approval?

Matthew Martorello - Direct

1   A    That's correct.

2   Q    Now, continuing in your declaration here, paragraph 22,

3   you state, "As a consultant to Red Rock, I made suggestions and

4   offered advice to Red Rock's co-managers."  Do you see that?

5   A    I do.

6   Q    And you never made a decision on behalf of Red Rock, or no

7   company you manage ever made such decisions; correct?

8   A    Correct.

9   Q    That was your testimony?

10  A    Yes.

11  Q    Let's take a look at Exhibit 3, please.  I'm sorry,

12  Exhibit 4.  So Exhibit 4 on the second page is an email

13  exchange between you and Richardson, Merritt, and Rosette dated

14  August 26, 2011.  Do you see that?

15  A    Yes.

16  Q    And there's highlight, but this highlight was already in

17  here when we got it, but do you know who did the all caps in

18  the highlight?

19  A    I believe -- I believe that was Flint.

20  Q    And you reviewed this document.  Was this responding to

21  questions that you had?

22  A    It seems so, yes.

23  Q    And if you'll take a look at the third page, do you see in

24  the highlighted "No representatives from the tribe are the

25  LLC's managers.  The servicer Bellicose operates the business

1    completely."

2    A    I see it.

3    Q    And that's what you understood at that point, that you

4    were structuring into the Red Rock deal?

5    A    I don't know -- no, I don't think that's what I

6    understood.

7    Q    Not what you understood.

8    A    I was asking questions at that time.  I didn't have an

9    understanding yet.

10   Q    Okay.

11            THE COURT:  I'm seeing in some instances where people

12   send an email, and then when somebody answers a question that's

13   embedded in an email, they type an answer right there, and

14   sometimes it's in different type.  Is that what was going on

15   here on page three do you know?

16            THE WITNESS:  Yes.

17            THE COURT:  Who was it that was answering -- who put

18   the question, "Does it mean that Bellicose is the manager,"

19   etcetera, in the lower case?  Who did that?

20            THE WITNESS:  I'm the one asking the questions, and

21   then -- I'm the lower case, and then the upper case is all

22   Flint Richardson.

23            THE COURT:  So Flint Richardson is answering that

24   question.  Who, again, is Richardson?

25            THE WITNESS:  He was one of the TLM partners.

Matthew Martorello - Direct

1              THE COURT:  Rosette group.

2              THE WITNESS:  Yes.

3    Q    I have you called out at paragraph or page four --

4              THE COURT:  Of what?

5    Q    Of Exhibit 5, page four of Exhibit 5, which is also on

6    your screen called out, and you ask can you elaborate.

7              THE COURT:  Mr. Bennett, excuse me.  My copy of

8    Exhibit 5 is one page --

9              MR. BENNETT:  Sorry, Exhibit 4.

10             THE COURT:  So you are on page four --

11             MR. BENNETT:  Of Exhibit 4, I'm sorry.

12             THE COURT:  Do you have that, Mr. Martorello?

13             THE WITNESS:  Yes, sir.

14   Q    You were told the design of this business was -- and,

15   again, it's all capped, that "your entity would be the servicer

16   for the lending operations.  The LLC managers are managers of

17   the LLC entity on behalf of the tribe but aren't involved in

18   the business."  Is that correct?

19   A    That's what this says here.

20   Q    In fact, that is how the business ultimately operated,

21   with the managers were not actively involved in the business.

22   A    That is not correct.

23   Q    That is not correct.  All right.  So -- now, when Red Rock

24   was created, what was the servicing entity at that time?

25   A    Well, there was none yet until months later.

1    Q    Who handled the servicing when Red Rock started operation

2    and when loans were being made in Red Rock's name?

3    A    That would have been Bellicose VI, Inc.

4    Q    That was your company?

5    A    Yes.

6    Q    And then at some point, it became Sourcepoint.

7    A    Yes.

8    Q    And at that point when either as Bellicose or Sourcepoint,

9    what intellectual property did you give to LVD's co-managers in

10   terms of underwriting?

11   A    Throughout the relationship you mean?

12   Q    Right now -- yes, with respect to the relationship between

13   Red Rock and Bellicose and Sourcepoint, what actual tangible,

14   by name and detailed description, underwriting intellectual

15   property did you give them?

16   A    Well, throughout the process, every recommendation that we

17   would make, they would receive.  So that could include

18   statements and procedures, how to do the verifications, the

19   underwriting criteria, and the systems and things.  So any of

20   the knowledge that we're transferring to them, they had to

21   implement at their call center, and so they received that.

22   They owned it, and that was their property we were creating for

23   them.

24   Q    Let's talk about that.  So when you say --

25        THE COURT:  Wait just a minute.  You're saying what

1    you told them.  He's asking you what did you give them

2    physically.  What did you hand to Red Rock?  What did

3    Bellicose, Sourcepoint, whoever it was, actually, by way of

4    intellectual property, physically hand to Red Rock; any?  If it

5    was, what is it?

6              THE WITNESS:  Well, I believe it would be like the

7    scripts and -- the papers that speak to those things I

8    mentioned.

9              THE COURT:  What are you talking about?

10             THE WITNESS:  So, for example, certain leads or loans

11   would go through a certain system or process.  So we had to put

12   that on paper and then send it to them, discuss it with them,

13   and if they accepted the recommendation, they would own the

14   process and that was their paper and process.

15             THE COURT:  Are you saying, though, that Bellicose

16   was processing the loan and then send it to Red Rock, and if

17   Red Rock thought it was okay, then Red Rock got all of the

18   information that you had sent along with them to help them

19   evaluate the loan?

20             THE WITNESS:  No, I don't think that's what I'm

21   saying.

22             THE COURT:  I'm utterly baffled by what you are

23   saying.  So think about it over the 20-minute recess, and then

24   we will come back and talk about it again.  We'll be in recess

25   for 20 minutes.

1            (Recess taken.)

2            THE COURT:  All right, Mr. Martorello I remind you

3    you are under the same oath that you took earlier in the day.

4            THE WITNESS:  Yes, sir.

5            THE COURT:  Mr. Bennett.

6    Q    Mr. Martorello, regarding the creation of Red Rock and

7    then, I guess, later the other tribal entities, you are aware,

8    and I think in paragraph 16 of your declaration you noted that

9    you reviewed the tribal council resolutions relating to the

10   lending entities Red Rock; right?

11   A    Yes, that's correct.

12   Q    And, in fact, in that time period when the tribe began to

13   implement the Red Rock program, you had hired a new lawyer to

14   help you; correct?

15   A    That's correct.

16   Q    And who was that?

17   A    I hired Jennifer Weddle of Greenberg Traurig.

18   Q    And she has a background in tribal lending?

19   A    Yeah, Native American law generally and tribal lending.

20   Q    If you take a look at Exhibit Number 10, please.  These

21   are sum of the emails we were able to get from Mr. Rosette's

22   subpoena.  This is an email from the tribe's lawyer, Ms.

23   Wichtman, to your lawyer, Ms. Weddle; correct?

24   A    Correct.

25   Q    And it states that Ms. Wichtman is sending a copy of the

1   proposed tribal resolution for her review prior to the next

2   meeting regarding the execution of Red Rock documents, the next

3   meeting of the tribal council; correct?

4   A     That's correct.

5   Q     And the second to last sentence says, "Please note that

6   there were changes made to your form resolution based upon

7   input and request of the tribal council"; do you see that?

8   A     I do.

9   Q     And this was customarily the way that these resolutions

10  that had implications for the Red Rock and then later the Big

11  Picture businesses operated; that is, the resolutions were sent

12  to you or to your representatives before the tribal council

13  actually voted on them.

14  A     That was not customary.

15  Q     It was not customary.  And so when it says Ms. Weddle's

16  form was modified, she had submitted a form resolution for the

17  execution and transaction that became Red Rock that the tribe

18  then felt it should edit; correct?

19  A     That seems to be what this says here.

20  Q     Now, when Red Rock began, what assets did Red Rock receive

21  from Bellicose and then Sourcepoint?  Like what actual assets,

22  and specifically I want to point you in your declaration to

23  paragraph 35.  Paragraph 35, which says in addition to whatever

24  the cash distributions were, that LVD received and retained the

25  significant additional economic value of ownership of all

Matthew Martorello - Direct

1    intellectual property developed under the agreement by

2    Sourcepoint.  Did you write that, or did your lawyers write

3    that?

4    A    I believe I wrote that.

5    Q    So your statement under oath is that Sourcepoint gave LVD

6    all intellectual property developed under the agreement with

7    Sourcepoint.  That's how I read it.  Am I wrong?

8    A    Anything that was theirs developed through the agreement

9    would be their intellectual property, yes.

10   Q    So underwriting criteria, the formula, the special sauce,

11   LVD received that; it was given to them, they had actual

12   possession and ownership over all that special sauce, secret

13   sauce?

14   A    Not the secret sauce related to our pre-qualified leads

15   but the secret sauce related to their underwriting

16   verifications.

17   Q    All right.  Well, tell the Court what underwriting

18   verifications are because it sounds a lot more complicated.

19   Explain to me what that is.

20   A    Sure.  So they have a set of underwriting criteria which

21   is generally, you know, age, income, you know, formulas for

22   what they want the loans to look like based on what the data

23   is, and then it comes in, and then the call center will go

24   through certain processes to verify, you know, bank, are they

25   employed, is it really their bank account, is it fraudulent,

 1   things like that.

 2        That's part of their underwriting process.  That's all

 3   their intellectual property and then, of course, there's the

 4   final process to do the final verifications on the reservation

 5   which is theirs as well, and separately, what I'm saying is

 6   different.  Pre-qualified leads is our formulas for how we do

 7   our algorithms to try and find leads that hopefully fit into

 8   their box of processes like a lead provider would do.

 9   Q    So you gave all that computer code and all those formulas

10   to a tribal member to own, possess, and keep?

11   A    I didn't give them our pre-qualified stuff, but I gave

12   them their statements and procedures, verification procedures,

13   and the underwriting box.

14        THE COURT:  What's this pre-qualified stuff that you

15   are talking about?

16        THE WITNESS:  Pre-qualified leads, kind of like when

17   you get pre-qualified for a mortgage, will run a bunch of data

18   to determine if you would be eligible, and then we'd solicit,

19   you know, a direct mail campaign or something, and then you

20   might apply if you're interested.  So we would generate leads

21   like marketing through analytics and such.

22        THE COURT:  And so the algorithms you developed for

23   pre-qualified leads, were they developed under the agreement by

24   Sourcepoint?

25        THE WITNESS:  No.  That was how we provided that

Matthew Martorello - Direct

1  service to them.  Our agreement required us to provide --

2            THE COURT:  That wasn't what I asked you.  I asked

3  you a different question.  Were those algorithms that you are

4  talking about respecting the pre-qualified leads developed

5  under the agreement by Sourcepoint?  Read your affidavit,

6  paragraph 35.

7            THE WITNESS:  Okay.  I've read it again.

8            THE COURT:  Were the algorithms that you spoke of for

9  the pre-qualified leads developed under the agreement by

10 Sourcepoint?

11           THE WITNESS:  No.

12           THE COURT:  And they were not given to the tribe.

13           THE WITNESS:  Correct.

14 Q    So what you are referring to when you discuss the

15 pre-qualified leads is the leads themselves.

16 A    Correct.

17 Q    That's what you are referring to as the significant

18 additional economic value of ownership of all intellectual

19 property developed under the agreement by Sourcepoint, is the

20 leads themselves?

21 A    No.

22 Q    All right.  The leads themselves is one of those.

23 A    No, the leads is the pre-qualified leads that I was

24 talking about.

25 Q    So the pre-qualified leads, that's the intellectual

1    property to which you are referring.

2    A    No.  Maybe I'm not explaining this well, but the

3    pre-qualified leads, the way we generate those is our

4    intellectual property.  Then we provide the leads themselves

5    which is, I think, what you're saying.  So that becomes the

6    customer for them which is their intellectual property, is the

7    customer list, so it becomes theirs at that point.

8          THE COURT:  Excuse me just a minute.  Let's go back

9    to your affidavit and try it another way.  What intellectual

10   property was developed under the agreement by Sourcepoint that

11   is referred to in paragraph 35 that was given by Sourcepoint to

12   the tribe?  What was it?

13         THE WITNESS:  So that would be all of the procedures

14   for how to verify the pre-qualified lead when they got it.

15   That -- meaning how the call center would do their analysis for

16   bank verifications or employment verification, how the loan and

17   rate and term should match up to two different types of

18   pre-qualified leads, and, you know, I'm probably missing some

19   processes, but the compliance management system, for example.

20   Those would be examples of things that we would have developed,

21   recommended for them, and then once they adopted it, that was

22   theirs.

23         THE COURT:  All right.

24   Q    So the algorithms, the analytics, the machine from which

25   business was generated, that was not given to the tribe.

1    A    Correct.

2    Q    The actual output, that is, here's the leads, and not all

3    leads but the leads that ultimately become their customers,

4    that intellectual property is the intellectual property that

5    you are referring to?

6    A    I think that sounds correct.

7    Q    Now, everything else you kept, and you guarded.

8    A    Our IP, how we did things --

9    Q    Your intellectual property --

10        THE COURT:  Wait a minute.  You are talking at the

11   same time, and I can't hear you and the court reporter can't

12   hear you.  Go ahead, start again.

13   Q    Everything else, all of the analytics, the --

14        THE COURT:  He has already answered --

15   Q    You retained and never gave that to the tribe?

16   A    Our systems and how we did our analytics and things, sort

17   of how we make the sausage, that's our IP.

18   Q    Okay.  So with the intellectual property that you gave,

19   that Sourcepoint gave to the tribe, the tribe could not operate

20   a business with that.  They didn't have -- they didn't know how

21   to cook the food, they just had the food; right?

22   A    I don't know that I would agree with that.  They could get

23   leads from other sources, for example.

24   Q    Okay.  But the analytics, the core of what made your

25   business special, what you were selling and charging 98 percent

1   less some expenses, that was the analytics that you marketed as

2   being so valuable.

3   A    That was the most valuable thing that we had.

4   Q    Now, I want to take a look at a few of these types of

5   intellectual property that you -- again, referring to 35, and

6   this is my apology, but I'm reading it, and it says "of all

7   intellectual property developed under the agreement by

8   Sourcepoint."

9        So I want to, in that context, talk about some of your

10  emails.  Take a look at Exhibit 13.  So Exhibit 13 is an email

11  dated November 13th, 2011, from Mr. Richardson to you.  And

12  it's following up, apparently, a phone call suggesting that you

13  should discuss these issues with GT.  GT was the law firm, Ms.

14  Weddle's law firm; correct?

15  A    That's correct.

16  Q    Greenberg Traurig?

17  A    Yes.

18  Q    And one of the items was intangible asset ownership.  You

19  were going to talk to Jennifer, the lawyer, your lawyer, about

20  the language that they have relating to you obtaining ownership

21  of the intangibles, specifically domain names, if you're no

22  longer the servicer.  Do you see that?

23  A    Yes.

24  Q    In fact, that ultimately made it into your deal with Red

25  Rock or LVD.  If LVD no longer used you and your companies as

Matthew Martorello - Direct

1   the servicer, the domains for these lenders reverted back to

2   you.

3   A    I'm not sure that that was ever put into the final deal.

4   Q    All right.  Well, let's take a look at Exhibit 89 -- no,

5   let's take a look at Exhibit 56 and 57.  Exhibit 56, this is an

6   email.  The last of the emails was dated August 26th, 2014, and

7   this was an exchange occurring between you and Ms. Wichtman in

8   her capacity as a lawyer for the tribe; correct?

9   A    That's correct.

10  Q    And I want to turn to the second page of the exhibit which

11  is an email from you on August 26th which I think is also on

12  your screen.

13  A    Yes.

14  Q    Can you read that first sentence.

15  A    "We respectfully opt to continue to keep any details of

16  SPVI IP including DM explicitly for internal eyes only, both

17  for the protection of our business and maintaining integrity of

18  an acquisition of the SPVI business."

19  Q    All right.  Now, that IP, and, in fact, you -- the IP is

20  intellectual property; correct?

21  A    That's correct.

22  Q    Now, if you'll turn to the first page of that same

23  exhibit, and then this is Ms. Wichtman responding to your

24  email.  And she says, "I wasn't recommending that SPVI disclose

25  its secret sauce but only that SPVI be willing to explain to

1    the co-managers what exactly they are approving."  By the way,

2    the process -- am I right the process was that Sourcepoint

3    would make recommendations, and I'm doing quote unquote for the

4    record, quote unquote recommendations to the co-managers of the

5    tribal lending entity; right?

6    A    Co-manager or CEO, yes.  For example, Shelly was both, in

7    both capacities.

8    Q    Okay.  So they would make the recommendation to them, and

9    then the, in this case Shelly which is Michelle Hazen; correct?

10   A    Correct.

11   Q    So Ms. Hazen would then approve, and, for the record, I'm

12   using quotes around the word approve.  So Ms. Hazen would

13   approve what SPVI was asking Red Rock to approve; correct?

14   A    She could approve or reject, but if it was going to be

15   implemented, she would approve.

16   Q    So Ms. Wichtman, in this exchange, was emailing you asking

17   for some details about what was being -- about the secret

18   sauce.  You responded you're not going to share the

19   intellectual property, and then she responds with this

20   sentence:  "I wasn't recommending that SPVI disclose its secret

21   sauce but only that SPVI be willing to explain to the

22   co-managers what exactly they are approving."  Do you see that?

23   A    I do.

24   Q    And this was August of 2014; correct?

25   A    Correct.

Matthew Martorello - Direct

1   Q    Now, one of the secret sauce items that you guarded was

2   the vendor relationships with the third-party companies that

3   Sourcepoint would use to generate leads, for example; correct?

4   A    Some of the vendor relationships which were related to

5   pre-qualified leads, yes.

6   Q    Okay.  In fact, the top of this email you address that

7   very point which is your email back says that the vendor

8   contracts and formulas used are very closely guarded internal

9   IP and entirely unobtainable by the clients.  Do you see that?

10  A    Yes.

11  Q    "The only reason we moved elements to be direct with

12  client was because the risk of working with tribal clients was

13  more and more dangerous and optics become very important."  If

14  there is -- the last paragraph, "If there's a fundamental

15  disagreement on IP ownership, though, I imagine the elements I

16  mentioned required in a deal are far from obtainable."  What

17  did you mean by that sentence?

18  A    Well, she was making the point basically that if -- if she

19  was making the point that she owned our secret sauce, then they

20  effectively already owned our business, and there would be

21  nothing for us to sell to them.

22  Q    And, in fact, therefore, you disagreed when you suggest in

23  response, your point is that the analytics, the secret sauce,

24  the vendor relationships, those were not given or made

25  available to Red Rock, those still belonged to you and your

1  companies; correct?

2  A     They were at some point, which I mention I think here that

3  we did do that, because we had to -- the whole industry got

4  really -- they wanted full clarity on the life cycle of a

5  consumer, meaning from the website through to origination or

6  debt collection agency or anything.  So all the vendors wanted

7  to go direct, and they didn't want us involved in pre-qualified

8  leads by way of contract.

9  Q     And you wanted to get your name out of it because of the

10 impending regulatory and litigation risks that you saw at this

11 time.

12 A     I was definitely interested in not being mischaracterized

13 as the lender.

14            THE COURT:  Was that an answer yes or no?

15            THE WITNESS:  I don't remember the exact question.

16            THE COURT:  From now on, answer yes or no, and if you

17 then want to say something, okay, but any other answers that

18 aren't yes or no I'm not going to pay much attention to because

19 I can't follow what you are saying.

20            You have -- your practice seems to be to try to

21 restate the question or to say something that's not even

22 remotely implicated by the question, and, therefore, it's

23 confusing to the record and to me, and it's not helpful to me

24 to understand things in that fashion.

25            Ask the question again.  Answer it yes or no.  If

Matthew Martorello - Direct

1    there needs to be an explanation, your lawyer can call for it.

2    Go on.

3              THE WITNESS:  Okay.

4    Q    On your screen, I believe, is Exhibit 57, and I've called

5    out on page one the sixth paragraph down.  This document itself

6    is an email from you to Ms. Wichtman dated August 26, 2014;

7    correct?

8    A    Correct.

9    Q    And, at this point, you're, I guess, negotiating or

10   discussing with Ms. Wichtman the terms of some future sale to

11   turn over your servicer business?

12   A    At this point, we were discussing a sale, yes.

13   Q    And so the paragraph I've called out says, "The servicer

14   is a servicer, so the IP it builds is its own, and for the use

15   of its client (multiple) which it services, or has serviced

16   from even the pre-LVD days."  By the way, you are referring to

17   you, to your company, as the servicer in that sentence; right?

18   A    Correct.

19   Q    Now, at the top of this same email, in the first -- or in

20   the third paragraph -- by the way, do you recall this email

21   that you wrote?

22   A    No, but I'm familiar with it because I've seen it in the

23   production a few times.

24   Q    You are referring -- this is referring to a transition

25   from the Red Rock time period to some future time period or

Matthew Martorello - Direct

1    future structure that we now know became Big Picture; right?

2    A    I believe that's correct.

3    Q    So it's fair to say that when you are describing how

4    things are going to be under the Big Picture structure in terms

5    of what information is going to be shared or what control is

6    going to be provided to the tribal managers, that it would

7    be -- that with respect to Red Rock, there would have been less

8    sharing and less control than after the servicer is actually

9    owned by the LVD?

10              THE COURT:  I don't have any idea --

11              MR. BENNETT:  That was horrible.

12              THE COURT:  -- and I can't imagine --

13              MR. BENNETT:  Every third word.  If you heard every

14   third word, it was a great question, Judge.

15              THE COURT:  Cut it down by two-thirds then.

16   Q    So, here, in this email, you write, "The seller will have

17   to keep a final say-so in business decisions."  That means

18   whatever deal you're going to agree to with the new Big Picture

19   structure, one thing that you were going to insist on was that

20   the seller -- that's you; right?

21   A    Yes.

22   Q    The seller will keep a final say-so in business decisions;

23   right?

24   A    Correct.

25   Q    So obviously that means that as of the time of writing

Matthew Martorello - Direct

1    this email, the seller, you, believed you had the final say-so

2    in business decisions.

3    A     No.

4    Q     No.  Now, continuing back to your declaration --

5              THE COURT:  Stop just a minute.  What did you mean by

6    business decisions in that sentence?  What business decisions

7    are you talking about?

8              THE WITNESS:  Well, at that point, it was very

9    premature because we hadn't gotten to documents, and I didn't

10   know yet what business decisions I was talking about, but I

11   just meant as a lender, interested in making sure the

12   collateral and IP were maintaining its integrity.  There had to

13   be some sort of, you know, control to make sure it wasn't just,

14   you know, degraded or trashed or something like that, but I

15   hadn't really thought through what that would mean yet at this

16   point in time.

17             THE COURT:  So you didn't know what business

18   decisions meant in that sentence?

19             THE WITNESS:  Correct.

20   Q    So that email, when you wrote that email, the seller you

21   are referring to was Sourcepoint; correct?

22   A    Eventide ultimately, but the entity sold was Sourcepoint.

23   Q    Now, continuing in your declaration, I want to talk about

24   the bank accounts.  So paragraph 27 of your declaration and 28,

25   you say, "Red Rock provided companies Bellicose and Sourcepoint

Matthew Martorello - Direct

1  certain limited access to bank accounts."  Do you see that?

2  A    Yes.

3  Q    So there was an operating account that was in the name of

4  Red Rock; correct?

5  A    Correct.

6  Q    Later there was an operating account in the name of Big

7  Picture; correct?

8  A    Yes, there was.

9  Q    And in the operating account, what money went into that

10  operating account, the Red Rock operating account?

11  A    Anything borrowed from creditors and any inbound revenue

12  or loan payments from the consumer loans.

13  Q    And who is Brian McFadden?

14  A    He is the CEO of the Ascension Technologies.

15  Q    At the time of this email -- I'm sorry, at the time of Red

16  Rock, rather, and of Sourcepoint, what was Brian McFadden's

17  role?

18  A    He was the -- just before the sale, he was the president

19  of Bellicose Capital.

20  Q    And then who was Simon Liang, L-i-a-n-g?

21  A    Simon was the controller at that time and then

22  subsequently the controller at Ascension.

23  Q    But prior to that, he worked for your companies?

24  A    Yes.

25  Q    And so the limited access to bank accounts, you actually

Matthew Martorello - Direct

1    had complete access, your employees, your companies, Bellicose

2    and Sourcepoint, had complete access to the operating account

3    for Red Rock; correct?

4    A    Within the scope of the deposit account control agreement,

5    yes.

6    Q    There's a word there that you put for a reason.  You say

7    certain limited access to bank accounts, and I'm challenging --

8    I'm asking you, in fact was not certain limited access, it was

9    complete access to the bank accounts; correct?

10   A    There were accounts that I wasn't on, and I don't know if

11   that's what I was talking about at the time I wrote that.  The

12   operating account specifically I had complete access to.

13            THE COURT:  Whose operating account, Red Rock or

14   Bellicose?

15            THE WITNESS:  Red Rock.

16            THE COURT:  Big Picture?

17            THE WITNESS:  Red Rock.

18   Q    And that meant that you and your employees could write

19   checks out of that account if they wanted.

20   A    I actually think we had a restriction on BillPay from the

21   bank -- I'm sorry, we didn't have checks.  We were allowed to

22   do BillPay.

23   Q    But you could take money out --

24            THE COURT:  What does that mean, allowed to do

25   BillPay?

Matthew Martorello - Direct

1        THE WITNESS:  So BillPay is like an online version of
2   writing a check where you go in and type it, but they didn't
3   give us a checkbook to physically sign.
4        THE COURT:  So, in essence, you could write checks on
5   the account, and you did it through a technology called
6   BillPay?
7        THE WITNESS:  Yes, for some period of time, and then
8   they terminated that and only allowed us to do wires.
9        THE COURT:  Wire transfers.
10        THE WITNESS:  Yes.
11   Q    And by "they," you mean the bank.
12   A    The bank.
13   Q    Now, again, before Big Picture, Brian and Simon were
14   signators on that account; correct?
15   A    Yes, that's correct.
16   Q    And who were the co-managers for Red Rock?
17   A    At what point in time?
18   Q    At any time.  How about if I give you the second question.
19   Can you name any of the managers of Red Rock, the tribal
20   employees, that had signing capability, could use BillPay to
21   take money out of the account in the manner that you and your
22   designees or delegees could?
23   A    They could do that.  Shelly could do that, Chairman
24   Williams could do that, and Craig Mansfield -- those are the
25   managers over the course of the time -- if they were to remove

1    me from the bank account, but without doing that, then I had

2    access at that time.

3    Q    So if they did not remove you from the bank account, then

4    you had control of the bank account.

5    A    Correct.

6    Q    When it says limited access to bank accounts, the key bank

7    account was the operating account?

8    A    Yeah, I think so.

9    Q    And you had total access, total unfettered access to

10   that -- correct? -- not limited?

11   A    To that one account, yes.

12   Q    That's the account that mattered; right?

13   A    It was the operating account.  It moved money in and out

14   for the things that I mentioned.

15   Q    Is there any account that Red Rock had that had as many

16   transactions or saw as much money coming in as the operating

17   account?

18   A    No.

19        THE COURT:  Excuse me a minute.  I want to make sure

20   I understand what you were saying.  As I understand what you

21   said, the Red Rock managers whose names you gave, Hazen and

22   Williams and somebody else, I couldn't hear what you said,

23   began with an M it sounded like, could have access to the

24   operating account only if your name was removed from the

25   account?

```
1              THE WITNESS:  Correct.

2              THE COURT:  How was your -- how would your name be

3    removed from the account?

4              THE WITNESS:  They would have to contact the bank and

5    request to do that.

6              THE COURT:  "They" meaning?

7              THE WITNESS:  The co-managers would have to do that.

8              THE COURT:  Was there any restriction on their

9    ability to do -- to contact the bank and remove you?

10             THE WITNESS:  Not that I'm aware.

11             THE COURT:  Pardon me.

12   Q    When you say there's no restriction, you do not believe

13   that -- you're not -- are you testifying that you don't think

14   that would have violated or been a breach of your agreement if

15   they removed you and your delegees from the account?

16   A    I don't recall that being a breach of any agreement.

17   Q    Well, if it --

18             THE COURT:  Excuse me a minute.  I don't think he's

19   asking you that, Mr. Martorello.  It was a little hard to

20   follow, though.  Do you want to try again, because the question

21   is, is he taking the position that removal would have been a

22   breach of some agreement; is that right?

23             MR. BENNETT:  Yes.

24             THE COURT:  Do you believe that removal of your name

25   from the account would have been a breach of any of the
```

Matthew Martorello - Direct

1    agreements between you and your companies and Red Rock?

2         THE WITNESS:  I'm not aware of any breach, a

3    provision that would breach as I sit here right now, but I

4    haven't looked to analyze it.

5    Q    Well, so -- in fact, what is a lockbox?

6    A    A lockbox is a bank account that receives cash and is

7    managed generally by some, you know, independent fiduciary

8    third party.

9    Q    And you insisted -- when Big Picture was created, you

10   insisted on a lockbox in addition to the DACA, the deposit

11   access control agreement; correct?

12   A    I believe we did ask for that, and it never got

13   implemented.

14   Q    All right.  And what were you asking for?

15   A    Some independent fiduciary to do the waterfall

16   calculations fairly between the parties.

17   Q    But instead of the lockbox in the Big Picture transition,

18   another DACA was implemented, and this time Brian McFadden and

19   Simon Liang remained as the signators on the operating account

20   of Big Picture.

21   A    I think you're correct.

22   Q    Now, in the paragraph just prior to 27, 26, you say, "No

23   company I own or manage has ever taken any action to collect,

24   in whole or in part, any consumer loan originated by Red Rock."

25   That's -- did you write that yourself, or did your lawyer write

Matthew Martorello - Direct

1   that?

2   A    I don't specifically recall.

3   Q    So could you help the Court know or understand the process

4   that a consumer loan, the birth-to-death process, would go

5   through after a consumer executes online a Red Rock loan, then

6   how is the money collected from that consumer?

7   A    They can either mail a check to the reservation, or

8   there's an automatic ACH process that would debit on the due

9   date and clear the cash into the operating account.

10  Q    And then the most common, as well as the most preferred

11  from your standpoint, from Sourcepoint's standpoint, was the

12  ACH process; correct?

13  A    That was the most common, yes.

14  Q    And, in fact, it was a big concern of yours that the ACH

15  process -- that banks were not willing to accept ACH

16  relationships with tribal loans; correct?

17  A    There was a period of time where that was an issue through

18  2014.

19  Q    Okay.  And then if a consumer terminated or their bank

20  didn't have money in it, the ACH, how was the consumer billed

21  and collected from?

22  A    I'm sorry, if --

23  Q    Right.  Some consumers didn't pay their bills; right?

24  A    Yes.

25  Q    And how were they notified, the consumer?  How were they

Matthew Martorello - Direct

1   notified, hey, you're late, you didn't pay your bill?

2   A    There would be an automated email that would recognize

3   that it wasn't paid, and so it would trigger an email through

4   the technology.

5   Q    Okay.  And was that technology part of the secret sauce

6   that Sourcepoint owned?

7   A    No.

8   Q    The code and everything that was shared with Red Rock?

9   A    No, that would have been triggered from the loan

10  management software.

11  Q    Who owned the loan management software?

12  A    That was a third-party vendor.

13  Q    And with whom -- again, the Red Rock period, with whom was

14  the contract with the loan management software vendor;

15  Sourcepoint or Red Rock?

16  A    I can't remember right now.

17  Q    So when you say that no action was taken to collect, what

18  do you mean by that?  When you testified under oath here in

19  this declaration that Sourcepoint and Bellicose had no

20  involvement at all in the process of collecting money from

21  consumers, that's how I read it.  Is that what you meant to

22  say?

23  A    What I meant was that we did not take or receive any cash

24  from the consumer.

25          THE COURT:  "We" meaning who?

1            THE WITNESS:  Me or Bellicose or Sourcepoint, that
2    Red Rock was the entity that would collect through taking,
3    receiving, or demanding payment or something.
4    Q    And that was because you used an on-reservation post
5    office box to receive checks; correct?
6    A    It wasn't because of that.  It was just because that's the
7    account that would do the collection.  That was the company
8    that would do the collection.
9    Q    What do you mean that was the company?  What was the
10   company?
11   A    Red Rock.
12   Q    And can you identify the names of the individuals that
13   would call and try to collect money from consumers who were
14   employees of Red Rock?
15   A    Well, that's different than this.  That's debt
16   collections.  That's like past due debt, and I don't know -- I
17   guess those would have been probably outsourced to a third
18   party center to do.
19   Q    Sourcepoint would have hired a third-party call center to
20   outsource the debt collection?
21   A    For bad debt I think we did for awhile, and I don't know
22   if it then changed to direct or not.
23   Q    And then when you say collect, you are talking about the
24   process of receiving a check and putting it into the operating
25   account or having an ACH go into the operating account;

Matthew Martorello - Direct

1   correct?

2   A     Right, collection, yes.

3   Q     And that didn't take -- ACH, for example, that did not

4   take any action at all on the part of Red Rock?

5   A     No, that's not accurate.

6   Q     Well, it went into the Red Rock account, the operating

7   account automatically; correct?

8   A     Yeah.

9   Q     That's the operating account that unless you were taken

10  off, only you and your company had control over; correct?

11  A     Correct.  But what I'm saying is someone had to take the

12  action to make the collection happen, and that happens through

13  the batch renewal process.

14  Q     So your company did take action to collect bad debt;

15  right?

16  A     No.

17  Q     Hired a third party.

18  A     We did hire -- well, I don't know that we hired a third

19  party.  I think the tribe hired a third party to purchase its

20  defaulted loans.

21  Q     Prior to -- well, and who selected the third party?  Who

22  found, selected, and contracted, did the contracts with the

23  third party that would buy bad loans, Sourcepoint or Red Rock

24  or Bellicose and Red Rock?

25  A     I'm trying to remember who it was.  Capture Financial was

Matthew Martorello - Direct

1  contracted with the tribe.

2  Q    Who found the contract?

3  A    I found the company.

4  Q    You found the company.  Who negotiated the contract with

5  the debt buyer?

6  A    I don't know if we recommended -- the tribe's general

7  counsel.

8  Q    So you found the company, and then you had no involvement

9  in the pricing or any of that; that's what your testimony --

10  A    No, I didn't say that.  I would have recommended some

11  structure or pricing that I thought was best for the tribe.

12  Q    And then the tribe would have given you a true/false, yes

13  or no?

14  A    They would have had to have said they would like to do the

15  deal or not, or they didn't like the deal, whatever they wanted

16  to say.

17  Q    Do you have any recollection here sufficient for you to

18  swear in a federal courtroom that that's what you recall, that

19  is that the tribe actually approved the debt collection

20  contract?

21  A    They would have had to approve the debt collection

22  contract.

23  Q    That's not what I'm asking you.  I'm asking you if you

24  have any independent recollection here today that the tribe did

25  that.

Matthew Martorello - Direct

1    A    I know it's an impossibility, so I don't know --

2            THE COURT:  The answer to that is yes or no; yes, I

3    have the recollection.  Do you or don't recall?

4            THE WITNESS:  Well, I know that they did.  I just

5    can't say -- maybe I'm not understanding the question right.

6    Q    Take a look at paragraph 34 of your declaration.  Now, you

7    say "Red Rock did not receive two percent of the net revenues

8    under the terms of the servicing agreements.  Instead, as the

9    documents I've reviewed that were provided in discovery

10   demonstrate, LVD chose to structure their arrangement to

11   stabilize their monthly income as a percentage of gross

12   revenues adjusted for bad debts."  Do you see that?

13   A    Yes.

14   Q    Now, first, I want to ask, did you write this, or did your

15   lawyer?

16   A    I presume that I wrote it, but I'm not certain.

17   Q    And when you say LVD chose, you are not suggesting that

18   this is a structure LVD wanted and it was their idea, are you?

19   A    It was their idea.

20   Q    It was their idea.  LVD said we want to pay two percent.

21   A    No, I'm talking about the structure of the arrangement.

22   Q    Well, you heard Mr. Merritt, so you suggested and asked

23   that he and then Mr. Rosette approach LVD and see if they would

24   accept two percent; correct?

25   A    Two percent was my counteroffer to their offer.

Matthew Martorello - Direct

1    Q    Okay.  Is there -- have you seen a document that says

2    that?

3    A    It was a verbal conversation.

4    Q    Oh, it was a verbal conversation.  All right, well, let's

5    take a look at Exhibit 16.  By the way, before we talk about

6    16, the tribe -- you know that the tribe didn't even get two

7    percent; right?

8    A    They -- TLM got one percent, and they got one percent.

9    Q    That was the middleman including Mr. Rosette's company?

10   A    Right.  That was until July 2012.

11   Q    So until July 2012, it was one percent that the tribe got,

12   one percent of gross less write-offs, bad debt; right?

13   A    Yes.

14   Q    And then after that, the tribe had a buyout where they had

15   to buy out TLM; correct?

16   A    I learned that a few weeks ago, yes.

17   Q    Now taking a look at Exhibit 16, this is an email chain

18   dated June 19, 2012, and then earlier between you and Karrie

19   Wichtman in her capacity as a lawyer at Rosette representing

20   the tribe; correct?

21   A    Correct.

22   Q    And then in this chain, this is one of those instances

23   that the Judge earlier asked about.  Some of it's colored that

24   has Matt Martorello's response to Ms. Wichtman's questions;

25   correct?

1    A    Yes.  I can't see the colors.

2    Q    You don't have the colors, all right.

3         THE COURT:  Neither do I.

4    Q    After Matt Martorello, you'll see in each of the

5    paragraphs starting on page -- the fifth page of the exhibit,

6    on the fourth page of the exhibit --

7         THE COURT:  What's the last Bates digit, 602?

8         MR. BENNETT:  It's 601.

9    Q    Everywhere where it says Matt Martorello and italicized

10   brackets, what follows in each is your text responding; is that

11   correct?

12   A    Yes.

13   Q    And can you explain the context of this email?

14   A    It's a really long email.

15   Q    Well, do you recall the email?  I'm not asking you to

16   summarize.  I'm just asking the context of it.

17        THE COURT:  What do you mean by context?

18   Q    Why were you communicating with Ms. Wichtman in this email

19   exchange?

20   A    I did not like that TLM was receiving part of what I

21   thought the tribe should be getting.

22   Q    And then there was a discussion about -- there's a

23   discussion here about regulatory risks.  Do you know who Scott

24   Tucker is?

25   A    I've heard of him, yes.

1    Q    Who do you understand him to be?

2    A    He was someone who had a complete fraudulent lending

3    enterprise.

4    Q    He did what you did but was not completely -- but in his

5    instance, it was completely fraudulent; right?

6    A    It was very, very different than this.

7    Q    He was a --

8              THE COURT:  Wait a minute.  What did you say?

9              THE WITNESS:  I said it was very, very different than

10   what happened here.

11   Q    Mr. Tucker was a non-tribal businessman who created a

12   servicing relationship with an Indian tribe to make high

13   interest loans to consumers; correct?

14   A    I think they found that the relationship didn't exist

15   effectively, that it was a total sham.

16   Q    And then he went to prison.

17   A    Yes.

18   Q    And prior to that, the regulatory agencies were suing Mr.

19   Tucker claiming that he was not a mere servicer but was the

20   true lender; right?

21   A    I think the suit against him was federal consumer lending

22   laws, like TILA and Reg E from the FTC.

23   Q    So I've called this out now on the screen, and starting

24   with -- and this is Ms. Wichtman.  You'll see on the screen it

25   said, "Personally, I see only a few issues on the regulatory

Matthew Martorello - Direct

1    side."  Do you see that?

2    A     Yes.

3              THE COURT:  What page are you on?

4              MR. BENNETT:  We are on the fourth page, and I have

5    this on the screen popped up.

6              THE COURT:  The bottom paragraph.

7              MR. BENNETT:  Bottom paragraph.

8              THE COURT:  All right.

9    Q    And one of the items that Ms. Wichtman told you about

10   was -- and she's outlining some of the possible regulatory

11   risks.  Right after your section, which your section in red

12   ends at the word "process."  Is everyone following me?  So your

13   insert was, "If so, I'd imagine just requiring somebody's

14   attention for two to three weeks a year to get through that

15   process."

16             And then she writes, "The second piece is the profit

17   to the servicer, we have to be prepared to show that the

18   percentage of net profit that the servicer is receiving is

19   defensible compared to what the tribe is receiving."  Do you

20   see that?

21   A     I do.

22   Q    And you responded to that on the next page; right?

23   A     Sorry, where on the next page are you?

24   Q    And I've called it out on the screen right there.  And you

25   defend saying that the Tucker case was tested in Colorado and

Matthew Martorello - Direct

1  the Supreme Court upheld it with just one percent.  Do you see

2  that?

3  A    Yes, that's correct.

4  Q    Okay.  Now, this conversation about money and the tribe's

5  questioning either directly or through its lawyers about money,

6  that was a topic that kept coming up.  It came up multiple

7  times from the tribe asking you either directly or impliedly

8  for more money.

9  A    You are talking pre-transaction?

10  Q    Pre-transaction.

11        THE COURT:  You're saying during the negotiations

12  that led to the creation of Red Rock, to sale, what?  Ask the

13  question in a way that puts some context --

14        MR. BENNETT:  Yes, sir.  This was 2012.  This was

15  before the sale.

16        THE COURT:  Just ask the question, though.

17        MR. BENNETT:  Sure.

18  Q    The tribe periodically would ask you for more money;

19  correct?

20  A    I don't recall them asking for more money pre-transaction.

21  Q    You don't.

22  A    No.

23  Q    So this -- this is in red on my screen, and I'm calling it

24  out on yours.  This is page, again of Exhibit 16, sixth page,

25  and you write, "Now all of that said, I get the feeling the

Matthew Martorello - Direct

1   tribes may want more money."  Skipping two sentences, "However,

2   the level of sophistication behind the scenes built into the IP

3   that SPVI uses, which makes SPVI clients succeed while majority

4   of lenders fail is massive.  Going it alone is an exercise in

5   how much money do you want to lose before you make it up the

6   learning curve high enough to know how to do it right.  That

7   takes a lot of analytics to get there and the faster the

8   better."  That was your response; correct?

9   A    Yes, I wrote that.

10  Q    That's not the only time prior to the negotiations

11  starting in which you responded that the tribe is pushing for

12  more money, and you don't want to provide that; correct?

13  A    They weren't pushing.  I was saying that I -- my instinct

14  was that maybe they wanted to get more.  They never asked.

15  Q    Well, let's take on paragraph 15.  I'm sorry, document 15.

16              THE COURT:  SPVI is Sourcepoint 6?  Is that what it

17  is?

18              MR. BENNETT:  I think it's Sourcepoint Virgin

19  Islands.

20  Q    Mr. Martorello, in fact --

21              THE COURT:  Wait a minute.  Is that right, Mr.

22  Martorello?

23              THE WITNESS:  Sourcepoint VI, Virgin Islands, that's

24  correct.

25  Q    Part of your business was in the Virgin Islands, and then

1   you moved to Puerto Rico?

2   A    Yes.

3   Q    Those were because of various tax structures that you were

4   able to benefit from?

5   A    There are the economic development programs of those

6   jurisdictions.

7   Q    And that's why you switched from Virgin Islands to Puerto

8   Rico?

9   A    I moved there, to Puerto Rico, to join their tax program,

10  their economic development program.

11  Q    Now, I'm showing you right now what is exhibit --

12          THE COURT:  What does that mean?  You were working

13  for the economic development people of Puerto Rico?

14          THE WITNESS:  Both Virgin Islands and Puerto Rico

15  have economic development programs, so they're recruiting

16  people to come down and create jobs and spend money on local

17  resources and things, and they give you an exemption to your

18  tax rates if you do it.

19          THE COURT:  So you moved for tax benefits.

20          THE WITNESS:  Yeah, to participate in that program.

21  Q    Now, this is an email just between you and Mr. Merritt

22  dated June 2012; do you see that?

23  A    Yes.

24  Q    Now, earlier today, you testified that you understood Mr.

25  Merritt worked for LVD, he was their agent; correct?

Matthew Martorello - Direct

1    A    Through TLM.  I said he was -- TLM was an agent of LVD,

2    and he wash associated with that.

3    Q    And so let me clear that real quick.  At the top here of

4    this very email is Mr. Merritt speaking to you.  And he

5    includes the statement, "We're your advocate, so we'll act on

6    your behalf regardless."  This was just June of 2012, a year

7    after the OLA conference; right?

8    A    Yes.

9    Q    So your advocate -- you had written your advocate here,

10   and you didn't, in this instance, copy either Mr. Rosette or

11   Ms. Wichtman; is that correct?

12   A    Correct.

13   Q    Unlike the other exchanges that we've gone through today.

14   A    Correct.

15   Q    And, here, you say in your text that you would like to

16   find a second tribal client.  "While I like the exclusivity and

17   very much like the relationship with LVD, I am concerned about

18   the long term as I think they likely have motives not aligned

19   with an exclusive servicing arrangement, and I think they are

20   starting to feel underpaid as the heat comes on at the federal

21   level."  Do you see that?

22   A    Yes.

23   Q    So their long-term motives were that they wanted to be

24   able to do this themselves and not involve you; correct?

25   A    That was their long-term motive.

Matthew Martorello - Direct

1   Q    And because they had that motive, you started looking to

2   get out of business with LVD, to find a second tribal client.

3   A    I know I wanted to diversify tribal clients, but I don't

4   recall exactly what triggered me to say the exclusive servicing

5   arrangement here or what triggered the concern about them not

6   wanting an exclusive servicing arrangement.

7   Q    Let's continue through your declaration.  How about

8   paragraph 40 now.

9          THE COURT:  Mr. Bennett, it's a good place to have

10  lunch.  We'll have an hour for lunch.

11         MR. BENNETT:  Yes, sir.

12         THE COURT:  I believe -- I don't know where we stand

13  on the time.  Who is the timekeeper?

14         MR. DILLON:  Your Honor, I have us at roughly about

15  one hour 44 minutes.

16         THE COURT:  Mr. Martorello's answers are so often not

17  concise and rambling, and they are rambling, that I may give

18  you a little bit more time.  I'll kind of wait and see how it

19  goes after the lunch break.  We'll see how we're coming.  If

20  that's the case, what I'll do is give you the rest of the day

21  and give them the day tomorrow.  We'll be in recess.

22         (Luncheon recess.)

23         THE COURT:  All right.  I remind you, Mr. Martorello,

24  you're under the same oath you took earlier this morning.  All

25  right.  Have you gotten things sort of streamlined, Mr.

1    Bennett, during the lunch recess?

2              MR. BENNETT:  Yes, sir.

3              THE COURT:  Good.

4    Q    Mr. Martorello, in your declaration, starting at paragraph

5    29, you discuss the servicing agreement between Red Rock and

6    Sourcepoint and Bellicose.  Do you see that?

7    A    Yes.

8    Q    And in particular, paragraph 33 says you are familiar with

9    the servicing agreement between the two; is that correct?

10   A    Sorry, which paragraph?

11   Q    33.

12   A    Yes.

13   Q    And you were heavily involved in the creation of that

14   servicing agreement; correct?

15   A    I was involved in the negotiation of the servicing

16   agreement.

17   Q    Well, you knew what was in it, you read it carefully?

18   A    While it was being negotiated, I did read it.

19   Q    So recall that we discussed the role that you played and

20   that your companies played in collection of the incoming

21   revenue from consumer borrowers, recall that just before lunch;

22   right?  Your testimony, your declaration is that none of your

23   companies collected --

24             THE COURT:  Wait a minute.  Give him a chance to

25   answer the question.  Do you remember the discussion you had

Matthew Martorello - Direct

1   before lunch about the collection of payments from consumers?

2        THE WITNESS:  I remember the conversation.

3        THE COURT:  You are talking about "I have never" --

4   paragraph 26, "I have never taken any action to collect, in

5   whole or in part, any consumer loan originated by Red Rock";

6   right?  Is that what you are talking about?

7        MR. BENNETT:  Yes, sir.

8        THE COURT:  We're there now.  We're all oriented.

9   Q    I'm orienting you now to document number 11, Exhibit

10  Number 11, which is the original servicing agreement dated

11  October 25th, 2011, between Red Rock Tribal Lending, LLC, and

12  Bellicose VI, Inc.  Do you have that before you?

13  A    Yes, now I do.

14  Q    And here it's on your screen now?

15  A    Yes.

16  Q    And I want to push us forward a little bit to page 15 of

17  it which is paragraph 4.9 which I've called out on our screens.

18  Do you see that?

19  A    I see it.

20  Q    And what does it say that you, as the servicer, did with

21  respect to the consumer loans revenue that was coming in?

22  A    Well, it doesn't say what we did.

23  Q    But it says, "The servicer shall collect all gross

24  revenues and other proceeds connected with or arising from the

25  operation of the enterprise"; right?

1    A    That's what it says.  We didn't do that.

2    Q    You didn't do that?

3    A    No.

4    Q    You didn't?

5    A    We did not.

6    Q    I could walk you to document number 20, I will, but you

7    agree with me that this will have the same paragraph; right?

8    4.9.

9              THE COURT:  I don't know whether he understood that

10   or not, but I didn't.

11             THE WITNESS:  Yes, we're going to Exhibit 20?

12             THE COURT:  We're going on exhibit what?

13             MR. BENNETT:  20.

14             THE COURT:  And what is that?  That's the amended --

15             MR. BENNETT:  That's the amended servicing agreement,

16   Your Honor.

17             THE COURT:  And you're going to paragraph --

18             MR. BENNETT:  4.9.

19             THE COURT:  All right.

20   Q    Who did the first draft of the servicing agreement between

21   you and your team versus Red Rock?

22   A    Of this one specifically or the one before it?

23   Q    Either one.  Tell us about both.

24   A    They provided an agreement which I think when Jennifer

25   Weddle got involved, I think maybe she had introduced this

1   agreement.

2   Q    All right.  Let's go back, and I'm sorry.  Now that I have

3   everybody's attention on 20, let's go back to 11.

4        Now, one of the questions I asked you was were you aware

5   that the tribe or LVD was receiving only one percent of the

6   defined revenue, and you said I just learned it last week;

7   right?

8   A    No.  I think my testimony was that I learned last week

9   about the buyout number, that they got bought out for some

10  additional 960,000.

11  Q    So you've always been aware that the tribe was only

12  receiving one percent.

13  A    No.  The tribe was receiving two percent, and then from

14  that it had an agreement to pay TLM one percent for the

15  brokerage services that it provided.

16            THE COURT:  Just so the record is clear, the

17  agreement was to pay half of the two percent to TLM.

18            THE WITNESS:  That was the tribe's agreement, yes.

19  Not my agreement.

20            THE COURT:  I understand that.  Literally, one

21  percent of two percent is quite different than half of two

22  percent.  So I want to make sure that we're all on the same

23  page, that TLM was receiving half of the two percent.

24            THE WITNESS:  Yes, the tribe was paying them gross

25  one percent, half of their two percent.

Matthew Martorello - Direct

1   Q    On your screen, I believe, I have from Exhibit 11 at page

2   17 paragraph 6.4.1.  And this was in your original service

3   agreement; correct?

4   A    This was in the original one, I believe, not the amended.

5   Q    Right.  And it was taken out of the amended because there

6   was concern that it might look bad if you were challenged as

7   the true lender if the tribe was only receiving one percent

8   of -- according to how this tribal net profits?

9   A    Well, my understanding was that it was taken out because I

10  didn't --

11          THE COURT:  Go back again.  Remember what I told you.

12  The answer is yes or no.

13          THE WITNESS:  That's not the reason it was taken out.

14  Q    All right, what was the reason that you took it out?

15  A    I didn't take it out, but it was taken out -- the reason

16  why I didn't like it was because I didn't want TLM getting paid

17  from the tribe because I felt that made me less competitive

18  with the other opportunities the tribe could have contracted

19  with.  So it was a way for the tribe to get the whole two

20  percent and, you know, if they could get away from paying their

21  broker.  Then they went and renegotiated something.

22  Q    And I have a reason --

23          THE COURT:  Excuse me.  I thought I understood it,

24  but I don't know, so I'll clarify.  Is it correct that the

25  amended agreement, Exhibit 20, does not contain a provision

Matthew Martorello - Direct

1   such as is in Section 6.4.1 of the Exhibit 11, the original

2   agreement; is that right?

3           THE WITNESS:  That's correct.

4           THE COURT:  And it's that provision being taken out

5   that you were referring to about why it was taken out; is that

6   right?

7           THE WITNESS:  Yes.

8           THE COURT:  All right.  Thank you.

9   Q   Now, we talked a bit before about intellectual property.

10  Mr. Martorello, do you change your interpretation of a

11  contractual term or relationship depending upon who you are

12  speaking to or writing to?

13  A   No.

14  Q   So, in some instances, you have had to -- it was to your

15  benefit -- correct? -- to explain why you, your company had a

16  lot of value; right?

17  A   In some instances, yes.

18  Q   In some instances, it's important for you to show how your

19  company had very little value; right?

20  A   Correct.

21  Q   And you know where I'm going.  We have documents where

22  you've done both; right?

23  A   Yes.

24  Q   So let's take a look at document 115 which is on your

25  screen, but it is probably in volume two.

Matthew Martorello - Direct

1          THE COURT:  115?

2          MR. BENNETT:  Yes, Judge.

3          THE COURT:  Do you have it there, Mr. Martorello?

4          THE WITNESS:  Yes.

5          THE COURT:  All right.

6          MR. BENNETT:  This is an email chain, and looking at

7   the last page of it, that you started December 6, 2016, with

8   some people from -- in this, it's from Budd Larner, B-u-d-d

9   L-a-r-n-e-r.  Do you see that?

10  A    Yes.

11  Q    So who are these people?  In this case, who is JBradley of

12  buddlarner.com?

13  A    It's a law firm, and I believe he's probably a tax or IP

14  lawyer.

15  Q    Okay.  And then the beginning of the document, there's a

16  domain for a person from a company Aranca, A-r-a-n-c-a.  Do you

17  see that?

18  A    Yes.

19  Q    What was Aranca?

20  A    They were a valuation firm.

21  Q    And so in 2016, what were you trying to do?  What were you

22  trying to accomplish in your communications with Budd Larner

23  and Aranca?

24  A    So it looks like here I'm going to try and figure out a

25  2012 allocation done by Deloitte, and the allocation was

Matthew Martorello - Direct

1    $7.7 million.  It says liquidation value, and so that's what

2    Deloitte came up with as a portion of the valuation attributed

3    to liquidation value.  I needed more information to understand

4    how that broke down in terms of what specific assets made up,

5    quote, liquidation value.  So we had to do a little research

6    project.

7    Q    You didn't just need more information.  You were trying to

8    see if there was any way that the valuation, the liquidation

9    number of 7.7 million could be lowered; correct?

10   A    I'd have to look at the document to decide if that's what

11   I was trying to do.

12              THE COURT:  Well, read it.

13              THE WITNESS:  I wasn't trying to adjust the number.

14   I was trying to clarify the specific assets that were within

15   the number, one of which, I guess, is goodwill which we talk a

16   lot about here.

17   Q    Even though this is a 2016 correspondence, you are

18   discussing the status or state of asset ownership and valuation

19   of Sourcepoint and Bellicose in 2012; correct?

20   A    That is correct.

21   Q    So can you read, so that we all have it in the record

22   here, under 2012, potential for intangible assets, about IP,

23   and by that, that's what you are referring to as intellectual

24   property; right?

25   A    Yes.

Matthew Martorello - Direct

1    Q    Did you read that paragraph?

2    A    "The client/tribe often argued with me that" --

3    Q    Do me a favor, Mr. Martorello.  Our court reporter is able

4    to transcribe me so you know she's good, but just keep it at a

5    regular pace, please.

6    A    Sure.  "The client/tribe often argued with me that they

7    view all of the IP and data as their property.  They strongly

8    believe that SPVI was paid to create the IP for them and to

9    facilitate them in using it.  Early on I agreed with their

10   position, but in 2014, I argued the opposite to that as I

11   wanted to sell the business and it felt pretty pertinent.  Now,

12   reading the contracts, nothing is stated about IP, but it is

13   very clear in Section 4.2 that SPVI is hired for the service of

14   creating all of these business methods for the tribe.  It

15   appears pretty clear that the tribe was correct in that the IP

16   created to service their business was always their property."

17   Q    Now, so I understand this, what you are writing to this

18   person here in 2016 is that in 2012, you agreed that

19   intellectual property was to go to the tribe; right?

20   A    No, I'm referring to 2014.

21   Q    But it says early on.  But then you had the opposite

22   position in 2014.

23   A    No, that's not correct.  The email we looked at earlier

24   where we're talking about prescreen direct mail and the

25   pre-qualified leads, that's where I was saying pre-qualified

Matthew Martorello - Direct

1   leads are our IP, and I had that disagreement with the tribe

2   there, and I'm referencing it here, but, obviously, as I'm

3   writing it, I'm not recalling the difference -- I'm not

4   recognizing as I write it that that was pre-qualified leads and

5   not the developed and recommended underwriting and verification

6   and procedures and things.

7   Q    Do you tell the truth when you're not under oath?

8   A    Yes.

9   Q    And so as I understand here, it says early on you agreed

10  with the tribe's position which is that you were supposed to be

11  giving IP to the tribe; right?  So before 2014, you said you

12  agreed with that position?

13  A    All of the IP, all of it, that's what it says, yes.

14  Q    In 2014, you took the opposite position because, hey, I

15  was trying to sell the business; right?

16  A    No.  When I wrote this, I wasn't understanding that -- one

17  of the things we do is provide pre-qualified leads.  That's our

18  IP.  So when we had that dispute in 2014, she was saying, I

19  think that's ours, and you saw the email where I said, no,

20  that's our whole business, you know, you would own us if that

21  was yours.  So there's a segmentation or a difference between

22  that IP and this IP.

23        I didn't articulate that well when I was writing this

24  email sort of kind of on the fly, but -- nor had I really

25  studied in detail.  I just looked at the document and said --

Matthew Martorello - Direct

1    it says develop and recommend, so what we give to them is

2    theirs.  One of the other things we do is provide pre-qualified

3    leads, and that's our formulas.

4              THE COURT:  Is there any part of the paragraph that

5    you all are talking about on page 445 of Exhibit 115 that talks

6    about pre-qualified leads?  I just don't see it, and if it's

7    there, I want to know.

8              THE WITNESS:  It's not in there.  Just with all of

9    the IP and data includes -- their view of all IP included my

10   IP, and that was the disconnect that I had with the tribe.

11             THE COURT:  But at one time you agreed with them, and

12   then you had a change of mind; is that right?

13             THE WITNESS:  No, because there were different

14   subjects.  I just wasn't clear on that when I typed this at the

15   time.  So the thought was, you know, we develop and recommend

16   IP to the tribe, and then I'm saying there was a time in 2014

17   where they said, hey, Matt, your pre-qualified lead software or

18   algorithms are also ours, and I said, no, that's not yours.

19             And so I'm referencing back to that conversation here

20   and saying that, you know -- just inartfully, I guess, saying

21   that I said all of the IP was theirs, and then when we had that

22   disagreement, that I said the opposite with respect to that IP,

23   but the accurate -- so what I said was actually inaccurate here

24   because I wasn't articulating what we were disagreeing on in

25   2014.

1           THE COURT:  All right.

2    Q    So what was the value of leads?  How would that have

3    changed the liquidation value if the story you are offering

4    today were so?  If all you were talking about there was leads,

5    how would that have had any real effect on the valuation in

6    your discussions with those two valuation companies handling

7    your tax issues?

8    A    Well, the 7.7 million is not classified.  So that would

9    include leads and everything else that we owned, not the tribe.

10   That was our IP value for purposes of a tax study end of 2012.

11   Q    Now, did you ever market to Bellicose and Sourcepoint and

12   Balance Credit, another company with which you were involved,

13   to investors to try to bring in money?

14   A    We had hired --

15           THE COURT:  Wait a minute.  Are you asking him if he

16   tried to sell another company he owned to those three or four

17   entities that you asked about?

18           MR. BENNETT:  No, sir.  I'm asking if he ever

19   marketed to Wells Fargo to try to bring in money for whatever

20   reason for one of his three companies.

21           THE COURT:  Ask him that, because I didn't understand

22   what you were saying.  Did he market what?  Start it again.

23   Did you try to sell another company; is that what it is?

24   Q    Well, how about if I bring you to Exhibit 47.  Let's help

25   us all out.  By the way, what is Balance Credit?

Matthew Martorello - Direct

1    A    Balance Credit is the d/b/a for a stay license lender in

2    Chicago.

3    Q    And it's just a random lender, or is there some connection

4    between you or any of your companies and Balance Credit?

5    A    I was the founder of Balance Credit.

6    Q    And what is Middlemarch?

7    A    Middlemarch is an investment bank that we hired to raise

8    capital for tribal lending between 2013 and July 2014 for the

9    tribal clients and also for Balance Credit.

10   Q    And so looking at 47, this is a pitch book that you and

11   Demetris P-a-p-a-d-e-m-e-t-r-i-o-u -- we'll say Demetris here

12   on out, that you and Demetris were putting together to market

13   to Wells Fargo; correct?

14   A    Let me take a look real quick, please.  The pitch book

15   was --

16   Q    That's not what I asked you.

17   A    The answer is no.

18   Q    So this was not -- you and Demetris were not putting

19   together a presentation to make to Wells Fargo?

20   A    We had one from a year ago that we were going to present

21   to Wells Fargo.

22   Q    But this document was a draft pitch book made by your

23   marketing company for your review to then submit to Wells

24   Fargo?

25   A    We did submit this to Wells Fargo, but it was made for a

1    bunch of reasons.

2    Q    So this is the pitch book that went to Wells Fargo.

3    A    I believe so.

4    Q    Now, let's talk about that.  Let's go to page -- let's

5    talk about the first page, and I can draw your attention to the

6    second paragraph, really the last two sentences, which I'm

7    trying to highlight a bit -- I'll try this -- on your screen.

8         "We should also discuss how much we want to expose on the

9    tribal lending experience.  I hear you that we don't want to

10   overload them, but it is important to show your history as a

11   lender to establish credibility."  Do you see that?

12   A    I do.

13   Q    And you were concerned that if a lot of information became

14   public about your role at Sourcepoint and providing service for

15   a tribal lender, that it could expose you; right?

16   A    I was -- well --

17             THE COURT:  Yes or no?

18             THE WITNESS:  At this date?  I'm trying to think.  We

19   were marketing ourselves --

20             THE COURT:  Yes or no?

21             THE WITNESS:  I can't say on this date exactly.

22   Q    Okay.  Let's skip ahead to the presentation itself.

23             THE COURT:  According to my copy of Exhibit 47, it's

24   a draft.  It says in the first sentence it's a draft.

25             MR. BENNETT:  Yes, sir.

1           THE COURT:  Is that correct, it's a draft of a

2    document that went to Wells Fargo, Mr. Martorello?

3           THE WITNESS:  I can't be --

4           THE COURT:  Did it actually go?  I'm confused whether

5    it went or whether it was a draft.

6           THE WITNESS:  I don't know if it actually went.

7           THE COURT:  Thank you.  He doesn't know.

8    Q    Mr. Martorello, you earlier, moments ago, testified that

9    this is what was used for Wells Fargo; right?

10   A    We're talking about sending it to Wells Fargo.

11          THE COURT:  Just a minute.  The answer to that is --

12   I'll answer that.  Yes, that is what he testified to, and that

13   is why I asked the question.  When I read the first line of it,

14   it says it's a draft, and -- but he testified this actually

15   went to -- was used to go to Wells Fargo.  And that's why I

16   asked the question.  So did there subsequently come about

17   another iteration of this draft?

18          THE WITNESS:  I was wrong with my testimony.  I

19   think --

20          THE COURT:  Yes or no with respect to my question?

21   Is there another iteration of this document later on?

22          THE WITNESS:  I don't know.

23          THE COURT:  You don't know.

24   Q    Now, in the document itself -- and, by the way, we only

25   have what was given to us.  Your lawyers received the same

Matthew Martorello - Direct

1   thing.  We don't have another iteration of it, but if you want

2   to take a look at the PowerPoint or pitch sheets themselves,

3   that would be the third page of -- the fourth page of the

4   document.

5                  THE COURT:  Still on Exhibit 47?

6                  MR. BENNETT:  We are.

7   Q    And this was an investor presentation made by Middlemarch,

8   your retained company, on behalf of Balance and Sourcepoint;

9   correct?

10  A    Yes.

11  Q    And I have the executive summary which, at this point, is

12  the only version that we've ever been provided.  Do you see

13  under Sourcepoint and its predecessor companies have over

14  15 years of experience in the short-term online lending

15  industry?

16  A    I see it.

17  Q    And do you see that Middlemarch, on your behalf, wrote

18  "Sourcepoint began lending in 2011 through its relationship

19  with," I'm just going to say LVD.  Do you see that?

20  A    Yes, I see that.

21  Q    And --

22                 THE COURT:  What are you talking about here?  Which

23  page?

24                 MR. BENNETT:  Your Honor, I'm at page two of the

25  PowerPoint presentation.

Matthew Martorello - Direct

1           THE COURT:  My page two of the PowerPoint says
2   executive summary.
3           MR. BENNETT:  Yes, sir.
4           THE COURT:  And the company overview industry
5   background.  The next page says executive summary to be
6   updated.
7           MR. BENNETT:  Yes, sir.
8           THE COURT:  Is that what you are talking about?
9           MR. BENNETT:  Yes, sir.  It's numbered page, on the
10  bottom, two, but it's page three of the document, and I've now
11  called out the question and the text that I've just asked and
12  received confirmation about.
13          THE COURT:  All right.
14          MR. BENNETT:  That Sourcepoint began lending in 2011
15  through its relationship with LVD.
16          THE COURT:  I'm now with you.  All right.
17          THE WITNESS:  That wasn't what I testified to, Mr.
18  Bennett.  I was just confirming what you read, but this is to
19  be updated.  It's a draft.  There's no way this would have gone
20  to Wells Fargo as I read it today.
21          THE COURT:  That isn't what he asked you.  What he
22  asked you is was that a correct statement that is made there
23  that he read.
24          THE WITNESS:  I thought he asked if I see that, and I
25  said yes, but it's definitely not correct.

Matthew Martorello - Direct

1           THE COURT:  Look at the text Sourcepoint began

2    lending in 2011 through its relationship with the LVD,

3    etcetera.  Is that correct or not?

4           THE WITNESS:  That's not a factual statement.

5           THE COURT:  Is it correct?

6           THE WITNESS:  It's not -- no, that's not what

7    happened.

8           THE COURT:  What's wrong about it?

9           THE WITNESS:  We weren't a lender.

10          THE COURT:  You weren't a lender.

11          THE WITNESS:  Correct.

12   Q    But, of course, you were here attempting to persuade --

13   whether or not you were a lender, you and Middlemarch, as your

14   spokesperson, were trying to persuade Wells Fargo and other

15   investors to invest in Sourcepoint and to invest in Matt

16   Martorello; correct?

17   A    No, incorrect.  It was to invest in our tribal clients.

18   Q    Okay.

19          THE COURT:  Wait a minute.  To invest in what?

20          THE WITNESS:  LVD, our tribal clients and other

21   tribes.

22   Q    The first page, the letter addressed to you says, "I hear

23   you that we don't want to overload them" -- that would be the

24   investors -- "but it is important to show your history as a

25   lender to establish credibility."  You understood that this was

Matthew Martorello - Direct

1    a pitch that you were connected to, was, hey, I'm Matt

2    Martorello, I've got a lot of experience, lend millions and

3    millions of dollars to whoever we ask you to; right?

4    A    I disagree.

5    Q    Well, where are the documents that update this or that

6    show that you made any corrections or an email back that said,

7    no, that's not right?

8    A    I don't know that there is one.

9    Q    I'm now showing you --

10           THE COURT:  Where did you get these documents?

11           MR. BENNETT:  We subpoenaed Middlemarch.  Third-party

12   subpoena.

13           THE COURT:  Of whom?

14           MR. BENNETT:  Middlemarch.

15           THE COURT:  How would he know what Middlemarch has?

16   He knows what he's got.

17           MR. BENNETT:  Then where is a document from him,

18   where is his email?

19           THE COURT:  Let's do this:  Did there come a time

20   when you -- when a presentation was made to Wells Fargo?

21           THE WITNESS:  Not that I recall.

22   Q    Now, I now have us on page six.  It says six on the bottom

23   which would be page seven of the PowerPoint, and top point says

24   "Sourcepoint VI History."  Are you with me, Mr. Martorello?

25   A    I am on the same page.

1  Q   I want to continue to ask you about parts of this that --

2            THE COURT:  What page are you on?

3            MR. BENNETT:  It's page six of the PowerPoint

4  presentation --

5            THE COURT:  There's no numbers on my copy of the

6  PowerPoint presentation.

7            MR. BENNETT:  At the top it says "Sourcepoint VI

8  History."

9            THE COURT:  All right, I see it now.  It's many pages

10  into it.  Okay.  I've got it now.  Do you have it, Mr.

11  Martorello?

12            THE WITNESS:  Yes.

13  Q   You've said that the pitch -- this pitch was to try to

14  convince your investors to lend money to your sovereign

15  clients -- right? -- your tribal sovereign clients?

16  A   No.  I said this never -- this is abundantly incorrect.

17            THE COURT:  Mr. Martorello, I'm sorry, but you did

18  say that the purpose of this was to make a pitch on behalf of

19  your tribal clients.  Every time you try to backtrack, every

20  time you evade, you create the impression that you're not

21  credible, and I have to decide your credibility.

22            So pay attention to the question that he asks you.

23  You were answering, I think, a different question, and that is

24  whether this document was used in doing anything.  He didn't

25  ask you that.  He asked you did you earlier testify that this

Matthew Martorello - Direct

1    was prepared for the purpose of making a pitch for somebody,

2    and you said, no, it was on behalf -- to make a pitch on behalf

3    of the tribal clients.  And then he just asked you the same

4    question again, and you said, no, that wasn't what it was done

5    for.

6              Can you understand how a person trying to determine

7    whether someone else is telling the truth is confused by

8    conflicting answers of that sort?  If you want to go back and

9    say you're changing your testimony, you can do that, but you

10   can't expect me to hear two different versions of the same

11   thing and come to the conclusion that I can rely on your

12   testimony.

13             All right.  I know what he said.  I heard what he

14   said.  Now, have you got a question you want to ask?

15             MR. BENNETT:  I do.

16   Q    I'm showing you that same page, but I've called out --

17             THE COURT:  What same page?

18             MR. BENNETT:  The document Exhibit 47 that says

19   Sourcepoint VI History at the top.

20             THE COURT:  All right.

21   Q    Under the timeline, I've now pulled up on your screen the

22   block for 2013.  Do you see that?

23   A    Yes.

24   Q    And I'm going to use my pen here and circle that begins --

25   the second bullet point from the bottom, "Begins wind down of

1    existing sovereign portfolios."  Do you see that?

2    A    Yes.

3    Q    In 2013, what sovereign portfolios did Sourcepoint have?

4    A    None.  The tribal portfolios, it may have been referencing

5    Duck Creek.

6               THE COURT:  Duck Creek?

7               THE WITNESS:  Yeah.  One of LVD's portfolios.

8    Q    It says portfolios, plural.  How many sovereign portfolios

9    did Sourcepoint ever have involvement with?

10   A    Just the two at LVD.

11   Q    So when it says 2013 begins wind down of existing

12   sovereign portfolios, plural, that would be referring to LVD if

13   Middlemarch, in the dec it sent you, had accurately summarized

14   information you gave them; right?

15   A    That's right.

16   Q    And, in fact, Middlemarch --

17              THE COURT:  Was it accurate?

18              THE WITNESS:  No.

19              THE COURT:  Did you have -- did Sourcepoint VI have

20   any so-called sovereign portfolios in 2013?  I thought you said

21   there was Duck Creek or something.

22              THE WITNESS:  Duck Creek is the portfolio at LVD that

23   winded down?

24              THE COURT:  In 2013?

25              THE WITNESS:  I believe it was 2013, yes.

Matthew Martorello - Direct

1           THE COURT:  And that portfolio, was it -- were you

2   helping somebody wind it down at that time?

3           THE WITNESS:  Yes, I was helping the tribe unwind it.

4           THE COURT:  Unwind it, undo it.  All right, thank

5   you.  All right, Mr. Bennett.

6   Q    Now --

7           THE COURT:  What was the other one that the tribe

8   had, Duck Creek and what else, Red Rock?

9           THE WITNESS:  Yes.

10          THE COURT:  Did you help unwind -- did Sourcepoint

11  help unwind Red Rock in 2013?

12          THE WITNESS:  No.

13          THE COURT:  Excuse me.  Go ahead, Mr. Bennett.

14  Q    Now, let's -- while we're -- pitches that you've made to

15  third parties, I want to talk about -- let me shift to

16  paragraph 69 of your declaration.

17      Now, there came a time when you began to shift towards

18  what became Big Picture Loans -- right? -- where you sold

19  Sourcepoint and then took a seller finance loan back to

20  Eventide, created Big Picture Loans; correct?

21  A    Correct.

22  Q    And on 69, paragraph 69, by the way, did you write this or

23  did your lawyers?

24  A    I believe I wrote this.

25  Q    And can you read that first sentence of which you swore

1    under oath.

2    A    "Contrary to the allegations of plaintiffs, the decision

3    to sell Bellicose to LVD was not motivated by impending threats

4    of litigation or enforcement actions by government agencies."

5    Q    Do you want to change that now that we've had discovery?

6    A    No.

7    Q    So your position under oath was that impending threats of

8    litigation or enforcement actions by government agents was not

9    a motivation for why you wanted to sell Bellicose to LVD.

10   A    It was not the motivation, no.

11   Q    Let's go through a few documents, if you can.  Do you have

12   your first binder?  Will you turn to -- I'm going to do this in

13   the order of our exhibits.  Let's start with 18.

14   A    Okay.

15   Q    So this, by my count, in my binder, is the earliest one of

16   these, but this is a document that is dated July of 2012, and

17   you are discussing in this the possible problems from the CFPB;

18   right?  I'm looking in the 4:01 a.m. email from you to the

19   tribe's lawyer and particularly the first paragraph which I'm

20   calling out on our screens.

21            THE COURT:  What exhibit are we on?

22            MR. BENNETT:  We are on Exhibit 18.

23   Q    And this is -- you've already started to negotiate a

24   future sale; is that right?

25            THE COURT:  Future sale of what?

Matthew Martorello - Direct

1          MR. BENNETT:  Of the business, I think.

2          THE COURT:  Which business?

3   Q    Mr. Martorello, will you tell me which business?  What

4   were you seeking to negotiate with Ms. Wichtman here?

5   A    This is actually about negotiating the TLM broker fee out,

6   that we didn't want that.  This isn't about the sale.

7   Q    Okay.  But here you acknowledge the possibility that in a

8   world where the CFPB could wipe out, in this case, Think and

9   Plain Green Loans, which were two other competitors; right?

10  A    Yes.

11  Q    That the valuation that was being discussed was too high?

12  A    Correct.  The TLM valuation was too high.

13         THE COURT:  The valuation that who wanted?

14         THE WITNESS:  TLM.

15         THE COURT:  TLM is the entity that's associated with

16  Red Rock, and they got one percent revenue share, and the tribe

17  got one percent revenue share.

18         THE WITNESS:  Yes.

19         THE COURT:  And TLM was charging a broker fee to whom

20  for what purpose?

21         THE WITNESS:  To LVD for having established the

22  tribal code and the lending laws and for finding me.

23         THE COURT:  And you were trying -- you or the tribe

24  was trying to get the fee down?

25         THE WITNESS:  Both of us.

Matthew Martorello - Direct

```
 1              THE COURT:  So that's what we're talking about here?
 2              THE WITNESS:  Correct.
 3              THE COURT:  Excuse me, Mr. Bennett.
 4   Q    But the concern, the argument you were making is that
 5   there was a risk that the Consumer Financial Protection Bureau
 6   could wipe it all out?
 7   A    Correct.
 8   Q    So if you could take a look now, let's move ahead a little
 9   bit of time, Exhibit 19 which has an email and an attached
10   letter.  This is from you communicating or forwarding a CID
11   from the Department of Financial Institutions for the State of
12   Kentucky -- correct? -- or the Commonwealth of Kentucky?
13   A    A C&D, yes.
14              THE COURT:  C&D is meaning cease and desist letter?
15              THE WITNESS:  Correct.
16   Q    And if you look at the second page of the document, it was
17   addressed to a P.O. Box 704 to Pepper Cash.  Pepper Cash was
18   the trade name for one of the Red Rock loan products; right?
19   A    Correct.
20   Q    And how is it that you got this instead of the tribe's
21   lawyer?
22   A    Well, it looks like Brian McFadden forwarded it to me and
23   Justin, and then I forwarded it to the tribe's lawyer and
24   Jennifer Weddle.
25   Q    And this -- let's skip ahead to Exhibit 25.  Can you tell
```

Matthew Martorello - Direct

1  me what Exhibit 25 is.

2  A    Yes.  Hold on one second, please.  Sorry, it's very

3  lengthy.  So I am -- this is December 2012.  I have engaged

4  Deloitte & Touche to provide me with a valuation to determine

5  the tax impact if I am to, at the end of the year, convert

6  Bellicose Corporation into an LLC.  So that would be a taxable

7  event, and I needed them to determine the valuation at that

8  moment in time to figure out what the tax impact would be from

9  the conversion.

10  Q    So this time, did you want people to believe that the

11  company is worth a lot or worth a little?

12  A    I mean, I wanted people to believe it was worth a lot, but

13  the technical valuation here and impact would be less the lower

14  the valuation was.

15  Q    Well, I have us on the screen about 12 pages in but the

16  Bates number that ends 38990.  I'd like to talk a little bit

17  about your email here.  38990, this was -- and this page isn't

18  part of the email that you sent on December 10th, 2012.  Do you

19  recall writing this email?

20  A    Vaguely.

21  Q    And were you telling the truth in this email?

22  A    Yes.

23  Q    Okay.  Now, recall your declaration under oath where you

24  said that your desire to sell Bellicose to LVD was not

25  motivated by impending threats of litigation or enforcement

1    actions by government agencies; correct?

2    A    Correct.

3    Q    Can you read the email starting "Hey guys"?

4    A    Yeah.  The whole thing?  It's three pages.

5    Q    Actually how about this.  Let's start with the third

6    paragraph that begins "This industry is going to be living in."

7    A    "This industry is going to be living in the grey area of

8    its legality for another year or two.  State governments will

9    continue to sue tribes and me saying their state laws apply.

10   Tribes will continue to say their laws apply."

11   Q    Next paragraph?

12   A    "The FTC right now is suing a competitor (FTC vs. AMG

13   Services and Scott Tucker, which you can Google) and are

14   alleging three or four violations of consumer lending laws.

15   Our client arguably employs similar practices and the FTC has

16   begun investigations of several tribal lenders like our

17   client."

18   Q    Can you read the next paragraph.

19   A    "Class action lawsuits follow and are already following

20   Tucker's case with the FTC.  Also see Martin Butch Webb/Western

21   Sky and look that up."

22   Q    And that was a company, Western Sky was a -- was owned by

23   a member of an Indian tribe and affiliated with a non-Indian

24   tribe entity named CashCall; correct?

25   A    I believe that's accurate, totally non-tribal.

Matthew Martorello - Direct

1    Q    Turn to the next page.  Let's drop halfway down, and if

2    you could start where it says "More equity risk."

3    A    "More equity risk you don't see in any business you'll

4    pull COE from:  Several states make it a felony crime to make

5    loans over a certain rate or without a license.  I had a 20

6    page document done for me to understand the risk that I have as

7    an equity owner for aiding and abetting felony crime in states

8    like Georgia and you will see the conclusion.  It says

9    something like... 'yes, it is possible the state will come

10   after you for helping the tribe lend against their laws and

11   charge you with aiding and abetting as a felony crime in their

12   state (in some capacities penalty could be jail time), but we

13   don't think it's going to happen.'  That's equity risk, how do

14   you price that into the equation?"

15   Q    Now, here, your position was that the valuation of this

16   business, one where the state could come and actually prosecute

17   Matthew Martorello for violating criminal laws against usury,

18   meant that your business shouldn't be highly valued; correct?

19   A    Correct.

20   Q    And your declaration said that you didn't -- you were not

21   motivated by threats of litigation or enforcement risk by

22   government agencies.

23   A    By impending threats, correct.

24   Q    Let's continue.  How about let's take a look at

25   Exhibit 26.  Exhibit 26 is an email dated April 16, 2013, from

Matthew Martorello - Direct

1  you to Rob Rosette regarding the significant ruling in Colorado

2  Western Sky case, order granting plaintiffs' motion for summary

3  judgment.  Do you see that?

4  A    Yes.

5  Q    And this was an order that was sent to you by your lawyer,

6  Jennifer Weddle, explaining how the tribal lending defendants

7  in that case had lost and were ordered to pay restitution and

8  monies for violating Colorado law; correct?

9  A    This was not a tribal lender.  That's incorrect.

10 Q    Well, it wasn't your model -- right? -- but it was

11 attempting -- the arguments that were being made were based on

12 the claim that there was sovereign immunity because the loans

13 were made on an Indian reservation?

14 A    No, there was no -- it wasn't an arm of the tribe.  They

15 didn't claim sovereign immunity.  I think it was choice of law,

16 tribal or otherwise, but it was only an individual tribal

17 member, not a government arm.

18 Q    And that you saw as significant or a big difference;

19 right?

20 A    Yes.  She said it would be significant.

21 Q    Okay.  So you were not at all fazed?  This was not

22 something that caused you any angst.

23 A    I was alarmed in 2012/2013.

24 Q    Okay.  We have a whole stack of ones bringing us up to

25 2016.  Take a look at Exhibit 27.  You were aware of this in

1    May of 2013.  You received this communication from the

2    Department of Banking for the State of Connecticut; correct?

3    A    Correct.

4    Q    And this was related to the Castle Payday operation that

5    your company was servicing; correct?

6    A    Correct.

7    Q    Now, take a look at Exhibit 28, and this was an email of

8    July 23rd, 2013, that Jennifer Galloway, another lawyer, sent

9    to you regarding Scott Tucker having had to settle with the

10   Federal Trade Commission after a U.S. magistrate judge ruled;

11   correct?

12   A    Yes.

13   Q    And can you indicate how you responded to that?  Read that

14   sentence at the top from you.

15   A    Yes.  I responded, "I'm told the judge's conclusion was

16   wrong.  But is there anything anyone can do about it?"

17   Q    Now let's turn to page -- Exhibit 29.  This is an email

18   regarding the tribal lawsuit in New York.  Were you aware that

19   LVD had participated in litigation against the banking

20   regulators in the state of New York arguing that essentially

21   the Red Rock lending model was legal?

22   A    I was aware that they were suing the State of New York.  I

23   don't know -- I couldn't articulate if that was the argument.

24   It was a preliminary injunction.

25   Q    You wanted to keep LVD out of it because you didn't want

1   to draw attention; is that correct?

2   A    I did want to keep LVD out of it.  I recommended they

3   didn't do it.  Why I made the recommendation, I think that was

4   part of the equation.

5   Q    Can you read the first sentence in the email that you sent

6   to Karrie Wichtman, the very top.

7   A    Yes.  It says, "LVD also" does not -- or "doesn't

8   represent the best facts on this either this minute."

9   Q    Can you take a look at Exhibit 30.

10          THE COURT:  What page are you on on 29?

11          MR. BENNETT:  29 was the very top, Judge, first page.

12          THE COURT:  I see it.

13          MR. BENNETT:  First sentence.

14          THE COURT:  All right.  30?

15  Q    Mr. Martorello, this is an email that you sent to Karrie

16  Wichtman on August 9th, 2013, regarding Think Finance, and the

17  litigation -- well, multiple lenders related to the New York

18  and CFPB actions; correct?

19  A    One second.  Let's see.  This is related to the Otoe

20  lawsuit against New York.

21  Q    And the question again was whether or not LVD should

22  participate in a lawsuit in New York; correct?

23          THE COURT:  Wait just a minute.  It's related to what

24  lawsuit?

25          THE WITNESS:  The lawsuit against the State of New

Matthew Martorello - Direct

1    York, the preliminary injunction lawsuit in Otoe-Missouria.

2              THE COURT:  You said Otoe lawsuit.

3              THE WITNESS:  I'm sorry, Otoe, O-t-o-e.

4              THE COURT:  Oh, the tribe's name.

5              THE WITNESS:  Yes.  The plaintiff tribe.

6    Q    And could you read the first two sentences in the second

7    paragraph of your email.

8    A    "LVD's house is not completely in order yet.  Time is our

9    most important commodity right now.  We don't have to be a

10   plaintiff, it will happen anyways with Think and Mark Curry.

11   RRTL/DCTF are too young for this right now."

12             THE COURT:  What does that mean?

13             THE WITNESS:  As you'll see down lower, I elaborate.

14   Too young, too small, too poor, not enough depth in the bench

15   with ACH and banks.  So this was a time during Operation Choke

16   Point where all they had to do was call the bank and turn off

17   your bank account, and we couldn't defend ourselves.

18             THE COURT:  But RRTL and DCTF means what?

19             THE WITNESS:  Sorry.  Red Rock Tribal Lending and

20   Duck Creek Tribal Financial.

21   Q    Your paragraph 69 of your declaration says under oath that

22   your decision to sell Bellicose to LVD was not motivated by

23   impending threats of litigation or enforcement actions by

24   government agencies.  That's what you said under oath; right?

25   A    Correct.

Matthew Martorello - Direct

1   Q    Now, Big Picture Loans is what ultimately was created, as

2   we know, when Bellicose Sourcepoint were sold; correct?

3   A    That's correct.

4   Q    All right.  And Big Picture Loans was actually registered

5   one month after those emails we've just been through; isn't

6   that correct?  And I'm showing you right now Exhibit 33 which

7   is the internet registry record.

8   A    I'm sorry, do you mean the entity or the domain was

9   registered?

10  Q    Let's start with the domain.

11  A    The domain, I'm sorry, it's not coming up.

12            THE COURT:  What exhibit?

13            MR. BENNETT:  This is 33, Your Honor.

14  A    So the domain is registered September 18th.

15  Q    And it was you or your companies that registered

16  bigpictureloans.com?

17  A    I believe it was Phenomenon Marketing but a hired

18  marketing firm.

19  Q    The firm hired by you or your companies?

20  A    By our companies.

21  Q    And, in fact, you set out shortly after to create a whole

22  set of marketing documents in the name of Big Picture; is that

23  correct?

24  A    Yes.  We had all that -- if you mean the branding

25  documents and imagery, yes.

Matthew Martorello - Direct

1    Q    The whole website was designed shortly after that; right?

2    A    I believe it was shortly after that.

3    Q    Now, you've -- again paragraph 69, you say that the threat

4    of enforcement actions and litigation was not a motivation for

5    why you wanted to move into the Big Picture project.  Is that

6    still the answer you want to hold to now?

7    A    Yes.

8    Q    All right.  Let's continue, let's go to document 34,

9    please.  This is an email dated September 29, 2013; is that

10   correct?

11   A    Yes.

12   Q    And you wrote to the tribe's lawyers, to your brother, and

13   your lawyer that "We know LVD is the next tribe to receive a

14   CID, and we know registering gets us favored treatment for

15   voluntary compliance versus the absolute torment a CID would

16   be."  This was discussing whether you would register your

17   relationship with Zion Bank; is that correct?

18   A    No.  This was discussing if LVD was going to register with

19   the CFPB.

20   Q    Okay, and you believed they should?

21   A    I recommended that they did because we have nothing to

22   hide and are fully federally compliant.

23   Q    Let's take a look at Exhibit 36.

24            THE COURT:  Excuse me.  On that Exhibit 34, the

25   second paragraph says, "We know LVD is the next tribe to

1    receive a CID."  What is a CID?

2            THE WITNESS:  It's a civil investigative demand.

3            THE COURT:  From the CFPB?

4            THE WITNESS:  Correct.

5    Q    So take a look at Exhibit 36.  On October 3rd, 2013, you

6    learned that -- or I'd say October 3rd, 2013, after receiving a

7    cease and desist notice from the State of New York, you

8    notified Red Rock that you were going to stop lending to New

9    York consumers; is that correct?

10   A    No, that is incorrect.

11   Q    All right.  What's incorrect about it?

12           THE COURT:  Let's go somewhere else.  Who received

13   the cease and desist order?

14           THE WITNESS:  That was -- let me just check it.  I

15   think it was Red Rock Tribal Lending, but it was one of the

16   tribal lending entities.

17   Q    I'm reading now from page five of this email.

18           THE COURT:  Wait a minute.  The first paragraph, the

19   bottom says all.  Who is it from; Karrie Wichtman?  Is she the

20   author of that on the first page?

21           THE WITNESS:  Yes.

22           THE COURT:  "Please find approval documents for the

23   consideration of the co-managers of RRTL and DCTF (the TLEs)."

24   So that's Red Rock and Duck Creek, and TLEs is tribal lending

25   entities; is that right?

Matthew Martorello - Direct

1          THE WITNESS:  That's correct.

2          THE COURT:  "Issuing a moratorium on consumer loans

3    in the state of New York and the winding down of the business

4    currently existing in the state of New York immediately until

5    further notice, which I understand only constitutes five

6    percent of the current business of RRTL and DCTF, will have

7    little to no effect in tribal net profits."

8          The way I read that is they're going to stop lending

9    in New York.  Is that correct or incorrect?

10         THE WITNESS:  That is correct.

11   Q   So this is October -- this is the first week of October of

12   2013 that this exchange in Exhibit 36 takes place; correct?

13         THE COURT:  Wait a minute.  Before this date,

14   October 3rd, 2013, had RRTL and DCTF gotten cease and desist

15   notices from the State of New York in respect of their lending?

16         THE WITNESS:  That is correct.

17         THE COURT:  All right, sorry.

18   Q   So -- I'm going back to it again.  Paragraph 69 of your

19   declaration says "the decision to sell Bellicose to LVD was not

20   motivated by the impending threats of litigation or enforcement

21   actions" --

22         THE COURT:  I believe everybody in this thing can

23   recite that thing backwards, that one sentence.  Just ask the

24   question.  I think he knows the topic upon which you are doing

25   your examination at this time, and I do, too, so let's go

1    ahead.

2    Q    So take a look at Exhibit 37 now.

3            THE COURT:  She recommended approval of these

4    documents stopping this lending.  Did the lending subsequently

5    stop in New York?

6            THE WITNESS:  I just correct that.  I think we

7    recommended we're not willing to work for you if you're going

8    to lend to residents of New York, and she said you don't have

9    the right to tell us where to lend, and eventually she complied

10   with that suggestion.

11           THE COURT:  That isn't what happened here.  It said

12   from her, and she says, "All, please find attached approval

13   documents for the consideration of co-managers of RRTL and DCTF

14   (the TLEs) issuing a moratorium on consumer loans in the State

15   of New York."  Was that approval granted?  Did they stop

16   lending?

17           THE WITNESS:  Yes.

18           THE COURT:  And then the winding down of the business

19   currently existing in the state of New York.  What does that

20   mean?  How do you wind down business in New York?

21           THE WITNESS:  Um, it's in here if you go back to the

22   prior email, I believe.

23           THE COURT:  Okay.  In the same chain you mean?

24           THE WITNESS:  Yes.  So the first emails are at the

25   back here, and I believe --

Matthew Martorello - Direct

1           THE COURT:  First email is from you; right?

2           THE WITNESS:  Yes.

3           THE COURT:  The first email is to you, and it's from

4    chairman and team; right?  That's what you are talking about?

5           THE WITNESS:  Page five from me to the chairman and

6    the co-managers and Karrie and my lawyer.

7           THE COURT:  Okay.  So is there something in there

8    about winding down?

9           THE WITNESS:  Yes, it's on page six, the second

10   page -- the next page.

11          THE COURT:  Hold on, I'll get there.  "And we do not

12   believe we should service any New York loans"; is that what you

13   are saying?

14          THE WITNESS:  Yes, and then the next --

15          THE COURT:  "We are willing to wind down our New York

16   services and see existing loans through to their completion but

17   we simply cannot flaunt the clear ruling from Judge Sullivan's

18   order however legally incorrect it might be."

19          THE WITNESS:  Correct.

20          THE COURT:  Now I understand.  Go ahead.  Pardon me.

21          MR. BENNETT:  Yes, sir.

22   Q    Mr. Martorello, can you turn to Exhibit 37, please.

23   A    Okay.

24   Q    Now, I understand I'm not going to reread the declaration

25   topic that refers to selling Bellicose to LVD.  What was the

1    subject of the email at Exhibit 37 dated October 14th, 2013,

2    the next week or so after the New York shutdown?

3    A    It reads, "LVD to take ownership of Bellicose VI."

4    Q    This was an email that you sent to Mr. Rosette; is that

5    correct?

6    A    Yes.

7    Q    And this was one of the emails where you begin to flesh

8    out what the sale of Bellicose to LVD was going to look like in

9    your view; correct?

10   A    That's incorrect.

11   Q    All right.  Were there earlier emails than this one?

12   A    There were on a different model, and then there's this

13   concept, and then there's the actual concept that got done in

14   2016.

15   Q    So when I said that -- so, in fact, we've just now gone

16   through about a quarter of these emails that we have here with

17   your discussion about the regulatory threat.  Your discussion

18   about the sale of Bellicose to LVD actually occurred earlier

19   than this one and during those others.

20   A    Not exactly.  The conversations in 2012, early 2013, were

21   to sell a copy of the intellectual property to the tribe and

22   engage in a ten-year contract to help them build their own

23   Sourcepoint so that they could be self-sufficient.

24   Q    But recall that you earlier confirmed to your investors

25   that Sourcepoint actually owned that intellectual property;

Matthew Martorello - Direct

1  right?

2  A    I don't recall that.

3  Q    That's what you actually believe today, is that

4  Sourcepoint was required to give its intellectual property to

5  the tribe?

6  A    Through the purchase.  They would have sold -- our

7  intellectual property was sold to the tribe.

8  Q    I mean the original.  All the intellectual property

9  generated by Sourcepoint was to go to Red Rock.  That's the

10 view you came up with later; right?

11 A    I'm sorry.  You said all of the original intellectual

12 property generated by us through our services went to Red Rock,

13 yes.

14 Q    Yes.

15 A    Agreed.

16 Q    And that included marketing methods, financial

17 forecasting, budgets, standard operating procedures for leads

18 and open accounts, collections strategy, vendor relationship,

19 all that was supposed to be included; right?

20 A    That was the IP that they already had, yes.

21 Q    But you didn't give that to them.  Red Rock never got

22 that; right?

23 A    They did.

24 Q    They did?

25 A    Yes.

Matthew Martorello - Direct

1   Q    Now, if you take a look at Exhibit 37, here you are

2   proposing a structure to Mr. Rosette; is that correct?

3   A    In some form or another, yeah.

4   Q    You are proposing some form or another of a structure by

5   which LVD will take ownership of Bellicose; correct?

6   A    Yes.

7   Q    And one of them was that you would give majority ownership

8   but zero profits.  That's the fourth bullet point down; right?

9   That LVD will own 51 percent of equity but zero profits until

10  month 49; correct?

11  A    Hold on one second, please.  Yes, I'm sorry.  I'm

12  struggling because that sounds incomplete and inaccurate, but

13  that is what it says.

14  Q    But you wrote it; right?

15  A    I did.

16  Q    And then the last sub bullet point under specific to

17  Bellicose SPVI equity says, "All structured to provide all

18  entities sovereign immunity."  Do you see that?

19  A    Yes.

20  Q    And that was important to you because of all the pending

21  threats of litigation and enforcement actions by government

22  agencies; correct?

23  A    It was a requirement of the tribe.

24  Q    This was your email to them, and it was all entities, not

25  just yourself -- I mean not just the tribes; right?

Matthew Martorello - Direct

1    A    In theory I think yes, it was -- I know it was their

2    requirement, but I think the 49 percent owner would have been

3    my company which would have -- if it passed the

4    arm-of-the-tribe test had immunity.

5    Q    And you needed that immunity because of the impending

6    threats of litigation and enforcement actions by government

7    agencies.

8    A    Not necessarily.  They're not immune from federal actions.

9            THE COURT:  Who is not immune?

10            THE WITNESS:  The tribe.

11            THE COURT:  They're not immune from federal actions?

12            THE WITNESS:  I'm sorry, from the FTC or CFPB.

13    Q    Take a look at Exhibit 38.  This is an email that we were

14    able to obtain from a third party, former tribal council member

15    Joette Pete, P-e-t-e.  But this is an email that you sent to

16    the tribal council following the email we've just discussed

17    that you sent to Mr. Rosette, this one dated October 14th,

18    2013; is that correct?

19    A    Yes.

20            THE COURT:  What exhibit are you on?

21            MR. BENNETT:  I'm on Exhibit 38, Your Honor.

22    Q    Let's take a look at Exhibit 39.  This is an email that

23    Bellicose's general counsel sent at your instruction, sent to a

24    third-party marketing company, Phenomenon Marketing; is that

25    correct?

Matthew Martorello - Direct

1    A    Yes.

2    Q    The first sentence says, "Given the various challenges and

3    legal uncertainty in the lending industry, Bellicose VI, LLC,

4    is in the process of reassessing and re-prioritizing current

5    projects and relationships with third-party vendors"; do you

6    see that?

7    A    Yes.

8    Q    These are -- the challenges and legal uncertainty in the

9    lending industry are those we've talked about with various

10   state regulators and class actions; correct?

11   A    Those were Dan Gravel's words.  I would presume that was

12   what he was referring to.

13   Q    Okay.  Take a look at Exhibit 41.  Exhibit 41.

14            THE COURT:  Do you have a copy of this number 39, Mr.

15   Martorello, that's down here?  It says you got a copy of it.

16            THE WITNESS:  It does say that.  I do remember Mr.

17   Gravel showing me the letter before he sent it.

18            THE COURT:  Before he sent it.

19            THE WITNESS:  Yeah.

20   Q    Exhibit 41, this was an email communication that you had

21   just passed along, not specifically about Red Rock, to Ms.

22   Wichtman when you received it from somebody in the United

23   Kingdom; correct?

24   A    Yes.

25   Q    And you note in there that the industry, particularly with

Matthew Martorello - Direct

```
1    the ruling in New York, could jeopardize -- and class actions

2    and personal threats of enforcement against individuals by

3    regulators has everyone spooked.  And this was communication

4    that you sent to Ms. Wichtman a couple weeks after you made the

5    first -- the proposal, rather, October 14th proposal we just

6    talked about; right?

7    A    Yes.

8    Q    Now, take a look at Exhibit 42.  This is an email that you

9    sent to Karrie Wichtman responding to her request for

10   consideration of whether you would agree to pay some of the

11   legal bills related to the New York court litigation and Second

12   Circuit appeal; correct?

13   A    Sorry.  Yeah, she's asking contribution for the legal

14   fight that they brought against New York, yes.

15            THE COURT:  "They" meaning?

16            THE WITNESS:  The tribe is requesting that we fund

17   the litigation against New York or help fund or contribute to

18   it.

19            THE COURT:  And Red Rock sued, or the tribe sued New

20   York seeking to enjoin certain conduct on their part, and that

21   led to the decision of the district court, Judge Sullivan and

22   subsequently the Second Circuit, and it's that litigation you

23   are being asked to contribute to fund; is that correct?

24            THE WITNESS:  That's correct.

25            THE COURT:  All right, I'm with you, Mr. Bennett.
```

Matthew Martorello - Direct

1    What about it?

2    Q    So in the third paragraph you respond "And considering."

3    Can you read those two paragraphs.

4    A    "Considering, a) where this puts us (i.e. SPVI is about to

5    be discovered and will need extreme resources to defend itself

6    against all kinds of aiding and abetting and 'true lender'

7    claims come Q1; b) and the very significant possibility that

8    should we even survive long enough to get there, I'll have to

9    defend myself even personally (in more than civil matters) with

10   no ongoing business or revenue at all should the decision be

11   made in the appeal that the activity is in fact off reservation

12   (a certain end to the industry).  Or if LST folds, I still have

13   those battles to face now on account of this suit."

14   Q    All right.  Take a look at Exhibit --

15              THE COURT:  Had Bellicose been sold yet by the time

16   of this memo?

17              THE WITNESS:  No.  It was 2016 when it was sold.

18   Q    The transaction was formally in what, January of 2016?

19   A    Yes.

20   Q    And the negotiations were ongoing even as we're going

21   through this chain right here; correct?

22   A    The transaction began negotiated August 15th of 2014.

23   Q    The transaction by which LVD purchased Sourcepoint.

24   A    Correct.

25   Q    Okay.  Take a look at Exhibit 46.

Matthew Martorello - Direct

```
1              THE COURT:  Are you moving to a different topic now?
2              MR. BENNETT:  No, sir.
3              THE COURT:  How much more have you got on this topic?
4              MR. BENNETT:  I will move quickly.
5              THE COURT:  I'm just asking how much more you've
6    got --
7              MR. BENNETT:  Judge, I probably have another
8    30 minutes.
9              THE COURT:  We're going to take a 20-minute recess.
10   All right.
11             (Recess taken.)
12             THE COURT:  All right, do you want to proceed.
13   Q    So we were --
14             THE COURT:  You were about to get into Exhibit 43, I
15   think.
16             MR. BENNETT:  Yes, sir.
17   Q    Exhibit 43, this is an email chain in December 31st, 2013.
18   The top of it is from Mr. Martorello to Nicole St. Germain,
19   G-e-r-m-a-i-n, and -- with the Rosette law firm amongst others.
20   Do you recall this email, Mr. Martorello?
21   A    Generally.
22   Q    You've reviewed it before today; right?
23   A    Correct.
24   Q    And this was the continuing discussion about finding a way
25   for -- to get the tribe to acquire Sourcepoint or Bellicose;
```

Matthew Martorello - Direct

1    correct?

2    A    No, incorrect.  This was the end of the discussion to sell

3    51 percent of Bellicose to the tribe.  This is about where that

4    conversation ended.

5    Q    Okay.  And I'm looking at the middle of this.  The

6    question was as to what percentage of equity would go to the

7    tribe.  Is it fair to say that your position was the percentage

8    of equity that went to the tribe was not the difficult part, it

9    was the amount of money that would go to the tribe; right?

10   A    One second, please.  I don't know that I would -- I don't

11   know which one was more difficult.  I hadn't really thought of

12   it that way.

13   Q    All right.  Well, so I'm looking at under subparagraph D

14   on the proposed changes, the bottom half of that, that big

15   paragraph over to the right, it says, "What I think you'd tell

16   a court that would challenge the immunity."  Do you see that?

17   A    I do.

18   Q    And "is that if a deal were not done," and that means a

19   deal by which the tribe would buy Sourcepoint; right?

20   A    51 percent, yes.

21   Q    You would tell them that, A, if Sourcepoint -- the tribe

22   didn't know if, A, Sourcepoint would be around in ten days

23   given the industry; B, executed its termination provision in

24   accordance with the service agreement; or, C, hike rates.

25   That's what you wrote; right?

Matthew Martorello - Direct

1    A    That's right.

2    Q    And you were saying that implicitly the tribe needs to

3    understand that Sourcepoint was intending or had the right to

4    walk?

5    A    We had that right, yes.

6    Q    And this was an implicit threat or maybe explicit threat

7    that if the tribe didn't buy your business, that you might

8    walk?

9    A    I disagree.  Because it does say I thought we agreed to

10   status quo on the next page.

11   Q    Okay.  So let's take a look at the second page at the top.

12   Just a detour here.  This was your writing where you said if

13   this issue isn't worked out -- "Management - if this issue

14   isn't worked out in some very particular way, the deal just

15   won't get done."  What was the management issue that had to be

16   worked out in a very particular way, otherwise you wouldn't do

17   a deal?

18   A    Yeah, it says it here.  "All the investors (institutional,

19   personal, and myself) won't allow the deal to occur without

20   being 100 percent certain that adequate management resources

21   are in control."  That was the first major hurtle to

22   accomplish, so it was just that they needed to have adequate

23   management to run a tribal servicing entity or institutional

24   investors wouldn't lend to them.

25   Q    Take a look at Exhibit 53, please.  This is an email from

Matthew Martorello - Direct

1   you to Robert Rosette dated August 25th, 2014.  You were

2   sending this August 2014 to the tribe's lawyer.  Can you read

3   the sentence at the top.

4   A    "So here is what I'm thinking (for now).  If we can't

5   reach terms with LVD to buy SPVI, then SPVI will be sold to

6   another tribe (likely Middletown).  If we do reach terms, some

7   of my team will likely proceed with Middletown in a new entity

8   to help them stand up a business.  So I'm sort of on hold, and

9   so is Middletown, until we know if LVD is going to be able to

10  come to terms on SPVI or not."

11              THE COURT:  What exhibit are you on?

12              MR. BENNETT:  Exhibit 53.

13  Q    So August 25th, 2014, is ten months after the October 2013

14  first proposal where you sent your suggested structure for LVD

15  to purchase Bellicose; right?

16  A    Yes.

17  Q    And the tribe still had not agreed to buy your business,

18  and this was a threat to the tribe's lawyers -- correct? --

19  that if it didn't come to terms with you, then you were going

20  to sell it to a competitor?

21  A    Incorrect.

22  Q    Well, did you -- were you meaning what you wrote in this

23  email to the tribe's lawyer?

24  A    Yes.  What you were incorrect about is the October to

25  December 2013 deal died, and we chose status quo.  A week

Matthew Martorello - Direct

1    before this, or ten days before this, the tribe sent a deal to

2    buy the whole company on August 15th, and their lawyers sent --

3              THE COURT:  Deal to buy what?

4              THE WITNESS:  Offer, term sheet to buy all of

5    Bellicose.  That was like, I think, August 15th, and so we had

6    a new, totally new deal, totally new structure.  So I think

7    that's where the incorrect part is.

8    Q    Okay.  So what you are saying is that whenever I'm

9    referring to the purchase of your business that became the Big

10   Picture Loan/Ascension business, that you characterize that as

11   totally unrelated to all of the negotiations that had taken

12   place in 2013, 2014?

13   A    They were very different.

14   Q    The structures are different; right?

15   A    One was an IP copy sale.  One was 49 percent, and then the

16   tribe came and wanted the whole thing.

17   Q    So let's take a look at Exhibit 54.  Before there was Big

18   Picture Loans, you were trying to pitch the tribe to shift its

19   brand to something called Chorus Loans; correct?

20   A    No.  That was a name they picked from several that I

21   provided to them.

22   Q    So you provided several possible names for a new business.

23   One was Chorus Loans, and that's the one they picked; correct?

24   A    Correct.

25   Q    Taking a look at Exhibit 54, the bottom email, you

1   received a proposed resolution approving Chorus Loans in Word

2   document format; correct?

3   A   Correct.

4   Q   And because that -- it was customary for you to have to

5   pre-approve tribal resolutions related to your business;

6   correct?

7   A   I testified earlier that is incorrect.

8   Q   Okay.  So two resolutions we know of that that's true on,

9   though; right?

10  A   It says final.  It doesn't say that I'm reviewing

11  anything.  I don't know what the exhibit looks like, and I

12  think we talked about the other one.

13  Q   So then you say, "Okay," and this is October 25th, '14,

14  "sorry for the runaround here, Karrie... Chorus has been sold.

15  Attached is another really great brand with just as much

16  energy, money, and time spent in developing.  Assuming LVD buys

17  SPVI, BigPictureLoans," with the three words all together,

18  BigPictureLoans.com but the three words all capitalized, "would

19  be an excellent domain.  If LVD doesn't buy SPVI, then

20  firstnationloans.com is the domain we can provide.  We haven't

21  gotten around to doing the build-out or design."

22          And so right above, you respond to her question,

23  "Which one do you want me to use" -- this is Karrie Wichtman

24  the Rosette lawyer, and you say, "BigPictureLoans.com";

25  correct?

Matthew Martorello - Direct

1   A    Correct.

2   Q    That's how Big Picture, the brand, and bigpictureloans.com

3   came into being; correct?

4   A    That's how the name was selected.

5   Q    Taking a look at Exhibit 55, please.  They selected that

6   name; right?

7   A    Correct.

8   Q    Now, this email, Exhibit 55, is the same email as 54

9   except it didn't have that top part where you say use Big

10  Picture Loans; right?

11  A    Correct.

12  Q    Except this one also has an attachment.  If you look at

13  the second page, Phenomenon, your marketing company, has

14  created the bigpictureloans.com website; right?

15  A    Right.

16  Q    And this was even before the tribe had picked it; right?

17  A    Yes.  They had created several names before the tribe

18  picked this one.

19  Q    Not just several names but everything.  The privacy

20  policy, the forms, everything had been designed, the marketing

21  materials, all created before you even informed Ms. Wichtman

22  about Big Picture Loans; correct?

23  A    I never noticed that.  I presume they took the same text

24  from Castle Payday or something and put it on here.

25  Q    By "they" took the --

Matthew Martorello - Direct

1    A    The marketing company.

2    Q    Your marketing company, Phenomenon?

3    A    Phenomenon.

4    Q    The one you just terminated because of all the problems in

5    the lending industry.  We went through that email a short time

6    ago; right?

7    A    Yeah.

8    Q    This was done before you terminated them for future

9    service; right?

10   A    Correct.

11   Q    You've had this in the bank for awhile?

12   A    I hired them July 2013.  So since August 2013.

13   Q    Right, but certainly -- did you rehire them after you

14   terminated them?

15   A    For limited work, yes.

16   Q    But not for this; this was done before you terminated

17   them?

18   A    Yes, I believe it was a different statement of work for

19   this versus the subsequent determination work they did.

20   Q    Trying to find the date of that.  So this is Exhibit 39

21   we'll flip back to real quick.  So Exhibit 39 is the letter

22   that we've talked about, Mr. Gravel terminating the agreement

23   to use the services of Phenomenon Marketing; right?

24   A    Correct.

25   Q    And so now going back to 55 again -- I'm sorry for all the

Matthew Martorello - Direct

1   paper movement.  Going back to Exhibit 55, we see the date on

2   the front of the marketing presentation which is the second

3   page of Exhibit 55, and it says September 23rd, 2013; do you

4   see that?

5   A    Yes.

6   Q    So you hired Phenomenon, they designed the new

7   bigpictureloans.com, and, in fact, it includes Red Rock in

8   here; right?

9   A    I'm sorry, how do you mean?

10  Q    Well, if you'll take a look at --

11       THE COURT:  What includes Red Rock?  You said "it."

12  That's an indefinite pronoun.

13       MR. BENNETT:  I'm sorry.

14  Q    The privacy policy, for example, which is within the

15  PowerPoint, let's see, after the cover or including the cover,

16  one, two, three, 13, page 13 --

17       THE COURT:  What's at the head of it?

18       MR. BENNETT:  Says privacy policy at the top.

19       THE COURT:  What about it?

20       MR. BENNETT:  It says privacy policy, Red Rock Tribal

21  Lending, LLC, doing business as Big Picture Loans.

22  Q    Mr. Martorello, so when you were speaking to the tribe's

23  lawyer, Karrie Wichtman, you told her that chorusloans.com had

24  been sold and that she should use bigpictureloans.com because

25  you thought it would be an excellent domain.  That was -- at

Matthew Martorello - Direct

1   that point, you knew you were already sitting on all this

2   material for Big Picture.  You had been sitting on it for a

3   year?

4   A    Correct.

5   Q    Now, the problems with regulators did not end in 2013 or

6   2014; right?

7   A    Which regulators?

8   Q    Well, state and federal regulators.

9   A    The federal regulators as far as FDIC/OCC did end in early

10  2014.  FTC really was a nonissue after 2012.  CFPB, probably

11  more like '15 or something, 2016.

12  Q    And it continued -- the CFPB risks and state regulators

13  continued as a risk to you all the way up until the actual

14  consummation, formal transaction of the sale of Big Picture and

15  Ascension, or the merger that became Big Picture and Ascension;

16  correct?

17  A    In a much more limited way.

18  Q    Between 2013 and 2014, you continued to receive -- the

19  companies continued to receive communications from state AGs,

20  cease and desist orders for example; correct?

21  A    Correct.

22  Q    And did that ever abate while Red Rock was around?

23  A    That was from day one and probably still continues today.

24  Q    Okay.  And in October of 2014, you were informed that the

25  Second Circuit, Court of Appeals for the Second Circuit had

Matthew Martorello - Direct

1   affirmed the district court's decision in the New York matter;

2   right?

3   A    That's right.

4           THE COURT:  When?

5           THE WITNESS:  October 1st, 2014.

6   Q    Take a look at Exhibit 65, please.  This is an email from

7   you to Karrie Wichtman dated November 11, 2014; is that

8   correct?

9   A    That is correct.

10  Q    And you were, at this point, discussing, because of the

11  takeaways from the Second Cir -- or in part because of what you

12  learned from the Second Circuit's panel's comments, you changed

13  over to Big Picture Loans as the brand; is that correct?

14          THE COURT:  What was the question again?

15          MR. BENNETT:  Sure.

16  Q    The move to Big Picture Loans and the creation of Big

17  Picture Loans as a company occurred, in part, because of the

18  fear about what the Second Circuit was going to do.

19  A    No, that's not correct.

20  Q    That's not true.  Take a look at 65.

21  A    Yes.

22  Q    You begin at the top by saying, "What were some of the key

23  takeaways from the Second Circuit's panel's comments?"  Do you

24  see that?

25  A    Yes.

Matthew Martorello - Direct

1   Q    And then you begin to discuss what to do with respect to

2   the different vendors and the move from Red Rock and Castle

3   Payday; correct?

4   A    There's a whole lot more in here.  I'm not sure what

5   you're trying --

6   Q    I'm trying to get to the second page.  At the top, Ms.

7   Wichtman had sent you an email, and the first sentence of it

8   says, "As far as Big Picture - BPL has already been created as

9   a company so legal work has already been done there aside from

10  contract review and legal issues resulting from migration and

11  whatever else comes out of your conference room systems chat."

12  Do you see that?

13  A    Yes.

14  Q    And so as of this point, which is November 2014, you are

15  about to make the transition fully from Castle Payday over to

16  Big Picture Loans; correct?

17  A    No.  That must have happened roughly a year later.

18  Q    The move to Big Picture Loans?

19  A    Yes.

20  Q    Okay.

21  A    As an operating business, yes.

22  Q    All right.  Can you take a look at --

23       THE COURT:  Wait a minute.  What?

24       THE WITNESS:  I said as an operating business, yes.

25  Q    Can you take a look at Exhibit 67.  This was in

Matthew Martorello - Direct

1    November 2014, November 24, 2014, you receive a copy of a cease

2    and desist notice sent by the consumer protection section of

3    the Department of Law at the State -- for the State of

4    Colorado; correct?

5    A    I don't know if I received it.  I don't see me on an email

6    or recall it.

7    Q    Do you recall it?

8    A    No, I don't recall it.

9    Q    Take a look at Exhibit 69.  This is an email from you to

10   Michelle Hazen, known here as Shelly H, and then her email with

11   your comments at the end of each paragraph.  What was the

12   purpose -- what was the subject of her email?  Why was she

13   communicating with you?

14   A    I'm sorry.  Let me look at this.  It's kind of a long

15   thread.  It looks like we were discussing what the 2015 budget

16   would look like.  They sent us their proposed budget, and we

17   had disagreement about some of the deductions to our revenue.

18   Q    Well, in fact, one of the reasons was that they started

19   paying their general manager, an interim general manager,

20   salaries without your approval of those ranges; correct?

21   A    I'd have to take a close look and see.  I'm sorry, where

22   would I find this, please?

23   Q    How about on the second page.  The bottom of the second

24   page is your email that had been sent to Ms. Hazen.

25   A    Starting with "Hi guys"?

Matthew Martorello - Direct

1   Q    Yes.

2   A    Okay.  Let me finish the paragraph, please.  There was --

3   it seems like -- and I vaguely recall this.  There was a salary

4   study sent over to Duck Creek for a position or positions with

5   some generalized sort of demographic data and geographies and

6   things, and that's what I see in that part.  Is there another

7   part you'd like me to --

8   Q    Well, the first is your -- you have input here on the

9   salary of individuals at Duck Creek; right?  Those were not

10  your employees purportedly; right?  Those would have been Red

11  Rock?

12  A    They were Duck Creek employees as a PEO to Red Rock, so

13  they serviced both entities.  But they would -- if there was an

14  annual increase over five percent for the total line item, then

15  we'd have to agree to that.

16  Q    But that would have been an entity that you would have

17  claimed had tribal immunity; right?  Duck Creek.

18  A    Duck Creek's labor expense, I think the documents in the

19  servicing agreement say that there was a five percent annual

20  increase without mutual agreement by the parties, and so I

21  think that's what we're talking about -- something -- some

22  growth in excess of the terms of the contract.

23  Q    And the third page, for example -- about halfway down it

24  says, "I can't say yet" -- this is you.  "I can't say yet about

25  hiring a compliance manager, but I don't think it's necessary

1    given the seven or eight touches everything receives today from

2    trained personnel and the deeper touch of the Duck Creek TF

3    compliance board."  You wrote that; right?

4    A    Yes.

5    Q    So they wanted to hire a compliance manager, and you said

6    no?

7    A    I said I can't say yet.  I don't know if I said no.

8    Q    But it was your decision?

9    A    Well, she says here we will not hire a compliance manager

10   in the prior email.

11   Q    Dropping two paragraphs down, under travel, you confirm

12   your agreement -- right? -- that Ms. Hazen can attend the NAFSA

13   which is a trade group for Native American Financial Services

14   Association; right?

15   A    That's the tribal lenders, yeah.

16   Q    And then OLA, the Online Lender Alliance, you indicate

17   that maybe she shouldn't attend that, but, again, you're

18   providing the approval as to whether Michelle Hazen can attend

19   these industry trade groups because, in theory, it would cost

20   money; correct?

21   A    It says here that I --

22         THE COURT:  Correct or not correct?

23         THE WITNESS:  Not correct.

24   Q    The next paragraph says, "A lot of this will be moot if we

25   can get the sale across the finish line, so my focus is much

Matthew Martorello - Direct

1   more so on exactly that and what the purchased business will

2   exactly do after acquisition (facilitating a transition to the

3   new owner)."  Do you see that?

4   A    Yes.

5   Q    So what you are saying is that if they'll buy your

6   business, then you could afford -- it could afford to do

7   certain other things; right?

8   A    No, I wouldn't characterize it that way.

9   Q    Read the rest of that paragraph.

10  A    Would you like me to read it out loud?

11  Q    Let me just ask you, the rest of the paragraph --

12          THE COURT:  Read it to yourself.

13          THE WITNESS:  Okay.  Okay, I've read that.

14  Q    So your point was that they'll be able to save money if

15  you do it that way, and, therefore, they would have the freedom

16  to do the hiring, make the raises, and do the industry travel

17  they were requesting.

18  A    I don't think that clarifies what I was saying, no, I

19  disagree.

20  Q    Take a look at the next page which -- actually two pages

21  in.  On the bottom right it has Bates number 43489.  This is

22  your email, and you state, "The recommended revisions to the

23  budget sent by Duck Creek were not accepted by SPVI."  Do you

24  see that?

25  A    Yes.

Matthew Martorello - Direct

1  Q   So the sale actually occurred, the technical sale occurred

2  in, you said, 2016; correct?

3  A   Yes.

4  Q   Take a look at Exhibit 71.  Is it still your position that

5  you weren't negotiating during this time period here?

6  A   Oh, no, we were still negotiating.

7  Q   So Exhibit 71, you were continuing --

8          THE COURT:  Time period here is January of 2015.

9          MR. BENNETT:  Yes, sir.

10         THE WITNESS:  Correct.

11 Q   And this was your email, Exhibit 71, detailing the

12 different things that you were going to have to do and the

13 employment details for your folks, that is the employees of

14 Sourcepoint, how were they going to be employed; correct?

15 A   Hold on one second, please.  It looks like it's addressing

16 the employment details of my folks, is what it says, for the

17 transaction.

18 Q   And in particular Brian McFadden and Simon Liang; right?

19 A   Among others.  I see Chelsea in here as well.

20 Q   And your brother Justin as well; correct?

21 A   I don't see their names, but it would have been everybody.

22         THE COURT:  You are dropping off.

23         THE WITNESS:  I'm sorry.  I said I don't see their

24 names, but it would have been everybody at the company.

25 Q   So take a look at Exhibit 72 and then Exhibit 73.  These

Matthew Martorello - Direct

1   are the operating agreements for -- actually it says first

2   amended operating agreement of Big Picture Loans dated February

3   of 2015 -- that's Exhibit 72 -- and the operating agreement of

4   Ascension February 4th, 2015; is that right?

5           THE COURT:  72 doesn't have a day in it.

6           MR. BENNETT:  72 does not have a date in it, Your

7   Honor.

8           THE COURT:  It says February, but it doesn't have a

9   day of the month.  Is this the final?

10          MR. BENNETT:  Says first amended, Your Honor.  It's

11  what they gave us.

12          THE COURT:  Is it the final document, or is it some

13  kind of --

14          MR. BENNETT:  It's signed, so I believe it's final.

15  Q    So Big Picture Loans was actually created sometime at

16  least prior to February 2015 or prior to the date of this first

17  amended operating agreement; right?

18  A    Yes.

19  Q    And Ascension was created by operating agreement

20  February 4th, 2015; is that correct?

21  A    At least the operating agreement date is that, but I don't

22  know if it was formed prior or the same day.

23  Q    Now, at this time, in 2015, there wasn't anything for

24  Ascension to do -- right? -- because you still had Sourcepoint;

25  correct?

Matthew Martorello - Direct

1   A    That's correct.

2   Q    And then if you'll take a look at Exhibit 76, you created

3   Eventide by operating agreement February 9th, 2015, just right

4   after the Ascension creation; correct?

5   A    Correct.

6   Q    And this is the operating agreement for Eventide; right?

7   A    Yes, it looks accurate.

8   Q    Take a look --

9   A    Yes, yeah.

10  Q    Take a look at the last page of Exhibit 76 while we're

11  here.  What is Kairos Holdings which apparently owned

12  100 percent of the voting interest, K-a-i-r-o-s, Kairos

13  Holdings, LLC?

14  A    Yes, Kairos was -- I don't want to speculate, but I

15  believe it was the owner of Bellicose.

16  Q    Who owns Kairos Holdings, LLC?

17  A    The Cook Islands trust.

18  Q    Which Cook Islands trust?

19  A    Bluetech.

20  Q    And who are the beneficiaries of the Bluetech Cook Island

21  trust that owns all of Kairos Holdings which owns 100 percent

22  of the voting interest of Eventide?

23  A    My wife and my future -- my current kids and any future

24  descendants.

25  Q    Where did you learn about the Cook Island trust as a place

Matthew Martorello - Direct

1    to store money?

2    A    I didn't learn about it as a place to store money.

3    Q    What did you learn about it?

4    A    It was in 2010, and probably an attorney of some kind.

5    I'm not sure.

6    Q    Mark Curry, who is Mark Curry?

7    A    Mark Curry was, I think, or is the maybe executive of

8    American Web Loans.

9    Q    Which is another lending entity, in fact one that's also

10   now sued in this same court; right?  Are you aware of that?

11   A    I think it is a lending entity.  Is it a lending entity or

12   a servicer?  I'm not sure.

13   Q    It's associated with an Indian tribe?

14   A    In some way, yes.

15   Q    And it had to defend the same types of true lender

16   arguments that you've had to defend; correct?

17   A    I believe so.

18   Q    Mark Curry would be the Matt Martorello of that --

19   A    I don't know --

20   Q    He's the non-Indian individual that invested money and

21   supposedly owned a servicing company; right?

22   A    I'm not sure of the facts of Mark Curry.

23   Q    But Mark Curry is actually the one who talked to you about

24   putting your money in a Cook Island trust; right?

25   A    No.  I never knew Mark Curry in 2010.

Matthew Martorello - Direct

1   Q    When did you first create Bluetech and direct its

2   ownership of Kairos?

3   A    2010.  And I didn't direct.  I'm sorry, I didn't direct

4   the ownership of Kairos or something that you had said.

5            THE COURT:  I'm losing what you are saying.

6            THE WITNESS:  I'm sorry.  I said I didn't direct the

7   trust ownership of the entity.

8            THE COURT:  Who did?

9            THE WITNESS:  The trustee.

10           THE COURT:  Who is the trustee?

11           THE WITNESS:  It's Asia City Pacific Limited, Tine --

12   I can't remember her last name right now.  Tine, T-i-n-e,

13   P-o-i-n-t-e, Pointe.

14   Q    So taking a look at Exhibit 80, please, this was an email

15   chain, the top email of which was Matt Martorello to Karrie

16   Wichtman dated February 23rd, 2015, and you are discussing here

17   the possible purchase that we've just talked about -- right? --

18   of Sourcepoint into Ascension?

19           THE COURT:  You mean Ascension is going to buy

20   Sourcepoint?

21           MR. BENNETT:  I think the assets that are Sourcepoint

22   will become part of Ascension.

23   A    It looks like we're talking about assigning a contract or

24   how we will go about assigning Sourcepoint contracts into the

25   buyer or ultimately to Ascension.

Matthew Martorello - Direct

1   Q    Okay.  And Ms. Wichtman, at the second page of the

2   document, her email up top, this was at 9:16 p.m. on

3   February 23rd, 2015.  She says about this particular vendor --

4   O2 is a vendor; correct?

5   A    Yes.

6   Q    And the tribe, you are asking for approval of a contract

7   with O2; right?

8   A    I'm sorry, I'm not sure.

9   Q    The contract price is going up with O2?

10            THE COURT:  What are you talking about?  I don't know

11  what O2 is, I don't know what contract price you are talking

12  about, price going up.  What on earth are we talking about

13  here?

14            MR. BENNETT:  Yes, sir.

15  Q    So O2 was a vendor that Sourcepoint had used; correct?

16  A    Correct.

17  Q    And O2 was going to have an increase in its contract price

18  or some other change in its contract terms that you were

19  telling Ms. Wichtman that the tribal entities would have to

20  agree to, they need a new resolution for that; right?

21  A    We're discussing it.  I don't see myself saying that

22  specifically.

23  Q    Okay.  So now I've highlighted part of the paragraph that

24  is in the middle of page two, and the sentence begins, "Also, I

25  can see the logic in an increase in contract price."  Do you

Matthew Martorello - Direct

1    see that?

2    A    So this is Karrie's email.

3    Q    It is.

4    A    Yes, I see her saying that.

5    Q    And she says, "However, the tribe needs to understand what

6    O2 did and what they will do under the new terms.  Also, how

7    does putting a company in charge of things Matt used to do help

8    the tribe learn the business?  At the end of the day,

9    especially if you guys are out in two years, with the tribe

10   holding all the cards they need to be playing with a full deck.

11   Sounds to me like we will be short some aces."  Do you recall

12   receiving that email?

13   A    I do.

14          THE COURT:  What page are you on?

15          MR. BENNETT:  Your Honor, I'm on the second page in

16   the middle of the document.  There's an email from Karrie

17   Wichtman to Justin copying Matt, and halfway in the paragraph

18   it says, "Also I can see the logic."  And the question is, how

19   will the tribe learn if you don't -- if we have to hire this O2

20   to run the business.

21          THE COURT:  Run what business?

22          MR. BENNETT:  According to this, whatever work Matt

23   used to do, quote unquote, in charge of things that Matt used

24   to do.

25          THE COURT:  What business was going to pay these

1    people, O2?

2                THE WITNESS:  We did, and after the acquisition,

3    Ascension would pay them.

4                THE COURT:  So Ascension is hiring and paying for

5    somebody to do, after the acquisition or sale, what you did

6    before the sale; is that what she's saying here?

7                THE WITNESS:  No.

8                THE COURT:  Is that what happened?

9                THE WITNESS:  No.  We had all of our vendor

10   contracts.

11               THE COURT:  What?

12               THE WITNESS:  All of our vendor contracts at

13   Bellicose they were purchasing, and so their company would need

14   to engage with all those vendors, and O2 was one of those

15   vendors.  So I guess we're presenting her the contract to

16   review and approve, you know, for when it closed.

17   Q    So Ms. Wichtman was emailing you in this communication and

18   asking how are we going -- how is the tribe going to learn the

19   business if you are making us hire these outside vendors to do

20   the work; right?

21   A    Let me see what she's saying.  She seems to be asking how

22   O2's role will help them learn the business.

23   Q    All right.  Now, could you turn to the first page of this

24   Exhibit 80.  Your email back responding to that is at the

25   bottom of the first page, 8:16 p.m. on February 23rd, 2015.

1    And you say, quote, I guess one question I have is who are you

2    expecting to learn it?  There isn't much to do for the buyer

3    since it's built and designed to be self-sustaining as a

4    passive investment opportunity.  That's what you wrote, that

5    and what followed; correct?

6    A    I wrote that, yes.

7    Q    And the last paragraph of that email you wrote, "I think I

8    need clarity on exactly who you are expecting to learn and what

9    it is you want them to learn.  I can't learn science because

10   the words frustrate me too much.  Just the same if you're

11   hoping to jam a square peg through a round hole, something will

12   get broke."

13           By that you were meaning the co-managers and the

14   persons that were actually at the tribe you did not expect to

15   understand tribal lending business any more than you understood

16   complicated science words; right?

17   A    Incorrect.  It was related to the servicing business.  I

18   said that the servicing business needed to have adequate

19   management or it could fall apart and wouldn't be able to raise

20   institutional capital.

21   Q    Take a look at Exhibit 81, please.  In addition to O2, in

22   this creation of Ascension and the assignment from Sourcepoint,

23   you were requiring that, or strongly insisting that the tribal

24   entities rehire MicroBilt, your allied vendor; correct?

25   A    I'm sorry.  I'm just catching up on the thread.  I'm

Matthew Martorello - Direct

1  recommending that they take assignment through the purchase of
2  our MicroBilt relationship and take a look at the changes to
3  the contract or something here.  She rejects them.  And then
4  they speak.
5  Q    And you tell her, essentially, if you don't hire
6  MicroBilt, the business can't work; right?
7  A    No, that's not --
8  Q    That's not what you said?
9  A    Well, it can work without it.  I don't think I said it,
10 though.  Let me see.  Did I say that?
11          THE COURT:  What?
12          THE WITNESS:  I'm checking to see if I said it.  I
13 don't have these memorized.  I'm just going to look real quick.
14 Q    Justin says it would cause significant performance issues
15 if you don't bring MicroBilt in and agree to their terms.
16 A    I'm sorry, where is that, please?
17 Q    The very first email at the top of the exhibit.
18          THE COURT:  As best I can tell, that doesn't have
19 anything to do with Matt Martorello.  He didn't write it.  He
20 got a copy of it.
21          MR. BENNETT:  Yes, sir.  Withdraw the question and
22 move to Exhibit 85, please.
23 Q    Now, who did you hire to help put together the Eventide
24 merger papers?
25 A    Initially Greenberg Traurig and then Conner & Winters.

Matthew Martorello - Direct

1    Q    And the merger agreement, you had a go-by.  Do you know
2    what a go-by is?
3    A    No.
4    Q    You had a document that was used -- unrelated tribe that
5    you had gotten hold of which you weren't involved; right?
6    A    Are you referring to the term sheet, the original term
7    sheet or merger agreement?
8    Q    Yes.
9    A    You mean the go-by meaning that it was a transaction
10   document from a different tribal acquisition deal that Rosette
11   did with another tribe?
12   Q    Yes.
13   A    That's what I understood it to be, yes.
14   Q    And I think that is Exhibit 136.  This was a document, a
15   merger agreement that was from Clear Lake Tacs, T-a-c-s, and
16   Nagus, N-a-g-u-s, Enterprises and Latinum Funding,
17   L-a-t-i-n-u-m, Funding, and this document was the basis for the
18   same document that is Exhibit 91, the agreement and plan of
19   merger for LVD and Bellicose and Eventide; correct?
20   A    I've never seen this document before.
21          THE COURT:  How does LVD merge with Eventide?
22   They're not merged.
23          MR. BENNETT:  LVD Tribal Acquisition Company, LLC,
24   was created, and that is the company --
25          THE COURT:  Doesn't merge with it.  It's a lender to

Matthew Martorello - Direct

1    it.

2            MR. BENNETT:  Well --

3            THE COURT:  Eventide was a lender to the -- a tribal

4    entity.  I don't know whether it was a tribe.  I think it was a

5    tribe entity.  We just had a whole big fight over that.

6            MR. BENNETT:  Yes, sir, but they created a new entity

7    called LVD Tribal Acquisition Company that formally acquired

8    and then --

9            THE COURT:  Formally acquired what?

10            MR. BENNETT:  Bellicose Capital.

11            THE COURT:  Yeah, but it didn't acquire Eventide.

12            MR. BENNETT:  Judge, I'm reading the name of the

13    document as Agreement and Plan of Merger.

14            THE COURT:  That may be, but that isn't what

15    happened.  It's 5:00 p.m.

16            MR. BENNETT:  Yes, sir.

17   Q    So I note that there's a document destruction paragraph in

18   your document that requires certain documents as part of the

19   sale to be destroyed.  Are you aware of that?

20   A    I know there is --

21            THE COURT:  Which document are you talking about?

22   You said your document.

23            MR. BENNETT:  Yes, sir.  I'm referring to Exhibit 91

24   which is the agreement and plan of merger among LVD Tribal

25   Acquisition Company and Bellicose Capital and Eventide Credit

Matthew Martorello - Direct

1   Acquisitions.

2           THE COURT:  So what are you asking?  Where is it,

3   what page?  I don't know who wrote these documents, but they

4   sure do not accurately describe what's going on.

5           MR. BENNETT:  Your Honor, page five of --

6           THE COURT:  I don't know how much you paid for these,

7   but they're certainly confusing.

8           MR. BENNETT:  It's page five of the document, Your

9   Honor.  It's actually paragraph 2.6(d).  Clarification on

10  company assets is the heading they put in there.

11          THE COURT:  Page what?

12          MR. BENNETT:  Page five.

13          THE COURT:  So what about it?  He's read it now.

14  Have you read it now, Mr. Martorello?

15          THE WITNESS:  Just about, yes, sir.

16  Q    So this is not in the model document that's Exhibit 136.

17  I'm wondering where did this come from?  Who drafted the

18  language that said, "All company information now or that may be

19  discovered on equipment of any kind or in any written materials

20  shall be immediately provided to acquirer," which is the LVD

21  acquiring entity, "and deleted or destroyed by the holder so

22  the holder retains no copies of company information"?

23  A    You are asking who created that provision?

24  Q    Yes.

25  A    I believe it was Conner & Winters.

Matthew Martorello - Direct

1   Q    That's your lawyers that did that; right?

2   A    Correct.

3   Q    And take a look at Exhibit 85, please.  And, in fact, you

4   recall it was Conner & Winters because in this, for example,

5   this email chain where Mr. Williams, John Williams, who was a

6   lawyer, emailed you document 85.

7   A    Okay, I'm on the document.

8   Q    This is an email from the lawyer John Williams to you

9   dated July 9, 2015, the subject regarding M-1, Agreement and

10  Plan of Merger.  And Mr. Williams suggested to you --

11  correct? -- that you should include a document retention policy

12  with a destruction schedule which, according to him, provides a

13  lot of cover should documents be destroyed that a government

14  agency wants some day.  Do you see that?

15  A    Sorry, let me just look at the thread, please, real quick.

16  Okay, I'm seeing discussions about transferring --

17            THE COURT:  What page is it on?

18            MR. BENNETT:  Page one.  That that I just read from

19  is in the top email.

20  A    The last email in the thread?

21  Q    Well...

22  A    So I see the provision in here on July 8th, 5:13 p.m.

23  Q    Yes.

24  A    Where he's asking if this addresses the concerns.

25            THE COURT:  What is your question again?

Matthew Martorello - Direct

```
1   Q    Well, this is the inclusion of a document destruction term
2   within the merger so that, in this case, it would provide
3   cover, quote, a lot of cover should documents be destroyed that
4   a government agency wants some day.
5   A    That's incorrect.  The correct reason is on the pages just
6   before.
7             THE COURT:  I couldn't understand you.
8             THE WITNESS:  The correct reason for the provision is
9   in the pages just prior.
10  Q    Okay, where?
11  A    So this is Bates number ending 196 where I say -- well,
12  might even be earlier.  So I say here, "It's just that on the
13  server and employee computers there must be lingering
14  information that doesn't belong and should be destroyed.  For
15  example, there may be code, data, or underwriting models on a
16  Bellicose Capital server that is a former customer's, not
17  LVD's.  Or more likely on some employee's computer somewhere or
18  in an old email.  They aren't buying that.  It needs to be
19  destroyed if it's left there.  Bellicose Capital was also at
20  one time the shared services entity" --
21            THE COURT:  Slow down.
22            THE WITNESS:  "Bellicose Capital was also at one time
23  a shared services entity for a bunch of affiliate businesses
24  and so it has all of those legal contracts and data, you name
25  it, floating around out there."  He proposed that section.
```

Matthew Martorello - Direct

1   Q    In the paragraph above he also responds, and I'm now

2   reading from the first page at the bottom --

3              THE COURT:  Who is "he"?

4              MR. BENNETT:  "He" is the lawyer John Williams,

5   Judge.

6   Q    Mr. Williams says, "Justin and Matt" -- attorney-client

7   communication.  "Justin and Matt, I have changed the wording to

8   exclude everything that was not related to a tribal entity for

9   the merger; however, as I thought through this, is there any

10  stale data that you might want to leave within the tribal

11  entity?  It will have sovereign immunity from subpoena where

12  your entities will not.  Just a thought as we finish this off.

13  John."

14  A    I see.

15  Q    In fact, you did transfer a lot of data into the tribal

16  entity such as your previous emails at Bellicose; correct?

17  A    Yes.  I say right here there certainly is data they will

18  be buying that is in the history.

19             THE COURT:  Mr. Bennett, we're past the four hours

20  originally allotted.  I told you I'd give you the day, but I

21  didn't mean that the day would end at midnight.

22             MR. BENNETT:  Yes, sir, if we can take a ten-minute

23  break and if I could have another 45 minutes.

24             THE COURT:  You've got to be kidding me.

25             MR. BENNETT:  Another half hour.

 1              THE COURT:  Why do you get anything more?

 2              MR. BENNETT:  Judge, because of the challenge that

 3    we've now had, and as I understand tomorrow, the defendant will

 4    get the day tomorrow.

 5              THE COURT:  If I were Mr. Scheff, what I would do is

 6    say the defense rests and say nothing and leave.

 7              MR. BENNETT:  Okay.

 8              THE COURT:  He wants 45 more minutes which is not

 9    going to come tonight, I will tell you that.  It will come

10    tomorrow.  How much time do you have?

11              MR. SCHEFF:  For the entire case, Your Honor --

12              THE COURT:  For whatever you've got.  We've gone the

13    four-hour period, and I'm not going to make you suffer

14    because -- but part of the reason I went beyond the four-hour

15    period, in fact most of the reason was that Mr. Martorello

16    doesn't really do a very good job of answering the questions

17    directly.  He reframes them, thereby necessitating further

18    inquiry and makes it difficult to understand him and rambles on

19    with some answers, and some of them are appropriate and some of

20    them aren't, and it just went on so I gave him extra time.

21              MR. SCHEFF:  Yes, sir.

22              THE COURT:  I'm not going to give you extra time

23    beyond the four hours either, but I want to know what you think

24    you have in mind because you're going to call Mr. Martorello,

25    but I imagine most of what you were going to have him say he's

1    already said unless I've been in the wrong room.

2            MR. SCHEFF:  You have not been in the wrong room,

3    Your Honor.  I appreciate the flexibility and direction of the

4    Court.  We're trying to keep it to four hours.  If we go over a

5    little bit it will be a little bit, but we're trying to keep it

6    to four hours.

7            I think Your Honor is correct.  We are going to work

8    tonight to try to streamline more than we've already done, but

9    if we run over a little bit, then we would appreciate Your

10   Honor's easing.

11           THE COURT:  It's only fair for you.

12           MR. SCHEFF:  Your Honor, it seems to me -- I don't

13   object to Mr. Bennett taking a few minutes to wrap up, and if

14   he wants to do it in the morning I'm okay with that, but I

15   don't see the need for another 30 or 45 minutes.  I really

16   don't.

17           I think Your Honor is correct about what we're going

18   to do.  We'll probably have a couple questions for Mr.

19   Martorello just to tie some things together, and then we're

20   going to play depositions is really what we're going to do.

21           THE COURT:  I understand.  All right.  Have you

22   consulted with the brains of the outfit back there, Mr.

23   Bennett?

24           MR. BENNETT:  Yes, but I didn't get a response yet.

25   We do -- I'd have to work through the numbers, but apparently

1    the time I've been talking is three hours and 40 minutes.

2              THE COURT:  Is that right?

3              MR. DILLON:  Roughly speaking, Your Honor, yes.

4              THE COURT:  Did you check him?

5              MR. ERBACH:  We have, I think, about a ten-minute

6    discrepancy from them.  As of now, I'm understanding they have

7    about five minutes left, but that's trying to reconcile several

8    discrepancies --

9              THE COURT:  Okay, but that's about -- as the old boy

10   said, that's about good enough for government work, isn't it?

11             MR. ERBACH:  I think that's fair, Your Honor.

12             THE COURT:  I'm astounded you only got three hours

13   and 40 minutes, but I guess I was -- I was pouring through

14   things at the break, during the breaks and lunch, so here's

15   what we'll do:  We'll come back at 10:00 tomorrow morning, and

16   you'll have 30 minutes.  Does that take care of it?

17             MR. BENNETT:  If I could have 35, Your Honor.

18   30 minutes, of course, Judge.  Yes, sir.

19             THE COURT:  If your wife ever wants a witness, have

20   her call me.  All right, and then you go, Mr. Scheff.

21             MR. SCHEFF:  Thank you, Your Honor.

22             THE COURT:  I'm kind of worn out.  I'm not paying

23   attention -- I mean I'm not going to be able to pay attention

24   for another 45 minutes and give you all the full attention you

25   need.  That's a toleration you have to put up with, as Judge

1    Williams said, when you're with old people.

2              MR. BENNETT:  I was going to read the Eventide merger

3    agreement into the record.

4              THE COURT:  I think you ought to do that.  You can do

5    that, and the court reporter will turn the recorder on and

6    you'll have it.

7              MR. SCHEFF:  Just one thing, Your Honor.

8              THE COURT:  Yes, sir.

9              MR. SCHEFF:  If we could start at 9:30 instead of

10   10:00 just for flight issues and things of that nature.

11             THE COURT:  Yes, we'll start at 9:30.

12             MR. SCHEFF:  Thank you, sir.

13             THE COURT:  Thank you very much.  We'll be in

14   adjournment.

15

16

17                        (End of proceedings.)

18

19

20             I certify that the foregoing is a correct transcript

21   from the record of proceedings in the above-entitled matter.

22

23

24   _____/s/_____                  _____

     P. E. Peterson, RPR                  Date

25