```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                     RICHMOND DIVISION

 4

 5   --------------------------------------
                                           :
 6   LULA WILLIAMS, et al., on behalf      :
     of themselves and all individuals     :   Civil Action No.
 7   similarly situated                    :   3:17CV461
     vs.                                    :
 8   BIG PICTURE LOANS, LLC, et al.        :
                                           :
 9   and                                    :   July 22, 2020
                                           :
10   RENEE GALLOWAY, et al., as            :
     individuals and as representatives    :
11   of the classes                        :   Civil Action No.
     vs.                                    :   3:18CV406
12   BIG PICTURE LOANS, LLC, et al.        :
                                           :
13   --------------------------------------

14

15        COMPLETE TRANSCRIPT OF THE EVIDENTIARY HEARING

16          BEFORE THE HONORABLE ROBERT E. PAYNE

17            UNITED STATES DISTRICT JUDGE

18   APPEARANCES:

19   Leonard A. Bennett, Esquire
     Kevin Dillon, Esquire
20   Consumer Litigation Associates, PC          VOLUME 2 OF 2
     763 J Clyde Morris Boulevard
21   Suite 1A
     Newport News, Virginia  23601
22

23

24                 Peppy Peterson, RPR
                 Official Court Reporter
25             United States District Court
```

```
 1    APPEARANCES:  (cont'g)

 2    Amy L. Austin, Esquire
      Consumer Litigation Associates, PC
 3    626 East Broad Street
      Suite 300
 4    Richmond, Virginia  23219

 5    Kristi C. Kelly, Esquire
      Kelly Guzzo, PLC
 6    3925 Chain Bridge Road
      Suite 202
 7    Fairfax, Virginia  22030
      Counsel for the plaintiffs
 8

 9

10

11    Richard L. Scheff, Esquire
      Michael C. Witsch, Esquire
12    Armstrong Teasdale, LLP
      2005 Market Street
13    29th Floor
      One Commerce Square
14    Philadelphia, Pennsylvania  19103

15    Douglas Marsh, Esquire
      Armstrong Teasdale, LLP
16    4643 S. Ulster Street
      Suite 800
17    Denver, Colorado  80327

18    John M. Erbach, Esquire
      Spotts Fain, PC
19    411 East Franklin Street
      Suite 600
20    Richmond, Virginia  23219
      Counsel for Matt Martorello
21

22

23

24

25
```

```
1                     P R O C E E D I N G S

2

3            THE CLERK:  Case number 3:17CV461, Lula Williams, et

4    al., versus Big Picture Loans, LLC, et al., and case number

5    3:18CV406, Renee Galloway, et al., versus Big Picture Loans,

6    LLC, et al.  The plaintiffs are represented by Leonard Bennett,

7    Kristi Kelly, Amy Austin, and Kevin Dillon.  The defendant Matt

8    Martorello is represented by Richard Scheff, John Erbach,

9    Michael Witsch, and Doug Marsh.  Are counsel ready to proceed?

10              MR. BENNETT:  Plaintiffs are, Your Honor.

11              MR. SCHEFF:  Yes, Your Honor.

12              MR. BENNETT:  Your Honor, may I remove my mask?

13              THE COURT:  Please do.  Do you have the same people

14   on the telephone that were on yesterday?

15              THE CLERK:  Yes, sir.  The sheet is to your right.

16              THE COURT:  All right.  But Casey Nash is not on the

17   phone; is that right?

18              THE CLERK:  Correct.

19              THE COURT:  So Hollis, Brewer, Scofield, Marchiando,

20   Guzzo.  All right, Ms. Austin is here.

21              MS. AUSTIN:  Good morning, Your Honor.  I apologize.

22              MR. DILLON:  Good morning, Your Honor.  I apologize,

23   too.

24              THE COURT:  Everything ready to go?

25              MR. BENNETT:  Yes, Your Honor --
```

```
 1          THE COURT:  When I left yesterday, I was told that I

 2   shorted you the promised four hours by not giving you

 3   40 minutes, and then I realized you said 3:40, so there was

 4   20 minutes left on your time, and I've given you 30 minutes,

 5   and you have -- notwithstanding your effort to negotiate it to

 6   a higher figure.  Are you ready to proceed on that schedule?

 7          MR. BENNETT:  Yes, except there is a housekeeping,

 8   agreed housekeeping matter to discuss.

 9          THE COURT:  All right, housekeeping will be

10   discussed.

11          MR. BENNETT:  So yesterday afternoon or after we

12   left, rather, we received the defendant's intended deposition

13   presentations for today.

14          THE COURT:  You're going to video them.

15          MR. BENNETT:  Videos.  And we had an opportunity

16   overnight to go through them and this morning to go through

17   them.  A number of the provisions we had objected to.  The

18   proposal that I made to my opposing counsel, to Mr. Scheff,

19   this morning and as I understand to which he has agreed is that

20   we will not prosecute those objections.

21          The Court can determine the relevance or usefulness

22   of the evidence because we don't want to interrupt the flow of

23   the video presentations and insert an hour-long argument about

24   objections.

25          In lieu of our prosecution of those evidentiary
```

 1   objections, Mr. Scheff and his client have agreed that we can

 2   put on roughly 20 minutes of counter designations to the part

 3   of the depositions that Mr. Scheff is presenting without that

 4   counting against our time.  Of course, the Court has the say.

 5          THE COURT:  That's agreeable to you, Mr. Scheff?

 6          MR. SCHEFF:  It is, Your Honor.

 7          THE COURT:  When counsel agree to reasonable things,

 8   I think it's obligatory on the Court to abide by the reasonable

 9   judgments of informed counsel, and we'll proceed in that

10   fashion.

11          MR. SCHEFF:  Thank you, Your Honor.

12          THE COURT:  And I thank you all for working things

13   out.  That's the way things ought to go in the practice of law.

14   In the face of zealous advocacy, reason in approaching problems

15   is, nonetheless, critically important to the operation of the

16   system.  And I benefit from it, and so do your clients, so I'm

17   grateful.

18          Mr. Martorello, I'll remind you you are under the

19   same oath that you took yesterday, sir.

20

21                    **MATTHEW MARTORELLO,**

22   a witness, called at the instance of the plaintiff, having

23   been previously duly sworn, testified as follows:

24

25          THE COURT:  All right, Mr. Bennett, you may proceed.

1          MR. BENNETT:  And, Your Honor, I'm going to be brief

2     here so we can reserve a couple minutes to cross-examine, as

3     necessary, Mr. Martorello when he's presented by the defendant.

4

5                         DIRECT EXAMINATION

6     BY MR. BENNETT:   (resuming)

7     Q    Mr. Martorello, we talked yesterday about a number of

8     statements of fact that you made in your original declaration.

9     You represented in your declaration that you had no involvement

10    with the creation of Red Rock.  Is that still your testimony

11    today?

12    A    Yes.

13    Q    And you represented that you had no involvement in the

14    creation of Big Picture.  Is that also still your testimony

15    that you would offer to the Court today?

16    A    It is.

17    Q    You represented that notwithstanding what the service

18    agreement says and the testimony regarding debt collection,

19    that your companies had no involvement in the collection of

20    money from consumers.  That's still your testimony?

21    A    I can't remember exactly what the provision said, but I

22    believe it was still accurate.

23    Q    Okay.  And you testified --

24         THE COURT:  Wait a minute.  You believe what you said

25    yesterday was still accurate?  You left with the impression --

Matthew Martorello - Direct

1    the "it" was an indefinite pronoun, and its antecedent noun was

2    the provision in the agreement, so your statement that you just

3    made is, I believe the statement in the agreement, in the

4    contract is still an accurate statement, but yesterday you said

5    it wasn't accurate.  So I want to make sure I know what your

6    answer is.  Is your testimony about that section of the

7    agreement still as it was yesterday?

8              THE WITNESS:  I believe both, I testified it

9    accurately yesterday.

10             THE COURT:  What?

11             THE WITNESS:  I believe I testified accurately

12   yesterday.

13             THE COURT:  Okay.

14   Q    And that testimony that you offered yesterday is that your

15   company was involved in debt collection or coordinating with

16   the debt collector; correct?

17   A    We were -- my testimony was that we identified debt

18   collection agency for the tribe to sell its bad debt, past due

19   loans to them for collection.

20   Q    And you were involved --

21             THE COURT:  Excuse me a minute.  When you all use --

22   the word collection has at least two different meanings that

23   are relevant here.  One is the actual collecting of money from

24   someone who owes a debt and receiving it in the tills of the

25   entity, and that's collecting.  I'm collecting the payments

Matthew Martorello - Direct

1    that are due me every month.

2          There is collection in another sense and collection

3    in the context of this business, and it's been -- the other

4    sense is that I am a debtor, I am owed -- I am in default;

5    therefore, collection efforts are made to forcibly collect the

6    money from me either -- or by legal means.  And I'm not sure

7    what you all are talking about in each -- you seem to be at one

8    point in time talking about the receipt of the loan payments

9    and another point in time implementing formal collection

10   efforts for those who are in default, and I'm not sure -- you

11   are somehow going to have to differentiate between the meanings

12   of collections that we're talking about.  Do you understand me?

13         MR. BENNETT:  I do.  I've tried -- really there are

14   three aspects of this.

15         THE COURT:  That's fine, but you cover them

16   separately then so I understand you're not commingling.  What's

17   the third one?

18         MR. BENNETT:  One is the receipt of money, the

19   other --

20         THE COURT:  In the ordinary course.

21         MR. BENNETT:  Ordinary course into the operating

22   account, and that's about what the service agreement says.

23   Service agreement says --

24         THE COURT:  Stop.  Do you agree that that is the kind

25   of collection that is referred to in the paragraph of the

Matthew Martorello - Direct

1    service agreement that we're talking about, Mr. Martorello, the

2    receipt of money from those who owe it to the lending

3    institution?

4              THE WITNESS:  Yes, I believe that is correct.

5              THE COURT:  All right.  All right, now, Mr. Bennett,

6    there's another one.

7              MR. BENNETT:  And in that regard, just to make sure

8    that we have --

9              THE COURT:  Do you need the system on?  Is it on?

10   There's nothing on the televisions.

11             MR. BENNETT:  So this, we're talking about Exhibit 11

12   which is the original service agreement, and we're talking

13   about paragraph 4.9.

14   Q    This was in your service agreement.  In fact, this

15   paragraph was in every iteration of the service agreements that

16   you had with Red Rock; correct?

17   A    That's correct.

18   Q    All right.  Servicer --

19             THE COURT:  Red Rock and Big Picture?

20             MR. BENNETT:  Well, this was not in the service

21   agreement --

22             THE COURT:  This is just Big Picture --

23             MR. BENNETT:  This is just Red Rock.

24   Q    "Servicer will collect all gross revenue and all

25   proceeds"; correct?

1    A    That's what it says.

2    Q    When you say your company -- in your declaration, you say

3    your company didn't collect.  What you mean is in a legal

4    standpoint -- from a technical contract perspective in -- the

5    actual collection was done in the name of the tribe; right?

6    The receipt of the revenue was done into the operating account,

7    and that operating account was in the name of the tribe.

8    A    Are you asking me what my testimony was?

9             THE COURT:  No, he's asking you what you mean by the

10   word -- he's asking you what you mean when you say in paragraph

11   26 "I have never taken any action to collect in whole or in

12   part any consumer loan originated by Red Rock," and then you

13   said yesterday that included you, Bellicose, and Sourcepoint.

14   So he's asking you what you mean by the word collect in that

15   sentence.

16            THE WITNESS:  Thank you.  It was your interpretation,

17   Your Honor, the collection of unlawful debt, the ordinary

18   course of taking or receiving money into the bank account.

19   That's what I was talking about.

20            THE COURT:  Of lawful then?  The collection of lawful

21   debt.  Is that what you said?

22            THE WITNESS:  The allegation was collection of an

23   unlawful debt, and so to your point, the first interpretation

24   of collection, which does mean many things, the ordinary course

25   of receiving payments.  That's what I'm talking about.

1          THE COURT:  I understand.

2    Q    And this was into a bank account that the tribe did not

3    have a signator authorized to take money out of?

4    A    I testified that I was the signer --

5    Q    Is that yes or no?

6          THE COURT:  Wait just a minute.  Let me start again.

7    You started that sentence with what word?

8          MR. BENNETT:  Yes, sir.  I'll rephrase the question.

9          THE COURT:  I don't know if he can understand it, but

10   I can tell you I didn't understand it.  For today's purposes,

11   it's important that both of us understand it.  So rephrase your

12   question and put some specificity to it so I can follow along.

13   Q    So your interpretation in your declaration of the process

14   of collection is the payment of money by consumers in the

15   ordinary course into the operating account of Red Rock.

16   A    No.  That's inaccurate.  It's the other side of the

17   equation.  It's not the payment but the actual taking or

18   receiving of the payment on the lender's side like the Judge

19   just described.

20   Q    Understood.  And the taking and receiving is the payment

21   by consumers into the operating account in the name of Red

22   Rock?

23         THE COURT:  What you mean is what are you taking and

24   receiving.  Answer, you are taking and receiving the payment

25   from the consumer; right so far?

Matthew Martorello - Direct

1            THE WITNESS:  Correct.

2            THE COURT:  The next part of the question is into

3   what account does that payment go.  What's the answer?

4            THE WITNESS:  Red Rock Tribal Lending.

5            THE COURT:  Red Rock what?

6            THE WITNESS:  The Red Rock bank account, the tribe's

7   bank account.

8            THE COURT:  Now we're at the point we're talking

9   about payments from the consumers that go into the Red Rock

10  Tribal Lending operating account; is that right?

11           THE WITNESS:  Yes, sir.

12           THE COURT:  What's your next question?

13  Q    So that was an operating account that so long as it was

14  open, you don't recall any time in which a tribal member was

15  the signator on the Red Rock operating account.

16  A    No, I don't recall any time that any tribal member was on

17  the account.

18  Q    And during the entire time that you recall, only you and

19  your employees were authorized on that account.

20  A    Yes, that is accurate.

21  Q    Now, I want to go to an area that we talked maybe too much

22  about.  This is your paragraph 69 of your declaration where you

23  represent that the decision to sell Bellicose was not motivated

24  by impending threats of litigation or enforcement actions.

25           Now, your explanation as to why that's not untrue is

Matthew Martorello - Direct

1   because you are breaking down the sale discussions into two

2   discrete time periods; one, you are asserting the 2012, '13,

3   and '14, that proposed sale of your assets, that didn't go

4   anywhere.  You would agree that that was motivated -- certainly

5   a significant motivation was your fear of impending litigation

6   and government action.

7   A    The one you are specifically talking about starting in

8   2012, 2013, that was not.

9              THE COURT:  That was not what?

10             THE WITNESS:  Motivated by regulatory threat or

11  impending litigation.  That's the one you are specific asking

12  about, no.

13  Q    What time period were you motivated to try to sell the

14  assets to the tribe because of impending government regulation

15  or action and/or threat of litigation?

16  A    The sort of, I guess, second arrangement that I had

17  hypothesized was to sell the 40 -- 51 percent equity in a

18  ten-year deal, and that was in September 2013.  I'm sorry,

19  October 2013, and that was at the height of Operation Choke

20  Point and the Otoe-Missouria district court ruling when I

21  proposed that.  So that I am saying was motivated by the

22  pressures around the industry at that time.

23  Q    And the Otoe ruling and the Second Circuit affirmance,

24  that occurred in October 2014; correct?

25  A    Second Circuit -- yes, that was October 2014.

Matthew Martorello - Direct

1    Q    And let's take a look at Exhibit 93.

2              THE COURT:  Are you saying there's a third -- you're

3    really saying there were three tries to sell this thing; is

4    that right?  One was in 2012/'13, it didn't go anywhere.  Then

5    the next one was the second arrangement, 51 percent,

6    October 2013, it didn't go anywhere, and then there's the one

7    that did go?

8              THE WITNESS:  That's very close.

9              THE COURT:  Is that right?  You keep talking about --

10   yesterday you said a couple of times there were three different

11   efforts to effectuate the sale.  Just for my purposes before he

12   gets to Exhibit 93, when was the third?  I understand when the

13   first two were.  When was the third?

14             THE WITNESS:  The third one was August 2014.

15             THE COURT:  And that was the one that worked.

16             THE WITNESS:  That's correct.  That's the one that

17   ultimately worked.

18             THE COURT:  I'm going to call that this sale for

19   purposes of a quick reference, and the other two were aborted

20   sales.  Aborted sale one was 2012/'13, aborted sale two was

21   October 2013.

22             THE WITNESS:  Correct.

23             THE COURT:  Am I correct in framing it that way?

24             THE WITNESS:  Yes.  The only distinction would be the

25   first aborted sale was to sell a copy of our IP, our secret

Matthew Martorello - Direct

1  sauce, to the tribes, and then we would get a seven-year

2  consulting agreement to help build their own tribal servicing

3  agency.  So it was very different.  We weren't selling our

4  assets.  We were trying to re-create who we were for the tribe

5  to own in an urban center where they could service themselves

6  with MBAs, Ph.D.s, and statisticians and such for their own

7  ownership.

8          THE COURT:  So 2012/'13, first aborted sale was not

9  an asset sale, it was an IP sale, and then you would have

10 replicated what you were selling, and it would be -- that's

11 what the tribe would get out of the sale.

12         THE WITNESS:  Yes.

13         THE COURT:  The second aborted was an asset sale in

14 the sense that it was a 51 percent ownership interest.

15         THE WITNESS:  Correct.

16         THE COURT:  And the third one was the sale of the

17 whole shooting match?

18         THE WITNESS:  Yes, sir.  Yes, Your Honor.

19         THE COURT:  Thank you very much.  Excuse me, Mr.

20 Bennett.  I interrupted you and Exhibit 93.

21         MR. BENNETT:  Let's go to his declaration instead,

22 Your Honor.

23         THE COURT:  All right.

24 Q   Mr. Martorello, this whole -- there were three distinct

25 sale periods is nowhere in your declaration at all; right?

Matthew Martorello - Direct

1  A    No, I did not elaborate on it here.

2  Q    Elaborate on it?

3        THE COURT:  Now, now, now, don't get argumentative.

4        MR. BENNETT:  Yes, sir.

5        THE COURT:  Remember the old way to do it.

6  Q    Will you take a look at paragraph -- let's start actually

7  with paragraph 47, and the heading is the sale of Bellicose to

8  LVD.  Now, first, yesterday we went through some of the emails

9  where you discussed positions that you were taking with your

10 valuation companies at different stages.

11 A    Yes.

12 Q    And would you agree with me that you believe that in the

13 business, it's okay to change your truth based on who is

14 listening and who is reading?

15 A    No, I disagree.

16 Q    So there's one truth?

17 A    There's one truth.

18 Q    There's the truth that you tell the Court, there's the

19 truth that you tell the Court two years ago, there's the truth

20 that you tell your investors, the truth that you told the

21 tribe.  One truth, you agree with that.

22 A    The truth is the truth.

23 Q    And you agree you have taken different truth positions in

24 some documents we've been through depending whether you're

25 talking to Wells Fargo, whether you're talking to the tribe,

Matthew Martorello - Direct

1    whether you're talking to your valuation people?

2    A    I disagree.

3    Q    Well, let's talk about your declaration.  Your explanation

4    is that this sale process starting in 2012 did not -- was not a

5    fluid ongoing process; right?  It was three discrete time

6    periods.  That's what your testimony moments ago was.

7    A    It was three discrete time periods, but it was fluid in

8    the sense that the tribe always wanted that discussion since

9    2012, and I tried to find things that might accommodate them.

10   Q    Sure.  So paragraph 49, take a look at it, please.

11   A    I'm sorry, did you say 47 or --

12   Q    49.  Start with 49.  49 says, "To that end," that is the

13   end of trying to help the tribe, your objective you claim,

14   "since at least 2012, LVD and I have engaged in multiple

15   conversations relating to the potential sale of my consulting

16   businesses to LVD."  Do you see that?

17   A    Yes, sir, I do.

18   Q    And this was to accelerate, according to your paragraph,

19   LVD's ability to maintain a profitable online consumer lending

20   business with no outsourced consulting services; do you see

21   that?

22   A    Yes.

23   Q    So the next paragraph, 50, please, you see you write, "As

24   a result of these discussions" -- that is the discussions that

25   began in 2012 to try to sell your business.  As a result of

1    these discussions, you were aware that on or about February 15,

2    LVD transformed its tribal lending business infrastructure to

3    prepare to purchase Bellicose and ensure protections for LVD

4    including liability limitations.  Did you write those two

5    paragraphs, or did your lawyers?

6    A    I believe that -- I mean, I don't know perfect knowledge

7    here, but I believe that I would have written that.

8    Q    So when you were writing this in 2017 to support a motion

9    to dismiss for the tribe, you suggested in those paragraphs

10   that this was one ongoing process beginning in 2012 and

11   culminating in February 2015.  That's what you told the Court

12   in 2017; correct?

13   A    I said the result of these discussions.  That was pretty

14   general.  It wasn't referring to IP sale in 2012.  I don't

15   understand the question, I guess.

16   Q    Okay.  You have the declaration in front of you.

17   A    Yes.

18   Q    Where in that declaration in any regard do you suggest

19   this three time periods of trying to sell the business to the

20   tribe?

21   A    That detail is not in the declaration.

22   Q    And, in fact, you would agree with me that any person

23   reading this, without the benefit of your new position today,

24   would conclude that this was a seamless process starting in

25   2012, ending in February of 2015?

Matthew Martorello - Direct

1  A    I'm sorry.  By seamless you mean there were no stops and

2  starts?

3  Q    That it was one process, negotiation that culminated in

4  what we see in 2015.

5  A    I guess someone could read it that way.  Yeah, it's

6  possible someone could read it that way.

7  Q    Now, take a look at Exhibit 93, please.

8  A    I said multiple conversations.  I don't know if that was

9  maybe not definitive, what it was in reference to.  I'm sorry,

10  93?

11  Q    Yes.  Now, this is an email from you to Zayra, Z-a-y-r-a,

12  dated October 2nd, 2015.  Who is Zayra?

13  A    I'm sorry, what's the exhibit, please?

14  Q    93.

15        THE COURT:  Exhibit 93?

16        MR. BENNETT:  Yes, sir.

17        THE COURT:  It's in the second book there, Mr.

18  Martorello.

19        THE WITNESS:  Thank you, Your Honor.

20        THE COURT:  Zayra Emanuelli, talking about the first

21  one?

22        MR. BENNETT:  Yes, sir, but I was trying to avoid

23  having to spell it which is E-m-a-n-u-e-l-l-i.

24  A    Zayra, she was a CPA at Liont, LLC, in Puerto Rico, and

25  she was assisting me with valuations for income tax purposes.

1   Q    And Liont, LLC, is -- was the new name or new entity that

2   succeeded Bellicose; correct?

3   A    No.  It was not affiliated with Bellicose or similar to

4   Bellicose.

5   Q    But Liont was your company, still your company today?

6   A    Correct.  It's a management company effectively.

7   Q    And you run it, so she worked for you?

8   A    She did, yes.

9   Q    And she's an accountant that worked for you?

10  A    She's a CPA, yes.

11  Q    Here, you were explaining the state of affairs, and this

12  was as of October 2015, the state of affairs related to the Red

13  Rock business; correct?

14  A    Incorrect.  It was -- the email is October 2015.  The

15  state of affairs was in a fair market value buyer's view

16  June 2015.

17              THE COURT:  For what purposes?

18              THE WITNESS:  For tax purposes.

19              THE COURT:  Whose tax?

20              THE WITNESS:  For my taxes.

21              THE COURT:  I know, but who was imposing the tax?

22              THE WITNESS:  It would be --

23              THE COURT:  Federal income tax, sales, what kind of

24  tax?

25              THE WITNESS:  It was income tax -- capital gains tax

1    to the U.S. and Puerto Rico.

2              THE COURT:  For your personal returns?

3              THE WITNESS:  Yes.  They would have -- yes.

4    Q    Now, as I understood, yesterday you were trying to explain

5    that whatever fear that motivated you as to government

6    regulators shutting down the business, that that had abated

7    before the negotiations, your fear had abated before the

8    negotiations that led to the 2015 transaction.

9    A    That's correct.

10   Q    Okay.  So in this Exhibit 93, this is October of 2015, and

11   you've just said it's describing your view of the world as of

12   June 2015; right?

13   A    No.  I said distinctly describing the fair market value or

14   public perception view of the world, not my view.  That's the

15   difference between the tax perspective or, you know, a

16   knowledged market participant in the industries.  Unique

17   knowledge.

18             THE COURT:  I don't understand what you said.

19             THE WITNESS:  So for the tax valuation studies, you

20   have to use the perspective of a random sort of Joe Public fair

21   market value buyer, not necessarily someone who is, you know,

22   knowledgeable about, you know, the goings-on of the changes in

23   the industry or, at a more intimate level, for example, with

24   successful lobbying efforts with federal agencies or Congress.

25   Like those sort things would be a unique -- it's not the same

1    as the fair market value buyer.  Is that helpful?

2              THE COURT:  I think I understand, but what you are

3    saying is that this fair market value you are talking about,

4    the buyer -- the person establishing that, whether it be an

5    appraiser or a buyer, is unaware of the things in the

6    particular industry that affect the market value; is that what

7    you are saying?

8              THE WITNESS:  Correct.  For better or worse, that's

9    correct.

10             THE COURT:  And that's created because of what?  Why

11   is that so?  Why is that a relevant framework; because of the

12   law of somebody, because of a tax ruling, or what?

13             THE WITNESS:  Yes.  The tax -- the way the valuations

14   have to be done for tax purposes have to be from the perceptive

15   of any general outsider.  So mainly it's going on in the press

16   or how do they see the regulatory impact or things going on,

17   not necessarily a unique individual -- I wouldn't be a fair

18   market value buyer because I have more specialized knowledge.

19   So for valuation purposes --

20             THE COURT:  Wait a minute.  As I understand the

21   regulations, the fair market value is determined by the

22   generally available knowledge in the industry -- about the

23   industry and the business.

24             THE WITNESS:  That's correct.

25             THE COURT:  So if, for example, there were lawsuits

Matthew Martorello - Direct

 1  pending against a business, that would be considered in

 2  assessing the fair market value.

 3           THE WITNESS:  Precisely, yes.

 4           THE COURT:  But the fair market value does not

 5  include the insider's knowledge of that particular business;

 6  right?  Is that what you are saying?

 7           THE WITNESS:  Correct, either the business or the

 8  pending threats of changes in legislation or Choke Point,

 9  things like that.

10           THE COURT:  But if the business -- if the public were

11  aware of Choke Point, lawsuits, whatever, that affected the

12  value of the business, then that's considered in the general

13  assessment of the fair market value.

14           THE WITNESS:  Yes.

15           THE COURT:  Okay.  But not your personal perception

16  of it all.

17           THE WITNESS:  Precisely, yes, sir.  Yes, Your Honor.

18  Thank you.

19           THE COURT:  All right, I understand.  Go ahead, Mr.

20  Bennett.  I apologize for interrupting.

21  Q    So what you are saying is that the valuation that you

22  would tell the tax authorities assume facts which you believed

23  were false as they pertain to your company?

24  A    Yes.  They were not necessarily what I would have believed

25  as we discussed, yes.

Matthew Martorello - Direct

1    Q    And so I've circled from Exhibit 93 some of the

2    assumptions that you said you could use.  I guess, what, if you

3    were audited, this is what you'd say?  It says, "We will

4    provide all the support in the world for this so we can support

5    fair market value.  If nobody could argue with us about fair

6    market value, then we did it right, and it doesn't matter what

7    the future value is later on."  That's what FV stands for, is

8    future value?

9    A    It could be fair value, or it could be future value.  I'm

10   not sure.  I'd have to look at the whole email.

11           THE COURT:  Where are you reading from?

12           MR. BENNETT:  I'm sorry, Judge.  I'm reading

13   Exhibit 93 --

14           THE COURT:  I know.  Where?

15           MR. BENNETT:  Bottom paragraph that has the numbered

16   subparagraphs.

17           THE COURT:  "Some thoughts to share."

18           MR. BENNETT:  Yes, sir.

19           THE COURT:  "Some thoughts to share on FMV versus

20   FV."  FMV is fair market value.  What is FV again?  I lost

21   that.

22           THE WITNESS:  I believe that would be fair value then

23   as a comparative.  For example, the tribe is a fair value

24   buyer, not a fair market value buyer.

25           THE COURT:  All right, go ahead.

Matthew Martorello - Direct

1   Q    So the explanation that you would tell the tax authorities

2   would include, number one, that the tribe is buying your

3   business because your contract gets terminated and the tribe

4   wants it to continue.  That's what you're saying; right?

5   A    From a fair market value perspective, these would be, yes,

6   the positions that I'm just sort of hypothesizing would be in

7   play.

8   Q    So the first point is that you were intending to terminate

9   your contract with the tribe?

10  A    No.  It was that the contract naturally terminates at some

11  date after however many -- I think it was a seven-year

12  contract, and they wanted self-sufficiency and continuity.  So

13  that purchasing would provide them that.

14          THE COURT:  Excuse me.  Paragraph one, the tribe is

15  buying it.  What does that mean, "it"?

16          THE WITNESS:  The Sourcepoint -- Bellicose and

17  Sourcepoint.

18          THE COURT:  So the tribe is buying Sourcepoint and

19  Bellicose because our contract -- what's our?

20          THE WITNESS:  That is the servicing agreement from

21  2012.

22          THE COURT:  And the parties to that were?

23          THE WITNESS:  That was through Sourcepoint VI and Red

24  Rock Tribal Lending.

25          THE COURT:  Because that contract gets terminated and

1    they want this to continue.  Who is "they"?

2                THE WITNESS:  The tribe would like the business to

3    continue.

4                THE COURT:  "This" is the business?

5                THE WITNESS:  They would like the services to

6    continue.

7                THE COURT:  All right.  So under that sentence, you

8    are saying, but if someone asks, you're going to tell them

9    this:  The tribe is buying Sourcepoint because the Sourcepoint

10   contract gets terminated, and the tribe wants the servicing to

11   continue.  Is that what we're saying there with the indefinite

12   pronouns as you've corrected them?

13   A    I believe you are correct, Your Honor.

14   Q    Now, the second reason supporting your lowered valuation

15   would be number two, that Operation Choke Point is a risk for

16   Sourcepoint owners but not for the tribe; correct?

17   A    Yes, I can see that.

18   Q    And that Operation Choke Point was one of the leading

19   government crackdowns that was interfering with the operation

20   of the tribal lending businesses; right?

21   A    I disagree with the -- I would define it differently, I

22   think.

23                THE COURT:  What is Operation Choke Point?

24                THE WITNESS:  So Operation Choke Point was a

25   coordination between government agencies.

Matthew Martorello - Direct

```
 1                 THE COURT:  Which agencies?

 2                 THE WITNESS:  It was the FDIC, the DOJ, and some

 3    state agencies like New York DFS.

 4                 THE COURT:  Did it involve the Consumer Protection

 5    Bureau?

 6                 THE WITNESS:  Some would argue they were involved,

 7    yes.

 8                 THE COURT:  So it's federal agencies and state

 9    agencies.  When you said agencies, you mean federal and state

10    agencies.

11                 THE WITNESS:  Correct.  It was a collaboration of

12    efforts, team effort sort of, and it was not a sanctioned

13    effort by any agency.  It was sort of factions had bonded

14    together to try and choke off bank accounts.

15                 THE COURT:  Well, Operation Choke Point had a name,

16    did it?  Did you give it the name, or did the government give

17    it the name?

18                 THE WITNESS:  The government gave it the name.

19                 THE COURT:  All right.  You say the tribe doesn't

20    have any risk from federal regulation.  Yesterday you told me

21    the tribe did have risk from federal regulation.  What's the

22    difference?

23                 THE WITNESS:  Well, they are subject to the federal

24    lending laws, but Operation Choke Point is not a federal

25    regulation.
```

1              THE COURT:  I know, but the tribe could be prosecuted

2     by the federal government for violation of federal law no

3     matter where it occurs; right?

4              THE WITNESS:  That's correct, yes.

5              THE COURT:  If there's a conclusion that federal law

6     is violated by whatever is being done by the tribe, the tribe

7     is amenable to the judicial process in the federal system to

8     adjust that; right?

9              THE WITNESS:  That's correct.  They don't have

10    immunity from that.

11             THE COURT:  Okay.  Excuse me, Mr. Bennett.  Go ahead.

12             MR. BENNETT:  Yes, sir.

13             THE COURT:  All right, Mr. Bennett, what else?

14    Q    So, Mr. Martorello, your declaration says that, and I'm

15    looking at paragraph 67, that "neither I nor any company I own,

16    manage, directed, or controlled the creation of Big Picture."

17    And, in fact, yesterday, we saw that you created

18    bigpictureloans.com, designed all the materials, suggested this

19    adoption, and then participated in the transition from Castle

20    Payday to Big Picture Loans; right?

21    A    That's correct.

22    Q    Now, what type of control did you have -- let me try it

23    this way:  With Red Rock, if the co-managers -- by the way,

24    with respect to the co-managers --

25             THE COURT:  Of what?  Co-managers of what?

 1            MR. BENNETT:  Co-managers of Red Rock.

 2    Q    During the time that Red Rock had these co-managers,

 3    you're aware that they had full-time jobs unrelated to Red

 4    Rock; correct?

 5    A    That's incorrect in the total context.

 6    Q    For Red Rock.  At what point did they not have a full-time

 7    job unrelated to Red Rock?

 8    A    Ms. Hazen, she did not have another full-time job when she

 9    became the full-time CEO of Red Rock, and I think that was

10    probably sometime in 2014.

11    Q    Okay.  In late 2014.

12    A    I don't know the exact date.

13    Q    Okay.  But nobody else had a -- I mean everybody else had

14    a full-time job.

15    A    Yes, I believe that's correct.

16    Q    How many employees did Red Rock have, actual Red Rock

17    Lending have in 2011?

18    A    I don't know.  In 2011 -- they didn't start lending until

19    2012, so none.

20    Q    Okay.  Are you aware that your brother has testified in a

21    declaration that Red Rock, even 2012, didn't have any

22    employees?

23    A    Well, it had the Duck Creek employees.

24            THE COURT:  Excuse me, I think the question was are

25    you aware that your brother testified that way.

1            THE WITNESS:  I believe that's an inaccurate --

2            THE COURT:  Wait a minute.

3            THE WITNESS:  It's inaccurate.

4            THE COURT:  There's an old movie star named John

5    Wayne, and he said listen tight, and what he meant by that is

6    listen to the question and just answer the question.

7            So the only question on the floor is are you aware

8    your brother testified that way, not whether he was correct or

9    not.  That can be dealt with later.  Are you aware he testified

10   that way or not?

11           THE WITNESS:  No, I don't think he testified that

12   way --

13           THE COURT:  No then.

14   Q    Duck Creek was a separate corporate entity; correct?

15   A    That's correct.

16   Q    I'm asking you about Red Rock Lending.  That's the company

17   you had a servicing agreement with; right?

18   A    One of them, yes.

19   Q    So with Red Rock Lending, Red Rock had no employees in

20   2012; right?

21   A    I'm sorry, as a technical answer to that, I don't know how

22   to answer it, because -- so Duck Creek had all the employees.

23   It was a PEO, so it provided all the --

24           THE COURT:  What's PEO?

25           THE WITNESS:  Professional employment organization

Matthew Martorello - Direct

1  similar to how ADP, for example, could be -- like I'm an

2  employee technically of Insperity although I work for Balance

3  Credit.  So everyone was employees of Duck Creek although they

4  worked for Red Rock full time.  It's --

5          THE COURT:  It's a big temp agency contract.

6          THE WITNESS:  Similar to that, but it's, you know,

7  internally owned.  So the tribe put their employees in Duck

8  Creek to work for Red Rock.  So it's correct that there were no

9  employees in Red Rock, but it's technically incorrect because

10 they were employees of Duck Creek acting as employees of Red

11 Rock.  That's what I'm trying to say.

12         THE COURT:  What, did they just throw them over

13 there, or was there an agreement, you go over and work for Red

14 Rock?

15         THE WITNESS:  All the employee benefits and

16 everything were in Red Rock, and there was an agreement -- I'm

17 sorry, Duck Creek, and there was an agreement between Duck

18 Creek to provide the services for Red Rock.

19         THE COURT:  So Duck Creek is just providing services,

20 not providing employees.

21         THE WITNESS:  It's providing --

22         THE COURT:  Providing people to do the services, not

23 providing temporary employment through like a temporary

24 employment agency.

25         THE WITNESS:  I think that's pretty close.  The

Matthew Martorello - Direct

1   reason generally you do this is to isolate employee liability.

2   So the employees will be in an entity, and then it will service

3   the actual business.  So that's how they structured it.

4           THE COURT:  Who tells you that that kind of system

5   works -- well, I'll get to that later.  I understand, I think,

6   what it is.  Go right ahead.

7   Q   So with Red Rock, could the tribe determine, without any

8   approval of Sourcepoint, to -- what interest rate to charge

9   consumers?

10  A   Yes, they could.

11  Q   And could Big Picture determine what interest rate to

12  charge consumers?

13  A   Yes.

14  Q   And --

15          THE COURT:  He said yes.

16          MR. BENNETT:  Yes.

17          THE COURT:  Let him answer the question.  Did you

18  answer yes?  I thought you did.

19          THE WITNESS:  Yes, they can.

20          THE COURT:  Is that through today?

21          THE WITNESS:  Yes.

22  Q   And Eventide does not have any legal right to determine

23  what interest rate Big Picture charges; right?

24  A   That's correct.

25  Q   Could Red Rock determine to settle any governmental action

1    with a governmental authority without Sourcepoint's approval?

2    A    Yes.

3    Q    And could Red Rock settle any lawsuit without

4    Sourcepoint's approval?

5    A    I believe they could.

6    Q    With respect to Big Picture now, can Big Picture resolve

7    any complaints or settle any matter with the governmental

8    authority without Eventide's approval?

9    A    They could.

10   Q    Could Big Picture settle any civil action with consumers

11   who have sued without Eventide having the right to approve

12   that?

13   A    They can do anything they want.  They can do that.

14   Q    And, legally, they're allowed to do that under their

15   contract without being in violation of the contract.

16   A    That's a little different.  They can take actions that are

17   in default of their agreements.

18   Q    And so when I say that they can do something, when I say

19   Red Rock can charge whatever interest rate, of course they can

20   do anything.  They could murder someone.  I'm asking could they

21   legally, without violating the contract, settle a lawsuit, Red

22   Rock, without Sourcepoint's approval and your approval?

23   A    You are asking about Big Picture?

24   Q    I'm asking about Red Rock first.

25   A    I don't really know the servicing agreement well enough to

Matthew Martorello - Direct

1    say that would violate a provision.  I don't recall any

2    provision that that would violate off the top of my head.

3    Q    What about setting an interest rate?  Could Red Rock set

4    any interest rate it wanted to set without violating any

5    provision?

6    A    I believe they could.

7    Q    Then Red Rock became Big Picture Loans; right?

8    A    In some respect, yes.

9    Q    And Red Rock can charge consumers any interest rate

10   that -- I'm sorry, Big Picture Loans is allowed to charge any

11   interest rate that it believes appropriate without violating

12   any prohibition that you and your companies could assert;

13   right?

14   A    I'm sorry.  Can you rephrase that, please.

15   Q    Do you believe that Red Rock -- I'm sorry, do you believe

16   that Big Picture has the authority and discretion to control

17   its own business?

18   A    Yes.

19   Q    And Eventide cannot interfere in that business because, as

20   you've said in your declaration, it's merely a creditor; right?

21   A    I'm sorry, you said it cannot interfere in the business.

22   Is that what you said?

23   Q    Why don't we look at your declaration.  We can talk about

24   86.  "As far as I'm aware, Big Picture's co-managers make all

25   decisions on behalf of that company"; right?

Matthew Martorello - Direct

1    A    Yes.

2    Q    One of those decisions the co-managers could make is what

3    interest rates to charge consumers; correct?

4              THE COURT:  He's already said this about three times.

5              MR. BENNETT:  But, Judge, then he said, he said, yes,

6    they could charge whatever interest rate, but then he says I'm

7    not conceding that they're allowed to charge any interest rate.

8              THE COURT:  Mr. Bennett, the problem lies in that you

9    didn't frame the question with particularity as to what

10   particular entity.  Your first line of questioning was whether

11   they could decide what interest rate to charge without Mr.

12   Martorello's permission or Sourcepoint's permission or

13   violating any contract they had.  You did the same thing with

14   respect to settling with or without the permission of those

15   folks or violating those contracts.  Then you shifted to

16   Eventide.  If you want to ask him about Eventide, ask about

17   Eventide, because you can't merge the two.  They are different

18   agreements.

19             MR. BENNETT:  Yes, sir.

20   Q    So is Big Picture -- I know we have the issue of the class

21   settlement, but prior to the class settlement, if Big Picture

22   had decided it only wanted to charge a 50 percent interest

23   rate, did Big Picture have the authority, did its co-managers

24   have the authority to do that?

25   A    They can do that, yes.

Matthew Martorello - Direct

1    Q    And had the authority to do it under their contracts with

2    Eventide as well.

3    A    You use the word authority.  They had the authority to do

4    it, but I believe that would have been a default of their loan

5    agreements.

6    Q    And if Big Picture's co-managers decide to resolve a

7    governmental action or a consumer class action, you believe

8    they can't do that without Eventide's approval without

9    violating Eventide's contract.

10   A    I don't know as to the former, but as to the latter, I'm

11   aware of the additional indebtedness provision, that it would

12   violate the additional indebtedness.

13            THE COURT:  Eventide can always -- Sourcepoint can

14   always waive any default provision in any contract; right?

15            THE WITNESS:  Absolutely.

16            THE COURT:  The bottom line is that they couldn't do

17   these things that he's asking about, charge interest rates,

18   settle cases without the permission of Sourcepoint or

19   Eventide -- is that right? -- in the form of a waiver of

20   default.

21            THE WITNESS:  Close.  I'm saying that they can do

22   them.  It may result in a default, and that can be worked out

23   through a waiver.  They can freely do -- they can default if

24   they can --

25            THE COURT:  One thing is the doing of it.  Of course

1   they can do it.

2            THE WITNESS:  Yes.

3            THE COURT:  They can do anything they want to do.

4            THE WITNESS:  Exactly, yes.

5            THE COURT:  The question is whether it has legal

6   consequences, and to avoid legal consequences, they have to

7   secure the approval of Eventide and Sourcepoint; is that right?

8            THE WITNESS:  That's absolutely correct.

9            THE COURT:  By way of the waiver.

10           THE WITNESS:  That's absolutely correct for Eventide.

11  I don't remember Sourcepoint's contract to articulate that.

12           MR. SCHEFF:  Your Honor, I believe Mr. Bennett is at

13  his time.

14           THE COURT:  How much time, because I talked a lot.

15           MR. DILLON:  Your Honor, I have Mr. Bennett having

16  roughly four minutes and 30 seconds left.

17           MR. SCHEFF:  Our folks call it differently, but four

18  minutes and 30 seconds is fine.

19           MR. BENNETT:  Judge, I would also --

20           THE COURT:  You're on your clock because you started

21  talking.  Four minutes and 30 seconds.  Go.

22  Q   Mr. Martorello, turn to Exhibit 100, please.  Now, after

23  the sale by -- after the merger that created Big Picture,

24  Ascension and Eventide's transaction, your former employees at

25  Sourcepoint became the management individuals or became the

Matthew Martorello - Direct

1    president and the controlling authority within Ascension;

2    correct?

3    A    I disagree.

4    Q    At 100, the lender had authority.  Eventide had authority

5    over the firing and hiring of the president; correct?

6    A    That's -- I don't agree with that interpretation.

7    Q    All right.  So you take a look at 100.  Do you have it in

8    front of you?

9    A    I do.

10   Q    And take a look at the top paragraph.  This is an email

11   from you to Karrie Wichtman dated January 14, 2016.  Do you see

12   that?

13   A    Yes, sir.

14   Q    It says, "The lenders care" -- and this would be the

15   investing lenders -- right? -- including Eventide?

16   A    Yes, institutional, private, and Eventide.

17   Q    They care about the person who runs the business of AT,

18   Ascension Technology; correct?

19   A    That's correct.

20   Q    And "If the transaction documents are clear that the

21   position in question and under scrutiny to lenders is president

22   and CEO" -- that's Brian McFadden; right?

23   A    Yes, that's correct.

24   Q    "Then I think we're okay."  You wrote, "As far as I know,

25   the managers don't really do anything"; is that correct?

Matthew Martorello - Direct

1   That's what you wrote?

2   A    That's what I wrote.

3   Q    Okay.

4           MR. BENNETT:  I don't have any other questions right

5   now, Judge.

6           THE COURT:  The word lenders, does that include any

7   of the entities that you own or control an interest in?

8           THE WITNESS:  Yes.

9           THE COURT:  The term lenders.

10          THE WITNESS:  That would include Eventide, yes.

11          THE COURT:  Anybody else?

12          THE WITNESS:  Yes.  The hedge funds that were lending

13  to the tribe, and there were maybe eight or nine --

14          THE COURT:  I mean companies in which you had an

15  interest.

16          THE WITNESS:  Oh, no.  There might have been an

17  entity that was involved for working capital at the inception

18  for a short period, but I can't articulate that off the top of

19  my head.

20          THE COURT:  All right, thank you.

21          MR. SCHEFF:  Thank you, Your Honor.

22          MR. BENNETT:  Your Honor, we also yesterday, in terms

23  of a housekeeping matter, offered a new exhibit which is

24  Exhibit 139.  The court reporter and Your Honor's law clerk

25  already have a copy as does, I believe, Ms. Brown, but this is

1 the Court's copy.

2    THE COURT:  What are we doing about all these

3 exhibits?  I've got exhibits numbered one through what here in

4 these two notebooks?  What are they?

5    MR. BENNETT:  Those are the exhibits we've gone

6 through.  We would move for their admission.

7    THE COURT:  You didn't go through all of them.

8    MR. BENNETT:  No, we didn't, Judge, but the exhibits

9 themselves still are evidence.  They're all documents produced

10 by the defendant or parties against interest.

11    THE COURT:  So you are saying that you all have

12 agreed that these can be considered as exhibits; is that what

13 you are saying?

14    MR. BENNETT:  There are some objections to exhibits.

15 We would move for their admission of the exhibits and can

16 defend if there's any objection that counsel has to any

17 particular exhibit.  With respect to those that we formally

18 examined the witness about, the defendants certainly could have

19 said something as we were examining the witness.  But we would

20 move for their mission.

21    THE COURT:  All of these including 139?

22    MR. BENNETT:  Yes, sir.

23    THE COURT:  Any objection?

24    MR. SCHEFF:  I just have a question for Mr. Bennett.

25    THE COURT:  All right, sure.

```
 1              (Counsel conferring.)

 2              MR. SCHEFF:  Your Honor, as I recall from yesterday

 3    morning when you -- when we opened court, you said that you

 4    would be considering all of the materials that have been

 5    submitted with the briefs.

 6              THE COURT:  That had been submitted with the briefs.

 7              MR. SCHEFF:  That's correct.  So to the extent that

 8    Mr. Bennett's exhibits match what's attached to his brief, we

 9    obviously have no objection.  To the extent there are

10    additional exhibits, we have no objection either.  I believe,

11    and I'll have to verify this with my team, that all of the

12    materials that we have provided to the Court, which I'm not

13    going to reference through Mr. Martorello's testimony, have

14    been attached to our briefs as well.

15              THE COURT:  All right.  Then Exhibits 1 through what?

16    What are the numbers?  One through 139 are admitted; is that

17    it, Mr. Bennett?

18              MR. BENNETT:  Yes, Your Honor.

19              (Plaintiffs' Exhibits 1 through 139 admitted.)

20              THE COURT:  Are you going to be using these

21    documents, these two notebooks, or am I going to shift to some

22    other notebook?

23              MR. SCHEFF:  Your Honor, I may make reference to --

24    with the exception of the declaration, which obviously Your

25    Honor has, I may make reference to one document that's in the
```

1    binder, but other than that, no.  I'm just going to ask Mr.

2    Martorello a handful of questions.  Your Honor is correct that

3    the overwhelming vast majority of his testimony has come in

4    through Mr. Bennett's testimony, or his questioning.

5

6                        CROSS-EXAMINATION

7    BY MR. SCHEFF:

8    Q    Mr. Martorello, I believe in response to the Court's

9    question and to Mr. Bennett's questions, you were describing

10   the difference between the fair market value valuation and the

11   fair value valuation; do you remember that testimony?

12   A    I do.

13   Q    What was the valuation that was used for tax purposes that

14   you actually used to pay tax on?

15   A    Of the note was 108 million.

16   Q    And --

17              THE COURT:  You mean the fair market value of the

18   company or of what?  I didn't hear what you said.  The fair

19   market value of what was 108 million?

20              THE WITNESS:  The fair market value of Bellicose

21   equity January 2016, date of the sale, was valued for tax

22   purposes at 108 million.

23   Q    And did you use --

24              THE COURT:  That's the date of the sale to the tribe.

25              THE WITNESS:  Yes, that's correct.

1            MR. BENNETT:  I object as hearsay, Judge, and no

2     foundation.

3            THE COURT:  All right.  Well, you need to lay

4     foundation, but I rather much assume he knows that, but it

5     hasn't been laid.

6  Q    Mr. Martorello, did you hire tax advisors for purposes of

7     establishing a valuation for tax purposes?

8  A    I hired Aranca, yes.

9  Q    Did you work closely with Aranca?

10 A    Yes.

11           THE COURT:  What are you saying?

12           MR. SCHEFF:  Aranca is the name of the company, Your

13    Honor, A-r-a-n-c-a.

14           THE COURT:  Aranca.

15 Q    And, Mr. Martorello, did you work closely with Aranca as

16    they worked to establish a valuation for tax purposes?

17 A    I did.

18 Q    And did you have other tax consultants and lawyers who you

19    used for that process as well?

20 A    I believe I used -- maybe BDO.  I can't recall.

21 Q    BDO meaning BDO Seidman?

22 A    BDO, yes.

23           THE COURT:  I understood him to say that the stated

24    FMV for the purposes of the sale was 108.  He wasn't opining

25    personally that it was; is that correct?

1           MR. SCHEFF:  Yes, that's right, Your Honor.

2           THE COURT:  What objection is there to that, Mr.

3    Bennett, that he's saying that's what the stated purpose was --

4    I mean the stated value in the sale document at the time of

5    sale as opposed to his opinion that that was actually the fair

6    market value?

7           MR. BENNETT:  We don't have any objection to the

8    testimony that Mr. Martorello put down, wrote that it was 108,

9    but the testimony heard to me seemed to suggest that that was a

10   value.

11          THE COURT:  Mr. Scheff has made clear he was just

12   asking him what was the stated value in the transaction, not

13   what Mr. Martorello's opinion was as to the value, and I am not

14   accepting the testimony as anything other than the stated value

15   in the sale transaction of Bellicose in January of -- what was

16   it?

17          THE WITNESS:  2016.

18          THE COURT:  2016 was $108 million per and that he

19   used Aranca in arriving at that figure.

20          MR. BENNETT:  Your Honor, as to that second, I would

21   object to that as hearsay and purported expert testimony, that

22   is having -- what the witness would say --

23          THE COURT:  It's relevant for the purpose that he

24   relied on it, not for the purpose of whether it's true or not.

25          MR. BENNETT:  Yes, sir.

1          THE COURT:  It's not a hearsay objection.

2          MR. BENNETT:  Yes, sir.

3          THE COURT:  It's only relevant for the fact that he

4   relied upon what they said, not whether what they said from an

5   expert's testimony is correct.

6          MR. BENNETT:  Yes, sir.

7          THE COURT:  All right, Mr. Scheff.

8          MR. SCHEFF:  Thank you, Your Honor.

9   Q    In your testimony, Mr. Martorello, you referred to

10  Operation Choke Point; correct?  Do you remember that?

11  A    Yes.

12  Q    And are you -- in the summer of 2014, what was your

13  understanding about what the status of Operation Choke Point

14  was?

15  A    It was expressly acknowledged by Congress and congressmen

16  and the agencies themselves as inappropriate abuse of

17  investigatory threats to choke off banking, and it was

18  admonished and ceased.

19          MR. BENNETT:  Object.  Again, objection, Judge.  It's

20  hearsay.  It's also opinion testimony by a lay witness, that is

21  to the extent that Mr. Martorello's testifying that Congress

22  and everyone else had decided that this governmental action was

23  inappropriate.

24          MR. SCHEFF:  Your Honor, it's relevant to state of

25  mind.  Mr. Bennett has been saying that Mr. Martorello's

 1   declaration with respect to his motivation for sale was driven

 2   by regulatory risk and potential litigation risk.  He

 3   testified, Your Honor --

 4              THE COURT:  It's not admissible to prove that

 5   Congress or anybody else did what he said they did.  It is

 6   admissible so long as he says it was his understanding that

 7   Congress had done that and that it had been suspended, because

 8   it informs his state of mind.

 9              In other words, if the threat has been dissipated by

10   dissolution, then it's not any longer a threat to be considered

11   in making a business decision as I understand your point.  Is

12   that correct?

13              MR. SCHEFF:  Yes, Your Honor.

14              THE COURT:  Objection is sustained to the extent that

15   if that testimony was proffered as true of what Congress

16   actually did or the agencies did, that's inadmissible for that

17   purpose.  It is admissible for the limited purpose of Mr.

18   Martorello's understanding and his state of mind respecting the

19   threat of litigation and government regulatory action.

20              MR. SCHEFF:  Thank you, Your Honor.

21   Q    What's the basis of your understanding, Mr. Martorello?

22   A    August 2013 letter from Congress to the FDIC and the DOJ

23   followed by the FDIC removing the word payday off what was --

24   what they title as a hit list for banks to not provide services

25   to anyone with the word payday, and then in June 2014 Congress

1    issued --

2           MR. BENNETT:  Objection.  Judge, now this is beyond

3    this.

4           MR. SCHEFF:  It's not, Your Honor.

5           THE COURT:  Wait a minute.

6           MR. BENNETT:  It's hearsay, and it's lay opinion.  To

7    the extent that the witness says I believe that this was no

8    longer the case, that's one thing.  To the extent the witness

9    is now saying there's this document, this document, and this

10   document, which, by the way, aren't even proffered here or in

11   this case and we think are untrue, but they're not proffered

12   and is contradicted by his own emails where he said Operation

13   Choke Point in 2015 was an issue.

14          THE COURT:  That's all right.  You can deal with

15   that.  He can say he relied on documents.  The documents aren't

16   in the record.  I'll give that whatever weight I can give it

17   which is nothing.  I don't have any documents that have been

18   offered into evidence about Congress or anybody else, but he

19   can say I read these things, and I formed the belief that

20   such-and-such, and it's admissible for that limited purpose.

21          So you can ask him what documents he relied on.  One

22   of them was an August 2013 letter, one was a June 2013

23   something.  I don't know what it was because the objection

24   interceded.

25          MR. SCHEFF:  I think it was 2014, but Mr. Martorello

Matthew Martorello - Cross

1  --

2           THE COURT:  What is it?

3           THE WITNESS:  It was a report from the -- one of the

4  Congressional -- it was from Congress.  I'm sorry I can't

5  articulate exactly who it was in Congress, but they had done a

6  multi-week study of Operation Choke Point and issued a --

7           THE COURT:  When was this?

8           THE WITNESS:  This was June 2014.

9           THE COURT:  What?

10          THE WITNESS:  It was June 2014, and it was, I think,

11 the House oversight committee.

12          THE COURT:  You read these things?

13          THE WITNESS:  Yes.  And it issued their study after

14 multi weeks of study what Operation Choke Point was and how

15 inappropriate it was.

16          THE COURT:  You read it, you interpreted it to mean

17 those things.

18          THE WITNESS:  That's correct.

19          THE COURT:  Whether it said that or not, I don't

20 know.  All right, go ahead.  And I don't know that it's

21 relevant.  Go ahead.

22 Q   Mr. Martorello, in your declaration -- strike that.  Mr.

23 Martorello, you've been asked several times yesterday and this

24 morning about your declaration insofar as it speaks to your

25 lack of involvement in the formation of either Red Rock or Big

1   Picture.  Do you remember those questions and your testimony?

2   A     Yes.

3   Q     In your declaration, what did you mean by the words

4   formation or creation?

5             THE COURT:  Can you point me to a paragraph?

6             MR. SCHEFF:  I can, Your Honor.  I believe paragraph

7   17.  And if you'll give me just a moment.  I believe the other

8   paragraph is 102.

9             THE COURT:  102 is creation or both or what?

10            MR. SCHEFF:  It is form, the word form, and 17 is

11   creation.

12            THE COURT:  All right, you are asking about 17 first,

13   what does he mean by creation.

14            MR. SCHEFF:  Yes.

15   Q     What did you mean by the word creation in paragraph 17?

16   A     I meant -- I was responding specifically to the statement

17   in the complaint which was that I had helped Dan Gravel and I

18   had helped form Red Rock or Big Picture, and we didn't help

19   form it.

20        Tribal council is the only one who can form it.  So it was

21   the formation of the LLC.  It was not advice as to, you know,

22   business advice.  It was the formation of the entity pursuant

23   to the method of creation factor which we were providing this

24   for, for the *Breakthrough* factors.

25   Q     In paragraph 102 --

1          THE COURT:  When you say you weren't involved in the

2     formation of the LLC or the creation of the LLC, you, do you

3     mean your lawyers were not involved and with your lawyers --

4     and that you didn't communicate with your lawyers on that

5     topic?

6          THE WITNESS:  No, that's not what I mean.

7          THE COURT:  In fact, you and your lawyers both

8     communicated on that topic with the tribe, did you not?

9          THE WITNESS:  That's correct.

10          THE COURT:  And that had to do with exactly how this

11     thing was to be formed and why; right?

12          THE WITNESS:  Correct.

13          THE COURT:  And it was in detail; right?  Your people

14     were thorough when they did that; right?

15          THE WITNESS:  I believe so.

16          THE COURT:  All right.  So there's no question from

17     the record that I'm aware of that his lawyers and he had

18     intimate discussions with the lawyers for the tribe about how

19     the documents were to be structured, what they were to provide,

20     etcetera, etcetera.  There was extensive back and forth on it.

21          MR. SCHEFF:  Your Honor, the issue is what Mr.

22     Martorello meant --

23          THE COURT:  I know, but I want to make clear so you

24     understand what I understand the record to be as of today.

25          MR. SCHEFF:  I understand.  I don't disagree with

1    that.  The question is what Mr. Martorello meant in his

2    declaration when he said formation and creation.

3    Q    In paragraph 102, Mr. Martorello, when you are --

4             THE COURT:  102 are you saying?

5             MR. SCHEFF:  Yes, Your Honor.

6    Q    When you are quoting paragraph 29 of the complaint, what

7    did you mean when you said, "Neither I nor Bellicose helped

8    form Big Picture or Red Rock"?

9    A    I meant that tribal council is the only one that can form

10   the entity.  They are the only ones that can do that.  I wasn't

11   involved or in the room or part of that process.

12            THE COURT:  Excuse me.  You've been citing paragraph

13   101 related to the formation, and it actually is paragraph 102

14   because he's quoting -- he's quoting the complaint and then

15   uses the word "form" there.  I don't see formation dealt with

16   in 101.  I think that's operation and control.

17            MR. SCHEFF:  Your Honor, if I said 101, I misspoke.

18   I was actually looking at 102 when I was asking the question.

19            THE COURT:  That's what he meant, that's what I

20   understood, because he was actually referring to that document.

21            MR. SCHEFF:  Thank you, Your Honor.

22   Q    Can you look at paragraph 69 of your declaration, Mr.

23   Martorello.

24   A    Yes.

25   Q    What motivated -- at the point in time that you agreed to

Matthew Martorello - Cross

1    sell Bellicose and Sourcepoint, what were the motivations for

2    that sale?

3    A    It was the attractive offer that I received from the

4    tribe's council and the tribe.

5    Q    And what do you mean by attractive offer?

6    A    They presented to me a summary of what a term sheet or

7    terms might look like, and they said it would be on a multiple

8    of revenue.  I asked what the multiple of revenue might be in

9    terms of comparable transactions.  They gave me a multiple that

10   was very attractive, and now, for the first time, because the

11   offers had economically been pretty low because I think they

12   thought I was a motivated seller from the Choke Point stuff,

13   this one was a real offer, and I was motivated by the price.

14   Q    And why did the transaction close in January of '16 as

15   opposed to some earlier time?

16   A    I had studied the -- if it would work from a tax

17   perspective for me.  At one point I found out that it wouldn't,

18   and I wasn't going to refuse to sell.  That was October 2014,

19   and then eventually I concluded that the sale would have to

20   close January 1st, 2016, because then that would allow me and

21   my family to move back to the mainland to raise our first kid.

22   Q    And why was that a factor in your decision to sell at the

23   time you sold?

24   A    Because if we sold in 2015, I would have had to have

25   stayed on the island until 2020, but in 2016, we could move

Matthew Martorello - Cross

1    back, and we were having -- our child was born, you know,

2    August 2015, so we were around first trimester, January,

3    February 2015.  So by that time, I knew that it was less likely

4    my wife would want to be away from family.

5    Q    Where is your wife's family?

6              THE COURT:  Wait a second.  Move back to the mainland

7    from where?

8              THE WITNESS:  From Puerto Rico.

9    Q    Where is your wife's family?

10   A    Southern Illinois.

11   Q    Would you look at the --

12             THE COURT:  So you moved back to where?

13             THE WITNESS:  We moved to Chicago and eventually to

14   Dallas.

15             THE COURT:  To Dallas?

16             THE DEFENDANT:  Dallas, Texas.

17             THE COURT:  You needed to get away from her family

18   then.

19             THE WITNESS:  We wish they were around more.

20             THE COURT:  You don't have to answer that.

21   Q    Mr. Martorello, I want you to take a look at the last

22   sentence of paragraph 69.  Read that to yourself.

23   A    "Plaintiffs claim were certain 'motivating factors' for

24   the sale which, in reality, occurred 18 months to three years

25   before the sale transaction closed."

1   Q    What were those motivating factors which occurred 18 moths

2   -- strike that.   What occurred 18 months to three years before

3   the sale closed?

4   A    That was Operation Choke Point, the Otoe-Missouria

5   litigation, and the New York DFS actions to choke off the banks

6   with the cease and desist.

7   Q    And at this point in time that you made the sale, were

8   they the motivating factors in the sale?

9   A    No.

10          MR. SCHEFF:  Your Honor, may I have a moment, please?

11          THE COURT:  Yes, sir.

12          MR. SCHEFF:  I have no further questions of Mr.

13   Martorello, Your Honor.

14          THE COURT:  Any cross-examination?

15          MR. BENNETT:  No, Your Honor.

16          THE COURT:  All right.  Mr. Martorello, you may step

17   down, and you are free -- he can leave if he wants so.  Nobody

18   is going to call him back.  If he wants to leave, he can leave.

19   He's a party.  He can stay if he wants to.

20          THE WITNESS:  Thank you, Your Honor.  Appreciate the

21   time.

22          MR. SCHEFF:  Your Honor, we're going to move into

23   playing our depositions, and I'll find out from my colleagues

24   who we're going to play first.  What we have for the Court is

25   there'll be video.  We do have the excerpted transcript for

1    Your Honor to follow along if you'd like with the exhibits

2    attached that are referenced in the deposition.  I believe

3    we've also provided the Court -- because those exhibits are

4    numbered differently, but we've corresponded them to the record

5    so Your Honor ultimately can match those up.

6              THE COURT:  All right.  Do you have those?

7              MR. SCHEFF:  I think so.

8              THE COURT:  For me and my law clerk.  Mr. Bennett,

9    somebody over there stood up.  Was it Ms. Kelly?  I just saw

10   some action.  Did somebody stand up?

11             MR. BENNETT:  Yes, Your Honor.  It was not something

12   controversial.  I wanted to make sure that the exhibit book

13   has -- I'm seeing mine as missing a page of a particular

14   exhibit.

15             THE COURT:  Fix it at the break.  Coordinate with Mr.

16   Scheff, make sure it's okay and just fix it.

17             MR. BENNETT:  Yes, sir.

18             THE COURT:  You have one for the law clerk?  Now,

19   she's not going to be required to transcribe what's being

20   played because what's in this book is what we're doing; right?

21             MR. SCHEFF:  Yes, Your Honor.

22             THE COURT:  Are we going to mark that book designated

23   testimony of Warren Scott Merritt as an exhibit?

24             MR. SCHEFF:  We'll mark it as our next sequential

25   exhibit, and I'll get that number from my colleagues, and we'll

1   continue to do that for the rest of your presentation.

2          THE COURT:  How long does this go?  Just

3   approximately.

4          MR. SCHEFF:  Eight minutes and 20 seconds.

5          THE COURT:  We'll take our break sometime after this

6   before we start.

7          MR. SCHEFF:  Your Honor, while that's playing may I

8   sit at counsel table?

9          THE COURT:  Sure.

10          MR. SCHEFF:  Thank you.

11          THE COURT:  Unless you're of a mind to stand up to

12   exercise yourself.  You want to go back somewhere else?  You

13   can sit anywhere you want to.

14          All right, this is the deposition of Merritt,

15   March 21, 2019.

16          (Video deposition of Warren Scott Merritt played.)

17          THE COURT:  Is that it?

18          MR. SCHEFF:  Yes, Your Honor.

19          THE COURT:  How long is the next one?

20          MR. SCHEFF:  It's about an hour, Your Honor.

21          THE COURT:  We'll take a break of 20 minutes at this

22   time.  I'd like to tell you something.  In listening to this

23   testimony and reading these exhibits in preparation for and

24   during the proceedings, I have very great difficulty

25   understanding who is who, and I need a chart that tells me from

1    the time the borrower pays until Mr. Martorello receives, if he

2    receives anything, what's the chain that money goes through,

3    because I don't understand -- it's so convoluted with offshore

4    trusts and whatever, but ultimately it appears to me from what

5    I've been able to read that Mr. Martorello receives the money,

6    and so do other people, investors and other people.

7            I have no idea what that is.  I just need to see that

8    so I know who the players are.  My suggestion is that the --

9    you all agree on a chart or the plaintiffs submit a chart based

10   on what they know and you object to it and correct it if you

11   want to do it.  I don't care how you do it, but I don't think

12   given your collective knowledge, I would think it wouldn't take

13   you long to get that together.  Is there any reason you can't

14   do that?

15           MR. SCHEFF:  No, Your Honor.  My suggestion is that

16   the parties work together to try and prepare a chart that we

17   can submit jointly to the Court.

18           THE COURT:  Are you agreeable to that, Mr. Bennett?

19           MS. KELLY:  Yes, Judge.  We would agree to do that.

20           THE COURT:  Get me something by the first of the

21   week, Monday.

22           MR. SCHEFF:  Yes, Your Honor.

23           THE COURT:  Thank you.  And then the next part of it

24   is, I want to know the percentage of the monies that go this

25   way so I understand where the money that goes to the tribe goes

```
 1   and where the money that goes to any of these entities.  If it
 2   drops off along the way to some corporation and then that's
 3   spun off to somebody else, I need to know, but it's so
 4   complicated from the documents that I really had some
 5   difficulty, and I think you all know all that, and you assume
 6   in your questions that I know it, Mr. Martorello assumed in the
 7   answers that I knew some of it, and I thought I had a pretty
 8   good handle on it until I was really wrapping myself in the
 9   papers to get ready for this, and I concluded that my knowledge
10   was inadequate to the task.  So if I could get those two things
11   by Monday, I would appreciate it.
12             MR. SCHEFF:  Yes, Your Honor.
13             THE COURT:  If you can't agree on them, then Monday
14   you submit yours, Mr. Bennett, or Ms. Kelly, and then on
15   Tuesday, you submit your corrections.
16             MR. SCHEFF:  Yes, Your Honor.
17             MS. KELLY:  Judge, can I ask for clarification?  Do
18   you want through the different time periods through today,
19   because we don't have all the discovery of like what's been
20   going on, so we may not have all of the information, but is it
21   from inception to the present?
22             THE COURT:  From Red Rock on.
23             MS. KELLY:  Would you like amounts as well?
24             THE COURT:  Separately.  No, I don't -- just in a
25   gross way what was the take for each.  You all continue to work
```

1    that out.  We'll take a recess of 20 minutes and then be ready

2    to go.

3              (Recess taken.)

4              THE COURT:  All right, the next thing is the

5    deposition of Ms. Wichtman?

6              MR. SCHEFF:  Yes, Your Honor.  That will be, and that

7    transcript you should have, should be marked 327.

8              THE COURT:  Hers is --

9              MR. SCHEFF:  Yes, sir.

10             THE COURT:  And the other one is 326?

11             MR. SCHEFF:  Yes, Your Honor.

12             THE COURT:  DX-326 and DX-327.  All right.

13             MR. SCHEFF:  Thank you, Your Honor.

14             (Video deposition of Karrie Wichtman played.)

15             THE COURT:  Excuse me just a minute.  Hold on.

16   There's something up on the screen.  What's that?  Is that the

17   way you want this depicted, or is there something wrong with

18   the machinery?

19             MR. SCHEFF:  Your Honor, this is the exhibit she was

20   looking at at the time.

21             THE COURT:  Did they say what it was?  The exhibit

22   attached here is Exhibit 2 which is a statement of position

23   regarding material misrepresentations, and Exhibit 6, Defense

24   Exhibit 325, which is a memo.

25             MR. SCHEFF:  Your Honor, I apologize.  That's not

1    attached to the transcript.  We had intended to do that.

2    That's an oversight.  I apologize.

3              THE COURT:  All right.  I'll hear what she has to

4    say.  You're going to give me the exhibit?  Do we have it?

5              MR. SCHEFF:  Your Honor, if we can have a moment,

6    we'll get you the exhibit.

7              THE COURT:  Go ahead with it.  Find it and hand it

8    up.

9              (Video deposition of Karrie Wichtman played.)

10             THE COURT:  Stop that a minute.  She, at the

11   beginning of this discussion, mentioned the timeframe, and I

12   didn't catch it, but I thought -- because her voice dropped,

13   and I thought -- I wrote down 2013 to '16.  Can you tell me if

14   that's correct or not from your knowledge, or can we go back?

15             MR. SCHEFF:  In terms of her testimony, I thought --

16             MR. BENNETT:  Judge --

17             THE COURT:  What page was that?

18             MR. BENNETT:  This is at page 55, line 17, "Question:

19   And over what period of time" --

20             THE COURT:  Wait a minute.  Let me find it.  Okay,

21   hold on.  I need to get it.  I don't have that page.  I don't

22   have page 55.

23             MR. BENNETT:  It would be numbered Section 8.

24             THE COURT:  55, line 14; is that right?

25             MR. BENNETT:  Yes, sir.

1           THE COURT:  "Probably centralized in 2013,

2      maybe 2015, '16."  Is that the timeframe we're talking about

3      here?

4           MR. SCHEFF:  Yes, that was her testimony, Your Honor.

5           THE COURT:  You may resume.  I just lost it, and I

6      need to understand it.  Go ahead and play.

7           (Video resumed.)

8           THE COURT:  Do we have a lot of this asking her to

9      vouch for what somebody else is saying?  That testimony is not

10     admissible.  You all know that.

11          MR. SCHEFF:  Your Honor, she has personal knowledge,

12     as she testified, that she observed the co-managers, so she is

13     in a position to determine whether someone's statement --

14          THE COURT:  You cannot have one witness testify that

15     another witness is telling the truth.  That's a credibility

16     judgment for the Court or the jury.  It's not allowed.  I don't

17     know where on earth you got the notion that it is just because

18     she has some personal knowledge about the circumstances -- are

19     you asking her a whole bunch of questions like that?

20          MR. SCHEFF:  Your Honor, there are a series of

21     questions like that, yes.

22          THE COURT:  Can you get rid of them?  Is it easier to

23     listen to them all?

24          MR. SCHEFF:  Probably easier to listen.

25          THE COURT:  I'm going to listen to them all but not

1    pay attention to them because that's not something I can

2    consider.

3                (Video resumed.)

4                THE COURT:   What paragraph are we on?  I'm having

5    trouble.

6                MR. SCHEFF:   As she was observing it, it appeared one

7    page ahead, so it's your page seven, last sentence of the last

8    full paragraph.  That's what she's referring to.

9                THE COURT:   "Thus, shortly after"?

10               MR. SCHEFF:   No.  On page seven of the exhibit,

11   starting, I believe, with the words "the tribal defendants."

12               THE COURT:   What paragraph -- what's the first words

13   in the paragraph?

14               MR. SCHEFF:   The first word in the paragraph is

15   "Rosette."

16               THE COURT:   Okay.  And then where, down there?

17               MR. SCHEFF:   If you look at the last sentence in the

18   paragraph, so it's the third line from the end of that --

19               THE COURT:   "The tribal defendants used"?

20               MR. SCHEFF:   Yes, Your Honor, I believe that's what

21   she's about to testify about.

22               THE COURT:   All right.

23               (Video resumed.)

24               THE COURT:   Where are we talking about?

25               MR. SCHEFF:   That is on page 12 of the exhibit --

```
 1                    THE COURT:  12, okay.

 2                    MR. SCHEFF:  First sentence under D.

 3                    THE COURT:  I just couldn't hear the page number.  So

 4       that's the heading D, Rosette and Richardson.

 5                    MR. SCHEFF:  Yes, sir, that's correct.

 6                    THE COURT:  Go ahead.

 7                    (Video resumed.)

 8                    THE COURT:  Where are we in the deposition?  I'm

 9       having trouble following here.  What page?

10                    Okay, I've got it.  Thank you.  Thank you.  You can

11       play.

12                    (Video resumed.)

13                    THE COURT:  All right, that's the end of that

14       deposition?

15                    MR. SCHEFF:  Your Honor, we could do another before

16       the lunch break.

17                    THE COURT:  How long do you have?

18                    MR. SCHEFF:  We're going to do James Dowd.  It's

19       18 minutes.  Is that all right?

20                    THE COURT:  That will put us a little bit into the

21       lunch hour -- have you all ordered your lunch?

22                    MR. SCHEFF:  Yes, Your Honor.

23                    THE COURT:  I signed some kind of document that said

24       you could bring it into the building.  Do we need to take an

25       hour for lunch?
```

1            MR. SCHEFF:  I don't believe so, Your Honor.

2            THE COURT:  So who -- who do you have after the

3    18-minute Dowd one?  What do you have?

4            MR. SCHEFF:  Well, we have a variety, but the next

5    one that we were intending to play was --

6            THE COURT:  How much time total?

7            MR. SCHEFF:  How much time total?

8            THE COURT:  Mr. Bennett said he wanted to play

9    something.

10            MR. SCHEFF:  25 minutes I think he said.

11            THE COURT:  A total of 25 minutes?  Do you want to do

12    your response to the Wichtman deposition now, or do you want to

13    do it later?

14            MR. BENNETT:  We discussed, because ours are not that

15    long individually, that we would just put them together at the

16    end of all this.

17            THE COURT:  Okay.  All right.  So how long?  Total.

18            MR. SCHEFF:  Your Honor, the total number that we

19    have remaining is 159 minutes.  We're going to talk over the

20    lunch break to see if we can pare that down, but that would

21    bring us in under the four hours.

22            THE COURT:  I'm just trying to figure out when's the

23    best time.  Maybe it's better to give you time to pare some of

24    it down at lunch.  Would you rather do that?

25            MR. SCHEFF:  That's fine, Your Honor.  We're happy to

1   do that.

2         THE COURT:  Is there any reason you all can't do

3   yours and get ready, Mr. Bennett?  Sounds to me like it will

4   help to take the lunch hour now as opposed to waiting.

5         MR. SCHEFF:  Right.  I believe Your Honor's shortened

6   lunch hour would be fine if that's okay with everybody else.

7         MR. BENNETT:  Logistically, Judge, we just now would

8   be ordering our lunch, and we would need to ask the Court for

9   the permission slip to save us the trouble of going out of

10  security and coming back --

11        THE COURT:  You can have it, but it has to be signed.

12        MR. BENNETT:  Yes, sir.  What I might suggest is --

13        THE COURT:  Ms. Tashima, will you do a thing like I

14  did for the others, and I'll sign it and send it down there.

15        MR. BENNETT:  There are a handful of really small

16  depositions that the defendant has designated, like five

17  minutes, two minutes.  So I don't want to interfere with the

18  Court's schedule, but in terms of by the time we get our lunch

19  here -- and I'm certainly not hurting for it --

20        THE COURT:  How are you going to get your lunch?  Why

21  am I dealing with that?

22        MR. BENNETT:  I said if we could put 15 more minutes

23  of time into this hearing by playing --

24        THE COURT:  That's fine by me.  Play Dowd.  That's

25  18 minutes.  I need to have something down to the CSOs, I

1    guess.

2              MR. SCHEFF:  Your Honor, this will be 328.

3              (Discussion off the record.)

4              THE COURT:  All right, go ahead, please.

5              (Video deposition of James Dowd played.)

6              THE COURT:  All right.  We'll take 30 minutes for

7    lunch at this time.

8              (Luncheon recess.)

9              THE COURT:  All right.  We have more depositions?

10             MR. SCHEFF:  Your Honor, with the -- I think the

11   Court has already permitted this, but Mr. Martorello is going,

12   with leave of Court, is going to go to the airport to catch his

13   flight back to Texas.

14             THE COURT:  Sure.  He was excused from when he

15   testified.

16             MR. MARTORELLO:  Thank you, Your Honor.

17             THE COURT:  Thank you, Mr. Martorello.

18             MR. BENNETT:  Your Honor, in terms of housekeeping, I

19   just had a conversation with Mr. Scheff.  There is quite a lot

20   of paper flying, information.  Mr. Scheff does not contemplate

21   us making any argument at the end of the evidence today which

22   we would be okay with if that's the Court's preference.  We've

23   asked, and I understand Mr. Scheff has agreed, that when we do

24   our other filings that the Court has asked for, a chart or the

25   money, that we supplement and provide maybe a short, not an

1    argument brief but a short brief that would summarize the

2    evidence as to the categories of misrepresentation we've

3    alleged so that we don't have argument.

4              THE COURT:  Tied to the transcript?

5              MR. BENNETT:  Tied to the transcript.

6              THE COURT:  Have you arranged for the transcript and

7    determined when it can be delivered to you?

8              MR. BENNETT:  Our court reporter, as I understand,

9    probably had today's transcript done last week given the

10   timing, but we certainly will order it as expeditiously as

11   possible.

12             THE COURT:  Well, she probably needs to work all

13   night, I guess, to get it done on the schedule that we're

14   talking about.  You've arranged with her to get it done?

15             MR. BENNETT:  I've not arranged it, but I'm a safe

16   distance from her so staplers --

17             THE COURT:  I don't know that that's correct.  All

18   right, we'll see.  Let's proceed with what we're doing, and

19   I'll reflect upon it.

20             MR. SCHEFF:  Your Honor, the next witness we're going

21   to call by deposition is Adil, A-d-i-l, Karam, K-a-r-a-m.  This

22   transcript that we handed up to the Court will be marked as

23   329.

24             THE COURT:  All right.  You are giving these to the

25   clerk for the record?

1          MR. SCHEFF:  Yes, Your Honor.

2          (Video deposition of Adil Karam played.)

3          MR. SCHEFF:  Your Honor, this relates to the

4    testimony of Jennifer Weddle, and it will be Exhibit 330.

5          (Video deposition of Jennifer Weddle played.)

6          MR. SCHEFF:  Your Honor, we're going to move on to

7    the testimony of Rob Rosette, and that transcript that we just

8    handed up will be marked as Defense Exhibit 331.

9          (Video deposition of Robert Rosette played.)

10         THE COURT:  Just so you all know, that answer is

11   exemplary of Mr. Rosette's utter disregard for answering the

12   question and for serving as a lobbyist on behalf of the tribe,

13   and that's exactly how I'm going to view all his testimony.  He

14   didn't answer the question.  He just spewed out something he

15   thought was okay, and wherever that appears in this testimony,

16   that's how I'm going to regard it, because he's just being a

17   lawyer there.  He's not being a witness at all.

18         He didn't answer the question, and the question

19   before that he didn't do and many others like that.  Just so

20   you know, don't cite him to me in any subsequent papers for

21   anything, because it's his -- at best, his opinion, and he's

22   not qualified to give it, and it's not relevant.  It wasn't

23   responsive to the question, and I'm kind of worn thin with a

24   lot of this stuff.  Ms. Weddle was the same way, and Ms.

25   Wichtman was worse.

1        So, anyway, maybe I should have reviewed all these

2   things ahead of time and stricken them, but I'm not paying

3   attention to them.  So in structuring your argument, you stay

4   to the facts instead of the nonsense that these people have

5   spewed by way of nonresponsive answers.

6        I'll let you figure out what fits that bill, and I'll

7   consider it as it comes in for what it's worth, but you'll do

8   well by yourselves and your clients if you will confine

9   yourselves to what the facts are, not to these side comments

10  that are not responsive.  Next question begins with "And did

11  Mr. Martorello," I believe.

12       (Video resumed.)

13       MR. SCHEFF:  Your Honor, this is Michelle Hazen, and

14  that will be Exhibit 332.

15       (Video deposition of Michelle Hazen played.)

16       THE COURT:  Stop just a minute.  What was that first

17  stuff?  It was a bunch of language I didn't understand.  Was

18  that just her name in the language of the tribe?

19       MR. SCHEFF:  That's my understanding, Your Honor.

20       THE COURT:  Oh, okay.  So when she said all that long

21  name and then said Michelle Hazen, she was answering what was

22  my name.

23       MR. SCHEFF:  Yes, Your Honor, that's my

24  understanding.

25       THE COURT:  Seeing it in writing is much better.  You

```
 1    can understand what it was.  Sorry.  All right, go right ahead.
 2                    (Video resumed.)
 3                    MR. SCHEFF:  Your Honor, the next witness will be
 4    Craig Mansfield, Exhibit 333.
 5                    (Video deposition of Craig Mansfield played.)
 6                    MR. SCHEFF:  Your Honor, next one is Joette Pete, and
 7    that's Exhibit 334.
 8                    (Video deposition of Joette Pete played.)
 9                    MR. SCHEFF:  Your Honor, this is Dan Gravel, and this
10    will be Exhibit 335, I believe.
11                    (Video deposition of Daniel Gravel played.)
12                    THE COURT:  You don't really expect me to pay
13    attention to that kind of stuff.  How can you ask a question
14    about somebody else's -- what's his state of mind opinion
15    without -- why am I listening to stuff like this?
16                    MR. BENNETT:  Your Honor, this was our team that was
17    questioning.  We were asking --
18                    THE COURT:  Why would you question it?
19                    MR. BENNETT:  We expected him, as a lawyer, to say I
20    can't tell you about state of mind.  We didn't expect --
21                    THE COURT:  That's why you asked the question, to get
22    an answer you couldn't -- put that one back in the box.  They
23    used it because it helps them, but it's something I'm not going
24    to consider because it's not something that's admissible under
25    any kind of rules of evidence, and it's logically inconsistent
```

1  that I can consider that.

2           Okay, go ahead.  What else have we got from this

3  fellow?  Anything else?

4           (Video resumed.)

5           THE COURT:  Can somebody tell me who Mr. Gravel is?

6           MR. SCHEFF:  Yes.  Mr. Gravel, Your Honor, was

7  in-house counsel to Bellicose and Sourcepoint.

8           THE COURT:  To who?

9           MR. SCHEFF:  Bellicose and Sourcepoint.

10          THE COURT:  Okay.

11          MR. SCHEFF:  Your Honor, the next witness is

12  26 minutes, and then we have one other after that.

13          THE COURT:  I thought you were going to cut some

14  stuff out.

15          MR. SCHEFF:  We did.

16          THE COURT:  Are you familiar in your readings in

17  history with water torture visited by -- I believe it was first

18  envisioned as a method of punishment in China in about the 11th

19  century.  I thought maybe we had gone beyond that.

20          MR. SCHEFF:  We're not trying to punish, Your Honor.

21  So would Your Honor prefer that we play the next witness or

22  take the afternoon break?

23          THE COURT:  We'll take the afternoon break with a

24  view to getting you to cut down some.  A lot of this stuff is

25  just not helpful.  It's opinions from people who are not

1    qualified to render opinions.  It's opinions on topics they

2    can't render opinions on like the credibility of witnesses or

3    the state of mind of somebody else.  That's just not helpful to

4    me in making decisions that need to be made.

5          The issue here is very simple:  As to

6    misrepresentations pointed out by the plaintiffs, what is the

7    evidence as to whether they were true or not.  That's what's

8    the issue here.  All right, we'll take 20 minutes.

9          (Recess taken.)

10         MR. SCHEFF:  Thank you, Your Honor.  We've completed

11   our presentation.

12         THE COURT:  Thank you very much.  I think you've got

13   enough.  All right, I'm going to let you now address what you

14   want to do.  Mr. Bennett suggested something about briefing.

15   First thing is I assume in the interim you talked to the court

16   reporter and figured out when you're going -- we will get a

17   transcript if you're going to tie things to the transcript.

18         MR. BENNETT:  That would have been the wise thing to

19   do, Judge.

20         THE COURT:  You didn't do it.  Here's the thing.  We

21   need to have this done quickly, because the brains of the

22   operation won't be here for a whole lot longer.

23         MR. BENNETT:  I understand.

24         THE COURT:  It's going to be some work, I guess.

25         MR. BENNETT:  So the --

```
 1              THE COURT:  Come to the lectern.  Have you told Mr.
 2    Scheff what it is -- it's Scheff.
 3              MR. SCHEFF:  Yes, Your Honor.
 4              THE COURT:  I keep trying to put an I into it, but I
 5    know how to say it.
 6              MR. SCHEFF:  I understand.
 7              THE COURT:  Have you told Mr. Scheff what it is you
 8    think you want to do?
 9              MR. BENNETT:  I have, but generally what I had
10    envisioned was rather than another brief that repeats all the
11    argument was something more akin to a chart where we would
12    identify the specific misrepresentations and then identify the
13    parts of the record that we think address those.
14              THE COURT:  You would have to identify the testimony,
15    too.
16              MR. BENNETT:  The testimony --
17              THE COURT:  I don't mean cite to the transcript.  I
18    mean identify -- put the testimony where I can read it all in
19    one document.
20              MR. BENNETT:  So that is what I would imagine.  I
21    imagine all we'd be doing would be --
22              THE COURT:  I understand.  Mr. Scheff, do you agree
23    with that approach?
24              MR. SCHEFF:  Your Honor, I hadn't heard that or Matt.
25    We had talked about short briefs.  That's fine.  We can do
```

1    that.  I have no objection to that.

2            THE COURT:  Now, I think you all followed basically

3    the briefing in the structure of what you were talking about,

4    you were following in your presentations the briefs that you

5    had filed.  I have something I need to get from you all,

6    though.  Maybe you all already know.

7            I've been checking the Fourth Circuit, and I've been

8    checking the other record, and it says that the purchase price

9    for Bellicose was $300 million, and the question I don't know

10   -- Ms. Kelly, I think, asked, she said $300 million, and you

11   objected to it and said that wasn't the price.

12           But the Fourth Circuit has -- and I think -- probably

13   they took that from my opinion.  I didn't go back and check my

14   opinion -- held that the purchase price was $300 million.

15   Aren't we stuck with that as the price for whatever purpose

16   there is or not?

17           MR. SCHEFF:  I don't recall that from the Fourth

18   Circuit opinion.  I'd have to go back and read it.

19           THE COURT:  I read it.

20           MR. SCHEFF:  I have no doubt if Your Honor says that

21   it's in the Fourth Circuit opinion that's what it says.  I

22   believe the document, the sales documents that are in the

23   record use the phrase up to $300 million, because the way the

24   payment works is through a monthly payment, certain monthly

25   payment which is not fixed.  It's variable, and it can be zero.

1          And the note expires at a certain point in time --

2          THE COURT:  Seven years.

3          MR. SCHEFF:  Whether or not the 300 million has been

4     paid or not.  So the way it works is that if $300 million was

5     paid, just by way of hypothetical, within five years, there

6     would be no further payments due under the note.  If you got to

7     the end of the seven years and 30 million had been paid, that's

8     all that would be paid for the business.

9          THE COURT:  Do you agree with that?

10         MR. BENNETT:  Yes, Your Honor.

11         THE COURT:  Then that takes care of that.  What is

12    the evidence of record as to who is it that establishes the

13    loan criteria?  That is, whether Payne, when he calls, can get

14    a loan.  I need to know what the record says about that.  Coach

15    Kelly is summonsing you, I assume.

16         MR. BENNETT:  Probably to sit down, Judge.  She's

17    putting out something unrelated.  Judge, we would have to

18    organize different parts of the record that address that

19    specific point.

20         THE COURT:  I need to know the answer to that

21    question.

22         MR. BENNETT:  Yes, sir.

23         THE COURT:  And that is, somebody has -- by that, I

24    am essentially, I guess, asking for the underwriting factors

25    that govern whether somebody can get a loan.  That, to me, is

1    the loan criteria.

2          MR. BENNETT:  Yes, sir.

3          THE COURT:  That's what I mean by it.  Is it set by

4    Red Rock, Duck Creek Lending, Big Picture, Ascension, TED, Mr.

5    Martorello?  Who sets the criteria by which, when I pick up the

6    phone and dial, I measure up to get a loan or not?  And then

7    the next part of it, is there any variability to that, because

8    there are certain instances, for example if my credit score is

9    800 I can get a loan, but if it's at 700 I can't get a loan,

10   but if I'm willing to pay triple, I can get a loan or pay

11   points.

12         That's how it ordinarily works in the banking

13   industries.  I want to know if there's any variability in the

14   criteria that are set and who is it that has the authority to

15   exercise that criteria.  I need to know that.

16         MR. BENNETT:  We're going to be challenged about the

17   detail with regard to credit score, for example.

18         THE COURT:  I don't mean for you to get into what the

19   credit -- I was using that as an example.  I'm saying, is there

20   anything -- asking is there anything in the record that says

21   here are the criteria that apply to the loans that are going to

22   be made, and, if so, who is it that establishes those criteria,

23   and that is you have to be over 25, you have to have a minimum

24   income of X, you have to have no credit or a credit history of

25   some kind, whatever it is.  I don't know what they are.

1          It may just be that there aren't any criteria.  If

2     you pick up the phone, you breathe, and you are willing to pay

3     600 percent interest, you can get a loan.  I don't know.

4     That's what I'm talking about, is the criteria for the loan and

5     who is it that sets those criteria that the people who are

6     processing the loans actually use to determine whether somebody

7     is or is not going to get a loan.  Do you understand?

8          MR. BENNETT:  I do.  I think we have to address some

9     misconceptions that we've left Your Honor with, that is that

10    there is an individual processing -- an individual as if you

11    might have if somebody applies for a mortgage and you're

12    weighing paper and looking at job, employment data or that type

13    of thing.

14         These are lead-generated loans.  That is, they hire

15    -- in fact, they hire MicroBilt to go find prospective targets,

16    and they prescreen those individuals on criteria that has not

17    been, to my knowledge, revealed in the discovery.

18         THE COURT:  I don't care what the criteria are.  I

19    want to know who sets those criteria.

20         MR. BENNETT:  Yes, sir.  We can present that

21    evidence.  I don't believe it was presented the last two days

22    other than --

23         THE COURT:  No, it wasn't, but it's referred to in

24    some of the papers.

25         MR. BENNETT:  Yes, sir.

```
 1          THE COURT:  Mr. Scheff, did you want to say anything
 2   about that?
 3          MR. SCHEFF:  Not in terms of the details.  We'll comb
 4   the record and provide that information to the Court as well.
 5          THE COURT:  Make a separate filing.
 6          MR. BENNETT:  Yes, sir.
 7          THE COURT:  Caption it something creative or mundane,
 8   but have it -- statement of position respecting loan
 9   origination criteria would be sufficient.
10          MR. BENNETT:  Yes, sir.
11          THE COURT:  The other thing is in those charts that I
12   was asking you to prepare about the corporate entities and
13   trusts and everything, I need to know associated with that what
14   is Mr. Martorello's interest in those particular entities, each
15   particular entity so that I understand where he personally fits
16   in as well to evaluate some of the testimony that's been given
17   here.
18          So those -- in part of your charts you have that to
19   be done.  All right, now, when do you want to submit these
20   summaries or summary charts of evidence based on the record
21   made in the last two days?
22          MR. BENNETT:  Your Honor, may we go off the record
23   for a second?
24          THE COURT:  Yes.
25          (Discussion off the record.)
```

```
 1                 MR. BENNETT:  So if we're able to get the transcript
 2    Sunday, counsel believes ten days --
 3                 THE COURT:  Huh-uh.  Sunday is what day?
 4                 MR. BENNETT:  26th.
 5                 THE COURT:  That puts it into August.
 6                 MR. BENNETT:  Yes, sir.
 7                 THE COURT:  Friday.  You get it Sunday, file it
 8    Friday.
 9                 MR. BENNETT:  Yes, sir.
10                 THE COURT:  That's as far as I'm willing to go on it.
11    We can do some work in the meantime, but Friday is as far as
12    I'm willing to go.
13                 MR. BENNETT:  May we have to that same date to submit
14    the charts and the statement of position as well regarding the
15    underwriting --
16                 THE COURT:  Can you get it earlier?
17                 MR. BENNETT:  We can.  I don't want to throw my
18    opponent under the bus.
19                 MR. SCHEFF:  We can as well, Your Honor.
20                 THE COURT:  It will help me to read and understand
21    what you are doing if I get some of this stuff in increments
22    instead of having to adjust it.  Could you do it on Wednesday?
23                 MR. SCHEFF:  Yes, sir.
24                 THE COURT:  Wednesday will be the charts and the
25    other information that I asked for.
```

1           MR. BENNETT:  Your Honor, next Wednesday?

2           THE COURT:  Wednesday will be the --

3           MR. SCHEFF:  Wednesday, the 29th.

4           THE COURT:  And that will -- you all are agreed on

5    what the purchase price is.  The charts showing the various

6    corporate structures and trusts and Martorello's interest

7    therein will be also on Wednesday, and then the evidence as to

8    who sets the loan criteria statement will be due on Wednesday,

9    and the other chart of what you've accomplished tied to which

10   misrepresentation in these last two days will be on Friday.

11          MR. BENNETT:  Yes, sir.

12          THE COURT:  One other -- here's something I think you

13   all need to focus on and I'm going to need to focus on.  I need

14   to really understand quite clearly what *Breakthrough* factor,

15   what evidence relates to as it pertains to the analysis of the

16   *Breakthrough* factor as presented by the Fourth Circuit, because

17   that's the only way a misrepresentation can keep me from

18   applying the Fourth Circuit's rules.

19          The Fourth Circuit evaluated all of the *Breakthrough*

20   factors, and I've asked, in the original order for this hearing

21   and the run-up papers, I asked that you tell me what was the

22   effect of the misrepresentation on the Fourth Circuit's --

23   applicability of the Fourth Circuit's opinion, and what that

24   really means is -- I'm not quite sure was maybe the best way to

25   say it, but it really is which of the misrepresentations

 1    pertains to which *Breakthrough* factor as analyzed by the Fourth

 2    Circuit or other finding of the Fourth Circuit that you think

 3    it affects, specific finding, and then I have the basis for

 4    making the decision about, A, whether there's a

 5    misrepresentation and whether it pertains to the Fourth

 6    Circuit opinion in such a way as there's some way that the

 7    Fourth Circuit's opinion does not apply, because the way this

 8    whole thing got started, don't forget, is that you all made

 9    these statements that there had been a number of

10    misrepresentations made to me and the Fourth Circuit, and Mr.

11    Scheff said we believe that the analysis, several of the

12    analyses in the motion to dismiss and the other papers are

13    governed by the Fourth Circuit's opinion.

14            And you said, well, that's not the case because the

15    Fourth Circuit's opinion was predicated on something that

16    wasn't true, and, by the way, I think that same scenario

17    occurred in another -- in a Fair Credit Act case you had

18    before.  I think it was *Soutter* where the Fourth Circuit didn't

19    certify a class, sent it back down, and Equifax then admitted

20    that what they told the Court, the Fourth Circuit, was

21    incorrect, because in the proceeding on remand, the deposition

22    was taken that proved that what they had said to the Fourth

23    Circuit wasn't true.

24            And then there's case law in there that discusses

25    what happens in that situation, and, in essence, what it means

 1    is not that you jettison the Fourth Circuit decision, but the

 2    Fourth Circuit decision doesn't have any binding effect because

 3    of the misrepresentation.

 4              Now, in this instance, there isn't any admission that

 5    there was a misrepresentation.  I understand that.  Do you

 6    remember the name of that case that I'm talking about?

 7              MR. BENNETT:  It was *Soutter v. Equifax*, Judge.

 8              THE COURT:  I had a written opinion on that.  I don't

 9    know whether it was published or not.

10              MR. BENNETT:  Yes, sir.

11              THE COURT:  You all both might consult that.  I

12    regard any effort -- I regard it obligatory on a district court

13    to follow the requirements of a Fourth Circuit opinion in a

14    very serious way.

15              MR. BENNETT:  Yes, sir.

16              THE COURT:  So I certainly will require you all to

17    adhere to the rules if I'm not --

18              MR. BENNETT:  Yes, sir.  If I could also note for the

19    Court, of course, that the second argument for why the Fourth

20    Circuit did not dispose of the claims regarding Mr. Martorello

21    is the misrepresentation point.  The first argument is that

22    it's because the Fourth Circuit found something totally

23    unrelated to whether Mr. Martorello is liable which is --

24              THE COURT:  You are talking about the merits of the

25    motion, his motion.

```
 1                    MR. BENNETT:  The motion --

 2                    THE COURT:  To dismiss.

 3                    MR. BENNETT:  To dismiss, to apply the tribal

 4     immunity to a non-tribal defendant.  The Court notes that we

 5     filed in this case our supplemental authority from two Fourth

 6     Circuit decisions yesterday, one of which we were opposite Mr.

 7     Scheff in a different matter, and in both of those decisions,

 8     the defendants were non-tribal entities, and the Fourth Circuit

 9     opinion as written by Justice Agee, or Judge Agee, found

10     that -- and those were arbitration clauses were not enforceable

11     because tribal law did not apply.

12                    They both footnote, footnote one making the

13     distinction between the defendants are not tribal defendants,

14     those individuals have sovereign immunity, but that's not

15     applicable here.

16                    THE COURT:  You say you filed something since then?

17                    MR. BENNETT:  We did.  We filed supplemental --

18                    THE COURT:  This morning?

19                    MR. BENNETT:  This morning, yes, sir.

20                    THE COURT:  Those are Judge Lauck's two cases.

21                    MR. BENNETT:  They are.  One, the appellant was Mr.

22     Hanes, and the other appellant was Sequoia, but both of them

23     were in the Gibbs district court case, and she was affirmed.

24                    THE COURT:  All right.  Anything else, Mr. Scheff?

25                    MR. SCHEFF:  No.  I don't think that Mr. Bennett has
```

1    characterized our position accurately, but we can deal with

2    that in the papers.

3              THE COURT:  That will be dealt with.

4              MR. SCHEFF:  I understand.

5              THE COURT:  What I was trying to direct your

6    attention to is insofar as we're dealing with

7    misrepresentations and the effect of the application of the

8    Fourth Circuit decision to the motion to dismiss, and there's

9    one other pleading, I can't remember what it is, that's been

10   briefed, then there is authority about how that occurs and what

11   can happen and what can't happen.

12             MR. BENNETT:  Judge, respectfully, we have five

13   minutes of counter designations, very short, for two of the

14   depositions that you heard, very, we think, pointed and

15   important testimony in each.

16             THE COURT:  And do you have the designations in

17   written form?

18             MR. BENNETT:  We do.

19             THE COURT:  We'll hear them then.

20             MR. BENNETT:  Yes, sir.

21             THE COURT:  I told you you could do that.  You

22   reserved some time.

23             MR. BENNETT:  I believe we would have as our

24   traveling witness Ms. Austin, and the examining lawyer would be

25   Mr. Dillon.

1                    THE COURT:  That's not on videotape.

2                    MR. BENNETT:  Not on videotape, but they're short.

3                    THE COURT:  What you do is come be sworn and swear

4     truthfully to read -- to read accurately that which is in the

5     deposition transcript that you are reading.  Raise your right

6     hand and put it on the Bible.

7                    Do you swear that you will truthfully and accurately

8     read the deposition transcript that you're about to read?

9                    MS. AUSTIN:  Yes.

10                    THE COURT:  And you're going to give me a copy and

11    the law clerk a copy as well?  Do you have it in writing?

12                    MR. DILLON:  Yes, Your Honor, just one moment.  I'm

13    organizing, getting the papers for you.

14                    THE COURT:  We'll mark it as a plaintiffs' exhibit

15    like we did the defendant.  Is this from one witness or more

16    than one witness?

17                    MR. DILLON:  Three witnesses, Your Honor.

18                    THE COURT:  As soon as we get that all accomplished,

19    we'll make the record straight on that.

20                    MR. DILLON:  Your Honor, in terms of timing, I

21    believe it's hopefully going to be about ten minutes or so.

22    Two of these are fairly short.  One of these we have a couple

23    more designations.

24                    THE COURT:  Who are you reading?

25                    MR. DILLON:  So one counter designation are from the

1 deposition of James Dowd.

2          THE COURT:  What plaintiffs' exhibit is that?

3          MR. DILLON:  This plaintiffs' exhibit -- one moment,

4 Your Honor.  140.

5          THE COURT:  And the next one is?

6          MR. DILLON:  Deposition of Karrie Wichtman.

7          THE COURT:  And that is?

8          MR. DILLON:  141.

9          THE COURT:  And the last one?

10          MR. DILLON:  The deposition of Robert Rosette.

11          THE COURT:  And you have copies of all those to give

12 the clerk.

13          MR. DILLON:  Yes.  I gave the copies.  And the

14 Exhibit 142 for Mr. Rosette.

15          THE COURT:  Yes, I know.

16          MR. DILLON:  I'd like to start with the deposition

17 for James Dowd.

18          THE COURT:  All right.

19          MR. DILLON:  All right.  So our counter designations

20 begin page 17, line six.

21          THE COURT:  Go right ahead.

22          (Deposition transcript of James Dowd read.)

23          MR. DILLON:  Next designation is page 19, line 17.

24          (Reading of deposition resumed.)

25          MR. DILLON:  Your Honor, for our next counter

1   designation on page 75, this is a continuation of defendant's

2   designations.  This is paragraph 17 in defendant's

3   designations.  We're just continuing the next several

4   subsequent lines.

5             THE COURT:  What?  I don't know what you are talking

6   about.  75, line two through four.  "Honestly, I don't work

7   with that specific process very closely, so I think it would be

8   better as to somebody else" is what's on my page.

9             MR. DILLON:  So, Your Honor, the designation here

10  from defendants, this was page 74, line 16, to page 75, line

11  one.

12            THE COURT:  I don't have that.  I have page 75, and

13  line one is not designated at all, and then I have lines three

14  and four.

15            MR. BENNETT:  Your Honor, this is our copy of the

16  defendant's text of what they submitted in the record for Mr.

17  Dowd, and this is a continuation starting at numbered paragraph

18  17.  The next lines after that text are what we are counter

19  designating.

20            THE COURT:  So this counter designates what?  Say

21  what it is.

22            MR. BENNETT:  It's a counter designation expanding --

23            THE COURT:  Here's the thing:  It's a counter

24  designation to the deposition of Dowd put on by the plaintiffs,

25  defendant's exhibit whatever it is, entry number 19, page 82 to

1   whatever it is.  That's what you put into the record and

2   explains -- your counter designation is 75, lines two through

3   four; is that right?

4            MR. BENNETT:  Yes, sir.

5            THE COURT:  That's how you do it.

6            MR. BENNETT:  Yes, sir.

7            THE COURT:  I'm not going to go through all that for

8   you.

9            MR. DILLON:  So beginning with defense designation

10  starting at page 74, line 16.

11           THE COURT:  What exhibit is that?

12           MR. DILLON:  This is exhibit number --

13           MR. BENNETT:  Judge, I don't have the exhibit number

14  for Mr. Dowd's deposition.  328.

15           THE COURT:  What?

16           MR. BENNETT:  This is the counter designation to

17  Exhibit 328 which was Mr. Dowd's original designation, and the

18  two sentences we intend to read, the Court needs to be able to

19  follow what the original text was because we believe that was

20  incorrect.

21           THE COURT:  I have 328 in front of me.  What is this

22  proposed counter designation on page 75 of plaintiff's

23  Exhibit 140, where does it fit?

24           MR. BENNETT:  It continues -- the next sentence after

25  the end of this.  So it says --

1           THE COURT:  No, not this --

2           MR. BENNETT:  Of and all that.

3           THE COURT:  First let's get the entry number.

4           MR. BENNETT:  Entry number 17, numbered paragraph 17.

5           THE COURT:  Hold on.  And that is page 74, line 16,

6     to 75-01.

7           MR. BENNETT:  Yes, sir.  And the defendant stopped at

8     75-01.  We're going to read 75-2, three, and four so it will be

9     complete.

10          THE COURT:  I'm seeing Plaintiffs' Exhibit 140, page

11    75, lines two through four.  Is that right?

12          MR. BENNETT:  Yes, sir.

13          THE COURT:  Now I understand where this fits.

14          MR. DILLON:  If Your Honor would like, I can reread

15    defense designation just to provide context before we provide

16    our counter designation.

17          THE COURT:  I don't know what you are doing.  Your

18    next thing is on page 82.

19          MR. DILLON:  Okay.  For this designation, I'm going

20    to reread from Defendant's Exhibit 328 to provide the context

21    so Ms. Austin can provide our counter designation.

22          THE COURT:  Take the 328 and tell me which entry you

23    are talking about.  It's got bold numbers there.

24          MR. DILLON:  It's entry 17 beginning --

25          THE COURT:  You just did that.

1          MR. DILLON:  Okay.  Then we'll continue -- the reason
2  we wanted to read this was just to give context for this second
3  portion because it was a continuation of the same response.
4          THE COURT:  I understand, and I've made a note to see
5  this particular next thing.
6          (Reading of deposition resumed.)
7          THE COURT:  That is a counter designation to entry 17
8  on DX-328.
9          MR. DILLON:  Yes, Your Honor.
10         THE COURT:  He says essentially what he's talking
11  about in entry 17 he doesn't know about.  All right.
12         MR. DILLON:  Next counter designation is page 82,
13  line one.
14         (Reading of deposition resumed.)
15         MR. DILLON:  Next is page 83, line four.
16         (Reading of deposition resumed.)
17         MR. DILLON:  Page 95, line 16.
18         THE COURT:  There's a whole lot more underscored here
19  on my copy.
20         MR. DILLON:  Your Honor, I think that was a
21  formatting error.  Our designation cuts off on line 14 after
22  "it works."
23         THE COURT:  All right.  Make sure that you mark an X
24  through what you give the clerk.
25         MR. DILLON:  Okay, yes, Your Honor.  Make a note of

1   that.  Next designation, page 95, line 16.

2             (Reading of deposition resumed.)

3             MR. DILLON:  Your Honor, that's the end of our

4   designations from the James Dowd deposition.

5             THE COURT:  All right.

6             MR. DILLON:  Next will be counter designations from

7   Karrie Wichtman's deposition.  I believe that's Exhibit 141.

8             THE COURT:  What's her deposition exhibit?

9             MR. BENNETT:  The original is 327, Your Honor.

10            THE COURT:  All right.

11            MR. DILLON:  Our first designation here, there are a

12  few extra pages at the beginning of the document I handed to

13  the Court.  We're starting on page 212.

14            THE COURT:  What was Mansfield's exhibit number?

15            MR. DILLON:  One moment, Your Honor.

16            THE COURT:  Mr. Scheff, do you know?

17            MR. SCHEFF:  I do, Your Honor.  333.

18            THE COURT:  And Wichtman is 327; right?

19            MR. DILLON:  Yes, Your Honor.  So our first counter

20  designation, page 212, line 13.

21            (Deposition designations of Karrie Wichtman read.)

22            THE COURT:  Wait a minute.  What are you reading

23  from?

24            MR. DILLON:  This is page 212 --

25            THE COURT:  You are talking about from Wichtman?

1              MR. DILLON:  Yes, Your Honor.

2              THE COURT:  First page I have is 161.  The next one I

3       have is page 193.

4              MR. DILLON:  There were some formatting issues with

5       the pages included, so there was some extraneous pages included

6       at the beginning.

7              THE COURT:  I have 184.

8              MR. DILLON:  I believe it's the first five or so

9       pages --

10             THE COURT:  How many?  Give me page numbers.

11             MR. DILLON:  So page two --

12             THE COURT:  161 and then 183 through 186 come out; is

13      that right?

14             MR. DILLON:  Yes.

15             THE COURT:  Everybody takes that out.  Now you want

16      to go back to page 212, you say?

17             MR. DILLON:  Yes, Your Honor.

18             THE COURT:  All right.  I've got that now.  Go ahead.

19             (Reading of deposition resumed.)

20             MR. DILLON:  Next counter designation is on page 229,

21      line 11.

22             (Reading of deposition resumed.)

23             MR. DILLON:  A third designation, counter

24      designations are from the deposition of Robert Rosette,

25      Exhibit 142.

 1          THE COURT:  What is his; number 331?

 2          MR. SCHEFF:  That's correct.

 3          MR. DILLON:  Yes, Your Honor, 331.

 4          THE COURT:  Okay, and yours is PX-142.

 5          MR. DILLON:  Yes, Your Honor.

 6          THE COURT:  That's it?

 7          MR. DILLON:  Yes, Your Honor.

 8          THE COURT:  All right.  Allergies, not COVID.  Is

 9  that it?

10          MR. BENNETT:  Yes, Your Honor.

11          THE COURT:  Is there anything else we need to do?

12          MR. BENNETT:  Not from the plaintiffs' perspective.

13          MR. SCHEFF:  Not from Mr. Martorello's perspective,

14  Your Honor.

15          THE COURT:  Let's go off the record.

16          (Discussion off the record.)

17          THE COURT:  We're discussing the suggestion that

18  choice of law provision needs to be decided, and I need to

19  figure out where it is.  It's pleading number what, 379?

20          MS. KELLY:  Judge, it is --

21          THE COURT:  Come to the lectern, if you would.

22          MS. KELLY:  If the Court recalls, the reason -- part

23  of the reason we had this hearing was because in the briefing

24  leading up to class certification, Mr. Martorello raised the

25  defenses about the effect of the Fourth Circuit on the issue of

1    the class action waiver in his briefing for class

2    certification.

3         And so we briefed that issue, and plaintiffs' brief

4    is ECF 734, and in that brief, the arguments that are made deal

5    with whether the class action waiver provision applies to Mr.

6    Martorello.  It also deals with whether the loan agreements

7    prospectively waive federal law which is why we just filed the

8    supplemental authority brief --

9         THE COURT:  Wait a minute.  Whether the loan

10   agreement prospectively what?

11        MS. KELLY:  Prospectively waives federal law, because

12   the loan agreements require consumers to go through a dispute

13   process under tribal law that we have asserted is --

14   prospectively waives federal law, because the consumers don't

15   have rights and remedies that be would available to them under

16   federal law, because, for example, the tribal code does not

17   allow a consumer certain damages --

18        THE COURT:  Too much information right now.  Your

19   position is that the decisions yesterday from the Fourth

20   Circuit help you in that analysis; is that what you are saying?

21        MS. KELLY:  Yes.

22        THE COURT:  They dealt with arbitration clauses.

23        MS. KELLY:  It did, but in the decision as to the

24   Sequoia defendant, which is the one that we filed, it also

25   dealt with the tribal code, because if a consumer also had to

1   go -- the option, if they opted out of arbitration or if

2   arbitration was unsuccessful, they would have to go through the

3   tribal dispute resolution procedure.

4           THE COURT:  Slow down.

5           MS. KELLY:  Sorry.  They would have to go through --

6   a consumer would have to go through the tribal dispute

7   resolution procedure, and in the case of Plain Green and Great

8   Planes, which are related to the Think Finance enterprise, that

9   tribal dispute resolution procedure was also -- is very similar

10  to the Red Rock/Big Picture tribal dispute resolution

11  procedure, and the Fourth Circuit found that the tribal dispute

12  resolution procedure deprived a consumer of their federal

13  rights and remedies and, essentially, prospectively waived

14  federal law as the arbitration -- analogous to the arbitration

15  prospective waiver doctrine that the Fourth Circuit has, you

16  know, routinely rejected enforcing arbitration on that ground.

17          So we think the language and the Court's analysis

18  looking at the tribal dispute resolution procedure in the Plain

19  Green/Great Plain scenario and finding that the provisions of

20  the rights and remedies available waiving prospective federal

21  law helps our position in this brief.  And we think that once

22  the Court rules on this issue, it is essentially --

23          THE COURT:  Rules on what issue?

24          MS. KELLY:  The issue in ECF 734 with whether or not

25  class, the class waiver is enforceable, because the analysis

1    essentially goes to the very heart of the case regarding choice

2    of law.  It's the same exact analysis, and so that would be the

3    law of the case, and, from our perspective, the summary

4    judgment or -- the loans would be illegal, these would be

5    unlawful debts, and the case would essentially be over in our

6    position.

7            THE COURT:  But what you are asking is for me to look

8    at and rule on the class waiver issue presented in his paper

9    number what discussed in your paper number what and responded

10   to in his paper number what?

11           MS. KELLY:  So Mr. Martorello's brief was ECF 664.

12           THE COURT:  What section of it are we talking about?

13   He has a table of contents, I think, in the front.

14           MS. KELLY:  The brief is addressing the effect of the

15   Fourth Circuit's decision on the motion for class

16   certification.  In section one, Mr. Martorello asserts that the

17   Fourth Circuit decision requires a finding that the class

18   action waiver is valid and enforceable.

19           THE COURT:  All right.  And then you respond to that

20   in?

21           MS. KELLY:  In ECF 734, and we cite multiple reasons

22   why we don't think it is enforceable.

23           THE COURT:  And then you have supplemented that with

24   a citation to one of the two cases yesterday?

25           MS. KELLY:  Mr. Martorello did reply to our response

1    at ECF 781, and then we filed today, Mr. Guzzo filed it, a

2    notice of -- motion for leave to file supplemental authority.

3    It was filed today.

4              THE COURT:  Is there any objection to the motion for

5    leave to file the supplemental authority, Mr. Scheff?

6              MR. SCHEFF:  Your Honor, I haven't seen the motion at

7    all.  I doubt there is, but at least I'd like the opportunity

8    to take a look at the motion.

9              THE COURT:  Seems reasonable to me.

10             MS. KELLY:  Thank you, Judge.

11             THE COURT:  Will you file something Friday, let me

12   know whether you object to it, just that part of it?

13             MR. SCHEFF:  Will do.

14             THE COURT:  Thank you very much.  We'll be in

15   adjournment.

16

17                       (End of proceedings.)

18

19

20             I certify that the foregoing is a correct transcript

21   from the record of proceedings in the above-entitled matter.

22

23

24   _____/s/_____              _____

     P. E. Peterson, RPR                Date

25