IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| LULA WILLIAMS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 3:17-cv-461 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | | |
|---|---|---|
| RENEE GALLOWAY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 3:18-cv-406 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' STATEMENT OF POSITION REGARDING THE
STRUCTURE OF MARTORELLO'S COMPANIES AND FLOW OF FUNDS**

Plaintiffs, by counsel, submit this Statement of Position in accordance with the Court's instructions during the July 22, 2020 Evidentiary Hearing and the Order dated July 23, 2020, requesting "how and through which trusts, corporations, people, or other entities money flows through from the time a borrower makes a payment until the money is distributed to Martorello and others; describing all trusts, corporations, people, and other entities involved in these transactions and how each trust, corporation, person, or other entity relate to each other; and explaining what Martorello's interest, involvement, or relationship is as to each trust, corporation, person, or entity." Pursuant thereto, Plaintiffs state as follows:

## I.      Structure of Martorello's Companies Involved in the Lending Business.

1.      As the Court is aware, Martorello's involvement with tribal lending began when Bellicose VI, LLC and Red Rock Tribal Lending entered a servicing agreement dated October 25, 2011. *See* Pls' Evid. Ex. 11.[1] This agreement was later amended and assigned to SourcePoint VI, LLC *See* Pls' Evid. Ex. 20. From October 25, 2011, through December 31, 2013, Martorello owned 100% of the voting and equity shares of Bellicose VI and SourcePoint VI, albeit through the convoluted structure of shell entities and trusts described below.

2.      As reflected by the attached chart produced in discovery (attached hereto as Ex. 1), the basic structure of Bellicose VI was: (1) 100% of the voting interest, *i.e.*, the member interest was held by Breakwater Holdings, a Cook Islands limited liability company, which is wholly owned by Bluetech Irrevocable Trust (Cook Islands) f/k/a the M. Martorello Irrevocable Trust;[2] (2) 70% of the profit interest in Bellicose VI went to 7X Services, a Delaware limited liability company, which was wholly owned by the Bluetech Irrevocable Trust; and (3) 30% of the profit interest in Bellicose VI went to MBM Services, LLC (Delaware), which was owned directly by

---

[1] Where possible, Plaintiffs cite to the exhibits submitted during the evidentiary hearing.

[2] On June 10, 2011, Martorello changed the name of his trust from the "The M. Martorello Irrevocable Trust" to the "Bluetech Irrevocable Trust." Ex. 2 at Martorello_013306. It is well documented why individuals like Martorello establish trusts in the Cook Islands. John Jennings, Forbes, *4 Ways Wealthy Families Protect Their Assets From Lawsuits* (Feb. 14, 2020) ("an offshore asset protection trust allows you to be both the grantor and a beneficiary. And because these countries do not recognize foreign judgments, plaintiffs that win lawsuits against you in the U.S. would have to retry their cases in the country where the trust is located to collect any damages. That makes it very difficult for U.S. litigants to access assets in offshore trusts."), available at https://www.forbes.com/sites/johnjennings/2020/02/14/4-ways-wealthy-families-can-protect-their-assets-from-lawsuits/#1492a2a36092; Leslie Wayne, *Cook Islands, a Paradise of Untouchable Assets* (Dec. 14, 2013) ("thanks to a recently released trove of documents, it's become clear that hundreds of wealthy people have stashed their money there, including a felon who ran a $7 billion Ponzi scheme and the doctor who lost his license in the Octomom case."), availableathttps://www.nytimes.com/2013/12/15/business/international/paradise-of-untouchable-assets.html.

Matt Martorello.[3] Martorello is the settlor of the Bluetech Irrevocable Trust and the discretionary beneficiaries are Martorello's wife and children. *See, e.g., In Re Eventide Credit Acquisitions, LLC*, Case No. 20-40349-elm, Ruling on Motion to Dismiss Trans. 16:10-12 ("Martorello acknowledged that he is both the Settlor and the Protector of the Bluetech Trust, and that the current Discretionary Beneficiaries are his family members.").

3.       As of June 1, 2013, Bellicose VI wholly owned six subsidiaries, including Alpha One Investments, Alpha Tau Capital, Iron Fence Investments, SourcePoint VI, Green Key Markets. Ex. 1 at Martorello_003106.

4.       Given this structure—all vehicles involved being indirectly owned by Martorello through trust and shell companies—he has repeatedly characterized these companies as his business. *See, e.g.*, Pls' Evid. Ex. 38, Oct. 14, 2013 email from Martorello to Tribal Council ("Below is the beginning of a concept I have to facilitate a transition to LVD of MY businesses.") (emphasis added); *id*. (detailing a transfer of Bellicose VI, SourcePoint VI, 7X Services, Iron Fence Investments); *see also* Pls' Evid. Ex. 123, Martorello's Declaration at ¶ 29 ("Under an October 25, 2011 written servicing agreement ("Servicing Agreement"), a company I owned Bellicose VI, LLC ("Bellicose VI"), provided consulting services to Red Rock.").

5.       On December 31, 2013, changes were made to the structure (Alpha Tau Capital became Bellicose VI's parent and 7X Services dissolved), but none that resulted in any overarching change, *i.e.*, Martorello continued to indirectly own 100% of the voting and profit interests in Bellicose VI and SourcePoint. Ex. 1 at Martorello_003107. On January 1, 2014, Bellicose Capital,

_____

[3] Plaintiffs attach hereto Bellicose VI's operating agreement, which explains the difference between Bellicose VI's two classes of shares. Ex. 3 at 01B Bellicose Priv_3211. The "Membership Interest" are the only class "entitled to vote on any and all matters presented to the Company for Member approval." *Id*. at II(C)(i)(a). The "economic interest" are the class of shares "entitled to the profits, gains, and losses" of Bellicose. *Id*. at II(C)(i)(b).

LLC was created, and 10% of its economic interest were issued to Justin Martorello. Ex. 1 at Martorello_003108; *see also* Ex. 4, Operating Agreement of Bellicose Capital at Martorello_000322 (showing a breakdown and date of issuance of shares). These economic interests came from the 70% economic interest held by Alpha Tau Capital and, thus, Bluetech Irrevocable Trust as its wholly owned parent. Ex. 1 at Martorello_003107 (showing MBM Services continuing to hold 30% of the economic interest as of December 31, 2013).

6.      On July 1, 2014, Brian McFadden, Simon Liang, and James Dowd—the key executives of SourcePoint VI—each received 1.5% of the economic interest in Bellicose Capital. Ex. 1 at Martorello_003109; *see also* Ex. 4, Operating Agreement of Bellicose Capital at Martorello_000322. It is unclear whether the 4.5% came from Alpha Tau Capital/Blue Tech Irrevocable Trust or MBM Services/Martorello. *Compare* Ex. 1 at Martorello_3109 (showing MBM Services continuing to receive 30% as of July 1, 2014); *with* Ex. 4 at Martorello_000322 (showing MBM Services as receiving 25.5% of the economic interest).

7.      Although there were multiple changes between July 1, 2014 and January 26, 2016, this was the basic ownership structure at the time of the sale. *See, e.g.*, Pls. Evid. Ex. 97 at Martorello_4895 (Bellicose Capital's tax return detailing the "[p]ercent of stocks or shares owned" as 85.1% to Matt Martorello, 9.9% to Justin Martorello, 2% to Brian McFadden, and 1.5% to James Dowd and Simon Liang).

8.      In sum, Martorello indirectly owned: (i) 100% of the voting and profit interests in Bellicose/SourcePoint between October 25, 2011, and January 1, 2014; (ii) 100% of the voting and 90% of the profit interest between January 1, 2014, and July 1, 2014; (iii) 100% of the voting and 85% of the profit interest between July 1, 2014 and January 26, 2016.

9.      Eventide, as the "seller" of Bellicose, followed this same basic structure, albeit with new companies created by Martorello to conceal his involvement. *See* Pls. Evid. Ex. 76, Operating of Eventide Credit Acquisitions, LLC at Martorello_004598. More specifically, when Eventide was formed it shares were distributed as follows: (i) 100% of the voting to Kairos Holdings, LLC, (ii) 59.5% of the profit interest to Kairos Holdings; (iii) 25.5% of the profit interest to Gallant Capital, LLC, (iv) 10% of the profit interest to Justin Martorello; and (v) 5% of the profit interest to Brian McFadden (2%), James Dowd (1.5%), and Simon Liang (1.5%). Pls. Evid. Ex. 76 at Martorello_4598.

10.      Similar to Bellicose's structure, the 59.5% profit interest in Kairos Holdings ultimately flows to Bluetech Irrevocable Trust; and the 25.5% profit interest flows to Martorello, who owns 85% of Gallant Capital, directly, and 15%, indirectly. In sum, Eventide's structure is as follows:



**II.   Structure of the Financial Relationship Between Martorello and the Tribe.**

**A.   Between October 2011 and January 2016.**

11.     The financial relationship between Martorello and Red Rock was established by the Servicing Agreement. The initial structure for distributing the money generated by the loans was as follows: (i) Red Rock received 1% of the ***gross revenue*** generated by the loans; (ii) Robert Rosette's company, Tribal Loan Management, received 1% of the ***gross revenue*** generated by the loans; and (iii) Bellicose VI received the ***net profits*** after accounting for advances, expenses, and other costs associated with the business. *See generally* Pls. Evid. Ex. 11, Martorello_26256. This basic structure is established by multiple provisions in the Servicing Agreement.

12.     *First*, the Servicing Agreement establishes a "Tribal Net Profits" provision, which was "calculated by adding the sum of Gross Revenues plus bad debt recoveries minus the sum of charge backs and bad debt charge-offs and multiplying the sum of this amount by two (2) percent calculated on a monthly basis all calculated on a cash basis." Pls. Evid. Ex. 11, Martorello_26263 at § 2.25. In other words, the Tribal Net Profits was essentially 2% of all money collected on the loans (gross revenue + bad debt recoveries) minus all money not paid on the loans (charge backs and charge offs).

13.     The Tribal Net Profits was then split 50/50 between Red Rock and Tribal Loan Management, Robert Rosette's company. Pls. Evid. Ex. 11, Martorello_26275 at § 6.4.1 (establishing that "50% of Tribal Net Profits" goes to Red Rock and the other 50% to Tribal Loan Management); *id*. at § 7.15 (acknowledging that "Tribal Loan Management, LLC has brokered the transaction" and it will "be paid directly" by Bellicose VI out of the money collected each month from consumers).

14.     *Second*, the Servicing Agreement establishes a "Servicing Fee" to be paid to Bellicose VI, which was a "performance-based fee equal to that amount remaining after payment of Tribal Net Profits, Servicer advances, all Servicing Expenses and any principal or interest on borrowed funds in accordance with Section 6.4." *Id*. at § 3.5.1. In other words, Bellicose VI received the net profits of the lending enterprise, *i.e.*, the net income of the enterprise minus expenses, interest, etc.

15.     In July 2012, Martorello raised concerns about the split between Red Rock and Tribal Loan Management complaining that "TLM shouldn't be profit sharing like an owner." Pls. Evid. Ex. 18 at Rosette_Revised 046397. This component "really [was] an issue to" Martorello, who believed TLM's revenue share put his "capital lent at risk." *Id*. He thought it was "very important we remove TLM as a 'profit sharing 50% of retained earnings broker' because it sounds like '50% owner,'" which "negates the entire tribal owned component that makes [him] as financer/servicer feel like [he was] safe." *Id*.

16.     Within a month of Martorello's objection, Rosette and LVD agreed to recharacterize the broker's fee pursuant to a "Side-Letter Agreement" dated August 1, 2012. Pls. Evid. Ex. 22. Rather than paying the "broker's fee," LVD paid a flat-fee of $960,000.00 to TLM for "professional services from June 2011 through July 2012," including "the development of all Tribal Consumer financial services laws and associated regulatory framework for review and consideration by Tribal client." Pls. Evid. Ex. 22. This amount was paid in $40,000.00 installments from September 2012 through August 2014. *See* Pls. Evid. Ex. 21.

17.     On July 31, 2012, Red Rock then entered into an Amended and Restated Servicing Agreement with SourcePoint VI, which removed the reference to the broker's fee but otherwise

kept the financial arrangement the same. *See generally* Pls. Evid. Ex. 20. This agreement remained in place until the closing of the restructure in January 2016.

### B. Between January 2016 and the present.

18.     As part of the restructure, Tribal Economic Development Holdings, LLC "purchased" Bellicose's assets in exchange for a $300,000,000.00 promissory note to Eventide, which sunsets after 7 years. Much like the previous structure, the Promissory Note requires TED to pay to Eventide the "Net Cash Available" at the end of each month, as well as 1.8% interest on the Promissory Note. Ex. 5, Martorello_129 at 1.1(e). The term Net Cash Available is defined as "Gross Revenues deposited in [TED's] and Subsidiaries' accounts" minus: (1) a "monthly distribution to the Tribe equal to two percent (2%) of the Gross Revenues;" (2) a "one-time reinvestment amount equal to $1.3 million dollars ($1,300,000), and a monthly reinvestment amount thereafter of two percent (2%);" and (3) interest, expenses, and reserves. *Id*. at § 1.2(a)-(b)(1)-(6). In other words, TED and Eventide's financial relationship mirrored the prior structure other than the additional 2% reinvestment amount that must be used by TED to grow the portfolio.

19.     On January 1, 2017, the parties entered into an addendum to the Promissory Note, amending the "monthly distribution to the Tribe" to "three percent (3%) of the Gross Revenues." *See* Ex. 6 at LVD-DEF0006281. This essentially means that Eventide receives—much like Bellicose and SourcePoint—the net profits of the lending business minus the 5% of the net revenue (3% monthly distribution and 2% reinvestment) taken off the top that goes to the Tribe.

### C. Flow of Money from Consumer Payment through Distribution.

20.     Prior to the restructure, Bellicose VI/SourcePoint collected all payments from consumers and deposited them into a bank account in Red Rock's name. In particular, the Servicing Agreement provides:

> **4.9    Daily Deposits to Bank Account.** The <u>Servicer shall collect all gross revenues</u> and other proceeds connected with or arising from the operation of Enterprise and all other activities of Enterprise and <u>deposit proceeds daily into a bank account</u> established under Section 4.4 consistent with Paragraph 3.5.1 herein, except as to any restrictions on cash deposits imposed by the local bank.

Pls. Evid. Ex. 11 at Martorello_26273 (emphasis added);[4] *see also* Pls. Evid. Ex. 20 at Martorello_003491 (same provision in Amended Servicing Agreement).

21.     Martorello's companies had  "sole signatory and transfer authority over" this bank account.  Pls. Evid. Ex. 11 at Martorello_26270. And each month, it was entitled "to sweep" Red Rock's bank account into Bellicose's account for the payment of its servicing fee. Pls. Evid. Ex. 11 at Martorello_26265. In particular, the Servicing Agreement provides:

> **3.5.1    Servicing Fee.** The Parties hereto have agreed that the success of the business is based in large part upon the services provided to the Enterprise by the Servicer. As a result, Enterprise has agreed to a performance-based fee equal to the amount remaining after payment of Tribal Net Profits, Servicer advances, all Servicing Expenses and any principal or interest on borrowed funds in accordance with Section 6.4. The Servicing Fees shall be paid monthly, with the Servicer having the ability to sweep Enterprise bank account amounts into Servicer's bank accounts, on or before the fifteenth (15th) day of the ensuing month.

22.     From October 2011 through January 2016, the total amount distributed to the LVD pursuant to this formula was ███████—without accounting for the amounts paid to Tribal Loan Management. Ex. 7 at Martorello_028715 at pg 4.[5] By contrast, the "total payments to MM/Trust" was ███████. *Id*. at pg. 4. However, this does not account for all monies—some of which were characterized as "operating costs"—received by Martorello pursuant to the scheme or the

---

[4] The Servicing Agreement defines Red Rock Tribal Lending as the "Enterprise" and Bellicose VI as the "servicer." Pls. Evid. Ex. 11 at Martorello_26259.

[5] Tribal Loan Management received $960,000, as well as 50% of the distributions between January 2012 and July 2012. The total distributions during that time were ███████████ and, thus, Tribal Loan Management received approximately ███████ of the distributions.

distributions to Justin Martorello, Brian McFadden, Simon Liang, and James Dowd. In reality, the total amount received by Bellicose VI and SourcePoint VI was at least ██████████ during this time. Ex. 8, Interrogatory # 2.[6] ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████.

████████████████████████████████████████████████████████. Ex. 7

at Martorello_028715 at pg 4 (assigning a 90/10% ratio).

23.     After the restructure, the collection responsibilities were transferred to Ascension. *See* Pls. Evid. Ex. 106 at LVD-DEF00002342 ("The Servicer shall insure that gross revenues and other proceeds connected with or arising from the operation of Enterprise and Subsidiaries are deposited daily into Enterprise and/or Subsidiary bank accounts pursuant to applicable lockbox agreement and deposit control agreements in effect under Section 4.4 except as to any restrictions on cash deposits imposed by the local bank."). Ascension, in turn, is contractually controlled by McFadden (a minority shareholder of Eventide), thereby ensuring continued non-tribal control over the bank accounts and collections. *See* Pls. Evid. Ex. 103.

24.     Due to the discovery cutoff associated with jurisdictional discovery related to sovereign immunity, as well as the appeal thereof, Plaintiffs do not have any documents from the Tribal Defendants after December 2017. In addition, a dispute has arisen between Eventide and the Tribal Defendants regarding the proper amounts due under the note. That being said, Eventide's bankruptcy schedules showed significant distributions to Eventide's shareholders

---

[6] By way of one example, SourcePoint directly contracted with the call center in the Philippines. This call center charged $5.60 an hour, but SourcePoint billed "$14.50 an hour" and thus creating an additional operating cost of "$120k every two weeks." Pls. Evid. Ex. 115 at Martorello_011446. By way of another example, Bellicose VI owned Iron Fence VI who provided the capital to Red Rock to make the loans in exchange for a 30% interest rate on the capital loaned. *See* Ex. __ at Martorello_8306. This interest was an "operating cost," some of which was kicked back to Martorello through his ownership of Iron Fence.

between February 2018 and January 2019. Ex. 9 at pg. 12. For example, Breakwater Holdings, LLC received close to $9.6 million in distributions and Gallant Capital, LLC received close to $2.25 million in distributions. *Id*. In addition, a document produced by Martorello shows a total of ███ million dollars in distributions to Eventide's shareholders between January 2016 and April 2017. Ex. 10 at Matorello_0003954. Based on the similarities between the formulas (*i.e.*, 2% premerger v. 5% post-merger), it is clear that Martorello continues to receive the vast majority of the profits associated with the lending enterprise.

Respectfully submitted,
**PLAINTIFFS**

By:_____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
*Counsel for Plaintiffs*

Leonard A. Bennett, Esq., VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of July, 2020, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system which will send a notification of such filing (NEF) to all counsel of record.

By:_____*/s/ Kristi C. Kelly*_____

Kristi C. Kelly, Esq., VSB #72791
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
*Counsel for Plaintiffs*

12