IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LULA WILLIAMS,
et al.,

     Plaintiffs,

v.                    Civil Action No. 3:17cv461

BIG PICTURE LOANS, LLC,
et al.,

     Defendants.

---

RENEE GALLOWAY,
et al.,

     Plaintiffs,

v.                    Civil Action No. 3:18cv406

BIG PICTURE LOANS, LLC,
et al.,

     Defendants.

## MEMORANDUM OPINION

In _Williams, et al. v. Big Picture Loans, LLC, et al.,_ 3:17cv461 (E.D. Va.) ("_Williams_"), _Renee Galloway, et al. v. Big Picture Loans, LLC, et al.,_ 3:18cv406 (E.D. Va.) ("_Galloway I_") and _Renee Galloway, et al. v. Martorello, et al.,_ 3:19cv314 (E.D. Va.) ("_Galloway II_"), the Plaintiffs filed three similar, but in some respects substantively quite different, actions arising out of a so-called "Rent A Tribe" scheme allegedly orchestrated by Matt Martorello ("Martorello"), members of his family, companies

that he controls, and investors who allegedly funded the scheme (the "Martorello Defendants").  Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, Inc. ("Ascension") (collectively sometimes referred to as the "Tribal Defendants") are entities formed under the tribal laws of the Lac View Band of Lake Superior Chippewa Indians ("LVD").  Big Picture and Ascension are also defendants in Williams and Galloway I, and both entities are alleged to be implicated in the Rent A Tribe scheme that lies at the core of the Plaintiffs' claims on those cases.

In Williams, Big Picture and Ascension claimed to share LVD's sovereign immunity and, on that basis, those entities sought dismissal of the case against them.  This Court rejected that argument.[1]  On appeal, the United States Circuit Court of Appeals for the Fourth Circuit[2] held that Big Picture and Ascension were entitled to the protection of LVD's sovereign immunity.[3]

---

[1] Williams v. Big Picture Loans, LLC, 329 F.Supp.3d 248 (E.D. Va. 2018).

[2] Williams v. Big Picture Loans, LLC, 929 F.3d 170 (4th Cir. 2019). In so ruling, the Fourth Circuit made clear that its decision does not affect the merits of the Plaintiffs' claims.  Id. at 185.  It appears that the Fourth Circuit relied on this Court's findings of fact, finding no clear error in those findings.  Williams v. Big Picture Loans, LLC, 929 F.3d at 177.

[3] Those entities also claimed sovereign immunity in Galloway I. Big Picture, Ascension and many other defendants since have reached a class action settlement of Williams, Galloway I, and Galloway II that was filed in yet another case, Renee Galloway, et al. v. James Williams, Jr., et al., 3:19cv470 (E.D. Va.) ("Galloway III").  That

2

Following the decision of the Fourth Circuit in <u>Williams</u>, the Court directed that the parties file Statements of Position explaining, how, if at all, the decision of the Fourth Circuit affected these proceedings and pending motions (ECF Nos. 599 and 601).[4]   In his Statement of Position, Martorello argued that the holding that Big Picture and Ascension are protected from suit by LVD's sovereign immunity has substantive and procedural consequences that necessitate dismissal of the case against them. MARTORELLO'S STATEMENT OF POSITION PURSUANT TO ECH NOS. 599 & 601 (ECF No. 613).   In their response to MARTORELLO'S STATEMENT OF POSITION PURSUANT TO ECH NOS. 599 & 601, the Plaintiffs asserted, <u>inter</u>   <u>alia</u>, that Martorello and others made material misrepresentations to this Court and to the Fourth Circuit about the facts pertaining to sovereign immunity and that, as a result, the Fourth Circuit's decision on that issue cannot be relied on by Martorello.  PLAINTIFFS' RESPONSE TO MATT MARTORELLO'S STATEMENT OF POSITION (ECF No. 624).  This Memorandum Opinion addresses the alleged misrepresentations and their effect in these proceedings.[5]

---

settlement has been preliminary approved and a hearing on a motion for final approval is set for December 15, 2020.

[4] Although this ORDER was not entered in <u>Galloway I</u>, the parties have briefed the misrepresentations issues in the same way as in <u>Williams</u>.

[5] There are pending other motions in which the parties take the same positions.

## BACKGROUND

The facts of <u>Williams</u> and <u>Galloway I</u>, insofar as they pertain to <u>Martorello</u>, have their genesis in the efforts of so-called payday lenders to evade state usury laws by using, as loan conduits, national banks, which, by virtue of the National Bank Act, 12 U.S.C. § 85, are exempt from the interest rate caps set by state laws.  Under those arrangements, the payday lenders funded, serviced, and collected loans that were nominally made by the national banks which received a small payment in return for fronting the loans.  Those schemes were known commonly as "Rent A Bank" schemes.  The payday lenders had to abandon Rent A Bank schemes when federal regulators intervened and put a stop to them.

When that happened, payday lenders then segued into the so-called "Rent A Tribe" scheme.  This new device to evade state usury laws used Native American tribal entities (rather than banks) as the nominal lender in an effort to cloak the payday lenders in the sovereign immunity of Native American tribes, and, in so doing, to preclude enforcement of the interest rate caps in state usury laws. <u>Nathalie Martin & Joshua Swartz, The Alliance Between Payday Lenders and Tribes:  Are Both Tribal Sovereignty and Consumer Protection at Risk?</u>, 69 Wash. & Lee L. Rev. 751, 785 (2012).

In 2008, Martorello became involved in payday lending using a company called MMP Finance and an internet domain

4

(www.peppercash.com, ECF No. 784, Ex.3; Ex. 4)  The interest rates on those loans would be usurious under state laws in the United States.  Therefore, the loans were to be governed by the laws of Costa Rica.  Later, in 2011, Martorello became interested in the tribal lending concept.  That, in turn, led him to the LVD and to the formation of Red Rock Tribal Lending ("Red Rock") and Duck Creek Tribal Lending ("Duck Creek").

Many of the alleged misrepresentations made by Martorello and others pertain to the formation and operation of Red Rock and Duck Creek.  Although Red Rock and Duck Creek are not parties to these actions, they later were supplanted by Big Picture and Ascension in the Rent A Tribe scheme at issue in <u>Williams</u> and <u>Galloway I</u>. Thus, why and how they were formed, how they were operated, and what happened to them are material matters in assessing the claims made against Martorello and the Tribal Defendants in these cases.

With this background in mind, it is necessary to identify the alleged misrepresentations and then to determine whether the record shows that the allegations of misrepresentation have been proved.  Thereafter, the Court will undertake to assess the consequences that flow from any proven misrepresentation.

## THE ALLEGED MISREPRESENTATIONS

The charge that material misrepresentations of fact have been made to a Court in pursuit of a favorable ruling is a most serious

matter.   Therefore, the Plaintiffs were ordered to specify the alleged misrepresentations and to submit proof in support of their assertions.   A number of filings were made as a result of those orders.[6]   In addition to the briefing, the parties presented documentary and deposition evidence and in-person testimony at an evidentiary hearing.   Supplemental briefs were filed (MATT MARTORELLO'S SUPPLEMENTAL BRIEF REGARDING ALLEGED MISREPRESENTATIONS, ECF No. 907 in <u>Williams</u>; ECF No. 562 in <u>Galloway I</u>; PLAINTIFFS' SUPPLEMENTAL MEMORANDUM SUMMARIZING ADMITTED EVIDENCE AT JULY 21 and 22, 2020 MISREPRESENTATIONS HEARING, ECF No. 910 in <u>Williams</u>; ECF No. 566 in <u>Galloway I</u>).[7]

---

[6] In <u>Williams</u>, those filing are the redacted and sealed versions of PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL MISREPRESENTATIONS AND OMISSIONS MADE TO THE COURT (ECF Nos. 784 and 788, respectively) and 98 exhibits thereto.   Three of the exhibits were sealed (ECF No. 788-1, 788-2, and 788-3), but have been removed from seal.   In <u>Galloway I</u>, that pleading is ECF Nos. 432 and 436, respectively.   The sealed exhibits are 436-1, 436-2, and 436-3.

[7] In this Memorandum Opinion, the citation to the Plaintiffs' initial statement will be to the unredacted version (ECF No. 788).   However, the Plaintiffs filed their supporting exhibits with the redacted version of their Statement which is ECF No. 784.   Because of limitations in the CM/ECF System, it was necessary to file the first batch of exhibits as ECF Nos. 784-1 through 784-50.   The second batch was filed under ECF No. 785 and are ECF Nos. 785-1 through 785-48.   The exhibits are all referred to in ECF No. 788 only by number, without regard to whether the exhibit was filed with ECF No. 784 or 785.   For convenience, the Memorandum Opinion uses ECF No. 788-1, No. 788-2, etc.

The alleged material misrepresentations were claimed to have been made by Martorello and others in support of the Tribal Defendants' Motion to Dismiss which the Fourth Circuit held should have been granted on the assertion of tribal sovereign immunity. According to the Plaintiffs, the misrepresentations "were designed to deliberately and materially mislead the Court" and to create a fictious storyline designed to convince this Court and the Fourth Circuit that:

> (1) the Lac Vieux Desert Band of Lake Superior Chippewa Indians ('LVD') created Red Rock to 'learn the lending industry;' (2) Red Rock was 'managed by appointed LVD members and under the control of the LVD Council;' (3) LVD 'had acquired years of knowledge and business acumen related to the online lending industry,' thereby prompting it to purchase Bellicose 'to begin in-housing services;' and ultimately, '[t]hrough Ascension, LVD would be able to 'in-house' many of the activities previously performed by its third-party vendors, including Bellicose, resulting in significant cost savings and efficiencies.'

PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL MISREPRESENTATIONS AND OMISSIONS MADE TO THE COURT (ECF No. 788, p. 1).[8]

---

[8] There is no allegation that counsel of record for Martorello or the Tribal Defendants with Troutman Pepper Hamilton Sanders LLP, Christian & Barton, LLP, Spotts Fain PC, or Armstrong Teasdale LLP were knowledgeable of the misrepresentations discussed herein, and the record shows no indication that any lawyer with those firms knew that what was being asserted by Martorello and Hazen were misrepresentations.
(footnote continued on next page)

The plaintiffs identified several misrepresentations, four of which have become the focus of the evidentiary hearing and the briefing.   They are:

    1.   Misrepresentations About Martorello's Involvement in the Creation of Red Rock

    2.   Misrepresentations About the Control of Red Rock's Lending Operations

    3.   Misrepresentations About How and Why Bellicose was Sold to LVD

    4.   Misrepresentations About the Creation of Big Picture

Each asserted misrepresentation will be examined in turn.

**1.  Martorello's Involvement In The Creation Of Red Rock**

Martorello filed a declaration in support of the Tribal Defendants' Reply in Support of the Motion to Dismiss (ECF No. 106-1 (Plfs Ex. 103) in <u>Williams</u>).   Therein, Martorello swore that "I was not involved in the creation of Red Rock, but made aware Red Rock had been formed."   <u>Id.</u> ¶ 17.   The Tribal Defendants made the same argument to this Court and to the Fourth Circuit.   (ECF 784, in <u>Williams</u>, Ex. 9, Reply Brief, at 10, note 7.)   "The Tribe

_____

  The record contains documents from Martorello to lawyers in Rosette LLP (some of whose partners or associates are counsel of record) and from lawyers in that firm to Martorello that are pertinent to some of the alleged misrepresentations.   However, plaintiffs do not allege that lawyers in Rosette LLP who are counsel of record were knowledgeable of the alleged misrepresentations.

approached Martorello in 2011 after independently deciding to explore tribal lending, not the other way around." Id.

The record shows that, contrary to these representations, Martorello was heavily involved in the creation of Red Rock. To begin, Martorello's legal counsel prepared the documents for the formation of Red Rock, and Martorello reviewed those documents for substantive comment. (July 21, 2020 Hearing Tr. pp 51-52); see also Plfs Hearing Ex 3 (Martorello wrote that he would "like to keep the legal documents all completed and ready for signature ASAP. Then on that week in Sept. we can execute the agreements with an October 1 launch date." (Plfs Hearing Ex. 5) Additionally, before the Red Rock formation documents were executed, counsel for the Tribe, Karrie Wichtman, sent to Martorello's attorney, Jennifer Weddle, a copy of the proposed Tribal resolution to review and asked for any changes that Weddle wanted to make. Martorello reviewed and commented on these documents as well.

The record is clear that Martorello actually selected the name "Red Rock." (ECF No. 788, Ex. 10) ("Matt has indicated that the intended tribal LLC should be established as 'Red Rock Lending, LLC,' a tribal entity.") See also ECF No. 788, Ex. 11 in which "Martorello was told that he could name the tribal entity." Thereafter, Martorello sent an email stating "I like the name Red

Rock Tribal Cash, LLC (or Corp.)" (ECF No. 788, Ex. 12). At the July 21-22 evidentiary hearing, Martorello admitted that he had picked the name "Red Rock." July 21, 2020 Hearing Tr., p. 41.

Martorello's declaration clearly stated that he "was not involved in the creation of Red Rock . . . ." (Martorello Decl. ¶ 17) The word "involved" is defined as "having a part in something; included in something." INVOLVED, Merriam-Webster, https://www.merriam-webster.com/dictionary/involved. The facts that Martorello's counsel prepared the formational documents for Red Rock and that Martorello reviewed them before they were sent to LVD Tribal Council for approval, and the fact that Martorello chose the name "Red Rock" show that his representation that he "was not involved in the creation of Red Rock" is not true.

The record reflects also that Martorello was involved in the formation of Red Rock in an even more fundamental sense, contrary to assertions made in his affidavit on which this Court relied in making its decision. In particular, in Martorello's affidavit there is a subheading entitled "**LVD Approached Martorello in 2011 to assist them create and grow online lending businesses.**" The first paragraph under that heading says: "In mid-2011, I learned that LVD had identified me as a potential consultant." Then, in the next paragraph (15), Martorello swore that, "[b]efore LVD

approached me in 2011, I was not familiar with the issues of Indian sovereignty."

The record demonstrates that those representations simply were not true. In fact, the record shows that Martorello sought out a connection with the LVD so that he could get into the Tribal lending business.

Joette Pete, former Vice-Chairman of LVD, testified that the "Tribal Council was approached by Matt Martorello with an opportunity to participate in a lending business." (July 21, 2020 Hearing, Plfs Ex. 129, August 20, 2019 Declaration of Joette Pete and its exhibits). Scott Merritt confirmed Pete's declaration when he testified that Martorello was the one who reached out to him seeking a Tribal connection for his lending business. (July 21, 2020 Hearing Tr., Plfs Ex. 139, Merritt's Dep 32:7-23) The record is clear that, Merritt, who had long been a proponent of the Tribal lending model, was sought out by Martorello and asked to give Martorello an introduction to a Tribe so that Martorello could enter the Tribal lending business. To that end, and at Martorello's request, Merritt introduced Martorello to Rob Rosette, a lawyer who was known as a "matchmaker" who put potential lenders together with Indian tribes. Merritt's testimony on that score illustrates the point.

11

> Question: Okay.  So what made you – what led you, then,
> to introduce him [Martorello] to Mr. Rosette?
>
> Answer:   Just his - [Martorello's] interest in working
> with the Tribe.  I knew Rob – Rob's a very
> well known attorney in that space.

Id.  At the time of that introduction, Merritt had not been told
by Rosette or Ms. Wichtman (the LVD lawyer) or anyone else that
"LVD was interested in finding a service provider."  Merritt's
testimony further undercuts Martorello's assertion that the Tribe
approached him with respect to an existing Tribal lending business.

> Question: So if Mr. Martorello said that, Scott Merritt
> approached me indicating that he represented
> the Tribe, that would be inaccurate; right?
>
> Answer:   Inaccurate.
>
> Question: And it would also be inaccurate if – that,
> Scott Merritt told Mr. Martorello that the LVD
> was involved in the -- in an online lending
> business and was looking for a servicer?
>
> Answer:   Inaccurate as well.
>
> Question: Okay, and it also would be inaccurate that you
> told him [Martorello] the LVD had a Tribal
> code and was set to make loans?
>
> Answer:   Inaccurate.

July 21, 2020 Hearing, Plfs Ex. 139, Merritt Dep. at 92:16-93:3.

The  testimony  of  Pete  and  Merritt,  supported  by  the
documentary record, demonstrate that this Court incorrectly found
that there was a lending operation underway when the Tribe was put

in touch with Martorello and that the Tribe had identified Martorello as a potential consultant.[9]

## 2. Misrepresentations About the Control of Red Rock's Lending Operations

Previously, the Court held that "the company [Red Rock] was managed by two members of the Tribe and the Tribe was Red Rock's sole member." <u>Williams</u>, 329 F. Supp.3d at 255. Martorello also asserted that Red Rock's co-managers were ultimately responsible for all decisions regarding Red Rock's operations (ECF No. 106-1, ¶ 22). In pressing their motion to dismiss on the basis of sovereign immunity, the Tribal Defendants argued that Red Rock's managers made all final decisions about operations and that Martorello was a consultant. And, the Court accepted those representations in making findings about the control of Red Rock, relying principally on Martorello's affidavit.

Considered as a whole, Martorello's affidavit and the position of the Tribal defendants on the issue of sovereign immunity are premised on representations that the Tribal entities controlled LVD's lending operations. The record disproves those representations.

---

[9] Those findings were based on misrepresentations made in Martorello's declaration, ¶¶ 14, 15 and 17, and were argued by the Tribal Defendants in seeking dismissal of the case against them.

At the outset, it is appropriate to note that, contrary to what was represented to the Court, at the time of the initial formation of Red Rock, Martorello understood that his company, Bellicose, would operate the lending business in which Red Rock was to be engaged completely and that the "Tribe's managers are not involved in the business." July 21, 2020 Hearing, Plfs Ex 4, August 26, 2011 email correspondence between M. Martorello and R. Richardson; see also July 21, 2020 Hearing Transcript, 54:14-19.

The rather meaningless role played by the Tribe's co-managers is manifest in an email exchange between Martorello and the Tribe's lawyers, wherein Martorello refused to respond substantively when the Tribe asked him to identify what the co-managers were being asked to approve. A part of that exchange illustrates how little the Tribe's managers knew when the Tribe's lawyers posited a number of questions that needed to be answered so that the Tribe's managers could understand the lending operation and what the lawyers were asking them to approve. (July 21 Hearing Ex. 56).

Evidence at the July 21 hearing also established the very limited involvement of the Red Rock employees in the lending operation. Specifically, what they did was: to verify the bank data submitted by borrowers, ascertain whether the borrowers were employed, and to determine whether the bank account was really the borrower's bank account. July 21, 2020 Hearing Tr. 59:23-60:1.

Neither the establishment of the actual underwriting criteria for making the loans nor the decision actually to make them (or not) was done by the Tribal entity or by its employees.

Joette Pete, Vice-Chairman of the LVD Tribal Council, explained that, while she was on the Tribal Council (from 2010 to 2016), Martorello operated the Tribe's lending business. She said:

> after the inception of the business, it was operated completely by Martorello until Government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement but the Tribe had no substantive involvement.

Plfs Ex. 126, at ¶ 4, July 21, 2020 Hearing (emphasis added).

Collection of the consumer loans was a key component of the lending operation. Martorello swore that neither he nor his company ever collected any consumer loan originated by Red Rock. In particular, in paragraph 26 of his declaration, Martorello swore that:

> I have never taken any action to collect, in whole or in part, any consumer loan originated by Red Rock. No company I own or manage has ever taken any action to collect, in whole or in part, any consumer loan originated by Red Rock.

ECF No. 106-1, p. 5, ¶ 26 (emphasis added). That statement is squarely at odds with the Servicing Agreement which, in paragraph 4.9, provides that the servicer shall collect all the gross

revenues.   The servicer was Bellicose, a company owned and controlled by Martorello.

At the evidentiary hearing it was established that money paid by consumers went into the Bellicose bank account over which only Martorello and his employees had control and access.   That, of course, is collection under the plain meaning of the word.

At the evidentiary hearing Martorello attempted to justify the statement in paragraph 26 of his declaration by saying: "What I meant was that we did not take or receive any cash from the consumer."   That is a fascile, unconvincing explanation, considering that there is no evidence that any consumer ever delivered cash to satisfy a payment obligation.   Nor is there evidence that the Servicing Agreement established a cash collection system.[10]   Moreover, the Court is constrained to conclude that Martorello's demeanor and conduct when answering questions on this topic of the evidentiary hearing compels the conclusion that Martorello was not telling the truth and that, in fact, contrary to the affidavit, Bellicose collected the consumer loans originated by Red Rock.

The initial draft of the Servicing Agreement reflected the following:

---

[10] And, considering that the borrowers lived all over the country, it is illogical to believe that payments could have been made in cash.

> It is the Party's intentions [sic] that all <u>business and [sic] affairs in connection with day-to-day operation, management, and maintenance</u> [of Red Rock] including the establishment of operating days and hours, <u>shall be the responsibility of the servicer [Bellicose</u> which is controlled by Martorello].

(ECF No. 788, Ex. 15) (emphasis added).   Although Martorello insisted on taking the word "management" out of the agreement, the concept embodied in that email was, in fact, the way that Red Rock operated.   This was confirmed by the testimony of LVD's Vice-Chairman, Pete Joette, (who was on the Tribal Council from 2010 to 2016).   Pete testified:

> <u>For Martorello to be able to claim that LVD law applied</u> to the consumer loans, the deal required that Red Rock 'originate' the loans. But this responsibility was immaterial because Red Rock would have no reason to reject a loan that satisfied Martorello's lending criteria <u>because Martorello ran the business and bore all the risk</u>.   After the inception of the business, it was <u>operated completely by Martorello</u> until government regulators and litigation against competitors began.   As these cases proceeded, <u>efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement</u>.

July 21, 2020 Hearing, Plfs Ex 129 at ¶ 4 (emphasis added).   Several years afterward, in explaining the role of the managers (Hazen and Williams), Martorello confirmed that to be the case, saying that, "[a]s far as I know, <u>the Managers' [sic] don't really do anything</u>." (ECF No. 788, Ex 14, emphasis added).

At this point, it is appropriate to note that Bellicose assigned the Servicing Agreement between it and the Tribe to SourcePoint VI ("SourcePoint"), a wholly owned subsidiary of Bellicose.  And, it is important to understand that the key to the operation of the lending business was the intellectual property (sometimes called the "special sauce") which Martorello's company kept for itself.  That intellectual property was the basis for underwriting loans, the heart of the lending operation.  The record shows that the intellectual property was kept by Martorello's company, Sourcepoint, and was not known by, or available to, the Tribal entities that nominally were making the loans at issue.

Martorello, who had controlling interest in Bellicose, told Wichtman:

> Remember when we started that [] all of these vendors and systems were 'tied internally within SourcePoint's systems' behind the scenes. . . . the vendor contracts and formulas used [were are] very closely guarded internal IP and <u>entirely unobtainable" by Red Rock</u>.

(ECF No. 788, Ex. 8).  The "formulas used" referred to the formulas for underwriting recommendations.

As Martorello made clear, this intellectual property was quite valuable to Bellicose/SourcePoint (Martorello companies running the LVD lending operation) and was "guarded" and "unobtainable" to Red Rock.  Without access to those formulas that

established the underwriting criteria, there would be no way for Red Rock's managers meaningfully to participate in the lending process. And, even though in 2014, Martorello had explained quite clearly that this intellectual property was closely guarded and unobtainable by the Tribal entities or managers, in his declaration, he said quite the contrary:

> [u]nder the Servicing Agreement, Red Rock paid SourcePoint to develop underwriting criteria to recommend for implementation by Red Rock. SourcePoint did not simply implement these underwriting criteria on behalf of Red Rock, but instead presented the underwriting criteria to Red Rock's co-managers for their evaluation and ultimate approval or rejection.

ECF No. 106-1 at ¶ 45.

And, later Martorello represented that:

> [n]either I nor Bellicose have 'controlled' any underwriting criteria used by and of LVD's lending businesses—at all times the LVD business retained full control over the underwriting criteria used to make loans.

ECF No. 106-1 at ¶ 101 (emphasis added).

The close guarding and unobtainability of intellectual property developed by SourcePoint, as described by Martorello in the written record, is also entirely at odds with his assertion in his declaration that "LVD received and retained the significant additional economic value of ownership of all intellectual property developed under the agreement by SourcePoint." That

simply did not happen.  In other words, Martorello misrepresented the pertinent facts.

The Tribal Defendants and Martorello claimed that "Red Rock consulted with Bellicose about day-to-day operations, but all decisions were either made by Red Rock's managers or expressly delegated and overseen by Red Rock's managers."  (ECF No. 40 at 5, Hazen Declaration at ¶ 11; ECF No. 106-1 at ¶ 22)  The record shows that is not true.  This is well-illustrated by the testimony of Craig Mansfield, a co-manager for Red Rock.  Mansfield admitted that he did not know "how the decision of whether to fund the loan occurred" or whether that process occurred on the reservation.  He did not know how loans were originated or how verifications of loans were completed.  He did not know how Red Rock obtained the money it needed to fund the loans and did not know how the call centers in the Philippines operated (Mansfield Dep. 114:25-115:3; 115:4-14; 115:15-22; 112:15-18; 128:24-129:12; 119:20-120:1)  That is fully consistent with Martorello's understanding that the Tribal managers do nothing.

The negotiations respecting the sale of Bellicose and its conversion into Big Picture are instructive.  When discussing the sale, in August 2014, Martorello informed LVD that, in any sale, "the seller will have to keep a final say so in business decisions to protect the business from being destroyed by the new owner

before being paid." (July 21, 2020 Hearing, Plfs Ex 57, August 26, 2014 email between M. Martorello, K. Wichtman, D. Gravel, and Giizhigookway) (emphasis added). Then, in September 2014, Martorello informed Wichtman that:

> After further discussions, the Bellicose companies will be <u>sold only 'as is</u>,' with existing capital management in place and the <u>company remaining substantially the same</u>. Of course, a purchase, merger and dissolution are required for a tribal buyer, so the name will/jurisdiction of the LLC will change . . . <u>it also needs to be run in the same format it is today</u>.

(July 21, 2020 Hearing, Plfs Ex 60, September 15, 2014 email between M. Martorello and K. Wichtman) (emphasis added). In August 2014, Martorello informed the Tribe's Council that:

> <u>We respectfully opt to continue to keep any details of [SourcePoint] IP (including DM) explicitly for internal eyes only, both for the protection of our business and maintaining</u> the integrity of an acquisition of the SourcePoint business. Should an acquisition actually transpire, obviously these will be relevant questions for the eyes of Management and those in the acquiring company on a need to know basis as well (I.e [sic] Certain IP, even in small doses should at all times be aggressively protected when the result is such a massive competitive advantage, like the process of even just utilizing DM itself which SourcePoint owns and created.

(July 21, 2020 Hearing, Plf Ex 56, August 26, 2014 email between M. Martorello, K. Wichtman, D. Gravel, and Giizhigookway) (emphasis added). During the discussions and negotiations for the

sale of Bellicose to become Big Picture, the intellectual property was referred to as the "secret sauce."   LVD's lawyer made the comment:

> I wasn't recommending that [SourcePoint] disclose its secret sauce but only that [SourcePoint] will be willing to explain to the co-managers what exactly they [the managers] are approving.

Id.

All of this shows quite clearly that the key ingredient of the lending operation, the underwriting criteria or "secret sauce," was SourcePoint's,[11] not that of any Tribal Entity.   And, the record shows that Martorello controlled the lending operations of LVD because, inter alia, he controlled the secret sauce (the key loan underwriting criteria), the linchpin to the lending operations.

In sum, the record establishes that the Plaintiffs have established, quite clearly, that the representations made to the Court about who controlled the LVD lending operations at Red Rock were not true.   And, it is not disputed that Red Rock later was "rebranded" to become Big Picture.   And, except for a few cosmetic changes (or "otpics" as Martorello described them), the LVD lending

---

[11] A wholly owned subsidiary of Bellicose, a company controlled by Martorello.

operation by way of Big Picture continued as it had under the Red Rock structure.

## 3.   Misrepresentations About Why Bellicose was Sold to LVD

In his declaration in support of the Tribal Defendants' Motion to Dismiss on the ground of sovereign immunity, Martorello swore that:

> [c]ontrary to the allegations of Plaintiffs, the <u>decision to sell Bellicose to LVD was not motivated by impending threats of litigation or enforcement action by government agencies</u>. Indeed much of the discussions as to the motivation behind the sales transactions described by the Plaintiffs' Complaint are nonsensical and are temporally problematic. Plaintiffs' claim there were certain 'motivating factors' for the sale which, in reality, occurred eighteen months to three years before the sale transaction closed.

ECF No. 106-1, ¶ 69 (emphasis added).  That representation was not true.

The record shows that the negotiations for the sale of Bellicose began in 2012 (Martorello Declaration, ¶ 49). Negotiations continued for four years.  Karrie Wicthman, counsel for LVD, testified that the sale "was a long, long, long negotiated transaction with many moving parts and many changes over a four year period."  (Defs Ex. 327, Wictman Depo. at 31:07-12).  Thus, although the terms of the sale changed over time, evolving from the sale of Bellicose's intellectual property (the so-called "secret sauce," which lay at the heart of the lending business),

to the sale of an ownership interest in Bellicose, and then to the sale of Bellicose itself, those changes were all part of Martorello's desire to evade liability by trying to use LVD's sovereign immunity. And the motivation for the sale, contrary to Martorello's declaration, were not distantly removed in time from the consummation of the sale.[12]

What then, according to the record, was the motivation for the sale of Bellicose to LVD? Some history is required to discern the truth as to why Bellicose was sold to LVD.

Red Rock began operation in approximately 2011. In December 2012, slightly a year into the lending business, Martorello became concerned about the liability presented by the Tribal lending model. (ECF No. 788, Ex. 43, December 10, 2012 email from Martorello to Arqyros).

These concerns were magnified when, on August 6, 2013, the New York Department of Financial Services ("NYDFS") issued cease and desist orders to 35 online lending companies, including Red Rock, alleging violations of New York's usury laws. Shortly after the issuance of the cease and desist orders, counsel for several

---

[12] At the July 21-22, 2020 hearing, Martorello sought to characterize the sale discussions as occurring in three discreet periods. However, Wichtman's testimony refutes that; Martorello's own affidavit refutes it; and there is nothing in the record to support Martorello's view. Nor, in his declaration, did Martorello make any reference to the three different phases.

tribes, including LVD, had prepared for LVD's consideration the draft of a Complaint to be filed against NYDFS.  (ECF No. 788, Ex. 45)

Rosette, counsel for LVD, wrote to Martorello recommending strongly that a lawsuit should be filed against NYDFS asserting that sovereign immunity rendered New York law inapplicable. Rosette urged that Red Rock should be part of that suit.  Wichtman, counsel for the Tribe, shared that view in an email to Martorello. However, she made clear to Martorello that nothing would be filed "unless and until fully vetted with the Tribe and you."  (ECF No. 788, Ex. 46, emphasis added).

Martorello expressed concern about joining the litigation and about the reaction of the regulators to such a lawsuit. Nonetheless, Martorello ultimately agreed to the filing of the lawsuit.  Once he had given assent, it was filed on August 21, 2013.[13]

However, the tactic was unsuccessful and, in fact, it was counterproductive because the district court found that plaintiffs, including Red Rock, were "subject to the States' non-discriminatory anti-usury laws" because the "undisputed facts demonstrate" that the illegal activity was "taking place in New

---

[13] That evidence, of course, is highly probative of the extent of Martorello's control over the Tribe's lending operation.

York off of the Tribe's lands." Otoe-Missouria Tribe v. N.Y. Dept. of Fin. Servs., 974 F. Supp.2d 353, 361 (S.D.N.Y. 2013).  On the latter point, the district court noted that the plaintiffs, which included Red Rock, had "built a wobbly foundation for their contention" that the activity was occurring "on the Tribes' lands." Id. at 360.

Under the then-existing structure of the Tribal lending operation in the Red Rock mold, neither Martorello nor Bellicose had any colorable claim of sovereign immunity.  Thus, within two days of the district court's decision in Otoe-Missouria Tribe, Martorello wrote that the decision "presents a significant liability for [Bellicose] and we do not believe that we should service any New York loans."  (ECF No. 788, Ex 49)

At this point, it is appropriate to note that the Tribal Defendants argued in the Fourth Circuit that "there was no evidence" that the restructure was intended to provide Martorello or his companies with immunity."[14]  That, of course, is what Martorello asserted in his declaration in support of the Tribal Defendants' Motion to Dismiss on the ground of sovereign immunity (¶ 69).

---

[14] United States Court of Appeals for the Fourth Circuit, oral argument/listen to oral arguments, opening argument of William Hurd, audio file at 13:35-14:30, http//www.ca4.uscourts.gov/OArchive/mp3/1827-20190507.mps.

Contrary to the statement in Martorello's declaration to this Court and to the argument made to the Fourth Circuit, two weeks after the district court had decided Otoe-Missouria Tribe, Martorello sent an email to Rosette proposing a restructure of the lending arrangement with LVD for the purpose of protecting Martorello and Bellicose from liability arising out of the Tribal lending arrangement.  The subject line of that email was "LVD to take ownership of Bellicose VI."  One of the options presented was for "Bellicose to immediately assign LVD 51% of Bellicose via Equity only membership interest tied to the SPVI [Source Point Virgin Islands] subsidiary only."  (ECF No. 788, Ex 50).[15] Importantly, Martorello's proposal included the requirement that the restructure would provide all entities with sovereign immunity protection.

Not long thereafter, Martorello once again explained to Wichtman his concerns over the liability created by the various pending investigations and legal actions against Rent A Tribe operations.  In particular, Martorello told Wichtman that the result of affirmance of the New York ruling would be "certain death."  He further said that "all vendors including [Source

---

[15] Source Point Virgin Islands, sometimes referred to as SPVI, was owned by Bellicose which was controlled by Martorello.

Point],[16] banks, ACH processors, bureaus, etc. would all obviously shut down if it were considered off reservation activity." (ECF No. 788, Ex. 52) Martorello commented, as well, upon his personal liability when he observed that class actions and "personal threats of enforcement action against individuals by regulators has everyone spooked." Id.

In subsequent communications between Martorello and Rosette, Martorello underscored the urgency of reaching an agreement to restructure his lending arrangement with LVD in the effort to secure sovereign immunity for Martorello and his entities that were central to the Red Rock lending activity.

> Clock is ticking before I end up in a Cash
> Call attack though, at which point, I think
> the deal is about dead.

(ECF No. 788, Ex 54) "Cash Call" was a decision arising out of Colorado in which a similarly structured lending operation and its owner had been held to have violated Colorado law. (ECF No. 788, Ex. 54).

In fact, after Martorello learned of the Cash Call ruling in Colorado, he wrote to Rosette stating:

> Let's zero in ASAP on minimizing my risk for
> being individually liable like CO [Colorado]
> just successfully did to Butch Webb . . . . I
> don't want my company on anything that goes to
> the CFPB.  This may mean DCTF [Duck Creek]

---

[16] A company owned by Martorello that was a key player in the Red Rock lending scheme.

> needs to do a lot more on [its] own including
> its compliance program.

ECF No. 788, Ex. 54 (emphasis added).  Confronted with the email communications described above, Martorello admitted that he "was alarmed in 2012/13" about several court rulings against lenders including in Colorado [Cash Call].  (July 21 Hearing Trans. at 122).

The record also reflects that Martorello told others with whom he interacted during the applicable time that he was concerned about the threat of litigation and the consequences thereof.  For example, Wichtman testified that Martorello was concerned about Operation Choke Point, "a campaign initiated by the United States Department of Justice to force banks to terminate their business relationships with payday lenders."  Advanced Am. Cash Advance CTRS, Inc. v. FDIC, 251 F. Supp. 3d, 78, 79 (D.D.C. 2017). According to Wichtman, Martorello's concerns were both operational for the business ventures as well his personal liability.  (Def Ex 327, Wichtman Dep. at 55:22-56:07).  Rob Rosette, the lender/tribal matchmaker and lawyer of LVD in the potential purchase of Bellicose, observed that Martorello was motivated to sell because he wanted to avoid a "CashCall type of attack."  (July 21 Hearing, ex. 142).  And, in an email exchange with a business associate on December 31, 2013, Martorello expressed his concern, stating

"Clock is ticking before I end up in a Cash Call type attack."
(July 21 Hearing, Ex. 43).

The record is thus clear beyond serious question that
Martorello was motivated to sell Bellicose to LVD because of the
threats of litigation and enforcement actions against him and his
entities under the then-current lending arrangement between him,
his entities, and LVD.  Nonetheless, Martorello, at the evidentiary
hearing, testified that his motivations for the sale included "the
attractive offer that [he] received from the Tribes' Council and
the Tribe, and his wish to raise his child in the mainland United
States."  (Hearing Trans. at 225:25-27:4)  That testimony is simply
not credible in view of the substantial record written at the time
by Martorello and the evidence presented at the evidentiary
hearing.  Nor, judged by his demeanor when testifying on the point
at the evidentiary hearing, can the Court accept Martorello's
testimony as credible.

4.    **Misrepresentation Respecting the Creation of Big Picture**

In support of the sovereign immunity argument and with respect
to the analysis to be made under applicable law,[17] the Court was
told that the Tribe created Big Picture "to be an online lending
business in order to bring revenue to LVD."  (ECF No. 788., Ex.

---

[17] <u>Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort</u>,
629 F.3d 1173 (10th Cir. 2010).

40; ECF No. 788, Ex. 48, Hazen Declaration at ¶ 16)   The Court also was told that "LVD began by creating Big Picture in August 2014."   (DEFENDANT BIG PICTURE LOANS, LLC'S FINANCIAL INTEREST DISCLOSURE STATEMENT, ECF No. 38 at 5)   Additionally, Hazen, the Chairman of the Tribe, was deposed and asked whose idea was it to create Big Picture Loans.  Hazen responded that it was the Tribe's idea.  (ECF No. 38, Ex. 33, at Hazen Depo. 34:4-8).  Hazen also was asked who selected the name for Big Picture and she testified that it was "kind of a group discussion."  (Id. at 38:7-9)  These representations were made as part of the story presented to this Court (and to the Fourth Circuit) to create the appearance that LVD was the driving force behind the creation of Big Picture. Martorello supported this story line in his declaration supporting the Tribal Defendants' motion to dismiss on grounds of sovereign immunity.   There, Martorello swore that:   "Neither I nor any company I own or manage directed or controlled the creation of Big Picture."  (ECF No. 106-1, ¶ 67).

The record shows that the representations as to the overall concept respecting the creation of Big Picture and the specific representations made by Hazen and Martorello on the subject were untrue.   In fact, the record shows that Martorello created the entity, Big Picture Loans, at least a year before LVD says that it created or formed the entity.  Specifically, the internet domain

31

name for Big Picture Loans was registered on September 18, 2013.
(ECF No. 788, Ex 59) The record shows that Martorello and
Bellicose (one of Martorello's companies) had anticipated using
the Big Picture company with another tribe (not LVD) that was
located at Fort Belknap Indian Reservation (ECF No. 788, Ex 60)
However, the launch of the Fort Belknap enterprise had to be put
on hold.

Nonetheless, Martorello was able to put the entity and domain
in use in the lending operations of LVD. In particular, in the
aftermath of the Otoe-Missouria decision in the district court in
New York, and, while that case was pending on appeal, Martorello
urged Wichtman, Hazen and Williams to "rebrand" Red Rock. (ECF
No. 788, Ex 62) In a memorandum in July 2014, Martorello observed
that Red Rock [which had been a party in the Otoe-Missouria case]
had been blacklisted and rolled through the mud in the press and
asserted that "it's time to get away from the word payday and the
black mark of [Red Rock] before rules come out and things get
hotter." Id. Accordingly, Martorello suggested forming "ASAP a
new LLC with a new domain/brand for purposes of transferring all
contracts, assets, bank accounts, liabilities, etc. over to the
new entities when ready." Id. Martorello urged that the parties
get moving on this project forthwith and volunteered that his

company, Bellicose, would facilitate the work.  Id.  The "rebrand" was Big Picture.

The evidence at the July 21-22 hearing also proved that Martorello registered the Big Picture website on September 18, 2013 (July 21-22 Hearing, Plfs Ex 33, September 18, 2013 Big Picture Loans domain registration).  Then, on September 30, 2013, a vendor, hired by Martorello, created a full design and operational materials for Big Picture Loans which Martorello intended to use to add an Indian tribe other than LVD as a business partner (July 21, 2020 Hearing, Plfx Ex 35, September 20, 20103 email between M. Icardo, M. Hona A. Mein) ("Bellicose has procured additional tribal business with entities not related to LVD or Midletown-I.E. Fort Belknap (Big Picture Loans) and Chorus Loans.")[18]

The record thus proves the falsity of the assertions made in Martorello's declaration that "neither I nor any company I owned, managed, directed or controlled the creation of Big Picture" and

---

[18] The record shows that Martorello also wanted LVD to buy Sourcepoint VI.  But, if that did not work out, he was prepared to sell Sourcepoint to another tribe.  As Martorello wrote:

> So here's what I'm thinking (for now) if we can't reach terms with LVD to buy SPVI, then SPVI will be sold to another tribe (likely Midletown).

(July 21, 2020 Hearing, Plfs Ex 53, August 25, 2014 email between M. Martorello and R. Rosette).

33

"neither I, nor Bellicose, helped form Big Picture."  (ECF No. 106-1, Martorello Decl. ¶¶ 67 and 102).  And, the record shows convincingly that Big Picture was not created by LVD as the result of the Tribe's years of knowledge and business acumen related to online lending.  In fact, Big Picture was created by Martorello for use with a different tribe and, when that fell through, Big Picture, at Martorello's instruction, was used to rebrand Red Rock. In other words, the record shows convincingly that Martorello was the driving force in the creation of Big Picture and Ascension, just as he was in the creation of Red Rock.

In sum, the record convincingly confirms that misrepresentations respecting the genesis of Big Picture were made by Martorello and Hazen.  Those misrepresentations were presented to, and relied on, by this Court in making its factual findings which were undisturbed by the Court of Appeals.

### THE EFFECT OF THE MISREPRESENTATIONS

To analyze whether the Tribal Defendants (Big Picture and Ascension) shared LVD's sovereign immunity, this Court and the Fourth Circuit used the test in <u>Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort</u>, 629 F.3d 1173 (10th Cir. 2010). <u>Williams v. Big Picture Loans, LLC</u>, 929 F.3d 170, 177 (4th Cir. 2019).  "Those non-exhaustive factors are: (1) the method of the entities' creation; (2) their purpose; (3) their structure,

ownership, and management; (4) the tribe's intent to share its sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) the policies underlying tribal sovereign immunity and the entities' connection to tribal economic development, and whether those policies are served by granting immunity to the economic entities." Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019) (quoting Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort, 629 F.3d 1173, 1187 (10th Cir. 2010)) (internal quotation marks omitted).  The Fourth Circuit adopted the first five of these factors.  Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019).  As to the "sixth Breakthrough factor, the Fourth Circuit held that whether the purposes underlying tribal sovereign immunity would be served by granting an entity immunity, overlaps significantly with the first five Breakthrough factors.  Thus, the extent to which a grant of arm-of-the-tribe immunity promotes the purposes of tribal sovereign immunity is too important to constitute a single factor and will instead inform the entire analysis."  Williams v. Big Picture Loans, LLC, 929 F.3d 170, 177 (4th Cir. 2019).

In one way or another, the misrepresentations now proved by the record are related to the Breakthrough factors and thus to the determination whether the Tribal Defendants shared the sovereign immunity of LVD.  The four misrepresentations pressed by the

Plaintiffs, individually and taken as a whole, are relevant to determining:

> (1) the method of creation of the entities (Big Picture and Ascension);
>
> (2) the purpose for the creation of those entities;
>
> (3) the structure, ownership and management of those entities;
>
> (4) the intent of LVD in creating the entities;
>
> (5) the financial relationship between the Tribe and those entities;
>
> (6) the policies underlying tribal sovereign immunity and the connection of those entities to LVD economic development and whether those policies are served by granting LVD's sovereign immunity to those entities.

The record shows that the misrepresentations produced significantly erroneous findings by this Court. Williams v. Big Picture Loans, LLC, 329 F. Supp.3d 248, (E.D. Va. 2018). Reviewing the findings made by this Court in Williams v. Big Picture Loans, LLC, 329 F. Supp.3d 248, 253-265 (E.D. Va. 2018), in perspective of the record made on the topic of the misrepresentations both in the exhibits and in the evidentiary hearing, the Court concludes that had the facts not been misrepresented to it, there are certain findings that simply could not have been made. Thus, the Court could not have found that:

The company was managed by two members of the Tribe.

*Williams*, 329 F. Supp.3d at 255.

Nor could the Court have found that:

- Red Rock subsequently decided to contract with an outside entity to better learn the lending industry. The Tribe had identified Martorello has a potential consultant in mid-2011, but he was not involved in the creation of Red Rock.

*Williams*, 329 F. Supp.3d at 255.

- In addition, aside from these distributions, Red Rock received and retained ownership of all intellectual property development under the Servicing Agreement by SourcePoint.

*Williams*, 329 F. Supp.3d at 256.

- Final determination as to whether to lend to a consumer rest[ed] with [Red Rock].

*Williams*, 329 F. Supp.3d at 257.

- All decisions about operations were made by Red Rock's managers . . . or that Red Rock's co-managers were ultimately responsible for all decisions regarding Red Rock's operations.

*Williams*, 329 F. Supp.3d at 257.

- Martorello, Bellicose and SourcePoint never, on Red Rock's behalf, made lending decisions; originated a consumer loan; purchased a loan originated by Red Rock; or took any action to collect a Red Rock loan.

*Williams*, 329 F. Supp.3d at 257.

- After 2011, through its operation of Red
  Rock and relationship with Bellicose and
  Martorello, the Tribe gained knowledge of
  the online lending industry . . . the Tribe
  wanted to apply that knowledge to expand
  its online lending platform and increase
  profitability for the Tribe, employ more
  Tribal members, and acquire its vendors'
  businesses so the Tribe would earn more
  money.

Williams, 329 F. Supp.3d at 258.

- LVD Council organized Big Picture, was
  'meant to serve as an independent Tribal
  lending entity,' that 'would ultimately
  consolidate the business of the Tribe's
  other lending entities, Red Rock and Duck
  Creek Financial, LLC.

Williams, 329 F. Supp.3d at 258.

- [Martorello] never provided any consulting
  services to Big Picture or Ascension;
  suggested marketing strategies,
  underwriting criteria or other policies to
  them; accessed any of their software
  systems, databases, bank accounts, or
  records, or hired or fired their employees.

Williams, 329 F. Supp.3d at 263.

Further, the entire section of the opinion describing Big Picture's lending process, Williams, 329 F. Supp.3d at 264, was materially erroneous because of the misrepresentations.

The established misrepresentations strongly suggest that the Fourth Circuit's decision on the Tribal Defendants' entitlement to share LVD's sovereign immunity is open to question. But, that is not a matter for this Court to decide.

However, in analyzing all pending and future motions in which Martorello argues that his position is supported by the Fourth Circuit's decision, this Court will now be required to take into account the record about the misrepresentations and the findings about them that are made herein.[19] And, now that the record on the misrepresentations has been made, the Court will turn to the various pending motions and this record is available to help resolve those motions.

It is so ORDERED.

/s/

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  November 18, 2020

---

[19] As the Plaintiffs correctly point out, the Fourth Circuit's decision on sovereign immunity does not confer on Martorello the immunity claimed by the Tribal Defendants. When, and as, it becomes necessary to assess that question, the record on the misrepresentations is now available.