**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| LULA WILLIAMS, *et al.*,           ) | |
|       ) | |
|         **Plaintiffs,** ) | |
| **v.**              ) | Civil Action No. 3:17-cv-461 (REP) |
|       ) | |
| **BIG PICTURE LOANS, LLC**, *et al.*,   ) | |
|       ) | |
|         **Defendants.** ) | |
|       ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL**
**PRODUCTION OF DOCUMENTS THAT MARTORELLO CLAIMS ARE COVERED**
**BY THE WORK-PRODUCT DOCTRINE**

Pursuant to the Court's order (ECF No. 954),  Plaintiffs, by counsel,  move the Court to compel Defendant Martorello to produce documents that he claims are covered by the work-product doctrine.  The Court should order production of the documents for four reasons.

First, Martorello has not established that any of the communications on his privilege logs were prepared in anticipation of litigation.  Indeed, Martorello has specifically and repeatedly disclaimed that any actions taken in furtherance of the usurious lending scheme were done in anticipation of litigation, including the sale of his company Bellicose Capital to the Tribe.  Because none of the communications were prepared in anticipation of litigation, the communications cannot be shielded form discovery under the work product privilege.

Second, Martorello has waived any work-product protections for the documents on his privilege logs due the inadequacy of the logs.  The logs do not comply with Fed. R. Civ. P. 26(b)(5) and do not provide an adequate description of the documents to assess whether the assertion of work-product is appropriate under the circumstances.  There is no excuse for the inadequacy of the logs, and waiver is an appropriate sanction.

1

Third, because Martorello intends to rely on attorney advice for his good faith defense, Martorello has waived work product protections for both fact and opinion work product.  As shown repeatedly throughout this litigation. Martorello intends to argue that he relied on the expert opinions of his lawyers regarding the legality of his business.  Ex. 1 at Int. Nos. 13 and 15. Martorello cannot use the attorney-client privilege as both a sword and shield to selectively disclosure certain communications but not others.  The same reasoning applies to attorney work product, both fact and opinion work product.

Fourth, Martorello is unable to claim work product protections for fact work product because he has forfeited that right under the crime/fraud exceptions.  Under binding Fourth Circuit law, when a client engaged attorneys in furtherance of a crime, work product protections are lost for fact work product.  With respect to opinion work product, the party seeking the documents needs to show that the attorneys were involved in the furtherance of the illegal activity.  Here, all of the lawyers involved knew the nature of the lending business and scheme, are well versed in tribal lending, and knew that the lending scheme at issue was designed to avoid the application of state usury laws.

Thus, Plaintiff moves to compel (a) all documents withheld on Martorello's privilege logs on work product grounds, and find a waiver for work product regarding: (i) the legality of the tribal business model, (ii) the legality of LVD's lending operations, (iii) the restructure (including the reasons for including and related negotiations surrounding the contractual provision that requires the destruction of Bellicose Capital's documents and records), and (iv) any litigation involving any similar business models, including but not limited to any litigation involving CashCall, John Reddam, Scott Tucker, Charles Hallinan, Think Finance, and Kenneth Rees.

## BACKGROUND[1]

As this Court observed in its November 18, 2020 opinion, the facts of this case "have their genesis in the efforts of so-called payday lenders to evade state usury laws by using as loan conduits, national banks, which by virtue of the National Bank Act, 12 U.S.C. § 85, are exempt from the interest rate caps set by state laws." Mem. Op., ECF No. 944 at 4. Those "Rent-A-Bank" schemes were abandoned "when federal regulators intervened and put a stop to them." *Id.* Subsequently, "payday lenders then segued into the so-called 'Rent A Tribe' scheme," which "used Native American tribal entities (rather than banks) as the nominal lender." *See* Mem. Op., ECF No. 944 at 4 (defining a "Rent A Tribe" scheme).

"In 2008, Martorello became involved in payday lending using a company" that would make loans in violation of United States usury laws that "were to be governed by the laws of Costa Rica." Mem. Op., ECF No. 944 at 4. Subsequently, in 2011 Martorello became interested "in working with Native American tribes" at an online lending conference. Ex. 2, Merritt Dep. 31:3-4; 93:16-20; *see also* Mem. Op., ECF No. 944 at 4. Martorello "sought out a connection with the LVD so that he could get into the Tribal lending business," which led to "the formation of Red Rock Tribal Lending ('Red Rock') and Duck Creek Tribal Lending ('Duck Creek')." *See* Mem. Op., ECF No. 944 at 4, 11. "Martorello understood that his company, Bellicose, would operate the lending business in which Red Rock was to be engaged completely" and that the Tribe's managers would play a "rather meaningless role." *Id.* at 14.

---

[1] While not identical, there is substantial overlap in the analysis of whether attorney-client privilege was waived and whether work-product privilege was waived. The factual background set forth herein is the same as in Plaintiffs' brief regarding waiver of attorney-client privilege.

A.     **Martorello's Rent a Tribe business is based on a misguided belief that the loans would be exempt from state usury laws so long as the final act of loan origination occurred on the reservation.**

The cornerstone of the Rent A Tribe business model is the misguided opinion that usurious loans are exempt from state usury restrictions so long as a tribal entity serves as a nominal lender by the delegation of loan originations to the tribal entity. Martorello created the Rent A Tribe business challenged here under this erroneous belief. This is demonstrated in Martorello's emails with Robert Rosette and Flint Richardson.

Martorello's interest in Tribal lending, led him to Robert Rosette, who was "a very well-known attorney in that space." Ex. 2, Merritt Dep. at 28:16-21; 32:7-11. In August 2011, Martorello received a draft of the initial agreement providing the structure for the tribal lending enterprise. *See* Ex. 3 at Rosette_Revised_052504, Aug. 25, 2011 E-mail from Martorello. After reviewing the draft of the "servicing" agreement, Martorello asked several questions to Rosette and his business partner, Flint Richardson, about this new business model. *Id.* at 052501. One of those questions was whether "the Tribal Lending entity" would have "a Tribal Management Company, which is going to be the Bellicose customer[?]" *Id*. In response, Richardson said "NO," and clarified that Martorello's "ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION. THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS." *Id*. at 052500 (caps in original). And, when asked by Martorello to further elaborate on this point, Richardson explained that "REPRESENTATIVES FROM THE TRIBE ARE THE LLC'S 'MANAGERS'. THE SERVICER, BELLICOSE OPERATES THE BUSINESS COMPLETELY." *Id*. at 052498. In their view, this structure was legitimate because the "cornerstone of the sovereign model," Richardson explained, was the delegation of "Loan Originations" to the tribal lending entity. *Id*.

4

at 052497. Delegating originations to the tribal lender, according to Richardson and Rosette, purportedly exempted the loans from state interest rates. *Id*. at 052497.

Richardson's e-mail is consistent with the LVD's understanding that it would "have no risk" in Martorello's Rent A Tribe business. *See* Ex. 4 at ¶ 1. The sworn declaration of Joette Pete, who served as the Vice Chairwoman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians explained: "When Tribal Council initially agreed to the deal with Martorello," they "understood that **all aspects of the lending business would be handled by Martorello** and that **the Tribe would have no risk**. It was understood that **Martorello's company would handle everything**, including underwriting, marketing, servicing, funding, and collection of the loans." *Id*. at ¶ 3 (emphasis added).

**B.     The business was initially structured in a manner to give Martorello complete control and the vast majority of the profits.**

Earlier in the litigation, Martorello portrayed himself to the Court as a mere consultant who was not involved in the formation of Red Rock and had little control over the Rent a Tribe business. *See* Mem. Op., ECF No. 944 at 8-9, 13-14. However, the record now shows that this was untrue. As the Court recently found, Martorello "was heavily involved in the creation of Red Rock," and he "understood that his company, Bellicose, would operate the lending business in which Red Rock was to be engaged completely." *Id.* at 9, 14.

Martorello chose the name "Red Rock," and he and his counsel prepared and reviewed the formational documents before they were sent to Tribal Council for approval. *Id.* at 9-10. On October 25, 2011, Martorello's company, Bellicose VI, LLC, executed the "servicing agreement" with Red Rock Tribal Lending, LLC, giving Martorello almost exclusive control over Red Rock's

operations. *See generally* Ex. 5, Oct. 25, 2011 Servicing Agreement.[2] Martorello not only had the contractual authority to control the lending business, but as detailed by the former Tribal Vice Chairwoman: "[a]fter the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement." Ex. 4 at ¶ 4; *see also* Mem. Op., ECF No. 944 at 15. Although the Tribe's co-managers held titles supposedly giving them a voice in Red Rock's lending operation, the co-managers actually played a "rather meaningless role" with limited involvement in or knowledge about the lending enterprise. Mem. Op., ECF No. 944 at 14. "Neither the establishment of the actual underwriting criteria for making the loans nor the decision actually to make them (or not)

---

[2] For example, the contract provided that Bellicose VI "shall have the authority and responsibility over all communication and interaction whatsoever between [Red Rock] and each service provider, lender and other agents of [Red Rock]." Ex. 5 at § 3.1; *see also id*. at § 4.1.1 (granting Bellicose VI "the necessary power and authority to act in order to fulfill its responsibilities" under the contract). Consistent with Bellicose VI's "authority and responsibility over all communication and interaction whatsoever" between Red Rock and others, the contract further specified that Bellicose VI was responsible for: (1) selecting and negotiating with service providers and lenders; (2) "[d]evelopment and promotion of sound and positive business relationships," including "the enforcement or termination of agreements with such service providers and lenders;" (3) preparation of regulatory, compliance, training, education, and accounting standards, as well as standards for "screening and review of" "website contents, marketing and consumer relations practices;" (4) providing "pre-qualified leads" and the "credit-modeling data and risk assessment strategies;" (5) oversight of Red Rock's call center in the Philippines; and (6) sales to third-party debt collectors. *Id.* § 4.2.1.

  Bellicose VI also had the authority to "collect all gross revenues and other proceeds connected with or arising from the operation" of Red Rock. *Id.* § 4.9. Bellicose VI also had the contractual right to "sweep [Red Rock's] bank account amounts into [SourcePoint's] bank accounts" to receive its share of the proceeds. *Id.* § 3.5. Bellicose VI had "sole signatory and transfer authority over such bank accounts." *Id.* §§ 3.5; 4.4. The Court recently summarized findings on this issue: "money paid by consumers went into the Bellicose bank account over which only Martorello and his employees had control and access. (Dkt. 944 at 16.)

was done by the Tribal entity or by its employees." *Id*. at 15. In fact, the relevant "intellectual property was kept by Martorello's company, SourcePoint, and was not known by, or available to, the Tribal entities that nominally were making the loans at issue." *Id*. at 18. In other words, "the key ingredient of the lending operation, the underwriting criteria or 'secret sauce' was SourcePoint's, not that of any Tribal Entity." *Id.* at 22. In exchange for running virtually all aspects of the business, Bellicose VI received 98% of the net income collected on the loans. Ex. 5 at §§ 2.25; 3.5.1. By contrast, Red Rock received 2% of the net revenue from the loans, less charge offs.[3] *Id.* § 2.25.

## C.    Martorello becomes concerned about the legality of the Tribal lending model.

As early as December 2012—a little over a year into the business—Martorello had concerns about the viability of the tribal lending model. Ex. 6 at Martorello_038990; *see also* Mem. Op., ECF No. 944 at 24. In an e-mail from December 2012 to a business valuation expert, Martorello wrote that he had "some urgent questions" for them "on valuation" of his business. Ex. 6 at Martorello_038990. Among other things, Martorello asked how to value illegal businesses, such as online poker sites, medical marijuana stores, and a drug cartel. *Id.*  Martorello further added that "[t]his industry is going to be living in the grey area of its legality for another year or two," and that they had already "received dozens of letters from State AGs saying we need to be licensed and sending Cease and Desist orders." *Id*., 038991. In Martorello's view, there was "no business with such risk to it" as the tribal lending model, and the "[b]ottom line" was that "this business

---

[3] However, Red Rock's compensation was reduced by 50% to pay a brokerage fee to another company owned by Rosette, Tribal Loan Management, LLC. *Id.* § 7.15. Rosette's 50% brokerage fee was paid directly by Bellicose VI. *Id.* ("[Red Rock] has authorized that fifty percent (50%) of the Tribal Net Profits due to the Tribe pursuant to Section 3.5.1 with the minimum set forth therein be paid directly to Tribal Loan Management, LLC by [Bellicose VI] on behalf of [Red Rock][.]").

will simply not exist in 2 to 3 years," at least how it did then. *Id*. In addition to this risk, Martorello further explained that Greenberg Traurig provided him with a 20-page legal opinion, concluding that Martorello could be liable "for aiding and abetting felony crime[s]" in states like Georgia. *Id*. The term of the arrangement between Martorello and Red Rock was supposed to last until December 31, 2018, per an express term of the Servicing Agreement, Ex. 5 at § 3.2, but Martorello knew it would not make it more than "2 to 3 years." Ex. 6 at 038991. As early as April 2013, Martorello began e-mailing Rosette about restricting the arrangement to reduce Martorello's liability, writing: "Let's zero in asap on minimizing my risk for being individually liable like [Colorado] just successfully did to Butch [W]ebb." Ex. 7 at Rosette_Revised_048497.

Over the next six months, regulators continued to threaten to take action to stop Red Rock's illegal business practices. *See, e.g.*, Ex. 8, May 2013 Ltr. from Conn. Dep't of Banking. "These concerns were magnified when, on August 6, 2013, the New York Department of Financial Services ("NYDFS") issued cease and desist orders to 35 online lending companies, including Red Rock, alleging violations of New York's usury laws." Mem. Op., ECF No. 944 at 24; *see also* The Official Website of New York State, Press Room, *Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans That Harm New York Consumers* (Aug. 6, 2013), *available at* https://www.governor.ny.gov/news/cuomo-administration-demands-35-companies-cease-and-desist-offering-illegal-online-payday-loans. Unlike other letters from state regulatory authorities, the NY DFS posed the biggest threat as it also sent letters to 117 banks and the National Automated Clearinghouse Association, requesting that "they work with DFS to cut off access to New York customer accounts for illegal payday lenders." *Id*.

Six days after the issuance of the cease and desist, Rosette had already drafted a complaint against the NY DFS "for LVD's consideration." Ex. 9 at Rosette 041064; *see also* Mem. Op., ECF

8

No. 944 at 25. In his e-mail to Martorello, Rosette—who was receiving 50% of Tribal profits for brokering the partnership—wrote that he "believe[d] strongly if we do nothing we may forever lose the tribal online lending opportunity." Ex. 9 at Rosette 041064 In a separate e-mail to Martorello, Karrie Wichtman, the Tribe's lawyer, echoed these concerns, writing "what do we achieve by laying low waiting for the next bomb to drop - hoping that it doesn't blow us up?" Ex. 10 at Rosette_Revised_049126.

"Martorello expressed concern about joining the litigation and about the reaction of the regulators to such a lawsuit." Mem. Op., ECF No. 944 at 25; *see* Ex. 10 at Rosette_Revised_ 049125. According to Martorello, the filing would "open the doors" and result in "counter attacks from all sides," and it would be "game over really quick." Ex. 10 at Rosette_Revised_ 049125. Additionally, Martorello added that the "LVD's house" was not "completely in order yet," which was a concern he raised on multiple occasions. *Id*. Because of Martorello's dominance over operations, he further cautioned that "LVD" did not "represent the best facts" at the moment because they were not originating the loans on the reservation. Ex. 11 at Rosette_Revised_046605. Ultimately, Martorello became comfortable enough with the lawsuit, and it was filed on August 21, 2013, including a request for a preliminary injunction to prevent the NY DFS from interfering with the lending operation.

As Martorello had feared, the lawsuit backfired—the district court not only denied Red Rock's motion for a preliminary injunction, but its findings jeopardized the entire business model and opened Martorello to potential prosecution. *See* Ex. 12 at Rosette 006304-5. Most notably, "the district court found that plaintiffs, including Red Rock, were 'subject to the State's non-discriminatory anti-usury laws' because the 'undisputed facts demonstrate' that the illegal activity was 'taking place in New York, off of the Tribe's lands.'" Mem. Op., ECF No. 944 at 25-26

(quoting *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 361 (S.D.N.Y. Sept. 2013)). The court further noted that Red Rock "built a wobbly foundation for their contention" that the activity was occurring "on the Tribes' lands," and contrary to their argument, consumers did not "in any legally meaningful sense, travel[] to Tribal land." *Otoe-Missouria Tribe v.*, 974 F. Supp. 2d at 360.

Two days after the ruling, Martorello wrote that the decision "presents a significant potential liability for [Bellicose] and we do not believe that we should service any new New York loans." Ex. 12, Rosette 06304-5. Martorello further added that they were willing to see existing loans through completion, "but [they] simply cannot flaunt the clear ruling from Judge Sullivan's order, however legally incorrect it might be." *Id*. Martorello expressed concern that the "finding that tribal enterprises are subject to New York's anti-usury laws will be regarded as sufficiently final... such that it will precipitate their potential investigation and potential prosecution of us personally and our companies if we continue" to conduct business in New York. *Id*.

> **D.      Two weeks after the district court's decision, Martorello contacts Rosette regarding a potential restructure to provide immunity to all entities involved in the illegal enterprise.**

Two weeks after the district court's decision, Martorello approached Rosette about a possible restructure of the business to protect Martorello/Bellicose. *See generally* Ex. 13. Martorello has misrepresented to this Court that he was motivated to sell Bellicose to LVD because of "the attractive offer" he received from the LVD. *See* Mem. Op., ECF No. 944 at 30. However, this Court found that this testimony was "simply not credible" and that "Martorello was motivated to sell Bellicose to LVD because of the threats of litigation and enforcement actions against him and his entities." *Id.*

In an e-mail dated October 14, 2013, with a subject matter entitled "LVD to take ownership

of Bellicose VI," Martorello presented options for a restructure so that Bellicose could attempt to share in the LVD's immunity. *Id*. Martorello proposed that Bellicose would "[a]ssign today LVD 51% of Bellicose via Equity only membership interest tied to the SPVI subsidiary only." *Id*. (underline in original). Additionally, Martorello also proposed assigning 51% of the interests in his other businesses involved in the scheme. *Id*. Anticipating the business would be shut down, Martorello further proposed that BlueTech, his trust, would "own 49% equity, but 100% profits interests until month 49," *i.e.*, ensuring Martorello would retain the profits until the business was gone. *Id*. Martorello's e-mail candidly explained that the transaction must be "structured to provide all entities sovereign immunity." *Id*. Thus, Martorello proposed "the restructure of the lending arrangement with LVD for the purpose of protecting Martorello and Bellicose from liability arising out of the Tribal lending arrangement." Mem. Op., ECF No. 944 at 27.

Martorello also sent a similar e-mail to the members of LVD's Tribal Council, entitled "SPVI Equity Transfer to LVD." Ex. 4 at JPB 00988. Martorello wrote: "Below is the beginning of a concept I have to facilitate a transition to LVD of MY businesses." *Id*. This concept, as described by Martorello, was to "[a]ssign today to LVD – 51% of Bellicose VI, LLC," but "0% profits interest" until four years after the restructure. *Id*. Martorello further added: the "Current Manager (myself) will be locked in as the decision maker for 48 months, at which point they will hire a new Manager to replace me." *Id*. According to the former Vice Chairwoman of LVD, this e-mail was "the first time [they] were ever presented with the opportunity 'to own' the business, but it would still be controlled by Martorello as proposed." Ex. 4 at ¶ 9.

Martorello continued to voice "his concerns" to Wichtman "over the liability created by the various pending investigations and legal actions against Rent A Tribe operations. Mem. Op., ECF No. 944 at 27. For example, Martorello noted that vendors and debt providers of Red Rock

were "asking what would happen to everything if the ruling in NY were upheld[?]" Ex. 14. The repercussions, according to Martorello, would be "certain death" and "all vendors including [SourcePoint], banks, ACH processors, bureaus etc would all obviously shut down if it were considered off reservation activity[.]" *Id*. Martorello added that "class actions" and "personal threats of enforcement actions against individuals by regulators" have "everyone spooked," causing "several of the biggest servicers" to "shut down." *Id*. In closing, Martorello proclaimed "[d]esperately hoping that Rule 19 works and a favorable outcome on the appeal!" *Id*.

On November 8, 2013, Martorello sent a similar e-mail to Wichtman, noting that SourcePoint was "about to be discovered and will need extreme resources to defend itself against all kinds of aiding and abetting and 'true lender' claims" coming in the first quarter of 2014. Ex. 15 at Rosette_Revised_052787. And similar to his earlier emails, Martorello reiterated that there was a "very significant possibility that should we even survive long enough to get there," he would need "to defend [him]self even personally (in more than civil matters), with no ongoing business or revenue at all should the decision be made in the appeal that the activity is in fact OFF reservation (a certain end to the industry)." *Id*. (capitals in original).

E.    **In December 2013, Rosette circulates a memorandum regarding a potential restructure to provide Martorello's entities with sovereign immunity, while Martorello's concerns grow.**

On December 30, 2013, Rosette circulated a legal memorandum regarding Martorello's proposed transaction, analyzing "whether formation of a new entity that is co-owned by the Tribe and Source Point and subject to the proposed profit, management and voting controls" suggested by Martorello would be "sufficient to pass muster with the 'arm of the tribe' test to extend the Tribe's sovereign immunity from suit to the new LLC." Ex. 16 at Rosette_Revised_052248. On proposed changes to the structure, Martorello commented that the tribe's percentage of ownership of the company "could easily be increased to whatever the benchmark of confidence is, since

equity and profits interest differ." *Id*. at 052247. He further added that he did not think "100%"
ownership was "out of reach," and "some caveats could simply be made." *Id*. Martorello, however,
took issue with Rosette's proposed revenue changes, writing "10% [to the tribal entity] certainly
isn't going to work from a business standpoint," and he "might as well be a state licensed lender,
as a comp[arison]." *Id*. Martorello also rejected Rosette's proposed management structure, writing
"[a]ll the investors (institutional, personal, and myself) won't allow the deal to occur without being
100% certain adequate [m]anagement resources are in control," *id*. at 052248, *i.e.*, unless non-
tribal members like Martorello continued to have final say over operations. And if challenged,
Martorello explained that "[w]hat I think you'd tell a court" is "that if the deal were not done,"
then the tribe would not know: (1) "if SPVI would be around in 10 days given the industry," (2)
execute "its termination provision in accordance with the" servicing agreement, or (3) "hike rates
as risk has gone through the roof with detractors now seeking out SPVI's of the world for major
attacks." *Id*. at 052247. Martorello stressed the deal's urgency, writing:

> **Clock is ticking before I end up in a Cash Call type attack though, at which
> point, I think the deal is about dead.**

*Id*. at 052248 (emphasis added).

A few days after receiving Rosette's memorandum analyzing the potential transaction,
Martorello sent an e-mail regarding the Consumer Financial Protection Bureau's civil complaint
against CashCall, which was filed on December 16, 2013. *Consumer Fin. Protection Bureau v.
CashCall, Inc.*, No. 1:13-cv-13167 (Mass) (complaint filed on Dec. 16, 2013). Ex 17. In this e-
mail, Martorello characterized the CFPB's position as "without question a major attack on legit
tribal lending operations." *Id*. at LVD-DEF00018128. Martorello's e-mail also expressed concern
with cooperating with the CFPB's investigative demands, explaining that it would "come with an
almost identical suit against the [tribal lending entities] as they just did against Cash Call." *Id*. at

00018129. If an "attack" on the Red Rock operation happened, Martorello warned, "the stakes are very literally everything." *Id*. at 00018128.

Less than a week later, things got worse for the industry and Martorello when the Department of Justice announced a consent decree with a major ACH provider. *See generally* Ex. 18 at Rosette_Revised_052155. Rosette described this consent decree as "the most disastrous result we have seen yet," and he predicted that he "would not be [] surprise[d] if we lost the last remaining banks and ach processors servicing tribal accounts after reading the consent decree." *Id*. Sure enough, the enterprise lost its only ACH processer the following day, which "obviously ha[d] major implications for [M]att since he ha[d] no other processors." Ex. 19. And, when Martorello attempted to hire another processor, one bank explained that they were told "if the bank so much as processes a single transaction [t]he DOJ will be relentless in shutting them down under the full weight of the US government." Ex. 20 at Rosette 036580-2. By this time, Red Rock had also received more than a dozen warnings from state attorney generals' offices. Ex. 6 at 038991.

Thus, "[t]he record also reflects that Martorello told others with whom he interacted during the applicable time that he was concerned about the threat of litigation and the consequences thereof." Mem. Op., ECF No. 944 at 27.

**F.     Martorello pushed for re-branding of Red Rock to Big Picture Loans, a lending platform he had already developed.**

Earlier in the litigation, Martorello and the Tribe represented to the Court that the Tribe "was the driving force behind the creation of Big Picture." Mem. Op., ECF No. 944 at 30-31. However, the record now reflects that these representations "were untrue" and that "Martorello created the entity, Big Picture Loans, at least a year before LVD says that it created or formed the entity." *Id.* at 31-32. Indeed, as further discussed below, "the record shows convincingly that Martorello was the driving force in the creation of Big Picture and Ascension, just as he was in the

creation of Red Rock", and "except for a few cosmetic changes (or 'optics' as Martorello described them), the LVD lending operation by way of Big Picture continued as it had under the Red Rock structure." *Id.* at 22-23, 34.

Email communications demonstrate that Martorello was the driving force behind the creation of Big Picture. For example, Martorello e-mailed Hazen and Wichtman in July 2014, urging that Red Rock "needs a rebrand." Ex. 21 at Rosette_Revised_058409. Martorello further explained that "RRTL ha[d] been blacklisted and rolled through the mud in the press" following the *Otoe-Missouria* decision. *Id*. He added that "it's time to get away from the word '[p]ayday' and the black mark of RRTL before rules come out and things get hotter." *Id*. To accomplish the rebrand, Martorello suggested "forming ASAP a new LLC with a new domain/brand, for purposes of transferring all contracts, assets, bank accounts, liabilities etc. over to the new entities when ready." *Id*. Martorello's e-mail concluded that Bellicose would "gladly facilitate the work," but it needed "the entity formed and approv[ed] to begin doing" the rest of the work. *Id*. Shortly thereafter, Martorello had "the work and imaging done for ChorusLoans." *Id*. at 058407. Martorello further claimed that "[d]omain names in this space" were "very very rare and hard to come by" and "trying to get a [trademark] to protect it from competition" was "another issue," and "SPVI did a lot of work" to create "Chorus[.]" *Id*. On August 25, 2014, Martorello e-mailed Wichtman that "Chorus has been sold." Ex. 22 at Rosette 043437. But Martorello had "another really great brand" known as Big Picture Loans. *Id*. In this e-mail, Martorello attached a document, "Big Picture Site Designs," showing a fully developed website and brand for Big Picture. *Id*. at 043437-57. Wichtman, who was drafting the resolution for approval by tribal council, responded, "Which one do you want me to use?" *Id.* at 043435. It was left up to Martorello to decide on "BigPictureLoans.com." *Id*. The following day, Wichtman presented a resolution for the creation

of Big Picture, as well as approving its Articles of Organization and Operating Agreement. Ex. 23, Resolution # T2014-066 ("the Council has been presented with Articles of Organization and an Operating Agreement for the tribally chartered business entity to be known as Big Picture Loans, LLC….").

### G.    Restructuring became urgent after the Second Circuit's decision.

Over the next month, the parties did not make significant progress on the key terms or mechanics of the sale, but on October 1, 2014, it became urgent when the Second Circuit affirmed the district court's decision in *Otoe-Missouria*. In doing so, the Second Circuit made several damaging findings, including that "New York's usury laws apply to all lenders, not just tribal lenders[.]" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 117 (2d Cir. 2014). The Second Circuit also observed that "Native Americans 'going beyond the reservation boundaries' must comply with state laws as long as those laws are 'non-discriminatory [and] … otherwise applicable to all citizens of that [State]." *Id.* (citations omitted). Against this backdrop, the Second Circuit observed that "[m]uch of the commercial activity at issue takes place in New York." *Id*. It reached these conclusions even though LVD/Red Rock never disclosed to the district court or Second Circuit the role of Martorello's companies in the operations.

After the Second Circuit issued its decision, Martorello wrote an e-mail to Wichtman on October 10, 2014, urging her to drop the case. Ex. 24 at Rosette 043659 ("I can't urge any stronger that LVD not proceed even if [O]toe does."). Martorello also indicated that "SPVI won't be willing to testify, or do anything as the result of another filing will certainly end in a slew of attacks on me, SPVI and my team." *Id*. Ultimately, Wichtman agreed, and as she explained in a subsequent e-mail to Martorello, their best option was to "go quietly into the night and restructure based on what we know from the opinion in order to build an even stronger case for future litigation." Ex.

25 at Rosette 001130. Following the Second Circuit's decision, the parties started moving quickly to restructure the business—even though the parties had not reached an agreement in principle to the major terms of the restructure, including the price to be paid. For example, Wichtman obtained an employer tax identification number for Big Picture on December 1, 2014. Ex. 26.

On February 5, 2015, the LVD's Tribal Council adopted a resolution creating Ascension Technologies and designating Brian McFadden as its president. Ex. 27. Similarly, even though they were employed by a different company, Ascension designated McFadden and Liang as the signatories on Ascension's bank account on February 19, 2015. Ex 28 at LVD-DEF00000229. And, immediately following its creation, SourcePoint began assigning its contracts to Ascension— another sign that the restructure was not an arm's length transaction, but a façade designed to protect Martorello and his team. *See, e.g.*, Ex. 29 at Rosette 035776. All of these steps—the creation of Ascension, the designation of McFadden as its president, the assignment of contracts, adding signatories to bank accounts—were taken months before the parties entered into the Agreement and Plan of Merger dated September 14, 2015.

### H.    Martorello forms Eventide Credit Acquisitions to facilitate his ongoing criminal objective.

On February 9, 2015, Martorello created a new company, Eventide Credit Acquisitions, to facilitate the continuation of the illegal lending enterprise. *See generally* Ex. 30. On September 14, 2015, Eventide, Bellicose, and a company formed by LVD to effectuate the merger, Tribal Acquisition Company, LLC, executed the "Agreement and Plan of Merger." *See generally* Ex. 31. Pursuant to § 2.7 of the Agreement and Plan of Merger, the "consideration to be paid to" Eventide was "an amount equal to three hundred million dollars, $300,000,000 (the 'Acquisition Amount')." *Id.* § 2.7.

The $300 million acquisition price was just an elaborate opportunity for Eventide and

Martorello to be the targeted recipient of all of the net profits from the lending operation for the anticipated life cycle of the enterprise. Martorello engineered the superficial changes to the structure of the operation—characterizing his interest as a $300 million debt rather than equity—in a vain attempt to avoid accountability for his oversight of the lending operation and blatant violations of state and federal lending laws. Through the inflated "sales" price with an accompanying sunset provision to "forgive" any remaining "debt," Martorello intended to receive all the net profits from the lending operation while maintaining the "status quo" of his oversight and management of the illegal scheme.

Approximately three weeks after the Agreement and Plan of Merger, Martorello wrote an e-mail providing his thoughts on the "FMV vs FV" of Bellicose, *i.e.*, its fair market value v. future value. Ex. 32 at Liont_09845. As for its low fair market value, Martorello stated "[e]veryone knows the CFPB rule shuts down the business and there is a court decision that shows the CFPB does control Tribes." *Id*. Martorello wrote that they could "provide all the support in the world for this." *Id*. And if "someone asks," Martorello provided 11 points for the low fair market value assigned to the business, including "1) the Tribe is buying it b/c our contract gets terminated and they want this to continue[,] 2) Operation Choke Point is a risk for SPVI owners but not for the Tribe[,] 3) All the lawsuits against Servicers is removed from the equation for the Tribe to lose us… 7) They risk that they lose their debt investors if we go away, this deal keeps debt investors comfortable to remain, whereas they'd leave if a new vendor replaced us… 10) IN THE UNLIKELY EVENT that the CFPB rule doesn't take them down, then they pay as they go via a Seller financed deal rather than taking risk. . . ." *Id*. at 09845-6. In closing, Martorello further added "there is the risk that we get shut off from banking immediately (or the Tribe does) and we suffer catastrophic damages even worse than CFPB rule." *Id*. at 09846.

Martorello sent a similar e-mail to a business valuation firm on December 5, 2015, *i.e.*, about six weeks before the closing. Ex. 33 at Martorello_05530-2. In this e-mail, Martorello explained that "efforts would be attempted by [s]tate governments to shut down tribal lenders (and are being attempted in fact)." *Id*. One of those was an action filed by the Pennsylvania Attorney General, which Martorello characterized as "the most significant issue/risk to SPVI" as "PA could bring the same claims against SPVI for sure." *Id*. Martorello further added that Red Rock had already "received threats from several state AGs demanding they stop lending or they will come after them." *Id*. In addition to attorney general threats, Martorello further explained that the NY DFS has "issues too" with tribal lending "and they could go after SPVI as well." *Id*. Martorello encouraged the firm to include all "of the support [] that says the CFPB rule will shut this business down, and how operation choke point is hurting everyone." *Id*.

In another email dated December 6, 2016, Martorello similarly wrote that "It was estimated that the industry would be wiped out in Feb 2014 by the new CFPB, and/operation chokepoint tactics." Ex. 34 at Martorello_011446. Martorello further explained that "[a]ccurately enough, the clients lost the ability to debit borrower bank accounts in January 2014" and they "made no loans for many months after out of fear banking would be fully cut off for good." *Id*.

There are multiple e-mails reiterating this position that the tribal lending would be shut down and the restructure was simply a disguise to allow Martorello to continue to make millions until his prediction came true. *See also* Ex. 35, at Liont_05387 ("Lawsuits by AGs and regulators against SPVI, myself, or the client (as the reports and cases filed to date against competitors supports) may end the business or seriously shrink the business"); Ex. 36 at Martorello_011671 (e-mail from Martorello explaining that "we thought (and data supported) 'end of days in 2015'" because of Operation Chokepoint). In a review of this record, the Court recently found, "The record

is thus clear beyond serious question that Martorello was motivated to sell Bellicose to LVD because of the threats of litigation and enforcement actions against him and his entities under the then-current lending arrangement between him, his entities, and LVD." Mem. Op., ECF No. 944 at 30.

I.      **During the negotiations, Martorello insists on retaining control over the business after the restructure.**

Although Martorello "sold" his companies to LVD, he insisted on control over the business until the expiration or repayment of the $300,000,000.00 promissory note. For example, in an e-mail dated August 26, 2014, Martorello insisted "the seller," "will have to keep a final say so in business decisions to protect the business from being destroyed by the new owner before paid." Ex. 37 at 045272. And, Martorello made clear he did not want any changes, explaining there was "[n]o need to reinvent the wheel or shake things up, just need to keep it alive and then use the earnings from it to take risks with and do other things." *Id*.

Similarly, in an e-mail to Wichtman, Hazen, and Chairman Williams dated September 15, 2014, Martorello insisted that "the Bellicose Companies will be sold only 'as is', with existing Management in place and the company remaining substantially the same." Ex. 38 at Rosette_Revised 040179. Despite servicing through a new entity, Martorello insisted that it needed to "remain an independent cutting edge" company, which "needs to be run in the same format it is today." *Id*. Although technically tribally owned, remaining separately managed by the servicer would aid the "PR effect" on hiring and retaining professionals "who will understand they risk being labeled by peers as working for some 'illegal' lender" if the companies were combined. *Id*.

They maintained the status quo even though one of Rosette's lawyers, Tanya M. Gibbs, identified the structure—requiring Big Picture "to establish certain relationships with a servicer"— as opening them up to rent-a-tribe arguments similar to "the current class action litigation pending

20

in Vermont, *Gingras & Givens v. Rosette*." Ex. 39 at Rosette_Revised 043997. To avoid this, Ms. Gibbs wondered whether they needed to "to put these things in writing." *Id*. Martorello insisted on formal control in writing, saying it was "take it or leave it[.]" *Id*. at 043996. Martorello further added that "Servicer comfort" was the "only way" that an important investor would "be involved." *Id*. From "their perspective," if LVD "was to cut SPVI out of the picture, then [it] simply cannot perform as a business." *Id*.

The parties' intent to restructure the form of the arrangement but, not its substance, is further demonstrated by an e-mail exchange dated January 14, 2016, *i.e.*, two weeks before closing. As a part of the email exchange, Martorello explained that the enterprise's lenders "care about the person who runs the business at AT." *Id*. So long as the restructure documents were "clear that the position in question and under scrutiny to the lenders is President and CEO (Brian)," it was sufficient according to Martorello. *Id*. Martorello further wrote "[a]s far as I know, the Manager[s]," *i.e.*, Hazen and Chairman Williams, "don't really do anything." *Id*. In closing, Martorello explained that he would leave it up to his attorney, John Williams, on what the transaction documents "say if that jives, and what the authority is of BMF [Brian McFadden] vs the Managers, but if Managers are really only involved per the [operating agreement] to get feedback from the CEO/President" then that seemed "OK." *Id*. If the managers did "more than that" or the governing documents "say the position of concern are the Managers," then there was "some cleaning up to do" according to Martorello. *Id*. A day after this exchange, John Williams e-mailed Wichtman a draft of the Delegation of Authority Policy to ensure it was clear who had operational control. Ex. 40. The Delegation of Authority policy ensured that "The Tribal Council does not get to make the decision regarding [McFadden's] employment nor determine his salary other than through the budgeting process [which involves Eventide]" as explained by Wichtman's

email dated January 14, 2016. Ex. 41 at Rosette_Revised_020473. Put differently, Wichtman explained that this structure ensured that "Tribal Council can't get a wild hair up their hiny and pass a resolution or motion to fire [Brian] because they do not have the authority to act in that capacity as Member." *Id*.

J.     **As demanded by Martorello, the restructuring documents are crafted to ensure Martorello's control over operations and retention of profits.**

In an effort to exploit sovereign immunity and conceal Martorello's role, the lending enterprise completed the merger on January 26, 2016. Ex. 42. On paper, the LVD now appeared to own the business, ostensibly shielding Bellicose/Martorello from any pre-merger claims—as desired by Martorello almost immediately after he read the district court's decision in *Otoe-Missouria*. Ex. 13 (proposing "LVD to take ownership of Bellicose VI," and "[a]ll structured to provide all entities sovereign immunity"). And, as designed by Martorello, LVD contractually relinquished any right to control the business through the restructuring documents, namely: (1) the Delegation of Authority Policy, (2) the Intratribal Servicing Agreement, (3) the Loan and Security Agreement, and (4) Eventide's Operating Agreement. Each of these documents worked together to ensure Martorello's control.

*First*, LVD contractually relinquished any right to control Ascension through the Delegation of Authority Policy. *See generally* Ex. 43. Under this policy, Ascension delegated McFadden with the authority to: (1) handle Ascension's "strategic direction, goals and targets," (2) execute documents on behalf of Ascension, (3) open and maintain bank accounts, (4) adopt employee benefit plans and programs, and (5) "authority regarding all matters necessary for the day to day management of Ascension." *Id*. at § 1.4(a)-(e). By contrast, the only matters designated to the tribal co-managers are: (1) approval of contracts in excess of $100,000 in a calendar year, (2) appointment of the president, and (3) approval of any "new major employee benefit plans." *Id*.

at § 1.2(a)-(c). And, while the authority to appoint the president seems to provide some control, the Loan Agreement takes this control away—to appoint a new president, Hazen and Williams must receive the approval of Eventide, *i.e.*, Martorello. *See* Ex. 44 at Martorello_000080 ("Management. Neither [TED] nor [Big Picture or Ascension] shall terminate or replace any manager, director or officer of [TED] or [Big Picture or Ascension] or modify delegations of authority without the prior written consent of [Eventide], which shall not be unreasonably withheld, conditioned or delayed.").

*Second*, because of McFadden's *de facto* control of Ascension, the restructuring documents were designed to provide Ascension with control over Big Picture's operations—no different than the relationship between SourcePoint and Red Rock. *See generally*, Ex. 45. Indeed, Ascension and Big Picture entered into a "Intratribal Servicing Agreement," which is virtually identical to the prior servicing agreement between SourcePoint and Red Rock. *Compare id.*, *with* Ex. 5 at § 4.2.1. Like the prior arrangement, this agreement grants Ascension "all the necessary power and authority to act in order to fulfill its responsibilities," which includes the enumerated responsibilities previously designated to SourcePoint. Ex. 5 at §§ 4.1, 4.2; *compare with* Ex. 45, at §§ 4.1, 4.2. And, just like the Delegation of Authority Policy, LVD cannot amend, modify, or terminate the Intratribal Servicing Agreement until satisfaction of the $300 million-dollar promissory note.[4] Ex. 44 at § 5.12. The Delegation of Authority Policy and Intratribal Servicing Agreement work in tandem to ensure that Martorello's designee, McFadden, has control over Ascension, and Ascension has control over the lending business.

---

[4] If TED breaches the Intratribal Servicing Agreement, it would forfeit the reinvestment amounts, as well as its ownership interest in Ascension. (Ex. 46, Secured Promissory Note at § 1.2(b)(2)).

Further, Eventide's operating agreement ensures that Martorello has control over McFadden. *See generally* Ex. 30 at § II(I). In particular, to ensure control over McFadden, Eventide's operating agreement allows Martorello to unilaterally revoke his shares in Eventide with 14-days notice. *Id.* ("The Manager, in his sole and absolute discretion, may require a Member to sell all or a portion of the Interest" within 14 days). In other words, if Martorello disagrees with any action by McFadden, including in his capacity as president of Ascension, Martorello possesses the sole discretion to revoke his primary economic interest in the lending enterprise, *i.e.*, McFadden's profit interest as a shareholder of Eventide. Ex. 30. And those profits have been substantial, including monthly distributions, on average, of $35,000. *See* Ex. 47 at p. 12.

The evidence shows that Martorello has already considered wielding this power, including in August 2016, when Martorello texted his brother and business partner, expressing concern that "Brian [McFadden] and James [Dowd] are getting too big for their britches." Ex. 48 at Justin_Martorello_00157. Martorello further explained that "they see monthly wires and are starting to think they deserve a lot more of it now than the $1mm a year Brian makes for being a hired CEO." *Id.* Martorello further wrote that McFadden "may have to be disappointed somewhere down the near term road," as "he's not the founder and $1mm a year buys a lot of very capable replacements." *Id.* In short, even after the sale, Martorello believed that he controlled the business, including the ability to remove the president of Ascension, who possesses the authority to run the lending business free from interference by the co-managers or Tribal Council—exactly as Martorello had insisted.

### K.   Martorello negotiates a provision requiring the destruction of his documents, including the damaging emails uncovered from third parties.

Martorello's efforts to avoid liability did not end with the restructure. To ensure the utmost protection, Martorello included a provision in the Merger Agreement that expressly required the

destruction of all of Bellicose's documents related to the lending enterprise, including Martorello's emails. In particular, the Merger Agreement provides that: "All [Bellicose] information now or that may be discovered on equipment of any kind or in any written materials shall be immediately provided to [TAC] and deleted or destroyed by [TAC] so that [TAC] retains no copies of Company information." Ex. 31 at § 2.6(d). Counsel for Big Picture represented that this destruction occurred, including Martorello's emails. Ex. 49. To help eliminate any trace of evidence, Martorello's attorneys at Greenberg Traurig were also instructed to delete their documents and "communications regarding Bellicose with Mr. Martorello and other persons and entities." Ex. 50, Jan. 24, 2019 Declaration of Jennifer Weddle.

Consistent with his conduct throughout the case, Martorello has also lied—under oath—about the genesis of the document destruction provision. According to Martorello in his deposition, the prior merger agreement was "a template document" provided to him by an attorney, John Williams, and the destruction provision was in the original document from the other transaction.[5] Plaintiffs' counsel has obtained the "template" document from the other transaction. The two agreements are substantively identical except for one term—there is no § 2.6(d) in the other agreement. *See* Ex. 52 at pg. 4. After § 2.6(c), the "template" goes immediately to § 2.7. *Id.* The provision requiring the destruction of Martorello's documents, in other words, was intentionally

---

[5] Ex. 51, 149:7-24 ("Q. And first, whose idea was it to put this language in this merger agreement? A. This provision was included in a -- sort of like a template, the original template document that came from a -- my understanding is that it came from another transaction. Q. Okay. Do you know what transaction? A. Yeah, I think it was related to Upper Lake. Q. What is Upper Lake? A. Upper Lake is a tribe in northern California that had made an acquisition in some similar capacity. So this was the -- this was the template document that was provided to me with the exception being the very last sentence, which I was adamant that I obviously needed to be able to retain anything required for tax returns and anything that would amount to that.").

added to Martorello's merger agreement. *See* Ex. 31 at § 2.6(d). And, when John Williams was asked: "Did Mr. Martorello advise you to put paragraph 2.6D or provisions to that effect into the merger agreement," he was instructed not to answer on the grounds of privilege. Ex. 53 at 183:18-184:3. There are also express communications between Martorello and John Williams related to § 2.6(d) of the Merger Agreement, which are being withheld based on Martorello's assertion of attorney client privilege. *See* Ex. 56.

## ARGUMENT

### I.     Martorello has not established that any work product was prepared in anticipation of litigation.

"Courts disfavor assertions of evidentiary privilege because they shield evidence from the truth-seeking process." *RLI Ins. Co. v. Conseco, Inc.*, 477 F. Supp. 2d 741, 748 (E.D. Va. 2007). "[T]he work product doctrine belongs to the attorney and confers a qualified privilege on documents prepared by an attorney in anticipation of litigation." *Solis v. Food Employers Labor Relations Ass'n*, 644 F.3d 221, 231 (4th Cir. 2011). "[T]he party claiming the protection bears the burden of demonstrating the applicability of the work product doctrine." *Id.*

"First, the party asserting work-product protection bears the burden to show that the 'work product' was prepared in anticipation of litigation." *RLI Ins. Co.*, 477 F. Supp. 2d at 748. "Second, in order to meet this burden, the proponent of the privilege must 'come forward with a specific demonstration of facts supporting the requested protection,' preferably though affidavits from knowledgeable persons." *Id.* (quoting *Suggs v. Whitaker,* 152 F.R.D. 501, 505 (M.D.N.C.1993)). "Finally, assertions of evidentiary privilege are narrowly and strictly construed, so that the privilege is strictly confined within the narrowest possible limits consistent with the logic of its principle." *Id.* (internal citations and quotations omitted).

The work product doctrine only covers documents that are prepared by an attorney in anticipation of litigation. "'Materials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes' do not constitute 'documents prepared in anticipation of litigation' protected by work product privilege." *Food Employers Labor Relations Ass'n*, 644 F.3d at 232 (quoting *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.,* 967 F.2d 980, 984 (4th Cir.1992) (internal modification omitted)).

"The document must be prepared *because* of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation." *Nat'l Union Fire Ins.,* 967 F.2d at 984. "The preparation of work merely because an attorney 'anticipates the contingency' of litigation is not sufficient to qualify the work for the protection afforded by the work-product doctrine. *RLI Ins. Co.*, 477 F. Supp. 2d at 747 (quoting *Nat'l Union Fire Ins.,* 967 F.2d at 984). Further, "the 'because of' standard is designed to protect only work that was conducted because of litigation, not work that would have been done in any event." *Id.*

On his privilege logs (Exs. 54 & 55), Martorello has not asserted that any of the documents were prepared with this litigation in mind, and most of them appear to relate to the sale of Bellicose and the tax consequences of the sale.[6]  As this Court already found on a different occasion, "Martorello has provided no information about what pending or imminent litigation prompted" the creation of each document and "vague, inchoate threat of future litigation based on the complicated

---

6 See, e.g., LVRMM_00005246, LVRMM_00005247, LVRMM_00001753, LVRMM_00001754, LVRMM_00002497, LVRMM_00002498, LVRMM_00003358, LVRMM_00006441, LVRMM_00006640. (Ex. 54)

sale of Bellicose is not enough." *Williams v. Big Picture Loans, LLC*, 303 F. Supp. 3d 434, 449 (E.D. Va. 2018). Nor is the prospect of being audited by the IRS. *Id.* at 449.

Of course, Plaintiffs contend that the entire sale of Bellicose was designed to shield Martorello from liability from impending litigation. But Martorello has not asserted that, and it is his burden to substantiate the work-product privilege. Indeed, Martorello has repeatedly disclaimed that he anticipated litigation at the time of the sale. *See, e.g.,* ECF 389 at 6 ("Martorello's sale of the business to LVD was not a sham and was not spurred by litigation or regulatory efforts directed at tribal lending."); ECF 299 at 5 ("Most importantly, there was no pending or threatened litigation at the time that the documents were destroyed.") Because Martorello has failed to demonstrate that any documents on his privilege logs, or any other documents that pre-date this lawsuit related to the operation of the lending business and its restructure were created *"because of"* the prospect of litigation, Martorello has not met his burden to show that work-product protection is appropriate.

## II.  Martorello's privilege logs are inadequate.

Rule 26(b)(5)(A)(ii)'s requires that a party "describe the nature of the documents" and "do so in a manner" that "will enable the other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A)(ii); *see also Rambus v. Infineon Technologies, Inc.*, 220 F.R.D. 264, 272 (E.D. Va. 2004) ("the descriptions in the log must satisfy the claiming party's burden.").

"[A]n adequate 'privilege log' should contain: a brief description or summary of the contents of the document, the date the document was prepared, the person or persons who prepared the document, the person to whom the document was directed, or for whom the document was prepared, the purpose in preparing the document, the privilege or privileges asserted with respect to the document, and how each element of the privilege is met as to that document." *Cappetta v.*

*GC Servs. Ltd. P'ship*, 3:08-cv-288, 2008 WL 5377934, at *4 (E.D. Va. Dec. 24, 2008) (quoting *Burns v. Imagine Films Entm't, Inc.,* 164 F.R.D. 589, 593 (W.D.N.Y. 1996).

Here, Martorello's description of the documents on the privilege logs makes it impossible for Plaintiffs to assess the applicability of privilege. Instead, Martorello's descriptions are nothing more than conclusory assertions such as "PMA attorney communication and work product,"[7] "attorney communication and work product,"[8] and "communication with counsel re transaction."[9] These descriptions fall far short of what is required.

Failure to provide an adequate privilege log may result in a waiver of privilege, *Cappetta*, 2008 WL 5377934, at *4, an outcome that is not rare in this District. *Burke v. Fed. Nat'l Mort. Ass'n*, No. 3:16-cv-00153 (E.D. Va. Oct. 6, 2016) (Novak, J.) (ECF No. 91) (finding privilege waived due to failure to provide privilege log with responses and insufficient descriptions); *ePlus Inc. v. Lawson Software, Inc.*, 280 F.R.D. 247, 251-52 (E.D. Va. 2012) (finding privilege waived where party failed to provide author and recipient information). In determining whether waiver is an appropriate sanction, this Court has examined a number of factors, including: (1) the reasonableness of the effort made by the party; (2) the time taken to rectify any error; (3) the scope of discovery; (4) and the overriding fairness of the assertion. *Cappetta*, 2008 WL 5377934, at *4. In short, waiver is appropriate "[w]here a party has taken no precautions to properly assert the privilege, and has allowed time to pass without clarifying the basis for its assertion of privilege[.]" *Id.*

In this case, waiver is an appropriate sanction because Martorello did not make reasonable

---

7 LVRMM_00011603-00011616 (Ex. 55).
8 LVRMM_00011714-00011716; LVRMM_00006454-00006460 (Ex.55).
9 LVRMM_00012653-00012669 (Ex.55).

efforts to satisfy his obligations under Rule 26(b)(5). He omitted basic information that would have taken a few hours to log, such as adequate descriptions of the documents. He has allowed far too much time to pass without correcting his errors as these privilege logs are over three years old. Waiver is an appropriate sanction here.

### III.    Martorello has waived work product by raising his good faith defense

Martorello has waived work product privilege by raising a good faith defense and intending to rely on advice of attorneys.  Martorello's Answer to the Complaint stated, "Defendant Matt Martorello, at all times relevant acted in good faith and in a lawful manner towards consumers and in conformity with all applicable laws and regulations." Martorello's Answer, ECF No. 35 at 23. Martorello again asserted this defense in his responses to Plaintiffs' interrogatories. Ex. 1 at Int. No. 13. Martorello further indicated that this defense was based "on non-privileged information provided by attorneys Jennifer Weddle, Karrie Wichtman, Blake Sims, John Williams, Jennifer Galloway, Dan Gravel, Saba Bazzazieh and Rob Rosette… about the legality of the tribal business model and LVD's operations." *Id.* at Int. No. 13. These attorneys "who had intimate knowledge of the entire operations of the Tribe's lending business and relationships, routinely issued opinion letters—which Martorello received… expressing the confidence in the Tribe's sovereign status, the legality of the Tribe's lending businesses…." *Id.* at Int. No. 15. According to Martorello, this legal advice provided him "with the assurances that the servicing relationship whereby Bellicose or SourcePoint would assist the Tribe's lending businesses was lawful in all respects." *Id.* at Int. No. 15.

Where a party raises a defense about his good faith belief that he was following the law, he cannot prevent disclosure of any advice related to that belief. *U.S. v. Bilzerian*, 926 F.2d 1285, 1292 (2nd Cir. 1991) (upholding trial court's ruling that if defendant testified about his good faith

belief he was following the law, he could not also invoke the privilege regarding what his attorneys told him because "[defendant's] testimony that he thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required in issue."); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (argument that defendants cannot use attorney client privilege as both a "sword" and a "shield" has merit); *see also United States v. Moazzeni*, 906 F. Supp. 2d 505, 518 (E.D. Va. 2012) ("By placing his attorneys' representation at the center of his defense, Moazzeni has waived any privilege to communications within the scope of that issue."); *Rhone–Poulenc Rorer v. Home Indem. Co.,* 32 F.3d 851, 863 (3d Cir. 1994); *see also United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982) ("Selective disclosure for tactical purposes waives the attorney-client privilege.").

Further, when a party asserts a defense based on advice received from attorneys, the party may not reveal "beneficial communication[s]" but withhold other "less helpful, communication(s) on the same matter." *E.I. Dupont de Nemours & Co. v. Kolon Indus., Inc.*, 269 F.R.D. 600, 605 (E.D. Va. 2010). This principle, often referred to as the "at issue" doctrine, is rooted in fairness— when a jury evaluates Defendants' good faith defense, it must be able to assess the full story to evaluate their belief of the legality of his conduct, not just the beneficial or conclusory assertions. Thus, when a party contends it acted in good faith based on its understanding of the law, "then the extent of its investigation and the basis for its subjective evaluation are called into question." *Hege v. Aegon USA, LLC*, 2011 WL 1791883, at *4 (D.S.C. May 10, 2011); (citing *City of Myrtle Beach v. United Nat. Ins. Co.*, 2010 WL 3420044, at *5 (D.S.C. Aug. 27, 2010) ("[I]f a defendant voluntarily injects an issue in the case, whether legal or factual, the insurer voluntary waives, explicitly or impliedly, the attorney-client privilege.").

"[W]here a party intends to use an 'attorney's opinions as a sword or shield to affect the factfinding process[,]' those opinions are not covered by the work product doctrine." *Twigg v. Pilgrim's Pride Corp.*, No. 3:05-CV-40, 2007 WL 676208, at *8 (N.D. W.Va. Mar. 1, 2007) (quoting *Vaughan Furniture Co. v. Featureline Manufacturing Co.,* 156 F.R.D. 123, 128 (M.D.N.C.1994)). An implied waiver of work product occurs is when a party "attempt[s] to make testimonial use of work-product materials."  *In re Martin Marietta Corp.*, 856 F.2d 619, 624 (4th Cir. 1988).

The Fourth Circuit has delineated between opinion work product and non-opinion work product, noting "that opinion work product is to be accorded great protection by the courts."  *Id.* at 626. However, "when work product concerns activities of counsel that are directly in issue, courts have not hesitated to find subject matter waiver." *E.I. Dupont de Nemours & Co. v. Kolon Indus., Inc.*, 269 F.R.D. 600, 608 (E.D. Va. 2010) (internal quotation and modifications omitted) (collecting authority). This is especially true where a party "intends to use its attorney as an expert witness and to use the attorney's opinions as a sword or shield to affect the factfinding process." *Vaughan Furniture Co. Inc.*, 156 F.R.D. at 128. In other words, "[a] party waives the opinion work product protection of its attorney by naming its attorney as an expert witness." *Id.* at 128.

It is evident that Martorello intends to use the "expert" opinions of lawyers to bolster his good faith defense. In these circumstances where a party intends to use an attorney's opinions in their defense at trial, work product protections for both opinion and non-opinion work product have been waived. *Vaughan Furniture Co. Inc.*, 156 F.R.D. at 128; *Cornett Mgmt. Co., LLC v. Lexington Ins. Co.*, No. CIV.A. 5:04-CV-22, 2007 WL 1140253, at *6 (N.D.W. Va. Apr. 17, 2007) (finding waiver where party "has placed its communications with its attorneys at the center of this litigation"); *Cincinnati Ins. Co. v. Zurich Ins. Co.*, 198 F.R.D. 81, 87 (W.D.N.C. 2000) (finding

opinion work product protection waived when the party intended to offer the attorney's opinion at trial); *Charlotte Motor Speedway, Inc. v. Int'l Ins. Co.*, 125 F.R.D. 127, 130 (M.D.N.C. 1989) ("Many courts faced with the issue of the production of opinion work product have recognized an exception to Rule 26(b)(3) protection for work product which concerns activities of counsel that are directly in issue.")

As to the scope of the waiver, broad "subject matter waiver applies" for fact work product. *In re Martin Marietta Corp.*, 856 F.2d 619, 625 (4th Cir. 1988). As evident in Martorello's privilege logs, the work product assertions here are broad and relate to all aspects of the lending business, including the corporate restructure. The subject matter waiver for fact work product thus should be co-extensive with the subject matter waiver for attorney-client privilege.

For opinion work product, the waiver is more limited: "[W]aiver of the opinion work-product protection is limited to the documents actually disclosed." *E.I. Dupont de Nemours & Co.*, 269 F.R.D. at 606 (modification omitted). Thus, to the extent that Martorello intends to rely on any opinions drafted by lawyers at trial, opinion work product privilege has been waived with respect to those documents. If there is protected opinion work product "commingled with fact work product that must be disclosed under subject matter waiver, the proper method of preventing disclosure of opinion work product is for the Court to review the material and redact the legal theories and mental impressions from the otherwise discoverable materials." *Id.*

### IV. Martorello waived work product under the crime-fraud exception.

The record establishes a prima facie showing that the crime/fraud exception for work product protection applies to any documents pertaining to the legality of the business model, the LVD's operations, and the restructure. "The crime/fraud exception to the attorney-client and work product privileges provides that otherwise privileged communications or work product made for,

or in furtherance of, the purpose of committing a crime or fraud will not be privileged or protected." *Rambus, Inc. v. Infineon Technologies AG*, 222 F.R.D. 280, 287 (E.D. Va. 2004) (citing *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999)).

The Fourth Circuit uses "similar standards when applying the crime-fraud exception to attorney-client and fact work product privileges." *In re Grand Jury Proceedings #5 Empaneled Jan. 28, 2004*, 401 F.3d 247, 252–53 (4th Cir. 2005). "[F]act work product may be discovered upon prima facie evidence of a crime or fraud as to the client only and thus even when the attorney is unaware of the crime or fraud." *Id.* For opinion work product, "[a] party seeking to compel the production of opinion work product under the crime-fraud exception must demonstrate attorney knowledge of or participation in the client's crime or fraud." *In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017).

Here, the lawyers involved in the lending scheme to whom Martorello or his companies went to for advice include John Williams, Jennifer Weddle, and Jennifer Galloway. All of these lawyers knew that about the lending scheme and Martorello's involvement, and the assertions that the Tribe did not have to comply with state usury laws. Thus, to the extent that Martorello is in possession of any opinion work product from these lawyers or any other lawyer who was involved in lending scheme or the restructure, that information should be produced and is not protected opinion work product

Plaintiffs must make a prima facie showing that the crime/fraud exception applies by establishing that "(1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme and (2) the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud." *See* Mem. Op., ECF No. 478 at 34.

### A.    Martorello was engaged in a criminal and fraudulent lending scheme when he sought the advice of counsel as early as 2011.

The record establishes that Martorello sought the advice of counsel for the purpose of furthering a usurious lending scheme that violates state and federal law. The Tribal lending model, or "Rent A Tribe" lending scheme, was preceded by the "Rent A Bank" scheme, in which payday lenders used national banks as loan conduits to evade state usury laws. *See* Mem. Op., ECF No. 944 at 4; *see also* Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012) (describing the rent-a-tribe model as "the most recent incarnation of payday lending companies regulation-avoidance"). After federal regulators intervened and put a stop the Rent A Bank model, many payday lenders began using Native American tribal entities as the conduit for the loans. *See* Mem. Op., ECF No. 944 at 4; *see also* Martin & Schwartz, supra at 785. Martorello's involvement in internet lending that attempts to avoid state usury caps follows a similar timeline: in 2008 he was involved with a payday lending company that attempted to use Costa Rica law to avoid the application of state usury laws. *See* Mem. Op., ECF No. 944 at 4. Subsequently, in 2011, Martorello became interested in the Tribal lending model. Ex. 2, Merritt Dep. 31:3-4; 93:16-20; *see also* Mem. Op., ECF No. 944 at 4.

Like many other states, Virginia law makes it a crime to violate or to participate in a violation of its usury statute. Va. Code § 6.2-1540.[10] In particular, the Virginia Code provides

---

[10] *See also,* Ga. Code Ann. § 16-17-2(d) (establishing that any person who violates Georgia's payday lending statute "shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both."); N.Y. Penal Law § 190.40 (same); Mass. Gen. Laws Ann. ch. 271, § 49 (same).

"[a]ny person, including *members*, officers, directors, agents, and employees of an entity, who violates or *participates in* the violation of any provision of § 6.2-1501 is guilty of a Class 2 misdemeanor." *Id*. (emphasis added). In turn, Va. Code § 6.2-1501 provides that "[n]o person shall engage in the business of making loans to individual . . . and charge, contract for, or receive, directly or indirectly, on or in connection with any loan interest" an amount greater than 12% without first obtaining a license from the Virginia State Corporation Commission. Va. Code § 6.2-1501(A). In sum, Virginia law "makes clear that it is a crime to participate in the violation of Virginia's usury statute, which limits a business to contracting for a loan interest rate of greater than 12%." *Williams*, 2019 WL 1983048, at *13 (citing Va. Code § 6.2-1501).

Similarly, "[t]he enactment of RICO was a result of twenty years of intense scrutiny of organized crime by Congress, the Department of Justice, and the public." Pamela Bucy Pierson, *Rico, Corruption & White-Collar Crime*, 85 TEMP. L. REV. 523, 535 (2013). The statutory scheme reflects Congress's recognition that groups—rather than individuals—working together present "a greater potential threat to the public than individual delicts." *Id*. Indeed, when enacting the statute, Congress declared that its purpose was to seek the eradication of organized crime in the United States," including loan sharking. Pub. L. 91–452, § 1; *see also United States v. Biasucci*, 786 F.2d 504, 512 (2d Cir. 1986) ("The elimination of loansharking was one of Congress' principal aims in enacting the statute.").

To accomplish Congress's goal to prevent loan sharking, RICO generally prohibits four activities associated with "unlawful debt," which is defined as debt that "is *unenforceable under State* or Federal law in whole or in part as to principal or interest because of laws relating to usury," where "the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6) (emphasis added). Against this backdrop: (1) § 1962(a) prohibits a person who has received income from the

collection of an unlawful debt from investing any of that income in the enterprise; (2) § 1962(b) prohibits a person to acquire or maintain control over an enterprise engaged in the unlawful collection of debt; (3) § 1962(c) prohibits a person from conducting or participating in the affairs of an enterprise engaged in the collection of an unlawful debt; and (4) § 1962(d) prohibits any person from conspiring to commit any of the provisions in §§ 1962(a)-(c). 18 U.S.C. § 1962(a)-(d). In sum, RICO "makes it unlawful for '*any person*'—not just mobsters—" to be part of an organized scheme to collect unlawful debt. *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 839 (4th Cir. 1990) (emphasis in original). And, if a person violates any section of § 1962 of RICO, including its prohibition against schemes to collect unlawful debt, it is a felony, and the person may be "imprisoned not more than 20 years." 18 U.S.C. § 1963(a).

Martorello's conduct was not only a crime, but it was also a fraudulent scheme that used the tribe as a front for his usurious lending. As the former Vice Chairman of the Tribe explained: "When Tribal Council initially agreed to the deal with Martorello," they "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans." Ex. 4 at ¶¶ 2-3. Pete further explained that "[a]fter the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement." *Id*. at ¶ 4.

In short, the crime/fraud exception exists for situations just like this and recognizes the "commonsense notion" that privileges "'cannot avail to protect the client in concerting with the

37

attorney a crime or other evil enterprise.'" *Rambus*, 222 F.R.D. at 281 (quoting Evidence § 2298 at 572 (McNaughton rev. 1961)).

### B. The documents bear a close relationship to Martorello's existing and ongoing criminal efforts.

The rent-a-tribe business model was developed, in large part, by attorneys in response to federal crackdowns on the rent-a-bank model. In the CFPB's litigation against CashCall, the legal advice provided by attorneys was revealed as part of CashCall's good faith defense. *CFPB v. CashCall, Inc.*, 2018 WL 485963, at *3 (C.D. Cal. Jan. 19, 2018) (post-trial fact of finding and conclusion of law). This evidence showed that CashCall's attorney, Claudia Callaway, began advising her clients in January 2009 that the rent-a-bank model "was no longer viable because of pressure from regulators and, therefore, she was advising her consumer lending clients to switch to a similar business model, which involved partnering with an Indian tribal entity or member who would act in the same capacity as a state-chartered bank[.]" *Id*. "[B]ecause the loans made pursuant to the Tribal Lending Model were originated by a tribe or tribal member," Callaway advised her clients that " the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id*.

Like CashCall, Martorello retained attorneys to assist him with launching and developing the tribal lending model with Red Rock and LVD. Martorello's attorneys, primarily Jennifer Weddle, Jennifer Galloway, and John Williams—presumably provided advice consistent with Callaway's and the overarching purpose of the model, which was to circumvent applicable state and federal laws. Over the past eight years, dozens of courts have rejected this dubious effort to avoid regulation, resulting in multi-million dollar enforcement actions and imprisonment of three

of the pioneers of the scheme, as well as some of their lawyers.[11] For example, the Third Circuit recently affirmed the criminal convictions of Charles Hallinan and Wheeler Neff (his lawyer), whose "RICO convictions" were "based on their efforts to skirt state usury laws by partnering with American Indian tribes to offer usurious payday loans." Neff, 787 F. App'x at 85, *cert. denied*, 140 S. Ct. 2674 (2020). In rejecting the defendant's argument about the legality of the tribal loans, the Third Circuit explained:

> Tribal sovereign immunity thus limits how states can enforce their laws against tribes or arms of tribes, but, contrary to Neff's understanding, it does not transfigure debts that are otherwise unlawful under RICO into lawful ones. A debt can be "unlawful" for RICO purposes even if tribal sovereign immunity might stymie a state civil enforcement action or consumer suit[.]

*Id*. at 92.

In the case against another pioneer, Scott Tucker, the United States District Court for the Southern District of New York applied the crime/fraud exception. *United States v. Tucker*, 2017 WL 2470836, at *1 (S.D.N.Y. June 6, 2017). In that case, the indictment charged Tucker with "conspiracy to collect unlawful debts" and "collection of unlawful debts," through several payday lending businesses that Tucker managed and controlled, but "were nominally owned by American Indian tribes, including the Miami Tribe of Oklahoma." *Id*. Just like this case, the government alleged that "Tucker entered into sham relationships with the Indian tribes in order to invoke tribal

---

[11] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

immunity and continue lending practices that would otherwise be unlawful." *Id*. In finding certain documents were not privileged due to the crime/fraud exclusion, the court observed that the "continuation of an unlawfully usurious lending business was the crime or fraud attempted, and the communications and documents concerning *Tucker v. AMG* were in furtherance thereof because they were part of an effort to baselessly invoke the protections of tribal immunity." *Id*.

Given the similarities between their business, Martorello has described Tucker as a "competitor," including in his email comparing his company to a drug cartel. Ex. 6, at MARTORELLO_038990. Because of the fundamental nature of the scheme, the crime/fraud exception warrants disclosure of the legal advice received by Martorello regarding the legality of the business model, its operations, the restructure, and any advice made pursuant to or in furtherance of this scheme. *Rambus*, 222 F.R.D. at 279 ("it is the planning and pursuit of the scheme with the advice of counsel, not the scheme's success or failure, that animates the crime/fraud exception."). Although blanket waivers of privilege are rarely appropriate, it is hard to imagine any legal advice that would not have been made in furtherance of the scheme. Put differently, any legal advice would have been "made for" or "in further" of the overarching purpose of the business model, *i.e.*, avoidance of state and federal law.

Additionally, there is ample evidence in the record establishing that Martorello restructured the Tribal lending business for the criminal purpose of continuing to violate state usury laws and RICO with no liability. Indeed, the record repeatedly reflects that Martorello was concerned about the viability of the tribal business model and his own potential criminal liability. For example, when discussing the valuation of the business, Martorello asked how to value illegal businesses, citing poker sites, medical marijuana stores, and a drug cartel as comparable to the Tribal lending model. Ex. 6 at Martorello_038990-0389911; *see also* Mem. Op., ECF No. 944 at 24. Similarly,

in November 8, 2013, Martorello expressly stated that he was concerned about defending himself "personally in more than civil matters"). Ex. 15 at Rosette_Revised_052787. Because of this, as well as his efforts to misrepresent what actually happened, all advice and communications regarding the restructure should be produced, including fact and opinion work product.

### C. The crime/fraud exception applies to any documents destroyed as part of the sale of Bellicose, as well as any communications planning or in further of the destruction.

In *Rambus*, this Court held that the crime/fraud exception extends to materials or communication created for planning, or in furtherance of, spoliation. *Rambus*, 220 F.R.D. at 283 (citing *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590–91 (4th Cir. 2001). In doing so, the Court explained that it "is self-evident" that protecting "any communication between lawyer and client respecting spoliation is fundamentally inconsistent with the asserted principles behind the recognition of the attorney-client privilege, namely, 'observance of law' or the 'administration of justice.'" *Id*. at 283. This is because "an attorney who counsels a client to spoliate evidence is not advancing the observance of the law, but rather counseling misconduct." *Id*.

As part of the restructuring, Martorello included a provision in the Merger Agreement requiring a tribal entity, Tribal Acquisition Company, requiring the destruction of Bellicose's records, including Martorello's emails. In particular, the Merger Agreement provides that: "All [Bellicose] information now or that may be discovered on equipment of any kind or in any written materials shall be immediately provided to [TAC] and deleted or destroyed by the [TAC] so that [TAC] retains no copies of Company information." Ex. 31 at § 2.6(d). The Big Picture's counsel has confirmed that the deletion occurred, including the deletion of Martorello's emails. Ex. 49. In particular, Big Picture's counsel stated:

> When we searched, the only Martorello emails on the server were the pre-2014 travel confirmation emails. Any other emails surrendered by Martorello to my

clients were deleted shortly after the time of the acquisition according to the requirements in the acquisition documents.

*Id*.

Consistent with his conduct throughout the case, Martorello has also lied—under oath—about the genesis of the document destruction provision. According to Martorello in his deposition, the prior merger agreement was "a template document" provided to him by an attorney, John Williams, and the destruction provision was in the original document from the other transaction.[12] If Martorello were telling the truth—that he simply used a template from another transaction—this would be important evidence that Martorello never intended to destroy documents. But, as with many of his other statements, the documents show otherwise.

Plaintiffs' counsel has obtained the "template" document from the other transaction. The two agreements are substantively identical except for one term—there is no § 2.6(d) in the other agreement. *See* Ex. 52 at pg. 4. After § 2.6(c), the "template" goes immediately to § 2.7. *Id*. The provision requiring the destruction of Martorello's documents, in other words, was intentionally added to Martorello's merger agreement. *See* Ex. 31 at § 2.6(d). And, when John Williams was asked: "Did Mr. Martorello advise you to put paragraph 2.6D or provisions to that effect into the merger agreement," he was instructed not to answer on the grounds of privilege. Ex. 53 at 183:18-184:3. There are also express communications between Martorello and John Williams

_____

[12] Ex. 51, 149:7-24 ("Q. And first, whose idea was it to put this language in this merger agreement? A. This provision was included in a -- sort of like a template, the original template document that came from a -- my understanding is that it came from another transaction. Q. Okay. Do you know what transaction? A. Yeah, I think it was related to Upper Lake. Q. What is Upper Lake? A. Upper Lake is a tribe in northern California that had made an acquisition in some similar capacity. So this was the -- this was the template document that was provided to me with the exception being the very last sentence, which I was adamant that I obviously needed to be able to retain anything required for tax returns and anything that would amount to that.").

related to § 2.6(d) of the Merger Agreement, which are being withheld based on Martorello's assertion of attorney client privilege. Ex. 56, Conner Winters, LLP.

In light of the evidence cited above, it inconceivable that this provision was included for a purpose other than to intentionally destroy evidence of Martorello and Bellicose's misconduct. And, the effort to obstruct justice did not stop with the destruction of Martorello's records—his attorneys at Greenberg Traurig were also instructed to delete their documents regarding the arrangement, including "communications regarding Bellicose with Mr. Martorello and other persons and entities." Ex. 50, Jan. 24, 2019 Declaration of Jennifer Weddle.

This widespread, intentional effort to destroy evidence warrants a severe sanction. *Silvestri*, 271 F.3d at 590–91 (noting that district courts may impose a wide range of remedies for spoliation). Before requesting the sanction, however, Plaintiffs believe it is necessary to exhaust all efforts to attempt to restore the information, including retaining an independent expert to examine all possible sources for the information. Plaintiffs further believe it is necessary to obtain any communications regarding the spoliation, as well as deposition testimony of those involved. Accordingly, Plaintiffs request the Court to make a finding that spoliation occurred and order: (1) production of all communications concerning the destruction of any of Martorello or his companies' information; and (2) that privilege is waived as to all such communications, as well as any documents retrieved as part of Plaintiffs' efforts to restore the destroyed information

## CONCLUSION

For the documents listed on Martorello's privilege logs, Martorello has failed to show that work product protection applies because there is no evidence that the documents were created in anticipation of litigation. Further, for the documents listed on his privilege logs, Martorello has waived any protections due to the inadequacy of the logs. To the extent that there are

43

communications protected by work-product, Martorello has waived such protections as to fact and opinion work product by raising his good faith defense, and waived any such protection afforded to fact and opinion work product under the crime-fraud exception.

Respectfully submitted,

Date: January 11, 2021

_____/s/_____
Leonard A. Bennett, VSB #37523
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
*Attorneys for Plaintiffs and Proposed Classes*