- Exhibit 4 -

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| RENEE GALLOWAY, et al., | : |
| Plaintiffs, | : |
| v. | : Civil Action No. 3:18-cv-406-REP |
| BIG PICTURE LOANS, LLC, et al., | : |
| Defendants. | : |

## DECLARATION OF JOETTE PETE

I, Joette Pete, hereby make this Declaration under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. My name is Joette Pete. I am the former Vice Chairwoman of the Lac Vieux Desert Band of Lake Superior Chippewa Indians. I served in this capacity between 2010 and 2016. I am over the age of twenty-one and otherwise competent to testify as to the matters contained herein. I have personal knowledge of these matters contained herein based on my experience as Vice Chairwoman, as well as a tribal member of the Lac Vieux Desert Band of Lake Superior Chippewa Indians.

2. In 2011, Tribal Council was approached by Matt Martorello with an opportunity to participate in a lending business. In the fall of 2011, Martorello visited our reservation to meet with Tribal Council to present the deal. During this presentation, Martorello explained that his company would run the business if LVD

1

allowed him to claim that LVD law applied to the loans. Under the deal, LVD would receive 2% of the gross revenue from the loans.

3. When Tribal Council initially agreed to the deal with Martorello, we understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans. Because Martorello was going to completely run the lending business, he received the most of the profits.

4. For Martorello to be able to claim that LVD law applied to the consumer loans, the deal required that Red Rock "originate" the loans. But, this responsibility was immaterial because Red Rock would have no reason to reject a loan that satisfied Martorello's lending criteria because Martorello ran the business and bore all the risk. After the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement.

5. I have read the declaration of Michelle Hazen submitted in connection with the lawsuits against Big Picture, Ascension, and Matt Martorello. It is my understanding that it is inaccurate for Hazen to assert that "All of Red Rock's employees, computers, and records were on LVD's reservation lands at all times." I

understand that Martorello operated Red Rock exclusively for a significant amount of time after its inception. I understand that some employees, computers, and records were located off the reservation.

6. It is also inaccurate for Hazen to claim that Red Rock contracted with Bellicose VI "to learn the lending industry." That was never the goal when LVD formed Red Rock; nor did Martorello attempt to teach us anything about the business. Tribal Council and other members of the tribe did not have access to information regarding the business. Instead, the relationship with Martorello was presented as an opportunity to make money, with no risk of loss, in exchange for rubberstamping LVD's name on loans. And that is what occurred.

7. Additionally, although business information was kept secret from Tribal Council, it was my understanding that the co-managers did not receive a salary or compensation for their roles as co-managers, at least for the first two years of the business. Instead, the co-managers were volunteers, who were involved for "optics" and to provide pro forma approval of recommendations provided by Bellicose. I believe both co-managers worked other full-time jobs, in addition to their service as tribal council members, at least until January 2014 after we started making structural changes due to lawsuits against the business model.

8. Similarly, it is also inaccurate and misleading for Hazen to assert that "LVD had gained considerable experience and knowledge of the online lending

3

industry" thereby prompting it to look for ways "to expand its online lending business to earn money for LVD." This is inaccurate because Martorello initiated and developed the concept to restructure after the district court ruled against Red Rock in its litigation against the New York Department of Financial Services.

9.  For example, less than three weeks after the district court's decision in Otoe-Missouria, I received the e-mail attached hereto as Exhibit 1 from Martorello. In this e-mail, Martorello detailed his "concept" to "facilitate a transition to LVD" of his "businesses." This e-mail was sent shortly after another e-mail from Martorello, where he detailed his fears that the Otoe-Missouria decision would "precipitate" a potential investigation and prosecution of him personally. Attached as Exhibit 2 is a true and accurate copy of that e-mail correspondence. This is the first time we were ever presented with the opportunity "to own" the business, but it would still be controlled by Martorello as proposed.

10. In 2014-2016, LVD's Tribal Council did not look for ways to expand its business and did not gain considerable experience and knowledge of the industry. The restructure was driven by Martorello's desire to attempt to obtain sovereign immunity for his businesses. Other than receiving our monthly proceeds, Tribal Council had nominal involvement and little understanding about the operations of the business, and the Tribe was not in a position to run the business.

11. As part of the restructure, I have learned that Matt Martorello's emails were destroyed. I did not participate in the destruction of Martorello's emails. I do not know who performed this task, and to my knowledge, it was not presented to Tribal Council for approval. However, it does not surprise me that the e-mails were destroyed because a shredding company was also hired to destroy paper records related to the business. This had never been done in the past and was performed specifically to conceal the truth about the business.

12. And unless they were deleted/destroyed, Tribal Council kept audio recordings of our monthly meetings. These audio recordings would be consistent with the statements herein and would show the lack of meaningful involvement of Tribal Council in the lending business.

I have reviewed this Declaration and declare under penalty of perjury that the foregoing statements are true to the best of my knowledge and belief.

Date: August 20, 2019

*Joette Pete* (signature)
Joette Pete

5

**Joette Pete-Baldwin**

| | |
|---|---|
| **From:** | Matt Martorello <mattm@bellicosevi.com> |
| **Sent:** | Monday, October 14, 2013 4:14 PM |
| **To:** | Karrie Wichtman; Chairman James Williams; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com) |
| **Cc:** | Craig Mansfield (craig.mansfield@lvdcasino.com); Justin Martorello |
| **Subject:** | SPVI Equity Transfer to LVD |

Good afternoon,

Below is the beginning of a concept I have to facilitate a transition to LVD of MY businesses. The abrupt termination of RRTL/DCTF, as it is written in the existing servicing agreements, is an oversimplified end that we have for some time been meaning to revisit. I think it is time to move forward on the proper legacy plan for how our companies come together. I believe Rob and Karrie can provide some highlights, but I do believe the items below should be able to get us to a term sheet with the goal of FINAL documents delivered on 10/30/13. The documents will not be as daunting as the list below appears, for tax structuring reasons, it is a little more complicated than it appears.

- Assign today to LVD - 51% of Bellicose VI, LLC <u>Equity only</u> membership interest tied to the SPVI subsidiary only (i.e. SPVI is a wholly owned sub of Bellicose, as it must be for tax reasons. Therefore, LVD's equity share for the subsidiary would be at the Bellicose parent company level):
    - LVD will own 51% equity, but 0% profits interest until month 49 when it becomes 100% equity and 80% profits
    - BlueTech will own 49% equity, but 100% profits interest until month 49 when it becomes 0% equity and 20% profits
    - Current Manager (myself) will be locked in as the decision maker for 48 months, at which point they will hire a new Manager to replace me
    - In month 49, Profits will be 80% LVD and 20% BlueTech for 10 years, after which it is 100% profits to LVD.
- Assign today to LVD - 51% of 7X Services, LLC <u>Equity only</u> for a membership class tied to:
    - Iron Fence Investments, LLC
    - Obsidian Armor Fund, LLC (note this will be dissolved before the 48 month mark)
    - WMS (where both WMS and SPVI terminate the existing option agreements)
    - On January 1st, due to my forthcoming 2014 restructuring, Bellicose VI, LLC will be transferred 100% to 7X Services, LLC and LVD's Equity will be shifted to DIRECTLY to SPVI (as we move from the VIs to Puerto Rico)
- Other:
    - Appropriate waivers of SI to protect the Assignors and Managers
    - Structured to ensure the integrity of sovereign immunity
    - It is possible the currently Delaware and Virgin Islands LLCs, may need to be migrated to be LVD LLCs (perhaps AFTER the closing in the interest of time)
    - Castle stops NEW customer loans beginning on January 31, 2014 and only does VIP loans thereafter (same as DCTF today)
    - Tribe uses its own capital to launch a new portfolio in Q1 2014, in which SPVI generates the same fees from the TLE, but LVD gets to keep 75% of the profits interest on the SPVI side for servicing the portfolio, until that 48th month. Adjusts the same thereafter. (This is required for tax purposes)
    - Proper indemnities to the Assignors and Managers
    - No strings attached, no requirements, no liability to LVD by Assignors or Managers on the new LVD portfolio, RRTL, DCTF, or on anything that may happen after month 48. Best efforts basis.

1

**Joette Pete-Baldwin**

**From:** Matt Martorello <mattm@bellicosevi.com>
**Sent:** Wednesday, October 02, 2013 4:28 PM
**To:** Karrie Wichtman; Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield
**Cc:** Justin Martorello; Daniel Gravel; weddlej@gtlaw.com; Saba Bazzazieh; Rob Rosette; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com)
**Subject:** RE: Notice to Cease Servicing Origination of New Loans to NY consumers

Thanks for the clarification on these points of distinction Karrie, we'll take a closer look at the details of the provisions and circle back shortly. Simply put in the meantime, we do recommend that RRTL and DCTF stop issuing new and returning customer loans in the State of NY at this time.

**From:** Karrie Wichtman [mailto:kwichtman@rosettelaw.com]
**Sent:** Wednesday, October 2, 2013 4:39 PM
**To:** Matt Martorello; Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield
**Cc:** Justin Martorello; Daniel Gravel; weddlej@gtlaw.com; Saba Bazzazieh; Rob Rosette; Cheryl McGeshick; Eli Edwards; gkway@lvdtribal.com; Henry Smith; Joette Pete-Baldwin (joette.pete@lvdtribal.com); John McGeshick, Jr.; Susan McGeshick (susan.mcgeshick@lvdcasino.com); Tyrone McGeshick (tyrone.mcgeshick@lvdcasino.com)
**Subject:** RE: Notice to Cease Servicing Origination of New Loans to NY consumers

Matt and SPVI Team,

Please advise as to the intent of your email as it is my understanding that your email and the citation to Section 9.4 of the Servicing Agreement is effectively a declaration of breach or dispute being asserted in writing in accordance with Section 18.1 of the Servicing Agreement, considering that that provision cited calls for cessation of the obligations of the parties to one another under the Agreement and states that the "Agreement shall be of no further force and effect". Claiming such a breach under 9.4 necessarily requires that such material change in law be based upon "a final judgment of a court of competent jurisdiction, after all appeals thereof". The Order of the Court denying the Plaintiff's Preliminary Injunction is certainly not such an order as it is not a final judgment of a court, appealable and while no such appeals have yet been file we have 30 days from yesterday's date to do so. Transmitting such a notice declaring a breach, if that is the intent here, is unwarranted and unsupported by the facts at hand. It matters not how Judge Sullivan's order will be regarded by overzealous regulatory agencies but rather that such an order IS NOT, in fact, a final order of the Court on the merits changing a material aspect of the Legal Requirements governing the agreement of the parties. Furthermore the provision does not appear to allow for the singling out of a particular state, in this case NY, to wind down business- which is the cause for my confusion – and leads me to believe that it is not your intent at all to make such a declaration of breach.

Indeed, your email, the concerns expressed, and the recommendations therein seem to fall more in line with Section 4.2 in that as the Servicer you have been contracted to advise the Enterprise regarding the "orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of third party servicer relationships, collections and risk assessment". Among other provisions included in Section 4.2, your observations, and recommendation to the Enterprise not to lend to and wind down business involving residents in the State of New York surely fits within Section 4.2.1 (a) whereby the "Servicer will be responsible for providing pre-qualified leads to Enterprise and providing the necessary credit-modeling data and risk assessment strategies by which the Enterprise may evaluate to whether or not to extend funds to an individual borrower based on criteria that has been established by the Enterprise." Note that the Agreement, in that same section, however,

1

makes quite clear that "The criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion of the Enterprise and the Enterprise shall execute all necessary loan documentation". Therefore, in the spirit of clarification of your earlier email, would you agree that a better way to approach this matter may be for the Servicer as provided for in Section 4.2.1 (a) to make a recommendation to the Enterprise that in light of recent enforcement actions taken by the State of NY Department of Financial Services, the pending litigation and the recent preliminary Order of the Court, that the Enterprise refrain, immediately, and until further notice, from making new loans in the State of New York and that current loans be wound down until paid in full or some other disposition of the debt to the Enterprise has been reached?

I look forward to your response so that I may advise my client.

Regards,

**Karrie S. Wichtman, Partner**
**Rosette, LLP**
**Attorneys at Law**
Michigan Office
25344 Red Arrow Hwy, Suite B
Mattawan, MI 49071
269.283.5005 – Office
480.242.6959 - Cell
517.913.6443 – Fax
kwichtman@rosettelaw.com
www.rosettelaw.com

CONFIDENTIAL COMMUNICATION: THIS MESSAGE IS A CONFIDENTIAL ATTORNEY COMMUNICATION ONLY FOR USE BY THE INTENDED RECIPIENT. ANY INADVERTENT RECEIPT SHALL NOT CONSTITUTE A WAIVER OF ATTORNEY-CLIENT OR WORK PRODUCT PROTECTION. IF RECEIVED IN ERROR, PLEASE NOTIFY KARRIE S. WICHTMAN IMMEDIATELY AND DELETE THIS MESSAGE. THANK YOU FOR YOUR COOPERATION.

**From:** Matt Martorello [mailto:mattm@bellicosevi.com]
**Sent:** Wednesday, October 2, 2013 2:50 PM
**To:** Chairman James Williams; gkway@duckcreektf.com; Craig Mansfield
**Cc:** Karrie Wichtman; Justin Martorello; Daniel Gravel
**Subject:** Notice to Cease Servicing Origination of New Loans to NY consumers

Dear Mr. Chairman and Team:

Due to Judge Sullivan's ruling, we believe we have an involuntary termination event under the Servicing Agreement as it relates to loans made in the State of New York. As you know, the Servicing Agreement provides:

## Involuntary Termination Due to Changes in Legal Requirements

It is the understanding and intention of the parties that the establishment and operation of Enterprise conforms to and complies with all Legal Requirements. If during the term of this Agreement, Enterprise, or any material aspect of the business conducted by Enterprise, becomes prohibited by operation of federal law or determined by final judgment of a court of competent jurisdiction, after all appeals thereof, to be unlawful under applicable law, the obligations of the parties hereto shall cease, and this Agreement shall be of no further force and effect; provided that (i) the Servicer shall have the rights in Section 4.4 of this Agreement; (ii) the Servicer and the Enterprise shall retain all money previously paid to them pursuant to Section 6 of this Agreement; (iii) funds of Enterprise in any account shall be paid and distributed as

2

JPB 00981

provided in Section 6 of this Agreement, provided any Authorized Debt shall be paid in full; (iv) any money lent by or guaranteed by the Servicer or its affiliates to Servicer shall be repaid to the Servicer to the extent provided in a written agreement entered in connection therewith, with recovery of monetary payments or damages limited in recourse to Enterprise assets and any such payments or damages shall be made only after payment in full of any and all amounts under any Authorized Debt; and (v) the Enterprise, directly or indirectly, shall retain its interest in the title to all Enterprise assets, fixtures, supplies and equipment subject to any requirements of financing arrangements. Nothing contained in this Section 9.4 shall be read to preclude either or both parties from contesting any actions which could lead to the involuntary cessation of business by Enterprise.

While we understand that an appeal of Judge Sullivan's order is imminent, our concern is that Judge Sullivan's order finding that tribal enterprises are subject to New York's anti-usury laws will be regarded as sufficiently final by the State of New York such that it will precipitate their potential investigation and potential prosecution of us personally and our companies if we continue to provide New York-related services at this time.

We might be able to resume servicing New York loans at some point in the future, but for now, Judge Sullivan's Order presents a significant potential liability for us and we do not believe that we should service any new New York loans. We are willing to wind down our New York services and see existing loans through to their completion, but we simply cannot flaunt the clear ruling from Judge Sullivan's order, however legally incorrect it might be.

This action applies both to services performed for the Red Rock Tribal Lending, LLC and Duck Creek Tribal Financial, LLC portfolios.

Regards,

**Matt Martorello**
Mobile: 773-209-7720
Email: mm@BellicoseVI.com

BELLICOSE VI

\*\*This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.\*\*

\*\*This email and any files transmitted with it are confidential and may contain privileged or copyrighted information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify us. If you have received this message in error, please notify the sender immediately, and delete this email from your system.\*\*

JPB 00982