IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA RICHMOND DIVISION

| | | |
|---|---|---|
| LULA WILLIAMS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 3:17-cv-00461 (REP) |
| v. | ) | |
| | ) | |
| BIG PICTURE LOANS, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**OPPOSITION TO PLAINTIFFS' RENEWED MOTION
FOR CLASS CERTIFICATION AGAINST MATT MARTORELLO**

Matt Martorello, by counsel, respectfully submits this Opposition to Plaintiffs' Renewed Motion for Class Certification against Matt Martorello.

## I.  INTRODUCTION

This case arises out of loan agreements between the Plaintiffs and Big Picture Loans, LLC ("Big Picture" or "Tribal Lender"), which is wholly owned and operated by the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe" or "LVD").  The loan agreements provide that they are governed by Tribal and applicable federal law, and include interest rates that are legal according to the Tribe's laws and policies.  The loan agreements also include waivers of class action claims.

After Plaintiffs settled with the Tribal Lender in a related proceeding (and after the dismissal of the Tribal Lender from this case due to sovereign immunity), Plaintiffs now seek to certify a class action against Matt Martorello personally, even though Martorello was never the lender or collector on the loans.  They target Martorello because, for a portion of the class period (not all), Martorello managed an outside vendor that assisted the Tribe with developing its lending business, furthering the federal policy of Tribal economic development.  In 2016, the Tribe purchased that outside vendor, and Martorello's assistance with the Tribe's lending

business ceased.

Class certification against Martorello personally fails for a number of reasons including: (1) Plaintiffs waived class action claims; (2) Plaintiffs cannot show ascertainability without loan data, which is inaccessible and under Tribal control; and (3) Plaintiffs cannot show predominance or superiority *with respect to Martorello,* whose involvement in the lending business varied significantly over time.  For any given year, individualized inquiries are required, including to assess (A) whether Martorello *could have* participated in the Tribal Lender's affairs "through a pattern of racketeering activity or collection of unlawful debt," as Plaintiffs allege; (B) whether Martorello received any payments derived from interest from the class borrowers per class-year or month; and (C) whether Martorello could have proximately caused the alleged injury.  The need for individualized mini-trials defeats predominance and renders the purported class unmanageable.

## II. PRELIMINARY ARGUMENT

### A.  PLAINTIFFS WAIVED THE ABILITY TO PURSUE A CLASS ACTION.

In their loan agreements, each of the Plaintiffs expressly agreed not to pursue class action litigation.  Specifically, Plaintiffs' loan agreements provide:

> **WAIVER OF JURY TRIAL**:
> ...
> 2. You acknowledge and agree that by agreeing to this Waiver of Jury Trial provision:
> **(a) YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT FILED AGAINST US AND/OR RELATED THIRD PARTIES;**
> …
> **3....NO JUDGE OR ARBITRATOR SHALL CONDUCT CLASS PROCEEDINGS; THAT IS, YOU SHALL BE INELIGIBLE TO SERVE AS A CLASS ACTION REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN LITIGATION OR ARBITRATION.**

ECF 222, Ex. DD, Williams Loan Agmt. at 000075.  All named Plaintiffs have agreed to loan

contracts with similar or identical waiver provisions.[1]  *See* ECF 222, Ex. EE, Coffy Loan Agmt.

at Williams 000010; Ex. FF, Turnage Loan Agmt. at 000040–41; Ex. GG, Hengle Loan Agmt. at

Williams 000020; Ex. HH, Gillison Loan Agmt. at 009955.[2]

Here, Plaintiffs voluntarily "contracted away the right to pursue [a] class" action.

*Freeman v. Capital One Bank*, 2008 WL 2661990, at *3 (E.D. Va. July 3, 2008).  That the

agreement was online makes no difference.  *See, e.g. In re Online Travel Co.*, 953 F. Supp. 2d

713, 718 (N.D. Tex. 2013) (website users contractually agreed to Travelocity's user agreement,

including class action waiver, by clicking on the button that said "agree").

**1.  The Class Action Waivers Apply to Martorello**.

Though Martorello is a non-party to the loan agreements, the class-action waivers

expressly apply to him because the waivers apply to "*disputes and claims related to* or arising

under this Agreement." *See* ECF No. 734-1 at 5.  The loan agreements further provide:

> **All disputes** including any Representative Claims **against Us and related third parties** shall be resolved by the TRIBAL DISPUTE RESOLUTION PROCEDURE only on an individual basis with You as provided for pursuant to Tribal law. THEREFORE, NO LITIGATION OR ARBITRATION IS AVAILABLE AND NO JUDGE OR ARBITRATOR SHALL CONDUCT CLASS PROCEEDINGS; THAT IS, YOU SHALL BE INELIGIBLE TO SERVE AS A CLASS ACTION REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN LITIGATION OR ARBITRATION.

[1] At their depositions, each Plaintiff (except for Coffy, an attorney who has taken a dozen small-dollar loans) testified that he/she read the loan agreement, including the waiver provision prior to signing.  *See* Hengle Dep. Tr. 28:2-10; Williams Dep. Tr. 50-18-51:16; Turnage Dep. Tr. 42:7-46:19.
[2] Martorello lacks access to loan agreements beyond those of the named Plaintiffs but believes that similar or identical class action waivers appear in all LVD loan agreements.  To the extent the waiver provisions are not identical, individual variations would weigh against predominance of common issues and militate against class certification.

ECF No. 734-1 at 5 (capitalization in original; other emphasis added).  The words "dispute" and "disputes" "are given the broadest possible meaning and include, without limitation . . . all claims, disputes, or controversies involving the parties to this Agreement and Our employees, **servicers** and agents including but not limited to consultants. . . ." *Id.* (emphasis added). Martorello-managed companies were "servicers" and consultants to the Tribe's business.

The class action waiver also applies to Martorello because he is a "related third party" which is defined to include any of Big Picture's "employees, agents, directors, officers, shareholders, governors, managers, members, parent company or affiliated entities."  ECF No. 734-1 at 5.  Martorello is both an "affiliated entity" and an alleged agent.  Martorello and companies he managed were "affiliated entities" because they provided consulting and servicing assistance to the Tribal Lender prior to the sale of Bellicose.[3]  In addition, Plaintiffs allege (incorrectly) that Martorello and businesses he managed were agents behind the entire lending business.  *See, e.g.,* ECF 1, ¶ 3, 14.

## 2.  The Class Action Waivers Are Valid and Enforceable.

Class action waivers are valid and enforceable under Tribal law, and are repeatedly upheld in federal courts.  *See, e.g.*, *Freeman*, 2008 WL 2661990, at *3 ("class action arbitration waiver is enforceable"); *see also Fielding v. Dolgen, LLC*, 2018 WL 3091012, at *2 (E.D. Va., June 21, 2018) ("inability to bring a class action ... cannot by itself suffice to render the provision unenforceable"); *Adkins v. Labor Ready, Inc.,* 303 F.3d 496, 503 (4th 2002) (waiver of class

---

[3] The term "entity" includes both legal organizations and natural persons.  *See, e.g.*, *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 158 (2001) ("[T]o establish liability under RICO § 1962 (C) one must allege and prove the existence of two distinct entities:  (1) a 'person'; and (2) and 'enterprise'); *Armstrong v. NewVA Entp.*, 23 Va. Cir. 352 (1991) (noting statutes "referring to a requirement that an entity state whether it is a 'natural person' or some other entity such as a partnership").

action "cannot by itself suffice to defeat the strong congressional preference for an arbitral forum");  (*Convergys Corp. v. Nat'l Labor Relations Bd.,* 866 F.3d 635, 638-640 (5th Cir. 2017) (class action waiver "must be enforced according to its terms;" class actions are not a substantive right; and class action waivers are enforceable outside of the arbitration context because "FAA places arbitration agreements 'on equal footing with other contracts'" and "there is no logical reason to distinguish a waiver in the context of an arbitration agreement from a waiver in the context of any other contract") (internal citations omitted); *ConRoman v. Spirit Airlines, Inc*., No. 19-CIV-61461-RAR, 2020 WL 5746830, *8 (S.D. Fla. Aug. 31, 2020) (enforcing contractual class action waiver in action against airline); *Am. Express Co. v. Italian Colors Rest*., 570 U.S. 228, 238 (2013) (enforcing contractual waiver of class arbitration, though plaintiff's cost of individually arbitrating federal statutory claim exceeded potential recovery).

Any contrary view would be preempted by federal law and policy, including federal policies favoring agreements to alternate dispute resolution and favoring Indian tribes' self-sufficiency and self-governance.[4]  *See, e.g., AT&T Mobility*, 563 U.S. 333 (Federal Arbitration Act preempted unconscionability of class-action waivers); *Litman v. Cellco P'ship*, 655 F.3d 225, 231 (3d Cir. 2011) ("state law that seeks to impose class arbitration despite a contractual agreement for individualized arbitration is inconsistent with, and therefore preempted by, the FAA"); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351–52 (2011) (Federal Arbitration Act preempted California's judicial rule regarding the unconscionability of class arbitration waivers in consumer contracts); *Muriithi v. Shuttle Express, Inc*., 712 F.3d 173, 180 (4th Cir. 2013) (defense of unconscionability could not be applied to invalidate arbitration agreement

---

[4] Congress views alternate dispute resolution as a "more efficient dispute resolution process than litigation."  *Adkins*, 303 F.3d at 500 (addressing liberal federal policy favoring arbitration agreements).

barring class-wide procedures); *Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 638 (4th Cir. 2002) (arbitration agreement was not unconscionable merely because it excluded class actions); *Abdul-Hasib v. Aerotek, Inc.*, 2017 WL 5903555, at *3 (D. Md. Nov. 30, 2017) ("class action waivers have been held permissible").

Federal policy strongly favors Tribal self-governance, and the Tribal loans further that purpose.  *See Williams v. Big Picture Loans*, 929 F.3d 170, 179-182 (4th Cir. 2019) (Big Picture's profits "constituted a significant percentage of the Tribe's general fund;" and "Big Picture and Ascension serve the purpose of tribal economic development and self-governance"); *see also Cabazon Band of Mission Indians v. Smith,* 34 F. Supp. 2d 1201, 1206 (C.D. Cal. 1998), *aff'd*, 249 F.3d 1101 (9th Cir. 2001), opinion withdrawn, 271 F.3d 910 (9th Cir. 2001) (state law may be preempted by federal law "if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the State interests at stake are sufficient to justify the assertion of State authority"); *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 884, 106 S. Ct. 2305, 2309 (1986) ("…considerations of tribal sovereignty, .. form an important backdrop"); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 170-171, 93 S.Ct. 1257, 1261-1262 ("[s]tate laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply"); *Seminole Tribe v. Florida*, 517 U.S. 44, 62 (1996) (similar); *Montana v. U.S.,* 450 U.S. 544, 565 (1981) ("A tribe may regulate … the activities of nonmembers who enter consensual relationships with the tribe … through commercial dealing, contracts…"); *see generally* NABDA, 25 U.S.C. § 4301.

### 3.  The Class Action Waivers Are Reasonable and Not Unconscionable.

The class action waivers are reasonable under the circumstances and not unconscionable.

*See, e.g.*, *Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 877 (11th Cir. Feb. 18, 2005) ("inclusion of a class action waiver in the Arbitration Agreements did not render those Agreements substantively unconscionable"); *Korea Week, Inc. v. Got Capital, LLC*, No. CV 15-6351, 2016 WL 3049490, at *9 (E.D. Pa. May 27, 2016) (class action waivers by small business managers were not unconscionable where they could "communicate, at least partially, in English;" understood the terms of the repayment; and met the terms of the repayment); *Carson v. LendingTree LLC*, 456 F. App'x 234, 236 (4th Cir. 2011) (concluding that contract with online lender was not unconscionable because, *inter alia*, plaintiff was "able to peruse the application from her home computer at her leisure, with no external pressure" and "visited the website on her own and applied for LendingTree's service for free"); *see also Forbes v. SeaWorld Parks & Ent't,* 2017 WL 2437348, at *5 (E.D. Va. June 2, 2017) (stating that unconscionability is "a narrow doctrine" that "requires a showing of inequality so gross as to shock the conscience") (internal citations omitted); *Lee v. Fairfax Cty. Sch. Bd.*, 621 F.App'x 761, 762 (4th Cir. 2015) (an unconscionable contract is one that "no man in his senses" would make).

### 4.  The Class Action Waivers Do Not Affect Any Substantive Rights.

The class action waiver does not affect "the substantive rights of the parties"— only the manner in which those rights can be pursued.  *DeLuca v. Royal Caribbean Cruises, Ltd.*, 244 F. Supp. 3d 1342, 1348 (S.D. Fla. 2017); *see also D.R. Horton, Inc. v. N.L.R.B.*, 737 F.3d 344, 357 (5th Cir. 2013) ("The use of class action procedures . . . is not a substantive right"); *Palmer v. Convergys Corp.*, No. 7:10-CV-145 HL, 2012 WL 425256, at *2 (M.D. Ga. Feb. 9, 2012) ("class action waivers are upheld because they are contractual provisions that do not affect any substantive rights"); *Deposit Guaranty Nat. Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 332 (1980) ("[T]he right of a litigant to employ Rule 23 is a procedural right only"); *Dimery v.*

*Convergys Corp.*, No. 4:17-CV-00701-RBH, 2018 WL 1471892, at *7 (D.S.C. Mar. 26, 2018) (upholding class action waiver, explaining, "Clearly, the right to employ Rule 23 is a procedural right only. As such, it can be waived.").

### 5.  RICO Is Compatible with Enforcement of Class Action Waivers.

Assertion of RICO claims does not weigh against enforcing class action waivers.  *See Korea Week,* No. CV 15-6351, 2016 WL 3049490, at *10  (finding that "RICO does not, through legislative intent, policy, or through the volumes of case law from other courts, weigh against enforcing the class action waiver"); *U1it4Less, Inc. v. FedEx Corp.*, No. 11-CV-1713 KBF, 2015 WL 3916247, at *5 (S.D.N.Y. June 25, 2015) ("Nothing in that statute [RICO] favors class claims versus pursuit of individual ones"); *see also Shetiwy v. Midland Credit Mgmt.*, 959 F.Supp.2d 469, 475 (S.D.N.Y. 2013) (civil RICO contains no statutory preference for proceeding on a class basis); *Khanna v. American Exp. Co.,* No. 11 Civ. 6245(JSR), 2011 WL 6382603 (S.D.N.Y. Dec. 14, 2011) ("In any event, in the absence of any evidence that Congress intended that RICO require the availability of class-based proceedings, the Court declines to find that RICO invalidates private agreements that render such proceedings unavailable.").

### 6.  The Class-Action Waivers Are Part of Valid and Enforceable Loan Agreements.

#### A.  Tribal Law Applies to the Loans.

Plaintiffs have sought to circumvent the class-waivers by trying to invalidate the loan agreements in their entirety.  But the loan agreements contain enforceable Tribal choice of law provisions, and the agreements are legal under Tribal law.  *See, e.g.*, *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 9 (1972) (choice of law provisions are presumptively valid, which presumption can only be overcome by a "clear showing that they are 'unreasonable under the circumstances;'"); *Settlement Funding, LLC v. Van Neumann-Lillie*, 645 S.E.2d 436 (Va. 2007)

(that choice-of-law clauses designating application of another sovereign's law should be enforced despite usury claims).

Even aside from the choice of law provision, Tribal law would apply under the doctrine of "lex loci contractus," whereby the "nature, validity and interpretation of contracts are governed by the law of the place where made, unless the contrary appears to be the express intention of the parties." *C. I. T. Corp. v. Guy*, 170 Va. 16, 16, 195 S.E. 659 (1938); *Insteel Indus., Inc. v. Costanza Contracting Co*., 276 F. Supp. 2d 479, 484 (E.D. Va. 2003) ("the law of the place where the contract was made governs questions of interpretation, validity, and enforceability of a contract.").

Tribal law further applies because the Tribal lending is firmly rooted on the Reservation, and state regulatory laws should not burden lending rooted on the Reservation. *See, e.g.*, *Otoe-Missouria Tribe of Indians v. N.Y. State Dept. of Fin. Serv.*, 769 F.3d 105, 115, n.4 (2d Cir. 2014) ("[a] court might ultimately conclude that, despite these circumstances, the transaction … **could be regarded as on-reservation**, based on the extent to which one side of the transaction is firmly rooted on the reservation"); *F.T.C. v. Payday Fin., LLC*, 935 F. Supp. 2d 926, 939–40 (D.S.D. 2013) (the "proper focus is on the nonmember Borrower's 'activities ' or 'conduct,' … not solely the nonmember Borrower's physical location") (internal citations omitted); *see also White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142 (1980) (exercise of "state regulatory authority" barred where it is "pre-empted by federal law" or infringes on Indians' right to "make their own laws and be ruled by them").  In short, because the loans at issue here originated on the Reservation by an instrumentality of the Tribe they come within the jurisdiction of the Tribe, which is entitled to regulate them through Tribal law.  *See, e.g.*, *Montana v. United States*, 450 U.S. 544, 565 (1981) ("A tribe may regulate … the activities of nonmembers who

enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangement").

Finally, Tribal law applies because the Indian Commerce Clause precludes application of Virginia law to the Tribal loans. *See, e.g.*, *Titlemax of Delaware Inc. et al. v. Weissmann*, No. CV 17-1325-MPT, 2020 WL 7186833, at *4 (D. Del. Dec. 7, 2020) (attempt to apply state usury laws to the loans issued in other states violated the Commerce Clause; under the Commerce Clause, "the 'critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the state…'") (emphasis added). This is true regardless of "whether or not the commerce has effects in the state." *Id.*; *see also Seminole Tribe v. Florida*, 517 U.S. 44, 62, 116 S. Ct. 1114, 1126 (1996) (Indian Commerce clause divests states of "virtually all authority over Indian Commerce and Indian tribes"); *c.f. Shivwits Band of Paiute Indians v. Utah*, 428 F.3d 966 (10th Cir. 2005) (tribal billboards could not be regulated by a state's police power).

## B.  The Prospective Waiver Exception Does Not Invalidate the Loans or Class Action Waivers.

The prospective waiver exception does not apply because (1) the class action waivers do not affect substantive rights; (2) the loans expressly incorporate federal law;[5]  (3) there is no elimination of the right to pursue a remedy in a Tribal forum; (4) the prospective waiver exception is a narrow judge-created exception in the arbitration context and should not be expanded to limit tribal jurisdiction; and (5) plaintiffs failed to exhaust Tribal remedies, after

---

[5] The loan contracts are distinguishable from those in the cases like *Hayes* and *Dillon*, where there was an express statement that no federal law would apply to the agreement. *C.f. Hayes v. Delbert Serv. Corp.*, 811 F.3d 666 (4th Cir. 2016) (arbitration agreement that purported to renounce any application of federal law to borrowers' claims was unenforceable); *Dillon v. BMO Harris, N.A.,* 856 F.3d 330 (4th Cir. 2017) (loan agreement precluded application of federal law).

which they would have been free to pursue their claims in federal courts.[6] *See, e.g., DeLuca*, 244 F. Supp. 3d at 1348 (class action waiver "does not affect substantive liability or rights"); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 865 (E.D. Va. 2020), *motion to certify appeal granted*, No. 3:19CV250 (DJN), 2020 WL 855970 (E.D. Va. Feb. 20, 2020) (though loan agreements indicated they "shall be governed by applicable tribal law," this did not expressly disavow the application of federal law, and the prospective waiver doctrine did not apply to the Mobiloans Contract); *Gibbs v. Stinson*, 421 F.Supp.3d 267 (E.D. Va. 2019), *affirmed sub nom., Gibbs v. Sequoia Capital Operations, LLC*, 966 F.3d 286 (4th Cir. 2000) (holding that "the phrase 'applicable federal law' renders the Mobiloans Contract subject to federal law, seemingly without qualification" and the prospective waiver doctrine did not apply); *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236, 133 S.Ct. 2304, 186 L.Ed.2d 417 (2013) (class-action waiver did not eliminate plaintiffs' right to pursue statutory remedy in arbitration); *see also* LVD Code, ECF 958-1 (¶1.1 (f) "It is essential that the Tribal Council regulate consumer financial services in a manner commensurate with Tribal law and policy ***and applicable federal law***" and ¶ 9.3(h) "Relief"); ECF No. 734-1 at 5 ("**GOVERNING LAW AND FORUM SELECTION:** This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Indians ("Tribal law"), including but not limited to the Code **as well as applicable federal law**") (emphasis added); *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 235-36 (2013) (noting prospective waiver is a "judge-made exception" to the Federal Arbitration Act); *Vimar Seguros y Reaseguros, S.A. v. M/V/ Sky Reefer*, 515 U.S. 528, 540-41 (1995) (holding no prospective waiver, even though Japanese law provided defenses to liability that were unavailable under U.S.

---

[6] Failure to exhaust Tribal remedies is a prerequisite to a federal court's exercise of jurisdiction. *See, e.g.*, *Watterson v. Fritcher*, No. 1:17-CV-01020-DAD-JLT, 2018 WL 5880776, at *3 (E.D. Cal. Nov. 8, 2018).

law).

### C.  Virginia's Consumer Finance Act Does Not Invalidate Loans or Waiver.

The class action waiver is not void based on any alleged violation of Virginia Code § 6.2-1501.  As discussed above, Tribal law (not Virginia law) applies.  But even if Virginia law applied, the Virginia Consumer Finance Act would not invalidate the loans or waiver including because at the applicable time, it did not require a license for online lenders without a physical presence in the Commonwealth.  *See, e.g.*, Va. Code § 6.2-1507 (setting forth procedures for license applicant with "another location in the Commonwealth"); *accord id.* § 6.2-1508, *see also id.* §6.2-1517; *accord id.* § 6.2-1518.  In 2020, the Code was amended to make it applicable to online lending, but the modified Code section did not apply during the applicable class period. *C.f.* Va. Code § 6.2-1523.2.

### III. FACTUAL BACKGROUND

To the extent this matter is not resolved summarily based upon Plaintiffs' waiver of a class action, we next proceed to the facts that inform the Rule 23 analysis.

### A.  History of the Tribe's Lending.

LVD is a federally-recognized Indian tribe whose members reside near their ancestral home in Watersmeet, Michigan (the "Reservation").  *See* ECF No. 146, at 3; Federal Register Vol. 83, No.20, pp 4235-4241 (January 30, 2018).  LVD is a sovereign "independent tribal entity" and governs itself according to its own laws and regulations.  *See* ECF No. 146, at 3; *Cherokee Nation v. State of Ga.*, 30 U.S. 1, 8, 8 L. Ed. 25 (1831).[7]

### 1.  LVD Needed to Develop New Businesses Due to its Struggling Economy.

---

[7] On May 14, 1992, LVD adopted its constitution, which, among other things, establishes LVD's Tribal Council and grants the Tribal Council the authority to enact laws, manage the economic affairs of LVD, and to promote the health, safety, education and general welfare of LVD and its members.  *See* ECF No. 23-1, at 1.

For many years, LVD's economic well-being depended largely upon federal funds and profits from its casino.  *See* Ex. A, Hazen Aff., p. 1, ¶ 3; ECF No. 999-18, at,  ¶ 10.  LVD casino profits sharply declined after the 2008 recession, however, forcing LVD to look elsewhere for a stable source of income and to achieve their goals of self-sufficiency and self-determination.  *See* Ex. B, Aug. 22, 2013 Dec. Chairman Williams ¶ 7-10; Ex. A, p. 1, ¶ 4; ECF No. 999-18, p. 2, ¶ 12; ECF No. 999-14, at 75:17-78:6 (LVD wanted a consumer lending business due to the tribes geographical isolation, lack of reliable income, and insufficient local population to support their casino business); Ex. C, Email from K. Wichtman to M. Martorello, LVD-DEF00006161 (LVD's counsel describing how declining revenues in gaming and tourism motivated LVD's interest in online lending).

Thereafter, LVD took a series of steps to facilitate the development of new business opportunities, including online lending.[8]  *See* Ex. A, p.1, ¶ 5; *See generally* ECF No. 999-11, (forming RRTL under LVD tribal authority).  In March 2010, LVD enacted the LVD Limited Liability Code.  Then, on July 8, 2011, LVD enacted the Tribal Consumer Financial Services Regulatory Code ("LVD Regulatory Code"), which authorizes consumer lending entities that are (i) wholly owned by LVD, (ii) operate from the Reservation, and (iii) operate exclusively to "improve [LVD's] economic self-sufficiency, to enable [LVD] to better serve the social, economic, educational, and health and safety needs." Ex. D, LVD Regulatory Code, pp. 3-5, 17, §§ 1.1(a), (d), (h); 1.3: 2.4; 5.1.

### 2.  With Outside Assistance, LVD Organized Red Rock Tribal Lending, LLC.

In September 2011, in consultation with lawyers and outside consultants including Martorello, LVD's Tribal Counsel formed Red Rock Tribal Lending, LLC ("RRTL") to provide

---

[8] In 2009, LVD asked its general counsel, Rob Rosette, to partner with Scott Merritt and research tribal online lending model.  *See* Ex. J Rosette Dep. (6/29/20), at 170:3-172-13, 73:10-23).

consumers with unsecured, small-dollar loans pursuant to the LVD Regulatory Code and applicable Federal law.  *See generally* ECF No. 999-11; ECF No. 999-12.  In the fall of 2011, Martorello engaged the most prominent Indian law lawyer that he could find, Jennifer Weddle, co-head of Greenberg Traurig's ("GT") Indian law department, to help ensure the loans and relationships were lawful.  See ECF No. 999-14 at 31:14-25; 47:19-50:24; 55:5-57:17; *see also* Ex. E, Weddle Aff., ¶ 6, 13; Ex. LLL Rosette_Revised_002831 (GT Law task list).

RRTL was organized under LVD law, wholly owned by LVD, and functioned as an arm of LVD on the Reservation. *See* Ex. A, p. 2, ¶ 6; *see generally* ECF No. 999-11; ECF No. 999-12.  RRTL's appointed co-managers were LVD members and under the control of the LVD Council.  *See* Ex. F, Hazen Dep. (10/16/2017), p.129:11-15; Ex. G, Mansfield Dep. (1/18/19), at 45:7-47:8 (testifying that as co-manager of RRTL he procured equipment, organized RRTL's call center, hired personnel, authored employee handbooks, reviewed contracts, discussed marketing strategies, developed call center scripts and interviewed and hired employees); *see generally* ECF No. 999-11; ECF 999-12; ROSETTE_REVISED_ 002601 RRTL Sep. 14, 2011 Operating Agreement.

For assistance developing and growing the online lending business, LVD worked with outside consultants, including companies managed by Martorello.  ECF No. 146 at 8; ECF No. 999-14, at 116:11-117:18 (testifying that tribes followed a known model which required finding, vetting and hiring service providers to help the tribe reach self-sufficiency); Ex. A, p. 2, ¶ 10.

### 3.  Red Rock Tribal Lending Contracted with Bellicose VI, LLC for Assistance.

Using a contract based upon the National Indian Gaming Commission ("NIGC") template, RRTL contracted with Bellicose VI, LLC ("Bellicose"), which Martorello managed, for vendor management services, compliance management assistances, marketing material

development, pre-qualified leads, and the development of risk modeling and data analytics.  *See* ECF No. 999-14, at p.117:11-119:13; Ex. A, p. 2, ¶ 10.  In October 2011, after six months of legal counsel negotiations and review, LVD and Martorello agreed Bellicose would provide service and support for LVD's new consumer lending business.  *See* RRTL Servicing Agreement, MARTORELO_003598, previously filed under seal at ECF No. 216.  RRTL consulted with Bellicose regarding day-to-day operations, and RRTL's managers approved operations.  *See* Ex. A, p. 2, ¶ 8-9; Ex. H, Gravel Dep. (4/5/19), at 36:2-22 (testifying that co-managers of RRTL could approve recommendations to RRTL).

Bellicose provided vendor services and assistance, but could not sell RRTL's assets, could not waive RRTL's immunity, and could not originate loans on behalf of RRTL.[9]  *See* Ex. A, p. 2, ¶ 8; Ex. I, Hazen Dec. (Galloway), ¶ 8.c. (detailing eight-step process for loan origination all of which is handled by RRTL); Ex. H, at 158:1-19 (testifying that loan applications were reviewed and approved by RRTL on LVD land prior to approval); Ex. J, Rosette Dep. (6/29/20), at 124:15-125:6 (testifying to the importance of LVD originating the loans and LVD's efforts to structure the business accordingly).

### 4.  Money From the Loans Flowed Into Red Rock Tribal Lending Accounts.

RRTL collected the loans on the Reservation, as evidenced by four years of RRTL bank statements showing borrower payments directly to the RRTL bank account.  *See generally* Ex. K, November 30, 2015 Chippewa Valley Bank Statement of RRTL Account, Chippewa_000013 (showing cash flows to and from consumer loans into RRTL's banking accounts); *see also* Ex.

---

[9]   These witnesses contradict the testimony of Joette Pete, a witness who is biased and who the Tribal Counsel involuntarily removed from her role on the basis of misconduct.  *See, e.g.,* Ex. RRR (Motion for the Resignation of Joette Pete Baldwin due to an unlawful incident). As shown below, other witnesses have also directly contradicted Pete's testimony on other significant matters.

G, at 106:6-12 ("we [LVD] had the account the money went through that we were the ones that would actually put the money in and take the money out of the accounts.  That was done at the tribe, at the call center"); Ex. M, Dowd Dep. (11.13.18) At 185:15-23 ("Q: Did Sourcepoint ever collect on any Red Rock loan? A: No, I don't believe so."); Ex N, Justin Martorello Dep. (1/9/19), at 46:20-47:3 ("I can tell you that the servicer SourcePoint never collected any amounts ever." … "Red Rock Tribal Lending or – or Duck Creek would have used payment processors that would debit consumers' accounts, and those funds would settle into Red Rock's bank account"); *Id.* at 52:14-20 (RRTL submitted the debit and credit files on the reservation); Ex. O, ROSETTE_REVISED _014047 (Nov. 2, 2012 discussion of activities taking place on the reservation including "payment processing" inputting payments into customer accounts, and depositing physical checks into bank account); Ex. P, LVD-DEF00018890-4 (April 4, 2013 batch renewal payment processing manual); Ex. Q, Wichtman Dep. (7/14/20) at 205:1-16 (the money went into the Chippewa Valley RRTL account); Ex. R, ROSETTE_REVISED_036363 (January 6, 2012 RRTL's loan origination and payment processing instructions).

The Servicing Agreement between RRTL and SourcePoint VI, LLC gave SourcePoint certain revocable depository account control access for purposes of processing accounts payable, but in practice this did not affect collections and the access could be terminated by the Tribe at will upon 180-days' notice.  *See* Ex. H, p. 152:12-18; *see also* Servicing Agreement § 9.2 (regarding terminating upon 180-day notice), previously filed under seal at ECF No. 216. Borrowers paid directly into RRTL accounts.  *See generally* Ex. K. (showing cash flows to and from consumer loans into RRTL's banking accounts); *see also* Ex. G, at 106:6-12.

### 5.  Pertinent Lending Activities Occurred on the Tribal Reservation.

RRTL's lending operations were on the Reservation under the supervision of LVD's

appointed managers and Tribal Council.  *See e.g.* Ex. S, Gerber Dep., 59:9-53:18 (testifying that it was important that lending activities occur on Tribal soil and the lender would only deal with customers who conducted business on Tribal soil); Ex. H, 158:1-19 (testifying that after loan applications passed the underwriting process, all loan applications were reviewed and approved by RRTL or Duck Creek on Tribal land before the loan was actually originated); *Galloway v. Big Picture*, Case No. 3:18-cv-00406, ECF 38-15 (summarizing 246 resolutions of Tribal Council regarding lending); Ex. T, ROSETTE_REVISED_037655 (Nov. 1, 2011 Operations Manager's job described as responsibility for "all … aspects" of Red Rock call center, including "handling of all customer communications," "review of daily applications," and daily origination of loans and ACH files); Ex. U, MidMarch DD 000536 p.3-4 (list of activities occurring at Red Rock); Ex. MMM, LVD-DEF00006043 and LVD-DEF00022840 (over 300 pages of LLC manager approvals); Ex. M, Dowd Dep. (11/13/18) at 74:18-75:7 (there was a team of RRTL "going through, checking to make sure all of those verifications were completed and completed to their satisfaction …. If all those requirements had been met, then they would originate the loan from the office on the reservation"); Ex. S, 59:9-53:18 (regarding importance of lending activities on Tribal soil). In addition, funds for LVD's lending operation flow to and from LVD-owned bank accounts.  *See* Ex. G, at 106:6-12.

Although Bellicose consulted on behalf of RRTL, ultimately RRTL employees processed the loans.  *See* Ex. A, p. 2, ¶¶ 8-9; Ex. M. (11/13/18), at 74:18-74:7 (testifying about the team of RRTL employees on the reservation conducting the loan process); *id.* at 58:12-59-19 (RRTL's review and approval includes "every single loan that gets made by [RRTL]);" *id.* at 79:19-80:1 (the loan will never originate if the verification process is not completed); Ex. H, 158:1-19 (all loan applications were reviewed and completed by RRTL or Duck Creek on Tribal land before

the loan was actually originated); Ex. W, December 16, 2015 email from K. Wichtman to Martorello, LVD-DEF00018915 (Tribal Council stated that "all recommendations related to underwriting are approved by the Co-Managers of the business within the tribal offices before use").

On-Reservation Tribal activity also includes collection of payments, payment processing, management of the loan origination software, and negotiation of debt settlements. *See* Ex. X, June 13, 2012 Email from K. Wichtman to Martoerello, ROSETTE_REVISED-045131 (discussing debt settlement authority for the co-managers of LVD's online lending business through RRTL); Ex. R, (explaining how to utilize RRTL's online loan origination software); Ex. Y, Nov. 2, 2012 Email from Martorello to K. Wichtman and C. Mansfield, 37053772-1-DI 505-52, (discussing activities occurring on reservation including payment processing and depositing funds into bank accounts); *See generally* Ex. K, (cash flows to and from consumer loans into RRTL's banking accounts).

### 6. RRTL Issues Loans in 2012.

On January 17, 2012, RRTL began making loans, all of which were authorized and extended by RRTL. *See* Ex. A, ¶¶26-28; Ex. Z, Williams Aff. ¶ 19. All funds for these loans came from LVD-owned and controlled bank accounts. *Id.*

Also in 2012, Bellicose assigned its rights under its servicing contracts to its affiliate, SourcePoint VI, LLC ("SourcePoint"). SourcePoint's relationship with RRTL mirrored Bellicose's, and although SourcePoint could make recommendations, "all final decisions about operations were made by [RRTL's] managers." *See* Ex. A, p. 2; Ex. M, 197:16-198:8; Ex. H, Gravel Dep., 152:12-18. Both Bellicose and SourcePoint had access to RRTL's bank accounts, but that access was limited by deposit access control agreements provided by [RRTL], which

[RRTL] or the Tribe could terminate at any time.  *See* Servicing Agreement Section 9.2 (RRTL could terminate its servicing relationship with Bellicose upon 180-days notice), previously filed under seal at ECF No. 216.[10]

### 7.  Over time, RRTL Learned and Expanded the Online Lending Business.

RRTL learned from the consulting services and expanded its operations with LVD employees under LVD employed management.  *See* Ex. AA, Oct. 5, 2012 Email between Bellicose and LVD officials, ROSETTE_REVISED_037729 (explaining LVD's need for more office space due to growing size of lending operation);  Ex. BB, May 14, 2015, Email between Bellicose and LVD officials, ROSETTE_REVISED_031665 (discussing RRTL's ability to identity and implement improvements to its day-to-day lending operations); ROSETTE_REVISED_044773 (July 30, 2013 email from Hazen, "me, and all the LVD regulators are [at compliance university] learning stuff"); ROSETTE_REVISED_045267 (Aug. 24, 2014 email from Wichtman "I have tribal leaders in my ear eager to learn").

### B.    LVD's Entities Evolved from 2012 through 2016, and Martorello Reduced his Involvement.

As LVD learned the lending business, SourcePoint's guidance became less necessary, and its involvement in LVD's business decreased.  *See, e.g.*, Ex. H, 63:2-63:13 ("Q. Now, Matt Martorello, what role did he play once you got to Puerto Rico? A. I'm not sure.  I saw a lot less of Matt after we moved to Puerto Rico.  Q. Was Mr. Martorello devoting more of his time to other businesses? A. That was my understanding.  Q. What was the basis of your understanding?

---

[10] Per the requirements of the Servicing Agreement between SourcePoint and RRTL, Iron Fence Investments, LLC ("Iron Fence") was formed to identify and aggregate capital sources for LVD. In January 2011, RRTL entered into an up-to-$30,000,000 line of credit agreement which required Iron Fence to raise capital for RRTL's operations – capital which was raised from third parties and which RRTL could draw upon and pay down at its discretion.  *See* Loan Agreement MARTORELLO_003564, previously filed under seal at ECF No. 216.

A. That I saw him in the office a lot less and that day to day I believe I was reporting to Brian

McFadden.").

During this period, RRTL actively managed and changed the loan collections practices.

*See* ECF No. 216-11, (LVD's outside legal counsel managing dispute with debt purchaser on

behalf of RRTL).  RRTL also became more active in the hiring, firing, and overseeing of

collections vendors.  *Id.*  RRTL also managed the frequency of communications to debtors, the

content of those communications and tracking the debt to learn if it was sold to third-parties.

*See, e.g.*, *Id.* at LVD-DEF00016826 (debt sale to third party); *see also* ECF No. 216-12,

(describing RRTL's operations as separate from SourcePoint).  RRTL also increased its direct

involvement in selecting and purchasing consumer loan leads, and required SourcePoint to end

its relationship with certain lead sources.  *See* ECF No. 216-11, at LVD-DEF00018579 (May 11,

2015, RRTL firing its outside compliance vendor to perform those services at RRTL).

In addition to Big Picture, LVD also formed Tribal Economic Development Holdings,

LLC ("TED") to "operate the Tribe's current and future lending companies." ECF No. 146, at 16

(citing ECF. No. 23 at 13).  LVD was the sole member of TED with Michele Hazen and James

Williams, Jr. as co-managers. *Id.* (citing ECF No. 23, at 14); Ex. I, p. 3, ¶ 15.; Williams Dec., p

2, ¶ 4.  LVD also formed Ascension, a subsidiary of TED, "for the purpose of engaging in

marketing, technological and vendor services" to support LVD's lending entities. *See* Ex. CC,

Feb. 5, 2015, Ascension Resolution, at 1.  Ascension was a "wholly owned and operated

instrumentality of the Tribe" and, just like Big Picture, it had TED as its sole member and its

appointed co-managers were Hazen and Williams.  *Id.* at 2-3, Ex. DD, Ascension Arts. of Org,

Arts. 8-9.  Ascension's president was Brian McFadden ("McFadden"). Ex. CC, at 3.

LVD supervised the front-line customer service employees and made steps to increase the

number of employees operating on Tribal land to over a dozen. *See* Ex. EE, 8/20/2014 Email

from Wichtman to Martorello, ROSETTE_REVISED_046799 (positive training and professional

results from new employees from the Tribe); ECF No. 845-40, ROSETTE_REVISED_045267

(LVD leaders to continue to learn about the online lending business).

 LVD routinely revised its consumer policies, including developing a complete

compliance management program internally and, in late 2012, LVD replaced a SourcePoint/

Bellicose recommended compliance program with the program it developed internally. *See* Ex.

FF, Aug. 30, 2013 Email from K. Wichtman to J. Martorello, ROSETTE_REVISED_030201

(approving new policies and management program by LVD counsel).  Policies which

SourcePoint helped RRTL create, such as loan underwriting processes, were instituted after

approval from RRTL managers.  *See* Ex. M, at 36:2-22, 37:3-20 (explaining how RRTL applied

SourcePoint's recommendations after RRTL approval, and RRTL rejected certain

recommendations).  LVD's plan was "to expand its online lending platform and increase

profitability for the Tribe, employ more tribal members, and acquire its vendors' businesses."

ECF No. 146 at 15-16.

 In 2013, RRTL increased its direct involvement in selecting and purchasing consumer

loan leads, and required SourcePoint to end its relationship with certain lead sources.  ECF 216-

11.  While SourcePoint would continue to recommend strategies to RRTL on marketing leads,

RRTL decided on marketing of its product. *Id.*; *see* Ex. M,  at 36:2-22, 37:3-20 (explaining how

SourcePoint's recommendations were applied after RRTL approval).

 RRTL's Co-Managers increasingly became the point people dealing directly with

vendors. *See* Ex. GG, June 3, 2014 Email from Dowd LVD-DEF00017101 (requesting direct

meeting with RRTL co-management).  RRTL also began directly contracting with other vendors,

including check verification services (May 2014), Ex. HH, LVD Resolution # 2014-070, at

LVD-DEF00010607, and new sources of consumer leads (May 2014), *id.*, at LVD-

DEF00017226.  RRTL entered into two settlement agreements with an ACH provider that had

provided services to LVD's lending entities prior to 2014.  *See* Ex. II, LVD Resolution # 2014-

071, LVD-DEF00010623.  RRTL's legal counsel advised as to negotiating the terms of each new

vendor contract.

      LVD continued developing its lending business over time with assistance from

SourcePoint and Bellicose.  *See* ECF No. 506-22, ROSETTE_REVISED_052365 (showing

conversations between Martorello, LVD counsel and LVD officials regarding origination

occurring on Tribal lands under Tribal authority and supervision); Ex. JJ, Aug. 29, 2013 Email

from SourcePoint to LVD leaders and LVD counsel, ROSETTE_REVISED_030201 (regarding

a recommended addition to the online lending process).

      Co-managing LVD officials oversaw LVD's online lending process.  *See* Ex. W, (Tribal

Council explicitly stating "all recommendations related to underwriting are approved by the Co-

Managers of the business within the tribal offices before use."); Ex. KK, LVD-DEF000006043

(over 150 pages of recommendations from Martorello to LVD's co-managers starting in January

2014); LVD-DEF00022840, Official Approval Request to Tribal Officials (requesting approval

for SourcePoint recommendations); Ex. M, at 50:8-23, 58:12-59:19, 74:18-75:7; Ex. LL, May

14, 2015 Email From J. Martorello to LVD Officials, ROSETTE_REVISED_031665 (RRTL

identifying and implementing its own improvements to lending operations).

      SourcePoint and Bellicose maintained strict separation of consulting and management

duties throughout the lifetime of those two entities. *See* Ex. M, at 37:3-20. 185:10-12, 193:14-

194:2, 197:16-198:8; Ex. H, at, 22:20-23:4; Mar. 18, 2014 Recommendation to Take Action and

Request for Approval from SourcePoint to RRTL officials, LVD-DEF00017189; Ex. MM, June

3, 20114 Email from Dowd to LVD officials and counsel, LVD-DEF00017101 (regarding

request for approval of SourcePoint recommendation).

The nuts and bolts of LVD's online lending business were conducted on Reservation

land, by LVD employees under LVD supervision.  *See* Ex. NN, Nov. 1, 2011 Email from

Martorello to K. Wichtman, ROSETTE_REVISED_037655 (discussing the job description of

Operations Manager for RRTL as responsible for all aspects of the RRTL call center including

handling of customer communications, review of daily loan applications, and daily origination of

loans and ACH files); Ex. OO, June 15, 2012 Email from K. Wichtman to Martorello,

ROSETTE_REVISED _044598 ("…our model is one of the best there is, we have made every

effort to ensure tribal control, and are tweaking things almost constantly, it seems, to allow for

more tribal control.").

Changes to the servicing relationship that occurred between January 2012 and January

2016 included: (1) Increasing involvement of the Tribal Council and co-managers in the

selection of vendors utilized by RRTL.  *See* Ex. J, at 146:4-147:11 (discussing purchase of

Bellicose/SourcePoint and LVD's desire to purchase its third-party vendors).  Ex. PP, Oct. 14,

2014 Emails between Martorello and LVD Officials, LVD-DEF00017855 (expressing LVD's

desire to prioritize bringing collection of debts in-house from third-party vendors); (2) LVD's

increasing use of outside legal counsel unaffiliated with Martorello in compliance, management,

contract negotiations, regulatory audits, and marketing. *See generally* Ex. QQ, Mar. 28, 2012

from K. Wichtman to Martorello, ROSETTE_REVISED_043977 (Rosette Law counsel with

draft of Assistant Manager position); Ex. RR, Sept. 30, 2014 Email between Martorello, K.

Wichtman and LVD officials, ROSETTE_REVISED_037429 (regarding discussion of possible

LVD purchase of part-ownership structure in a bank for online lending purposes); (3) RRTL's direct involvement in marketing operations for the online lending business.  Down, Ex. M, at 175:4-176:7, 186:2-12 (testifying that RRTL co-managers approved direct mail marketing campaigns for RRTL; testifying Hazen would review and approve marketing materials prior to implementation); Ex. G, at 47:3-7 (testifying that Mansfield, as Tribal co-manager, reviewed contracts, marketing strategies, and call center scripts for LVD's online lending business); RRTL and LVD officials managed employee training and employee management. *See* A ECF No. 506-22 at ROSETTE_REVISED_052365 (showing conversations between Martorello, LVD counsel and LVD officials regarding origination occurring on Tribal lands under Tribal authority and supervision); *See* Ex. GG (requesting direct meeting with RRTL co-management).

      **C.**    **Over Time, Online Lending Industry Became Increasingly Targeted, and a Projected CFPB Small Dollar Loan Rule Threatened Business.**

LVD closely tracked federal regulatory efforts with potential impacts on the online and tribal lending industries.  LVD was aware of a new effort by federal and state regulators called "Operation Chokepoint."  *See* Ex. SS, Comm. On Oversight and Gov't Reform, *The Department of Justice's "Operation Choke Point": Illegally Choking Off Legitimate Businesses?*, May 29, 2014, *available at* https://republicans-oversight.house.gov/wp-content/uploads/2014/12/Staff-Report-FDIC-and-Operation-Choke-Point-12-8-2014.pdf.  The State of New York employed a similar strategy and sent cease-and-desist letters to 32 online lenders, including RRTL.  *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs*, 974 F. Supp. 2d 353, 356-357 (S.D.N.Y. 2013), aff'd, 769 F.3d 105 (2d Cir. 2014).  LVD voted to sue the State of New York to preserve its right to self-determination and Indian e-commerce.  LVD sought to "permanently enjoin the New York State Department of Financial Services . . . from interfering with [tribal] lending activities." *Id.* at 355-56.  To counter the threat of overreaching state regulatory attacks,

LVD began to accelerate its business strategy to internalize vendor services and acquire vendors and prevent regulators from interfering with its Tribal lending by threatening third-party vendors.

Despite regulatory pressure, Martorello's Indian-law attorneys continued to assert that the regulation "must yield to the inherent and fundamental political independence of tribes" and "tribes' freedom of contract and sovereign right to trade freely."  *See* Greenburg Traurig, LLP, 1017 Brief of the National Congress of Am. Indians, D. Kan., Case No. 2:17-cv-02521-JAR-JPO, authored by Ms. Weddle; *see also* Weddle Dep. 178:24-184:10 (discussing her view that Tribal loans remain lawful).

### D.  LVD Purchased Bellicose and its Subsidiaries on January 26, 2016, after Years of Negotiations and Plans for LVD to Own Its Outside Vendors.

Starting in 2012, LVD and Martorello consistently engaged in conversations regarding the potential sale of Martorello's consulting companies to LVD, giving the Tribe the ability to engage in online lending without relying on outside vendors for support services. ECF No. 146, at 17.  This sale closed in January 2016, but had been discussed between LVD, SourcePoint and Martorello since at least 2012.  *See* Ex. UU, Oct. 5, 2012 Email from Martorello to LVD (officials discussing drafting of sale documents of Bellicose to LVD); Ex. VV, Hazen Dep. (Smith) page 81:8-82:3 (Hazen and Wichtman first asked Martorello to consider selling Bellicose in 2012); Ex. WW, ROSETTE REVISED 053374-6 (Nov. 2, 2012 email stating "research is underway on this IP sale option").  At the time of the sale, LVD expected the purchase of Bellicose to allow the Tribe to generate over $50 million per year by January 2023, if not sooner.  Ex. XX, September 2014 Pro Forma Report, LVD-DEF00014706 (showing yearly profits to LVD after payment of note or expiration of seven-year term).  LVD created new entities under LVD law to complete the sale in compliance with Tribal law.  Ex. A, ¶¶ 14, 16-17, 22-23.

After LVD's purchase of Bellicose on January 26, 2016, Martorello's involvement with LVD's lending operations ended.  Martorello has no involvement in the day-to-day activities of any entity owned or operated by LVD, including Big Picture and Ascension. *See* Ex. ZZ, McFadden Dec, ¶ 10; ECF No.146, at 27-28; *see also* Ex. M, Dowd Dep. 11/13/2018 at 208:18-210:20.

      **E.**     **The Formation of Eventide Credit Acquisitions, LLC Enabled the Sale of Bellicose and its Subsidiaries to the Tribe.**

As discussed above, in January 2016 LVD purchased Bellicose and its subsidiaries. Around the same time, LVD formed Big Picture, its new lending entity and Ascension, its new servicing company; Big Picture and Ascension assumed assets and liabilities of Duck Creek and RRTL; Eventide Credit Acquisitions, LLC ("Eventide") formed to sell Bellicose to LVD in exchange for a Note requiring Big Picture to make contingent loan payments which would sunset after seven years; SourcePoint and its subsidiaries merged into Bellicose; the Tribal entity TED acquired Bellicose; Bellicose ceased to exist; and RRTL and Duck Creek dissolved.  *See generally* Ex. AAA, Promissory Note.

Whether the sale was motivated in part by regulatory pressure makes no difference. Ultimately the sale allowed the Tribe build their businesses "in a self-sufficient manner [and] learn and hire for all the various business components, and then [Martorello would] walk away leaving them with a business that literally transforms an impoverished Tribe to one of financial stability."  Ex. BBB, Apr. 15, 2014 Email from Martorello to P. Wilson, MARTORELLO_ 003731.

Though there may have been regulatory uncertainty, Martorello and the Tribe in good faith made every effort to navigate and comply with a very uncertain legal landscape. *See, e.g.,* Ex. C, at 00006162 ("I am confident that if we can survive the payment processing storm, Tribal

lending will ultimately prevail."); ECF No. 506-40, Liont_05387 (discussing the *possible* end of

tribal lending but always referring to this conclusion as only a possibility, and never a certainty);

Ex. DDD, Mar. 10, 2017 Email from Martorello to other employees, MARTORELLO_011671

("You'll notice that the rule went from shutting everyone down, to shutting down the storefront

payday product (meaning that entire demand and market opens up to online install, as a massive

competitive advantage!").

> ### F. For A Period Between 2018-2020 the Tribal Lender Stopped Paying Eventide.

Between approximately November 2018 to July 2020, the Tribal Lender stopped paying

Eventide, defaulting on its Note with Eventide.  *See, e.g.*, Ex. EEE, December 12, 2019 Notice of

Default; *see also* Ex. FFF, Dep. Matt Martorello, Arbitration: Eventide v. TED, June 25, 2020, p.

99, ln 25- p.100 ln 2 ("Q. …When was the last time that ECA actually got a waterfall payment

from the tribe.  A. Probably October or so of 2018");  *id.* p. 101, ln 6-8 ("Has ECA received any

payments from the tribe since the MOU [Memorandum of Understanding] was executed? A. No,

it has not."); Ex. GGG, Dep. Michelle Hazen, Arbitration: Eventide v. TED, July 7, 2020, p. 79,

ln. 16-23 ("Q. Isn't it true that the litigation expenses you've just described as being through the

roof, those were deducted from the payments that would have otherwise gone to Eventide,

correct? A. …  Once the bad debts and any expenses are taken out of the gross revenue, if there's

anything left, that goes to the note payment for Eventide."); *id.* p. 80-81 ("Q… So it's your

position that the tribe can offset an additional two million, five hundred thousand plus before it

has to pay any monies to Eventide; is that correct? A. Yes").

> ### G. Throughout the Course of its Online Lending, LVD Has Acted Through its Independent Tribal Authority by Resolutions Approved by the LVD Council.

LVD legislates and speaks through the Tribal Council and its resolutions, which are

consensus documents of all of the Tribal Council members.  The online lending enterprise has and continues to be performed through valid Tribal Authority and resolutions.[11] There are many examples of such independent Tribal resolutions.  *See, e.g., Galloway v. Big* Picture, Case No. 3:18-cv-00406, ECF 38-15 (summarizing 246 resolutions of Tribal Council regarding lending).

### H.  LVD's Ownership and Operation of RRTL and Big Picture has Provided Tremendous Benefits to the Tribe

LVD has realized tens of millions of dollars in profit since beginning its online lending business in 2012.[12]  LVD has used that revenue for the construction and purchase of housing on the reservation, the development of youth programs for LVD members, assisting in the construction of an on-reservation health clinic, the funding of college scholarships for LVD members, the purchasing of new vehicles for the LVD police department, the modernization of LVD's court system, the enhancement of cultural programs targeted at the preservation of LVD's Ojibwe language, providing elder care services, and a propane purchasing assistance program to enable LVD members to stay warm during the Upper Peninsula's harsh winters.  Ex. A, ¶ 31(a)-(l); Ex. Z, at ¶¶ 21-23, 25.  Both RRTL and Big Picture have provided jobs for LVD members on the reservation. *See generally id.*  Through new products and investments from third-parties, LVD predicts it could make up to $200,000,000 of net income per year within five years, at which point LVD's longstanding objective of creating a self-determined and self-sufficient

---

[11] Any individual Tribal Council member's motives or intent is wholly irrelevant to the Tribe's purpose or intent. *See Va. Uranium, Inc. v. Warren*, 848 F.3d 590, 598 (4th Cir. 2017) ("adher[ing] to the edict that courts 'will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'") (quoting *United States v. O'Brien*, 391 U.S. 367, 383 (1968)).  Thus the testimony of Joette Pete, who was never subject to cross-examination and cannot credibly be claimed to reflect the Tribe's purpose and intent.

[12] *See* Ex. HHH., Chico Harlan, *Indian Tribes Gambling on High-Interest Loans to Raise Revenue*, Wash. Post, Mar. 1, 2015, available at https://www.washingtonpost.com/business/economy/indian-tribes-gambling-on-high-interest-loans-to-raiserevenue/2015/03/01/8551642d-e51b-4d3a-89c6-4de0d3bdf385_story.html.

Tribal business will be fully realized.  *See* Ex. III, Big Picture Confidential Investment

Opportunity Powerpoint Presentation, LVD-DEF00022047 (predicting almost $486,000,000 in

gross revenue from Big Picture in 2022 and $196,542,290.68 in profits).  LVD's lending

business has provided upwards of 46% of LVD's government budget at various times.  *See*

Williams Aff. ¶ 22; *see also* Ex. OOO Cowhey report, p. 20 (showing how much value LVD had

created).

Under the contingent Note payment arrangement, Big Picture earned millions and its

equity value continues to benefit the Tribe.  The payment structure was standard for tribal online

lending and other types of online lending. *See* Ex. JJJ, Merritt Dep. (3/21/19) at 53:4-20

(testifying that LVD's 2% of revenue distribution to owner was similar to revenue sharing in

state licensed small dollar lending operations); *see also* Ex. KKK, Ross Dep. (3/15/19) at 134:1-

25.

**I.  Settlement of Purported Class with the Tribal Lender**.

Plaintiffs have already settled their usury claims with Tribal entities, including the

lending entity, Big Picture.  *Galloway et al. v. Williams et al.*, 3:19-cv-00470 ("*Galloway III*"),

ECF No. 55-1 ("Settlement Agreement").  By settling with the Tribal lender for $8,700,000, to

be paid over two years, Virginia plaintiffs in *Galloway III* endorsed continued collection of loans

at interest rates exceeding Virginia usury laws.  Specifically, for any loan executed between June

2013 and December 2020, Big Picture and Ascension may collect "2.5 times the original

principal amount of the loan in payments over the life of the loan," but otherwise the operations

of Big Picture are not materially changed. (Settlement Agmt. § 11.2.)

The proposed class in *Williams* overlaps with the purported class of settling plaintiffs in

*Galloway III* by including borrowers who executed loans on or after June 22, 2013.  Notably,

however, only <u>4245</u> out of the 491,018 who received notice in *Galloway III* opted into receiving restitution from the Tribal lender (and 486,773 never responded). *See* ECF 105-4. This Court approved the *Galloway III* settlement on December 18, 2020, by preliminary approval order dated December 20, 2019. *Galloway III*, ECF Nos. 65, 114, 115.

### III. ARGUMENT

Determining whether Plaintiffs have met the required showing as to each class certification factor requires the Court to perform a "rigorous analysis." *Branch v. Gov't Employees Ins. Co*., 323 F.R.D. 539, 544 (E.D. Va. 2018) (citing *WalMart Stores, Inc. v. Dukes*, 564 U.S. 338, 351, 131 S.Ct. 2541 (2011). The "Court is not required 'to accept plaintiff['s] pleadings when assessing whether a class should be certified.'" *Branch*, 323 F.R.D. at 545. Instead, the Court must take a "close look" at the facts relevant to the certification. *In re Safety-Kleen Corp. Bondholders Litig.*, 2004 WL 3115870 (D.S.C. Nov. 1, 2004); *see also Branch*, 323 F.R.D. at 545 ("[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule–that is, he must be prepared to prove that there are <u>in fact</u> sufficiently numerous parties, common questions of law or fact, etc." (emphasis in original) (quoting *Dukes*, 564 U.S. at 350)).

### A.  THE PROPOSED CLASSES ARE NOT ASCERTAINABLE.

"Ascertainability," i.e., the ability to actually and readily identify class members, is a "threshold requirement" for class certification. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014). It is satisfied only if "it is administratively feasible for the court to determine whether a particular individual is a member." *Id.* at 358 (quoting 7A Charles Alan Wright et al., *Federal Practice & Procedure* § 1760 (3d ed. 2005)). It is not satisfied if "class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials.'" *Id.*; *see*

*also Branch*, 323 F.R.D. at 545 (same).  It is also not satisfied if the information is not **actually available**, such that the class is not **"currently and readily** ascertainable."  *Marcus*, 687 F.3d at 593 (3d Cir. 2012)(emphasis added); *Brooks,* 2012 WL 5195982, *3.

Plaintiffs cannot demonstrate ascertainability here for at least four reasons.  **First**, the loan information is largely under Tribal control (subject to sovereign immunity); Martorello has not been able to obtain it in discovery; and there is no assurance that all relevant loan data will be timely obtainable.[13]  *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012) (ascertainability problematic where requisite information was in possession of third-party foreign corporation).  The specific loan information for each proposed class member (including residency, date of borrowing; payment histories; and balances) is currently unknown by either Martorello or Plaintiffs.  Martorello sought this information from the Tribe without success.  *See* AAA Arbitration Decision (arbitrator ruled that Eventide is not entitled to provide loan data).  Plaintiffs also apparently cannot obtain loan information until *after a class is* certified, according to § 6.3 of Plaintiffs' settlement with the Tribe.  *See* ECF 55-1.

Without timely access to loan information, Martorello is not able to properly identify and evaluate the purported class especially *as it relates to Martorello*.  Forcing Martorello to defend against certification of a class where the loans are unavailable is contrary to ascertainabilty, fairness, and due process.[14]  *See, e.g. Brooks v. GAF Materials Corp.,* No. 8:11-

---

[13] Though Plaintiffs contend that non-tribal entities TranDotCom and DataX have the information, the loan data remains presently unavailable to Martorello.  To the extent Plaintiffs had an agreement with TranDotCom sanctioned by the Court (see ECF 415), no loan data has been produced to Martorello.  If Plaintiffs secured the loan data from TranDotCom, they should have produced it in response to Martorello's discovery requests.  If Plaintiffs have not secured the loan data, they cannot satisfy ascertainability without evidentiary support.  *See Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d 2013) ("A Plaintiff may not merely propose a method of ascertaining a class without any evidentiary support that the method will be successful.")

[14] For this and other reasons, Martorello continues to assert that this case should be dismissed under Rule 19 of the Federal Rules of Civil Procedure, in accordance with Martorello's pending

CV-00983-JMC, 2012 WL 5195982, at *3 (D.S.C. Oct. 19, 2012), *clarified on denial of*

*reconsideration*, No. 8:11-CV-00983-JMC, 2013 WL 461468 (D.S.C. Feb. 6, 2013)

("Ascertainability serves several critical purposes including … allowing adequate opportunity

for defendants to protect themselves by confirming that those bound by the class proceedings

are easily identifiable").

      Without the loan records, the only way to identify class members is to seek documents

and testimony regarding loan and payment details from each putative class member.  This is

exactly the type of individualized review that renders a class not ascertainable.  *See Adair*, 764

F.3d at 358 (rejecting ascertainability where identification of class members would have

required a "complicated and individualized process" of reviewing records); *Supler v. FKAACS,*

*Inc.*, 2012 WL 5430328, at *3 (E.D.N.C. 2012) (ascertainability was "impossible" for lack of

records).

      ***Second***, even if the loan information could be acquired, its review and application to

Martorello likely would be so individualized and complicated that the class still would not be

readily ascertainable *as to Martorello*.  This is primarily because Martorello was <u>not the lender</u>,

and Martorello's assistance to the Tribe (as manager of outside vendors for a portion of the class

period) varied considerably over time.  Due to this variance, each member of the putative class

would be differently situated vis-à-vis Martorello, depending on when his or her loans and each

payment was made and whether any interest payments ever reached Martorello at all.

Application of loan information to Martorello would be complicated and indirect, militating

against ascertainability.  *See, e.g., Adair*, 764 F.3d at 359 (4th Cir. 2014) (vacating class

certification and finding that complications associated with the land records "pose[d] a

---

motion at ECF 987.  Other reasons include that Martorello has had very limited opportunity for
discovery from Tribal entities (in contrast to Plaintiffs), and his defense is thereby prejudiced.

significant administrative barrier to ascertaining the ownership classes"); *Inetianbor v. Cashcall, Inc.,* 314 F.R.D. 535, 537 (S.D. Fla. 2016) (there was no ascertainability of the class because the proposed definition would require the Court to determine on a loan-by-loan basis whether each class member's loan agreement was "substantially similar" to Plaintiff); *see also Supler v. FKAACS, Inc.*, 2012 WL 5430328, at *3 (E.D.N.C. Nov. 6, 2012) (concluding ascertainability was "impossible" for lack of records identifying the specific autodialer at issue).

Plaintiffs cannot satisfy their burden of showing that the sought-after records clearly and feasibly will offer the information needed to ascertain the class, without individualized review. *See Piotrowski v. Wells Fargo Bank, NA*, No. CIV.A. DKC 11-3758, 2015 WL 4602591, at *18 (D. Md. July 29, 2015)(quoting *Karhu v. Vital Pharm., Inc*., 621 F. App'x 945, 958 (11th Cir. 2015) ("A plaintiff cannot establish ascertainability simply by asserting that class members can be identified using the defendant's records; the plaintiff must also establish that the records are in fact useful for identification purposes, and that identification will be administratively feasible"). Without actually having the loan information or the ability to assess its complexity, Plaintiffs cannot reliably assert that the information will be "readily obtainable" through "electronic data analysis." *See, e.g.*, *Dykes v. Portfolio Recovery Associates, LLC*, 2016 WL 346959 (E.D. Va., Jan. 28, 2016), at *4–5 (rejecting ascertainability of a class that, although theoretically identifiable by available records, would require examination of each putative member's file); *Piotrowski*, 2015 WL 4602591, at *16–18 (rejecting class that would have required "loan by loan review" of defendant's data).

Plaintiffs likewise cannot surmount the likely need for individualized review of loan records by relying only on putative class members' "say so," because such would be unreliable. *Marcus*, 687 F.3d at 594 ("Forcing [defendants] to accept as true absent persons' declarations

that they are members of the class, without further indicia of reliability, would have serious due process implications"); *see also In re Asacol Antitrust Litigation*, 2018 WL 4958856 (1st Cir. Oct. 15, 2018) ("A 'claims administrator's' review of contested forms completed by consumers concerning an element of their claims would fail to be "protective of defendants' Seventh Amendment and due process rights").

**Third**, even if Martorello could acquire the requisite loan information (which he has not been able to do as of this date, despite Eventide's unsuccessful attempt to secure loan information by initiating an arbitration with the Tribe), individualized mini-trials likely still would be necessary to verify purported class members have not released their rights, already recovered, or are otherwise estopped through settlement in *Galloway III*.[15]  (ECF 968, p. 26).

**Fourth,** analysis of whether "the loan or payment occurred within the statute of limitations would require an individual analysis of the timeliness of individual claims to determine class membership." *Inetianbor*, 314 F.R.D. at 537  (internal quotations omitted); *see also Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 295 (1st Cir. 2000) ("because a time bar constitutes an affirmative defense, see Fed.R.Civ.P. 8(c), statute-of-limitations defenses are appropriate for consideration in the class certification calculus").  This is relevant to inquiries including usury (2 years statute of limitations) and unjust enrichment (three-year statute of limitations).  *See E. W., LLC v. Rahman*, 873 F. Supp. 2d 721, 731 (E.D. Va. 2012) (dismissing unjust enrichment claim because it was filed more than three years after accrual); Va. Code 6.2-305 (two year limitations period for usury).

---

[15] The Settlement requires Big Picture to pay the proposed class members $8,700,000 over two years from funds derived from continued lending, after the 2013-2019 class period and obtain ownership in the alleged lynchpin, Eventide.  In effect, many or all in the proposed class will be deriving interest *from other post-2019 borrowers* outside of Plaintiffs' class.  They therefore will be engaging in what they condemn (receiving interest derived from other borrowers' Tribal loans) and should be estopped.

## B.  COMMON ISSUES DO NOT PREDOMINATE.

Federal Rule of Civil Procedure 23(b)(3) requires "questions of law or fact common to class members [to] predominate over any questions affecting only individual members."  This test is "even more demanding" than the commonality requirement in Rule 23 (a).  *Branch,* 323 F.R.D. at 550 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)).  The Supreme Court has noted that "[a]n individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045, 194 L.Ed.2d 124 (2016) (internal quotation marks omitted).  The "predominance requirement applies to damages as well, because the efficiencies of the class action mechanism would be negated if '[q]uestions of individual damage calculations ... overwhelm questions common to the class.'" *In re Modafinil Antitrust Litig*., 837 F.3d 238, 260 (3d Cir. 2016), as amended (Sept. 29, 2016) (quoting *Comcast*, 133 S.Ct. at 1433).

The predominance "inquiry is especially dependent upon the merits of a plaintiff's claim, since the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual."  *In re Constar Int'l Inc. Sec. Litig*., 585 F.3d 774, 780 (3d Cir. 2009) (internal quotation marks omitted).

For liability against Martorello personally, Plaintiffs must show predominance of questions relating to the elements of usury, RICO, and unjust enrichment *as to Martorello*.  Here, as explained below, predominance is not satisfied.  Martorello *personally* was never the lender or loan collector, and the analysis *relating to Martorello* requires individualized inquiries by year.

### 1. Plaintiffs Cannot Show that Martorello Throughout the Class Period Uniformly Received Loan Payments from Borrowers in the Purported Class.

For usury, Plaintiffs cannot show Martorello personally is the lender or collector, so they argue that Martorello indirectly received loan proceeds (which is still insufficient for liability but is Plaintiffs' proffered theory).[16]  Plaintiffs cannot show that Martorello throughout the class period uniformly received loan payments from borrowers in the purported class, and the usury and damages questions *as to Martorello* therefore do not predominate.

Whether Martorello received payments derived from the purported class of borrowers varied over the class period.  As a preliminary matter, Martorello was not "the person" receiving interest payments.  The "person" receiving interest payments was the Tribal Lender.  And to the extent the Tribe used any money derived from borrowers to pay companies Martorello managed, the path and activity varied over time, including a complete cessation of Tribal payments to Eventide from November 2018 to July 2020.  Even before the sale, the variable payment provisions in the Servicing Agreement yielded changing or no payments because they depended not on loan repayment, but rather on the total profitability (or not) of the lender.  *See* Ex. NNN, ROSETTE_REVISED_030897 (in a 2014 email, Martorello stated "[Red Rock Tribal Lending] for example, [Bellicose] had losses in the millions for well over a year before [we] ever saw a penny of profit!").  A substantial number of short-term consumer loans never provided any financial benefit to Martorello.

The issue of whether the specific interest payments, therefore, ever reached Martorello

---

[16] Even if Virginia law applied (which it does not), Virginia Code § 6.2-305 does not apply to non-lender and non-collector, Martorello, because Martorello was never "the person taking or receiving such payments" under that Section.  *See also id.* (referencing "creditor" regarding "bona fide error" defense to usury).  The Tribal entities took and received payments on Tribal loans, and whether any money derived from the loans ever reached Martorello requires an individualized analysis.  *See also* Va. Code 6.2-1541 (B) (listing remedies against the lender only); *Greenberg v. Commonwealth ex rel. Att'y Gen. of Va.*, 255 Va. 594, 499 S.E.2d 266, 270 (1998) (§ 6.2-1541(B) permits "a recovery of **restitution only from the lender**," which excludes members, officers, directors, agents and employees of that lender) (emphasis added).

over the class period requires individualized analysis and does not predominate throughout the class period.  *See Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011) ("What matters to class certification ... is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation."); *Pearce v. UBS PaineWebber, Inc.,* 2004 WL 5282962, at *8 (D.S.C. Aug. 13, 2004) (proposed class failed to satisfy predominance requirement, where individual issues overwhelmed common questions).

Plaintiffs cannot ignore changes over time through mere *allegations* of uniformity.  *See Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 359 (4th Cir. 2004) (vacating class certification where "the district court's reliance on the mere assertions did not fulfill the requirements that the district court take a 'close look' …, conduct a 'rigorous analysis,' and make findings … that the requirements of Rule 23 (b) (3) have been satisfied").

### 2.  Whether Martorello Conducted or Participated in Tribal Affairs "Through A Pattern of Racketeering Activity or Collection of Unlawful Debt" Cannot Be Evaluated in the Same Manner Over the Class Period.

For RICO under Section 1962 (c) of RICO, Plaintiffs must prove that Martorello was a "person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the *conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt*." (emphasis added.)  Here, whether Martorello conducted or participated in Tribal affairs "through a pattern of racketeering activity or collection of unlawful debt" cannot be evaluated in the same manner over the class period, due to Martorello's decreasing involvement and ultimate 2016 sale of Bellicose to the Tribe.  The analysis (application of facts to law) will substantially vary by year, militating against predominance.

Martorello's support for the Tribe's lending business declined considerably over time, and ceased after Martorello's 2016 sale of Bellicose to the Tribe.[17]  For example, between January 2012 and January 2016, Red Rock developed more and more knowledge and capacity and internalized third party services.  These changes in Martorello's role with respect to the Tribe's business militate against predominance of common questions *relating to Martorello*.

The changing analysis *as to Martorello* signifies that the RICO question cannot be evaluated similarly with respect to each borrower each month or year of the class period.  The analysis of whether Martorello could have participated (indirectly) in the Tribe's lending business or collected any money derived from the Tribe's lending business varies by month.[18]  Initially, the Tribal Lender paid its outside vendors (Bellicose and Sourcepoint), then internalized third party vendor services (unaffiliated with Martorello) and used less assistance from outside vendors.  Then, the Tribal Lender purchased Bellicose from Eventide such that Martorello was no longer involved with the consumer lending operations of the Tribe.  Payments from the Tribal Lender also varied, including a default on the Tribal Lender's Note to Eventide from approximately November 2018 to at least July 2020.

### 3. Individualized Issues Regarding "True Lender" Questions Predominate Over Common Questions.

Questions relating to attributing the acts of a tribal government and a corporation to Martorello, i.e. the "true lender" inquiry (which is Plaintiffs' flawed theory of the case), require a

---

[17] This case is different from cases like *Henry v. Cash Today, Inc.*, 199 F.R.D. 566 (S.D. Tex. 2000) because that case involved common questions of lender activity, i.e. "whether Defendants were engaged in making consumer loans").  In contrast, here, questions relating to Martorello do not involve lender activity because Martorello was never the lender.  Questions relating to Martorello are much more complicated, as facts pertinent to Martorello (receipt of money, assistance with the Tribe's lending business) changed over time.

[18]   The relevant time frame is monthly because the Tribe's loans are short-term, often being paid off or charged off in a matter of weeks or most often, months.

changing analysis over time.  To prove "true lender," Plaintiff would need to bypass deference to the Tribal sovereign, ignore corporate formalities, and argue that Martorello personally and uniformly "committed" or "authorized" the Tribal loans at issue.[19]  *See McFarland,* 477 F. Supp. 2d at 738-739 (E.D. Va. 2007) (officers could only be liable for intentional torts "he or she commits or authorizes on behalf of the corporation.").  Plaintiffs cannot show *for each purported class member* that Martorello **committed or authorized** any intentional tort(s) on behalf of the lender.  *McFarland* at 739 ("an officer or director of a corporation is liable only for those ***intentional torts*** he or she ***commits or authorizes*** on behalf of the corporation.") (emphasis added).  Indirect facilitation or "setting the stage" would not suffice.  *Airlines Reporting Corp. v. Pishvaian*, 155 F. Supp. 2d 659, 666–67 (E.D. Va. 2001).  The analysis is particularly indirect with respect to Martorello because Martorello was never an officer, director, or employee of a Tribal Lender or servicer.

Facts relevant to whether Martorello personally could have **committed or authorized** any intentional torts toward all members of the proposed class varied over time.  Martorello's knowledge and personal engagement significantly declined over time and effectively ceased after the January 2016 sale of Bellicose to the Tribe.

Plaintiffs incorrectly argue that there were no meaningful changes over time because Martorello indirectly controlled Tribal lending even after the sale of Bellicose.  Plaintiffs allege that McFadden (not Martorello) effectively controlled Ascension, and that Martorello effectively

---

[19] *See, e.g., McFarland v. Virginia Ret. Servs. of Chesterfield, L.L.C.*, 477 F. Supp. 2d 727, 738-739 (E.D. Va. 2007) (members of LLC are not personally liable for actions of the company; and officers of a corporation are "liable only for those intentional torts he or she commits or authorizes on behalf of the corporation."); Va. Code Ann. § 13.1-1019 ("no member, manager, organizer or other agent of a limited liability company ... shall have any personal obligation for any liabilities of a limited liability company, whether such liabilities arise in contract, tort or otherwise, solely by reason of being a member, manager, organizer or agent of a limited liability company.").

controlled McFadden through Eventide's ability to buy back McFadden's membership interest. *See* ECF 968, p.21-22. This assertion is wrong. Eventide could not buy back any member's interest without paying "the Fair Market Value of the interest." *See* ECF 968, Ex. 30 (I), p.5. The value for McFadden's interest would have been approximately two million dollars ($2,000,000.00), making it very expensive buy McFadden's interest.[20] Moreover, there is no evidence that Martorello ever exercised or threatened any post-sale buy-out of McFadden's shares. Plaintiffs therefore are wrong that Martorello exercised control of Tribal lending after the sale of Bellicose to the Tribal Lender. *See also Williams*, 929 F.3d at 182–83 (the Servicing Agreement allows Big Picture "within [its] sole and absolute discretion" to "change the criteria used to extend funds when and if it deems such change appropriate. In other words, the fact that Big Picture currently chooses to utilize Ascension's criteria does not mean that it does not have the power to choose differently in the future); *see also* Ex. YY Dep. McFadden, 86:18-24 (Q….What role, if any does Eventide or Matt Martorello have in the day-to-day operations of Ascension Technologies? A. None. Q. Has that always been the case? A. Correct); *Id.* at 70:17-21 (McFadden did not know that his interest in Eventide could be bought out).

Tribal outsourcing of certain aspects of operations varied over time, especially after the Tribe purchased its outside vendors. Martorello's assistance to the Tribe's lending business also varied over time. Any "true lender" theory questions, therefore, would vary over time.

### 4. Individualized Issues Regarding RICO's Causation Requirement Preclude Predominance.

Plaintiffs fail to demonstrate predominance with respect to RICO's causation

---

[20] The approximate two million is calculated by multiplying McFadden's 2 % ownership interest in Eventide by the value of the Note. *See* Ex. PPP- Aranca - Bellicose Capital, LLC Business Valuation as of January 26, 2016, p. 97 (identifying "sum of present values" of Bellicose as 107,684 million); Ex. OOO Cowhey Report, p. 21 (finding present value of the Eventide Note to be $164,578,000 in 2016.

requirement.  To prevail on a civil RICO claim, "it is not enough that a RICO plaintiff prove that, but for the defendant's violation, he would not have been injured; he must also show that the violation **proximately** caused the harm."  *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir. 1996) (emphasis in original).  "Proximate cause is a necessary element of analysis to 'limit a person's responsibility for the consequences of that person's own act,'" and requires "some **direct relation** between the injury asserted and the injurious conduct alleged." *Slay's Restoration*, *LLC v. Wright Nat'l Flood Ins. Co.*, 226 F. Supp. 3d 589, 595 (E.D. Va. 2017), aff'd, 884 F.3d 489 (4th Cir. 2018) (emphasis added).

A RICO action cannot lie where "[t]he causal connection [is] considered too tenuous, and the Plaintiffs' theory ignore[s] the more immediate causes of their injuries" or "[w]here the injuries [are] more appropriately attributable to intervening causes." *Mid Atlantic Telecom, Inc. v. Long Distance Serv., Inc.*, 18 F.3d 260, 263 (4th Cir. 1994); *see also Mendelovitz v. Vosicky*, 40 F.3d 182, 185 (7th Cir. 1994) (failure to satisfy proximate cause where representations themselves did not cause harm; rather, intermediary was necessary before harm would occur).

Failure to show a direct relationship between Martorello's conduct and each purported class member's alleged harm will preclude liability under RICO.  For example, in *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010), though the Supreme Court found a RICO predicate act in the cigarette vendor's failure to report cigarette sales, the plaintiff failed to establish proximate cause because "the City's harm was directly caused by the customers, not [the vendor]."  *Hemi*, 559 U.S. at 11.  Proximate cause did not exist where the link was "too remote," "purely contingent," or "indirect."  *Id.* at 9.  Proximate cause required *more than* likelihood that the harm was "foreseeable" or "intended," or even "desired."  *Id.* at 12.

Plaintiffs fail adequately to address whether RICO's causation question predominates

over the class period, instead arguing that "[n]o reliance or causation need be shown."  ECF 968,

p.36.  Plaintiffs rely, however, on an inapposite case.  In *Henry v. Cash Today, Inc.*, 199 F.R.D.

566, 572 (S.D. Tex. 2000), the plaintiffs "provided evidence … that demonstrate[d] that

Defendants operated in essentially the same manner … with regard to all customers."  199

F.R.D. at 572.  The *Henry* case does not apply here because there could be no showing that

*Martorello individually* (as opposed to the lending entities) acted causally and materially in

essentially the same manner with respect to each proposed class member.

The RICO proximate cause question weighs strongly against predominance.  *See, e.g.,*

*Sunbird Air Servs., Inc. v. Beech Aircraft Corp.,* No. CIV. A. 89-2181-V, 1992 WL 193661, at

*5 (D. Kan. July 15, 1992) ("individual issues of causation and reliance as to each class member

would predominate over the common issues of liability and legal elements of RICO"); *Grider v.

Texas* Oil & Gas Corp., 868 F.2d 1147, 1150-51 (10th Cir.), *cert. denied*, 493 U.S. 820 (1989)

(to state a claim under RICO, plaintiff must allege it was harmed by defendants' acquisition or

maintenance of an interest in or control of the alleged enterprise, rather than alleging injury from

the racketeering activity itself).

The Court will need to consider each class member's claims and *connect them to actions

by Martorello* to determine whether the alleged conduct "led directly to the plaintiff's injuries."

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (analysis of proximate causation is

necessary for Plaintiffs to fulfill their "responsibility to prove that the amount of damages … is

fairly attributable to the defendant"); *Slay's,* 884 F.3d at 494  ("without a direct-relationship

requirement, to avoid the risk of multiple recoveries, courts would need to engage in the

complicated task of apportioning damages among plaintiffs along the causal chain of the

defendant's violation").  In addition, the Court will need to analyze what happened to borrower's

interest payments to the Tribal lender and whether and to what extent any interest payments ended up with Martorello.

### 5. Common Questions Do Not Predominate As To Unjust Enrichment Claims.

To prevail on an unjust enrichment claim in Virginia, a "plaintiff must prove (1) a benefit conferred on the defendant by the plaintiff; (2) knowledge on the part of the defendant of the conferring of the benefit; (3) acceptance or retention of the benefit by the defendant in circumstances that render it inequitable for the defendant to retain the benefit without paying for its value." *Quick Serve Concepts, LLC v. Cedar Fair*, L.P., 83 Va. Cir. 59 (Va. Cir. Ct. 2011). These are necessarily fact-specific inquiries; "an 'unjust enrichment' claim would typically require a factual inquiry into the circumstances of each [transaction] to determine whether it would be 'unjust' for the defendant to retain the alleged benefit." *In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36, 62–63 (D.N.H. 2015) (denying class certification for unjust enrichment claims); *see also Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1070 (9th Cir. 2014) (issue of whether receipt of benefit was unjust or inequitable "necessarily rests on individualized determinations"); *Covert v. LVNV Funding,* LLC, 779 F.3d 242, 247 (4th Cir. 2015); *Doe I v. Wal–Mart Stores, Inc.,* 572 F.3d 677, 684 (9th Cir. 2009).

Because of the need for such individual-specific considerations, unjust enrichment claims are especially poor candidates for class certification. "[D]emonstrating that individual questions will not predominate common questions is particularly problematic where a claim of unjust enrichment is asserted." *Hegel v. Brunswick Corp.*, 2010 WL 2900379, at *5 (E.D. Wis. July 20, 2010). There is widespread agreement that "common questions will rarely, if ever, predominate an unjust enrichment claim, the resolution of which turns on individualized facts." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009); *see also Douglas Cty.*

*Fed'n v. Douglas Cty. Sch. Dist. RE-1*, 325 F.R.D. 355, 367 (D. Colo. 2018) ("Because of the

individualized nature of each class member's intentions and expectations, courts generally find

that unjust enrichment claims are not appropriately certified for class treatment, as common

questions will rarely, if ever, predominate.") (internal quotation marks omitted); *In re:*

*McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 145 (D.D.C. 2016) (collecting cases and noting

that "courts often refuse to certify classes for unjust enrichment claims because these equitable

claims require courts to evaluate the plaintiffs' individual circumstances"). As a leading treatise

observes,

> [t]he majority view is that unjust enrichment claims usually are not amenable to
> class treatment because the claim requires evaluation of the individual
> circumstances of each claimant to determine whether a benefit was conferred on

1 McLaughlin on Class Actions § 5:60 (11th ed.).

Plaintiffs here fail to show that their unjust enrichment claims are an exception to this

rule.  For example, with respect to the first element, not every putative class member paid

interest that ultimately could be traceable to Martorello.  The putative class members paid the

Tribal Lender (not Martorello), and whether any interest ultimately reached Martorello depended

upon the given loan, Martorello's role at the time, whether the Tribal Lender made contractual

payments to Eventide (which it did not from November 2018-July 2020), and whether Eventide

made any distributions to Martorello.  In short, whether Martorello has been enriched at all

depends on the specific borrower, time period, and whether Martorello indirectly received any

money.  Plaintiffs cases on this issue are inapposite because they involve the lender or bank.

*See, e.g. In re Checking Account Overdraft Litig.*, 307 F.R.D. 656, 675 (S.D. Fla. 2015)

(customers formed a class against their bank).  Martorello is not the lender.

In addition, many putative class members did not confer a benefit on anyone (including

the Tribal lender) because they paid back less than the principal on their loans. *See In re Citizens Corp.,* 2013 WL 4039048, at *8 (Bankr. M.D. Tenn. Aug. 7, 2013) ("Fi–Data paid far more than what it received ... and was not unjustly enriched") (citing *Black v. Boyd*, 248 F.2d 156, 162 (6th Cir. 1957) (no unjust enrichment where bank applied monies received against a loan previously made); *see also Pro Bono Inv., Inc. v. Gerry*, 2005 WL 2429777, at *9 (S.D.N.Y. Sept. 30, 2005) ("[If] funds were paid ... and never repaid, the [lender] may have a valid claim of unjust enrichment.  Indeed, if [the borrower] really borrowed money but failed to repay the loan, then those funds should arguably be returned even though the Note itself fails."); *DAGS II, LLC v. Huntington Nat'l Bank, NA,* 2016 WL 4536328, at *17 (W.D. Mich. Aug. 31, 2016) (similar).

Because the equities of each loan can only be determined on a case-by-case basis, Plaintiffs cannot establish predominance with respect to unjust enrichment.  Unjust enrichment claims should not be collectivized, especially where some putative class members may even have been grateful for the loans, to avert short-term crises.[21]  Different levels of loan satisfaction militate against a finding of predominance, damages, harm, and injury.  *See Bearden v. Honeywell Int'l, Inc.*, 2010 WL 1223936, at *10–11 (M.D. Tenn. Mar. 24, 2010) (finding no predominance where "there are undoubtedly many other class members who are satisfied with" the product); *see also* https://www.trustpilot.com/review/bigpictureloans.com (over 94% of Big Picture reviews as "great" or "excellent"); *see also* ECF 105-4 (only 4245 out

---

[21] For example, despite he and his wife having a combined annual income of over $90,000, Ex. II, Hengle Dep. Tr. at 12:13–14:1, Plaintiff George Hengle took ten separate loans from Defendants and other loans from at least five other on-line lenders to help his brother make his mortgage payments and to pay his personal bills. Id. at 18:15–21:12; Ex. JJ, Hengle Interrog. Resp. at 11. In addition, the loans helped certain borrowers avoid eviction, foreclosure, and repossession, and similar emergencies.

of the 491,018 who received notice in *Galloway III* opted into receiving restitution from the Tribal lender (and 486,773 never responded).

### 6. Common Questions Do Not Predominate Regarding Alleged RICO Conspiracy.

Regarding RICO 1962(d), questions pertinent to conspiracy do not predominate because Martorello's consulting services significantly decreased over the class period and ceased upon the 2016 sale of Bellicose.  Martorello could not be conspiring with the Tribe after the sale because Martorello had and continues to have no involvement with lending operations.  *See, e.g.*, *Parm v. Nat'l Bank of California,* N.A., No. 4:14-CV-0320-HLM, 2015 WL 11605748, at *26 (N.D. Ga. May 20, 2015), aff'd, 835 F.3d 1331 (11th Cir. 2016) (RICO conspiracy claim against bank failed, where Defendant solely originated entries on the ACH Network on behalf of the payday lenders).  The conspiracy question, therefore, does not predominate throughout the class period.

## C.  THE CLASS DEFINITION FAILS BECAUSE MANY PROPOSED MEMBERS WERE NOT INJURED BY MARTORELLO

### 1.  The Proposed Classes Include Members Who Were Not Injured.

A class cannot be defined so broadly that it includes "a great number of members who for some reason could not have been harmed by the defendant's alleged unlawful conduct." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824-25 (7th Cir. 2012).  Because Plaintiffs' proposed classes include consumers who paid "any amount" and "any principal, interest, *or* fees," Plaintiffs classes are impermissibly broad.  They are not adequately limited to injured parties, i.e. parties paying back more than principal on loans.[22]  Those class members who paid less than the full amount of the loan principal have had no concrete injury, and are

---

[22] According to ALCS settlement processor in *Galloway III*, only 26.33% of the purported settling class (1) repaid his or her loan in full, and also (2) paid more than 2.5 times their original principal amount of the loan.  *Galloway III,* Case 3:19-cv-00470-REP, *ECF* 105-4.

therefore different than members who paid both principal and interest.  This difference will be important in evaluating the claims.  *See Chevron Corp. v. Donziger*, 833 F.3d 74, 137 (2d Cir. 2016) ("a federal court is authorized to grant equitable relief to a private plaintiff **who has proven injury** to his business or property by reason of defendant's violation of … § 1962).

### 2.  There Was No Uniformity of Benefit to Martorello throughout the Proposed Class Period.

In addition, any payment of interest would have been to the Tribal Lender, and Plaintiffs cannot show without individualized analysis whether any particular interest is legally attributable to Martorello.  For example, from November 2018 to July 2020, the lending entities paid Eventide nothing and in the first year of Red Rock's operations, Bellicose lost money for providing services.  In addition, certain distributions during the class period were invested in non-lending subsidiaries of Bellicose and *never reached Martorello*.  In short, each borrower dollar is uniquely situated with respect to Martorello.

### 3.  Many Purported Class Members Have Already Recovered Via the Settlement in Galloway III.

As Plaintiffs admit, thousands of Virginia residents within Plaintiffs' purported class here have already settled.  In so settling, Virginia plaintiffs in *Galloway III* endorsed continued collection of loans at interest rates exceeding Virginia usury laws.  (Settlement Agreement § 11.2.).  This shows that some of Plaintiffs' proposed classes likely already recovered and discerning which have already fully recovered would take individualize review of loans and payments.  *See, e.g., Slay's,* 884 F.3d at 494 (noting the goal of "avoid[ing] the risk of multiple recoveries"); *Comcast*, 133 S.Ct. at 1433 (class action mechanism would be negated if "[q]uestions of individual damage calculations ... overwhelm questions common to the class.").

### D.  A CLASS ACTION AGAINST MARTORELLO WOULD NOT BE SUPERIOR.

The second prong of Rule 23 (b)(3) requires a finding that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Principal among the "superiority" considerations are the "likely difficulties in managing the class action." *Id.* Manageability "is perhaps the most important consideration in a Rule 23(b)(3) determination." *Pitt v. City of Portsmouth, Va*., 221 F.R.D. 438, 446 (E.D. Va. 2004); *accord* William B. Rubenstein, Newberg on Class Actions § 4:72 (5th ed.) (manageability is "the most critical concern" in determining superiority). Manageability "'encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit.'" *Fisher v. Virginia Elec. & Power Co*., 217 F.R.D. 201, 213 (E.D. Va. 2003) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974)).

Crucially, Rule 23(b)(3) speaks in terms of "fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3) (emphasis added), not "disputes against some of the defendants" or "part of the controversy." Thus, the Fourth Circuit directs that "[a] trial judge cannot, in determining the manageability ... look exclusively to only one aspect of the case ... he can and must look at the case as a whole...." *Windham v. Am. Brands, Inc*., 565 F.2d 59, 71 (4th Cir. 1977) (en banc), *cert. denied*, 435 U.S. 968 (1978).

A variety of issues likely defeat manageability here. As mentioned, 98% of the 2013-2019 proposed class *never* signed up for restitution from the Tribal Lender and consequently could still bring claims individually (though not as a class action). *See* ECF 105-4. Specifically, only 4245 out of the 491,018 who received notice opted into receiving restitution from the Tribal lender (and 486,773 never responded). *Id.* The class is not superior and manageable where 98% of the purported class could still bring individual claims (due to never opting into restitution from the Tribal lender).

In addition, because Plaintiffs are asking the Court to look beyond the sovereign Tribal lenders and only at Martorello personally, there will need to be "highly individualized ... proof of injury and damages," which defeats manageability. *Windham*, 565 F.2d at 66. This will be especially difficult because discovery will be limited due to Tribal sovereign immunity. In addition, there are significant "intraclass differences" in the proposed classes, including whether any injury occurred, which further reduces manageability. *See Petersen v. Am. Gen. Life Ins. Co.*, 2016 WL 7365187, at *14 (M.D. Fla. Mar. 30, 2016) ("intraclass differences may affect the manageability of this proposed class and individualized inquiries could indeed overwhelm common questions"). Here, the purported class cannot uniformly attribute liability to Martorello (absent any tribal entities left to bolster his defense), particularly considering the ever-shifting roles, relationships, and responsibilities over time. Lack of uniformity militates against superiority of the class. *See Windham,* 565 F.2d 59, 71–72 (denying class certification where "no severance of issues could remove or even alleviate the overwhelming burden of damage mini-trials that class certification would impose").

### E. THE ADMINISTRATOR OF MR. GILLISON'S ESTATE IS NOT AN ADEQUATE CLASS REPRESENTATIVE.

Plaintiffs substituted the administrator of Mr. Gillison's estate, Marcella Singh, for Mr. Gillison. See Dkt. #200. As this Court has observed, "the administrator of the deceased plaintiff's estate is not an adequate [class] representative for obvious reasons." *Chappelle v. E. I. DuPont DeNemours & Co.*, 75 F.R.D. 74, 79 n.10 (E.D. Va. 1977). Ms. Singh is also not an adequate class representative because she has virtually no knowledge—firsthand or otherwise— of any facts relating to this case. Ex. QQ, Singh Dep. Tr. at 12:17–25, 20:8–17, 18:19–19:8, 22:18–22. Her lone source of information, records she obtained through Plaintiffs' counsel, *id.* at 23:1–7, is insufficient. *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 316 (E.D. Va. 2007).

## IV.  CONCLUSION

Plaintiffs have not satisfied their burden to certify a class against Martorello in his

personal capacity.  In addition to having waived class actions in their loan agreements, Plaintiffs

cannot satisfy the requirements of Rule 23.  For example, Plaintiffs cannot establish

ascertainability without pertinent loan data (controlled by the sovereign Tribe).  In addition,

because Martorello was never the lender and his assistance to the Tribe varied significantly over

time, common questions *relating to Martorello* do not predominate throughout the class period.

Instead, an individualized loan-by-loan assessment will be required to assess questions relating

to Martorello (including whether he received any financial benefit derived from borrowers in any

a given month).

Respectfully submitted,

MATT MARTORELLO

By: /s/ Jon Hollis
    Of Counsel

Jon Hollis (VSB No. 84908)
J. Benjamin Rottenborn (VSB No. 84796)
Karen M. Stemland (VSB No. 47167)
WOODS ROGERS PLC
901 East Byrd Street, Suite 1550
Ricmond, Virginia 23219
Telephone: (804) 343-5020
Facsimile: (804) 343-5021
jhollis@woodsrogers.com
brottenborn@woodsrogers.com
kstemland@woodsrogers.com

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of February, 2021, a true and correct copy of the foregoing

was served upon all parties that are registered through the Court's ECF notice system.

/s/ Jon Hollis