# EXHIBIT 4

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF VIRGINIA

 3   LULA WILLIAMS, GLORIA TURNAGE,     ) CASE NO: 3:17-cv-461

 4   GEORGE HENGLE, DOWIN COFFY, and    )

 5   FELIX GILLISON, JR. on behalf of   )

 6   themselves and all individuals     )

 7   similarly situated,                )

 8                  Plaintiffs,          )

 9   -vs-                                )

10   BIG PICTURE LOANS, LLC; MATT        )

11   MARTORELLO; ASCENSION TECHNOLOGIES )

12   INC.; DANIEL GRAVEL; JAMES          )

13   WILLIAMS, JR.; GERTRUDE McGESHICK;  )

14   SUSAN McGESHICK; and                )

15   GIIWEGHZHIGOOKWAY MARTIN,           )

16                  Defendants.          )

17   _____)

18            VIDEOTAPED DEPOSITION OF DANIEL GRAVEL

19                       Washington, DC

20                       April 5th, 2019

21                        10:00 a.m.

22   REPORTED BY:  ALEXANDRIA KAAN
```


Page 13

1  sure I understand that.
2    A.  Sure.  We give banks who don't currently have the
3  ability, who want to partner with us the ability on
4  their website, to have customers apply to them for small
5  business lens.  We provide the software, the digital
6  solution, in order for those customers to complete and
7  submit applications.
8    Q.  Has that been part of the business of Fundation
9  since you joined the company?
10   A.  The first -- when I first started, we were just a
11  direct lender.  We started offering the solution to
12  banks a few months after I started.
13   Q.  So if I'm understanding this correctly -- but I
14  want you to correct me if I'm wrong -- it sound like
15  Fundation has two lines of business.  Is that right?
16   A.  Yes.
17   Q.  And one of them is as a direct lender?
18       MR. ANTHONY:  You need to say "yes" or "no".
19   A.  Yes.
20  BY MR. SCHEFF:
21   Q.  How would you describe the second line of
22  business?

Page 14

1    A.  We call ourselves a credit solutions provider,
2  basically providing digital capability to banks and
3  other partners who want to partner with us.
4    Q.  So when you say "Providing digital capabilities",
5  what does that mean?
6    A.  It means customers are able to go to those bank
7  websites, fill out their applications, get their
8  applications decision'ed [sic], at least an initial
9  decision, relatively quickly.
10   Q.  Through the software platform that you've
11  licensed to the bank?
12   A.  Yes.
13   Q.  Is it a licensing relationship with the bank?
14   A.  Yes, it is a licensing relationship.
15   Q.  In this latter second line of business that we're
16  talking about now, who's the lender in those instances?
17   A.  So it depends.  The banks would be the lender if
18  a particular application meets their credit
19  criteria/fits their credit box.  We would be the lender
20  in the case of if the application does not fit their
21  credit criteria but the applicant has opted in to have
22  us view their application.

Page 15

1    Q.  So when the applicant goes online, they have an
2  option of the bank, some other lender, or both?
3    A.  Yes, yes.
4    Q.  And does the bank sort of get the first
5  opportunity, and then if the bank chooses not to lend it
6  flips over if the business elects?
7    A.  So it depends, because we have several bank
8  partners.  So it just depends on the partnership.
9    Q.  So it's different with each bank?
10   A.  Yes.
11   Q.  Other than providing the digital platform that
12  you're describing, what other services does Fundation
13  provide to its bank partners in this what I'll call
14  "Other line of business", not direct-lending line of
15  business?
16   A.  I would say just sort of general advice on how to
17  -- marketing advice, advice on like disclosures on the
18  application and what the application should look like,
19  and sometimes compliance matters.
20   Q.  And again, I'm going to ask you a question based
21  on my understanding of what you've said, but if that's
22  not accurate just tell me, please.  Okay?  So when you

Page 16

1  say that Fundation's in this second line of business,
2  not direct-lending line of business, provides advice to
3  your bank partners in connection with marketing,
4  disclosures, and the other things you testified to,
5  could you also call that advice a "Recommendation"?
6    A.  Yes.
7    Q.  And the bank then decides whether to accept the
8  recommendation or not accept the recommendation?
9    A.  That's right.
10   Q.  In the instance where Fundation is a direct
11  lender, is it state licensed?
12   A.  We're licensed in several states, yes.
13   Q.  What states are you licensed in?
14   A.  We're licensed in California, Vermont, North
15  Dakota, South Dakota, and Tennessee.
16   Q.  Does that mean you, as a direct lender, only lend
17  into those states, or do you lend across the country?
18   A.  No, we lend into 49 states.
19   Q.  What's the state you don't lend?
20   A.  Nevada.
21   Q.  With the bank partner relationships that you've
22  described -- and I don't care what banks they, are it



Page 21

1  Q. What were the services that Bellicose VI and
2  Bellicose Capital provided, as best as your memory
3  allows you to tell us?
4  A. So, expertise in the lending industry.
5  Q. Can you be more specific?
6  A. So I guess, marketing materials, underwriting
7  information, general know-how in the lending industry.
8  Q. And over the course of the almost three years
9  that you worked for Bellicose VI and Bellicose Capital,
10  did those entities as a servicer provide recommendations
11  to the lender that had hired Bellicose VI and then
12  Bellicose Capital?
13      MS. KELLY:  Object to the form.
14  BY MR. SCHEFF:
15  Q. What was your answer?
16  A. Yes, they did.
17  Q. Who were the lenders, or who was the lender?
18  A. The lenders were two companies:  One called
19  Capital Payday; and another called Pepper Cash.
20  Q. And have you ever heard of Duck Creek Financial
21  or Red Rock Financial?
22  A. I have.

Page 22

1  Q. And did those entities have any relationship, as
2  far as you know, to Payday --
3      What was it called, Payday?
4  A. Capital Payday and Pepper Cash.
5  Q. -- Capital Payday or Pepper Cash?
6  A. Yes, those were the entities that owned those two
7  companies.
8  Q. In that relationship as servicer-to-lender, would
9  it be accurate to say that the servicer Bellicose VI and
10  Bellicose Capital made recommendations to Red Rock and
11  Duck Creek --
12      MS. KELLY:  Object to the form.
13  BY MR. SCHEFF:
14  Q. -- with respect to its lending operation?
15      MS. KELLY:  Sorry, Richard.
16      Object to the form.
17      MR. SCHEFF:  It's okay.
18  A. Yes.
19  BY MR. SCHEFF:
20  Q. Based on your experience, who had the
21  decisionmaking authority, Bellicose VI and Bellicose
22  Capital, the lending entities?  Which one?

Page 23

1  A. Decisionmaking authority with respect to how they
2  acted on their recommendations?
3  Q. Yes.
4  A. The tribal entities did.
5  Q. And so this is the first time either in my
6  question or answer that you've made a reference, or
7  anyone has made a reference, to "Tribal entities."  Did
8  you have an understanding -- strike that.
9      If you know, did a Native-American tribe own Red
10  Rock and Duck Creek?
11  A. Yes.
12  Q. What was the name of that Native-American tribe?
13  A. That was the Locviex Desert Band of Lake Superior
14  Chippewa Indians.
15  Q. And how did you come to know that?
16  A. I think when I started working at Bellicose, that
17  was something that became clear to me.  I don't know
18  exactly how.
19  Q. Did you interact with people from the tribe?
20  A. I did.
21  Q. Who did you interact with?
22  A. I interacted with Shelly Hazen, Michelle Hazen,

Page 24

1  primarily though infrequently.
2  Q. And did you understand that Red Rock and Duck
3  Creek had counsel/had lawyers?
4  A. Yes.
5  Q. And who did you understand, if you did, to
6  represent Red Rock and Duck Creek?
7  A. Primarily Karrie Witchman at Rosette, and then
8  Tanya Gibbs at Rosette.
9  Q. And if you know, was Bellicose VI and Bellicose
10  Capital represented as well?  Did they have counsel?
11  A. We did.
12  Q. And can you identify counsel for Bellicose and
13  Bellicose VI and Bellicose Capital?
14  A. Yes.  So we had local counsel in the Virgin
15  Islands Keller Hals Ferguson I believe was the name.  We
16  were also represented by Jennifer Galloway, PC, I
17  believe was the name of the law firm; Hudson Cook; and
18  Greenberg Traurig; and maybe Pepper Hamilton.
19  Q. I'm not looking for privileged communications;
20  just you, as a lawyer, understand what a privileged
21  communication is?
22  A. I do.



Page 37

1   A.  There was a golf course I think on the hotel
2   property.
3   Q.  What was the purpose of you going to the
4   reservation, LVD's reservation, on the approximate three
5   occasions that you did?
6   A.  So I don't remember the purpose the first time I
7   was there; it might have been just to meet the people at
8   the entities.  I was there one time to sit with a
9   third-party compliance consultant, that I don't recall
10  whether they had been hired by Bellicose or by the
11  tribe.  But we sat with Shelly Hazen, and I believe
12  Karrie Witchman and maybe others, to review compliance
13  policies that I believe the compliance consultant had
14  developed.
15  Q.  Who was the compliance consultant?
16  A.  I believe it was called VP Compliance Services,
17  or I think I'm getting that wrong.
18  Q.  Is it VP or BP [sic]?
19  A.  V.
20  Q.  "V" as in Victor?
21  A.  Yeah.
22  Q.  Where were they located, if you know?

Page 38

1   A.  I believe the people who I met who worked for
2   them just worked sort of remotely.  I don't know if they
3   all had offices or if they worked remotely.
4   Q.  Were they hired on a project basis or did they
5   provide continuing services over a period of time to Red
6   Rock and Duck Creek?
7   A.  They provided continuing services.
8   Q.  And what were the nature of the services they
9   provided, if you can recall?
10  A.  So I recall them helping to create compliance
11  policies, and then doing sort of ongoing monitoring of
12  compliance.
13  Q.  When you say "Compliance policies", what are you
14  referring to?  What subject areas?
15  A.  Compliance with federal lending law.
16  Q.  And did you have an understanding as to whether
17  or not Red Rock and Duck Creek were intending to comply
18  with federal lending laws?
19  A.  Yes.
20  Q.  What's the basis of your understanding?  Again, I
21  don't want privileged information; I just want to again
22  give you that admonition throughout.

Page 39

1   A.  Because they took part in developing the
2   policies.  The only reason to develop compliance
3   policies is if you intend to comply with what they say.
4   Q.  And were you privy to the monitoring efforts or
5   monitoring work that VP provided to Red Rock and Duck
6   Creek?
7   A.  Yes.
8   Q.  And did VP, as a general matter, find that Red
9   Rock and Duck Creek were in compliance with federal laws
10  or not in compliance with federal laws?
11  A.  My recollection is they found they were generally
12  in compliances with federal lending laws.
13  Q.  And did they on occasion make recommendations for
14  changes in the way Red Rock and Duck Creek operated the
15  business from a compliance perspective when they found
16  what they believed might be deficiencies?
17  A.  I'm sure that they did.
18  Q.  Why are you sure that they did?
19  A.  We would have calls -- I would be involved with
20  calls that they were on.  There would be a
21  representative from VP Compliance Services, and then
22  Michelle Hazen and I believe either Carrie or Tanya

Page 40

1   would be on the calls periodically following the review
2   that VP Compliance services would do.  And my
3   recollection is if they found any deficiencies or areas
4   where there was room for improvement, they would make
5   recommendations on how to deal with and solve those
6   issues.
7   Q.  At the point in time that you left the employment
8   --
9       At that point, I guess it would have been
10  Bellicose Capital?
11  A.  Yes.
12  Q.  -- was VP still providing services to Red Rock
13  and Duck Creek?
14  A.  That is what -- actually, I don't recall,
15  actually.
16  Q.  What about Jennifer Galloway?  Was she still
17  providing compliance services?
18  A.  I believe she was providing -- well, it depends
19  on how we define "Compliance services."  I believe up
20  until I left the employment of Bellicose Capital that I
21  would call her as things came up and ask for advice.
22  Q.  Ms. Galloway was located in Florida.  Is that



Page 41

1  right?
2   A.  That's right.
3   Q.  So she was providing advice and direction
4  remotely?
5   A.  Primarily remotely.  I believe she came to the
6  Virgin Islands once, maybe twice.
7   Q.  Do you know how many times Jennifer Galloway went
8  to the reservation, LVD reservation?
9   A.  I don't believe she ever went to the reservation.
10  Q.  Was Jennifer Galloway providing compliance advice
11 to Bellicose, to Red Rock and Duck Creek, or both?
12  A.  To Bellicose.
13  Q.  Now, again, the same way you described the types
14 of compliance services that VP was providing to Red Rock
15 and Duck Creek, can you also describe the type of
16 compliance services that Ms. Galloway or Jennifer
17 Galloway, PC, was providing to Bellicose?
18  A.  Yes.  So she helped us develop compliance
19 policies.  And I believe she conducted some compliance
20 trainings and was -- we would contact her for advice on
21 different issues from time to time.
22  Q.  So what was it that Bellicose was trying to be

Page 42

1  compliant with?
2   A.  We were trying to be compliant with federal
3  lending law.
4   Q.  Same as Red Rock and Duck Creek?
5   A.  Yes.
6   Q.  And why is that?  Why was Bellicose trying to
7  comply with federal law?
8   A.  Because part of the services were providing
9  advice and other materials to the lending entities.  And
10 I think it would have been negligent for us to be
11 providing advice or materials that were not compliant
12 with the law.
13  Q.  What was your role, if any, with compliance or in
14 the compliance field for Bellicose?
15  A.  My title was compliance director.
16  Q.  So what were your duties and responsibilities as
17 compliance director?
18  A.  It was to sort of to implement the compliance
19 policies, make sure they were being followed, review
20 internal compliance from time to time, provide advice
21 internally.
22  Q.  During the time period you were employed by

Page 43

1  Bellicose VI and Bellicose Capital, did you ever have a
2  sense that the people at Red Rock and Duck Creek did not
3  want to comply with federal law?
4   A.  No.
5   Q.  Did you ever have a sense that the people at
6  Bellicose VI and Bellicose Capital did not want to
7  comply with federal law?
8   A.  No.
9   Q.  Let me go back to the visits you had at the
10 reservation.  Did Red Rock and Duck Creek have employees
11 located on the reservation?
12  A.  Yes.
13  Q.  And if you know, can you identify any of those
14 people by name?
15  A.  No.
16  Q.  Do you know what duties and responsibilities they
17 had?
18  A.  I don't recall.
19  Q.  Did you ever meet with the tribal council?
20  A.  So on one of my visits, I believe my last visit
21 to LVD, I attended a tribal council meeting.
22  Q.  And what was your understanding, if any, of the

Page 44

1  function of the tribal council?
2   A.  With regard to the lending entities?
3   Q.  Just with regard to the tribe.
4   A.  Just that they essentially were responsible for
5  overseeing a high level, the governance and functioning
6  of the tribe.
7   Q.  And would that include the lending operation?
8   A.  Yes.
9   Q.  So what did you observe at the tribal council
10 meeting?
11  A.  I don't recall the specifics of the meeting.
12  Q.  Was Mr. Martorello present?
13  A.  Yes.
14  Q.  What did he do at the tribal council meeting?
15  A.  I know he spoke for a bit, but I don't recall the
16 contents of what he said.
17  Q.  While the business was located in the Virgin
18 Islands, that is the business of Bellicose VI, can you
19 identify as many employees as you can that you recall?
20  A.  Yes.  So aside from myself and Matt Martorello,
21 Justin Martorello, James Dowd, Brian McFadden, Simon
22 Liang, Chelsea Wever, Lincoln Walker, Brian Burdick,



Page 69

1  A.  Yes, the name is familiar.
2  Q.  What do you understand about the Arenbergs, if
3  anything?
4  A.  My recollection is that it was several members of
5  the Arenberg family were investors in -- I'm not sure
6  which entity that may have been related to Bellicose.
7  Q.  Now, from your involvement with Bellicose VI and
8  Bellicose Capital during the almost three years, did you
9  ever -- well, strike that.
10      You testified in the first segment of your
11  deposition that you did review the consumer lending
12  contract or contracts between Red Rock and consumers,
13  and Duck Creek and consumers, and on occasion would make
14  recommendations for changes.  Did I recall that
15  testimony correctly?
16  A.  Yes.
17  Q.  To whom were those recommendations made?
18  A.  They would have been made to Michelle Hazen, with
19  a cc -- perhaps a cc -- to Karrie Witchman.
20  Q.  So would I have a correct understanding that you
21  have read the consumer lending contracts between Red
22  Rock and consumers, and Duck Creek and consumers?

Page 70

1  A.  Yes.
2  Q.  Do you have an understanding as to what law
3  governed those contracts?
4  A.  I recall it was the law of LVD.
5  Q.  Did you ever see the LVD law/actually read it?
6  A.  Yes, I did.
7  Q.  Did you have any role in drafting it?
8  A.  No.
9  Q.  Did you ever have a concern that tribal law
10  actually did not apply the lending relationship between
11  Red Rock and consumers, and Duck Creek and consumers?
12  A.  No.
13  Q.  Why not?
14  A.  Because it a was the law stated in the contract
15  that consumers agreed to.
16  Q.  Did you ever talk to Karrie Wichtman about why
17  tribal law applied to that lending relationship between
18  Duck Creek and consumers, or Red Rock and consumers?
19  A.  My guess is that we discussed it at some point.
20  I'm not sure exactly what the context of the discussion
21  would have been.
22  Q.  Do you consider yourself an expert in tribal law?

Page 71

1  A.  No.
2  Q.  Do you consider yourself an expert in the
3  relationship -- strike that.
4      Do you have an understanding of the term "Tribal
5  sovereign unity"?
6  A.  Yes.
7  Q.  What is your understanding?
8  A.  That the tribe is an entity that has its own laws
9  and regulations that apply to anyone on tribal land who
10  might agree to abide by tribal law, essentially.  And
11  that state law cannot supersede tribal law.
12  Q.  When you were with Bellicose VI or Bellicose
13  Capital, did you believe that the lending activities of
14  Red Rock and Duck Creek were illegal?
15  A.  No.
16  Q.  At any time that you were with Bellicose Capital
17  or Bellicose VI, did you believe that you were engaging
18  in any illegal activity?
19  A.  No.
20  Q.  During the time that you worked at Bellicose
21  Capital and Bellicose VI, did you believe that Bellicose
22  VI or Bellicose Source Point as an entity was engaging

Page 72

1  in illegal activity?
2  A.  No.
3  Q.  Did anyone ever suggest to you that in fact Red
4  Rock and Duck Creek were engaging in illegal activity?
5  A.  No.
6  Q.  Did anyone suggest to you that you were engaging
7  in illegal activity?
8  A.  No.
9  Q.  Did anyone suggest to you that Bellicose VI and
10  Bellicose Capital were engaging in illegal activity?
11  A.  No.
12  Q.  Did Matt Martorello ever say anything to you that
13  suggested to you that Mr. Martorello believed that
14  tribal law did not apply to the lending contracts
15  between Red Rock and consumers, and Duck Creek and
16  consumers?
17  A.  No.
18  Q.  Did Mr. Martorello ever say anything or do
19  anything which led you to believe that he believed that
20  his conduct in connection with Bellicose VI and
21  Bellicose Capital was in any way illegal?
22  A.  No.



Page 73

1  Q. You're familiar -- well, I'll ask it: Have you
2  ever heard of the CFPB?
3  A. Yes.
4  Q. What is your understanding of what the CFPB is?
5  A. It's a governmental agency. Part of its mandate
6  is to regulate lenders.
7  Q. In connection with your employment at Bellicose
8  VI and Bellicose Capital in the compliance field, was
9  any of the compliance work that you did that outside
10 vendors did for Bellicose VI and Bellicose Capital
11 relate in any way to the fact that the CFPB was a
12 governmental agency that had some sort of regulatory
13 authority?
14 A. Yes.
15 Q. Describe what that was.
16 A. So some of our -- a couple of our compliance --
17 or we had compliance policies, among other things, fair
18 lending, FCRA, and UDAAP.
19     MR. ANTHONY: Give her the acronym.
20 A. Fair Credit Reporting Act is FCRA, and UDAAP is
21 Unfair Deceptive and Abusive After-Practices.
22     And because it was my understanding that the CFPB

Page 74

1  had authority to regulate those laws, that we needed to
2  comply with those in order to satisfy the regulator.
3  BY MR. SCHEFF:
4  Q. As far as you -- well, strike that.
5     Did any of the compliance work that you either
6  did or managed or was provided by third-party vendors to
7  Bellicose VI or Bellicose Capital related to an effort
8  to prepare for a potential CFPB audit?
9  A. Yes, that's my recollection.
10 Q. Was there ever a CFPB audit?
11 A. No, there wasn't.
12 Q. In connection with whatever work was done by the
13 compliance people that you've identified, either
14 internal or external, did you have any understanding or
15 belief that in preparation for the CFPB audits there was
16 ever any intention to mislead or deceive the CFPB if it
17 came in to audit?
18 A. No.
19 Q. Was there anything that you did or that you
20 understood the third-party vendors you had assisted with
21 compliance did that was done in an effort to not comply
22 with what you understood to be CFPB regulations or

Page 75

1  guidance?
2     MS. KELLY: Object to the form.
3  A. No. The whole purpose of the compliance program
4  and engaging with the third-party compliance consultant
5  was to ensure compliance with federal law and
6  regulation.
7  BY MR. SCHEFF:
8  Q. Have you ever heard of Operation Chokepoint?
9  A. Yes.
10 Q. What did you have an understanding of what
11 Operation Chokepoint was?
12 A. My recollection is that it was an effort by the
13 Department of Justice, I believe, to influence banks and
14 payment processors not to work with certain lending
15 entities.
16 Q. Including tribal lending entities?
17 A. From what I remember, yes.
18 Q. Let's go back to the CFPB for a second. Based on
19 your understanding of CFPB guidance or regulations, did
20 that in any way change your view as to whether or not
21 you were engaging in any illegal activity?
22 A. No.

Page 76

1  Q. Did it change your belief as to whether or not
2  Bellicose VI or Source Point was engaging in illegal
3  activity?
4  A. No.
5  Q. Did it change your belief as to whether Red Rock
6  or Duck Creek was engaging in any illegal activity?
7  A. No.
8  Q. Same questions for Operation Chokepoint:
9  Anything you understand for Operation Chokepoint impact
10 or change or affect your belief in whether or not
11 Bellicose VI or Source Point were engaging in illegal
12 activity?
13 A. No.
14 Q. What about Red Rock or Duck Creek?
15 A. No.
16 Q. Do you have an understanding of what happened
17 with Operation Chokepoint?
18 A. I don't recall what happened.
19 Q. Does it still exist today, as far as you know?
20 A. I don't believe it does, but I'm not sure.
21 Q. Have you ever heard that Congress has criticized
22 Operation Chokepoint as an overreaching activity by the



Page 77

1  Department of Justice and FDIC?
2  A. I believe I did hear that.
3  Q. When did you hear that?
4  A. I believe sometime after I left Bellicose.
5  Q. Are you familiar with a lawsuit that LVD and
6  another tribe called the Otto Missouri filed against the
7  New York Division of Financial Services?
8  A. I have a vague recollection of it.
9  Q. What do you remember about it, if anything?
10 A. Nothing really. I saw an e-mail yesterday sort
11 of related to that, but I don't recall what the case was
12 about or really what LVD's involvement was.
13 Q. Is there anything that you remember about the
14 case against the New York Division of Financial Services
15 which either changed your view, then or now, about
16 whether or not you were engaging in any illegal
17 activity?
18 A. No.
19 Q. Is there anything about the New York Division of
20 Financial Services case that you knew, then or now,
21 which affected your belief about whether the activities
22 of Bellicose VI or Bellicose Capital were illegal?

Page 78

1  A. No.
2  Q. What about Red Rock or Duck Creek?
3  A. No.
4  Q. Can we mark this as Exhibit 1, Exhibit 2, and
5  Exhibit 3, please?
6  (Whereupon Exhibit Nos. 1 through 3 are marked for
7       identification.)
8  Q. So Mr. Gravel, I'd like you to take a look at
9  what's been marked as Exhibit 1, which bears -- you're
10 familiar with Bates labelling. Is that right?
11 A. Yes.
12 Q. Lower right-hand corner of the first page says
13 Rosette 002699. Do you have that?
14 A. Yes, I do.
15 Q. And where it all starts is on the last page,
16 which is Rosette 002705. Can you look at this document
17 and just familiarize yourself with this document,
18 please?
19 A. Okay, I've read it.
20 Q. Does reading Exhibit 1 refresh your recollection,
21 in any respect, with respect to the New York litigation?
22 A. No, it doesn't.

Page 79

1  Q. It sounds to me -- tell me if I'm wrong -- that
2  the New York litigation, whatever it was, was not a
3  significant event for you?
4  A. That's correct.
5  Q. Now, I want you to look -- did Red Rock and Duck
6  Creek stop lending in New York?
7  A. I'm not sure.
8  Q. Take a look at Bates No. 002703, the first e-mail
9  in the chain goes from Matt to Chairman Williams to
10 Craig Mansfield. Can you pronounce the other person who
11 it went to?
12 A. That's Michelle Hazen.
13 Q. That's Michelle Hazen?
14 A. Yes.
15 Q. cc'd to Karrie Witchman, Justin Martorello and
16 yourself. Is that correct?
17 A. Correct.
18 Q. And it's dated October 2nd, 2013?
19 A. Correct.
20 Q. Can you look at the next page, please?
21     MR. ANTHONY: Being 274?
22     MR. SCHEFF: Yes. I'm sorry.

Page 80

1     MR. ANTHONY: No worries.
2  BY MR. SCHEFF:
3  Q. Do you know who wrote this e-mail, actually wrote
4  the words?
5  A. It was sent by Matt Martorello. I'm not sure if
6  he wrote it or if someone else did.
7  Q. I want you to look please at 002704, the
8  second-to-last paragraph, the one that starts: "We
9  might be able to resume servicing New York loans at some
10 point in the future."
11 A. Yes.
12 Q. The second sentence of that paragraph says: "We
13 are willing to wind down our New York services and see
14 existing loans through to their completion, but we
15 simply cannot flaunt the clear ruling of Judge
16 Sullivan's order, however incorrect we believe it might
17 be." Did I read that correctly?
18 A. Yes.
19 Q. The intention -- strike that.
20    Is this sentence, in the e-mail that you've
21 identified, consistent with your belief of Matt
22 Martorello's intent with respect to complying with the



Page 81

1  law?
2       MS. KELLY:  Objection to the form.
3    A.  I'm not sure.  I mean, typically at Bellicose if
4  we saw that certain states were more aggressive, we may
5  have recommended the tribe not lending to borrowers
6  based in those states.
7  BY MR. SCHEFF:
8    Q.  I think I asked you a different question, but I
9  am going to follow up on your question [sic] in just a
10 minute.  Did anything you ever observe or hear from Matt
11 Martorello or read what he wrote suggest to you that he
12 didn't want to comply with any law?
13   A.  No, no.
14   Q.  Now, let's talk about what you were talking about
15 with respect to recommendations not to lend in certain
16 states.  Tell me about that.  What do you mean by that?
17   A.  If we saw that certain states -- I guess Attorney
18 Generals are aggressive in prosecuting usury cases, we
19 might have recommended the tribe didn't lend in those
20 states.
21   Q.  Why?
22   A.  To avoid the headache of having to deal with an

Page 82

1  AG that was being aggressive.
2    Q.  Were those recommendations, if any that were made
3  like that, made because of a belief that you had that
4  Bellicose VI or Bellicose Capital was engaging in
5  illegal activity?
6       MS. KELLY:  Object to the form.
7    A.  No.
8  BY MR. SCHEFF:
9    Q.  So how can you reconcile the recommendation with
10 not having a belief that Bellicose VI or Bellicose
11 Capital was engaging in illegal activity?
12   A.  Because while we believed that Bellicose VI and
13 Bellicose Capital were engaging in perfectly legal
14 activities and that the tribal entities were engaging in
15 perfectly legal activities, my recollection is that we
16 may have decided it wasn't worth the time and effort of
17 having to deal with state regulators who disagreed with
18 us.
19   Q.  And -- strike that.
20      Take a look, would you please, at Exhibit 2.
21 Just if you could read that and familiarize yourself
22 with that.  We're going to need to take a break soon

Page 83

1  because we're running out of video.
2    A.  Okay.  I read it.
3    Q.  What is Phenomenon Marketing?
4    A.  I don't recall.
5    Q.  Do you remember writing this letter?
6    A.  No, I don't.
7    Q.  Do you remember what types of services Phenomenon
8  provided?
9    A.  Based on their name, I assume marketing.  But I
10 don't know specifically.
11   Q.  In the first line you said:  "Given the various
12 challenges and legal uncertainty in the lending
13 industry, Bellicose L.L.C. is in the process of
14 assessing and re-prioritizing its prior projects and
15 relationships with third-party vendors."  Have I read
16 that correctly?
17   A.  Yes.
18   Q.  What were the "challenges in and the legal
19 uncertainty in the lending industry" that you were
20 referring to, that you can recall as you sit here today?
21   A.  I don't recall what I was referring to.
22   Q.  Do you know whether the termination of the

Page 84

1  relationship with Phenomenon was based on any belief
2  that Bellicose VI or Bellicose Capital was engaging in
3  illegal activity?
4    A.  No, it wasn't.
5    Q.  Do you know whether "the various challenges and
6  legal uncertainty in the lending industry" that you're
7  referring to relates to a belief or a conclusion that
8  you had made that Bellicose VI and Bellicose Capital
9  were engaging in illegal activity?
10   A.  No, it wasn't.
11      MR. SCHEFF:  Let's take the break you need
12 for the tape.
13      VIDEOGRAPHER:  Going off the record at 12:09
14 p.m.  This marks the end of DVD No. 1.
15      (Whereupon a short recess is taken.)
16      VIDEOGRAPHER:  Going back on the record at
17 12:40 p.m.  This marks the beginning of DVD No. 2.
18 BY MR. SCHEFF:
19   Q.  Mr. Gravel, take a look at Exhibit 3 that has
20 been previously marked, and just familiarize yourself
21 with it, please, your copy of it.
22   A.  Did you want me to read the other documents as



Page 85
1  well, or just the e-mail?
2      Q.  Review as much as you need to familiarize
3  yourself with the document.
4      A.  Okay.  I've read it.
5      Q.  The e-mail, the first page, which is from Karrie
6  Witchman to a list of people including yourself dated
7  October 14th, 2014, are you familiar with this e-mail?
8      A.  No, I'm not.
9      Q.  Do you know what the Jackson versus Cash Call
10  case that's referred to on the first page?
11     A.  No.
12     Q.  Do you know the second Cash Call case,
13  Inetianborr versus Cash Call?  Do you know what that one
14  is?
15     A.  I'm not familiar with that.
16     Q.  "The decision in our case in the Second and Third
17  Court" referred to in the second and third line, do you
18  know what that means/what that refers to?
19     A.  No.
20     Q.  Did any case law during the time period that you
21  were employed by Bellicose VI or Bellicose Capital that
22  was coming out impact your belief that the conduct of

Page 86
1  Bellicose VI and Bellicose Capital was legal?
2      A.  No.
3      Q.  Did any of the case law that came out impact your
4  view as to whether the conduct of Red Rock or Duck Creek
5  was lawful?
6      A.  No.
7      Q.  Why not?
8      A.  We had gotten the advice of many different
9  attorneys that the conduct of Bellicose as a service
10  provider and the conduct of the tribal lending entities
11  was legal.
12     Q.  Let me ask you about what you just said:  You
13  talked about Bellicose as the servicer and Red Rock and
14  Duck Creek as the tribal lender.  Were they the same
15  entity or separate entities?
16     A.  They were separate entities.
17     Q.  As far as you know, did Mr. Martorello control
18  Red Rock?
19     A.  No.
20     Q.  Did he control Duck Creek?
21     A.  No.
22     Q.  Who did?

Page 87
1      A.  Well, the co-managers had management
2  responsibilities of those entities, as far as I know;
3  and then the tribal council had sort of oversight of the
4  entities themselves at a higher level.
5      Q.  From your involvement in the lending industry,
6  generally while you were at Bellicose and Source Point
7  and since you've left, are you familiar with the idea
8  that there are entities out there that serve as
9  servicers to lending entities?
10     A.  Yes.
11     Q.  Is that common or uncommon?
12     A.  It's extremely common.
13     Q.  Is that in part what Fundation does with respect
14  to the banks that it partners with?
15     A.  Yes.
16     Q.  Do you have any specific understanding of the
17  economics that were in place or negotiated between
18  Bellicose and the tribal lending entities?
19     A.  No.
20     Q.  Do you have a general understanding?
21     A.  I wasn't aware of how the finances worked, no.
22     Q.  Do you know, on a rough percentage basis, who got

Page 88
1  what?
2      A.  No, not specifically.
3      Q.  What about generally?
4      A.  Generally, no.
5      Q.  Did anything about the economics cause you to
6  believe that the conduct of Bellicose VI or Bellicose
7  Capital was illegal?
8      A.  No.
9      Q.  What about with respect to Red Rock or Duck
10  Creek, anything about that, about the economics, suggest
11  to you or cause you to the believe that the conduct of
12  Red Rock or Duck Creek was illegal?
13         MS. KELLY:  Object to the form:  Lack of
14  foundation.
15     A.  No.
16  BY MR. SCHEFF:
17     Q.  Are you aware that at some point Mr. Martorello
18  sold Bellicose to a tribal entity?
19     A.  Yes, I am aware.
20     Q.  And did that occur while you were employed at
21  Bellicose?
22     A.  So I believe I saw an e-mail recently where I had



Page 93
1  with Bellicose VI and Bellicose Capital, was that
2  document honored/was it complied with?
3     A.  Yeah, as far as I know.
4     Q.  Could you go back to Exhibit 4 for a second,
5  please?  It's the October -- not that one, Exhibit 3, I
6  apologize.  Do you got that?
7     A.  Yes.
8     Q.  Two more questions about that:  Do you know whose
9  handwriting is on the document?
10    A.  No, I have no idea.
11    Q.  "The meeting" it refers to in the e-mail, did you
12  ever attend that meeting?
13    A.  It's possible that I did.  I had mentioned
14  earlier that I had been to LVD maybe about three times.
15  I don't think we talked about the third time.  The last
16  time I was there was to attend a meeting.  Maybe we did
17  talk about it, I don't know.  But it was to attend a
18  tribal council meeting.
19    Q.  You did mention that.  What relation, if any,
20  does that have to the meeting that's referred to in
21  Exhibit 3?
22    A.  It's possible that this was the meeting I

Page 94
1  attended.
2     Q.  Now, Mr. Gravel, when this case was filed you
3  were a Defendant in this case.  Correct?
4     A.  Correct.
5     Q.  And you were dismissed at some point without
6  prejudice?
7     A.  Correct.
8     Q.  Did you meet with Ms. Kelly?
9     A.  Yes.
10    Q.  She asked you a series of questions and you
11  provided answers?
12    A.  Yes.
13    Q.  Since that time, you have not been rejoined as a
14  Defendant in this case.  Correct?
15    A.  That is correct.
16    Q.  Let me mark whatever the next exhibit is.  Is
17  that 6?
18   (Whereupon Exhibit No. 6 is marked for identification.)
19    Q.  Mr. Gravel, you're familiar with this document.
20  Correct?
21    A.  Yes.
22    Q.  This is the complaint that was filed against you?

Page 95
1     A.  Yes.
2     Q.  Can you turn to the second page, please?  Let me
3  ask you a different question:  You became employed by
4  Bellicose VI and Bellicose Source Point, as you said, in
5  or about early August 2012.  Correct?
6     A.  Correct.
7     Q.  So in terms of how it was that LVD and Bellicose
8  came to have a business relationship, as you've been
9  testifying about today, you don't have any personal
10  knowledge about that.  Is that correct?
11    A.  That's correct.
12    Q.  Because you weren't around at that time?
13    A.  That's correct.
14    Q.  Have you heard people talk about that?
15    A.  No, I have not.
16    Q.  Take a look please at page 3, paragraph 5.  And
17  read the first sentence of that to yourself of that
18  complaint.
19    A.  Okay.
20    Q.  Do you believe that you participated in an
21  unlawful lending enterprise which violated Virginia's
22  usury laws?

Page 96
1     A.  No.
2     Q.  Why not?
3     A.  Because we were a service provider to a lender
4  who we believed was lending lawfully.
5     Q.  Under tribal law?
6     A.  Under tribal law.
7     Q.  Can you read the next sentence to yourself,
8  please, in paragraph 5?
9     A.  I would say also with respect to the first
10  sentence:  I wasn't around, I hadn't been involved with
11  Big Picture or Ascension Technologies, so.
12       Okay.
13    Q.  Do you believe you violated Virginia's usury laws
14  in Rico's prohibition against the collection of unlawful
15  debts?
16    A.  No.
17    Q.  Based on what you know, do you believe Mr.
18  Martorello violated Virginia usury laws in participating
19  in an unlawful lending enterprise?
20    A.  No.
21    Q.  Based on what you know, do you believe Mr.
22  Martorello violated Rico's prohibition against



Page 97

1  collection of unlawful debts?
2  A. I don't know what Rico says specifically.
3  Q. Take a look at paragraph 16, please. Paragraph
4  16, first sentence, can you read that to yourself,
5  please?
6  A. Uh-huh.
7  Q. Do you believe you were a mastermind of a
8  rent-a-tribe lending scheme?
9  A. No.
10  Q. Do you believe you have direct and personal
11  involvement in the day-to-day operations of an illegal
12  enterprise?
13  A. No.
14  Q. With respect to the conduct, the rest of the
15  conduct that is attributed to you in paragraph 16, is
16  that something you did or didn't do, that is drafting
17  your review and software, financial payment processing
18  and servicing contracts? Did you do that?
19  A. Part of my job at Bellicose was reviewing a lot
20  of contracts, yes.
21  Q. Did you believe that any of that was in
22  furtherance of an illegal enterprise?

Page 98

1  A. No.
2  Q. Did you think you were violating the law?
3  A. No.
4  Q. Did you review advertising and marketing
5  material?
6  A. I did.
7  Q. Did you think that that was illegal conduct?
8  A. Reviewing the material?
9  Q. Yes.
10  A. No.
11  Q. What about reviewing websites, the legal content
12  of websites? Did you think that was illegal?
13  A. No.
14  Q. Take a look at paragraph 29 on page 8. It says:
15  "With the assistance of Gravel, Martorello and Bellicose
16  helped form Big Picture and Red Rock." Is that true?
17  A. No, it is not.
18  Q. Paragraph 30: "Although the tribe holds itself
19  out as the actual lender in that Payday loan, the tribe
20  is merely a front." Is that true or false?
21  A. That's false.
22  Q. Look at paragraph 34: "Despite representations

Page 99

1  in the loan agreements, Big Picture and Red Rock were
2  owned and operated by the tribe. Bellicose Capital was
3  the de facto owner and controlled the operations of Big
4  Picture Loans and Red Rock." True or false?
5  A. I can't speak to anything that happened with Big
6  Picture. But if it's the same arrangement as it was
7  with Capital Payday and Pepper Cash, I would say it's
8  false.
9  Q. Would you look at paragraph 54, please, page 13?
10  It says: "Defendants marketing initiated and collected
11  injurious loans in Virginia. Martorello and Gravel
12  shows Virginia as the place where loans and collection
13  efforts would ensue." Is that true or false?
14  A. That's false.
15  Q. Paragraph 55: "Martorello and Gravel knew the
16  subject loans were illegal under Virginia law, but they
17  pursued to scheme anyway through Red Rock, Big Picture,
18  and Bellicose in Virginia." True or false?
19  A. False.
20  I would point out also that: I believe the
21  subject loans were taken out after I had left Bellicose.
22  Q. Look at paragraph 106, page 22: "Martorello and

Page 100

1  Gravel, during pertinent times, were directly and
2  materially involved in this intentional misconduct and
3  knew the subject loans were illegal under Virginia law
4  but they pursued the scheme anyway through Bellicose
5  Capital." True or false?
6  A. False.
7  And, again, "During the pertinent times", I
8  assume that's referring to when the subject loans were
9  taken out. I wasn't an employee of Bellicose Capital or
10  in any way involved with Big Picture Loans or anything
11  else having to do with the tribe.
12  MR. SCHEFF: I've got nothing further at
13  this time. Thank you, Mr. Gravel.
14  VIDEOGRAPHER: Let's go off the record for a
15  second. Going off the record at 1:10 p.m.
16  (Whereupon a short recess is taken.)
17  VIDEOGRAPHER: Going back on the record at
18  1:15 p.m.
19  EXAMINATION
20  BY MS. KELLY:
21  Q. Mr. Gravel, we've met before. Right?
22  A. Yes.



Page 133

1  A.  That sounds familiar, yes.
2  Q.  I'm going to mark this Exhibit 7.
3  (Whereupon Exhibit No. 7 is marked for identification.)
4  Q.  Do you recognize this document?
5  A.  I believe so.
6  Q.  You produced this document in response to a
7  subpoena we served to you.  Correct?
8  A.  Yes.
9  Q.  And this is an e-mail that Mr. Martorello sent to
10 you on August 1, 2012.  Correct?
11  A.  Yes.
12  Q.  And you had this e-mail in your possession and
13 you produced it as part of a response to a subpoena we
14 sent.  Correct?
15  A.  Yes.
16  Q.  Does this refresh your recollection as to whether
17 or not Mr. Martorello considered PlainGreenLoans.com a
18 competitor?
19  A.  No.
20  Q.  What did Mr. Martorello ever say to you about
21 Think Finance?
22  A.  I don't recall any specific conversations about

Page 134

1  Think Finance.
2  Q.  How did you first hear about Think Finance?
3  A.  It would have been from Matt.
4  Q.  And what is your knowledge of what Think Finance
5  did?
6  A.  I'm sure I knew at one point.  I guess they're a
7  service provider or a lender.
8  Q.  Have you ever discussed any litigation related to
9  Think Finance with Mr. Martorello?
10  A.  It's possible.
11  Q.  Do you have any recollection of ever having
12 discussions of litigation regarding Think Finance with
13 Mr. Martorello?
14  A.  I don't recall any specific conversations about
15 it.
16  Q.  When Mr. Scheff asked you if Mr. Martorello ever
17 said anything to you about tribal law may not apply, you
18 give a very definitive response.  How can you be sure
19 about that?
20  A.  About Matt's -- can you repeat the question?
21  Q.  Yes.  Mr. Scheff asked you if Mr. Martorello ever
22 said anything to you that tribal law might not apply to

Page 135

1  the Red Rock and Duck Creek partnership, and you
2  responded that he never did.  Do you recall that?
3  A.  Yes.
4  Q.  How can you be sure that he never said anything?
5  A.  I just don't recall him ever saying anything like
6  that, that didn't apply.
7  Q.  And you don't ever recall any communications with
8  him about Think Finance.  Correct?
9  A.  No specific conversations.
10  Q.  And you don't recall any specific conversations
11 with him about Cash Call.  Correct?
12  A.  Correct.
13  Q.  And do you recall any specific conversations with
14 him about the Department of Financial Services New York
15 case?
16  A.  No.
17  Q.  Do you recall any specific conversations with him
18 about Operation Chokepoint?
19  A.  No, I don't.
20  Q.  Do you recall any specific conversations with him
21 about potential CFPB audits?
22  A.  Nothing specific.

Page 136

1  Q.  So you, sitting here today, can you testify what
2  you understood Mr. Martorello's state of mind to be
3  regarding the legality of what he believed the Bellicose
4  and Red Rock/Duck Creek relationship was without any
5  specific recollection about those types of
6  conversations?
7      MR. SCHEFF:  Objection:  Asked and answered.
8      He can answer.
9  A.  His state of mind with regard to you said the
10 legality of --
11 BY MS. KELLY:
12  Q.  His belief about the legality.
13      MR. ANTHONY:  Just to be clear:  Of the
14 loans that were being served by Bellicose?
15      MS. KELLY:  The Bellicose/Red Rock/Duck
16 Creek relationship.
17  A.  My impression of his state of mind is that the
18 relationship was perfectly legal.
19 BY MS. KELLY:
20  Q.  Under what laws?
21  A.  Under federal law and tribal law.
22  Q.  Do you know if Mr. Martorello believed the



Page 137
1  Bellicose relationship with Duck Creek/Red Rock was
2  legal under state laws?
3      A. When you say "The relationship", are you talking
4  about -- I'm not sure what would have been illegal about
5  the relationship. Are you referring to usury rates or
6  interest rates?
7      Q. Yes, yes.
8      A. So I think it wasn't that the relationship was
9  illegal under state laws, it's just that state laws
10 didn't apply.
11     Q. And what did Mr. Martorello base that
12 understanding on, to the extent you're able to speak to
13 the state of mind?
14     A. I think he would have based that understanding on
15 the advice of legal experts in the area.
16     Q. Which legal experts?
17     A. Probably Jennifer Weddle at Greenberg Traurig;
18 possibly attorneys at Hudson Cook; possibly Karrie
19 Witchman in the Rosette firm.
20     Q. Did you ever draft any policies or procedures to
21 attempt to comply with usury laws of any state?
22     A. No, I did not.

Page 138
1       MS. KELLY: We'll take a brief recess.
2       VIDEOGRAPHER: Going off the record at 2:12
3  p.m. This marks the end of DVD No. 2.
4       (Whereupon a short recess is taken.)
5       VIDEOGRAPHER: Going back on the record at
6  2:19 p.m. This marks the beginning of DVD No. 3.
7  BY MS. KELLY:
8      Q. Were you involved in any way in the decision of
9  Red Rock to bring the case against the New York
10 Department of Financial Services?
11     A. No, I don't believe so.
12     Q. Were you involved in any conversations about
13 that?
14     A. I actually don't recall the specifics of the
15 case, but it's possible I was involved in some
16 discussions.
17     Q. When the District Court made the decision on
18 December 30th, 2013, did you have any conversations with
19 Matt after that about the decision of the New York
20 Court?
21     A. It's very possible, but I don't recall any
22 specific conversations about it.

Page 139
1      Q. If you'd look at Exhibit 1, if you'd go to the
2  e-mail that Mr. Martorello sent that started off this
3  chain, it was sent on October 2nd, 2013, a few days
4  after the decision.
5      A. Yes.
6      Q. Did you help draft this e-mail that Mr.
7  Martorello sent on October 2nd?
8      A. It's possible, but I have no recollection of this
9  e-mail.
10     Q. And in reading this, Mr. Martorello states --
11        MR. SCHEFF: Where are you reading from?
12 BY MS. KELLY:
13     Q. "While we understand an appeal of Judge
14 Sullivan's order is imminent, our concern is that Judge
15 Sullivan's order when you meant that tribal enterprises
16 are subject to New York's anti-usury laws, will be
17 regarded as sufficiently final by the State of New York
18 such that it will precipitate their potential
19 investigation and potential prosecution of us personally
20 and our companies if we continue to provide New
21 York-related services at this time." Do you see that?
22     A. I do.

Page 140
1      Q. Does that statement at all refresh your
2  recollection about whether or not you had any
3  involvement in drafting this e-mail?
4      A. No, it doesn't.
5      Q. Does that statement refresh your recollection of
6  any conversations you and Mr. Martorello might have had
7  after the Judge Sullivan decision?
8      A. No, it doesn't.
9      Q. Are you aware of any differences between New
10 York's usury laws and Virginia's usury laws?
11     A. No, I'm not.
12     Q. Did you have any involvement in the decision to
13 cease lending in New York after this, Judge Sullivan's
14 decision?
15        MR. SCHEFF: Whose decision to cease
16 lending?
17        MS. KELLY: Mr. Martorello's in this
18 document.
19        MR. SCHEFF: Objection: Misstates the
20 testimony and misstates the document.
21        You can answer, if you can.
22     A. My guess is that considering that I was General



Page 153

1   A. I'm not aware of the particular laws or states
2   that you're referring to.
3     Q. As part of your tenure as compliance director,
4   did you ever undertake to learn what state usury laws
5   would apply to Bellicose?
6     A. I don't recall doing that.
7     Q. Why not?
8     A. It just wasn't on our radar. Our efforts were
9   towards ensuring compliance with federal law.
10    Q. Why did Bellicose not have compliance with state
11  laws on its radar?
12    A. Because the tribe was not required to comply with
13  state law, was our understanding. So the
14  recommendations we would make to them, given that fact,
15  were just based on federal law.
16    Q. So is it fair to say that because the tribe did
17  not need to comply with state law, that Bellicose
18  believed that its conduct did not need to comply with
19  state law because it was affiliated with a
20  Native-American tribe for purposes of servicing the
21  loans?
22        MR. SCHEFF: Objection: Misstates the

Page 154

1   testimony.
2         You can answer.
3     A. Can you repeat the question?
4   BY MS. KELLY:
5     Q. Is it fair to say that Bellicose did not believe
6   it had to concern itself with compliance with state law
7   because it had a partnership with two lending entities
8   that asserted sovereign unity?
9         MR. SCHEFF: Objection: Misstates the
10  testimony.
11        You can answer the question.
12    A. I think it's fair to say that we weren't focused
13  on compliance with state law because, like I said, it
14  was not applicable to the tribal entities, and one of
15  our jobs or the services we provided was making sure the
16  services we provided to them, to the tribes. Tribal
17  entities were compliant with federal law because that's
18  what they needed to comply with.
19  BY MS. KELLY:
20    Q. Are you aware that the LVD paid or has agreed to
21  pay up to $300 million for the purchase of Bellicose?
22    A. No.

Page 155

1     Q. You were not aware of that?
2     A. Am I aware of it now or was I aware of it at the
3   time?
4     Q. Are you aware of it now?
5     A. Now that you told me.
6     Q. But before today you did not know that?
7     A. No. I mean, I remember reading a Bloomberg
8   article about it. I can't remember if that contained
9   like a purchase price or something. But no, I don't
10  think I ever heard that number before you just mentioned
11  it.
12        MS. KELLY: I'm just going to take a
13  few-minute break. We'll go off the record.
14        VIDEOGRAPHER: Going off the record at 2:55
15  p.m.
16        (Whereupon the a short recess is taken.)
17        VIDEOGRAPHER: Going back on the record at
18  2:58 p.m.
19  BY MS. KELLY:
20    Q. Do you know who Josh Landy is?
21    A. No.
22    Q. Do you know who Scott Asmer is?

Page 156

1     A. No.
2     Q. In your role at Fundation as General Counsel, if
3   they were to get into consumer lending would you
4   recommend that it lend at the rates that Red Rock or
5   Duck Creek 100 percent interest or higher?
6         MR. ANTHONY: Object to the form of the
7   question.
8     A. Would I recommend it?
9   BY MS. KELLY:
10    Q. Yes.
11    A. No.
12    Q. Why not?
13    A. Because we would be lending at usury rates.
14    Q. And if Fundation were to partner with another
15  lending entity where it just provided servicing
16  activity, would it partner with a lending entity that
17  lended [sic] at interest rates of 100 percent or more?
18        MR. ANTHONY: Object to the form the
19  question.
20    A. No, I don't think so.
21  BY MS. KELLY:
22    Q. Why not?

