| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | EASTERN DISTRICT OF VIRGINIA |
| 2 | RICHMOND DIVISION |

3 _____
                                 )
4  LULA WILLIAMS, et al.         )
                                 )
5  v.                            )    Civil Action No.:
                                 )    3:17 CV 461
6  BIG PICTURE LOANS, LLC, et al.)
   _____)
7                                      May 18, 2023

8          COMPLETE TRANSCRIPT OF STATUS CONFERENCE
            BEFORE THE HONORABLE ROBERT E. PAYNE
9            UNITED STATES DISTRICT COURT JUDGE

10

11 APPEARANCES:

12 Leonard Anthony Bennett, Esquire
   CONSUMER LITIGATION ASSOCIATES
13 763 J. Clyde Morris Boulevard, Suite 1A
   Newport News, VA 23601
14
   Kristi C. Kelly, Esquire
15 KELLY GUZZO, PLC
   3925 Chain Bridge Road, Suite 202
16 Fairfax, VA 22030

17          Counsel on behalf of the Plaintiffs

18 John David Taliaferro, Esquire
   LOEB & LOEB LLP
19 901 New York Ave NW, Suite 300 East
   Washington, DC 20001
20
   Bethany D. Simmons, Esquire
21 LOEB & LOEB LLP
   345 Park Avenue
22 New York, NY 10154

23          Counsel on behalf of the Defendant

24             TRACY J. STROH, RPR
             OFFICIAL COURT REPORTER
25          UNITED STATES DISTRICT COURT

1               (The status conference commenced at 4:04 p.m.)

2               THE COURT:  Hello.  This is Williams against

3    Martorello, 3:17 CR 461.

4               Who's here for whom, starting with counsel for

5    the plaintiff?

6               MS. KELLY:  Good morning, Judge.  This is

7    Kristi Kelly on behalf of the plaintiffs.

8               MR. BENNETT:  Good afternoon, Judge.  This is

9    Leonard Bennett on behalf of the plaintiff.

10              THE COURT:  Is that it for the plaintiff?

11              Ms. Kelly, is that it?

12              MR. TALIAFERRO:  Good afternoon, Your Honor.

13   This is J.D. Taliaferro, from Loeb & Loeb, on behalf of

14   Matt Martorello.

15              And also on the phone I believe is

16   Bethany Simmons from Loeb & Loeb.

17              THE COURT:  All right.  Okay.  I've been going

18   through these various motions, and I've reviewed your

19   joint statement about time, gone back and studied some

20   papers in the case, and I think we need to have some

21   get-togethers to sort out where we are.

22              Conceptually, some of these motions in limine

23   are fundamentally at odds with the allegations in the

24   complaint and with what positions have been taken

25   throughout this litigation on certain questions.

1          For example, there is a motion about not using

2  terms called rent-a-tribe or rent-a-bank scheme.   The

3  complaint is ladened with those terms.   Many of the papers

4  in this case are ladened with those terms.   The documents

5  that have been offered in evidence have those terms

6  throughout them.   The expert reports, particularly of the

7  plaintiff, have those terms throughout them.

8          The plaintiff says, well, we're not going to use

9  the term rent-a-bank and rent-a-tribe except as in the

10 depositions and documents.   Well, that doesn't really mean

11 anything because the documents are rife with references to

12 them.   And, in fact, I don't see how the story of the

13 alleged enterprise case can even be told without reference

14 to those terms in any way that would make sense,

15 consistent with the allegations in the complaint.

16         Now, I don't -- another situation raised by

17 these motions in limine is how to refer to or what to say

18 about tribal immunity.   The concept of tribal immunity

19 lies at the heart of the rent-a-bank alleged business

20 model and at the centerpoint of the complaint and at

21 virtually all -- most of the evidence in the case.   And

22 how you can try the case without reference to the concept

23 of tribal immunity I don't know.

24         The decisions in the *Otoe* District Court and

25 Court of Appeals Second Circuit are a focal point of the

1  evidence that has been presented in a number of different

2  contexts about how and why certain business models were

3  abandoned and adopted and the positions of people, and yet

4  there's some discussion about that.  And the real reason

5  why the decisions engendered the changes has always been

6  that they alleged to be that the District Court and the

7  Second Circuit held that there was no showing of a

8  likelihood of success sufficient to warrant a preliminary

9  injunction.

10         If I remember the case, the tribe brought -- not

11  the tribe involved in this case, but the Otoe tribe

12  brought an injunction case and lost it in part because of

13  the finding that there was not much of a likelihood of

14  success on the merits, and the Second Circuit, inter alia,

15  affirmed that view.

16         Then the allegation generally has been,

17  throughout the case, that out of apprehension or stark

18  terror, depending on your particular point of view,

19  Martorello set about the business to change things and

20  restructure things.

21         Now, how -- those are three things that appear

22  in the motions in limine that seem fundamentally at odds

23  with the way the case has proceeded from the complaint

24  until I got the motions in limine.  And I don't know

25  what -- it made me realize that I'm not quite sure what

1    case we're supposed to be trying here if these motions in

2    limine are any indication of how you all perceive the

3    case.

4           Another thing.  Motion in limine number 5 of the

5    plaintiffs deals with the so-called good faith advice of

6    counsel defense that is referred to, and there's discovery

7    that says that Mr. Martorello is not going to pursue such

8    a defense.  And then there's an argument that he is and

9    that everything was resolved.  And then I've read in the

10   reply brief that it wasn't resolved.  So that's fairly

11   central to the case and how the case would be tried.

12          So it occurs to me that it's necessary to have

13   an early hearing on the -- at least that motion in limine

14   and maybe some others, and I wanted to get you all

15   thinking about these things so I decided to have a call

16   and I want to set dates.

17          Mr. -- who's going to speak for the plaintiff?

18   Ms. Kelly or Mr. Bennett?

19          MR. BENNETT:  Your Honor, I think I will.

20   Mr. Bennett will right now.

21          THE COURT:  Well, are you planning to put on a

22   case that remotely resembles what is alleged in the

23   complaint?

24          The class action complaint, ECF Number 1, is the

25   operative one, isn't it?

1          MR. BENNETT:  Judge, we are intending to put on

2   that case.  And I think that the use of rent-a-bank -- I

3   don't -- I agree with Your Honor that it's hard to not

4   commend.  The defendant's own expert uses the rent-a-bin

5   and the rent-a-tribe model.  Whether it's those words or

6   it's other language that defendant would claim less -- I

7   believe less pejorative.

8          THE COURT:  Well, I can hear those.  But your

9   intention is to put on evidence that there was a -- a

10  rent-a-bank industry and that -- and when the government

11  regulators cracked down -- this is what you allege in the

12  complaint and in some of your motions in limine -- that

13  the model switched to the rent-a-tribe in order to get the

14  tribal immunity.  And I don't see how you tell the story

15  you're alleging without having evidence about that,

16  particularly after having read the expert reports.  So

17  we're going to have to figure out what we're trying and

18  how we're going to try it here, it seems to me.

19          So my question, though, at the beginning was is

20  the class action complaint, ECF Number 1, the operative

21  complaint in this case?

22          MR. BENNETT:  Yes, Your Honor.

23          THE COURT:  All right.  And in that complaint,

24  there are five counts.  And as I have reviewed it, the

25  complaints are against all defendants or named defendants,

1    and in the named defendants, Martorello is named as a

2    defendant in all of the counts, either through the "all

3    defendants" or through use of his name; is that correct,

4    Mr. Bennett?

5            MR. BENNETT:  That's correct.

6            THE COURT:  Are we planning at all to try a case

7    involving Counts Four and Five as to Mr. Martorello or has

8    that fallen by the wayside now and you're just trying the

9    RICO claims?

10           MR. BENNETT:  No, Judge.  We're seeking judgment

11   on Counts Four and Five as well.

12           THE COURT:  Well, how do you seek judgment on

13   Counts Four and Five against Martorello personally when

14   there isn't any evidence that Martorello made any loan?

15   How do you do that?

16           MR. BENNETT:  Yes, sir.  We believe he caused

17   the loan.  He created the loans, and he collected the

18   loans, even though he did it through his controlled

19   entities.

20           And the unjust enrichment count doesn't have

21   even that element in it, Judge.

22           THE COURT:  Well, I don't know what you're

23   really going to try on unjust enrichment.

24           Your complaint is kind of a goofy complaint

25   anyway because all of your allegations are up in the front

1   part of it and I guess piecing it together, that there's

2   violations of 19 -- 18 U.S.C. Section 1962(c) and (d), if

3   you take some of those allegations up front where you're

4   telling stories and putting them together with your class

5   complaint, but it's not in a traditional way.

6          But I don't know what Count Five against

7   Martorello, how you're going to do that.  Tell me how you

8   do that.  Tell me how you do Four and Five is what I'm

9   going to need to hear.  Not now, but I'm going to need to

10  hear it.

11         See, I don't understand how you're trying these

12  cases and where you're going.  You all have structured the

13  whole operation in that Martorello set up all these

14  entities to do things and they just were basically cover

15  for the tribal entities, and that's most of what's in the

16  complaint.

17         Well, isn't that somewhat at odds with the

18  notion that Martorello himself is personally liable for

19  making the loans if the loans were made by a company?

20  Unless you are proceeding on a piercing the veil theory,

21  which is not alleged in the complaint that I see, or is

22  it?

23         MR. BENNETT:  We've not alleged veil piercing,

24  especially in the complaint, Judge.

25         THE COURT:  Nor by implication, I think.

1          So I don't know that there even -- I'm wondering
2   whether the only thing to be tried here is the RICO issue
3   and the declaratory -- the two RICO counts, 1962(c) and
4   (d), and the declaratory judgment count.  So that seems to
5   me to be something that the plaintiffs need to give some
6   thought to.
7          MR. BENNETT:  Yes, Your Honor.
8          THE COURT:  A lot of this was structured with
9   efforts to get to defendants who are no longer in the
10  case.  I'm correct, am I not, that Big Picture Loans;
11  Ascension Technologies; Daniel Gravel; James Williams,
12  Jr.; Gertrude McGeshick; Susan McGeshick; and -- I won't
13  even try to pronounce that name -- Martin, they are no
14  longer in the case, are they?
15         MR. BENNETT:  They are not, Judge.
16         THE COURT:  Okay.
17         Now, as to Martorello, there have been such
18  fights on every front for years over denying access -- the
19  plaintiffs access to any communication from any lawyers.
20  I think I may have seen just parts of it, but what
21  evidence is there in the record that any lawyer gave
22  Martorello any advice, and what is that advice?
23  Mr. Taliaferro.
24         MR. TALIAFERRO:  Ms. Simmons handled that part,
25  Your Honor.  I'd like to turn that over to her.

1              THE COURT:  Say again.

2              MR. TALIAFERRO:  Ms. Simmons handled that part

3    of our motions, and I'd like to turn that over to her,

4    Your Honor.

5              THE COURT:  Sure.

6              MS. SIMMONS:  Yes, Your Honor.  Bethany Simmons

7    from Loeb & Loeb on behalf of Matt Martorello.

8              Your Honor, we cited the various evidence

9    that -- of the advice that Mr. Martorello received in our

10   opposition to plaintiffs' motion for summary judgment.

11   There's also substantial evidence in --

12             THE COURT:  I don't see anything in there at all

13   about it.  I'm baffled about where you cited that.

14             I'm talking about is there -- first thing is

15   Martorello can't get on the witness stand and say, "I had

16   the advice -- I acted on the advice of counsel."

17             "And what was that advice?"

18             "Well, he told me such and such and such and

19   such."

20             That's quintessential hearsay.  So you can't

21   even put on the defense unless you put on the defense of

22   what the advice was.

23             I need to see what it was.  I don't see it in

24   your -- can you cite to me where you're talking about,

25   what document it's in and where it might be that the

1  advice itself is posited?

2         MS. SIMMONS:  Your Honor, we submit that that

3  advice would be contained in paragraphs 24 to 42 of our

4  opposition to plaintiffs' motion for summary judgment and

5  the exhibits that are set forth --

6         THE COURT:  Wait just a minute.  Wait just a

7  minute.  That's in -- this is ECF 1205; is that right?

8         MS. SIMMONS:  I believe that's correct,

9  Your Honor.

10         THE COURT:  And page what?

11         MS. SIMMONS:  It would be pages 6 through 9.

12         THE COURT:  Okay.  Let me see.

13         MR. TALIAFERRO:  And, Your Honor --

14         THE COURT:  Just a minute.

15         MR. TALIAFERRO:  -- just a point of

16  clarification.  That is -- we have a replacement brief

17  that we filed.

18         THE COURT:  What's the number?

19         MS. SIMMONS:  I apologize.

20         THE COURT:  What's the number?

21         MR. TALIAFERRO:  The docket number for the

22  replacement brief --

23         MR. BENNETT:  I believe it was 1218.

24         MR. TALIAFERRO:  Yes, that's correct.  1218,

25  Your Honor.

12

```
 1              THE COURT:  Tell Anna I need that.

 2              MS. MALONEY:  Replacement brief?

 3              THE COURT:  Yeah, 1218.

 4              And is that the document you're referring to,

 5  page 6?

 6              MS. SIMMONS:  Yes, beginning on page 6 of Docket

 7  Number 1218, Your Honor.

 8              MS. MALONEY:  Anna said she took out the old

 9  brief and put in the new brief.

10              THE COURT:  That's Number 1218.  That's not in

11  here.  It's 1205.

12              MS. MALONEY:  Okay.  She's bringing it.

13              THE COURT:  Let me see if it's back in the back

14  somewhere.

15              Well, is it referred to in paragraph 6 --

16              MS. SIMMONS:  The paragraphs that set forth the

17  evidence is paragraphs 24 --

18              THE COURT:  Twenty-four?

19              MS. SIMMONS:  Paragraphs 24 to 42, pages 6 to 9

20  of that document, Your Honor.

21              THE COURT:  There isn't any numbered paragraph

22  like that.

23              MS. SIMMONS:  Okay.  I'm sorry.  Maybe I'm --

24              THE COURT:  What are you talking about?  Are you

25  talking about the -- where is the brief?
```

1          MS. HOOPER:  I'm bringing it now.  It's 43

2    pages.  So I was just going to look really quick to see.

3          THE COURT:  You're talking about the memo

4    opposing the plaintiffs' omnibus motion in limine?

5          MS. SIMMONS:  No, Your Honor.  It's Docket

6    Number 1218 is our replacement brief.

7          MS. HOOPER:  Summary judgment, Judge.

8          THE COURT:  Is this the summary -- you said it

9    was in opposition to their motion in limine, and that

10   motion in limine is 1173.  Their brief is 1174.  Your

11   reply is 1205, and their reply is 1229.

12         So now you're telling me it's the summary

13   judgment brief?  Is that what you --

14         MS. SIMMONS:  If I said that it was the

15   opposition to the motion in limine, Your Honor, I

16   misspoke.  I certainly meant to refer to our opposition

17   to --

18         THE COURT:  All right.  Number 1218 is something

19   different.  All right.  So tell me where you're talking

20   about.  Page 6 through 8?

21         MS. SIMMONS:  Your Honor, it's paragraphs --

22   yes, paragraphs 24 to 42 of our counterstatement of facts

23   on pages 6 to 9.

24         THE COURT:  Paragraphs what?  Twenty-four to

25   what?

1           MS. SIMMONS:  Twenty-four to 42, Your Honor.

2           THE COURT:  All right.  I see what you're

3    talking about.

4           And that's the extent of it, right?

5           MS. SIMMONS:  Your Honor, I believe so.  I would

6    have to confirm in my review of the deposition transcript

7    to see if there was anything else.

8           THE COURT:  Well, it's time for you to get off

9    the dime.  I want to know what your basis is because of

10   all of the briefing on this topic that you all have

11   withheld privileged information.

12          So this is your advice of counsel defense, is

13   that right, that you're talking about?  Page 6 of

14   ECF 1218, through page 9, paragraphs 24 through 42 is

15   advice of counsel; is that right?

16          MS. SIMMONS:  It's a good faith defense,

17   Your Honor, which is informed by advice of counsel as well

18   as, you know, other information received from laypeople

19   and actions taken by the CFPB at the time, things like

20   that, that are all set forth in our opposition to

21   plaintiffs' motion for summary judgment.

22          THE COURT:  In these paragraphs?

23          MS. SIMMONS:  And there's argument relating to

24   this issue, you know, in the argument section of the

25   brief.

```
1              THE COURT:  Where is that?  Where is that?
2              MS. SIMMONS:  Sure, Your Honor.  Give me just a
3   second while I move to that section of the brief.
4              At pages 31 through 37.
5              THE COURT:  Okay.  All right.  So we're going to
6   have to have some information -- some argument on the
7   summary judgment motion, too, I think.  So I want to get
8   that done.
9              So it looks like to me, Mr. Bennett, that they
10  have specified what is the predicate for his good faith
11  defense and have identified the advices he received that
12  he says informed his state of mind.
13             Is there anything that you still -- you make an
14  argument that they instructed people, including
15  Ms. Weddle, not to answer questions after 2016.  And I
16  can't tell exactly what your position is.  Have you had
17  full discovery on the good faith defense or not is the
18  question that we're going to have to deal with, which is
19  raised in your motion in limine.  What's your position?
20             MR. BENNETT:  Judge, if I -- Ms. Kelly took
21  Ms. Weddle's deposition, and I'll let her respond.
22             THE COURT:  Well, I guess I'm asking a bigger
23  question than that.  I'm asking as a general proposition,
24  is the fight here what is the meaning of the good faith
25  defense and what evidence informs it or is it that he
```

 1   eschewed presentation of a good faith defense and never

 2   did end up filing supplemental answers saying he was

 3   asserting a good faith defense and he thwarted efforts to

 4   take discovery?  Those are two different issues about how

 5   to approach the thing.

 6               MR. BENNETT:  Yes, sir.

 7               THE COURT:  And it may require different kinds

 8   of hearings and evidence.  That's what I'm trying to get

 9   at.

10               MR. BENNETT:  Yes, sir.  It's --

11               THE COURT:  Let Ms. Kelly say it.

12               Go ahead, Ms. Kelly.

13               MS. KELLY:  So, Judge, even before that, our

14   position is that there's no good faith basis defense

15   available pursuant to this provision in RICO regarding the

16   collection of unlawful debts.  And so we briefed that --

17               THE COURT:  Right.

18               MS. KELLY:  -- in our motion in limine.  So as a

19   threshold matter, we don't even think this type of defense

20   would be available for the claim that we're asserting.

21               THE COURT:  I do understand that.  I just

22   skipped over that because I understand that argument.

23               MS. KELLY:  Yes.  But I just wanted to make sure

24   that was our first position.

25               And then to what you say is Mr. Martorello has

1  still never asserted an advice of counsel defense because

2  when you actually look at the documents and depose the

3  witnesses, none of them ever represented Mr. Martorello or

4  gave him advice.

5          Ms. Weddle specifically testified that she never

6  gave him advice because she never knew exactly what he was

7  doing and didn't represent him personally throughout this

8  time.

9          The letter referenced in paragraph 24 is for a

10 credit facility that was provided through one of

11 Mr. Martorello's companies.  And there are numerous

12 disclaimers saying this is only good for this time only

13 based on the limited facts that we have in this letter.

14         I repeatedly inquired of Ms. Weddle does she

15 have any idea what Mr. Martorello did?  No.

16         Would she have needed to know this to give him

17 advice on whether what he was doing was legal or not?

18 Yes.  Right?

19         And so he never had personally a lawyer tell him

20 whether what he was personally doing was legal or not.

21 What he is relying on is, like, random propaganda law

22 review articles about, you know, tribal lending in general

23 and things that the tribe may have written to their

24 creditors and what their position was to a state AG to

25 kind of tell them leave us alone, you know.  But that

1  doesn't mean that those people who gave advice knew what

2  he was doing and told him, You're good, you don't have a

3  reason to worry.

4          And, in fact, the only evidence we have of his

5  state of mind and his basis is him saying he got these

6  20-page memos from Greenberg Traurig telling him he could

7  be liable for aiding and abetting and violating state

8  laws.  And that's never been proved still because he asked

9  Greenberg Traurig to destroy their files, and they won't

10 produce it.

11         And then --

12         THE COURT:  Wait a minute.  Wait a minute.  Say

13 again.

14         MS. KELLY:  The only advice that we know that

15 Mr. Martorello personally received was a memo -- a 20-page

16 memo that Greenberg Traurig supposedly wrote to him and

17 told him that he could be liable for aiding and abetting

18 and even face criminal penalties in states like Georgia.

19         THE COURT:  But you say -- well, how do you know

20 it exists?

21         MS. KELLY:  Because Mr. Martorello wrote in an

22 e-mail to one of his tax valuation companies trying to

23 value his company.  And he was outlining why they should

24 discount the value of the company because of the legal

25 risks, and he told them advice that he received from his

1    lawyers about the legality of the operation.

2            THE COURT:  Did you subpoena that document from

3    Greenberg Traurig?

4            MS. KELLY:  Yes.  And they told us they

5    destroyed it.  When the business was sold, there was a

6    provision added by Mr. Martorello's lawyer, at his

7    request, to require the tribe to destroy documents from

8    his time at Bellicose.  And Ms. Weddle complied with that

9    request, and so she said she did not have it.  And she did

10   not -- wouldn't be able to testify to anything.  And so --

11           THE COURT:  Well, she can testify to what she

12   said.

13           MS. KELLY:  Yeah.  So she said she doesn't

14   remember and that other lawyers in her firm were involved

15   in writing the memo.  And she doesn't remember what it

16   said, but she can't recall that -- that doesn't sound like

17   lawyerly language to her.  That was -- but that was what

18   she said.

19           And then when I tried to ask Ms. Weddle

20   questions about Mr. Martorello, when he actually retained

21   them, Mr. Martorello did not waive the privilege.  Because

22   Greenberg Traurig never represented Mr. Martorello prior

23   to 2015, and so she answered questions prior to 2016

24   because she didn't represent Mr. Martorello then

25   personally.

1          But in 2016, during the Big Picture part of this

2  operation, she represented Mr. Martorello and Eventide,

3  and she was instructed by her lawyers not to answer my

4  questions on the basis of attorney-client privilege at the

5  most recent deposition two weeks ago.

6          THE COURT:  Where is she?

7          MS. KELLY:  In Colorado.

8          THE COURT:  Well, you know how to get a remedy

9  on that if you need it, I suppose.

10         I don't understand, if she represented him and

11  is part of what they're asserting as a defense, how a

12  privilege obtains to it.  But if that's the record on it,

13  then that's the record and we'll have to deal with it in

14  whatever motion you bring, which I assume you'll bring

15  forthwith.

16         MS. KELLY:  Understood, Judge.

17         We --

18         THE COURT:  I see that there's a complaint about

19  that topic in one of the papers that were filed -- I guess

20  it was Friday or Monday.  I can't remember now.

21         MS. KELLY:  It was Friday in response to their

22  motion in limine.

23         THE COURT:  Yeah.  So if -- if there's -- if

24  there's a ground to require her to answer, you have to

25  bring it forward or if Martorello is going to have the

1   privilege -- he can't have it both ways, Mr. Taliaferro.

2   He either lets them have the advice that she gave -- have

3   you -- or he just can't present the information at all at

4   trial.  So you're going to have to fish or cut bait on it

5   pretty soon.

6          So we'll have to figure out what we have to have

7   hearings on.  And I want you all to focus on that, talk

8   about it.  I want an agenda, and I want to put it on the

9   books right away.

10         MS. KELLY:  And, Judge, the other -- second

11  point you raised about that issue is what they provided in

12  discovery.  And we had interrogatories on this issue, and

13  Mr. Martorello was supposed to supplement interrogatories

14  in 2019.  And he's never since supplemented any of the two

15  interrogatories regarding advice of counsel or good faith

16  basis to state the reasons why he has a good faith basis.

17         So, you know, we also, I know, raised that in

18  our motion in limine, that he should be excluded from

19  asserting anything outside of what he put in his discovery

20  responses pursuant to Rule 37.

21         THE COURT:  All right.  We'll have a hearing on

22  that, and I'm assuming that you will have a package of

23  materials that I can look at right there all at one time

24  without rooting through the whole file.

25         MS. KELLY:  Certainly, Judge.

1          THE COURT:  So we need to have a -- and there's

2    a difference between a good faith belief and advice of

3    counsel, and they don't -- they can be the same thing, but

4    they might be different.

5          For example, if Martorello says, "Well, I

6    read" -- I think you made this reference, Ms. Kelly.

7          If Martorello says, "I read these things in the

8    law review articles and public sources, et cetera," and

9    they cite public sources in their summary judgment brief

10   that she just referred to, that can be the source of

11   information of a belief that he had, assuming that there's

12   a good faith defense at all.

13         The -- it then becomes a matter of -- for the

14   jury to decide or it may be that that, as a matter of law,

15   isn't sufficient to bring that issue to the jury.  I don't

16   know all that.  That's something you all are going to have

17   to get into.

18         So conceptually, the source could be somewhere

19   other than advice of counsel.  The source could also be

20   advice of counsel and it could be in addition to or in

21   lieu of the public sources.

22         But for there to be advice of counsel, there has

23   to be the advice of counsel.  Because Martorello cannot

24   get on the witness stand and say, "Well, I got the advice

25   of counsel, and Ms. Such-and-such told me such and such."

1          That's hearsay.  So somewhere you've got to have
2     the advice of counsel.

3          Usually the way it's presented is the lawyer
4     comes to the trial and says, "I talked to Mary Smith, and
5     I told Mary Smith this.  This is what she told me."

6          And that's the way it's presented.  That's the
7     usual way that advice of counsel is presented.

8          Just out of curiosity, Ms. Kelly, did you ask if
9     this 20-page memo that he refers to in his papers was
10    prepared on a computer and whether anybody has gone back
11    and looked at the metadata in the computer and tried to
12    find that stuff that way?

13         MS. KELLY:  We did ask whether they kept
14    electronic files, and they said they destroyed everything
15    when I first took this deposition a couple years ago.

16         And it was my understanding that he was not
17    relying on this defense, based on the discovery responses,
18    advice of his counsel, right, and that it was just good
19    faith basis.

20         And so, you know, we now know that she never
21    even represented him personally.  And she was really clear
22    that she never gave him advice about his role in the
23    lending operation.  She just gave that one opinion for a
24    line of credit facility and was doing transactional work,
25    not providing legal advice about --

1       THE COURT:  Well, we'll have to lay a predicate.

2       Now, the other question is am I going to need to

3  have, out of the presence of the jury and before the

4  trial, some hearing to lay the framework for the issue of

5  good faith defense and advice of counsel?

6       A quick look-see suggests to me that you all

7  have such disparate views of things that -- and I haven't

8  studied the summary judgment motion yet.  I've been

9  looking at the motions in limine -- that it may be

10  necessary to have a hearing on that topic where you all

11  present your supporting positions all at one place and

12  argue it all at one place so I can then make a decision on

13  the question.  And the sooner that all is done, the better

14  off you all will know what to do and how to proceed.

15       So --

16       MS. KELLY:  Judge, I think --

17       THE COURT:  Go ahead.

18       MS. KELLY:  I think if we did that, we would

19  need Mr. Martorello to actually testify what his belief

20  was.  And then we could cross-examine him with what his

21  own words and documents say, and we can really determine

22  and get to the bottom of this, then.

23       Because it's really not clear to me what his

24  belief is, but some -- like, finding a couple law review

25  articles or finding, you know, like, a lawyer's argument

1  to, you know, opposing counsel or something, that's

2  completely different than what he believes things to be.

3  He followed all these court cases.  He has numerous

4  e-mails freaking out about his role in the business.

5          And, you know, I'm -- I'm just surprised that

6  this is being brought forward again, which is fine.  But I

7  think the trial would be most expeditious if we had

8  Mr. Martorello testify what he really believed so then we

9  would know and we could streamline things.

10          THE COURT:  Well, what I really want to know

11  is -- I didn't understand it, from the way it was

12  addressed in the motion in limine brief -- and as I said,

13  I haven't studied the assertions on the good faith defense

14  and advice of counsel and the summary judgment brief

15  that -- I'm sorry.  What is your name, ma'am?

16          MS. KELLY:  I'm Kristi Kelly.

17          THE COURT:  No.  No.  No.

18          MR. TALIAFERRO:  Ms. Simmons.  Bethany Simmons.

19          THE COURT:  Simmons.  Ms. Simmons.

20          MS. SIMMONS:  Yes, Your Honor.  I'm here.

21          THE COURT:  That Ms. Simmons prepared -- or

22  mentioned and pointed out to me.  I haven't studied that.

23  But it seems to me that I'm going to be best served, just

24  from skimming what I was directed to today and from what I

25  have studied on the motions in limine, if I have a

1   clean-cut statement from the defendant about what exactly

2   the advice of counsel -- what exactly was -- is going to

3   be the testimony about what the belief was and what the

4   advice was and appended to it the documents that comprise

5   any written advice or written things that were relied on.

6           How long, Ms. Simmons, would it take for you to

7   put that together for me just as a piece on its own?

8           MS. SIMMONS:  Your Honor, I think we could have

9   that ready for Tuesday of next week.  I think a lot of it

10  is already in our opposition to plaintiffs' motion for

11  summary judgment and -- so we have a lot of it.

12          THE COURT:  It is, according to what you showed

13  me, but also, it's in different places.  And I'm looking

14  for a single piece of paper.  So you'll file that on

15  Tuesday, you say?

16          MS. SIMMONS:  Yes, Your Honor, we can do that.

17          THE COURT:  What date is that?  The 23rd of May?

18          MS. SIMMONS:  Yeah.  That's correct, Your Honor.

19          THE COURT:  All right.  You file that on the

20  23rd of May, and then I think I'll have a better idea of

21  how to proceed on this.

22          MS. SIMMONS:  We will do so.

23          And just to respond to the Court's question, you

24  know, as I said before, the -- the good faith defense

25  really is a combination of those public sources, plus

1  advice that Mr. Martorello received.  Whether it was

2  advice that he received as part of -- as an executive of

3  Bellicose or, you know, as a personal attorney, we submit

4  that all of that is reasonable, and obviously, we'll be

5  prepared to argue that at the appropriate time.

6        THE COURT:  That's correct.  But you must

7  understand, if he received it as -- in a corporate

8  capacity as somebody through Bellicose or Eventide or

9  anybody else, you cannot use it unless you disclose it.

10  And the lawyer has to present the paper and the lawyer has

11  to present the stand for deposition.  Because you can't --

12  otherwise you're just flat out evading the responsibility

13  to comply with the discovery requests that were posited

14  and running afoul of hearsay, potentially.

15        MS. SIMMONS:  Understood, Your Honor.  And we

16  briefed this in opposition to their motion in limine on

17  this point where they had previously moved to compel the

18  production of documents on this basis and then later

19  withdrew it because Mr. Martorello had, in fact, produced

20  the documents.

21        THE COURT:  Well, they say that's not true,

22  and --

23        MS. SIMMONS:  Okay.  Understood.

24        THE COURT:  -- I'll have to have a hearing on

25  that.  So what I'm asking you all to do is to, in short

1   form, make a list of things that you think I need to

2   resolve by having a hearing.

3            Now, there are a whole bunch of motions in

4   limine that Martorello said they didn't oppose.  So we

5   don't need to address any of those.

6            And I need to understand how you all propose to

7   deal with the concept of tribal immunity and the other

8   things I've talked to you about today because all of

9   that's part and parcel of this case.  And there are

10  motions in limine that, in essence, are motions for

11  summary judgment asking for a certain kind of evidence not

12  to be presented, and it's just utterly out of context with

13  what the case is all about.

14           So we're going to have to have a gathering, and

15  the starting point for that is going to be a list of the

16  things you think we need to have a hearing on.

17           I then am going to take that list and go through

18  it, see what I think.  And I'm talking about the things

19  that are in your motions in limine and in your summary

20  judgment brief.  So I'd like for you to think about that.

21  You can talk about it.  But I want that -- today is

22  Wednesday -- Thursday.  I would like that list Monday by

23  noon because I'm going to then make decisions about when

24  we're going to have what and schedule it.

25           If you have some motion about -- I will tell

1    you, Ms. Simmons, that my preliminary look-see is that

2    there never was a proper disclosure of the -- at least the

3    advice of counsel defense and that things were withheld

4    and so -- and that they weren't washed off the board, as

5    you suggest, by some kind of discovery adjustments.  But

6    I'm not sure about that.

7            So I think we're going to have to have these

8    preliminary issues kind of sorted out a little bit better

9    in order that we have a trial that won't last forever and

10   that a jury can really understand.  In other words, we

11   need to get the thing organized for trial in a way that

12   you can get results from it in the form of a verdict.

13           And the defendants -- I mean the plaintiffs need

14   to figure out if you're really going after -- is this just

15   a RICO case as to Martorello now that he's the only

16   defendant left in the case or not?  That will make a lot

17   of difference.

18           And I want -- I want you to put together a

19   record for me of some sort that very succinctly explains,

20   with the backup to it, about this 20-page memo where he

21   was told he stood to be liable.  He said that, apparently.

22   And if he said that, that's part of his advice of counsel.

23   Whether the memo comes in or not, if he's actually owned

24   up to having been told that, that evidence has to come in

25   as part of the good faith belief and advice of counsel,

1  too, I would think.

2          All right.  Can you all get me the list Monday

3  by noon?

4          MR. TALIAFERRO:  Yes, Your Honor.

5          MR. BENNETT:  Yes, Your Honor.

6          THE COURT:  You can submit separate ones.  It's

7  all right, but it probably wouldn't hurt you to talk, but

8  that's all right.

9          Now, the other thing is I asked you, in June of

10  2021, to give me a list of the elements of Counts Two

11  through Five, and each of you provided me with your view.

12  I don't really see that there's much difference in them,

13  but are you all still of the view that those are the

14  elements, one?

15          Two, do you know of any case where there has

16  been a trial and a Court has submitted instructions on the

17  RICO -- civil RICO in a context involving this kind of

18  case or otherwise?  But can you tell me preferably this

19  kind of case, even if -- even if the case was settled,

20  there wasn't a verdict returned, but the Court had decided

21  on what instructions to give?

22          Do you know of any cases where the instructions

23  were actually given or the Court had decided on what

24  instructions to give?  Mr. Bennett and Ms. Kelly.

25          MR. BENNETT:  Judge, I believe there are, but I

1  can't answer your question with more specificity here,

2  right now at this time.  I can by tomorrow morning.  There

3  were -- there were two trials under RICO that we know of.

4              THE COURT:  Is that the *Brice* case and the other

5  one that you mentioned in the papers?

6              MR. BENNETT:  Well, we have the *Brice* case, but

7  it didn't try.  But there was a case brought against

8  CashCall by the CFPB.  And there was a criminal matter

9  brought against Scott Tucker under RICO.

10             And while those wouldn't have been a civil set

11 of jury instructions, they still wouldn't have the same

12 mens rea, but they still would have had the elements with

13 respect to the unlawful loan and RICO provision.  But --

14             THE COURT:  All right.  Well, you all need to

15 get those and let me have the information.

16             And I'd like to get copies of the instructions

17 that were given.  Just the elements of the offense.  In

18 fact, it would probably be easier just to get them all.

19 Rather than worry about having them parsed out, it would

20 be easier on the Court or the court reporter.  And I don't

21 think you can get that done by tomorrow, but can you get

22 that done by Monday?

23             MR. BENNETT:  Yes, Your Honor.

24             THE COURT:  All right.

25             Same thing.  Do you know of any, Mr. Taliaferro,

1  Ms. Simmons?

2        MR. TALIAFERRO:  I do not, Your Honor, know

3  where the civil RICO instruction was given in a tribal

4  lending case --

5        THE COURT:  Or any --

6        MR. TALIAFERRO:  -- or in a bad debt case of any

7  kind, for that matter.

8        THE COURT:  Yeah.  Okay.  All right.

9        All right.  I'll expect to have your input, and

10 then we'll proceed from there and go forward and see if we

11 can get this case organized for trial.  But we may have to

12 have two or three different sessions to get together, but

13 it's time to do that and get it done in a way that the

14 interests of your clients are best afforded a fair trial

15 and that a jury can actually have in front of it matters

16 and things that it can decide and I can get a verdict on.

17       So what I'm going to do is as long as you agree

18 that the elements are the same as what you filed in

19 ECF 1098 and ECF 1099, that's okay for the elements.

20       Do you have any instructions prepared,

21 Mr. Taliaferro, for the good faith defense?

22       MR. TALIAFERRO:  We do not yet have those

23 instructions prepared, Your Honor.

24       THE COURT:  Get on it, because I'm going to need

25 to see them early on as part of the hearing on the issue.

1    So you might get to look at them.

2          You know, back in the old days, what was sort of

3    common, when one took on a case, was if you were the

4    plaintiff, the first thing you did was go outline the

5    elements of the case, and if you were a defendant, you

6    outlined the elements of your defenses.  And then as you

7    went along, you added to them the proofs -- evidence of

8    what the proofs were that proved a particular element.

9    But everybody focused on elements.

10         And you'll note that in almost all decisions of

11   appellate courts, they start off with the elements.  And

12   so judges are element driven, and that's why I'm asking

13   you to do this.  Because that's the way I started off

14   life.  That's the way I practiced.  That's the way the

15   Courts of Appeals approach this thing, and so I try, in

16   this job, to do it the same way.

17         All right.  Thank you, all.

18         Anything else you all need to get into?

19         MR. TALIAFERRO:  Nothing from defendant,

20   Your Honor.

21         MR. BENNETT:  Nothing from the plaintiffs,

22   Judge.

23         Your Honor, there -- will the Court -- is there

24   a range of dates that the Court would intend for us to

25   have these hearings?

1          THE COURT:  Well, it depends on how many there

2    are.  But the final pretrial conference is June what?

3          The trial is July the 12th.

4          MR. TALIAFERRO:  I believe it's June 26th,

5    Your Honor.

6          THE COURT:  Yeah, 26 and 27.

7          So we're looking at having these hearings around

8    the -- right after Memorial Day.  Say the -- the --

9    sometime between the 30th and the 9th of June.

10         MR. BENNETT:  Yes, sir.  The plaintiffs' summary

11   judgment motion itself will be ripe, fully briefed next

12   week, and --

13         MS. KELLY:  Len, it's already fully briefed.

14         MR. BENNETT:  It's already fully briefed.

15         THE COURT:  Yeah.  You're talking about your

16   partial summary judgment motion?

17         MR. BENNETT:  We are, Judge.

18         THE COURT:  Yeah, it's briefed, I think.  Yeah.

19         MR. BENNETT:  And if at all possible, I would

20   ask if there's a way to avoid -- we would like to have a

21   hearing on everything as quickly as possible.  But the

22   summary judgment argument, if at all possible, we'd like

23   Mr. Guzzo to argue it, and he is out May 30th to June 5th.

24         So while we -- your date that you just suggested

25   ranges up to June 9th.  If we have separate hearings, then

1  it's not an issue for summary judgment.  But certainly we

2  would like to get the motions in limine and the issues

3  that the Court has just raised here resolved as quickly as

4  possible.

5          We can have a hearing next week or whenever the

6  Court and the defendant are ready.  We believe we're ready

7  on everything quickly.

8          THE COURT:  Well, what are you saying?  You want

9  a hearing on your summary judgment motion on what date?

10         MR. BENNETT:  June 6th, 7th, 8th.  Whatever --

11         THE COURT:  Why does he have to argue?

12         MR. BENNETT:  Well, because we want our best

13  voice on that important motion, and on summary judgment,

14  Mr. Guzzo has become a -- has encyclopedic knowledge of

15  the RICO and tribal lending law.  So we're at a

16  disadvantage if you're stuck with me on that motion.  I

17  think I'd still do fine, but I --

18         THE COURT:  Well, I'll take that into account,

19  schedules of the lawyers.  But I don't want to put it off

20  too long.  There's things that have to happen between

21  early -- end of May, early June and the 26th, you know.

22         MR. BENNETT:  We understand, and we agree, and

23  we --

24         THE COURT:  So why did you let him schedule some

25  vacation at a time when all this was coming to a head?

1            MR. BENNETT:  Well, I -- he -- he, Mr. Guzzo,

2  has been doing nothing but this case for this whole time

3  period.  Almost the -- the major lifting pleadings that

4  you've seen have had his hands on them in some fashion.

5  So I can't direct what Mr. Guzzo does or doesn't do.  I

6  know that that particular time period, for someone who

7  doesn't take vacation at all, including when he flew back

8  to this side of the country to attend the first big

9  settlement conference, I can't begrudge him anything,

10 Judge.

11            THE COURT:  You didn't begrudge anybody

12 anything.

13            MR. BENNETT:  That's just for summary judgment.

14 Judge, for all the other motions that you've talked about,

15 for all these issues that we've discussed today, we're

16 ready to do them Monday if you're -- Mr. Guzzo is not

17 arguing those.  And we can do them anytime, including that

18 period.

19            It's just the summary judgment argument, which I

20 don't think it would necessarily be piggybacked, I mean,

21 on the same day, but I'm just giving the Court a heads-up

22 on that.  And, of course, Your Honor decides the schedule.

23            THE COURT:  Well, I always try to respect

24 people's vacation schedules.  But my point is that when

25 you have a big case coming up is not the time you usually

1   schedule vacation.  So if he's having surgery, that's a

2   different thing, you know.  He's entitled -- he's

3   entitled to have his --

4          MR. BENNETT:  Judge, I don't know if he's having

5   surgery or not.  I mean, I know that -- or whether his

6   infant or his wife are.

7          THE COURT:  Yeah, I mean, somebody -- it's

8   different issues.  All right.  I understand your schedule.

9          So thank you all very much.

10          MR. BENNETT:  Thank you, all.

11          THE COURT:  Bye.

12          MR. TALIAFERRO:  Thank you, Your Honor.

13          (The status conference concluded at 5:03 p.m.)

14                     REPORTER'S CERTIFICATE

15      I, Tracy J. Stroh, OCR, RPR, Notary Public in and for

16   the Commonwealth of Virginia at large, and whose

17   commission expires September 30, 2023, Notary Registration

18   Number 7108255, do hereby certify that the pages contained

19   herein accurately reflect the stenographic notes taken by

20   me, to the best of my ability, in the above-styled action.

21      Given under my hand this 19th day of May 2023.

22

23          _____/s/_____
               Tracy J. Stroh, RPR

24

25