**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **LULA WILLIAMS, *et al.*,** : | |
| : | |
| **Plaintiffs,** : | |
| : | |
| **v.** : | **Civil Action No.: 3:17-cv-00461-REP** |
| : | |
| **BIG PICTURE LOANS, LLC; *et al.*,** : | |
| : | |
| **Defendants.** : | |

**DEFENDANT MATT MARTORELLO MEMORANDUM OF LAW OF**
**IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Matt Martorello ("Martorello"), by and through undersigned counsel, hereby files his memorandum of law in support of his *Motion for Partial Summary Judgment* (the "Motion") and respectfully states as follows:

**INTRODUCTION**

Plaintiffs' claims are premised on the flawed assumption that the Lac Vieux Desert Band of Lake Superior Chippewa Indians' ("LVD" or Tribe") loans were governed by Virginia law. This is incorrect. Pursuant to decades of Supreme Court precedent, unless the state of Virginia's interests in consumer lending are sufficient to escape the preemptive force of the federal and tribal interests they do not apply. Because Virginia's usury laws are regulatory, not prohibitory, they cannot, and LVD law sustains, a fact that is fatal to Plaintiffs' claims.

However, even if the Court ultimately determines that Virginia law applies to LVD's loans, Martorello is still entitled to summary judgment on Plaintiffs' usury and unjust enrichment claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.     Origins of the Tribe's online lending business**

1.      The LVD is a federally recognized Indian tribe whose members reside close to their ancestral home in Watersmeet, Michigan (the "Reservation"). 25 U.S.C. § 1300h.

2.      LVD's constitution established the Tribal Council as the governing body of the LVD, which had the power to enact laws and manage the economic affairs of the LVD in order to "promote and protect the health, safety, education, and general welfare of the Band and its members." Ex. A (LVD Constitution) at 1; Ex. C (Williams Dec.) at ¶ 3.

3.      After the 2008 recession hurt its casino and impeded its ability to generate revenue to provide essential funding for the Tribe's government, LVD began exploring online lending to fund its governmental services. *See* Ex. C (Williams Dec.) at ¶ 7-10, 12; Ex. D (Hazen Aff.) at ¶ 3-4; Ex. E (Weddle Dep.) at 75:17-78:6.

4.      In 2009, LVD took steps to facilitate the development of such new businesses and introduced Rob Rosette, its counsel, to Scott Merritt, who had worked in the finance industry since 2000, with the hope the two would use their combined skills to research and develop a tribal lending operation. *See* Ex. D (Hazen Aff.) at ¶ 5; Ex. H (Rosette Dep.) at 73:8-23.

**II.    The Tribal Consumer Financial Services Regulatory Code's structure**

5.      On July 8, 2011, LVD enacted the Tribal Consumer Financial Services Regulatory Code ("Code") to "regulate[]" lending over the internet from the Reservation. *See* Ex. B (resolution adopting Code). The Code was later amended to permit the creation and regulation of consumer lending entities that are wholly owned by LVD, operate from the reservation, and operate exclusively to "improve [LVD's] economic self-sufficiency". Ex. G (Code) at §§ 1.1, 1.2, 1.3, 2.4, 5.1. The Tribe's lending entities and their operations are governed by the Code, which requires all regulated entities to "conduct business in a manner consistent with principles of federal consumer

2

protection law." *Id.* at §§ 1.1(a), 1.1(f), and 6.2.

6.     The Code also created the Tribal Financial Services Regulatory Authority ("TFSRA") to license and regulate online lending and protect consumers. *Id.* at §§ 1.1(c), (i), and 4.1. The Code vested the TFSRA with expansive powers to investigate and ensure Code compliance. *Id.* at §§ 4.1–4.18.

7.     TFRSA agents are required to be enrolled members of LVD, answerable to the Tribal Council via quarterly reports, are empowered to "order compliance" with the Code, issue fines, suspend and revoke licenses, and generally investigate any person engaging in consumer financial services within their jurisdiction. *Id.* at §§ 4.8, 4.9, 4.17.

8.     Under the Code, all people and entities engaged in tribal consumer financial services are required to be licensed and to comply with the Code and all applicable federal laws. *Id.* at §§ 1.3(d), 5, 6, 7, 5.2(b)(8).

**III.   The Tribe negotiates for Martorello to provide assistance to its lending business.**

9.     After years of Rosette's research, LVD contracted with Rosette and Flint Richardson (through Tribal Loan Management, LLC ("TLM")) and Scott Merritt (Tribal Loan Solutions, LLC ("TLS"), as agents, to develop LVD's lending operations. *See* Ex. CCC (JPB 00382) (Exclusivity Agreement and Letter of Intent).

10.    Through TLM and TLS, LVD identified additional expertise, first in online title lending (Sovereign Lending Solutions) and then from Martorello and his companies. *See* Ex. I (Wichtman Dep.) at 21:4-21:25; 32:19-33:7; 65:17-66:24; 72:25-74:5; Ex. E (Weddle Dep.) at 17:15-18:16; Ex. J (Mansfield Dep.) at 47:9-22.

11.    By the time the Tribe and Martorello were connected in August 2011, the Tribe had already decided to expand, had a basic framework for their lending operation, and even had a preliminary deal structure in mind and draft deal documents that it provided to Martorello. *See,*

*e.g.*, Ex. M at Rosette_Revised _048833 (Tribe has established a Tribally charted LLC and has passed a lending law ordinance with its lending commission); Ex. N at Rosette_Revised _048835 (LVD's agents inform Martorello of LVD's minimum Tribal Net Profits requirements, proposed contractual term, and other deal terms); Ex. Q at Rosette_Revised _052381 (LVD's agents forwarded initial draft of servicing agreement); Ex. U at Rosette_Revised _007017 (LVD already had its ACH processor); *Id.* at 007018 (LVD already had its "Tribal Consumer Financial Services Regulatory Agent").

12.     In September 2011, LVD formed RRTL under LVD law to function as an arm of LVD with all of its operations on the reservation and to provide consumers with unsecured, small-dollar loans under the Code and applicable Federal law. *See* Ex. C (Williams Dec.) at ¶¶ 11-26; Ex. D (Hazen Aff.) at ¶ 6; Ex. F (resolution forming RRTL), Ex. K (RRTL Articles of Organization).

13.     In October 2011, Martorello engaged prominent Indian law lawyer, Jennifer Weddle, co-head of Greenberg Traurig's ("GT") Indian law department, to help ensure the loans and relationships between his companies and LVD were lawful. *See* Ex. E (Weddle Dep.) at 30:20-32:15; 34:25-38:17; 47:19-50:24; 55:5-57:17; *see also* Ex. L (Weddle Aff.) at ¶ 2-4, 6, 13-15.

14.     More than a dozen well-respected GT lawyers were engaged on the matter, and covered everything from the loan agreements, the Code, the RRTL website and disclosures, and the agreements with servicing entities and creditors. *See* Ex. E (Weddle Dep.) at 211:10-212:14; 26:15-29:2; 121:25-123:25; Ex. L (Weddle Aff.) at ¶ 6; Ex. UU (Rosette_Revised_002169) (GT task list for completing RRTL deal). Weddle testified that she was involved because her view was that LVD's loans are lawful. *See* Ex. E (Weddle Dep.) at 66:4-69:6.

15.     On October 25, 2011, RRTL entered into the Servicing Agreement with Bellicose,

which Martorello managed, for vendor management services, compliance management assistance, marketing material development, pre-qualified leads, and the development of risk modeling and data analytics. Ex. PP (Martorello_003474) (RRTL Servicing Agreement); Ex. E (Weddle Dep.) at 19:03–21:01; 117:03–118:11; Ex. D (Hazen Aff.) at ¶ 10.[1]

16.     GT and Rosette LLP used a National Indian Gaming Commission ("NIGC") template as the template for its Servicing Agreement with Bellicose so that they would already be compliant with any future Congressional legislation to regulate such a servicing arrangement. Ex. E (Weddle Dep.) at 117:06–119:16.

17.     The Servicing Agreement provides that the SPVI would be paid a performance-based fee. *See* Ex. PP at § 3.5. The economics between the Tribe and Mr. Martorello's company caused Ms. Weddle no concern and were "standard." *See* Ex. E (Weddle Dep.) at 103:1-104:3 and 105:4-10.

**IV.     LVD's governance and RRTL's approvals, operations, loan consummation and collection activities occurred on the Reservation.**

18.     Tribal Council member Mansfield established RRTL's office on the Reservation. *See, e.g.,* Ex. J (Mansfield Dep.) at 45:9-46:19; 47:3-6; Ex. GG (CM0000286); Ex. HH (CM0000287); Ex. FF (CM0000157) at CM0000162 (email regarding obtaining Mansfield's signature on a vendor contract); Ex. AA (Rosette_Revised_044773) (emails regarding compliance education initiatives).

19.     RRTL's servers were located on the reservation. *See* Ex. OO (Rosette_Revised_053311).

20.     In January 2012, RRTL began originating loans, all of which were authorized and

---

[1] The Servicing Agreement was later assigned by Bellicose VI to SourcePoint VI, LLC ("SPVI"), a wholly-owned subsidiary of Bellicose Capital, LLC ("Bellicose").

consummated by RRTL on the Reservation. *See* Ex. D (Hazen Aff.) at ¶¶ 26-28; Ex. C (Williams Dec.) at ¶ 19; Ex. J (Mansfield Dep.) at 53:11-54:18; Ex. I (Wichtman Dep.) at 272:3-20; 244:2-18 Ex. P (Gravel Dep.) at 158:1-19; Ex. S (Dowd Dep.) at 50:8-23; 58:12-59:19; 74:18-75:7. *See also* Ex. PPP (Rosette_Revised_034686) (illustrating the loan origination process); Ex. T at Rosette_Revised_047002 (Jan. 2013 emails describing their "weekly management meeting" and noting that the day's 51 originations processed on the reservation and "it took most of his day"); Ex. XXX (Rosette_Revised_037655) (Nov. 1, 2011 operations manager job description including daily origination of loans and processing ACH files); Ex. S (Dowd Dep.) at. at 79:19–80:1 (testifying that a loan origination depended on RRTL's completion of verification processes); *Id.* at 185:10-23 (testifying that Sourcepoint never made any origination or lending decisions on behalf of Red Rock).

21.     The Servicing Agreement provided that Bellicose "had no authority to engage in origination activities, execute loan documentation, or approve the issuance of loans" and makes clear that final determination as to whether to lend to a consumer "rest[ed] with [RRTL]" and further that "the criteria used to extend funds to individual borrowers remain[ed] within the sole and absolute discretion of [RRTL]" and that "[only RRTL] shall execute all necessary loan documentation." *See* Ex. PP at §§ 4.1.1, 4.2.1(i)); *see also* Ex. P (Gravel Dep) at 22:20–23:04; Ex. J (Mansfield Dep.) at 60:02–61:21 (testifying that recommendations from SPVI must be approved by RRTL co-managers).

22.     RRTL also collected the loans on the Reservation. Ex. S (Dowd Dep.) at 185:18–23; Ex. I (Wichtman Dep.) at 205:1–16 (testifying that the money went into the Chippewa Valley RRTL account); Ex. FFF (J. Martorello Dep.) at 46:20–47:03 ("I can tell you that the servicer SourcePoint never collected any amounts ever." . . . "Red Rock Tribal Lending or – or Duck Creek

would have used payment processors that would debit consumers' accounts, and those funds would settle into Red Rock's bank account"); *id.* at 52:14–20 (RRTL submitted the debit and credit files on the reservation); Ex. J (Mansfield Dep.) at 112:19–113:2 (testifying LVD originated and collected the loans on reservation).

23.    To that end, while SPVI used its proprietary marketing formulas to generate prequalified leads of persons who would likely qualify for a loan, the leads—RRTL's potential customers—became RRTL's intellectual property. Ex. V (2020.07.21 Hearing Tr. at 62:02–62:07).

24.    The methodology underlying the marketing campaigns and the content of the campaigns to drive pre-qualified leads to RRTL were extensively reviewed by RRTL for its feedback and approval, including the necessary approvals of RRTL's independent compliance board pursuant to their compliance management systems.[2] *See also generally* Ex. NNN (Rosette_Revised_032369) (Compliance Management System).

25.    There were "a lot of instances over the years" when SPVI's recommendations were not approved. *See* Ex. S (Dowd Dep.) at 36:2-25; 37:3-20; 186:2–12. *See also* Ex. RRR (Rosette_Revised_046892) (Hazen would not approve a recommendation); Ex. MM (Rosette_Revised_058722) (showing that a recommendation took nearly two weeks for approval and needed to go to RRTL's board).

26.    RRTL's Co-Managers, Hazen and Williams, who were at all relevant times

---

[2] Mansfield, former RRTL co-manager and Tribal Council member, confirmed that this process was standard. Ex. J (Mansfield Dep.) at 55:16–56:03; *id.* at 58:15–25; Ex. S (Dowd Dep.) at 186:2–12 (testifying that Ms. Hazen would review and approve marketing materials before they were implemented); *id.* at 191:24–192:13 (testifying that emails presenting recommendations would "precede a formal recommendation document"); *id.* at 193:14–194:02 (testifying that recommendations at RRTL were approved by compliance and legal before any change or action was recommended or approved).

members of the Tribal Council, had authority to manage the day-to-day operations of RRTL. Ex. CC (Williams Dec. (Galloway)) at ¶ 4; Ex. Z (Hazen Dep.) 25:15–19; Ex. NN (RRTL Operating Agreement) at § 5.1(a) ("Once hired or appointed by [RRTL], the Manager may have the power and authority to do and perform all actions as may be necessary or appropriate to the conduct of the [RRTL's] business."). As CEO, Hazen testified she did not ask permission from Martorello to make decisions relating to the lending business. *See* Ex. Z (Hazen Dep.) at 99:12–100:5; *see also id.* at 14:19-22).

27.    For example, Mansfield and Hazen hired, trained and fired reservation-based employees. *See, e.g.,* Ex. Y (Rosette_Revised_053208) (co-manager hiring compliance manager, Jennifer Steiner); Ex. OOO (Rosette_Revised_040016) (termination of employee by co-manager); Ex. T (Rosette_Revised_046999) at Rosette_Revised_047002 (in January 2013, Hazen emails regarding immediate need for two open positions, with a third possible on a later date depending on availability of viable candidates).

28.    Hazen and Mansfield also managed the tribal personnel involved in RRTL's loan approval, origination, collections and consumer settlement offers. *See, e.g.,* Ex. LL (Rosette_Revised_045131) (showing co-manager reviewing settlement offers for delinquent loan accounts).

29.    Processes implemented at or for RRTL were approved by Hazen or Mansfield on the LVD reservation. *See, e.g.,* Ex. HHH (LVD-DEF00006043) (over 150 pages of LLC manager approvals starting in January 2014); Ex. III (LVD-DEF00022840) (requesting approval for SourcePoint recommendations); Ex. JJJ (LVD-DEF00017101) (regarding request for approval of SourcePoint recommendation); Ex.KKK (Rosette_Revised_030201) (approving new policies and management program by LVD counsel). *See also* Ex. S (Dowd Dep.) at 36:2-24; 37:3-20; 181:23-

184:4; Ex. P (Gravel Dep.) at 22:8-23:4; 27:7-8; (testifying that co-managers of RRTL approved recommendations).

30.     Hazen and Mansfield also reviewed and approved contracts and other legal documents on the Reservation. *See, e.g.,* Ex. J (Mansfield Dep.) at 47:3–6; Ex. E (Weddle Dep.) at 108:5–14; Ex. MMM (Rosette_Revised_029177) (customer facing online materials "need review and approval prior to production").

31.     The Tribe also pursued litigation in the *Otoe-Missouria* matter over Martorello's objections. *See* Ex. QQ (Rosette_Revised_052701); Ex. RR (Rosette_Revised_053063). At conclusion of the litigation in October of 2014, Martorello noted that "there were so many comments by the panel that outright demonstrate the legality of tribal lending…" believed the outcome was "rather victorious" while LVD's counsel agreed and believed they were on the "best footing we have ever been" Ex. EEE at Rosette_Revised_001118-19. *See* Ex. I (Wichtman Dep.) at 62:15–63:01 ("No, I don't believe he thought [RRTL and Duck Creek operations] were illegal after the Second Circuit Opinion [in *Otoe*]. I remember conversations in which he was – he was very pleased with the outcome.").

32.     By June of 2014, RRTL registered with the CFPB portal to co-regulate consumer complaints with the CFPB. *See* Ex. JJ (Rosette_Revised_030630). By May 2015, Chairman Williams even submitted a statement to the CFPB regarding its potential rules relating to small dollar lending. *See* Ex. KK (Rosette_Revised_000977). Mr. Williams has frequently met with the CFPB ever since. *See* Ex. WW (Williams Dep. (Smith)) at 21:01–23:02.

**V.     LVD Purchased Bellicose and its Subsidiaries in January 2016, after Years of Discussions and Plans for LVD to Integrate Third-Party Services.**

33.     Hazen and Wichtman first asked Martorello to consider selling the business to the Tribe in 2012. *See* Ex. SS (Hazen Dep. (Smith)) at 81:8-82:3; Ex. J (Mansfield Dep.) at 186:15-

20; Ex. E (Weddle Dep.) at 227:14-229:20. Martorello suggested to sell a copy of SPVI's IP and train RRTL to use it. Ex. I (Wichtman Dep.) at 30:1-32:17; Ex. TT at Rosette_Revised_053375; Ex. VV (Rosette_Revised_048729).

34.     Prior to the 2016 sale, LVD created Big Picture Loans, LLC ("BPL"), by passing LVD Council Resolution 2014-044. Ex. EE (Hazen Dec. (Duggan)) at ¶ 12.

35.     The Tribe's decision to rebrand away from RRTL's brand was regardless of any sale. Ex. GGG (Rosette_Revised_053251) at Rosette_Revised_053252.

36.     Once the terms of a sale had progressed, Martorello retained counsel with expertise in such transactions,[3] an Indian law attorney and an adjunct professor of Indian law. *See* Ex. UUU (Williams CV). Mr. Williams has testified that he drafted the documents relating to the sale of Bellicose to the Tribe based on his belief that state laws do not apply to tribal lending entities. *See* Ex. BB (Williams Dep.) at 20:10-21:11; 58:20-61:4; 116:17-117:2; 120:25-123:14; 126:1-9; 146:3-149:21.

37.     In early 2015, LVD created Tribal Economic Development Holdings, LLC ("TED"), as a wholly owned and operated economic arm and instrumentality of LVD. Ex. EE (Hazen Dec. (Duggan)) at ¶ 15. LVD was the sole member of TED with council members Hazen and Williams as co-managers. *Id.* at ¶ 15; Ex. CC (Williams Dec. (Galloway)) at ¶ 4.

38.     LVD also formed Ascension Technologies, LLC ("Ascension"), as a wholly owned and operated subsidiary of TED. *See* Ex. EE (Hazen Dec. (Duggan)) at ¶ 15. Similar to BPL, Hazen and Williams were appointed co-managers of Ascension. Ex. D (Hazen Aff. (Williams)) at ¶ 19;

---

[3] The parties do not dispute that the sale-model was "designed by the Rosette law firm", not Martorello, and used by "several other tribal lending enterprises" both before (including one in which Mr. Williams represented the seller) and after the 2016 sale. *See Hengle v. Asner*, No. 3:19-cv-00250-DJN (E.D. Va. Apr. 21, 2022) [Dkt. No. 184-1] (Plaintiffs' counsel referring to the sale model as having been developed by Rosette LLP).

Ex. CC (William Dec. (Galloway)) at ¶ 4(b); Ex. QQQ (McFadden Dep. (Smith)) 86:15–17.

39.     In 2015, the Tribal Council hired Brian McFadden as President of Ascension pursuant to LVD Tribal Council Resolution T2015-10. Ex. XX (McFadden Dec. (Williams)) at ¶ 6. LVD delegated to McFadden the authority to manage the day-to-day operations of Ascension and McFadden reports exclusively to Ascension's Co-Managers and the LVD Council. *Id.* at ¶¶ 7 & 9; Ex. QQQ (McFadden Dep.) at 83:19–84:01.

40.     The sale closed in January 2016 in exchange for a variable payment note of unknown sum because it sunsets after seven years though it was capped at $300 million. *See* Ex. YY at ¶ 1.2-3.

41.     The value of the equity conveyed to LVD and upon which Martorello paid taxes based on, was $108 million. *See* Ex. W (7.22.20 Tr.) at 216:13-22; *see also* Ex. DDD (Cowhey Report) at 16 (valuing the note at time of sale as $164,578,000).

42.     Eventide, however, has received nowhere near $108 million in note payments.  *See* Ex. O (LVRMMM_00009698) (showing payments to Eventide through April 2018); *See* Ex. ZZ (Notice of Default), Ex. AAA (M. Martorello Dep.) at 99:25-100:2; *id.* at 101:6-8, Ex. BBB (Hazen Dep.) at 79:16-23; 80:9-81:2 (demonstrating no payments from November 2018 and July 2020); Ex. TTT (setting forth revised payment schedule based on fixed amounts).

43.     Also in February 2016, BPL and Ascension entered into the Intratribal Servicing Agreement ("ISA") which was virtually identical to the RRTL Servicing Agreement. Ex. II (LVD-DEF00002335).

## VI.     LVD's governance and BPL's approvals, operations, loan consummation and collection activities occurred on the Reservation.

44.     BPL is wholly owned by LVD, organized under LVD law, and operated by LVD under LVD law. Ex. DD (Hazen Dec. (Smith)) at ¶ 4. Like RRTL, BPL conducts extensive

activities exclusively on the LVD Reservation. *Id.* at ¶ 2, 6-8, 10-11, 15-19. The Tribal Council created BPL to help the Tribe achieve its long-term goals of self-sufficiency and self-determination. Ex. Z (Hazen Dep. (Williams)) at 34:04–35:20.

45.     BPL's and Hazen's on-reservation conduct is no different than her conduct with respect to RRTL. Under the ISA, BPL retains control over its operations. *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 183 (4th Cir. 2019) ("The Intratribal Servicing Agreement, which lays out the relationship between the two Entities, indicates that Big Picture remains in control of its essential functions."). Further, the ISA expressly provides that "[Ascension] has no authority to engage in origination activities, execute loan documentation, or approve the issuance of loans to consumers. *Id.*; Ex. II at § 4.1.

46.     The Tribal Council retains significant oversight authority over BPL. Tribal council may appoint and remove managers, designate authority to appointed managers, and may waive BPL's sovereign immunity. Ex. R (BPL's 2nd Am. Interrogatory Responses (Williams)) at Response ¶ 19. Additionally, LVD requires monthly meetings with BPL's upper management and also requires annual business strategy planning meetings with LVD Tribal Council. *Id.*

47.     As SPVI did for RRTL, Ascension provides pre-qualified leads for BPL. The ISA between BPL and Ascension assigns to Ascension the duties to provide pre-qualified leads as well as provide the "necessary credit-modeling data and risk assessment strategies" BPL can use to determine whether to make a loan. *Williams*, F.3d at 183. However, "the [ISA] also provides that the 'criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion" of Big Picture and that Big Picture 'shall execute all necessary loan documentation." *Id.* "In other words, the fact that Big Picture currently chooses to utilize Ascension's criteria does not mean that it does not have the power to choose differently in the future." *Id.*

48.    All of BPL's processes are approved first by Hazen on the reservation, who is involved in the discussions before a recommendation is even made. *See* Ex. SS (Hazen Dep. (Smith)) at 82:25-84:13 and 123:25-125:2.

49.    Loan origination is always done on the LVD Reservation—never elsewhere. *See* Ex. R at Response ¶ 24; Ex. SS (Hazen Dep. (Smith)) at 50:02–19; 51:20–23.

50.    All BPL loans are originated using discretionary verification criteria on the reservation and the pre-origination automation used "have been put together based on attributes of the business by Ascension, approved by Big Picture, and then those all go into the decision engine." *Id.* at 50:2-61:22 detailing the underwriting, verification and origination processes). There is no third-party service provider who performs underwriting for Big Picture's Loans." Ex. R at Response ¶ 13(3).

51.    BPL's loans are collected on the reservation, its website hosted there, no third party participates in BPL's underwriting, collection or loan servicing processes, and no third party servicer providers are entities owned or controlled by Martorello *See id.* at Response ¶¶ 2, 3, 10; *See* Ex. R at Response ¶13. "Final determination as to whether to lend to a consumer rests with [BPL] and its Subsidiaries." Ex. II at § 4.1. *See also* Ex. S (Dowd Dep.) at 73:22-84:2 (explaining the process always comes back to discretion on the reservation).

52.    Once an applicant signs the loan agreement, it still may take multiple days for the lender to accept the application. For example, in the case of Dana Duggan, BPL completed its acceptance and origination process two days after she submitted her signed loan application. *Compare* Ex. LLL at DUGGAN 00006 (showing Duggan signed her loan application on October 14, 2017 at 10:07 a.m.), *with id.* at DUGGAN 00042 (showing loan application was not approved until two days later on October 16, 2017).

53.     BPL's collection activities also occur on the reservation. "Big Picture collects its own loans and there is no third party that collects loans on behalf of Big Picture." *See* <u>Ex. R</u> at Response ¶ 10. Also, "Big Picture services its own loans and there is no third party that services loans on behalf of Big Picture." *Id.*

54.     BPL uses software that automatically generates communications to be sent to borrowers about notice of approval, payments, past due amounts, and returned payments. *See id.* at Response ¶¶ 24-25. Each automated communication has been approved by BPL on the reservation and is sent from its on reservation tribal server where the website is hosted. *See id.*; <u>Ex. EE</u> (Hazen Dec. (Duggan)) at ¶ 34(a); <u>Ex. DD</u> (Hazen Dec. (Smith)) at ¶ 28-29.

55.     BPL's on-Reservation employees handle all alternative payment schedules as well as settlement agreements. *See* <u>Ex. R</u> at Response ¶ 25. The call center resolution team attempts to contact a borrower who has been paid according to the agreed payment schedule or settlement agreement. *Id.*

56.     The call center resolution team uses pre-generated scripts, calculators, and templates. The call center is required to receive approval from BPL's on-Reservation staff in order to reach a settlement agreement whose terms deviate from those generated by BPL's settlement calculator. *See id.*

**VII.     After LVD's purchase of Bellicose, Martorello's role in the lending operations ends.**

57.     After LVD's purchase of Bellicose in January 2016 (disclosed in a press release issued at that time)[4], Martorello's involvement with LVD's lending operations ended as it pertained to any consumer loan made by BPL. *See* <u>Ex. XX</u> (McFadden Dec.) at ¶ 10; <u>Ex. S</u> (Dowd

---

[4]     Available   at:   https://www.prnewswire.com/news-releases/lac-vieux-desert-band-of-lake-superior-chippewa-indians-bolsters-tribal-economic-development-portfolio-with-purchase-of-bellicose-capital-llc-300210679.html

Dep.) at 208:18-210:20; Ex. R at Response ¶¶ 13(ii), 19(2).

58.     Since the sale, Martorello has had nothing to do with BPL other than being a representative of TED's creditor, Eventide. Ex. S (Dowd Dep.) at 207:14–209:08. Neither Eventide nor Martorello has ownership in or control over Ascension or BPL, nor have they ever participated in the day-to-day operations of Ascension or BPL. Ex. XX (McFadden Dec. (Williams)) at ¶ 10; Ex. QQQ (McFadden Dep. (Smith)) at 86:18–24. Martorello is not involved in the business operations of Ascension or BPL. Ex. SS (Hazen Dep. (Smith)) 43:21–44:02.

59.     Unless Ascension needs to expand its budget for operational needs, Ascension is not required to, and does not, seek approval from Martorello or Eventide for any decisions regarding day-to-day operations including:  operations, personnel, revenues, distributions, or contracts with third party vendors and service providers. Ex. XX (McFadden Dec. (Williams)) at ¶¶ 10–12.

60.     Moreover, neither Martorello nor Eventide have ever provided *any* consulting services, whether formal or informal, or advice to Ascension or BPL *Id.* at ¶ 13.

61.     Between about November 2018 and July 2020, TED stopped paying ECA and defaulted on its Promissory Note. *See, e.g.*, Ex. ZZ (Notice of Default); *see also* Ex. AAA (M. Martorello Dep.) at 99:25-100:2; *id.* at 101:6-8; *see also* Ex. BBB (Hazen Dep.) at 79:16-23; 80:9-81:2.

62.     In fact, TED's failure to pay resulted in an arbitration between the parties, which resulted in restructuring the agreements between TED and ECA to fixed payments. *See* Ex. SSS at Art. 5; Ex. TTT at ¶1.

63.     Plaintiffs settled with the Tribe and others over ECA's objection. *See Galloway v. Williams*, No. 3:19-cv-470, 2020 U.S. Dist. LEXIS 141856, at *20 (E.D. Va. Aug. 7, 2020).

**VIII.   LVD engaged in a concerted and sustained undertaking to develop its on-reservation lending business and it generates substantial value for LVD.**

64.     LVD's Tribal Council has passed more than 200 Tribal Council resolutions over 8 years relating to its arm of the tribe lending operations. *See, e.g.,* Ex. IIII (setting forth a summary of the Tribal Council resolutions).

65.     LVD has invested around nine million dollars of its own funds into BPL. *See* Ex. WW (Williams Dep. (Smith)) at 27:10–22.

66.     As of 2013, the Tribe's lending enterprises accounted for 46% of the Tribe's government budget and revenues from Tribal lending have been used towards housing, youth programs, health and wellness, and law enforcement. Ex. C (Williams Dec.) at ¶¶ 22–23; Ex. CC (Williams Dec. (Galloway)) at ¶ 2; Ex. VVV (Hazen Dec. (Galloway)) ¶¶ 5, 14, 35; Ex. J (Mansfield Dep.) at 32:10–33:06; see Ex. X (Martin Dep.) at 56:24–57:15.

67.     LVD paid Martorello's company to help them build a business worth nearly $25 million in equity value to LVD as of date of sale in 2016 (*i.e.* in just over four years). *See* Ex. DDD (Cowhey Report) at 20 (valuing LVD's equity in RRTL by the date of the sale at $24,729,000 and approaching $135,093,000 by 2023). LVD additionally took dividends from RRTL along the way, tens of millions of dollars of which provided upwards of 46% of LVD's government budget at various times. *See* Ex. C (Williams Dec.) at ¶ 22. LVD uses those dividends to fund numerous essential government services and to provide numerous jobs for LVD members, directly and indirectly. *See* Ex. D (Hazen Aff.) at ¶ 31(a)-(l); Ex. C (Williams Dec.) at ¶¶ 21-23, 25.

68.     By 2018, more than 44% of LVD's general fund came from BPL with profits from BPL totaling $46,397,315.04. Ex. CC (Williams Dec. (Galloway)) at ¶ 18. By this time TED, BPL and Ascension were all headquartered on the Reservation with BPL then employing fifteen individuals on the Reservation and Ascension employing thirty-one individuals, most of whom

worked at Ascension's satellite offices. Ex. D (Hazen Aff.) at ¶¶ 24-25; see Ex. VVV (Hazen Dec. (Galloway)) at ¶¶ 28–30.

## IX.    Plaintiffs' Loan Agreements were with the Tribal Entities.

69.    The lender to Plaintiffs Coffy and Gillison Estate was RRTL. *See* Ex. ZZZ (Coffy Dep. Ex. 1) at WILLIAMS 000012; Ex. FFFF (Singh Dep. Ex. 2) at 10.

70.    The lender to Plaintiffs Hengle, Turnage and Williams was BPL. *See* Ex.HHHH (Hengle Dep. Ex. 3) at WILLIAMS 000021; Ex. DDDD (Turnage Dep. Ex. 3) at WILLIAMS 0000039; Ex. BBBB (Williams Dep. Ex. 3) at WILLIAMS 000076.

71.    At the time of filing suit against Martorello, none of the class Plaintiffs had met, spoken to or even heard of Martorello. Nor had they heard of Bellicose or SourcePoint. *See* Ex. AAAA (Williams Dep.) at 8:11-11:24; Ex. CCCC (Turnage Dep.) at 7:21-8:19; Ex. GGGG (Hengle Dep.) at 29:19-30:14; Ex. YYY (Coffy Dep.) at 45:7-46:9; 55:10-56:2; Ex. EEEE (Singh Dep.) at 5:5-17.

## <u>ARGUMENT</u>

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and  the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986); *Nguyen v. CNA Corp.,* 44 F.3d 234, 236-37 (4th Cir. 1995).

"[T]o avoid summary judgment, the non-moving party's evidence must be of sufficient quantity and quality as to establish a genuine issue of material fact for trial." *Local Union 7107, UMW v. Clinchfield Coal Co.,* 124 F.3d 639, 640 (4th Cir. 1997). Whether a fact is material depends on the relevant substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc*.,

477 U.S. 242, 248 (1986). Although "[a]ll reasonable inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion," a "mere scintilla of evidence supporting the case is insufficient." *Nguyen*, 44 F.3d at 237.

## I.      FEDERAL PREEMPTION PRECLUDES APPLICATION OF VIRGINIA LAW.

If the Court concludes that BPL and RRTL's loans were governed by LVD's laws, and not Virginia's, then the loans were not unlawful and all of Plaintiffs' claims fail. The Court should conclude that Virginia's laws are preempted because a state's regulatory interests are insufficient to escape the federal preemptive power of the Indian Commerce Clause.

### A.      State regulatory interests are insufficient to escape federal preemption by the Indian Commerce Clause, requiring the court to sustain the application of Tribal law.

Plaintiffs' entire theory of the case rests on the erroneous proposition that the Court should look to Virginia's choice of law jurisprudence to determine the applicable law. However, in matters involving economic activity on a reservation, traditional choice of law analysis is inapplicable. "[T]he Indian Commerce Clause makes 'Indian relations . . . the exclusive province of federal law.'" *Seminole Tribe v. Florida*, 517 U.S. 44, 60 (1996) (quoting *Cnty. of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 234 (1985)); U.S. Const. art. I, § 8, cl. 3; *see also White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143 (1980) ("[t]he unique historical origins of tribal sovereignty make it generally unhelpful to apply . . . standards . . . that have emerged in other areas of the law."). To that end, the Supreme Court "has relied on the Indian Commerce Clause as a shield to protect Indian tribes from state and local interference . . . ." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 153-54 (1982). As such, the Supreme Court has consistently required courts to assess the applicability of state law through an interest-weighing analysis whenever it impacts on-reservation business activity. *See, e.g.*, *Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 837 (1982); *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324,

333 (1983); *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 155 (1980). Here, LVD's lending operations are firmly rooted on the reservation, requiring the Court to engage in an interest-weighing analysis. Because LVD's interests and federal interests in promoting Native American self-governance and self-determination outweigh Virginia's interests in this instance, Virginia's usury laws are preempted.

### 1.   Development of the framework for the interest-weighing analysis.

Forty-Three years ago, in the seminal case, *Bracker*, Arizona sought to apply its motor carrier license and fuel taxes to *non-Indian* logging companies that harvested and transported timber for a tribal timber company on an Indian reservation. The Supreme Court assessed whether the state's assertion of taxation authority over non-Indians' on-reservation activities "unlawfully infringe[d]" on tribal sovereignty. 448 U.S. at 142-45. The Supreme Court observed that "[t]his inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Id.* at 145. The Court found that the state's general interest in raising revenue was outweighed by the federal and tribal interests, including the "general federal policy of encouraging tribes 'to revitalize their self-government' and to assume control over their 'business and economic affairs.'" *Id.* at 149 (citation omitted). These interests coupled with the indirect "economic burden of the asserted taxes" on the tribe, caused the Supreme Court to conclude that taxing the non-Indians was impermissible. *Id.* at 151.

In 1987, the interest-balancing analysis was articulated and applied again in *Cabazon*. At issue in *Cabazon* was whether California, in an effort to protect its consumers from organized crime, could enforce its laws relating to high-stakes bingo games at tribal casinos offering the games to non-tribal members. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202,

205 (1987). In determining if state jurisdiction may outweigh the Indian Commerce Clause and undermine federal and tribal interests, "the inquiry [was] to proceed in light of traditional notions of Indian sovereignty and the congressional goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development" *Id.* at 216. According to the Court:

> The Cabazon and Morongo Reservations contain no natural resources which can be exploited. The tribal games at present provide the sole source of revenues for the operation of the tribal governments and the provision of tribal services. They are also the major sources of employment on the reservations. *Self-determination and economic development are not within reach if the Tribes cannot raise revenues and provide employment for their members.*

*Id.* at 218-19 (emphasis added).

As for the state interests, California argued that application of state law to tribal casinos, despite the sovereign status of the tribes, was authorized by Congress under two federal statutes and because California's public policy interests were sufficient to justify the regulatory burden imposed on the tribes. *Id.* The Supreme Court disagreed, concluding no federal statute authorized enforcement of the state regulatory law against the tribes, and held that any consumer protection interest California had in preventing the infiltration of organized crime "d[id] not justify state regulation of the tribal bingo enterprises in light of the compelling federal and tribal interests supporting [the tribal enterprises]." *Id.* at 221-22.

Also critical to the Court's decision regarding state interests was the fact that California did not fully prohibit all forms of gambling, but merely regulated the circumstances under which they were permitted. *Id.* at 211 (noting "California regulates rather than prohibits gambling in general and bingo in particular"). In particular, the California statute regulated how bingo games could be operated and staffed, placed restrictions on the use of game profits, and capped the size

of the prizes that could be awarded. *Id.* at 205. However, the Supreme Court held that "[e]ven to the extent that the State and county seek to regulate short of prohibition, the laws are preempted" because "the asserted state interest is not sufficient to escape the preemptive force of the federal and tribal interests" *Id.* at 221-22.

The Second Circuit in *Otoe-Missouria* recognized that the test set forth in *Cabazon* is applicable to online tribal lending. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 113-14 (2d Cir. 2014).[5] While the Second Circuit denied the preliminary injunction that was sought based on the undeveloped record, it recognized that "[a] court might well find that the tribes' sovereign interest in raising revenue militate in favor of prohibiting a separate sovereign from interfering in their affairs." *Id.* at 112 n.4. Canvassing Indian Commerce Clause jurisprudence, the Second Circuit further noted that a "state's interest waxes . . . if 'the conduct of non-Indians' is in question", but "once a state reaches across a reservation's borders its power diminishes and courts must weigh the interests of each sovereign—the tribes, the federal government, and the state—in the conduct targeted by the state's regulation." *Id.* at 113. The Second Circuit further observed that, although the loan transactions at issue "involve[] the collection as well as the extension of credit, and that collection clearly takes place in New York" "[a] court might ultimately conclude that, despite these circumstances, the [off-reservation collection] being regulated by New York could be regarded as on-reservation, based on the extent to which **one side** of the transaction is firmly rooted on the reservation." *Id.* at 115 (emphasis added). The task for the Court then is to determine whether the activity Virginia's usury laws are targeting is rooted on the reservation and, if so, to then weigh the interests of the Tribe, the federal

---

[5] As the Court knows, LVD was one of the two tribal plaintiffs in that case who sought a preliminary order enjoining New York from threatening non-Indian New York banks from working with tribes, in an effort to choke off LVD's business.

government and Virginia.

**2.    The legal incidence test shows that Virginia's usury laws target on-reservation conduct.**

Virginia's usury laws target LVD's consumer lending operations, which are firmly rooted on the Reservation. The starting point for online tribal lending involves the legal incidence test described in *Otoe*:  "[t]he 'Who,' 'Where,' and 'What' of the Indian Commerce Clause". *Id.* at 112. In reviewing a state's usury law against the record, "[a] court must know who a regulation targets and where the targeted activity takes place." *Id.* at 114. These determinations are "often dispositive." *Id.* at 113 (quoting *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 101 (2005)). However, "even when the 'who' and 'where' are clear, a court must still understand 'what' a regulation targets to weigh interests appropriately" because "[a] tribe's interest peaks when a regulation threatens a venture in which the tribe has invested significant resources." *Id.* Analysis of the legal incidence test described by the Second Circuit in *Otoe-Missouria* as well as the Supreme Court's precedent in *Cabazon*, demonstrates why Virginia law does not "escape" the federal preemption of the Indian Commerce Clause to diminish LVD's tribal sovereignty.

**a)    "Who":  Application of Virginia's usury laws regulate lenders, like RRTL and BPL, and thus would infringe on tribal entities.**

The conduct of non-Indians is not at issue here. The "who" Virginia's usury laws aim to regulate is clear:  lenders, like RRTL and BPL. *See* Va. Code Ann. § 6.2-303 (fixing the terms under which a creditor may originate loans and holding liable "the person taking or receiving such payments" if interest is in excess of 12 percent). Virginia does not attempt to regulate the non-Indian borrower's conduct through its usury laws. Instead, the "legal incidence" of the regulation would fall upon LVD's on-reservation lending entities. *See Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 467 (2d Cir. 2013) ("[T]he initial and frequently dispositive question in Indian tax cases is who bears the legal incidence of the tax."). Though not necessary, here LVD's

22

lending entity is a governmental arm of the Tribe. *See Williams*, 929 F.3d at 185. Accordingly, application of Virginia's usury laws to BPL and RRTL would result in regulation of an arm of the tribe governmental entity by the Commonwealth of Virginia, thus satisfying the first part of the *Otoe-Missouria* legal incidence test.

> **b)**     **"Where":  Application of Virginia's usury laws would infringe upon substantial on-reservation conduct.**

The "where" of the *Otoe-Missouria* test also shows that application of Virginia's usury laws would target substantial on-reservation conduct. As a starting point, LVD has the exclusive authority to regulate any economic affairs on the reservation unless Congress has legislated otherwise. *See, e.g.*, *Merrion*, 455 U.S. at 137  (holding that tribes have general authority, as a sovereign, to control economic activity on the reservation, even over non-Indian businesses). Here, the Indian targets of the usury laws, BPL and RRTL, have not left the reservation. *See supra* ¶¶ 18-30, 44-45, 48-51, 53-56. The lending businesses were established under LVD's laws by the Tribe's governing body and are located on the Reservation. *See supra* ¶¶ 12, 44. BPL and RRTL (before it was dissolved) are subject to the Tribe's regulatory Code and are also subject to oversight by the Tribal Council and TFSRA. *See supra* ¶¶ 5-8, 12, 44. In addition to the LVD government's extensive legislative conduct, legal authority, oversight and regulation over RRTL and BPL, all of RRTL and BPL's CEO and co-manager's approvals over their business processes occurred on the Reservation. *See supra* ¶¶ 18, 20, 24-30, 45. The lending transactions themselves also occur on the reservation as all of RRTL and BPL's loan originations and occurred on the Reservation. *See supra* ¶¶ 19-20, 49-50. In short, the Tribe has "engaged in a concerted and sustained undertaking to develop and manage limited capital resources" and the lending side of the transaction is "firmly rooted" on the Tribe's reservation. *Otoe-Missouria*, 769 F.3d at 113, 115.

Another approach to determining "where" the loan took place for purposes of a federal

23

preemption test regarding usury laws would be to look, by way of analogy, to the body of law interpreting the National Bank Act ("NBA"), Rev. Stat. § 5197, as amended, 12 U.S.C. § 85. The NBA "provides that a national bank may charge interest 'on any loan' at the rate allowed by the laws of the State in which the bank is 'located.'" *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 308 (1978). The Office of the Comptroller of the Currency ("OCC") has interpreted the NBA and *Marquette* to mean this is true "regardless of the location of the borrower and even if the bank had specifically targeted borrowers in another state."[6] A national bank is "located' for purposes of NBA § 85 in the State named in its organization certificate or in a state in which it has its main or branch offices. *See Marquette*, 439 U.S. at 308. In addition, a bank must demonstrate, at least one significant non-ministerial action associated with the account took place in the bank's "home state." *See Citibank N.A. v. Hansen*, 28 Misc. 3d 195, 196 (N.Y. Misc. 2010). The three non-ministerial functions are the "approval, disbursal and the extension of the credit." *See* OCC Interpretive Letter No. 822 (March 1998) at 12.[7]

According to OCC Interpretative Letter No. 822, if bank personnel apply subjective underwriting criteria and exercise discretion in reviewing loan applications, loan approval occurs where the person making the decision is located. *See id*. at 12-13. "In contrast, if the determination to approve or deny a loan is based on non-discretionary criteria that will be applied mechanically,

---

[6] *See* Office of the Comptroller of the Currency, Interpretive Letter No. 1171 (Aug. 2020), available at: https://www.occ.gov/topics/charters-and-licensing/interpretations-and-actions/2020/int1171.pdf (citing *Marquette* 439 U.S. at 310-13).

[7] Available at https://www.occ.treas.gov/topics/charters-and-licensing/interpretations-and-actions/1998/int822.pdf. *See also id.* at 9 (relying on sections 102(b)(1) and 111 of Riegle-Neal Act and related legislative history to conclude that "if a branch or branches in a particular host state approves the loan, extends the credit, and disburses the proceeds to a customer, Congress contemplated application of the usury laws of that state **regardless of the state of residence of the borrower**") (emphasis added).

loan approval occurs where the decision establishing those non-discretionary criteria is made. However, if bank personnel have discretion to review and approve loans rejected by non-discretionary criteria, approval of these loans occurs where that discretion is exercised." In any event, "[t]he principles established by the framework adopted in [OCC Interpretive Letter No. 822] do not change based on the state in which the borrower resides or the mere presence of branches in other states." *See* OCC Interpretative Letter No. 1171 at 4, n. 18.

The FDIC also publishes "Guidance for Third-Party Lending" making clear that national banks may originate loans for non-banks to export rates under the bank's home state law, including for "Subprime Programs" and "Payday Lending".[8] Accordingly, it is perfectly permissible for an entity to deliberately structure its affairs with this test in mind. *Hansen*, 28 Misc. 3d at 201 ("[T]he court does not question [the banks'] right, consistent with federal law, to structure its credit line and credit card affairs in a manner that enables it to avoid and circumvent the usury limits of th[e] state," provided that it "has, indeed, so structured its affairs.").

Here, LVD's lending entities are located on the Reservation as they are organized under LVD's laws and exclusively maintain their offices there. *See supra* ¶¶ 12, 18, 44, 61. Martorello only need prove that *one* of the three non-ministerial functions occur on LVD's reservation. He has demonstrated that *all three* non-ministerial functions occur on LVD's Reservation. Approval occurs on the reservation. *See supra* ¶¶ 18, 48-50. Even if the non-discretionary criteria applied mechanically method were used, all processes of BPL and RRTL were approved on the reservation under consultation with Hazen. *See supra* ¶¶ 23-25, 48-50. And, even then, RRTL and BPL personnel have discretion in the verifications that occurs on the reservation, and thus the loans are

---

[8] *See* FDIC Examination Guidance for Third-Party Lending As of July 29, 2016 at https://www.fdic.gov/news/news/financial/2016/fil16050a.pdf

still made at LVD. *See supra* ¶ 20, 50. Disbursement occurs on the Reservation. *See supra* ¶¶ 20, 50. Extension of credit occurs on the reservation. *See id*. Under this federal preemption analysis of the NBA (which does not benefit from the strong federal policy that the Indian Commerce Clause does), the "where" of the conduct clearly occurs on the Reservation, thus application of state law would impermissibly infringe on LVD's on-reservation conduct.

> ### c)   "What":  Virginia's laws are regulations that would infringe on BPL and RRTL's consummation of loans.

The Court must understand "'what' a regulation targets to weigh interests appropriately." *Otoe-Missouria*, 769 F.3d at 113. The "what" in this instance encompasses the time, place and manner in which a lender (RRTL and BPL) may consummate their loans.  *See* Va. Code Ann. § 6.2-303.

> ### 3.   Tribal and federal interests outweigh Virginia's interests.

With legal incidence test resolved, (i.e. the "who" being RRTL and BPL, the "where" being the Reservation, and the "what" being the consummation of consumer loans) and showing that the target is on the Reservation, the Court must then balance Virginia's interests with the tribal and federal interests to determine if Virginia's interests are powerful enough to escape federal preemption. They are not.

Virginia's usury laws are regulations because rather than "'forbid,' 'prevent,' 'effectively stop,' or 'make impossible' [consumer lending] in the State" they are "rule[s]" that 'fix the time,' place, and manner [in which loan originations] may be conducted. *Ysleta del Sur Pueblo v. Texas*, 142 S. Ct. 1938, 1929, 1931 (2022). In fact, like California, which did not outlaw bingo entirely, Virginia permits lenders to offer loans comparable to those entered into by Plaintiffs, and even consumer loans at interest rates in excess of the rates charged to the Plaintiffs. The provision setting forth the 12 percent rate highlights nine separate categories of "[l]aws that permit payment of

interest at a rate that exceeds 12 percent per year." Va. Code Ann. § 6.2-303(B)(1)–(9). Those laws in turn set forth dozens of exceptions. *See, e.g.*, *id.* § 6.2-309–329.  As the Supreme Court recently recognized in *Yselta del Sur Pueblo*, laws cannot be "both (permissible) prohibitions and (impermissible) regulations." 142 S. Ct. at 1939. Accordingly, Virginia's usury laws are price caps, which regulate, but do not prohibit entirely, loans with interest rates above 12 percent. *See id.*

On the other side of the scale, the federal and tribal interests in self-governance, self-regulation, self-determination and tribal economic development prevail. LVD has invested millions of dollars of its own funds into its business. Funds from lending activities have accounted for upwards of 44% of LVD's governmental budget in various years, from both RRTL and BPL. *See supra* ¶¶ 66, 68. LVD has also passed more than 200 resolutions relating to its online lending businesses, has coordinated with the CFPB, and has established the TFSRA to regulate lending activities occurring on the Reservation. *See supra* ¶ 64. LVD has also assigned authority to members of its Tribal Council to manage and operate RRTL and BPL since inception of the entities. *See supra* ¶¶ 12, 28-30, 44.

Like the tribes in *Cabazon* and *Mescalero II* as cited in *Otoe,* LVD has unquestionably "engaged in a concerted and sustained undertaking to develop and manage the reservation's" online lending industry and "state regulations threaten[] to unsettle and supplant those investments". *Otoe-Missouria*, 769 F.3d at 113 (citing *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324 (1993) (*Mescalero II*)). Moreover, LVD has furthered its own independence and economic development and the federal policies related thereto. *See supra* ¶¶ 64-68; *see infra* at § I.B. As the Fourth Circuit has already recognized and Martorello has demonstrated here, the tribal lending operations at issue further the federal interests underlying sovereignty:

> [T]he Entities have increased the Tribe's general fund, expanded the
> Tribe's commercial dealings, and subsidized a host of services for

> the Tribe's members. Accordingly, the Entities have promoted the Tribe's self-determination through revenue generation and the funding of diversified economic development..

*Williams*, 929 F.3d at 185.

Public policy interests by Virginia with respect to usury regulations cannot override tribal and federal interests in self-sufficiency, self-governance and economic development and are preempted. Subjecting BPL and RRTL to Virginia's usury regulations, even if Plaintiffs had not already agreed that LVD's laws would govern (as they did here) would infringe on LVD's sovereignty and is preempted under *Cabazon*.[9] The Court should grant this Motion and hold the Virginia's usury laws are preempted by the Indian Commerce Clause.

**B.    Application of Virginia law is at odds with the Native American Business Development Act ("NABDA").**

Where "state law interferes with the purpose or operation of a federal policy regarding tribal interests, it is preempted," *Hoopa Valley Tribe v. Nevins*, 881 F.2d 657, 659 (9th Cir. 1989), because tribal sovereignty is "dependent on, and subordinate to, only the Federal Government, not the States." *Confederated Tribes of Colville Indian Reservation,* 447 U.S. at 154. Applicable federal policy relevant here includes NABDA. *See* 25 U.S.C. § 4301 *et seq.* NABDA is required "to be liberally construed in favor of the Indians." *See Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052, 1062 (D.S.D. 2016) (citing *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 767 (1985) ("statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit")); *see Bryan v. Itasca County,* 426 U.S. 373, 392 (1976)

---

[9] In response to *Cabazon,* Congress passed the Indian Gaming Regulatory Act, 102 Stat. 2467, 25 U.S.C. § 2701, *et. seq.* ("IGRA")in order to regulate relationships between casinos and non-Indian managers and give the states "some measure of authority over gaming on Indian lands." *Seminole Tribe*, 517 U.S. at 58. As set forth below, Congress has not, however, passed similar legislation affording states any authority to regulate online loans originating on Indian lands.

("'statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians'" (quoting *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89 (1918))). The Supreme Court has cautioned lower courts not to give "short shrift" to policies codified in statutes, but to construe them generously. *See Ramah Navajo School Board Inc.,* 458 U.S. at 846-47 ("We have consistently admonished that federal statutes and regulations relating to tribes and tribal activities must be 'construed generously in order to comport with . . . traditional notions of [Indian] sovereignty and with the federal policy of encouraging tribal independence.' *White Mountain,* at 448 U.S. 144; *see also McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 174-75 n.13 (1973); *Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 690-91 (1965).

In enacting NABDA, Congress recognized the obligation of the United States to "facilitate the movement of goods to and from Indian lands and the provision of services by Indians", to promote private investment in the economies of Indian Tribes", and to "encourage intertribal, regional, and international trade and business development" (just as internet lending involves) and to "trade freely, and seek enforcement of treaty and trade rights" (just as LVD sought here). *See id.* at § 4301. Congress also recognized the obligation of the United States to create "conditions with respect to Indian lands to— (A) encourage investment from outside sources that do not originate with the tribes; and (B) facilitate economic ventures with outside entities that are not tribal entities" (emphasis added). *Id.* Congress further found that "the twin goals of economic self-sufficiency and political self-determination for Native Americans can best be served by making available to address the challenges faced by those groups— (A) the resources of the private market [i.e. the internet, outsourced call centers, and modern technologies]; (B) adequate capital [i.e. Eventide's financing]; and (C) technical expertise [SPVI services]." *Id.* The business relationships

between companies affiliated with Martorello and the Tribe furthered the exact goals of NABDA and Virginia law is preempted to the extent it would undercut federal law, including NABDA.

### C.   Unlike IGRA, Congress has not exercised its exclusive authority to restrict tribal sovereignty in this area, and until it does, federal policy applies.

Because tribes retain all inherent attributes of their sovereignty not otherwise divested by Congress and Congress has not acted to diminish tribal sovereignty in connection with online consumer lending, the Tribe's actions and its decisions are protected by federal policy and privileged from diminution by Virginia law. *See United States v. Wheeler*, 435 U.S. 313, 323 (1978) ("But until Congress acts, the tribes retain their existing sovereign powers."); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978) ("As separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority."). This is so even where a tribe is engaging in commercial activities. *See Kiowa Tribe v. Mfg. Techs.*, 523 U.S. 751, 758 (1998) ("Respondent does not ask us to repudiate the principle [of sovereignty] outright, but suggests instead that we confine it to reservations or to noncommercial activities. We decline to draw this distinction in this case, as we defer to the role Congress may wish to exercise in this important judgment.").

In fact, rather than diminishing the sovereign authority of tribes in the area of online consumer lending, Congress has made tribes co-regulators of entities making consumer loans. In the Consumer Financial Protection Act of 2010 ("CFPA"), Congress defined "state" to include "any federally recognized Indian tribe." 12 U.S.C. § 5481(27). In doing so, Congress recognized tribes as lending *regulators*, not merely the *regulated*. To that end, tribes are actively co-regulating their online lending businesses with the CFPB being supported by the CFPB.[10] The Tribe's lending

---

[10] The relationship between the CFPB and tribal governments is expressly set forth on the CFPB website where the CFPB recognizes that "[p]art of [the CFBP's] commitment to protecting

entities have been registered and co-regulating with the CFPB since 2014 and the Tribe has also made submission to the CFPB in connection with its rulemaking process and Chairman Williams has visited with the CFPB frequently. *See supra* ¶ 32. Accordingly, the Tribe's lending operations further tribal and federal interests.

### D. Neither outsourcing of management nor economics change the preemption analysis.

By focusing on the services and economics of the arrangements between LVD and Martorello's companies, Plaintiffs impermissibly attempt to encourage the Court to exercise its own business judgment over what commercial dealings tribal governments should be permitted to engage in, which is at odds with the plenary power of Congress to restrict tribal contracting with non-Indian managers (as demonstrated by IGRA) and the federal policy of self-determination.

Congress has already made clear that business arrangements that include economics similar to those at issue here are permissible in Indian country, including with respect to Low Income Housing Tax Credits[11] and New Market Tax Credits.[12] NABDA also makes clear that tribes are allowed (even encouraged) to hire experienced non-Indian management teams to run their businesses. *See supra* § I.B.

The 10th Circuit has also recognized that economics are irrelevant to the preemption analysis. In S*hivwits Band of Paiute Indians v. Utah*, the court held that federal law was preempted

---

consumers across the country means paying particular attention to the needs and concerns of Indian Country." *See* CFPB, "Working with tribal governments" which publishes information for tribal regulatory authorities, available at https://www.consumerfinance.gov/tribal/.

[11] Because tribes are federally tax-exempt entities, non-Indian investors may own up to **99 percent** of a tribal project for the 10-year period of the tax credits. *See Low Income Housing Tax Credits 101,* Travois, Inc. (2013).

[12] The non-Indian investor may own up to **99 percent** of the tribal project for seven years. *See* 26 U.S.C. § 45d.

with respect to a business relationship where the non-Indian *owned* the business, *operated* the business, generated the entire idea and invested all of the money, and the tribe made only a few thousand dollars a year. *See Shivwits Band of Paiute Indians v. Utah*, 428 F.3d 966, 969 (10th Cir. 2005); *Shivwits Band of Paiute Indians v. Utah*, 185 F. Supp. 2d 1245, 1247 n.1 (D. Utah 2002) ("The lease transaction involves no payment to the Shivwits for fifteen (15) years and small (\$ 2,500 per year) payments for the next five years.")

Here, in holding that BPL and Ascension are arms of LVD and that BPL and Ascension serve the purposes of tribal economic development and self-governance, the Fourth Circuit also rejected any requirement that the Tribe needed to receive a certain percentage of revenue. *Williams*, 929 F.3d at 180. It recognized that "policy considerations of tribal self-governance and self-determination counsel against second-guessing a financial decision of the Tribe where, as here, the evidence indicates that the Tribe's general fund has in fact benefited significantly from the revenue generated by an entity." *Id.* at 181; *see also supra* ¶¶ 65-68. Until Congress acts on tribal management contracting, as it did in IGRA and as only Congress may lawfully do, sovereignty has not been restricted and federal law and policy of self-determination applies. As such, the level of services provided by Martorello's business, and the economics paid for them (which are required to be promoted and supported under the policy) are irrelevant to the federal preemption analysis. The Court should grant this Motion and hold that Virginia law does not apply.

## II. SUMMARY JUDGMENT ON PLAINTIFFS' USURY CLAIM IS WARRANTED.

Even if the Court determines that Virginia law applies to Plaintiffs' loan agreements, Martorello should be granted summary judgment on Plaintiffs' usury claim because he was not the person who took or received loan payments on Plaintiffs' loans. Plaintiffs premise their right of recovery for usury against Martorello on section 6.2-305 of the Virginia Code. This statute provides, in part:

> If interest in excess of that permitted by an applicable statute is paid upon any loan, the person paying may bring an action within two years from the first to occur of: (i) the date of the last scheduled loan payment or (ii) the date of payment of the loan in full, to recover from ***the person taking or receiving such payments***…[.].

Va. Code § 6.2-305(A) (emphasis added).

No Virginia court to date has decided whether a third party who assists a lender and receives compensation derived from loan payments is liable under Va. Code § 6.2-305. However, California courts have addressed this issue with respect to a statute that uses similar terminology. The California statute provides that borrowers who have paid a sum in excess of the applicable interest rate limit may recover "against *the person*, company, association or corporation who shall *have taken or received* the same, or his or its personal representative, treble the amount of the money so paid." Cal. Civ. Code § 1916-3 (emphasis added). California courts have held that, under this provision, "[t]he recipient of the interest alone is liable" because "[t]he liability is purely statutory and the statute makes no provision for imposing liability on agents or abettors of the offending creditor." *Clarke v. Horany*, 212 Cal.App.2d 307, 311 (1963) (citations omitted). Thus, for example, a company that provided servicing and administration services to the lender was not liable under this provision although it ultimately benefited from the loan proceeds. *See Ubaldi v. SLM Corp.*, No. 11-cv-01320-EDL, 2014 U.S. Dist. LEXIS 199634, at *9-12 (N.D. Cal. Dec. 19, 2014); *see also Dillon v. BMO Harris Bank, N.A.*, 16 F. Supp. 3d 605, 619 (M.D.N.C. 2014) (holding no cause of action for usury under North Carolina law against intermediaries in loan transactions or for aiding and abetting usury).

This analysis is equally applicable to Va. Code Ann. § 6.2-305. In construing usury statutes, the Virginia Supreme Court "assume[s] that the legislature chose, with care, the words it used when it enacted the relevant statute, and we are bound by those words." *Greenberg v. Com. ex rel. Atty. Gen. of Virginia*, 255 Va. 594, 600 (1998) (internal quotation and citation omitted). The

statutory language here imposes liability only on "the person" (single tense) who "took" or "received" "such payments" (i.e. interest or other charges collected in excess of the amount permitted by applicable statute") and provides relief to "the creditor" if there was a "bona fide error in computation." Va. Code Ann. § 6.2-305. Under Plaintiff's interpretation of the statute, third parties would all be liable for usury, despite their distance from the loan and the consumer, yet not have the bona fide error relief of a direct creditor of the borrower. This is nonsensical. If Plaintiffs' interpretation were upheld, then Martorello, who is not the "creditor" would not be entitled to the benefit of the bona fide error defense even where Plaintiffs' lenders, RRTL and BPL, could assert the defense. *See supra* at ¶¶ 69-70 (showing RRTL and BPL as the lenders).

Plaintiffs cannot transform all of a lender's payments for services rendered on its income statement, or loan payments made to its creditors, into consumer loan payment receipts subject to Section 6.2-305 just because *RRTL's* and *BPL's revenue* come from consumer "interest and other charges". This express interpretation is consistent with both Va. Code Ann. § 6.2-1541, which permits restitution only from a "lender" and excludes members, officers, directors, agents and employees of that lender, *see Greenberg¸* 255 Va. at 602, and Va. Code § 6.2-1501, which also states "the lender". This statutory scope cannot be expanded to "any person" for downstream payments, without legislative approval. *See Greenberg*, 255 Va. at 601-02 (Virginia usury statute permits "recovery of restitution solely from the 'lender' and does not impose liability on 'any person'" to allow broader scope would be to "invade the province of the legislature").

There is no evidence that anyone but RRTL (and BPL post sale) was "the person", and "the creditor" who took or received interest payments from the consumers. *See supra* ¶¶ 69-70. Martorello should be granted summary judgment on Plaintiffs' usury claim.

III.   **MARTORELLO IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' UNJUST ENRICHMENT CLAIM.**

To the extent the Court does not find that Virginia law is preempted, Martorello should nevertheless be granted summary judgment on Plaintiffs' unjust enrichment claim because Plaintiffs' are limited, if anything, to their statutory damages for usury. And, even if they could be entitled to recover on a quasi-contract theory, there is no evidence that would establish each of the elements of the claim.

A.   **Plaintiffs are limited to their statutory damages.**

Plaintiffs seek to recover from Martorello, on a theory of unjust enrichment, all amounts repaid on any loans with BPL or RRTL. Plaintiffs' theory is that the loan contracts were void under Va. Code Ann. § 6.2-1541 and that Martorello was unjustly enriched by the receipt of any payments on these loans. But the statute creates a remedy for borrowers who enter into such void loan agreements. It provides that "the lender on any loan . . . shall not collect, receive, or retain any principal, interest, or charges whatsoever with respect to the loan, and any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made." *Id.* § 6.2-1541(B). The Virginia Supreme Court has ruled that this provision "permits a recovery of restitution only from the lender," which excludes members, officers, directors, agents and employees of that lender. *Greenberg*, 255 Va. at 600. The court further ruled that that the trial court erred by allowing the recovery of restitution from the chairman and majority shareholder of the lender based on an "active participation" theory. *Id.* at 601.

Plaintiffs cannot invoke the equitable doctrine of unjust enrichment to expand the remedies provided by statute. "Since usury is purely a creature of statute, it necessarily follows that when determining the rights and remedies of the parties to a usurious transaction, courts must look to the provisions of the relevant statutes." 47 C.J.S. Interest & Usury; Consumer Credit § 299 (2018).

Courts cannot fashion additional remedies for usury. "On what principle could this Court add another to the penalties [for usury] declared by the law itself?" *De Wolf v. Johnson*, 23 U.S. (10 Wheat.) 367, 392 (1825). Thus, "[r]elief under the theory of unjust enrichment is not available where there is an adequate legal remedy or where statutory standards for recovery are set by the legislature." *United States v. Bame*, 721 F.3d 1025, 1030 (8th Cir. 2013) (citation omitted); *see also Tomasella v. Nestlé USA, Inc.*, 962 F.3d 60, 82-83 (1st Cir. 2020) (existence of statutory remedy prohibits a claim for unjust enrichment). Martorello is entitled to summary judgment on Plaintiffs' unjust enrichment claim.

**B.     Plaintiffs cannot establish all three elements of unjust enrichment.**

Even if Plaintiffs' claim were not barred by the statutory remedy, Plaintiffs also cannot establish all of the requisite unjust enrichment elements with respect to Martorello. To prevail on the theory, Plaintiffs must show (1) they conferred a benefit on Martorello, (2) that he was aware of the benefit conferred and should reasonably have expected to repay Plaintiffs, and (3) he accepted or retained the benefit without paying for its value. *See Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 838 (Va. 2008); *GIV, LLC v. Int'l Bus. Machines Corp.*, No. CIV.A. 3:07CV067-HEH, 2007 U.S. Dist. LEXIS 30168, at \*\*8-9 (E.D. Va. Apr. 24, 2007).

**1.     Any "benefit" conferred by Plaintiffs was to the Tribal lender, not Martorello.**

Any benefits Plaintiffs may have conferred through their loan payments were conferred to the entities with whom Plaintiffs actually contracted—i.e., RRTL and BPL. *See supra* ¶¶ 69-70. Martorello is far removed from the payments made by the Plaintiffs on their loans RRTL or BPL. To extend liability to Martorello would create a scenario of potentially limitless liability, without any showing of piercing the corporate veil, whereby any individual, vendor, or creditor who received any "benefit" of any type from Plaintiffs' lenders—no matter how small, indirect or

remote—could be liable. This is not the law, and given the absence of any evidence showing Plaintiff conferred a benefit on Martorello, Plaintiffs' unjust enrichment claim fails.

### 2. Plaintiffs could not have reasonably expected repayment by Martorello for payments they made to their lender.

Even if Plaintiffs could prove a benefit conferred to Martorello, this alone would not be sufficient for them to prevail on a claim for unjust enrichment. The Plaintiffs must also prove "sufficient additional facts which imply that the defendant promised to pay the plaintiff[s] for the benefit received." *Rosetta Stone Ltd. v. Google Inc.*, 732 F. Supp. 2d 628, 631-632 (E.D. Va. 2010), *aff'd*, 676 F.3d 144 (4th Cir. 2012) (emphasis added) (*citing Nedrich v. Jones*, 429 S.E.2d 201, 207 (Va. 1993) and *Mullins v. Mingo Lime & Lumber Co.*, 10 S.E. 2d 492, 495 (Va. 1940)).

Here, Plaintiffs concede they had no interaction whatsoever with Martorello and were unaware of his existence prior to filing suit against him. *See supra* at ¶ 71. Entities affiliated with Martorello provided services to RRTL, but even they did not interact with consumers. *See supra* ¶ 21. Moreover, after January 26, 2016, Martorello's only connection to the Tribe or its lenders was as the owner of the company that financed the sale of Bellicose to LVD. *See supra* ¶¶ 57-63. Given these facts, there is simply no reasonable basis upon which Plaintiffs could have expected to receive compensation from an individual who was not a party to their loan contracts and never promised the Plaintiffs to repay or confer some additional benefit on them. Plaintiffs' unjust enrichment claim fails as a matter of law and Martorello's motion for summary judgment should be granted.

### 3. Any "benefit" Martorello received was paid for.

Martorello was CEO and founder of a company that provided extensive, sophisticated services to RRTL under the Servicing Agreement. *See supra* ¶¶ 14-17. Whatever distributions Martorello ultimately received from companies that provided services to RRTL were the result of

the extensive labor and effort they rendered pursuant to said Servicing Agreement. As such, the companies' revenues from RRTL (and thus Martorello's distributions) were *paid for* through services rendered under contract and thus there was no unjust enrichment with respect to RRTL.

As for BPL, Martorello sold his business to the Tribe and taxes were paid based on a $108 million valuation. *See supra* ¶ 41. Despite conveying a $108 million business to the Tribe, Eventide has only been repaid a small fraction of that amount. *See supra* ¶ 42. As such, Eventide and its owners have not been enriched, justly or otherwise, given their losses.

## **CONCLUSION**

For the foregoing reasons, Martorello requests summary judgment on all of Plaintiffs' claims because they are all premised on Virginia law and Virginia law does not apply to the loan agreements. Alternatively, even to the extent the Court holds that Virginia law applies, Martorello requests that the Court grant him summary judgment on Plaintiffs' usury and unjust enrichment claims.

Dated: May 22, 2023

    */s/ John D. Taliaferro*    
John David Taliaferro (Va. Bar. 71502)
LOEB & LOEB LLP
901 New York Ave., NW
Suite 300-E
Washington, DC 20001
Tel. (202) 618-5015
Facsimile: (202) 318-0691
jtaliaferro@loeb.com

Bernard R. Given (*pro hac vice*)
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Telephone: (310) 282-2348
Facsimile: (310) 742-0414
bgiven@loeb.com

*Counsel for Defendant Matt Martorello*

—

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 22nd day of May, 2023, a true and correct copy of the foregoing was

served upon all parties that are registered to receive electronic service through the Court's ECF

notice system in the above case.


    */s/ John David Taliaferro*

John David Taliaferro (Va. Bar. 71502)

1