# EXHIBIT A

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE EASTERN DISTRICT OF VIRGINIA
 3                    RICHMOND DIVISION
 4     Civil Action No. 17-CV-461
       _____
 5
       VIDEO DEPOSITION OF JENNIFER WEDDLE
 6     May 20, 2019
       _____
 7
       LULA WILLIAMS, GLORIA TURNAGE,
 8     GEORGE HENGLE, DOWIN COFFY, and
       FELIX GILLISON, JR., on behalf of
 9     themselves and all individuals similarly
       situated,
10
       Plaintiffs,
11
       v.
12
       BIG PICTURE LOANS, LLC, MATT
13     MARTORELLO, ASCENSION
       TECHNOLOGIES, INC., DANIEL GRAVEL,
14     JAMES WILLIAMS, JR., GERTRUDE
       MCGESHICK, SUSAN MCGESHICK, and
15     GIIWEGIIZHIGOOKWAY MARTIN,
16     Defendants.
       _____
17
       APPEARANCES:
18
           KELLY GUZZO
19             By Kristi Kelly, Esq.
                  Andrew Guzzo, Esq.
20                3925 Chain Bridge Road
                  Suite 202
21                Fairfax, Virginia 22030
                  703.424.7572
22                kkelly@kellyguzzo.com
                  Appearing on behalf of Plaintiffs
23
24
25     Job No. CS3302797
```

Page 57

1      Q     No. 12, New consumer loan agreement,

2   Jennifer Weddle, Scott Shehan (GT)?

3      A     It appears to be another misspelling of my

4   former colleague, Scott Sheehan, S-H-E-E-H-A-N.

5      Q     Does this document indicate that you and

6   Mr. Sheehan were responsible for preparing the new

7   consumer loan agreement?

8      A     Yes, it does.

9      Q     Did you do that?

10      A     I do not recall being involved in it

11   personally.  My partner -- my former partner, Scott

12   Sheehan, was an experienced consumer finance lawyer

13   who would have dealt with the consumer law issues.

14      Q     And did he do that?

15      A     My vague recollection is that yes, he did,

16   although what specific elements he did, I could not

17   speak to.

18      Q     Take a look at Exhibit 10.  It's an email

19   from you to a number of different people:  Matt

20   Martorello, Karrie Wichtman, Craig Mansfield, Shelly

21   Allen and Ben Huber, correct?

22      A     Yes.

23      Q     Dated December 12th, 2011?

24      A     Yes.

25      Q     Who was Karrie Wichtman?

1      A     She at the time was an attorney with

2   Rosette Law representing the tribal entities in

3   transactions with Bellicose.

4      Q     And what about Craig Mansfield, who was

5   that?

6      A     I believe he was, at the time, the general

7   manager of the Lac Vieux Desert Casino.

8      Q     And what role, if any, did he play with

9   respect to the tribal lending entities at -- at

10  inception?

11     A     I believe he had been designated as the

12  representative for the tribal council in negotiating

13  the transactions.

14     Q     And who was Shelly Allen?

15     A     Likewise, a tribal employee and member who

16  was assigned by the tribal council to negotiate the

17  transactions, to give direction to Rosette Law, and

18  to otherwise participate in establishing the

19  business.

20     Q     Okay.  And according to this email that

21  you sent to those people that I've identified, there

22  were a number of attachments.

23           Do you see that?

24     A     Yes.

25     Q     RRTL privacy policy?

Page 59

```
 1        A      What page?  I'm sorry.
 2        Q      I'm looking at the first page, the
 3   heading.  First page of the exhibit on the heading,
 4   where it says Attachments.
 5        A      What -- I'm sorry --
 6        Q      I'm looking at the first page of the
 7   exhibit, at the heading --
 8        A      Oh, okay.  I'm sorry.
 9        Q      -- where it says Attachments.  That's
10   okay.  It says RRTL privacy policy.  RRTL is Red Rock
11   Tribal Lending; is that right?
12        A      Yes.
13        Q      And RRTL adverse action notices, correct?
14        A      Yes.
15        Q      RRTL authorization for automated clearing
16   house debits.
17               I read that correctly?
18        A      Yes.
19        Q      RRTL consumer application?
20        A      Yes.
21        Q      I read that correctly?
22               RRTL loan agreement and promissory note,
23   correct?
24        A      Yes.
25        Q      PepperCash new loan agreement, correct?
```

Page 60

1      A      Yes.

2      Q      Did Greenberg prepare all these documents?

3      A      I do not recall.

4      Q      Well, it appears from this email that you

5  are sending them around to Mr. Martorello,

6  Ms. Wichtman, Mr. Mansfield, Ms. Allen, and

7  Mr. Huber.  Is that what it appeared to you as well?

8      A      Yes, it does.

9      Q      Okay.  And in fact, if you look, those

10  documents are attached, aren't they?

11      A      Yes, they are.

12      Q      And was it your understanding that tribal

13  law, that is, LVD law was to apply to the consumer

14  lending -- the consumer loans from Red Rock and

15  PepperCash to consumers?

16      A      That would have been my general

17  understanding, yes.

18      Q      What was the basis of that understanding?

19      A      Without revealing client confidences, the

20  whole point of the deal was to allow the Lac Vieux

21  Desert tribe to establish lending businesses and make

22  loans pursuant to its tribal laws.

23      Q      And where state laws would not be

24  applicable, correct?

25      A      That is correct.

Page 61

 1      Q      And that was your understanding at the

 2   outset of this transaction; is that right?

 3      A      Yes, it was.

 4      Q      And did that -- did that understanding

 5   ever change between then and January of 2016?

 6      A      No.

 7      Q      Did you discuss that with Ms. Wichtman at

 8   the time?

 9      A      I don't recall specific discussion with

10   Ms. Wichtman.  I'm quite certain we talked about what

11   the deal was and what we were doing.

12      Q      Did you discuss that with Mr. Mansfield

13   and Ms. Allen at the time?

14      A      I don't recall specific conversations with

15   them, no.

16      Q      Was that sort of the assumption under

17   which everyone was proceeding, as far as you knew,

18   that tribal law was going to apply to these consumer

19   lending contracts?

20      A      I couldn't speak to anyone else's

21   assumptions, but that was the negotiation and

22   discussion amongst the group, was that that was the

23   transaction at hand, yes.

24      Q      And on that basis, it was your

25   understanding and belief that the loans to consumers

1   would be lawful under tribal law; isn't that correct?

2        A    Yes.

3        Q    Okay.  And your understanding as to that

4   never changed between the time you were retained in

5   2011 and January of 2016, when Bellicose and

6   SourcePoint were sold to the tribe; isn't that

7   correct?

8        A    That's correct.

9        Q    Okay.  Now, if you look, please, at

10  Exhibit 10, again, that first page, please, you --

11  you say, Attached please find track changes versions

12  of the existing consumer loan documents.  We tried to

13  put in solid notice provisions for the consumers in

14  compliance with the tribe's consumer code.  Our

15  consumer finance specialists have not yet had a

16  chance to quickly review (we're hoping that will

17  happen tonight), but you should be able to start

18  business with these if they are acceptable to Shelly

19  and Craig.

20           Have I read that accurately?

21       A    Yes, you have.

22       Q    Okay.  Why was it necessary for the

23  documents that are referred to in this email, the

24  consumer loan documents, to be acceptable to Shelly

25  and Craig?

Page 63

1        A       Shelly and Craig were the designated

2    tribal officials, so any documentation or matter for

3    the business would have had to met with their

4    approval.

5        Q       Why?

6        A       Because they're the authorized officers

7    for the government business.

8        Q       Why wasn't it Bellicose VI's decision as

9    to what documents were acceptable?

10       A       Because Bellicose VI was simply providing

11   services pursuant to its contract.

12       Q       And so it was not necessary for

13   representatives of Bellicose VI to be approving the

14   consumer loan documents?

15       A       I don't recall the specifics of the

16   contract in terms of who had to review what

17   components of materials for the business.

18       Q       But it was necessary for representatives

19   of the tribal lending entity to do so; is that

20   correct?

21       A       From the context of my email, it would

22   appear, yes.

23       Q       Have you -- strike that.

24               With respect to the relationship -- strike

25   that.

Page 66

1    than the one that I have asked you about?

2         A    Yes.  The language says what the language

3    says in this line of the contract.

4         Q    Okay.  Well -- but you're aware that the

5    underlying consumer loans stated that tribal law

6    applied to them; isn't that correct?

7         A    Yes.

8         Q    And tribal law governed them?

9         A    That's correct.

10        Q    And unless you believed that, you would

11   not have been a part of this transaction, would you

12   have?

13             MS. KELLY:  Object to the form.

14        A    So this transaction is a contract between

15   a tribal entity and a non-tribal entity for the

16   provision of services --

17        Q    (BY MR. SCHEFF)  Correct.

18        A    -- which Greenberg Traurig was retained to

19   do.

20        Q    And if those services were intended to be

21   provided to an entity that was breaking the law, you

22   would not have been involved in that transaction,

23   would you?

24        A    No.

25        Q    No, you wouldn't have been or no, that's

Page 67

1    not a correct statement?

2         A    No, Greenberg Traurig does not engage in

3    furthering illegal activities.

4         Q    And you don't do that personally either;

5    isn't that correct?

6         A    No, I do not.

7              MR. SCHEFF:  Let me -- let me mark Exhibit

8    11.

9              Kristi, 11 --

10             MS. KELLY:  Yes.

11             MR. SCHEFF:  -- is Martorello 012230.

12             (Exhibit 11 marked.)

13        Q    (BY MR. SCHEFF)  Are you familiar with

14   this document?

15        A    Yes.  It is a copy of an article I

16   published in the Federal Lawyer in April 2014.

17        Q    Okay.  And did you write this?

18        A    Yes, I did.

19        Q    And when you wrote it, did you -- strike

20   that.

21             Take a look at Page Bates No. 012234.  Do

22   you have that?

23        A    I do.

24        Q    And if you would look at the left-hand

25   column, under the title Tribal Sovereignty and

Page 68

```
 1    Federal Preemption.
 2              Do you see that?
 3    A    Uh-huh.
 4    Q    Uh-huh meaning yes?
 5    A    Yes, I do.
 6    Q    Okay.  And do you see the first sentence
 7    of the third paragraph under that heading that says,
 8    Similarly, loans by sovereign Indian tribes represent
 9    another category of loans under U.S. law that may be
10    made to residents of states without regard to state
11    usury law.
12    A    Yes, I do.
13    Q    Have I read that accurately?
14    A    Yes.
15    Q    And so what you intended to communicate in
16    that sentence is that loans made by sovereign Indian
17    tribes can be made with state usury laws not
18    applying, correct?
19    A    Correct.
20    Q    And you were saying that states had no
21    authority to regulate tribal lending entities in that
22    regard?
23    A    Yes.
24    Q    And did you hold that view in 2011?
25    A    Yes.
```

Page 69

1        Q      Did you hold that view in 2014?

2        A      Yes.

3        Q      Did you hold that view in 2016?

4        A      Yes.

5        Q      Do you hold that view today?

6        A      Yes.

7        Q      So in this first sentence of Exhibit 11,

8    on Bates No. 012234 -- strike that.

9              I want to go back to Exhibit 2, please.

10   And I'm -- I'm done with -- I'll be coming back to 4,

11   5, 6 and 8 at some point.

12       A      Okay.

13       Q      But if -- you can put those aside for now.

14              THE DEPONENT:  Thank you, Carolyn.

15              MR. SCHEFF:  Before I do that, let me mark

16   what's going to be Exhibit 12 and just sort of close

17   off this.

18              Kristi, Exhibit 12 --

19              MS. KELLY:  Yes?

20              MR. SCHEFF:  -- is going to be 003 -- I'm

21   sorry -- Rosette 003244.

22              (Exhibit 12 marked.)

23       Q      (BY MR. SCHEFF)  So that's small print.

24   I'm sorry, that's just the way it prints out.  And

25   I'm -- I'm just going to refer you to Page 1, the top

1      Q      Do you remember anything about the
2  economic relationship between the lending entity and
3  Bellicose which caused you any concern?
4      A      No.
5      Q      Did you believe at the time that the
6  economic relationship, in terms of who was getting
7  what moneys and how it was being earned, was pretty
8  standard in the consumer lending industry in -- from
9  your experience in dealing with tribal consumer
10 lending?
11     A      Yes.
12     Q      At the time, that is, 2011, was there any
13 restriction, that you were aware of, on the amount of
14 fees or money that the servicer could earn as a
15 result of the services it provided to the tribal
16 lending entity?
17     A      There's no such restriction in 2011, and
18 there's no such restriction today.
19     Q      Why do you say that?
20     A      Because tribes as governments are free to
21 retain whatever services they desire on terms that
22 are acceptable to them.  There is no indicia of the
23 amount of moneys or the degree of success of a tribal
24 business that somehow influences its tribalness.  If
25 an entity is formed by the tribe for the tribe under

Page 104

1    tribal law, it's a tribal entity entitled to engage

2    in contracts, including paying for services,

3    including very expensive services.

4         Q    Can you turn -- I'm sorry.  In 3.5.1 in

5    the exhibit that's in front of you, I think -- do you

6    have Exhibit 5 in front of you or is it 4?

7         A    I have Exhibit 8 in front of me.

8         Q    Exhibit 8.  Well, that's fine, they're all

9    the same.

10             If you could please turn -- I'm sorry,

11   before you do that.

12             Towards the bottom of the page, it says,

13   The enterprise acknowledges and agrees that the

14   servicer is not responsible for the performance or

15   activities of any of the lenders or servicing

16   companies that may be doing business with the

17   enterprise nor any minimum revenue from the unsecured

18   lending business.

19             Have I read that correctly?

20        A    Yes.

21        Q    And then it goes on to say, However,

22   servicer has agreed that the minimum amount per

23   month, which shall be paid to the enterprise, shall

24   be $20,000.

25             Have I read that accurately?

1      A     Yes.

2      Q     Do you know how that provision came about?

3      A     I do not recall.

4      Q     Is it uncommon, at the time in 2011, for

5  the tribal lending entity to receive a minimum

6  monthly payment of a certain amount if -- in order to

7  make sure that money is paid to the tribe?

8      A     No, that was not uncommon at the time.

9      Q     Is that uncommon today?

10     A     No.

11     Q     Take a look at 3.1, please.  About 30

12  percent down the page, do you see where it says

13  the -- the words "authorized agents" are in quotes

14  with a parentheses?

15     A     In 3.1?  Yes.

16     Q     Yeah.  3.1.

17           Do you see that?

18     A     Uh-huh.

19     Q     I'm going to start at the next sentence.

20  Okay?  Nothing contained herein grants or is intended

21  to grant servicer a titled interest to or in the

22  Enterprise.

23           Have I read that correctly?

24     A     Yes.

25     Q     Was it your understanding that Bellicose

1    had an ownership interest in Red Rock or Duck Creek?

2         A    No, they did not.

3         Q    How do you know that?

4         A    Because they were tribal businesses owned

5    exclusively by the tribe, and that's how they were

6    established.  And a significant part of the

7    discussions, I recall, related to protecting the

8    servicer, since the tribe -- these were the tribe's

9    businesses that were controlled by the tribe.

10        Q    When you say "these were the tribe's

11   businesses that were controlled by the tribe," are

12   you referring to Red Rock and Duck Creek?

13        A    Yes.

14        Q    Okay.  During the time period that you've

15   testified that you were representing Bellicose and

16   SourcePoint, that is, from late 2011 until sometime

17   in 2016, did your view ever change that Red Rock or

18   Duck Creek were controlled by the tribe and the

19   tribal entity?

20        A    No.

21        Q    Did you ever have a belief, based on your

22   observation or involvement in any respect in your

23   representation of Bellicose and SourcePoint, that

24   Bellicose and SourcePoint or Mr. Mat- --

25   Mr. Martorello had any type of control or ownership

1    interest in the tribal lending entities?

2         A     I'm sorry, can you repeat that question,

3    please?

4         Q     Yeah, I'll rephrase.  It was a little bit

5    garbled.

6               Did you ever believe, based on your

7    involvement in representing Bellicose and

8    SourcePoint, that Mr. Martorello, or any entity in

9    which he was a principal, had control or ownership of

10   the tribal lending entities?

11        A     No.

12        Q     Now, at the time, that is, between 2011

13   and 2016, did you have conversations with people from

14   the tribe, and with lawyers from Rosette, about this

15   issue that we're talking about now; that is, the

16   ownership and control of the tribal lending entities

17   being vested with the tribe?

18        A     Not that I --

19              MR. GRAY:  I'm sorry.  Are you asking if

20   the conversations took place?

21              MR. SCHEFF:  I'm asking if the

22   conversations took place, and I'm confining the time

23   frame to inception of Greenberg Traurig's retention

24   to the point in time of the sale.

25              MR. GRAY:  Thank you.

1      A     No.  I recall no such conversations, and

2  it would not have been unusual, given that the tribal

3  nature of the entities was never in doubt.

4      Q     (BY MR. SCHEFF)  What do you mean by that?

5      A     I mean these were tribal entities formed

6  by the tribe, for the tribe, under tribal law, and

7  the tribe was, at all instances, in my observation,

8  directing the companies.  Directing their legal

9  decisioning, directing their contracting, acting with

10  recommendations from Bellicose and later from

11  SourcePoint, but at no point was Mr. Martorello, or

12  any entity he was ever involved in, controlling

13  anything.  Those were determinations made by the

14  appropriate tribal officials.

15      Q     How do you know that?

16      A     Because I was subject to a number of

17  conversations that I could not divulge outside Rule

18  1.6 that reflected that operational and substantive

19  control to me.

20      Q     And without disclosing the conversations,

21  with whom were those conversations?

22      A     Chairman James Williams, Craig Mansfield,

23  Shelly Hazen, Karrie Wichtman, Rob Rosette, and I'm

24  sure other counsel as well.

25      Q     Okay.  What were the conversations?

```
                                              Page 109

   1              MR. SCHEFF:  Justin?

   2              MR. GRAY:  Are you asking subject matter

   3    or substance?

   4              MR. SCHEFF:  Both.

   5              MR. GRAY:  I'm going to need to confer

   6    with Ms. Weddle on that --

   7              MR. SCHEFF:  Understood.  That's fine.

   8              MR. GRAY:  -- if it involved privilege.

   9              MR. SCHEFF:  Understood.

  10              THE VIDEOGRAPHER:  The time is 10:55.  We

  11    are going off the record.

  12              (Recess taken.)

  13              THE VIDEOGRAPHER:  The time is 11:07.  We

  14    are back on the record.

  15              MS. FAIRLESS:  Could you please read back

  16    the last question?

  17              (Requested record read.)

  18              MR. GRAY:  Before she answers, I believe

  19    your question calls for the conversations among Big

  20    Picture -- or, I'm sorry -- Red Rock, Duck Creek,

  21    Bellicose, SourcePoint contemporaneous to that

  22    relationship, and not communications Ms. Weddle may

  23    have had directly with your client.

  24              So to the extent that you're asking about

  25    conversations among that group contemporaneous, we'll
```

Page 110

1    allow her to answer even though we believe that's

2    confidential information.

3              MR. SCHEFF:  That's what I'm asking.

4       A     So there would have been a significant

5    number of conversations over that period of years

6    that demonstrated to me the tribe's control over

7    decision-making.

8              They were not -- the specific matters

9    would have largely related to attorney-client advice,

10   but at all times it was clear to me that I was

11   advising Bellicose, as a service provider, who was in

12   turn providing that information and advice to Red

13   Rock and Duck Creek, and that the individuals

14   responsible for decision-making for Duck Creek and

15   for Red Rock were at all times tribal officials.

16      Q     (BY MR. SCHEFF)  Okay.  I think, in your

17   response, when I asked you to identify who you had

18   these conversations with, you listed Chairman

19   Williams; you listed Shelly Hazen; Craig Mansfield;

20   Rob Rosette, and you said other counsel as well.

21   What other -- Karrie Wichtman.  What other counsel

22   were you referring to?

23      A     I was referring to, perhaps, others from

24   Rosette Law.  I just don't recall any specific

25   conversations that included others from Rosette Law,

Page 111

1    although it's highly likely that over a period of

2    years others were involved.

3         Q    So just so I'm clear, you had

4    conversations on this issue of tribal control of the

5    tribal lending entities with Chairman Williams,

6    Ms. Hazen, Craig Mansfield, and lawyers from Rosette?

7         A    No, I did not have any conversations about

8    tribal control with any of those individuals.  My

9    testimony is that the tribal control was evident from

10   my conversations with those individuals --

11        Q    Ah.

12        A    -- related to the subject matter of the

13   business.

14        Q    So again, let me just be clear so I

15   understand what you're talking about.  So it's not

16   like you had a conversation, for example, with

17   Chairman Williams about the importance or necessity

18   of the tribe having control over the tribal lending

19   entities, but rather the subject matter of

20   conversations demonstrated to you that the tribe had

21   that understanding and was acting in accordance with

22   it?

23        A    That is correct.

24        Q    Okay.  And again, without revealing the

25   substance of conversations, you had similar

1    conversations with your own client?

2         A    Yes.

3         Q    And who from your client, that is, from

4    Bellicose and SourcePoint, did you have those

5    conversations with?

6         A    My recollection is most conversations

7    would have been with Matt Martorello.  Other

8    conversations would also have involved Dan Gravel.

9              MR. SCHEFF:  What's our next exhibit,

10   please?

11             THE REPORTER:  14.

12             MR. SCHEFF:  Okay.

13             (Exhibit 14 marked.)

14        Q    (BY MR. SCHEFF)  And I think --

15             MS. KELLY:  Richard, can you --

16             MR. SCHEFF:  Oh, I'm sorry, Kristi.  I'm

17   sorry.  Rosette 006684.

18             MS. KELLY:  Thank you.

19             MR. GRAY:  This is Exhibit 14?

20             MR. SCHEFF:  Yes, that's correct.

21             Carolyn, I'm going to ask her -- I'm going

22   to go back to the servicing agreement, Exhibit 8, I

23   think she was testifying from.  Thank you.

24        Q    (BY MR. SCHEFF)  Have you read this?

25        A    I have read the document.

1    Justin are putting sticky notes on their laptops to

2    remind them to always copy Craig on emails.

3            Have I read that correctly?

4    A    Yes, you have.

5    Q    What -- why did -- why was that occurring?

6    A    My recollection is that Matt and Justin at

7    that time were communicating only directly with

8    Karrie as counsel, and she wanted to make sure that

9    her clients' principals were also copied on all email

10   communications related to these issues.

11   Q    Did you know why that was?  Did

12   Ms. Wichtman explain why that was her request?

13   A    I don't recall a specific explanation at

14   the time, other than our ongoing mindfulness that the

15   tribal officials had to be fully informed about all

16   matters related to the business.

17   Q    Okay.  Would you then look down to, one,

18   two -- the paragraph that starts with, Matt is going

19   to talk to my partner.

20   A    Yes.

21   Q    Do you have that?

22   A    I do.

23   Q    Have you read that?

24   A    I have.

25   Q    Okay.  Matt is going to talk to my partner

Page 122

1    who is the former regional director for FTC to have

2    him do a federal law compliance audit for RRTL and

3    DCTF to make sure all procedures are federally

4    compliant (which he thinks they already are, but

5    another check is always good).  He will email you,

6    Craig and Shelly about that concept once we flesh it

7    out a little more.

8              Who was your partner who was the former

9    regional director for FTC?

10        A    His name is Claude Wild.

11        Q    Is he still at Greenberg Traurig?

12        A    No, he is not.

13        Q    Where is he now, if you know?

14        A    I do not know.

15        Q    Okay.  Did this audit go forward?

16        A    I do not recall.

17        Q    Why was there thought of doing this audit?

18        A    My recollection is that it was a belt and

19    suspenders layer that Bellicose had had an initial

20    draft of consumer documents prepared by another law

21    firm, not Greenberg Traurig, and we felt it was

22    beneficial, as part of the umbrella of services that

23    Bellicose was providing, to have another layer,

24    another set of eyes, experienced eyes, looking at the

25    FTC-related issues in the consumer loan documents.

Page 123

1     Q     Okay.  Do you know what law firm had
2   prepared consumer loan documents?
3     A     I do not.
4     Q     Okay.  Now, the lens through which someone
5   from the FTC, or formerly with the FTC, would be
6   reviewing things, is that to determine whether they
7   are deceptive or misleading?
8     A     I don't -- I can't speak to what someone
9   with FTC experience would be looking for.  I think
10  anecdotally certainly, yes, those would be broad
11  topics.  But more generally, whether the disclosures
12  met with the FC -- FTC's expectations with respect to
13  parts of the consumer document over which the FTC
14  generally exercises regulatory authority, the
15  advertising statements.
16    Q     During your -- during the time that you
17  and Greenberg Traurig represented Bellicose and
18  SourcePoint, that is, from the end of 2011 until the
19  sale of Bellicose and SourcePoint to the tribe, did
20  you have concerns about whether or not the consumer-
21  facing material and messaging was compliant with
22  federal law?
23    A     No, I did not, and nor do I recall any
24  concerns about that being presented to my partners,
25  who are experienced in those areas.

1      A      Yes.

2      Q      Okay.  Why was that important to you at

3  the time?

4      A      In order for tribal jurisdictional

5  agreements to be enforceable, it is helpful for the

6  contracting parties to be on notice that they are

7  dealing with a tribal entity.  It goes to the

8  fairness of the underlying consumer document if the

9  consumer is on notice that they are doing business

10  with a tribal entity, which cannot be sued.

11      Q      And when you say a tribal jurisdictional

12  argument -- is that what you said?

13             MR. SCHEFF:  Could you look back?  Is that

14  what was said?

15             THE REPORTER:  Tribal jurisdictional

16  agreements.

17      Q      (BY MR. SCHEFF)  Agreements, I'm sorry.

18             What is a tribal jurisdictional agreement?

19      A      It's an agreement where a non-Indian

20  entity consents to tribal adjudicatory jurisdiction.

21      Q      Okay.  Are you familiar with the lawsuit

22  in the Southern District of New York captioned the

23  Otoe Missouria, et al. versus New York Division of

24  Financial Services?

25      A      I am.

Page 127

1          Q      And do you recall -- strike that.

2                 What, if you recall, was the -- strike

3     that.

4                 LVD was a plaintiff in that lawsuit?

5          A      That is correct.

6          Q      If you recall, what was the precipitating

7     event which resulted, or events, which resulted in

8     the filing of that lawsuit?

9          A      I don't believe I can answer that question

10    without violating Rule 1.6.

11         Q      Okay.

12                MR. SCHEFF:  Justin?

13                MR. GRAY:  You're asking for her

14    recollection of why LVD entered that lawsuit?

15                MR. SCHEFF:  No.  I asked what her

16    recollection of was the precipitating event or

17    events.

18                MR. GRAY:  To the extent that you can

19    answer that without divulging privilege between you

20    and your client at that time, feel free to answer,

21    but we believe it is confidential information.

22         A      The precipitating events occurred in

23    August 2013, when the then superintendent of the New

24    York Department of Financial Services, Benjamin

25    Lawsky, sent a number of cease and desist letters to

Page 128

1    consumer lenders around the country and indeed the

2    world, then published that list of letters to New

3    York receiving depository financial institutions

4    under his jurisdiction, suggesting that those banks

5    not honor transactions involving those companies.

6         Q    (BY MR. SCHEFF)  Now, that lawsuit was

7    filed seeking a preliminary injunction; is that

8    correct?

9         A    My recollection is that, yes, the lawsuit

10   sought to enjoin that speech by Superintendent

11   Lawsky.

12        Q    And the preliminary injunction was not

13   granted; is that correct?

14        A    That is correct.

15        Q    And then the Second Circuit did not

16   reverse that decision, correct?

17        A    Correct.

18        Q    As a result of the decision by the

19   Southern District of New York and the Second Circuit,

20   in that case, did that impact your belief that tribal

21   law applied to the consumer contracts between LVD and

22   the LVD tribal lending entities and consumers?

23        A    No, it did not.

24        Q    Why not?

25        A    The issue before Judge Sullivan, at the

Page 129

1    preliminary injunction hearing, was simply whether or

2    not -- an evidentiary issue, whether or not the two

3    tribal plaintiffs had met the preliminary injunction

4    standard to restrain further speech by Superintendent

5    Lawsky.

6            No evidence was presented about the

7    underlying contracts whatsoever.  Seven pages of

8    Judge Sullivan's 11-page order related to an issue

9    the tribal plaintiffs prevailed upon; namely, whether

10   they had standing to question the speech by

11   Superintendent Lawsky.

12           The issue on appeal at the Second Circuit

13   was whether Judge Sullivan had presented the correct

14   preliminary injunction standard, and they found that

15   he did.

16       Q    Okay.  I think this is going to be Exhibit

17   17.

18           (Exhibit 17 marked.)

19           MR. SCHEFF:  Kristi?

20           MS. KELLY:  Yes.

21           MR. SCHEFF:  17 is Rosette 002801.

22       Q    (BY MR. SCHEFF)  Okay.  Take a look at as

23   much of this as you need to, please.

24       A    I see it.

25       Q    Okay.  Now, just -- I want to do a --

Page 130

1    just -- show you some dates, just to give you a frame

2    of reference.

3              The email at the top on Page 1 of the

4    exhibit is from you to Matt Martorello and Karrie

5    Wichtman, a copy to Justin Martorello.  Subject, RRTL

6    and DCTF Legal Opinion, dated Monday, August 19th,

7    2013.

8              Have I identified that correctly?

9      A    Yes.

10     Q    This is -- this email traffic that is in

11   this exhibit occurred after the letter issued by

12   Mr. Lawson but before the lawsuit that was filed; is

13   that correct?

14     A    Superintendent Lawsky.

15     Q    Lawsky, sorry.  I apologize.

16          Is that correct?

17     A    I'm sorry, can you read back the rest of

18   the question?

19          (Requested record read.)

20     A    That is correct.

21     Q    (BY MR. SCHEFF)  Okay.  Now, if you go to

22   the second page of the exhibit, there is a letter to

23   Ms. Jane Larimer, Senior Vice President and General

24   Counsel, AC -- ACH Network Services in Herndon,

25   Virginia, dated August 14th, 2013.

Page 131

1            Have I identified that correctly?

2      A     Yes, you have.

3      Q     And that letter goes on for 14 pages and

4   is the remainder of Exhibit 17; is that correct?

5      A     Yes.

6      Q     Okay.  Now, the letter is on the

7   letterhead of Troy A. Eid, Greenberg Traurig; is that

8   correct?

9      A     That is correct.

10     Q     And I think you identified Mr. Eid as

11  being the former U.S. Attorney for the District of

12  Colorado from 2006 to 2009?

13     A     That is correct.

14     Q     Okay.  And are you familiar with this

15  letter?

16     A     I am.

17     Q     Okay.  Did you participate in drafting

18  this letter?

19     A     I did.

20     Q     Okay.  And was it primarily you and

21  Mr. Eid who drafted it?

22     A     No.  There would have been several dozen

23  lawyers who contributed to this letter at that time.

24     Q     Okay.  My understanding is that this

25  letter was prepared for another client of Greenberg

Page 132

1    Traurig; is that right?

2         A    That is correct.

3         Q    All right.  I don't want to know who that

4    client is.

5              If you look at Page 1 of the exhibit, in

6    the middle of the first page, there's an email from

7    you to Ms. Wichtman, copied to Matt Martorello and

8    justice -- Justin Martorello, dated August 18, 2013,

9    which has some redactions, but refers to the letter:

10   If it's sufficient for me to send him a note that

11   says the same law applies and our views are identical

12   with respect to LVD's operations, I'm happy to do

13   that, or do you think he really needs something

14   different?

15             Have I read that correctly?

16        A    Yes, you have.

17        Q    So the discussion here was to send a copy

18   of this letter, from Mr. Eid to Ms. Larimer, to

19   someone else on behalf of LVD because the views

20   expressed in the letter as to that particular client,

21   whoever it was, were identical as to the views for

22   LVD?

23        A    Yes.

24        Q    Okay.  Now, looking at Page -- okay.  In

25   -- this -- this letter has certain headings within

Page 133

1    it, and on Page 6 of the letter, which is 002807, the

2    heading is Tribal Sovereignty, correct?

3         A    Yes.

4         Q    Okay.  If you turn the page and go to Page

5    7, there is reference on Page 7, in the middle of the

6    page, to the Native American Business Development

7    Act, where Congress made specific findings regarding

8    tribal economic development and the role of federal

9    government and federal agencies in that nation-

10   building pursuit.

11             Is that right?

12        A    That's correct.

13        Q    And the indented portion of the letter, 1

14   through, it looks like, 12, which then goes on Page 8

15   and onto Page 9, is that a direct quote from the

16   American Business -- the Native American Business

17   Development Act?

18        A    Yes, it is.

19        Q    And does this, in your view, reflect

20   federal policy, as of 2000, regarding tribal economic

21   development and the role of the federal government in

22   assisting in that process?

23        A    It reflected federal policy in 2000, and

24   it's still reflected today.

25        Q    Okay.  Before 2000 -- well, I guess, was

Page 134

1    this -- is this a -- this is a statute?

2         A     Yes, it is.

3         Q     And so the specific findings are part of

4    the statute?

5         A     Yes, they are.

6         Q     Okay.  Was federal policy, with respect to

7    tribal economic development and the role of the

8    federal government in promoting that, different

9    before the Native American Business Development Act

10   was passed?

11        A     It was -- it was different many years in

12   the past.  The United States tribal relationship has

13   undergone many iterations.  This particular statute

14   is part and parcel of what we call the so-called

15   self-determination era of tribes, which began with

16   President Nixon and has basically endured since then,

17   designed to make tribes more self-sufficient so that

18   the federal government is less involved with respect

19   to matters involving Native Americans and tribes can

20   sustain their own economies.

21        Q     Did the Native American Business

22   Development Act authorize states to play a role in

23   regulating tribal economic development?

24        A     No, it did not.

25        Q     And the Native American Business

Page 135

1    Development Act relates to tribal economic

2    development as a general matter, as opposed to any

3    particular way or business that a tribe might enter

4    into to promote its economic development; is that

5    right?

6         A    That's correct.  It's a very broad

7    statute.

8         Q    What is the role of the federal government

9    and federal agencies in what is referred to in this

10   letter as the nation-building pursuit?

11        A    Again, it's to increase tribes'

12   self-determination.  The federal government has a

13   trust relationship with Indian tribes, acknowledged

14   by the U.S. Supreme Court since the 1800s, as the

15   relationship of a guardian to his ward.

16        Q    And what does that mean?

17        A    It means the federal government is

18   supposed to be there looking out for tribes, helping

19   tribes, and assisting them in their functioning as

20   governments.

21        Q    And the Native American Business

22   Development Act describes ways that the federal

23   government is supposed to support tribes in that

24   regard, in -- in economic development?

25        A    It does.  It's legislation that was

Page 136

1    introduced by Senator Ben Nighthorse Campbell to

2    encourage tribal economic development.  It's often

3    very difficult, has been historically very difficult

4    to develop business in Indian country for a host of

5    reasons, including land tenure status, taxing

6    authorities, dual taxation, and other issues.

7              So this legislation was aimed at providing

8    both certainty and encouragement to outside entities,

9    in particular, to invest in Indian country and help

10   tribes succeed in their economic development

11   endeavors.

12        Q    When you say entities outside of Indian

13   country, do you mean non-Native American entities?

14        A    Yes, particularly capital markets, service

15   providers, developers, professionals who would go

16   into Indian country and help tribes assist in

17   economic development.

18        Q    Would you, based on your observation of

19   Bellicose and SourcePoint, during the 2011 to early

20   2016 time frame, is it your view that what the tribe,

21   LVD, was hiring Bellicose and SourcePoint to do and

22   what SourcePoint and Bellicose were doing for the

23   tribal lending entities was consistent with the

24   American Business -- Native American Business

25   Development Act?

Page 137

1      A      Yes, it was.

2      Q      Is there anything about it that was

3   inconsistent with the Native American Business

4   Development Act?

5      A      No.

6      Q      So this is a -- well, it doesn't say

7   because it's been redacted.

8             You said that -- you said dozens of

9   Greenberg Traurig lawyers worked on this letter to

10  Ms. Larimer?

11     A      Yes.

12     Q      And I assume that in 2013 -- in August of

13  2013, when this was sent, you agreed with everything

14  that was in this letter?

15     A      To the best of my recollection, yes.

16     Q      And what about today?

17     A      If you want me to go line by line, I'm

18  happy to read it, but my general recollection would

19  be yes, I agreed with everything in this letter.

20     Q      Okay.

21     A      And I think my testimony was more than a

22  dozen, not dozens.  I should clarify that as well.

23     Q      I'm sorry, I didn't hear what you said.

24     A      It's more than a dozen.

25     Q      Oh, I'm sorry.

Page 138

1        A      Not dozens, plural.

2        Q      Got it.  I understand.  Thank you.

3               So if you look at Pages 10 -- so, I'm

4     sorry.  I don't want to -- I'm sorry for asking

5     such -- what might appear to be such basic questions.

6     How does the Native American Business Development Act

7     relate to tribal sovereignty?

8        A      So it's specific in the findings that

9     Congress made that -- and it's in Subparagraph 4 on

10    Page 7, Consistent with the principles of inherent

11    tribal sovereignty and the special relationship

12    between Indian tribes in the United States, Indian

13    tribes retain the right to enter into contracts and

14    agreements, to trade freely and seek enforcement of

15    treaty and trade rights.

16       Q      Okay.  Thank you.

17              If you look at Page 12 of this opinion, in

18    the, one, two -- third full paragraph that starts,

19    Instead, federal law permits?

20       A      Yes.

21       Q      Do you see that?

22              Do you see that the last sentence reads,

23    They represent another category of loans under the

24    laws of the United States that may be made to

25    residents of New York without regard to New York

Page 139

1    usury law.

2              Have I read that correctly?

3       A     You have.

4       Q     And the category of loans that are

5    referred to are loans made by tribal lending entities

6    or Indian tribes as sovereigns?

7       A     Correct.

8       Q     Okay.  All right.  Do -- do you know

9    whether this letter to Ms. Larimer was sent out to

10   whomever the intended or the -- the recipient was

11   that was being talked about in the email traffic on

12   the first page of Exhibit 17?

13      A     I do not know.

14      Q     You don't know one way or the other?

15      A     I don't recall.

16      Q     Okay.

17            MR. SCHEFF:  Let's mark Exhibit 18.

18            (Exhibit 18 marked.)

19            MR. SCHEFF:  Kristi, 18 is Martorello

20   012696.  Okay.

21            MS. KELLY:  Thank you.

22            MR. SCHEFF:  You're welcome.

23      Q     (BY MR. SCHEFF)  Ms. Weddle, this is a

24   letter dated November 30, 2012, to Alpha Credit

25   Resources --

1        A     Yes.

2        Q     -- on Greenberg Traurig letterhead.  And

3    on the last page it purports to bear your signature

4    on behalf of the firm.

5        A     That's correct.

6        Q     Is that your signature?

7        A     Yes, it is.

8        Q     Okay.  Did you write this letter?

9        A     In conjunction with numerous other

10   Greenberg Traurig shareholders & Associates who

11   contributed to it, yes.

12       Q     Okay.  And this letter was sent out after

13   the district court decision in the Otoe versus New

14   York DFS case?

15       A     That's incorrect.

16       Q     Okay.  Oh, it's before.  I'm sorry.  I

17   apologize.  It's the year before.

18             Second full paragraph, We have acted as

19   Indian law counsel in connection with the

20   transactions provided for in the loan agreement for

21   Bellicose VI, Inc., the parent company of SourcePoint

22   VI, LLC, the guarantor of borrower's obligations

23   under the loan agreement, paren, guarantor --

24       A     Yes.

25       Q     -- close paren.

Page 141

1          Have I repre- -- have I stated that

2     accurately?

3          A     Yes.

4          Q     Okay.  Please turn to the last page,

5     No. 9.  The consumer loans made by the borrower

6     pursuant to the consumer loan documents are

7     enforceable under the tribe's laws.

8          Have I read that correctly?

9          A     Yes.

10         Q     The borrower in this instance was the

11    tribal lending entity; is that right?

12         A     That is correct.

13         Q     And the consumer loans referenced were the

14    consumer loans that the tribal lending entity was

15    making to consumers, correct?

16         A     Yes.

17         Q     And that would be Red Rock and Duck

18    Creek's consumer loans?

19         A     I don't recall if Duck Creek was part of

20    this borrowing facility.  I know it included Red

21    Rock.

22         Q     Got it.  Why was this letter sent out?

23         A     It was a legal opinion required for the

24    underlying transaction for which Bellicose was a

25    guarantor.

```
                                                    Page 143
1    this, correct?
2         A     Yes.
3         Q     Okay.  Do you know why Rebecca Martorello
4    was asked to sign this agreement, this document?
5         A     I do not know.
6         Q     Okay.  Turn to Rosette 000150.  You see it
7    says, The undersigned Rebecca LeAnn Martorello, the
8    spouse of MM herein, hereby executes this Agreement
9    solely in her capacity as the spouse for MM and
10   solely and exclusively for the purposes of 3(i)
11   within.
12              Have I read that correctly?
13        A     Yes.
14        Q     Did Rebecca Martorello have to sign
15   because she owned assets with her husband?
16        A     I don't know.
17        Q     Would Ben Huber be a logical person to ask
18   about that?
19        A     My guess would be yes.
20        Q     Thank you.
21              Are you familiar with cases that were
22   filed against a company called Western Sky?
23        A     I am generally familiar with litigation
24   involving Western Sky, yes.
25        Q     What is Western Sky, or what was Western
```

Page 144

1    Sky?

2         A      To my knowledge, based on reading the

3    litigation opinions and materials, Western Sky was a

4    South Dakota LLC that engaged in consumer lending

5    business.

6         Q      Was it a tribal lending entity, according

7    to the documents that you reviewed?

8         A      No.

9         Q      And why do you say that?

10        A      Because it was a South Dakota LLC formed

11   by Native American individuals that had no aspects of

12   sovereignty attached to it.  It was not formed by a

13   tribal government or on behalf of or for a tribal

14   government.

15        Q      So therefore, Western Sky would not be

16   deemed an arm of the tribe?

17        A      No, it would not.

18        Q      Okay.  The litigation involving Western

19   Sky, did there come a point in time in 2013 when

20   there was adverse -- there was an adverse ruling with

21   respect to a Colorado Western Sky case?

22        A      Yes, there was.

23        Q      And at that time was that the only

24   litigation against Western Sky, that you recall, by

25   Colorado?

Page 145

1        A     I believe it was the only Colorado-
2   connected litigation against Western Sky, but there's
3   been a great deal of litigation around the country
4   related to Western Sky.
5        Q     And did you believe at the time, that is,
6   in 2013, when the Colorado ruling came out with
7   respect to Western Sky, that -- did that cause you to
8   question your belief in -- that tribal law applied to
9   the consumer lending contracts between Red Rock, Duck
10  Creek and consumers?
11       A     No.
12       Q     Why not?
13       A     Because Western Sky was at no point a
14  tribal entity, and irrelevant to any legal
15  consideration of what a tribe's entity should do
16  compliant with another tribe's laws.
17       Q     Did you discuss that, that conclusion that
18  you've just stated, with officials of LVD at the time
19  and lawyers at Rosette?
20       A     I don't believe I can answer that question
21  without violating Rule 1.6.
22            MR. SCHEFF:  Justin?
23            MR. GRAY:  I believe the question is
24  asking if you did discuss it and we believe it's
25  confidential, but we'll allow you to answer it.

1      A      Yes, I did.

2      Q      (BY MR. SCHEFF)  And what were the --

3   first of all, who did you have those discussions

4   with?

5      A      My recollection would be certainly Karrie

6   Wichtman, and I think she also had principals of her

7   client and colleagues involved in those

8   conversations, but I don't recall the specifics of

9   exactly who participated in one conversation or

10  another.

11     Q      Did you also have conversation by email?

12     A      I'm certain that we did, although I don't

13  remember specific emails --

14     Q      Okay.

15     A      -- six years later.

16     Q      Okay.

17            MR. SCHEFF:  Can you mark this as 20,

18  please?

19            (Exhibit 20 marked.)

20            Kristi, this is Rosette 037187.

21            MS. KELLY:  Thank you.

22     Q      (BY MR. SCHEFF)  Ms. Weddle, could you

23  just take a look at this, please, and familiarize

24  yourself with the document?

25     A      Okay.

Page 147

1    Q    Okay.  The top, just for purposes of
2    identification, is an email from Mr. Martorello to
3    Ms. Wichtman dated April 16, 2013, forwarding an
4    email of the same date from you to, it looks like to
5    you.
6    A    Yes.
7    Q    So when you -- I assume that, and correct
8    me if I'm wrong, this email that you've just looked
9    at, which is Page 1 of Exhibit 20, that's an email
10   that you sent to a number of people, including
11   Mr. Martorello, regarding this Western Sky case?
12   A    I would assume their -- whoever the
13   recipients were were listed in a bcc line.
14   Q    Right.  Is that something that you
15   commonly did when there was something that occurred
16   sort of in the American -- American Indian law realm
17   that was noteworthy to talk about or offer a view on?
18   A    Yes.
19   Q    And do you continue to do that today?
20   A    Sometimes, yes.
21   Q    Okay.  And who generally are the
22   recipients -- I don't -- I'm not looking for any
23   specific names, but what categories of people
24   typically are recipients of emails like this?
25   A    Clients, other attorneys in the space, and

1    sometimes tribal leaders represented by other counsel

2    when their counsel is also blind-copied or copied.

3         Q    Okay.  So if you would, please, look at

4    the last paragraph of the email, the third line,

5    where you say, And we all know that the nature of

6    Western Sky's business and arguments is much

7    different than that of sovereign lenders operating as

8    arms of the tribe.

9         A    Yes.

10        Q    Have I read that correctly?

11        A    Yes.

12        Q    And that's the differences that you

13   described from your memory about the Western Sky

14   model before I marked this exhibit, correct?

15        A    Yes.

16        Q    Okay.  Nothing to add to that, as a result

17   of reading Exhibit 20?

18        A    No.

19        Q    Okay.  Thank you.

20             I should have asked you this before.  By

21   the way, have you read Judge Payne's memorandum

22   opinion in this case from May 3rd, 2019?

23        A    Yes, I have.

24        Q    Okay.  Do you agree that you participated

25   in furthering an unlawful lending enterprise?

1       A       No.

2       Q       Do you believe that there was anything

3   unlawful about the Red Rock or Duck Creek lending

4   enterprise?

5       A       No.

6       Q       And I assume you didn't believe it during

7   the time that you were representing Bellicose and

8   SourcePoint, and you don't believe that today either;

9   is that correct?

10      A       That's correct.

11      Q       Do you believe that Mr. Martorello was the

12  -- structured a rent-a-tribe lending scheme with Red

13  Rock and Duck Creek?

14      A       No.

15      Q       Are you familiar with the term "rent a

16  tribe"?

17      A       Yes, I am.

18      Q       What do you understand that to mean?

19      A       It is a pejorative term borrowed from the

20  so-called rent-a-bank context in which some

21  unscrupulous outsiders pay for the use of the tribe's

22  sovereignty without any involvement of the tribe

23  itself, no regulatory infrastructure, no employees,

24  no substantive knowledge of the business.

25      Q       And based on your observation during the

Page 150

```
 1    time period that you were representing Bellicose and

 2    SourcePoint, you do not believe that would accurately

 3    be ascribed to Red Rock, Duck Creek, Bellicose and

 4    SourcePoint?

 5         A      That's correct.

 6         Q      Bear with me one second, please.  I'm

 7    sorry.

 8                And why don't you think that should

 9    accurately be ascribed to the lending enterprise, the

10    Red Rock and Duck Creek lending enterprise?

11         A      As I say, it's a pejorative term.  I don't

12    know any tribe that rents out its sovereignty.

13    Sovereignty is the most sacred value that tribes

14    hold.  It's what makes you a tribe.  It's your value

15    for generations.  And I've never seen tribal leaders

16    act carelessly or recklessly with respect to their

17    sovereignty.

18                Instead, tribes exercise their sovereignty

19    by engaging in activity, such as this, and everything

20    I've ever known or observed about the Lac Vieux

21    Desert tribal lead- -- leadership says to me that

22    they have the utmost integrity and well-being of

23    their people in mind, and I've never seen them take

24    any action that would hinder or impede their

25    sovereignty.
```

1       Q     (BY MR. SCHEFF)  And you said, I don't

2   believe I can answer that without getting into 1.6.

3       A     My recollection, without violating

4   attorney-client privilege and sticking to

5   confidential information only, was that, yes, it was

6   a result of Judge Payne's decision.

7       Q     Judge Payne or --

8       A     Judge Payne.  Excuse me, Judge Sullivan's

9   decision, but not any coin- -- coinciding or

10  resultant belief regarding the legality of lending.

11  Rather, no one's understanding of the legality of

12  lending had changed, but rather it was an agreement

13  to stop fighting that issue in New York at that time.

14      Q     Okay.

15          MS. KELLY:  Richard, I would just -- I

16  would like to put on the record that it's my

17  understanding that your position is you've noticed

18  this deposition and you can use the time you want,

19  but I would like to reserve time for

20  cross-examination.

21          I've also separately noticed Ms. Weddle's

22  deposition, and if you do not want to split time, I

23  am fine taking my seven hours on another date, as

24  soon as we can, practically after -- since we have

25  served the subpoena and in accordance with Judge

Page 164

1       A      I do not know.

2       Q      Did Red Rock or Duck Creek have compliance

3    counsel?

4       A      I do not know.

5       Q      Did you provide any compliance advice or

6    assistance to Bellicose and SourcePoint?

7       A      Not that I recall.  Whether others at

8    Greenberg Traurig may have done that over the course

9    of time, I don't recall either.

10      Q      Okay.  Did you provide any compliance

11   assistance or advice to Red Rock or Duck Creek?

12      A      Not that I recall.

13      Q      Okay.  Did you participate in assisting

14   the tribal lending entity, that is Red Rock and Duck

15   Creek, to respond to consumer complaints?

16      A      I don't believe I can answer that without

17   violating Rule 1.6.

18              MR. SCHEFF:  Justin?

19              MR. GRAY:  The question is whether you

20   assisted.  We believe it's confidential, but we'll

21   allow you to answer.

22      A      Yes, I did.

23      Q      (BY MR. SCHEFF)  And what did you do?

24      A      Occasionally, and not with regularity, I

25   would discuss with Ms. Wichtman, and I think others

Page 165

1    at the Rosette Law Firm, various communications that

2    may have come in from state regulatory authorities,

3    and either reviewed their draft responses or

4    otherwise assisted in discussing what appropriate

5    responses would be on behalf of the tribal lending

6    entity.

7         Q    And why did you do that?

8         A    It was part of the general services that

9    Bellicose was providing to try to provide perspective

10   and assistance to the tribal lending entity.

11        Q    Would you ever draft responses for the

12   tribal lending entity to provide to the Rosette Law

13   Firm?

14        A    Someone at the firm may have.  We may

15   have.  I don't have a recollection of any specific

16   response that I personally was involved in drafting.

17        Q    Okay.  Let's --

18             MR. SCHEFF:  Let's mark this as Exhibit

19   21 -- 22?  I'm sorry, 22.

20             (Exhibit 22 marked.)

21             MR. SCHEFF:  Kristi, it's Rosette 035384.

22             MS. KELLY:  It's 035384?

23             MR. SCHEFF:  I'm sorry.  Yes, 035384,

24   Rosette.

25             MS. KELLY:  Okay.  Thanks.

Page 171

1    has no bearing on his loan.

2              Do you know why you said that?

3        A     I don't recall at this time, no.

4        Q     Okay.  Would, in your view, state law have

5    a bearing on any of the loans made by Red Rock or

6    Duck Creek, as of this point in time, July of 2012?

7        A     It should not have.  My best guess is that

8    this is a not atypical customer issue that arises

9    when customers move across state lines and they get

10   counsel familiar with one state's law versus another,

11   which is a source of confusion, especially when

12   overlaid with tribal choice of law provisions in the

13   consumer loan document.

14       Q     Okay.

15       A     But abstracted without attachments or any

16   record of what the drafts were, I really couldn't say

17   more.

18       Q     Okay.  Do you also remember providing

19   assistance or drafting responses to letters that came

20   in from Attorney Generals' offices?

21       A     Generally, yes, I do.

22       Q     And how were those letters handled?

23       A     I could not answer that question without

24   violating Rule 1.6.

25              MR. SCHEFF:  Justin?

1          MR. GRAY:  You're asking about the

2     procedure that they were handled, we believe that's

3     confidential, but we'll allow her to answer.

4          Q    (BY MR. SCHEFF)  Ms. Weddle?

5          A    My general understanding was that

6     correspondence was received by the tribe at the

7     tribal offices, in which case Rosette Law would work

8     with the tribal officials to formulate responses.

9               When they encountered something that was

10    new or different or particularly concerning for some

11    reason, they would consult Bellicose, based on prior

12    industry experience, and also on occasion involve

13    Greenberg Traurig, not only from an Indian law

14    perspective and -- and frankly, probably not very

15    often from an Indian law perspective, which was their

16    area of expertise, but would instead seek input from

17    consumer finance experts within our firm to assist in

18    those responses.

19         Q    Do you recall any of the Attorney General

20    letters ever taking the position that state law

21    applied to the loan?

22         A    I don't recall any particular letters

23    pertaining to Lac Vieux Desert.  Generally, across

24    the industry, it is not unusual for states to take

25    that position, and most tribal lenders, that I'm

Page 173

1    familiar with, will frequently respond to those

2    states in written correspondence, explaining why

3    that's legally incorrect, and then offer to meet with

4    those state officials to resolve any remaining issues

5    following their responsive correspondence.

6         Q    Is that your understanding of what

7    officials from LVD did?

8         A    I am unaware of what communications with

9    state officials LVD may have had.

10        Q    Did you ever have communications with

11   state officials to that effect on behalf of LVD,

12   Bellicose or SourcePoint?

13        A    Not that I recall.

14        Q    What about on behalf of Red -- Red Rock or

15   Duck Creek?

16        A    I don't believe I had communications with

17   anyone on behalf of Red Rock or Duck Creek.

18        Q    Okay.  Let me direct your attention --

19   you're familiar with the CFPB; is that correct?

20        A    With the Consumer Financial Protection

21   Bureau, yes, I am.

22        Q    Yes.  And are you aware of any interaction

23   between the CFPB and Red Rock and Duck Creek?

24        A    I'm familiar with Chairman James Williams'

25   participation in the SBREFA panel for the Consumer

1    Bureau was broadly established by Congress to protect

2    consumers and engage in a variety of enforcement and

3    other activities; that statute, Dodd Frank, is a

4    federal statute of general applicability that defines

5    tribes as states within it.  Defines tribes as

6    regulators and not merely the regulated.

7        Q    And what is the significance of that to

8    the issue of whether or not the CFPB can decide or

9    dictate what law applies to a loan to a consumer made

10   by a tribal lending entity?

11       A    The CFPB is not inserting itself into

12   consumer contracts or dictating choice of law

13   provisions in consumer contracts.  Rather, their

14   concerns are the panoply of federal consumer

15   protection laws that exist.

16       Q    Now, you're familiar with a civil action

17   brought by the CFPB against Golden Valley?

18       A    I am.

19       Q    And Golden Valley is a tribal lending

20   entity of Upper Lake; is that correct?

21       A    To the best of my knowledge, which stems

22   from allegations in that complaint and interactions

23   in the industry, yes.

24       Q    Okay.  Did you coauthor an Amicus brief in

25   that matter?

Page 179

1      A      Yes, I did.

2      Q      And who did you -- who did you submit that

3   brief on behalf of?

4      A      I have been authorized to indicate that I

5   represented the National Congress of American Indians

6   on that brief.

7      Q      Okay.

8             MR. SCHEFF:  Let's mark what is Exhibit

9   52.

10            MS. FAIRLESS:  52?

11            MR. SCHEFF:  I'm sorry, it's not.  It's --

12            MS. FAIRLESS:  25?

13            MR. SCHEFF:  -- 25.  I apologize.

14            MS. FAIRLESS:  I didn't know if you had

15   marked a bunch when we were out of the room.

16            MR. SCHEFF:  Didn't do that.  Didn't do

17   that.

18            (Exhibit 25 marked.)

19      Q      (BY MR. SCHEFF)  Ms. Weddle, take a look

20   at Exhibit 25, please.

21            MR. SCHEFF:  Kristi, that's the NCAI

22   Amicus brief in the Golden Valley case.

23            MS. KELLY:  Okay.

24      Q      (BY MR. SCHEFF)  Is this the brief that

25   you and others submitted on behalf of the NCAI?

1        A     Yes, it is.

2        Q     And do you -- and this was submitted in, I

3   think, November or December of 2017?

4        A     That's correct.

5        Q     And does it accurately state your belief

6   with respect to tribal sovereignty in tribally made

7   loans?

8        A     Yes, it does.  It reflects the belief

9   asserted by my client in this matter, the National

10  Congress of American Indians.

11       Q     And do you concur with that belief?

12       A     Yes.  This is the most accurate legal

13  advice that we provided to the National Congress of

14  American Indians.

15       Q     Okay.  Now, this brief was submitted years

16  after the Otoe Missouria case, which you've testified

17  about previously, correct?

18       A     Yes, that's correct.

19       Q     And it was submitted after the Western Sky

20  litigation; is that correct?

21       A     It's submitted after a significant amount

22  of Western Sky litigation, although significant

23  Western Sky litigation endures presently.

24       Q     Are you aware of litigation relating to

25  Cash Call?

Page 181

1        A      Yes, I am.

2        Q      And does the outcome of that litigation

3    impact your view at all as to whether the lending

4    being done by Red Rock and Duck Creek was lawful or

5    unlawful?

6        A      No, it does not.

7        Q      So it does not affect your belief that the

8    loans to consumers that you've testified about were

9    lawful under tribal law?

10       A      No, it does not.

11       Q      Why not?

12       A      Because Cash Call purchased loans from

13   nontribal entities immediately upon their issuance.

14   At least that is the allegations that have been

15   recited in court and found by numerous courts

16   repeatedly.

17              They purchased loans originated by South

18   Dakota LLCs.  And my understanding of that

19   litigation, the Cash Call litigation, from various

20   forums, is the courts were looking at whether it was

21   appropriate to set aside the choice of law provision

22   in the consumer contracts under the Restatement

23   (Second) of Contracts, as well as applicable

24   precedents from those jurisdictions.

25              And none of that applies to instances in

Page 182

1   which the Lac Vieux Desert tribe, as a sovereign

2   government, is involved.  None of that relates to the

3   tests on materially greater interests of the

4   sovereign government whose law is asserted in the

5   choice of law provision.

6          Q     What do you mean by that last statement?

7          A     That is, in part, one of the tests flowing

8   from the Restatement (Second) of Contracts.  I think

9   it's Subcomment B, if I recall correctly off the top

10  of my head, where, when you're choosing between two

11  different forums and you're measuring the contacts of

12  the two different forums and their interest in having

13  their law apply in a given contract, that's one of

14  the interests that you look for, is whether the -- in

15  this case, the usury law is fundamental to state

16  public policy, and even if it is, that state must

17  still have a materially greater interest in the

18  underlying loan or contract than in this case the

19  tribe, which, under my analysis of the facts,

20  circumstances and the totality of Lac Vieux Desert's

21  interest in the lending business, could never obtain.

22         Q     You're familiar with an individual named

23  Scott Tucker?

24         A     I am aware of who Mr. Tucker is.  I've

25  never met or been familiar with him.

Page 183

1       Q      You're aware that Mr. Tucker was convicted

2    of certain crimes in U.S. District Court relating to

3    a lending operation that he was involved with?

4       A      Yes, I am.

5       Q      Does -- do any of the circumstances or

6    your knowledge relating to the Scott Tucker case

7    impact your view as to whether or not the loans made

8    by Red Rock and Duck Creek were lawful?

9       A      I cannot answer that question without

10   violating Rule 1.6.

11      Q      Okay.

12             MR. SCHEFF:  Justin, would you weigh in

13   here?

14             MR. GRAY:  I believe that's confidential,

15   but we'll allow her to answer.

16      A      My knowledge and analysis of that case

17   comes from the firm's representation of a testifying

18   witness in that case, and I cannot answer without

19   violating Rule 1.6.

20      Q      (BY MR. SCHEFF)  Okay.  Thank you very

21   much.

22             What about, you're familiar with an

23   individual names Charles Hallinan?

24      A      I am aware of who Mr. Hallinan is.  I've

25   never met or been familiar with Mr. Hallinan.

Page 184

1      Q      You're aware that Mr. Hallinan has been
2  convicted of certain federal crimes --
3      A      Yes, I am.
4      Q      -- in connection with a lending operation?
5      A      Yes, I am.
6      Q      Do you believe any of the circumstances
7  relating to Mr. Hallinan's conviction bear on the
8  lawfulness of the loans made by Red Rock and Duck
9  Creek?
10     A      No, I do not.
11     Q      And why is that?
12     A      I cannot answer without violating Rule 1.6
13  due to the firm's representation of testifying
14  witnesses in that matter.
15     Q      Okay.  Thank you.
16            MR. GRAY:  And I don't believe that 1.6
17  claim relates to my clients but...
18            MR. SCHEFF:  No, it doesn't sound like it
19  does.
20            MR. GRAY:  Thank you.
21     Q      (BY MR. SCHEFF)  Are you familiar with
22  efforts made by Bellicose and SourcePoint to prepare
23  for a potential audit by the CFPB?
24     A      Not that I recall.
25     Q      Are you aware of any efforts that Red Rock

1  by my client.  I'll advise her not to answer.

2       Q    (BY MR. SCHEFF)  Okay.  Ms. Weddle, as I

3  have been listening to your testimony all day, you

4  have said that the various pieces of litigation that

5  were out there, Cash Call, Western Sky, the New

6  York -- the Otoe versus New York DFS case, and other

7  sort of enforcement noise, Operation Chokepoint, et

8  cetera, never caused you to believe that the LVD

9  tribal lending entities were doing anything illegal;

10 is that correct?

11      A    That is correct.

12      Q    And you maintain --

13           MS. KELLY:  Objection to the form.

14      Q    (BY MR. SCHEFF)  And you maintain that

15 belief today?

16      A    That is correct.

17      Q    And that belief is -- also would apply to

18 Bellicose and SourcePoint?

19      A    Yes.

20           MR. SCHEFF:  I have nothing further.

21           MS. FAIRLESS:  Does anyone else have any

22 questions?

23                          EXAMINATION

24 BY MS. KELLY:

25      Q    Ms. Weddle, this is Kristi Kelly.  I'm

Page 244

1            I, JENNIFER WEDDLE, do hereby certify that

2      I have read the foregoing transcript and that the

3      same and accompanying amendment sheets, if any,

4      constitute a true and complete record of my

5      testimony.

6

7

8

                  _____

9                      Signature of Deponent

                       ( ) No Amendments

10                     ( ) Amendments Attached

11            Acknowledged before me this

12      _____ day of _____, 2019.

13

14            Notary Public: _____

15            My commission expires _____

16            Seal:

17

18

19

20

21

22

23

24

25      Job No. CS3302797

1   STATE OF COLORADO)                              **Page 245**

2                   )   ss.     REPORTER'S CERTIFICATE

3   COUNTY OF DENVER )

4           I, Pamela J. Hansen, do hereby certify that

5   I am a Registered Professional Reporter and Notary

6   Public within the State of Colorado; that previous to

7   the commencement of the examination, the deponent was

8   duly sworn to testify to the truth.

9           I further certify that this deposition was

10  taken in shorthand by me at the time and place herein

11  set forth, that it was thereafter reduced to

12  typewritten form, and that the foregoing constitutes

13  a true and correct transcript.

14          I further certify that I am not related to,

15  employed by, nor of counsel for any of the parties or

16  attorneys herein, nor otherwise interested in the

17  result of the within action.

18          In witness whereof, I have affixed my

19  signature this 22nd day of May, 2019.

20          My commission expires September 3, 2022.

21

22          *Pamela J. Hansen*

23          Pamela J. Hansen, CRR, RPR, RMR
            216 - 16th Street, Suite 600
            Denver, Colorado  80202

24

25

Page 246

1           Veritext Legal Solutions
            290 W. Mt. Pleasant Ave. - Suite 3200
2           Livingston, New Jersey 07039
            Toll Free: 800-227-8440  Fax: 973-629-1287

3

4

    May 22, 2019

5

    To: Carolyn J. Fairless

6

    Case Name: Williams, Lula v. Big Picture Loans, Llc, Et Al

7

    Veritext Reference Number: 3302797

8

    Witness:  Jennifer  Weddle       Deposition Date:  5/20/2019

9

10  Dear Sir/Madam:

11  The deposition transcript taken in the above-referenced matter, with
    the reading and signing having not been expressly waived, has been
12  completed and is available for review and signature.  Please call our
    office to make arrangements for a convenient location to accomplish
13  this or if you prefer a certified transcript can be purchased, which
14  can be sent to you or the deponent directly.

15

16  If the jurat is not returned within thirty days of your receipt of
17  this letter, the reading and signing will be deemed waived.

18

19  Sincerely,

20

21  Production Department

22

23  Cc: Richard L. Scheff
24      Kristi Kelly
25      Justin Gray