# EXHIBIT B

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF VIRGINIA

 3   LULA WILLIAMS, GLORIA TURNAGE,    ) CASE NO: 3:17-cv-461

 4   GEORGE HENGLE, DOWIN COFFY, and   )

 5   FELIX GILLISON, JR. on behalf of  )

 6   themselves and all individuals    )

 7   similarly situated,               )

 8              Plaintiffs,            )

 9   -vs-                              )

10   BIG PICTURE LOANS, LLC; MATT      )

11   MARTORELLO; ASCENSION TECHNOLOGIES)

12   INC.; DANIEL GRAVEL; JAMES        )

13   WILLIAMS, JR.; GERTRUDE McGESHICK;)

14   SUSAN McGESHICK; and              )

15   GIIWEGHZHIGOOKWAY MARTIN,         )

16              Defendants.            )

17   _____ )

18           VIDEOTAPED DEPOSITION OF DANIEL GRAVEL

19                      Washington, DC

20                      April 5th, 2019

21                        10:00 a.m.

22   REPORTED BY:  ALEXANDRIA KAAN
```



1   A.  No.

2   Q.  Do you consider yourself an expert in the

3   relationship -- strike that.

4       Do you have an understanding of the term "Tribal

5   sovereign unity"?

6   A.  Yes.

7   Q.  What is your understanding?

8   A.  That the tribe is an entity that has its own laws

9   and regulations that apply to anyone on tribal land who

10  might agree to abide by tribal law, essentially.  And

11  that state law cannot supersede tribal law.

12  Q.  When you were with Bellicose VI or Bellicose

13  Capital, did you believe that the lending activities of

14  Red Rock and Duck Creek were illegal?

15  A.  No.

16  Q.  At any time that you were with Bellicose Capital

17  or Bellicose VI, did you believe that you were engaging

18  in any illegal activity?

19  A.  No.

20  Q.  During the time that you worked at Bellicose

21  Capital and Bellicose VI, did you believe that Bellicose

22  VI or Bellicose Source Point as an entity was engaging



```
 1   in illegal activity?
 2      A.  No.
 3      Q.  Did anyone ever suggest to you that in fact Red
 4   Rock and Duck Creek were engaging in illegal activity?
 5      A.  No.
 6      Q.  Did anyone suggest to you that you were engaging
 7   in illegal activity?
 8      A.  No.
 9      Q.  Did anyone suggest to you that Bellicose VI and
10   Bellicose Capital were engaging in illegal activity?
11      A.  No.
12      Q.  Did Matt Martorello ever say anything to you that
13   suggested to you that Mr. Martorello believed that
14   tribal law did not apply to the lending contracts
15   between Red Rock and consumers, and Duck Creek and
16   consumers?
17      A.  No.
18      Q.  Did Mr. Martorello ever say anything or do
19   anything which led you to believe that he believed that
20   his conduct in connection with Bellicose VI and
21   Bellicose Capital was in any way illegal?
22      A.  No.
```



DANIEL GRAVEL  
LULA WILLIAMS vs BIG PICTURE LOANS  
April 05, 2019  
75

```
 1  guidance?
 2            MS. KELLY:  Object to the form.
 3     A.  No.  The whole purpose of the compliance program
 4  and engaging with the third-party compliance consultant
 5  was to ensure compliance with federal law and
 6  regulation.
 7  BY MR. SCHEFF:
 8     Q.  Have you ever heard of Operation Chokepoint?
 9     A.  Yes.
10     Q.  What did you have an understanding of what
11  Operation Chokepoint was?
12     A.  My recollection is that it was an effort by the
13  Department of Justice, I believe, to influence banks and
14  payment processors not to work with certain lending
15  entities.
16     Q.  Including tribal lending entities?
17     A.  From what I remember, yes.
18     Q.  Let's go back to the CFPB for a second.  Based on
19  your understanding of CFPB guidance or regulations, did
20  that in any way change your view as to whether or not
21  you were engaging in any illegal activity?
22     A.  No.
```



1    Q.  Did it change your belief as to whether or not
2  Bellicose VI or Source Point was engaging in illegal
3  activity?
4    A.  No.
5    Q.  Did it change your belief as to whether Red Rock
6  or Duck Creek was engaging in any illegal activity?
7    A.  No.
8    Q.  Same questions for Operation Chokepoint:
9  Anything you understand for Operation Chokepoint impact
10 or change or affect your belief in whether or not
11 Bellicose VI or Source Point were engaging in illegal
12 activity?
13   A.  No.
14   Q.  What about Red Rock or Duck Creek?
15   A.  No.
16   Q.  Do you have an understanding of what happened
17 with Operation Chokepoint?
18   A.  I don't recall what happened.
19   Q.  Does it still exist today, as far as you know?
20   A.  I don't believe it does, but I'm not sure.
21   Q.  Have you ever heard that Congress has criticized
22 Operation Chokepoint as an overreaching activity by the



1    Department of Justice and FDIC?
2        A.   I believe I did hear that.
3        Q.   When did you hear that?
4        A.   I believe sometime after I left Bellicose.
5        Q.   Are you familiar with a lawsuit that LVD and
6    another tribe called the Otto Missouri filed against the
7    New York Division of Financial Services?
8        A.   I have a vague recollection of it.
9        Q.   What do you remember about it, if anything?
10       A.   Nothing really.  I saw an e-mail yesterday sort
11   of related to that, but I don't recall what the case was
12   about or really what LVD's involvement was.
13       Q.   Is there anything that you remember about the
14   case against the New York Division of Financial Services
15   which either changed your view, then or now, about
16   whether or not you were engaging in any illegal
17   activity?
18       A.   No.
19       Q.   Is there anything about the New York Division of
20   Financial Services case that you knew, then or now,
21   which affected your belief about whether the activities
22   of Bellicose VI or Bellicose Capital were illegal?



```
 1    A.   No.
 2    Q.   What about Red Rock or Duck Creek?
 3    A.   No.
 4    Q.   Can we mark this as Exhibit 1, Exhibit 2, and
 5  Exhibit 3, please?
 6       (Whereupon Exhibit Nos. 1 through 3 are marked for
 7                    identification.)
 8    Q.   So Mr. Gravel, I'd like you to take a look at
 9  what's been marked as Exhibit 1, which bears -- you're
10  familiar with Bates labelling.  Is that right?
11    A.   Yes.
12    Q.   Lower right-hand corner of the first page says
13  Rosette 002699.  Do you have that?
14    A.   Yes, I do.
15    Q.   And where it all starts is on the last page,
16  which is Rosette 002705.  Can you look at this document
17  and just familiarize yourself with this document,
18  please?
19    A.   Okay, I've read it.
20    Q.   Does reading Exhibit 1 refresh your recollection,
21  in any respect, with respect to the New York litigation?
22    A.   No, it doesn't.
```



```
 1   AG that was being aggressive.
 2      Q.   Were those recommendations, if any that were made
 3   like that, made because of a belief that you had that
 4   Bellicose VI or Bellicose Capital was engaging in
 5   illegal activity?
 6              MS. KELLY:   Object to the form.
 7      A.   No.
 8   BY MR. SCHEFF:
 9      Q.   So how can you reconcile the recommendation with
10   not having a belief that Bellicose VI or Bellicose
11   Capital was engaging in illegal activity?
12      A.   Because while we believed that Bellicose VI and
13   Bellicose Capital were engaging in perfectly legal
14   activities and that the tribal entities were engaging in
15   perfectly legal activities, my recollection is that we
16   may have decided it wasn't worth the time and effort of
17   having to deal with state regulators who disagreed with
18   us.
19      Q.   And -- strike that.
20           Take a look, would you please, at Exhibit 2.
21   Just if you could read that and familiarize yourself
22   with that.  We're going to need to take a break soon
```



```
 1   well, or just the e-mail?
 2       Q.   Review as much as you need to familiarize
 3   yourself with the document.
 4       A.   Okay.  I've read it.
 5       Q.   The e-mail, the first page, which is from Karrie
 6   Witchman to a list of people including yourself dated
 7   October 14th, 2014, are you familiar with this e-mail?
 8       A.   No, I'm not.
 9       Q.   Do you know what the Jackson versus Cash Call
10   case that's referred to on the first page?
11       A.   No.
12       Q.   Do you know the second Cash Call case,
13   Inetianborr versus Cash Call?  Do you know what that one
14   is?
15       A.   I'm not familiar with that.
16       Q.   "The decision in our case in the Second and Third
17   Court" referred to in the second and third line, do you
18   know what that means/what that refers to?
19       A.   No.
20       Q.   Did any case law during the time period that you
21   were employed by Bellicose VI or Bellicose Capital that
22   was coming out impact your belief that the conduct of
```



```
 1   Bellicose VI and Bellicose Capital was legal?
 2       A.   No.
 3       Q.   Did any of the case law that came out impact your
 4   view as to whether the conduct of Red Rock or Duck Creek
 5   was lawful?
 6       A.   No.
 7       Q.   Why not?
 8       A.   We had gotten the advice of many different
 9   attorneys that the conduct of Bellicose as a service
10   provider and the conduct of the tribal lending entities
11   was legal.
12       Q.   Let me ask you about what you just said:  You
13   talked about Bellicose as the servicer and Red Rock and
14   Duck Creek as the tribal lender.  Were they the same
15   entity or separate entities?
16       A.   They were separate entities.
17       Q.   As far as you know, did Mr. Martorello control
18   Red Rock?
19       A.   No.
20       Q.   Did he control Duck Creek?
21       A.   No.
22       Q.   Who did?
```



```
 1  what?
 2      A.  No, not specifically.
 3      Q.  What about generally?
 4      A.  Generally, no.
 5      Q.  Did anything about the economics cause you to
 6  believe that the conduct of Bellicose VI or Bellicose
 7  Capital was illegal?
 8      A.  No.
 9      Q.  What about with respect to Red Rock or Duck
10  Creek, anything about that, about the economics, suggest
11  to you or cause you to the believe that the conduct of
12  Red Rock or Duck Creek was illegal?
13              MS. KELLY:  Object to the form:  Lack of
14  foundation.
15      A.  No.
16  BY MR. SCHEFF:
17      Q.  Are you aware that at some point Mr. Martorello
18  sold Bellicose to a tribal entity?
19      A.  Yes, I am aware.
20      Q.  And did that occur while you were employed at
21  Bellicose?
22      A.  So I believe I saw an e-mail recently where I had
```



```
 1      Q.  So you, sitting here today, can you testify what
 2   you understood Mr. Martorello's state of mind to be
 3   regarding the legality of what he believed the Bellicose
 4   and Red Rock/Duck Creek relationship was without any
 5   specific recollection about those types of
 6   conversations?
 7              MR. SCHEFF:  Objection:  Asked and answered.
 8              He can answer.
 9      A.  His state of mind with regard to you said the
10   legality of --
11   BY MS. KELLY:
12      Q.  His belief about the legality.
13              MR. ANTHONY:  Just to be clear:  Of the
14   loans that were being served by Bellicose?
15              MS. KELLY:  The Bellicose/Red Rock/Duck
16   Creek relationship.
17      A.  My impression of his state of mind is that the
18   relationship was perfectly legal.
19   BY MS. KELLY:
20      Q.  Under what laws?
21      A.  Under federal law and tribal law.
22      Q.  Do you know if Mr. Martorello believed the
```



1  Bellicose relationship with Duck Creek/Red Rock was

2  legal under state laws?

3     A.   When you say "The relationship", are you talking

4  about -- I'm not sure what would have been illegal about

5  the relationship.  Are you referring to usury rates or

6  interest rates?

7     Q.   Yes, yes.

8     A.   So I think it wasn't that the relationship was

9  illegal under state laws, it's just that state laws

10 didn't apply.

11    Q.   And what did Mr. Martorello base that

12 understanding on, to the extent you're able to speak to

13 the state of mind?

14    A.   I think he would have based that understanding on

15 the advice of legal experts in the area.

16    Q.   Which legal experts?

17    A.   Probably Jennifer Weddle at Greenberg Traurig;

18 possibly attorneys at Hudson Cook; possibly Karrie

19 Witchman in the Rosette firm.

20    Q.   Did you ever draft any policies or procedures to

21 attempt to comply with usury laws of any state?

22    A.   No, I did not.



1  A.  Yes.

2  Q.  Ms. Kelly asked you about the New York case and
3  she asked you about Operation Chokepoint.  Again,
4  anything about those matters, Operation Chokepoint or
5  the New York case, impact your belief in the legality of
6  the loans issued by Red Rock and Duck Creek?

7  A.  No.

8  Q.  Anything about Operation Chokepoint or the New
9  York case which impacts your belief in the legality of
10 the conduct that Bellicose VI and Bellicose Capital?

11         MS. KELLY:  Object to the form:  Lack of
12 foundation.  He testified he doesn't know anything about
13 that.

14         MR. SCHEFF:  He testified it had no impact
15 on his beliefs either, unlike your attempted inference
16 when you asked him questions.

17 BY MR. SCHEFF:

18 Q.  Can you answer my question, please?

19 A.  Yeah, it didn't affect our beliefs.

20 Q.  Now, Bellicose Capital I believe you stated was
21 created as a result of moving to Puerto Rico.  Is that
22 right?



District of Columbia, to wit:

I, Alexandria Martin Kaan, Notary Public of the District of Columbia, do hereby certify that the within-named proceedings took place before me at the time and place herein set out.

I further certify that the proceedings were recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not Counsel to any of the parties, nor an employee of Counsel, nor related to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand this 7th day of April, 2019.



_____

Alexandria Kaan

```
 1   Reference No.: 3916927
 2
 3   Case:   LULA WILLIAMS vs BIG PICTURE LOANS
 4
            DECLARATION UNDER PENALTY OF PERJURY
 5
           I declare under penalty of perjury that
 6   I have read the entire transcript of my Depo-
     sition taken in the captioned matter or the
 7   same has been read to me, and the same is
     true and accurate, save and except for
 8   changes and/or corrections, if any, as indi-
     cated by me on the DEPOSITION ERRATA SHEET
 9   hereof, with the understanding that I offer
     these changes as if still under oath.
10
11               _____
12               Daniel Gravel
13
14              NOTARIZATION OF CHANGES
15                    (If Required)
16
17   Subscribed and sworn to on the _____ day of
18
19   _____, 20____ before me,
20
21   (Notary Sign)_____
22
23   (Print Name)                        Notary Public,
24
25   in and for the State of _____
```

