# EXHIBIT G

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA - (RICHMOND)

LULA WILLIAMS, et al.,


Plaintiff,

-vs-          Civil Docket #3:17-cv-00461-REP

HON.  {Judge}

BIG PICTURE LOANS, LLC,

Defendant.

_____/

The Videotaped Virtual De` Bene`
Esse` Deposition of KARRIE SUE WICHTMAN,
ESQUIRE, taken on behalf of the Defendant, in
the above-entitled action before Anita L.
Flanagan, CSR-2621, a Notary Public and Court
Reporter in and for the County of Wayne,
acting virtually in the County of Philadelphia
in the City of Philadelphia, Pennsylvania, in
said county on Tuesday, July 14, 2020, at 9:00
a.m. (CT), or thereabouts, pursuant to notice.



Page 48

```
 1           can give me something specific.
 2   Q.  Did you have discussions with Mr. Martorello
 3           about the issue of whether or not the tribal
 4           lending businesses were legal?
 5   A.  Yes, several.
 6   Q.  And over what period of time?
 7   A.  Between probably July, two thousand -- well,
 8           not July, I'm looking at the screen, sorry;
 9           2012 until 2016, when -- when the deal closed.
10           I mean there was always something that Matt
11           had a question about.
12   Q.  Did you ever take a view that the businesses
13           were illegal?
14   A.  No.
15   Q.  Did you take a contrary view that the
16           businesses were illegal?
17   A.  A contray view to the businesses being
18           illegal?
19   Q.  That the businesses were illegal?
20   A.  Yes.
21   Q.  Do you think they were legal, as you sit here
22           today?
23   A.  Yes.
24   Q.  Was there ever a point in time that you
25           believed the businesses were illegal?
```



Page 49

```
 1                        MS. KELLY:  Objection, form.
 2            Are you referring to the travel lending
 3            businesses?
 4                        MR. SCHEFF: Yes.
 5                        THE WITNESS:  Was there ever
 6            a point in time when I was concerned that the
 7            businesses were illegal; was that the
 8            question?
 9                        MR. SCHEFF:  Yes.
10   A.   No.
11   (By Mr. Scheff):
12   Q.   You referred to Jennifer Wells, as someone who
13        you negotiated with in 2011, correct?
14   A.   Correct.
15   Q.   And do you know -- does -- does --  did Ms.
16        Wells have a similar practice to yours.
17                        MS. KELLY:  Objection, scope.
18                        MR. SCHEFF:  You can answer.
19   A.   She worked for a much larger firm with an
20        Indian law practice, so I -- I -- so I would
21        say yes, similar.
22   (By Mr. Scheff):
23   Q.   Did you ever talk to Ms. Wells about her views
24        of the lawfulness of the tribal lending
25        operation?
```



Page 50

```
 1   A.   Yes.

 2   Q.   And what was her view?

 3   A.   Same as mine, that they were legal.

 4   Q.   Now, did you ever hear Ms. Wells say that she

 5        thought the tribal lending businesses were

 6        illegal?

 7                    MS. KELLY:  Objection, lack

 8        of foundation.

 9                    MR. SCHEFF:  You can answer.

10   A.   No, I never heard her say that.

11   (By Mr. Scheff):

12   Q.   Did you ever hear her say that the services

13        provided by Bellicose and Sourcepoint for Red

14        Rock and Duck Creek constituted illegal acts?

15                    MS. KELLY:  Objection,

16        foundation.

17                    MR. SCHEFF:  You can answer.

18   A.   No.

19   (By Mr. Scheff):

20   Q.   Did you ever tell Mr. Martorello that

21        Bellicose and Sourcepoint's provision of

22        consulting managements and servicing to Red

23        Red and Duck Creek constituted illegal acts?

24                    MS. KELLY:  Objection,

25        leading, lack of foundation.
```



Page 51

1                        MR. SCHEFF:  You can answer.

2    A.   Not that I recall.

3    (By Mr. Scheff):

4    Q.   Did you ever believe that?

5                        MS. KELLY:  Objection,

6         outside the scope.

7                        MR. SCHEFF:  You can answer.

8    A.   Yes.

9    (By Mr. Scheff):

10   Q.   Are you familiar with an enitity called the

11        CFPD?

12   A.   Yes.

13   Q.   And Ms. Wichtman, the CFPD stands for Consumer

14        Financial Protection Bureau?

15   A.   Yes.

16   Q.   And how is it that you are familiar with the

17        CFPD?

18                       MS. KELLY:  Objection, scope.

19                       MR. SCHEFF:  You can answer.

20   A.   Consumer Financial Services is a highly

21        regulated business, and the CFPD is one of the

22        regulators.

23   (By Mr. Scheff):

24   Q.   And if you know, what, approximately, was the

25        CFPD for?



Page 59

```
 1   A.   It depends on what occasions we had the
 2        conversation.
 3   Q.   Can you describe What you told him?
 4   A.   I told him, you know, that the tribal
 5        sovereign lending model was sound, and that we
 6        weren't structured in the same way, and that
 7        all of the -- I think that the -- the Western
 8        Skys, AMGs, Cash Calls, Butch Webb's of the
 9        world could be distinguished from the
10        operation of Red Rock and Duck Creek and --
11        ane the involvement of the tribe.
12                       You know, I mean we --we
13        truly believed in the -- the tribal lending
14        model and the structure that we had put in
15        place in order to operate the tribe's
16        business.
17   Q.   Are you familiar with a case that was solved
18        in the Southern District of New York by the
19        Otoe-Missouria Tribe and others?
20   A.   Yes.
21   Q.   And did you have discussions with
22        Mr. Martorello about that case, both the
23        district court and the court of appeals case?
24   A.   Yes.
25   Q.   And did you -- did you and Mr. Martorello
```



Page 60

```
 1          discuss that that case -- Strike that.
 2                          Did the result of that case
 3          cause you to believe that the Red Rock and
 4          Duck Creek lending operation was illegal?
 5                          MS. KELLY:  Objection,
 6          leading.
 7   A.   No.
 8   (By Mr. Scheff):
 9   Q.   Why not?
10   A.   Well, you asked about two cases, Richard, the
11          District of New York and then the appeal, so I
12          guess at what point in time are we talking?  I
13          mean neither one of them caused me to believe
14          that it's illegal, but for different reasons.
15   Q.   Okay.  So let's start with the district count.
16   A.   So with the district court that was on a
17          hearing for a preliminary injunction, and what
18          the Court was looking at was the information
19          in the papers filed before it, it -- it was
20          never an Evidentiary Hearing; there was never
21          a hearing on the merits; there was never a
22          trial and so the findings that the Court made
23          and the Order that the Court entered was based
24          on whether or not the Court believed that the
25          plaintiffs had met the standard necessary for
```



Page 61

1           a preliminary injunction, and it was denied.

2                       That wasn't the end of the

3           case, by any means, and so -- but because it

4           was -- it was appealable, you know, the tribes

5           choose to appeal.  That's the first reason why

6           I didn't believe that -- that lending was

7           illegal, after the -- the Southern District of

8           New York decision.

9                       And then when the Second

10          Circuit opinion came out, the Second Circuit

11          recognized, very strongly, the relationship

12          that exists between Indian Tribes as sovereign

13          and their ability to diversify, you know,

14          their economy, and there wasn't -- I mean

15          there were -- I mean it was a very balanced

16          opinion that it all wasn't up -- upholding the

17          -- the pre -- the denial of the preliminary

18          injunction.  It -- it still wasn't -- was at a

19          very preliminary stage in that case.

20   Q.     You had discussions with Mr. Martorello about

21          those opinions?

22   A.     Yes.

23   Q.     And did you understand from your discussions

24          with Mr. Martorello that he accepted your view

25          of those cases, or didn't accept your view of



Page 62

```
 1        those cases?
 2   A.    Matt and I had fights about these cases; I
 3         mean we had arguments.  I don't believe he
 4         accepted my view, but my view was coming from
 5         the prospective of the tribe, and what was
 6         necessary for the tribe to assert its
 7         sovereignity.
 8                      You know, Matt had a very
 9         different view, and that's -- I think that
10         there were -- at some points during both
11         cases, where views kind of, you know, merged
12         and -- and diverged, but it -- it depended on
13         the day with regard to what Matt's views (sic)
14         was (sic) with regard to the cases.
15   Q.    Based on your conversations with Mr.
16         Martorello, do you believe that once the
17         Second Circuit Opinion came down, that he
18         believed thst the Red Rock and Duck Creek and
19         lending operations were illegal?
20                      MS. KELLY:  Objection,
21         leading, lack of foundation.
22                      MR. SCHEFF:  You can answer.
23   A.    No, I don't believe he thought they were
24         illegal after the Second Circuit Opinion.  I
25         remember conversations in which he was -- he
```



Page 63

```
 1          was very pleased with the outcome.
 2                      MR. SCHEFF:  Ms. Kelly needs
 3          to take her break, and I'm sorry that I've run
 4          over a little bit on that, Kristi, and so
 5          Kristi, do you still need 30 minutes, or can
 6          you come back at one?
 7                      VIDEOGRAPHER:  One moment, we
 8          are going off the record at 11:36 a.m.
 9                      (Recess taken at 11:36
10          a.m. (CT) and 12:36 p.m (ET).
11                      (Back on the record at
12          12:07 p.m. (CT) and 1:07 p.m. (ET).
13                      VIDEOGRAPHER: We are back on
14          the record at 12:07 p.m.
15                      MR. SCHEFF:  We are back on
16          the record.
17                      (Defendant's Deposition
18          Exhibit Number 2, marked and identified for
19          the record remotely via Sarah).
20                      MR. SCHEFF:  Ms. Wichtman, I
21          want to show you another document.  Sarah,
22          could you pull our Tab 1A; Fred this is Tab 11
23          for you.
24                      MR. BAKER:  Thank you.
25                      MR. SCHEFF:  And if you could
```



Page 152

1    for Red Rock?

2         A.   Yes.

3         Q.   Okay.  So if you go back to the first

4    page, the cover, your e-mail to counsel.  And you

5    see where it says Dear Honorable Counsel?

6         A.   Yes.

7         Q.   And then there's that paragraph.  And

8    then, you know, from you, that says, "Attached is

9    the legal opinion that has been drafted to satisfy

10   the request (demand) for legal opinion regarding the

11   validity of the sovereign model for both RRTL and

12   DCTF, along with the attachments referenced in the

13   letter."

14             Have I read that sentence correctly?

15        A.   Yes.

16        Q.   RRTL is Red Rock?

17        A.   Yes.

18        Q.   And DCTF is Duck Creek?

19        A.   Yes.

20        Q.   And if you then turn to page 2 of the

21   opinion, probably page 4 of the .pdf.  Yeah, the

22   next page.

23             When you go to the paragraph -- the

24   last paragraph on the page.

25        A.   Hold on.  I'm gonna blow it up.



Page 153

1        Q.    Yeah.  Sure.

2        A.    (Complied.)  That didn't do much.

3        Q.    That's what I have to do, that shouldn't

4   be what you have to do.

5        A.    Not 200 percent, just 150 percent.

6              What paragraph, Rich?

7        Q.    The paragraph that starts, "To be sure."

8        A.    Okay.

9        Q.    Could you just read that to yourself,

10  please.

11       A.    (Complied.)  I've read it.

12       Q.    Did you believe that to be true at the

13  time you authored this opinion?

14       A.    Yes.

15       Q.    Do you believe it to be true today?

16       A.    Yes.

17       Q.    Did you discuss this opinion at all with

18  Mr. Martorello?

19       A.    Mr. Martorello was cc'd on the opinion.

20       Q.    Okay.  Could you go, please, to page --

21  it's probably page 10 of the .pdf.

22       A.    (Complied.)

23       Q.    Yes.  Could you read the conclusion to

24  yourself, please.

25       A.    (Complied.)  I've read it.



Page 154

```
1      Q.   Do you believe it to be true at the time
2   you wrote this?
3      A.   Yes.
4      Q.   Do you believe it to be true today?
5      A.   Yes.
6      Q.   Did you talk to Mr. Martorello about it?
7      A.   He was cc'd.
8      Q.   Okay.  If you could go, please, to Tab 8.
9           Fred, that will be your 37.
10          MR. BAKER:  Thank you.
11     A.   (Complied.)
12     Q.   (BY MR. SCHEFF)  Are you familiar with
13  this document, Miss Wichtman?
14     A.   Yes.
15     Q.   And this is a supplement to the legal
16  opinion that you just testified about, correct?
17     A.   Yes.
18     Q.   Now, in this opinion, you were explaining
19  to LST Financial your view of the district court
20  opinion in the ^ Oto Missouri case, correct?
21     A.   Yes.
22     Q.   And you did so at their request.  They
23  requested this from you?
24     A.   That would have been the only reason I
25  drafted it, so yes.
```



Page 155

```
 1      Q.   Okay.  And after this letter was sent to
 2  LST Financial, did LST Financial terminate its
 3  relationship with Red Rock?
 4      A.   No.
 5      Q.   How long did that relationship continue?
 6      A.   Until LST went out of business.
 7      Q.   Do you know when that was, approximately,
 8  or not?
 9      A.   I don't know.
10      Q.   Okay.
11           MR. SCHEFF:  Sarah, could you please
12  mark Tab 12.
13           And, Fred, that will be your 41.
14           THE COURT REPORTER:  Just one second.
15  Okay.  I'm back.
16           MR. SCHEFF:  Okay.
17      Q.   (BY MR. SCHEFF)  Miss Wichtman, have you
18  ever seen this document before?
19      A.   Yes.
20      Q.   Did you participate in writing it or
21  contribute to it?
22      A.   I believe so, yes.
23      Q.   Okay.  And did you agree with this when
24  you wrote it or participated in writing it?
25      A.   (Examined exhibit.)  I'm just taking a
```



Page 156

1  look at it.

2      Q.   Sure.  Of course.

3      A.   (Examined exhibit.)  Okay.  I'm ready for

4  questions now, Rich.

5      Q.   Did you agree with this when you

6  contributed to it?

7      A.   Yes.

8      Q.   Do you agree with it today?

9      A.   Yes.

10      Q.   What is Turtle Talk?

11      A.   Turtle Talk.

12           THE COURT REPORTER:  I'm sorry,

13  T-a-l-k?  Turtle Talk?

14           MR. SCHEFF:  Yes.

15           THE COURT REPORTER:  Okay.  Thank you.

16      A.   Turtle Talk is a blog that is well-known

17  in Indian country with regard to indigenous law and

18  policy issues.  I'm not -- I mean, I think it's

19  housed at MSU, Michigan State University College of

20  Law.

21      Q.   (BY MR. SCHEFF)  All right.  Just didn't

22  know.

23           Miss Wichtman, could you take a look

24  at -- I'm sorry.

25           MR. SCHEFF:  Sarah, could you mark the



Page 157

1    document behind Tab 9, please.

2                    Fred, that will be your 20.

3                    MR. BAKER:  Thank you.

4                    MR. SCHEFF:  And could you give

5    Miss Wichtman control, please.

6                    DOCUMENT TECHNICIAN:  (Complied.)

7         Q.   (BY MR. SCHEFF)  So Miss Wichtman, this

8    one's dated January 10th of 2014.  It's redacted in

9    terms of who it's addressed to, but if you look at

10   the first paragraph, second sentence, "We appreciate

11   your services and thank you for providing payment

12   processing services to the tribe Duck Creek

13   Financial LLC doing business as Pepper Cash."

14                   Does that give you a hint as to who

15   this was addressed to?

16        A.   I think I saw who it was addressed to when

17   I read the documents.  The redaction wasn't

18   thorough.

19        Q.   I'm sorry?

20        A.   The redaction wasn't very thorough.

21        Q.   So at the bottom --

22        A.   Page 2.

23        Q.   -- page 2.  It says Payment Data Systems?

24        A.   Right.

25        Q.   Is that who it was addressed to?



Page 158

1      A.   That would be the way I would format my

2   letters, so that's my best --

3      Q.   Who was Payment Data Systems?

4      A.   A payment processor.

5      Q.   And what does that mean, a payment

6   processor?

7      A.   An ACH provider.

8      Q.   I'm sorry, an ACH provider?

9      A.   ACH provider.

10         THE COURT REPORTER:  I'm sorry.  I'm

11   sorry.  You're cutting out.  "An ACH provider," did

12   you say? .

13      Q.   (BY MR. SCHEFF)  Miss Wichtman, I'm sorry.

14   I didn't hear your answer to my question?

15      A.   An ACH provider when you say payment

16   processor it could be a debit or credit card

17   processor.

18      Q.   Okay.  Could you turn to page 2, please.

19   And this paragraph, again, right above the

20   background on LVD Lending Enterprises, the "to be

21   sure" paragraph?

22      A.   Yep.

23      Q.   Accurate at the time?

24      A.   Yes.

25      Q.   Accurate today?



Page 159

1      A.   Yes.

2      Q.   Could you turn to page 8 of the exhibit,

3  please?

4      A.   (Complied.)

5      Q.   And this conclusion paragraph, accurate at

6  the time?

7      A.   Yes.

8      Q.   Accurate today?

9      A.   Yes.

10     Q.   Did you discuss these concepts with

11  Mr. Martorello?

12     A.   I don't know who this was addressed -- I

13  mean, who this was cc'd to -- yes.  Over time.

14     Q.   Thank you.  Okay.  Why don't you go?

15          MR. SCHEFF:  Sarah, could you mark

16  Tab 10 as the next exhibit.

17          Fred, that will be your Number 15.

18          MR. BAKER:   Thank you.

19     A.   (Examined exhibit.)

20     Q.   (BY MR. SCHEFF)  Okay.  Miss Wichtman, do

21  you recognize this document?  It's dated

22  January 22nd, 2014.

23     A.   Yes.

24     Q.   And I know this is redacted.  Do you know

25  who it was sent to?



Page 160

1      A.   Lewis Hodge was the president and CEO of

2   PDS, so the same person that received.

3           THE COURT REPORTER:   "CEO of" --

4   what's the acronym?

5           THE WITNESS:   PDS, Payment Data

6   Systems.

7           THE COURT REPORTER:   Thank you.

8      Q.   (BY MR. SCHEFF)   So Miss Wichtman, this

9   one concerns the tribal dispute resolution mechanism

10  available to consumers under the tribe's Consumer

11  Financial Services Regulatory Code, correct.

12     A.   Correct.

13     Q.   Do you remember this inquiry coming in for

14  an opinion on the tribal dispute resolution

15  mechanism?

16     A.   Vaguely.  I do.

17     Q.   Are you familiar with the tribal dispute,

18  the resolution mechanism?

19     A.   Yes.

20     Q.   And do you believe it to be a sham

21  process?

22     A.   No.

23     Q.   Did you ever believe it to be a sham

24  process?

25     A.   No.



Page 161

1      Q.   Would you please turn to the second page

2   of the opinion under the heading "Red Rock

3   Operations."

4            Can you read that to yourself, please.

5      A.   (Complied.)  The whole section, right,

6   read it?

7      Q.   Yeah.  It's the whole section.  It's just

8   that one page.

9      A.   Okay.  I've read it.

10     Q.   Is there anything about that that's

11  inaccurate, as far as you know?

12     A.   Other than, you know, just qualifying with

13  the understanding that the Red Rock service delivery

14  was happening through Duck Creek employees.

15     Q.   Okay.  That's the one correction?

16     A.   Right.

17     Q.   Okay.  And other than that, it's accurate,

18  correct?

19     A.   Yes.

20     Q.   Okay.  Could you please --.

21            MR. SCHEFF:  Sarah, could you mark

22  Tab 11, please.

23            Fred, that will be your 19.

24            MR. BAKER:  Thank you.

25     A.   (Examined exhibit.)



Page 162

1      Q.   (BY MR. SCHEFF)  So Miss Wichtman, this
2   form of document which comes out from the Rosette
3   law firm to tribal lending clients, are you familiar
4   with that form of memorandum?

5      A.   This particular document or just kind of
6   the updates?

7      Q.   Well, let me ask you about just the form
8   of document first and then this particular one.

9      A.   Rosette would often provide updates to
10  their clients, yes.

11     Q.   Okay.  Did you participant or contribute
12  to the writing of this one?

13     A.   I don't know.  Let me take a look.

14     Q.   Okay.

15     A.   (Examined exhibit.)  Given the date on the
16  document, Rich.

17     Q.   Yeah.

18     A.   I'm sure I reviewed it.  It came out of
19  our California office, though.

20     Q.   Okay.  In reading it, is there anything
21  about it that you disagree with?

22     A.   No.

23     Q.   No?  Did you discuss this decision with
24  Mr. Martorello?

25     A.   Yes.



Page 163

1      Q.   Okay.  And did you share the views that

2   are expressed in this exhibit with Mr. Martorello?

3      A.   I'm sure that was the basis of our

4   discussion, yes.

5      Q.   Okay.  I'm sorry.  I didn't mean to cut

6   you off.

7      A.   I can't recall -- I mean, there were lots

8   of discussions about lots of cases as the decisions

9   came down or, I mean . . .

10      Q.   I understand.

11           But you do remember discussing this

12   case and these types of concepts with Mr. Martorello

13   over those years?

14      A.   Yes.

15      Q.   Okay.

16           MR. SCHEFF:  Sarah, could you mark as

17   the -- as the next four exhibits, our tabs 14, 15,

18   16 and 17 -- I'm sorry, 14, 15, 16 -- 13, 14, 15,

19   16.  Sorry.

20           Fred, 13 is your 32.

21           14 is your 22.

22           15 is your 21.

23           And 16 is your 18.

24           MR. BAKER:  Thank you.

25           MS. KELLY:  I'm sorry, Richard, but



Page 164

1   these are exhibits numbers:  15, 16, 17, and 18,

2   right?

3                MR. SCHEFF:  No.  These are tab

4   numbers in my book.  I'm asking Sarah if she'll just

5   mark them as consecutive exhibits.

6                MS. KELLY:  Okay.

7                MR. SCHEFF:  Because Fred has

8   different numbers, based on a misunderstanding that

9   we had.  I'm providing his numbers to him so he can

10  find them easily.

11               MS. KELLY:  Okay.  But your numbers

12  are not the exhibit number, for the record.

13               MR. SCHEFF:  No, they're not.  These

14  are AW 15 through 18, if I'm correct.

15       A.   (Complied.)

16               MR. SCHEFF:  So, Sarah, is it possible

17  that Miss Wichtman can look at all these exhibits

18  without going back and forth?

19       Q.   (BY MR. SCHEFF)  And, Ms. Wichtman, the

20  reason I say that they're all dated the same date

21  November 3rd, 2014, and they're all to the Chippewa

22  Valley Bank.

23               And so 13 relates to Red Rock.

24               14 relates to Duck Creek.

25               15 relates to Red Rock.



Page 165

1              And 16 relates to Big Picture Loans.

2              So take a look at 13 first -- and

3    Miss Wichtman, Chippewa Valley Bank had what

4    relationship with Red Rock in November of '14?

5        A.    They were one of our depository banks.

6        Q.    Okay.  And so that means that Red Rock had

7    bank accounts at Chippewa Valley?

8        A.    Yes.

9        Q.    Could you turn to the second page of this

10   opinion.

11       A.    Um-hum.  (Complied.)

12       Q.    And you see the paragraph starting, "Thus

13   the legality of tribal lending operations" and then

14   "to be sure"?

15       A.    Yeah.

16       Q.    Can you read those and then tell me

17   whether those were accurate at the time and then

18   accurate today.

19       A.    (Complied.)  Yes and yes.

20       Q.    Could you go to the next exhibit,

21   Exhibit 16, I guess it is.  And, I'm sorry.  This

22   one's dated November 3rd, 2015, the other one was

23   14, sorry.  I misspoke.

24       A.    Right.

25       Q.    As of November 3rd, 2015, was Chippewa



Page 166

1    Valley a bank -- a bank that Duck Creek used?

2        A.   Yes.

3        Q.   Okay.  And if you could look at the next

4    page, please.

5        A.   (Complied.)

6        Q.   And if you could scroll down to that

7    paragraph that says thus the legality and then the

8    next paragraph, the "to be sure" paragraph.

9        A.   Um-hum.

10       Q.   And, again, I just want to know whether

11   accurate then and whether they're still accurate

12   today?

13       A.   (Examined exhibit.)

14            MR. BAKER:  Pardon me, our time frame

15   is.

16            MR. SCHEFF:  2015.

17            MR. BAKER:  2018.

18            MR. SCHEFF:  As of the date you left

19   Rosette, if it was accurate as of that date.

20       A.   Yes.

21       Q.   (BY MR. SCHEFF)  Okay.  And then to page 8

22   of the exhibit, please, the conclusion paragraph.

23   Keep going.

24       A.   Oh, sorry.

25       Q.   You can read whatever you want, but I'm



Page 167

1   asking you about the conclusion paragraph.

2        A.   (Examined exhibit.)  Okay.  I'm there.

3        Q.   Accurate as of November 2015 when this was

4   issued?

5        A.   Yes.

6        Q.   Accurate as of the date you left Rosette?

7        A.   Yes.

8        Q.   Did you discuss the substance of this

9   opinion, the issues with Mr. Martorello?

10       A.   Not this particular opinion, probably, but

11  the issues that are discussed within it, yes.

12       Q.   Okay.  And as of this date of the opinion

13  of November 3rd, 2015, the sale has not yet closed,

14  right, the sale of Bellicose and SourcePoint to the

15  tribe?

16       A.   Right.

17       Q.   Okay.  Could you go to the next exhibit,

18  please.

19       A.   16?  Is that where we're at?

20       Q.   I thought we were at 16.  So 17.

21       A.   17, okay.  (Complied.)

22       Q.   Okay.  November 3rd, '15, again to

23  Chippewa Valley.  This one on behalf of Red Rock

24  Tribal Lending?

25       A.   Um-hum.



Page 168

1      Q.   And if you could go to the next page,
2  please.  The --
3      A.   Sorry.
4      Q.   That's all right.  Go to the next
5  paragraph.
6      A.   Yes.
7      Q.   The paragraph, "thus the legality" and
8  then the "to be sure" paragraph, just, again,
9  accurate then and accurate of the date you left
10  Rosette?
11      A.   Yes.
12      Q.   And if you turn to page 8, if you could
13  read the conclusion paragraph.
14      A.   (Complied.)  I read it.
15      Q.   Accurate then?
16      A.   Yes.
17      Q.   Accurate as of the date that you left
18  Rosette?
19      A.   Yes.
20      Q.   Discussed the concepts with Mr. Martorello
21  over the years?
22      A.   Yes.
23      Q.   Okay.  Could you turn to Exhibit 18,
24  please.  Again November 3rd, 2015, to Chippewa
25  Valley Bank.  This one on behalf of Big Picture?



Page 169

1        A.    Um-hum.   (Examined exhibit.)

2        Q.    Now, this is the first one on behalf of

3   Big Picture loans that we're looking at.

4              As of this date was Big Picture Loans

5   operational?

6        A.    Was in existence.  I don't think -- it

7   wasn't operational.

8        Q.    Okay.  If you look at page 2.  Again, I'm

9   just pointing to the two paragraphs I've been

10  pointing you to.  "Thus the legality" and the "to be

11  sure" paragraphs.

12             If you could read that and tell me

13  whether they're accurate then and accurate as of the

14  date you left Rosette?

15       A.    (Examined exhibit.)  Yes.

16       Q.    Okay.  And accurate then and accurate as

17  of the date you left Rosette?

18       A.    Yes.

19       Q.    Could you go to the next page, please.

20  I'm sorry.  The page that you're on.  Background of

21  LVD Lending Enterprises?

22       A.    Okay.

23       Q.    And, again, if you could just read that

24  section to yourself.  And, again, I want to know

25  whether it was accurate then and was accurate as of



Page 170

1    the date that you left Rosette?

2         A.    (Examined exhibit.)

3         Q.    And was that section accurate, Miss

4    Wichtman, then and when you left?

5         A.    Yes, I believe so.

6         Q.    Okay.

7               MS. KELLY:  Richard, when you're at a

8    good stopping point.  Can we have a brief break?

9               MR. SCHEFF:  Sure.  Do you want to do

10   it right now?

11              MS. KELLY:  I was waiting until you

12   were done with the set of exhibits.

13              MR. SCHEFF:  Let me mark one more and

14   then we'll take the break, if that's okay.

15              MS. KELLY:  That's fine.  Thank you.

16

17

18              (Conclusion of section.)

19

20

21

22

23

24

25



Page 171

```
 1                    REPORTER'S CERTIFICATE
 2
 3            I, Karen L. D. Schoeve, CSR, RDR, CRR,
    RSA, in and for the State of Texas, certify that the
 4  foregoing is a correct transcription, to the best of
    my ability, from the audio recording of the
 5  proceedings in the above-entitled matter.
 6            I further certify that I am neither
    counsel for, related to, nor employed by any of the
 7  parties to the action in which this recording was
    taken, and further that I am not financially or
 8  otherwise interested in the outcome of the action.
 9            Please note that I was not personally
    present for said recording to make a stenographic
10  record; therefore, due to the quality of the
    recording provided, unintelligibles or inaudibles
11  may have created inaccuracies in the transcription
    of said recording.
12
              Without being present or having a video,
13  I cannot verify the accuracy of the speakers.
14
15
16
17
    _____
18
    Karen L. D. Schoeve, CSR, RDR, CRR
19  Realtime Systems Administrator
    Texas State Certification No. 3354
20  Certification Expiration: 12-31-16
    Magna Legal Services
21  1635 Market Square, 9th Floor
    Philadelphia, PA 19103
22  866.624.6221
    www.magnaLS.com
23
24
25
```



Page 172

```
 1                    MS. KELLY:  Okay.
 2                    Richard, when you're at a
 3           good stopping point, can we have a
 4           brief break?
 5                    MR. SCHEFF:  Sure.
 6                    Do you want to do it right
 7           now?
 8                    MS. KELLY:  I was just waiting
 9           until you're done this set of exhibits,
10           so if you have --
11                    MR. SCHEFF:  Okay.
12                    Well then, let me mark one
13           more and then we'll take the break, if
14           that's okay.
15                    MS. KELLY:  That's fine.  Thank
16           you.
17                    MR. SCHEFF:  Sarah, if you can
18           mark our Tab 20.
19                    Fred, it's your Tab No. 9
20           nine.
21  BY MR. SCHEFF:
22      Q   So Ms. Wichtman, you can see that this
23           one is dated December 13, 2016, so that's
24           post sale, correct?
```



Page 173

1    A    Yes.

2    Q    And this relates to Big Picture Loans

3         against the Chippewa Valley Bank.

4              If you could turn to page 2,

5         please.  You see the thus, the legality

6         paragraph and the to be sure paragraph?

7         Again, I just want to make sure, were they

8         accurate then and accurate as of the time

9         you left Rosette?

10   A    Yes.

11   Q    Did -- did you discuss these

12        concepts -- strike that.  Did you continue

13        to discuss the concepts that are detailed

14        in this later with Mr. Martorello post sale

15        up to the point in time that you left

16        Rosette?

17   A    No.  I mean -- no.  I had very little

18        contact with Mr. Martorello after the sale.

19   Q    Okay.

20             That's fine.  One other quick --

21        are you familiar with the proposed ability

22        to repay rule that the CFPB was considering

23        in 2015?

24   A    Yes, I am.



Page 280

CERTIFICATE

       I HEREBY CERTIFY that this transcript is a true record of the content on the file provided to me to the best of my ability.

Maureen Cunningham Brzycki,

Dated: July 17,

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

