# EXHIBIT OO



1095 Avenue of the Americas
New York, NY 10036-6797
+1 212 698 3500 Main
+1 212 698 3599 Fax
www.dechert.com

**DAVID BERNICK**

david.bernick@dechert.com
+1 212 698 3551 Direct
+1 212 698 0606 Fax

January 24, 2014

**VIA CM/ECF**

Catherine O'Hagan Wolfe, Esq.
Clerk of Court
United States Court of Appeals for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

Re: *In re: Otoe-Missouria Tribe of Indians*, No. 13-3769

Dear Ms. O'Hagan Wolfe:

Pursuant to Fed. R. App. P. 28(j), I write on behalf of Appellants in the above-captioned action to advise the Court of the recent decision in *People v. Miami Nation Enterprises*, No. B242644, 2014 WL 216318 (Cal. Ct. App. Jan. 21, 2014) (attached), which correctly held that tribal sovereign immunity protects tribal entities and their online lending business arms from state enforcement action.

This case affirms the importance of tribal interests in preserving their sovereignty and promoting economic self-sufficiency. Specifically, the court held that "[t]ribal sovereign immunity 'is a necessary corollary to Indian sovereignty and self-governance'" and that "in the absence of federal authorization, tribal immunity, like all aspects of tribal sovereignty, is privileged from diminution by the States." *Id.* at *6 (citing *Three Affiliated Tribes v. Wold Engineering*, 476 U.S. 877, 890 (1986)). Thus, while acknowledging the State's interest in enforcement of anti-usury laws, the court nonetheless refused to abrogate sovereign immunity. *See Miami Nation Enters.*, 2014 WL 216318, at *11 ("[A]lthough we recognize the public policy considerations supporting the Commissioner's efforts to protect poor and poorly educated consumers, sovereign immunity is not a discretionary doctrine that may be applied as a remedy depending on the equities of a given situation.") (internal quotation marks omitted).

The court also acknowledged the tribal sovereign right to conduct business with third parties and held that these relationships in no way diminish the sovereign character of the business activities. *See id.* at *10 ("A tribal entity engaged in a commercial enterprise that is otherwise entitled to be protected by tribal immunity does not lose that immunity simply by contracting with non-tribal members to operate the business.").

Respectfully submitted,

*/s/ David Bernick*

David Bernick

US Austin Boston Charlotte Hartford Los Angeles New York Orange County Philadelphia Princeton San Francisco Silicon Valley
Washington DC   EUROPE Brussels Dublin Frankfurt London Luxembourg Moscow Munich Paris   ASIA Beijing Hong Kong

CONFIDENTIAL                                                                                                                    LVD-DEF00006121

2014 WL 216318
Only the Westlaw citation is currently available.
Court of Appeal,
Second District, Division 7, California.

The PEOPLE of the State of
California, Plaintiff and Appellant,
v.
MIAMI NATION ENTERPRISES et
al., Defendants and Respondents.

B242644  |  Filed January 21, 2014

APPEAL from an order of the Superior Court of Los Angeles County, Yvette M. Palazuelos, Judge. Affirmed. (Los Angeles County Super. Ct. No. BC373536)

**Attorneys and Law Firms**

Uche L. Enenwali, Senior Corporations Counsel, and Mary Ann Smith, Deputy Commissioner, California Corporations Counsel; Kamala D. Harris, Attorney General, Sara J. Drake, Senior Assistant Attorney General, Jennifer T. Henderson, Deputy Attorney General, for Plaintiff and Appellant.

Fredericks Peebles & Morgan, John Nyhan, Sacramento, Nicole E. Ducheneaux and Conly J. Schulte, for MNE and SFS, Inc., Defendants and Respondents.

**Opinion**

PERLUSS, P.J.

*1 Applying the arm-of-the-tribe analysis as we directed in *Ameriloan v. Superior Court* (2008) 169 Cal.App.4th 81, 86 Cal.Rptr.3d 572 (*Ameriloan*), the trial court dismissed for lack of subject matter jurisdiction this action by the Commissioner of the California Department of Corporations against five "payday loan" businesses owned by Miami Nation Enterprises (MNE), the economic development authority of the Miami Tribe of Oklahoma, a federally recognized Indian tribe, and SFS, Inc., a corporation wholly owned by the Santee Sioux Nation, also a federally recognized Indian tribe. Because the two tribal entities and their cash-advance and short-term-loan businesses are sufficiently related to their respective Indian tribes to be protected from this state enforcement action under the doctrine of tribal sovereign immunity, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**1.** *The Commissioner's Complaint and the Initial Ruling on the Motions To Quash*

Following an investigation by the Department of Corporations, in August 2006 the Commissioner[1] issued desist-and-refrain orders to Ameriloan, United Cash Loans, U.S. Fast Cash, Preferred Cash and One Click Cash, directing them to cease their unlicensed and unlawful loan activities in California. In June 2007, after the businesses failed to comply with the desist-and-refrain orders, the Commissioner filed a complaint in the name of the People of the State of California for injunctive relief, restitution and civil penalties against Ameriloan, United Cash Loans, U.S. Fast Cash, Preferred Cash and One Click Cash alleging they were providing short-term, payday loans over the Internet to California residents in violation of several provisions of the California Deferred Deposit Transaction Law (DDTL) (Fin.Code, § 2300 et seq.).[2] Specifically, the complaint alleged the five businesses engaged in deferred deposit transactions within California without being licensed (Fin.Code, § 23005, subd. (a)), originated loans in excess of the $300 statutory maximum (Fin.Code, § 23035, subd. (a)), charged excessive loan fees (Fin.Code, § 23036, subd. (a)), and failed to provide their customers with various required written notices (Fin.Code, § 23001, subds. (a), (e)). The trial court granted the Commissioner's ex parte request for a temporary restraining order against each of the businesses and set a date for them to show cause why the request for a preliminary injunction should not be granted.

[1] Effective July 1, 2013 the Department of Corporations and Department of Financial Institutions combined and became the Department of Business Oversight within the Business, Consumer Services and Housing Agency pursuant to the Governor's Reorganization Plan (G.R.P.) No. 2 of 2012. (See Gov.Code, §§ 12080.2, 12080.5.) The Corporations Commissioner is now the Commissioner of Business Oversight.

[2] "Payday loans are controversial. They typically offer about two weeks of credit, due in full on the borrower's next payday, at annual interest rates of around 400 percent. While borrowers find fast relief, they are often left indebted for months, struggling to repay a loan that was marketed as a short-term solution. Proponents argue that payday loans are a useful form of credit for consumers who lack access to more conventional banking services, but

CONFIDENTIAL                                                                    LVD-DEF00006122

opponents claim they overburden people who are already struggling to make ends meet." (The Pew Charitable Trusts, *Payday Lending in America, Series Summary* (Oct.2013) <http:// www.pewstates.org/uploadedFiles/PCS_Assets/2013/Pew_Payday_Lending_Series_Summary.pdf [as of January 21, 2014].) According to the findings of the Pew Charitable Trusts' *Payday Lending in America* study, 12 million Americans take out payday loans each year, spending approximately $7.4 billion annually. The average loan is $375. The average borrower is in debt for five months during the year, spending $520 in interest to repeatedly renew the loan. Sixty-nine percent of first-time borrowers use the loan for recurring bills, including rent or utilities; only 16 percent use them to deal with an unexpected expense such as a car repair. (*Ibid.*)

> In affirming the judgment of dismissal under the doctrine of tribal sovereign immunity, we obviously take no position in the policy debate over the general undesirability or predatory nature of online payday loans and express no view on the merits of the Commissioner's allegations that the cash advance and short-term loan services offered by the tribal entities violate the DDTL.

*2 MNE and SFS specially appeared and moved to quash service of summons and to dismiss the complaint on the ground the five payday loan businesses named as defendants were simply trade names (or "dba's") of the two tribal entities and, as wholly owned and controlled entities of their respective tribes operating on behalf of the tribes, they were protected from this state enforcement action under the doctrine of tribal sovereign immunity.[3] Both tribal entities submitted declarations describing in some detail their relationship to their respective tribes and the economic benefits the tribes obtained from operating the businesses. In opposition, in addition to arguing the doctrine of tribal sovereign immunity did not apply to commercial activities outside of Indian country, the Commissioner urged at the very least discovery should be permitted with respect to the jurisdictional facts articulated in the declarations accompanying the motions to quash.

[3] In addition to asserting their immunity to suit, MNE and SFS contended their businesses, utilizing automated clearing house transactions, were not subject to the provisions of the DDTL, which, by its terms, applies to transactions involving "personal checks"—an issue we identified but did not resolve in *Ameriloan* in light of the uncertainty as to the court's subject matter jurisdiction.

(See *Ameriloan, supra,* 169 Cal.App.4th at pp. 99–100, 86 Cal.Rptr.3d 572.)

On October 19, 2007 the trial court denied the motion to quash service, concluding tribal sovereign immunity did not apply to the tribal entities' payday loan activities. In the same order the court granted the Commissioner's request for a preliminary injunction prohibiting the five named defendants from engaging in unlicensed, nonexempt deferred deposit transaction business, charging excessive fees, violating the Commissioner's cease-and-refrain orders and destroying records.

**2.** *Our Ameriloan Decision*

MNE and SFS, on behalf of the named payday loan businesses, petitioned this court for a writ of mandate vacating the trial court's order. In *Ameriloan, supra,* 169 Cal.App.4th 81, 86 Cal.Rptr.3d 572 we granted the petition in part and directed the trial court to vacate its order denying the motions to quash and granting the preliminary injunction and to conduct a new evidentiary hearing to determine the applicability of the doctrine of tribal sovereign immunity in the particular circumstances of this action.[4]

[4] We had initially issued a summary denial of MNE and SFS's petition. The Supreme Court granted MNE and SFS's petition for review and transferred the matter to us with directions to issue an alternative writ and hear the matter. (See *Ameriloan, supra,* 169 Cal.App.4th at p. 88, 86 Cal.Rptr.3d 572.)

Our opinion briefly summarized the tribal sovereign immunity doctrine, explaining, "An Indian tribe's sovereign nation status confers an absolute immunity from suit in federal or state court, absent an express waiver of that immunity or congressional authorization to sue." (*Ameriloan, supra,* 169 Cal.App.4th at p. 89, 86 Cal.Rptr.3d 572.) We then quoted the key language from the United States Supreme Court's decision in *Kiowa Tribe v. Manufacturing Tech.* (1998) 523 U.S. 751, 118 S.Ct. 1700, 140 L.Ed.2d 981 (*Kiowa*), which held a federally recognized Indian tribe enjoys immunity from suit in state court even if the subject of the action is purely commercial activity that occurs on nontribal lands. Based on *Kiowa* we concluded the trial court had erred in ruling as a matter of law the doctrine of tribal sovereign immunity did not apply to the payday loan companies' commercial activities occurring outside of Indian country. (*Ameriloan,* at pp. 89–90, 86 Cal.Rptr.3d 572.)[5] We also held the trial court had erred in concluding tribal sovereign immunity had been waived based on a "sue or

CONFIDENTIAL                                                                                    LVD-DEF00006123

be sued" clause in the resolution establishing MNE as an economic subdivision of the Miami Tribe of Oklahoma or the arbitration provision contained in each of the payday loan companies' loan agreements with consumers. (*Id.* at pp. 94–96, 86 Cal.Rptr.3d 572.)

5   Relying on *Kiowa, supra,* 523 U.S. 751, 118 S.Ct. 1700, we explained the question was not whether state regulatory laws, here the DDTL, apply to commercial activities conducted outside Indian country by a tribal entity, but whether the tribal entity is protected from a government enforcement action under the doctrine of tribal sovereign immunity. (*Ameriloan, supra,* 169 Cal.App.4th at pp. 90–91, 86 Cal.Rptr.3d 572; see *Kiowa,* at p. 755, 118 S.Ct. 1700["[t]here is a difference between the right to demand compliance with state law and the means available to enforce them"].)

*3 To decide the motion to quash—that is, to decide whether the tribal entities, operating through the named payday loan companies, are entitled to the benefits of tribal sovereign immunity—we explained, the trial court "must first determine whether those entities, in fact, are acting on behalf of federally recognized tribes." (*Ameriloan, supra,* 169 Cal.App.4th at p. 97, 86 Cal.Rptr.3d 572.) "Tribal sovereign immunity extends not only to the Indian tribes themselves but also to those for-profit commercial entities that function as 'arms of the tribes.' [Citations.] The doctrine, however, does not ' "cover tribally chartered corporations that are completely independent of the tribe." ' " (*Ibid.*) In light of the trial court's failure to make findings pertinent to the arm-of-the-tribe analysis, we directed it to conduct a new evidentiary hearing and to consider whether the two tribal entities are sufficiently related to their respective tribes to be entitled to the protection of tribal sovereign immunity. "To this end, the court should consider the criteria expressed by the Courts of Appeal in *Trudgeon* [*v. Fantasy Springs Casino* (1999) ] 71 Cal.App.4th [632,] 638 [84 Cal.Rptr.2d 65] and [*Redding* ] *Rancheria* [*v. Superior Court* (2001) ] 88 Cal.App.4th [384,] 389 [105 Cal.Rptr.2d 773], including whether the tribe and the entities are closely linked in governing structure and characteristics and whether federal policies intended to promote Indian tribal autonomy are furthered by extension of immunity to the business entity. (See also *Allen v. Gold Country Casino* (9th Cir.2006) 464 F.3d 1044, 1046 [the relevant question for purposes of applying tribal sovereign immunity 'is not whether the activity may be characterized as a business, which is irrelevant under *Kiowa,* but whether the entity acts as an arm of the tribe so that its activities are properly deemed to be those of the tribe']." (*Ameriloan,* at pp. 97–98, 86 Cal.Rptr.3d 572.)

In response to the Commissioner's request to be permitted discovery into the assertion that profits from the payday loan operations benefit the two tribes that created MNE and SFS, we observed, "we see no reason why limited discovery, directed solely to matters affecting the trial court's subject matter jurisdiction, should impact the payday loan companies' special appearance...." (*Ameriloan, supra,* 169 Cal.App.4th at p. 98, 86 Cal.Rptr.3d 572.) Nonetheless, because no issue relating to discovery was raised in the petition for writ of mandate, we made no express ruling on the permissible scope of any discovery when the matter returned to the trial court. (*Id.* at pp. 98–99, 86 Cal.Rptr.3d 572.)

### 3. *The Parties' Evidentiary Presentations Regarding the Arm–of–the–Tribe Issue*

Following our *Ameriloan* decision, discovery was conducted in the trial court, ultimately under the supervision of a discovery referee appointed pursuant to the parties' stipulation under Code of Civil Procedure section 639.[6] Thereafter, MNE and SFS renewed their motion to quash service and to dismiss the action for lack of subject matter jurisdiction, submitting with the moving papers extensive supporting documentary evidence. In response, the Commissioner filed a motion for a preliminary injunction, which the trial court deemed an opposition to the motion to quash. After further consideration the trial court then conducted an evidentiary hearing on May 10, 2012.

6   In a companion, nonpublished opinion we affirm the separately appealed August 12, 2011 order imposing $34,437.50 in discovery sanctions against the Commissioner after the court denied in substantial part her motion to compel further responses to a second set of requests for production of documents. (*People v. MNE* (Jan. 21, 2014, B236547) 2014 WL 212220.)

#### a. *Evidence from the tribal entities*

#### i. *The Miami Tribe of Oklahoma*

According to the tribal entities' evidence, the Miami Tribe of Oklahoma was organized in 1936 pursuant to the Oklahoma Indian Welfare Act of 1936 (25 U.S.C. § 501) and is governed by a constitution and by-laws approved by the Secretary

CONFIDENTIAL                                                                                                LVD-DEF00006124

of the Interior. Its ancestral homelands included much of the upper Midwest (what is now Indiana, Illinois, Ohio and lower Michigan and Wisconsin), but the Miami people were forcibly removed from this area in 1846 and relocated several times thereafter, ultimately to "Indian Territory," now Oklahoma. Its headquarters are located on land held in trust for the tribe's benefit by the United States in rural northeastern Oklahoma, approximately 90 miles from Tulsa. The United States Small Business Administration has included this land within its designations of historically underutilized business zones.

Recognizing "a critical need for the development of economic activities ... to provide for the well-being of the citizens of the Miami Tribe," the tribe organized MNE as a wholly owned and controlled tribal entity pursuant to the May 2005 Amended Miami Nation Enterprises Act. That Act specifies MNE "shall be a subordinate economic enterprise of the Miami Tribe of Oklahoma" and provides the tribe's governing body, the Tribal Business Committee, has delegated its authority to MNE: "[T]he creation and operation of Miami Nation Enterprises serves an essential government function of the Miami Tribe of Oklahoma by allowing the Miami Tribe to provide directly for the development of tribal revenue generating activities and to acquire property." The Miami Tribe expressly provided MNE would enjoy all privileges and immunities of the tribe itself, including "the right of sovereign immunity from unconsented civil suit."

*4 MNE's initial board of directors consisted of the members of the Tribal Business Committee; the chief of the Miami Tribe appointed all successor members of the MNE board with the approval of the Tribal Business Committee; the current members of the board are members of the Miami Tribe; and the initial officers of MNE were hired by the Tribal Business Committee, including its current chief executive officer. MNE Services, Inc. is a wholly owned subsidiary of MNE, created in 2008 pursuant to the Amended Miami Nation Enterprises Act. MNE Services, Inc. processes and approves loan applications pursuant to underwriting criteria approved by MNE. MNE/MNE Services, Inc. transact Internet lending under the trade names Ameriloan, U.S. Fast Cash and United Cash Loans. Their lending activities are subject to tribal laws governing interest rates, loans and cash advance services. According to supporting declarations, all loan applications are approved by MNE on federal trust land under the sovereign jurisdiction of the Miami Tribe of Oklahoma; and profits from MNE/MNE Services, Inc. "directly or indirectly enable the Miami Tribe to fund critical governmental services to its members, such as tribal law enforcement, poverty assistance, housing, nutrition, preschool, elder care programs, school supplies and scholarships.... The cash advance business is a critical component of the Miami Tribe's economy and governmental operations."

### ii. *The Santee Sioux Nation*

The Santee Sioux Nation was organized under section 16 of the Indian Reorganization Act of 1934 and is governed by a constitution approved by the Secretary of the Interior in 2002. The Santee Sioux reservation is located in an isolated, rural region of northeastern Nebraska. (The ancestral home of the Santee Sioux is in present-day Minnesota. They were forcibly relocated first to South Dakota and then to their current site.) The United States Small Business Administration has also included this land within its designations of historically underutilized business zones.

Acting through its governing body, the Tribal Council, in 2005 the tribe created SFS, Inc., a wholly owned chartered tribal corporation whose sole purpose is to generate revenue to help fund the Santee Sioux's governmental operations and social welfare programs. SFS's articles of incorporation expressly state it enjoys the tribe's sovereign immunity from suit. SFS is licensed pursuant to tribal law to operate an online lending business (cash advance services and short-term loans) utilizing the trade names Preferred Cash Loans and One Click Cash. SFS's articles of incorporation mandate that the board of directors of SFS, which consists of the members of the Tribal Council, manage SFS; and the Tribal Council appointed the tribe's business manager as the chief executive officer of SFS.

According to the declaration of Robert Campbell, an enrolled member of the Santee Sioux Nation, a member of the Tribal Council and the treasurer of SFS, "the loan transactions are approved and consummated in Indian lands and within the jurisdiction of the Santee Sioux Nation." In addition, Campbell testified, "These cash advance services are the primary source of income for SFS." "All profits earned by SFS go to the Santee Sioux to help fund its government operations and social welfare programs.... The Santee Sioux reservation is a severely economically depressed region, and the profits generated by SFS are essential to maintaining a functioning government that is able to provide the essential government services to its members."

CONFIDENTIAL

LVD-DEF00006125

### b. *The Commissioner's evidence*

Without seriously questioning the close structural relationship between the Miami Tribe of Oklahoma and MNE or the Santee Sioux Nation and SFS, the Commissioner presented evidence to demonstrate the actual cash advance services and loan activities of the named defendants were actively operated and controlled by nontribal third parties, not the tribes themselves or their tribally owned corporations. At the outset, the Commissioner explained the various trade names used by the named defendants were originally registered by one Scott Tucker to advertise and market payday lending services several years before they were adopted by MNE and SFS. In July 2008 SFS and MNE entered into management agreements with a Tucker-controlled company, N.M. Service Corp. (NMS) to direct and operate their lending activities. The Commissioner conceded MNE and SFS had final authority under these agreements for making the loans, but contended Tucker's management company effectively exercised that authority through advance instructions or approval parameters; in fact, the Commissioner argued, Tucker and his company totally controlled, operated and managed the businesses as part of an interrelated network of companies that have common ownership, business functions and employees and that persistently commingle funds. According to the Commissioner's information obtained independently from the Federal Trade Commission and other sources (that is, not through discovery in this proceeding), MNE and SFS received one percent of the gross revenues from their cash advance/loan businesses while Tucker's company retained the "net cash flow of the Lending Business."

*5 The Commissioner noted the officers, directors and shareholders of MNE Services and SFS are not personally liable to creditors or claimants of the corporations for corporate actions. Consequently, neither the Miami Tribe of Oklahoma nor the Santee Sioux Nation is potentially subject to liability for any misconduct in the cash advance, short-term lending businesses. The Commissioner also asserted MNE's and SFS's lending businesses regularly violated tribal laws in the areas of permissible interest rates, control of bank accounts and the commingling of funds.

**4. *The Trial Court's Order Dismissing the Commissioner's Enforcement Action***

Following the evidentiary hearing, the trial court granted MNE and SFS's motion to quash service of summons and dismissed the case for lack of subject matter jurisdiction. Applying the criteria articulated in *Trudgeon v. Fantasy Springs Casino, supra,* 71 Cal.App.4th 632, 84 Cal.Rptr.2d 65 for determining whether a tribal entity functions as an arm of the tribe for purposes of tribal sovereign immunity, as we had directed in *Ameriloan,* the trial court summarized the evidence and concluded the tribal entities were closely linked in governing structure and characteristics to their respective tribes. The court rejected as unpersuasive the Commissioner's argument the payday loan businesses were not arms of their tribes or entitled to tribal sovereign immunity because Tucker and his company completely controlled their operations and were the primary beneficiaries of the payday loan activities: "[C]ontrol of a corporation does not mean control of business minutiae; the tribe can be enmeshed in the direction and control of the business without being involved in the actual management.... [The Commissioner's] arguments go beyond governing structure and characteristics and seek a determination that sovereign immunity does not apply because the Tribes have not exercised sufficient control of the Defendants or have allowed third parties to extract too much money (benefit) from the tribal entities. However, these concerns are the Tribes' concerns. The fact that the Defendant tribal entities may be violating the Tribes' own laws and regulations is a matter for the Tribes and is not a basis to determine the entities are not closely linked in governing structure and characteristics."

The court also ruled the federal policies intended to promote tribal autonomy were furthered by extension of immunity to MNE and SFS and their payday loan businesses notwithstanding the Commissioner's contrary position based on the purportedly disproportionate benefits received by the nontribal managers: "It is undisputed that the Tribes receive some amount of the gross revenues, which allows the Tribes to fund important services and projects for their members. It is not the province of this court to determine that, because the Tribes did not make a better deal with [the nontribal third parties] in which they secured a greater percentage of gross revenues, Indian tribal autonomy is no longer furthered. Such an interpretation would substitute this court's analysis of the Tribes' interests for the Tribes' own analysis of what is in their best interests.... Tribal immunity cannot be defeated simply because third parties who operate Tribe directed/controlled businesses also benefit substantially —even perhaps substantially more than the Tribes."

CONFIDENTIAL

LVD-DEF00006126

The Commissioner filed a timely notice of appeal.

## DISCUSSION

### 1. *Standard of Review*

"On a motion asserting sovereign immunity as a basis for dismissing an action for lack of subject matter jurisdiction, the plaintiff bears the burden of proving by a preponderance of evidence that jurisdiction exists." (*Campo Band of Mission Indians v. Superior Court* (2006) 137 Cal.App.4th 175, 183, 39 Cal.Rptr.3d 875; accord, *American Property Management Corp. v. Superior Court* (2012) 206 Cal.App.4th 491, 498, 141 Cal.Rptr.3d 802 (*American Property*).) If resolution of the jurisdiction question depends on disputed issues of fact, we review the trial court's findings for substantial evidence. (*Singletary v. International Brotherhood of Electrical Workers, Local 18* (2012) 212 Cal.App.4th 34, 41, 151 Cal.Rptr.3d 107; see *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1032, 56 Cal.Rptr.3d 814, 155 P.3d 226.) Absent conflicting extrinsic evidence, the question of subject matter jurisdiction over an action against an Indian tribe is purely one of law, subject to de novo review. (*American Property*, at p. 498, 141 Cal.Rptr.3d 802; *Warburton/Buttner v. Superior Court* (2002) 103 Cal.App.4th 1170, 1180, 127 Cal.Rptr.2d 706; see *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449, 58 Cal.Rptr.2d 899, 926 P.2d 1085.)

### 2. *Tribal Sovereign Immunity and the Arm–of–the–Tribe Analysis*

*6 "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." (*Oklahoma Tax Comm'n v. Potawatomi Tribe* (1991) 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112.) The recognition of tribes as sovereigns in a government-to-government relationship with other sovereign nations has its source in the United States Constitution and is a well-established principle of federal Indian law. (See 25 U.S.C. § 3601(1), (3) ["there is a government-to-government relationship between the United States and each Indian tribe"; "Congress, through statutes, treaties, and the exercise of administrative authorities, has recognized the self-determination, self-reliance, and inherent sovereignty of Indian tribes"]; see generally Judicial Council Comment, Cal. Rules of Court, rule 10.60.)

Tribal sovereign immunity "is a necessary corollary to Indian sovereignty and self-governance." (*Three Affiliated Tribes v. Wold Engineering* (1986) 476 U.S. 877, 890, 106 S.Ct. 2305, 90 L.Ed.2d 881.) "[I]n the absence of federal authorization, tribal immunity, like all aspects of tribal sovereignty, is privileged from diminution by the States." (*Id.* at p. 890, 106 S.Ct. 2305; see *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 ["Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers. [Citations.] This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress. But 'without congressional authorization,' the 'Indian Nations are exempt from suit.'"].)

"[A]n Indian tribe is not subject to suit in a state court—even for breach of contract involving off-reservation commercial conduct—unless 'Congress has authorized the suit or the tribe has waived its immunity.'" (*C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.* (2001) 532 U.S. 411, 414, 121 S.Ct. 1589, 149 L.Ed.2d 623; accord, *Kiowa, supra,* 523 U.S. at p. 760, 118 S.Ct. 1700 [tribal sovereign immunity applies without distinction between on- and off-reservation or governmental or commercial activities]; see generally Cohen's Handbook of Federal Indian Law (2012 ed.) *Sovereign Immunity* § 7.05[1][a] ["[t]he doctrine of tribal sovereign immunity is rooted in federal common law and reflects the federal Constitution's treatment of Indian tribes as governments in the Indian commerce clause"].)

Much as Eleventh Amendment immunity from suit in federal court applies not only to the states themselves but also to entities that are properly considered arms of the state (see, e.g., *Alden v. Maine* (1999) 527 U.S. 706, 756, 119 S.Ct. 2240, 144 L.Ed.2d 636; *Mt. Healthy City Board of Ed. v. Doyle* (1977) 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471), tribal sovereign immunity protects not only a tribe itself but also subordinate governmental or commercial entities acting as arms of the tribe. (*American Property, supra,* 206 Cal.App.4th at p. 500, 141 Cal.Rptr.3d 802; *Ameriloan, supra,* 169 Cal.App.4th at p. 97, 86 Cal.Rptr.3d 572; see Cohen's Handbook of Federal Indian Law, *supra,* § 7.05[1][a] [tribal immunity "extends to entities that are arms of the tribes"]; see generally *Cook v. AVI Casino Enterprises, Inc.* (9th Cir.2008) 548 F.3d 718, 727 [comparing arm-of-the-tribe analysis to deciding whether a state instrumentality could invoke the state's sovereign immunity].)

CONFIDENTIAL
LVD-DEF00006127

The United States Supreme Court has acknowledged, but not yet analyzed, the arm-of-the-tribe concept. In *Inyo County v. Paiute-Shoshone Indians of Bishop Community of Bishop Colony* (2003) 538 U.S. 701, 705, fn. 1, 123 S.Ct. 1887, 155 L.Ed.2d 933, a federally recognized Indian tribe and its tribally chartered, wholly owned gaming corporation asserted in a civil rights action that tribal sovereign immunity precluded a county district attorney from executing a search warrant and seizing casino employment records. At the outset the Supreme Court noted, "The United States [as amicus curiae] maintains, and the County does not dispute, that the Corporation is an 'arm' of the Tribe for sovereign immunity purposes." The Court did not thereafter discuss the status of the gaming corporation as an arm of the tribe, resolving the case without deciding the immunity issue.[7] However, opinions from a number of federal and state courts, including the California Supreme Court and this court in *Ameriloan,* have recognized the arm-of-the-tribe prong of the tribal sovereign immunity doctrine and identified a range of factors to consider in determining whether a subordinate entity is sufficiently related to a tribe to be protected by tribal sovereign immunity. (See *Agua Caliente Band of Cahuilla Indians v. Superior Court* (2006) 40 Cal.4th 239, 247–248, 52 Cal.Rptr.3d 659, 148 P.3d 1126 [" 'immunity extends to entities that are arms of the tribes,' " but " 'apparently does not cover tribally chartered corporations that are completely independent of the tribe' "]; see generally Cohen's Handbook of Federal Indian Law, *supra,* § 7.05[1][a] [arm-of-the-tribe analysis "considers tribal involvement in the creation and control of the entity, tribal intent to clothe the entity with immunity, and whether the entity serves tribal sovereign interests such as economic development"]; Martin & Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* (2012) 69 Wash. & Lee L.Rev. 751, 776 [observing that "[c]ourts have articulated numerous variations on the test for whether a tribal business enterprise is entitled to the tribe's immunity" and identifying six "common factors" used in arm-of-the-tribe analysis].)

[7]  The Court held only that the tribe did not qualify as a "person" who could sue under title 42 United States Code section 1983 "to vindicate the sovereign right it here claims." (*Inyo County v. Paiute-Shoshone Indians of Bishop Community of Bishop Colony, supra,* 538 U.S. at p. 712, 123 S.Ct. 1887.) Whether the action could be maintained under the " 'federal common law of Indian affairs' " was remanded for further consideration. (*Ibid.*)

*7 In *Trudgeon v. Fantasy Springs Casino, supra,* 71 Cal.App.4th 632, 84 Cal.Rptr.2d 65 our colleagues in Division Two of the Fourth District adopted a three-factor analysis developed by the Supreme Court of Minnesota: " '1) whether the business entity is organized for a purpose that is governmental in nature, rather than commercial; [¶] '2) whether the tribe and the business entity are closely linked in government structure and other characteristics; and [¶] '3) whether federal policies intended to promote Indian tribal autonomy are furthered by the extension of immunity to the business entity.' " (*Id.* at p. 638, 84 Cal.Rptr.2d 65, quoting *Gavle v. Little Six, Inc.* (Minn.1996) 555 N.W.2d 284, 294–295.)[8] Applying this test the court held sovereign immunity barred plaintiff's state court personal injury lawsuit against Cabazon Bingo, Inc., a corporation organized by the Cabazon Band of Mission Indians, a federally recognized Indian tribe, to operate a gaming and entertainment complex on tribal land.[9]

[8]  The *Trudgeon* court recognized whether the purpose of the tribal entity is governmental or commercial might no longer be germane after *Kiowa.* Nonetheless, the court explained: "[I]t is possible to imagine situations in which a tribal entity may engage in activities which are so far removed from tribal interests that it no longer can legitimately be seen as an extension of the tribe itself. Such an entity arguably should not be immune, notwithstanding the fact it is organized and owned by the tribe." (*Trudgeon v. Fantasy Springs Casino, supra,* 71 Cal.App.4th at p. 639, 84 Cal.Rptr.2d 65.)

[9]  The court suggested the claim could be pursued in a tribal court "which has civil jurisdiction over all disputes within reservation boundaries" and presumed the tribal court "can and will fairly adjudicate the matter." (*Trudgeon v. Fantasy Springs Casino, supra,* 71 Cal.App.4th at p. 645, 84 Cal.Rptr.2d 65.)

In *American Property, supra,* 206 Cal.App.4th 491, 141 Cal.Rptr.3d 802, a panel of Division One of the Fourth District employed the set of six factors set forth in the Tenth Circuit's decision in *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort* (10th Cir.2010) 629 F.3d 1173, 1181, 1187–1188, for examining the relationship between a subordinate economic entity and the tribe: " '(1) their method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are

CONFIDENTIAL   LVD-DEF00006128

served by granting immunity to the entities.' " (*American Property*, at p. 501, 141 Cal.Rptr.3d 802.) Applying those factors, which it found "accurately reflect[ed] the general focus of the applicable federal and state case law" (*ibid.*), but also quoting from several other decisions considering the arm-of-the-tribe question including *Trudgeon*, the court held U.S. Grant, LLC, the owner of a historic hotel in downtown San Diego, was not an arm of the Sycuan Band of the Kumeyaay Nation, a federally recognized Indian tribe, and thus not protected by the tribe's sovereign immunity. The "dispositive fact" for the court was that U.S. Grant, LLC was a California limited liability company, separated by several other layers of California limited liability companies from the Sycuan Tribal Development Corporation (STDC), a corporation charter under Sycuan's tribal laws. (See *American Property*, at pp. 495, 501, 505, 141 Cal.Rptr.3d 802.) From the complex structure created to insulate STDC from any possible liability in connection with ownership of the hotel, the court concluded "STDC was not primarily concerned about sovereign immunity with respect to the entities that it created to facilitate its investment...." (*Id.* at p. 505, 141 Cal.Rptr.3d 802.) The court expressly noted it was not expressing any view on whether STDC itself was protected by tribal sovereign immunity. (*Id.* at p. 505, fn. 10, 141 Cal.Rptr.3d 802.)

*8 The Colorado Supreme Court in *Cash Advance and Preferred Cash Loans v. Colorado ex rel. Suthers* (Colo.2010) 242 P.3d 1099, after reviewing decisions from a number of federal courts of appeals, articulated its own variation of the arm-of-the-tribe analysis in considering the precise question presented by the case at bar: Are MNE, conducting a short-term loan business under the trade name Cash Advance, and SFS, conducting a similar business under the trade name Preferred Cash Loans, arms of the Miami Nation of Oklahoma and the Santee Sioux Nation, respectively, and therefore protected by the tribes' sovereign immunity from state investigatory enforcement actions? Remanding the matter to the trial court to resolve that question in the first instance, the Supreme Court identified three factors, "each of which focuses on the relationship between the tribal entities and the tribes, to help guide the trial court's determination whether the entities in this case [MNE and SFS] act as arms of the tribes so that their activities are properly deemed to be those of the tribes: (1) whether the tribes created the entities pursuant to tribal law; (2) whether the tribes own and operate the entities; and (3) whether the entities' immunity protects the tribes' sovereignty." (*Id.* at p. 1110.)

### 3. *The Law of the Case Doctrine Does Not Restrict the Factors Appropriately Considered in the Arm–of–the–Tribe Analysis*

Under the law of the case doctrine, "a matter adjudicated on a prior appeal normally will not be relitigated on a subsequent appeal in the same case." (*Davies v. Krasna* (1975) 14 Cal.3d 502, 507, 121 Cal.Rptr. 705, 535 P.2d 1161; *People v. Barragan* (2004) 32 Cal.4th 236, 246, 9 Cal.Rptr.3d 76, 83 P.3d 480 ["when an appellate court ' "states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout [the case's] subsequent progress, both in the lower court and upon subsequent appeal" ' "].) The doctrine applies to decisions of intermediate appellate courts as well as courts of last resort (*People v. Murtishaw* (2011) 51 Cal.4th 574, 589, 121 Cal.Rptr.3d 586, 247 P.3d 941) and "even if the court that issued the opinion becomes convinced in a subsequent consideration that the former opinion is erroneous." (*Santa Clarita Organization for Planning the Environment v. County of Los Angeles* (2007) 157 Cal.App.4th 149, 156, 68 Cal.Rptr.3d 449; see *Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 491, 20 Cal.Rptr.3d 890, 100 P.3d 433 [" 'it is only when the former rule is deemed erroneous that the doctrine of law of the case becomes at all important' "].) The doctrine promotes finality by preventing relitigation of issues previously decided. (*George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd.* (1989) 49 Cal.3d 1279, 1291, 265 Cal.Rptr. 162, 783 P.2d 749; see *Searle v. Allstate Life Ins. Co.* (1985) 38 Cal.3d 425, 434, 212 Cal.Rptr. 466, 696 P.2d 1308.)

In *Ameriloan, supra,* 169 Cal.App.4th 81, 86 Cal.Rptr.3d 572 we held MNE and SFS's motion to quash should be granted if the tribal entities and the lending businesses they operate are sufficiently related to their respective tribes to be protected by tribal immunity and specifically referred to the criteria expressed in *Trudgeon v. Fantasy Springs Casino, supra,* 71 Cal.App.4th 632, 84 Cal.Rptr.2d 65 for analyzing the arm-of-the-tribe doctrine. (*Ameriloan,* at p. 98, 86 Cal.Rptr.3d 572.)[10] In urging us to reverse the trial court's order dismissing the case for lack of subject matter jurisdiction, the Commissioner analyzes the evidence primarily in light of the six factors for evaluating the immunity question set forth in the Tenth Circuit's decision in *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort, supra,* 629 F.3d 1173, as restated by Division One of the Fourth

CONFIDENTIAL                                                                    LVD-DEF00006129

District in *American Property, supra,* 206 Cal.App.4th 491, 141 Cal.Rptr.3d 802. In their respondents' brief MNE and SFS argue the Commissioner's reliance on *American Property* violates the law of the case doctrine, which, they assert, requires use of a "two-part test"[11] based on the analysis in *Trudgeon* to the exclusion of any other arm-of-the-tribe analysis.

10    We also cited *Redding Rancheria v. Superior Court, supra,* 88 Cal.App.4th 384, 105 Cal.Rptr.2d 773, a case that discusses the arm-of-the-tribe doctrine and the factors identified as dispositive in *Trudgeon* : "*Trudgeon* specifically held an Indian casino (a tribal *corporation* ) was entitled to immunity because of the importance of gaming in promoting tribal self-determination, the close link between the tribe and the casino, and the existence of federal law promoting Indian gambling." (*Redding Rancheria,* at p. 389, 105 Cal.Rptr.2d 773.)

11    As discussed in footnote 8, above, *Trudgeon* identified three factors, not two, but questioned the continued significance of evaluating whether the purpose of the tribal entity is governmental or commercial. (*Trudgeon v. Fantasy Springs Casino, supra,* 71 Cal.App.4th at p. 639, 84 Cal.Rptr.2d 65.) In directing the trial court to consider the criteria expressed in *Trudgeon,* our *Ameriloan* opinion omitted any express reference to that element of the arm-of-the-tribe analysis. (See *Ameriloan, supra,* 169 Cal.App.4th at p. 98, 86 Cal.Rptr.3d 572.)

*9 MNE and SFS misapprehend the import of our prior decision in *Ameriloan.* As discussed, in *Ameriloan* we mandated the trial court vacate its ruling that tribal sovereign immunity did not apply simply because MNE and SFS were conducting off-reservation, for-profit commercial activities (*Ameriloan, supra,* 169 Cal.App.4th at pp. 89–91, 86 Cal.Rptr.3d 572). We also rejected the arguments that application of tribal sovereign immunity in this case would intrude on California's exercise of its reserved powers under the Tenth Amendment (*id.* at pp. 91–94, 86 Cal.Rptr.3d 572) and tribal sovereign immunity had been waived (*id.* at pp. 94–96, 86 Cal.Rptr.3d 572). Accordingly, under the law of the case, as the trial court recognized when it revisited the motion to quash, the only question remaining was whether MNE and SFS and the businesses they operate function as "arms of the tribe." (*Id.* at pp. 97–99, 86 Cal.Rptr.3d 572.) Although we directed the trial court to consider the criteria expressed in *Trudgeon* in making that determination, nothing we said prohibited the trial court—or restricts this court in deciding the appeal now before us—from considering additional aspects of the relationship between the Miami Tribe of Oklahoma and the Santee Sioux Nation, on the one hand, and MNE and SFS and their payday loan businesses, on the other hand, in deciding the immunity issue. Regardless of how many nonexclusive and overlapping factors a court identifies, the relevant inquiry is ultimately the same: Are the tribal entities sufficiently related to their respective tribes to be protected by tribal sovereign immunity? *Ameriloan* established the governing legal principle. It did not prescribe a precise analytic process to apply that principle to the facts developed at the evidentiary hearing we authorized.

### 4. *MNE and SFS Are Protected by Tribal Sovereign Immunity from the Commissioner's Enforcement Action*

There can be little question that MNE and SFS, considered initially by themselves and without regard to the payday lending activities at issue in this enforcement action, function as arms of their respective tribes. In marked contrast to the situation considered in *American Property, supra,* 206 Cal.App.4th 491, 141 Cal.Rptr.3d 802, where the dispositive fact was that U.S. Grant, LLC had been organized under California law and was separated from the STDC, an entity created under tribal law, by several other lawyers of California limited liability companies (see *id.* at pp. 495, 501, 505, 141 Cal.Rptr.3d 802), MNE was created directly under the Miami Tribe's tribal law as a subordinate unit of the tribe itself to provide for its economic development. Also unlike the Sycuan Band's relationship to U.S. Grant, LLC (see *id.* at p. 505, 141 Cal.Rptr.3d 802), the Miami Tribe expressly intended for MNE to be covered by tribal sovereign immunity. Like our colleagues in Division One of the Fourth District, we believe the tribe's method and purpose for creating a subordinate economic entity are the most significant factors in determining whether it is protected by a tribe's sovereign immunity and should be given predominant, if not necessarily dispositive, consideration. (See *American Property,* at p. 501, 141 Cal.Rptr.3d 802 [quoting a number of court decisions that "have considered creation of an entity under tribal law as a factor weighing significantly in favor of a conclusion that the entity shares in the tribe's sovereign immunity"].)[12]

12    Identifying the weight to be given the various factors in the arm-of-the-tribe analysis is important; for, as Judge Frank H. Easterbrook of the Seventh Circuit Court of Appeals colorfully observed in a far different context, a "list of factors without a rule of decision is just a chopped salad." (*In re Synthroid Marketing Litigation* (7th Cir.2001) 264 F.3d 712, 719.)

CONFIDENTIAL                                                                    LVD-DEF00006130

Other elements of the various tests appearing in the case law also support the trial court's arm-of-the-tribe conclusion as applied to MNE. As discussed, MNE's initial board of directors consisted of the Miami Tribe's business committee, and the chief of the tribe has appointed all successor members of the MNE board in consultation with the business committee; all five members of the board are members of the Miami Tribe. Profits earned by MNE are utilized by the Miami Tribe to fund critical governmental services to its members including tribal law enforcement, poverty assistance, preschool and elder care programs. In addition, any tribal funds and other resources used to create, capitalize and operate MNE are necessarily at risk in its business operations. That tribal assets might not be directly jeopardized if MNE were allowed to be sued does not appear to be significant since the very purpose of creating any subordinate corporate entity is to create the opportunity for economic gain while protecting the tribe from potential liabilities; in the absence of a tribal guarantee, a judgment against a corporation will never impact a tribal treasury. (Cf. *Cook v. AVI Casino Enterprises, Inc., supra,* 548 F.3d at p. 725 [tribal corporation "competing in the economic mainstream" protected by tribal immunity if it functions as an arm of the tribe; here, economic benefits produced by tribal corporation inure to the tribe's benefit because "all capital surplus from the casino shall be deposited in the Tribe's treasury and because the Tribe, as the sole shareholder, enjoys all of the benefits of an increase in the casino's value"]; *Memphis Biofuels v. Chickasaw Nation Industries Inc.* (6th Cir.2009) 585 F.3d 917, 920–921 [section 17 of the Indian Reorganization Act of 1934, 25 U.S.C. § 477, authorizing incorporation of a federally chartered tribe's business activities, "creates 'arms of the tribe' that do not automatically forfeit tribal-sovereign immunity"]; but see *American Property, supra,* 206 Cal.App.4th at p. 506, 141 Cal.Rptr.3d 802 ["due to U.S. Grant, LLC's status as a California limited liability company, the Sycuan tribe's assets would not be exposed by any judgment against U.S. Grant, LLC"].) In sum, the Miami Tribe of Oklahoma and MNE are closely linked through method of creation, ownership, structure, control and other salient characteristics; and, although the operations of MNE are commercial rather than governmental—itself an essentially neutral consideration after *Kiowa*—extension of immunity to it plainly furthers federal policies intended to promote tribal autonomy. (See *Ameriloan, supra,* 169 Cal.App.4th at p. 98, 86 Cal.Rptr.3d 572; *Trudgeon v. Fantasy Springs Casino, supra,* 71 Cal.App.4th at p. 638, 84 Cal.Rptr.2d 65.)

*10 As with MNE, and again unlike the California limited liability company evaluated in *American Property,* SFS is a wholly owned corporation organized under tribal law and expressly protected from suit by the tribe's immunity. Pursuant to SFS's articles of incorporation, its board of directors consists of the members of the Tribal Council, who manage SFS; and the Tribal Council appointed the tribe's business manager as the chief executive officer of SFS. All profits earned by SFS are used by the Santee Sioux to help fund its government operations and social welfare programs, furthering the tribe's sovereign interest in economic development. Indeed, the evidence before the trial court was, because the reservation is in a severely depressed region, those profits are essential to maintaining a functioning tribal government able to provide necessary services to the tribe's members. Thus, the Santee Sioux and SFS are also closely linked by virtue of SFS's method of creation, ownership, structure and control, and extension of immunity to it substantially promotes tribal autonomy.

Although the tribes own and control MNE and SFS, their relationship to the cash advance and short-term loan businesses operated by those tribal entities under various trade names—Ameriloan, U.S. Fast Cash, United Cash Loans, One Click Cash and Preferred Cash Loans—is slightly more complicated. According to the Commissioner's evidence at the hearing on the motion to quash, those names had been registered and used to market payday lending services by Scott Tucker and/or his company NMS (or its predecessors) for several years prior to the entry of MNE and SFS into the short-term loan business in July 2008. More significantly, day-to-day operations of these fast-cash businesses—what the trial court referred to as "business minutiae"—have been effectively delegated pursuant to management agreements to NMS, a third-party, nontribal entity. Additionally, MNE and SFS do not participate in the net income from the businesses, receiving instead only a modest percentage of the gross revenues, characterized by the Commissioner as similar to a royalty. Thus, the Commissioner asserts in the opening brief, "The management agreements and bank records demonstrate that SFS and MNE, doing business as the Payday Lenders, are simply revenue-producing businesses created to facilitate Tucker's ordinary for-profit payday lending business for a set fee"—disparagingly denominated as a "sham," "rent-a-tribe" scheme by the Commissioner.

Yet the Commissioner necessarily concedes, as the evidence demonstrated, under the management agreements MNE

CONFIDENTIAL

LVD-DEF00006131

Case 3:17-cv-00461-REP   Document 1261-41   Filed 05/23/23   Page 13 of 14 PageID# 54136

People v. Miami Nation Enterprises, --- Cal.Rptr.3d ---- (2014)
Case: 13-3769   Document: 92   Page: 12   01/24/2014   1141637   13

and SFS have final decisionmaking authority to approve or disapprove any loans; advance instructions or approval parameters are established by them to allow the third-party managers to function on a quick-turnaround basis. Indeed, the agreements expressly provide that the tribal entities have "the sole proprietary interest in and responsibility for the conduct of the business" and that NMS's day-to-day management of the operations is "subject to the oversight and control of" MNE and SFS, respectively.

In other words, MNE and SFS are not merely passive bystanders to the challenged lending activities. A tribal entity engaged in a commercial enterprise that is otherwise entitled to be protected by tribal immunity does not lose that immunity simply by contracting with non-tribal members to operate the business. (See, e.g., *Native American Distrib. v. Seneca–Cayuga Tobacco* (10th Cir.2008) 546 F.3d 1288, 1294 [recognizing tribal immunity protected tobacco business of Seneca–Cayuga Tribe of Oklahoma from suit by third-party distributor notwithstanding limited waiver of that immunity in separate agreement with management company engaged to operate tribal business]; *Cabazon Band of Mission Indians v. County of Riverside* (9th Cir.1986) 783 F.2d 900, 901, *affd. sub nom. California v. Cabazon Band of Mission Indians* (1987) 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 [noting with approval the tribal business was "operated by non-Indian professional operators, who receive a percentage of the profits"]; but cf. *American Property, supra*, 206 Cal.App.4th at p. 505, 141 Cal.Rptr.3d 802 [designation of a nontribal entity to manage business created under state law, rather than tribal law, is a further indication that the business should not be considered an arm of the tribe for the purpose of sovereign immunity].) [13] Similarly, whether or not the Miami Tribe and the Santee Sioux negotiated good or poor management agreements for themselves—whether a share of net profits would be more beneficial under the circumstances than a percentage of gross revenues and whether they could have insisted on a higher percentage than they actually received—even if not minutiae, cannot serve as the basis to determine the tribal entities are not functioning as arms of their respective tribes.

[13]   In part in response to *California v Cabazon Band of Mission Indians, supra,* 480 U.S. 202, 107 S.Ct. 1083, which held California lacked authority to regulate bingo gambling conducted by Indian tribes on Indian land within the state, Congress enacted the Indian Gaming Act of 1988 (IGRA) "to provide a statutory basis for the operation and regulation of gaming by Indian tribes." (*Seminole Tribe of Florida v. Florida* (1996) 517 U.S. 44, 48, 116 S.Ct. 1114, 134 L.Ed.2d 252.) IGRA creates a cooperative federal-state-tribal scheme for regulation of gaming by federally recognized Indian tribes on Indian land.

*11 The recurring theme of the Commissioner's briefing and oral argument is that online payday lenders engage in egregious, deceptive and exploitive practices prohibited by California law. That leitmotif is reinforced by the assertion MNE and SFS's business activities also violate tribal laws and their own organizational documents with respect to interest rates as well as control of bank accounts and commingling of funds. Repeated commercial conduct the tribal entities concede violates tribal law or that is shown by uncontroverted evidence to be prohibited by the tribes as a matter of law may well be a factor properly considered in determining whether the entities are functioning as arms of the tribe. (Cf. *Flatley v. Mauro* (2006) 39 Cal.4th 299, 316, 46 Cal.Rptr.3d 606, 139 P.3d 2.) But the record here is far from undisputed, and it would offend all notions of tribal sovereignty for a state court to adjudicate whether MNE or SFS is violating tribal law. Moreover, as we explained in *Ameriloan, supra,* 169 Cal.App.4th at page 93, 86 Cal.Rptr.3d 572, although we recognize the public policy considerations supporting the Commissioner's efforts to protect poor and poorly educated consumers, " ' "sovereign immunity is not a discretionary doctrine that may be applied as a remedy depending on the equities of a given situation...." Rather it presents a pure jurisdictional question.' " [14]

[14]   Recognizing that online payday lending businesses owned and operated by tribal entities are likely to be found immune to enforcement actions by state authorities, several commentators have proposed federal legislation to regulate the industry. (See, e.g., Note, *Usury on the Reservation: Regulation of Tribal-affiliated Payday Lenders* (2011–2012) 31 Banking & Fin. L.Rev. 1053, 1071–1077; Martin & Schwartz, *The Alliance Between Payday Lenders and Tribes, supra,* 69 Wash. & Lee L.Rev. at pp. 790–791; Comment, *Circumventing State Consumer Protection Laws: Tribal Immunity and Internet Payday Lending* (2012) 91 N.C. L.Rev. 326, 342.)

In the end, tribal immunity does not depend on our evaluation of the respectability or ethics of the business in which a tribe or tribal entity elects to engage. Absent an extraordinary set of circumstances not present here, a tribal entity functions as an arm of the tribe if it has been formed by tribal resolution and according to tribal law, for the stated purpose of tribal

CONFIDENTIAL   LVD-DEF00006132

economic development and with the clearly expressed intent by the sovereign tribe to convey its immunity to that entity, and has a governing structure both appointed by and ultimately overseen by the tribe. Such a tribal entity is immune from suit absent express waiver or congressional authorization. Neither third-party management of day-to-day operations nor retention of only a minimal percentage of the profits from the enterprise (however that may be defined) justifies judicial negation of that inherent element of tribal sovereignty.

## DISPOSITION

The judgment is affirmed. MNE and SFS are to recover their costs on appeal.

We concur:

WOODS, J.

ZELON, J.

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.                12

CONFIDENTIAL                                                                                    LVD-DEF00006133