# EXHIBIT EEE



# Duck Creek Tribal Financial, LLC

N5384 US 45 N, Suite 400, P.O. Box 704, Watersmeet, Michigan 49969
Telephone: 906-358-2008     Facsimile: 906-358-2010

### Written Submission of James Williams, Jr. to the SBREFA Panel for Potential CFPB Rulemaking for Payday, Vehicle, Title, and Similar Loans

Duck Creek Tribal Financial, LLC ("Duck Creek") was chosen as a small entity representative to participate in the Small Business Review Panel ("Panel") convened on April 29, 2015. Duck Creek is a wholly owned and operated economic arm and instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribe"), a federally recognized Indian tribe, who owns and operates online small-dollar consumer lending businesses, including Duck Creek, pursuant to the Tribe's laws (the "Business"). I have served as an elected tribal leader for the Tribe for the past 28 years and as Co-Manager of the Business for the last two years.

It is important to note at the outset that tribal lending businesses are unique in the respect that money generated is used for the purpose of furthering the goals of tribal self-sufficiency; thus providing economic stability to our people. For the first time –with the Internet as the great equalizer – it does not that my Tribe is located in a geographically isolated portion of the western Upper Peninsula of Michigan. For tribes like mine – income generated from the Business makes up a significant portion of the Tribe's general fund budget which funds essential governmental services such as education, social services programs, health care, senior services, housing, and law enforcement.

Contrary to the presumptions outlined within the Consumer Financial Protection Bureau ("CFPB") March 26, 2015 *Small Business Review Panel For Potential Rulemakings for Payday, Vehicle Title, and Similar Loans: Outline of Proposals under Consideration and Alternatives Considered* ("Proposal"), we take great pride in our ability to provide assistance to consumers in their time of need. The Tribe has invested significant resources in the Business to focus on being a leader in the offering of tribal online consumer financial services products that balances business needs and provide the highest level of protections for consumers through licensing, audits, and available dispute resolution. While the question of whether any final rule will apply to the Tribe's businesses is suspect, our commitment to consumer protection and above-board business operation inspires us to provide thoughts regarding any rules we may later consider adopting as our own.

Our tribal lending business offers only longer-term covered loans, therefore my comments only pertain to the longer-term covered loans as described in the Proposal.

As a basis for regulation of covered longer term loans, the Proposal states the CFPB is looking "only to those loans with a cost above a specific threshold in order to focus regulatory



May 13, 2015 Written Statement of Chairman/Co-Manager James Williams, Jr. on behalf of Duck Creek Tribal Financial, LLC
A wholly owned and operated instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians
CONFIDENTIAL                                                                                                 ROSETTE_REVISED_000977
Page 1 of 12

treatment on the segment of the longer-term credit market that poses the greatest risk of consumer harm." Proposal at 19. The presumption that starting at a 36% all-in APR, mirroring the Military Lending Act, is appropriate could not be further from the truth.

The CFPB provides no data to support this presumption or to demonstrate that the APR is an adequate measure of harm to consumers. For example, if a lender offered a loan that had a duration of more than 45 days and charged a 400% all-in APR, but did not have either (1) access to repayment through the consumer's bank account; or (2) have a non-purchase money security interest in the consumer's vehicle, this would not be considered a longer-term covered loan, yet a loan at 37% interest for which a consumer opts to pay via their bank account is treated as a covered longer term loan. It is this lack of rhyme or reason that spurred the Tribe's interest in participating in the Panel in order to witness for ourselves what happens when a government agency is motivated by politics and paternalism rather than on ferreting out the truth and proposing regulations based in fact rather than assumptions. We are hopeful that we, as a Tribe, will learn from this process as we continue to promulgate laws and regulations to govern the Business.

## I.   False Presumption 1: Businesses Engaged in the Offering of Longer-Term Covered Loans do not Underwrite or Assess the Consumer's Ability to Repay

### a.   Presumption

The CFPB makes the unfounded presumption that businesses in the small-dollar lending industry do not underwrite or assess consumers' ability to repay. The Proposal states, "[I]n contrast to common underwriting practices in many other markets for consumer credit, many lenders make no attempt to analyze consumers' other financial obligations or to check credit reports." Proposal at 9. This presumption is false and relies on data obtained from store-front lenders that offer short-term covered loans. Had the CFPB collected adequate data related to the longer-term covered loan product it seeks to regulate, it would be aware that those offering longer-term covered loans, similar to the Business, underwrite loans using sophisticated algorithms that analyze thousands of data points to determine whether the consumer has the ability to repay the loan as well as the consumers commitment to repay. Indeed, the ability to successfully underwrite loans and accurately screen for fraud is the only way to ensure profitability of the Business.

### b.   Data

Less than 10% of consumers who submit applications to the Business are approved for a loan. During the underwriting process, the Business looks at over 1,000 data points as part of a statistically sound and empirically derived formula that includes, but are not limited to: income, identity verification, employment or other source of income, bank account, financial obligations, repayment history, OFAC, DOD database, fraud indicators, and data from two of the "big three" traditional credit reporting agencies. This type of comprehensive underwriting requires the assistance of vendors to obtain certain data _____ about applicants which includes traditional

May 13, 2015 Written Statement of Chairman/Co-Manager James Williams, Jr. on behalf of Duck Creek Tribal Financial, LLC
A wholly owned and operated instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians
CONFIDENTIAL                                                                    ROSETTE_REVISED_000978
Page 2 of 12

credit reporting agencies, non-traditional credit reporting agencies, fraud prevention technology and identity verifying services, and bank verification service providers.

Underwriting allows the Business to manage its risk and the risk to consumers appropriately and ensures that our customers pay back their loans. Moreover, major financial obligations are already considered during the underwriting process. Household obligations do not provide any statistical significance in the underwriting process because the loan is provided to a single individual, and even if such information proved statistically significant, this data is not available in any verifiable form. The CFPB's assumption that inclusion and verification of major financial and household obligations will somehow serve as a better indicator than the current sophisticated underwriting algorithms used to determine a consumer's ability to repay is unfounded and simply false.

c. Costs to Tribal Lending Business

Underwriting as well as marketing costs are sunk costs at the time a consumer applies for a loan. If the final rule requires additional underwriting criteria, those sunk costs will increase and have a detrimental effect on our business as well as the consumer in the form of increased overhead and an increased cost per loan which ultimately would be borne by the consumer.

It is clear that there are also many immeasurable costs to small businesses operating in this industry including tribal lending businesses, consumers, and the industry as a whole that the CFPB has not considered. First, access to capital needed to operate the small business would dry up due to the cost of capital often being tied to performance metrics of the business. If the business cannot perform, or afford the capital necessary to operate  - it will close  Furthermore, increased underwriting criteria and lower conversion rates (as discussed more fully in Section II) would result in less consumers qualifying for loans, leaving  consumers  less options to obtain cash during  an emergency.  Finally, the industry is harmed through the lack of innovation in the marketplace, decreased competition, and barriers to entry created by harsh unnecessary rules.

d. Alternatives

The CFPB should reconsider its presumption that the Business does not currently underwrite loans made to consumers and adopt a reasonable standard for determining the ability to repay that reflects the fact that the Business currently engages in extensive underwriting. Acceptance that a manual process is not better than an automated process is key. In order for the industry to survive, the Business must have the ability to determine a consumer's ability to repay through an automatic underwriting process that provides the consumer with a decision in seconds, anything longer will prove harmful to both the industry and consumers.

Before proposing any rule, the CFPB should also consider gathering and analyzing data specific to longer-term covered loan products to determine whether other lenders, like the Business, are already determining consumers' ability to repay and whether those methods are working.



May 13, 2015 Written Statement of Chairman/Co-Manager James Williams, Jr. on behalf of Duck Creek Tribal Financial, LLC
A wholly owned and operated instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians
CONFIDENTIAL                                                                                    ROSETTE_REVISED_000979
Page 3 of 12

## II.  False Presumption 2: Manual Verification Protects the Consumer Better than Self-Reporting and other Underwriting Tools Currently Used.

a.  <u>Presumption</u>

The Proposal would require lenders to verify a consumer's income, major financial obligations, borrowing history on covered loans, and possibly other household expenses.  The CFPB assumes that this will not unduly burden the Business and that costs to manually verify are insignificant.  This assumption is false and based on the misguided notion that these criteria can actually be verified, that such verification of expenses would be more indicative of a consumer's ability to repay than the underwriting techniques currently being used by lenders in the industry, and that verification would be simple.

The Proposal also does not consider the fact that requiring the consumer to fax or scan copies of their pay stubs and other documents evidencing major financial obligations will likely increase fraud.  Altering a statement or paystub is fairly easy and all that is needed is software or a pen and a scanner to insert, delete, or change the text.  Anyone with a word processor and basic skills could create and print documents to look like a real pay stub.  In fact, all someone needs to do is a quick Google search to find the steps on how to do it.[1]  For example, see

http://www.freddiemac.com/news/blog/joan_ferenczy/20120123_looking_mortgage_fraud_in_the_face.html.

As indicated in Section I, the Business underwrites 100% of its loans.  Part of this underwriting process may include manual verification when certain red flags or other data points trigger the need for manual verification.  Data provided below reflects that when our Business requires manual verification of consumer information, a significant drop in conversion rates (accepted applications subsequently approved and originated) is experienced.  This industry, for the consumer, is about urgency, customers need an immediate response to meet their financial needs.  Manual verification requirements will severely hinder the speed and convenience of obtaining a loan for the consumer and many consumers would choose not to go through that process.  If such verification were required for every applicant, the drop in conversion rates would drastically increase, thus creating higher costs for the business (and, in turn, the consumer) and significant losses in revenue for the Business.

b.  <u>Data</u>

Consumers continue to apply for and receive loans from our Business because of its convenience and speed.  When a consumer applies for a loan through the Business, underwriting

---

[1] http://www.checkstubmaker.com/ and
http://www.freddiemac.com/news/blog/joan_ferenczy/20120123_looking_mortgage_fraud_in_the_face.html



May 13, 2015 Written Statement of Chairman/Co-Manager James Williams, Jr. on behalf of Duck Creek Tribal Financial, LLC
A wholly owned and operated instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians
CONFIDENTIAL                                                                                                    ROSETTE_REVISED_000980
Page 4 of 12

is performed in real-time, and an approval or denial is usually provided within seven (7) seconds or less.

If income, major financial obligations, and other expenses are required to be verified (as discussed in the Proposal), it would be impossible to provide consumers with the same real-time decisioning which would cause consumers to go elsewhere and result in a massive losses to the Business.

A data sample of 1,438 loan applications for which consumers in the sample group were similarly qualified for a loan, however, one or more underwriting indicators raised concerns as to the applicants' identity, ability or commitment to repay or both was taken and split into two groups. The first group of 142 applicants for which sufficient verification could be validated without manual verification went through our automatic underwriting process and the second group of 1,296 applicants went through our manual verification process. The first group had a 72% conversion rate – meaning that 72% of the 142 applicants received a loan from our tribal lending business. The second group had only a 35% conversion rate – meaning that only 35% of the 1,296 applicants received a loan from the tribal lending business. The primary reason for the drastic reduction in conversion rates is squarely based on manual verification and the time it takes for the consumer to provide additional information that may not be easily accessed or is simply unavailable.

To further demonstrate this effect, we took a data sample of loans originated this year and analyzed the conversion rate (accepted applications subsequently approved and originated) based on the time that had passed between application submission and origination. In the first three hours 64.13% were originated or converted. Between three and six hours after application submission only 6.42% of the remaining outstanding applications were originated or converted. After 24 hours, the conversion rate is even lower at 3.36% of applications remaining.

The data samples reflect the drastic effect of manual verification which prohibits the ability to provide real time decisioning to a consumer on the tribal lending business. If we cannot tell the consumer their loan is fully approved and funds are on the way immediately, they will go elsewhere. Therefore, if the final rule requires the Business to verify information for each and every applicant, and such verification entails manually gathering information, we expect our conversion rates to drop, our consumers to go elsewhere and our Business to close.

c.  Costs

Manual verification of a consumer's income and expenses, leaving the Business without the ability to provide a real time decision - will have a chilling effect on our business. Decreased conversion rates and increased overhead will translate into higher costs per loan which will be ultimately be borne by the consumer.



May 13, 2015 Written Statement of Chairman/Co-Manager James Williams, Jr. on behalf of Duck Creek Tribal Financial, LLC
A wholly owned and operated instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians
CONFIDENTIAL                                                                                          ROSETTE_REVISED_000981
Page 5 of 12

d.  Alternatives

The CFPB should consider providing a "safe harbor" within the final rule in which the consumer's income and major financial obligations are deemed verified, constituting a "reasonable determination" of the consumer's ability to repay, if that lender uses a credit reporting agency to cross reference information contained within the consumer's loan application.

## III. False Presumption 3: Re-borrowing Traps Consumers in a Cycle of Debt.

a.  Presumption

The CFPB presumes that re-borrowing is indicative of the consumer's inability to repay. This presumption is false, and again, is based on data from lenders who offer short-term covered loans.  While those lenders may allow their customers to re-borrow before the loan is satisfied or re-borrow in order to pay off the first loan – this is not the case for our Business.

The Business does not allow a customer to take out a second loan until the first has been satisfied.  A customer who re-borrows is a returning customer whose loan terms have been satisfied and makes a new application for a new loan with the Business.  Our returning customers are some of our best customers and receive the best rates.  Our Business offers returning customers a VIP rate, which is less than the standard rate, because we know from prior experience with that customer that they possess both the ability and commitment to repay. To be sure, returning customers have lower default rates, pay their loans off faster, and therefore incur less fees and interest.

Contrary to the CFPB's presumption, our data shows that only about 15% of our customers ever re-borrow and the number of customers who re-borrow drops dramatically for second, third, fourth, etc. loans.  Re-borrowing is not the norm, does not harm consumers in the way the CFPB presumes, and re-borrowing in the longer-term covered loan context cannot be compared to the customer experience with the short term covered loan context.

b.  Data

Although our returning customers are some of our most valuable customers, not every customer chooses to take out a new loan, and those that do, act responsibly and use the product as intended.  We have analyzed data from our customers who took out their first loan with our tribal lending business between April and December of 2013.

During this time period, only 50% of first time customers were eligible for a new loan once the first loan had been satisfied.  Of _____ those that were eligible to take out a new

May 13, 2015 Written Statement of Chairman/Co-Manager James Williams, Jr. on behalf of Duck Creek Tribal Financial, LLC
A wholly owned and operated instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians
CONFIDENTIAL                                                                                 ROSETTE_REVISED_000982
Page 6 of 12

loan only about 30% actually did – meaning that only about 15% of the data sample ever re-borrowed.  There was an average of 77 days between the satisfaction of the customers' first loan and origination of the customers' second loan.

Of that 30% of customers who took out a second loan, 76% were eligible for a new loan once their second loan had been satisfied.  Of the 76% who were eligible only 31.98% actually took out a third loan.  There was an average of 56 days between the satisfaction of the customers' second loan and origination of the customers' third loan.

Of the original data sample of first time customers, only .36% took out 7 loans in a 24 month period, and even those customers averaged more than 30 days in between the sixth and seventh loans.

The CFPB's presumption that re-borrowing is indicative of the consumer's ability to repay is clearly false and without basis.  The data sample above shows that only a small percentage of consumers *ever* re-borrow, those that do still undergo underwriting before approval and there is a statistically significant amount of time between consecutive loans.

   c.  <u>Alternatives</u>

Instead of limiting the number of loans a consumer can take out in a given timeframe, the CFPB could prohibit lenders from allowing the consumer to take out a new loan to pay off the prior loan, require lenders to underwrite the new loan, or some other workable measure that makes sense for both the consumer and the lender.

## IV. False Presumption 4: Alternatives Proposed Allow for Continued Operation of the Industry

   a.  <u>Presumption</u>

The CFPB admitted during the April 29, 2015 Panel, that the proposed 5% PTI ratio was not based on any data, but rather an arbitrary number.  Such arbitrary decision-making by a federal agency is astounding.  The 5% PTI alternative would require the lender to shorten the duration of the loan which would require a drastic reduction in the APR to meet the ratio.  Given the costs associated with serving a high risk credit market, such changes would be harmful to both the lender and the consumer.  Any presumption that a 5% PTI would allow the industry to survive is false.

Moreover, the CFPB's presumption that the NCUA model is a viable alternative is equally ill-informed.  Credit unions who offer these types of loans are non-profit institutions.  Small businesses including tribal lending businesses engaged in this industry are for-profit.  Even so, many credit unions do not offer these _____ products because they do not make

May 13, 2015 Written Statement of Chairman/Co-Manager James Williams, Jr. on behalf of Duck Creek Tribal Financial, LLC
A wholly owned and operated instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians
CONFIDENTIAL                                           ROSETTE_REVISED_000983
Page 7 of 12

economic sense.  The same is true for tribal lending businesses.

b.  Data (related to 5% PTI)

The median gross annual income of the customers of the Business is $41,092.49, with a median gross monthly income of $3,424.37.  The average new customer takes out a loan for approximately $640 with a fully amortized 24 month repayment term. The current cost per loan is $300 over and above principal with a very efficient real-time underwriting process.  However, changes in underwriting, manual verification, and decreased conversion rates will likely drive the cost per loan to more than $600.  If the Business was required to abide by the 5% PTI alternative, a customer with the median income could pay a maximum of $171.21 per payment and the most that could be collected from that customer over the maximum six month term would be $1,027.31.  The Business would need to recover $1,240 from the customer just to break even – meaning that if the Business chose to follow this alternative each loan would be made at a $212.69 loss.

c.  Costs

Both alternatives would destroy the industry.  If the Business is required to take a loss on the loans it makes, there is no possibility of making a profit, and therefore no reason to remain in business.

Closing the business will also result in the loss of jobs for employees and reduce, if not eliminate, the consumers' ability to obtain money in emergencies.

d.  Alternatives

The CFPB should consider gathering and analyzing data from lenders offering longer-term covered loans that reflects what is actually affordable for consumers and how much offering these products actually costs small businesses.  A feasible alternative would be to increase the PTI ratio to reflect reality.  A 25%-30% PTI and a longer term might be more palatable.

**V.  False Presumption 5: Consumers are Harmed by the Product**

a.  Presumption

The CFPB makes a presumption that all consumers are harmed by both short-term and longer-term covered loan products primarily because lenders do not take into consideration the consumer's ability to repay and do not _____ perform any underwriting.   As already

May 13, 2015 Written Statement of Chairman/Co-Manager James Williams, Jr. on behalf of Duck Creek Tribal Financial, LLC
A wholly owned and operated instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians
CONFIDENTIAL                                                                                                    ROSETTE_REVISED_000984
Page 8 of 12

discussed above, this is simply not true of the Business.

A glaring hole in the Proposal is that the CFPB has not included or analyzed any data regarding how the Proposal might negatively affect consumers nor does it appear to have considered data from consumers expressing whether any of the covered loan products provide benefits to them or measure their satisfaction with current products.

The CFPB, as an entity created specifically to protect consumers, would be undermining its own mission by putting regulations in place that would essentially terminate this industry. The Proposal, if adopted into a final rule, would eliminate the ability of consumers, who would generally be unable to qualify for a loan from a traditional lender, to receive a loan of any kind. Beyond that, recent studies have shown that these kinds of regulations have very limited benefits for consumers.

b. Data

We ask our customers to take a short four-question survey following each call with one of our customer service representatives.  Our customers are asked the following questions and asked to measure their satisfaction on a scale of 1 to 4, 4 being very satisfied and 1 being very dissatisfied:

1. Please rate the professionalism of the customer service representative you just spoke with;
2. Please rate how well the customer service representative answered all of your questions;
3. Please rate your overall experience with our services; and
4. Please rate how likely you are to use our services in the future.

Out of a sample of over 50,000 calls, customers were asked to rate their experience with the Business.  Results are overwhelmingly positive, the surveys reflect:

1. 3.785 out of 4 when asked about the professionalism of our customer service representatives.
2. 3.831 out of 4 when asked how well our customer service representatives answered all of their questions.
3. 3.699 out of 4 when rating their overall experience with our services
4. 3.480 out of 4 when asked how likely they would be to use our services in the future.

Furthermore, a series of recent studies have shown that taking out small-dollar loans does not inflict the kind of financial distress on borrowers presumed by the CFPB.  One study suggests that, in the year of a default on a loan, a consumer's credit score will decrease by only an insignificant amount.  In the following years, it will begin to rebound, making that credit drop



May 13, 2015 Written Statement of Chairman/Co-Manager James Williams, Jr. on behalf of Duck Creek Tribal Financial, LLC
A wholly owned and operated instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians
CONFIDENTIAL                                                                                              ROSETTE_REVISED_000985
Page 9 of 12

even less significant.[2]  In comparison to something like a "catastroph[ic]" loss that would occur in the face of a mortgage loan default, the effects of defaults on [small-dollar] loans are "trivial at best."[3]

The predictive and practical value of regulations imposing a payment-to-income ratio requirement have also had little benefit for consumers and lenders alike, while heavily reducing access to credit for consumers.  Regulation that fails to consider the reality of the consumers' situation will stunt access to credit: capping the interest rate on loans, for example, can all but eliminate the small-dollar lending industry in a state.[4]  One study found that regulations imposing a ceiling on payment-to-income ratio results in a reduction in access to credit for a typical consumer but do not provide a significant improvement in the rate at which a loan is paid off.[5] **With a payment-to-income limit of 5%, the loan payoff rate was only increased by 0.7% while the volume of credit was reduced between 55.1% and 92.6%.**[6]  Another study found the same result: payment-to-income ratios are "non-predictive for the default of the average consumer who receives a loan."[7]  Thus, while underwriting requirements and payment-to-income requirements greatly reduce access to small-dollar loans, they do not appear to increase the rate at which consumers pay off their loans or do a very good job of predicting if consumers have the ability to repay.

Using regulation to limit access to small-dollar loans may also have unintended effects on consumers.  One study found that, after Georgia banned small-dollar lending, Georgia saw a decrease in creditworthiness and an increase in bankruptcy filings.  The study reflects that "[r]elative to other states, households in Georgia bounced more checks after the ban, complained more about lenders and debt collectors, and were more likely to file for bankruptcy under Chapter 7."[8]  Similar results have been seen in North Carolina.[9]  The study suggests that this result occurs because the alternatives to small-dollar loans, such as bounced check protection fees, are still more expensive and detrimental to consumers than small-dollar loans are.[10]

These recent studies show that the Proposal may not really improve the current small-dollar lending system.  At the same time, they indicate that consumers will clearly be harmed by reducing their access to credit.  Consumers' credit scores have not been shown to be harmed in a

---

[2] RONALD MANN, DO DEFAULTS ON PAYDAY LOANS MATTER?, 22 (2014). ("[T]he effect of a default on the borrower's overall financial health is trivial at best—associated with a trivial drop of 15 points or less . . . . Moreover, because of rebounds in credit scores in the years following the default, the regressions indicate that the "all-in" credit score decline associated with a default is considerably smaller, in the ranger of 5 – 7 points.").

[3] Id.

[4] For example, New York's criminal usury state caps interest rates at 25%, which has essentially criminalized short-term lending. Chris Cirillo, *Payday Loan Regulation: Any Interest?*, 11 DePaul Bus. & Com. L. J. 417, 433 (2013).

[5] J. HOWARD BEALES, III & ANAND M. GOEL, SMALL-DOLLAR INSTALLMENT LOANS: AN EMPIRICAL ANALYSIS, 58 (2015).

[6] Id.

[7] PETER TOTH, NONPRIME101, MEASURES OF REDUCED FORM RELATIONSHIP BETWEEN THE PAYMENT-INCOME RATIO AND THE DEFAULT PROBABILITY, 6 (2015).

[8] Donald P. Morgan and Michael R. Strain, *Payday Holiday: How Households Fare after Payday Credit Bans*, FED. RES. BANK OF N.Y. STAFF REPORTS, Nov. 2007, at 3.

[9] Id.

[10] Id. at 4.



May 13, 2015 Written Statement of Chairman/Co-Manager James Williams, Jr. on behalf of Duck Creek Tribal Financial, LLC
A wholly owned and operated instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians
CONFIDENTIAL                                                                                          ROSETTE_REVISED_000986
Page 10 of 12

non-trivial way by taking out a small-dollar loan.  The CFPB, in its mission to protect consumers, should consider the negative effects of these restrictions before promulgating a rule.

## VI.  The Impact of the Proposal Would Be Devastating, Not Only to Small Lenders, But Also to Families, Communities, and Tribes

The Proposal in its present form, if adopted by the Tribe to be applied to the Business would almost surely lead to immediate closure.

While, the loss of a small business like ours may seem inconsequential to Washington DC regulators at the CFPB, the impact of such a loss is far more profound to those of us who live and work in geographically remote, rural areas where jobs are scarce and resources are limited. In these areas, businesses that SBREFA classifies as "small" are, in fact, "big."  The loss of those businesses would be significant, not only to the employees of the businesses, but also to their family members and other members of their communities, each of whom are themselves consumers and worthy of protection.

For tribally-owned businesses like ours, the impact of the Proposal would be especially severe. The Tribe uses the revenue generated from its tribal lending business directly and substantially supports our citizens, many of whom are unemployed and otherwise impoverished. In a community that suffers from historically high unemployment (exceeding fifty percent) where the Tribe does not enjoy the same traditional revenue-generating tools available to other sovereigns, the tribal lending business offers opportunity and hope.  The Tribe does not have any realistic ability to impose property, sales or income taxes to fund government services to citizens and nor is the Tribe proximate to a major population center that would afford significant recreation or tourism opportunities.  The Tribe is geographically remote.  The Tribe has made the most of its rural resources, but the Tribe must utilize commercial enterprises, as extensions of the Tribal government, to fund its governmental functions.  The revenues from the tribal lending business supports the Tribe's economy, allowing us to diversify, and supplement a waning government budget in order to provide essential governmental services such as education, social services programs, health care, senior services, housing, and law enforcement.

In recounting the disadvantages of the Tribe, I do not mean to suggest that our struggles provide the Tribe with a license to earn money by any means necessary.  Instead, and as stated previously, the Tribe has expended considerable resources to structure our tribal lending business in a way that protects the consumers.  Indeed, my Tribe is a leader in the tribal consumer financial services industry in part because of our commitment to consumer protection by the tribal lending business and the independent regulatory body charged with regulation of the same. The Tribe's lending businesses operate under Tribal laws and regulation comparable to federal and state laws and regulation.  An independent regulatory authority is tasked to implement Tribal consumer finance laws and to regulate all Tribal consumer financial services—everything from lender to vendor to consumer.

May 13, 2015 Written Statement of Chairman/Co-Manager James Williams, Jr. on behalf of Duck Creek Tribal Financial, LLC
A wholly owned and operated instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians
CONFIDENTIAL                                                                                                    ROSETTE_REVISED_000987
Page 11 of 12

Given the immeasurable impact the Business has on my Tribal community, it is imperative that we be able to continue to operate in order to meet the needs of the Tribe. We know the best way to achieve such longevity is to treat our customers well and earn their repeat business and good references. We do this by employing rigorous consumer protection measures and by responding to customer inquiries and complaints in a manner that is favorable for the customer. For example, our tribal lending business on-boarded with the CFPB last year to provide its customers with another platform to submit complaints and inquiries to the Business through the CFPB Portal. The CFPB Portal has proved to be a beneficial mechanism for both the tribal lending business and its customers to resolve complaints. Quite frankly, customer complaints, including those received through the CFPB Portal, account for a very small percentage of loans originated – less than .0001%.

## VII.    Conclusion

I thank you again for the opportunity to participate in this Panel. I sincerely hope that the CFPB will reconsider its decision to create an all-encompassing rule to include longer-term covered loan products without a sufficient statistical or data driven basis to do so. The CFPB would do well to go back to the drawing board when it comes to longer-term covered loan products in order to first gain a better understanding of the industry and the product as a whole. Unintended consequences of hasty ideas and decision-making could be devastating for both small businesses and consumers.

I am available to further discuss any of my oral or written comments to the Proposal.

Regards,

James Williams, Jr.
Co-Manager

May 13, 2015 Written Statement of Chairman/Co-Manager James Williams, Jr. on behalf of Duck Creek Tribal Financial, LLC
A wholly owned and operated instrumentality of the Lac Vieux Desert Band of Lake Superior Chippewa Indians
CONFIDENTIAL                                                                                                    ROSETTE_REVISED_000988
Page 12 of 12