# **Exhibit J**

CRAIG MANSFIELD - 01/18/2019

```
 1              UNITED STATES DISTRICT CIRCUIT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                       Richmond Division

 3     ----------------------------------------------------
       LULA WILLIAMS, et al.,
 4
                 Plaintiffs,
 5
       v.                                Case No. 3:17-cv-00461
 6
       BIG PICTURE LOANS, LLC, et al.,
 7
                 Defendants.
 8     ----------------------------------------------------

 9

10

11

12

13

14

15     ----------------------------------------------------

16                   VIDEO-RECORDED DEPOSITION

17                            OF

18                     CRAIG R. MANSFIELD

19     ----------------------------------------------------

20

21

22

23

24

25     Taken January 18, 2019       By Christine M. Clark, RPR
```

1    to me the member was always the council.
2  Q. Yep.  I'm just trying to help understand what Article 6
3    means when it says that you were hired or appointed by
4    the member.  And I believe that what you've said is that
5    the tribal council appointed you as --
6  A. Yes.
7  Q. -- co-manager.  Could you describe generally your roles
8    as co-manager of Red Rock?
9  A. I wasn't involved.  At the very beginning I helped set
10   up the -- our call center that we had on our property.
11   It started with where we purchased cubicles.  It was six
12   cubicles.  We purchased computers.  We set up the
13   Internet to go there.  We got billing.  We had set up
14   the payment.  We went through the hiring.  We, you know,
15   hired an assistant manager.  Then the first go-around we
16   hired four call center operators, and then we hired an
17   additional two who sat down and worked up the employee
18   handbook and set up a payroll for it.  This was what we
19   -- I did at the very beginning.
20      As far as being a co-manager, I wasn't really
21   heavily involved in the day-to-day operations.  I did
22   more so where we were reviewing contracts, where I would
23   look at contracts.  I would review them, look at edits
24   with our lawyer and approve them.  I also looked at
25   marketing strategies that were -- were discussed,

1   customer acquisition.  We sat down and developed call
2   center scripts, and -- and I'm sure there's other
3   things.  I just don't recall at this point.
4   Q. Sure.  Just to be clear when you say you weren't
5      involved in the day-to-day operations, what you mean is
6      you were involved in the management function, but not so
7      much the on the ground, you know, day-to-day, for
8      example, the call center op?
9               MR. ALBANESE:  Object, leading.
10  A. Well, what I mean I wasn't -- the day-to-day in the call
11     center I was involved at the very beginning.  I also sat
12     there and hired people to staff it, not only for the
13     first go-around, but then afterwards, when I wasn't
14     involved as the operations manager there, I sat there
15     and hired more people for the sit down in the interviews
16     and go through all of that.
17  Q. And those were the people who were involved in the
18     day-to-day operations?
19  A. Yes.
20  Q. You said you hired an assistant manager.  Do you
21     remember who that was?
22  A. I remember his first name.
23  Q. Sure.
24  A. It was Jason.
25  Q. Do you remember the names of any of the call center

1    operators?
2  A. From seven years ago, I'm sorry I do not.
3  Q. How about the people who helped you with the handbook?
4  A. I wrote -- well, it was Karrie helped me, our lawyer,
5     with doing some of that. I did some of the edits, and
6     we sat down together and finished out the handbook.
7  Q. Was the handbook just you and Karrie then?
8  A. Yes.
9  Q. Do you know why the tribe felt it needed an outside
10    consultant to help with the lending business?
11           MR. DUROCHER: Object to the form.
12 A. Well, sure. Any time you start a new business, you --
13    you don't have expertise in it. You don't understand
14    how to -- to run it properly. So that's why you pay a
15    service provider to help you learn this business.
16 Q. And who was the service provider that the tribal lending
17    entity selected, if you remember?
18 A. It was Matt Martorello.
19 Q. And do you recall whether the companies that Matt
20    Martorello worked with, do you remember the names of
21    them?
22 A. The one I know is Bellicose.
23 Q. How did the tribe come to select Bellicose, if you know?
24 A. There was a meeting of -- I don't recall exactly when,
25    and we had met with Matt and it was discussed. People

1  that?
2         MR. WITSCH: Yes. Just to yourself though
3  please.
4         THE WITNESS: Okay.
5  Q. MR. WITSCH: So is it true under this provision that the
6     criteria used to determine whether to extend funds to
7     individual borrowers rested solely and absolutely in the
8     discretion of Red Rock?
9         MR. ALBANESE: Objection, leading.
10 A. Yes.
11 Q. MR. WITSCH: Were decisions as to whether to originate
12    loans made by employees at Red Rock, if you know?
13 A. Define originate.
14 Q. Well, what does originate mean to you, Mr. Mansfield?
15 A. It's where the loans would -- you would begin the loan
16    process.
17 Q. So were the decisions as to whether to make individual
18    loans to individual borrowers being made by people who
19    worked at Red Rock?
20 A. Yes.
21 Q. And where did those people work?
22 A. At the call center.
23 Q. And when you say the call center, you mean the call
24    center in Watersmeet, Michigan?
25 A. Yes.

1  Q. So that would be on tribal reservation?
2  A. Yes.
3  Q. When Red Rock went to collect a loan, do you know who
4     would be the company that would ultimately make
5     collection decisions?  Would it be Red Rock?
6  A. When a -- when you talk about someone defaulted on a
7     loan, or just the actual for us to collect like the
8     money from their account?
9  Q. I think my question is, when you were collecting funds
10    from individual borrowers' accounts, those collections
11    were being done by the same employees at the call
12    center, right?
13 A. Yes.
14 Q. And those collection activities were happening again at
15    the call center in Watersmeet, Michigan?
16 A. Yes.
17 Q. Which is on the tribal reservation?
18 A. That is correct.
19 Q. Do you recall whether there was a similar agreement in
20    place between Duck Creek Tribal Financial and
21    SourcePoint?
22           MR. DUROCHER:  Similar to Exhibit 9?
23           MR. WITSCH:  9, yes.
24 A. I don't recall the exact one.
25 Q. MR. WITSCH:  Did Bellicose and SourcePoint provide

1    consulting advice to Duck Creek, in addition to Red
2    Rock?
3  A. Yes.
4  Q. Were the functions that Bellicose and SourcePoint
5    performed essentially the same vis-à-vis Duck Creek that
6    they were with Red Rock?
7  A. Yes.
8  Q. What specific tasks would you say were within your
9    bailiwick as co-manager of the tribal lending entities?
10        MR. DUROCHER:  He already talked about some
11    of the work he did in the formation.
12        MR. WITSCH:  Sure.
13        MR. DUROCHER:  I don't want him to repeat
14    all of that.  Right?
15        MR. WITSCH:  I understand.  Yeah.  No.
16  Q. MR. WITSCH:  I'd just like to know your day-to-day as
17    co-manager of Red Rock.
18  A. Day to day, I wasn't heavily involved in the day-to-day
19    operations.  I would -- we would -- when there is
20    contracts that need to be signed, and again I would just
21    -- I would look at them, review them, and have them
22    looked over by legal counsel, and then we would approve
23    them.  The same thing when we were -- for funding, I was
24    part of that, the discussions and the approval process,
25    when we went through direct mail, when we went through

1   some of the strategies for to get the people to get the
2   loans, acquisition of customers, the actual how -- how
3   the form of that was set for it.
4   Q. So, in other words, you were performing a management
5   function as opposed to a day-to-day function?
6   A. Yes.
7   Q. You said one of the things you would do would be to
8   review contracts that needed to be signed, and you'd
9   review them with counsel. I don't want you to tell me
10  what you discussed with counsel. But who -- which
11  lawyer would you discuss contracts with, or lawyers?
12              MR. DUROCHER: You can answer that.
13  A. Karrie Wichtman.
14  Q. MR. WITSCH: Who is Karrie Wichtman?
15  A. She was our -- the lawyer for our company, legal
16  counsel.
17  Q. Do you know where Karrie Wichtman worked at the time you
18  were co-manager?
19              MR. DUROCHER: Which law firm or which
20  location?
21  Q. MR. WITSCH: Which law firm Karrie Wichtman worked at.
22  A. Rosette & Associates.
23  Q. And is Rosette outside general counsel to the tribe, or
24  was it at the time you were tribal co-manager?
25  A. I don't remember the exact -- how it worked, but we --

1  A. Yes.
2  Q. Do you recall there being a recommendation process
3     whereby folks from Bellicose and SourcePoint would make
4     certain recommendations to you and Michelle Allen as to
5     certain things?
6  A. We would have conference calls, and we would sit down
7     and discuss things.
8  Q. Do you recall whether there was a recommendation -- when
9     SourcePoint and Bellicose would make recommendations to
10    you whether sometimes they were made through a formal
11    recommendation form?
12 A. I don't have exact knowledge of it, but I don't recall.
13              MR. WITSCH:  This will be Number 10.
14              (Exhibit 10 is marked for identification.)
15 Q. MR. WITSCH:  Mr. Mansfield, I've just marked Number 10.
16    Do you recognize what Number 10 is?
17 A. It's a Recommendation to Take Action, for Request for
18    Approval.
19 Q. And it's addressed from SourcePoint to yourself, and --
20    I would butcher it if I tried.  But that is Michelle
21    Allen's name, correct?
22 A. Yes.
23 Q. And it's dated 1/6/2014.  You were still one of the
24    co-managers of Red Rock at the time, right?
25 A. At that point, yes, I was.  I believe about eight days

```
 1     later I resigned.
 2  Q. Are you familiar with this type of form?
 3  A. Yes.
 4  Q. Could you just describe the process by which SourcePoint
 5     would send you this type of form?
 6  A. I am familiar with it because I've seen it before, but,
 7     as far as how we went about obtaining it, I don't recall
 8     exactly how that went about.
 9  Q. But you recall receiving documents that look like this
10     one?
11  A. Yes.
12  Q. And what would you do when you received a document like
13     this?
14  A. I would look it over, see what the recommendation is and
15     the reason, and if it made sense I would approve it.
16  Q. And if it didn't make sense?
17  A. Then wouldn't be approved.
18  Q. And ultimately any SourcePoint recommendation would have
19     to be approved by you or -- you and/or Michelle Allen,
20     right?
21  A. Yes.
22            MR. ALBANESE:  Leading, objection.
23  Q. MR. WITSCH:  This wouldn't be adopted unless one of you
24     approved it?
25            MR. DUROCHER:  By this, you mean this
```

1  A. I wouldn't know.
2  Q. When you were a co-manager, how -- how -- was your term
3     at Red Rock and Duck Creek, did that all happen around
4     the same time as co-manager?
5  A. Yes.
6  Q. Okay. Did Duck Creek have separate call center
7     representatives than Red Rock?
8  A. I don't know the answer to that, but we had one call
9     center. From my understanding, so you had a business
10    that became another one, and that's -- I mean I believe
11    that's how it -- it went. What did we have? We had one
12    call center, and that was Duck Creek.
13 Q. Okay. And you said at the time you left there were
14    eight people working in the call center?
15 A. There may have been more. At the time I left, there
16    were eight people at least.
17 Q. Okay. But there weren't like 50 people?
18 A. No.
19 Q. No. There might have been 10 maybe?
20 A. I --
21 Q. Yeah.
22 A. Somewhere around there.
23 Q. Okay. So, when you were co-manager at Duck Creek and
24    Red Rock, how frequently would you interact with Matt
25    Martorello?

1  A. We would have conference calls with myself, with Shelly,
2     with Matt. I believe Karrie would be on them.
3     Infrequently.
4  Q. So like once a month?
5  A. We tried to do it every week.
6  Q. Okay. When you were co-manager of Duck Creek and Red
7     Rock, did you work -- where was your office? Did you
8     have an office?
9  A. When I was the office manager, I had one right there in
10    the call center. Other than that, I just worked from my
11    area as the hotel manager.
12 Q. Okay. And when were you office manager?
13 A. Right around when we went down to the travel -- down to
14    Chicago, for approximately three to five months, I was
15    the manager of that business, operations manager.
16 Q. Okay. And while you were operations manager, you would
17    work in the office with the call center representatives?
18 A. Yeah.
19 Q. How many hours a week were you spending in that office?
20 A. Approximately -- it varied. I started around 40, and at
21    the end it was closer to about 20.
22 Q. And during this time you still had responsibilities at
23    the other tribal businesses that you worked with?
24 A. Yes.
25 Q. And did -- there was no office on tribal grounds related

1   A. That's correct.
2   Q. Okay.  Were there certain underwriting criteria in terms
3      of whether Red Rock or Duck Creek would approve a loan?
4   A. There were things discussed about that.  Do I remember
5      exactly what they are?  No, I do not.
6   Q. But were there underwriting criteria, do you remember,
7      just in general?
8   A. Well, there was, I believe so, yes.
9   Q. Okay.  Do you know who would have developed that
10     underwriting criteria?
11  A. That information would have been provided by our service
12     provider, our paid service provider.
13  Q. Okay.  And your paid service provider was Bellicose?
14  A. Yes.
15  Q. Were there -- do you know if there were any
16     verifications done to ensure that the information that
17     that the borrower was providing was correct?
18  A. No, I do not.
19  Q. Okay.  You said earlier that I think that the -- the
20     tribe ultimately had the authority about whether to fund
21     the loan or not; is that correct?
22  A. Yes.
23  Q. How would they indicate to fund the loan?
24  A. I -- we had the account the money went through that we
25     were the ones that would actually put the money in and

```
 1     take the money out of the accounts.  That was done at
 2     the tribe, at the call center.
 3  Q. How was that done though?  The -- do you know how
 4     exactly that was done?
 5  A. No, I don't.
 6  Q. Okay.  So someone submits a loan application, and then
 7     there's some determination about whether to approve the
 8     loan or not, but you're not entirely sure how that whole
 9     process worked?
10  A. That is correct.
11  Q. Okay.  Was there a loan -- was there a particular piece
12     of software used to manage this whole process?
13  A. There was a software program that was used at the call
14     center, yes.
15  Q. Okay.  Do you know the name of that program?
16  A. No, I do not know.
17  Q. Okay.
18  A. I do not remember.
19  Q. Did you use that program?
20  A. Yes.
21  Q. Okay.  Did you train people on how to use that program?
22  A. Myself and Jason.
23  Q. Okay.
24  A. More so Jason had the ability to train them a little bit
25     better than myself.
```

```
 1    was used --
 2                MR. WITSCH:  Objection to the form.
 3  Q. MR. ALBANESE:  -- in relation to Red Rock loans.
 4                MR. WITSCH:  Objection to the form.
 5  Q. MR. ALBANESE:  Are you aware of any call center in the
 6    Philippines being used at Red Rock?
 7                MR. WITSCH:  Objection to the form.
 8  A. I'm aware there were call centers in the Philippines.
 9    Yes.
10  Q. MR. ALBANESE:  Okay.  And call centers in the
11    Philippines were used at the time you were co-manager of
12    Red Rock?
13                MR. WITSCH:  Objection to the form.
14  A. Yes.
15  Q. MR. ALBANESE:  And what did those call centers do?
16  A. I -- I don't know exactly what they did, but we would
17    support them and answer questions for them.
18  Q. Okay.
19  A. About loans that people had.
20  Q. Okay.  So were they -- were they performing a similar --
21    were the people working at the call center in the
22    Philippines performing a similar function to the people
23    working on tribal grounds, the call center
24    representatives?
25                MR. DUROCHER:  Object to the form.
```

1    definitively.

2  Q. That's fine.  But I guess my question more specifically

3    is this contractual provision leaves the responsibility

4    for loan documentation functions with Red Rock, right?

5  A. Yes.

6           MR. ALBANESE:  Objection, form.

7  Q. MR. WITSCH:  And then in subsection (j), that's the one

8    that says Servicer may also be responsible for training

9    and monitoring employees of the Enterprise that operate

10    the Enterprise's call center.

11      Did I read that correctly?

12  A. Yes.

13  Q. So, in other words, they were providing some training to

14    the folks who worked in the call center.  But at the end

15    of the day it was the co-managers who were in charge of

16    the folks who worked at the call center, right?

17           MR. ALBANESE:  Objection, leading.

18  Q. MR. WITSCH:  I'll ask it again.  So this provision seems

19    to say that SourcePoint would provide some training to

20    the people in the call center.  Is that what they did?

21  A. The only people that were trained was myself and my

22    co-manager.  And excuse me.  My -- the assistant

23    operations manager.

24  Q. And then the assistant operations manager would provide

25    training to other folks that worked for you?

1  A. Yes. In the call center that we had at the -- on the
2     reservation.
3  Q. And just to go back to the folks that worked at the call
4     center on the reservation one more time, I think it was
5     your testimony, but correct me if I'm wrong, but it was
6     ultimately those folks who were the ones who were moving
7     the funds in and out of the consumers' bank accounts,
8     right?
9  A. Yes. At the end of the day we made sure that the funds
10    are transferred through just following some basic steps
11    of moving the money and setting up so the program runs.
12 Q. And just to be precise, when you say we, you mean the
13    folks who worked at Red Rock on the reservation?
14 A. Yes. The employees of Red Rock.
15 Q. Do you know whether the tribe always intended to
16    ultimately to purchase the servicers from the beginning?
17    Was the idea to learn and then ultimately purchase the
18    business outright?
19 A. Yeah. I believe all along they wanted to run the
20    business and own it on their own.
21 Q. One more. If you would go back to Exhibit Number 11.
22    On the second page, Mr. Albanese spent some time talking
23    to you about the compensation you were paying folks that
24    worked at Red Rock. The ultimate authority or decision
25    -- let me start that again.

1  I, Craig R. Mansfield, have read this transcript, pages
2  1 - 190, and acknowledge herein its accuracy except as
3  noted on the errata sheet.
4
5                      _____
6                                      Signature
7
8  _____
9          Notary Public
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1   STATE OF MINNESOTA

 2                    CERTIFICATE

 3   COUNTY OF CARVER

 4          I, Christine M. Clark, RPR, hereby certify
     that I reported the Video-Recorded Deposition of Craig
 5   R. Mansfield, on this 18th day of January, 2019, in
     Minneapolis, Minnesota, and that the witness was by me
 6   first duly sworn to tell the truth and nothing but the
     truth concerning the matter in controversy aforesaid;
 7
            That I was then and there a notary public in and
 8   for the County of Carver, State of Minnesota; that by
     virtue thereof I was duly authorized to
 9   administer an oath;

10          That the foregoing transcript is a true and
     correct transcript of my stenographic notes in
11   said matter, transcribed under my direction and
     control;
12
            That the cost of the original has been
13   charged to the party who noticed the deposition and
     that all parties who ordered copies have been
14   charged at the same rate for such copies;

15           That the reading and signing of the
     deposition was not waived;
16
            That I am not related to any of the
17   parties hereto, nor interested in the outcome of the
     action and have no contract with any parties,
18   attorneys or persons with an interest in the action
     that has a substantial tendency to affect my
19   impartiality;

20            WITNESS MY HAND AND SEAL this 30th day of
     January 2019.
21

22
                            ------------------------
23                          Christine M. Clark, RPR
                            Notary Public
24

25
```