# Exhibit S

**In the Matter Of:**

*Williams v.*
*Big Picture*

*James Dowd*
*November 13, 2018*
*Confidential*



**Confidential**

1

1        IN THE UNITED STATES DISTRICT COURT
                     FOR THE
2            EASTERN DISTRICT OF VIRGINIA
                 RICHMOND DIVISION
3

4

   LULA WILLIAMS, et al.,                )
5                                        )
                                         )
6                    Plaintiffs,         )
                                         )
7           vs.                          ) No. 3:17-cv-00461
                                         )
8   BIG PICTURE LOANS, LLC, et al.,      )
                                         )
9                    Defendants.         )

10
   STATE OF ILLINOIS      )
11                        )  SS.
   COUNTY OF COOK         )
12

13

14        The videotaped deposition of JAMES V. DOWD

15  taken before Melanie E. Kubiak, Certified Shorthand

16  Reporter, at 180 North LaSalle Street, Suite 2800,

17  Chicago, Illinois, commencing at 9:05 a.m. on the

18  13th day of November, 2018.

19

20

21

22

23

24

James Dowd - November 13, 2018
**Confidential**

36

1      A.    Can you be more specific?

2      Q.    Sure.  Like, did you -- did Bellicose VI

3   provide parameters as to when Red Rock should make a

4   loan to a consumer?

5      A.    They would provide analysis or guidance or

6   suggestions to the Tribe that -- you know, that the

7   analysis said maybe you want to add this criteria or

8   delete it.  But that all would have been ultimately

9   approved by the co-managers of -- of either Duck Creek

10  or Red Rock.

11     Q.    Were you involved in providing those

12  recommendations to the Tribe?

13     MR. DUROCHER:  Object to the form.

14  BY THE WITNESS:

15     A.    Yes, from time to time.

16     Q.    Okay.  How -- How were those recommendations

17  provided to the Tribe?  Was it like a memo or an e-mail

18  you would send to the tribal managers?

19     A.    There could have been a variety of different

20  ways, either e-mails or phone calls, in-person meetings

21  from time to time.  And then there's also a more formal

22  approval process that I can't remember when that started

23  to go into place to document the -- the approvals and

24  compliance reviews and legal reviews.

37

1      Q.   Do you recall any time where the Tribe didn't
2   accept any -- Let me rephrase that.
3            Do you recall any times where the Tribe
4   wouldn't accept a recommendation made by Bellicose VI
5   for the Tribe about tribe lending business?
6      A.   I can't recall specifically, but there were a
7   lot of instances over the years.  And a lot of times I
8   wouldn't have been the one directly speaking with them
9   to make the recommendation.
10     Q.   Okay.  Who -- So at times, were you the one --
11  So I assume there were various people at Bellicose VI
12  who would have interacted with the Tribe --
13     A.   Yes.
14     Q.   -- is that correct?
15     A.   Yes.
16     Q.   And sometimes that would include you?
17     A.   Yes.
18     Q.   Who else would that include?
19     A.   I would say virtually all of the employees at
20  the -- the Bellicose VI company at some time or other.
21     Q.   So all of the employees at Bellicose VI would
22  have -- would have at some point potentially interacted
23  with the Tribe to make recommendations to the Tribe
24  about the lending business?

James Dowd - November 13, 2018
**Confidential**

50

1      A.    And then -- since then, the -- you know, the

2   team has evolved and different people have been there.

3   So that was true at points in time, but the point people

4   would change from time to time.

5      Q.    All right.  Are you aware of anybody at the

6   Tribe who would deal with the software vendor?

7      A.    I don't know.

8      Q.    All right.  So we have the loan application

9   and the credit report.

10          What -- Just remind me, what happens after

11  that point?  Just -- What's the next step?

12     A.    The -- There's a set of rules or criteria that

13  come up with an initial decision of whether to accept

14  the application or not.  And if -- the application could

15  be declined at that point if they don't meet the credit

16  criteria that has been established by the Tribe or the

17  Tribe's businesses.

18          And then if the application is initially

19  accepted, there would be an initial offer that's

20  presented to the consumer.  And then that would be

21  subject to additional verification and things before the

22  final approval process that happens at the office on the

23  reservation.

24     Q.    Okay.  So the consumer's loan application and

James Dowd - November 13, 2018
**Confidential**

58

1      MR. GUZZO:  To be -- we should technically receive

2   something from you -- I think it's in ten days -- from

3   your receipt of the transcript that is line by line.

4      MR. DUROCHER:  Okay.  All right.  Very good.  We

5   will do that.  Although it may be line by line, meaning

6   we say every line.  But we'll -- we'll look at the --

7   the terms of the protective order and do everything we

8   can to comply with that.  Very good.

9      MR. GUZZO:  Thanks.

10      MR. DUROCHER:  Okay.  Thank you.

11   BY MR. ALBANESE:

12      Q.   Where did we leave off?  So there's -- Let me

13   just back up.

14         There's an initial acceptance -- some consumer

15   applications are rejected and then some are initially

16   accepted subject to further verifications --

17      A.   Yes.

18      Q.   -- is that correct, Mr. Dowd?

19      A.   Yes.

20      Q.   Okay.  What -- What are some of those

21   verifications?

22      A.   So I don't work specifically -- or haven't

23   worked specifically with the -- the groups that do those

24   verifications.  Generally, verification of income and

James Dowd - November 13, 2018
**Confidential**

59

1   employment and account ownership.

2       Q.   Okay.  So verification of the consumer's

3   income, the consumer's employment, and then whether the

4   consumer owns the bank account; is that correct?

5       A.   Yes.

6       Q.   Then you said there are groups that do that.

7   What -- What do you mean by groups?

8       A.   So there is a team on the reservation at the

9   tribe that does all of the review and approval of every

10  single loan that gets made by the -- the tribal lending

11  entities.  So really it's up to them to -- you know, if

12  there's not sufficient information to get the -- you

13  know, that they're satisfied that the -- you know, that

14  they want to approve the loan.  They could refer it --

15  they can either handle some things electronically

16  through e-mail correspondence with a customer or there's

17  a call center that the Tribe has a relationship with

18  that handles customer service and it can be done over

19  the phone.

20      Q.   Okay.  Call center that the Tribe had a

21  relationship with, is that located on the

22  tribe (inaudible)?

23      MR. DUROCHER:  On the what?

24

74

1  of a tribal team would conduct verifications of the

2  consumer's income employment and bank account ownership

3  information.  Let's -- And they could do that via e-mail

4  or sometimes it would be -- they would use a call center

5  based in the Philippines to do that.

6          Is that a fair summary of your testimony?

7      MR. DUROCHER:  Object to the form.

8  BY THE WITNESS:

9      A.   I guess I'm not sure what fair means there,

10  but --

11      MR. DUROCHER:  I object.  His testimony -- He's

12  already testified to it.  I think it's unfair to ask him

13  to summarize now what he's already testified to.

14      MR. ALBANESE:  Sure.

15  BY MR. ALBANESE:

16      Q.   Okay.  So let's say that all the verifications

17  are approved.  What happens next?

18      A.   So there's a team at the Big Picture Loans

19  office and, you know, it would have been other lenders

20  in the past.  But on the reservation, physically in the

21  office there, they are going through, checking to make

22  sure that all of those verifications were completed and

23  completed to their satisfaction, reviewing other, you

24  know -- I guess, make sure that the loan setup is

75

 1    correct and all that.

 2           I -- Honestly, I don't work with that specific

 3    process very closely.  So I think it would be better

 4    asked to somebody else.

 5           But -- And then if all those requirements had

 6    been met, then they would originate the loan from the

 7    office in the reservation.

 8        Q.   What do you mean by that they would originate

 9    the loan?  They would -- what -- send a loan

10    agreement -- a proposed loan agreement to the consumer;

11    is that the next step?

12        A.   Well, at that point, before -- you know,

13    before they were doing this final approval that one of

14    the requirements would obviously be a loan agreement

15    that's been signed before it could be originated --

16    approved and originated.

17        Q.   So who -- how -- do you know how the

18    consumer's presented with the loan agreement?

19        A.   It's on the website.

20        Q.   So -- And when are they presented with the

21    loan agreement?  Is it while the other verifications are

22    going on or when it -- when it -- is it only after the

23    verification of the income --

24        A.   No.

79

1      Q.   Okay.  And then when the Tribe's doing the --

2  or whoever's doing the verifications of the income,

3  employment, and bank account ownership information, are

4  they inputting that information into the TranDotCom

5  system?

6      A.   Yes, I believe so.  But as I said before, I

7  don't work specifically with that part of the process

8  and haven't.  So I can't say for sure what gets put in

9  there and in what form.

10      Q.   But are you aware of any field in the data

11  storage that TranDotCom information, if, like, income

12  verified, yes or no, or -- or something like that or do

13  you know how that information is stored?

14      A.   I don't recall like a specific field, but

15  there -- I do believe there's some kind of flag or some

16  kind of indicator that -- that tells the person who's

17  doing the, you know, review and approval of it that that

18  verification was completed or needs to be completed.

19      Q.   Is verification absolutely required in order

20  to fund the loan?

21      A.   Yes.

22      Q.   So if the verification process is not

23  completed for one reason or another, the loan will never

24  originate; is that your understanding?

James Dowd - November 13, 2018
**Confidential**

80

1      A.   Yes.

2      Q.   Do you know how many people on the travel

3  reservation were involved in that verification process?

4      MR. DUROCHER:   Object to the form.

5  BY THE WITNESS:

6      A.   I don't, and I imagine it varied from time to

7  time.

8      Q.   But it was like a verification department or

9  something like that?

10     MR. DUROCHER:   Object to the form.

11 BY THE WITNESS:

12     A.   Yeah.   More of an approval department.   You

13 know, like I said, they do some verification via e-mail

14 but they also use a call center to do some things over

15 the phone.

16     Q.   Is there a -- Do you know if there's

17 information that's stored in the database about whether

18 the call center was used or whether an e-mail was used

19 to verify?

20     A.   I believe there is; but, again, I'm not sure

21 the exact format that that gets entered in there.

22     Q.   And then is there information about, like,

23 which employee did the verification?

24     A.   I guess, again, I'm not 100 percent certain

James Dowd - November 13, 2018
**Confidential**

185

1      Q.   Do you know whether Bellicose or Sourcepoint

2   could sell any of Red Rock's assets?

3      A.   I don't believe so.  They're separate

4   companies.

5      Q.   Do you know whether Bellicose or Sourcepoint

6   could waive Red Rock's sovereign immunity?

7      A.   I'm almost certain no because I know that's a

8   very involved process.  It involves approval from the

9   Tribal Council.

10      Q.   Sourcepoint never made any lending decisions

11   on behalf of Red Rock, right?

12      A.   No.

13      MR. ALBANESE:  Objection, leading.

14   BY MR. WITSCH:

15      Q.   Did Sourcepoint ever make any originating

16   decisions on behalf of Red Rock?

17      A.   No.

18      Q.   Did Sourcepoint ever collect on any Red Rock

19   loan?

20      A.   No, I don't believe so.

21      Q.   All of those decisions would ultimately be

22   made by Red Rock, right?

23      A.   Yes.

24      MR. ALBANESE:  Objection, leading.

James Dowd - November 13, 2018
**Confidential**

186

1   BY MR. WITSCH:

2        Q.    Would Ms. Hazen ultimate- -- Strike that.

3              Would Ms. Hazen ordinarily review and approve

4   marketing materials?

5        A.    Yes.

6        Q.    How about the prescreening of credit reports?

7        A.    Yes.  Typically, if there's any change to

8   that, the -- the risk team would -- if the risk team was

9   proposing any change to that or the vendors that have

10  been used in the past, they would put together a

11  proposal of that that would be approved before it was

12  implemented.

13       Q.    Did Sourcepoint have any access to Red Rock's

14  bank accounts?

15       A.    I'm not sure.

16       Q.    Do you know whether there were any deposit

17  access control agreements that would limit that?

18       A.    I can't say for sure.

19       Q.    Would you say that Mr. Martorello's

20  involvement in Red Rock decreased over time?

21       MR. DUROCHER:  Object to the form.

22  BY THE WITNESS:

23       A.    I mean -- Well, first of all, you know, he

24  worked with Bellicose VI and --

James Dowd - November 13, 2018
**Confidential**

191

1   Hazen -- I'm going to botch this name, I apologize --

2   but Ivelisse Morales and Chairman James Williams dated

3   October 30th, 2015, 10:54 a.m.

4            Did I read that correctly?

5        A.   That's what it says.

6        Q.   And what this looks like is the -- the type of

7   e-mail recommendation you would make.

8            Is that what's going on here?

9        MR. DUROCHER:  Object, foundation.

10  BY THE WITNESS:

11       A.   Yeah.  I would say that this type of e-mail

12  would accompany or precede a formal recommendation

13  document like the one you were showing me just now.

14       Q.   And you'd agree that Mr. Martorello is not

15  copied on this e-mail either, right?

16       A.   I do.

17       Q.   Would you typically --

18       MR. ALBANESE:  Objection, leading.

19  BY MR. WITSCH:

20       Q.   Would Mr. Martorello typically be

21  carbon-copied on this type of recommendation?

22       A.   I guess can we just --

23       MR. DUROCHER:  Object to the form.

24  BY THE WITNESS:

James Dowd - November 13, 2018
**Confidential**

192

1       A.   I just want to make it clear that I do see

2  Justin Martorello is on this.  So when you're saying

3  Mr. Martorello --

4       Q.   Sorry.  I should be clear.  Let me rephrase,

5  then.

6            Mr. Martorello in this case being Mr. Matt

7  Martorello.

8       A.   So -- So can you repeat the question.

9       Q.   Sure.  You wouldn't typically carbon copy Matt

10  Martorello on this type of recommendation?

11       MR. DUROCHER:  Object to the form.

12            Go ahead.

13  BY THE WITNESS:

14       A.   Yeah.  He's not copied here.

15       Q.   I think we can put this one to the side.

16       MR. DUROCHER:  That was 26, right?

17       MR. WITSCH:  That was 26, yes.

18  BY MR. WITSCH:

19       Q.   Do you know whether Mr. Martorello delegated

20  authority to either Sourcepoint or Bellicose employees

21  over time?

22       A.   I can't say for sure.

23       Q.   You -- If you can't say for sure, but you

24  can't say that he wasn't doing that?

193

1      A.    I don't know.

2      Q.    Were you involved in interfacing with any

3  regulators while you worked at Sourcepoint?  Let me take

4  that question back because you didn't work at

5  Sourcepoint.  You worked at Bellicose.  Let me rephrase

6  the question.

7           When you worked at Bellicose, did you

8  interface with any regulators?

9      A.    I don't recall specifically.  I know that

10 there's a tribal financial services regulatory authority

11 that I may have been asked to provide information to

12 them from time to time, but I don't recall anything

13 specific.

14     Q.    Were you involved at all in Bellicose's

15 compliance efforts?

16     A.    Virtually everybody in the office was.  I

17 mean, both at Bellicose and at Red Rock and Big Picture,

18 there's always been a very strong culture around making

19 sure that the -- the compliance is a theme throughout.

20     Q.    Would you describe that culture?

21     A.    You know, for example, on the recommendation

22 forms that we were just looking at before, you can see

23 they're signed off from compliance and signed off from

24 legal.  So before any change or action was recommended

194

1    or approved, you know, it was reviewed by the internal

2    people who specialize in that.

3        Q.   When you say the people who specialize in

4    that, could you be a little more specific?

5        A.   There's compliance.  There's several

6    compliance people in the Ascension team who also worked

7    at Bellicose Capital before that.  And there are

8    compliance specialists in the Big Picture Loans office.

9        Q.   Was there a compliance board at Bellicose and

10   Sourcepoint?

11       A.   There was.

12       Q.   Do you know who was on it?

13       A.   Again, it probably changed over time.  I would

14   have thought -- I guess I shouldn't speculate, right?

15       Q.   Do you remember anyone in particular who was

16   on the compliance board?

17       A.   Not -- Not for certain.

18       Q.   What generally did the compliance board do?

19       A.   Review internal audits and actions taken by

20   the company and receive reports on whether, you know --

21   on whether the, I guess, procedures and actions in the

22   company were compliant with the internal policies.

23       Q.   Were there efforts to ensure compliance with

24   federal and tribal law as well?

James Dowd - November 13, 2018
**Confidential**

197

1      A.    I believe they did.

2      Q.    Tell us a little bit more about that.

3      A.    I believe they were participating in the

4  rule-making process for the CFPB's proposed regulations

5  or --

6          THE COURT REPORTER:  What was that?

7          THE WITNESS:  Sorry.  I believe they were taking

8  part in the CFPB -- Consumer Financial Protection

9  Bureau's -- rule-making process for small dollar loans

10  that could have potentially applied to their business.

11  BY MR. ALBANESE:

12      Q.    So it wasn't always Bellicose or Sourcepoint

13  that were interfacing with regulators?

14      A.    No.  It was many times Red Rock or Big Picture

15  independently.

16      Q.    We learned earlier that you were involved in

17  the underwriting process at Bellicose and I wanted to

18  ask you a couple questions about that.

19          Do you know whether Red Rock could have

20  altered its underwriting procedures as an example by

21  tightening them without Bellicose or Sourcepoint's

22  approval?

23      A.    Yes, I believe they could do that.

24      Q.    What, if anything, could Bellicose and

198

1    Sourcepoint have done about that?

2        A.    Expressed distaste in it and make a

3    recommendation that they don't do that or -- or undo it

4    if they thought it was something that would be damaging

5    to the business.

6        Q.    But it had no formal right to do anything more

7    than make a recommendation?

8        A.    Not that I'm aware of.

9        Q.    Did you ever go to LVD to meet with the people

10   at the Tribe?

11       A.    Yeah, I've been there several times.

12       Q.    When you say several, do you -- could you be a

13   little more specific?

14       A.    More than five and less than ten.

15       Q.    How would you -- With whom did you meet when

16   you went to LVD?

17       A.    It varies depending on what the purpose of the

18   trip was.  But usually in the Big Picture Loans or Red

19   Rock office with Shelly Hazen, their legal counsel, if

20   they were there, the Tribal Council, tribal government

21   sometimes was asking for, you know, information about

22   the performance of the business.  And then just other

23   members of the Tribe that are connected.  It's a very

24   small community -- tight-knit community.  So once you're

207

1    Bellicose Capital.

2        Q.    I apologize.  Let me try one more time.

3            Ascension plays the same role in origination

4    activities that Sourcepoint did?

5        A.    Yes.

6        Q.    And Sourcepoint -- Sorry.

7            Ascension as with Sourcepoint cannot

8    conduct orig- -- cannot originate a loan?

9        A.    I would say -- Can is a -- is kind of

10   an interesting word there.  They don't.  That's not a

11   normal part of the business.  It's as far as I know not

12   the plan of the business.  But can can mean a lot of

13   different things.

14       Q.    How would you describe Mr. Martorello's

15   involvement with the lending activity of Big Picture

16   after Bellicose and Sourcepoint were sold to the Tribe

17   in 2016?

18       A.    My -- To my knowledge, very limited.  I really

19   haven't seen them be involved on a day-to-day basis at

20   all.  I can't speak about his interactions or lack

21   thereof with other people.  But just me personally, I

22   haven't seen any day-to-day involvement whatsoever.

23   Just been limited to certain instances where the -- I

24   think the agreement between the sale agreement provides

208

1    that they need to keep him apprised of certain potential

2    developments of the Tribe.  But I think that's a pretty

3    normal condition of a seller finance agreement.

4         Q.   You haven't spoken to Mr. Martorello about

5    business decisions since then, though, right?

6         A.   No.

7         Q.   Are you aware of Mr. Martorello making any

8    decisions on behalf of -- Let me take a step back.

9              If I refer to an entity called Tribal Economic

10   Development Holdings, LLC, as TED, will you understand

11   what I mean?

12        A.   Yes.

13        Q.   What is your understanding of what Tribal

14   Economic Development Holdings or TED is?

15        A.   I understand that to be a business that's

16   owned by the Tribe that is ultimately the owner of Big

17   Picture and Ascension.

18        Q.   Do you -- To the best of your knowledge, has

19   Mr. Martorello made any decisions on behalf of TED, Big

20   Picture, or Ascension since the sale?

21        A.   I'm not aware of any.

22        Q.   Do you know whether Mr. Martorello has

23   provided any consulting services to TED, Big Picture, or

24   Ascension since the sale?

James Dowd - November 13, 2018
**Confidential**

209

1          A.    I'm not aware of any.

2          Q.    Do you know whether Mr. Martorello has been

3     involved in finding any investors for TED, Big Picture,

4     or Ascension since the sale?

5          A.    I'm not aware of any instance of that.

6          Q.    Is it your understanding that Mr. Martorello's

7     role after the sale is that essentially of a creditor?

8          A.    Yes.

9          Q.    I'd like to just ask a little bit about your

10    time at Ascension.

11              I think you testified to this earlier, but I

12    just want to confirm before I ask you these questions.

13    Was your role at Ascension roughly the same as it was

14    when you were at Bellicose?

15         A.    Yes, I would say so.

16         Q.    Were you involved in marketing strategies at

17    Ascension?

18         A.    Yes, to a similar extent that I was at

19    Bellicose.  But in more recent, you know, time, there's

20    a marketing team that Ascension has and taken on more of

21    that.

22         Q.    Mr. Martorello, though, wouldn't have been

23    involved in this decision?

24         A.    Not to my knowledge, no.

210

1          Q.    Now, were you inv- -- Sorry.

2                Were you involved in developing underwriting

3     criteria at Ascension?

4          A.    Not -- Not really after the -- Ascension.

5     There's a team that works on that.

6          Q.    Mr. Martorello, though, wouldn't have been

7     involved in this?

8          A.    Not to -- Not to my knowledge, no.

9          Q.    Did you make -- did you -- Were you involved

10    in making any suggested changes to policies to Big

11    Picture while you worked at Ascension?

12         A.    Yes.  From time to time, they would give us

13    policies to review and comment on to see if it made

14    sense for any update.  And that was pretty common

15    practice, that many people throughout the company would

16    review them and offer feedback to see if it made -- you

17    know, there were any edits that were required.

18         Q.    But Mr. Martorello wouldn't have been involved

19    in any of those decisions?

20         A.    No.

21         Q.    Were you involved in suggesting any changes to

22    Big Picture's website or e-mail campaigns while you

23    worked at Ascension?

24         A.    I can't remember specific instances, but

**Confidential**

235

1              IN THE UNITED STATES DISTRICT COURT

2                           FOR THE

3                 EASTERN DISTRICT OF VIRGINIA

4                     RICHMOND DIVISION

5    LULA WILLIAMS, et al.,              )
                                         )
6                                        )
                     Plaintiffs,         )
7                                        )
          vs.                            ) No. 3:17-cv-00461
8                                        )
     BIG PICTURE LOANS, LLC, et al.,     )
9                                        )
                                         )
10                   Defendants.         )

11

12            I, JAMES V. DOWD, state that I have read the

13   foregoing transcript of the testimony given by me at my

14   deposition on the 13th day of November, 2018, and that

15   said transcript constitutes a true and correct record of

16   the testimony given by me at the said deposition except

17   as I have so indicated on the errata sheets provided

18   herein.

19

20

                                  _____
21                                     JAMES V. DOWD

22
     SUBSCRIBED AND SWORN to
23   before me this _____ day
     of _____, 2018.
24   _____

**Confidential**

236

<pre>
 1

 2    UNITED STATES OF AMERICA          )
      EASTERN DISTRICT OF VIRGINIA      )
 3    RICHMOND DIVISION                 )

 4

 5           I, Melanie E. Kubiak, Certified Shorthand

 6    Reporter, do hereby certify that JAMES V. DOWD was first

 7    duly sworn by me to testify to the whole truth and that

 8    the above videotaped deposition was reported

 9    stenographically by me and reduced to typewriting under

10    my personal direction.

11           I further certify that the said videotaped

12    deposition was taken at the time and place specified and

13    that the taking of said deposition commenced on the

14    13th day of November, 2018, at 9:05 a.m.

15           I further certify that I am not a relative or

16    employee or attorney or counsel of any of the parties,

17    nor a relative or employee of such attorney or counsel,

18    nor financially interested directly or indirectly in

19    this action.

20

21

22

23

24
</pre>

**Confidential**

237

1           In witness whereof, I have hereunto set my

2    hand this 16th of November, 2018.

3

4

5

6

7
                                    _____
8                                   MELANIE E. KUBIAK, CSR
                                    180 North LaSalle Street
9                                   Suite 2800
                                    Chicago, Illinois 60601
10                                  Phone:  (312) 236-6936

11
     CSR No. 084-004794
12

13

14

15

16

17

18

19

20

21

22

23

24