**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| LULA WILLIAMS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 3:17-cv-461 (REP) |
| | ) | |
| BIG PICTURE LOANS, LLC, *et al.*, | ) | **REDACTED VERSION** |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' OPPOSITION TO MATT MARTORELLO'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs, by counsel, submit this Memorandum in Opposition to the Motion for Partial Summary Judgment filed by Defendant Matt Martorello (ECF No. 1254).

## INTRODUCTION

Matt Martorello seeks summary judgment on two issues. First, he contends that summary judgment should be granted as to all claims because the laws of Lac Vieux Desert Band of Lake Superior Chippewa Indians ("LVD") apply to the loan contracts. Martorello argues that those laws, therefore, do not have an interest-rate cap. Second, Martorello contends that, in any event, he is entitled to summary judgment on the usury and unjust enrichment claims because Red Rock Tribal Lending, LLC and Big Picture Loans, LLC, took and received the payments.

As to the first issue (*i.e.*, what law applies), Martorello's theory ignores binding precedent from the Fourth Circuit. Less than two years ago, the Fourth Circuit held that "substantive state law applies to off-reservation conduct, and although the Tribe itself cannot be sued for its commercial activities, its members and officers can be." *Hengle v. Treppa*, 19 F.4th 324, 349 (4th Cir. 2021) (citing *Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 755 (1998)). The Fourth Circuit further held that online lending activities "clearly constitute off-reservation conduct subject to nondiscriminatory state regulation." *Hengle*, 19 F.4th at 349 (citation omitted).

Martorello's brief inexplicably ignores *Hengle*—even though Martorello previously sought to stay this case pending the Fourth Circuit's decision and argued that "*Hengle* and this case present certain virtually identical dispositive legal questions and involve certain very similar tribal lending facts." (ECF No. 949 at 6.) Now that those dispositive legal questions have been decided against his interests, Martorello frivolously posits that "the federal preemptive power of the Indian Commerce Clause" precludes the application of state law to tribal activities. (ECF No. 1255 at 18.)

Martorello's argument defies decades of Supreme Court case law that recognizes that "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have

1

generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973); *see also Kiowa*, 523 U.S. at 755 (acknowledging prior "cases allowing States to apply their substantive laws to tribal activities," including when the "tribal activities" occur "within the State but outside Indian country"). Until the Supreme Court overrules these decisions, they govern here as the activities at issue "clearly constitute off-reservation conduct subject to nondiscriminatory state regulation." *Hengle*, 19 F.4th at 349.

Martorello's second argument—that Virginia law only provides for a usury claim against the lender—fares no better. Although Martorello claims that "[n]o Virginia court to date" has determined this issue, Judge Novak concluded in *Hengle* that the plain language of Virginia's usury law permits recovery against "any 'person,'" including "individuals who take and receive payments on usurious loans, even if those payments pass through corporate entities." *Hengle v. Asner*, 433 F. Supp. 3d 825, 895 (E.D. Va. 2020) (emphasis added). Judge Lauck similarly "found that owners and managers of entities receiving payments on usurious loans constitute a 'person taking or receiving such payments.'" *Id.* at 895 (quoting *Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901, 928 (E.D. Va. 2019)). The undisputed evidence here will similarly show that most proceeds were paid to Martorello through his companies and trusts.

Rather than discussing this Court's interpretation of Virginia Code § 6.2-305, Martorello contends that California has a similar usury statute that has been interpreted not to extend to "servicing and administration services." (ECF No. 1255 at 33 (citation omitted).) This is wrong as reflected by a recent summary judgment decision that rejected the defendants' argument that "that only the Tribal Entities could be liable for usury because only they received the usurious payments directly from the consumers." *Brice v. Haynes Invs., LLC*., 548 F. Supp. 3d 882, 898 (N.D. Cal.

2021). The evidence in that case showed that the defendants—a middleman and shareholders of the large company at the heart of the scheme—"actually received some of the usurious interest payments, albeit indirectly." *Id*. (citation omitted). The court also rejected the defendants' motion as to the unjust enrichment claim on similar grounds. *Id*. at 898–99.

In sum, no authority—appellate or otherwise—supports Martorello's position. Because the evidence shows that Martorello designed, implemented, substantially participated, and handsomely benefitted from the tribal lending scheme, summary judgment should be denied with respect to each claim for the reasons explained below.

## **RESPONSE TO MARTORELLO'S STATEMENT OF FACTS**

### A.   **Martorello's Statement of Facts Contradict this Court's Factual Findings in its Misrepresentation Opinion.**

Martorello's statement of "undisputed material facts" includes many false, misleading, immaterial, and unsupported statements that do not comply with the Local Rules or Rule 56(c)(1). Worse yet, Martorello's statement of "undisputed material facts" directly contradicts this Court's Misrepresentation Opinion, which it issued after substantial briefing and a two-day evidentiary hearing on many of these issues. *Williams v. Big Picture Loans, LLC*, 2020 WL 6784352, at *1 (E.D. Va. Nov. 18, 2020), *aff'd sub nom., Williams v. Martorello*, 59 F.4th 68 (4th Cir. 2023).

Under Rule 56(c)(3), a court "may consider other materials in the record," not just the factual position supplied by the movant for summary judgment. Plaintiffs request that the Court consider its previous factual findings—including Martorello's testimony and demeanor at the evidentiary hearing—when considering his statement of facts. *See Scott v. Harris,* 550 U.S. 372, 380 (2007) (""[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

**B.    Plaintiffs' Response to Martorello's Statement of Facts.**

In accordance with the Local Rules and Rule 56(c)(1), Plaintiffs state that the facts below are disputed or immaterial:

1.    Undisputed.

2.    Undisputed.

3.    Disputed and immaterial.[1] Other than the inadmissible hearsay declarations of Chairman Williams and Michelle Hazen, there is no evidence that "LVD began exploring online lending to fund its government services" after the recession in 2008. (ECF No. 1255 at 2.) Instead, as explained in the declaration and deposition testimony of the former Vice Chairwoman of the LVD: "In 2011, Tribal Council was approached by Matt Martorello with an opportunity to participate in a lending business. In the fall of 2011, Martorello visited [the] reservation to meet with Tribal Council to present the deal," which was that "his company would run the business if LVD allowed him to claim that LVD law applied to the loans." Ex. 1, Pete Decl. ¶ 2. Pete also testified that "[w]hen Tribal Council initially agreed to the deal with Martorello, we understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans." *Id*. ¶ 3.[2]

The Vice Chairwoman's testimony is supported by additional evidence. For example, the evidence shows that a "mutual colleague" introduced Martorello to Warren Scott Merritt in 2011,

---

[1] In this paragraph, Martorello attempts to lay the foundation for his irrelevant narrative that the LVD had a genuine interest in entering the tribal lending industry before its introduction to Martorello. Even if this were true, it does not matter because the LVD's motive and intent is irrelevant to the claims and defenses. Out of caution, however, Plaintiffs will nonetheless respond to these so-called "facts."

[2] Unlike Chairman Williams and Hazen, Vice Chairwoman Pete testified and confirmed the statements during her deposition. Thus, the declaration is admissible under Rule 56(c)(2).

who was interested in selling software to Martorello for his online lending business. Ex. 2, Merritt Dep. 28:16-21. During this conversation, Martorello "indicated that he had an interest in working with Native American tribes." *Id.* at 31:3-4; *see also id.* at 93:16-20 (testifying that Martorello expressed his desire to find a tribal partner during this initial meeting).  Because of his interest in tribal lending, Merritt introduced Martorello to Robert Rosette, who was "a very well-known attorney in that space." *Id.* at 32:7–11.

The evidence further shows that Martorello worked with Rosette and his business partner, Flint Richardson, to memorialize the structure and terms of the venture prior he met with the Tribal Council for the LVD. *See, e.g.*, Ex. 3 at Rosette_Revised _052501. As part of this process, Martorello wrote several emails, asking about this new business model. *Id.* at 052499-052501. One of Martorello's questions was whether "the Tribal Lending entity" would have "a Tribal Management Company, which was going to be the Bellicose customer[?]" *Id.* at 52500. In response, Richardson said "NO," and clarified that Martorello's "ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION. THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE BUT ARENT INVOLVED IN THE BUSINESS." *Id.* at 52498 (capital letters in original, underlining added). And when asked by Martorello to elaborate on this point, Richardson explained that "REPRESENTATIVES FROM THE TRIBE ARE THE LLC'S 'MANAGERS'. THE SERVICER, BELLICOSE OPERATES THE BUSINESS COMPLETELY." *Id.* (same).

Martorello's assertions are also contradicted by the expert report of Nathalie Martin, who is a leading expert on the high-cost lending industry. As Professor Martin's report explains: "non-tribal payday lenders' desire to avoid state laws was the impetus behind the creation of the tribal business model," and "the tribal lending model was the most recent incarnation of payday lending

regulation avoidance after the federal government took steps to shutdown rent-a-bank arrangements." Ex. 4, Martin Rept. at 6. Martin further opined that "the structure between Martorello and the tribe was consistent with the tribal lending model in general, and included the hallmark features of these relationships." *Id*.

Martorello's communications with Karrie Wichtman, LVD's attorney, reinforce that Red Rock was originally designed to be a front for Martorello. For instance, more than four years after the start of the lending enterprise, Martorello wrote an e-mail candidly stating "As far as I know, the Manager[s], don't really do anything." Ex. 5 at Rosette_Revised_043978. This is evident from an email from August 2014—almost three years into the lending business—where Bellicose sent a request for approval to the co-managers. *See generally* Ex. 6. When Wichtman forwarded the request to Hazen, she wrote that "due to the desire to learn and the pending restructure," she recommended that Hazen "set up a conference call with SPVI" so she could learn the specifics regarding the direct mail launch. *Id*. at Rosette_045269. In response, Martorello wrote:

> Remember when we started, that all of these vendors and systems Jennifer is white boarding out were tied internally within SPVI systems behind the scenes, just like services do in the banking and credit card space. The vendor contracts and formulas used [are] very closely guarded internal IP and entirely unattainable by the clients. Running clients through it all is what we built and do. The only reason we moved elements to be direct with client was because the risk of working with tribal clients was more and more dangerous and optics became very important. So the trust element came into play as a necessity and exposure of IP may have been the result.
>
> If there is a fundamental disagreement on IP ownership though, I'd [i]magine the elements I mentioned required in a deal are far from obtainable. In fact, I think if that were the case, LVD would essentially make the claim that they already own us today.

*Id*. at Rosette045268 (emphasis added). These emails, coupled with the evidence above, demonstrate that LVD did not have a genuine interest of owning and operating a payday lending company before its introduction to Martorello.

4. Disputed and immaterial for the reasons explained in the previous paragraph.

5. Most of this paragraph is disputed and immaterial. Plaintiffs do not dispute that the LVD enacted the Tribal Consumer Financial Services Regulatory Code on July 8, 2011 ("the Code"), or that it was later amended. Other than this, this paragraph is disputed for several reasons.

First, Martorello uses the language from the Code to support his argument that the tribal lending entities operate on the reservation and thus the lending activities constitute on-the-reservation conduct. ECF No. 1255 at 2. This is misleading because it is undisputed that consumers do not travel to the reservation to obtain, use, or repay the loans. Instead, as explained by Judge Novak and the Fourth Circuit, "the conduct alleged is not limited to where the parties 'made and accepted' the agreements," but where the loans were marketed, taken out, and collected—all of which was performed in Virginia. *Hengle*, 19 F.4th at 348 (citation omitted).

Second, Plaintiffs also dispute that the Code requires the tribal lending entities to comply with federal law as posited by Martorello. As the Fourth Circuit held, "the Loan Agreement, and the Code provisions incorporated into the Loan Agreement make clear that the waiver does not permit the Borrowers to effectively vindicate their federal rights." *Williams v. Martorello*, 59 F.4th 68, 84 (4th Cir. 2023).

6. Disputed and Immaterial. In this paragraph, Martorello attempts to lay the foundation that the tribal entities' loans were subject to the regulatory supervision of the Tribal Financial Services Authority ("TFSRA"). ECF No. 1255 at 3. Martorello suggests that the TFSRA was an independent body with "expansive powers to investigate" any misconduct. *Id*. Both assertions are wrong.

First, the evidence shows that the TFSRA was part of Rosette's self-interested farce designed to create the appearance of a legitimate, regulated business. But as of June 2012, the LVD's regulatory authority did not even have an employee. Ex. 7 at 044601, June 2012 email from

Wichtman to Martorello ("We have a fight coming and I understand you wanting to lay low …
Personally, I see only a few issues – on the regulatory side, the Tribal Regulatory Authority that
is, it needs to have a designated employee, even if only part time, to ensure licensing is done
correctly and tracked and audits of lending practices are performed."). And Wichtman was
concerned that the Tribe had not "embrace[d] this as a new position intended to strengthen the
model and protect the Tribe and consumers." *Id*.

Second, the evidence further shows that Martorello and other executives at Bellicose had
a voice in TFSRA matters, objected to the meetings, and tried to dictate the scope of the discussions
(to which the Tribe complied). Ex. 8, June 9, 2015 email from Justin Martorello at LVD-
DEF00023203 ("I [a]gree that the TFSRA should be knowledgeable about the product and
applicable federal and tribal laws. But, they're treating the meetings as-if they were going to visit
their next door neighbor. This can't be a handshake deal. There should be a MOU with NDA and
defined scope of meeting that limits the discussion specifically to the CMS Training."). After
Martorello's brother voiced these concerns, McFadden brought them to Wichtman, and they
agreed that "there must be MOA between the lender and the authority (to protect the lenders
interests)." Ex. 9 at LVD-DEF00018733.

Third, once they hired someone to staff the symbolic positions (years after its creation and
when they were under attack), they did not hire independent regulators. Instead, one of two TFSRA
agents is the sister of Chairman Williams—the head of the LVD and co-manager of Big Picture.
Ex. 10, Williams Depo., 187:11-12. And, according to Chairman Williams' social media account,
the siblings appear to be very close. Ex. 11 at May 7, 2012 Post ("Would like to wish my baby
sister Lilly a Happy Birthday today. I love you with all my heart[.]"); *id*. at Oct. 20, 2016 Post
("Love you two more than words!!"). The other agent is also the nephew of another tribal council

member. Ex.12, S. McGeshick Depo., 33:2-9.

And finally, the TFSRA does not have expansive powers. Instead, the Code specifically limits the TFSRA's authority to only consider claims under Tribal Law and by limiting its authority to award damages. *See, e.g., Williams*, 59 F.4th at 84 ("the Code does not clearly provide for a private right of action such that consumers can seek redress for violations of the Code").

7.    Disputed and immaterial for the reasons explained in the response to Paragraph 6.

8.    Disputed and immaterial for the reasons explained in the response to Paragraph 6.

9.    Plaintiffs dispute that LVD contracted with Rosette "[a]fter years of research." The cited document, the Exclusivity Agreement and Letter of Intent, does not state this. Even so, it is undisputed that LVD contracted with Rosette and Flint Richardson (through Rosette's company, Tribal Loan Management) to develop the LVD's lending operations. Plaintiffs note though that the Exclusivity Agreement confirms that LVD would lack meaningful involvement in the operations. In particular, the contract provides that Rosette's company agreed "to provide an entire turn-key operation to provide consumers with small loans," and "a business structure and pro-forma models" to "achieve maximum profitability to the Tribe in its first month of operation." Ex. 13 at JPB00383 (emphasis added). The agreement further acknowledged that Rosette's company would be "required to spend significant resources both in up-front cash, and to exploit relationships". *Id*. The contract further established that Rosette's company would "negotiate and enter into Transaction Documents with any and all parties… to develop and manage all aspects of the Project." *Id*. at JPB00383 (emphasis added).

10.    Disputed and immaterial for the reasons explained in the response to Paragraph 3.

11.    Disputed and immaterial. In this paragraph, Martorello states the Tribe had "a preliminary deal structure in mind and draft deal documents that it provided to Martorello" in August 2011. ECF No. 1255 at 3. But on July 14, 2011, Martorello was approached with a potential

referral for a partner and responded:

> Thanks for the referral! We're happy to do it at Bellicose. We can do the entire soup to nuts deal for her. Our fee is generally 99% of Net Revenue, less than operating expenses of the portfolio. She gets 1% of net revenue off the top. Let me know if she's interested and we'll prepare a proposal.

> If not let me know, maybe I can find something different for her if she's looking for something less 'all encompassing.'"

Ex. 14 at Rebecca_Martorello_0000002. Martorello, in other words, was already in the business of performing the "entire soup to nuts" for potential lending partners as of July 14, 2011, in exchange for the net profit of the enterprise. Moreover, the Exclusivity Agreement confirms that LVD did not have a deal structure in mind, but it agreed to allow Rosette "to provide an entire turn-key operation to provide consumers with small loans," and "a business structure and pro-forma models." Ex. 13 at JPB00383 (emphasis added).

12.     Undisputed that LVD formed Red Rock until LVD law in September 2011. Disputed that "all of [Red Rock's] operations" were "on the reservation" for several reasons. ECF No. 1255 at 4. First, as explained in Paragraph 3, Martorello substantially operated most of Red Rock's business. Along with the evidence in Paragraph 3, Plaintiffs also attach a March 2012 email where Martorello invites Craig Mansfield, the tribal co-manager of Red Rock, to come to Chicago "where the duties that will be happening at LVD are occurring today (email, strategy, ACH)" so he could "see it live in action and sit with the crew, etc." Ex. 15 at CM0000869. And while some low-level activities (*i.e.*, customer service) related to the lending business were eventually transferred, the evidence shows that Martorello and his companies were the de facto heads of the lending operations.

Second, Martorello's so-called facts that that "all of [Red Rock's] operations" were "on the reservation" do not make a difference under *Hengle* as explained in Paragraph 5. Even

assuming the origination and customer service activities were always performed by Red Rock's employees, they are still engaged in off-the-reservation activity by the marketing, making, and collection of loans over the internet.

13.     Plaintiffs do not dispute that Martorello engaged Jennifer Weddle. But Plaintiffs dispute that Weddle provided any legal opinion to Martorello that "the loans and relationships between his companies and LVD were lawful" as claimed by Martorello. ECF No. 1255 at 4. Weddle prepared and provided a legal memorandum to Martorello in August 2012, which informed him that state law applied to the loans and he could be criminally prosecuted for his involvement. Ex. 16 at Rosette_Revised_001986-1996.[3]

14.     Undisputed that lawyers at Greenberg Traurig worked on the initial transaction between Bellicose and Red Rock. Plaintiffs dispute that Weddle believed the loans were lawful. This is directly contradicted by Weddle's legal memorandum from August 2012. *See id.*

15.     Undisputed that Martorello managed Bellicose. Undisputed that Red Rock contracted with Bellicose for vendor management services, compliance management assistance, marketing material development, pre-qualified leads, and development of risk modeling and data analytics. However, disputed to the extent that Martorello implies that these were the only services provided by Bellicose for the reasons set forth in Paragraphs 3 and 9.

16.     Partially disputed and immaterial. Under the Indian Gaming Regulatory Act, tribe "may enter into a management contract for the operation" for gaming activities on tribal lands. 25 U.S.C. § 2711(a)(1). However, the Chairman of the National Indian Gaming Commission must

---

[3] Plaintiffs further note that the involvement of Weddle and Greenberg Traurig is immaterial because knowledge of illegality is neither an element, nor a defense to a RICO claim revolving around the collection of unlawful debt. *Mao v. Glob. Tr. Mgmt., LLC*, 2022 WL 989012, at *9 (E.D. Va. Mar. 31, 2022). Because of this, a person may be liable for a civil RICO claim "whether they knew the debt was unlawful or not." *Id.*

approve any "management contract providing for a fee based upon a percentage of the net revenues of a tribal gaming activity," and "such fee shall not **exceed 30 percent** of the net revenues." *Id*. at 2711(c)(1) (emphasis added). Although Martorello touts that the servicing agreement follows the model contract under the IGRA—a statute enacted to "shield" Tribes from "organized crime" and "to ensure that the Indian tribe is the primary beneficiary of the gaming operation"— it diverges from it in this important respect. 25 U.S.C. § 2702(2).

17.    Undisputed that the Servicing Agreement provided a performance-based fee to SourcePoint. Also, undisputed that Weddle testified that the economics of the arrangement were standard *in the tribal lending industry*.

18.    Undisputed.

19.    Undisputed.

20.    Disputed. The loan contracts are originated through an "automated process" that does not require handling by any BPL employees. Ex. 17, Hazen Dep. at 191:5-21, 192:1-7.[4] And although Martorello claims that a final verification of loan agreements was performed on the reservation, Hazen testified that employees located in a call center in the Philippines also would perform that task. *Id.* at 193:4-22. Ms. Hazen did not know what percentage of the approximately 10,000 loans originated each month were verified by employees located on tribal lands. *Id.* at 194:1–18. Given the enterprise contracted with 200 customer service representatives in the Philippines, *Id.* at 161:2–15, most of the verifications inevitably occurred off the reservation.

It is also important to note that the Tribe's verification was *pro forma*, as they did not even know the underwriting criteria. Ex. 6 at Rosette_Revised_045267 ("Remember when we started, that all of these vendors and systems…were tied internally within SPVI systems behind the scenes

___

[4] Although this testimony references the Big Picture process, there was no material change between RRTL and Big Picture loan verifications.

.... the vendor contracts and formulas used []are very closely guarded internal IP and entirely unobtainable" by Red Rock.").

21.     Undisputed that the Serving Agreement contains the language cited in Martorello's brief. Disputed that RRTL's loan approval was anything but a *pro forma* approval for the reasons stated in response to Paragraph 20.

22.     Disputed. The Servicing Agreement expressly provides that Bellicose "shall collect all gross revenues and other proceeds connected with or arising from the operation of [Red Rock]… and deposit proceeds daily into a bank account…" Ex. 18 § 4.9, Martorello_026273. The evidence further shows that Martorello's companies were contractually responsible for collection of the amounts, and Martorello had signatory authority over Red Rock's bank accounts. Ex. 59 at Martorello_003488. This servicing agreement also contained a revenue split whereby Bellicose received a "performance-based fee equal to that amount remaining after payment of" 2% of the gross revenue to the Tribe. *Id*. §§ 3.5.1 and 2.25.

The Servicing Agreement not only created this revenue split, but documents produced in discovery further confirm that Martorello received nearly all amount collected on the loans. For example, Martorello produced an excel spreadsheet entitled "Summary of Payments from January 1, 2012, through January 31, 2016." Ex. 58 at Martorello_028715. This document contains the following fields: (1) Distributions to the Tribe; (2) Payments to BVI/SPVI (i.e., Bellicose VI and SourcePoint); (3) Operating Costs (of Bellicose VI/SourcePoint); (4) Net Payment; (5) MM/Trust's Ownership % (of Bellicose VI/SourcePoint); and (6) Net Payment Allocated to MM/Trust. *Id*.

████████████████████████████████████████

████████████████████████████████████████



Martorello's email to Hazen and Wichtman also revealed that Red Rock did not handle collections as they did not occur on the reservation. Ex. 19 at Rosette_Revised_043487 ("Collections probably will begin in 2015 in Watersmeet[.]"). And in reality, "collections" were accomplished via an ACH transfer, which was overseen by Bellicose. Ex. 20 at Martorello_005441 (describing McFadden's responsibilities as the manager of "payment processing for Tribal client portfolios including: ACH, RCC, Debit/Credit Card."); *id.* at Martorello_005446 (describing Bellicose's payment processing responsibilities, including acquiring and maintaining processing relationships; maintaining procedures for daily processing; managing ACH upload process; controlling the state distribution to different payment processors).[6]

23.     Disputed. This is Martorello's self-serving testimony, made during a hearing in

---

[5] At this time, the Servicing Agreement was between Bellicose VI and Red Rock. *See* Ex. 18.

[6] This was a central issue at the evidentiary hearing on Martorello's material misrepresentations. After hearing the evidence on this issue, the Court ruled that "contrary to the affidavit, Bellicose collected the consumer loans originated by Red Rock." *Williams v. Big Picture Loans*, 2020 WL 6784352, at *6 (E.D. Va. Nov. 18, 2020).

which the Court found that he had been dishonest, *Williams v. Big Picture Loans, LLC*, No. 3:17-cv-461, 2020 WL 6784352, at *11 (E.D. Va. Nov. 18, 2020), and is entirely unsupported by any reliable evidence. And in fact, when Hazen asked for details about a direct mail campaign, Martorello refused to provide it and stated that it was SPVI's "very closely guarded internal IP and entirely unattainably by clients." Ex. 6 Rosette_Revised_045267-69.

24.    Disputed. Martorello's cited evidence, Red Rock's Compliance Management System (Exhibit NNN), does not discuss any mechanism under which Red Rock was to review Bellicose's marketing materials. But even if this document contained the statements that Martorello claims, citation to a single document certainly does not support Martorello's claims of "extensive" review. If extensive reviews had occurred, there would be hundreds of documents to support this claim, but none have been produced in discovery. Moreover, although Martorello cites to self-serving deposition testimony that such reviews did occur, this testimony is contradicted by other evidence in the case. For example, as late as 2014, it didn't appear that the LVD even know basic elements of the marketing strategy. Ex. 6 at Rosette_Revised_045267 ("do [Chairman Williams] and [Hazen] even know what 'DM'[direct mail] means because I don't."). And even if Martorello had cited to signed approvals regarding these marketing campaigns, the evidence would be unpersuasive because other people, including Karrie Wichtman, signed often signed for the Tribal managers. Ex. 21 at Rosette_Revised_058681 ("We have [Chairman Williams] and Shelly's signature on file for us to use when they are not available to sign" and indicating that she was signing "on a regular basis for quite some time[.]").

25.    Disputed. Although Dowd testified that there were "a lot of instances over the years" where the Red Rock managers did not approve SPVI's recommendation, he could not recall a specific instance in which that had occurred. Ex.22 at 37:3-20. And contrary to Martorello's

representations, Ex. RRR does not show Hazen's refusal to approve a request—instead she is simply asking for more information "before [she] approve[s] this request." Similarly, Exhibit MM does not indicate that the co-managers rejected a recommendation, only that they took two weeks to approve one. If there were "a lot of instances" of rejections, Martorello could have produced at least one. Instead, this fact is completely unsupported by any credible evidence.

26.     Disputed. Hazen's testimony that she managed the lending business's day-to-day operations and did not ask Martorello's permission to make business decisions is contradicted by the evidence as detailed in Plaintiffs' response to Paragraph 3. Mansfield and Hazen's deposition testimony also undercuts Martorello's assertion that they were involved in RRTL's day-to-day operations. For example, when asked if RRTL made loans under a particular name, Mansfield testified "I don't know the answer to that," and he could not explain its association with Castle Payday. Ex. 24 at 104:5-13 and 104:22 – 105:3. In other words, Mansfield could not identify or explain the most basic piece of information about Red Rock: the name it did business as and used when interacting with consumers. He also could not explain why the enterprise created two entities, Red Rock and Duck Creek, rather than operating a single entity—a seemingly important detail for a manager of a business. *Id.* at 91:3–23. Mansfield further demonstrated a lack of knowledge for each of the material aspects of the lending business—even for the limited tasks ostensibly designated to Red Rock under the Servicing Agreement.[7]

And despite supposedly working hand-in-hand for more than two years, Hazen could not

---

[7] For example, Mansfield did not know the process of "how the decision of whether to fund the loan occurred." *Id.* at 114:25–115:3. Or whether that process occurred on the reservation. *Id.* at 115:4–14. He did not know how loans were originated, including "whether the ultimate determination to fund the loan was made on tribal grounds." *Id.* at 115:15–22. He further testified that he did not know what verifications were completed to ensure that borrowers provided the correct information, *id.* at 112:15–18, how Red Rock obtained the money it needed to fund the loans, *id.* at 128:24–129:12, or any details about the call center in the Philippines or what it did on behalf of Red Rock. *Id.* at 119:20–120:1.

recall whether Mansfield was even a Red Rock co-manager. Ex. 17, Hazen Dep. at 26:4-7. ("Q: [d]o you know if Mr. Williams or Craig Mansfield were a co-manager of Red Rock Tribal Lending with you? A: I don't recall.").

Moreover, neither Mansfield nor Hazen were compensated for their roles as managers. Instead, the positions were unpaid, and Mansfield continued to work full time at the Tribe's casino. Ex. 24, Mansfield Dep. At 121:11-122:13. Similarly, it appears Hazen was a volunteer. Ex. 19 at ROSETTE_REVISED_043485, Dec. 2, 2014 email from Hazen ("I guess I have to ask you to take into consideration the fact that I have volunteered from the get go to do whatever it took to move this business forward…") ;*see also* Ex. 1, Pete Decl. ¶ 7 ("the co-managers were volunteers, who were involved for 'optics' and to provide pro forma approval of recommendations provided by Bellicose."). This is significant because someone cannot run a complicated lending business when they are a full-time employee working for another company.

Finally, other email, including emails dated September 2013—almost two years into the lending business—demonstrates the managers' ignorance of the tribal lending business.  During that time, Red Rock's attorneys were seeking information from the Martorellos to provide in Chairman Williams's declaration to be filed in Otoe-Missouria litigation so that they could "supplement Chairman Williams' declaration with regard to the specific operational impacts that RRTL has faced post-DFS action.". Ex. 25 at Rosette_Revised_46388. It is also telling that LVD and Red Rock's general counsel did not even know the operational structure of the lending enterprise, asking the Martorellos to review the "attached operational diagram" and let them know if it was "consistent with Red Rock's structure?" *Id.*

27.    Undisputed that Mansfield and Hazen were involved with the reservation-based employees. But both Matt Martorello and Justin Martorello participated in the initial hiring of

tribal employees. Ex. 26 at Rosette_Revised 037462. And under the original servicing agreement between Bellicose VI and RRTL, Bellicose VI assisted "the Operations Manager and/or Tribal Representatives in directing the hiring and management" of employees. Ex. 18 at Martorello_026269

28.     Disputed. Martorello cannot prove Hazen's and Mansfield's extensive involvement in this process by citation to a single document. Indeed, if their oversight were as significant as Martorello implies, then there should be hundreds of documents to support this paragraph. But there aren't—and documents supporting this assertion were not produced in discovery. And, of course, Martorello wrote an email in January 2016, which made clear that "the Manager[s], don't really do anything." Ex. 5 at Rosette_Revised_043978.

29.     Disputed. It is unclear whether Hazen or Mansfield approved these processes because Wichtman was authorized to use the co-managers' signatures on documents. Ex. 21 at Rosette_Revised _058681 ("We have [Chairman Williams] and Shelly's signature on file for use when they are not available to sign."). Wichtman not only had the "signature on file," but she was signing "on a regular basis for quite some time[.]" *Id*. And even if Hazen or Mansfield did approve these processes, they were designed and implemented by Matt Martorello. *See, e.g.,* Ex. 1, Pete Decl. ¶ 5 ("the co-managers were volunteers, who were involved for 'optics' and to provide pro forma approval of recommendations provided by Bellicose.").

30.     Disputed for the same reasons explained in response to Paragraph 29.

31.     Disputed. Martorello originally expressed concern about pursuing the *Otoe Missouria* litigation, but ultimately agreed to the filing of the lawsuit. Williams, 2020 WL 6784352, at *10 ("Martorello expressed concern about joining the litigation and about the reaction of the regulators to such a lawsuit. Nonetheless, Martorello ultimately agreed to the filing of the

lawsuit. Once he had given assent, it was filed on August 21, 2013."). And Martorello did not view the conclusion of the litigation in October 2014 as a victory. Instead, After the Second Circuit issued its decision, Martorello wrote to Wichtman on October 10, 2014, urging her (as general counsel for LVD and Red Rock) to drop the case. Ex. 27 at Rosette_Revised_-043659 ("I can't urge any stronger that LVD not proceed"). He stated that "SPVI won't be willing to testify, or do anything as the result of another filing will certainly end in a slew of attacks on me, SPVI and my team." *Id.* Ultimately, Wichtman agreed and, as she explained in a subsequent email, their best option was to "***go quietly into the night and restructure*** based on what we know from the opinion in order to build an even stronger case for future litigation." Ex. 28 at Rosette_Revised_001130 (emphasis added).

32.    Undisputed that RRTL registered with the CFPB or that Chairman Williams submitted a statement to the CFPB regarding its potential rules about small dollar lending. But Plaintiffs object to Martorello's reliance on the Williams deposition in *Smith v. Big Picture Loans, LLC, 3:18-cv-1651 (D. Ore.).* The use of this deposition testimony violates Rule 32 "because the party as to whom the prior deposition testimony was proposed to be used was not present at the depositions"—as this Court has already held. (ECF No. 828 at 1–2 (excluding the depositions of Michelle Hazen, Brian McFadden, and James Williams, Jr. taken in *Smith* and *Cumming* from the misrepresentations hearing in July 2020).) The same reasoning applies to all of the deposition testimony in *Smith*, *Cumming*, and *Duggan v. Martorello*, No. 1:18-cv-12277 (D. Mass.) because Plaintiffs were not parties to those cases and were not present or represented at any of the depositions. *See GAVCO, Inc. v. Chem-Trend Inc.*, 81 F. Supp. 2d 633, 638 (W.D.N.C. 1999) (prior deposition testimony from a separate litigation failed to meet the "threshold criterion for admissibility" because the plaintiffs "were not parties," and "were neither present nor represented

at the[] depositions, nor did they have any obligation to be present"); *see also Patterson v. Yeager*, No. CV 12-01964, 2016 WL 589881, at *6 (S.D. W. Va. 2016) (excluding deposition where the plaintiff was not present or reasonably notified of the deposition under Rule 32(a)(1)(A)).

The testimony is not admissible under Rule 804(b)(1)(B) for the same reason—Plaintiffs had no opportunity to participate in the depositions and develop the testimony offered by the witnesses. *See Progressive N. Ins. Co. v. Ashford*, 2021 WL 4226159, at *3, n.3 (D.S.C. Feb. 26, 2021) (prior deposition testimony was inadmissible because the plaintiff "was not a party in the [prior] action and did not have an opportunity to cross-examine" the witnesses); *Witcher v. Bayer Cropscience USA LP*, 2008 WL 7137185, at *10 (S.D. W. Va. 2008) (excluding prior deposition testimony because Rule 32 and Rule 804 "do not allow the use of a deposition from a prior action against one who was not a party to the prior action").

33.     Disputed. The Tribe was never interested in learning the lending industry. Ex. 1, Pete Decl. ¶ 6. ("It is also inaccurate for Hazen to claim that Red Rock contracted with Bellicose VI 'to learn the industry.' That was never the goal when LVD formed Red Rock; nor did Martorello attempt to teach us anything about the business. . . Instead, the relationship with Martorello was presented as an opportunity to make money, with no risk of loss, in exchange for rubberstamping LVD's name on loans."). The evidence also shows that it was Martorello—and not the Tribe— who initiated restructuring. On August 11, 2014, Martorello emailed Chairman Williams—not vice versa—"we're working on something" that "will have some talking points to go over about the concept for a potential bigger deal for LVD learning the Servicing business." Ex. 29 at LVD-DEF00020786. Martorello suggested to start "with a phone call, and then if we're close you can come to Puerto Rico to finalize" the terms. *Id.* On August 26, 2014, Martorello emailed Chairman Williams providing more details and stressing the urgency of the restructure. Ex. 30 at

20

Rosette_Revised-048541-2 (stressing the urgency on Martorello's end, stating that he was looking to "move very quickly on such an exit," and noting that "rather than putting the business on the 'auction block' to the highest bidder," they were coming "exclusively to LVD," but it was "important that LVD knows that time is of the essence for SPVI/BVI in getting a sale done."). Martorello was clear with LVD's attorneys that "If we can't reach terms with LVD to buy SPVI, then SPVI will be sold to another Tribe (likely Middletown)." Ex. 31. When he did not receive an immediate response, he followed up with LVD's attorney later that evening because he didn't get "any sense of excitement from anyone[.]" Ex. 32 at Rosette_Revised_045272. Martorello made clear he wanted nothing beyond cosmetic changes, explaining there was "[n]o need to reinvent the wheel or shake things up, just need to keep it alive and then use the earnings from it to take risks with and do other things." *Id.* This push became even more urgent after the Second Circuit's decision in the *Otoe-Missouria* litigation, as explained in response to Paragraph 31.

34.    Disputed. The evidence shows that Martorello created Big Picture Loans at least a year before LVD supposedly created/formed Big Picture. The domain name was registered on September 18, 2013. Ex. 33. Martorello's marketing company provided a "Communications Plan," for Bellicose Capital dated September 30, 2013, *i.e.*, the same day the district court issued its opinion in *Otoe-Missouria*. Ex. 34 at PHEN0002899. This document shows that Bellicose had anticipated launching Big Picture with another tribe located at the Fort Belknap Indian Reservation, *Id.* at PHEN0002904, but the launch of the lending enterprise was on hold pending ACH configuration. *Id.* at PHEN0002908. And shortly after the district court's decision in *Otoe-Missouria*, Justin Martorello e-mailed the marketing company, instructing that tasks associated with "Big Picture" should be a "FULL STOP," and "given the massive attacks on the industry we do not plan [to] use these sites." Ex. 35 at PHEN0003894. Later, when he decided that RRTL

needed to be re-branded, Martorello emailed Wichtman that he had a "really great brand" known as Big Picture Loans. Ex. 36 at Rosette_Revised_043437. In this email, Martorello attached a document entitled "Big Picture Site Design" showing a fully developed website, logo and brand for Big Picture. *Id*. at 043438-57. Wichtman, who was drafting the resolution for approval by tribal council, responded "[w]hich one do you want me to use?" Ex. 37 at Rosette_Revised_043435. It was left up to Martorello to decide on "BigPictureLoans.com," a domain name that he already owned. The next day, Wichtman presented a resolution for the creation of Big Picture, as well as approving its Articles of Organization and Operating Agreement. Ex. 38  Resolution # T2014-066.

35.     Disputed. It was Martorello's decision to rebrand, not the Tribe's. Martorello urged Wichtman, Hazen, and Chairman Williams to "rebrand" Red Rock in July 2014. Ex. 39 at Rosette_Revised_058409. In this email, Martorello explained that that "RRTL ha[d] been blacklisted and rolled through the mud in the press" following the *Otoe-Missouria* decision. *Id*. He also added that "it's time to get away from the word 'Payday' and the black mark of RRTL before rules come out and things get hotter." *Id*. Thus, Martorello suggested "form[ing] ASAP a new LLC with a new domain/brand, for purposes of transferring all contracts, assets, bank accounts, liabilities etc. over to the new entities when ready." *Id*. Bellicose would "gladly facilitate the work," but it needed "the entity formed and approv[ed] to begin doing so as to step 1." *Id*. In conclusion, Martorello stated, "the sooner we can get moving away from 'Payday' and the poor image of RRTL the better." *Id*.

36.     Undisputed, but immaterial.

37.     Undisputed.

38.     Undisputed.

39.     Disputed. This paragraph implies that it was the Tribe's decision to hire Brian McFadden as Ascension's CEO when, in reality, Matt Martorello made it a condition of the

Bellicose sale. Ex. 5 at Rosette_Revised_043978 ("The Lenders care about the person who runs the business of AT. If the Transaction Docs are clear that the position in question and under scrutiny to the lenders is [Brian McFadden], then I think we're OK. As far as I know, the Manager's don't really do anything . . . but if Managers are really only involved per the OA to get feedback from [Brian McFadden] then seems OK. If they do more than that . . . then we'd have some cleaning up to do.").

      40.    Undisputed.

      41.    Disputed. There is no evidence that the equity value conveyed to LVD was $108 million. In fact, after he signed the Agreement and Plan of Merger, Martorello sent several emails essentially acknowledging that the business had an incredibly low—if anything—fair market value due to pending litigation and regulatory risks. Ex. 40 at LIONT_09846 (providing 11 points in support of his certainty in the business's law fair market value); Ex. 41 at Martorello_009775 (detailing regulatory and litigation risks and suggesting real risk that business will be terminated); Ex. 42 at Martorello_011446 (""[i]t was estimated that the industry would be wiped out in Feb 2014 by the new CFPB, and/operation chokepoint tactics."); Ex. 43 at LIONT_05387 ("Lawsuits by AGs and regulators against SPVI, myself, or the client (as the reports and cases filed to date against competitors supports) may end the business or seriously shrink the business"); Ex.44 at MARTORELLO_011671 ("we thought (and data supported) 'end of days in 2015'" because of Operation Chokepoint). There is also no credible evidence that Martorello paid taxes on this valuation. If he had, he would have cited to his tax returns, which have been produced. Plaintiffs also object to Mr. Cowhey's valuation of the business, as explained in their motion to exclude him as an expert witness. (ECF No. 1183.)

      42.    Undisputed, but immaterial.

      43.    Undisputed.

44.     Undisputed that Big Picture is organized under LVD law and wholly owned by the LVD. Disputed that Big Picture is operated by the LVD and that Big Picture conducts extensive activities exclusively on the LVD reservation. Instead, as explained in response to Paragraph 45, Ascension, which was largely operated out of Atlanta, Georgia, performed all the day-to-day tasks for the lending business under the Delegation of Authority Policy. And as explained in Paragraph 20, there was a large call center in the Philippines that handled a large volume of the business. Even if Martorello's statements were accurate, it would be immaterial under the Fourth Circuit's decision in *Hengle*. Also disputed that the Tribal Council created Big Picture to help the Tribe achieve its long-term goals on self-sufficiency and self-determination for the reasons explained in response to Paragraphs 31, 33, and 34.

45.     Undisputed that the lending structure did not significantly change after the Bellicose sale, meaning that it was controlled by non-tribal actors. Disputed that any lending activity was on-reservation conduct as explained in response to Paragraphs 5 and 12. Plaintiffs also dispute that BPL retained control over its lending operations. Instead, because of the agreements governing the restructure, Martorello—not the BPL or the Tribal Council—retained control over the lending operation through Brian McFadden. First, through the Intratribal Servicing Agreement, BPL relinquished to Ascension the right to control nearly all responsibilities for its operations. Ex. 45. Ascension then contractually relinquished the right to control its operations to McFadden, Martorello's childhood friend and business partner. Under the Delegation of Authority Policy, Ascension delegated to McFadden the authority to handle Ascension's "strategic direction, goals and targets," and over "all matters necessary for the day to day management of Ascension." Ex. 46 § 1.4(a)-(e)). By contrast, the only matters designated to the tribal co-managers are: (1) approval of contracts in excess of $100,000 in a calendar year, (2) appointment of the president,

and (3) approval of any "new major employee benefit plans." *Id.* § 1.2(a)-(c).

And while the tribal co-mangers' authority to appoint the president seems to provide some control, the Loan Agreement neutralizes this power because it requires the tribal co-managers to obtain approval from Martorello (albeit via Eventide) to replace McFadden. Ex. 47. Martorello created a check on McFadden's power through Eventide's operating agreement, which allows him to revoke McFadden's shares with 14-days' notice. Ex. 48 § II(I). Martorello considered wielding this power in August 2016 as shown by a text message exchange with his brother, another former officer of Bellicose and now owner of Eventide. Ex. 49. In this text exchange, Martorello expressed concern that "Brian [McFadden] and James [Dowd] are getting too big for their britches." *Id.* at 00157. He added that "they see monthly wires and are starting to think they deserve a lot more of it now than the $1mm a year Brian makes for being a hired CEO." *Id.* Martorello wrote that McFadden "may have to be disappointed somewhere down the near term road," as "he's not the founder and $1mm a year buys a lot of very capable replacements." *Id.* Put differently, even after the sale, Martorello remained in control through this ability to remove McFadden, albeit by revoking his shares and equity in Eventide.

46.     Disputed for the same reasons explained in response to Paragraph 45. It is also inaccurate because the Tribal Council did not have unilateral discretion to take these actions. Instead, Tribal Council must receive approval of Martorello to even remove the co-managers of Big Picture. Ex. 47  at Martorello_000080.

47.     Undisputed as to the language of the ISA. But disputed that Big Picture did anything but conduct a *pro forma* review as explained above in response to Paragraphs 20, 21 and 26.  Big Picture's approval was necessarily limited to a pro forma review because Martorello wouldn't disclose any significant information to the Tribe as part of the sale, as he was afraid that the LVD

Tribe was not competent enough to run the business. Ex. 23 at Rosette_Revised- 053118 ("I wouldn't buy Pfizer and then ask to be CEO, or everyone will be out of a job at Pfizer in 12 months when I destroy it. The optics are important due to the bastards out there against us, but the practicality and sustainability of the business is the basic necessary foundation over optics.").

48.     Disputed. The only evidentiary support for this paragraph is a citation to a *Smith* deposition, which is inadmissible for the reasons explained in response to Paragraph 32.

49.     Disputed for the same reasons explained in response to Paragraph 20.

50.     Disputed for the same reasons explained in response to Paragraph 49.

51.     Disputed. As explained above in response to Paragraph 45, Ascension, located in Atlanta, does most of the day-to-day operations of the lending enterprise, including ACH.

52.     Disputed. The *Duggan* documents are not admissible evidence, as explained in response to Paragraph 32. Even if it were admissible, Hazan has testified that the approval process is automated, see response to Paragraph 20, and it is immaterial that it may take a day or two to fund the loans.

53.     Disputed. Martorello cites to a dismissed party's interrogatory responses, which is inadmissible hearsay, to support this paragraph. Even if this paragraph were properly supported, it is disputed for the reasons explained in response to Paragraphs 20 and 52.

54.     Disputed. Martorello cites to a dismissed party's interrogatory responses, which is inadmissible hearsay, to support this paragraph. The *Smith* and *Duggan* declarations are also inadmissible for the reasons explained in response to Paragraph 32. Even if this paragraph were properly supported, it is disputed for the reasons explained in response to Paragraphs 20 and 52.

55.     Disputed. Martorello cites to a dismissed party's interrogatory responses, which is inadmissible hearsay, to support this paragraph. Even if this paragraph were properly supported, it is disputed for the reasons explained in response to Paragraphs 20 and 52.

56.     Disputed. Martorello cites to a dismissed party's interrogatory responses, which is inadmissible hearsay, to support this paragraph. Even if this paragraph were properly supported, it is disputed for the reasons explained in response to Paragraphs 20 and 52.

57.     Disputed for the same reasons explained in response to Paragraph 45. In addition, Martorello continued to approve operational changes to the lending business. For example, in June 2016, Martorello provided written consent for "Ascension Technologies, LLC's expansion and establishment of an office in Atlanta, Georgia." Ex. 50 at LVD-DEF00003643.  Martorello also approved requests for outside third parties to "reinvest in the Business of BPL[.]" Ex. 51 at Martorello_000020; *see also* Ex. 52 at Martorello_00021 (consenting to a $720,593.16 reinvestment by an outside noteholder); *see also* Ex. 53 at Martorello_00022 (consenting to a $750,000 reinvestment by an outside noteholder); *see also* Ex. 54 at Martorello_00023 (consenting to a $900,000 reinvestment by an outside noteholder). Also, the hiring of new employees for Ascension requires Martorello's approval, and he has exercised this power. *See* Ex. 55 at LVD-DEF00015613 (consenting to the hiring of a Risk and Analytics Manager, as well as a Vice President of Marketing).

Martorello also continued to collect payments from the lending enterprise after the restructure. ██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████     ██████████████

---

[8] Plaintiffs calculated this number based on the 85% economic interest Martorello's companies have in Eventide. Ex. 64 at Martorello_004598. This 85% economic interest in nearly identical to

58.     Disputed for the same reasons detailed in response to Paragraphs 45 and 57.

59.     Disputed for the same reasons detailed in response to Paragraphs 45 and 57.

60.     Disputed for the same reasons detailed in response to Paragraphs 45 and 57.

61.     Undisputed.

62.     Undisputed.

63.     Undisputed.

64.     Undisputed that the Tribe passed these resolutions. But for the reasons explained above in response to Paragraph 25, the Tribe's involvement in making these resolutions was a pro forma approval of requirements by Martorello for the lending enterprise. *See* Ex. 1 ¶ 2–3.

65.     Disputed. The only evidentiary support for this paragraph is a *Smith* deposition, which is inadmissible for the reasons explained in response to Paragraph 32.

66.     Undisputed, but immaterial to any of the issues before this Court.

67.     Plaintiffs do not dispute that the lending enterprise comprises much of the Tribe's budget but believe that it is immaterial to any of the issues before this Court. Plaintiffs dispute the valuation of the business for the reasons explained in response to Paragraph 41, and also note that the $25 million figure provided in this paragraph conflicts with the asserted $108 million figure provided in Paragraph 41. Plaintiffs also dispute Mr. Cowhey's valuation of the business, as explained in their motion to exclude him as an expert witness, including because he included no risk analysis in his valuation. (ECF No. 1183.)

68.     Undisputed that the lending enterprise comprised much of the Tribe's budget in 2018 but believe that this is immaterial. Plaintiffs also dispute that Ascension was headquartered on the reservation. Instead, most of its employees and all of its significant operations occurred at

---

the percentage Martorello received through his companies prior to the restructure. *Compare Id.* with Ex. 60 at Martorello_000319.

its offices in Atlanta, Georgia. Ex. 56. It also appears that most of Big Picture's lending operations occurred at a call center in the Philippines, as explained in response to Paragraph 20.

69.   Undisputed that the loans were made in the name of RRTL but disputed that RRTL acted as the lender. Instead, the loans were made and controlled by Martorello and Bellicose for the reasons explained above.

70.   Undisputed that the loans were made in the name of Big Picture but disputed that Big Picture acted as the lender. Instead, the loans were made and controlled by Martorello and Ascension for the reasons explained above.

71.   Undisputed.

## ARGUMENT

**I.     Matorello's request for summary judgment that tribal law applies should be denied because it contradicts binding precedent.**

### A.     State substantive law applies to off-the-reservation activities.

For over fifty years, the Supreme Court has consistently reaffirmed that substantive state law applies to tribes and their members "going beyond reservation boundaries." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973) ("Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State."); *see also Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014) (explaining that "a State, on its own lands, has many other powers over tribal gaming that it does not posses (absent consent) in Indian territory," because Native Americans going "'beyond reservation boundaries' are subject to any generally applicable state law" (quoting *Mescalero Apache Tribe*, 411 U.S. at 148)); *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 113 (2005) ("If a State may apply a nondiscriminatory tax to Indians who have gone beyond the boundaries of the reservation, then it follows that it may apply a nondiscriminatory tax where, as here, the tax is imposed on non-Indians as a result of an off-

reservation transaction."); *Washington v. Confederated Tribes of Colville Indian Rsrv.*, 447 U.S. 134, 166 (1980) (explaining that there "is a significant territorial component to tribal power. Thus state taxes on the off-reservation activities of Indians are permissible"); *Puyallup Tribe v. Dep't of Game of Wash.*, 391 U.S. 392, 398 (1968) ("we see no reason why the right of the Indians may not also be regulated by an appropriate exercise of the police power of the State."); *Organized Vill. of Kake v. Egan*, 369 U.S. 60, 75 (1962) (acknowledging that "State authority over Indians is yet more extensive over activities, such as in this case, not on any reservation," such as "off-reservation hunting and fishing rights," which "have been held subject to state regulation").

The crucial question, therefore, concerns whether the conduct at issue was is considered off-the-reservation conduct. The Fourth Circuit dispositively decided this question in *Hengle*.

**B.   Every court to consider the issue has held that online lending constitutes off-the-reservation activity, including the Fourth Circuit's decision in *Hengle*.**

One of the cornerstones of the tribal lending model was the erroneous belief that, so long as the tribal lending entity performed the administrative act of "originating" the loan, it would be considered "on-the-reservation" activity. The tribal lending industry needed to win this legal argument to avoid application of the general rule that "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe*, 411 U.S. at 148–49.

In 2008, the first court to consider this issue concluded that online lending activities "conducted over the Internet" constituted "off-reservation activity." *State ex rel. Suthers v. Cash Advance & Preferred Cash Loans*, 205 P.3d 389, 400 (Colo. App. 2008). A few years later, a federal court considered the same question and likewise rejected the argument that online lending "involved regulation of Indian affairs on a reservation." *Colorado v. W. Sky Fin., LLC*, 845 F.

Supp. 2d 1178, 1181 (D. Colo. 2011). That court explained it was off-the-reservation conduct

because: (1) the "defendants were operating via the Internet," (2) borrowers did not "go to the

reservation in South Dakota to apply for, negotiate or enter into the loans," (3) borrowers repaid

the loans from Colorado, (4) the entity withdrew the "funds electronically from" the borrowers'

bank accounts, and (5) the "impact of the allegedly excessive charges was felt in Colorado." *Id.*

Two years later, the United States District Court for the Southern District of New York

addressed this same question in a case filed by Red Rock. *Otoe-Missouria Tribe of Indians v. New

York State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 355 (S.D.N.Y. 2013). Denying Red Rock's

motion for preliminary injunction, the court ruled that Red Rock was "subject to the State's non-

discriminatory anti-usury laws" because the "undisputed facts demonstrate[d]" that the illegal

activity was "taking place in New York, off of the Tribes' lands." *Otoe-Missouria Tribe*, 974 F.

Supp. 2d at 361. The court explained:

> Plaintiffs overlook that none of these activities relates to the activity that the State
> is seeking to block. The State's action is directed at activity that takes place entirely
> off tribal land, involving New York residents who never leave New York State.
> These consumers are not on a reservation when they apply for a loan, agree to
> the loan, spend loan proceeds, or repay those proceeds with interest. These consumers
> have not, in any legally meaningful sense, traveled to Tribal land. Therefore, to the
> extent the State seeks to prevent the Tribes from making loans to New York
> residents who are in New York, it is regulating off-reservation activity.

*Id.* And critically, the district court reached this conclusion even though Red Rock never disclosed

the substantial role or beneficial interest of Martorello in the operations. *See id.*

Martorello knew and understood the significance of the court's decision in *Otoe-Missouria*

on this issue. For example, a month after the district court's decision, Martorello wrote an email

to Wichtman that stated:

> It's impossible to buy any volume, debt providers are asking what would happen to
> everything if the ruling in NY were upheld (certain death and all vendors including
> spvi, banks, ACH processors, bureaus etc **would all obviously shut down if it were
> considered off reservation activity**), and the class actions against banks and

31

> personal threats of enforcement against individuals by regulators all has everyone
> spooked. No joke, several of the biggest services have shut down.

Ex. 57 at Rosette_Revised 045573 (emphasis added). That fear became true when the district

court's decision was affirmed by the Second Circuit, which found that Red Rock "provided

insufficient evidence to establish that they are likely to succeed in showing that the internet loans

should be treated as on-reservation activity." *Otoe-Missouria Tribe of Indians v. New York State*

*Dep't of Fin. Servs.*, 769 F.3d 105, 115 (2d Cir. 2014). The Second Circuit added:

> Much of the commercial activity at issue takes place in New York. That is where
> the borrower is located; the borrower seeks the loan without ever leaving the state,
> and certainly without traveling to the reservation. Even if we concluded that a loan
> is made where it is approved, the transaction New York seeks to regulate involves
> the collection as well as the extension of credit, and that collection clearly takes
> place in New York.

*Id.*[9]

In 2020, Judge Novak considered this issue in *Hengle* and rejected an identical argument.

Judge Novak explained that "[e]ven after accepting the Tribal Officials' contention that Plaintiffs'

loans originated on the Tribe's reservation, that fact alone does not render the Tribal Lending

Entities' lending activities wholly on-reservation conduct." *Hengle v. Asner*, 433 F. Supp. 3d 825,

875 (E.D. Va. 2020). Relying on the cases cited above, Judge Novak further explained:

> The Tribal Officials do not dispute that Plaintiffs resided on non-Indian lands when
> applying for their respective loans, executing relevant loan documents and making
> loan payments from bank accounts maintained in Virginia. Plaintiffs did not travel
> to the Tribe's lands at any point. Such activity proves directly analogous to the
> lending activity that other courts have found to clearly constitute off-reservation
> conduct subject to nondiscriminatory state regulation.
> …
> [T]he Tribal Officials' contention stands in direct opposition to the Supreme
> Court's instruction that "[a] State's regulatory interest will be particularly
> substantial if the State can point to off-reservation effects that necessitate State
> intervention." Such "off-reservation effects" clearly exist here and warrant the

---

[9] In 2019, the Second Circuit definitely concluded that certain "Tribal Defendants [] engaged in
conduct outside of Indian lands when they extended loans to the Plaintiffs in Vermont." *Gingras
v. Think Fin., Inc.*, 922 F.3d 112, 121 (2d Cir. 2019).

> imposition of Virginia's generally applicable laws. Moreover, . . . the lending activities in question constitute at least partly off-reservation conduct, because they reach into the sphere of a different sovereign and rely on conduct—including performance of the loan agreements—that occurred within that sphere.

*Id*. at 876–77.

The Fourth Circuit affirmed Judge Novak's decision and foreclosed Martorello's ability to claim that Virginia law does not apply to these transactions. The Fourth Circuit observed that "the conduct alleged is not limited to where the parties 'made and accepted' the agreements." *Id*. (citation omitted). Instead, it noted:

> Defendants allegedly marketed their lending businesses throughout the country, including in Virginia, and Plaintiffs resided on non-Indian lands when they applied for their loans online. Defendants allegedly collected loan payments from Plaintiffs while they resided in Virginia from bank accounts maintained there, and the effects of Defendants' allegedly illegal activities were felt by Plaintiffs in Virginia.

*Id*. Such activities, the Fourth Circuit concluded, were "directly analogous to the lending activity that other courts have found to clearly constitute off-reservation conduct subject to nondiscriminatory state regulation." *Id*. at 348–49 (gathering cases).

A straightforward application of *Hengle* forecloses Martorello's bid for summary judgment that tribal law applies to the loans. As the Fourth Circuit held: "substantive state law applies to off-reservation conduct, and although the Tribe itself cannot be sued for its commercial activities, its members and officers can be." *Id*. at 349. Because online lending constitutes off the reservation activity, Martorello can be held liable for his violations of Virginia's generally applicable laws, like its usury statute.

### C.   Martorello's entire argument rests on a legal test of when the conduct is considered on the reservation activity.

Martorello ignores the binding precedent in this Circuit that online lending constitutes off the reservation activity. Instead, just as in *Hengle*, Martorello argues that because the "LVD's lending operations are firmly rooted on the reservation," the Court must "assess the applicability

of state law through an interest-weighing analysis." (ECF No. 1255 at 18–19.) This interest weighing analysis comes from the Supreme Court's decision in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980).

Martorello's argument should be rejected because the Supreme Court has held that "the *Bracker* interest-balancing test <u>applies only</u> where 'a State asserts authority over the conduct of non-Indians engaging in activity on the reservation.'" *Wagnon*, 546 U.S. at 99 (2005) (emphasis added). In reaching this conclusion, the Supreme Court explained that the "*Bracker* interest-balancing test has never been applied where, as here, the State" applies its laws to "non-Indians off the reservation." *Id*. at 110. "Limiting the interest-balancing test <u>exclusively</u> to *on-reservation* transactions between a nontribal entity and a tribe," it noted, also followed its jurisprudence. The Supreme Court, thus, held that the interest-balance test did not apply when "a state tax is imposed on a non-Indian and arises as a result of a transaction that occurs off the reservation." *Id*.

Once again, Martorello's brief ignores *Wagnon*'s binding precedent. Instead, Martorello erroneously claims that the "Second Circuit in *Otoe-Missouria* recognized that" the interest-balancing test was "applicable to online tribal lending." (ECF No. 1255 at 21.) This is wrong in two respects. First, the Second Circuit did not rule that the interest-balancing test was applicable to online tribal lending. In fact, six years later, the Second Circuit held that tribal officials involved in an online lending enterprise were "engaged in conduct outside of Indian lands when they extended loans to the Plaintiffs in Vermont." *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 121 (2d Cir. 2019).

Second, the Second Circuit declined to apply the interest-balancing test because it was rightfully suspicious of Red Rock's vague filings, which omitted any reference to Martorello and his companies' dominant role and profit-sharing. Among other things, the Second Circuit noted:

> The lenders' affidavits boldly (but conclusorily) assert that "loans are approved through processes that occur on . . . Reservation[s]," but nowhere do they state what specific portion of a lending transaction took place at any facility physically located on a reservation. . . . [E]ven if we agreed that New York customers traveled elsewhere when they opened an internet browser, the lenders failed to establish where those customers metaphorically went, and who exactly approved their loans.

*Otoe-Missouria*, 769 F.3d at 115. And "[b]ecause significant aspects of the transaction and its attendant regulation are distinctly *not* located on-reservation," the Second Circuit noted that the "ambiguities in the record about those portions of the transaction that purportedly *are* loom all the larger." *Id.* (emphasis in original).

Here, this analysis is easy: *Hengle* has conclusively determined that online lending activities "clearly constitute off-reservation conduct subject to nondiscriminatory state regulation." *Hengle*, 19 F.4th at 349. Accordingly, as the Supreme Court held in *Wagnon*, the *Bracker* interest-balancing test does not apply.

### D.   NABDA does not authorize tribes and their business partners to conduct business outside the reservation without conforming to state law.

Martorello also contends that "the business relationships between companies affiliated with Martorello and the Tribe" further the goals of the Native American Business Development Act, Trade Promotion, and Tourism Act ("NABDA") and so "Virginia law is preempted to the extent it would undercut federal law, including NABDA." (ECF No. 1255 at 29–30.)

Although Martorello broadly cites the NABDA, he fails to point to any provision of the Act that preempts state usury laws. *Muscogee (Creek) Nation v. Henry*, 867 F. Supp. 2d 1197, 1214 (2010) (holding that NABDA did not preempt Oklahoma's tax statutes on non-tribe members who bought cigarettes), *aff'd sub nom. Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159 (10th Cir. 2012). This is because NABDA—"even when given the broadest reading to which [it is] fairly susceptible"—does not provide any authorization or "discernable regulatory framework for the activity that is the subject" of this case. *Tulalip Tribes v. Washington,* 349 F. Supp. 3d 1046, 1055

(W.D. Wash. 2018) (citations and quotations omitted).

Indeed, the Supreme Court has confirmed since the passing of NABDA that there are a "panoply of tools" available to "shutter, quickly and permanently" unlawful conduct involving tribes. *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014). One example is a suit for "*injunctive* relief against individuals, including tribal officers, responsible for unlawful conduct." *Id*. (emphasis added) (citations omitted). Another is denying "a license to Bay Mills for an off-reservation casino." *Id*. (citing Mich. Comp. Laws Ann. §§ 432.206–432.206a). And if the tribe "went ahead anyway," a state "could bring suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction for, say, gaming without a license" in violation of Michigan's gaming laws. *Id*. (citing Mich. Comp. Laws Ann. § 432.220).

In sum, the "purpose of Congress is the ultimate touchstone in every preemption case." *Scott v. GMAC Mortg., LLC*, 2010 WL 3340518, at *3 (W.D. Va. 2010) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Without express preemptive language in a statute, courts have "long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Id*. (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Here, there is no preemption clause in NABDA, nor is there any language in the statute remotely suggesting that Native American businesses may operate outside the reservation without complying with state law.

## II.     Martorello's motion for summary judgment on the usury claim should be denied.

### A.     The evidence shows that Martorello took and received usurious amounts.

In their Complaint, Plaintiffs alleged a usury claim against Martorello under Va. Code § 6.2-305(A), which provides: "If interest in excess of that permitted by an applicable statute is paid upon any loan, the person paying may bring an action… to recover from the person taking or receiving such payments[.]" Va. Code § 6.2-305(A). Unlike some other usury statutes, the plain language of this section allows recovery against "the person taking or receiving such payments,"

36

not merely the lender. *Compare* Va. Code § 6.2-305(A), *with* Va. Code § 6.2-1541(A) (limiting recovery against the "lender").

Here, the evidence shows that Martorello took and received usurious payments as expressly prohibited by Va. Code § 6.2-305(A). First, a jury could conclude that Martorello took the payments through the provision in the Servicing Agreement that provided that SourcePoint "shall collect all gross revenues and other proceeds connected with or arising from the operation of [Red Rock]." *See supra* ¶ 22 (citing Ex. 18 § 4.9, Martorello_026273). And second, a jury could conclude that Martorello received 98% of the payments through the revenue split in the Servicing Agreement, whereby SourcePoint received a "performance-based fee equal to that amount remaining after payment of" 2% of the gross revenue to the Tribe. *Id*. (citing Ex. 18 §§ 3.5.1 and 2.25). This revenue split clearly establishes that Red Rock only received 2% of the revenue on the loans, and all other amounts flowed to SourcePoint (either via payment of expenses or net profits).

The Servicing Agreement not only created this revenue split, but documents produced in discovery reaffirm that Martorello received nearly all amount collected on the loans. As explained above, there is evidence in this case showing the precise amount received by the Tribe, Bellicose VI, SourcePoint, Martorello and the Trust during discrete time periods. *See supra* ¶ 22. The same is true after the restructure. *See supra* ¶ 57.

### B.    Martorello's argument ignores the plain language of the statute, as well as multiple cases from this Court.

Martorello seeks summary judgment on the usury claim based on a theory that Va. Code § 6.2-305 only applies to lenders. According to Martorello, the lender technically takes and receives all of the payments and thus third parties such as Martorello cannot be held liable under § 6.2-305. Rather than supporting his argument with the plain language of the statute, Martorello contends that "[n]o Virginia court to date has decided whether a third party who assists a lender and receives

compensation derived from loan payments is liable under Va. Code § 6.2-305." ECF No. 1255 at 33. Against this backdrop, Martorello claims that "California courts have held that, under a similar provision to Virginia's usury laws, that a "recipient of the interest alone is liable" under California's usury laws. *Id*. (citing *Clarke v. Horany*, 212 Cal. App. 2d 307, 311 (1963)). This argument fails for three reasons.

First, Martorello's argument defies the plain language of § 6.2-305, which allows recovery against a "person" taking or receiving the payment. As Judge Novak explained in *Hengle*, "while the usury statute provides no definition of 'person,' the plain meaning of the word includes any 'human being.'" *Hengle*, 433 F. Supp. at 895–96 (quoting *Person*, Black's Law Dictionary (11th ed. 2019)). Based on this "plain reading of § 6.2-305," Judge Novak concluded that the statute permits recovery against "individuals who take and receive payments on usurious loans, even if those payments pass through corporate entities." *Id*. at 896.

Judge Lauck has reached similar conclusions in two tribal lending cases. In the first case, Judge Lauck held that the plaintiffs stated a claim under § 6.2-305 against a middleman who brokered the deal between the tribe and the payday lender who sought to use the tribe as the conduit for its loans. *Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901, 928 (E.D. Va. 2019). Because the complaint alleged that the middleman's company "received 1% of the revenue collected on the loans," Judge Lauck found these allegations were sufficient as to the middleman because "as the owner and managing partner," it could be inferred that the middleman "ultimately received proceeds from these loan repayments through both partnerships." *Id*. In the second case, Judge Lauck similarly concluded that a shareholder—who owned 25% of the payday lending company at the heart of the scheme—could be held liable under § 6.2-305(A).

Second, although Martorello posits otherwise, a review of other statutes confirms that the

Virginia General Assembly has limited certain statutory causes of action against the lender. For example, the Virginia Consumer Finance Act ("the VCFA") prohibits "[t]he lender" from collecting, receiving, or retaining any amounts if the loan violates the VCFA. Va. Code § 6.2-1541(B). Because the VCFA used the word "lender," the Virginia Supreme Court interpreted this section to exclude "members, officers, directors, agents, and employees of that lender." *Hengle*, 433 F. Supp. at 879 (citing *Greenberg v. Commonwealth ex rel. Att'y Gen. of Va.*, 255 Va. 594 (1998)). But unlike the VCFA, the General Assembly used the word "person" in § 6.2-305(A). Thus, treating the two statutes the same would violate the rule of statutory interpretation that "differences in language like this convey differences in meaning." *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) (citation omitted).

And third, Martorello erroneously contends that California has a similar usury statute that has been interpreted not to extend to "servicing and administration services." ECF No. 1255 at 33 (citing *Clarke v. Horany*, 212 Cal.App. 2d. 307, 311 (1963); *Ubaldi v. SLM Corp.*, 2014 WL 12639953 (N.D. Cal. Dec. 19, 2014)). But neither of these cases contained facts similar to this case. In *Horany*, the usury claim failed because there was no allegation of "any joint venture or partnership with the [lenders] in lending money or extending credit (as distinguished from concerted action to exact usurious interest)." *Brice v. Plain Green, LLC*, 372 F. Supp. 3d 955, 986, n. 26 (N.D. Cal. 2019) (discussing and distinguishing *Horany* from the tribal lending scheme before the court). And in *Ubaldi*, "there were no facts supporting allegation that the corporate parent indirect received 'residual profits' from the usurious scheme." *Brice*, 372 F. Supp. 3d at 986, n. 26 (discussing and distinguishing *Ubaldi* from the tribal lending scheme before the court).

The *Brice* court not only refused to dismiss the usury claims, but it also denied the defendants' motion for summary judgment where they once again argued "that only the Tribal

Entities could be liable for usury because only they received the usurious payments directly from the consumers." *Brice v. Haynes Invs., LLC.*, 548 F. Supp. 3d 882, 898 (N.D. Cal. 2021). The court rejected that argument because the evidence showed that the defendants—a middleman and shareholders of the large company at the heart of the scheme—"actually received some of the usurious interest payments, albeit indirectly." *Id.* (citation omitted). The court also rejected the defendants' motion as to the unjust enrichment claim on similar grounds. *Id.* at 898-899.

Here, the evidence against Martorello is stronger than *Hengle*, *Gibbs*, and *Brice*. As to the borrowers with loans with Red Rock, the evidence shows that Martorello was contractually entitled to receive all but 2% of the revenue collected on the loans. *See supra* ¶ 22 (citing Ex. 59 at Martorello_003481 and 3484). The evidence further shows that Martorello's companies were contractually responsible for collection of the amounts, and Martorello had signatory authority over Red Rock's bank accounts. *Id.* (citing Ex. 59 at Martorello_003488). And the evidence further shows that, as detailed above, ███████████████████████████████████████

███████████████████████

### C.     The Supreme Court of Virginia has repeatedly instructed courts to look beyond the form of transactions and to analyze their substance.

When interpreting the word "person" in Virginia Code § 6.2-305(A),[10] The Court should consider the "need to scrutinize with care loans made to borrowers in financial distress" and "to look beyond the mere form of a transaction and analyze its substance." *Valley Acceptance Corp. v. Glasby*, 230 Va. 422, 429 (1985). This principle—called the "true lender" doctrine in other jurisdictions—has been applied several times by the Supreme Court of Virginia. *Glasby*, 230 Va.

---

[10] It has also been recognized by the Fourth Circuit when analyzing whether a "transaction violated Virginia's usury statute." *Smith v. Anderson*, 801 F.2d 661, 664 (4th Cir. 1986) (explaining that "courts considering alleged violations of usury laws must 'look beyond the mere form of a transaction and analyze its substance'" (quoting *Glasby*, 230 Va. 422)).

422; *Van Dyke v. Com.*, 178 Va. 418, 424 (1941).

For example, in *Glasby*, the issue before the Supreme Court of Virginia was whether the principal amount of loans fell "below the ceiling for small dollar loans" in Virginia's Consumer Finance Act.[11] In that case, one of the consumers borrowed $850 and in exchange "obligated themselves to repay" a "total of $2,065.25 over five years," which was secured by "a deed of trust on their home." *Id*. At the time of the loan, "the small loan ceiling was $1,500 in principal amount," and the defendant was "not licensed to make loans covered" by the Consumer Finance Act. *Id*. In response to the borrowers' claim, the defendant claimed that the loans "under review were not small loans, but were mortgage loans." *Id*. at 430.

The trial court rejected the defendant's argument and entered summary judgment for the borrowers. *Id*. at 425. Affirming that ruling, the Supreme Court of Virginia explained that the "need to scrutinize with care loans made to borrowers caught in financial distress continues to be a valid concern." *Id*. at 429. The court noted that it "remain[ed] necessary, today, as in 1941" when *Van Dyke* was decided, "for courts to look beyond the mere form of a transaction and analyze its substance." *Id*. The court rejected the defendant's argument that the transaction was outside the purview of the statute, holding that "[m]aking mortgage loans" to the borrowers was "simply a device designed to transform a small loan into something other than a small loan." *Id*. at 432.

Courts in other jurisdictions have likewise looked "to the substance, not the form, of the transaction" when considering usury claims. *See, e.g.*, *CFPB v. CashCall, Inc.*, 2016 WL 4820635, at *5 (C.D. Cal. Aug. 31, 2016) (gathering cases); *People ex rel. Spitzer v. Cty. Bank of Rehoboth Beach, Del.*, 846 N.Y.S.2d 436, 439 (N.Y. App. Div. 2007) ("It strikes us that we must look to the

---

[11] Virginia's Consumer Finance Act was previously "known as the Small Loan Act." *Glasby*, 230 Va. 422, n.1. "In 1981," before the 1976 transaction at issue in *Glasby*, "the name of the Act was changed to the Consumer Finance Act." *Id.*

reality of the arrangement and not the written characterization that the parties seek to give it, much like Frank Lloyd Wright's aphorism that "form follows function."). This includes multiple cases involving the tribal lending model. *See, e.g.*, *CFPB*, 2016 WL 4820635, at *5; *CashCall, Inc. v. Morrisey*, 2014 WL 2404300, at *15 (W. Va. May 30, 2014).

In sum, Martorello cannot shield himself by turning requirements of Virginia's usury laws into a matter of form over substance—a practice rejected by *Glasby* and other cases from the Supreme Court of Virginia. Although Red Rock and Big Picture were held out as the lenders, the circumstances of their formation and operation reveal a deceptive tribal lending scheme where Martorello was the main recipient of the usurious loans.

## III.   Martorello's motion for summary judgment on the unjust enrichment claim should be denied.

An unjust enrichment claim has three elements: "(1) [the plaintiff] conferred a benefit on [the defendant]; (2) [the defendant] knew of the benefit and should reasonably have expected to repay [the plaintiff]; and (3) [the defendant] accepted or retained the benefit without paying for its value." *Hengle*, 433 F. Supp. 3d at 896 (citation omitted). Applying those elements in cases involving analogous lending schemes, this Court has repeatedly held that an unjust enrichment claim lies where a plaintiff paid—and a defendant received—money on a void loan:

> Under Virginia law, "[a]ny contract made in violation of [Virginia's usury laws] is void and no person shall have the right to collect, receive, or retain any principal, interest, fees, or other charges in connection with the contract." Va. Code. § 6.2-303(F). So, says Plaintiffs, any money paid on a void contract could constitute a benefit for the purposes of an unjust enrichment. The Court agrees.

*Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 63 (E.D. Va. 2021), *aff'd sub nom. Williams v. Martorello*, 59 F.4th 68 (4th Cir. 2023); *see also Gibbs v. Stinson*, 421 F. Supp. 3d 267, 313 (E.D. Va. 2019) (explaining that shareholders of a company involved in a tribal lending scheme "benefitted from Plaintiffs' payments on their loans because . . . [they] derived income from the

enterprise based on borrowers entering into Loan Contracts").

**A.    Virginia's usury statute does not preempt Plaintiffs' unjust enrichment claim.**

Despite that precedent, Martorello argues that Virginia's usury laws preempt Plaintiffs' unjust enrichment claim. In support, Martorello does not cite Virginia cases but relies on: (i) an out-of-context sentence from a general law treatise; (ii) a rhetorical question posed by a Supreme Court opinion from 1825; and (iii) two circuit court cases applying the laws of other states. None of those authorities indicate that the Virginia legislature intended to preempt unjust enrichment claims by enacting the Commonwealth's usury laws.

First, the cited *Corpus Juris Secundum* treatise contradicts the very point that Martorello seeks to make. It states a mere few sentences after the isolated text quoted by Martorello: "Statutes that provide for a penalty do not abrogate any common-law right borrowers may have as parties to an illegal contract but merely add a statutory remedy." 47 C.J.S. Interest & Usury § 299 (May 2023 update) (citing *Stock v. Meek*, 221 P.2d 15, 20 (Cal. 1950) ("[T]his section did not abrogate any common law rights of borrowers as parties to an illegal contract, but merely added a statutory remedy to aid the borrower and penalize the lender.")).

Second, the cited Supreme Court case does not hold—as Martorello's vague citation intimates—that usury statutes preempt common-law claims seeking the same or similar remedies. Instead, it merely poses the question of available remedies and then confirms that contracts that are remade to cure their illegal aspects can be considered lawful. *De Wolf v. Johnson*, 23 U.S. 367, 392 (1825) ("[A]lthough a contract be in its inception usurious, a subsequent agreement to free it from the illegal incident shall make it good."). That case has no application here.

And third, the cited circuit court opinions concern neither usury statutes nor the application of Virginia's preemption principles. *See United States v. Bame*, 721 F.3d 1025, 1030 (8th Cir. 2013) (citing Minnesota cases that adhere to the principle that "[r]elief under the theory of unjust

43

enrichment is not available where there is an adequate legal remedy or where statutory standards for recovery are set by the legislature"); *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 82 (1st Cir. 2020) (same for Massachusetts).

Unlike those jurisdictions, Virginia courts do not foreclose unjust enrichment claims simply because the same or similar remedies may be available by Virginia statute.[12] In any event, Martorello claims that Virginia's usury statute does not even cover him as someone tangential to the actual lender. The Court, therefore, should deny Martorello's motion for summary judgment on grounds that Plaintiffs' usury claim preempts it.

### B. Plaintiffs can establish the elements of an unjust enrichment claim.

Martorello first argues that he is insulated from liability because Plaintiffs' money went to other entities before it eventually reached him as an end beneficiary. This argument has been rejected by this Court time and again. *See, e.g.*, *Hengle*, 433 F. Supp. 3d at 896 (finding that plaintiffs stated an unjust enrichment claim against nontribal defendants who "owned and operated companies that received a substantial portion of the revenues from the Tribe's lending businesses"); *Gibbs*, 368 F. Supp. 3d at 933–34 (finding that the plaintiffs stated a plausible unjust enrichment claim where the nontribal defendants "derived income from the enterprise based on borrowers entering into loan [c]ontracts with [the tribal lending entities]").

Martorello next argues that Plaintiffs could not have expected repayment from him—again because he was insulated from Plaintiffs by design. This argument misconstrues the element that Martorello claims that Plaintiffs cannot meet. To be sure, Plaintiffs need not establish that *they*

---

[12] A Virginia court, of course, would prohibit an unjust enrichment claim if the basis of the claim were expressly covered by a contract between the parties. *See CGI Fed. Inc. v. FCi Fed., Inc.*, 814 S.E.2d 183, 190 (Va. 2018) (awarding summary judgment to defendant because "[plaintiff] may not recover on a quasi-contractual claim that is otherwise precluded by a contract which [it] has affirmed"). That is not the situation here.

expected to be repaid by Martorello but that *Martorello* should have reasonably expected to repay Plaintiffs. In other words, it's Martorello's state of mind that matters—not Plaintiffs'. And Martorello, of course, knew of the illegality of the scheme and should have expected to have to repay Plaintiffs for his ill-gotten gains.

Martorello's final argument posits that he earned any "benefit" he received because he and his companies performed services on behalf of the lending scheme. Martorello, of course, did not perform those services for Plaintiffs (directly or indirectly), and Plaintiffs did not benefit from them. In other words, Martorello cannot use unrelated services performed for the lending scheme to escape liability for the injustice to Plaintiffs. *See James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 654 (Va. 2020) (noting that defendant would not be required "to pay a remote, non-privity plaintiff when the defendant has already paid or is legally obligated to pay a party with whom he is in privity for *the same benefit*" (emphasis added)). Likewise, Martorello cannot offset his liability to Plaintiffs based on losses he later suffered following the sale of the business to the Tribe or taxes he purportedly paid based on a valuation he did not realize. Plaintiffs' unjust enrichment claim pertains to the monies that Plaintiffs paid and that Martorello eventually realized—irrespective of whether Martorello made sound business decisions afterward.

## CONCLUSION

For the foregoing reasons, the Motion for Partial Summary Judgment filed by Defendant Matt Martorello (ECF No. 1254) should be denied.

Respectfully submitted,
**PLAINTIFFS,** *on behalf of themselves and the classes as certified by the Court*

By: */s/ Kristi C. Kelly*
Counsel

45

Kristi Cahoon Kelly (VSB #72791)
Andrew Joseph Guzzo (VSB #82170)
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Phone: 703-424-7572
Fax: 703-591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

Leonard Anthony Bennett
Consumer Litigation Associates
763 J Clyde Morris Boulevard, Suite 1A
Newport News, VA 23601
Telephone: 757-930-3660
Facsimile: 757-930-3662
Email: lenbennett@clalegal.com
*Counsel for Plaintiffs*