# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

LULU WILLIAMS, et. al.,            )
on behalf of themselves and all    )
others similarly situated,         )
                                   )
            Plaintiffs,            )        Civil Action No. 3:17-cv-461
v.                                 )
                                   )
BIG PICTURE LOANS, LLC, et. al.')  )
                                   )
                                   )
      Defendants.                  )

Expert Report of Professor Nathalie Martin

I. QUALIFICATIONS AND BACKGROUND

*A. Title and Background*

I am the Frederick M. Hart Chair in Consumer and Clinical Law at the University of New
Mexico School of Law ("UNM School of Law"). Prior to joining the faculty at UNM School of
Law, I taught at Temple University School of Law, and before that, I practiced transactional and
business bankruptcy law. I have been a law professor for nearly three decades and was in
practice for a decade before that. My endowed chair was the first in the country dedicated to
consumer law scholarship and service. It remains one of a handful of endowed chairs dedicated
to consumer law in the country.

*B. Courses*

My current courses include contracts, consumer law, bankruptcy, secured transactions, and the
economic justice clinic. In the past, I also have taught business associations, the sale of goods,
payment systems, real estate transactions, and other commercial and consumer law courses. In
the economic justice clinic, I have represented consumers who have taken out payday and other
high-cost loans.

*C. Professional Honors, Testimony, and Presentations*

I am a member of the American Law Institute, a group of American judges, lawyers, and law
professors that helps write, amend, and pass the Uniform Commercial Code and helps write and
draft the various Restatements of Law.   I am also a member of the American College of
Bankruptcy, an honorary bankruptcy organization for top professionals in the field, the former
Dean of Faculty of the American Board of Certification (which writes the test for national

bankruptcy certification), and a former Resident Scholar of the American Bankruptcy Institute, the preeminent nonprofit professional organization for bankruptcy professionals.

I have spoken about high-cost loans to dozens of audiences, including the U.S. Senate Banking Committee and the New Mexico Legislature. For years, I have provided content, context, feedback, and commentary on high-cost loans and high-cost loan scholarship at two consumer law conferences, the Berkeley Consumer Law Scholars' Conference and the Teaching Consumer Law Conference, as well as to various audiences at the annual meeting of the Association of American Law Schools.

*D. Scholarship*

I have written over forty law review articles and a dozen books or treatises, including a twelve-volume treatise on commercial and consumer law known as the MATTHEW BENDER FORMS AND PROCEDURES. My scholarship covers many subjects, including corporate and consumer bankruptcy, elder law, and various consumer and commercial law topics, including continuing-care contracts, corporate contracts, various consumer contracts, real estate contracts, rent-to own contracts, and high-cost lending contracts, among other topics. Attached as Exhibit A is my curriculum vitae, which lists all of my publications for the past ten years and prior to that time.

My largest body of my work, spanning over a dozen articles between 2010 and 2022, focuses on high-cost loan products (which include *payday loans*, *title loans*, and triple and quadruple-digit interest rate *installment loans*). I study and write about high-cost loan contracts, the demographics of those who use high-cost loans, the public's attitudes about high-cost loans and interest rate caps in general, and the business models of certain high-cost lenders, including lenders claiming to be entitled to tribal sovereign immunity. Much of this opinion is based upon my own scholarship and study of high-cost loans, as well as the work of various consumer law nonprofit organizations.[1]

My research on high-cost lending includes the articles listed below:

---

[1] For example, *see* Alex Horowitz, *Reforming Payday Loans Can Save Consumers Billions*, January 20, 2023, https://www.pewtrusts.org/en/research-and-analysis/video/2023/reforming-payday-loans-can-save-consumers-billions, *State Laws Put Installment Loan Borrowers at Risk: How Outdated Policies Discourage Safer Lending*, October 17, 2018 https://www.pewtrusts.org/en/research-and-analysis/reports/2018/10/17/state-laws-put-installment-loan-borrowers-at-risk; *How Borrowers Choose and Repay Payday Loans*, PEW CHARITABLE TRUST, February 20, 2013, available at http://www.pewtrusts.org/en/research-and-analysis/reports/2013/02/19/how-borrowers-choose-and-repay-payday-loans; Susan K. Urahn,  Travis Plunkett, Nick Bourke, Alex Horowitz, Walter Lake, and  Tara Roche,  *Payday Lending in America: Policy Solutions, Report 3 in the Payday Lending in America series*, THE PEW CHARITABLE TRUSTS, October  2013, 12-13, available at http://www.pewstates.org/uploadedFiles/PCS_Assets/2013/Pew_Payday_Policy_Solutions_Oct_2013.pdf. ;Nick Bourke, Alex Horowitz, and Tara Roche, *Who Borrows, Where They Borrow, and Why* , July 2012, available at http://www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2012/PewPaydayLendingReportpdf.pdf.; *Profiting from Poverty: How Payday Lenders Strip Wealth from Working-Poor for Record Profits*, NATIONAL PEOPLE'S ACTION, January 2012;Uriah King and Leslie Parish, *Springing the Debt Trap: Rate Caps are Only Proven Payday Lending Reform*, CENTER FOR RESPONSIBLE LENDING, December 13, 2011' Borne, Rebecca, Joshua Frank, Peter Smith, and Ellen Schloemer, *Big Bank Payday Loans: High-interest Loans Through Checking Accounts Keep Customers in Long-term Debt*, CENTER FOR RESPONSIBLE LENDING, July 2011.

B*rewing Disharmony: Addressing Tribal Sovereign Immunity Claims in Bankruptcy*, 96 AM. BANKR. L. J. 149 (2022).

*The Power of Community Action: Anti-Payday Loan Ordinances in Three Metropolitan Areas* (2017) (with Robert Mayer).

*What Communities Can Do to Rein In Payday Lending: Strategies for Successful Local Ordinance Campaigns Through a Texas Lens*, 80 DUKE LAW & CONTEMP. PROBS. 147 (2017) (with Robert Mayer).

*Nefarious Neighbors: How Living Near Payday Loan Stores Affects Loan Use*, 88 MISS. L. J. 333 (2019) (with Younghee Lim, Aimee Moles & Trey Bickham).

*Public Opinion and the Limits of State Law: The Case for Federal Usury Caps*, 34 N. ILL. L. REV 259 (2014).

*Interest Rate Caps, State Legislation, and Public Opinion: Does the Law Reflect the Public's Desires?* 89 CHICAGO KENT L. REV. 1 (2013) (with Timothy Goldsmith).

*High-Interest Loans and Class: Do Payday and Title Loans Really Serve the Middle Classes?* 24 LOYOLA CONSUMER L. REV. 524 (2012) (with Ernesto Longa).

*The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?,* 69 WASH & LEE L. REV.751 (2012)(with Joshua Schwartz).

*Grand Theft Auto Loans: Repossession and Demographic Realities in Title Lending*, 77 MISSOURI LAW REV. 41(2012) (with Ozymandias Adams).

*Regulating Payday Loans: Why This Should Make the CFPB'S Short List*, 2 HARV. BUS. L. REV. ONLINE 44 (2011).

*Double Down-and-Out: The Connection Between Payday Loans and Bankruptcy,* 39 SOUTHWESTERN L. REV. 789 (2010) (with Koo Im Tong).

*1,000% Interest—Good While Supplies Last: A Study of Payday Loan Practices and Solutions,* 52 ARIZONA LAW REVIEW 563 (2010).

My research in the area of high-cost loans has been cited by the U.S. Supreme Court, the California Supreme Court, the New Mexico Supreme Court, the Fourth Circuit Court of Appeals, and various federal and state trial courts.

1. High-Cost Lending Research: Relevant Empirical Research

I have completed seven empirical studies related to high-cost lending and attitudes toward high-cost lending.

    a. First Study in 2009

I devised my first study, *1,000% Interest—Good While Supplies Last: A Study of Payday Loan Practices and Solutions,* after meeting clients in our clinical law program that had taken out some form of these loans. Before meeting these clients, I had no idea what the terms of these loans were. I sought to determine why interest rates did not drop when more lenders entered the market. I also sought to determine what people were using these loans for and whether consumers shopped around based on interest rates. Finally, I sought to determine if consumers knew the loans were interest-only loans when they took them out. I went into the study with an open mind, just trying to learn the facts. In the study, the article for which was published in the Arizona Law Review, I and my students interviewed 109 consumers outside payday lending stores. Key findings of this study include that: 1.) consumers do not shop for payday loans based on price so supply and demand principles do not reduce loan cost, 2.) most consumers do not understand the loans before they get into them and have no idea they are paying only interest, 3.) the vast majority of consumers do not use the loans for short term needs, but often to meet regular expenses, which means these consumers are worse off the subsequent month than they were before they took out the loan. I also learned that many were paying on multiple loans and loans so old they had no idea what they used the original loan for.

    b. Subsequent Empirical Research

Before I began the first study, I had no idea how many loans consumers carried at a time. I assumed most people used just one loan at a time. Discovering the use of multiple loans at a time led to my next study, an empirical analysis of the debts of over 1,000 bankruptcy debtors to determine what percentage of the debtors used payday loans in a state with lax regulations, and of those, how many loans the borrowers had. I discovered that 19% of debtors in the study used the loans, nearly 70% of those with loans had more than one loan, 37% had more than five loans, and 14% had more than 10 loans.[2]

In my next study, I analyzed state data on *title loans* and discovered, among other things that title lenders do not underwrite the loans for affordability because they rely on the value of the car to be repaid, and also that the loans create a high risk of repossession.[3] I then did a demographic study of borrowers, again using bankruptcy data, and discovered that most payday loan borrowers are not middle-class people as the industry suggests. Instead, these borrowers typically have incomes lower than the median income in their state and also have lower than average

---

[2] 1 *Double Down-and-Out: The Connection Between Payday Loans and Bankruptcy,* 39 SOUTHWESTERN L. REV. 789 (2010)(with Koo Im Tong).
[3] *Grand Theft Auto Loans: Repossession and Demographic Realities in Title Lending*, 77 MISSOURI LAW REV. 41(2012) (with Ozymandias Adams).

home ownership rates.[4] Next I empirically studied the attitudes of the public regarding interest rate caps, discovering what essentially all other polls on the subject have found, namely that consumers from all religious and political groups favor double-digit interest rate caps over no caps.[5] I then completed an empirical study on how local governments can regulate high-cost lending when their state has failed to do so.[6]  Finally, I explored how living near a payday loan store affects payday loan usage.[7]

2. High-Cost Lending Research: Relevant Doctrinal Research

My doctrinal scholarship on high-cost loans includes these two articles on tribal lending:

> *Brewing Disharmony: Addressing Tribal Sovereign Immunity Claims in Bankruptcy*, 96 AM. BANKR. L. J. 149 (2022).

> *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?,* 69 WASH & LEE L. REV. 751 (2012)(with Joshua Schwartz).

My doctrinal scholarship discussing the substance over form doctrine includes the two tribal lending articles listed above, as well as these two articles:

> *The Afterpay Hangover*, J. CONSUMER LAW (2023) (with David Lynn) (forthcoming).

> *Shadow Credit and the Devolution of Consumer Credit Regulation*, 24 LEWIS & CLARK L. REV. 1349 (2021) (with Lydia Pizzonia).

*E. Prior Expert Testimony and Consulting Work*

I have been a trial expert in one case on high-cost lending during the past ten years. The opinion in this case can be found at James v. National Financial, L.L.C., Court of Chancery of Delaware, March 14, 2016, 132 A.3d 799 (2016).

II. SCOPE OF THIS REPORT, SOURCES RELIED UPON, AND SUMMARY OF OPINIONS

In rendering this opinion, I rely on my scholarship, my years of experiences and expertise gleaned from the study of high-cost lending and high-cost loans, my experience teaching in the UNM School of Law clinical law program, my experience, expertise, and general knowledge of the law in the areas in which I teach, and the sources in this report and in my own work.  I also reviewed the Complaint, the Plaintiff's Statement of Position Regarding Material

---

[4] *High-Interest Loans and Class: Do Payday and Title Loans Really Serve the Middle Classes,* 24 LOYOLA CONSUMER L.REV. 524 (2012) (with Ernesto Longa).
[5] *Public Opinion and the Limits of State Law: The Case for Federal Usury Caps,* 34 N. ILL. L. REV 259 (2014).
[6] *What Communities Can Do to Rein In Payday Lending: Strategies for Successful Local Ordinance Campaigns Through a Texas Lens*, 80 DUKE LAW & CONTEMP. PROBS. 147 (2017) (with Robert Mayer).
[7] *Nefarious Neighbors: How Living Near Payday Loan Stores Affects Loan Use*, 88 MISS. L. J. 333 (2019) (co-authored with Younghee Lim, Aimee Moles & Trey Bickham).

Misrepresentation and Omissions, Matt Martorello's Response to Plaintiffs' Statement of Position, the Plaintiffs' Reply in Support of Statement of Position Regarding Material Misrepresentations Made to the Court by Defendants, and Plaintiffs' Statement of Position Regarding How Money from the Alleged Scheme Flowed Through Each of the Martorello Companies. Additionally, I reviewed some of the Exhibits to these pleadings as needed, with particular attention to the Amended and Restated Servicing Agreement Between Red Rock Tribal Lending LLC ("Red Rock") and Sourcepoint VI, LLC, the Intratribal Servicing Agreement Between Big Picture Loans, LLC and Ascension Technologies, LLC, the Ascension Technologies LLC Designation of Authority Policy, the Secured Promissory Note, the Loan and Security Agreement between the tribe and Eventide Credit Acquisitions, LLC ("Eventide"), and the Eventide Operating Agreement.

Part I of this report covers the history, practices, and customs of the high-cost lending industry, including the history and development of the tribal lending model. As explained in more detailed below, it is my opinion that non-tribal payday lenders desire to avoid state laws was the impetus behind the creation of the tribal business model. It is also my opinion—as expressed in my early scholarship on this topic—that the tribal lending model was the most recent incarnation of payday lending regulation avoidance after the federal government took steps to shutdown rent-a-bank arrangements.

Part II of this report cover the structure of the lending enterprise between Martorello, the tribe, and their respective entities, as well it's the consistency of that structure with the tribal lending model. As explained in more detail below, it is my opinion that the structure between Martorello and the tribe was consistent with the tribal lending model in general, and included the hallmark features of these relationships.

## I.      Opinion #1: The History, Practices, and Customs of the High-Cost Lending Industry, Including the History and Development of the Tribal Lending Model.

*A. Background on the Current State of High-Cost Lending and How Lenders Avoid Interest Rate Caps*

There are many varieties of high-cost loans, including store-front payday loans, title loans, and installment loans.[8] A true "payday" loan is called a payday loan because its original purpose was to help a customer survive a short-term cash flow crisis between the time of the loan and the customer's next payday. In one common form of payday loan, a consumer borrows money at a rate of between $15 and $25 per $100 borrowed, for a period of fourteen days or less. In other words, if a consumer was paid four days ago but is already out of cash, she can go borrow, for example, $400 between now and her next payday (now ten days away). To get that $400 at the $15 per $100 rate, for example, she would need a checking account and would write a check, or authorize an automatic debit, for $460 post-dated to her next payday.

---

[8] *See* Nathalie Martin, *Public Opinion and the Limits of State Law: The Case for Federal Usury Caps*, 34 N. ILL. L. REV. 259, 267-69 (2014) (describing different types of high-cost loans including high-cost installment loans).

When payday comes, this consumer can either let the check or debit clear, or she can go in and pay another $60 to borrow the same $400 for the next two weeks. The loan is interest-only. When taken as an annual percentage rate (calculated by multiplying this rate by twenty-six two-week periods over the course of a year), these terms result in an interest rate of roughly 390% per annum or higher. Annualized, these loans run anywhere from 390% to 500% per annum, depending on how long the loan is outstanding.

Title loans are a different form of high-cost loan. In these loans, the lender takes an unencumbered auto title as collateral for the loan. These loans typically run 25% per month or 300% per annum.[9] There are also high-cost installment loans, including high-cost internet installment loans, which are among the most expensive in the industry.[10] People refer to all of these loans as payday loans because the public recognizes that name, but each type is slightly different.

High-cost loans are regulated at the state level. Many forms of high-cost loans, other than traditional payday loans, were designed to get around state payday loan regulations that typically limit interest and fees, rollovers, and numbers of loans per year, and also require that loans be placed in a public database. Most of these state statutes apply only to loans of short duration.  A typical lender work-around is to offer only longer loans.  This change in practice has led to a proliferation of longer, high cost "installment loans," which are now more common than payday loans.

The phenomenon of morphing loans into another form in order to avoid state laws is discussed in many of my law review articles, particularly my piece in the Arizona Law Review.[11] The move to offer high-cost installment loans instead of traditional payday loans has occurred all over the country in both storefronts and on line. These installment loans are often more expensive than the previous payday loans. In one such loan, a customer borrowed $100, to be repaid in twenty-six bi-weekly installments of $40.16 each, plus a final installment of $55.34. In total, this borrower was scheduled to pay a total of $1,099.71 on a $100 loan. The annual percentage rate on the loan was 1,147%.[12] Due to these and other work-arounds, most states now cap interest on high-cost loans.[13]

---

[9] *See* Nathalie Martin and Ozymandias Adams, *Grand Theft Auto Loans: Repossession and Demographic Realities in Title Lending*, 77 MO. L. REV. 41, 48 (2012).

[10] *See, e.g.*, State ex rel. King v. B&B Inv. Group, Inc., 329 P.3d 658, 663 (N.M. 2014).

[11] Nathalie Martin, *1,000% Interest—Good While Supplies Last: A Study of Payday Loan Practices and Solutions,* 52 ARIZONA LAW REVIEW 563 (2010). As one example of such morphing, in Illinois a statue was passed that applied only to loans of less than 31 days. As one scholar explains:

> Regulators in Illinois imposed rules in 2001 that were designed to [curb the number of payday loans and roll-overs]. Customers were allowed to borrow no more than $400; only two renewals were permitted, with some of the principal paid down each time; and a cooling-off period was mandated to prevent borrowers from using the proceeds of a new loan to pay off the old one. The state . . . promised to establish a database to track loan activity and enforce the rules.

Robert Mayer, *One Payday, Many Payday Loans: Short-Term Lending Abuse in Milwaukee County* (working paper, 8), *available at* http://lwvmilwaukee.org/mayer21.pdf (last accessed Aug. 6, 2009).

[12] *State ex rel. King v. B&B Inv. Group, Inc.,* 329 P.3d 658, 663 (N.M. 2014).

[13] Carolyn Carter, *Predatory Installment Lending in the States (2022),* June 28, 2022, NCLC, https://www.nclc.org/resources/predatory-installment-lending-in-the-states-2022/. Further elaborating, this source states that:

*B. The Background and History of High-Cost Lending and the Rise of Rent-Bank and Rent-a Tribe*

For most of our country's history, almost all states capped interest rates at 18% or even lower.[14] Usury laws, and substance over form analysis, originally applied to all lenders including banks. When the National Bank Acts were passed in 1863 and 1864, however, these laws gave national banks the choice of two alternative usury caps—a state one or a federal one—both of which were true usury caps.[15]

Both the rent-a-bank and rent-a-tribe methods described below were made possible through the 1978 Supreme Court's decision in *Marquette National Bank of Minneapolis v. First of Omaha Service Corp,*[16] which permitted national banks to export the interest rates allowed in their home state across state lines, and preempt the usury law of the borrower's home state.[17]   Stated another way, lenders could use those national banks as conduits because they were exempt from state interest rate caps set by state laws. Under these arrangements, the payday lenders funded, serviced, and collected loans that were nominally made by the national banks, and the national banks received a small payment in return for fronting the loans.

If the bank in the unlimited interest rate state was made to look like it was the actual lender, then the bank's right to avoid state usury limits would apply to the loans.[18]   State usury caps were

- 19 states and the District of Columbia cap the annual percentage rate (APR) at 36% or less.
- 13 states cap the APR between 36% and 60%.
- 13 states cap the APR at more than 60%.
- Three states—Idaho, Utah, and Wisconsin—require only that the loan not be " unconscionable" (a legal principle that bans terms that shock the conscience).
- Two states—Delaware and Missouri—impose no cap at all.

The NCLC map below shows the maximum APRs allowed by the states for closed-end installment loans as of 2022. *Id.* These numbers do not reflect 36% caps recently passed in Colorado and New Mexico in 2023 and 2022 respectively.



[14] Christopher Lewis Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion and American Credit Pricing Limits*, 92 MINNESOTA LAW REVIEW 1110, 1111 (2008)
[15] Kimball v. Nat'l Bank of North America, N. A., 468 F. Supp. 1069, 1071 (D.C.N.Y., 1979).
[16] 439 U.S. 299, 318-19 (1978).
[17] *Id.* State chartered depository institutions obtained the same most favored lender status when Congress enacted § 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (codified at 12 U.S.C. § 1831d).
[18] This partnership scheme was the industry's primary action plan to avoid regulatory restrictions. *See* Elizabeth R. Schiltz, *The Amazing, Elastic, Ever-Expanding Exportation Doctrine and Its Effects on Predatory Lending*

essentially preempted, though the practice violated the substance over form rule.[19] In "rent-a-bank" and the newer so-called "rent-a- tribe" arrangements described below, the high-rate lender assumes most, if not all, of the risk of nonpayment of the loans and also arranges the loans. In a rent-a-bank transaction, the high-rate lender provides the initial lending capital, markets the loans, takes the applications, controls the underwriting and approval process, and merely forwards the borrower's information to the bank to perform the ministerial function of advancing the funds.[20]   The high-rate lender then purchases the loan from the bank, thus assuming the entire economic risk of nonpayment, as well as the potential economic upside of the loan.[21]

Once rent-a-bank schemes appeared, federal regulators took steps to shut them down whenever it appeared that the loans were really made by and for the non-bank, high-rate lender.[22]   The FDIC eventually invalidated rent-a-bank, by bringing actions against banks engaged in these agreements.[23]

---

*Regulations*, 88 MINN. L. REV. 518, 581-583, 621- 22 (2004) (discussing renting charters and concluding that applying the exportation doctrine to non-bank lenders is not justified under principles of banking law).

[19] Christopher Lewis Peterson, *'Warning: Predatory Lender' - A Proposal for Candid Predatory Small Loan Ordinances,* 69 WASH. & LEE L. REV. 893, 897-898 (2012). Attempts to evade usury laws are not new.  In 1825, the Supreme Court remarked:

> Usury is a mortal taint wherever it exists, and no subterfuge shall be permitted to conceal it from the eye of the law; this is the substance of all the cases, and they only vary as they follow the detours through which they have had to pursue the money lender.

De Wolf v. Johnson, 23 U.S. 367, 385 (1825). In 1835, Chief Justice Marshall explained this concept in greater detail in *Scott v. Lloyd*:

> The ingenuity of lenders has devised many contrivances, by which, under forms sanctioned by law, the [usury] statute may be evaded. Among the earliest and most common of these is the purchase of annuities, secured upon real estate or otherwise.
> . . . . The purchase of an annuity therefore, or rent charge, if a bona fide sale, has never been considered as usurious, though more than six per cent profit be secured. Yet it is apparent, that if giving this form to the contract will afford a cover which conceals it from judicial investigation, the [usury] statute would become a dead letter. Courts, therefore, preceived [sic] the necessity of disregarding the form, and examining into the real nature of the transaction. If that be in fact a loan, no shift or device will protect it. Scott v Lloyd, 34 U.S. 418, 446–47 (1835); *see also* 12 U.S.C. § 38 (2018).

[20] Commonwealth of Pennsylvania v. Think Fin., Inc., No. 14-CV-7139, 2016 WL 183289, at *2 (E.D. Pa. Jan. 14, 2016).

[21] *Id*.

[22] In 2000, both the Office of the Comptroller of the Currency and the Office of Thrift Supervision issued letters warning national banks and thrifts of the potential credit, transaction, reputation, compliance, and legal risks involved with payday lending. *See* OCC Advisory Letter No. AL 2000-10 (Nov. 27, 2000), *available at* https://www.occ.treas.gov/news-issuances/advisory-letters/2000/advisory-letter-2000-11.pdf *See also* Office of Thrift Supervision, Letter P-2000-4 (Feb. 3, 2000) (OTS will conduct examinations of the thrift's partner in payday lending to the same extent as it will of the thrift).

[23] *See, e.g.,* Republic Bancorp Inc, SEC Form 8-K at ITEM 1.01 (Feb. 24, 2006), ("By letter to the Bank dated February 17, 2006, the FDIC cited inherent risks associated with payday lending activities and asked the Bank to consider terminating this line of business.  Consequently, on February 24, 2006, the Bank and ACE amended the agreement regarding the Bank's payday loan activities in Texas, Pennsylvania and Arkansas."), *available at* www.sec.gov/Archives/edgar/data/921557/000110465906011951/a06-5812_18k.htm.   In fact, Second Bank's

High-cost lenders, however, were still looking for ways to continue lending at triple-digit and even quadruple-digit interest rates. Eventually a new work-around was created in which existing high-cost lenders teamed with Native American tribes in hopes of availing themselves of these tribal partners' tribal sovereign immunity.

### C. Background on the Business Structure of Tribal Lenders

As explained above, the shut-down of rent-a-bank led to a new work-around, sometimes referred to as "rent-a-tribe," the tribal lending model, or the sovereign model. Under this new structure for lending, an existing lender forms an alliance with a Native American tribe in an attempt to use the tribe's sovereign immunity and provide loans in states in which the loans are illegal.[24]   Rather than claiming to be based in a state with permissive lending statutes and using a bank's ability to export rates across state lines, lenders claim that the tribes with which they partner are the real lenders.  The lenders then assert that due to these tribal partnerships, their loans are protected by sovereign immunity and not subject to state usury laws.[25] Low tribal profits and little tribal control are the hallmarks of these relationships. As my prior scholarship explains:

> Typically, a non-tribal payday lender makes an arrangement with a tribe under which the tribe receives a percentage of the profits, or simply a monthly fee, and otherwise forbidden practices of the lender are presumably shielded by tribal immunity. This is described in the payday lending industry as the "sovereign model."[26] Although there is little sunlight on the true financial arrangements between the tribes and payday lenders, under one such agreement, between one and two percent of the payday profits of one "tribal" lender actually went to the tribes.[27] By contrast, the Indian Gaming Regulatory Act, which extensively regulates the Indian gaming industry for the benefit of tribes, mandates that at least 70% of the profits from each gaming enterprise go directly go to the tribe … with a maximum of 30% going to a non-tribal consultants and mangers.[28]

---

[24] Megan Leonhard, *Payday loans can have interest rates over 600%—here's the typical rate in every U.S. state*, CNBC, Feb 16, 2021, available at https://www.cnbc.com/2021/02/16/map-shows-typical-payday-loan-rate-in-each-state.html, last visited on June 30, 2021.

relationship with a Think Finance subsidiary (ThinkCash) was explicitly mentioned by the FDIC in charges it brought against Second Bank in 2007. In the Matter of Second Bank of Delaware, and CompuCredit Corporation, Notice of Charges for an Order to Cease and Desist and For Restitution, Federal Deposit Insurance Corporation, FDIC-07-256b, FDIC-07-257k, at 8 (June 10, 2008), *available at* http://www.fdic.gov/news/news/press/2008/FBD_Notice_of_Charges.pdf.

[25] *See* Western Sky Fin., L.L.C. v. Maryland Comm'r of Fin. Regulation, No. WDQ 11-1256, 2011 WL 4929485, at *1 (D. Md. Oct. 13, 2011) (describing loan contract that asserts agreement is not subject to any state law); Online Payday Loan Companies Ignoring Colorado Law, CBS4 News (Nov. 14, 2011), *available at* http://denver.cbslocal.com; Jessica Silver-Greenberg, *Payday Lenders Join With Indian Tribes*, WALL ST. J., Feb. 10, 2011, *available at* www.wsj.com. *See also* Allen J. Parker & Assoc., Inc., Payday Lending -- the Sovereign Model 3 (Apr. 2012) (publication by consultant for payday lenders).

[26] *See* http://www.consultants4tribes.com/category/sovereign-model/ and *see* http://paydayloanindustryblog.com/Payday%20loan%20industry/sovereign-nation-model/

[27] Real Parties in Interest's Answer to MTE Financial Services, Inc.'s Petition for Review and Request for Stay at 4, No. S194110, 2011 WL 2907024, at *4 (Cal. June23, 2011). ("Verirfied discovery responses in this case supplied by another defendant, Processing Solutions, LLC, states that MTE received between 1% and 2% of the total loan revenue.").

[28] IGRA 25 U.S.C. § 2711(7).

As a result of the rent-a-tribe method, many high-cost internet loans are made by entities that claim immunity based on their tribal partnerships.[29] Because payday loans are regulated at the state level, and tribes are bound by state law but cannot be sued for violations of such laws due to tribal sovereign immunity, lenders see opportunities to skirt state usury caps.[30] One industry web site explains the allure for the non-tribal party to these arrangements:

> Due to the strict regulations that are hitting the payday loan industry hard, many lenders are now turning to Indian Tribes to help them out. The American Indian Tribes throughout the United States have been granted sovereign immunity which means that they are not held subject to the laws that payday loans are currently going up against. There are 12 states which have banned payday lending but as long as their [sic] is an Indian tribe who runs the operation on this sovereign land, the lenders can continue their business even where payday loans have already been banned. Similar to the Casino boom, payday loans are the new financial strategy that many are using as a loophole through the strict payday loan laws.
> …
> It is no surprise that many lending companies are currently seeking out American Indian Tribes in an effort to save their businesses by escaping US lending laws. Tribal leaders are paid a few thousand dollars a month for allowing a payday lender to incorporate on tribal land. The more lenders that tribes allow to move onto their reservation, the larger the profit that they make.[31]

As this excerpt articulates, most lenders using this model are not created or controlled by tribes or even by tribal members. It is most common for existing lenders to form an alliance with a tribe *after* loans have been curtailed in a particular market.[32]  Moreover, most "tribal" lending entities are owned by close corporations in which the decision-making lies with a non-tribal member, making the tribe's involvement minimal.

Typically, an existing lender contacts a tribe through an intermediary and proposes a lending partnership in which the tribe receives 1-5% of loan profits in exchange for allowing the lender to use the tribe's sovereign immunity.[33]  The tribe typically has little control over the business

---

[29]Kyra Taylor and Leslie Bailey, and Victoria W. Ni, *Stretching the Envelope of Tribal Sovereign Immunity?: An Investigation of the Relationships Between Online Payday Lenders and Native American Tribes,* Public Justice Foundation, at 1, available at https://www.publicjustice.net/wp-content/uploads/2018/01/SVCF-Report-FINAL-Dec-4.pdf.*see also* Nathalie Martin and Joshua Schwartz, *The Alliance between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 WASH. & LEE L. REV. 751, 751 (2012).

[30]  Taylor, Bailey, & Ni, *supra* note 29, at 1.

[31] The Connection Between Indian Tribes and Payday Lending, ONLINE CASH ADVANCE, *cited in Public Opinion and the Limits of State Law: The Case for Federal Usury Caps,* 34 N. ILL. L. REV 259, 280(2014).

[32] Commonwealth of Pennsylvania v. Think Fin., Inc., No. 14-CV-7139, 2016 WL 183289, at *11 (E.D. Pa. Jan. 14, 2016).

[33] Taylor, Bailey, & Ni, *supra* note 29, at 157; *see also* Consumer Financial Protection Bureau V. CashCall, Inc. et al., 2018 WL 485963(C.D. Ca. 2018), at *2-4 (describing role of attorney Claudia Callaway in facilitating tribal lending).

decisions or management of the business.[34] The tribe, while perhaps employing a few members in clerical positions on tribal land, stands by and receives its small percentage of the profits.[35] The Public Justice Foundation recently created a detailed, 200-page inventory of tribal lenders, describing which high-cost loan companies have worked with which tribes.[36]  This report details the lack of control tribes typically have over these lending arrangements, even if the lender claims to be "100% owned" by the tribe.  For example, when the Chippewa Cree formed an alliance with Think Finance Inc. ("Think Finance") and Plain Green, LLC as a "wholly owned subsidiary" of the tribe, Think Finance and its subsidiaries received about 95 percent (95%) of the loan profits while Plain Green received just 4.5%.[37]   When Chippewa Cree tribal Chairman St. Mark questioned the fairness of the Plain Green, LLC and Think Finance division of profits, Think Finance told the tribal council that Chairman St. Marks needed to be removed from office or Think Finance would end its business arrangement with the tribe.[38]  Think Finance explicitly insisted that the tribal council impeach Chairman St. Marks.[39]  Think Finance could make this demand because it controlled all of the money in the partnership.  Yet Plain Green was a 100% wholly-owned subsidiary of the Chippewa Cree tribe.[40]

Based on my training, education, and experience, it is my opinion that non-tribal payday lenders desire to avoid state laws was the impetus behind the creation of the tribal business model. It is also my opinion—as expressed in my early scholarship on this topic—that the tribal lending model was the most recent incarnation of payday lending regulation avoidance after the federal government took steps to shutdown rent-a-bank arrangements.

## II.   Opinion # 2: The Structure and Scope of Martorello's Relationship with the Tribe, As Well As Its Consistency with the Tribal Lending Model.

This section describes the structure of this lending business through some of the corporate documents executed in connection with this business.

### The Original Transaction and the Initial Operating Agreement

In this transaction, in 2012, Martorello and the Tribe signed a document named Amended and Restated Servicing Agreement Between Red Rock Tribal Lending LLC ("Red Rock") and Sourcepoint VI, LLC (the "Initial Operating Agreement").[41] As described below, under this

---

[34] *Id.; see also* Otoe-Missouria Tribe of Indians v. New York State Dept. of Financial Services, 769 F.3d 105 (2d Cir 2014); Otoe–Missouria Tribe Of Indians, v. New York State Department Of Financial Services, 974 F.Supp.2d 353 (S.D.N Y.2013); Gibbs, et al., v. Haynes Investments, LLC, et al., Defendants., 368 F.Supp.3d 901 ( E.D. Va.2019); Gibbs V.  Elevate Credit, Inc., 2021 WL 4851066 United States District Court, (E.D. Virginia, Richmond Division); Consumer Fin. Prot. Bureau v. CashCall, Inc., 2016 WL 4820635, at *5; CashCall, Inc. v. Morrisey, 2014 WL 2404300, at *6 (W. Va. May 30, 2014); Commonwealth of Pennsylvania v. Think Fin., Inc., No. 2016 WL 183289, at *11.
[35] Taylor, Bailey, & Ni, *supra* note 29, at 157.
[36] *Id.*
[37] *Id.*
[38] *Id.* at 163.
[39] *Id.*
[40] *Id.* at 209.
[41] Amended and Restated Servicing Agreement Between Red Rock Tribal Lending LLC and Sourcepoint VI, LLC, Ex.42 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.

agreement, Red Rock was 100% owned by the tribe, but relinquished most of the control over the lending business and received just 1-2% of its profits.

Red Rock was one party to the Initial Operating Agreement and the other party was Sourcepoint VI, LLC ("Sourcepoint").  Sourcepoint was assigned its rights under the Initial Operating Agreement from Bellicose VI, LLC ("Bellicose"). Since both Bellicose and Sourcepoint were owned and controlled by Martorello, these entities are referred to here as the "Martorello Parties." In the Initial Operating Agreement, the Martorello Parties are named the "Servicer" and Red Rock Tribal Lending LLC is named the "Enterprise."

The Initial Operating Agreement had a seven-year term which automatically renewed for another two years unless terminated.[42] Section 3.3.1 contained the following non-competition clause:

> In consideration for Servicer providing its expertise to the Enterprise, the Enterprise agrees that so long as this Agreement is in effect neither it nor any Affiliate shall, directly or indirectly, either on its own or through any agent, joint venture, subsidiary or independent contractor, engage in the Unsecured Lending Business anywhere in the world except through the Enterprise without engaging the Servicer to provide the management and consulting services contemplated by this Agreement.[43]

Section 3.1provided that the Servicer has "authority and responsibility over all communication and interaction whatsoever between Enterprise and each service provider, lender and other agents of Enterprise."[44] Section 4.2.1 sets out the Servicer's broad duties which included selecting and forming relationships with service providers and lenders and suggesting practices and recommendations to tribal representatives regarding:

> generally accepted industry practices for lenders and service providers,
> regulatory and compliance standards for the Enterprise,
> training and education standards,
> financial reporting, and
> website, marketing, and customer relations.[45]

Part 4.2.1(i) provided that the Servicer would provide pre-qualified leads, credit-modelling data, and risk assessment data to the Enterprise. Additionally, Section 1.4 provided that the Servicer would develop, manage, and provide operation guidelines regarding the lending business and also provide investment and capital management services, management, operations, marketing consulting, and analytic services, including risk assessment management.

---

[42] Under Section 3.2, "the term of the Agreement begins on the Effective Date of this Agreement (October 25, 2011), *Id.* Section 3.2 The Term automatically renews for an additional period of two (2) years unless either party provides written notice to the other Party at least one hundred twenty (120) days, but no greater than one (I) year, prior to the end of the term." *Id.*
[43] *Id.* Section 3.3.1.
[44] *Id.* Section 3.1.
[45] *Id.* Section 4.2.1.

Regarding the revenue sharing agreement, Section 2.25 provided that tribe would get what amounts to roughly 1-2% of the profits of the business,[46] with the rest going to the Martorello parties. Section 3.5.1 further elaborates on this revenue-sharing arrangement. It provided that "the success of the business is based in large part upon the services provided to the Enterprise by the Servicer. As a result, Enterprise has agreed to a performance-based fee equal to cash basis revenue remaining after payment of Tribal Net Profits, Servicer advances, and all Servicing Expenses."[47]

Regarding the handling of the funds and access to bank accounts, Section 4.9 provided that Servicer would "collect all gross revenues and other proceeds connected with or arising from the operation of the Enterprise, and to deposit such funds daily." Section 4.4 provided that the Servicer had the sole signatory and transfer authority over these bank accounts, meaning that the Enterprise had no access to these funds.[48] More specifically, Section 4.4 provided:

> The Servicer shall select a bank or banks for the establishment of (i) a primary bank account by Enterprise into which all funds generated by the Unsecured Lending Business will be transferred and deposited (the "Primary Bank Account") and (ii) any other bank accounts by Enterprise subject to the Deposit Account Control Agreement as the Servicer deems necessary or appropriate to conduct the Unsecured Lending Business consistent with this Agreement, e.g., an account to hold the Regulatory and Litigation Reserve Fund (as defined below). Unless otherwise mutually agreed in writing by the Enterprise and Servicer, the Servicer shall have sole signatory and transfer authority over such bank accounts. Servicer shall have sole authority to sweep monies from such bank accounts for distributions made to the Enterprise consistent with Sections 3.5.1 and 6.4. In addition to the foregoing, Servicer shall further have the sole authority to instruct and direct any ACH providers that Enterprise may engage to assist it in operating the Unsecured Lending Business, to the extent provided by this Agreement.[49]

Regarding disbursements to the tribe, Section 6.3 provided that:

---

[46] More specifically, Section 2.25 defines "Tribal Net Profits" as the sum of Gross Revenues plus bad debt recoveries minus the sum of charge backs and bad debt charge-offs and multiplying the sum of this amount by two (2) percent calculated on a monthly basis all calculated on a cash basis. At this time, an entity owned by the Rosette Law Firm got half of the 2% reserved for the tribal entity. *Id*. Section 2.25.

[47] Section 2.22 defines "Servicing Expenses" as:

> the expenses of the operation of Enterprise, incurred pursuant to the Servicing Budget, including but not limited to the following: (I) the payment of salaries, wages, and benefit programs for all employees of Enterprise subject to the approval described in Section 4.3; (2) supplies for Enterprise; (3) utilities; (4) repairs and maintenance of any facility used by Enterprise for the conduct of its business; (5) interest expense on Authorized Debt of Enterprise; (6) insurance and bonding; (7) advertising and marketing; (8) professional fees; (9) reasonable travel expenses for officers and employees of Enterprise, Servicer or its affiliates to inspect and oversee Enterprise; (10) the Regulatory and Litigation Reserve fund expense; (II) security costs; (12) underwriting expenses; (13) bad debt expenses and (14) legal or professional fees incurred for lobbying or litigation that is not adequately covered by the Regulatory and Litigation fund.

*Id*. Section 2.22.

[48] *Id*. Section 4.4.

[49] *Id*.

> All revenues received by Enterprise in connection with the Unsecured Lending Business shall be deposited into the Primary Bank Account. These revenues shall, in turn, be disbursed by Servicer, for and on behalf of Enterprise, from the Primary Bank Account to pay, to the extent available, Servicing Expenses.[50]

In my opinion, the structure between Martorello and the tribe was consistent with and similar to the structures described above for tribal lending in general. As explained above, low tribal profits and little tribal control are the hallmarks of these relationships. It is my opinion that the structure between Martorello and the tribe featured these hallmarks and continued until Martorello restructured the business as a sale of Bellicose to the tribe in 2016, and a renaming of the business from Red Rock Lending LLC to Big Picture Loans. This restructuring and renaming is more particularly described below.

<u>The Sale and Rebranding of Big Picture Loans and Ascension Technologies</u>

In 2016, Martorello restructured the business as a sale of Bellicose to the tribe for $300 million, through two new 100% owned tribal entities.  One of these new corporations is a new unsecured loan business named by Martorello as Big Picture Loans ("Big Picture"), which replaced Red Rock Tribal Lending, LLC. The other is Ascension Technologies, LLC ("Ascension"), which essentially replaced Bellicose as the servicer. Despite that both of these corporate parties to the transaction are 100% owned by the tribe under the $300 million sale, the tribe continues to receive a small percentage of profits and to have little decision-making power over the business. Ascension is 100% controlled by its non-tribal President Brian McFadden.[51] Collectively, the sale and other documents give McFadden and Martorello control over Big Picture and Ascension.

These details are found in: (1) the Intratribal Servicing Agreement Between Big Picture Loans, LLC and Ascension Technologies, LLC ("New Servicing Agreement"), dated February 16, 2016,[52] (2) the Ascension Technologies LLC Delegation of Authority Policy, dated January 22, 2016 ("Designation of Authority Policy"),  and executed between two tribal managers of Ascension Technologies and President Brian McFadden,[53] (3) the Secured Promissory Note,[54]

---

[50] *Id.* Section 6.3

[51] Intratribal Servicing Agreement Between Big Picture Loans, LLC and Ascension Technologies, LLC, Ex. 83 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions; Ascension Technologies LLC Delegation of Authority Policy, Ex.82 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions; Loan and Security Agreement between the tribe and Eventide Credit Acquisitions, LLC, Ex. 86 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.

[52] Intratribal Servicing Agreement Between Big Picture Loans, LLC and Ascension Technologies, LLC, Ex. 83 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.

[53] Ascension Technologies LLC Delegation of Authority Policy, Ex.82 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.

[54] Secured Promissory Note dated September 14, 2015, at Martorello_000129.

and (4) the Loan and Security Agreement between the tribe and Eventide Credit Acquisitions, LLC ("Eventide"), dated September 14, 2015.[55]

As set out above, Martorelllo fashioned the new arrangement as a sale of his company Bellicose, the servicer of former lender Red Rock, to the tribe for $300 million. To facilitate this sale, Martorello created a third corporation, Eventide Credit Acquisitions, LLC ('Eventide') to hold the $300 million note executed by the tribe. In the sale, the tribal lending business was renamed Big Picture and the tribe executed the $300 million note.

Lender Eventide's Operating Agreement provides for two different share classes. First, the Operating Agreement creates a "Class A Voting Interest," which is "the only Class of Membership entitled to vote on any and all matters presented to the Company for Member approval."[56] These Class A Voting Interests were all owned by companies wholly owned or managed by Martorello.[57] In addition, the Operating Agreement created a "Class A Economic Interest," which is separate from a voting interest. This interest entitled a shareholder to an "economic interest in the Company's future net profits and net losses[.]"[58] Martorello—through companies or trusts owned by him—owns 85% of the Class A Economic Interest in Eventide. The rest is owned by Martorello's brother Justin Martorello (10%), his long-time business partner Brian McFadden (2%), and two former executives from Bellicose (1.5% each). If he wishes, Martorello can buy any of these other owners out at any time,[59] meaning that Martorello may reclaim any of the economic shares.

In connection with the loan and the sale, the tribe (through Tribal Economic Development Holdings, LLC) signed a Loan and Security Agreement with Eventide, dated September 14, 2015 ("Security Agreement") collateralizing the $300 million loan and providing that until the $300 million loan is paid by the tribe in full, the New Servicing Agreement cannot…without Eventides' approval…. be amended in any way,[60] nor can any delegation of authority be modified, nor any manger, director, or officer be terminated or replaced.[61] In other words, through these transactional documents, Martorello was able to retain significant control over Big Picture, Ascension, and Eventide, and thus the lending business operations. This is similar to the structures described above for tribal lending in general.

Under this restructured deal, the servicer, whose duties are described above, is now Ascension. The President of Ascension is non-tribal member Brian McFadden, who cannot be removed by

---

[55] Loan and Security Agreement between the tribe and Eventide Credit Acquisitions, LLC, Ex. 86 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.
[56] *See* Section II(C) of Eventide's Operating Agreement, Ex.87 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.
[57] *See id.* Schedule A.
[58] *See id.* Section II(C).
[59] *See id.* Section H(iv).
[60] *See* Section 5.12 of Loan and Security Agreement between the tribe and Eventide Credit Acquisitions, LLC, Ex. 86 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.
[61] *See id.* Section 5.14.

the Tribe. In the Delegation of Authority Policy, two tribal managers delegate to McFadden these tasks:

a) approval of Ascension strategic direction, goals and targets which shall be communicated to Co-Managers in accordance with Section 1.5 but no less frequently than quarterly.

b) authority to execute documents on behalf of Ascension, subject to the limitations contained in Sections 1.2(a) and 1.3 herein;

c) authority to open and maintain bank accounts and to interface with any lockbox service providers in the ordinary course of business of Ascension; provided however Co-Managers are informed of the locations and account numbers for any bank accounts opened pursuant to this delegation;

d) authority to adopt, terminate, or change employee benefit plans or programs, except major additions or changes to major employee benefit plans or programs as set forth in Section 1.2(d) above; and

e) authority regarding all matters necessary for the day to day management of Ascension, including delegation to subordinates, and the implementation of corporate objectives that are not specifically reserved to the Co-Managers set forth in Section 1.2 or Member set forth in Section 1.3.[62]

According to this section, McFadden has the right to execute all documents on behalf of Ascension, to open and maintain bank accounts, and to perform "all matters necessary for the day to day management of Ascension, including delegation to subordinates and the implementation of corporate objectives…"[63] Regarding communications with the outside world, under Sections 3.1 and 3.2:

All verbal communications with media, regulatory bodies, or other entities which may have a material effect on Ascension, are limited to the President, or a person directly delegated by the President to speak on behalf of Ascension or pursuant to Ascension's written and duly adopted communications policy. Any such inquiries as well as how they were handled shall be reported to the Co-Managers within a reasonable time of the inquiry.

Any written communication with media, regulatory bodies, or other entities which may have a material effect on Ascension, must be approved by the President, or a person directly delegated by the President, priori to release. The President, or President's delegee, must circulate any proposed release to news media to the Co-managers prior to release.[64]

---

[62] *See* Section 1.4 of Ascension Technologies LLC Delegation of Authority Policy, Ex.82 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.
[63] *Id.*
[64] *Id.* Sections 3.1 and 3.2.

Section 4 provides that these polices cannot be changed without McFadden's approval.[65] Regarding the distribution of funds under the restructured transaction, while the fee structure is changed somewhat, the percentages to the tribe remain small. Specifically, under Section 1.2 of the Secured Promissory Note, the amount to be distributed to the respective parties is described as the Net Cash Available. The Net Cash Available is distributed as follows: first, 4% of goes to the tribe, with half of that to be reinvested in the business,[66] next the expenses are then paid, and then the rest goes to Eventide.

Finally, regarding the New Servicing Agreement, under Section 3.2, the term of the agreement is extended to ten years and it automatically renews for two more years if not terminated.[67] In terms of the duties of the servicer, these duties are similar to those of the servicer in the Initial Servicing Agreement. For example, Section 4.2.1 contains the duties of servicer, and for the most part, those duties track the duties of servicer found in 4.2.1 of the Initial Operating Agreement.[68] Finally, the New Servicing Agreement provides no remedy for the servicer's breach, but as to a breach on the part of the enterprise, provides that:

---

[65] *Id.* Section 4.

[66] *See* Section 1.2 of the Secured Promissory Note dated September 14, 2015, at Martorello_000129.

[67] *See* Section 3.2 of New Servicing Agreement, Ex. 83 to Plaintiff's Statement of Position Regarding Material Misrepresentation and Omissions.

[68] *Id.* Section 4.1.1, which provides that in providing services to Enterprise and its Subsidiaries, the Servicer's duties include, without limitation, the following:

> Consistent with the Servicing Budget, the Servicer shall develop and recommend to the Enterprise and its Subsidiaries reasonable measures for the orderly administration and management of Enterprise in the areas of financial reporting, financing, regulatory compliance, marketing, human resources, development of vendor relationships, collections and risk assessment, and shall implement such recommendations, including:
>
> (a) Screening of and selecting vendors and Commercial Finance Providers, and negotiating agreements with such vendors and Commercial Finance Providers on behalf of the Enterprise on such terms and conditions as Servicer may reasonably determine to be appropriate;
>
> (b) Development and promotion of sound and positive business relationships on behalf of Enterprise with the designated vendors and Commercial Finance Providers, including, but not limited to, the enforcement or termination of agreements with such vendors and Commercial Finance Providers;
>
> (c) Identification of vendors needed for the Small Loan Transaction Business;
>
> (d) Preparation of suggested practices and recommendations of suggested practices governing the operations of the Enterprise and its Subsidiaries to provide that operations are conducted in a manner that is consistent with the best interests of Enterprise and its Subsidiaries and generally accepted industry standards;
>
> (e) Preparation of regulatory and compliance standards and practices and recommendations to the Enterprise and its Subsidiaries of such standards and practices.to be adopted by the Enterprise and its Subsidiaries provided that such operations are conducted in a manner consistent with the best interests of Enterprise and its Subsidiaries and generally accepted industry standards;
>
> (f) Preparation of training and education standards and recommendations to the Enterprise and its Subsidiaries of suggested practices to be adopted by the designated vendors to provide that such designated vendors are conducting business with the Enterprise in a manner that is consistent with the best interests of Enterprise and its Subsidiaries and generally accepted industry standard;
>
> (g) Assistance to the CEO, at his or her request, in the selection, hiring, training, control and discharge of employees performing regular services for Enterprise and its Subsidiaries in connection with the maintenance, operation, and management of the Small Loan Transaction Business;

> In the event of termination of this Agreement by the Servicer for cause under Section 7.2, the Servicer shall not be required to perform any further services under this Agreement and Enterprise shall indemnify and hold the Servicer harmless against all liabilities of any nature whatsoever relating to Enterprise…[69]

In my opinion, despite the restructure between Martorello and the tribe, the structure of the business model remained consistent with and similar to the structures described above for tribal lending in general because the tribe relinquished independent control and the majority of the profits through the transactional documents.

## III.    COMPENSATION

I am being compensated at an hourly rate of $750 per hour for work associated with this report and for preparing for deposition or for trial. To the extent necessary, my hourly rate for time spent in a deposition or for trial testimony is $1,750.

Professor Nathalie Martin

*Nathalie Martin*

_____
Professor Nathalie Martin

---

(h) Preparation of standards for financial reporting and accounting and recommendations to the Enterprise and its Subsidiaries of best practices to be adopted by the designated vendors and Commercial Finance Providers of the Enterprise and its Subsidiaries to provide that such designated vendors and Commercial Finance Providers are conducting business in a manner that is consistent with the best interests of Enterprise and its Subsidiaries and generally accepted accounting standards presented on a cash basis;

(i) Preparation of standards and screening and review of and making recommendations to the Enterprise and its Subsidiaries regarding the website contents, marketing and consumer relations practices and designated vendors to provide that such designated vendors are conducting business in a manner that is consistent with the best interests of Enterprise and its· Subsidiaries and generally accepted industry standards;

(j) Monitoring and supervision of and reporting to the Enterprise and its Subsidiaries regarding the designated vendors to provide that such designated vendors are conducting business in a manner that is consistent with the standards, best practices, policies and requirements established by the Enterprise and its Subsidiaries;

(k) Coordinating pre-qualified leads to Enterprise and its Subsidiaries and providing the necessary credit-modeling data and risk assessment strategies by which the Enterprise and its Subsidiaries may evaluate whether or not to extend funds to an individual borrower based on criteria that has been established by the Enterprise and its Subsidiaries.  The criteria used to extend funds to individual borrowers will remain within the sole and absolute discretion of the Enterprise and/or its Subsidiaries and the Enterprise and/or its Subsidiaries shall execute all necessary loan documentation;

(l) May be responsible for certain training and monitoring employees of the Enterprise and its Subsidiaries that operate the Enterprise's call center on behalf of itself and its Subsidiaries; and

(m) Coordinating sale of Consumer Loan Transactions in default at prevailing market rates, to third-party debt collector vendors of the Enterprise.

[69] *Id*. Section 7.3.

Frederick M. Hart Chair in Consumer and Clinical Law
University of New Mexico School of Law

Dated: April 14, 2023

# Exhibit A

**Curriculum Vitae**
**NATHALIE D. MARTIN**

**EMPLOYMENT HISTORY**
Frederick M. Hart Chair in Consumer and Clinical Law *University of New Mexico School of Law,* Albuquerque, NM
        Professor of Law since Spring 2004
        Associate Professor since July 2001
        Assistant Professor since Fall of 1998

*Temple University School of Law,* Philadelphia, PA
        Visiting/Adjunct Professor, Temple Rome, Summer 2006, 2004 and 2002 and Temple Greece, Summer of 2001 and Summer of 2000. Taught International Business Transactions (with Stewart Paley)

*Montgomery, McCracken, Walker & Rhoads*, LLP Philadelphia, PA
        Corporate, commercial transactions and business bankruptcy attorney February, 1993 to June, 1996

*Hoyle, Morris & Kerr,* Philadelphia, PA
        Commercial litigation and business bankruptcy attorney November, 1990 to January, 1993

*Fine & Ambrogne,* Boston, MA
        Business bankruptcy attorney
        September, 1988 to October, 1989

*Stradley, Ronon, Stevens & Young,* Philadelphia, PA
        Corporate and bankruptcy attorney
        September, 1986 to August, 1988

**EDUCATION**
L.L.M. in Legal Education *Temple University School of Law,* Philadelphia, PA
        Honorable Abraham L. Freedman Fellowship, Sept. 1996-May, 1998

J.D., *Syracuse University College of Law*, Syracuse, NY
        May, 1986, *cum laude*
        Syracuse Law Review, Senior Notes and Comments Editor
        Robert M. Anderson Award for Outstanding Publication
        Justinian Honor Society

B.A, *St. Olaf College*, Northfield, MN
        Philosophy and Psychology, May, 1983
        Year Abroad at Oxford and Cambridge Universities

**PROFESSIONAL RECOGNITION and HONORS**
Frederick M. Hart Chair in Consumer and Clinical Law
      Awarded on October of 2011

Member, *American Law Institute*, since 2011

Member, *American College of Bankruptcy*, since 2013

Dean of Faculty, *American Board Certification*
      2007-2010
      Wrote and administered National certification test for bankruptcy and creditors'
      rights

*State Bar of New Mexico*, 2006 Pinnacle Award
      For highest ranked CLE Program of Year
      Summer 2006

*American Bankruptcy Institute*
      Robert M. Zinman Resident Scholar, Washington, D.C.
      Acted as media contact and scholarly liaison for largest insolvency organization
      in the world
      Fall 2005

Author for *U.S. State Department* Entrepreneurship Web page
      Winter 2006

**BOOKS**

LAWYERING FORM THE INSIDE OUT: LEARNING PROFESSIONAL IDENTITY FORMATION THROUGH MINDFULNESS AND EMOTIONAL INTELLIGENCE (CAMBRIDGE UNIVERSITY PRESS (2018).

FORMS AND PROCEDURES (8 VOLUME SET, WITH FRED HART) (MATTHEW BENDER UPDATED SEMI-ANNUALLY).

EMMANUEL LAW OUTLINES, SECURED TRANSACTIONS, (with Frederick Hart) (Aspen 2006) (updated periodically most recently in 2021).

YOGA FOR LAWYERS: MIND-BODY TECHNIQUES TO FEEL BETTER ALL THE TIME (AMERICAN BAR ASSOCIATION PRESS 2013).

THE GLANNON GUIDE TO BANKRUPTCY (Aspen 2005)(updated periodically most recently in 2021).

INSIDE BANKRUPTCY (WITH OCEAN TAMA) (Aspen 2007)(updated periodically most recently in 2011).

WHEN WORLDS COLLIDE: BANKRUPTCY AND ITS IMPACT ON DOMESTIC RELATIONS AND FAMILY LAW (American Bankruptcy Institute 3rd ed. 2005) (with MICHAELA M. WHITE and MARIANNE B. CULHANE).

THE NEW BANKRUPTCY LAW AND YOU (with Stewart Paley) (Wiley 2005).

COUNSELING OLDER AMERICANS, ALI/ABA Book (with Alison Barnes and A. Frank Johns) (2003).


**ARTICLES**

B*rewing Disharmony: Addressing Tribal Sovereign Immunity Claims in Bankruptcy*, 96 AM. BANKR. L. J. 149 (2022).

*Bad Apples or a Rotten Tree: Ameliorating the Double Pandemic of COVID 19 and Racial Economic Inequality*, 82 MONT. L. REV. 105 (2021), available at: SSRN.

*Reducing The Wealth Gap Through Fintech 'Advances' in Consumer Banking and Lending*, U. 2021 ILL. L. REV. 459 (2021) (co-authored with Pamela Foohey), available at: UNM-DR.

*Shadow Credit and the Devolution of Consumer Credit Regulation*, 24 LEWIS & CLARK L. REV. 1349 (2021) (co-authored with Lydia Pizzonia), available at: SSRN

*Bringing Relevance Back to Consumer Bankruptcy*, 36 EMORY BANKR. DEV. J. 581 (2020), available at: UNM-DR.

*Nefarious Neighbors: How Living Near Payday Loan Stores Affects Loan Use*, 88 MISS. L. J. 333 (2019) (co-authored with Younghee Lim, Aimee Moles & Trey Bickham). available at: UNM-DR.

*The Virtue of Vulnerability: Mindfulness and Well-Being in Law Schools and the Legal Profession*, 49 SW. L REV. 367 (2019), available at: UNM-DR.

Nathalie Martin & Robert N. Mayer, *What Communities Can Do to Rein In Payday Lending: Strategies for Successful Local Ordinance Campaigns through a Texas Lens*, 80 LAW AND CONTEMPORARY PROBLEMS 147-175 (2017), available at http://scholarship.law.duke.edu/lcp/vol80/iss3/7.

*The Power of Community Action: Anti-Payday Loan Ordinances in Three Metropolitan Areas*, Executive Summary (with Robert Mayer, University of Utah Department of Sociology).

*The Power of Community Action: Anti-Payday Loan Ordinances in Three Metropolitan Areas* (with Robert Mayer, University of Utah Department of Sociology).

*What Communities Can Do to Rein In Payday Lending: Strategies for Successful Local Ordinance Campaigns Through a Texas Lens*, 80 DUKE LAW & CONTEMP. PROBS. 147 (2017) (with Robert Mayer).

*Right Scholarship and the Goddesses of Commercial Law*, 34 COLUMBIA J. GENDER AND THE LAW 124 (2017).

*Survival in the Face of Scarcity: The Undocumented Immigrant Experience*, 58 AZ. L. REV. 103 (2016).

*Giving Credit Where Credit is Due: What We Can Learn from the Banking and Credit Habits of Undocumented Immigrants*, 2015 MICH. STATE L. REV. 989 (2015).

*Think Like a (Mindful) Lawyer,* 34 ULAR LAW. REV. 259 (2015).

*Public Opinion and the Limits of State Law: The Case for Federal Usury Caps,* 34 N. ILL. L. REV 259 (2014).

*Interest Rate Caps, State Legislation, and Public Opinion: Does the law Reflect the Public's Desires?* 89 CHICAGO KENT L. REV. 15 (2013) (with Timothy Goldsmith) (2014).

*Addressing the Foreclosure Crisis through Law School Clinics,* 20 GEORGETOWN J. L. & POVERTY 531 (with Max Weinstein) (2013).

*High-Interest Loans and Class:  Do Payday and Title Loans Really Serve the Middle Classes, 24* LOYOLA CONSUMER L. REV. 524 (2012) (with Ernesto Longa).

*The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 WASH & LEE L. REV. 751 (2012) (with Joshua Schwartz).

*Grand Theft Auto Loans: Repossession and Demographic Realities in Title Lending*, 77 MISSOURI LAW REV. 41 (2012) (with Ozymandias Adams ).

*Regulating Payday Loans: Why This Should Make the CFPB'S Short List*, 2 HARV. BUS. L. REV. ONLINE 44 (2011), available at: http://www.hblr.org/?p=1595.

*Testing Materiality Under the Unfair Practices Acts: What Information Matters When Collecting Time-Barred Debts?* 64 CONSUMER FIN. L. Q. REP. 372 (2010) (with Timothy Goldsmith).
Available at: SSRN

*1,000% Interest—Good While Supplies Last: A Study of Payday Loan Practices and Solutions,* 52 Arizona Law Review 563 (2010).

*Double Down-and-Out: The Connection Between Payday Loans and Bankruptcy,* 39 Southwestern L. Rev. 789 (2010) (with Koo Im Tong).

*Consumer Scams and the Elderly: Preserving Independence through Shifting Default Rules,* 17 J. Elder Law 1 (2009).

*Winners and Losers in Bankruptcy Reform: Do Women and Children Really Come out on Top,* 49 Fam . L. Quar. 219 (2007).

*Mind Games:  Rethinking BAPCPA's Debtor Education Provisions,* 10 Southern Illinois Law Review 517 (2007)(with Ocean Tama ).

*American Bankruptcy Laws: Encouraging Risk-Taking and Entrepreneurship, (U.S. Department of State, International Information Programs, Entrepreneurship and Small Business)*, available at http://usinfo.state.gov/journals/ites/0106/ijee/ijee0106.htm.

*Poverty, Culture and the Bankruptcy Code: Narratives from the Money Law Clinic*, 12 Clinical L. Rev. 203 (2005).

*The Role of History and Culture in Developing Bankruptcy and Insolvency Systems: The Perils of Legal Transplantation*, 28 B.C. College Int'l. & Comp. L. Rev. 1 (2005), also available at http://law.bepress.com/expresso/eps/172.

*Operating in the Zone:  Lessons for Directors and Officers of Corporations Approaching Insolvency (with Mark Paban),* for the American Bar Association, Section of Business Law, Spring Meeting, April 1-4, 2004, Seattle, Washington.

*Common Law Bankruptcy Systems:  Similarities and Differences,* 11 Amer. Bankr. Inst. L. Rev. 367 (2003).

*Explorations in the Classroom: A Book Review of Secured Credit: A Systems Approach,* 26 Seattle Law Review 13 (2002).

*Que es la Diferencia:  A Comparison of the First Days of a Chapter 11 Reorganization Case in the United States and Mexico,* 10 U.S.- Mexico. L.J.85 (2002).

*Funding Long Term Care:  Is There a Way to Ensure That Our Assets Will Last Longer Than We Will?,* 3 Elder's Advisor 66 (2001)(shortened version of Article found at 16 Journal of Contemporary Health Law & Policy).

*Les Jeux Ne Sont Pas Faits:  The Right to Dignified Long-Term Care in the Face on Industry-Wide Financial Failure* (with Elizabeth Rourke), 10 Cornell Journal of Law and Public Policy 129 ( 2000).

*Funding Long-Term Care: Some Risk-Spreaders Create More Risk Than They Cure,* 16 JOURNAL OF CONTEMPORARY HEALTH LAW & POLICY 355 ( 2000).

*The Insolvent Life-care Provider: Who Leads the Dance Between State Continuing-Care Statutes and the Federal Bankruptcy Code*, 61 OHIO STATE LAW JOURNAL 267 (2000).

*Noneconomic Interests in Bankruptcy:  Standing On The Outside Looking In*, 59 OHIO STATE LAW JOURNAL 429 (1998).

*Fee Shifting in Bankruptcy:  Deterring Frivolous, Fraud Based Objections to Discharge*, 76 NORTH CAROLINA LAW REVIEW 97 (1997).

Note, *Fathers and Families:  Expanding Men's Familial Rights*, 36 SYRACUSE LAW REVIEW 1265 (1986).

**EXCERPTS IN LEGAL TEXTS**
*Funding Long-term Care, Some Risk Spreaders Create more Risk than they Cure*, excerpt reprinted  in Dolgin and Shepherd, BIOETHICS AND THE LAW  719-20 (2009).

**REPRODUCTIONS OF ARTICLES IN MONOGRAPHS**
*The Role of History and Culture in Developing Bankruptcy and Insolvency Systems: The Perils of Legal Transplantation*, 28 B.C. COLLEGE INT'L. & COMP. L. REV. 1 (2005), also available at http://law.bepress.com/expresso/eps/172., reproduced in CONSUMER BANKRUPTCY:  REHABILITATION ISSUES (Ivafia University Press, Hyberbad, India, Edited by Madhuri V 2009) .

*Mind Games:  Rethinking BAPCPA's Debtor Education Provisions,* 10 SOUTHERN ILLINOIS LAW REVIEW 517 (2007)(with Ocean Tama y Sweet)  reproduced in CONSUMER BANKRUPTCY:  REHABILITATION ISSUES (Ivafia University Press, Hyberbad, India, Edited by Madhuri V 2009).

**CURRICULUM DEVELPOMENT or ADMINISTRATIVE POSITIONS**

*Associate Dean for Faculty Development,* 2016 -2022

*Committee:*

2022-2023: Chair, Retention, Promotion and Tenure Committee, Main Campus Provost -level Promotion and Tenure Committee, International Programs Committee.

2021-2022: Main Campus Provost -level Promotion and Tenure Committee, Promotion and Tenure Committee, Colloquium Committee.

2020-2021: Main Campus Provost -level Promotion and Tenure Committee, Colloquium Committee, International Committee.

2019-2020: Main Campus Provost -level Promotion and Tenure Committee, Colloquium Committee, International Committee.


2018-2019: Promotion and Tenure Committee, Colloquium Committee, International Committee.

2017-2018: Chair, Faculty Appointments Committee, International Programs Committee, Pipeline Committee.

2016-2017: Fall, Chair, Faculty Appointments Committee; Spring, sabbatical.

2015-2016: Chair, Faculty Appointments Committee, Ad-hoc Voting Committee, International Programs Committee, Kellogg Grant Committee, Library Committee, UNM Main Campus Iberian Studies Grants and Awards Committee.

2014-2015: Associate Dean of Faculty Development, Faculty Colloquium Committee.

2013-2014 Administrative Positions: Director, Law School Economic Development Program.  Committees:  Faculty Appointments Committee, Self-Study Committee.

2012-2013 Administrative Positions: Director, Law School Economic Development Program.  Committees:  Faculty Appointments Committee, Faculty Retention and Promotion Committee, Self-Study Committee, Dean Search Committee.

2011-2012 Administrative Positions: Director, Law School Economic Development Program.  Committees:  Faculty Appointments Committee, Faculty Retention and Promotion Committee.

2010-2011 Administrative Positions: Director, Law School Economic Development Program.  Committees:  Faculty Appointments Committee.

2009-2010 Administrative Positions: Director, Law School Economic Development Program.  Committees:  Faculty Appointments Committee, Faculty Retention and Promotion Committee

2008-2009: Sabbatical

2007-2008:  Administrative Positions: Director, Law School Economic Development Program.  Committees:  Faculty Colloquia Committee.

2006-2007 Committees:  University Faculty Benefits Committee, University Study Abroad Committee, Law School:  Self-Study Committee, Outreach Committee, Financial Aid Committee,

2006-2007 Administrative Positions: Director, Law School Economic Development Program

2005-2006:  Committees:  Co-Chair, Curriculum Committee

2005-2006 Administrative Positions: Director, Law School Economic Development Program

2004-2005 Committees:  Co-chair, Curriculum Committee

2003-2004 Committees:  Co-chair, Curriculum Committee, Appointments Committee

2002-2003 Committees:  Co-chair, Curriculum Committee, Library Committee, Reference Librarian Search Committee

2001-2002 Committees:  Co-chair, Curriculum Committee

2000-2001 Committees:  Chair, Student Affairs Committee, Self-Study Committee, University Faculty Senate, Budget Sub-Committee and Indirect Cost Sub-sub-Committee of the University Faculty Senate.

1999-2000 Committees:  Self-Study, Tenure and Promotion, Faculty Appointments, University Faculty Senate, Budget Sub-Committee and Indirect Cost Sub-sub-Committee of the University Faculty Senate.

**SERVICE**

Pro Bono Expert Witness Testimony and Other Pro bono Expert Assistance
Amicus brief author, **THE BANK OF NEW YORK v. JOSEPH A. ROMERO and MARY ROMERO,** before the Supreme Court of New Mexico (with Frederick M. Hart, writing on behalf of 12 community groups).

Assisted staff o**f United States Senate Special Committee on Aging** to prepare for hearing on July 21, 2010 on Continuing Care Retirement Communities.

Assisted with passage of new **Continuing-care Retirement Community Statute** in New Mexico, SB70 (Spring 2010).

**Pro Bono Expert Witness testimony** in ***In re Plaza de Retiro,*** bankruptcy case in New Mexico involving an insolvent life-care facility.

**Pro-bono work for Consumers' Union** in several capacities, most extensively and recently consulted on and helped draft briefs and pleadings for, Logan General Hospital Bankruptcy, Logan, West Virginia, in which theories of article on Non-Economic interests in bankruptcy were used to protect community and public interest groups in sale of hospital.

8

<u>Sample of Academic Presentations</u>

**Speaker and Co-Director,** Teaching Consumer Law Conference (with Houston Law School dean Emeritus Richard Alderman), Santa Fe New Mexico, 2019, 2021, and 2022).

**Commentator, Berkley Scholars' Conference,** March 2018, 2020, and 2021, 2022, and 2023.

**Speaker,** AALS, Panel at 2019 Annual Meeting of the Association of American Law Schools (AALS), on a real estate foreclosure, sponsored by the Real Estate Section January 5, 2016, New York, New York

**Speaker,** AALS, Panel at 2016 Annual Meeting of the Association of American Law Schools (AALS), on a panel sponsored by the Commercial Law Section entitled *Women in Commercial Law*, January 6, 2016, New York, New York.

**Speaker,** AALS, Panel at 2014 Annual Meeting of the Association of American Law Schools (AALS), on a panel sponsored by the Balance in legal Education and Teaching sections, entitled *The Many Connections Between Well-Being and Professionalism in the Practice of Law: Implications for Teaching*, January 5, 2014, New York, New York.

**Speaker**, AALS, Panel on 2013 Annual Meeting of the Association of American Law Schools (AALS), on a panel sponsored by the Commercial and Other Consumer Law section, entitled *Aberrant Contracts*, January 6, 2013, New Orleans, Louisiana.

**Speaker**, AALS, Panel on 2013 annual meeting of the Association of American Law Schools (AALS), on a panel sponsored by the Clinical Legal Education and Poverty Law sections, entitled *The Debt Crisis and the National Response: Big Changes or Tinkering at the Edges?*, January 5, 2013, New Orleans, Louisiana.

**Panelist at Houston Law Center, Consumer Law Conference**
Gave conference paper on defending foreclosures through clinical law programs, May 17, 2012, Houston, Texas

**Speaker,** *Louisiana State University Family Impact Seminar on Predatory Lending,* a day-long bi-annual workshop for legislators, community groups, and nonprofits, regarding issues of impact on families.  This year's Louisiana seminar focused on predatory lending, and I spoke to a group of about 100 people on March 9, 2012.

**Speaker and Organizer**, Loyola Chicago School of Law, Symposium on *The Effects of the Financial Crisis on Consumers,* February 24, 2012, http://www.luc.edu/law/activities/publications/clrsymposium/index.html.  I presented my paper on payday loan customer demographics, and also blogged about the event. http://www.creditslips.org/creditslips/2012/03/loyola-chicago-law-school-hosts-symposium-on-the-effects-of-crisis.html,

**Neighborhood Law Center Conference**
Participated in panel on Bankruptcy and Foreclosure, December 8, 2011. Santa Fe, New Mexico

**Speaker, Consumer Federation of American's High-Cost Credit Summit**
Spoke about payday loans and tribal enterprises. November 30, 2011.
Washington, D.C.

**Symposium Creator and Presenter, Washington and Lee Fringe Banking Symposium**
Gave paper on tribal sovereign immunity and payday loans, November 11, 2011.
Lexington, Virginia

**Moderator, National Conference of Bankruptcy Judges**
Moderated panel about difficult consumer bankruptcy issues, October 15, 2011.
Orlando, Florida

**Faculty Colloquia Presenter, University of San Francisco School of Law**
Gave paper entitled "The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?, September 14, 2011.
San Francisco, California

**Panelist at Northwestern University School of Law, 10th Annual Transactional Clinical Conference**
Led panel on "Transactional Clinics' Impact on Social Justice Issues," April 16, 2011.

**Speaker, Consumer Federation of American's High-Cost Credit Summit**
Spoke about payday and installment loans, December 1, 2010.
Washington D.C.

**Speaker, National Conference of Bankruptcy Judges**
Spoke about bankruptcy trends and payday loans, October 15, 2010.
New Orleans, Louisiana

**Panelist at Houston Law Center, Consumer Law Conference**
Gave conference paper about payday lending and the Consumer Financial Protection Bureau, May 22, 2010.
Houston, Texas

**Symposium Panelist at Southwestern School of Law Conference entitled "Bankruptcy in the new Millennium:  Consumer Bankruptcies**
Gave conference paper on the correlation between bankruptcy filings and the use of payday loans, February 12, 2010.
Los Angeles, California

**Speaker, Annual Meeting of the National Association of Attorneys General**
Spoke on payday and  installment  lending legislation, December 2, 2009.

**Keynote Conference Speaker, Tecnológico de Monterrey in the State of Mexico**
Phi Delta Phi conference. Spoke on Legal Aspects of the U.S. Financial Crisis. October 16, 2010, Mexico City, Mexico

**Speaker to the Asociación Nacional de Abogadas del Empresa, Colegio de Abogadas (The National Association of Corporate Lawyers)**
Spoke on Chapter 11 bankruptcy. October 15, 2010.
Mexico City, Mexico

**Panelist at Annual U.S.-Mexico Institute Conference, gave presentation entitled "A Comparison of the Reorganization Laws in Mexico and the United States"**
Gave conference paper comparing "Ley de Concursos Merchantiles" to Chapter 11 of the Bankruptcy Code, at the U.S. Mexico Law Institute Conference, September 6, 2001 Guanajuato, Mexico

Other AALS Participation
**AALS Section on Elder Law, 2009-2010**
Member of Executive Committee of Section.

**Section Chair, AALS Section on Debtor-Creditor Law, 2005-2006**
Member of Executive Committee of Section 2003-2007.

**Section Chair, AALS Section on New Law Professors, 2004-2005**
Also on executive committee and one of three founders of new section, instituted in 2001.

Additional Continuing Legal Education Presentations (representative sample)
**Bankruptcy Year in Review, Panelist,** reviewed recent bankruptcy cases of note from our district and circuit, New Mexico State Bar Association, 2013, 2011, 2010, 2008, 2004, 2002.

Presentation on **Business Law Developments**, New Mexico Judicial Conclave for all State Court Judges, June 2007.

Presentation for Bankruptcy Section of State Bar on **Ethic and Professionalism**, September 2007.

**Presentation to the State Bar of New Mexico, 2006 Year in Review,** *Basic Bankruptcy Practice in the Brave New World of Bankruptcy Reform, march 2006* (received CLE Pinnacle Award for this presentation).

**Presentation for the American Bar Association Section of Business Law,** Spring Meeting, April 1-4, 2004,Seattle, Washington, on *The Role of Culture in Drafting and Implementing New Bankruptcy Laws: A Look at China, Hong Kong, and Japan.*

11

**Presentation for the American Bar Association, Section of Business Law,** Spring Meeting, April 1-4, 2004,Seattle, Washington *Operating in the Zone: Lessons for Directors and Officers of Corporations Approaching Insolvency.*

**State Bar of New Mexico, Business Law Year in Review,** Prepared and gave Enron-Themed CLE in game show Format entitled Corporate Scandal Jeopardy (with Business Law Society), November 15, 2002.

**Fellow, National Conference of Bankruptcy Judges, October 2002.** Attended largest and most prestigious conference of U.S. Bankruptcy Judges, at their invitation, as preparation for future contributions to the conference.

**Enron Teach-in,** Organized Forum (with Business Law Society) and Presented Presentation on this Landmark Case, Law School Forum, March 21, 2002.

**State Bar Association, Real Estate Section**, Albuquerque, N.M.
Gave CLE on the Revised Article 9, December 8, 2000.