**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

LULA WILLIAMS, et al.,

     Plaintiffs,

v.                           Case No. 3:17cv461

BIG PICTURE LOANS, LLC,
et al.,

     Defendants.

## AMENDED MEMORANDUM OPINION

This matter is before the Court on the PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ("Plaintiffs' Motion") (ECF No. 1165). By ORDER entered on June 16, 2023 (ECF No. 1328), Plaintiffs' Motion was granted in part. This MEMORANDUM OPINION further explains the reasons for so doing.[1]

## BACKGROUND

### A.    Factual Background

This class action proceeding concerns a "lending scheme allegedly designed to circumvent state usury laws." Williams v. Martorello, 59 F.4th 68, 72 (4th Cir. 2023) [hereinafter Williams

---

[1] It also explains subsequent orders that were based on the resolution of the Plaintiffs' Motion.

II). Plaintiffs, representing a class of borrowers,[2] allege that the defendant, Matt Martorello ("Martorello"), conspired with the Lac Vieux Desert Band of Chippewa Indians ("the Tribe") and various other entities and individuals to issue high-interest loans through the internet to consumers within the Commonwealth of Virginia. Plaintiffs brought a five count CLASS ACTION COMPLAINT ("Compl.") (ECF No. 1) against Martorello. COUNT ONE seeks a

---

[2] The Court certified the following classes:
  (a) **Big Picture RICO Class**: All Virginia consumers who entered into a loan agreement with Big Picture where a payment was made from June 22, 2013 to December 20, 2019.

  (i) **Big Picture Usury Sub-class**: All Virginia consumers who paid any principal, interest, or fees on their loan with Big Picture from June 22, 2015 to December 20, 2019.

  (ii) **Big Picture Unjust Enrichment Sub-class**: All Virginia consumers who paid any amount on their loan with Big Picture from June 22, 2014 to December 20, 2019.

(b) **Red Rock RICO Class**: All Virginia consumers who entered into a loan agreement with Red Rock where a payment was made from June 22, 2013 to December 20, 2019.

  (i) **Red Rock Usury Sub-class**: All Virginia consumers who paid any principal, interest, or fees on their loan with Red Rock from June 22, 2015 to December 20, 2019.

  (ii) **Red Rock Unjust Enrichment Sub-class**: All Virginia consumers who paid any amount on their loan with Red Rock from June 22, 2014 to December 20, 2019.

Class Certification Order (ECF No. 1111) which was affirmed by the United States Court of Appeals for the Fourth Circuit in Williams II.

2

Declaratory Judgment that "the choice of law and forum-selection provisions are void and unenforceable under Va. Code § 62-1541(A) and as a matter of Virginia's well-established public policy." Compl. at ¶ 94.[3] COUNT TWO seeks relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), COUNT THREE seeks relief under RICO, 18 U.S.C. § 1962(d). COUNT FOUR is based on violations of Virginia Usury Laws. COUNT FIVE presents a claim for unjust enrichment under Virginia law. Compl. at 20-31.

The Plaintiffs Motion seeks summary judgment on COUNT THREE, the RICO conspiracy claim[4] based on 18 U.S.C. § 1962(d) which provides that:

It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

18 U.S.C. § 1962(d).

The Plaintiffs' Motion also seeks summary judgment on certain elements of COUNT TWO based on 18 U.S.C. § 1962(c): participation in the affairs of the RICO enterprise. Section 1962(c) provides that:

---

[3] COUNT ONE will be dismissed pursuant to PLAINTIFFS' CONSENT MOTION TO DISMISS COUNT ONE OF THE COMPLAINT (ECF No. 1400).

[4] PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ("Pls. Memo. in Supp.") at 3 n.1 (ECF No. 1169). An unsealed version is filed at ECF No. 1166.

3

> It shall be unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

Section 1962(c) is also the RICO section that is charged as that which was violated by the conspiracy that is alleged in COUNT THREE. A brief summary of the factual underpinnings of Plaintiffs' RICO claims is necessary to an understanding of the issues that are the subject of this MEMORANDUM OPINION.

According to Plaintiffs and supported by the record offered in support of Plaintiffs' Motion, and not much materially disputed, Martorello began engaging in the online lending business in 2008. In 2011, Martorello, working with Robert Rosette, a well-known lawyer in the tribal lending business, established a relationship with the Tribe. The alleged purpose of this relationship was to establish a so-called "rent-a-tribe" online lending operation. The online lending operation was conducted by the alleged RICO enterprise, which was comprised of Martorello, several entities created and controlled by Martorello, several of his friends and relatives, the Tribe, and several entities created by the Tribe.

The purpose to be served by the relationship Martorello sought with the Tribe was to imbue a forthcoming online lending operation

4

with the Tribe's sovereign immunity. If that could be accomplished, Martorello envisioned that he (and entities that he would control and use to make high interest, usurious loans that violated the laws of most states and RICO) would be immune from civil and criminal liability for such violations.

There is undisputed evidence that, through the alleged RICO enterprise, the alleged RICO conspiracy made high interest loans.[5] First, under the name of Red Rock Tribal Lending, LLC ("Red Rock"), and then in the name of Big Picture Loans, LLC ("Big Picture Loans"). Both of those entities are considered arms-of-the-tribe. Williams v. Big Picture, 929 F.3d 170 (4th Cir. 2019) [hereinafter Williams I].

However, the loans were funded by Martorello's company, Bellicose VI and then Bellicose Capital, LLC ("Bellicose Capital"). The record shows that Bellicose VI and then SourcePoint VI, LLC ("SourcePoint") (Bellicose VI's subsidiary), which were owned and controlled by Martorello, handled the day-to-day operation of the business of the tribal entities and, for all practical purposes, underwrote, issued, and serviced the loans made online by the alleged RICO enterprise. For most of the time at issue, the Tribe received approximately 2% of the net revenue

_____

[5] I.e., loans that were unlawful under Virginia law and 18 U.S.C. § 1961(6).

5

from loan payments.[6]   Martorello's companies received the rest. And, ultimately, those companies sent the money to Martorello and his family through offshore trusts that Martorello established to receive the proceeds of the unlawful loans.

The undisputed evidence shows that Martorello was the founder and Chief Executive Officer of Bellicose Capital.   There is no material dispute that Martorello created Bellicose VI and Bellicose for the purpose of funding, making, and collecting the alleged unlawful loans made by the alleged RICO enterprise.

Nor is it disputed that, in 2014 and 2015, Martorello knew about enforcement actions taken by various state agencies against unrelated, but similar, rent-a-tribe operations engaged in online lending operations such as the one being operated by Martorello's entities and the Tribe. So, in January 2016, Martorello arranged a restructuring of the online lending operation in which Martorello, his entities, and the Tribe were involved.  As part of that restructuring, the Tribe acquired Bellicose Capital, and Martorello's entities and the Tribe entered into several related

---

[6] Late in the timeframe, the Tribe's percentage was increased slightly, to 4%, following a restructuring of the enterprise that will be discussed below.

contracts that facilitated the continuation of their allegedly illegal online lending activities.[7]

After the restructuring, most of the proceeds from the online lending enterprise continued to flow to Martorello and his family through a series of companies and trusts. Throughout the entire course of the alleged RICO enterprise, its purpose was to make and collect unlawful debts (i.e., loans on which the interest rate exceeded the usury rate permitted under Virginia law and which met the definition of "unlawful debt" in 18 U.S.C. § 1961(6)). There is substantial evidence to support that Martorello was extensively involved in the affairs of the alleged RICO enterprise.

It is important to keep in mind that the Tribe enjoyed sovereign immunity. Therefore, even if it made loans that exceeded permissible usury rates, it could not be sued. The same is true of entities organized by the Tribe to participate in the RICO enterprise's online lending scheme. See Williams I, 929 F.3d at 185. The record contains substantial, undisputed evidence, that Martorello's purpose in making online loans under the so-called "rent-a-tribe model" was to attempt to clothe the alleged RICO enterprise with the sovereign immunity which the Tribe and its entities possessed.

---

[7] Under the restructured lending arrangements, the Tribe was to receive approximately 4% of the gross revenues.

7

There is evidence to show that Martorello (the alleged mastermind and principal beneficiary of the rent-a-tribe scheme), the entities that make and collect the usurious loans and that distribute the loan payments, and the people who run these various entities comprise the alleged RICO enterprise. The present action focuses on Martorello because he is said to have conceived of, and set up, the unlawful online lending arrangements, and spearheaded efforts to make them appear to be of tribal origin. But allegedly, in fact, it was his business entities and Martorello himself who were conducting the affairs of the alleged RICO criminal enterprise. And, it was Martorello and his family and investors who ultimately received the funds generated by the unlawful usurious loans.

## B. Procedural Background

This case has a long procedural history. It has twice been to the United States Court of Appeals for the Fourth Circuit. On the first occasion, the Fourth Circuit considered the question of tribal sovereign immunity and dismissed the two tribal entity defendants, Big Picture Loans and Ascension Technologies, LLC ("Ascension"). Williams I, 929 F.3d at 185; see also Dismissal Order (ECF No. 668) (dismissing Big Picture Loans and Ascension). On the second, and more recent occasion, the Fourth Circuit affirmed this Court's class certification order. Williams II, 59

8

F.4th at 73. Thereafter, the parties conducted extensive discovery on the merits of the case after which the Plaintiffs and Martorello both filed motions for summary judgment.

### 1.  Martorello's Motion for Summary Judgment

Martorello requested summary judgment that:

(1)  Tribal law applied to the loans;

(2)  Martorello could not be held liable under Virginia's usury laws; and

(3)  Martorello could not be held liable for unjust enrichment.[8]

On June 26-27, 2023, the Court heard oral argument on Martorello's Motion for Summary Judgment (June 26, 2023 Minute Entry (ECF No. 1351)).  That motion was denied in its entirety. June 28, 2023 ORDER (the "June 28 ORDER") (ECF No. 1354).  On July 11, 2023, a MEMORANDUM OPINION (ECF No. 1392) was issued explaining that decision.

### 2.  The Plaintiffs' Motion for Partial Summary Judgment

To some extent, the issues presented for decision in the Plaintiffs' Motion evolved over time because of the positions

---

[8] DEFENDANT MATT MARTORELLO MEMORANDUM OF LAW OF IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT ("Martorello Memo. in Supp.") at 18, 32, 35 (ECF No. 1255).

asserted in the briefs[9] and even in argument. Accordingly, it is necessary to explain the evolution of the issues from inception to decision.

The brief supporting the Plaintiffs' Motion originally specified that the only entire count presented for summary judgment was COUNT THREE, the RICO conspiracy claim under 18 U.S.C. § 1962(d) (Plaintiffs' Opening Memo, ECF No. 1169, p. 3 n.1). However, later in their brief, the Plaintiffs also presented Argument VI which was entitled: "Summary judgment should be granted that a violation of § 1962(c) [COUNT TWO] occurred."[10] However, an examination of Plaintiffs' opening and reply briefs make it clear that Argument VI was addressed only to certain elements of COUNT TWO (the § 1962(c) claim); and that the Plaintiffs' Motion only sought summary judgment on those elements, not on COUNT TWO

---

[9] PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 1169); DEFENDANT MATT MARTORELLO REPLACEMENT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 1218); and PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 1244). At the request of Martorello, (ECF Nos. 1216 and 1217), a replacement memorandum (ECF No. 1218) was filed in an effort to remove from the decisional process the need to decide whether Martorello's original filing was objectionable for failure to satisfy the requirement of a local rule of civil procedure. The replacement memorandum was filed with the consent of the Plaintiffs, and it is intended to respond to the Plaintiffs' motion for partial summary judgment (the brief for which is ECF No. 1169).

[10] (ECF No. 1169, pp. 36-40).

as a whole. With that clarification in mind, the Plaintiffs'
Motion sought partial summary judgment:

- On the choice of law issue (ECF No. 1169, pp. 26-31);

- On the tribal immunity defense presented by Martorello
  (ECF No. 1169, pp. 31-32); and

- That Martorello had violated § 1962(d) (ECF No. 1169,
  pp. 32-36) based on the assertions that: (A)
  Martorello knew about the alleged RICO scheme and (B)
  Martorello furthered the scheme and knowingly took
  millions of dollars therefrom; and

- On certain elements of COUNT TWO, to-wit:

    (i)   an enterprise existed; and

    (ii)  the loans made by the enterprise are unlawful
          debts; and

    (iii) persons associated with the enterprise engaged
          in collection of those debts.[11]

In response, Martorello substantively addressed some of those
issues, stipulated as to some of them, and ignored others. It is
thus necessary to sort out where Martorello now stands on those
issues.

---

[11] Again, it is appropriate to keep in mind that at the time the
Plaintiffs' Motion was filed, the Plaintiffs acknowledged the
existence of a disputed issue of fact respecting whether Martorello
participated in the management of the enterprise and therefore did
not seek summary judgment on COUNT TWO, the alleged violation of
18 U.S.C. § 1962(c).

First, Martorello's response to the Plaintiffs' Motion took the position that Tribal law (not Virginia law) applied to the loans at issue because FEDERAL PREEMPTION PRECLUDES APPLICATION OF VIRGINIA LAW (ECF No. 1218, pp. 21-31). That argument is comprised of several subparts which are as follows:

- [The Tribe's] sovereignty rights require application of tribal law because of provisions in the so-called "Indian Commerce Clause;" and

- Application of Virginia law is at odds with the Native American Business Development Act ("NABDA") (ECF No. 1218, pp. 26-28); and

- The Economics of a Deal do not Change the Preemption Analysis; and

- The National Bank Act Preemption supports application of federal law; and

- The prospective waiver provisions in the choice of forum clause in the loan agreements do not render the tribal choice of law clause unenforceable; and

- <u>Hengle v. Treppa</u> is distinguishable and not controlling.

Second, Martorello opposed the requested partial summary judgment by claiming that he was entitled to present a mistake of law to the RICO claims and that therefore those claims were not amenable to summary judgment.

12

On June 7 and 8, 2023, the Court heard oral argument on Plaintiffs' Motion and the parties' respective motions in limine.[12] June 7, 2023 Trans. (ECF No. 1316); June 8, 2023 Trans. (ECF No. 1317). In his briefing and at oral argument, Martorello stipulated that:

(1)   if the Court determined that Virginia law applies, the loans constituted unlawful debts within the meaning of RICO (18 U.S.C. § 1961(6));

(2)   Martorello knew that there was an enterprise, as defined by 18 U.S.C. § 1961(4); and

(3)   "persons associated with the enterprise engaged in the collection of unlawful debt."

Hearing Trans. at 171-73. In addition, Martorello clarified that he no longer was claiming tribal immunity. Id. at 165.

Subsequently, the parties agreed that, based on the foregoing stipulations by Martorello and the Court's ruling on the choice of law issue, the only remaining questions as to the claim under 18 U.S.C. § 1962(d) (COUNT THREE) were whether Martorello could present a mistake of law defense (that tribal law applied) and, relatedly, whether the Plaintiffs had to prove that Martorello had to know that the loans were illegal. Id. In some iterations, the

---

[12] For a complete list of all matters heard during the June 7-8 hearings, see May 24, 2023 ORDER (ECF No. 1267).

latter contention was whether he had to know that the specific interest rate was illegal.   At other times, the contention was merely a repetition of the belief that tribal law applied.

On June 16, 2023, the Court granted summary judgment in favor of the Plaintiffs as to:

(1) The choice of law issue (¶ I(1));

(2) Tribal immunity issue (¶ I(2));

(3) Martorello's mistake of law defense (¶ I(3));[13] and

(4) The following elements of the claim under 18 U.S.C. §§ 1962(c) (COUNT TWO):[14]

> "(a) The loans in question are 'unlawful debts' as defined in 18 U.S.C. §§ 1961(6), 1962(c); and
>
> (b) An 'enterprise' existed as defined in 18 U.S.C. §§ 1961(4), 1962(c); and
>
> (c) Persons engaged in the enterprise collected unlawful debts; and

---

[13] As explained below, MATT MARTORELLO'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT ("Martorello's Answer") (ECF No. 23) refers to the defense as one of "good faith," and the parties' briefs used the terms "good faith," "advice of counsel," and "mistake of law" interchangeably, but, at oral argument, both agreed that the defense actually was "mistake of law."

[14] And, to the extent that § 1962(c) is alleged as part of the § 1962(d) RICO conspiracy claim, to that aspect of COUNT THREE.

> (d) There is no willfulness element for a civil cause of
>
> action under 18 U.S.C. §§ 1962(c)-(d)."[15]

June 16, 2023 ORDER at 2-3 ("June 16 ORDER") (ECF No. 1328). This
MEMORANDUM OPINION will further explain the reasoning on which
those decisions were based.

After the June 16 ORDER was issued, Plaintiffs filed a request
for reconsideration and asked the Court to amend the June 16 ORDER
"to reflect that summary judgment is granted in favor of Plaintiffs
as to 18 U.S.C. § 1962(d)'s elements that Martorello: (1) knew
about; and (2) facilitated the usurious lending enterprise."[16]
Martorello conceded that, after the Court's ruling that the loans
are governed by the law of Virginia and that a mistake of law
defense is not available as a defense to liability, "there are no
remaining triable issues of fact on Plaintiffs' § 1962(d) claim
[COUNT THREE]."[17] In perspective of that concession, the June 16
ORDER was amended to read: "Summary judgment is granted in favor

---

[15] By ORDER (ECF No. 1397), this part of the ORDER (ECF No. 1328)
was deleted.

[16] PLAINTIFFS' NOTICE AND REQUEST FOR RECONSIDERATION OF COURT'S
RULING ON SATISFACTION OF THE 1962(d) ELEMENTS at 2 (ECF No. 1340).

[17] DEFENDANT MATT MARTORELLO'S RESPONSE TO PLAINTIFFS' NOTICE AND
REQUEST FOR RECONSIDERATION OF COURT'S RULING ON SATISFACTION OF
THE 1962(d) ELEMENTS (ECF No. 1345).

of the Plaintiffs as to all elements of Plaintiffs' 18 U.S.C. §
1962(d) claim [COUNT THREE]." June 26, 2023 ORDER (ECF No. 1350).[18]

Following the Court's June 26, 2023 oral ruling that "control
is not a prerequisite for purposes of [18 U.S.C.] § 1962(c)
liability," Martorello stipulated:

> that, for the entire class period, he was associated
> with an association-in-fact enterprise the activities of
> which affect, interstate or foreign commerce, and Mr.
> Martorello participated in the operation of the affairs
> of the enterprise through the collection of "unlawful
> debt" [19]

He also informed the Court that "there are no remaining triable
issues of material fact regarding Plaintiffs' § 1962(c) claim
[COUNT TWO]." Id. Thereafter, the Court granted summary judgment
on COUNT TWO of the Complaint (the claim under 18 U.S.C. §
1962(c)). July 7, 2023 ORDER (ECF No. 1373).

Then, on July 10, 2023, for purposes of simplifying the
forthcoming trial, Plaintiffs moved to dismiss the state law counts
without prejudice, COUNTS FOUR and FIVE.[20] The Court granted that

---

[18] The June 26, 2023 ORDER was later amended to correct a
scrivener's error. July 5, 2023 ORDER (ECF No. 1362).

[19] DEFENDANT MATT MARTORELLO'S STIPULATION REGARDING REMAINING
ELEMENTS OF RICO 1962(c) CLAIM (ECF No. 1359).

[20] PLAINTIFFS' CONSENT MOTION TO DISMISS USURY AND UNJUST
ENRICHMENT CLAIMS WITHOUT PREJUDICE PURSUANT TO RULE 41(a)(2) (ECF
No. 1387).

motion, and dismissed COUNTS FOUR and FIVE without prejudice. July 10, 2023 ORDER (ECF No. 1390).

Also, on July 10, 2023, the parties stipulated "that the damages amount for the § 1962(c) claim [COUNT TWO] is $43,401,817.47." JOINT NOTICE AND STIPULATION REGARDING § 1962(c) DAMAGES (ECF No. 1389). They then stipulated "that the damages for [the] § 1962(c) claim [COUNT TWO] are the same as the damages for the § 1962(d) claim [COUNT THREE]." (ECF No. 1389).

After conferring with the parties in a conference call, July 10, 2023 Call Trans. (ECF No. 1393), and "understanding that there are no remaining triable issues," the Court canceled the trial that had been set to begin with jury selection on July 12, 2023. (July 11, 2023 ORDER (ECF No. 1391)).

With the foregoing background in mind, we return to explaining the decisions on Plaintiffs' Motion.

DISCUSSION

**A.   Legal Framework**

Rule 56 sets forth the familiar standard for summary judgment, providing that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c).  The Supreme Court has construed Rule 56(c) to "mandate the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The Court explained that, "[i]n such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial."  Id. at 323, 106 S. Ct. 2548; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

In reviewing a motion for summary judgment, a court must view the facts and any inferences drawn from these facts in the light most favorable to the nonmoving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Seabulk Offshore, Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004).  The nonmoving party must demonstrate that there are specific facts that would create a genuine issue for trial.  See Anderson, 477 U.S. at 250, 106 S. Ct. 2505.  "Where . . . the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

18

disposition by summary judgment is appropriate." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

## B.   Analysis

This MEMORANDUM OPINION principally addresses two issues on which the Plaintiffs sought summary judgment: (1) the applicable law (the choice of law issue); and (2) the availability of a mistake of law defense to a claim for civil liability for conspiracy under RICO: 18 U.S.C. § 1962(d).   It also resolves aspects of the Plaintiffs' Motion in Plaintiffs' favor because Martorello did not contest them.

### 1.   Choice of Law: Tribal Law or Virginia Law

The parties dispute what law applies to the loans that were made by the alleged RICO enterprise. Plaintiffs argue that Virginia law governs because: (1) all Plaintiffs in this class resided in Virginia when they took out the loans and the effects of the loan were felt by Plaintiffs in Virginia and (2) the loan agreement's choice of law clause (which specifies tribal law as the governing law) is unenforceable. Pls. Memo. in Supp. at 27, 30.[21] So, the

---

[21] This dispute is also related to Plaintiffs' Motion in Limine 3, MEMORANDUM IN SUPPORT OF PLAINTIFFS' OMNIBUS MOTIONS IN LIMINE at 4 (ECF No. 1174) (requesting the Court to "Exclude Argument or Suggestion that Tribal Law Governs the Loans or Virginia law does not apply to the loans, or that the Class Action Waivers are Enforceable") (emphasis removed), and id. at 6 (requesting the Court to "Exclude Any Suggestion that Federal Policy Supports these Commercial Activities") (emphasis removed).   Over Martorello's

19

Plaintiffs ask for summary judgment that Virginia law applies to the loan agreements.[22]

In response, Martorello argues that various federal preemption principles preclude the application of Virginia law and, instead, that the loans at issue are governed by tribal law because of the Indian Commerce Clause, U.S. Const. Art. 1, § 8, and the federal preemption principles[23] said to derive from the NABDA and the National Bank Act ("NBA"). Martorello also argues that, even if the Indian Commerce Clause, the NABDA, and/or the NBA do not require the application of tribal law, the choice of law clauses in the loan agreement, specifying the application of tribal law, are enforceable under federal law.[24]

(a)   The Indian Commerce Clause, the NABDA, the NBA

Martorello argues that, instead of engaging in the usual choice of law analysis (which admittedly would not apply tribal

---

opposition, DEFENDANT MATT MARTORELLO'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' OMNIBUS MOTION IN LIMINE at 2-3 (ECF No. 1205), the Court granted both these Motions in Limine. June 16, 2023 ORDER at 3 (ECF No. 1328).

[22] Pls. Memo. in Supp. at 26.

[23] Martorello Memo. in Supp. at 18.

[24] DEFENDANT MATT MARTORELLO REPLACEMENT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ("Martorello Response") at 29 (ECF No. 1218).

law), the Court should engage in an Indian Commerce Clause analysis. Martorello Response at 21-22. Under that analysis, says Martorello, tribal law governs the loans, and any attempt to apply Virginia law to the loans violates the Tribe's sovereign authority and preempts federal law. Id. at 26.[25]

The Indian Commerce Clause states: "The Congress shall have Power . . . To regulate Commerce. . . with the Indian Tribes." U.S. Const. Art. I, § 8, cl. 3. Under that clause, "Congress has broad power to regulate tribal affairs," and federal law concerning tribal affairs preempts state law. White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142 (1980). Federal preemption and the "tradition of Indian sovereignty over the reservation and tribal members" together serve to limit the states' ability to interfere in tribal affairs. Id. at 143.

Tribal affairs are implicated when states attempt to regulate "activity undertaken on the reservation or by tribal members." Id. at 143; see also California v. Cabazon Band of Mission Indians, 480 U.S. 202, 205 (1987) (discussing regulation of "non-Indians coming onto the reservations"). When tribal affairs are implicated, the Supreme Court has instructed that a multi-faceted

---

[25] Martorello reiterated these same arguments in his Motion for Summary Judgment. See DEFENDANT MATT MARTORELLO MEMORANDUM OF LAW OF IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT at 18, 28 (ECF No. 1255).

test is to be employed to determine if state laws can apply. Id. at 145; Otoe-Missouria Tribe of Indians v. N.Y. Dep't of Fin. Servs., 769 F.3d 105, 112 (2d Cir. 2014).

However, the Supreme Court has made clear that the Bracker test does not apply where a state imposed a regulation on "a non-Indian" engaging in "a transaction that occurs off the reservation." Wagnon v. Prairie Band Potawatomi Nation, 546 U.S. 95, 99 (2005). And, "[u]nless federal law provides differently, Indians going beyond reservation boundaries are subject to any generally applicable state law." Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 795 (2014) (citation omitted).

Binding Fourth Circuit precedent makes clear that online tribal lending is considered "off-reservation" conduct. Hengle v. Treppa, 19 F.4th 324, 348-49 (4th Cir. 2021). Here, as in Hengle, the office of the entities that (at least nominally) issued the loans, Red Rock and Big Picture Loans, were "located on tribal land,"[26] but it is not disputed that the Plaintiffs in this case (the targets of the lending activity) "reside[d] on non-Indian lands when they applied for their loans online. . . and the effects of Defendants' allegedly illegal activities were felt by the Plaintiffs in Virginia," not on tribal land. Hengle, 19 F.4th at

---

[26] Loan Agreement at 2 (ECF No. 1-1).

22

348-49 (citing Gingras v. Think Fin., Inc., 922 F.3d 112, 121 (2d Cir. 2019); Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs., 974 F. Supp. 2d 353, 360-361 (S.D.N.Y. 2013); Colorado v. W. Sky Fin., LLC, 845 F. Supp. 2d 1178, 1181 (D. Colo. 2011); United States v. Hallinan, No. 16-cr-130, 2016 WL 7477767, at *1 n.2 (E.D. Pa. Dec. 29, 2016)); see Pls. Memo. in Supp. at ¶ 140; Martorello Response at ¶ 140.[27]

The undisputed record in this case establishes that the loan activities in this case are "directly analogous to the lending activity that other courts have found to clearly constitute off-reservation conduct subject to nondiscriminatory state regulation." Hengle, 19 F.4th at 348-49 (citation omitted). And, there is no assertion that Martorello is a tribal member. Thus, on this record, the Bracker Indian Commerce Clause test is inapplicable.

Martorello also points to the NABDA and the NBA, arguing that these federal laws preempt the application of state law. Martorello

---

[27] When citing to the Plaintiffs' statement of facts, Pls. Memo. in Supp. at 5-26, the Court will refer to the numbered paragraphs therein. Martorello submitted both a "Counterstatement of Undisputed Material Facts," Martorello Response at 2-15, and a "Response to Plaintiffs' Statement of Facts," id. at 15-21, both of which use numbered paragraphs. All citations to numbered paragraphs in Martorello's Response correspond to the section titled "Response to Plaintiffs' Statement of Facts," not to Martorello's "Counterstatement."

Response at 26-29. But, he has identified neither a statutory provision nor a court decision that would permit a finding that those statutes preempt state usury laws. Id. Martorello also mentions, in passing, that "[t]he economics of a deal do not change the pre-emption analysis." Id. at 28. That conclusory argument cites authorities that, upon examination, have no bearing on the issues in this case. Indeed, that argument, like the NABDA and the NBA arguments, is so lacking in merit as to warrant summary rejection.

Therefore, unless there is an enforceable choice of law clause providing otherwise, Virginia law applies. The analysis turns next to that question.

> (b)  **The Choice of Law Clauses in the Loan Agreements**

The Loan Agreement's tribal choice of law clause states:

> This Agreement will be governed by the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("Tribal law"), including but not limited to the [Tribal Consumer Financial Regulatory] Code as well as applicable federal law. All disputes shall be solely and exclusively resolved pursuant to the Tribal Dispute Resolution Procedure set forth in Section 9 of the Code and summarized below for Your convenience.

Loan Agreement at 4 (ECF No. 1-1) (emphasis added).

Because "the parties have not provided the Court with any tribal law concerning contract interpretation," the Court "will apply the contract interpretation principles of the forum, Virginia." Hengle, 19 F.4th at 340 n.5; see also Williams II, 59

24

F.4th at 77-78 n.7. Choice of law clauses are often enforceable under Virginia law, Hengle, 19 F.4th at 349; however, those clauses are not given effect when enforcement is "contrary to compelling public policy." Id.

The choice of law clause in these loan agreements is contrary to public policy for two reasons. First, the clause violates federal public policy under the prospective waiver doctrine. Second, the clause violates Virginia's strong public interest against usurious loans.

As explained by the Fourth Circuit, "[t]he prospective waiver doctrine invalidates agreements that prospectively waive a party's right to pursue statutory remedies in certain circumstances" because such a wavier "violates public policy." Williams II, 59 F.4th at 80.  In this case, the Fourth Circuit has found that this choice of law clause runs afoul of the prospective waiver doctrine. In so doing, the Fourth Circuit held that, notwithstanding its references to federal law, the Loan Agreement "in general" is "governed exclusively by Tribal law." Id. at 84 (emphasis added). And, although it is true that the Tribe's Regulatory Code[28] incorporates some federal consumer protection laws, it does not

_____

[28] Lac Vieux Desert Band of Lake Superior Chippewa Indians Tribal Consumer Financial Services Regulatory Code ("Tribe's Regulatory Code") § 6.2 (ECF No. 1207-6).

25

include the federal statute (RICO) at issue in this litigation.
Thus, under the terms of the Loan Agreement, Plaintiffs would not
be able to "effectively vindicate their federal statutory rights"
to relief under RICO. Id. at 85.

By denying Plaintiffs the ability to pursue those federal
statutory remedies, the choice of law clause in these loan
agreements violates the prospective waiver doctrine. The clause is
therefore unenforceable for that reason alone. Id.

The choice of law clause in the loan agreements also is
unenforceable because it is contrary to the Commonwealth of
Virginia's public policy. The Tribe's Regulatory Code states:

> Except as otherwise specified in this Code, a consumer
> financial services transaction may provide for such
> price, interest, time price differential, rent, fees,
> filing fees, and other charges as agreed upon by the
> parties.

Tribe's Regulatory Code § 7.2(b). The Tribe's Regulatory Code
provides for no limitation on the interest charged on small loan
transactions. Id. at § 11.[29] Virginia, on the other hand, has a
"compelling public policy against unregulated usurious lending"
and caps general interest rates at 12%. Hengle, 19 F.4th at 350,

_____

[29] It appears that only vehicle loans are subject to a usury cap
under the Tribe's Regulatory Code. Vehicle loans may not be subject
to more than 390% annual interest rates. Tribe's Regulatory Code
§ 12.2(b).

26

352 (citing Va. Code Ann. § 6.2-303(A)).[30] Therefore, as the Fourth Circuit has recognized, "unregulated usurious lending of low-dollar short-term loans at triple-digit interest rates to Virginia borrower-unquestionably 'shocks. . . one's sense of right' in view of Virginia law." Id. at 352 (quoting Tate v. Hain, 25 S.E.2d 321, 325 (Va. 1943)); see also Radford v. Cmty. Mortg. & Inv. Corp., 312 S.E.2d. 282, 285 (Va. 1984) ("The usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated . . . ." (citation omitted)). Thus, under Virginia's compelling public policy, the choice of law clause is unenforceable.

In sum, neither the Indian Commerce Clause, the NABDA, the NBA, nor the choice of law provision in the loan agreements precludes application of Virginia's usury laws. For those reasons, the Court held that Plaintiffs are entitled to summary judgment on the choice of law issue. And that judgment is that Virginia law applies and governs, inter alia, the lawful interest rate. And, under RICO, any rate that exceeds twice the rate allowed by state law offends the RICO statute and is an unlawful debt.[31]

---

[30] There are circumstances in which Virginia law allows interest rates in excess of 12%, but these loans do not fall within any exception.  Martorello does not contend otherwise.

[31] After the Court found that Virginia law applied to the loans, June 16, 2023 ORDER (ECF No. 1328), Martorello conceded that the loans in question were "unlawful debt," as defined by 18 U.S.C. §

## 2. Mistake of Law Defense and Knowledge That Loans Were Unlawful

Martorello argues that he can assert, as a defense to RICO civil liability under § 1962(c) and § 1962(d), that he acted as he did on a mistaken belief of law that (1) the loans made by the alleged RICO enterprise were governed by tribal law and that, therefore, (2) those loans were legal under tribal law. Martorello Response at 33-34. Relatedly, Martorello also argues that to be liable under § 1962(d), "Plaintiffs must prove that Martorello knew that the loans were unlawful and, with that knowledge, intentionally conspired with co-conspirators to collect them." Martorello Response at 33 (emphasis added).

Plaintiffs assert that there is no "mistake of law" defense to liability under § 1962(c) or § 1962(d).[32] They also take the view that neither § 1962(c) nor § 1962(d) requires proof that Martorello knew that the loans in question were unlawful. Id.

_____

1961(6), June 7, 2023 Hearing Trans. at 171-72. Virginia caps interest rates at 12%, Va. Code Ann. § 6.2-303. Therefore, all loans in excess of 24% are "unlawful debts" under RICO. Here, it is undisputed that the "average [Annual Percentage Rate] for the consumer loans was 727.80%" and the lowest was 34.8887%. Pls. Memo. in Supp. at ¶ 146; Martorello Response at ¶ 146.

[32] PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT at 19-27 (ECF No. 1241).

### (a) Mistake of Law

The mistake of law defense seems to have its genesis in Martorello's SEVENTH AFFIRMATIVE DEFENSE which is:

Defendant, Matt Martorello, at all times relevant acted in good faith and in a lawful manner towards consumers in conformity with all applicable laws and regulations.[33]

During the course of the case and in their summary judgment briefs, the parties confused the record respecting the true nature of the defense because they variously referred to it as a "good faith" defense, a "mistake of law" defense, the "scienter question," or "advice of counsel." Indeed, the parties used all of those terms interchangeably to refer to what seemed to be the same issue: whether Martorello's alleged mistaken belief that tribal law governed the legality of the collected debt [the loans] at issue is available as a defense to COUNT TWO and COUNT THREE.

Of course, good faith, advice of counsel, scienter, and mistake of law are somewhat different, albeit sometimes related, concepts. So, at the June 7 hearing, the Court sought to understand the true nature of the defense that, in the briefs, bore these various sobriquets.[34]

---

[33] MATT MARTORELLO'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT (ECF No. 35, p. 23).

[34] Martorello advised that he was not presenting an advice of counsel defense.

29

At the June 7 hearing, counsel for Martorello clarified that, notwithstanding the various references made in the briefs and pleadings, Martorello indeed was relying on a mistake of law defense and whether such a defense was available to Martorello in defense of COUNT TWO and COUNT THREE. June 7, 2023 Hearing Trans. at 8, 45-46, 60-61 (ECF No. 1316). Counsel for the Plaintiffs agreed that was the issue.

But then, counsel for Martorello stated: "when I have conceived of this argument and I've drafted it, I did not refer to it as a mistake of law. So I may not use that terminology, but I'm certainly on the same page with what we're discussing and what we're arguing here." June 7, 2023 Hearing Trans. at 61.

> MS. SIMMONS: Okay. So the threshold question we believe here is - and Your Honor has - has conceived of it as a mistake of law.
>
> The question we think that the Court has to answer is—
>
> THE COURT: Just a minute. Just a minute. I didn't conceive of it. You all conceived of it. He [Plaintiffs' counsel] agreed with that's what it was. The plaintiffs agreed that's what it was. It's in your briefs. It is articulated in three different ways, advice of counsel, good faith, mistake of law, but its predominant thesis is it's a mistake of law.
>
> * * *
>
> MS. SIMMONS: . . . The question is does section 1962(d), the conspiracy section of the RICO statute, have a scienter element that would place the burden on Plaintiffs to show that Martorello willfully agreed that he, or some member of the alleged RICO conspiracy, would engage in the collection of unlawful debt. And we submit

30

that it does have that scienter requirement as the first point.

So in the *United States* --

THE COURT: Mark that right there. I need to have that typed up.

That isn't how these briefs read.

MS. SIMMONS: I think that it is how the --

THE COURT: It's a refinement on it that I don't think is quite in the papers.

MS. SIMMONS: It's certainly the intention of the portion of our opposition to their motion for summary judgment on this point.

(June 7, 2023 Transcript ("June 7 Tr."), pp. 60-64.

Martorello's counsel then turned to United States v. Mouzone, 687 F.3d 207, 218 (4th Cir. 2012). There, the Court of Appeals, when deciding that a conviction for violating § 1962(d) did not require that the defendant have a role in directing the RICO enterprise, also made the statement that the § 1962(d) criminal liability charge had as an element that "each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts." Id. at 218; June 7 Tr. at 62.

And counsel for Martorello continued:

MS. SIMMONS: And so the existence of Mr. Martorello's good faith belief goes to the question of whether or not he could have engaged in willful conduct.

31

In [another] case,[35] in a footnote, the Court said, "Willfulness generally requires a showing of knowledge of unlawfulness." And it did so in the citation to the Supreme Court's decision in Bryan v. United States at 524 U.S. 184.

So if we are correct, and we think we are, that a section 1962(d) claim requires a showing of willfulness to engage in the collection of unlawful debt, then Mr. Martorello should be entitled to present evidence of his good faith belief.

THE COURT: Good faith belief of what?

MS. SIMMONS: That he was not engaging in the collection of unlawful debt, that he - that he had a good faith belief that tribal law would apply to the loans.

\* \* \*

THE COURT: So it's mistake of law.

MS. SIMMONS: Yes, Your Honor.

THE COURT: He made a mistake of law.

MS. SIMMONS: Yes, Your Honor.

THE COURT: Okay.

MS. SIMMONS: But the case law saying that mistake of law is not a defense we submit doesn't apply here because there is a willfulness element, which, in and of itself, allows a defendant to present evidence of his good faith belief that it wasn't unlawful. And so that's why this type of evidence is relevant.

(June 7 Tr., pp. 63-65) (emphasis added).

Thus, when all is said, Martorello wanted to defend against RICO liability by asserting the mistaken belief that tribal law,

---

[35] United States v. Grote, 961 F.3d 105 (2d Cir. 2020).

not Virginia law, governed whether the loans were unlawful (i.e., whether the debt being collected was unlawful). So, sobriquets notwithstanding, the issue to be decided is whether there is a mistake of law defense to the RICO civil conspiracy claim under § 1962(d), and to the claim under § 1962(c).

As matters now stand, Martorello's mistake of law defense has two purposes. First, he wishes to present the mistake of law argument to defend against a perceived willfulness element that Martorello says is in § 1962(d). Second, he wishes to use the mistake of law argument to defend against what he asserts to be the knowledge of illegality of the debt (the loans) element in § 1962(c) (which is alleged to be the object of the § 1962(d) conspiracy).

### (b) The Mistake of Law Defense: Factual Basis

Before addressing those two issues, it is necessary to understand the factual basis for the mistake of law defense as Martorello presents it in the case. Because of the broad and vague text of Martorello's SEVENTH AFFIRMATIVE DEFENSE in his Answer and the varying sobriquets attached to it in subsequent discovery responses and briefs, Martorello was ordered to submit a statement detailing his mistake of law defense and produce all documents reflecting the sources of his belief that tribal law applied (ECF No. 1247). In response, Martorello submitted fifty documents that

purportedly reflected written advice, or the substance of oral advice, provided to Martorello to support his belief that tribal law applied to the loans at issue and that, therefore, the debt being collected was not unlawful.[36]

For various reasons set forth on the record, the Court sustained the Plaintiffs' objections to the use of most of the proffered documents. In so doing, the Court narrowed those documents to seven exhibits.[37]

Those documents fit into three categories:[38] (1) letters from lawyers who are counsel to online tribal lending expressing the view that tribal laws govern the loans;[39] (2) communications showing that, in 2013 and 2014, Martorello was aware of the decision in Otoe that was adverse to rent-a-tribe online lending

---

[36] DEFENDANT MATT MARTORELLO'S STATEMENT OF POSITION REGARDING GOOD FAITH DEFENSE PURSUANT TO ORDER AT DOCKET NO. 1247 at 9-17 (ECF No. 1275) (unsealed version at ECF No. 1261).

[37] BB (ECF No. 1264-13; refiled at ECF No. 1396 with email attachment per ECF No. 1394), EE (ECF No. 1261-31), KK (ECF No. 1264-18), MM (ECF No. 1264-20; refiled at ECF No. 1396-1 with email attachment per ECF No. 1394), CCC (if foundation was provided) (ECF No. 1264-29; refiled at ECF No. 1396-2 with email attachment per ECF No. 1394), HHH (ECF No. 1264-32), and JJJ (ECF No. 1261-62). See June 7 Hearing Trans. at 270-272, 284, 286, 297, 298, 3030, 307-08, 310, 313, 318.

[38] Some of the exhibits of which do not reflect that Martorello even received or saw them and for which that foundation must be laid if they are to be admitted.

[39] Exhibits BB, KK, and JJJ.

34

that, in turn, necessitated the decision to suspend the Martorello/Tribe online lending in New York;[40] and (3) a 2015 letter from Rosette, LLP, counsel for many tribes, including the Tribe, outlining a strategy to deal with the Otoe decision.[41]

Assuming that those documents are admissible (i.e., that Martorello was aware of them at the relevant times), they are probative of Martorello's assertion that he believed that Tribal law governed the loans at issue (the debt being collected). However, those documents are not the only evidence pertaining to the mistake of law defense.

For example, in his briefing, Martorello says that he knew "tribal lending. . . was under legal and regulatory attack in some quarters throughout the relevant period of time." Martorello Response at 35.[42] And, the record as a whole reflects that Martorello knew that he was operating in, at-best, a grey area of the law. In fact, in 2012, he said that the tribal lending "industry is going to be living in the grey area of its legality for another year or two" and noted that "[w]e have received dozens of letters from State AGs saying we need to be licensed and sending

---

[40] Exhibits EE and MM.

[41] Exhibit KK.

[42] Exhibits EE and MM confirm that to be so.

Cease and Desist order." Martorello to Argyros Email at 13-14 (ECF No. 1266-1); see also Connecticut Cease & Desist Letter (ECF No. 1166-20).

Martorello closely followed successful lawsuits against, and criminal prosecutions of, other players in the rent-a-tribe lending industry. Martorello to Argyros Email at 12; Martorello to Rosette Email at 1 (ECF No. 1166-19); Martorello to Wichtman Email (ECF No. 1166-26). Martorello was so concerned about his own liability that he asked two attorneys to put together an opinion letter detailing his potential for personal criminal liability for the online lending rent-a-tribe involved in this case. In response, the attorneys stressed "[t]here isn't a bright-line answer here from a legal standpoint" and informed him that "[i]t is possible that individual or third-party service-providers could be held liable for criminal violations of Georgia [and other states'] law." Weddle & Compton Email & Memo to Martorello at 2, 14 (ECF No. 1270-2) (emphasis added). Martorello summed up the content of this email and the accompanying memorandum to say "something like ... 'yes it is possible the state will come after you for helping the tribe lend against their [the state's] laws and charge YOU for aiding and abetting as a felony crime in their state (in some instances penalty could be jail time), but we don't think it's going to happen.'" Martorello to Argyros Email at 14 (ECF No. 1266-1).

36

Another attorney advised Martorello that "it will be an uphill battle" to persuade a court that the loans were legal in a civil proceeding. Wichtman to Martorello Email at 3 (ECF No. 1166-22).

In sum, Martorello knew that the online rent-a-tribe operation in which he was engaged was of questionable legality; that courts had held that tribal law did not apply to tribal online lending; that, in a civil proceeding, it would be difficult ("uphill") to persuade a court that the loans were legal; and that, if he persisted in asserting that tribal law governed the loans, he might face state felony prosecution. And, he knew that the tribal lawyers knew as much even while asserting their belief that tribal law applied.[43]  With that knowledge, and aware that online tribal lenders had been found to be wrong by the federal courts in New York, Martorello deliberately took the risk that his guess about what law would apply might well be wrong.

Of course, Martorello's mistake of law defense cannot rest on documentary evidence alone.  In particular, because his defense depends on his knowledge and subjective belief, Martorello cannot rely on his mistake of law defense unless he testifies to what his belief was and why he held it.

_____

[43] Exhibits BB, EE, KK, MM, CCC, HHH, and JJJ cited on p. 31, supra.

37

Considering that this Court and the Court of Appeals has held that Martorello previously has lied under oath about topics that are pertinent to the mistake of law defense,[44] it would be quite surprising if Martorello were to testify at trial. If he does not, there could be no mistake of law defense. However, counsel has represented that Martorello will testify at trial. So, at this stage, it must be assumed that he will and that he would say that he held the belief that tribal law governed whether the loans were unlawful debt.

That, in sum, is the factual predicate for what Martorello calls the mistake of law defense. Whether that fact basis could constitute a mistake of law defense is not now before the Court. But, assuming that it could, the question is whether that defense is even available to Martorello in defense of the RICO counts.

### (c) Willfulness and the Mistake of Law Defense

To assess Martorello's position on his mistake of law defense, it is necessary to understand the elements of § 1962(c) and (d). Subsection (c) is involved in the analysis of liability under COUNT TWO and under COUNT THREE because COUNT THREE alleges a conspiracy to violate § 1962(c).

The starting point is the statutory text.

---

[44] Williams v. Big Picture Loans, LLC, No. 3:17-cv-461, 2020 WL 6784352 (E.D. Va. Nov. 8, 2020); Williams II, 59 F.4th at 89-90.

Section 1962(c) reads, in full:

> It shall be unlawful for <u>any person</u> employed by or
> associated with <u>any enterprise engaged</u> in, or the
> activities of which affect, <u>interstate or foreign</u>
> <u>commerce</u>, <u>to conduct or participate, directly or</u>
> <u>indirectly, in the conduct of such enterprise's affairs</u>
> through a pattern of racketeering activity or <u>collection</u>
> <u>of unlawful debt.</u>

18 U.S.C. § 1962(c) (emphasis added). To establish the collection

of unlawful debt, Plaintiffs must show that the defendant "(1)

conducted [or participated in conducting] the affairs of an

enterprise (2) through the collection of unlawful debt (3) while

employed by or associated with (4) the 'enterprise engaged in, or

the activities of which affect, interstate or foreign commerce.'"[45]

Gibbs v. Stinson, 421 F. Supp. 3d 267, 312 (E.D. Va. 2019), aff'd

on different grounds sub nom. Gibbs v. Sequoia Cap. Operations,

LLC, 966 F.3d 286 (4th Cir. 2020) (quoting § 1962(c)); see also

Salinas v. United States, 552 U.S. 52, 62 (1997) (holding that

"[t]he elements predominant in a subsection (c) violation are: (1)

the conduct (2) of an enterprise (3) through a pattern of

racketeering activity [like the collection of unlawful debt").

---

[45] It is undisputed that the loans involved interstate or foreign
commerce. There is also no dispute that Plaintiffs were injured by
the alleged RICO violation. See Nunes v. Fusion GPS, 531 F. Supp.
3d 993, 1012-1013 (E.D. Va. 2021).

Section 1962(c) does not mention willfulness. In that situation, it is often helpful to examine what the instructions would be if the case were to go to trial.

A widely used instruction on civil RICO liability delineates the elements of § 1962(c) as follows:

> In order to prove that the defendant violated section 1962(c), plaintiff must establish by a preponderance of the evidence each one of the following five elements:
>
> First, that an <u>enterprise existed</u> as alleged in the complaint;
>
> Second, that the enterprise <u>affected interstate</u> or foreign <u>commerce</u>;
>
> Third, that the <u>defendant</u> was <u>associated with</u>, or employed by, <u>the enterprise</u>;
>
> Fourth, that the <u>defendant engaged</u> in a pattern of racketeering activity (<u>or the collection of an unlawful debt</u>); and
>
> Fifth, that the <u>defendant</u> conducted, or <u>participated in, the conduct of the enterprise through</u> that pattern of racketeering activity (<em>or</em> <u>collection of an unlawful debt</u>).

<u>Modern Federal Jury Instructions</u> (Civil), § 84-23 (emphasis added).

The instruction, like the statutory text, does not mention that willfulness is an element to be proved in establishing a civil

claim under Section 1962(c).⁴⁶ Accordingly, Martorello's purported
purpose to use a mistake of law defense to counter a willfulness
element in a Section 1962(c) claim is not supportable.

But, were willfulness an element of a Section 1962(c) claim,
the jury would be told that:

> The term "willfully," as used in these instructions to
> describe the alleged state of mind of defendant . . .
> means that he acted knowingly, deliberately and
> intentionally as contrasted with accidentally,
> carelessly, or unintentionally.

1A O'Malley, Grenig & Lee, Federal Jury Practice and Instructions,
§ 17.05 (6th ed. 2008). The "mistake of law" defense, as
Martorello would present it, would not be probative to refute that
Martorello's participation in directing the affairs of the
enterprise was knowing, deliberate, and intentional.

More importantly, mistake of law defenses are heavily
disfavored in civil cases and should not be allowed here. The
Supreme Court has "long recognized the 'common maxim, familiar to
all minds, that ignorance of the law will not excuse any person,
either civilly or criminally.'" Jerman v. Carlisle, McNellie,
Rini, Kramer & Ulrich LPA, 558 U.S. 573, 581 (2010) (quoting Barlow
v. United States, 7 Pet. 404, 411 (1833) (opinion for the Court by

---

⁴⁶ Section 1962(c) is both a claim in its own right and is also
necessary to the § 1962(d) claim, which requires proof that the
object of the RICO conspiracy was to violate § 1962(c).

Story, J.)); see also id. at 582 n.5 (referring to the "'venerable principle' that ignorance of the law generally is no defense") (quoting Ratzlaf v. United States, 510 U.S. 135, 149 (1994)); United States v. Evans, No. 2204307, slip op. at 13 (4th Cir. July 25, 2023).

As a result, individuals are nonetheless liable for their actions even if they, in good faith, believe that they are acting in accordance with the law. See United States v. Fuller, 162 F.3d 256, 261-62 (4th Cir. 1998). Indeed, as the Supreme Court has made clear, American "law is . . . no stranger to the possibility that an act may be 'intentional' for purposes of civil liability, even if the actor lacked actual knowledge that her conduct violated the law." Jerman, 599 U.S. at 582-83. The "background presumption must be that 'every citizen knows the law.'" Fuller, 162 F.3d at 262 (quoting Bryan v. United States, 524 U.S. 184, 193 (1998)).

There are, of course, some instances when ignorance of the law may be a defense to civil liability under federal law. However, "when Congress has intended to provide a mistake of law defense to civil liability, it has often done so more explicitly than here." Jerman, 559 U.S. at 583 (discussing the Fair Debt Collection Practices Act). Congress did not do so when it enacted RICO. Martorello does not contend otherwise.

Martorello's mistake of law defense does not fare better under Section 1962(d) which provides that:

It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

18 U.S.C. § 1962(d) (emphasis added). The statutory text of § 1962(d) does not mention willfulness. "[T]o prove a RICO conspiracy, the Plaintiffs must establish: (1) that two or more people agreed to commit a substantive RICO offense; and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." Blackburn v. A.C. Israel Enters., No. 3:22cv146, 2023 WL 4710884, at *31 (E.D. Va. July 24, 2023) (quoting Solomon v. Am. Web Loan, No. 4:17cv145, 2019 WL 1320790, at *11 (E.D. Va. March 22, 2019)) (emphasis added); see also Mao v. Glob. Tr. Mgmt., LLC, No. 4:21CV65, 2022 WL 989012, at *12 (E.D. Va. March 31, 2022). RICO conspiracy does not require "some overt act or specific act" and is therefore "even more comprehensive" than the general conspiracy statute. Salinas, 522 U.S. at 63. "The partners in the criminal plan must agree to pursue the same criminal objective . . . ," "even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." Id. at 63-64.

RICO does not include a definition of "conspiracy," but we are not without guidance. "When Congress uses a term with a well-established meaning, we presume—absent evidence otherwise—that

43

Congress intends to adopt that meaning, because Congress is presumed to be aware of judicial interpretations." Jackson v. Home Depot U.S.A., Inc., 880 F.3d 165, 171 (4th Cir. 2018), aff'd, 139 S. Ct. 1743, 204 L. Ed. 2d 34 (2019); see also Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 652 (2008) (describing "the presumption that Congress intends to adopt the settled meaning of common-law terms"). By adopting "terms of art in which are accumulated the legal tradition and meaning of centuries of practice," Congress "presumably knows and adopts the cluster of ideas that were attached to each borrowed word." Morrisette v. United States, 342 U.S. 246, 264 (1952). "Conspiracy" is, of course, a legal term of art with "a settled common-law meaning." Bridge, 553 U.S. at 652.

Of course, "[t]he function of a conspiracy claim differs in criminal and civil cases." Beck v. Prupis, 162 F.3d 1090, 1099 n.18 (11th Cir. 1998), aff'd, 529 U.S. 494, 501-03 (2000). So, the question becomes: when determining the meaning of RICO conspiracy as alleged in this civil action, do we look to the civil common law or the criminal common law? The answer depends upon which enforcement provision is the basis for the action. If an action is being brought pursuant to 18 U.S.C. § 1963, setting forth criminal penalties for RICO violations, the criminal common law applies. Salinas, 522 U.S. at 63 ("When Congress uses well-settled

44

terminology of criminal law, its words are presumed to have their ordinary meaning and definition."). But, if the action is being brought pursuant to 18 U.S.C. § 1964,[47] providing for civil remedies, we look to the civil common law. Beck, 529 U.S. at 501 n.6 (holding that, when interpreting § 1962(d) in conjunction with § 1962(c), "[t]he obvious source in the common law for the combined meaning of these provisions is the law of civil conspiracy"). Because this case is a civil action, we look to the civil common law definition of "conspiracy."

In contrast to criminal law, where "the requirement of some mens rea for a crime is firmly embedded" in the "background rules of the common law," Elonis v. United States, 575 U.S. 723, 744 (2015) (Alito, J., concurring in part) (quoting Staples v. United States, 511 U.S. 600, 605 (1994)), civil liability is "more strict," Morrisette, 342 U.S. at 254. When it comes to civil torts, "the defendant's knowledge, intent, motive, mistake, and good faith are generally irrelevant." Id. at 270. That principle applies where the claim is one for civil conspiracy. According to the Restatement, an individual is liable for civil conspiracy if:

---

[47] Section 1964 sets forth two forms of civil remedies: proceedings instituted by the Attorney General pursuant to § 1964(b) and proceedings instituted by private individuals pursuant to § 1964(c).

> (a) the defendant <u>made an agreement</u> with another <u>to
> commit a wrong</u>; (b) a tortious or unlawful <u>act was
> committed</u> against the plaintiff in furtherance of the
> agreement; and (c) the plaintiff <u>suffered economic loss</u>
> as a result.

Restatement (Third) of Torts: Liability for Economic Harm § 27
(Am. Law Ins. 2020) (emphasis added).

The Restatement does not require that the defendant to a civil
conspiracy claim know that the purpose to which he agreed was
unlawful. Civil conspiracy only requires an agreement to
accomplish "an unlawful purpose." Here, Martorello agreed to the
collection of debts with interest rates above 24%. Although that
was an unlawful purpose, Martorello's civil conspiracy liability
does not require proof that he knew that the purpose was unlawful.

No doubt, it must be shown that the defendant knowingly agreed
to join the conspiracy alleged under 18 U.S.C. § 1962(d). And,
the act of joining the conspiracy would have to be willful on the
part of the defendant. But here too the jury would be told:

> The term "willfully," as used in these instructions to
> describe the alleged state of mind of defendant . . .
> means that he acted knowingly, deliberately and
> intentionally as contrasted with accidentally,
> carelessly, or unintentionally.

1A O'Malley, Grenig & Lee, <u>Federal Jury Practice and Instructions</u>,
§ 17.05 (6th ed. 2008). And, as is the case under § 1962(c),
Martorello's mistake of law defense would not be probative to

refute that his joining the conspiracy was knowing, deliberate, or intentional.

But, in any event, that is not Martorello's willfulness issue: his willfulness contention is that, although he was aware that tribal law had been held inapplicable to rent-a-tribe online lending operations such as his, he nonetheless subscribed to the view that tribal law governed and, because of that mistake of law, he did not act willfully. For the reasons explained above in discussing the defense as to § 1962(c), the general, well-settled principles of Jerman, Barlow, and Fuller foreclose such a defense to the claim under § 1962(d), COUNT THREE.

So, as is true of the Section 1962(c) claim in COUNT TWO, there is no place for a mistake of law defense in responding to a willful component of the claim under Section 1962(d) (COUNT THREE). And, for the reasons previously given,[48] there is no more place for the mistake of law defense in defending the civil conspiracy claim under Section 1962(d) than there is in defending the civil Section 1962(c) claim.

A final word about Martorello's citation to United States v. Mouzone. Martorello relies on the statement in Mouzone that an element of § 1962(d) criminal liability is "that each defendant

---

[48] See pp. 38-39, supra.

knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts." 687 F.3d at 218.

Assuming that actually is an element necessary in a criminal case, the willful aspect in that element is attached to the agreement to commit the alleged racketeering act, whatever it might be. Nothing in that formulation requires proof that the defendant knew that the racketeering act to be committed was an unlawful one.

And, in any event, the jury would be told that:

The term "willfully," as used in these instructions to describe the alleged state of mind of defendant . . . means that he acted knowingly, deliberately and intentionally as contrasted with accidentally, carelessly, or unintentionally.

So, the general rules about mistake of law would apply and a mistake of law would not preclude civil liability under § 1962(d) as alleged in COUNT THREE.

That then brings the analysis to the second aspect of Martorello's theory: using the mistake of law defense to counter what Martorello perceives (erroneously) to be an element of RICO liability: knowledge that the loan itself was illegal.

### (d) Knowledge of Illegality of the Loans

As explained above, Martorello also asserts the mistake of law defense against what he erroneously perceives to be another

element of the claims under both Section 1962(c) and Section 1962(d). Specifically, Martorello argues that Plaintiffs must prove that he knew that the loans were unlawful, and that his mistake of law defense is available to counter that element. For the reasons set forth below, this twist on Martorello's mistake of law defense also lacks merit.

To begin, the text of neither § 1962(c) nor § 1962(d) say that knowledge that the loans (the asserted unlawful debt) are illegal is an element of the RICO claims asserted in COUNTS TWO and THREE. Nor does the definition of "unlawful debt" in § 1961(6) say that such knowledge is required. So, the statutory text does not predicate liability on a finding of a defendant's knowledge that the collected debt is an unlawful one. That is not dispositive, but it is helpful in deciding whether Congress intended RICO liability for collecting an unlawful debt to necessitate proof that a defendant knew the debt to be unlawful.

When determining whether knowledge of the illegality of the loans is required, it is helpful to look to the elements of the respective claims. The elements of a § 1962(c) claim do not require knowledge of the illegality of the loans. Gibbs v. Stinson, 421 F. Supp. 3d at 312 (E.D. Va. 2019); Mao, 2022 WL 989012, at *9; Gibbs v. Elevate Credit, No. 3:20cv632, 2021 WL 4851066, at *15 (E.D. Va. Oct. 17, 2021) (quoting Slay's Restoration, LLC v. Wright Nat'l

Flood Ins. Co., 884 F.3d 489, 493 (4th Cir. 2018)); see also
Solomon v. Am. Web Loan, No. 4:17cv145, 2019 WL 1320790, at *5-6
(E.D. Va. March 22, 2019) (quoting Dillon v. BMO Hams Bank, N.A.,
16 F. Supp. 3d 605, 618 (M.D.N.C. 2014)).

Nor do the elements of a § 1962(d) civil claim bespeak the
need for proof of knowledge that the predicate acts (here,
collection of unlawful debt) are illegal. To be found liable of
RICO conspiracy, a defendant must have "by either words or action,
objectively manifested an agreement to participate directly or
indirectly in the affairs of the enterprise." United States v.
Tillett, 763 F.2d 628, 632 (4th Cir. 1985). Plaintiffs "need not
establish that each conspirator had knowledge of all the details
of the conspiracy but, rather, only that the defendant participated
in the conspiracy with knowledge of the essential nature of the
plan." Id. (emphasis added). Unlike the general conspiracy
statute, § 1962(d) contains "no requirement of some overt act or
specific act." Salinas, 552 U.S. at 63. "The RICO conspiracy
provision, then, is even more comprehensive than the general
conspiracy offense." Id.

When evaluating a motion to dismiss, the court found in
another civil tribal lending case that "Plaintiffs do not have to
allege knowledge of illegality." Mao, 2022 WL 989012, at *9.
Instead, the Plaintiffs must show that the enterprise members,

including Martorello, were "associated together for a common purpose of engaging in a course of conduct." Id. (quoting United States v. Turkette, 452 U.S. 576, 583 (2009)). The "purpose" requirement "may be [satisfied with a showing that] Defendants associated for the purpose of collecting unlawful debt, whether they knew that debt was unlawful or not." Id. (emphasis added).

Here too, it is helpful to consider the way in which the jury would be instructed. To secure the views of the parties on that subject, the Court called upon them to provide their views of what the instructions would be on the two RICO claims. (ORDER, ECF No. 1247).

Martorello's provided instructions were from United States v. Tucker, No.16-cr-91 (PKC), 2020 WL 6891517 (S.D.N.Y. Nov. 24, 2020), a 2017 criminal RICO case.[49] Tucker Jury Instructions (ECF No. 1253-1).[50] On the conspiracy charge, the Court instructed the jury that the Government must prove that "each defendant intentionally joined the conspiracy" and did so "knowingly and willfully. . . for the purpose of furthering its unlawful object,

---

[49] United States v. Grote, 961 F.3d 105 (2d Cir. 2020), discussed in further detail below, is related to this case.

[50] DEFENDANT'S NOTICE OF FILING PURSUANT TO ORDER AT DOCKET NO. 1247 OF JURY INSTRUCTIONS GIVEN IN OTHER UNLAWFUL DEBT RICO CASES (ECF No. 1253).

which is the collection of an unlawful debt." Id. at 3287.[51] The Tucker Court instructed that "the government must prove. . . that the defendant willfully and knowingly engaged in the collection of unlawful debt." Id. at 3296.

Then, as to whether the defendant acted "willfully" and "knowingly," the Court instructed that "[t]he defendant need not have known that he was breaking any particular law, but he must have been aware of the generally unlawful nature of his act." Id. at 3288 (emphasis added). The Government also did not need "to prove that the defendant knew what the usury rates were in the states that the borrowers lived." Id. at 3293 (emphasis added). The Court in Tucker summed up its instructions on that point by stating:

> In this case, ignorance of the specific terms of any law is no excuse to the charged conduct. The government can meet its burden on the "willfully" and "knowingly" element by proving that a defendant acted deliberately, with knowledge of the actual interest rate charged on the loan. It may also meet its burden by showing a defendant acted deliberately, with an awareness of the generally unlawful nature of the loan, and also that it was the practice of the business engaged in lending money to make such loans.

---

[51] The pagination is from the original case transcript.

Id. at 3293-94 (emphasis added).[52] So, even Martorello's view does not necessitate proof that he knew the specific interest rate charged or that the debt being collected was an unlawful one.

Plaintiffs attached four different sets of jury instructions but only two of these had actually been given at trial. PLAINTIFFS' STATEMENT OF POSITION IN RESPONSE TO THE COURT'S ORDER DATED MAY 19, 2023 at 2 (ECF No. 1252). One of the offered instructions comes from Tucker and has been discussed. The other given instructions come from the 2019 Northern District of California civil RICO case Planned Parenthood Federation of America, Inc. v. Center for Medical Progress, Case No. 3:16-cv-236 (N.D. Cal. 2019). Id. The claim in Planned Parenthood involved a theory of "pattern of racketeering activity," rather than collection of unlawful debt. Thus, this does not directly answer the question whether Martorello needed to know that the debts were unlawful. However, in Planned

---

[52] In Tucker, the Court did allow for an advice of counsel defense. The Court instructed the jury to:

> consider whether, in seeking and obtaining advice from lawyers, [the defendant] intended for his acts to be lawful. If he did so, a defendant cannot be convicted of a crime that requires willful and unlawful intent, even if such advice were an inaccurate description of the law.

Id. at 3301 (emphasis added). However, Martorello is not presenting an advice of counsel defense.

Parenthood, the Court did provide guidance on RICO. It instructed that, to show that a defendant had associated with the enterprise, "Plaintiffs must prove that the Defendant was connected to the enterprise in some meaningful way and that the Defendant knew of the existence of the enterprise and of the general nature of its activities." Planned Parenthood Jury Instructions at 60 (ECF No. 1252-1) (emphasis added). As to the conspiracy question, the Court instructed that:

> One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even if the person does not have full knowledge of all the details of the conspiracy.

Id. at 66. Notably, there is no requirement that the defendant know that the alleged acts of racketeering are illegal.

Neither respected instruction book specifies knowledge of illegality as an element of either 1962(c) or (d). That, of course, teaches that a mistake of law as to the legality of the underlying unlawful debt could be no defense to the Subsection (c) aspect of the conspiracy claim.

The Fourth Circuit has not addressed whether, in a civil RICO case, the defendant must have knowledge of illegality, but other federal courts of appeals have. In 1980, the United States Court of Appeals for the Second Circuit squarely held that RICO "does not include a scienter element over and above that required by the

54

predicate crimes." United States v. Boylan, 620 F.3d 359, 361-62 (2d Cir. 1980). Six years later, in United States v. Biasucci, 786 F.2d 504 (2d Cir. 1986), cert. denied, 479 U.S. 827 (1986), the Second Circuit rejected an argument that the "government was required to establish that [the defendants] had knowledge of the specific interest rates" on the loans at issue, i.e., knowledge of the illegality of the loans. Id. at 512-13. In so doing, the Second Circuit, citing Boylan, reiterated that "RICO imposes no additional mens rea requirement beyond that found in the predicate crimes." Id. at 512. And so, "we look to the scienter elements found in the statutory definitions of the predicate crimes to determine the degree of knowledge that must be proved to establish a RICO violation." Id.

Finding that the New York usury law (the predicate crime) "does not require specific intent to violate the usury laws," the Second Circuit declined to find that the government had to have proven that the defendant had knowledge of the specific illegal interest rate. Id. Thereupon, the Second Circuit approved the district court's instruction that the RICO scienter requirement could be satisfied "either by proving specific knowledge of the interest rates on the usurious loans, or by showing the defendant's awareness 'of the general unlawful nature of the particular loan in question and also that it was the practice of the lenders to

make such loans.'" Id. (emphasis added) (quoting the trial court's jury instructions).

The Second Circuit also found that neither the statutory language nor the policies underlying RICO and the predicate state law "impel us. . . to require knowledge of the specific interest rates charged on usurious loans." Id. Indeed, because "one of Congress' principal aims" in enacting RICO was to eliminate loansharking, and because "Congress expressly commanded that the RICO statute 'be liberally construed to effectuate its remedial purposes,'" it "could not have intended to hobble the government's ability to combat loansharking by requiring it to prove knowledge of the specific interest rates charged." Id. (citation omitted) (quoting U.S. v. Ruggiero, 726 F.2d 913, 919 (2d Cir. 1984)).

Martorello correctly notes that, in United States v. Grote, 961 F.3d 105 (2d Cir. 2020), the Second Circuit, in dicta, queried whether Biasucci was consistent with a "presumption in favor of a scienter requirement" for criminal statutes, as provided in Elonis, 575 U.S. at 727, and United States v. X-Citement Video, Inc., 513 U.S. 64 (1994). Grote, 961 F.3d at 117-19.[53] In United States v. Moseley, 980 F.3d 9, 19 (2d Cir. 2020), the Second

---

[53] DEFENDANT MATT MARTORELLO REPLACEMENT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ("Martorello Response") at 33 (ECF No. 1218).

Circuit noted Grote, but, like Grote, declined to depart from
Biasucci concluding only that the defendant must be aware of the
unlawful nature of his actions.

In any event, Elonis does not help Martorello in his assertion
that the mistake of law defense, as he would present it, is
available in this case. Indeed, Elonis quite plainly says that,
even in a criminal case, where guilty mind is an element in every
crime:

> This is not to say that a defendant must know that his
> conduct is illegal before he may be found guilty. The
> familiar maxim 'ignorance of the law is no excuse'
> typically holds true. Instead, our cases have explained
> that a defendant generally must 'know the facts that
> make his conduct fit the definition of the offense,"
> [citation omitted] even if he does not know that those
> facts give rise to a crime.

Elonis, 575 U.S. at 735 (emphasis added). The dicta in Grote
notwithstanding, Elonis does not support Martorello's view that he
can present a mistake of law defense.

The Second Circuit's approach in Biasucci has met with
approval from the United States Court of Appeals for the Eleventh
Circuit. In United States v. Pepe, the Eleventh Circuit agreed
with Biasucci that "[a] plain reading of the statute indicates
that RICO does not contain any separate mens rea or scienter
elements beyond those encompassed in its predicate acts." 747 F.2d
632, 675-76 (11th Cir. 1984) (emphasis added). The Eleventh
Circuit went on to explain that the district court correctly

instructed, as to the § 1962(d) conspiracy charge, that "the defendant with knowledge of the conspiracy, willfully became a member of the conspiracy by agreeing to participate." Id. at 676. That instruction would, of course, be given as to COUNT THREE at the trial of this case, but it certainly does not open the door to a mistake of law defense.  And, as to the § 1962(c) charge, the Eleventh Circuit approved the district court's charge that the jury had to find that the "defendant was engaged in a pattern of racketeering activity . . . by knowingly and willfully committing at least two acts of racketeering activity or knowingly and willfully collecting an unlawful debt." Id. at 676 (internal quotations omitted).  That instruction would be appropriate here as well, but, as the Eleventh Circuit explained, it does not require "a mens rea or scienter requirement beyond those encompassed in the predicate acts."  So, if the Virginia law does not require proof that the defendant knew the loan was illegal (and it does not), then neither does § 1962(c).  And, as is true with § 1962(c), the willful aspect of the instruction (knowingly and willfully) modifies the act of collecting, not whether the debt was unlawful.  And, the instruction certainly does not suggest that a mistake of law defense is available.

In addition to Mao, two other district courts within the Fourth Circuit, in deciding civil RICO cases, have endorsed the

Second Circuit's <u>Biasucci</u> view. The Western District of North Carolina, citing to a District of Connecticut decision governed by <u>Biasucci</u>, found that "[t]he plaintiff must demonstrate, with respect to a defendant, both that the defendant committed a predicate offense as delineated in Section 1961 [the definitions section] and that the defendant had the <u>requisite scienter for the underlying predicate offense</u>." <u>Smith v. Chapman</u>, No. 3:14-cv-00238, 2015 WL 5039533, at *7 (W.D.N.C. Aug. 26, 2015) (emphasis added) (quoting <u>Interstate Flagging, Inc. v. Town of Darien</u>, 283 F. Supp. 2d 641, 645 (D. Conn. 2003)). The Middle District of North Carolina reached the same conclusion, finding "[i]t appears there is no mental state requirement '<u>beyond that found in the predicate crimes</u>.'" <u>Dillon v. BMO Harris Bank, N.A.</u>, 16 F. Supp. 3d 605, 618 (M.D.N.C. 2014) (emphasis added) (quoting <u>Biasucci</u>, 786 F.2d at 514).

Moreover, even in criminal cases, "[t]he presumption in favor of scienter requires a court to read into a statute only that <u>mens rea</u> which is necessary to separate wrongful conduct from 'otherwise innocent conduct.'" <u>Carter v. United States</u>, 530 U.S. 255, 269 (2000) (quoting <u>X-Citement Video</u>, 513 U.S. at 72). When it comes to general intent crimes, the prosecution only needs to prove "knowledge with respect to the <u>actus reus</u> of the crime." <u>Id.</u> In other words, a defendant "generally <u>must 'know the facts that make</u>

his conduct fit the definition of the offense,' even if he does not know that those facts give rise to a crime." Elonis, 575 U.S. at 735 (emphasis added) (quoting Staples v. U.S., 511 U.S. 600, 608 n.3 (1994)). This, of course, is a manifestation of the principle that there is no mental state requirement beyond that found in a predicate crime. It also reinforces the principle that a mistake of law defense is no defense at all.

In United States v. Lawson, 677 F.3d 629, 652 (4th Cir. 2012), the Fourth Circuit considered a position like Martorello's under 18 U.S.C. § 1955, which prohibits illegal gambling. Section 1955, which is quite similar to § 1962, provides that "[w]hoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both."  The statute goes on to define "illegal gambling business" as a "gambling business which is a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1955(b)(1)(i).

In reviewing a defendant's conviction under that provision, the Fourth Circuit rejected the defendant's argument that the jury should have been instructed that she "must have known that her conduct constituted gambling under [applicable state] law." Lawson, 677 F.3d at 652. The Court of Appeals reasoned that the

"plain language" of the statute sets forth a general intent crime
and thus "does not require the government to establish that the
defendant knew that their conduct violated state law." Id. at 652-
53.

The same holds true for § 1962. "Conduct" and "participate,"
the operative verbs in § 1962, impute the same scienter requirement
as § 1955's operative verbs, which include "conduct." In addition,
both the definition of "gambling business" and "unlawful debts"
incorporate state law. 18 U.S.C. § 1961(6). Mirroring the statutory
framework of § 1955, when used in a criminal prosecution, § 1962
is a general intent crime. And, when a general intent crime is
involved, a "good-faith instruction [which, in Lawson, was based
on a mistake of law] . . . is unavailable." Lawson, 677 F.3d at
653.

The teaching of Lawson, applied in the civil context, is that
§§ 1962(c) and (d) do not require knowledge of illegality of the
collected debt as an element of either COUNT TWO or COUNT THREE.
Lawson likewise teaches that Martorello may not raise a mistake of
law defense based on the notion that he did not know the loans
were illegal, because he chose to take the view tribal law applied,
but guessed wrongly.

In this case, of course, RICO is being asserted as the basis
for civil liability. Courts follow much of the same process in

61

determining if a civil statute contains a scienter requirement.
First, they look to the language of the statute to ascertain
congressional intent. For example, when it has intended to excuse
mistakes of law, Congress has required violations to be "willful."
Jerman, 559 U.S. at 584-85. Even more explicitly, Congress
sometimes includes a mistake of law defense. It did so, for
instance, in the Fair Debt Collection Practices Act ("FDCPA") by
requiring that the defendant acted with "actual knowledge or
knowledge fairly implied" that his action was prohibited by the
statute. Id. at 584 (quoting 15 U.S.C. §§ 45(m)(1)(A), (C)). The
RICO statute, on the other hand, contains no provision requiring
that the defendant knew his conduct (collection of an unlawful
debt) was unlawful. Nor does it provide a mistake of law defense.

The Supreme Court also has had multiple occasions to consider
scienter requirements in the various provisions of the Securities
and Exchange Act of 1934, making it an especially useful comparison
statute. For example, in assessing § 10(b), which makes it unlawful
to "use or employ" "any manipulative or deceptive device or
contrivance" in connection with the purchase or sale of securities,
15 U.S.C. § 78j(b), the Supreme Court determined that Congress had
imposed a scienter requirement for liability under this provision
by using "[t]he words 'manipulative or deceptive'. . . in
conjunction with 'device or contrivance . . . .'" Ernst & Ernst v.

Hochfelder, 425 U.S. 185, 197 (1976). The ordinary meaning of those words, particularly "manipulative," "make unmistakable a congressional intent to proscribe a type of conduct quite different from negligence." Id. at 199. "[M]anipulative," so the Supreme Court explained, "connotes international or willful conduct designed to deceive or defraud." Id.

In contrast, the Supreme Court found that another provision in the Act, prohibiting "any person from obtaining money or property 'by means of any untrue statement of a material fact or any omission to state a material fact,' is devoid of any suggestion whatsoever of scienter requirement." Aaron v. Securities & Exchange Comm., 446 U.S. 680, 696 (1980) (quoting § 17(a)(2) of the Securities and Exchange Act of 1934). Likewise, the Supreme Court determined that a prohibition on "'engag[ing] in any transaction, practice, or course of business which operates or would operate as a fraud or deceit' . . . quite plainly focuses upon the effect of particular conduct on members of the investing public, rather than on the culpability of the person responsible." Id. at 696-97 (quoting § 17(a)(3) of the Securities and Exchange Act of 1934). Therefore, that provision was found not to contain a scienter requirement.

RICO contains no language that overcomes the presumption against mistake of law defenses. Section 1962(c) contains no

scienter requirement, see supra, nor does it contain an explicit mistake of law defense like the FDCPA. The language used by § 1962(c)—"conduct or participate" in conjunction with "collection"— does not connotate the sinister intentions implicit in "manipulative" or "deceptive" as found in § 10b of the Securities and Exchange Act. Instead, these terms are far more similar to "engage," as found in § 17(a)(3) of the Act, which does not excuse mistake of law.

In addition to evaluating statutory text, the Supreme Court has also turned to legislative history to understand Congressional intent. Hochfelder, 425 U.S. at 201. Considering the history of § 10(b) of the Securities and Exchange Act, the Supreme Court determined that the legislative history indicated Congress only wanted to impose liability on those who act other than in good faith. Id. at 206.

With RICO, on the other hand, the legislative history supports the opposite conclusion. RICO itself contains a provision instructing that "its terms are to be 'liberally construed to effectuate its remedial purposes.'" Boyle v. United States, 556 U.S. 938, 944 (2009) (quoting § 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961). And supporters of the bill were especially concerned with loansharking. Turkette, 452 U.S. at 591-92 & n. 14 (considering RICO's legislative history). Congress's

64

remedial intentions in passing RICO, therefore, would not be advanced by "permit[ting] the defendant to avoid [liability] by simply claiming that he had not brushed up on the law." Hamling v. United States, 418 U.S. 87, 123 (1974).

In sum, the text of §§ 1962(c) and (d) does not require that the defendant knew the loans were illegal, nor does the legislative history indicate that Congress intended such a result or that a "mistake of law" defense should be available. The Court declines to read into RICO what Congress omitted. Unless the predicate offense contains a scienter requirement,[54] all that RICO requires is that the defendant knew that the loans were issued at a rate above that permitted by 18 U.S.C. § 1961(6) or that Martorello had knowledge of the general illegal nature of the enterprise. Brice v. Haynes Invs., Inc, 548 F. Supp. 3d 882, 894 (N.D. Cal. 2021) (holding that defendants must have "knowledge of the purpose" of the scheme or "knowledge of the terms on which the loans would be provided and repayment required"). In other words, Martorello must knowingly engage in the activity itself, but he does not have to know that, by doing so, he would break the law. The next question

_____

[54] For example, when pursuing a RICO conspiracy case based on violations of a federal statute prohibiting the knowing hiring of unauthorized aliens, 8 U.S.C. § 1324(a)(3), that knowledge requirement is then imputed to RICO. See Walters v. McMahen, 684 F.3d 435, 440 (4th Cir. 2012).

65

is whether Virginia's usury statute contains a scienter requirement.

### 3. Virginia's Usury Statute: Va. Code Ann. § 6.2-303(A)

The underlying Virginia statute, Va. Code Ann. § 6.2-303(A), does not contain a mens rea or scienter requirement. Nor has it been interpreted to contain one. The provision states, in full:

> Except as otherwise permitted by law, no contract shall be made for the payment of interest on a loan at a rate that exceeds 12 percent per year.

Va. Code Ann. § 6.2-303(A). The statute goes on to clarify that it "shall apply to any person who seeks to evade its application by any device, subterfuge, or pretense whatsoever" followed by a non-exhaustive list of such subterfuges. Va. Code Ann. § 6.2-303(E). The statute provides for only one defense: if the "interest or other charges in excess of those permitted by law were imposed or collected as a result of a bona fide error in computation or similar mistake." Va. Code Ann. § 6.2-305(C).

There is no Virginia decision that addresses whether the current Virginia statute allows for mistake of law defense. But, in 1826, the Supreme Court of Appeals of Virginia interpreted an earlier version of this provision to explicitly exclude a mistake of law defense, stating:

> Wherever such intention appears in the taking more than legal interest, it is evidence of the corrupt agreement required by the statute; though the party may never have heard of the law, or may think that he is steering quite

66

> clear of it. Ignorance or mistake of the law excuses no
> man; but a mistake of fact does excuse.

Childers v. Deane, 4 Rand. 406, 410-11 (Va. 1826) (emphasis
added).[55]

Although Childers is an older precedent interpreting an
earlier version of the statute, it is in accord with more recent
decisions explaining how courts understand the current statute. To
make out a claim under Va. Code Ann. §6.2-303(A), plaintiffs need
only show that defendants "collected or received payments on loans
that violated Virginia's statutory limits." Gibbs v. Stinson, 421
F. Supp. 3d at 309. The elements of the statutory cause of action
include no reference to the defendants' intent or knowledge.

Modern caselaw reinforces the fact that a creditor's belief
that he is acting in accordance with the law is no defense. For
example, the Supreme Court of Virginia invalidated a usurious loan
even though the issuing bank believed, presumably in good faith,
that it fell under one of the statutory provisions exempting it

---

[55] The version of the statute in effect at the time reads: "No
person shall, upon any contract, take, directly or indirectly, for
loan of any money, wares, or merchanize [sic], or other commodity,
above the value of six dollar for the forbearance of one hundred
dollars for a year." "An act to reduce into one act, the several
acts against Usury" (Feb. 24, 1819) § 1, in Revised Code of the
Laws of Virginia: Being a Collection of All Such Acts of the
General Assembly, of a Public and Permanent Nature, as are Now in
Force, ch. 102, pp. 373-74 (1819).

from the usury laws. Radford v. Cmty. Mortg. & Inv. Corp., 312 S.E.2d 282, 285 (Va. 1984). That, of course, is a mistake of law. In so deciding, the Supreme Court of Virginia reaffirmed that "[t]he [Commonwealth's] usury laws. . . are to be liberally construed with a view to advance the remedy and suppress the mischief" and the courts "should therefore be chary in permitting this policy to be thwarted." Id.[56]

Looking at the statutory language and the public policy underlying the statute, the Virginia usury statute does not impose a scienter requirement, nor can it be read to allow a mistake of law defense.

---

[56] There is one easily distinguishable case finding that the lenders' good-faith belief can excuse a usurious debt. In this case, the debtor and creditor engaged in a complicated loan transaction involving real estate liens, corporate debts, and individuals acting on behalf of themselves and partnerships. Heubusch v. Boone, 192 S.E.2d 783, 787-78 (Va. 1972). On its face, the Supreme Court of Virginia determined that the resulting loan was usurious. Id. at 789. However, the debtors in the case were a lawyer and his law firm and had "induce[d] the lender to enter into a usurious agreement that he would not otherwise have made." Id. at 789-91. As the debtor/lawyers "were the direct causes of the illegality complained of," the debtors were "estopped from profiting by that illegality of their defense" and the loan was deemed valid. Id. at 790. While Heubusch does involve a creditor relying in good faith on the advice of counsel, it is readily distinguishable from Martorello's asserted defense. Martorello relied on his own lawyers' advice, not that of the debtor. Martorello's debtors in no way "induce[d]" him to enter into the loans as in Heubusch. Thus, that decision does not support the availability of a good-faith defense to Virginia Code Ann. § 6.2-303(A) in this case.

68

## C.     Summary Judgment: Certain Elements of COUNT TWO

The Plaintiffs' Motion asked for summary judgment on certain elements of the 18 U.S.C. § 1962(c) claim in COUNT TWO (ECF No. 1169, pp. 36-40).  In particular, they asked for summary judgment that: (i) "an enterprise existed;" (ii) that "an association-in-fact enterprise existed;" (iii) the loans at issue "constituted 'unlawful debt'" because the interest rates on those loans exceeded 24% (twice the 12% rate permitted by Virginia law; and (iv) "persons associated with the enterprise engaged in the collection of the debt."     (ECF No. 1169, pp. 36-40, § VIA-C).     However, recognizing that there was a material fact dispute over one element of COUNT TWO, Plaintiffs did not seek summary judgment as to COUNT TWO as a whole.

As explained above, Martorello did not respond to the arguments on those points.[57]     At oral argument on June 7, Martorello's counsel agreed.  June 7 Tr. p. 173.  Hence, summary judgment on those points (the elements) in Plaintiffs' favor is appropriate.

---

[57] Compare PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT (ECF No. 1241, pp. 7, 28-30) with DEFENDANT MATT MARTORELLO REPLACEMENT MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 1218).

69

**CONCLUSION**

For the reasons set forth above, the Court granted PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 1165) in part and
denied in part.

Subsequent orders have taken the matter further so that, as
of now, summary judgment has been granted as to COUNTS TWO and
THREE and COUNTS FOUR and FIVE have been dismissed without
prejudice.[58]   As a result of this MEMORANDUM OPINION and those
ORDERS, a final judgment will be entered separately on COUNTS TWO
and THREE.

It is so ORDERED.

                                        /s/
                              _____
                              Robert E. Payne
                              Senior United States District Judge


Richmond, Virginia
Date: September 21, 2023

_____

[58] June 16, 2023 ORDER (ECF No. 1328), as amended by ECF No. 1350;
July 7, 2023 ORDER (ECF No. 1373) (granting summary judgment in
favor of the Plaintiffs as to COUNT TWO); July 10, 2023 ORDER (ECF
No. 1390) (dismissing without prejudice COUNTS FOUR and FIVE).