**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| **LULA WILLIAMS, *et al.*,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil Action No. 3:17-cv-461 (REP)** |
| | ) | |
| **BIG PICTURE LOANS, LLC, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT MOTION TO COMPEL
<u>DOCUMENTS ON MARTORELLO'S PRIVILEGE LOG</u>**

Plaintiffs hereby file this Memorandum in Support of their Motion to Compel Documents

on Martorello's Privilege Log from January 2024.[1]

---

[1] As this Court is aware, the January 2024 was provided shortly before the parties entered into the class action settlement, which subsequently unraveled. Thereafter, Martorello filed a personal bankruptcy in the United States Bankruptcy Court for the Northern District of Texas, thereby triggering the automatic stay as to these proceedings. On June 10, 2026, the Bankruptcy Court granted the Plaintiffs' motion to lift stay "to permit the Virginia District Court to proceed with the prosecution of the Motion to Repatriate pending in the Virginia District Court," including this motion. *In Re: Matthew Brandon Martorello*, Case No. 24-90016-MXM-7 (N.D. Tex. Bankr.), ECF 411.

## INTRODUCTION

Martorello's privilege log is another example of his repeated discovery misconduct, and his worst yet. In this instance, Martorello seeks to withhold 49,331 separate documents that have been vaguely identified on a 5,937-page privilege log. For a multitude of reasons, the vast majority of these documents should be produced.

*First*, Martorello seeks to withhold more than 11,000 documents where the "privileged subject" pertains to two foreign trusts, the Capstone Irrevocable Trust and the Bluetech Irrevocable Trust. Martorello, however, lacks standing to assert any privilege on behalf of either trust because he has repeatedly disclaimed any involvement in the control or management of the trusts. For example, in other filings before this Court, Martorello asserted that "he has no rights, benefits, controls, authority, or access with respect to" the Capstone Irrevocable Trust. ECF 1530-1 at 2. Given his position, Martorello lacks any standing to claim privilege over documents relating to the foreign trusts because "the attorney client privilege must be asserted and established by the privilege holder." *Gibbs v. Stinson*, 2021 WL 4853575, at *6 (E.D. Va. Oct. 17, 2021) (citing *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982)). The same is true for the domestic trusts, including the RLM 2018 Family Trust and the 2018 Martorello Children Trust.

*Second*, even assuming Martorello has standing, Martorello has waived privilege as to all the trusts by placing the advice received from attorneys at issue. Martorello has done so by designating two of his asset protection lawyers at the law firm of Giordani Fitte Grossman & Ripp, LLP ("GFGR") to provide testimony regarding: (1) the "reasons why a settlor of such a trust would have been counseled to establish such a trust," (2) the "reasons why a settlor of an irrevocable non-self-settled spendthrift trust would have been counseled to establish it in the Cook Islands," (3) the "lack of power, control, or authority over the Trust Assets provided to Matt Martorello and the

reasons for this," (4) the "effect of interactions over the years between the Trustee of the Trust and Matt Martorello," (5) the effect of funding the trust "with a partial interest in a closely held business" and the "reasons why a Settlor of such a trust would be counseled to do so," (6) the "risk management, and estate planning concerns that typically motivate the creation of overseas trusts." Dkt. 1520-3 at pgs. 3-4 (emphasis added). This intended defense triggers the firmly established rule that "[b]y placing his attorneys' representation at the center of his defense," regarding the trusts, Martorello "has waived any privilege to communications within the scope of that issue." *United States v. Moazzeni*, 906 F. Supp. 2d 505, 518 (E.D. Va. 2012).

*Third,* even if Martorello did not place his advice at issue, the crime-fraud exception to the attorney-client privilege applies to "a scheme to defraud creditors by hiding assets." *Moazzeni*, 906 F. Supp. 2d at 516. Here, Martorello hired a law firm that expressly boasts that it specializes in helping "to preserve individual wealth from threats" such as "litigation," including through the "settling offshore trusts and forming various foreign entities that provide clients with a comfortable balance of control and protection of assets, allowing clients to manage their family's wealth risk." Exhibit 1. After the commencement of this case, Martorello sent his first communication to Leslie Giordani, with the subject line "Transfer of **my Braviant Equity**" for the express purpose of furthering his "**objective of protecting personal assets from multiple claims by transferring them into a trust**." Exhibit 19 at pg. 5472. (emphasis added).[2]

Plaintiffs not only have this unequivocal evidence of Martorello engaging Giordani to help with a fraudulent transfers, but they also have a spreadsheet entitled "Martorello Pending Matters,"

---

[2] Martorello's privilege log (and, hence, his asset protection communications) are so robust that the privilege log could not be filed as a single exhibit because of the 10MB limit for a document on the CM/ECF. Accordingly, the privilege log has been split into 5 separate exhibits. When citing a specific entry, Plaintiffs have used the page number on Martorello's privilege log.

showing the extensive asset protection measures taken by Defendants to hide and conceal Martorello's assets following this case. Exhibit 2. This document is essentially a playbook showing the extensive asset protection measures taken by the Giordani Defendants, and it includes an express column entitled "ASSET PROTECTION ISSUES," with numerous projects designed to hide and conceal Martorello's assets,  such "[s]et up trustee engagement with Guardian and Asiatrust Nevis," and a notation that "[c]ommunications with the trustee/investment manager should go through" her law firm "to provide privilege." *Id.* at Martorello_656607. Thus, even if Martorello somehow has standing to assert privilege with respect to communications related to the trust, any documents related to the establishment, implementation, operation, and consequences of the trusts are encompassed by the crime-fraud exception because Martorello hired Giordani and her firm for the express purpose of defrauding creditors and abusing privilege.

*Fourth*, Martorello seeks to withhold thousands of communications with third parties, such as the Asiaciti Trust, which is an international trust provider. This type of communication must be produced for one of two reasons. First, if "the communication between the attorney and client takes places in the presence of a third party," such as Asiaciti Trust, then "the attorney-client privilege never existed." *Fed. Election Comm'n v. Christian Coal.*, 178 F.R.D. 61, 71 (E.D. Va.), *order aff'd in part, modified in part*, 178 F.R.D. 456 (E.D. Va. 1998). And second, if the "communication took place in private, between the attorney and the client alone," subsequent disclosure "to a third party then waives the privilege." *Id*. Thus, Martorello cannot shield his communications as he did not have an attorney client relationship with these parties—regardless of whether: (1) an attorney was copied on the communication; or (2) where he apparently forwarded legal advice.

*Fifth*, Martorello has waived privilege by providing a woefully inadequate privilege log that fails to comply with Rule 26(b)(5)'s privilege log. Among other things, Martorello's privilege

3

log fails to provide even the most basic information like the identity of the author or recipient as to a significant number of documents.

## ARGUMENT

The attorney-client privilege "is the oldest of the privileges for confidential communications known to the common law." *Upjohn v. United States*, 449 U.S. 383, 389 (1981). The privilege is intended to "promote broader public interests in the observance of law and administration of justice" and is recognition "that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Id*. Even though the privilege serves an important purpose, it also has an adverse consequence: it prevents disclosure of "otherwise pertinent information from the fact-finder, thereby impeding the full and free discovery of the truth. "*Rambus, Inc. v. Infineon Techs. AG*, 220 F.R.D. 264, 271 (E.D. Va. 2004). Because it often has adverse consequences, the attorney client privilege "is not absolute," and the Fourth Circuit has repeatedly noted that an assertion of privilege "is to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *Solis v. Food Employers Labor Relations Ass'n*, 644 F.3d 221, 226 (4th Cir. 2011).

"The United States Court of Appeals for the Fourth Circuit has adopted the 'classic test' for determining the existence of attorney-client privilege:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Gibbs v. Stinson*, 2021 WL 4853575, at *6 (E.D. Va. Oct. 17, 2021) (citing *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982)). "The burden is on the proponent of the attorney-client

4

privilege to demonstrate its applicability." *Gibbs*, 2021 WL 4853575 at \*6 (quoting *Jones*, 696 F.2d at 1072)). "The proponent must establish not only that an attorney-client relationship existed, but also that the particular communications at issue are privileged and that the privilege was not waived." *Gibbs*, 2021 WL 4853575 at \*6 (quoting *Jones*, 696 F.2d at 1072)).

Here, Martorello's 5,937-page privilege log fails to satisfy his burden on numerous grounds.

## I.    Martorello lacks standing to invoke the privilege of the Capstone Irrevocable Trust, the Bluetech Irrevocable Trust, and other trusts.

Because the attorney-client privilege belongs to the *client*, the "party claiming the privilege must be a client who has sought legal advice." *Gibbs*, 2021 WL 4853575 at \*6 (quoting *Williams v. Big Picture Loans, LLC*, 303 F. Supp. 3d 434, 444 (E.D. Va. 2018) (citing *NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 501–02 (4th Cir. 2011)). Put differently, "the attorney client privilege must be asserted and established by the privilege holder." *Gibbs*, 2021 WL 4853575 at \*6 (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 114 F. Supp. 3d 323, 346 (E.D. Va. 2015)). In short, "[s]ince the document in question is a communication between [the client] and its attorney," "the privilege belongs only" to the client; and third parties "have no privilege with respect to the document and have no standing to bring" motion for a protective order to prevent the disclosure of the documents. *Fed. Deposit Ins. Corp. v. Marine Midland Realty Credit Corp.*, 138 F.R.D. 479, 480, n.1 (E.D. Va. 1991).[3]

---

[3] This is not only the law in this district, but across the country. *See also In re Behr Dayton Thermal Prod., LLC*, 298 F.R.D. 536, 541 (S.D. Ohio 2014) (explaining that "[f]ormer managers have no power to assert the privilege, even as to communications they were involved in, because the privilege may only be exercised by those who control the corporation," and, thus, denying motion for a protective order on standing grounds);  United States v. Martoma, 962 F. Supp. 2d 602, 604 (S.D. N.Y. 2013) (finding that government lacked standing to assert attorney client privilege on behalf of cooperating witness);  *Henderson v. United States*, 815 F.2d 1189, 1192 (8th Cir.1987) (defendant lacked standing to object to testimony of former attorney of girlfriend on basis of

Throughout the pendency of the Motion to Repatriate, Martorello has repeatedly taken the position that "does not own or control" several of the trusts identified by Plaintiffs, including the Capstone Irrevocable Trust and the Bluetech Irrevocable Trust. Dkt. 1469 at 8; *see also id*. at 13 ("In addition to the fact that there are no control or access provisions relating to Mr. Martorello in any of the trust agreements, there is no ability to take trust property back due to the irrevocable nature of the trusts."); *id*. at 2 (arguing that the proposed asset freeze order provides "absolutely no examples" of "any foreign entity or account" to which "Martorello is 'entitled,' 'posseses,' or 'controls'").[4] Despite disclaiming any ownership, management, or control over the trusts, Martorello's privilege log contains: (1) 9,712 entries where the "privileged subject" is Capstone Irrevocable Trust; (2) 10,366 entries where the "privileged subject" is Bluetech Irrevocable Trust; (3) 875 entries where Capstone appears in the "privilege reason sentence ender;"; and (4) 477 entries where Bluetech appears in the "privilege reason sentence ender."

For example, Martorello's privilege log contains an email from December 20, 2021, authored by Martorello to Lauren Fitte (a lawyer with Martorello's asset protection firm), Rebecca Puni (an employee with Asiacititrust), which copied Tine Ponia (an employee with Asiacititrust) and Murisa Mimetua Daniel (an employee with Asiacititrust). Exhibit 14 at pg. 852. This entry identifies the Bluetech Irrevocable Trust as the "[p]rivileged subject," and the description as

---

attorney-client privilege, which "belongs to and exists solely for the benefit of the client."); *Application of Sarrio, S.A.*, 119 F.3d 143, 148 (2d Cir. 1997) (explaining that party did not "have standing to assert an attorney-client privilege belonging to" unless it was the holder).

[4] As the Court will recall, Bluetech has taken the same position in the Galloway matter. For example, when arguing that service was improper on Martorello, Bluetech argued that "Martorello is not an agent of Bluetech," and that he "neither owns nor controls Bluetech." *Galloway v. Martorello*, Case No. 3:19-cv-314 (E.D. Va.), Bluetech Reply Brief, ECF 455 at 2; *see also id*. at 5 (arguing that service was invalid because "Mr. Martorello neither maintains, owns, nor controls," Bluetech.

"providing, containing, reflecting, requesting, or discussing confidential legal advice from counsel regarding advice from outside counsel related to Bluetech, ATC, and dissolutions." *Id*. Similarly, Martorello's privilege log contains an email from December 17, 2021, authored by Martorello to Rebecca Puni, Tine Ponia, Bob Chesner (a lawyer with Martorello's asset protection firm), with a description as "providing, containing, reflecting, requesting, or discussing confidential legal advice regarding advice from outside counsel related to trust management issues." Exhibit 14 at pg. 886.

By way of another example, Martorello's privilege log contains another email dated August 30, 2022, from himself to Leslie Giordani that identifies the Capstone Irrevocable Trust, Braviant, and Eventide Credit Acquisitions as the "[p]rivileged subject," and "advice from outside counsel related to trust planning" as the description. Exhibit 14 at pg. 824. For Capstone, Martorello's claim of privilege is even weaker because Martorello is not even the settlor of the Capstone Trust as confirmed by his sworn interrogatory responses, which assert:

> Capstone Irrevocable Trust ("Capstone Trust") is not owned by Defendant and the property of its res is not owned by him. Capstone Trust was established by Guardian Trust Corporation, a Cook Islands trust company, as trustee of the BlueTech Irrevocable Trust, as sole settlor, and AsiaTrust Nevis Limited, as Nevis trust company, on July 11, 2013. . . . Defendant has never been protector. Defendant has never been a beneficiary. Capstone Trust has always been governed by Nevis law. The trustee is AsiaTrust Nevis Limited. The beneficiary upon establishment was Bluetech Trust.

Exhibit 3 at pg. 14. Martorello has not only disclaimed any association with the trusts in his pleadings and sworn interrogatories, but also in depositions. For example, in a recent deposition, Martorello testifies as follows:

Q.    Were you ever the trustee of the Capstone Irrevocable Trust?

A.    No.

…

7

Q.    Were you ever a beneficiary of the Capstone Trust?

A.    No.

Q.    Were you ever a manager of the Capstone Irrevocable Trust?

…

A.    No.

Q.    Were you ever a protector of the Capstone Irrevocable Trust?

A.    No.

Exhibit 4 at 23:6 – 24:6. Martorello provided nearly identical testimony as to Bluetech (except he came trustee for a short moment to dissipate the asserts of the trust when this Court ruled against Bluetech in the Galloway matter). *Id.* at 29:7 – 30:12.

Given this position, Martorello cannot possibly have standing to assert privilege over thousands of documents related to the trusts, such as documents: (1) with the description "related to trust planning," (2) with the description "contents of a Trust and Ownership Structure," (3) with the description "regarding trust funding," (4) with a description "professional services rendered relating to foreign trusts," (5) with a description "related to trust documents," (6) with a description "related to distribution from trusts," (7) with a description "related to proposed trust structure," (8) with a description "related to Bluetech and Capstone trusts," (9) with a description "related to corporate governance" and a privileged subject line of Capstone, (10) with a description line of "the operations of a trust," (11) with a description line of "the structure of a trust," (12) with a description line of related "to the formation of a trust," (12) with a description line of "administrative risks foreign v. domestic entity," and (13) with a description line "related to distribution from Capstone Trust to Rebecca's bank account." *See generally* Exhibit Nos. 14-19.

If Martorello is neither the owner, beneficiary, manager, nor operator of the trust, it naturally follows that he cannot be a privilege holder with respect to any such documents.

It is well settled in the "corporate context, the company is the client and holds the corresponding attorney-client privilege." *Gibbs*, 2021 WL 4853575 at *7 (citing *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985)). Because a corporation is "an inanimate entity," control over the privilege "must necessarily be undertaken by individuals empowered to act on behalf of the corporation," *i.e.*, its current officers and directors. *Weintraub*, 471 U.S. at 348. Thus, the Supreme Court has held that "[d]isplaced management, disempowered to act on behalf of the corporation," retain no control over its privilege even to statements that they might have made to counsel. *Gibbs*, 2021 WL 4853575 at *7 (citing *Weintraub*, 471 U.S. at 349, n. 5).

Like corporations, trusts are inanimate entities and, thus, courts have had to repeatedly address the issue of who holds the privilege as to the trust. These cases have uniformly found that "the ultimate or real clients were the beneficiaries of the trust." *Comegys v. Glassell*, 839 F. Supp. 447, 448 (E.D. Tex. 1993); *see also Bonde v. Wexler & Kaufman, PLLC*, 2023 WL 8756986, at *6 (S.D.N.Y. Dec. 8, 2023) (recognizing that the beneficiaries of the trust are the "real clients," and, thus, the privilege holder); *Cobell v. Norton*, 212 F.R.D. 24, 28 (D.D.C. 2002) ("no attorney-client privilege is involved" in communications with trustee's attorneys "because the trust beneficiaries are the attorneys' clients"); *In re Est. of McAleer*, 665 Pa. 275, 297–98 (2021) (finding that beneficiaries of a trust are the "real client" entitled to attorney-client privilege); *Anderson v. Sotheby's Inc. Severance Plan*, 2005 WL 6567123, at *9 (S.D.N.Y. May 13, 2005) (noting that only the beneficiary or "real client," not the trustee, is entitled to enjoy the attorney-client privilege).

9

In short, the analysis is easy on this issue because Martorello is neither the trustee, nor the beneficiary of the Bluetech Irrevocable Trust, the Capstone Irrevocable Trust, the RLM 2018 Family Trust and the 2018 Martorello Children Trust. Moreover, Martorello has steadfastly and repeatedly disclaimed any ownership, management, or control over the Bluetech Irrevocable Trust and the Capstone Irrevocable—going as far as hiring two experts to support his lack of control over the trusts. By doing so, Martorello cannot invoke the attorney-client privilege because he lacks standing to assert any privilege related to the trusts.

**II.      Martorello has waived privilege as to a significant number of documents by placing his asset protection advice at issue.**

**A.      Martorello has placed legal advice surrounding the trusts at issue.**

Even assuming that Martorello has standing to invoke the attorney-client privilege, Martorello has waived it as to all trusts—Bluetech, Capstone, the Martorello Children's Trust, the RLM 2018 Family Trust, and the VROOM Trust—by placing his communications with attorneys at issue. For instance, Martorello designated two attorneys, Leslie Giordani or Lauren Fitte, as potential witnesses for the hearing on the Motion to Repatriate. Dkt. 1520-3 at pg. 2. These two attorneys work for the firm Giordani Fitte Grossman & Ripp, LLP ("GFGR"), which touts:

> [T]he attorneys at GFGR have extensive knowledge of, and practical experience implementing, the various techniques available t**o preserve individual wealth from threats such as divorce, litigation, future creditors**, and investment risk.
> …
> The **attorneys at GFGR maintain strong relationships with fiduciaries, money managers, and attorneys in more than a dozen foreign jurisdictions**, and ensure the continued integrity of international planning by conforming to strict due diligence and "know your client" policies. In the area of "outbound" international estate planning, **GFGR attorneys are experienced in assisting U.S. clients with settling offshore trusts and forming various foreign entities that provide clients with a comfortable balance of control and protection of assets, allowing clients to manage their family's wealth risk** and accumulate assets for future generations.

Exhibit 1 (emphasis added).

Among other things, Martorello has designated these asset protection trusts to provide generic testimony regarding: (1) the "reasons why a settlor of such a trust would have been counseled to establish such a trust," (2) the "reasons why a settlor of an irrevocable non-self-settled spendthrift trust would have been counseled to establish it in the Cook Islands," (3) the "reasons settlors choose to establish Grantor Trusts generally," (4) the "lack of power, control, or authority over the Trust Assets provided to Matt Martorello and the reasons for this," (5) the "effect of interactions over the years between the Trustee of the Trust and Matt Martorello," (6) the effect of funding the trust "with a partial interest in a closely held business" and the "reasons why a Settlor of such a trust would be counseled to do so," (7) the "legal, tax, business, risk management, and estate planning concerns that typically motivate the creation of overseas trusts." Dkt. 1520-3 at pgs. 2-4.

The case law on this is clear: when a party asserts a defense based on advice received from attorneys, may not reveal "beneficial communication[s]" but withhold other "less helpful, communication(s) on the same matter." *E.I. Dupont de Nemours & Co. v. Kolon Indus., Inc.*, 269 F.R.D. 600, 605 (E.D. Va. 2010). In other words, "[b]y placing his attorneys' representation at the center of his defense," regarding the trusts, Martorello "has waived any privilege to communications within the scope of that issue." *United States v. Moazzeni*, 906 F. Supp. 2d 505, 518 (E.D. Va. 2012); *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) ("Selective disclosure for tactical purposes waives the privilege."); *United States v. Dallmann*, 433 F. Supp. 3d 804, 813 (E.D. Va. 2020) (explaining that "the Fourth Circuit has made clear that "[s]elective disclosure [of attorney-client communications] for tactical purposes waives the [attorney-client] privilege.") (citing *Jones*, 696 F.2d at 1072); *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir. 1994) ("the client has made the decision and taken the affirmative step in

11

the litigation to place the advice of the attorney in issue. Courts have found that by placing the advice in issue, the client has opened to examination facts relating to that advice.").

This principle, often referred to as "selective disclosure" or the "at issue" doctrine, is rooted in fairness—when the Court evaluates Martorello's story (apparently good faith in establishing the trust and lack of control), it must be able to assess the full story to evaluate his actual motives and actual involvement with the trust. *See Brown Univ. v. Tharpe*, 2012 WL 12894480, at *3 (E.D. Va. Mar. 30, 2012) (explaining that the "at issue" doctrine is "rooted in fairness, and justified on the basis that 'it would be inequitable to permit the party to use the attorney/client privilege as a sword by placing the advice of the attorney at issue while permitting the same party to use the attorney/client relationship as a shield to prevent inquiry into the asserted claim or defense.'") (citation omitted). In other words, when a party contends it acted in good faith based on the advice from his lawyer, "then the extent of its investigation and the basis for its subjective evaluation are called into question." *Hege v. Aegon USA, LLC*, No. 1:10-CV-1635-GRA, 2011 WL 1791883, at *4 (D.S.C. May 10, 2011); (citing *City of Myrtle Beach v. United Nat. Ins. Co.*, No. CIV.A. 4:08-1183, 2010 WL 3420044, at *5 (D.S.C. Aug. 27, 2010) ("if a defendant voluntarily injects an issue in the case, whether legal or factual, the insurer voluntary waives, explicitly or impliedly, the attorney-client privilege."); *see also Favors v. Cuomo*, 285 F.R.D. 187, 199 (E.D.N.Y. 2012) ("forfeiture of the privilege may result where the proponent asserts a good faith belief in the lawfulness of its actions, even without expressly invoking counsel's advice.").

This Court has already rejected one of Martorello's attempts to game the system by selectively using legal advice. As the Court will recall, Martorello claimed to have acted in good faith based on "non-privileged information provided by attorneys Jennifer Weddle, Karrie Wichtman, Blake Sims, John Williams, Jennifer Galloway, Dan Gravel, Saba Bazzazieh, and

12

Robert Rossette, as well as others at their respective law firms, as well as from additional non-attorney public sources, about the legality of the tribal business model and [the Tribe's] lending operations." *Williams v. Big Picture Loans, LLC*, 2019 WL 1983048, at *8 (E.D. Va. May 3, 2019), *vacated on other grounds*, 2020 WL 13892585 (E.D. Va. Dec. 8, 2020). Because Martorello's defense was "based on his reliance on information communicated to him by attorneys," this Court held that he "placed his communications with attorneys at issue" and required the production of a broad range of documents on this privilege log. *Id*. at *9.

So too here. Once again, Martorello wants to selectively inject legal advice from GFGR. By injecting the issue of generic legal advice that someone might hypothetically receive about asset protection, Martorello has opened the door to discovery regarding the actual advice he received from these attorneys, who admittedly touts that it helps individuals "preserve individual wealth from threats" such as "litigation." It would be patently unfair to allow Martorello to present generic evidence about the reasons why someone might create an asset protection trust, while at the same time concealing damaging communications about why he actually did it and what he hoped to accomplish. In this same vein, it would be unfair to allow Martorello to present the "effect of interactions over the years between the Trustee of the Trust and Matt Martorello" without disclosing communications related to the same.

**B.    Given the breadth of Martorello's intended defense, the scope of the waiver should be broadly applied.**

When a party places the advice of counsel at issue, it waives privilege "as to the subject matter of the disclosure." *E.I. Dupont*, 269 F.R.D. at 605. "[D]efining the 'subject matter,' and thus the scope of the waiver, is a critically important aspect of the waiver analysis because 'subject matter waiver does not open up the possibility of a fishing expedition of all confidential communications during the course of [an attorney's] representation." *Id*.

Although the subject matter waiver does not allow for "a fishing expedition of all confidential communications," Martorello has designated his attorneys to testify on a broad range of issues, including: (1) the reasons for the creation of the trust, (2) the reasons for establishing it in the Cook Islands, (3) Martorello's apparent lack of power, control, or authority over the trusts, (4) Martorello's interactions with the trust over the years, (5) the effect of funding it with businesses owned and controlled by Martorello, and (6) the motivations for creating overseas trusts. Dkt. 1520-3 at pgs. 2-4 (emphasis added).

To evaluate this testimony, the Court must be able to assess the totality of the legal advice and Martorello's interactions, including any advice regarding potential use of the trust as an asset protection vehicle to shield his liability from his blatantly unlawful conduct. *See, e.g.*, *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (finding waiver where a defendant testified that he thought his actions were legal based on his knowledge of the law, reasoning: "His conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent."). Similarly, the Court must be able to assess the totality of Martorello's apparent lack of control and involvement by review of emails with GFGR—a firm that flaunts that it helps individuals "preserve individual wealth from threats" such as "litigation." Exhibit 1. By designating these attorneys to testify, Martorello has opened the door to discovery and cross-examination as to the actual advice he received, as well as his actual communications regarding the trusts, so that the Court may assess whether the actual communications show to the contrary.

A significant number of documents on Martorello's privilege log should be produced under the "at issue" doctrine. In particular, Plaintiffs request the Court to order production of all documents on Martorello's privilege log: (1) with the description "related to trust planning," (2)

14

with the description "contents of a Trust and Ownership Structure," (3) with any attorney at the GFGR law firm, (4) with the description "regarding trust funding," (5) with the description "year-end estate and gift tax planning," (6) with a description "professional services rendered relating to foreign trusts," (7) with a description "related to trust documents," (8) with a description "related to distribution from trusts," (9) with a description "regarding MBM Family Trust," (10) with a description "related to Bluetech Trust tax issues," (11) with any employee or representative of the AsiaCitiTrust,[5] (12) with a description "related to proposed trust structure," (13) with a description "related to tax, trust, and estate matters," (14) with a description "related to Bluetech and Capstone trusts," (15) with a description "related to corporate governance" and a privileged subject line of Bluetech, Capstone, Breakwater, or Bellicose, (16) with a description line of "related to Martorello ownership structure," (17) with a description line of "the operations of a trust," (18) with a description line of "the structure of a trust," (19) with a description line of related "to the formation of a trust," (20) with a description line of "administrative risks foreign v. domestic entity," (21) with a description "regarding resignation and appointment of trustee/manager," (22) with a description line "related to distribution from Capstone Trust to Rebecca's bank account," (23) with a description line related to "assignment of Breakwater assets," (24) with sentence ender of "Martorello trust structure," or "regarding Martorello trust," (25) with sentence ender of "ITOCHU concerns over Martorello family control," (26) with sentence ender of "ITOCHU deal and changes to Martorello Trust control," (27) with a sentence ender of "martorello trusts revised amendments," (28) with a sentence ender of "regarding establishment of blind trust," (29) with a subject line

---

[5] As explained below, Martorello's communications with AsiaCiti—the third party company who manages the trust—are not privileged. But even if they were, Martorello has waived any such privilege by designating attorneys to testify on "effect of interactions over the years between the Trustee of the Trust and Matt Martorello."

15

"Change in Martorello Trustee/Manager," (30) that are identified as "business structure planning" and include an attorney at GFGR, (31) with a sentence ender "related to trustee appointment of the Children's and Family Trusts," (32) with a sentence ender of "transfers of indirect ownership in Braviant," (33) with a sentence ender "Trustee changes discussion," or "Martorello Trusts Trustee," and (34) with a sentence ender "related to ITOCHU, blind trust and draft agreements." *See generally* Exhibit Nos. 14-19.

### III. The crime/fraud exception applies to schemes to defraud creditors by hiding assets.

The crime/fraud exception to the attorney-client and work product privileges provides that otherwise privileged communications or work product made for, or in furtherance of, the purpose of committing a crime or fraud will not be privileged or protected." *Rambus, Inc. v. Infineon Technologies AG*, 222 F.R.D. 280, 287 (E.D. Va. 2004) (citing *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999)). While this concept is often referred to as an "exception" to privilege, it is actually an "exclusion of certain activity from the prospective reach of the privileges." *Id*. The policy underlying the crime/fraud exception is that advice in furtherance of "fraudulent or unlawful goals" is "not worthy of protection." *Id*. (quoting *In re Grand Jury Subpoena*, 731 F.2d 1032, 1038 (2d Cir. 1984)).

Though discussed as the "crime/fraud" exception, the concept is much broader. For example, the Fourth Circuit has even referred to it as the "the tort, fraud, or crime exception." *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1220 (4th Cir. 1976). And "many courts have applied the exception to situations falling well outside of the definitions of crime or fraud." *Rambus*, 222 F.R.D. at 288 (citing *Parrott v. Wilson,* 707 F.2d 1262, 1271 (11th Cir.1983); *Cleveland Hair Clinic, Inc. v. Puig*, 968 F. Supp. 1227, 1241 (N.D. Ill. 1996)). One such situation, as previously recognized by this Court, "is a scheme to defraud creditors by hiding assets."

*Moazzeni*, 906 F. Supp. 2d at 516; *see also In re Andrews*, 186 B.R. 219, 224 (Bankr. E.D. Va. 1995) (applying the crime/fraud exception because the plaintiffs "have raised through the indicia of fraud the inference that the transfers may have been fraudulent"); *Galaxy CSI, LLC v. Galaxy Computer Servs., Inc.*, 2004 WL 3661433, at *2 (E.D. Va. Mar. 31, 2004) ("The crime/fraud exception has been applied to reach both fraudulent transfers in the bankruptcy context and breaches of fiduciary duty.").

This is not only the law in Virginia; courts across the country have "held that the crime-fraud exception applies to fraudulent transfers intended to defraud potential creditors." *Carbajal v. Hayes Mgmt. Serv., Inc.*, 2022 WL 2869205, at *17 (D. Idaho July 21, 2022); *see also United States v. Ballard*, 779 F.2d 287, 293 (5th Cir. 1986) (holding that the attorney-client privilege did not apply to legal advice in furtherance of concealing property from creditors); *In re DiLoreto*, 2002 WL 34573858, at *15 (Bankr. E.D. Pa. May 3, 2002) (applying crime-fraud exception where a client received "services of an attorney to hide assets from creditors"); *Cendant Corp. v. Shelton*, 246 F.R.D. 401, 405 (D. Conn. 2007) (finding probable cause existed to believe that the defendant transferred assets to a trust to defraud creditors and, thus, applying the crime-fraud exception); *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 180 F. Supp. 3d 273, 283 (S.D.N.Y. 2016) (applying crime-fraud exception to emails regarding a restructuring designed to deny creditors of a company's profitable assets).

Before applying the crime/fraud exception, the movant "must make a prima facie showing that: (1) [the defendant] was engaged in or planning a criminal or fraudulent scheme when he sought the advice of each lawyer to further his scheme to commit a crime or fraud, and (2) the documents containing the privileged materials bear a close relationship to his scheme." *Moazzeni*, 906 F. Supp. 2d at 515. Here, both of these elements are easily satisfied.

17

## A.    The evidence shows that Martorello knew he was engaged in a criminal lending scheme that placed his assets at risk.

As early as December 2012—a little over a year into his business operation—Martorello had concerns about the viability of the tribal lending model. Exhibit 5 at Martorello_038990. In an e-mail to a business valuation expert, Martorello wrote that he had "some urgent questions" for them "on valuation" of his business. (*Id.*) Among other things, Martorello asked how to value illegal businesses, such as online poker sites, medical marijuana stores, and a drug cartel. (*Id.*) Martorello further added that "[t]his industry is going to be living in the grey area of its legality for another year or two," and that they had already "received dozens of letters from State AGs saying we need to be licensed and sending Cease and Desist orders." *Id.* at Martorello_038990-038991. Martorello also added that he received a 20-page legal opinion, concluding that he could be liable "for **aiding and abetting felony crime**" in states like Georgia. *Id.* (emphasis in original).

Several months later, Martorello began e-mailing the Tribe's lawyer, Rob Rosette, about restructuring the arrangement to reduce Martorello's liability, writing: "Let's zero in asap on minimizing my risk for being individually liable like [Colorado] just successfully did to Butch [W]ebb." Exhibit 6 at Rosette_Revised_048497. Over the next six months, regulators continued to threaten to take action to stop Red Rock's illegal practices. *See, e.g.*, Exhibit 7, May 2013 Ltr. from Conn. Dep't of Banking. On August 6, 2013, the New York Department of Financial Services ("NY DFS") issued a cease and desist to 35 online lending companies, including Red Rock.[6] Six days after the issuance of the cease and desist, Rosette had drafted a complaint against the NY DFS "for LVD's consideration." Exhibit 8 at Rosette_Revised_041064. In an e-mail to Martorello,

---

[6] *See*, *e.g.*, The Official Website of New York State, Press Room, *Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans That Harm New York Consumers* (Aug. 6, 2013), *available at* https://www.governor.ny.gov/news/cuomo-administration-demands-35-companies-cease-and-desist-offering-illegal-online-payday-loans.

Rosette wrote that he "believe[d] strongly if we do nothing we may forever lose the tribal online lending opportunity," and he further added it would be "impossible to unwind or undo what the State of New York (in collaboration with federal agencies) have started without a legitimate piece of litigation being filed." *Id*. In a separate e-mail to Martorello, the Tribe's other lawyer, Karrie Wichtman, echoed these concerns, writing "what do we achieve by laying low waiting for the next bomb to drop—hoping that it doesn't blow us up?" Exhibit 9 at Rosette_Revised_049126. Martorello too expressed concerns, noting that the filing would "open the doors" and result in "counter attacks from all sides," and it would be "game over really quick." (*Id*.)

The lawsuit being discussed was filed on August 21, 2013. It sought a preliminary injunction to prevent interference with the business during the pendency of the case. *See generally Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 361 (S.D.N.Y. Sept. 2013). The court denied this request and found that Red Rock was "subject to the State's non-discriminatory anti-usury laws" because the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands." *Id*. The court further noted that Red Rock "built a wobbly foundation for their contention" that the activity was occurring "on the Tribes' lands," and contrary to their argument, consumers did not "in any legally meaningful sense, travel[] to Tribal land." *Id*. at 360. Two days after the district court's decision, Martorello wrote that the decision "presents a significant potential liability for [Bellicose] and we do not believe that we should service any new New York loans." Exhibit 10 at Rosette_Revised_06304-5. Martorello further added that they were willing to see existing loans through completion, "but [they] simply cannot flaunt the clear ruling from Judge Sullivan's order, however legally incorrect it might be." *Id*. And Martorello express his concern that the "finding that tribal enterprises are subject to New York's anti-usury laws will be regarded as sufficiently final . . . such that it will

19

precipitate their potential investigation and potential prosecution of us personally and our companies if we continue" to conduct business in New York. *Id*.

Two weeks after the *Otoe* decision, Martorello conjured up a solution and approached Robert Rosette regarding a restructure. *See* Exhibit 11.  In an e-mail dated October 14, 2013, with a subject matter entitled "LVD to take ownership of Bellicose VI," Martorello presented some options for a restructure so that Bellicose could attempt to share in the LVD's immunity. *Id*. Martorello proposed that Bellicose would "[a]ssign today LVD 51% of Bellicose via Equity only membership interest tied to the SPVI subsidiary only." *Id*. (emphasis in original). Martorello further proposed that BlueTech, his trust, would "own 49% equity, but 100% profits interests until month 49." *Id*.  Martorello's e-mail candidly explained that the transaction must be "structured to provide all entities sovereign immunity." *Id*.

Later that same day, Martorello sent a similar e-mail to the members of LVD's Tribal Council. Exhibit 12 at JPB 00988. In this e-mail, entitled "SPVI Equity Transfer to LVD," Martorello wrote: "Below is the beginning of a concept I have to facilitate a transition to LVD of MY businesses." *Id*. (emphasis in original).  As described by Martorello, this concept was to "[a]ssign today to LVD – 51% of Bellicose VI, LLC," but "0% profits interest" until four years after the restructure. *Id*.  Martorello further added: the "Current Manager (myself) will be locked in as the decision maker for 48 months." *Id*.

A few weeks later, in an email dated October 29, 2013, Martorello informed Wichtman that vendors and debt providers of Red Rock were "asking what would happen to everything if the ruling in NY were upheld." Exhibit 13 at Rosette_Revised_045573.  The repercussions, according to Martorello's e-mail, would be "certain death" and "all vendors including [SourcePoint], banks, ACH processors, bureaus etc would all obviously shut down if it were considered off reservation

activity." *Id*.  Martorello further added that "class actions" and "personal threats of enforcement actions against individuals by regulators" has "everyone spooked," causing "several of the biggest servicers" to "shut down." *Id*. In closing, Martorello proclaimed that he was "[d]esperately hoping that Rule 19 works and [for] a favorable outcome on the appeal!" *Id*.

As part of the misrepresentation hearing, this Court has already reviewed this evidence and concluded that "slightly a year into the lending business, Martorello became concerned about the liability presented by the Tribal lending model." *Williams v. Big Picture Loans, LLC*, 2020 WL 6784352, at *11 (citation omitted). "These concerns were magnified," this Court concluded, when the NYDFS issued the cease and desist and especially after it was "counterproductive." *Id*. at 9–10. Examining this and other evidence above, the Court concluded that "[t]he record is thus clear beyond serious question that Martorello was motivated to sell Bellicose to LVD because of the threats of litigation and enforcement actions against him and his entities under the then-current lending arrangement between him, his entities, and LVD." *Williams*, 2020 WL 6784352, at *11.

And, of course, a judgment has now been entered against Martorello, that judgement was affirmed on appeal, *Williams v. Martorello*, 143 F.4th 555, 557 (4th Cir. 2025), and Martorello's petition for certiorari to the Supreme Court of the United States was denied. The exhaustion of his appellate rights cements that Martorello was engaged in a usurious lending scheme in violation of RICO and Virginia law—both of which criminalize such conduct.

**B.      There is prima facie evidence that Martorello engaged in a scheme with Defendants to hide his assets following this Court's initial rulings in *Williams*.**

Additionally, there is *prima facie* evidence that Martorello engaged the Giordani and her cohorts for the purpose of hiding his assets. To place this evidence in its proper context, it is important to first note that this case commenced on June 22, 2017—**more than eight months before Martorello first communicated with or retained Giordani**. *See* ECF No. 1.

21

Eight months after *Williams* was filed, Martorello sent a communication to Leslie Giordani **on March 9, 2018**, with the subject line "Transfer of **my Braviant Equity**" for the express purpose of furthering his "**objective of protecting personal assets from multiple claims by transferring them into a trust**."   *See* Exhibit 19 at 5472. (emphasis added). Martorello sent this e-mail to Giordani because she and her firm touted themselves as specialists in helping "to preserve individual wealth from threats" such as "litigation," including through the "settling offshore trusts and forming various foreign entities that provide clients with a comfortable balance of control and protection of assets, allowing clients to manage their family's wealth risk." Exhibit 1.

Three days later, on March 12, 2018, this Court denied Martorello's motion to dismiss, and, in doing so, rejected his one genuine legal defense to the claims in *Williams*, *i.e.*, that tribal law applied to the loans. *Williams*, No. 3:17-cv-461, ECF No. 117.[7] **The following day**, on March 13, 2018, Shannon Clifton (an employee with GFGR) sent Martorello an engagement letter. Exhibit 19 at pg. 5334. Following the execution of this agreement, the Giordani Defendants developed a complex asset protection scheme designed to hide and conceal Martorello's assets from the Plaintiffs.

The privilege log, GFGR firm resume, and history of the *Williams* litigation is only part of the proof that Martorello engaged the Giordani Defendants for the purpose of hiding his assets. In addition to this evidence, Martorello also produced a document created by Giordani and her firm in June 2018. *See* Exhibit 2. This document is a spreadsheet entitled "Martorello Pending Matters," showing the extensive asset protection measures taken by the Giordani Defendants to hide and conceal Martorello's assets. In a column entitled "ASSET PROTECTION ISSUES," there are a

---

[7] As reflected by his subsequent stipulations, Martorello never seriously contested that his conduct violated RICO except for his two, legal arguments that were rejected by the Fourth Circuit: (1) tribal law applied to the loans; and (2) mistake of law was an available defense. ECF No. 117.

number of "projects" listed to be accomplished by the Giordani Defendants, including: (1) a "Financial Solvency Analysis" to "justify gifts of interests in Braviant and Gallant," (2) review "operating agreements of existing entities for asset protection features," (3) "[s]et up trustee engagement with Guardian and Asiatrust Nevis," and a notation that "[c]ommunications with the trustee/investment manager should go through" her law firm "to provide privilege," (4) "[r]emove Liont as manager of trust-owned entities," and "change Manager to Capstone Holdings," a Nevis entity, and (5) "remove Liont/MM from trust structure," and to appoint her company, ATX, so as to create the appearance that Martorello did not control the trusts. Exhibit 2 at Martorello_656607. These are just five of the projects—on a 4-page list with approximately 80 items— showing the various asset protection measures undertaken by Giordani and her firm **after the commencement of this case**.

In addition to these documents, Martorello's privilege log further shows that the documents bear a close relationship to his scheme. For example, one of the privilege log descriptions states "providing, containing, reflecting, requesting or discussing confidential legal advice from counsel regarding advice from counsel **related to fraudulent transfers**." Exhibit 14 at pg. 862 (emphasis added). Another email from Giordani to Martorello is likewise described as providing "advice from outside counsel related to asset protection." Exhibit 17 at pg. 3689. And yet another entry states "GSRJ Asset protection litigation strategy," and others say things such as "advice from outside counsel related to underwriting fraudulent transfer risk." Exhibit 18 at pg. 4313 and Exhibit 14 at pg. 850. Such documents plainly bear a close relationship to the alleged scheme.

In addition to these, other documents that bear a close relationship on Martorello's privilege log include those: (1) with the description "related to trust planning," (2) with the description "contents of a Trust and Ownership Structure," (3) with any attorney at the GFGR law firm, (4)

23

with the description "regarding trust funding," (5) with a description "professional services rendered relating to foreign trusts," (6) with a description "related to trust documents," (7) with a description "related to distribution from trusts," (8) with a description "regarding MBM Family Trust," (9) with a description "related to Bluetech Trust tax issues," (10) with any employee or representative of the AsiaCitiTrust, (11) with a description "related to proposed trust structure," (12) with a description "related to tax, trust, and estate matters," (13) with a description "related to Bluetech and Capstone trusts,"  (14) with a description "related to corporate governance" and a privileged subject line of Bluetech, Capstone, Breakwater, or Bellicose, (15) with a description line of "related to Martorello ownership structure," (16) with a description line of "the operations of a trust," (17) with a description line of "the structure of a trust," (18) with a description line of related "to the formation of a trust," (19) with a description line of "administrative risks foreign v. domestic entity," (20) with a description "regarding resignation and appointment of trustee/manager," and (21) with a description line "related to distribution from Capstone Trust to Rebecca's bank account." *See generally* Exhibit Nos. 14-19.

As this Court has explained, Plaintiffs are "not required to prove" the alleged scheme "beyond a reasonable doubt, by clear or convincing evidence, or even by a preponderance of the evidence." *Moazzeni*, 906 F. Supp. 2d at 516 (citation omitted). Instead, "it is sufficient that" Plaintiffs make "a prima facie showing that a fraudulent scheme was afoot and that the otherwise privileged documents relate to the fraud." *Id*. Here, the evidence more than shows that Martorello: (1) knew he was engaged in an illegal lending scheme; (2) attempted to hide his involvement in the criminal lending scheme, including through a deceptive restructure designed to exploit sovereign immunity; and (3)  hired an asset protection law firm to help conceal his assets, including to establish trusts after this Court issued an opinion rejecting his primary defense in this case.

24

Such facts more than satisfy the burden to make a showing of a scheme to defraud the Plaintiffs, especially given the inherent nature of why Americans use foreign trusts. Indeed, in the related *Galloway* case against one of Martorello's trusts, this Court has already found:

> Notwithstanding these strong American ties and Martorello's apparent lack of any connection to the Cook Islands, Martorello created Bluetech and Breakwater as Cook Islands entities. The reason for this decision is not difficult to fathom. The Cook Islands has made a name for itself as an especially settlor-friendly jurisdiction and has created a legal system dedicated to promoting 'asset protection trusts.' Indeed, according to at least one legal scholar, the Cook Islands intentionally fashioned its 'asset protection' legal regime explicitly to attract an American clientele and to serve as an overseas haven for American citizens' funds. Asset protection is, however, nothing more than a euphemism for evasion. For decades, Americans have used Cook Islands trusts trying to avoid the reach of American courts. Courts throughout the nation have rejected these attempts to impede their jurisdiction and to avoid compliance with their orders.

*Galloway v. Martorello*, 2023 WL 5229231, at *10 (E.D. Va. Aug. 14, 2023) (cleaned up).

By Martorello's design, the trusts were established to create the appearance that his assets belonged to someone else—while at the same time allowing him to receive seven and eight figure distributions either through his wife or other companies owned by him. Martorello used the GFGR firm to perpetrate this fraud. Thus, even if Martorello somehow has standing to assert privilege on behalf of the trust, all of the documents related to the establishment, implementation, operation, and consequences of the trusts are encompassed by the crime-fraud exception.

**IV.    Martorello's communications with AsiaCitiTrust, Braviant, Tassone, and other third parties cannot possibly be privileged.**

The "attorney-client privilege does not protect all aspects of the attorney-client relationship, it protects only confidential communications occurring between the lawyer and his client." *Hawkins v. Stables*, 148 F.3d 379, 383–84 (4th Cir. 1998). Thus, "[t]hird party disclosure has two effects on the attorney-client privilege." *Fed. Election Comm'n v. Christian Coal.*, 178 F.R.D. 61, 71 (E.D. Va.), *order aff'd in part, modified in part*, 178 F.R.D. 456 (E.D. Va. 1998).

25

First, if "the communication between the attorney and client takes places in the presence of a third party," then "the attorney-client privilege never existed." *Id*. And second, if the "communication took place in private, between the attorney and the client alone," subsequent disclosure "to a third party then waives the privilege." *Id*.

"Regardless of whether the privilege ever existed or whether it existed and the client waived it, the result for the communication revealed is the same." *Id*. "Under the common law of attorney-client privilege, the parties privy to the communication must zealously and carefully guard against disclosure to third parties." *Id*. Because of this, this Court takes "almost a strict liability approach to third party disclosure." *Id*. "If the information ends up in the hands of a third party, courts don't want to hear how it got there," absent some compelling exception like misappropriation. *Id*. "Once in the hands of a third party," the privilege is lost—assuming it even existed. *Id*.

Here, Martorello's privilege log contains <u>thousands</u> of documents that include the presence of third parties. For example, Martorello's privilege log contains hundreds of documents where the sender or a recipient has an email address "@asiacititrust.com." *See, e.g.*, Exhibit 15 at pgs. 1479, 1485, 1540, 1555. Asiaciti Trust, however, is "an international trust and corporate services provider committed to delivering best in class service to private clients, intermediaries, business owners and corporations." *See* Asiaciti Trust, HOME, available at: https://asiacititrust.com/ (last visited on Jan. 23, 2024). Martorello's scant entries make it impossible to understand why his communications with Asiaciti Trust are privileged. Put differently, Martorello's log does not even provide the most basic information, such as who is the purported client with respect to these communications. But even without this required information, Martorello's position forecloses any possibility of privilege. If Martorello indeed has no control or management powers, his

communications with anyone at Asiaciti cannot possibly between attorney and client.

This same analysis applies to a substantial number of other documents on Martorello's privilege log. By way of another example, Martorello claims privilege over thousands of documents that include the presence of an employee with Braviant. *See, e.g.*, Exhibit 14 at pgs. 2, 3, 4, 6, 10. Mr. Martorello, however, asserts he transferred all of his interests in Braviant in 2018 pursuant to his scheme with Giordani. As soon as he transferred his shares, Martorello created a third-party consulting relationship with Braviant; and cannot possibly claim such communications are privileged. In other words, "[d]isplaced management," like Martorello, retains no control over its privilege even to statements that they might have made to counsel. *Gibbs*, 2021 WL 4853575 at *7 (citing *Weintraub*, 471 U.S. at 349, n. 5).

Likewise, there are hundreds of withheld communications between Martorello and his friend, Anthony Tassone. *See, e.g.*, Exhibit 14 at pgs. 124, 436, 437, 971.[8] One such document relates to the hiring of Braviant's new chief executive officer, Kim Anderson, with a description of "Braviant Offer Letter." Exhibit 17 at pg. 3804. Martorello provides no explanation how any such communications with Tassone could possibly be privileged as Tassone is not a lawyer (as opposed a cohort simply aiding him with his scheme to conceal his assets).

Similarly, Martorello withheld close to 100 documents where the sender or a recipient has an email address "@requisitecm.com." *See, e.g.*, Exhibit 14 at pg. 886, 962, and Exhibit 15 at pgs. 1198, 1316. One such document, for instance, is an email between Martorello and Angie Parra and Rachel Neimuth, which is described as related to "family trust management issues." Exhibit 14 at pg. 886. Another such document is an email with a description "valuation figures for the 2018

---

[8] As this Court will recall, Mr. Tassone serves as the trustee for several of the domestic trusts, and he signed the Settlement Agreement

trusts." Exhibit 15 at pg. 1120. Requisite Capital Management, however, is "a wealth management firm," not a law firm hired by Martorello.  *See* Requisite Capital Management, OUR APPROACH TO MANAGING WEALTH, available at: https://requisitecm.com/our-approach.asp (last visited on June 16, 2026). And here again, Martorello's scant entries make it impossible to understand why his communications with Requisite Capital Management are privileged. And even if they were, the communications appear to be for purposes unrelated to legal advice, such as valuation and investment services.

## V.      Waiver is also an appropriate because of Martorello's failure to comply with Rule 26(b)(5)'s description requirements.

Privilege protections serve "an important purpose in our legal system, but that application can also 'remove otherwise pertinent information from the fact finder, thereby impeding the full and free discovery of the truth.'" *ePlus Inc. v. Lawson Software, Inc.*, 280 F.R.D. 247, 251 (E.D. Va. 2012) (quoting *Rambus, Inc. v. Infineon Techs. AG*, 220 F.R.D. 264, 271 (E.D. Va. 2004)). In the Fourth Circuit, assertions of work-product and attorney-client privilege are construed "quite narrowly" and the proponent of the privilege bears the burden to demonstrate its applicability. *Rambus*, 220 F.R.D. at 271. Accordingly, Rule 26(b)(5)(A)(ii)'s requires that a party "describe the nature of the documents" and "do so in a manner" that "will enable the other parties to assess the claim." FED. R. CIV. P. 26(b)(5)(A)(ii); *see also Rambus*, 220 F.R.D. at 272 ("the descriptions in the log must satisfy the claiming party's burden.").

To establish the applicability of the attorney-client privilege, a party's log must be sufficiently detailed to show: (1) "the person to whom the communication was made . . . act[ed] as a lawyer [in connection with the communication]," (2) "the communications relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily (i) an opinion on law or (ii) legal services or (iii) assistance in some

28

legal proceeding[.]" *Hawkins*, 148 F.3d at 383. To establish each of these elements, a privilege log "should contain: a brief description or summary of the contents of the document, the date the document was prepared, the person or persons who prepared the document, the person to whom the document was directed, or for whom the document was prepared, the purpose in preparing the document, the privilege or privileges asserted with respect to the document, and how each element of the privilege is met as to that document." *Cappetta v. GC Servs. Ltd. P'ship*, 3:08-cv-288, 2008 WL 5377934, at *4 (E.D. Va. Dec. 24, 2008) (quoting *Burns v. Imagine Films Entm't, Inc.,* 164 F.R.D. 589, 593 (W.D.N.Y. 1996); *see also Clark v. Trans Union, LLC*, 2017 WL 11504623, at *8 (E.D. Va. Mar. 1, 2017)

Despite a one-month extension to provide the log, Martorello's privilege log contains a number of deficiencies that make it nearly impossible to assess his claim of privilege. For starters, Martorello never once identifies the privilege holder of any of the documents. *See generally* Privilege Log. While it is apparent from one general category of entries (i.e., communications between Martorello and his attorneys related to this litigation), Plaintiffs are left to guess as to who is the privilege holder for the vast majority of the documents on the nearly 6,000 page privilege log. And this is not Martorello's first offense as this Court has previously explained that Martorello must identify the privilege holder of the documents as the "client could, in theory, have been Bellicose, or any one of the many shell entities of which Martorello is president." *Williams v. Big Picture Loans, LLC*, 303 F. Supp. 3d 434, 445, n. 7 (E.D. Va. 2018). Despite this Court's prior ruling, Martorello has once again "made no attempt to prove" who is the client/privilege holder, "instead completely ignoring the distinction between the privilege possessed" by Martorello or one of the many shell entities involved. *Id*. at 445. This failure to provide even the most basic

29

information constitutes a waiver except to the extent the communications are <u>solely</u> with either Armstrong Teasdale or Loeb & Loeb (i.e., his litigation counsel in this case).

Second, Martorello's privilege log fails to identify the author and recipient of a significant number of documents. Without identification of this information, the proponent of the privilege cannot possibly satisfy their burden. As this Court explained in a comparable situation:

> many entries do not identify an attorney in the recipient or author field. Lawson did not properly assert attorney-client privilege with respect to these entries. Because the entries lack an attorney's name in the recipient and author fields, it is not clear that these communications were made by or to an attorney.

*ePlus Inc. v. Lawson Software, Inc.*, 280 F.R.D. 247, 252 (E.D. Va. 2012); *see also Rein v. U.S. Patent & Trademark Office*, 553 F.3d 353, 367 (4th Cir. 2009) (explaining that "the challenged entries, which fail to provide any information about the document's author or recipient, are inadequate").

Although almost all of the documents can be produced based on the four other grounds explained above, Martorello's scant descriptions serve as another independent basis to find waiver.

<u><strong>CONCLUSION</strong></u>

For the foregoing reasons, Plaintiffs request the Court to enter an order requiring the production of all documents on the January 2024 Privilege Log unless the document is a communication is solely between Martorello and his litigation counsel in this case.

Respectfully submitted,
**PLAINTIFFS**

By: /s/ *Kristi C. Kelly*
Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA  22030
Telephone: (703) 424-7570
Facsimile: (703) 591-0167

30

Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
*Counsel for Plaintiffs*

## CERTIFICATION CONCERNING ARTIFICIAL INTELLIGENCE

I hereby certify that no artificial intelligence was employed in doing research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg.

I hereby certify that every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

By:____*/s/ Kristi C. Kelly*_____
Kristi C. Kelly, VSB #72791
Kelly Guzzo, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com

*Counsel for Plaintiffs*

31